**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-NYW

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

     Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

     Defendant.

---

**DEFENDANT'S MOTION TO DISMISS**

---

A significant change in a prison policy has mooted the First Amendment claim in this lawsuit, providing Prison Legal News ("PLN") all the relief this Court could award on that claim. PLN publishes a magazine. It contends that the Federal Bureau Prisons ("BOP") violated its First Amendment rights by not allowing inmates at the United States Penitentiary – Administrative Maximum ("ADX") to receive certain issues of the magazine. The issues were rejected because they contained articles that identified and discussed BOP inmates or personnel. This claim is moot because the ADX adopted a revised policy in February 2016 that eliminated the former rejection practice PLN challenges. The ADX Warden has re-reviewed the previously rejected issues of PLN's magazine under the new policy and determined that those issues can be provided to ADX inmate subscribers.

PLN also claims that its procedural due-process rights were violated in connection with the past rejections. PLN states no plausible claim because it received notice and an opportunity to be heard that satisfies due process in this context.

Finally, PLN's Administrative Procedure Act ("APA") claim merely reiterates its First and Fifth Amendment claims and should be dismissed for the same reasons.

This table summarizes the grounds for dismissing each claim:

| Claim | Grounds for dismissal |
|---|---|
| <u>Claim One</u>: First Amendment claim alleging that PLN's magazines were illegally "censored" | Lack of subject-matter jurisdiction based on mootness under Rule 12(b)(1) |
| <u>Claim One</u>:  Aspect of claim based on rejecting entire publications containing some objectionable content | Lack of subject-matter jurisdiction based on mootness under Rule 12(b)(1)<br>Failure to state a claim under Rule 12(b)(6) |
| <u>Claim Two</u>:  Fifth Amendment procedural due-process claim alleging that BOP did not adhere to its regulations and did not provide adequate notice or opportunity to be heard | Failure to state a claim under Rule 12(b)(6) |
| <u>Claim Two</u>:  Aspect of claim based on alleged practice of returning publication before completion of publisher's appeal process | Lack of subject-matter jurisdiction based on standing under Rule 12(b)(1)<br>Failure to state a claim under Rule 12(b)(6) |
| <u>Claim Three</u>:  APA claim reiterating First and Fifth Amendment claims | Lack of subject-matter jurisdiction based on mootness under Rule 12(b)(1)<br>Failure to state a claim under Rule 12(b)(6) |

I.     **The Court lost subject-matter jurisdiction over PLN's First Amendment claim when the BOP changed its policy for reviewing incoming publications.**

  A.     **ADX Wardens rejected some issues of PLN's magazine in the past, but the policy that prompted those rejections has been changed.**

  1.     **The magazines were rejected because they identified inmates or staff.**

PLN publishes a monthly magazine called *Prison Legal News*.  Doc. 1 ¶¶ 1, 6.  Former ADX Wardens rejected eleven issues of *Prison Legal News* sent to ADX inmate subscribers between January 2010 and April 2014.  *Id.* ¶ 22.  PLN claims the magazines were rejected simply because an article referred to an ADX inmate or staff member, and alleges that such content did not constitute a security risk at the ADX.  *Id.* ¶¶ 25, 27.  PLN also contends that the "ADX made no effort" to redact or remove the material to which ADX objected and deliver the unobjectionable portion to subscribers."  *Id.* ¶ 36.  It seeks an order "compelling Defendant and its agents to deliver (i) all past issues of *Prison Legal News* that have been previously censored and withheld from PLN's subscribers at ADX, and (ii) all future issues of *Prison Legal News* absent a legitimate penological interest supported by specific facts[.]"  *Id.* at 16, ¶ B.

PLN correctly identifies the rationale for rejecting its magazines in the past.  "The eleven issues of *Prison Legal News* referenced in the complaint were rejected because they discussed an

ADX or Bureau inmate, or Bureau staff member."  Declaration of Todd Chapman, Ex. 1 ¶ 28; *id.*

¶ 24.[1]  *Id.*  Based on those references to BOP inmates or staff, ADX Wardens determined that the

magazines contained information that was "detrimental to the security, good order, or discipline

of the institution or … might facilitate criminal activity."  *See id.*; *see also* 28 C.F.R. §

540.71(b)).[2]  Prior to February 2016, the ADX had a practice of rejecting publications that

contained information discussing an ADX or BOP inmate, or BOP staff member.  Chapman

Decl. ¶ 24.  But that practice was abolished—for *all* incoming publications, not just *Prison Legal*

*News*—with the implementation of a new ADX policy in February 2016.  *Id.* ¶¶ 24-25; *see also*

*id.* Att. 2, Institution Supplement, FLM 5266.11C, *Incoming Publications* (the "February 2016

Policy").[3]

### 2.        The February 2016 Policy changed the past practice.

Under the February 2016 Policy, the ADX will *not* reject an incoming publication under

28 C.F.R. § 540.71(b) simply because it identifies and discusses an ADX or BOP inmate, or

BOP staff member.  Chapman Decl. ¶ 25.  There must be some additional basis, above and

beyond discussing information about inmates or staff, for the Warden to reject the publication.

