# Exhibit A

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 15-cv-02184-RM-STV
3   _____

4   DEPOSITION OF:  TODD CHAPMAN
    _____
5
    PRISON LEGAL NEWS,
6   a Project of the Human Rights Defense Center,

7   Plaintiff,

8   v.

9   FEDERAL BUREAU OF PRISONS,

10  Defendant.
    _____
11

12              PURSUANT TO NOTICE, the deposition of
    TODD CHAPMAN was taken on behalf of the Plaintiff at
13  1888 Sherman Street, Suite 370, Denver, Colorado
    80203, on January 17, 2017, at 8:26 a.m., before
14  Teresa Coogle, Registered Professional Reporter,
    Certified Realtime Reporter, and Notary Public within
15  Colorado.

16

17

18

19

20

21

22

23       **H+G**

24
    Hunter + Geist, Inc.
25

**303.832.5966**        1900 Grant Street, Suite 1025        ▪ www.huntergeist.com
**800.525.8490**        Denver, CO 80203                      ▪ scheduling@huntergeist.com

Your Partner in Making the Record

9

A. I was in the United States Marine Corps
for four years.
Q. And what did you do after that?
A. After that, I was on unemployment for two
to three months before I started working for the
Federal Bureau of Prisons.
Q. Okay. Do you remember what year that was
that you started working for the BOP?
A. Yes. I started February 1, 1998.
Q. Okay. And have you been with the Federal
Bureau of Prisons since then?
A. Yes.
Q. Okay. And can you give the positions
that you have held since starting in 1998 up until
your current position?
A. Sure. When I started, I started at -- do
you want to know where I worked or just my positions?
Q. Both.
A. Okay. I started at the United States
penitentiary in Lompoc, California, on February 1,
1998. I started as a correctional officer. I worked
there until March, middle of March, I think it was,
like, March 11, something like that. Middle of
March 2001 where I moved to Florida and activated the
United States Penitentiary Coleman No. 1 as a senior

10

officer specialist. I was a GSA at the time.
I worked there for three years until May
of 2004 where I lateraled to the United States
penitentiary located in Victorville, California, as a
senior officer specialist to activate that new prison
there as well.
Then in 19 -- in 2010 -- in October 2010,
I received another promotion -- oh, I missed a job. I
lateraled inside of Victorville. I went from a senior
officer specialist to the receiving and discharge back
in 2008, I believe.
Q. Okay.
A. 2000 -- 2009, I apologize. 2009. And
that was a correctional systems officer where I was
working within the mail room working in the receiving
and discharge area and our records department.
And then I received a promotion again in
October of 2010 to the supervisory correctional
systems specialist -- it's a long government name --
which is the supervisor of that department in Devens,
Massachusetts, at the federal medical center then.
Q. Supervisor of which department? I'm
sorry.
A. Of the mail room, the records, and the
receiving and discharge.

11

Q. And so that was -- you became supervisor
of that department --
A. In 2010.
Q. -- in 2010 in Massachusetts?
A. Yeah, Devens, Massachusetts, federal
medical center. Then --
Q. And can you --
A. I'm sorry.
Q. I'm sorry.
A. No, go ahead.
Q. -- explain what that department does,
what its functions are.
A. That department is a multi-faceted
department. So we're responsible for all incoming and
outgoing staff and inmate mail. We're also
responsible for all incoming and outgoing inmate
property. We also process in every inmate in and out
of the prison.
We also work with the records. We work
with all of the law enforcement federal and state,
county locals to go over detainers with inmates.
Also, warrants, and stuff like that, to make sure
their sentence computations are correct, that they got
out on time. That was the main rules of that job.
Q. Okay. And then how long were you in

12

Massachusetts?
A. I was there until November of 2013 --
Q. Okay.
A. -- when I promoted to Federal
Correctional Complex, Butner, North Carolina, as a
unit manager. And I was there until I moved here at
the end of July 2015 for my current position at
executive assistant.
Q. And what were your duties as a unit
manager in North Carolina?
A. As a unit manager I ran M unit, was the
name of my unit. And we had four wings to that unit.
And I had about 800 inmates under me. And I was
responsible for their welfare and care -- you know,
their halfway house, whether or not they got halfway
house, how much halfway house they got.
We were over there visiting, you know, in
the family visits. Basically their lives. I was the
one who told them, Hey, stay on the straight and
narrow. This is what you need to program. This is
what you need to move on. This is what you need to
transfer.
We did inmate discipline at that level,
and stuff like that. So that was my main thing, I was
the care and welfare of those inmates --

TODD CHAPMAN - 1/17/2017
Prison Legal News v. Federal Bureau of Prisons

---

13

1    Q.  Okay.
2    A.  -- in my unit.
3    Q.  And then in 2015, you moved to Colorado?
4    A.  Yes, sir.
5    Q.  You've really gotten around.
6    A.  Yes.
7    Q.  All over the country.
8    A.  And I got a long way to go in my career,
9  so I'll probably move around some more.
10   Q.  That's fantastic.  One thing I forgot to
11 mention --
12   A.  Okay.
13   Q.  -- if you -- just the basics.  If you
14 need to have any breaks, you need to take a break at
15 any time, just let us know, and we can take a break.
16   A.  Okay.
17   Q.  And I wanted to ask you about your
18 current position now in Colorado in Florence.  What
19 are your duties as executive assistant?
20   A.  My primary duty is public information
21 officer, so I deal with all media contacts, I deal
22 with inmate family members, I'm in charge of
23 different -- some re-accreditations such as ACA or
24 American Correctional Accreditation re-accreditation.
25 I give some training to staff.  I'm over the

---

14

1  institution supplement program there at the ADX.
2    Q.  And what does that mean?
3    A.  That means I'm the final reviewer before
4  the warden for all supplements, institution
5  supplements.  I also do all tours, deal with a lot of
6  family members, assist in writing Congressional
7  responses, stuff like that.
8    Q.  And who do you report to?
9    A.  I report to the ADX warden, Mr. Jack Fox.
10   Q.  And who reports to you?
11   A.  The warden's secretaries throughout the
12 complex technically are under me.  And I have a
13 research analyst that works under me.
14   Q.  Okay.  How many secretaries does the
15 warden have?
16   A.  There is one at each institution -- at
17 each institution minus the camps.  There are three
18 warden secretaries total at the complex.
19   Q.  Okay.  And I want to ask you about the
20 institution supplement program.
21   A.  Okay.
22   Q.  Can you describe how that program works
23 and what -- what it means when you say you are in
24 charge of that program essentially?
25   A.  Okay.

---

15

1    Q.  Is that right?  Is that the correct way
2  to put it?
3    A.  Yes.  What it is every year all of our
4  supplements need, for policy, to be reviewed.  You
5  know, whether any changes are made or not is --
6  inconsequential.  What it is is we have to show that
7  we've at least looked at our supplements to make sure
8  they are still valid, current, they are up to date
9  with current program statements, any other changes
10 that have been made possibly, missions at our
11 institution.  If we were to change missions, for
12 example, then we would have to make sure that our
13 stuff is updated or, if we have new wardens in, to
14 make sure the proper name is on there.
15      So I'm the final reviewer to make sure
16 that process happens.  I make sure at least once a
17 year -- there's no set time during the year, just that
18 one time during the year a review has to be done.  And
19 I make sure those are done.
20      And if someone who's over a department
21 that's responsible for a certain supplement -- if they
22 feel there needs to be changes, say we had a program
23 statement, some federal law changed somewhat, and they
24 say, Hey, we need to make this change to this
25 supplement now because of this or recommend, then we

---

16

1  can also do it at another time; they can bring that
2  process to me.
3    Q.  Okay.  So do you initiate new versions of
4  institution supplements or changes to institution
5  supplements, or do other people -- do other people
6  say, We think this institution supplement on X topic
7  needs to be reviewed or updated or revised?  How does
8  that -- how does the process work?
9    A.  That process is done by the department
10 who is over or responsible for that particular
11 supplement.  I send out the packet to say, Hey, this
12 -- if this hasn't been reviewed yet this year, this
13 needs to be reviewed.
14      If there are no changes required, just
15 sign it and say, No changes required, and we'll move
16 on.  But it's up to that -- to actually make the
17 change, it's up to that department that it's over to
18 say, Hey, we need to make this change.
19   Q.  And if the department says, okay, we need
20 to make a change, then what is the process for that
21 from -- from them saying that to final supplementation
22 of the change?
23   A.  Okay.  So if a department head approaches
24 us and says, Hey, we need to make a change to this
25 supplement, we will send that packet out -- the same

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

---

29

1  beyond the floor set by the federal level?
2      A.  I believe that to be an accurate
3  statement.  Like I said, what happens when a C.F.R.
4  comes out, our legal department in our central office
5  will base our program statements based off of that.
6  And so we at the local level go off of a program
7  statement, and so that's what we use as our basis
8  locally is that.
9          So how the legal department or our
10 executive staff in the central office deem that to get
11 down to us, I think that we don't change law,
12 but . . .
13     Q.  Okay.  Do you know who has the authority
14 to issue and change the C.F.R.s?
15     A.  I would guess Congress, but I honestly
16 don't know.
17     Q.  Okay.  Not the warden at ADX or Florence?
18     A.  I honestly don't know, to be honest.  I
19 don't know.  I don't think so.  I don't know all about
20 law and the technical stuff.  I'm not aware of it.
21     Q.  No, that's fine.  I want to look at
22 paragraph 5 of your declaration.
23     A.  Okay.
24     Q.  Which provides a list of criteria.  And
25 you state that, "Publications which may be rejected by

