**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

    Plaintiff,
v.

FEDERAL BUREAU OF PRISONS,

    Defendant.

---

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS [DOC. 31]**

---

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|---|
| I. | Unrefuted evidence proves that PLN's "censorship" claim is moot (Claim 1) | | | 1 |
| | A. | The BOP's evidence shows that it has willingly remedied the old practice | | 2 |
| | | 1. | The BOP adopted a formal written policy that imposes extra review requirements before any publication can be rejected at the ADX | 2 |
| | | 2. | The BOP conducts mandatory quarterly training to ensure that ADX personnel understand the new procedures and will recommend rejection only when a publication could harm ADX security, good order, and discipline | 3 |
| | | 3. | The BOP's implementation of the February 2016 Policy has been thorough and effective, resulting in a significant drop in the number of rejected publications at the ADX | 4 |
| | | 4. | It has been almost three years since the ADX rejected an issue of PLN's magazine, and the BOP has agreed to provide previously rejected issues to subscribers who remain at the ADX | 4 |
| | | 5. | The BOP is committed to the new procedures | 4 |
| | B. | The BOP's evidence shows that PLN's claim is constitutionally moot | | 5 |
| | | 1. | There is no relief left for the Court to award | 5 |
| | | 2. | The evidence confirms that voluntary cessation does not apply | 8 |
| | C. | The BOP's evidence shows that PLN's claim is prudentially moot | | 10 |
| | D. | The redaction allegations do not state a claim, even if Claim 1 were not moot | | 11 |
| II. | The well-pleaded facts do not state a plausible due process claim (Claim 2) | | | 12 |
| | A. | The well-pleaded facts permit no inference of inadequate notice or lack of opportunity to be heard | | 12 |
| | B. | PLN has failed to produce counter-evidence to show the existence of an alleged practice at the ADX | | 14 |

PLN claims to want the BOP to refrain from rejecting its publication at the ADX unless the content is detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity. The undisputed evidence shows that is exactly what PLN got. The ADX adopted a policy which ensures that this standard is applied to every incoming publication.

The evidence also shows that the ADX publication-review policy has eliminated all vestiges of the past rejection practice that prompted this lawsuit. Publications are no longer rejected solely because they mention the names of BOP inmates or BOP staff. And the undisputed evidence confirms that these procedures work. Between February 2 and December 31, 2016, the ADX rejected only **19** publications for content, out of some 18,000 sent to the prison. PLN's "censorship" claim is moot.

The facts the Court can consider on a motion to dismiss do not permit the Court to infer that PLN lacked notice or an opportunity to be heard when its publication was rejected in the past. The Court should dismiss the procedural-due-process claim.

## I.     Unrefuted evidence proves that PLN's "censorship" claim is moot (Claim 1).

In the past, the ADX sometimes rejected incoming publications for inmates because those publications mentioned the names of BOP inmates or personnel. Chapman Decl., Doc. 31-1 ¶ 23; *see also* Fox. Decl., Ex. 1 ¶ 3.[1] That happened with certain issues of PLN's magazine, which triggered

---

[1] PLN incorrectly suggests that the sworn statements of ADX Executive Assistant Todd Chapman are not trustworthy because he is not "in charge of censorship" at the ADX. Doc. 55 at 1, 7. As Executive Assistant, Mr. Chapman is in charge of all Institution Supplements at the ADX and has knowledge about each of them. Chapman Depo. Excerpt, Ex. 2; Doc. 31-1 ¶¶ 2-3 (Chapman is "familiar with the procedures for processing incoming publications at ADX Florence," including the February 2016 Policy); *see also Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1123 (2005) (supervisor who reviewed company data had sufficient personal knowledge to report that data in a declaration).
    Nevertheless, to leave no doubt that Mr. Chapman spoke truthfully about ADX practices, the BOP submits a declaration from Warden Jack Fox, who confirms and adopts Mr. Chapman's statements. Ex. 1 ¶ 3. The Warden provides updated information. PLN obtained discovery on these matters and had an opportunity to depose Warden Fox, but decided not to take his deposition.

this lawsuit. Doc. 1 ¶ 25. PLN forced the BOP to take a critical look at this practice, and that evaluation resulted in a significant decision: the BOP eliminated the old practice of rejecting publications at the ADX based on the mere mention of BOP inmates or staff. Doc. 31-1 ¶¶ 25-27, 29; Ex. 1 ¶¶ 17-21 . PLN "no longer suffers an actual injury that can be redressed by a favorable judicial decision." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015).

