**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

     Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

     Defendant.

_____

**ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

     This matter comes before the Court on Defendant's Motion to Dismiss [#31] and Motion to Stay Discovery and to Vacate the Scheduling Conference and Related Deadlines [#34] ("Motion to Stay").  Both motions were originally referred to Magistrate Judge Nina Y. Wang [#32, 35], then reassigned to this Court [#44].  This Court has carefully considered the motions and related briefing, oral argument held on February 17, 2017, the case file and the applicable case law.  For the following reasons, I **DENY** the Motion to Stay and respectfully **RECOMMEND** that the Motion to Dismiss be **DENIED**.

**I.    FACTUAL BACKGROUND**

     Plaintiff Prison Legal News ("PLN") is a project of the Human Rights Defense Center, a not-for-profit entity organized under the laws of the State of Washington.  [#1, ¶ 6]  According to the Complaint, PLN publishes *Prison Legal News*, a monthly magazine that provides news about legal decisions affecting prisoners and information

1

designed to help prisoners navigate the judicial system.  [*Id.* at ¶¶ 1, 6]  *Prison Legal News* has thousands of subscribers, including nineteen inmates at the United States Penitentiary – Administrative Maximum Facility at Florence, Colorado ("ADX") as of the filing of the Complaint.  [*Id.* at ¶ 1]  ADX is the highest security prison in the United States.  [*Id.* at ¶ 33]

Defendant Federal Bureau of Prisons ("BOP") is the federal agency responsible for administering all federal correctional institutions, including ADX.  [*Id.* at ¶ 7] BOP has adopted regulations for all of its facilities, including ADX, permitting inmates to subscribe to or receive publications without prior approval, except where prohibited by statute.  [*Id.* at ¶ 16 (citing 28 C.F.R. § 540.70)]  The regulations permit rejection of an incoming publication if the facility determines that the publication is "detrimental to the security, discipline, or good order of the institution or . . . might facilitate criminal activity."  [*Id.*; *see also* 28 C.F.R. § 540.71(b)]

BOP regulations set forth certain steps that the Warden must undertake with respect to the rejection of any publication.  First, the Warden must "review the individual publication prior to rejection of that publication."  [*Id.* at ¶ 17 (citing 28 C.F.R. § 540.71(c)]  Second, upon rejection of the publication, the Warden must "promptly advise the inmate [in writing] of the decision and the reasons for" the rejection.  [*Id.* at ¶ 18 (citing 28 C.F.R. § 540.71(d)]  Finally, the Warden must provide the "publisher or sender" with a copy of the rejection letter sent to the inmate.  [*Id.* at ¶ 19 (citing 28 C.F.R. § 540.71(e)]

BOP regulations allow both inmates and publishers to appeal rejection decisions.  [*Id.* at ¶ 20]  While inmates may appeal rejections through the BOP's Administrative

Remedy Program, publishers have the right to "obtain an independent review of the rejection by writing to the Regional Director [of BOP] within 20 days of receipt of the rejection letter." [*Id.* at ¶ 20; *see also* 28 C.F.R. § 540.71(d, e)]  Unless an inmate files for review, the Warden must return a rejected publication to its sender. [*Id.*; *see also* 28 C.F.R. § 540.71(e)]

The instant litigation arises out of the rejection by ADX Wardens of at least eleven issues of *Prison Legal News* between January 2010 and April 2014. [*Id.* at ¶ 22] The issues were rejected in their entirety. [*Id.*]  For each, the Warden who rejected the issue signed a rejection notice stating that the issue "has been rejected in accordance with BOP Program Statement 5266.10, Incoming Publications, which states in part, 'The Warden may reject a publication if it is determined detrimental to the security, good order, or discipline of the institution or if it may facilitate criminal activity.'" [*Id.* at ¶ 23] "Each notice then provides a single sentence purporting to identify the material that caused the issue to be censored." [*Id.* at ¶ 24]  According to the Complaint, for most of the rejected issues, the notices claim that the issue was censored due to references in the magazine "to ADX inmates or ADX or other BOP personnel" but do not give any further description of how that content "is detrimental to the security, good order or discipline of ADX." [*Id.* at ¶ 25]  Instead, the rejections "appear to treat any reference to any ADX inmate or staff member—current or former—as a security risk." [*Id.*]

The content that forms the basis for the rejections consists of articles about legal proceedings or other events pertaining to ADX or BOP. [*Id.* at ¶ 26]  With respect to the information about ADX inmates and staff, such information "is limited and often publicly available." [*Id.* at ¶ 28]  "[M]uch or all of this information is already available to prisoners

3

at ADX through other sources," such as general-interest publications, television and radio.  [*Id.* at ¶ 30]  Inmates at ADX also have access to a law library, which includes access to an electronic service containing court decisions and filings.  [*Id.* at ¶ 31]

According to the Complaint, ADX did not provide notice of its rejection of the November 2011 issue of *Prison Legal News* to PLN.  [*Id.* at ¶ 37]  With respect to the remaining issues that were rejected, PLN did receive rejection notice letters, but some of those notices did not reach PLN until six to nine months after the rejection occurred. [*Id.* at ¶ 38]  PLN appealed at least four of these rejections.  [*Id.* at ¶ 41]  Each appeal was rejected by the Regional Director reciting Program Statement 5266.11, which allows rejection of incoming publications that are "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity."  [*Id.* at ¶ 45] None of the Regional Director's letters provides specific reasoning for the rejection.  [*Id.*]

