## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

## BUREAU OF PRISONS' OBJECTIONS TO THE RECOMMENDATION [DOC. 62]

---

The Court lacks subject-matter jurisdiction over all claims in this case.  The claims are moot.

## BACKGROUND

### I.    Plaintiff challenged the BOP's rejections of eleven issues of a publication.

Plaintiff Prison Legal News ("PLN") "br[ought] this action to address the government's refusal to deliver numerous issues of *Prison Legal News* to inmate-subscribers at ADX."  Doc. 1 ¶ 2.  Between 2010 and 2014, the ADX had rejected eleven issues of its magazine.  PLN alleged that BOP had improperly rejected these issues because they included "content . . . that refers to ADX inmates or ADX or other BOP personnel," and that the BOP "treat[ed] any reference to any ADX inmate or staff member—current or former—as a security risk."  *Id.* ¶ 25.

In the Complaint, PLN sought different forms of relief.  Some of the relief it requested was retrospective:  it requested an order requiring the BOP to deliver all past issues of *Prison Legal News* "that have been previously been censored and withheld from PLN's subscribers at ADX," and "a declaration that Defendant's censorship of *Prison Legal News* . . . and lack of due process regarding such censorship violates the First and Fifth Amendments to the U.S. Constitution and the

[Administrative Procedure Act]."  *Id.* at 16 ¶¶ A, B.  PLN also requested broad, prospective relief:
an order for the BOP to deliver "all future issues of *Prison Legal News* absent a legitimate penological
interest supported by specific facts," and "to provide PLN with timely, individualized, specific, and
detailed notice" and other process for any future rejection.  *Id.* at ¶¶ B, C.

## II.     The BOP delivered the magazines and changed its practice.

When the case was brought in 2015, the ADX did reject publications solely because they
mentioned staff or inmate names, even if those names posed no security concern.  Decl. of ADX
Executive Assistant Todd Chapman, Doc. 31-1 ¶¶ 24, 28 (issues rejected because they identified a
BOP inmate or staff member); *see also* Decl. of ADX Warden Jack Fox, Doc. 59-1 ¶ 3.[1]  The BOP
decided to change this practice.  Doc. 31-1 ¶¶ 25-27, 29; Doc. 59-1 ¶¶ 17-21.  The undisputed
evidence shows that to do so, the BOP fundamentally revised its official policies and procedures[2]:

- In February 2016, the ADX implemented enhanced publication-review procedures to ensure
  that no publication will be rejected unless its content is "detrimental to the security, good
  order, or discipline of the institution or if it might facilitate criminal activity," as required by
  federal regulation.  Doc. 59 at 2-3 (discussing procedures required by Doc. 31-1, FLM
  5266.11C, *Incoming Publications* ("February 2016 Policy")); Doc. 31-1 ¶¶ 18, 29; Doc. 59-1
  ¶¶ 16, 17; *see also* 28 C.F.R. § 540.71(b).

- Under the February 2016 Policy, ADX personnel are required to articulate a security reason
  for every rejection, which must specifically describe how the content is detrimental to ADX
  security, good order, and discipline, describe that content by "page number, applicable
  quotes, and details," and identify the relevant rejection criteria in 28 C.F.R. § 540.71(b).
  Doc. 59 at 2; Doc. 59-1 at 17-18 (setting forth criteria to be met for every ADX rejection).

- ADX personnel are also specifically instructed that "[a]n incoming publication at the ADX
  may not be rejected solely because it discusses an ADX or Bureau inmate, or Bureau staff
  member.  When a publication identifies and discusses an ADX or Bureau inmate, or Bureau
  staff member, [Correctional Services Management/Special Investigative Services] staff must
  conduct an individualized assessment of each such incoming publication, taking into account

---

[1] Warden Fox confirmed and adopted each of Mr. Chapman's sworn statements, Doc. 59-1 ¶ 3, and
provided updated evidence that had accrued since the BOP filed its motion to dismiss in July 2016.
[2] The discussion of this evidence in the underlying briefing, *see* Doc. 31 at 3-6, Doc. 59 at 3-5, is
incorporated herein by reference.  Fed. R. Civ. P. 10(c).  The BOP summarizes the evidence here.

specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.71(b). CSM and SIS staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment." Doc. 59-1 ¶ 16.

- In addition, to ensure that the ADX will recommend rejection only when there is a finding that the content is "detrimental to the security, good order, or discipline of the ADX or if it might facilitate criminal activity[,]" ADX attorneys provide quarterly training on the February 2016 Policy to ADX employees involved in the publication-review process. Doc. 59 at 3-4. These enhanced procedures also include a mandatory review by ADX security personnel and attorneys before the Warden can even consider rejecting the publication. Doc. 31-1 ¶¶ 18-19.

