## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 15-CV-02184-RM-STV

PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER,

      Plaintiff,

      v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

_____

## PLAINTIFF PRISON LEGAL NEWS'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT
_____

This case arises from the unlawful censorship of a news magazine at the U.S. Penitentiary – Administrative Maximum Facility ("ADX") in Florence, Colorado.  Prison Legal News ("PLN") brought this action to challenge (a) ADX's improper rejection of eleven issues of *Prison Legal News* ("*PLN*") mailed to prisoner-subscribers and (b) the failure to provide adequate due process notice to PLN of the rejections.

A central issue in the case is whether the censorship of these issues bears any rational relationship to security concerns or other penological interests of ADX, as required by the First Amendment.  Defendant Federal Bureau of Prisons ("BOP") initially took the position, in moving to dismiss PLN's claims on mootness grounds, that the eleven issues had been censored pursuant to a blanket practice of censoring publications solely because they discuss an ADX or BOP prisoner, or BOP staff member (the "name only practice").  Ex. 37, Def.'s Mot. to Dismiss, ECF No. 31 at 2–3; *see also* Ex. 38, Decl. of Todd Chapman, ECF No. 31-1 at ¶¶ 24, 28; Obj. to

R&R, ECF No. 66 at 2.  But in rejecting BOP's mootness argument, the Court recognized that elimination of the name only practice would not moot the case, as PLN's claims were "not premised upon names alone."  Order of Aug. 14, 2017, ECF No. 81 at 9.  Rather, PLN's central claim was that the eleven issues of *PLN* were improperly rejected because the issues were not detrimental to the security, good order, or discipline of ADX.  *Id.*

During discovery, BOP shifted its position, claiming the wardens had *not* relied on the name only practice to reject *PLN*, but had made individualized determinations with respect to the rejected issues.  Ex. 10, Dep. of Todd Chapman (Mar. 16, 2018) ("Chapman Dep. II") at 32:22–34:5.  But BOP has still failed to provide consistent – let alone, rational – explanations for the rejection of the relevant issues of *PLN*.

The evidence obtained by PLN during discovery establishes violations of the First and Fifth Amendments, as well as the Administrative Procedure Act, with respect to the rejection of the eleven issues of *PLN*.  These constitutional claims rest in part on factual questions that are appropriately resolved at trial.  PLN, however, has identified four discrete issues that are ripe for summary judgment.  *First*, the censorship of the October 2011, November 2011, and September 2013 issues of *PLN*, which BOP has conceded were improperly rejected, violated the First Amendment.  *Second*, the censorship of the February 2013, April 2013, and July 2013 issues of *PLN*, which was based solely on information from published court opinions already available to ADX prisoners, violated the First Amendment.  *Third*, BOP regulations do not preclude PLN's argument that the First Amendment required ADX to redact or remove objectionable material in the rejected issues of *PLN*.  *Fourth*, all of BOP's rejection notices failed to provide sufficient notice of the reasons for the rejection of the issues of *PLN*, thereby depriving PLN of due process

in violation of the Fifth Amendment.  Because no disputes of material fact exist with respect to these four issues, the Court should grant this motion for summary judgment.

**FACTUAL BACKGROUND & PROCEDURAL HISTORY**

*Prison Legal News* is a monthly magazine that contains reviews and analysis of prisoner rights issues, reports on recent court decisions, and other news relating to the criminal justice system.  Plaintiff's Statement of Material Undisputed Facts ("SOF") ¶ 1.  *PLN* has subscribers at ADX.  SOF ¶ 2.

BOP has adopted regulations for all of its facilities, including ADX, that permit "an inmate to subscribe to or receive publications without prior approval" except where prohibited by statute or regulation.  28 C.F.R. § 540.70 (2015).  BOP regulations permit rejection of an incoming publication if the facility determines that the publication is "detrimental to the security, discipline, or good order of the institution or . . . might facilitate criminal activity."  *Id.*  The ADX warden must review an individual publication prior to rejection.  *Id.* § 540.71(c).  Upon rejection of a publication, the warden is required to "promptly advise the inmate of the decision and reasons for [rejection]," and such notice must also be provided to the publisher.  *Id.* § 540.71(d)–(e).  ADX's Institutional Supplement on Incoming Publications outlines procedures to implement these regulations at ADX.  *See, e.g.*, Ex. 34, ADX Institution Supplement 5266.11C.