*Id.* ¶¶ 25, 27.

The February 2016 Policy also established enhanced review procedures that must be

completed before the Warden can reject a publication, including a mandatory review by ADX

legal personnel.  Before February 2016, during the period when issues of *Prison Legal News*

were rejected, ADX mailroom staff conducted an initial review of incoming publications to

assess whether they contained unacceptable content under 28 C.F.R. § 540.71(b).  *Id.* ¶ 14.  If

---

[1] The Court has "wide discretion" to examine affidavits and other documents in resolving an evidence-based motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).

[2] 28 C.F.R. § 540.71(b) provides that a Warden may reject a publication only if it is determined to be "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity."  In conducting that evaluation, the Warden may consider seven non-dispositive criteria. *Id.* §§ 540.71(b)(1)-(7).  Only the Warden can reject an incoming publication.  Chapman Decl. ¶ 6.

[3] Undersigned counsel provided the February 2016 Policy to counsel for PLN on February 4, 2016.

such material was identified, the officer forwarded the publication to the ADX Case

Management Coordinator ("CMC") for review.  *Id.*  The CMC supervises mailroom operations.

*Id.*  If the CMC decided to recommend rejection, the CMC drafted a rejection notice for the

Warden's review and signature.  *Id.*

      Now, under the February 2016 Policy, mailroom officers forward publications with

potentially objectionable content to the ADX Special Investigative Services ("SIS") Department,

rather than the CMC.  *Id.* ¶ 17.  The SIS Department conducts investigations in the prison.  *Id.*

SIS personnel have expertise in assessing potential security risks.  *Id.*  The SIS Department

reviews the publication, and, if the SIS Department decides to recommend rejection, it prepares a

draft rejection notice for the Warden's signature.  *Id.* ¶ 18.  The draft notice must explain the

basis for rejection, notating "specific objectionable pages and content, as well as the national

policy and Code of Federal Regulations citation."  *Id.* ¶ 18 (quoting February 2016 Policy at §

IV.B.); *see also id.* Att. 1 (the "national policy" is BOP Program Statement 5266.11, *Incoming

Publications*).  The SIS Department then forwards the rejection recommendation packet to the

ADX Legal Services Department for review.  Chapman Decl. ¶ 19.  If Legal Services does not

concur with the recommendation, "the rejection packet is not forwarded to the Warden and the

incoming publication is not rejected."  *Id.*

      Finally, to ensure that ADX staff involved in the review process fully understand and can

effectively implement the review procedures, they must participate in mandatory quarterly

training conducted by the ADX Legal Services Department.  *Id.* ¶ 20; *see also* Att. 2 § IV.Q.

(describing training "regarding the procedures outline in Program Statement 5266.11 and this

supplement").  Since February 2016, two quarterly trainings have been conducted, with a third

scheduled for September 2016.  Chapman Decl. ¶ 20.

        **3.**      **Rejections are significantly lower under the February 2016 Policy.**

      The implementation of the February 2016 Policy has resulted in a more thorough

screening of incoming publications.  *Id.* ¶ 24.  The number of rejected incoming publications has also been reduced.  Between February 2, 2016, and July 12, 2016, approximately 9,000 incoming publications were received at the ADX.  *Id.* ¶ 21.  Only 30 of those publications were rejected. *Id.*[4]  None were rejected solely because they identified and discussed an inmate or BOP staff member.  *Id.* ¶ 22.  In comparison, during the February 2015 to July 2015 period, 66 incoming publications were rejected, including some rejections based solely on content discussing BOP inmates or staff.  *Id.* ¶ 23.[5]  The ADX anticipates that the number of rejections of incoming publications will remain consistent with the reduced levels since February 2016.  *Id.* ¶ 22.