---

30

1  a Warden include, but are not limited to, publications
2  which meet one of the following criteria."  And then
3  you list seven criteria also from the C.F.R., it looks
4  like, that would be grounds for rejection.  That's
5  correct?  That's what these are?
6      A.  Yes.  It's a basic guideline for us to go
7  off of in regards to rejection.
8      Q.  Okay.  And at the beginning of paragraph
9  5 where you say that "Publications which may be
10 rejected" for these criteria, "but are not limited to"
11 these criteria, what does that language mean, "are not
12 limited to"?
13     A.  That language gives the warden discretion
14 if there's something that isn't listed on here, but we
15 feel it could be a threat in any way or it could
16 disrupt the institution or the agency in some way that
17 we can.  Because if we were to hold ourselves to just
18 this blind list and something else were to come in,
19 then we would have to give it to the inmate.  And
20 there may be times where that is not feasible.
21     Q.  Okay.  And how much discretion does the
22 warden have in going beyond this list of seven
23 criteria?
24     A.  The warden is the C --
25         MS. PROSE:  I'll just put an objection on

---

31

1  the record to the extent it calls for a legal
2  conclusion.  You can answer.
3      A.  The warden is a CEO of the institution.
4  And if they say X,Y,Z, when it comes to this, over
5  that, they have the final say.  But at that point, it
6  leaves open the appeal process to both the inmate and
7  to whoever, company or person, sent in something that
8  was rejected.
9      Q.  (BY MR. KIEHL)  Okay.  So I want to make
10 sure I understand the -- the reason for the "not
11 limited to" language is that it is there so that the
12 warden has some discretion in evaluating incoming
13 publications in case they do not fit into one of these
14 seven categories, but the warden still feels that for
15 the security, good order, and discipline of the
16 institution, the publication should be rejected; is
17 that --
18     A.  Yes.
19     Q.  -- a correct summary?
20     A.  Yeah, it's pretty close to what I would
21 say.
22     Q.  Can you correct me or say it in your own
23 words?
24     A.  Well, I don't know -- well, yes.  What it
25 is is the warden would make that discretionary charge.

---

32

1  I mean, the decision based on that, you know; but it
2  would go -- it goes through multiple layers before it
3  gets to the warden.
4          So it wouldn't just be that the warden
5  out of left field goes into the mail room and picks
6  something and says, We want to reject this because --
7  it's -- it goes through the review process for the
8  different areas.
9          So he will get a good educational basis
10 to why -- from different departments as to why it
11 should be rejected, even if it doesn't fit one of
12 those.  So while, yes, they do have the final approval
13 and, yes, they do say, it will be based on good, sound
14 correctional judgment that someone has put in front of
15 them or was able to get the warden to agree with what
16 their assessment of it was.
17     Q.  So the warden has to have some kind of
18 good reason for taking that action?
19     A.  I would say so, yes.
20     Q.  Okay.  Thanks.  And turning next -- to
21 the next page to paragraph 6 of your declaration, you
22 refer to Program Statement 5266.11.  And I'd like to
23 show you that.
24         (Deposition Exhibit 2 was marked.)
25     Q.  And so what we've marked as Exhibit 2 is

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**41**

statement, not off an institution supplement, it
doesn't appear, unless the reference to the ADX inmate
had to do with something serious, that if that
knowledge were to become the common knowledge it could
affect that inmate or us, for example.

So, say, if a publication came in and
said Joe Smith ADX inmate is offering $50 billion if
someone can help him escape, we might not give that to
the population because we wouldn't want them to use
that information to possibly attack staff or help the
inmate escape.

So just because it referred to that
inmate, while, yes, that inmate was covered, it would
have to -- usually Florence, while there along with -- so
if it just said Joe Smith is an inmate at ADX, we
wouldn't reject, unless that person was, like, a
witness security inmate or something along those
lines.

Q.   So to make sure I understand, under this
program statement, it would be allowable for a
facility to reject a publication because it discusses
or identifies a BOP inmate or staff member?

A.   Again, we locally go with the institution
supplement.  If there is an institution supplement
available at our institution, we -- the final say is

**42**

the institution supplement.  Because, again, this --
C.F.R. is a guideline to make these.  These are
guidelines to make our institution supplements.  So we
go off of our institution supplements.

Now, if it's something that's not covered
in an institution supplement, we would refer back to
the more broad program statement.  But, again, an
institution may have a more narrow version on theirs
based on their mission, their institution, things they
have encountered in the past.

Q.   Okay.  So if a local institution may have
a more narrow version of this, is it correct to say
that that means that nothing in this program statement
prohibits a local institution from rejecting a
publication solely because it discusses or identifies
a BOP inmate or staff member?

A.   I would -- I would have to read the
institution supplement.  It should contradict it
completely.  It's more, like I said, about the
cellphones.  You can have four, and the institution
says, No, you can have two.  Or maybe you can have
two, but we need to inspect those two cellphones.
They need to be this criteria, this model, this brand,
this year.

So like I said, this is an outline for us

**43**

to go off of to create the more narrow one focused on
our institution or our mission, whichever that is.

Q.   So if an institution decided that it
wanted to reject a publication solely because it
identified a BOP inmate or staff member, would
anything in this program statement prohibit the
institution from doing that?

A.   It would probably be hard for someone to
do that, because you would have to define that there
is a security need of the institution related to that
inmate need.

So like I said, I'll refer back -- if you
just send in an envelope saying, Joe Smith is an
inmate at FCI, Florence, and if that is solely what it
said, it would have no problem coming in, unless there
was, like, a wood sack inmate.

Q.   Let's return to Exhibit 2, which is
program statement --

A.   This one here.

Q.   -- 5266.11, which is the program
statement dated November 9, 2011.  And I want to ask
the same question about this program statement as
well.

A.   Sure.

Q.   Does any of the language in this

**44**

statement prohibit a local institution from rejecting
a publication solely because it identifies a BOP
inmate or staff member?

A.   I do not believe so, unless, like I said,
you can make a case based off 2(b).

Q.   So you can't point to any language in
this program statement that says a local institution
cannot reject a publication for the reason we've
stated?

A.   No.  It says on here that you can only
reject or may reject if it is only -- if it is
detrimental to the security, good order, or discipline
of the institution or might facilitate criminal
activity.

So unless the name goes with that, no,
then this does not tell you to reject mail just based
just on someone's name.

Q.   But it doesn't tell you that you can't;
is that correct?

A.   It says you're only supposed to.  But
when you do our institution supplement, like I said,
you can put more broad language, at the warden's
discretion, or something like that.

Q.   I want to make sure I understand.  Does
this institution supplement -- I'm sorry.  Does this

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

TODD CHAPMAN - 1/17/2017
Prison Legal News v. Federal Bureau of Prisons

45

1    program statement say that you cannot reject a
2    publication solely because it names an inmate or staff
3    member?
4         A.   Not in those exact records, but I believe
5    that's what it meant is that, you know, it has to meet
6    one of these criteria.
7         Q.   And if the warden decides that -- the
8    fact that an incoming publication discusses or
9    identifies the BOP inmate or staff member, and that is
10   detrimental to the security, good order, or discipline
11   of the institution, in the correctional judgment of
12   the warden, may a warden reject a publication on that
13   basis under this program statement?
14        MS. PROSE:  Could you read the question
15   to me?
16        A.   Yeah, if you could rephrase that
17   question.
18        (The last question was read back as
19   follows: "And if the warden decides that -- the fact
20   that an incoming publication discusses or identifies
21   the BOP inmate or staff member, and that is
22   detrimental to the security, good order, or discipline
23   of the institution, in the correctional judgment of
24   the warden, may a warden reject a publication on that
25   basis under this program statement?")

46

1         A.   So what I think you're asking me is that
2    if a warden locally sees something that comes in with
3    just an inmate's name, do they have the authority or
4    can they reject it?  Is that what you're asking me?
5         Q.   (BY MR. KIEHL)  Yes.
6         A.   You know, I would say generally no.  You
7    know, an institution may say something -- an
8    institution supplement -- I haven't seen them all.
9    They are different at every institution.  I haven't
10   seen them all.  But, again, a warden could make that;
11   but that's what we have the appeal process for, both
12   whoever is sending it in plus the inmate that is
13   receiving it.  So if the warden were to make an error
14   in judgment or to overstep their bounds, it gives the
15   people the right to appeal that and to possibly get
16   back that magazine or whatever it was that was
17   rejected.
18        Q.   So you think it would be an error in
19   judgment for the warden to make that call?
20        A.   If the warden had something come across
21   the desk that just said Joe inmate is -- or Joe Smith
22   is an inmate at this prison alone, and there was
23   nothing else, there was no meat, there was no
24   documentation by our special investigative services to
25   say that, Hey, this person is this or that, there was

47

1    no reason behind it, no, I believe that would be an
2    error in judgment.
3         Q.   Okay.  And can you point to the language
4    in this Program Statement 5266.11 that leads you to
5    that conclusion.
6         A.   I see two places under -- on page 3 of
7    the document at the bottom.  You see under No. 7, it
8    says, "Only the Warden may reject an incoming
9    publication.  In the Warden's absence, only the Acting
10   Warden may perform."
11        So right there, the warden is the one who
12   is making the rejection.  Also, when you look at 2(b),
13   it kind of gives a general outline of things that only
14   should be rejected.
15        Q.   Okay.  Okay.  You can set those aside for
16   a moment.  And I think we'd like to look at some of
17   the rejection notices that were issued in Prison Legal
18   News.  So we'll mark as Exhibit 4.
19        (Deposition Exhibit 4 was marked.)
20        Q.   So we're marking as Exhibit 4 a document
21   starting with the Bates number BOP000052.
22        A.   Where did you see that number at?
23        Q.   It's the bottom --
24        A.   Oh, that number.  I was looking somewhere
25   -- okay.  Thank you.