        **A.**        **The BOP's evidence shows that it has willingly remedied the old practice.**

        **1.**        **The BOP adopted a formal written policy that imposes extra review requirements before any publication can be rejected at the ADX.** The BOP has committed to the change by adopting a formal written policy that requires extra work for ADX personnel across multiple departments, who must carefully scrutinize incoming publications and identify, in writing, specific grounds for any rejection. Doc. 31-3, FLM 5266.11C, *Incoming Publications* ("February 2016 Policy"). While the Warden makes the final decision to reject a publication, 28 C.F.R. §540.71(b), many other ADX staff weigh in, exercising their correctional and legal judgment.

        First, the ADX Correctional Systems Management ("CSM") staff, who handle incoming inmate mail, identify material that might be subject to rejection. Doc. 31-1 ¶ 17. Those publications are sent to the ADX Special Investigative Services ("SIS") Department for further review. *Id.* SIS staff are security professionals who know the ADX inmate population and understand its unique risks. *Id.* The SIS Department examines each publication for content that is "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Id.* ¶ 18; *see also* 28 C.F.R. §§ 540.71(b) & (b)(1)-(7) (listing 7 non-dispositive guidelines). If SIS officials believe that the publication should be rejected, they draft a rejection memorandum for the Warden's review. Doc. 31-1 ¶ 18. That memorandum must specify—by "page number, applicable quotes, and details," and § 540.71(b) criteria, if applicable—how the publication is detrimental to ADX security, good order, and discipline. Ex. 1 Att. 2, 17-18.

2

The SIS memorandum must be reviewed by an attorney in the ADX Legal Services Department. Doc. 31-1 ¶ 19. If the reviewing attorney does not agree that the publication would facilitate criminal activity or be detrimental to ADX security, good order, or discipline, the publication is not rejected and is given to the inmate. *Id.* No proposed rejection goes to the Warden for review without approval from both an ADX attorney and an SIS investigator. *Id.*

The old publication-review procedures were less exacting. *Id.* ¶¶ 12-15. A publication typically was reviewed only by the mailroom staff and supervisor before it was sent to the Warden for possible rejection. *Id.* ¶ 14. Under the old procedures, since eradicated by the February 2016 Policy, a publication could be rejected without ever being seen by an ADX attorney or SIS investigator. *Id.*

**2.    The BOP conducts mandatory quarterly training to ensure that ADX personnel understand the new procedures and will recommend rejection only when a publication could harm ADX security, good order, and discipline.** The February 2016 Policy is not just a paper change. The BOP has taken steps to ensure that ADX employees understand the procedures and know what they are required to do. ADX attorneys conduct training on the February 2016 Policy four times a year, which personnel involved in the publication-review process attend. Doc. 31-1 ¶ 20; Ex. 1 ¶¶ 12-15 & Att. 2 (training materials). The ADX attorney-trainer gives a detailed explanation of the publication-review process under the February 2016 Policy. Ex. 1 ¶ 15 & Att. 2, p. 1 (training outline). The attorney-trainer emphasizes the mandatory legal review of all proposed rejections, but ADX staff are encouraged to seek legal input at any point in the process. *Id.* Att. 2, p. 1 ("at any time, an attorney from the Legal Services Department may be consulted").