On October 1, 2015, PLN filed its Complaint in this action.  [#1]  Count One alleges censorship of constitutionally protected speech in violation of the First Amendment.  [*Id.* at ¶¶ 51-58]  Count Two alleges failure to provide due process in violation of the Fifth Amendment.  [*Id.* at ¶¶ 59-70]  Count Three alleges violations of the Administrative Procedure Act ("APA").  [*Id.* at ¶¶ 71-81]  The Complaint seeks declaratory and injunctive relief, as well as costs and attorneys' fees.  [*Id.* at 16]

On July 27, 2016, BOP filed its Motion to Dismiss.  [#31]  In it, BOP argues that a change in ADX's procedures renders PLN's claims moot.  [*Id.* at pp. 6-12]  In support, BOP attaches the Declaration of Todd Chapman, BOP's Executive Assistant at ADX. [#31-1, ¶ 1]  In this Declaration, Mr. Chapman states that, pursuant to BOP Program Statement 5266.11, "only the Warden may reject an incoming publication.  In the

Warden's absence, only the Acting Warden may perform this function." [*Id.* at ¶ 6] When the Warden determines that a publication's content includes materials that should be rejected, the entire publication is withheld, "even if the basis for the rejection is one article in a magazine or only a few pages in a book or other publication." [*Id.* at ¶ 7]

Mr. Chapman further explains that ADX has in effect an institution supplement that more fully implements federal regulations and national policy regarding incoming publications at ADX. [*Id.* at ¶ 12] Prior to February 2, 2016, an incoming publication was x-rayed and searched by ADX mailroom personnel. [*Id.* at ¶ 14] If a mailroom officer questioned whether a particular publication might include unacceptable content, the officer forwarded the publication to the ADX Case Management Coordinator for review. [*Id.*] If the Case Management Coordinator determined that the publication should be recommended for rejection, he or she prepared a draft rejection notice for the Warden's signature. [*Id.*]

On February 2, 2016, the current ADX institution supplement regarding incoming publications was issued. [*Id.* at ¶ 16] Under the current supplement, ADX mailroom personnel continue to x-ray and search incoming publications to identify potentially objectionable content. [*Id.* at ¶ 17] But, if potentially objectionable material is discovered, mailroom personnel now forward the material to the ADX Special Investigative Services ("SIS") Department for additional review. [*Id.*] SIS personnel have expertise in assessing potential security risks. [*Id.*] SIS Department, rather than the Case Management Coordinator, decides whether to recommend rejection of the publication to the Warden. [*Id.* at ¶ 18] When SIS Department recommends rejection, SIS personnel draft a notice of rejection for the Warden's signature. [*Id.*] Prior to the

rejection notice being given to the Warden, however, SIS Department forwards the completed rejection recommendation packet to the Legal Services Department for review. [*Id.* at ¶ 19] The rejection letter is only provided to the Warden if the Legal Services Department concurs in the rejection. [*Id.*] As part of the new procedure, the Legal Services Department provides quarterly training to BOP personnel involved in the publication review process. [*Id.* at ¶ 20]

Prior to the new procedure, ADX would reject a publication solely because it identified and discussed ADX or BOP inmates or staff members. [*Id.* at ¶ 24] Since the new procedure was implemented, however, no publication has been rejected solely because it discussed an ADX or BOP inmate or staff member. [*Id.* at ¶ 22] In his Declaration, Mr. Chapman asserts that "ADX will not utilize the fact that a publication discusses an ADX or [BOP] inmate, or [BOP] staff member, standing alone, as a basis for the Warden to find that the incoming publication" should be rejected. [*Id.* at ¶ 25]

Since the adoption of the new policy, the Warden has rejected fewer publications. [*Id.* at ¶¶ 21 & 23] ADX did not reject any issues of *Prison Legal News* in 2015 and had not rejected any issues in 2016 as of the time of filing of the Motion to Dismiss. [*Id.* at ¶¶ 22 & 23] Because the eleven previously rejected issues of *Prison Legal News* were rejected because they discussed an ADX or BOP inmate or staff member, the Warden has now determined that all of those issues could be provided to the inmate subscribers. [*Id.* at ¶ 28]

Nine days after filing the Motion to Dismiss, BOP filed the Motion to Stay. [#34] In it, BOP argues that the Court should determine its jurisdiction and whether PLN has adequately pleaded a plausible claim before the parties proceed to discovery. [*Id.* at p.

1]  BOP argues that the five-factor test set forth in *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 1:02-cv-01934-LTB-PAC, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006), compels staying the matter.

Briefing on these motions was halted for several months as the parties attempted to reach a settlement.  [#47, 51]  Those efforts were unsuccessful.  Thus, on January 30, 2017, PLN filed its Memorandum in Opposition to the Motion to Dismiss [#55] and its Memorandum in Opposition to the Motion to Stay [#56].  On February 13, 2017, BOP filed its Reply in Support of its Motion to Dismiss [#59] and its Reply in Support of its Motion to Stay [#60].