- Since the adoption of the February 2016 Policy, no publication has been rejected at the ADX solely because it named an inmate or staff member. Doc. 59-1 ¶ 5; *see also* Supplemental Decl. of Jack Fox, Ex. 1 hereto at ¶ 1.

- PLN's magazine has not been rejected at the ADX since April 2014. Ex. 1 ¶ 5. Since the adoption of the February 2016 Policy, thirteen new issues of PLN's magazine have been delivered to ADX inmate-subscribers, each of which contained articles about the BOP, and most of which identified BOP inmates or staff members by name. Ex. 2 hereto (listing articles about the BOP in *Prison Legal News* from March 2016 to March 2017).[3]

- The eleven previously rejected issues of PLN's magazine have been re-reviewed under the February 2016 Policy, and the Warden determined that those issues would be delivered to inmate subscribers. Doc. 31-1 ¶ 28. On March 1, 2017, the previously rejected magazines were delivered to ADX inmates. Ex. 1 ¶ 4.

- Two high-level ADX officials have sworn, under penalty of perjury, that the ADX will continue to implement the highly effective review and training procedures in the February 2016 Policy, which "have made ADX staff, specifically CSM/SIS staff and [the Warden], more knowledgeable about the correct standards for evaluating incoming publications and more insightful when it comes to detecting genuine security threats—thus increasing the Bureau's ability to protect the safety of inmates, correctional staff, and the public. To revert to a less-thorough review process would undermine this critical penological interest." Doc. 59-1 ¶ 20; *see also id.* ¶ 17; Doc. 31-1 ¶ 29.

After these official policy changes, the BOP filed a motion to dismiss. It argued that the claims were both constitutionally and prudentially moot. It also argued that the well-pleaded facts

---

[3] The Court can take judicial notice of this content. *See, e.g., Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 162 n.5 (3d Cir. 2004); *Bardney v. United States*, 151 F.3d 1032, *4 (7th Cir. 1998) (table).

did not show that the rejections were made without notice and an opportunity to be heard.

### III.   The Recommendation found that the issues had been delivered, the policy had been changed, and none of PLN's recent issues had been rejected, but recommended holding the case not moot because of the possibility of future conduct that PLN would object to as impermissible.

The Magistrate Judge issued a Recommendation, Doc. 62, which recognized that the Warden had determined that all of the eleven previously rejected issues could be provided to the inmate subscribers. The Recommendation also observed that since the new policies and procedures at the ADX had been adopted, the ADX had not rejected any publication solely because it discussed a BOP inmate or staff member and had not rejected any issues of *Prison Legal News*. *Id.* at 6.

The Recommendation observed that it still remained possible, however, that the ADX might reject a future issue on a ground that PLN viewed as impermissible. *Id.* at 13. The Recommendation noted that PLN had complained, in the Complaint, that when prior issues of PLN had been rejected, the BOP had rejected certain material that reported on publicly available information, and the BOP had rejected the entire issue rather than redacting or removing the objectionable material. The Recommendation noted that while no issues of *Prison Legal News* had been rejected since the changes in the ADX policies, the policy changes would not prevent the ADX from rejecting material that was publicly available, or from rejecting an entire issue rather than just redacting the objectionable material. *Id.* at 12-13, 15-16. Because of this possibility that the ADX might reject a future issue on one of these grounds PLN had claimed were impermissible, the recommendation was to deny the motion to dismiss based on mootness. *Id.* at 16-17.

This Court should decline to accept the Recommendation because, under well-settled case law, the case is moot. As the Recommendation recognized, PLN no longer needs an order directing the BOP to provide the eleven issues in question, and the BOP has also eliminated the old name-alone policy that prompted the rejections of those issues of PLN's magazine. PLN claims that the

case is not moot because PLN also seeks broader prospective relief to govern how the ADX handles future publications.  But as set forth below, PLN has not made the showing required to justify those requests for relief.  PLN seeks a declaration that it was wronged, but a request for a declaration that a party was wronged is not enough to support jurisdiction.  Moreover, the fact that PLN desires to resolve certain general, abstract legal questions—such as whether the law would prevent the ADX from rejecting a publication whenever the objectionable material is public information, or whether the law would prevent the ADX from rejecting an entire publication instead of redacting the offending material—is insufficiently tied to any specific ongoing case or controversy to support this Court's exercise of jurisdiction to resolve those abstract issues.