Since January 2010, ADX has rejected in their entirety eleven issues of *PLN*:  the issues published in January 2010, June 2010, October 2011, November 2011, June 2012, November 2012, February 2013, April 2013, July 2013, September 2013, and April 2014 (the "Rejected Issues").  SOF ¶ 3.

3

For each of the Rejected Issues, the ADX official who rejected the issue signed a rejection notice. SOF ¶ 4. The rejection notice for each issue states that the issue was rejected because it was allegedly "detrimental to the security, good order, or discipline of the institution" or "may facilitate criminal activity." SOF ¶ 5. The rejection notices provide no explanation or reasons for why the cited content is purportedly detrimental to the security, good order, or discipline of ADX, beyond (in most cases) stating that a specific page or pages discuss an ADX or BOP inmate or BOP personnel. SOF ¶¶ 7–12, 16–17, 29–35, 40–41, 46–47, 52–53, 55–56.

In 2012, BOP reversed its rejections of two Rejected Issues after a prisoner appeal. An ADX prisoner appealed the rejection of the October and November 2011 issues to the regional BOP office, SOF ¶ 21, which remanded the prisoner's appeal to ADX for further review, SOF ¶ 22. On remand, ADX determined that these issues were improperly rejected, SOF ¶ 23, and delivered the two issues to the prisoner, SOF ¶ 24.

Several other *PLN* issues were rejected based on the discussion of a published court case. In particular, the allegedly objectionable content identified in the rejection notices for the February 2013, April 2013, and July 2013 issues consists of articles discussing published opinions of the U.S. Court of Appeals for the Tenth Circuit. SOF ¶¶ 34, 36, 40, 42, 46, 48. ADX prisoners have access to these cases through the ADX Electronic Law Library ("ELL"). SOF ¶¶ 37, 43, 49, 57. ADX does not censor these cases (or any cases) in the ELL. SOF ¶ 58. And the articles that gave rise to the censorship did not contain any information beyond what was reported in the published Tenth Circuit decisions. SOF ¶¶ 38, 44, 50.

All but one of the notices for the Rejected Issues cited page numbers on which the allegedly objectionable content appeared. SOF ¶¶ 7–12, 16–17, 29–35, 40–41, 46–47, 52–53,

55–56.[1]  The notices cited at most three pages as containing allegedly objectionable content.  *Id.*

Nevertheless, each of the Rejected Issues was rejected in its entirety, *see* SOF ¶ 6—*i.e.*, no effort

was made to redact or remove the allegedly objectionable content and deliver the remaining

unoffending portion of the issues, SOF ¶ 61.  The Rejected Issues contained, on average,

approximately sixty pages.  *See, e.g.*, Ex. 5, October 2011 *PLN* Issue (56 pages); Ex. 32,

September 2013 *PLN* Issue (64 pages).

On October 1, 2015, PLN filed suit to challenge BOP's practices.  Ex. 39, Compl., ECF

No. 1.  PLN's Complaint alleges that the censorship of the Rejected Issues violated the First

Amendment (Count I), *see id.* at ¶¶ 51–58; that BOP failed to provide adequate notice of the

censorship of the eleven issues in violation of the Due Process Clause of the Fifth Amendment

(Count II), *see id.* at ¶¶ 59–70; and that the conduct also violated the Administrative Procedure

Act ("APA") (Count III), *see id.* at ¶¶ 71–81.  PLN seeks declaratory and injunctive relief.  *Id.* at

16–17.

In 2016, BOP unsuccessfully attempted to dismiss PLN's Complaint, arguing that PLN's

claims were moot.  BOP claimed the Rejected Issues had been censored pursuant to ADX's

blanket practice of censoring publications solely because they discuss an ADX or BOP inmate,

or BOP staff member, but that ADX had eliminated this practice.  Ex. 37, Def.'s Mot. to

Dismiss, ECF No. 31 at 2–3; Ex. 38, Decl. of Todd Chapman, ECF No. 31-1 at ¶¶ 24, 28.