### 4.    The ADX is committed to the February 2016 Policy.

The ADX is committed to continuing to implement the February 2016 Policy.  *Id.* ¶ 29. The ADX will continue to employ the enhanced review procedures required under the Policy, including the requirement that *every* publication recommended for rejection must be reviewed by the ADX Legal Services Department before it can be submitted to the Warden for consideration. *Id.*  The ADX will evaluate each incoming publication in accordance with BOP regulations.  *Id.* In conducting that evaluation, "the ADX will adhere to the standard that a publication will *not* be rejected solely because it discusses an ADX or Bureau inmate, or Bureau staff member."  *Id.*

### 5.    The BOP will give ADX inmate subscribers the rejected issues.

The eleven rejected issues of *Prison Legal News* referenced in the complaint, Doc. 1 ¶ 22, were rejected under the practice that predated February 2, 2016.  Chapman Decl. ¶ 28.  The magazines have now been reviewed in accordance with the review procedures mandated under the February 2016 Institution Supplement.  *Id.*  "As a result of that review, the Warden determined that all of those previously rejected issues of *Prison Legal News* could be provided to

---

[4] Of those 30 publications, 21 were rejected because they contained sexually explicit material and/or nudity.  Chapman Decl. ¶ 21; *see also* 28 C.F.R. § 540.71(b)(7).  The remaining nine were rejected because they endorsed violence against Americans, described advanced war tactics, called for a nationwide prison shutdown by inmates, discussed advanced mind-control techniques, or discussed sensitive and non-public information about ADX inmates.  Chapman Decl. ¶ 21.
[5] No issues of *Prison Legal News* were rejected in 2015 or thus far in 2016.  Chapman Decl. ¶¶ 22-23.

the inmate subscribers." *Id.*  Counsel for PLN has been informed of that decision.  *Id.*  The BOP is in the process of identifying the inmate subscribers for the rejected issues and will provide the rejected issues to those inmates who are currently housed at the ADX.  *Id.*

**B.     PLN's challenge to past ADX practices for rejecting publications is moot.**

With the adoption of the February 2016 Policy, PLN's challenge to the practice that prompted rejections of its magazine ceased to be a "case" or "controversy" under Article III. The February 2016 Policy renders the threat that any future issue of *Prison Legal News* may be rejected so speculative that a live controversy no longer exists.  And there is *no* threat that a future issue will be rejected simply because it identifies and discusses an inmate or staff member. That means PLN's First Amendment claim is moot, both constitutionally and prudentially.

**1.     The claim is constitutionally moot.**

The Constitution limits federal court jurisdiction "to deciding actual 'Cases' or 'Controversies.'"  *Hollingsworth v. Perry*, _ U.S. _, 133 S. Ct. 2652, 2661 (2013) (quoting U.S. Const. Art. III, § 2).  The Supreme Court has made clear that "courts have no business deciding legal disputes or expounding on law in the absence of such a case or controversy."  *Already, LLC v. Nike, Inc.*, _ U.S. _, 133 S. Ct. 721, 726 (2013) (quotation omitted).  "The narrow scope of Article III, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Brown v. Buhman*, 822 F.3d 1151, 1164 (10th Cir. 2016) (quotation omitted).  PLN must establish jurisdiction.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision."  *Brown*, 822 F.3d at 1163.[6]  Mootness is "the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."

---

[6] The BOP assumes for purposes of this motion that PLN had standing to challenge the former ADX practices related to the rejection of incoming publications.

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quotations omitted).  A claimant must satisfy the requirements of both standing and mootness, lest the dispute fall "outside the reach of the federal courts."  *Brown*, 822 F.3d at 1164 (citation omitted).

Mootness is the jurisdictional defect in PLN's First Amendment claim.[7]  A "suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Chafin v. Chafin*, _ U.S. _, 133 S. Ct. 1017, 1023 (2013) (quotation marks omitted).  "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world."  *Wyoming v. U.S. Dep't of Agriculture*, 414 F.3d 1207, 1212 (10th Cir. 2005).  "[A] case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision."  *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (quotation marks omitted).

Applying these standards here, this Court lost jurisdiction over PLN's claim when the ADX adopted the February 2016 Policy and ceased its prior practice of rejecting publications only because they identified and discussed BOP inmates or personnel.  Mr. Chapman's public declaration about the practices and procedures under the February 2016 Policy, and the ADX's public commitment to the Policy, make clear that rejecting issues of *Prison Legal News* on this basis alone "could not reasonably be expected to recur."  *Already*, 133 S. Ct. at 727.

The Tenth Circuit has confirmed that a policy change like the February 2016 Policy establishes mootness.  In *Brown*, the Tenth Circuit held that the plaintiffs' constitutional claims challenging Utah's bigamy statute were rendered moot by a declaration from a Utah county attorney setting forth the new policy of the county attorney's office for bigamy prosecutions.  *See* 822 F.3d at 1168-69.  The county attorney explained that the policy was "intended … to prevent

---

[7] PLN seeks both injunctive and declaratory relief.  Doc. 1 at 16, ¶¶ A.-D.  That fact does not change the mootness analysis.  "Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit."  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (citing *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1147 (10th Cir. 2007)).

the future prosecution in Utah County of bigamous marriages entered into for religious reasons," and that the county attorney's office had concluded it would not charge the plaintiffs "for bigamy unless new evidence is discovered which would comport with the [policy] pertaining to the prosecution of bigamy crimes." *Id.* at 1159. The Tenth Circuit accepted the county attorney's sworn statements about the prosecution policy, finding that the policy made "it clear that prosecution of the Browns 'could not reasonably be expected to recur.'" *Id.* at 1155, 1168 (finding that trial court "erred by proceeding to the merits," and reversing summary judgment in favor of plaintiffs) (citation omitted).