48

1         Q.   No problem.  Can you identify what this
2    document is?
3         A.   This appears to be a publication of a
4    mail rejection for an inmate Blyther.
5         Q.   And when is this dated?
6         A.   February 1, 2010.
7         Q.   Okay.  And can you tell what publication
8    this concerns?
9         A.   Yes.  I'm on page 2.  It appears in
10   Prison Legal News.
11        Q.   Okay.  And if you turn a couple of pages,
12   it appears that this is Prison Legal News issued
13   January 2010.  I think it's also at the --
14        A.   Yeah, that's what this document says.
15   That's a different inmate name, so I was just making
16   sure it was the same.
17        Q.   -- bottom of page 30.
18        A.   Okay.
19        Q.   So this appears to be Prison Legal News
20   issued January 2010.  And this issue was rejected at
21   ADX, correct?
22        A.   It appears so, yes, sir.
23        Q.   And who signed this notice?
24        A.   It appears to be an acting warden who was
25   acting for Mr. Blake Davis.

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

57

1   to read it again real quick.
2        Q.  Okay.  So my question is –
3        A.  Okay.
4        Q.  – can you explain why this issue was
5   rejected?
6        A.  Okay.
7        Q.  And I'll give you a second to look –
8        A.  Thank you.
9        Q.  – to read the article.
10          (The deponent read the document.)
11       A.  I do not see good cause on this one to
12  reject based on what I read.  It says ADX inmates.
13  I'm not sure which of those inmates were ADX inmates
14  or if there was some implication.
15          Again, I wasn't there at the time; so
16  there may have been a supporting memorandum or a
17  document stating -- citing this person, and it is a
18  threat because of X,Y,Z; but reading it myself, I do
19  not see a reason why we would have rejected it.
20       Q.  So if we turn to page BOP000131, what is
21  this document here –
22       A.  Okay.
23       Q.  – that we're looking at.
24       A.  This is a publication mail rejection that
25  is sent to the inmate, I believe.  It's a different

59



58

1   document than I've used at other institutions, so I'm
2   guessing that's what it is.  I missed that originally.
3        Q.  And so this says -- I think you were
4   reading paragraph 8 of page BOP131.
5        A.  Yes.
6        Q.  It says on page 50 -- there is a brief
7   article of the homicide that occurred at FCC Florence.
8   It gives the names of the inmates that were involved
9   in the homicide and the amount of sentence that each
10  received.  The article also states that the assault
11  homicide occurred allegedly due to a disrespect issue
12  involving the Surenos --
13       A.  Surenos.
14       Q.  My apologies -- S-u-r-e-n-o-s -- gang.
15  So if we turn to page 50, it has these little news
16  brief items, and there's one in the middle of the page
17  that says, "In June 2011, following a federal trial in
18  Denver, four prisoners were convicted of beating
19  another prisoner to death at FCC Florence."  And it
20  gives the names of the prisoners who were convicted
21  and the prisoner who died.  And it says, "The four
22  assailants were members of the prison gang."
23          So that news item, would that be
24  considered detrimental to the security, good order, or
25  discipline of the institution?

60

1   a sanctioned hit, that it was approved -- and that may
2   have came out during the trial -- I'm not sure -- then
3   there's no harm, no foul to these guys.  They can
4   continue to walk.  They may even get promoted in rank
5   through the prison.  But us, again, having those gang
6   members at the prison if we weren't aware of whether
7   it was a sanctioned hit or not, then that would give
8   us cause for concern, because we are now -- again,
9   here are the names of the people who did the murder.
10  So if you want retaliation, here they are.
11          Other gangs won't retaliate.  If the
12  person is a member of the same gang and it was
13  sanctioned, it's a done deal, it's over.  If not,
14  these guys are targets for the rest of their lives.
15       Q.  So if you don't know if it was a
16  sanctioned hit or not, then you would err on the side
17  of caution and reject the publication?
18       A.  Personally, I would.  I can't speak for
19  Mr. Davis, who was the warden at the time or others;
20  but, again, when it comes down to the safety and
21  security of -- I've seen staff members stabbed, I've
22  seen many inmates murdered, died, assaults.
23          I personally am a little more
24  conservative, and I also look into this kind of stuff
25  maybe a little more deeper than some people might.

15 (Pages 57 to 60)

---

61

1  And I actually didn't -- missed that because I was
2  looking at page 20 and 21.  I'm, like, this means
3  nothing.  Why would we reject this?
4      Q.   Right.
5      A.   It's actually case law.
6      Q.   All right.
7      MR. KIEHL:  Maybe we'll look at one more,
8  and then take a break, if that sounds good.
9      MS. PROSE:  Whenever.
10     THE DEPONENT:  Sure.
11     MS. PROSE:  Whenever you'd like.
12     MR. KIEHL:  Are you okay?
13     THE DEPONENT:  Yeah, I'm fine.
14     Q.   (BY MR. KIEHL)  Let's go to No. 7.
15     (Deposition Exhibit 7 was marked.)
16     Q.   So we're marking as Exhibit 7 a document
17  starting with the Bates BOP000215.
18     A.   Okay.
19     MR. KIEHL:  And, Suzanne, just for your
20  reference, some of these have multiple copies of the
21  same rejection notice.
22     MS. PROSE:  Sure.
23     MR. KIEHL:  So I skipped some numbers so
24  I didn't have to print many, many pages of the same
25  thing.

---

62

1      MS. PROSE:  Thank you.
2      Q.   (BY MR. KIEHL)  Okay.  And so it appears
3  that this is a rejection notice concerning Prison
4  Legal News, issue November 2011 signed by Blake Davis,
5  or somebody acting for him.  Does that all sound
6  correct?
7      A.   Yes, it is someone acting for a warden,
8  Blake Davis.
9      Q.   Okay.  Does that guy work?  And then if
10  we turn to page BOP000243 at paragraph 1, it says this
11  "Publication contains an article regarding a BOP
12  inmate who cooperated in an investigation who claims
13  he was assaulted by a BOP employee on page 38.  Also
14  contains an article regarding a BOP inmate whose
15  charges were dropped due to mishandling of evidence on
16  page 47."
17      So do you mind again taking a look at
18  this?
19      A.   I do not mind.  Do you -- I don't know
20  which article.
21      Q.   It sounds like on page 38, it's this top
22  article --
23      A.   Okay.
24      Q.   -- referencing --
25      A.   And then the other article is this one on

---

63

1  the back.  Okay, yeah, BOP evidence -- yeah, okay.
2      (The deponent read the document.)
3      A.   I don't see any reason to reject this,
4  especially when they are referring to the inmate as
5  John Doe.  And then these inmates, the second story,
6  when it comes down to that, they were just upset that
7  the bureau mishandled evidence.  We would have no
8  reason to not let them have that.
9      Q.   Right.  Okay.  So it appears that there
10  is no reason that this -- that the articles you
11  reviewed in this issue would be detrimental to the
12  security, good order, or discipline of the
13  institution?
14      A.   With the present information I have,
15  without knowing any sort of back story, no, I do not
16  see any reason why.
17      Q.   Okay.  Great.  Thank you.
18      MR. KIEHL:  Maybe we'll take a brief
19  break.
20      (Recess taken, 9:58 a.m. to 10:02 a.m.)
21      Q.   (BY MR. KIEHL)  We're back on the record.
22  Mr. Chapman, would you like to clarify a point?
23      A.   Yes.  The point I would like to clarify
24  is that one of the attachments --
25      Q.   Which one are you looking for?

---

64

1      A.   The Program Statement 5266.11, I believe,
2  dated November 9, 2011, is, in fact, our current one.
3      Q.   Okay.
4      A.   So there has not been one released since
5  then.  I know -- I wasn't sure, but I made sure it is.
6      Q.   Okay.  Great.  And I think that was
7  Exhibit 2, maybe.
8      A.   Yes, sir, it is Exhibit 2.
9      Q.   Okay.  And while you have that, I just
10  wanted to ask another question about Exhibit 2,
11  Program Statement 5266.11.  And this is the current
12  program statement on incoming publications, which is
13  issued by the Federal Bureau of Prisons in Washington,
14  as we discussed.
15      Does this set forth the overall standards
16  by which a warden evaluates incoming publications to
17  determine if they can be distributed in the
18  institution?
19      A.   Yes, sir.  This is, like, a framework or
20  ground rules of --
21      Q.   Okay.
22      A.   -- this is typically what you should be
23  doing.
24      Q.   Okay.
25      A.   Yes.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

69

1  inmate, after seeing the notice to inmate and
2  publisher on the front of BOP000322.  This must be an
3  internal form that I'm not used to seeing.
4      Q.  Okay.  So this was apparently being used
5  at the time in 2013, but it's not something that --
6  this form does not look like something that's been
7  used since you've been at Florence?
8      A.  Not in that capacity, no, sir.
9      Q.  Right.  Okay.  Okay.  Thank you for that
10 clarification.
11     A.  You're welcome.
12     Q.  So the question is why do you believe
13 this issue was rejected?  And I'll give you a moment.
14         (The deponent read the document.)
15     A.  Okay.  I've read this one.
16     Q.  Okay.  Why do you believe this issue was
17 rejected?
18     A.  I have not a clue.
19     Q.  Okay.  And that's based on looking at
20 pages 8 and 9, which were the reference pages?
21     A.  Yes, I read the articles.
22     Q.  That are referenced on the rejection
23 notice?
24     A.  Yes.
25     Q.  Okay.  Now, the rejection notice at