ADX personnel are specifically instructed that the old practice of rejecting a publication based *solely* on the name of an inmate or staff member has been abolished. Ex. 1 ¶ 15. They are taught that they must be able to identify an additional security concern, above and beyond a name

3

alone, in order to recommend rejection. *Id.* The attorney-trainers provide a statistical comparison showing the decline in content-based rejections under the February 2016 Policy. *Id.*, Att. 2, p. 20.

      **3.**     **The BOP's implementation of the February 2016 Policy has been thorough and effective, resulting in a significant drop in the number of rejected publications at the ADX.** Since February 2, 2016, not one publication has been rejected at the ADX simply because it contained the name of an inmate or staff member. Ex. 1 ¶ 5. From February 2, 2016, through December 31, 2016, **only 19 publications** were rejected for content, out of approximately 18,000 received. *Id.* ¶¶ 4, 8; Doc. 31-1 ¶ 21.[2] There were legitimate security reasons for these content-based rejections. Ex. 1 ¶ 7; Doc. 31-1 ¶ 21. The total number of all publications rejected for content during these eleven months dropped **77%** in comparison with the same period in 2015. *Id.* ¶ 9.

      **4.**     **It has been almost three years since the ADX rejected an issue of PLN's magazine, and the BOP has agreed to provide previously rejected issues to subscribers who remain at the ADX.** Eleven issues of PLN's magazine were rejected between January 2010 and April 2014 because they discussed a BOP inmate or staff member. Doc. 31-1 ¶ 28. After the adoption of the February 2016 Policy, the Warden re-reviewed those rejected issues pursuant to the new procedures and decided that those back issues can be given to current ADX inmates who subscribed to the magazine at the time. *Id.*; Ex. 1 ¶ 3.

      **5.**     **The BOP is committed to the new procedures.** The procedures in the February 2016 Policy benefit both inmates and the BOP. ADX professionals have become "more knowledgeable about the correct standards for evaluating incoming publications and more insightful

---

[2] A number of these content-based rejections were for inmates who are subject to SAMs, which are reviewed by law-enforcement agencies outside the BOP. Ex. 1 n.2. There were 30 rejections for sexually explicit or nudity-based material, as mandated by federal statute. *Id.*; 18 U.S.C. § 4042.

4

when it comes to detecting genuine security threats—thus increasing the Bureau's ability to protect the safety of inmates, correctional staff, and the public." Ex. 1 ¶ 20.  The BOP intends to continue to enforce these effective, security-enhancing procedures.  "To revert to a less-thorough review process would undermine this critical penological interest."  *Id.*

### B. The BOP's evidence shows that PLN's claim is constitutionally moot.

#### 1. There is no relief left for the Court to award.

PLN does not refute any of this evidence.  Nor does it deny that the BOP has expressed its continued commitment to the February 2016 Policy and to refrain from rejecting publications solely because they mention BOP inmates or staff.  *See generally* Doc. 55.  Any relief this Court might order now would not "affect[] the behavior of the [BOP] toward [PLN]."  *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012).  The BOP already provides everything PLN can legally request—and more:

First, the BOP already bases "each individual rejection" on a specific finding that the content of the publication is "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity."  Doc. 55 at 2, 3, 10 (PLN seeks this relief)[3]; *see also* Ex. 1 Att. 2, p. 17 (rejection recommendation must specify, by "page number, applicable quotes, and details" how publication satisfies § 540.71(b)).  An injunction requiring the BOP to apply § 540.71(b) would be no more than an injunction to obey the law, but "[i]njunctions that broadly order the enjoined party simply to obey the law and not violate the statute are generally impermissible."  *N.L.R.B. v. U.S. Postal Service*, 486 F.3d 683, 690 (10th Cir. 2007).  Second, the BOP already reversed its former practice of using the mere mention of BOP inmates or staff, standing alone, as a basis for finding that the publication meets the § 540.71(b) standard.  Ex. 1 ¶¶ 17, 21; Doc. 31-1 ¶ 25.  Third, the

---

[3] PLN interprets this standard as requiring that the BOP have "a compelling legitimate penological interest," Doc. 55 at 10, but that is not quite right.  Under *Turner v. Safley*, 482 U.S. 78, 90 (1986), the government's interest need only be "legitimate," not "compelling."