Attached to its Reply in Support of its Motion to Dismiss, BOP attached a Declaration of Jack Fox, ADX's current Warden.  [#59-1] In it, Warden Fox stated that from July 12, 2016 through December 2016, ADX has rejected 19 incoming publications out of approximately 9,000 incoming publications received.  [*Id.* at ¶ 6] Moreover, ADX has not rejected a single issue of *Prison Legal News* since April 2014.  [*Id.* at ¶ 10]

Warden Fox reaffirmed that BOP has changed its past practice of rejecting a publication solely because it identifies and discusses an ADX or BOP inmate or staff member.  [*Id.* at ¶ 11]  Warden Fox further confirmed ADX's continued quarterly training sessions.  [*Id.* at ¶ 12]  Training packets now contain an explicit statement that "[a]n incoming publication at the ADX may not be rejected solely because it discusses an ADX or [BOP] inmate, or [BOP] staff member."  [*Id.* at ¶ 16]  Warden Fox concludes his declaration by stating that "ADX is committed to the current incoming publication review procedures, and the ADX will not utilize the fact that an incoming publication discusses an ADX or [BOP] inmate, or [BOP] staff member, standing alone, as a basis to find that

7

the incoming publication is 'detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity.'" [*Id.* at ¶ 17 (citing 28 C.F.R. § 540.71(b))]

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction."  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).   Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"   *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."   *Id.* (quoting *Twombly*, 550 U.S. at 556).   The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."   *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## III.   ANALYSIS – MOTION TO DISMISS

BOP has moved to dismiss the Complaint (or portions thereof) on two grounds. First, BOP argues that the change in the ADX institution supplement moots Count One, thereby depriving the Court of subject matter jurisdiction with respect to that Count. Second, BOP argues that the Complaint fails to state a claim upon which relief can be granted.   The Court addresses each argument below.

### A.  BOP's mootness arguments

BOP makes two independent, though related, mootness arguments.   First, BOP argues that the change in the ADX institution supplement renders Count One constitutionally moot.   Second, BOP argues that, even if Count One is not constitutionally moot, the Court should withhold relief pursuant to the prudential-mootness doctrine.   The Court does not find either argument compelling.

### 1.  Constitutional mootness

"Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).  "Two related doctrines, standing and mootness, keep federal courts within their constitutional bounds."  *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016). "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision."  *Id.* "The Supreme Court has described mootness 'as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'"  *Id.* at 1163-64 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)).

"A 'suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *Id.* at 1165 (quoting *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013)).  "[T]he case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights."  *Id.* (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013)).  "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world."  *Id.* at 1165-66 (quoting *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)).  "Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision."  *Id.* at 1166 (quoting *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015)).

"When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a likelihood of substantial

and immediate irreparable injury, and the inadequacy of remedies at law." *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). In a declaratory relief action, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Id.* (quoting *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011)).

Courts recognize two "exceptions" to the mootness doctrine. *See Brown,* 822 F.3d at 1166. Of relevance to the instant litigation is the exception for "voluntary cessation" of the defendant's conduct. *See id.*[1] "Under this exception, 'voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.'" *Id.* (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, __, 132 S. Ct. 2277, 2287 (2012)). Courts "view voluntary cessation 'with a critical eye,' lest defendants manipulate jurisdiction to 'insulate' their conduct from judicial review." *Id.* (quoting *Knox*, 132 S. Ct. at 2287).

While viewed with a critical eye, voluntary cessation may moot a case "if the defendant carries 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *Already*, 133 S. Ct. at 727). Voluntary actions will moot litigation if two conditions are satisfied: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Rio Grande Silvery Minnow*

---

[1] The other exception involves disputes that are "capable of repetition, yet evading review." *Id.*

*v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  "The party asserting mootness bears the heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again."  *Id.* at 1116 (quotations omitted).

In practice, however, this "heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case."  *Id.* "[T]he withdrawal or alteration of administrative policies can moot an attack on those policies."  *Id.* at 1117 (quotations omitted).  Indeed, "the 'mere possibility' that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy."  *Id.* (quoting *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983)).  Rather, "[a] case cease[s] to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency."  *Id.* (quotations omitted).

Applying these standards, the Court cannot conclude that the February 2016 change in the ADX institution supplement renders Count One constitutionally moot.  The February 2016 change does not have any impact on many of the violations alleged in Count One of the Complaint.[2]  For example, PLN alleges that BOP's "rejection of issues of *Prison Legal News* in their entirety results in the censorship of admittedly unobjectionable content."  [#1 at ¶ 56]  Count One further alleges that BOP "has an obvious and easy alternative to full censorship of *Prison Legal News* that does not pose a threat to the security or good order of ADX, namely redaction or removal of articles deemed objectionable."  [*Id.*]  Thus, the Complaint clearly challenges BOP's policy of

---

[2] At oral argument, BOP conceded that Count One must be considered as a whole and that the Court should not engage in attempts to determine whether certain aspects of Count One were moot while others were not.

rejecting an entire publication when any portion of that publication is deemed objectionable, a policy that impacted PLN's publications eleven times. The February 2016 change does not purport to affect that policy. [#31-1 (describing both written and informal changes); 31-3 (February 2, 2016 ADX Institution Supplement)] Indeed, in its Motion to Dismiss, BOP argued ADX's practice of withholding entire publications is constitutionally permissible. [#31 at 12-13]

Similarly, the Complaint challenges BOP's rejection of certain material that reported on publicly available information. [#1 at ¶ 28] The Complaint further challenges BOP's rejection of certain material that was "a matter of common knowledge within the prison." [*Id.* at ¶ 29] PLN alleges that BOP's censorship is not rationally related to any legitimate and neutral government purpose, particularly because "most or all of the information is already available or known to inmates at ADX." [*Id.* at ¶ 54]