The Court similarly lacks subject-matter jurisdiction over PLN's procedural-due-process claim, which challenged the procedures the BOP used in rejecting the eleven issues.  Those rejected issues have been delivered to ADX inmates.  Were this Court to order that PLN be given more process, PLN could obtain no more at the end of that process than the delivery of its magazines.  Conjecture about hypothetical future rejections and about possible defects in the ensuing appeal process does not support a claim seeking injunctive relief to require a particular type of process.

## ARGUMENT

## I.   The Court must conduct a *de novo* review of the evidentiary record and arguments.

This Court must review the Recommendation and the evidentiary record *de novo*.  Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  This *de novo* review requires the Court to "consider relevant evidence of record and not merely review the magistrate judge's recommendation."  *In re Griego*, 64 F.3d 580, 584 (10th Cir. 1995); *see also Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) ("When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.").  When performing this review, the Court

"may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3)).

## II.     The remaining claims for relief are moot.

The Constitution mandates that there be a live controversy at all times during a case; if a party loses standing during the pendency of a case, the court loses jurisdiction. *See, e.g.*, *PeTA v. Rasmussen*, 298 F.3d 1198, 1202-03 (10th Cir. 2002). "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *Ind. v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015). Mootness requires an assessment not only of each claim, but also of each request for relief. The Supreme Court has repeatedly emphasized that a plaintiff must demonstrate standing *separately* for each claim and for "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Here, PLN's Complaint requested three types of relief. First, it requested an order requiring the BOP to deliver all past issues of *Prison Legal News* "that have been previously censored and withheld from PLN's subscribers at ADX." Doc. 1 at 16 ¶ B. Second, it requested a declaration that these rejections had been in violation of "the First and Fifth Amendments to the U.S. Constitution and the [Administrative Procedure Act]" *Id.* ¶ A. Third, PLN requested broad, prospective relief to govern how the BOP would evaluate and process future publications. *Id.* ¶¶ B, C (requesting an order for the BOP to deliver "all future issues of *Prison Legal News* absent a legitimate penological interest supported by specific facts," and to "provide PLN with timely, individualized, specific, and detailed notice" and other process for each rejection).

There is no dispute that PLN's first request, for the delivery of the rejected issues, is no longer a live controversy. The BOP has delivered those issues to ADX inmate-subscribers, just as PLN requested in its prayer for relief. The sole issue is whether PLN's requests for a declaration

and for broad prospective relief are sufficient to show that this case has not become moot.

**A.     PLN's request for declaratory relief is not sufficient to support jurisdiction.**

The legal interest sufficient to support jurisdiction "must be more than simply the satisfaction of a declaration that the person was wronged"; rather, it must "affect[] the behavior of the defendant toward the plaintiff." *Wirsching v. Colorado*, 360 F.3d 1191, 1196 (10th Cir. 2004).  It is not sufficient to request a "retrospective opinion that [the plaintiff] was wrongly harmed by the [defendant]." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011).  After all, a legal declaration of whether the defendant's past actions were lawful does not necessarily affect how the defendant will act in the future.  *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1975-76 (2016) (in a case challenging a procurement and also seeking declaratory relief that the procurement had been improper, holding that "declaratory relief would have no effect here" once the services under the procurement had been provided); *Prier v. Steed*, 456 F.3d 1209, 1213-14 (10th Cir. 2006) (holding that a legal determination about whether a former employee had had the right to carry a firearm might provide the employee with a declaration that she "was wronged" but would not compel her employer to reinstate her; that request for declaratory relief thus would not support jurisdiction).

Typically, when a plaintiff has obtained the main relief sought, the plaintiff's additional desire for a declaration about the law does not suffice to support jurisdiction.  *See, e.g., Alvarez v. Smith*, 558 U.S. 87, 92-93 (2009) (holding that a case where plaintiffs sought return of allegedly wrongly-seized cars was moot when the cars were returned; the Court acknowledged that the parties "continue to dispute the lawfulness of the State's hearing procedures" that had preceded the cars' seizure, but held that this continuing "abstract dispute about the law" was not sufficiently concrete to show a continuing case or controversy); *Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (refusing to allow award of declaratory relief where a controversy existed at the start of a case but was no longer live).

Accordingly, "with respect to declaratory relief, [the Court] look[s] beyond the initial controversy which may have existed at one time and decide[s] whether the facts show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 892-93 (10th Cir. 2008) (in case challenging sales of leases, once the leases terminated, the additional request for declaratory relief was not supported by a "substantial controversy of sufficient immediacy and reality").