The Court rejected BOP's mootness argument.  The Court found that ADX's alleged

policy change actually changed "very little if anything" about ADX's treatment of incoming

---

[1] The rejection notice for the June 2012 issue did not specify a page number on which the allegedly objectionable material appeared.  SOF ¶ 30.

publications, as it did *not* expressly prohibit the use of the name-only practice or address PLN's

due process challenges.  Order, ECF No. 81 at 8.  And the Court recognized that even if BOP

*had* eliminated the name only practice, this change would not moot the case, because PLN's

claims are "not premised upon names alone."  *Id.* at 9.  Rather, PLN's central claim is that the

eleven issues were improperly rejected because the issues posed no threat to the security, good

order, or discipline of ADX.  *Id.*

After this lawsuit was filed, BOP re-reviewed the Rejected Issues and determined that

none of the issues was detrimental to security at ADX.  SOF ¶ 63.  Consequently, the Rejected

Issues were delivered to ADX prisoner-subscribers on March 1, 2017.  SOF ¶ 64.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Reed v. Bennett*, 312 F.3d

1190, 1194 (10th Cir. 2002).  When ruling on a motion for summary judgment, the Court should

construe the evidence "in the light most favorable to the party opposing the [summary judgment]

motion."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Once the moving party demonstrates the

lack of a genuine dispute as to any material fact, the burden shifts to the non-moving party to

demonstrate the existence of a genuine issue for trial concerning a material matter.  *Concrete*

*Works, Inc. v. City and County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  Summary

judgment for the moving party is proper "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

Partial summary judgment as to PLN's First Amendment claims (Counts I and III) is warranted with respect to the following issues: (1) the censorship of the October 2011, November 2011, and September 2013 issues of *PLN* violated the First Amendment; (2) the censorship of the February 2013, April 2013, and July 2013 issues of *PLN* violated the First Amendment; and (3) BOP is not precluded from redacting or removing content from *PLN*, as the First Amendment requires.  Further, PLN seeks partial summary judgment on its Due Process claims (Counts II and III), because BOP failed to provide PLN with sufficient notice of the reasons for the rejections of *PLN*.

## I.      PLN Is Entitled to Partial Summary Judgment on Its First Amendment Claim.

There is "no question" that magazine publishers have a First Amendment right to communicate with subscribing prisoners.  *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Courts assess regulations that impinge on First Amendment rights in prison by applying the test set forth in *Turner v. Safley*, 482 U.S. 78 (1987), which asks whether there is a rational link between the prison's stated penological goals and the regulation.  *Id.* at 89.  In making this determination, courts must consider (i) whether the regulation at issue is rationally related to a legitimate and neutral government objective; (ii) whether there are alternative means for prisoners to exercise the First Amendment right being restricted; (iii) whether the existence of easy and obvious alternatives suggests that the regulation is an "exaggerated response" by prison officials to security concerns; and (iv) "the impact that accommodation" of the right will have on other inmates, guards, and prison resources.  *Thornburgh*, 490 U.S. at 414–18.

Rationality is "the controlling factor," and if this first factor is not met, the constitutional inquiry ends. *Mayfield v. Texas Dep't of Crim. Justice*, 529 F.3d 599, 607 (5th Cir. 2008); *see also Jordan v. Sosa*, 577 F. Supp. 2d 1162, 1170 (D. Colo. 2008) ("If the court determines that a valid rational connection exists, then it must consider three other factors in determining whether the regulation is reasonable."). Prison authorities must show more than "a formalistic logical connection" between a regulation and the penological interest it serves. *Beard v. Banks*, 548 U.S. 521, 535 (2006). While prison wardens possess discretion to determine which policies will advance the prison's legitimate interest in security and order, this discretion does not allow them to adopt policies that take "certain shortcuts" leading to overly broad exclusions. *Thornburgh*, 490 U.S. at 416–17.

Under the second *Turner* factor, which examines whether there are alternative means for prisoners to exercise the First Amendment right being curtailed, the alternative means should fulfill the right "sensibly and expansively." *Wardell v. Duncan*, 470 F.3d 954, 961 (10th Cir. 2006). The third and fourth prongs of the *Turner* analysis assess (i) whether the existence of an "obvious, easy alternative[]" to censorship is evidence that the challenged regulation is an "exaggerated response" to safety concerns, and (ii) the impact a proposed alternative will have on the prison environment's safety and order. *Thornburgh*, 490 U.S. at 418.

While PLN contends that the rejection of all of the Rejected Issues violated the First Amendment, summary judgment is appropriate as to six of the issues because the undisputed facts establish that the rejections lacked any rational basis.