The same is true of the February 2016 Policy, accompanied by Mr. Chapman's declaration, which confirms that future issues of *Prison Legal News* will not be rejected merely because they identify and discuss an inmate or BOP staff member. Mr. Chapman explains that the ADX will continue to implement the February 2016 Policy. Chapman Decl. ¶ 29. He explicitly states that "the ADX will adhere to the standard that an incoming publication will *not* be rejected solely because it discusses an ADX or Bureau inmate, or Bureau staff member"—as occurred with past issues of *Prison Legal News*. *Id.* ¶¶ 25, 27-29 (emphasis in original).

In short, the past behavior that PLN complains of here—rejecting its magazine simply because it contained information about inmates or staff—cannot "reasonably be expected to recur." *Already*, 133 S. Ct. at 727. And, because there is no more than a speculative risk that *any* future issue of *Prison Legal News* will be rejected, it is also entirely speculative that PLN will be subjected to the BOP practice of withholding entire publications that contain objectionable content. *See* Doc. 1 at ¶ 57 (complaining of "full censorship" in lieu of "redaction or removal of articles deemed objectionable"). These facts establish no live case or controversy. As in *Brown*, PLN's First Amendment claim is moot.

### 2. The exceptions to the mootness doctrine do not apply.

Neither of the two exceptions to the mootness doctrine applies here.

First, the "voluntary cessation" exception to mootness does not apply.  "Under this exception, voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Brown*, 822 F.3d at 1166 (citation and internal quotation marks omitted).  A defendant must carry "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Already*, 133 S. Ct. at 727).

However, this "burden is not insurmountable, especially in the context of government enforcement." *Id.* at 1167.  It "has not prevented governmental officials from discontinuing challenged practices and mooting a case." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115-16 (10th Cir. 2010) (holding that a federal agency's adoption of a new policy mooted a claim challenging prior versions of that policy).  Indeed, governmental entities like the BOP may bear a *lighter* burden than private actors to prove that a case has been mooted by changed circumstances.  "[I]n this governmental context, most cases that deny mootness rely on *clear showings* of reluctant submission by governmental actors and a desire to return to the old ways." *Id.* at 1116 (internal brackets, quotation marks, and citation omitted) (emphasis in original).  Moreover, "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." *Id.* at 1117 and n.15 (quotation omitted).  The Tenth Circuit has recognized that government "self-correction … provides a secure foundation for mootness so long as it seems genuine." *Id.* at 1118 (citation omitted).

The BOP has met its burden to show that it has not attempted "to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001).  Mr. Chapman has declared under penalty of perjury that the ADX has adopted, and intends to abide by, a formal written policy

that imposes significant (and time-intensive) requirements on the review process for all incoming publications. That policy includes a review by investigative personnel who are adept at identifying security threats, mandates a legal review before any publication is presented to the Warden, and requires that ADX employees receive frequent training on the review procedures. Chapman Decl. ¶¶ 17-20. Mr. Chapman has explained that the ADX is committed to abiding by the standard that a publication will not be rejected solely because it identifies and discusses a BOP inmate or staff member. *Id.* ¶ 29. He has attested that the ADX will evaluate all incoming publications in accordance with the applicable federal regulations. *Id.* The ADX has demonstrated its good-faith commitment to the February 2016 Policy by agreeing to provide the previously rejected issues of *Prison Legal News* to ADX inmate subscribers. *Id.* ¶ 28.

As in *Brown*, there is no basis for the Court here to find that these policy changes are "a sham for continuing possibly unlawful conduct." *Brown*, 822 F.3d at 1170 (citing *Rio Grand Silvery Minnow*, 601 F.3d at 1118). Nor is there any support for the conclusion that Mr. Chapman's declaration, signed under penalty of perjury and submitted to the federal district court, is "a deliberate misrepresentation to the court." *Id.* There is no "clear showing" that the ADX has reluctantly changed its policy for reviewing incoming publications; neither do the facts evince any desire by the BOP "to return to the old ways." *See Silvery Minnow*, 601 F.3d at 1116.

Second, the "capable of repetition, yet evading review" exception does not apply. That exception applies only where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). Under the February 2016 Policy, future issues of *Prison Legal News* will not be rejected simply because they discuss BOP inmates or staff. The challenged conduct thus cannot "reasonably be expected to recur." *Already*, 133 S. Ct. at 727.