71



70

1  BOP322 in the second paragraph says, "The publication
2  has been rejected because the referenced pages discuss
3  individuals incarcerated at Y.S. Penitentiary Florence
4  (ADX)."
5      Does that help you at all in trying to
6  understand why this was rejected?
7      A.  If that is their sole reason, I don't see
8  a reason to reject it.  Again, just because it
9  mentions inmates who were at the ADX at the time of
10 filing, it doesn't -- no one is snitching on anyone.
11 This doesn't look like a security threat to me.
12     Q.  Okay.  But the warden at the time signed
13 this rejection notice, and so he or she must have
14 determined that it posed a security threat to the
15 security, good order, or discipline of the
16 institution, correct?
17     A.  It would appear that, you know, whoever
18 gave him this notice either attached something that
19 was really juicy that we don't have or the wardens
20 themselves, based off just that alone, decided that
21 maybe that was a threat.  I don't see it.
22     Q.  Okay.  You don't see it.  And I want to
23 go back to something -- and sorry to make you
24 shuffle --
25     A.  Okay.  I've got them in order now,

72

1  have to read anymore of the article based just on
2  that.
3      Q.  Okay.  So do you believe that this issue
4  of Prison Legal News, even today, should not be
5  admitted at ADX?
6      A.  My personal opinion or speaking on the
7  agency's behalf?
8      Q.  Give me both.
9      MS. PROSE:  Well, just let me interpose
10 an objection.  You're not designated as a 30(b)(6)
11 witness, so you can answer the question based on your
12 opinion about the matter.  Unless you have other
13 information about the agency's position.
14     A.  Me personally, I would not like to see
15 this go in just because of the staff member and the
16 chance of extortion.  I mean, on a lot of cases when
17 it regards a staff member, it could be minor
18 extortion; but when your spouse is in prison for life,
19 that is the most serious of extortion threats,
20 because, you know, the mother of your child can be
21 murdered.  So me personally, I would not.
22     Now, if our agency decides or ADX decides
23 to, that's their position.
24     Q.  (BY MR. KIEHL)  Right.
25     A.  But me personally, I would not allow it

18 (Pages 69 to 72)

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

73



74

1  those previously rejected issues of Prison Legal News
2  could be provided to the inmate subscribers."
3      Do you believe that these two issues that
4  we just discussed should be provided to the
5  subscribers, as you state in your declaration?
6      A.  Well, here in my declaration, I put that
7  "the Warden has reviewed and determined."  I may have
8  a disagreement with the warden, but if the warden is
9  the ultimate approving official -- so if the warden
10  feels that these can be provided to the inmate, then
11  they are going to be provided to the inmate if the
12  warden believes that.  So my personal opinion, while
13  it may conflict at times with other people, I follow
14  the chain of command.  And that's why I put the
15  warden.  I didn't put that I decided, but that the
16  warden decided.
17      Q.  Okay.  Thank you.
18      A.  You're welcome.
19          (Deposition Exhibit 9 was marked.)
20      Q.  And Exhibit 9 is a document with Bates
21  stamp beginning BOP000347.
22      A.  Yes.
23      Q.  Okay.  And this appears to be a rejection
24  notice for Prison Legal News issue April 2013.  I'm
25  looking at page BOP000350.

75

1      A.  Okay.
2      Q.  Does that appear correct, Mr. Chapman,
3  that this is Prison Legal News, April 2013?
4      A.  Yes, it does.
5      Q.  Okay.  And who signed this rejection
6  notice?
7      A.  Again, this looks -- I'm not sure if
8  that's Warden Berkebile's signature or not, because it
9  is different than the other one I thought was his.  So
10  I'm not sure which one of the two is.  So someone
11  signed for the warden.  Whether it's him or not, I
12  don't know.
13      Q.  He has many signatures.  So either Warden
14  Berkebile or somebody acting for him signed this
15  rejection notice?
16      A.  It appears.  Yes, sir, it appears so.
17      Q.  And still looking at BOP350, it says in
18  the second paragraph that "The publication has been
19  rejected because the referenced page discusses
20  individuals incarcerated at U.S. Penitentiary Florence
21  (ADX)," and it references page 32.
22      A.  All right.  I'll read.
23      Q.  Would you -- yes, take a second and look
24  at 32, and let us know the reason why you believe this
25  issue was rejected.

76

1          (The deponent read the document.)
2      A.  Okay.  I've read that.
3      Q.  Okay.
4      A.  The only reason I can see is possibly due
5  to his terrorism charges that there may be someone at
6  the institution who may have been affected personally
7  and may want to take retribution.
8          Over the years, a lot of our inmates who
9  have had terrorism-related charges and went to
10  prisons, if other inmates were made available, did get
11  assaulted because of it.  But even that, I don't know
12  if that's why they rejected it.
13      Q.  So this article concerns an ADX inmate
14  serving life for his role in the 1998 bombing of the
15  U.S. Embassy in Nairobi, Kenya, and he's housed at
16  ADX.  And it concerns his communication and mail
17  privileges, would that be a correct way of saying --
18  capture -- what he can and cannot receive by mail and
19  who he can communicate with, that sort of thing?
20      A.  It is discussing special administrative
21  measures, and he's challenging those measures in
22  court.  That part of it, I see no problem with.
23          Even his charges, based on the time, if
24  we knew of a credible threat to him based on those, it
25  might have been a reason.  But if it were to come by

19 (Pages 73 to 76)

77

1   today and not anything else, I would most likely let
2   that one in.
3       Q.   So you said if you knew of a credible
4   threat to him.
5       A.   Yes.
6       Q.   Can you explain that?
7       A.   And what I can say is possibly one of the
8   inmates we have at the ADX, maybe one of his family
9   members worked there and was killed during that
10  explosion.  And so he might like to seek retribution,
11  knowing who this person is.
12          Again, while most court cases are public
13  information, the inmates have to know the person, they
14  have to know the case, they have to know what they
15  need to look for.
16          It's the time we hand them, Hey, here's
17  the case numbers, here's all of the names involved.
18  Have a good time.  So that would be the only reason I
19  can think of.  Chances are we don't have an inmate who
20  fits that bill.  So like I said, looking at it today,
21  if this were to come through, I would sign it.
22      Q.   You would permit this to be circulated in
23  the prison?
24      A.   Yes.
25      Q.   Yes?  Okay.  So you do not believe it was

78

1   properly rejected at the time?
2       A.   Without any supporting documentation, no.
3       Q.   All right.  Okay.
4          (Deposition Exhibit 10 was marked.)
5       Q.   We're marking as Exhibit 10 a document
6   beginning with Bates No. BOP000300.  And this appears
7   to be a rejection notice for Prison Legal News issue
8   November 2012.  Does that appear correct, Mr. Chapman?
9       A.   It does appear correct, yes.
10      Q.   Okay.  And can you tell who signed this
11  one?
12      A.   This is the third different signature
13  I've seen for Mr. Berkebile.
14      Q.   Set a record?
15      A.   So someone who is acting in this
16  capacity.
17      Q.   So this was signed by somebody acting for
18  the warden?
19      A.   I believe so.
20      Q.   And it looks like the signature is dated
21  December 10, 2012?
22      A.   Yes, sir.
23      Q.   Okay.  And if we go back to the first
24  page of the exhibit, Exhibit 10, at BOP300, it says at
25  paragraph 1 at page 42 of this issue of Prison Legal

79

1   News, it discusses ADX Inmate ███████.
2          And page 42, we have an article
3   headlined, "BOP Supermax Lawsuit Claims Horrific Abuse
4   of Mentally Ill at ADX."  And -- let's see.  It -- can
5   you take a look at this --
6       A.   Okay.
7       Q.   -- and let us know why you believe this
8   issue was rejected?
9       A.   Okay.  Will do.
10         (The deponent read the document.)
11      A.   Okay.
12      Q.   Why do you believe this issue was
13  properly rejected?
14      A.   If you look in the second column, there
15  it talks about Inmate █████.  It says there that he
16  witnessed a prisoner-on-prisoner killing, testified in
17  the case.
18         You can't be more of a bigger snitch than
19  testifying on another inmate, especially over a murder
20  like that.  So if this inmate there was at the ADX and
21  we were to tell everyone else, Hey, your neighbor is a
22  snitch, if you didn't know that, I just wanted to give
23  you a heads up, that is bad for us, bad for business.
24      Q.   Okay.  And that presents a safety and
25  security risk both to Inmate Powers and to the staff

80

1   at ADX?
2       A.   Yes, sir.  The rest of the article, I --
3   I don't see anything wrong with.  Just that one
4   sentence.
5       Q.   And if ████████ today remains an inmate
6   at any BOP facility, would you recommend this issue
7   containing this article be permitted to circulate
8   inside ADX?
9       A.   This one here is a little tougher because
10  it doesn't give the case number or the inmate he
11  snitched on.  While it is telling him he is a snitch,
12  it isn't giving the easier access to the other inmates
13  to look it up.
14         And if he's no longer at the ADX -- it
15  says -- it doesn't give case numbers, it doesn't give
16  any of the inmates he snitched on.  I would give him a
17  fighting chance for other inmates to have to find that
18  information.  But if we would have given a case number
19  or an inmate's name that he testified against, that
20  would have been bad.  But if he's no longer at the
21  ADX, then that would be the reason I might let that
22  one in.
23      Q.   And if he is at any other BOP facility,
24  would you allow this in?
25      A.   That would be tough.  I'd have to look up