5

BOP already has agreed to provide the previously rejected issues to ADX inmates.  Doc. 31-1 ¶ 18.  These facts show that PLN is not subject to any "byproducts" of the BOP's former publication-review practices.  *See Rezaq*, 677 F.3d at 1009.  PLN's arguments do not refute this.

PLN contends that there is still a "live dispute" over whether the past rejections violated the First Amendment, Doc. 55 at 8, 9, but PLN is not entitled to a declaratory judgment or an injunction if its claim is moot.  The Court's decision about mootness does not hinge on whether the past conduct was "illegal."  *Brown v. Buhman*, 822 F.3d 1151, 1173 (10th Cir. 2016), *cert. denied*, 2017 WL 276182 (U.S. Jan. 23, 2017).  If PLN's claim is moot, the Court lacks subject-matter jurisdiction to award *any* relief, even if there was a past constitutional violation.  *Brown*, 822 F.3d at 1169-70.

Nor does it matter that Mr. Chapman believes that some of the rejected issues of PLN's magazine "*were* properly censored, even under the February 2016 Policy," or that a former Warden refused to countenance PLN's view that the rejections were "illegal."  Doc. 55 at 9, 11.  The BOP does not have to concede that it acted illegally in the past in order for its new practices to moot PLN's claim.  "Mootness turns on future threats, not upon penance."  *Brown*, 822 F.3d at 1177 (county attorney's "continued belief in the Statute's constitutionality does not show he will disregard the statements he made to the district court under penalty of perjury"); *see also Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (to receive declaratory relief, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant").

PLN argues that *Brown* is not relevant to the analysis in this case, Doc. 55 at 9, but *Brown* addressed the very situation the Court faces here:  the loss of subject-matter jurisdiction over claims challenging a prior governmental practice when a government official submits a sworn public declaration confirming a policy change.  *See* 822 F.3d at 1169-72.  The BOP presents an even stronger case for mootness than the government in *Brown*.  It has not merely *said* what it will do; it has taken *action*, adopting review and training procedures to put its words into practice.

6

What PLN really seems to want is an order eliminating the BOP's discretion to decide whether future incoming publications compromise ADX security, but the BOP's correctional judgment is entitled to deference. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). PLN demands, "at a minimum, that *future issues with similar content* [to the past rejected issues] will be timely delivered to subscribers." Doc. 55 at 8 (emphasis added). The Prison Litigation Reform Act ("PLRA") prevents the Court from issuing that vague order. Prospective relief in this context must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right[.]" 18 U.S.C. § 3626(a)(1)(A); *see also Brown v. Plata*, 563 U.S. 493, 539 (2011).[4]

There is no way to construct a workable definition of "similar content" in this context, or to prejudge what specific content may compromise institutional security at the ADX years in the future. Every incoming publication must be evaluated on an individualized basis, taking "into account specific information about the inmate or staff member, the content of the article and how that information may affect institutional security at the ADX." Ex. 1 ¶ 18. That is why the BOP can represent that it will not use names alone to reject a publication, but cannot represent that a publication containing names will never be rejected. *Id.* ¶ 21. PLN is not entitled to an injunction that allows perpetual second guessing of the BOP's correctional judgment. And a judicial declaration mandating the BOP to do what it is already doing would have "no effect in the real world." *Wyo. v. U.S. Dep't of Agriculture*, 414 F.3d 1207, 1212 (10th Cir. 2005) (appeal moot where agency promulgated rule superseding challenged rule). Claim One is moot.

---

[4] The PLRA also provides that any injunction the Court might issue would be subject to termination upon motion within two years of the date of the Court's order. 18 U.S.C. § 3626(b)(1)(A)(i).