The February 2016 change does not affect BOP's alleged practice of censoring certain publications based upon information that is publicly available or otherwise already known to inmates. Although Warden Fox testified under penalty of perjury that ADX will no longer reject an incoming publication solely because it identifies and discusses an ADX or BOP inmate or staff member [#59-1, ¶ 17],[3] Warden Fox has not agreed not to censor publications that contain only publicly available information or information already commonly known within ADX. Instead, Warden Fox states that "[t]he fact that information may be publicly available, or even available to an inmate by means of the prison's Electronic Law Library, does not automatically mean that it is also

_____

[3] Nothing in the February 2016 institution supplement itself prohibits ADX from rejecting a publication solely because that publication mentions ADX inmates or staff. [*Id.*, ¶ 19] The written changes encompassed in that institution supplement only affect ADX's procedures for reviewing publications. [*Id.*; *see also* #31-3]

suitable for introduction into a maximum security institution in the form of an incoming publication that highlights the information."  [*Id.*, ¶ 18]  Moreover, Mr. Chapman has stated that he believes that at least three of the previously censored *Prison Legal News* publications could still be censored under the new policy.  [#55-2 at 60:15-18; 72:3-21; 80:5-22]

*Brown*, relied upon heavily by BOP, is readily distinguishable.  In *Brown*, plaintiffs formed a "plural family," arguably in violation of Utah's bigamy statute.  822 F.3d at 1155.  After the Lehi Police Department opened an investigation of the plaintiffs for violation of the bigamy statute, the plaintiffs filed a 42 U.S.C. § 1983 action in federal district court against the Governor and Attorney General of the State of Utah and the Utah County Attorney.  *Id.*  The plaintiffs sought declaratory relief and a permanent injunction enjoining enforcement of the bigamy statute against them.  *Id.*

The district court dismissed the Governor and Attorney General.  *Id.* The Utah County Attorney's Office ("UCAO") subsequently closed its file on the plaintiffs and adopted a "formal office policy" (the "UCAO Policy") that it would only bring bigamy prosecutions in two limited circumstances, neither of which applied to the plaintiffs.  *Id.* at 1159.  The County Attorney himself filed a declaration with the District Court stating that the UCAO "ha[d] concluded its investigation of the [plaintiffs] and ha[d] determined that no other prosecutable crimes related to the bigamy allegation have been or are being committed by the [plaintiffs] in Utah County as of the date of this declaration."  *Id.* The County Attorney further declared that the criminal case was closed and that no charges would be filed against the plaintiffs for bigamy "unless new evidence is discovered which would comport with the [UCAO Policy] pertaining to the prosecution of

bigamy crimes." *Id.* The district court concluded that the County Attorney had "found no evidence of any crime by the [plaintiffs]." *Id.* Nonetheless, the District Court refused to dismiss as moot the Complaint against the County Attorney. *Id.*

On appeal, the Tenth Circuit reversed the District Court's mootness determination. *Id.* at 1178. According to the Tenth Circuit, plaintiffs did not face a credible threat of prosecution. *Id.* at 1170. The Tenth Circuit reasoned that the plaintiffs did not fall within the category of individuals that could be prosecuted under the UCAO Policy. *Id.* Thus, plaintiffs would only be prosecuted if the UCAO abandoned that policy. But, the County Attorney had "declared under penalty of perjury" that the plaintiffs would not be prosecuted based upon their known conduct. *Id.* Thus, the Tenth Circuit concluded that to find the voluntary cessation exception applicable, it "would have to conclude the highest-ranking law enforcement official in Utah County had engaged in deliberate misrepresentation to the court." *Id.* The Tenth Circuit found no basis for such a conclusion. *Id.*

Thus, in *Brown*, the only way that plaintiffs could face the prosecution they sought to enjoin would be for the County Attorney to reverse an official written policy in contravention of his sworn statement. Here, however, the policy currently in place would not prohibit BOP from rejecting PNL publications on the same allegedly unconstitutional grounds previously utilized to reject PNL publications. BOP retains its policy of rejecting publications in their entirety rather than making any attempt to censor only the objectionable content and remains free to censor publications based upon publicly-available information and information already known or available to inmates at ADX. Although BOP has agreed to allow the previously rejected publications to be

distributed, it has not made any representation with regard to whether or not future editions of *Prison Law News* containing similar content would be rejected.[4]   Such rejections would in no way contravene the sworn declarations of Warden Fox or Mr. Chapman.  Indeed, as discussed earlier, Mr. Chapman testified that, in his view, at least three of the rejected PLN publications should be censored under the current policy.  As a result, this case presents a very different situation from that in *Brown* and BOP has not satisfied its heavy burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.   Accordingly, the Court RECOMMENDS denying BOP's Motion to Dismiss the Complaint to the extent it argues that the claims are constitutionally moot.

### 2.  Prudential Mootness

Alternatively, BOP argues that Count One is prudentially moot.  [#31 at 11-12] "Even if a case is not constitutionally moot, a court may dismiss the case under the prudential-mootness doctrine if the case 'is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the *power* to grant.'"  *Rio Grande Silvery Minnow*, 601 F.3d at 1121 (emphasis added) (*quoting Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)).  Prudential mootness "addresses not the power to grant relief, but the court's *discretion* in the exercise of that power."  *See Jordan v. Sosa*, 654 F.3d

---

[4] As PLN points out, that BOP permitted the previously rejected publications to be distributed two to seven years after their original publication "does nothing to ensure that similar content [will] be delivered in the future."  [#55 at 9]  It may be that the previously rejected issues were permitted to be distributed, at least in part, as a result of the passage of time rather than pursuant to the change in policy.  Notably, Warden Fox, who apparently made the determination that the issues could now be provided to the inmate subscribers [#31-1, ¶ 28], did not offer any testimony regarding the previously rejected issues.