The delivery of the magazines mooted PLN's request for a declaration that the rejections violated the Constitution and the Administrative Procedure Act.  Doc. 1 at 16 ¶ A.  Issuing such a declaration now, after the magazines have been delivered, would amount to nothing more than a "retrospective opinion that [PLN] was wrongly harmed by the [BOP]." *Jordan*, 654 F.3d at 1025.  The Court cannot issue this illegal advisory opinion.  *Rio Grande Silvery Minnow v. Bureau of Recl.*, 601 F.3d 1096, 1109-10 (10th Cir. 2010); *CSG Exploration Co. v. F.E.R.C.*, 930 F.2d 1477, 1482 (10th Cir. 1991) (courts "cannot issue advisory opinions or 'decide questions that cannot affect the rights of litigants before them.'") (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

### B.    PLN lacks standing to seek the broad prospective relief it requests.

PLN faces an even higher burden to show that it has standing to obtain the forward-looking injunctive relief it seeks.  As noted, PLN requested broad injunctive relief to regulate how the ADX would evaluate and process future publications.  Doc. 1 at 16 ¶¶ B, C.

For a plaintiff to have standing to seek a permanent injunction restraining a party's future conduct, the plaintiff must show that future injury is reasonably certain.  For example, in *Buchwald v. Univ. of N.M. Sch. of Medicine*, 159 F.3d 487 (10th Cir. 1998), a student, challenging an admission policy, sought an injunction ordering her admission, and also sought "a different form of prospective relief"—namely, a permanent injunction prohibiting the school from considering a

certain factor in future admissions, as well as "a declaration that the present admissions policy is unconstitutional." *Id.* at 493. The Tenth Circuit held, however, that it was not persuaded "that plaintiff has standing to seek that specific form of prospective relief" because a request for "forward-looking injunctive or declaratory relief" required an "adequate showing" of another coming injury "in the relatively near future." *Id.*; *see also, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (plaintiff had no standing to seek injunction against police department's chokehold policy; the fact that plaintiff "may have been illegally choked" in the past "does nothing to establish a real and immediate threat" that he would be in the future, and allegations that police "routinely apply" the policy did not establish a case or controversy)*; PeTA*, 298 F.3d at 1202 ("claims for prospective relief require a continuing injury"); *F.E.R. v. Valdez*, 58 F.3d 1530, 1534 (10th Cir. 1995) (observing that past exposure to illegal conduct "does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects"); *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991) (to have standing to seek prospective relief, a plaintiff must "demonstrate a good chance of being likewise injured in the future").

Here, the evidence does not show that PLN faces such an imminent injury. PLN cannot point to any rejection it has faced at all since 2014; on the contrary, its issues have been delivered to ADX inmate-subscribers. The record establishes that the name-alone practice was the basis for the challenged rejections, but that this practice is a thing of the past and that all rejections at the ADX comply with the standards in 28 C.F.R. § 540.71(b). Under these facts, PLN cannot show it has standing to seek the sweeping forward-looking injunction it demands.

### C.    The possibility of future rejections did not show that there was still a case or controversy.

The Magistrate Judge did not reject the BOP's evidence showing that the name-alone practice has been eliminated. Nor did he find that the change was likely to be reversed.

9

Instead, the Magistrate Judge found that the claims were not moot because future issues of *Prison Legal News* might still be rejected, based on reasons *other* than the name-alone practice. The Magistrate Judge found that the February 2016 Policy "did not have an impact" on other practices PLN had alleged in its complaint, and he noted that those other practices might be repeated in the future. Doc. 62 at 12. The Magistrate Judge identified three practices that might be repeated. First, he noted the absence of "any representation" from the ADX Warden that content "similar" to that in the eleven rejected issues would not be rejected in the future. *Id.* at 16. Second, he noted that the ADX retains the authority to reject a publication even if the rejection was "based upon information that is publicly available or otherwise already known to BOP inmates." *Id.* at 13. Third, the Magistrate judge cited the fact that the BOP retains the authority to withhold rejected publications in their entirety, rather than redacting or removing objectionable content. *Id.* at 12-13.

In short, the Magistrate Judge found that these practices continued and might be repeated in the future. On that basis, he found that the case was not moot. In effect, the Magistrate Judge reasoned that the case was not moot because the BOP had not shown that certain practices, which PLN viewed as invalid, would not be repeated in the future.