A.     **The Censorship of the October 2011, November 2011, and September 2013 Issues of _Prison Legal News_ Violated the First Amendment.**

The Court should grant summary judgment in PLN's favor on Counts I and III, with respect to the October 2011, November 2011, and September 2011 issues of _Prison Legal News_. BOP has admitted in discovery that these issues were improperly rejected, thereby demonstrating that there was no rational link between the stated reasons for rejection and the censorship of these issues.

According to the rejection notice, the October 2011 issue was initially rejected because pages 20-21 and 50 "contain information on FCC Florence inmates and staff." SOF ¶ 11. Pages 20-21 of this issue contain an article about a lawsuit brought by federal prisoners alleging constitutional violations and violations of the Administrative Procedure Act due to their placement in Communication Management Units.[2] SOF ¶ 13; Ex. 5, October 2011 _PLN_ Issue, PLN_0001187 at 1206–07. Page 50 of this issue includes two news briefings, one describing the federal trial of four prisoners at FCC Florence convicted of beating another prisoner to death, and the other describing the indictment of a BOP prison guard for stealing equipment from a BOP facility. SOF ¶¶ 14, 15. According to the rejection notice, the November 2011 issue was censored because pages 38 and 47 "contain information on inmates who cooperated with BOP investigations." SOF ¶ 16. Page 38 describes the Eleventh Circuit's reversal of the dismissal of an unidentified BOP inmate's lawsuit alleging that he was attacked by a BOP prison guard for

---

[2] On the face of this article, its connection to FCC Florence (ADX's sole stated reason for the censorship) is completely unclear. The article does not reference FCC Florence or the ADX, nor does it suggest that any of the named inmates are currently or have been previously incarcerated at FCC Florence. SOF ¶ 13; Ex. 5, October 2011 _PLN_ Issue, PLN_0001187 at 1206–07.

participating in an investigation.  SOF ¶ 18.  Page 47 describes a federal criminal case that was dismissed due to the BOP mishandling evidence.  SOF ¶ 20.

In January 2012, a PLN subscriber incarcerated at the ADX appealed the rejection of the October 2011 and November 2011 issues to the North Central Regional Office.  SOF ¶ 21.  The North Central Regional Office remanded the prisoner's appeal back to ADX for further consideration.  SOF ¶ 22.  Upon re-review, Acting Warden Dennis Stamper determined that the October and November 2011 issues of *Prison Legal News* "were improperly rejected," and provided both publications to the prisoner, but not to any other PLN subscribers, on August 10, 2012.  SOF ¶¶ 23, 24, 28.[3]

Despite the determination *in 2012* that these issues were "improperly rejected," BOP initially maintained in this lawsuit that the issues constituted security risks.  *See* Ex. 8, Def.'s 2d Suppl. Resp. to Pl.'s 1st Interrog. at 4-5.  But during the Rule 30(b)(6) deposition of BOP, the BOP's representative admitted that the October 2011 and November 2011 issues were improperly rejected by the ADX.  SOF ¶¶ 25, 26.

BOP has also conceded that the September 2013 issue was improperly rejected. According to the rejection notice, this issue was rejected because pages 18 and 20 contain the names of former BOP staff members who have been sentenced for criminal convictions.  SOF ¶ 52.  These pages were part of a report of nationwide arrests and convictions of prison employees.  SOF ¶ 65.  BOP's Rule 30(b)(6) witness testified that the September 2013 issue was

---

[3] ADX never informed PLN that an appeal of the rejection of these issues was successful.  SOF ¶ 27.

improperly rejected by ADX at the time that it was rejected, SOF ¶ 54, effectively conceding that the BOP lacks a rational basis for rejection of this issue.

In light of BOP's concession that the October 2011, November 2011, and September 2013 issues were improperly rejected, no dispute of material fact exists concerning whether these rejections violated the First Amendment, and this Court should grant summary judgment in PLN's favor on Count I with respect to these three publications.

**B.     The Censorship of the February 2013, April 2013, and July 2013 Issues of *Prison Legal News* Violated the First Amendment.**

The Court should also grant summary judgment in PLN's favor on Count I with respect to the February 2013, April 2013, and July 2013 issues of *PLN*.  It is undisputed that the information in these articles was already available to ADX prisoners through published judicial opinions in the ADX Electronic Law Library (the "ELL").  Because the censorship of such information is not rationally related to BOP's interest in maintaining security at ADX, BOP cannot satisfy the *Turner* standard, and summary judgment should be granted.