In sum, in the face of the ADX's commitments concerning the February 2016 Policy, any prospective relief this Court might have awarded to PLN would have virtually no effect in the real world.  *See Brown*, 822 F.3d at 1171 (citing *Wyoming*, 414 F.3d at 1212).  Exceptions to the mootness doctrine do not apply.  PLN's challenge to past ADX practices for rejecting publications is constitutionally moot.

### 3.      The claim is prudentially moot.

"Even if a case is not constitutionally moot, a court may dismiss a case under the prudential-mootness doctrine if the case is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the *power* to grant."  *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (emphasis in original).  The facts here present compelling grounds for the Court to find that PLN's claim about the former ADX rejection policy may also be dismissed as a prudential matter.

The BOP has done everything that it *can* do to address PLN's complaint.  It has confirmed that the ADX no longer rejects publications for the reason that prompted the rejection of past issues of *Prison Legal News*, *i.e.*, merely because a BOP inmate or staff member was discussed.  The BOP has implemented a comprehensive new formal written policy designed to ensure that every rejection is made in accordance with BOP regulations.  Chapman Decl. ¶ 29.  It has agreed to deliver the previously rejected issues of *Prison Legal News* to inmate subscribers currently housed at the ADX.  *Id.* ¶ 28.  That policy change has given PLN the prospective relief it asked the Court to award.  *See* Doc. 1 at 16.

The BOP cannot do more.  It is impossible to promise that every future issue of *Prison Legal News*, including those that identify and discuss BOP inmates or staff, will be suitable for dissemination in the maximum-security ADX environment.  Chapman Decl. ¶ 27.  Nor can the BOP promise that every piece of "publically available" information discussed in future issues necessarily can be introduced into the ADX without compromising institutional security.  *Id.* ¶

26 (explaining that the Warden must individually assess all information contained in incoming publications, including information in the public domain).

PLN's challenge to superseded incoming publication-rejection policies and practices has "reach[ed] the point where prolonging the litigation any longer would itself be inequitable." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012) (claim alleging manufacturer's defect rendered prudentially moot by national recall of vehicles pursuant to federal statute) (citations omitted).  The facts here show no "likelihood that [the ADX] will recommence the challenged, allegedly offensive conduct."  *Silvery Minnow*, 601 F.3d at 1122 (discussing prudential mootness); *see also Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997) (under prudential-mootness doctrine, "[a] court may refuse to grant relief where it appears that a change of circumstances renders it highly unlikely that the actions in question will be repeated").  Therefore, even were the Court to find that PLN's First Amendment claim is not constitutionally moot, the Court can properly exercise its discretion to find that PLN's First Amendment claim is prudentially moot.

### C.     The Supreme Court has upheld the BOP's practice of withholding an entire incoming publication when it contains objectionable material.

There is one more reason the Court should dismiss PLN's First Amendment claim.  To the extent PLN alleges that the ADX rejected "entire issues" of *Prison Legal News*, even where the rejection was based on "a fraction of" their total content, Doc. 1 ¶¶ 35-36, those allegations state no plausible claim for relief.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court must evaluate whether the facts alleged plausibly establish the legal elements of the claim.  *Iqbal*, 556 U.S. at 679, 682-83.  The complaint must include "sufficient factual matter" to support the claim, which means "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The Court considers only well-pleaded facts.  Allegations that merely assert conclusions are not entitled to the presumption of truth.  *Id.*  Allegations that are compatible with lawful behavior do not plausibly suggest an entitlement to relief.  *Id.* at 679-80.  "[W]here the well-pleaded facts do not permit the court to infer more that the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

PLN's allegations do not allow the Court to reasonably infer that the BOP engaged in unlawful behavior by rejecting entire incoming publications.  A BOP regulation authorizes prison officials to return the entire rejected publication to the publisher.  28 C.F.R. § 540.71(e); *see also* Chapman Decl. ¶ 7.  The Supreme Court upheld the BOP's "all-or-nothing" rule, finding that the practice "was not an 'exaggerated response' under *Turner* [*v. Safley*, 482 U.S. 78, 89-90 (1986)]." *Thornburgh v. Abbott*, 490 U.S. 401, 418-19 (1989).  The Court recognized that "the administrative inconvenience of this proposed alternative [of tearing out rejected portions] is also a factor to be considered and adds additional support to the … conclusion that [the BOP was] not obligated to adopt it." *Id.* (citation omitted).[8]

Any claim contending that the BOP's practice of rejecting publications in their entirety violates the First Amendment fails, as a matter of law.  The Court should dismiss it.