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

81

1   his -- his -- I would have to see who he testified
2   against, because if he testified against a nobody,
3   it's less of a risk than if he testified against a
4   gang member or gang leader.
5         He will always have a risk because he's
6   labeled a snitch; but depending on who he snitched
7   against, it gives a level of risk. You know, I would
8   have to weigh -- I would have to do a lot of research
9   into this one to decide if I would let this one in
10  personally.
11        Q.  Okay. Thank you.
12        A.  You're welcome.
13        Q.  All right. Let's do one more. And I
14  appreciate your patience.
15        A.  Oh, no problem.
16             (Deposition Exhibit 11 was marked.)
17        Q.  So this is a document we're marking as
18  Exhibit 11. It begins with Bates No. BOP000386. And
19  this appears to be a rejection notice for Prison Legal
20  News issue July 2013. Does that appear correct,
21  Mr. Chapman?
22        A.  Yes, it does appear to be correct.
23        Q.  And who appears to have signed this
24  rejection notice?
25        A.  It appears to be someone acting in



21 (Pages 81 to 84)

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

101

1    might want to see, and we were to send it to the FBI,
2    they could make a decision on their behalf because of
3    it being a SAMs inmate that for whatever reason they
4    deem -- they don't have to tell us -- this inmate
5    doesn't get that.  Because inmates under a SAM, while
6    we house them, their security procedures are done by
7    the institution that placed them or requested it be
8    placed on them.
9        So while we may think this is harmless,
10   the FBI or DEA, or whatever agency is over that
11   particular inmate with a SAM, they may decide, This is
12   not coming in.  We don't have to tell you why for
13   national security.  So us, as the BOP at Florence
14   making that decision, I do not see that.  But is there
15   a fact -- could it happen?  Yes.
16       Q.  Okay.  So -- and paragraph 6 that you
17   were referring to falls under paragraph P, which
18   specifically regards inmates who are under a SAM --
19       A.  Yes.
20       Q.  -- correct?
21       A.  Yes, correct.  So it would be more
22   towards inmates just with SAMs.
23       Q.  Okay.  And so speaking more broadly, does
24   anything in this institution supplement prohibit ADX
25   from rejecting a publication for the sole reason that

102

1    it discusses a BOP inmate or staff member?
2        A.  I do not see that section written in here
3    anywhere.
4        Q.  Okay.  So as your declaration noted,
5    there were several versions of this institution
6    supplement in effect over the years; so we're just
7    going to go to the next one.
8        (Deposition Exhibit 14 was marked.)
9        Q.  So we are marking as Exhibit 14 a
10   document entitled on the first page Attachment 4 to
11   the Declaration of Todd Chapman.  And can you identify
12   this document for us?
13       A.  This document appears to be the incoming
14   publications -- or incoming Institution Supplement
15   dated March 1, 2011, for the ADX Florence center.
16       Q.  And who approved this institution
17   supplement?
18       A.  That actually appears to be the signature
19   of Mr. Blake Davis, the warden at the time.
20       Q.  The actual signature.
21       A.  Yes.
22       Q.  And this institution supplement, if we
23   look at paragraph 1, the Purpose and Scope, it appears
24   to be very similar to the previous institution
25   supplement in that it says that it is prepared to

103

1    outline the procedures at ADX for implementing Program
2    Statement 5266.10 and that it, "Must be read in
3    conjunction with the program statement for a clear
4    understanding of the policy."
5        And does that language seem similar to
6    you to the language that we saw on the previous
7    institution supplement just --
8        A.  Yes.
9        Q.  -- in paragraph 1, the purpose?
10       A.  Yes, it does.
11       Q.  Okay.  And the meaning of that language
12   that it must be read in conjunction with the program
13   statement for a clear understanding is the same
14   meaning as we discussed with the previous institution
15   supplement, correct?
16       A.  Yes, sir.  I believe so.
17       Q.  Okay.  And under paragraph 2, it says,
18   Summary of Changes, "To update format of supplement."
19       Now, I'm not going to ask you to compare
20   every line of this institution supplement to the prior
21   one, but does it appear that this institution
22   supplement also outlines the procedures to be used at
23   ADX for evaluating incoming publications?
24       A.  It appears to be the same.  Like I said,
25   it looks like it was a format change.  They changed

104

1    the font.
2        Q.  Right.
3        A.  They changed some things to Roman
4    numerals --
5        Q.  Right.
6        A.  -- and whatnot.  But it appears to be
7    very similar, if not the same.
8        Q.  Okay.  And were you involved in drafting
9    this institution supplement?
10       A.  I was not.
11       Q.  Okay.  And do you recall when you first
12   saw this institution supplement?
13       A.  The same time I saw the 2007, when I was
14   preparing for this and, you know, going through the
15   history.
16       Q.  Sure.  Okay.  And preparing your
17   declaration --
18       A.  Yes, sir.
19       Q.  -- for this case?  Okay.  Does anything
20   in this institution supplement prohibit ADX from
21   rejecting a publication for the sole reason that it
22   identifies a BOP inmate or staff member?
23       A.  So you're asking is there anything in
24   this supplement that says we're not allowed to reject
25   it based solely on the name?  Is that what you're

26 (Pages 101 to 104)

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

105

1  asking me?
2      Q.  Yes, that's my question.
3      A.  If it is written the same as No. --
4  Attachment 3, then nowhere on here does it say that
5  you cannot do it.
6      Q.  Do you want to take one second to look
7  through it to make sure?
8      A.  Sure.
9      Q.  I don't want -- I don't want you to have
10 to make guesses.
11          (The deponent read the document.)
12      A.  I do not see anywhere in the supplement
13 where it states you cannot reject just based on
14 someone's name at ADX.
15      Q.  Okay.  Thank you.  We're going to now go
16 to the next one.
17      A.  I figured.
18      Q.  And keeping in order.
19          (Deposition Exhibit 15 was marked.)
20      Q.  So I'm handing you Exhibit 15, which is a
21 document titled Attachment 5, Declaration of Todd
22 Chapman.  And can you identify this document?
23      A.  Yes.  This document appears to be the
24 institution supplement for ADX Florence entitled
25 Incoming Publications.  And it is signed by Mr. D.

106

1  Berkebile by warden at ADX.
2      Q.  Okay.  Were you involved in drafting this
3  document?
4      A.  No, sir, I was not.
5      Q.  Okay.  And it, again, appears that the
6  purpose and scope stated in paragraph 1 are highly
7  similar to the purpose and scope that we saw in the
8  previous institution supplements.  Does that appear to
9  be the case to you?
10      A.  I will read it again just so I don't make
11 any assumptions.
12      Q.  Sure.
13          (The deponent read the document.)
14      A.  Okay.  I have read this one.
15      Q.  Okay.
16      A.  I see minor changes that they referenced.
17 It looks like they narrowed down the SAM.  And it
18 looks like they took off reference in regards to the
19 camp.
20      Q.  Okay.  And this institution supplement
21 describes the procedures for ADX staff to follow in
22 evaluating incoming publications; is that correct?
23      A.  Yes.
24      Q.  Does anything in this institution
25 supplement prohibit ADX from rejecting a publication

107

1  for the sole reason that it identifies a BOP inmate or
2  staff member?
3      A.  I did not see that written anywhere in
4  here.
5      Q.  Okay.  We'll go to the next one.
6          (Deposition Exhibit 16 was marked.)
7      Q.  So we'll mark as Exhibit 16 a document
8  entitled Attachment 6 to the Declaration of Todd
9  Chapman.  And can you identify this document for us?
10      A.  This document appears to be an
11 institution supplement on incoming publications dated
12 December 8, 2014, electronically signed by Mr. J.
13 Oliver, Warden of ADX Florence.
14      Q.  And if we look at just paragraph 1, it
15 says the purpose and scope of "This institution
16 supplement is to outline the procedures at ADX for
17 implementing Program Statement 5266.10, Incoming
18 Publications.  This institution supplement must be
19 read in conjunction with the program statement for a
20 clear understanding of the policy."
21          Does that sound similar to the purpose
22 and scope language from the previous institution
23 supplements?
24      A.  Yes, it does.
25      Q.  And paragraph 2 is the summary of

108

1  changes.  And it says, "To update Warden's signature
2  block."
3          Did the warden change between the
4  previous institution supplement and this institution
5  supplement?
6      A.  Yes.  The previous institution supplement
7  was Mr. Berkebile, and this supplement was Mr. J.
8  Oliver.
9      Q.  And Mr. Oliver was, at this time, in
10 December 2014, the warden at ADX?
11      A.  Yes, he was.
12      Q.  Okay.  Does any language in this
13 institution supplement prohibit ADX from rejecting a
14 publication for the sole reason that it identifies a
15 BOP inmate or staff member?  And please take as much
16 time as you need to review the document.
17          (The deponent read the document.)
18      A.  I do not see anything in the document
19 that specifically says you cannot based on having an
20 inmate's name at ADX.
21      Q.  That you cannot reject on that basis?
22      A.  I do not see any specificity for that.
23      Q.  And if we can just turn to the next one.
24          (Deposition Exhibit 17 was marked.)
25      Q.  So we will mark as Exhibit 17 a document

27 (Pages 105 to 108)