### 2. The evidence confirms that voluntary cessation does not apply.

"When a party goes beyond the allegations contained in the complaint and challenges the facts upon which subject matter jurisdiction depends, as the BOP does here by arguing that Plaintiff's claim is moot, the Court may not presume the truthfulness of the complaint's factual allegations but must rely on evidence." *Ajaj v. Fed. Bureau of Prisons*, No. 15-cv-992-RBJ-KLM, Doc. 97 at 23 (citing *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)). The BOP's evidence shows that there is no reasonable likelihood that future rejections will be made without a security justification. PLN presents no contradictory evidence, and its legal arguments are unavailing.

A separate written prison policy stating that the ADX has abolished the practice of rejecting publications for names alone, Doc. 55 at 6, 9, is not required to show mootness. The BOP has adopted a panoply of mandatory procedures which ensure that ADX personnel actually learn and apply this standard. Ex. 1 ¶ 19. This is a more effective guarantee of genuine "self-correction" than a bare written statement without mechanisms to implement the rule. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117-18 (10th Cir. 2010). Moreover, two high-level ADX officials have sworn under penalty of perjury that the old name-only rejection practice has been eliminated. Doc. 31-1 ¶ 25; Ex. 1 ¶ 17. As the Tenth Circuit has recognized, this is compelling evidence—not a "bald assertion" or "mere informal promise," as PLN claims. *Brown*, 822 F.3d at 1171; *Silvery Minnow*, 601 F.3d at 1118 (agency did not make "a mere informal promise" where it "established a new regulatory context for assessing the propriety of [the agency's] conduct").

Importantly, including a specific rule in the February 2016 Policy could jeopardize security by dissuading staff from using the interactive procedures. "Having such mandatory language in the February 2016 Policy would likely result in hindering open, frank, and unfettered internal review/discussion . . . of the suitability of an incoming publication, … thus creating safety and security concerns[.]" Ex. 1 ¶ 19. Just as the BOP does not allow blanket rejections based on names,

8

it does not want to promote the opposite effect: the belief that every publication that mentions a name *must* be allowed. However, as additional assurance for the Court and PLN, the BOP will not only train its employees that rejections cannot be based on names only, it will add that language to the written training materials given to ADX staff. *Id.* ¶ 16.

The fact that the BOP adopted the February 2016 Policy after PLN filed this lawsuit, Doc. 55 at 11, argues *in favor of* mootness, not against it. "A government official's decision to adopt a policy in the context of litigation may actually make it *more likely* the policy will be followed, especially with respect to the plaintiffs in that particular case." *Brown*, 822 F.3d at 1171 (emphasis added). Neither does the fact that a future Warden could change the February 2016 Policy, Doc. 55 at 12, "breathe life into an otherwise moot case." *Brown*, 822 F.3d at 1175 (observing that, "[t]o argue that a county attorney cannot bind future county attorneys to his non-prosecution policy is unremarkable and unpersuasive" when it comes to evaluating mootness).

This analysis applies here. The BOP, like any government entity, could never prove that a policy will exist in perpetuity. But that is not the test for whether voluntary cessation moots a claim. The test is whether the Court is "convinced that 'the allegedly wrongful behavior could not **reasonably** be expected to recur'"—not whether "there is *no possibility* of future enforcement." *Id.* (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013)) (bolded emphasis in original). Here, the enhanced review procedures, mandatory training, and sworn declarations provide convincing evidence that the conduct at issue cannot *reasonably* be expected to recur.