1012, 1023 (10th Cir. 2011) (emphasis in original) (quotations omitted).  The "central inquiry" with respect to both prudential mootness and constitutional mootness is essentially the same: "have circumstances changed since the beginning of litigation that forestall any occasion for meaningful relief."  *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997).

Here, BOP's arguments as to prudential mootness largely track its arguments on constitutional mootness.  BOP argues that it "has done everything that it *can* do to address PLN's complaint" and that there is no likelihood that ADX will recommence the challenged conduct.  [#31 at 11-12]  As outlined above, however, many of PLN's complaints have not been affected in any way by the changed policies.  Accordingly, the Court finds the prudential mootness doctrine inapplicable, and RECOMMENDS denying the Motion to Dismiss to the extent it relies upon prudential mootness.

### B.  BOP's failure to state a claim arguments

BOP also argues that the Complaint fails to state a plausible claim for relief.  With respect to Count One, BOP argues that Count One's challenge to BOP's policy of rejecting an entire publication when only a portion of that publication is objectionable fails to state a claim.  [#31, pp. 12-13]  With respect to Count Two, BOP argues that PLN was given the required notice and opportunity to be heard, thereby satisfying the minimum due process requirements.  [*Id.* at pp. 13-19]  Finally, with respect to Count Three, BOP argues that PLN's APA claim is based on the same alleged violations as set forth in Counts One and Two and thus fails for the same reasons.  [*Id.* at 19-20]  The Court addresses each of these arguments below.

**1.  Count One adequately alleges a plausible First Amendment claim**

Citing *Thornburgh v. Abbott*, 490 U.S. 401 (1989), BOP's Motion argued that the Supreme Court has already approved BOP's "all-or-nothing" approach whereby entire publications may be rejected if any portion of the publication is found offensive.  [#31, p. 13]  BOP thus argued that "[a]ny claim contending that the BOP's practice of rejecting publications in their entirety violates the First Amendment fails, as a matter of law.  The Court should dismiss it."  [*Id.*]  In its Reply, BOP withdrew this argument to the extent it relied upon *Thornburgh.*[5]  [#59 at 12]

Nonetheless, BOP argues in its Reply that "PLN's two allegations concerning the supposed ease with which the ADX can remove or redact material in a publication would not state a plausible claim in any event."  [*Id.* at 13]  BOP argues that the Complaint's allegations that redactions would be "easy" and not present "a significant burden" are conclusory.  [*Id.*]  Moreover, BOP argues that these allegations fail to "take into account the additional burdens of redacting or tearing apart publications in the context here: the operation of the most secure prison in the BOP."  [*Id.*]

Initially, it is not entirely clear what BOP is asking the Court to dismiss through this argument.  BOP's failure to state a claim argument with respect to Count One addresses only the allegations related to BOP's all-or-nothing policy.  Count One, however, alleges a much broader violation of the First Amendment.  Count One alleges that BOP is rejecting publications that do "not pose any risk to the security, discipline, or good order of ADX, particularly given the stringent security measures in place at ADX,

---

[5] As noted above, at oral argument, BOP argued that Count One must be considered as a whole and thus that the Court should not independently evaluate individual aspects of the First Amendment claim.  *See supra* note 2.

and the fact that most or all of the information is already available or known to inmates at ADX." [#1, ¶ 54] BOP's Motion to Dismiss for failure to state a claim does not even address this portion of Count One and, as a result, dismissal of Count One in its entirety would be inappropriate.

To the extent that BOP is only asking the Court to dismiss Count One to the extent Count One challenges BOP's all-or-nothing policy, the Court agrees with PLN that the Complaint adequately alleges a cause of action. To the extent that BOP argues that Count One is conclusory because PLN fails to describe how the allegedly "easy" redaction could be accomplished, that argument fails. It is clear from the Complaint that PLN is stating that BOP could simply remove the offending portions and allow the remainder of the publication to go to the inmates. [*Id.* at ¶¶ 35-36]

To the extent that BOP is arguing that such redactions are not easy and the Complaint fails to adequately account for the burdens that BOP officials would face in making such redactions, this argument is premature. On this point, *Thornburgh* is instructive. In *Thornburgh*, federal prisoners brought both a facial challenge to the BOP publication regulations, and an as-applied challenge to those regulations as they related to 46 specific publications. *Thornburgh*, 490 U.S. at 403. After a 10-day bench trial, the district court upheld the regulations without addressing the propriety of the 46 specific exclusions. *Id.* The Court of Appeals, on the other hand, found the regulations wanting and remanded the case to the district court for an individualized determination of the constitutionality of the 46 exclusions. *Id.* at 403-04. The Supreme Court reversed, concluding that the regulations were facially valid. *Id.* at 404. But, the Supreme Court

agreed with the Court of Appeals' remand to the district court for a determination of the validity of the regulations as applied to each of the 46 publications. *Id.*

With respect to the all-or-nothing rule, the Supreme Court found that the rule was facially valid. In reaching this conclusion, the Supreme Court relied on the district court's finding that "on the basis of testimony in the record, [] petitioners' fear that tearing out the rejected portions and admitting the rest of the publication would create more discontent than the current practice was 'reasonably founded.'" *Id.* at 418-19. In the Supreme Court's view, "when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under [*Turner v. Safley*, 482 U.S. 78 (1987)]." *Id.* at 419. As indicated above, however, the Supreme Court only upheld the regulations against the facial challenge and remanded to the district court for consideration of the constitutionality of the regulations as applied to the 46 exclusions. *Id.* at 404. The *Thornburgh* decision thus makes clear that prison officials must come forward with *evidence* "to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears" to defend against challenges to the all-or-nothing policy. As such, PLN's challenge to the all-or-nothing policy is not appropriate for resolution at this stage.