This reasoning conflicts with the well-established law on whether a "capability of repetition" argument will defeat mootness. There is an exception to mootness if "the issue is a wrong capable of repetition which will evade review." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1215 (10th Cir. 2015). This exception is "narrow" and "is only to be used in exceptional situations," and the "plaintiff bears the burden of establishing" that this exception applies. *Id.* While the Magistrate Judge relied on the likelihood of repetition of the wrongs, the Recommendation did not cite this standard. The record here makes clear that this exception does not apply.

First, the "wrongs" the Magistrate Judge identified are not the practice that led to the rejections at issue in this case.  The record shows that the reasons for the rejections of PLN's past issues were the ADX's former practice of rejecting any publication that mentioned a BOP inmate or staff member.  That practice was the "wrong" that caused the rejections, and that practice has ceased due to policy changes.  Thus, any rejection of a future *Prison Legal News* issue would not be a "repeat" of the practice that caused the rejections at issue in this case.

Second, it is not enough to show that a wrong is capable of repetition; the plaintiff must also show that "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Id.*  PLN clearly has not met this prong.  Any future rejection of a publication would not be limited in "duration," and there would be no bar to PLN challenging any future rejection it chooses.  Thus, even if there is a chance that the ADX will reject future issues of *Prison Legal News* and will do so based on practices that PLN identified in its complaint here, this "chance of repetition" is not enough to show that this case has not become moot.

**D.     The "voluntary cessation" doctrine also does not apply here.**

PLN has argued that the ADX's adoption of a new practice amounts to "voluntary cessation" of the practice, and that this practice might re-occur.  This argument lacks merit.

As an initial matter, the Magistrate Judge noted this argument, but did not appear to adopt it. The Magistrate Judge discussed the new policy, but did not suggest that there was any evidence that the policy was likely to be abandoned; he noted that "Warden Fox testified under penalty of perjury that ADX will no longer reject an incoming publication solely because it identifies and discusses an ADX or BOP inmate or staff member."  Doc. 62 at 13.  Rather, the Magistrate Judge focused on aspects of the policy that had *not* changed.  In focusing on *unchanged* policies, the Magistrate Judge did not base his analysis on voluntary cessation, which is a doctrine that applies to *changes* in practice;

rather, the Magistrate Judge focused on whether PLN would be harmed by a *repetition of existing practices* (as discussed above).

In any event, the doctrine of voluntary cessation does not apply here.  First, the doctrine does not appear to apply when the requested relief has been provided.  *See Valdez*, 58 F.3d at 1534 (where a party requested files to be returned to a psychiatrist, and they were returned, "[t]he exception of voluntary cessation is not applicable" because the files had been provided).  Here, similarly, the requested issues of *Prison Legal News* have been provided to ADX inmate-subscribers.

Second, even if the doctrine does apply here, there is no evidence that shows that the ADX is reasonably likely to resume the challenged practice of rejecting publications that mentioned BOP inmates or staff.  The relevant question here is whether the BOP has carried its burden to show that the former practice of rejecting publications that merely identify inmates or staff—the reason the ADX rejected PLN's magazines—"could not reasonably be expected to recur."  *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013).  The BOP's evidence shows that it has met that burden.  The ADX has reworked its publication-review process from top to bottom.  It has taken on significant new burdens in connection with the process, involving security personnel and attorneys who would not otherwise be required to review publications.  It requires that personnel be trained quarterly on these procedures so that they understand that *no* publication can be rejected unless its content is "detrimental to the security, good order, or discipline of the ADX or if it might facilitate criminal activity[.]"  Doc. 59 at 3-4; *see also* 28 C.F.R. § 540.71(b).  These procedures have ensured the demise of the old name-alone practice.  And they have reduced the number of rejected publications for ADX inmates to a tiny fraction of the number of incoming publications.  Doc. 59-1 ¶¶ 4, 6, 8, 9; Ex. 1 ¶¶ 2-3.  These facts do not demonstrate any "reluctant submission" by the BOP, nor do thy signal a desire "to return to the old ways."  *Brown v. Buhman*, 822 F.3d 1151, 1167 (10th Cir. 2016), *cert.*

*denied*, 137 S. Ct. 828 (2017).

The Tenth Circuit has made clear that a government official is not required to provide an exhaustive explanation of the reasons behind a policy change. *Id.* at 1167 (rejecting argument that "prosecutor's promise not to bring charges is credible only if he believes enforcement would be unconstitutional"). All that matters is that the Warden has sworn under penalty of perjury that a publication that merely identifies inmates or staff will *not* be rejected at the ADX without a legitimate security justification for doing so. *Id.* (prosecutor's belief in constitutionality of former statute does not "render unreliable his or her statements to the court—signed under penalty of perjury—that he will not enforce it"). The undisputed evidence confirms that the Warden means what he says.