According to the rejection notices, the February 2013, April 2013, and July 2013 issues were rejected because they discussed "individuals incarcerated at U.S. Penitentiary Florence (ADX)."  SOF ¶¶ 34, 40, 46.  The allegedly objectionable content in each of these issues discusses a published decision of the Tenth Circuit.  *See* SOF ¶¶ 36, 42, 48.  These censored articles contain valuable legal information to ADX inmates.  For example, the censored February 2013 article discusses a Tenth Circuit ruling in a case brought by ADX prisoners who challenged their transfers to the facility.  SOF ¶ 36; Ex. 16, *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012). This article provides information for prisoners who might seek to challenge their transfer to ADX, and explains that in the Tenth Circuit, inmates do not have a liberty interest in avoiding

confinement at ADX.  *See* SOF ¶ 36; Ex. 14, February 2013 *PLN* Issue, PLN_0001572, at 1579-80.

All of the information in the censored articles is present in the published court opinions. SOF ¶¶ 38, 44, 50.  BOP admits that all three of these opinions are available to ADX prisoners through the ELL.   *See* SOF ¶¶ 37, 43, 49.  BOP further admits that it has never censored information contained in the ELL, even if it has been censored in an incoming publication such as *PLN*.  SOF ¶ 58.

During discovery, PLN sought BOP's contentions on whether these issues (and the other Rejected Issues) constituted a security risk.  BOP's interrogatory responses, which BOP supplemented on multiple occasions, never provided specific reasons for the rejections of these three issues. *See* Ex. 35, Def.'s 1st Supp. Resp. to Pl.'s Interrog. at 1-3; Ex. 8, Def.'s 2d Supp. Resp. to Pl.'s Interrog. at 3-6.  Nevertheless, BOP's 30(b)(6) witness suggested some justifications during his deposition—even though he neither signed the rejection notices nor had personal knowledge as to the reasons for the rejections.[4]

In any case, all of the information that BOP's witness claimed was a security threat is also contained in the published—and uncensored—court opinions referenced in the articles.  *See* Ex. 10, Chapman Dep. II at 222-23 (claiming identification of ADX inmates as terrorists justified censorship of February 2013 issue); Ex. 16, *Rezaq v. Nalley*, 677 F.3d at 1004 (stating "plaintiffs . . . were all convicted of terrorism offenses" and specifying specific offenses for each plaintiff); Ex. 10, Chapman Dep. II at 230-31 (claiming that identification of inmate as terrorist

---

[4] Notably, BOP's expert witness on prison security does not offer an opinion as to whether any of the Rejected Issues constitute security risks.  *See* Ex. 26, Dep. of Mark Collins (Apr. 19, 2018) ("Collins Dep.") at 11:22-12:7.

justified censorship of April 2013 issue); Ex. 19, *Al-Owhali v. Holder*, 687 F.3d 1236, 1239

(10th Cir. 2012) ("Al-Owhali was convicted of several terrorism-related offenses stemming from

the 1998 bombing of the United States embassy in Nairobi, Kenya."); Ex. 10, Chapman Dep. II

at 244:11-20 (claiming that identification of inmate and particular drug cartel with which he was

involved justified censorship of July 2013 issue); Ex. 21, *Palma-Salazar v. Davis*, 677 F.3d

1031, 1034 (10th Cir. 2012) ("Inmate Palma-Salazar is one of the leaders of the Sinaloa Cartel

which is an international Criminal Organization based in Mexico.").

There can be no legitimate reason to censor information that is also available to ADX

prisoners through the ELL.[5]  *See, e.g.*,  *Smith v. Daily Mail Pub. Co.,* 443 U.S. 97, 110 (1979)

(Rehnquist, J., concurring) ("It is difficult to take very seriously [the] asserted need to preserve

the anonymity of . . . offenders when it permits other . . . effective means of mass communication

to distribute this information . . ."); *In re Charlotte Observer*, 882 F.2d 850, 853-55 (4th Cir.