## II.     PLN's due-process claim fails because it received constitutionally sufficient process.

Claim Two fails to state a plausible procedural due-process claim because PLN was notified when the Warden rejected its magazines, and it had an opportunity to be heard by the

---

[8] *See also*, *e.g.*, *Murchison v. Rogers*, 779 F.3d 882, 892-93 (8th Cir. 2015) (discussing *Thornburgh* in finding that state prison officials did not violate prisoner's First Amendment rights by refusing to tear out objectionable articles); *Lindell v. McCaughtry*, 115 F. App'x 872, 879 (7th Cir. 2004) (recognizing that *Thornburgh* "approved the Federal Bureau of Prisons' retention of the 'all-or-nothing- rule," and refusing to require a state prison system to adopt a redaction policy for rejected publications); *Rodriguez v. Bell*, No. 14-cv-447, 2015 WL 3756509, *5 (S.D. Tex. June 16, 2015) (rejecting a demand for redaction because "[t]his administratively burdensome, content altering, and property-destroying alternative has been rejected by the Supreme Court.")

BOP Regional Director.  The Constitution requires no more process than this.  In addition, PLN lacks standing to challenge the alleged practice of failing to retain a copy of the rejected publication for review by the Regional Director.  The ADX does not have such a practice.

As a threshold matter, PLN's assertion that the BOP did not follow its own procedures, Doc. 1 at ¶ 64, does not state a constitutional claim.  *Hovater v. Robinson,* 1 F.3d 1063, 1068 n.4 (10th Cir. 1993).  Prison regulations are designed to guide correctional officials in the administration of prisons; they do not confer rights or benefits.  *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995).  Regardless, as explained below, the facts show that the BOP's actions comported with both the Constitution *and* BOP procedures.

## A.       The Constitution requires some notice and some opportunity to be heard.

Inmates and their correspondents have a qualified liberty interest in those communications protected by the First Amendment.  *Procunier v. Martinez*, 416 U.S. 396, 417-18 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989); *accord Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004).  Because this liberty interest is "qualified of necessity by the circumstance of imprisonment," only "minimum procedural safeguards" are required.  *Martinez*, 416 U.S. at 417-18.[9]

*Martinez* approved the following minimal procedures when a prison rejects inmate communications:  "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence."  *Id.* at 418-19; *see also Prison Legal News v. Crews*, No.

---

[9] The *Martinez* standard reflects the well-established rule that "informal, nonadversary procedures" satisfy due-process requirements in the prison context.  *Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005) (citing *Hewitt v. Helms*, 459 U.S. 460 (1983), and *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979)).  In those limited situations where a liberty interest may be implicated, prison officials need only "engage in some sort of periodic review" of the decision affecting the inmate.  *Hewitt*, 459 U.S. at 477 n.9 ("This review will not necessarily require that prison officials permit the submission of any additional evidence or statements.").

4:12cv239, 2014 WL 11411829, **20, 24 (N.D. Fla. Aug. 11, 2014) (accepting PLN's argument that the *Martinez* test applied in determining the procedural requirements for rejecting a publication, and finding that the prison regulation met the *Martinez* test). In *Thornburgh*, the Court recognized that the BOP procedures under 28 C.F.R. § 540.70 and § 540.71 "provide procedural safeguards for both the recipient and the sender." *See* 490 U.S. at 406 (describing the procedures). The BOP's procedures have been used as a model for state prisons—including at the urging of PLN. *See Prison Legal News, Inc. v. Werholtz*, No. 02-4054, 2007 WL 2875113, **7-8 (D. Kan. Oct. 1, 2007) (on remand of *Jacklovich*, accepting PLN's proposal that state department of corrections adopt "the notification utilized by the Federal Bureau of Prisons," which "is sufficient to provide adequate notice to both the inmate and the publisher").

**B.    PLN received notice and an opportunity to be heard.**

The facts show that PLN received all the process the Constitution required.

**1.    The notice provided to PLN satisfied the Constitution.**

PLN received notice. "[T]he ADX warden who rejected the issue signed a rejection notice" for each of the eleven rejected issues of *Prison Legal News*. Doc. 1 ¶ 23; *see also* Ex. 2 (rejection notices).[10] The facts show no deficiency in the notice the BOP provided.

The notices explained the basis for the Warden's judgment in sufficient detail to enable PLN to understand the Warden's reasoning. Each notice specifically stated that the Warden rejected the magazines because they contained information about inmates (most of whom were incarcerated at the ADX) or about BOP personnel. Ex. 2 at 1-11. The notices provided additional detail, by listing the specific pages in each magazine on which this objectionable content was found. *See id.*

---

[10] The Court can consider these notices because PLN has referred to them in its complaint. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (on a Rule 12(b)(6) motion, court can consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity"). Exhibit 2 contains one sample notice for each rejected issue of *Prison Legal News*. The names and registration numbers of inmates who are not parties to this case are redacted. Page numbers have been added for ease of reference.