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

109

1  titled Attachment 2 to the Declaration of Todd
2  Chapman. And can you identify this document for us?
3      A. This document appears to be an
4  institution supplement for ADX Florence entitled
5  Incoming Publications signed by Jack Fox, Warden.
6      Q. Is this the institution supplement that
7  is currently in effect?
8      A. Yes, it is.
9      Q. And if we look at paragraph 1, Purpose
10  and Scope, it says that "This institution supplement
11  is prepared to outline the procedures at ADX for
12  implementing Program Statement 5266.11, Incoming
13  Publications." And it "must be read in conjunction
14  with the program statement for a clear understanding
15  of the policy."
16         And that sounds like the language from
17  the previous institution supplements. Does that sound
18  right?
19      A. Yes, it does.
20      Q. Okay. And this institution supplement in
21  paragraph 2, Summary of Changes, says, "To incorporate
22  additional review procedures and training
23  requirements." Is that correct?
24      A. Yes, it does.
25      Q. Okay. And were you involved in the

110

1  drafting of this institution supplement?
2      A. I was not involved in the drafting, but I
3  was involved in the review process as being I was here
4  at this time. So as the person who is over the
5  institution supplements at the ADX, I did review this
6  prior to the warden's signature.
7      Q. Okay. Can you explain the process by
8  which this institution supplement was issued from --
9  from the beginning of your knowledge of how it worked?
10      A. I believe this one was a change was
11  recommended to it. So at that point, we issued the
12  packet that we would for anytime that someone was
13  going to update a supplement and send it off to the
14  department head over it, over who is responsible for
15  it, to go through the process.
16      Q. Okay. And so the process began at the
17  department level?
18      A. It may have started at another department
19  level as far as like, Hey, I think we should review
20  this or update; I think we should add language to it.
21         So whether it was the correctional
22  system's department who was over that or the one who
23  actually initiated saying, Hey, we should start, or
24  whether it was another department, I'm not 100 percent
25  sure.

111

1      Q. Okay. When did you first become aware
2  that there was a revision process underway for this
3  institution supplement?
4      A. I usually find out about supplements once
5  they have gone through that process and it's ready for
6  the warden's signature. And that's the point I
7  normally do it. May there have been an email in the
8  past? There could have been, but I don't recall if I
9  was involved in an email prior to that.
10      Q. So for this -- in this case for this
11  institution supplement, do you recall when you first
12  became aware of the process?
13      A. If it was signed on February 2, then
14  shortly before that. So maybe, like, January.
15      Q. Okay. And do you recall if you offered
16  input or any edits, any other kind of opinions on this
17  institution supplement?
18      A. I personally don't remember sending any
19  edits. I don't remember saying that there should be
20  any changes other than the ones that were already
21  submitted to it.
22      Q. Okay. Do you recall any of the internal
23  discussion regarding this institution supplement?
24         MS. PROSE: And I'll just put an
25  objection on the record. You can answer that question

112

1  to the extent it does not implicate attorney-client
2  privileged information. But you can answer his
3  question.
4      A. Generally when they do institution
5  supplements, I am not involved in any procedure. My
6  spot is to review it before the warden reviews it, and
7  that's at my point. As far as internal negotiations
8  go with supplements, I'm usually not involved in that.
9      Q. (BY MR. KIEHL) Okay. Did you review
10  this one before the warden -- before it went to the
11  warden?
12      A. I did review this before it went to the
13  warden.
14      Q. Okay. Did you make a recommendation to
15  the warden as to whether he should approve it or take
16  any other action?
17      A. By me signing it, which I did, I
18  recommended to the warden my approval.
19      Q. Okay. And if we look at this institution
20  supplement, it outlines, as it says, additional review
21  procedures for incoming publications. And if we look
22  at paragraphs B and C on page -- numbered page 2, I
23  believe it has some of these review procedures.
24         For instance, paragraph B says that "A
25  Correctional Systems Officer will review all incoming

28 (Pages 109 to 112)

TODD CHAPMAN - 1/17/2017
Prison Legal News v. Federal Bureau of Prisons

113

1  publications for potentially objectionable content in
2  accordance with 28 C.F.R. 540.70.  If the content is
3  preliminarily deemed objectionable by the Correctional
4  Systems Officer, the publication is forwarded to the
5  SIS department for additional review in accordance
6  with 28 C.F.R. 540.70."
7       What does that mean "for review in
8  accordance with 28 C.F.R. 540.70"?
9       A.  Well, if you go back to our programs, it
10  says that it needs to have a level of review.  I don't
11  believe it gives a specific level, like this person
12  and this person have to review it, kind of thing.  But
13  what we're relating in here is that instead of just
14  putting it on the line staff, the frontline staff who
15  is looking at the mail immediately, to make them,
16  like, Hey, this is rejection -- or rejectible, we're
17  adding more layers to it.  So, okay, you believe it's
18  rejectible.  Let's send it to this department and let
19  them review it.  So that's what we're looking at there
20  is we're adding another layer of review to it to
21  streamline our process and make it a better product.
22       Q.  And so that is a change to the review
23  procedure?
24       A.  Yes, it is.
25       Q.  And the reference to 28 C.F.R. 540.70 in

114

1  paragraph B, that is where you can find the standards
2  governing the evaluation of incoming publications?
3       A.  It should be.  Generally, I read and most
4  of our staff read program statements and institution
5  supplements.  We usually don't have the time to
6  research every C.F.R. that every one was based off of.
7  So I -- assuming that that is where that would be
8  found at, and that's why we're quoting it in our
9  supplement.
10       Q.  Okay.  And that C.F.R. governs this
11  supplement; is that a correct way of saying it?
12       A.  I believe so.  That it's over the
13  procedure of either inmate compurgations,
14  complications or inmate mail or --
15       Q.  Okay.  Is there any language in this
16  institution supplement that says the ADX may not
17  reject a publication for the sole reason that it
18  identifies a BOP inmate or staff member?
19       A.  Do you mind if I read through it again?
20       Q.  Please do.
21       A.  Thank you.
22       (The deponent read the document.)
23       A.  Okay.  In reading this, we've added some
24  layers of security, such as with the SIS in No. B.
25  And we've added the legal review in letter Q.

115

1       On those, it does not specify that we
2  cannot reject inmates based solely on it.  But I do
3  know that the training associated with Q, we cover
4  that as one of the bases that we would not reject
5  something based strictly on an inmate's name or the
6  mention of the word ADX.
7       Q.  Okay.  So there is no language in this
8  institution supplement that prohibits ADX from
9  rejecting a publication for the sole reason that it
10  identifies or discusses a BOP inmate or staff member?
11       A.  That's why I tried to reference that.  B
12  tells us we'll have more layers.  Q references we'll
13  have more layers in the training that Q references
14  that is part of the training that's provided.
15       Does it specifically say on there, No. B,
16  at no time will this ever happen?  No.  But in the
17  training that was provided by our legal department to
18  people in the review process, that is covered in that.
19       Q.  Okay.  Paragraph Q that you're referring
20  to says, "The Legal Services Department will conduct
21  quarterly training with the Correctional Systems
22  Department and Special Investigative Services
23  Department staff regarding the procedures outlined in
24  Program Statement 5266.11 in this supplement,"
25  correct?

116

1       A.  Yes, it does say that.
2       Q.  That's the legal training you're
3  referring to?
4       A.  Yes, sir.
5       Q.  Okay.  But I just want to make sure I get
6  an answer.  Does any language in this supplement
7  prohibit ADX from rejecting a publication for the sole
8  reason that it discusses or identifies a BOP inmate or
9  staff member?
10       A.  I do not see that written in here.
11       Q.  Okay.  Thank you.  And I think we'd like
12  to talk a little bit about the training that you
13  referenced, but it might be a good -- a good point to
14  take a break.  And then we'll discuss the training.
15       (Recess taken, 11:41 a.m. to 12:02 p.m.)
16       Q.  (BY MR. KIEHL)  Mr. Chapman, we're back
17  on the record.  I just wanted to quickly look again at
18  the last exhibit we were looking at, which was the
19  institution supplement dated February 2, 2016, which
20  you have there.
21       A.  Exhibit 17?
22       Q.  Exhibit 17.  Thank you.  And as you said,
23  this is the institution supplement that is currently
24  in effect at ADX, correct?
25       A.  Yes.

29 (Pages 113 to 116)

121

1      (Deposition Exhibit 18 was marked.)
2      **Q.  So we are marking as Exhibit 18 a**
3  **document entitled ADX Florence Incoming Publications**
4  **Rejection Procedures.  And this bears Bates No.**
5  **BOP000731, and it is dated February 24, 2016.  Can you**
6  **identify what this document is for us?**
7      A.  This document here appears to be the
8  rough outline for training that is given to the CSM,
9  Correctional Systems Management, and the SIS, Special
10 Investigative Services staff, from the legal
11 department.  So it looks to be like an outline to
12 No. 1, expand on that, No. 2, expand on that.
13     **Q.  Okay.  And is this the first quarterly**
14 **training that was done under the new institution**
15 **supplement?**
16     A.  I honestly couldn't answer that correctly
17 -- or, I mean, 100 percent certainty.  I believe based
18 on the date of our program statement and then the date
19 of this being in the same month, I would believe it
20 is, since it would be the first month, first quarter.
21     **Q.  Okay.**
22     A.  I would believe so.
23     MS. PROSE:  Counsel, could I just
24 interject something for the record?  We did produce
25 the full training packet from February, I believe.