Finally, there is no factual support for PLN's assertion that the BOP is strategically manipulating the record to extricate itself from this litigation. Doc. 55 at 11-12. The BOP does not know why PLN stipulated to the dismissal of *PLN v. Hood*, No. 03-D-2516 (PAC), in 2005. The case was not settled. Synsvoll Decl., Ex. 3 ¶¶ 4-6; Prose Decl., Ex. 4 ¶ 4. What *is* certain is that the undisputed facts here are very different from the record before the Court in *Hood* over a dozen years

9

ago.[5]  In *Hood*, the BOP removed a statement from an institution supplement and, on that basis alone, the BOP argued, and the Court agreed, that PLN's claim was moot.  Doc. 55-8 at 7; *see also* PACER, https://ecf.cod.uscourts.gov/cgi-bin/DktRpt.pl?441411395317119-L_1_0-1, Docket 30. Here, there is supporting *evidence*.  The BOP has submitted sworn declarations; there were no declarations in *Hood*.  Doc. 55-8 at 15-42 (exhibits to BOP's motion to dismiss in *Hood*); *see also* PACER Docket Report (no reference to declarations).  Here, the BOP has created and follows enhanced review and training procedures to effectuate the policy the officials articulated; there was no evidence of such concrete policy changes in *Hood*.  *See id.*

In sum, the BOP has committed correctional, security, and legal resources to a time-intensive review and training policy.  On this record, there is no "clear showing[] of reluctant submission" or a desire by the BOP "to return to the old ways."  *Brown*, 822 F.3d at 1167; *see also*, *e.g.*, *Ajaj*, 2016 WL 6212518, *3 (D. Colo. Oct. 25, 2016) (voluntary-cessation exception did not apply where there were no "clear showings" that the BOP desired "to return to the old ways" after it changed an ADX Institution Supplement), *revised on other grounds*, 2017 WL 219343 (D. Colo. Jan. 17, 2017).  The risk that the BOP "will revoke or ignore" the requirements of the February 2016 Policy or resume the name-only-rejection practice "is minimal at best, and certainly not enough to sustain a live case or controversy."  *Brown*, 822 F.3d at 1170.  PLN's censorship claim is constitutionally moot.

       **C.**     **The BOP's evidence shows that PLN's claim is prudentially moot.**

Were the Court to order the BOP to obey the law and adhere to the standards for rejection set forth in § 540.71, that order would have no effect because the BOP is already obeying that law. Were the Court to order the BOP not to base rejections on inmate or staff names alone, that order also would have no effect because the BOP clearly adheres to that practice.  In light of this evidence,

---

[5] The BOP's prohibition on inmate-to-inmate correspondence was at issue in *Hood*.  Doc. 55-8 at 4.

the Court should exercise its discretion to "stay its hand" and find that PLN's censorship claim is prudentially moot. *Jordan*, 654 F.3d at 1023.

The fact that PLN seeks an injunction against an agency of the federal government strengthens the case for prudential mootness. "[T]he remedial commitments of the coordinate branches of the United States government bear special gravity." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1211 (10th Cir. 2012); *accord Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993). The Tenth Circuit has emphasized that courts take governmental promises seriously to encourage government entities to fix problems outside of litigation. *Winzler*, 681 F.3d at 1211.

The Tenth Circuit's concerns are evident here. Continuing this litigation would discount the BOP's efforts to respond to PLN's concerns. It would discount the BOP's significant investment of its finite resources. And it would discount the commitment of many ADX employees—the Warden, attorneys, investigators, and mailroom personnel—to improving a process that affects every inmate in the prison. The Court is on solid legal footing in applying the prudential mootness doctrine and dismissing PLN's claim.

### D.  The redaction allegations do not state a claim, even if Claim 1 were not moot.

One of PLN's allegations in Claim 1 is that the Constitution requires the BOP to remove content that poses a security threat, rather than rejecting the entire publication. Doc. 1 ¶ 56. As explained above, Claim 1 is moot in its entirety and should be dismissed for that reason alone.

After reviewing PLN's response to the motion to dismiss, the BOP has decided not to pursue at this juncture its argument related to the Supreme Court's upholding the validity of the BOP's "all-or-nothing" rule in 28 C.F.R. § 540.71(e). *See Thornburgh v. Abbott*, 490 U.S. 401, 418-19 (1989).[6] That is an issue the Court need not resolve in order to dismiss Claim 1, which is moot.