Other Supreme Court and Tenth Circuit jurisprudence also support a denial of BOP's Motion to Dismiss the challenge to the all-or-nothing policy. In *Turner*, the Supreme Court explained that, to be valid, "a prison regulation [which] impinges on inmates' constitutional rights . . . [must be] reasonably related to legitimate penological

20

interests." *Turner*, 482 U.S. at 89.  In answering this question, the Supreme Court has directed lower courts to consider a number of factors, including "the absence of ready alternatives" to the prison regulation.  *Id.* at 90.  While prison officials "do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint, . . .if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Id.* at 90-91.  Here, Plaintiff's complaint adequately sets forth a proposed alternative - *i.e.*, redaction.  A determination of whether that alternative can be achieved at *de minimis* cost to valid penological interests is not one that can be made at a motion to dismiss stage.

Similarly, in *Shabazz v. Parsons*, 127 F.3d 1246 (10th Cir. 1997), decided eight years after *Thornburgh*, the Tenth Circuit addressed an inmate's challenge to the all-or-nothing rule.  There, following an earlier remand by the Tenth Circuit, the magistrate judge directed the parties to supplement the record on the narrow question of "whether any rational basis existed for denying entire issues of the magazine *Muhammad Speaks* to the Plaintiff, rather than simply redacting the offending portions."  *Id.* at 1249.  The defendants "*offered evidence* showing that the costs to implement such a procedure would be prohibitive, and that the procedure would prevent the prisoner from obtaining meaningful administrative review."  *Id.* (emphasis added).  The magistrate judge found that the defendants had offered sufficient evidence to support their policy choice, and the Tenth Circuit affirmed.  *Id.*  In doing so, however, the Tenth Circuit quoted *Turner* for the proposition that "if an inmate claimant can point to an alternative that fully

accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* (quoting *Turner*, 482 U.S. at 91).

BOP may very well have valid, constitutional reasons for adhering to the all-or-nothing rule in this case. Indeed, as the Supreme Court noted in *Turner*, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officers." *Turner*, 482 U.S. at 90. But the Motion to Dismiss stage is not the proper stage to engage in the balancing of the First Amendment rights of inmates and publisher against the "burdens of redacting or tearing apart publications in the context here: the operation of the most secure prison in the BOP." [#59 at 13] This type of analysis - applied by the courts in *Turner*, *Thornburgh* and *Shabazz* - cannot be conducted at the motion to dismiss stage. Moreover, it would be unreasonable to require Plaintiff to identify and address all of the penological interests BOP may offer to support the policy in its Complaint. Plaintiff's allegations are sufficient to place BOP on notice of the basis for the alleged constitutional violation. BOP must now come forward with some evidence showing a rational basis for their complete censorship of the publications. Accordingly, the Court RECOMMENDS denying BOP's Motion to Dismiss Count One.

### 2.  Count Two adequately alleges a plausible due process claim

The Supreme Court has held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth

Amendment even though qualified of necessity by the circumstance of imprisonment."
*Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled in part on other grounds by*
*Thornburgh*, 490 U.S. at 409-14; *accord Barrett v. Orman,* 373 Fed. App'x 823, 825
(10th Cir. 2010) (holding that "*Martinez's* procedural requirements survived
*Thornburgh*"); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004) (applying the
*Martinez* due process protections to publishers after *Thornburgh*).  In *Martinez*, the
Supreme Court approved a district court's requirement "that an inmate be notified of the
rejection of a letter written by or addressed to him, that the author of that letter be given
a reasonable opportunity to protest that decision, and that complaint be referred to a
prison official other than the person who originally disapproved the correspondence."
*Id.* at 418-19.[6]

PLN's complaint alleges that BOP violated these minimal procedural safeguards
in several ways: (1) BOP, in at least one instance, failed to give any notice  and, in other
instances, failed to provide timely notification of the rejections [#1, ¶¶ 37-38, 62]; (2) the
rejection notices did not give sufficient detail about the grounds for rejection [*Id.* at ¶¶
23, 24, 39, 63]; and (3) PLN could not obtain a meaningful review of the violation,
because the censored writing was not provided to the Regional Director at the
secondary level of review, the lack of specific regulations governing the Regional
Director's review deprived PLN of the ability to receive an independent review of

---

[6] Although the *Martinez* Court did not express an opinion as to whether any or all of
these procedures were required to pass constitutional muster, Courts of Appeals have
held that notice and a reasonable opportunity to protest are required procedures when a
prison censors inmate mail.  *See Barrett,* 373 Fed. App'x at 825; *Montcalm Pub. Corp.*
*v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996); *Martin v. Kelley*, 803 F.2d 236, 243 (6th Cir.
1986).   Moreover, BOP expressly acknowledges that the *Martinez* procedural
safeguards apply [#31 at 14] but seeks dismissal on the grounds that it has complied
with these requirements.

rejected publications, or the Regional Director gave insufficient explanations for the upholding of the rejection notice [*Id.* at ¶¶ 45-47, 65-66].[7]