## III. The Court should exercise its discretion to dismiss the case as prudentially moot.

The prudential mootness doctrine "applies where, as here, a plaintiff seeks injunctive or declaratory relief." *Jordan*, 654 F.3d at 1024. A court may find that a case is not constitutionally moot, but that it is "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand." *Id.* at 1024-25 (discussing factors). Here, the facts discussed above support a finding that the case should be found prudentially moot. In addition, there are several additional strong reasons that support such a ruling.

### A. The nature of the dispute to be litigated is abstract and unclear.

First, the nature of the dispute PLN wishes to litigate is unclear. Past rejections of *Prison Legal News* issues occurred under a policy that has been substantially changed, and there are no recent rejections of *Prison Legal News*. There is no clear imminent injury to PLN. PLN challenges other broad practices, but it is unclear what the nature of any dispute would be.

A claim is "not fit for judicial resolution" when "it involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Morgan v. McCotter*, 365

F.3d 882, 890 (10th Cir. 2004); *see also Farrell-Cooper Min. Co., v. U.S. Dep't of Interior*, 728 F.3d 1229, 1234 (10th Cir. 2013) (observing that courts apply a functional approach in assessing ripeness of an issue for decision, evaluating "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration").

Resolution of the theoretical legal questions PLN wishes to litigate—whether the ADX can reject a publication based on public information and whether it can reject the whole issue when some material in the issue is objectionable—will be difficult in the abstract. Every one of PLN's magazines has been delivered to ADX inmate-subscribers, and a future rejection based on the "publicly available" practice (or for any other reason) is highly speculative and may never occur. *See Alvarez*, 558 U.S. at 92-93 (while the parties "continue to dispute the lawfulness of the State's hearing procedures" that had preceded the seizure of the plaintiff's now-returned cars, this continuing "abstract dispute about the law" was not sufficiently concrete to show a continuing case or controversy). The Court cannot know now what information may be "publicly available" months or years from today, or whether that information may be "otherwise known" to the ADX inmate population at the time. Nor can the Court prejudge that "public" information will never pose a security threat in the unique environment of the ADX. As the Magistrate Judge observed at oral argument, "publicly available" information about a sex offender could pose a threat to his safety at the ADX. Thus, a claim challenging the alleged "publicly available" practice will not be ripe until the specific facts supporting the yet-to-be-determined rejection are known.

Nor can the issues PLN raises necessarily be resolved in the abstract. For example, common sense dictates that not all "public" information—*e.g.*, an inmate's role as a government witness, his conviction for sexually assaulting a child—can be safely disseminated in a maximum-security prison. Some inmates may know this information, but many may not. As the BOP has explained here,

14

"[t]he fact that information may be publicly available, or even available to an inmate by means of the prison's Electronic Law Library, does not automatically mean that it is also suitable for introduction into a maximum security institution in the form of an incoming publication that highlights that information." Doc. 31-1 ¶ 26.  Nor can the Warden be expected to survey the inmate population to ascertain whether potentially dangerous "public" information is "otherwise known" to them.  An injunction that makes such demands on the Warden is not the least-intrusive means of addressing any violation related to censorship of publications at the ADX.

There is similar vagueness in the issue the Magistrate Judge identified, that the Warden might, in the future, reject issues of *Prison Legal News* that contain "similar content" to the eleven issues rejected in the past.[4]  The evidence shows that PLN faces no certainly impending risk that "similar" content will be rejected in the future because the basis for the previous rejections (*i.e.*, the name-alone practice) has been eradicated.  PLN has had three years of unrestricted access to ADX inmate subscribers, and the procedures in the February 2016 Policy ensure that no publication from any publisher will be rejected unless its content poses a legitimate security threat.  Nor can the Court issue an order enjoining the BOP to deliver all future issues of PLN's magazines containing "similar content" to that in the eleven past issues.  The vague term "similar content" admits of no precise, workable definition that can be articulated in a narrowly drawn enforceable injunction.  The Warden cannot know exactly what future content the Court—or PLN—may deem to be "similar" to that in the eleven rejected issues.

### B.     Litigation of the abstract legality of certain practices will be difficult, given legal limits on the relief the Court could provide here.