1989) (stating that "[w]here [suppression] is wholly inefficacious to prevent the perceived harm,

that alone suffices to make it constitutionally impermissible").  BOP's own expert witness on

prison security admitted that he was not aware of a situation that would justify limiting a

prisoner's access to a published court decision, nor a situation that would justify censorship of a

*PLN* article that solely repeats information in a published court decision.  *See* Ex. 26, Collins

Dep. at 127:19 - 128:3. Similarly, at the outset of this litigation, then-ADX Warden John Oliver

committed that ADX would take actions to ensure that "future issues of *Prison Legal News*, that

---

[5] Remarkably, BOP has suggested that "while inmates at the ADX have access to an electronic law
library, they may have no reason to search for specific information concerning another inmate or BOP
staff member."  Ex. 35, Def.'s 1st Suppl. Resp. to Pl.'s Interrog. No. 2, at 2.  This position raises
significant constitutional concerns, as it suggests that it is improper for PLN to bring critical legal
information to the attention of its inmate subscribers.

may contain personal information about an ADX inmate, will be more thoroughly reviewed to ensure information contained therein *is not already available publicly through the Electronic Law Library or other federal publications*."  SOF ¶ 60 (emphasis added).

The importance of the legal material contained in these censored issues confirms that their censorship was inappropriate.  The censored articles contain critical legal information about issues directly affecting the prisoners at ADX, such as how to, or indeed whether to, bring legal challenges related to their incarceration at ADX.  *See Palma-Salazar v. Davis*, 677 F.3d at 1036 (explaining that a legal challenge requesting transfer from one BOP facility to another must be brought pursuant to *Bivens*).  Indeed, BOP's expert witness recognized that *PLN* contains legal information that may be relevant to prisoners, and it is important for prisoners to have access to legal information.  *See* Ex. 26, Collins Dep. at 69:25-70:2.  Similarly, BOP's 30(b)(6) witness agreed that it is "important for prisoners to have access to legal developments that may relate to their own incarceration."  Ex. 10, Chapman Dep. II at 245:20-246:1.

There is no dispute of material fact that the information censored in the February, April, and July 2013 issues of *PLN* was available to ADX prisoners through published court opinions that were accessible in the ELL and were not censored by ADX.  Therefore, this Court should find that BOP's interest in maintaining security at ADX was not rationally related to the censorship of these publicly available judicial opinions containing important information on the legal rights of prisoners at ADX.[6]

---

[6] While the arguments contained herein are sufficient for purposes of summary judgment on the six issues discussed above, PLN has adduced further support through discovery for its contention that none of the Rejected Issues constituted a security risk at the time it was rejected.  For example, BOP has conceded that ADX prisoners have access to many other sources of information, and ADX should therefore develop

**C.**    **The BOP's Regulations Do Not Preclude PLN's Claim That the First Amendment Required the ADX to Redact or Remove Content from the Rejected Issues of *Prison Legal News*.**

PLN's as-applied challenge to BOP's unwillingness to redact publications as an alternative to wholesale rejection must be allowed to proceed to trial.  As the Magistrate Judge recognized in recommending denial of BOP's motion to dismiss, Supreme Court and Tenth Circuit precedent permit PLN to pursue an as-applied challenge to BOP's "all-or-nothing" practice, and this challenge requires BOP to "come forward with some evidence showing a rational basis for their complete censorship of the publications."  Order & Rec. of United States Magistrate Judge, ECF No. 62 at 22 (discussing *Turner*, *Thornburgh*, and *Shabazz v. Parsons*, 127 F.3d 1246 (10th Cir. 1997)); *see also Thornburgh*, 490 U.S. at 404 (upholding lower court decision to require individualized determinations of the constitutionality of BOP's all-or-nothing rule on an as-applied basis).

Yet despite this ruling, and despite the First Amendment's clear mandate for courts to consider "the existence of obvious, easy alternatives" to a given prison rule as evidence that the rule is an "exaggerated response to prison concerns," *Turner v. Safley*, 482 U.S. 78, 90–91 (1987), BOP claimed in discovery that the Code of Federal Regulations *prohibits* a Warden from redacting or removing objectionable portions of a publication—even though in the case of *PLN*, this practice results in the censorship of substantial amounts of concededly unobjectionable content.  *See* Ex. 28, Dunkleberger Dep. at 79:11–23.  As BOP asserted during discovery, "federal regulations and BOP national policy direct prison officials at the ADX to reject an entire