The notices make clear that, in the Warden's judgment at the time, allowing this information to enter the ADX *would* be "detrimental to the security, good order, or discipline of the institution or … may facilitate criminal activity" simply because it discussed inmates or prison staff. *See id.*; *see also* 28 C.F.R. § 540.71(b). PLN complains that the notices do not explain *how* this information could compromise security at the ADX, Doc. 1 ¶ 25, but due process does not require a detailed explanation of the Warden's security evaluation. In the due-process context, the BOP need not establish to PLN's satisfaction that the BOP had a penological justification for its actions; it need only give "*some* kind of notice" of the decision it made. *Moore v. Bd. of Cnty. Com'rs*, 507 F.3d 1257, 1259 (10th Cir. 2007) (observing that "[t]he essence of procedural due process is the provision to the affected party of "'*some* kind of notice and … *some* kind of hearing") (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original)). The notices satisfy that standard.

The fact that PLN disagrees with the Warden's judgment, *see*, *e.g.*, Doc. 1 ¶ 27, is irrelevant to the due-process analysis. The Warden, not PLN, receives deference when it comes to assessing how to maintain security at the ADX. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (professional judgment of prison administrators receives judicial deference when they "defin[e] the legitimate goals of a corrections system and [determine] the most appropriate means to accomplish them"). Regardless, even if the Court were to assume that PLN is correct and that the Warden misjudged the situation, that fact would show no defect in the process. Procedural due process is precisely that: a *process-focused* inquiry. The Supreme Court has emphasized that "the right to procedural due process … does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). Nor does the due-process right depend on whether the procedures "produced the result that the evidence required[.]" *Swarthout v. Cooke*, 562 U.S. 216, 221 (2011) (observing that "it is no federal concern" whether a state's review procedure was correctly applied).

Next, PLN's contention that it did not receive a rejection notice for one of the eleven rejected issues is not a well-pleaded fact because it is contradicted by information the Court can consider here.  *See* Doc. 1 ¶ 37.  ADX records show that there is a rejection notice for the November 2011 issue, denoting under the Warden's signature that a copy of the rejection notice was mailed to PLN.  Ex. 2 at 4; *see also* Chapman Decl. ¶ 9 (describing publisher-notification procedures).  The BOP is entitled to a presumption that the rejection notice was provided to PLN.  *See*, *e.g.*, *Yuk v. Ashcroft*, 355 F.3d 1222, 1232 (10th Cir. 2004) ("In view of the presumption of regularity attaching to administrative procedures … we will not assume" that agency officials "do not follow the regulations or do not perform their jobs properly."); *Bar MK Ranches v. Yuette*r, 994 F.2d 735, 740 (10th Cir. 1993) (observing that "the designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity"); *see also Nat'l Archives & Records Admn. v. Favish*, 541 U.S. 157, 174 (2003) ("clear evidence" required to overcome presumption of regularity).

The facts also show no due-process violation with regard to the "timing" of the notices. *See* Doc. 1 ¶¶ 3, 62.  PLN's unsupported contention that the BOP delayed sending the notices "until six to nine months after the rejection occurred," *id.* ¶ 38, is not entitled to the presumption of truth.  The facts show that the rejection notices were mailed to PLN on the same day the notices were delivered to ADX inmates.  Ex. 2 at 1-11 (stating that PLN was copied by mail). The notices were mailed in close proximity to the date of publication of each rejected issue, either in the same month as the date of publication, or within the following month.  *See id.*

The only notice requirement under *Martinez* is that some notice be given at some point in time.  *See* 416 U.S. at 417-18; *see also Moore*, 507 F.3d at 1259.[11]  Unless the timing of the notice negates the publisher's "reasonable opportunity to protest" the decision, there is no

---

[11] Nor is there any timing requirement imposed by BOP regulation—except that the publisher has 20 days from "*receipt* of the rejection letter" to appeal, thus ensuring that, no matter when the publisher receives notice, its appeal rights will not be jeopardized.  *See* 28 C.F.R. § 540.71(e) (emphasis added).

procedural defect of constitutional magnitude.  *See Martinez*, 416 U.S. at 417-18.  As discussed in the next subsection, PLN's appeal rights were in no way compromised.

In sum, neither the content nor the timing of the notices hindered PLN's right to be heard. PLN received the notice required under the Constitution.

### 2.    PLN's opportunity to be heard satisfied the Constitution.

PLN had an opportunity to be heard in the form of a review by a BOP Regional Director. *See Martinez*, 416 U.S. at 417-18 (opportunity to be heard means "a reasonable opportunity to protest that decision … to a prison official other than the person who originally disapproved the correspondence").  PLN appealed "at least four rejections[.]"  Doc. 1 ¶ 41.  PLN made "detailed" and "substantive arguments" in support of its appeals.  *Id.* ¶¶ 42-44; *see also* Doc. 1-3 at 2-3, Doc. 1-5 at 2-3 (appeal letters from PLN).  It is apparent from PLN's arguments on appeal that it understood the reason the Warden rejected the magazine.  *See* Doc. 1-3 at 2 (complaining about "the mere mention of a prisoner's name" as the justification for a rejection).