122

1      MR. KIEHL:  Okay.  I --
2      MS. PROSE:  Do you have that?
3      MR. KIEHL:  I don't think I do.
4      MS. PROSE:  You could not locate it?
5      MR. KIEHL:  Yeah.  I can check my laptop,
6  because I brought the productions with me; but I did
7  not see that.
8      MS. PROSE:  All right.  Yes, I believe
9  there's a packet that has the signature sheet for
10 everyone who participated.
11     MR. KIEHL:  I have that.
12     MS. PROSE:  Okay.  All right.  So you do
13 have that.  This is -- this is one page probably of
14 that.  Just so you know.
15     MR. KIEHL:  Right.
16     MS. PROSE:  Okay?  All right.  We are --
17 I just wanted to be sure we were clear on the record
18 about that.  Thank you.
19     **Q.  (BY MR. KIEHL)  Okay.  Well, sure, let's**
20 **look at -- so let's mark as Exhibit 19 --**
21     (Deposition Exhibit 19 was marked.)
22     **Q.  -- what appears to be a sign-in sheet.**
23 **Can you identify Exhibit 19?**
24     A.  Yes.  Exhibit 19 seems to be the sign-in
25 sheet for Exhibit 18.

123

1      **Q.  Okay.  So returning to Exhibit 18, what**
2  **you described as the outline for the training for the**
3  **CSM staff, this discusses the procedures for the**
4  **review of incoming publications; is that correct?**
5      A.  Yes.  In conjunction with the new
6  institution supplement with the additional training
7  and layers of security that we've added -- or level of
8  review, we implemented this training that legal
9  conducts with SIS and with our correctional system
10 staff to ensure that everyone is on the same sheet of
11 music and that we are ensuring better product from our
12 institution.
13     **Q.  Did you draft this outline that we're**
14 **looking at, Exhibit 18?**
15     A.  I did not.
16     **Q.  Did you have input in the drafting of it**
17 **or review it in any way?**
18     A.  I did not.  This was put together, I
19 believe, by the legal department who conducts the
20 training.  And since I'm not in the review practices
21 process, I was not in the negotiations or not in the
22 planning stage for their additional training.
23     **Q.  Okay.  So just to take a moment to look**
24 **at Exhibit 18, again, which is BOP000731 Bates number,**
25 **is there any language in this outline that prohibits**

124

1  **ADX from rejecting a publication for the sole reason**
2  **that it discusses or identifies a BOP inmate or staff**
3  **member?**
4      A.  This is an outline to be expanded upon --
5  it -- as part of some of the training that the legal
6  would give to them.  Because it ties back to
7  Exhibit 17, for example, B, which ties into an earlier
8  exhibit which goes into -- if something rings a bell
9  or raises a red flag in regards to the security, good
10 order, or running of the institution, then something
11 may run a red flag to come through.
12     So this basically focuses on, okay,
13 something brought a red flag to your attention.  It
14 could be just the name of an inmate or it could be
15 just the mere mention of the ADX.  That brings up the
16 bell, but that is not why we reject it.
17     So when we come back to our training, it
18 comes back and goes -- expands on that.  Okay, that
19 brought a red flag to your attention.  Now you brought
20 it to us.  We look at it and say, like, Is that all it
21 has in it?  Then no.  We're going to -- we don't get
22 specific about that because most of our stuff -- our
23 policies and institution supplements are more
24 guidelines.  They don't have exact verbiage.
25 Sometimes they do, but usually they don't have exact

125

1  verbiage of, You will X-ray this for three seconds on
2  high and then this person wearing gloves.  It says,
3  You will X-ray.  And then after that, you receive
4  additional training on how to X-ray and what's
5  expected and what to look for.
6          It is the same with this outline as it is
7  outlined in here.  So to answer your question
8  specifically, no, nowhere on here does it say, you
9  know, you cannot reject something based solely on an
10  inmate's name.
11      Q.  Okay.  And did you attend this training?
12      A.  I did not attend this training.
13      Q.  Okay.  All right.  Let's move on to the
14  next training.
15      A.  Okay.
16          MS. PROSE:  Counsel, would you mind if we
17  went off the record?
18          MR. KIEHL:  Sure.
19          (Discussion off the record.)
20          (Deposition Exhibit 20 was marked.)
21      Q.  (BY MR. KIEHL)  So we're marking as
22  Exhibit 20 a document that begins with Bates No.
23  BOP0007333 and goes through 000741.
24          Now, Mr. Chapman, I believe we handed you
25  previously an exhibit that had the outline for the

126

1  February 24 training that began with BOP000731.
2      A.  Yes.
3      Q.  Okay.  And the back page of that is
4  BOP732, correct?
5      A.  Yes.
6      Q.  Okay.  So the exhibit I just handed you,
7  Exhibit 20, picks up right after that at BOP000733,
8  correct?
9      A.  Yes.
10      Q.  And this document, as we received it, had
11  highlighting on it, as you see in this exhibit.  Can
12  you explain to us what this document is?
13      A.  What this is is this is a portion of our
14  program statement, the -- for incoming publications.
15  So the 5266.11, this is just a cutout of that program
16  statement.
17          So what it is is when legal is giving
18  this training to them, they are highlighting why and
19  only why we should be rejecting things.  And then they
20  are expanding on that.  So that's where the training
21  comes in that an inmate's name alone is not a good
22  reason to do it -- is not a good reason to reject.
23          So when they highlight these trainings
24  saying while there may be a red flag that brings
25  something to your attention, it shouldn't be and will

127

1  not be the way things are rejected.
2          And since we've instituted this, our
3  rejections overall have gone down tenfold over with
4  the new training.  So instead of putting the burden on
5  a correctional service or a correctional system staff
6  to look for this stuff, they can come in and say, Hey,
7  what do you think?
8          And then SIS will give their opinion, and
9  then it will go up to our legal department, and then
10  finally up to the warden if it's made it up to that
11  point.  So by adding those extra layers and by
12  describing what this means and expanding on each one
13  of these, instead of going word for word, we are able
14  to, again, reduce the amount of rejections by
15  clarifying what we should and we should not be
16  rejecting, for what basis and why.
17      Q.  So --
18      A.  So that's why this is highlighted so they
19  are focusing on it.
20      Q.  So this Exhibit 20 that we're looking at
21  was part -- was used as part of the training for the
22  new institution supplement?
23      A.  Yes.
24      Q.  Okay.  And this includes excerpts of
25  Program Statement 5266.11, and it also includes a copy

128

1  of the current Institution Supplement 5266.11(c),
2  correct, which also has highlighting on it?
3      A.  Yes.
4      Q.  Okay.  And it also includes the outline
5  of the presentation that we were looking at, and it
6  also includes what appears to be a draft memorandum
7  for the rejection of a publication, correct?
8      A.  It has multiple different rejections,
9  different types.
10      Q.  Right.
11      A.  So -- okay.
12      Q.  Okay.
13      A.  So, yes, it includes all of the things
14  you mentioned.
15      Q.  Okay.  Thank you.  Is there any language
16  in this training packet that says ADX will not reject
17  a publication for the sole reason that it identifies
18  or discusses the BOP inmate or staff member?
19      A.  The reason this is highlighted is to
20  cover that.  But, no, there's no specific written,
21  because it is something that is expanded upon.  I've
22  been told by legal that what you're asking about is
23  covered during the training.
24      Q.  Okay.  Did you attend the training?
25      A.  I have not attended the training.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

TODD CHAPMAN - 1/17/2017
**Prison Legal News v. Federal Bureau of Prisons**

---

129

Q.  Okay.  And the second page of this training packet where there's highlighting, which is the excerpt from Program Statement 5266.11, at the top of the page Bates No. BOP000734, it lists seven reasons or criteria for which a publication may be rejected, correct?

A.  Yes, it does.

Q.  And it also says, "Publications which may be rejected by a warden include, but are not limited to, publications which meet these criteria," correct?

A.  Yes.

Q.  So this is not an exclusive list, correct?

A.  Our program statements are designed to be outlines and guidelines to be -- and you can specify it more at each institution by each department down to each person.  So -- I lost my train of thought.  Can you rephrase the question again?  I'm sorry.

Q.  Is this an exclusive list of criteria by which a publication may be rejected?

A.  It is an exclusive outline to go off of.

Q.  Well, what does it mean, then, where it says that, "Publications which may be rejected by a warden include, but are not limited to, these criteria"?

---

130

A.  That's that phrase right there, "but are not limited to."  So in the course of our daily duties or the course of working in a correctional environment or in the course of working through the mail room where you receive various different items, you may come across something that in your mind says, Hey, while it doesn't meet this criteria word for word, I think it might be something because of this.  Maybe I was an HVAC foreman, and I know if you take this and that and you put it together, it makes a bomb.  Even though it doesn't reference that in the material, I might want to bring that to someone's attention.

So what it does is it gives the warden saying that if you were to reject something off here, it may be rejected by policy if it meets the specific security, good orderliness of the institution.

Q.  So even if a publication does not fall into one of these seven categories, if it's still determined to be detrimental to the security, good order, and discipline of the institution, it may be rejected by the warden, correct?

A.  Let me give you an example.  If you got a publication and all it was, kill the cops, kill the cops, kill the cops, while on here, it doesn't say, kill the cops, it might fall back into that catch-all

---

131

at the top where, Hey, this is not something we want to be hyping or pushing to these inmates to inflame them.

So while it isn't specifically set to No. 1 or No. 7, like I said, these are guidelines that are the most common, general things that we get in the institution.

So these are a basic thing for the average person who has never done this before to look at and be like, Okay, it doesn't meet that or we can expand on.  Or, like I said, nothing is all-encompassing.  We find new stuff where inmates hide contraband, create new contraband on a daily basis across our agency.  And then people are constantly coming up with creative ways to mail in drugs and other codes and stuff like that.