---

[6] The BOP reserves its right to re-raise this argument, if appropriate, at a later time.

11

But PLN's two allegations concerning the supposed ease with which the ADX can remove or redact material in a publication would not state a plausible claim in any event. The allegations are completely conclusory, simply declaring that redaction is "easy" and not "a significant burden." Doc. 1 ¶¶ 36, 56; *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (conclusory allegations not entitled to presumption of truth). Nor do the two allegations take into account the additional burdens of redacting or tearing apart publications in the context here: the operation of the most secure prison in the BOP. *Id.* at 679 (determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). These allegations do not permit the Court to infer that the no-redaction rule is not rationally connected to a legitimate penological interest.

## II.     The well-pleaded facts do not state a plausible due process claim (Claim 2).

The BOP explained why the facts the Court can consider on a motion to dismiss fail to state a plausible procedural-due-process claim based on the previous rejections of PLN's magazine. Doc. 31 at 13-19. These are not "merits-based arguments," as PLN claims, Doc. 55 at 13, 17 n.1, but an analysis of the pleading deficiencies in the complaint under Supreme Court and Tenth Circuit law.

### A.     The well-pleaded facts permit no inference of inadequate notice or lack of opportunity to be heard.

PLN's principal allegation in support of its due-process claim is that the BOP's rejection "notices contain uninformative, perfunctory language that sheds little or no light on the reason for rejection." Doc. 1 ¶ 63. In light of the facts properly before the Court here, this is not a well-pleaded fact. *See, e.g., In re Gilead Scis. Sec. Litg.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (court must not assume the truth of "allegations that contradict matters properly subject to judicial notice or by exhibit"); *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013) (same). Here is the relevant language from each of the eleven notices[7]:

---

[7] PLN does not dispute the authenticity of the notices, which are central to its due-process claim and are incorporated by reference in the complaint. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

- 1/2010 issue (pp. 30, 31): "The publication has been rejected because the referenced pages contain information on an ADX inmate. Due to the reason cited, the above-named publication is not suited for introduction into a correctional facility." Doc. 31-8 at 2.[8]
- 6/2010 issue (p. 11): "The publication has been rejected because the referenced page contains information on a riot at USP Florence and information on an ADX inmate." Doc. 31-8 at 3.
- 10/2011 issue (pp. 20-21, 50): "The publication has been rejected because the referenced pages contain information on FCC Florence inmates and staff." Doc. 31-8 at 4.
- 11/2011 issue (pp. 38, 47): "The publication has been rejected because the referenced pages contain information on inmates who cooperated with BOP investigations." Doc. 31-8 at 5.
- 6/2012 issue: "The publication has been rejected because it contains information about an ADX inmate and former staff members. This information has been determined to be detrimental to the security, good order and discipline of the institution." Doc. 31-8 at 6.
- 11/2012 issue (p. 42): "The publication has been rejected because the referenced page discusses individuals incarcerated at Administrative Maximum Security Institution." Doc. 31-8 at 7.
- 2/2013 issue (pp. 8, 9): "This publication has been rejected because the referenced pages discusses individuals incarcerated at U.S. Penitentiary Florence (ADX)." Doc. 31-8 at 8.
- 4/2013 issue (p. 32): "The publication has been rejected because the referenced page discusses individuals incarcerated at U.S. Penitentiary Florence (ADX)." Doc. 31-8 at 9.
- 7/2013 issue (pp. 36-37): "The publication has been rejected because the referenced pages discuss individuals incarcerated at U.S. Penitentiary Florence (ADX)." Doc. 31-8 at 10.
- 9/2013 issue (pp. 18, 20): "The publication has been rejected because the referenced pages contain the named of former Bureau of Prisons staff members that have been sentenced." Doc. 31-8 at 11.
- 4/2014 issue (p. 42): "The publication has been rejected because the referenced page contains information on an individual incarcerated at United States Penitentiary (ADX) and details on his case." Doc. 31-8 at 12.