The Court finds that, taken together, the allegations in the Complaint adequately allege a due process claim. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Stanko v. Maher*, 419 F.3d 1107, 1115 (10th Cir. 2005) (quoting *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976))). Here, the Complaint adequately states that PLN did not receive one of the notices, and that the other notices were delayed six to nine months. [#1, ¶¶ 37-38] Given that the publications at issue are periodicals designed to update prisoners on changes in the law, the Court cannot conclude at this stage that delayed notice of six to nine months constitutes an opportunity to be heard "at a meaningful time." *Stanko*, 419 F.3d at 1115.[8]

BOP's argument that it only need give notice "at some point in time," [#31, p. 17], would render meaningless the "meaningful time" component of due process. BOP's

---

[7] The Complaint also alleges that BOP failed to follow its own regulations which require BOP to inform inmates and publishers of "the reasons for [rejection]." [*Id.* at ¶ 64, citing 28 C.F.R. § 540.71(d), (e)] Even if true, however, BOP's failure to follow its own regulations does not give rise to a constitutional claim. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993).

[8] BOP disputes the fact that it either failed to provide notice or delayed providing notice. [#31 at 17] But, at the motion to dismiss stage, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova*, 595 F.3d at 1124 (quoting *Smith*, 561 F.3d at 1098). None of the cases cited by BOP in support of its contention that it is "entitled to a presumption that the rejection notice was provided to PLN" on or near the dates reflected on the notices applied the presumption in the context of a motion to dismiss pursuant to Rule 12(b)(6). [#31 at 17]

argument would allow it to delay notice for decades.  Certainly, the *Martinez* Court anticipated the notice requirement to have some temporal proximity to the censorship.

Similarly, the Complaint pleads sufficient facts to assert that PLN was not given a "reasonable opportunity to protest [the Warden's] decision."  *Martinez*, 416 U.S. at 418. The Complaint alleges that the Regional Director did not even have copies of the censored materials when conducting the review, and acted without any regulations or guidelines when conducting that review.  [#1, ¶¶ 65-66][9]  "Whatever the merits of [PLN's] claim . . . , the facts alleged 'nudged' [its] claim against [BOP] 'across the line from conceivable to plausible.'"  *Barrett*, 373 Fed. App'x at 826 (quoting *Twombly*, 550 U.S. at 570).  Accordingly, the Court RECOMMENDS denying BOP's Motion to Dismiss Claim Two.

### 3.  Claim Three adequately alleges an APA claim

BOP's Motion to Dismiss Claim Three relies entirely on its arguments that: (1) Count One is constitutionally moot; and (2) PLN failed to adequately plead its First Amendment and due process claims.  [#31, pp. 19-20]  As detailed above, the Court disagrees that Count One is moot and believes that PLN has adequately pled its

---

[9] BOP disputes some of these assertions.  Once again, however, at the motion to dismiss stage, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova*, 595 F.3d at 1124 (quoting *Smith*, 561 F.3d at 1098).  BOP also argues that PLN lacks standing to challenge BOP's alleged policy of returning the rejected publications prior to completion of a publisher's appeal, because "that is not the practice at the ADX."  [#31 at 19]  Although the Court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)," *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995), the Court finds it unnecessary and a waste of judicial resources to resolve this factual dispute at this stage given that ADX's alleged practice of returning rejected publications prior to the completion of the appeal is just one of several bases for PLN's due process claim [*see* #55 at 19].

constitutional claims.  As a result, the Court RECOMMENDS denying BOP's Motion to Dismiss Claim Three.

## IV.    ANALYSIS – MOTION TO STAY

BOP makes three arguments in support of its Motion to Stay.  First, BOP argues that the Court should first determine its jurisdiction before the parties proceed to discovery.  [*Id.* at p. 1]  Second, BOP argues that the Court should delay discovery until it determines whether PLN has adequately pleaded a plausible claim.  [*Id.*] Finally, BOP argues that the five-factor test set forth in *String Cheese Incident* supports staying the matter.  The Court addresses each argument below.

### A.  BOP's jurisdictional and adequate pleadings arguments

While this Court has discretion to stay proceedings while a dispositive motion is pending, a stay of proceedings is generally disfavored in this district.  *See*, *e.g.*, *Breckenridge v. Vargo & Janson, P.C.*, No. 16-cv-01176-WJM-MEH, 2016 WL 7015702, at *1-2 (D. Colo. Nov. 28, 2016) ("The decision to issue a protective order and thereby stay discovery rests within the sound discretion of the trial court. . . .Generally, it is the policy in this District not to stay discovery pending a ruling on motions to dismiss."); *Profitstreams LLC v. Ameranth, Inc.*, No. 11-cv-01710-RBJ-KLM, 2011 WL 5024912, at *1 (D. Colo. Oct. 21, 2011) ("Although the stay of proceedings in a case is generally disfavored, the Court has discretion to stay discovery while a dispositive motion is pending.").  BOP argues that the Court should stay discovery until it has determined: (1) that it has jurisdiction over the claims, and (2) that the Complaint asserts a plausible claim for relief.  But, jurisdictional and sufficiency of allegations issues are frequently raised in motions to dismiss and, as indicated above, such issues do not generally

cause courts in this jurisdiction to stay litigation.  There is nothing particularly unique about BOP's Motion to Dismiss that would alter the general presumption that discovery should proceed.[10]

Moreover, as indicated above, the Court is recommending to the Article III Judge that the Motion to Dismiss be denied.  Ultimately, that decision will be made by the Article III Judge.  Nonetheless, as outlined above, the Court believes that the law supports allowing the matter to proceed to discovery.  As a result, the Court does not see anything particularly unique about the nature of the Motion to Dismiss that would warrant a stay of the proceedings, and instead will review the Motion to Stay pursuant to the *String Cheese Incident* factors.