Second, litigation of abstract questions of ADX policy presents special problems given limits

---

[4] PLN did not specifically seek this relief in its complaint, *see generally* Doc. 1, but made the "similar content" argument in its response to the motion to dismiss.  Doc. 55 at 9.

on the prospective relief the Court can award under the applicable law.  Prospective relief is circumscribed by the Prison Litigation Reform Act ("PLRA") in "*any* civil action with respect to prison conditions," which applies here.  18 U.S.C. § 3626(a)(1)(A) (emphasis added).  PLN's claim about access to publications for ADX inmates is a claim about "the effects of actions by government officials on the lives of persons confined in prison."  *Id.* § 3626(g)(2).[5]  Under the PLRA's prospective relief provision, any injunction must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [use] the least intrusive means necessary to correct the violation of the Federal right."  *Id.* § 3626(a)(1)(A).  The Court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief," *id.*, reflecting the long-established rule that courts must give deference to "the professional judgment of prison administrators" in evaluating constitutional claims.  *Overton v. Bazzetta*, 539 U.S. 132 (2003); *accord*, *e.g.*, *Thornburgh v. Abbott*, 490 U.S. 401, 416 (1989) ("When the regulations at issue concern the entry of materials into the prison, we agree with the District Court that a regulation which gives prison authorities broad discretion is appropriate.").

It would be difficult to apply these standards here, where the prospective relief PLN seeks does not rely on specific issues of the publication.  A broad injunction would exceed the scope of the injunctive relief allowed under the Constitution and the PLRA.  That includes the injunctive relief contemplated in the Recommendation.  *See* § II.C., above.

Another legal limitation is that it would be difficult to draw a broad injunction.  The BOP has the legal obligation to assess what content is "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity."  28 C.F.R. § 540.71(b).  A broad

---

[5] The definition in § 3626(g)(2) is not limited to suits brought by prisoners, distinguishing it from other PLRA provisions that are specifically limited to prisoners.  *See*, *e.g.*, 42 U.S.C. § 1997e(a) (disallowing any action "*by a prisoner*" until administrative exhaustion is complete) (emphasis added).

injunction would intrude on the authority of the Warden, and other prison administrators, to exercise their correctional expertise to make the nuanced security judgments required to protect institutional and public safety.  *See* 18 U.S.C. § 3626(a)(1)(A) (prospective relief must be "the least intrusive means necessary to correct the violation of the federal right").  It would contravene the Supreme Court's directive that courts "accord substantial deference to the professional judgment of prison administrators[.]"  *Overton*, 539 U.S. at 132.  And it violates the statutory requirement that a court "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1).  This Court cannot prospectively judge, for all future ADX Wardens, (1) that there are no security risks associated with presently unknown and unknowable "publicly available" information, (2) that future "publicly available" information will be "otherwise known" among future ADX inmate populations, and (3) that future "publicly available" and "otherwise known" information can be given to unknown ADX inmates without compromising the security of the inmate population, prison staff, or the public at that time.

>    **C.**    **PLN can challenge any future rejections.**

Third, PLN will suffer no hardship if the Court withholds consideration of this speculative future claim.  *Farrell-Cooper*, 728 F.3d at 1235.  No issues of its magazine have been rejected.  A hypothetical challenge to future rejections of "public" or "similar" information does not "create[] a direct or immediate dilemma for the parties."  *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).  Postponing a decision on a conjectural claim until censorship of "publicly available" or "similar" information occurs, if it ever does, causes no harm to PLN.

>    **D.**    **The challenged practices were not a central factor in the past rejections.**

Fourth, the issues identified by the Magistrate Judge for resolution are not even tied to specific facts relating to the past rejections.

PLN's magazines were rejected solely because they identified inmates and staff, not because of any supposedly routine practice of rejecting "publicly available" information.  Doc. 31-1 ¶ 28 (magazines rejected solely because they identified inmates and staff).  PLN may contend that its magazine *could* be rejected pursuant to the alleged practice of rejecting "publicly available" information, or even that such a rejection is likely (though the evidentiary record contradicts that).  "Such 'some day' speculations are insufficient to establish an injury-in-fact for purposes of Article III standing."  *Colo. Outfitters*, 823 F.3d at 551.  At this point, it is pure speculation that PLN's magazine will ever be rejected when it contains "publicly available" information, or for any reason.