---

security measures that account for the assumption that prisoners may obtain the content rejected in *Prison Legal News* elsewhere.  *See* Ex. 35, Def.'s 1st Suppl. Resp. to Pl.'s Interrog. No. 2, at 2.

publication containing objectionable content, rather than redacting or extracting the content that is subject to rejection."  Ex. 36, Def.'s Resp. to Pl.'s Interrog. No. 19, at 7.  BOP further contends that a "publication" is defined by regulation as a "single issue of a magazine, periodical, newsletter, newspaper. "  *Id.* at 7–8 (citing 28 C.F.R. § 540.70).  Thus, according to BOP, the ADX Warden is not permitted to redact less than a whole "publication," even if he wanted to do so. As a result, ADX never made any effort to redact or remove the material in the Rejected Issues, SOF ¶ 61, and has *never* seriously considered redaction or removal of objectionable content as an alternative to wholesale rejection of publications, SOF ¶ 66.

Like all federal laws, BOP regulations are subordinate to the strictures of the Constitution, including the First Amendment.  The Administrative Procedure Act—which serves as the basis for one of PLN's claims in the Complaint—expressly compels courts to "hold unlawful and set aside any agency action . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  "Agency action" includes "the whole or a part of an agency rule," 5 U.S.C. § 551(13), including the BOP's definition of "publication," or its conclusion that it may only redact a publication in full.

Here, BOP has failed to meet its burden of demonstrating that the less restrictive alternative—redaction—is either more harmful, *Thornburgh*, 490 U.S. at 419, or cost prohibitive, *Shabazz*, 127 F.3d at 1249. This presents a factual matter that is appropriately resolved at trial.[7]  But there can be no question that the First Amendment duty to avoid an

---

[7] That such wholesale rejection is an exaggerated response is demonstrated by the fact that other prison systems deliver redacted versions of PLN after the removal of purportedly objectionable content (notwithstanding the pendency of PLN's appeal of such redactions).

"exaggerated response" to concerns about preventing objectionable material from entering a prison must preempt the BOP's interpretation of its regulation, even assuming, *arguendo*, that such interpretation is correct.[8]  Accordingly, PLN urges the Court to enter summary judgment that BOP's regulations do not preclude PLN's claim that, as applied, the First Amendment required redaction of the allegedly objectionable content contained in the Rejected Issues.

## II.     BOP's Failure to Provide Sufficient Notice of the Reasons for the Rejections of *Prison Legal News* Deprived Prison Legal News of Due Process in Violation of the Fifth Amendment.

The rejection notices for the Rejected Issues violated the Due Process Clause, because they failed to provide constitutionally adequate notice to PLN of the bases for censorship.  The notices in this case stated only that the issues discussed prisoners or staff, but the BOP has *conceded* that this fact alone does not justify rejecting a publication.  Because there is no dispute as to the content of the notices, PLN is entitled to judgment as a matter of law that the rejection notices were constitutionally inadequate.

The Fifth Amendment requires BOP to provide publishers with notice and an opportunity to be heard, whenever BOP rejects a publication.  *Jacklovich v. Simmons*, 392 F.3d 420, 433–34 (10th Cir. 2004).  But not *any* notice will suffice.  The amount of process required by the Fifth Amendment is context-specific.  As the Supreme Court has explained, the "timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved."  *Goss v. Lopez*, 419 U.S. 565, 579 (1975).  In the context of prison mail rejections, "the sender must have a *reasonable* opportunity . . . to protest the

---

[8] *But see Perez v. Mortg. Bankers Ass'n*, 575 U.S. ___, 135 S. Ct. 1199, 1208 n.4 (2015) ("[I]t is the court that ultimately decides whether a given regulation means what the agency says.")

decision." *Procunier v. Martinez*, 416 U.S. 396, 418–19 (1974) (emphasis added), *overruled in part on other grounds by Thornburgh*, 490 U.S. at 409-14; *accord Jacklovich*, 392 F.3d at 433 (applying the *Martinez* due process protections to publishers after *Thornburgh*).