The Regional Director denied PLN's appeals.  Doc. 1 ¶ 45.  In PLN's view, the Regional Director's responses were inadequate.  *Id.* ¶¶ 45-47.  But the BOP is not required to engage in a debate with PLN in order to satisfy due process.  As explained above, due process does not require that the BOP provide a detailed justification for its decisions.  At bottom, PLN simply disagrees with the outcome of its appeals, but that is not a measure of whether the process met constitutional standards.  *See Moore*, 507 F.3d at 1259 (requiring only "*some* opportunity to be heard") (emphasis in original).  The facts show that PLN had an opportunity to be heard.

In conclusion, PLN has not pleaded facts plausibly showing the existence of the extreme procedural defects required to establish a violation of procedural due process in the prison arena, where only minimal procedures are required.  *See Jacklovich*, 392 F.3d at 425, 433 (finding due process violation where PLN was "*never* notified of non-delivery, given a reason for the non-delivery, and/or given an opportunity to contest it") (emphasis added).  PLN received process

that satisfied the Due Process Clause.  The Court should dismiss Claim Two.

C.     **PLN does not have standing to challenge a practice that does not exist.**

PLN claims that the BOP policy of returning a rejected publication to the publisher impaired its "ability to obtain a meaningful appeal" because "the censored writing itself is unavailable for consideration by the Regional Director[.]"  Doc. 1 ¶ 65.  In fact, that is not the practice at the ADX, where staff retain a copy of the material that prompted the rejection, even if the inmate does not appeal.  Chapman Decl. ¶ 11.  PLN cannot meet its burden to show that it has standing to challenge a non-existent policy.  *See Lujan*, 504 U.S. at 560-61 (plaintiff must prove "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," that is "traceable to the challenged action of the defendant," and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").  PLN cannot show that it has been injured by a non-existent policy.  There is no relief for the Court to award.

This allegation would fail to state a claim in any event.  PLN had an opportunity to be heard, even if the BOP did not maintain a copy of the rejected material.  PLN can describe that material to the Regional Director, or it can submit another copy.  Due process does not require procedures that maximize ease of review, from PLN's perspective.  Moreover, the facts here do not plausibly indicate that the Regional Director was unaware of the rejected content.  *See* Doc. 1-6 at 2 (concluding that "[s]pecific names, location housed, case details, and other information may pose a security concern").  The Court should dismiss this claim under both Rule 12(b)(1) and Rule 12(b)(6).

III.   **The Administrative Procedure Act claim should be dismissed for the same reasons.**

PLN reasserts its constitutional claims under the guise of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  Doc. 1 ¶¶ 72-74 (BOP failed to provide notice and an opportunity to be heard and to "follow its own procedures"); *id.* ¶¶ 76-78 (BOP engaged in

"improper censorship" of the magazine).  The Court should dismiss the APA claim for the same reasons the constitutional claims should be dismissed.

PLN cannot establish subject-matter jurisdiction over its APA claim to the same extent its constitutional claims are moot or it lacks standing to bring them.  *See*, *e.g.*, *McKeen v. U.S. Forest Service*, 615 F.3d 1244, 1256-57, 1260 (10th Cir. 2010) (dismissing APA claim as moot where "any declaration regarding the cancellation of" a superseded livestock grazing permit "would be of no effect in the real world") (citations omitted).  And, to the same extent PLN has failed to plead a plausible constitutional claim, it also has not plausibly alleged that (1) the BOP did not take an action it was legally required to take, or (2) in taking a final action, the BOP acted arbitrarily, capriciously, or otherwise contrary to law.  *See* 5 U.S.C. § 706.  PLN cannot bring those claims under the APA, either.  *See*, *e.g.*, *Yagman v. Whittlesey*, _ F. App'x _, 2016 WL 1039265, *1 (9th Cir. Mar. 8, 2016) (affirming dismissal of APA claim on Rule 12(b)(6) motion).  The Court should dismiss Claim Three.

## CONCLUSION

The Court should dismiss the complaint and award Defendant its costs.

Respectfully submitted July 27, 2016.

<div style="margin-left:40%">

JOHN F. WALSH
United States Attorney

s/ *Susan Prose*
Susan Prose
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0404
E-mail: susan.prose@usdoj.gov

Counsel for the Federal Bureau of Prisons

</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on July 27, 2016, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

Steven Zansberg
Lance Weber
Sabarish Neelakanta
Peter Swanson
Matthew Shapanka
Elliot Mincberg
David Shapiro
Stephen Kiehl

_s/ Susan Prose_
Susan Prose
United States Attorney's Office

21