So if we held our stuff or hamstrung the warden to just word for word if it doesn't meet this exactly, we would be doing ourselves a disservice, and then we would be coming right back now to it is not a safe prison now for the inmates or staff.

Q.  Okay.  So to go back to my question, if a publication does not fall into one of the seven categories on this list, it could still be determined detrimental to the security, good order, and

---

132

discipline of the institution and rejected for that reason by the warden, correct?

A.  Yes.

Q.  Okay.

A.  I believe after going through those layers, the warden could still reject this.

Q.  And that's in part because there's this catch-all language, to use your words, at the top here that says not limited to these criteria, correct?

A.  Yes.

Q.  Okay.  Let's move on to the next training.  We'll mark as Exhibit 21.

(Deposition Exhibit 21 was marked.)

Q.  I'm showing you what's been marked as Exhibit 21, which begins with Bates No. BOP000751 and continues through BOP000753.  Can you identify this document?

A.  This document appears to be the ADX Florence Incoming Publications Quarterly Training dated July 19, 2016.

Q.  Okay.  And this appears to be the outline for that training?

A.  Yes.

Q.  Okay.  And did you draft this document?

A.  No, sir, I did not.

---

33 (Pages 129 to 132)

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

133

1  Q.  Okay.  Did you provide any input or edits
2  to this document?
3  A.  No, sir, I did not.
4  Q.  Okay.  And turning the page, it appears
5  that BOP000753 is the sign-in sheet from that
6  training?
7  A.  Yes, sir, it does appear that it is.
8  Q.  Okay.  Did you attend this training?
9  A.  No, sir, I did not attend this training.
10  Q.  Okay.  Is there any language in this
11  document that states that ADX will not reject a
12  publication for the sole reason that it identifies or
13  discusses a BOP inmate or staff member?
14  A.  This is the same outline as the last one
15  minus the little last bottom section under the
16  miscellaneous where it looks like they are adding
17  stuff.  Where, no, it's still covered as part of
18  expanding on the outline.  But, no, nowhere does it
19  say those exact words.
20  Q.  Let's move to the next training.
21  (Deposition Exhibit 22 was marked.)
22  Q.  So we're showing you Exhibit 22, which
23  begins with Bates No. BOP000769 and continues through
24  000771.  Can you identify this document?
25  A.  Yes.  This document appears to be the ADX

134

1  Florence Incoming Publications Quarterly Training
2  dated September 8, 2016.
3  Q.  Okay.  And the next page at 771, is that
4  the sign-in sheet for this quarterly training?
5  A.  Yes, sir, it appears to be the sign-in
6  sheet for that particular training.
7  Q.  Okay.  And who are the people listed
8  here, generally speaking?  What are their positions?
9  A.  Their titles are listed on the third
10  column, so the first one would be an attorney, SIS.
11  So Special Investigative Services, SIS, SIS, SIS, SIS,
12  attorney, and then attorney.
13  Q.  Okay.  And the people whose title says
14  SIS, are those people who would be involved in
15  evaluating incoming publications?
16  A.  Yes, they would.
17  Q.  Are they in the correctional systems
18  department?
19  A.  No, sir, they are not.  They are the next
20  level of review after the correctional systems
21  department.  So if the correctional systems feels
22  there's something that needs to be flagged, these are
23  the next people, once it's been flagged, who will
24  review it.
25  Q.  Do you know why there are not any names

135

1  listed here in the correctional systems department?
2  A.  Offhand, I do not.  It could be a variety
3  of things, but I don't have specific reasons in front
4  of me right now.
5  Q.  But folks in the correctional systems
6  department are sort of the front line of reviewing
7  incoming publications?
8  A.  The correctional systems folks are the
9  first ones who decide whether something should be
10  flagged and sent up through the next level, next
11  level, and next level of review.
12  So, yes, they are the front lines with
13  the SIS being the next layer and the attorneys on here
14  being the next layer after that.
15  Q.  Should the employees in the correctional
16  systems department who review incoming publications
17  also receive training on the new institution
18  supplement?
19  A.  All of the staff should be receiving
20  training.  This training appears to be the exact same
21  one as Exhibit 21, which was dated July 19, which had
22  a variety of correctional system staff.  And I don't
23  see any new information added on this one.
24  Should they receive it as a whole?  Yes.
25  But if they don't receive the training, it's kind of

136

1  -- could hurt us where they are not flagging anything,
2  and we may be letting in things that we shouldn't be.
3  But I believe this has a different case.  It could be
4  people on leave, training.  It's a small department
5  over at the ADX.
6  Q.  Okay.
7  A.  But they just received it in July, and I
8  assume they received it again.
9  Q.  And if we turn to the first page of
10  Exhibit 22 at BOP000769, is there any language on this
11  page or in this document that states that ADX will not
12  reject a publication for the sole reason that it
13  discusses or identifies at a BOP inmate or staff
14  member?
15  A.  No, it does not.
16  Q.  Okay.  So I think we have one more
17  training.
18  (Deposition Exhibit 23 was marked.)
19  Q.  Just to go back to Exhibit 22 briefly, I
20  can't remember if I asked, did you draft that
21  document?
22  A.  You asked me; but, no, I did not.
23  Q.  And you did not provide any edits to that
24  document?
25  A.  No, sir, I did not.

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

141

1    order, or discipline of the institution, correct?
2         A.   Yes.
3         Q.   Okay.  Thank you.  Let's look at one
4    more.
5              (Deposition Exhibit 25 was marked.)
6         Q.   So we are marking as Exhibit 25 a
7    document bearing Bates No. BOP000816 through
8    BOP000822.  Can you identify this document for us?
9         A.   This appears to be a rejected
10   publication, I guess, from the San Gabriel Valley
11   Tribune from the Wednesday June 5, 2016, edition,
12   signed for by an acting warden on July 7, 2016.
13        Q.   Okay.  And this notice also states that
14   the publication was rejected in accordance with the
15   program statement because it was determined
16   detrimental to the security, good order, or discipline
17   of the institution, correct?
18        A.   Yes.
19        Q.   Okay.  And then it further says that the
20   publication was rejected because it published an
21   article which, by its nature or content, poses a
22   threat to the security, good order, or discipline of
23   the institution or facilitates criminal activity.
24             Do you -- can you explain why this
25   publication was rejected?



143

142

144

36 (Pages 141 to 144)

**TODD CHAPMAN - 1/17/2017**
**Prison Legal News v. Federal Bureau of Prisons**

145



147

1  Q.  Have you received any institution
2  supplements or program statements or policy documents
3  that state what you stated in the first sentence of
4  paragraph 25?
5  MS. PROSE:  Could you read me that
6  question back?
7  (The last question was read back as
8  follows:  "Have you received any institution
9  supplements or program statements or policy documents
10 that state what you stated in the first sentence of
11 paragraph 25?")
12 A.  I have only received verbal confirmation
13 from legal department that that is being taught.  I
14 have not seen it written on a document.
15 Q.  (BY MR. KIEHL)  Okay.  And then I want to
16 ask you about the second sentence of paragraph 25.
17 You state, "Under the procedures adopted since the
18 implementation of the February 2, 2016, institution
19 supplement, an incoming publication that only
20 discusses an ADX or Bureau inmate, or Bureau staff
21 member, is not rejected solely on that basis."
22 In this sentence when you refer to the procedures
23 adopted since the implementation of the new
24 institution supplement, are those the procedures that
25 we discussed that are part of the institution

146

1  that something deserves a rejection, if the FBI or
2  whatever agency that's over that inmate says, Hey,
3  we're going to reject something because of something
4  none of us know because of their law enforcement
5  privilege, we have no say in that matter.
6  Q.  (BY MR. KIEHL)  And let's finally return
7  to Exhibit 1, which was your declaration.
8  A.  Okay.
9  Q.  If you could turn to page 9, paragraph
10 25.  Okay?  Paragraph 25 of Exhibit 1, your
11 declaration, states, "The ADX will not utilize the
12 fact that a publication discusses an ADX inmate" --
13 I'm sorry -- "discusses an ADX or Bureau inmate or
14 Bureau staff member, standing alone, as the basis for
15 the Warden to find that the incoming publication is
16 'detrimental to the security, good order, or
17 discipline of the institution or might facilitate
18 criminal activity.'"
19 What is the source of your knowledge for
20 this statement?
21 A.  In preparing this, talking with legal,
22 it's talking about the training that they are giving
23 to the staff as far as this alone will not be a
24 reason, this will not be a reason.  So by talking with
25 legal, that's what they are covering in the training.

148

1  supplement and that were part of the training
2  documents that we reviewed?
3  A.  Yes.  They are the institution
4  supplements, the additional layers of review and
5  security, and the additional training that legal gives
6  to the different departments involved in the process.
7  Yes, that's what I'm referring to.
8  Q.  Okay.  And then turning to the next page
9  of your declaration, page 10, at paragraph 26, which
10 is the carryover paragraph, the last sentence of the
11 paragraph states that, "The Warden relies upon his
12 correctional experience, using sound correctional
13 judgment, in making this individualized assessment."
14 And this refers to the warden making an
15 individualized assessment of each publication to
16 determine whether it should be accepted or rejected at
17 the institution, correct?
18 A.  Yes.  It's referring to him having the
19 final review authority.  And while we'll give him the
20 educated advice and recommendations, at the end of the
21 day, the warden is the one who decides to approve or
22 deny.
23 Q.  And what do you mean when you reference
24 the warden's correctional experience and sound
25 correctional judgment?

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**