Each notice told PLN exactly why the BOP rejected each publication: because each discussed a BOP inmate or staff member. The well-pleaded facts show that PLN was under no misapprehension about this reason. It knew, as it alleges here, that the BOP was "treat[ing] any reference to any ADX inmate or staff member—current or former—as a security risk." Doc. 1 ¶ 25. In other words, PLN *knew* the reason; it simply *disagreed* with the reason. But that disagreement has no bearing on the due-process analysis. *Carey v. Piphus*, 435 U.S. 247, 266 (1978)

---

[8] Some form of the sentence beginning with "[d]ue to the reason cited" is contained in every notice, but is not replicated below for ease of reference.

13

("the right to procedural due process . . . does not depend upon the merits of a claimant's substantive assertions").

What matters is that the notices were sufficient to give PLN an opportunity to be heard. They allowed PLN to put forward the credible counter-arguments that it pleads in its complaint. Doc. 1 ¶¶ 28-31 (asserting that the information in the rejected publications is available through other sources). That PLN found the Regional Director's response to these arguments to be "vague," Doc. 55 at 16, does not plausibly suggest a due-process violation. PLN is entitled only to notice and an opportunity to be heard, not to an exhaustive explanation of the appellate body's decision.

At bottom, PLN's claim rests on the presumption that it is entitled to be told the particulars of the BOP's security assessment, but that is not the law. Theirs is but a "qualified liberty interest" in which "minimum procedural safeguards" suffice. *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004) (citing *Procunier v. Martinez*, 416 U.S. 396, 418 (1974)). In this context of limited procedural protections, only "adequate individualized notice" is required. *Id.* at 434. Information enabling PLN to delve deeply into the BOP's security rationale (and possibly to report it in its magazine) is not. *See Thornburgh*, 490 U.S. at 416 (recognizing "the security risk presented by incoming publications," and the need for "the broad discretion accorded prison wardens").[9] The well-pleaded facts permit no inference that PLN failed to receive notice and a hearing sufficient to address its qualified liberty interest. The Court should dismiss PLN's procedural-due-process claim.

### B. PLN has failed to produce counter-evidence to show the existence of an alleged practice at the ADX.

The BOP challenged PLN's standing to claim that the ADX has a practice of not retaining rejected publications for review. Doc. 31 at 19. There definitely *is* a dispute about whether this

---

[9] PLN suggests that the lower court's analysis in *Thornburgh* has some application here. Doc. 55 at 17 (discussing *Abbott v. Meese*, 824 F.2d 1166, 1174 (D.C. Cir. 1987)). It does not. That decision was vacated in its entirety. *See* 490 U.S. at 419.

14

alleged practice can be any part of PLN's due-process claim, and it is proper for the Court to resolve it. *See id.* The BOP mounted a jurisdictional argument based on standing, challenging the existence of this practice and producing evidence to support its argument. Doc. 31-1 ¶ 11. PLN did not explore this issue during jurisdictional discovery and produced no evidence to counter the BOP's. *See* Doc. 55 at 19. A practice that does not exist can be no part of PLN's due-process claim.

## CONCLUSION

For the reasons set forth here and in the motion to dismiss, the Court should dismiss PLN's complaint and award the BOP its costs.

Respectfully submitted on February 13, 2017.

> ROBERT C. TROYER
> United States Attorney
>
> s/ *Susan Prose*
> Susan Prose, Assistant United States Attorney
> 1801 California Street, Suite 1600
> Denver, Colorado 80202
> Tel.: (303) 454-0100; Fax: (303) 454-0404
> E-mail: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)**

      I hereby certify that on February 13, 2017, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

Steven Zansberg
Lance Weber
Sabarish Neelakanta
Peter Swanson
Matthew Shapanka
Elliot Mincberg
David Shapiro
Stephen Kiehl


                    <u>s/ *Susan Prose*</u>
                    Susan Prose
                    United States Attorney's Office