### B.  *String Cheese Incident* analysis

When considering whether to grant a stay, the Court considers the following factors: (1) the interest of the plaintiff in proceeding expeditiously with discovery and the potential prejudice to the plaintiff of a delay; (2) the burden on the defendant of proceeding with discovery; (3) the convenience to the Court of staying discovery; (4) the interests of nonparties in either staying or proceeding with discovery; and (5) the public interest in either staying or proceeding with discovery.  *See String Cheese Incident,* 2006 WL 894955, at *2; *Profitstreams LLC*, 2011 WL 5024912, at *1.  Considering these factors, the Court concludes that a stay is not warranted.

---

[10]  Notably, because PLM only seeks prospective relief and does not seek damages, qualified immunity is not at issue in this case.  *Cf. Iqbal*, 556 U.S. at 685 (noting that "[t]he basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'") (quoting *Siegert v. Gilley*, 500 U.S. 226, 236 (1991)).

First, Plaintiff has an interest in proceeding expeditiously. This case has already been pending for more than a year, and remains at the pleadings stage. Herein, this Court is issuing a Recommendation on the Motion to Dismiss. But, if any party files an objection, the district court will need to review that objection *de novo*. *See* 28 U.S.C. § 636(b)(1). Given that this case has already been pending for more than a year and that a final determination of the Motion to Dismiss could take several months, the Court finds the first factor weighs against granting a stay. *See Breckenridge*, 2016 WL 7015702, at *2 (finding first factor weighed against staying the matter; "a stay of proceedings in a civil case pending resolution of a dispositive motion can last several months or more"); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-cv-091468-WJM-BNB, 2011 WL 4018207, at *3 (D. Colo. Sept. 8, 2011) (finding stay unwarranted because, at the time, "[i]n this district, the average time from the filing to determination of dispositive motions exceeds six months").

BOP argues that the burden to PLN is minimal given that BOP is now allowing *Prison Legal News* to be distributed within ADX. [#34 at 10-11] But, as indicated above, nothing in the February 2016 change in the ADX institution supplement requires such continued distribution. Indeed, Mr. Chapman believes that at least three of the past issues should have been rejected. Moreover, the fact that this case has already been pending for fifteen months and remains at the pleading stage counsels heavily against further delay.

Second, while proceeding with discovery will cause some burden to BOP, BOP has not pointed to any unique aspects of this case that make discovery especially burdensome. BOP asserts that prison officials will likely need to be deposed and that

BOP will be required to respond to discovery.  [#34 at 11]  But, such is the case any time suit is brought.  *See Breckenridge*, 2016 WL 7015702, at *2 ("[D]efendants always are burdened when they are sued, whether the case ultimately is dismissed, summary judgment is granted, the case is settled, or a trial occurs.").  Thus, while the Court acknowledges some burden on BOP, that burden is not particularly unique.

Third, the Court's interest in controlling its docket outweighs any concern over use of judicial resources.  As indicated above, the policy in this district is to allow discovery to proceed.  BOP argues that discovery disputes may arise that would require the Court's resolution.  [#34 at 12]  But this is true in any case.  Nothing in this case presents unique challenges that would monopolize the Court's time.  As a result, the potential that some judicial resources will need to be spent to resolve discovery disputes does not outweigh the Court's interest in controlling its docket and ensuring the fair and speedy administration of justice.  *See Breckenridge*, 2016 WL 7015702, at *2.  Thus, this factor too supports a denial of the stay.

Fourth, the interests of third parties support denying a stay.  ADX inmates subscribe to *Prison Legal News* and they have an interest in a prompt resolution of this case.  If the Article III Judge denies the Motion to Dismiss, then resolution cannot occur until discovery has been completed.  Granting the stay will delay that discovery.  Thus, the fourth factor weighs against granting a stay.

Finally, the public interest supports denying the stay.  BOP argues that "the public has no interest in seeing unnecessary discovery proceed, especially where the efficient use of the resources of both a federal court and a federal agency charged with safely housing almost 200,000 prisoners are concerned."  [#34 at 13]  BOP has not

made any showing, however, that allowing discovery to proceed will somehow threaten the safety of its inmates.  Moreover, the public has an interest in the speedy resolution of legal disputes.  *See*, *e.g.*, *Genetic Techs Ltd. v. Agilent Techs., Inc.*, No. 11-cv-01389-WJM-KLM, 2011 WL 5024839, at *8 (D. Colo. Oct. 20, 2011); *Waisanen v. Terracon Consultants, Inc.*, No. 09-cv-01104-MSK-KMT, 2009 WL 5184699, at *2 (D. Colo. Dec. 22, 2009).  Thus, the fifth factor weighs against granting a stay.

Accordingly, weighing each of the *String Cheese Incident* factors, the Court **DENIES** the Motion to Stay.

## V.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** that Defendant's Motion to Stay [#34] is **DENIED**.  Further, the Court respectfully **RECOMMENDS** that Defendant's Motion to Dismiss [#31] be **DENIED.**[11]  The Court will conduct a Scheduling Conference in this matter on April 10, 2017 at 9:00 a.m.

---

[11] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review." *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (concluding that district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir.

DATED:  February 23, 2017                    BY THE COURT:

                                             s/Scott T. Varholak_____
                                             United States Magistrate Judge

---

1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).