### E.   The involvement of a coordinate branch of government also supports finding prudential mootness.

Fifth, the special deference offered to the BOP, especially in the context of screening incoming publications to preserve public safety, supports finding this case prudentially moot.  Special considerations apply when a court evaluates claims seeking prospective relief against an agency of the federal government.  "[T]he remedial commitments of the coordinate branches of the United States government bear special gravity."  *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1211 (10th Cir. 2012).  In addition, courts take governmental promises seriously to encourage government entities to fix problems outside litigation.  *Id.*

These factors support the Court staying its hand here.  The evidence shows that the BOP has fixed the name-alone problem that prompted this lawsuit.  Continuing this litigation now would discount the BOP's commitment of substantial correctional, legal, and investigative resources.  It would discourage the BOP from trying to correct problems in the future.  And there is no reason to prolong this litigation.  The Court cannot enter an injunction that compels the ADX Warden never to reject any vaguely defined "publicly available," "otherwise known," or "similar" information.  And, in this case, the Court cannot order the ADX to abandon the practice of withholding rejected

publications because PLN lacks standing to bring that claim. The Court should apply the prudential mootness doctrine and dismiss PLN's First Amendment claim.

## IV.     PLN's procedural-due-process claim based on the past rejections is also moot.

PLN claims that its procedural-due-process rights were violated because it did not receive adequate notice or an opportunity to be heard concerning the rejections of the eleven issues of its magazine at the ADX. *See generally* Doc. 1 ¶¶ 37-47.[6] The Court lacks subject-matter jurisdiction over this claim.[7]

First, the delivery of the rejected issues of PLN's magazines mooted its request that the magazines be returned to ADX inmate-subscribers. Doc. 1 at 16 ¶ B. The appropriate remedy for a due-process violation is some form of additional process. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (in procedural-due-process context, the appropriate remedy is not damages, but "procedural protections as the particular situation demands"); *Codd v. Velger*, 429 U.S. 624, 627 (1977) (for a procedural-due-process claim "the remedy mandated by the Due Process Clause . . . is an opportunity to refute the charge"). The best outcome for PLN following more process would be the delivery of its magazines. PLN has obtained that relief. Similarly moot is PLN's request for a declaration that the rejections violated the Fifth Amendment and the APA. Doc. 1 at 16 ¶ A. Following the delivery of the magazines, that declaration would be nothing more than a "retrospective opinion that [PLN] was wrongly harmed by the [BOP]." *Jordan*, 654 F.3d at 1025.

PLN lacks standing to pursue relief demanding certain procedural protections "as to any

---

[6] The BOP does not object to the recommendation to deny its Rule 12(b)(6) motion to dismiss the procedural-due-process claim.

[7] The BOP respectfully acknowledges that it did not specifically argue to the Magistrate Judge that the Court lacks subject-matter jurisdiction over PLN's action to the extent PLN raises a due-process claim. However, "[f]ederal courts have an independent obligation to determine whether subject-matter jurisdiction exists . . . at any stage in the litigation," even if the parties have not raised that issue. *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1208 (10th Cir. 2012).

future issues that are censored."  Doc. 1 at 16 ¶ C.  PLN has no "certainly impending" injury associated with the allegedly defective procedures.  *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1150 (2013).  Every one of PLN's magazines has been delivered to ADX inmates.  The BOP has eliminated the practice that triggered those rejections.  No issue of PLN's magazine has been rejected in three years, though many articles have discussed BOP inmates and staff.  Ex. 2.  And rejected publications at the ADX overall have been reduced to a miniscule level since the implementation of the February 2016 Policy.  That PLN might someday face another rejection that would subject it to the BOP appeal procedures rests on a "speculative chain of possibilities" that does not give PLN standing to pursue a due-process claim now.  *Clapper*, 133 S. Ct. at 1150.

Nor is any due process claim challenging the appeal procedures ripe at this point in time.  A possible rejection, and any potential defects in the ensuing appeal process, are "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Morgan*, 365 F.3d at 890.  Unless and until those events occur, the Court has no concrete facts on which to base a merits evaluation.  It should refrain from considering an unripe due-process claim.

## VI.   Conclusion

The First Amendment claim that PLN brought is moot, nor does the Court have jurisdiction over claims about the abstract legality of certain practices.  The Court also does not have subject-matter jurisdiction over PLN's procedural-due-process claim.  The Court should sustain these objections, reject the Recommendation, and dismiss PLN's complaint.

Respectfully submitted on March 16, 2017.        ROBERT C. TROYER
                                                 United States Attorney
                                                 s/ *Susan Prose*
                                                 Susan Prose, Assistant United States Attorney
                                                 1801 California Street, Suite 1600
                                                 Denver, Colorado 80202
                                                 Tel.: (303) 454-0100; Fax: (303) 454-0404
                                                 E-mail: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on March 16, 2017, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

Steven Zansberg
Lance Weber
Sabarish Neelakanta
Peter Swanson
Matthew Shapanka
Elliot Mincberg
David Shapiro
Stephen Kiehl

s/ *Susan Prose*
Susan Prose
United States Attorney's Office