The content of the rejection notices is not in dispute. *See* SOF ¶¶ 7–12, 16–17, 29–35, 40–41, 46–47, 52–53, 55–56.  Each of the notices states that the issue was rejected in accordance with BOP Program Statement 5266.10, which states that a "warden may reject a publication if it is determined detrimental to the security, good order, or discipline of the institution or if it may facilitate criminal activity."  SOF ¶ 5.  Each notice then contains a single additional sentence stating that the issue "discussed" or "contained information on" ADX or BOP prisoners or staff members.[9]  For example, the January 2010 rejection notice stated, "The publication has been rejected because the referenced pages contain information on an ADX inmate."  SOF ¶ 7.  The February 2013 rejection notice states, "The publication has been rejected because the referenced pages discusses [*sic*] individuals incarcerated at U.S. Penitentiary Florence (ADX)."  SOF ¶ 34.  None of the notices identifies the information about the prisoner or staff person that allegedly posed a security risk, nor did the notices provide any other reasons or information concerning the basis for the rejection. *See* SOF ¶¶ 7–12, 16–17, 29–35, 40–41, 46–47, 52–53, 55–56.

As the Court has recognized and BOP has conceded, the fact that a publication discusses a prisoner or staff member is not by itself a reason to reject a publication. *See* Order of Aug. 14, 2017, ECF No. 81 at 9–10 (explaining that, had ADX wardens rejected publications based only

---

[9] The rejection notice for the June 2010 issue states that the publication was rejected "because the referenced page contains information on a riot at USP Florence, and information on an ADX inmate." SOF ¶ 9.  While the reliance on the report of a riot provides an additional reason for rejecting this issue, the June 2010 notice offers no explanation for what information about the riot—which was also reported in general circulation newspapers—constituted a security risk.

on the names of inmates or staff, they would have "ignored their governing regulations"); SOF ¶ 62. Thus, a rejection notice that simply states that a publication mentions or discusses information about a prisoner does not identify any legitimate reason for rejection, and leaves PLN to guess as to what in the publication led to the rejection. Absent *some* indication of which information about the prisoner or staff member triggered the rejection, BOP has not provided PLN with adequate notice sufficient to permit a meaningful opportunity to be heard.

Nothing prevents BOP from providing additional information on its rejection rationale. BOP provided two sets of interrogatory responses during discovery in which BOP asserted that at least seven of the Rejected Issues constituted a security risk at the time of rejection. *See* Ex. 35, Def.'s 1st Suppl. Resp. to Pl.'s Interrog. No. 2, at 2–3; Ex. 8, Def.'s 2d Suppl. Resp. to Pl.'s Interrog. No. 2, at 4–7. While PLN disputes the substance of BOP's arguments, the fact that BOP articulated *any* justification to PLN for rejection of these issues—albeit *post hoc* rationalizations delivered in the context of litigation—simply underscores that BOP *could* have articulated some version of these rationales in a rejection notice at the time the Rejected Issues were censored.

Because the perfunctory nature of the rejection notices denied PLN the ability to engage in a meaningful opportunity to appeal the notices, PLN is entitled to summary judgment on its claim that the notices violated the Due Process Clause of the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment should be granted.

DATED: May 14, 2018

Sabarish Neelakanta
Masimba Mutamba
Human Rights Defense Center
PO Box 1151
Lake Worth, Florida 33460
Telephone: (561) 360-2523
Email:
sneelakanta@humanrightsdefensecenter.org
mmutamba@humanrightsdefensecenter.org

*Of Counsel:*
Elliot Mincberg
Washington Lawyers' Committee for Civil
Rights & Urban Affairs
11 Dupont Circle NW
Suite 400
Washington, DC 20036
Telephone: (202) 319-1000
Email: elliot_mincberg@washlaw.org

David M. Shapiro
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, IL 60611
Telephone: (312) 503-0711
Email: david.shapiro@law.northwestern.edu

*Attorneys for Plaintiff Prison Legal News*

Respectfully Submitted,

*s/ Terra W. Fulham*
Steven D. Zansberg
Ballard Spahr LLP
1225 17th Street, Suite 2300
Denver, CO 80202
Telephone: (303) 376-2409
FAX: (303) 296-3956
E-mail: zansbergs@ballardspahr.com

Peter A. Swanson
Terra W. Fulham
Matthew S. Shapanka
Alyson R. Sandler
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
FAX: (202) 662-6291
E-mail: pswanson@cov.com
        tfulham@cov.com
        mshapanka@cov.com
        asandler@cov.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF/CM electronic filing system, which will send electronic notification to all counsel of record.


*s/Terra W. Fulham*
Terra W. Fulham