# EXHIBIT 5

# PRISON
# Legal News

VOL. 22  No. 10

*ISSN 1075-7678*

*Dedicated to Protecting Human Rights*

October  2011

## The Failed Promise of Prison Privatization
### by Richard Culp, Ph.D.

We have been experimenting with prison privatization in the U.S. now for over twenty-five years. The privatization idea originated out of a notion that the private sector, with its competition-driven efficiency and innovation, could operate prisons of higher quality and lower cost than the public sector. Create a market for incarceration services, the argument ran, and the market will work its magic, improving prison conditions and rehabilitative outcomes while saving the taxpayers millions of dollars. That market has effectively been created over the past quarter century and we have now arrived at a place where prison privatization has been studied extensively and evaluated rigorously.

## Inside

| | |
|---|---|
| From the Editor | 12 |
| Florida Pen Pal Ban Upheld | 11 |
| HRDC Litigation Update | 12 |
| California Ad Seg Abuses | 16 |
| CMU BOP Suit Proceeds | 20 |
| $200,000 Child Birth Award | 22 |
| DOJ Sexual Assault Statistics | 30 |
| Strip Search Verdict Reduced | 32 |
| PLN Sues Arizona Jail | 36 |
| Taser Death Suit Settled | 40 |
| CCA Psychiatrist Rapes Prisoners | 46 |
| Louisiana Prisoner Castrated | 48 |
| News in Brief | 50 |

Although hyperbole continues to propel prison privatization policy along, research findings are incontrovertible: even in the best private prisons, quality of prisoner care is no better than in public prisons and the cost advantage of privatization, which initially accounted for minimal savings, is steadily eroding as the private prison industry matures. The big promises of prison privatization – less cost, higher quality – have simply not materialized. Despite these disappointing results, prison privatization advocacy maintains traction in diverse jurisdictions as policymakers from Ohio to Florida and from Maine to California seek expedient solutions to budget shortfalls triggered by a lingering great recession.

In retrospect, it should come as no surprise that prison privatization would fail to live up to its promises. There are several reasons for this. First, free market solutions to social problems like crime assume, after all, that there are "free" markets for appropriate services. However, there is no such thing as a natural market for the services provided by private prison companies. On the contrary, the marketplace for incarceration services is created by the government, for the government. It is an artificial market. Many of the services that have been privatized by government (e.g., custodial services, food preparation, medical care) are provided by the private sector independently of the government's decision to privatize or not. There is a free market analogue for many kinds of services that governments routinely provide. Other fields such as education and health care, for example, have an active market of existing nonprofit and for-profit providers willing to sell educational and healthcare services to a huge market of potential buyers that includes both individuals and governments.

The prison business is fundamentally different in that no one can freely purchase incarceration services as a private individual. There is no natural market for incarceration services. The power to incarcerate someone – to hold a person against his or her will – is a defining characteristic of the state. The government holds a monopoly over the legitimate use of physical force and the power to incarcerate. Only the government has the legitimate power to restrict a citizen's liberty; individuals are prohibited by law from incarcerating another person under "false imprisonment" statutes. The government can delegate this power on a limited basis – for example, "shopkeeper's privilege" allows merchants to temporarily detain suspected shoplifters. But long-term incarceration is a different matter. The only potential buyers who can legally purchase incarceration services are the government jurisdictions that have custody over indicted, convicted or detained persons. In order to privatize its incarceration function, the government has had to create a market since one does not and cannot exist without its direct intervention.

Secondly, the development of the private prison industry has resulted in a highly concentrated producer market where only four companies control over 90% of the incarceration services business. Economic theory tells us that when production is highly concentrated in very few companies, the market becomes an *oligopoly*, a market situation that is in-

PLN_0001187

# INMATE TOLL BUSTERS
## Discount Inmate Telephone Calling Services

Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide

FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours: 888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.


  

# Great Self-Help Book Deals
## From Prison Legal News!

### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer

**Order from Prison Legal News**
Add $6 shipping for orders under $50

Prison Legal News
P.O. Box 2420
West Brattleboro, VT 05303
Phone: 802 579-1309
www.prisonlegalnews.org


The Criminal Law Handbook
$39.99


Represent Yourself in Court
$39.99


Legal Research
$49.99


Nolo's Deposition Handbook
$34.99


NOLO
YOUR LEGAL COMPANION

PLN_0001188

PUBLISHER
**Rollin Wright**

EDITOR
**Paul Wright**

ASSOCIATE EDITOR
**Alex Friedmann**

COLUMNISTS
**Michael Cohen, Kent Russell, Mumia Abu Jamal**

CONTRIBUTING WRITERS
**Mike Brodheim, Matthew Clarke, John Dannenberg, Derek Gilna, Gary Hunter, David Reutter, Mike Rigby, Brandon Sample, Jimmy Franks, Mark Wilson, Joe Watson**

RESEARCH ASSOCIATE
**Sam Rutherford**

ADVERTISING DIRECTOR
**Susan Schwartzkopf**

LAYOUT
**Lansing Scott/ Catalytic Communications**

CHIEF COUNSEL,
HRDC LITIGATION PROJECT
**Lance Weber**

### *PLN* is a Monthly Publication

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. *PLN* accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News
P.O. Box 2420
West Brattleboro, VT 05303
802-257-1342
info@prisonlegalnews.org
www.prisonlegalnews.org**

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - **The Editor -** at the above address. We cannot return submissions without a SASE. Check our website or send a SASE for writers guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

### Failed Prison Privatization (cont.)

herently less competitive and innovative than a market with more broad-based representation. An oligopoly is characterized by interdependence, avoidance of competition and a rigid attachment to the status quo among the leading firms.

A third part of the story is that government itself unwittingly stifles innovation in the private prison industry. Since the only legitimate customers of prison companies are the jurisdictions that can indict, convict or otherwise detain people, the potential customer base for incarceration services is very limited. In practice, this has led to a situation where only a handful of customers, an *oligopsony* in economic terms, has come to dominate the customer base. The limited number of customers serves to dissuade private prison companies from conducting research and development into innovative correctional programming, as the tiny customer base tends to demand only those services that mimic what the governments themselves are accustomed to providing.

### Origins of the Artificial Market

Contracting out of noncustodial prison services such as medical care, food service, maintenance, education and mental health services has been practiced for a long time and with little controversy. Contracting out of custody services, for which there is no free market analogue, is much more controversial. The deinstitutionalization movement in juvenile corrections during the 1970s initiated a number of experiments in privatized services *and* custody for juveniles. A major step toward contracted custody of adults occurred when the Immigration and Naturalization Service (INS), the forerunner to today's Immigration and Customs Enforcement (ICE), decided in 1983 to partially outsource the detention of undocumented immigrants in its custody. In the summer of 1983, the INS issued a request for proposals and the newly-formed Corrections Corporation of America (CCA) submitted the winning bid.

Likewise, the community corrections movement in the adult system involved contracting out of the custody function in many low-security adult facilities. Minnesota passed the Community Corrections Act in 1971, and 25 states followed suit with similar legislation over the next 12 years. Community corrections legisla-

tion transferred funding from state-level departments of correction to local governments which, in turn, used the funds for halfway house programs and other services for lower-level offenders. Many jurisdictions turned to private contractors to operate these facilities.

In 1986, Management and Training Corporation (MTC) secured a contract to operate a community corrections facility in Eagle Mountain, California. Also in 1986, the State of Kentucky contracted out the development and operation of a 200-bed minimum-security facility in Marion County. Another newly-formed company, the U.S. Corrections Corporation, was awarded the contract. Similarly, the U.S. Bureau of Prisons (BOP) began contracting out the operation of low-security halfway house programs to the private sector during this time. Another early private prison company, Correctional Services Corporation, originally Esmor Correctional Corp., began business in 1989 with two contracts from the BOP to operate halfway houses in New York City.

These early entrants to the incarceration services market found a political climate supportive of privatization in several states, including Kentucky, Tennessee, Texas, Florida, Arizona, New Mexico and Louisiana. By 1994 there were approximately 20 companies actively seeking contracts to either build and manage company-owned prisons or manage existing facilities owned by federal, state and local jurisdictions.

### The Supply Side of the Incarceration Services Industry

The traditional industrial life cycle model suggests that new markets move through a process marked by four stages: fragmentation, shakeout, maturity and decline. The fragmentation period occurs when the industry is new, many entrepreneurs enter the market, and they operate at low volume and tend to serve narrow geographic areas. Eventually, a shakeout period occurs as some companies become more efficient and the less efficient ones fail to stay in business. Growth and competition are strongest during this period, as are the profits of the largest companies. The industry reaches maturity when growth slows and surviving companies try to solidify their positions in the industry. At some later time, the industry moves into decline as the demand for the product or service drops and companies seek new

PLN_0001189

## Failed Prison Privatization (cont.)

ways to recover profitability.

The decade of the 1990s witnessed the rapid growth of prison privatization, consolidation of the industry and the cooling off of growth rates as the decade ended. The industry moved through the traditional life cycle stages of fragmentation to maturity during this period. The industry experienced tremendous growth from 1992 to 1998, averaging an increase in capacity of 36% each year. But from 1999 to 2006, growth declined to an average rate of under 4% per year. As market maturity is commonly defined as reaching a state of equilibrium marked by the absence of significant growth or innovation, the industry reached maturity as the new millennium began.

The shakeout stage of the industry is reflected in the difference between the companies doing business in 1996 and those doing business in 2011. In 1996, there were 14 companies with private prison contracts in the United States. Table 1 lists these companies, their rated capacity and their market share of U.S. private prison business. A common measure of the dominance of companies in a given market is the market concentration ratio (CR), or the percentage of total industry sales (or capacity or employment, or value added or physical output) contributed by the four leading firms ranked in order of market share. A market is considered to have a high CR when the four leading firms control over two-thirds of market share, a moderate concentration when the ratio falls between one-third and two-thirds, and a low concentration when the top four companies control less than a third of total market share.

The four-firm market concentration

### TABLE 1: PRIVATE PRISON MARKET CONCENTRATION IN 1996

| | Bed Capacity | Market Share | CR |
|---|---|---|---|
| Corrections Corporation of America | 40,365 | 52.3% | 52.3% |
| Wackenhut Corrections Corporation | 19,479 | 25.2% | 77.5% |
| U.S. Corrections Corporation | 4,038 | 5.2% | 82.7% |
| Management & Training Corporation | 2,978 | 3.9% | 86.6% |
| Cornell Corrections, Inc. | 2,611 | 3.4% | |
| The Bobby Ross Group | 2,164 | 2.8% | |
| Correctional Services Corporation | 2,150 | 2.8% | |
| Capital Correctional Resources | 1,908 | 2.5% | |
| Maranatha Production Company, LLC | 500 | 0.7% | |
| The GRW Corporation | 302 | 0.4% | |
| Dove Development Corporation | 295 | 0.4% | |
| Fenton Security, Inc. | 228 | 0.3% | |
| Avalon Community Services, Inc. | 144 | 0.2% | |
| Correctional Systems, Inc. | 82 | 0.1% | |
| | | 100.0% | |

*Source:* Charles W. Thomas, Private Adult Correctional Facility Census, 1997 (formerly available at: http://www.crim.ufl.edu/pcp/)

ratio of the private prison industry was 86% in 1996, a significantly high level of concentration. But by the end of 2011 only seven companies remained in the private prison business, and the market share of the top four firms increased to 92% (see Table 2).

### Acquisitions and Ethical Challenges

The rise in concentration ratio means that the industry as a whole has become less competitive. Five of the companies that disappeared between 1996 and 2011 (U.S. Corrections Corporation, Correctional Services Corporation, Cornell Corrections, Inc., Fenton Security, Inc. and Correctional Systems, Inc.) were acquired by larger companies. Four other firms went out of business (Bobby Ross Group, Capital Correctional Resources, Dove Development Corporation and Maranatha Production Company, LLC). Three newcomers, LaSalle Southwest Corrections, Louisiana Corrections Services and Emerald Companies, are small and regionally-based in Texas and Louisiana. A review of the ongoing concentration in the market is illustrative of shakeouts in the industry and of some of the ethically-challenged behavior that can attend to the process of profit seeking.

The largest company – Corrections Corporation of America – acquired the third-ranked company, U.S. Corrections Corporation, in 1998. U.S. Corrections,

### SMITH'S GUIDE to HABEAS CORPUS RELIEF
for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence. 380 pages.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company

Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*

### TABLE 2: PRIVATE PRISON MARKET CONCENTRATION IN 2011

| | Bed Capacity | Market Share | CR |
|---|---|---|---|
| Corrections Corporation of America | 90,277 | 44.3% | 44.3% |
| GEO Group (formerly Wackenhut) | 63,366 | 31.1% | 75.4% |
| Management & Training Corporation | 25,295 | 12.4% | 87.8% |
| Community Education Centers | 9,243 | 4.5% | 92.3% |
| LaSalle Southwest Corrections | 7,680 | 3.8% | |
| Louisiana Corrections Services, Inc. | 4,738 | 2.3% | |
| Emerald Companies | 3,416 | 1.7% | |
| | | 100.0% | |

*Source:* CCA and GEO totals from their 2011 SEC filings, other companies' total capacity from their web sites

PLN_0001190

based in Kentucky, had much in common with Tennessee-based CCA. Both companies were founded by entrepreneurs who were well connected with the political establishment in their state. One of CCA's founders, Thomas W. Beasley, was a former chair of the state Republican Party and managed the successful 1978 gubernatorial campaign of Lamar Alexander. Honey Alexander, the governor's wife, was an early investor in CCA. U.S. Corrections Corporation, based in neighboring Louisville, did all of its business in Kentucky prior to 1995. Executives of the company contributed over $77,000 to political campaigns in the state between 1987 and 1993, including $23,000 to Governor Wallace G. Wilkinson and his wife Martha.

Clifford Todd, the CEO of U.S. Corrections, was implicated in a payoff scandal involving the company's contract to run the county jail in Louisville. He was arrested by the FBI in 1994, pleaded guilty to mail fraud and was sentenced to 6 months in jail and fined $250,000. He sold his stake in the company for $15 million in 1994. At the time of the buyout by CCA, U.S. Corrections owned a total of four facilities in Kentucky, Ohio and North Carolina with a capacity of 5,275 beds, and had contracts to manage publicly-owned facilities in Kentucky, Florida and North Carolina with a capacity of 5,743 beds.

The second-largest company in 1996, Wackenhut Corrections Corporation (WCC), was formed in 1984 as a subsidiary to security firm Wackenhut Corporation, which was founded by George Wackenhut, a former FBI agent. Over the ensuing years, WCC grew to become one of the largest private prison companies in the world. The company began providing residential services for at-risk juveniles and young adults under the Job Corps program. WCC went public in 1994 (with Wackenhut Corporation as the majority shareholder). In 2002, the Danish company Group 4 Falck merged with the Wackenhut Corporation and, indirectly, became the owner of 57% of WCC's stock. In 2003, WCC bought out Group 4 Falck's interest in the company and changed its name to the GEO Group, Inc. The GEO Group acquired the industry's seventh-largest company, Correctional Services Corporation (CSC), in 2005 and Cornell Corrections, the fifth-largest company, in 2010.

Founded in 1989, CSC operated under several different names, including Esmor Correctional Services, Inc. The company was founded by the owners of a welfare hotel in New York City and began its prison business operating halfway houses under contract with the BOP. CSC also managed the INS Detention Center in Elizabeth, New Jersey, remembered best for a June 1995 riot in which 300 detainees took over the facility in protest of poor conditions of confinement. Esmor staff fled from the detention center, leaving order to be restored by federal, state and local law enforcement officers. The INS closed the facility after the riot, noting that CSC guards had abused detainees, gave them spoiled food and deprived them of sleep. The facility was reopened in 1997.

Later, in 2003, CSC was fined $300,000 by the New York State Lobbying Commission for failing to report free transportation, meals and gifts given to a dozen state legislators from Brooklyn and the Bronx. The fine was the largest the state had ever imposed on a company for violating the state's lobbying laws. In May 2008, the Securities and Exchange Commission (SEC) filed charges against three Fort Lauderdale, Florida physicians, alleging insider trading in GEO Group's 2005 acquisition of CSC. According to the complaint, one of the three worked as a consultant to GEO and had a son who worked in GEO's finance department, where he allegedly learned of the pending deal. The three were charged with illegally purchasing $390,000 in CSC stock before the acquisition. Two of the defendants entered into settlement agreements while the third was cleared of the charges.

Another GEO acquisition, Cornell Corrections, Inc., had been the third-largest private prison company in 2006, with 8% of industry market share. Incorporated in 1994, the company built its business primarily with youth services and community-based rehabilitation programs for adults. Pirate Capital, LLC, a hedge fund firm, acquired a 13% interest in Cornell in 2004, becoming the com-

## Do you have diabetes? Is your diabetes under control?

Living with diabetes in prison is very difficult. Order your FREE copy of *Prisoner Diabetes Handbook: A Guide to Managing Diabetes — for Prisoners, by Prisoners.*

This handbook, written by prisoners, will explain:
• Facts about diabetes
• How to help yourself when you have diabetes
• Complications of diabetes
• The medical treatment you need to manage your health

**ORDER FORM**
Fill out the information below, and send this order form to:

Prison Legal News
PO Box 2420
West Brattleboro, VT 05303

*"When a diabetic patient is serious and informed about his disease, health staff have to be on their toes. They pay more attention."* —JAMES, A PRISONER LIVING WITH DIABETES

Order your FREE copy and start managing your diabetes and your health. Quantity is limited, so order today.

Name
ID number
Facility
Address
City        State        Zip

SPLC   Southern Poverty Law Center
*Handbook made possible by the Southern Poverty Law Center*

**CONVERT YOUR**
## POSTAGE STAMPS
to **MONEY ORDERS, WIRE TRANSFERS, PACKAGES**

**WE PAY THE HIGHEST REIMBURSEMENT RATES**

**COMPLETE OR PARTIAL BOOKS, STRIPS, OR SHEETS SINGLE STAMPS ACCEPTED 24-HOUR TURNAROUND**

**See Our Ad on Back Cover**
CLN, Box 687, Walnut CA 91788

**or Visit Our WEBSITE:**
**cash4urStamps.com**

PLN_0001191

## Failed Prison Privatization (cont.)

pany's largest shareholder, and replaced several board members and the company's CEO with financiers more oriented toward short-term growth. Pirate Capital unloaded its shares of Cornell in 2006 in the midst of an SEC investigation over its stock sales practices, several bad investment decisions and company downsizing. The company warned its stockholders in 2009 of looming problems in managing indebtedness of some $303 million. GEO Group bought Cornell, along with its debt, in 2010.

Management and Training Corporation (MTC) is the third-largest company currently providing incarceration services. MTC is a privately-held Utah-registered company that gained expertise in working with at-risk young people as a major provider of Job Corps programs. The company first entered the private prison market in 1987 when it received a contract to manage the Eagle Mountain Community Correctional Facility in Desert Center, California (which experienced a major riot that resulted in the deaths of two prisoners in 2003). MTC expanded slowly and steadily since 1987 and now runs a total of 20 correctional facilities in Arizona, California, Florida, Idaho, New Mexico, Ohio and Texas.

The company's generally positive reputation as a job training provider has been tarnished by its corrections experience. In 1997, MTC hired the former director of the Utah Department of Corrections, Lane McCotter, as Director of Corrections Business Development. McCotter was well connected in pro-privatization states, having served as director of both the Texas Department of Criminal Justice and the New Mexico Corrections Department before serving as the corrections head in Utah. He left the Utah DOC job in the midst of an investigation over the death of a prisoner with schizophrenia who had been shackled to a hard plastic chair for the final sixteen hours of his life.

In 2003, MTC's Santa Fe, New Mexico facility was under investigation by the U.S. Justice Department for unsafe conditions and poor quality prisoner medical care while McCotter was employed with the company. Nonetheless, that same year he was appointed by Attorney General John Ashcroft to serve on a U.S. Department of Justice team

commissioned to assess and implement a plan for rebuilding Iraq's criminal justice system. The team's final act before leaving Iraq was to conduct a ribbon cutting ceremony at the refurbished Abu Ghraib prison, a centerpiece of their corrections planning. Although the facility was empty when McCotter left Iraq, the work of the committee of experts was indelibly stained by the infamous events that subsequently occurred at the prison and from on-going human rights abuse allegations in prisons under the direct supervision of other committee members.

MTC was also involved in a failed experiment in prison privatization in Canada. In 2001, the company won a five-year contract to operate the Central North Correctional Centre (CNCC) in Ontario as part of a pilot project to compare operations of the CNCC facility with a similar publicly-run prison, the Central East Correctional Centre. The government hired PricewaterhouseCoopers to evaluate the two prisons across a variety of dimensions. The evaluation found that the public prison outperformed the MTC facility overall. While the MTC prison was cheaper to operate and provided a greater variety of programming than the government facility, the public prison rated significantly better on security, recidivism rates, health care and community impact. Based on the results of the experiment, Ontario decided to turn management of the privatized facility over to the public sector.

Community Education Centers (CEC), incorporated in 1996, rounds out the quartet of companies that control 92% of the current incarceration services market. Like MTC, CEC is a privately-held company whose finances and governance structure are much less transparent than is the case with publicly-held companies. Until a few years ago, CEC's business was concentrated in providing community-based residential, re-entry and rehabilitative services to offenders, mostly in New Jersey and Pennsylvania, but the company moved into the secure incarceration services business with its acquisition of CiviGenics in 2007.

CiviGenics was founded in 1995 in Marlboro, MA by Roy Ross, the former president of Spectrum Health Systems, Inc., a nonprofit company that provided drug and alcohol treatment services for prisoners in the Massachusetts Department of Corrections. Ross arranged a contract for CiviGenics to provide man-

agement of Spectrum's Massachusetts in-prison treatment programs. In 1996, CiviGenics acquired Fenton Security, Inc., a small company that had management contracts to operate two county jails in Colorado. Tom Rapone, a former Secretary of Public Safety in Massachusetts, joined CiviGenics as the firm's Chief Operating Officer. CiviGenics expanded its secure custody operations and by 1998 operated several small jail facilities, employed more than 1,000 staff and had revenues of more than $30 million.

In July 1999, the Ohio Department of Rehabilitation and Correction (ODRC) awarded CiviGenics a $14.9 million contract to operate the newly-built North Coast Correctional Treatment Facility (NCCTF) in Grafton. However, the ODRC elected not to renew its contract with CiviGenics when the contract expired in July 2001, citing problems with high staff turnover (including five different wardens in its first 18 months), repeated failure to maintain minimum staffing levels and problems with over-billing the state for positions that remained uncovered. The ODRC subsequently awarded the contract to MTC, which continues to operate the NCCTF facility.

In 2004, the Massachusetts State Auditor completed an audit that found Spectrum Health Systems had misused $17.4 million in state money, with $10.2 million of the total amount involving excessive payments to CiviGenics. The matter was settled in January 2007 in an agreement that required CiviGenics to repay the state $3.4 million and Roy Ross to repay $650,000. With its acquisition of CiviGenics in 2007, CEC became the fourth largest private prison company in the U.S.

### The Demand Side of the Incarceration Services Industry

The demand side of prison privatization, like the oligopoly of private prison companies, is also highly concentrated. The potential customers in the private prison market are government agencies at the federal, state and local level that operate jail, prison and detention programs. At the federal level, the Bureau of Prisons, the U.S. Marshals Service and Immigration and Customs Enforcement all manage a variety of custody facilities. The four branches of the military also operate facilities for military personnel sentenced under the Uniform Code of Military Justice. Of

PLN_0001192

course, the 50 states and the District of Columbia each have departments of correction.

According to the Bureau of Justice Statistics, there are some 1,821 state and federal correctional facilities, not counting facilities operated by the U.S. Marshals Service and ICE. At the local level, counties and cities operate about 2,875 jail facilities in the United States. In sum, the potential consumer base of the private prison industry numbers somewhere in the area of 4,700 facilities.

After over 25 years of correctional privatization, there are fewer than 200 private correctional facilities in the United States – only about 4% of all facilities. The federal government is the most actively involved in privatization, with 16.3% of federal prisoners serving time in private facilities. State governments are next, with 6.6% of state prisoners in private facilities. However, whereas 60% of all correctional facilities in the United States are at the local level, only about two dozen city and county jurisdictions (1.7% of the total) contract with private companies to operate their jails and detention centers.

In practice there are very few buyers of privatized incarceration services, and the federal government is the largest single customer. Between 2000 and 2008, the number of state prisoners placed in private prisons increased by about 25%, from 75,018 to 93,537. In the federal system, however, the number increased from 15,525 to 32,712, or about 110%. During the same period, the number of states placing some portion of their prisoners

in private facilities actually *declined* from 30 states to 27.

There are in practice only fifty-four "customers" buying incarceration services from the private prison industry – the three federal agencies, twenty-seven state departments of correction and two dozen local jurisdictions. Within this small customer base, the federal government plus eight states (Texas, Florida, Arizona, Oklahoma, Colorado, Tennessee, California and Mississippi) collectively account for more than 70% of all private prison business. In effect, the market of buyers constitutes an oligopsony, or a market form in which only a few customers buy a certain good and therefore possess the power to affect pricing. The two largest publicly-traded private prison companies recognize their dependency on a limited number of governmental customers as a threat to their profitability and include a warning to stockholders to that effect in their annual reports.

At CCA, just three federal government agencies, the BOP, ICE and the U.S. Marshals, accounted for 43% of the company's total revenue for fiscal year 2010, or $717.8 million. The state of California, which is placing thousands of prisoners out-of-state in an effort to reduce in-state prison populations, provided 13% of CCA's total revenue for fiscal year 2010, or $214 million. GEO Group reports that while they have a total of 45 governmental clients (customers), 4 of those clients accounted for over 60% of their U.S.-based revenue (BOP, ICE, U.S. Marshals and the State of Florida). Among those, the three federal agencies combined are re-

sponsible for 53% of GEO Group's total U.S. revenue.

The oligopsony of governmental consumers serves to discourage innovation. In practice, government purchasers of incarceration services have required that private prison companies simply duplicate policies and procedures practiced in public prisons, to the effect that the standard operating procedures of most private prison programs closely mirror those of public prisons in the same state. Notably, none of the companies have distinct and viable research and development departments as would be expected in an industry that values innovation. Private prison companies



**FREE BOOK CATALOG**

HUNDREDS OF BOOKS:
• FICTION • NON FICTION, • NOVENAS, • RELIGIOUS CARDS, • PASTIMES, ~ENGLISH & SPANISH~

**WRITE CLEARLY:** Name, Address, City, State & Zip Code, Booking Number and Prison.

For shipping expenses, SEND one dollar or three .44 cent US stamps for EACH catalog you order to:

40-Page, Full Color, Letter Size, Magazine type Catalog.

*CATALOG will NOT fit in #10 SASE

CIENTOS DE LIBROS:
• RELATO • HÁGALO USTED MISMO, • NOVENAS, • ESTAMPAS RELIGIOSAS, • PASATIEMPOS, ~INGLÉS & ESPAÑOL~

Para recibir un CATÁLOGO DE LIBROS en Inglés y Español, ENVÍE SUS DATOS JUNTO CON UN DÓLAR o 3 estampillas de correo de .44 cents para gastos de envío a:

**JAGUAR**
www.myjaguarbooks.com
**7271 GARDEN GROVE BLVD #E GARDEN GROVE, CA 92841**

**FREE! 12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription! Quarterly drawing **WINS $100! (Void in New York)** (Last Quarter's winner from **Navasota, TX.**) **TELL YOUR FRIENDS! ACT NOW!!**

**PO Box 2063 • Fort Walton Beach FL. 32549** www.InmateMagazineService.com

**Inmate Magazine Service**

PLN_0001193

## Failed Prison Privatization (cont.)

encourage the adoption of public prison practice, rather than the development of innovative practice, by actively recruiting management-level staff from within the public sector.

As a case in point, a review of the background of CCA's facility management staff suggests a widespread practice of mining the public corrections system for managers. Among the wardens of 63 of the company's correctional facilities, nearly two-thirds formerly worked in state departments of correction (36 wardens) or the federal BOP (5 wardens). The most warden-rich jurisdiction was the Texas Department of Criminal Justice, from whence 28% of all CCA wardens were recruited. These experienced staffers bring a degree of order and control to the company's private prisons, but they are not likely to be hired for their spirit of experimentation and innovation.

Arguably, private prisons are not looking to be innovative unless it is a way of cutting costs. The most common way for these companies to make money from government contracts is by reducing personnel expenses. Because labor represents about 80% of the operating cost of a prison, much of the cost savings in private prisons results from paying private correctional officers less than comparable public correctional officers. But this advantage begins to erode in a market where private companies are dependent upon contract renewals (with more experienced staff) rather than new facilities (with new, entry-level staff). Even as labor rates vary among the states, public sector correctional officer starting salaries average $28,000 across all states with a (one standard deviation) range between $23,000 and $34,200. By comparison, the Bureau of Labor Statistics reports a mean annual salary of $42,270 for all occupations in the United States (in May 2008). Public sector prison staff salaries are very low already, suggesting that it is not easy for the private sector to continue to undercut the government in personnel costs.

### Conclusion

The increasing concentration of market share among the top four companies and the declining number of companies in the incarceration services market mean that governments considering the privatization option

will find a decreasing competitive environment when seeking contract bids. In 1995, for example, a total of seven companies submitted bids in response to a Arkansas Department of Corrections request for proposals for two new privately-operated prisons. In contrast, a 2006 request for proposals to manage a private prison in Pennsylvania yielded only two bidders. With market maturation and increased concentration, it is increasingly difficult for new companies to get into the business and for marginal performers to stay afloat.

Oligopoly theory and industry life cycle theory suggest that the remaining companies will be less competitive overall, seeking interdependent relationships with their competitors to help secure their position now that industry growth rates have cooled. As this scenario continues to unfold, any possibility of meaningful cost savings from privatization will decline over time. A recent study of private prison costs in Arizona found that this has already occurred, as the cost of incarcerating minimum-security prisoners has reached parity between state prisons and private prisons while the cost of housing medium-security prisoners is now actually lower in state prisons than in private facilities.

The private prison industry bears a fair share of the responsibility for not registering a better showing in research results. Despite the fact that it has hired away from the public sector many "best and brightest" correctional staff, the industry's penchant for financially rewarding its executives and top managers has drained resources that could have been devoted to program research and development.

Governments have also played a role in the failure of private prisons to perform better, particularly in the area of program quality. As an oligopsony, governments hold the power to be more demanding in the area of performance yet have systematically failed to do so. In the main, contracting governments have simply abdicated demand for increasing program quality, settling for an illusory decrease in program costs. Given the history of "iron triangle" relationships that intertwine the private prison industry and government officials, this failure is perhaps not surprising.

One of the more depressing statistics to emerge in criminal justice in recent years is the fact that two-thirds of released

prisoners are re-arrested within three years. Enlightened government officials around the country have realized that they can reduce correctional expenditures only by focusing their efforts on reducing recidivism, not by building or contracting for more prison space. Government jurisdictions that are having the greatest success in reducing correctional expenditures are those that are turning to evidence-based practice to guide sentencing decisions and devoting correctional resources toward programs proven to reduce recidivism. Prison is not one of them. In enlightened jurisdictions, incarceration rates are beginning to decline.

As this trend continues, the private prison industry will eventually enter the fourth stage of the industrial life cycle – decline – and will begin shedding some of its capacity. Some companies have already sighted this trend on the horizon and have begun developing alternative business opportunities in areas such as electronic monitoring and prisoner health care. For those government agencies with heavy reliance on private prisons, decline in the industry will pose new problems as companies shed unprofitable contracts and simply walk away. Albert Einstein suggested that insanity is doing the same thing over and over again and expecting different results. If a quarter century of experience with prison privatization has not led to better quality and cost outcomes, it is time to take a more sane approach. ▧

*Richard Culp is an Associate Professor of Public Administration at John Jay College of Criminal Justice in New York City and the Coordinator of the Bachelor of Science in Criminal Justice Management program. He is also a member of the doctoral faculty in Criminal Justice at the Graduate Center of the City University of New York and serves as Deputy Executive Officer of the CUNY Criminal Justice Doctoral Program. Professor Culp's research has been published in Justice Quarterly, Journal of Contemporary Criminal Justice, Criminal Justice Policy Review, The Prison Journal and the Journal of Public Affairs Education.*

*This article includes new and expanded research findings previously published in "Prison Privatization Turns Twenty-five." In K. Ismaili (Ed.) U.S. Criminal Justice Policy: A Contemporary Reader (pp.183-209). Boston: Jones and Bartlett Publishers (2010).*

PLN_0001194

# PLN FUNDRAISER 2011



### *Please Support Prison Legal News and the Human Rights Defense Center!*



Prison Legal News, a project of the non-profit Human Rights Defense Center, cannot fund its operations through subscriptions and book sales alone. We rely on donations from our readers and supporters like you!

PLN conducts one fundraiser a year, and this is it; we don't bombard our readers with donation requests, only ask that if you are able to contribute something to our important work, please do so. Every dollar counts and is greatly appreciated and will be put to good use.

## Where does your donation go? Here's some of what we've done in the past year:

- Celebrated our 20th Anniversary of publishing *Prison Legal News*, which is the longest-running publication devoted to prison, jail and criminal justice-related news in the U.S.
- Published our second in-house book, "The Habeas Citebook: Ineffective Assistance of Counsel," by Brandon Sample.
- Filed a wrongful death suit on behalf of the family of a prisoner who died due to medical neglect at a jail in Nashville, Tennessee.
- Filed censorship lawsuits against jails in New Orleans, Kansas, Michigan, Arizona, California and South Carolina. We settled censorship cases involving jails in Georgia, Louisiana and Texas, as well as censorship suits against the Virginia DOC and a CCA prison in Arizona.

## With your help we can do more! You can mail a check or money order to:

### Prison Legal News, P.O. Box 2420, W. Brattleboro, VT  05303

*Or* call PLN's office at 802-257-1342 and use your credit card to donate.
*Or* visit PLN's website at www.prisonlegalnews.org and click on the "Donations" link.

## PLN Support Gifts

### Gift option 1

As a token of our gratitude for your support, we are providing the PLN card when making a donation of $50. The card is hand  embroidered by women prisoners in Bolivia who are paid a fair wage for the cards to help support their families.

### Gift option 2

In recognition of your support, we are providing the PLN hemp tote bag when making a donation of at least $75. Handmade in Vermont using hemp fiber. Carry books  and groceries stylishly and help end the war on drugs!

### Gift option 3

To show our appreciation for your support, we are providing the following selection of books for you to choose from when making a donation of $100. Donations of $100 or more can choose one free title. Each $100 donation entitles you to another free title; i.e., donate $500 and you get five books! $1,000 and you get everything on the page! Please circle the books you want and send the corresponding donation amount.










### Gift option 4

As a thank you gift for your support, we are providing the entire PLN anthology of critically acclaimed books on mass imprisonment signed by editor Paul Wright! (The Ceiling of America, Prison Nation and Prison Profiteers) plus the PLN hemp tote bag to carry the books in when making a donation of $250 or more.





PLN_0001195

# From the Editor

## by Paul Wright

Tropical storm Irene caused serious damage in Vermont on August 27 and 28, including in Brattleboro where our offices are located. We received a lot of phone calls, e-mails and inquiries asking if we were okay, and the good news is that our office is safe and sound and none the worse for wear, and only one of our staff was seriously affected by the storm. Dennis, our office manager, lost his tool shed and firewood due to flooding but the flood waters stopped an inch from his door. Thanks to everyone who was concerned about us.

This month's cover story regarding the private prison industry is the story the mainstream media should be covering but isn't. As states like Ohio, Arizona and Florida seek to privatize portions of their prison systems as part of the attack on organized labor (government employees are the last bastion of unionized workers left in the U.S.), little attention is being paid to the fact that the private prison industry is merely another mechanism to transfer public tax dollars into private hands.

By now subscribers should have received their annual fundraiser mailing from Prison Legal News, as it was mailed a few weeks before this issue of *PLN*. In addition to publishing the magazine, distributing books and advocating on behalf of prisoners, PLN often has to go to court to vindicate free speech rights and ensure prisoners can receive our written materials. We filed five censorship suits around the country in August and September alone.

While advertising, subscription and book sales make up most of our income, they do not cover all of our expenses. We rely on grants and donations from you, our readers, to make it through the year. We also have unanticipated one-time expenses that come up and need to be met.

Until the floods in August we had mistakenly thought that Vermont was not prone to regional disasters. While we back-up our data, we do not do so out of the region which can lead to problems. During Hurricane Katrina many businesses and organizations had their data backed-up off-site, across town. So while their computers were under 10 feet of water, their back-ups were under 20 feet. We emerged unscathed from the recent flooding (some parts of downtown Brattleboro were under 10 feet of water), and are now taking steps to immediately back-up our data out-of-state, which is an unforeseen expense of $4,000.

We do not bombard our readers with fundraisers; we do this once a year. If you can afford to make a donation, please do so. Even if you can't, please encourage others to donate, subscribe and purchase books from us. Every little bit helps. We are also doing a sample mailing of this issue of *PLN*. If you have received this copy of *PLN* and do not know if you are a subscriber, look at the label on the magazine. If there is a subscriber number and expiration date above your name and address, you are a subscriber. If not, this is a sample copy and you need to subscribe if you wish to continue receiving the magazine.

After we ran a photo of Nellie, our office mascot, a 12-year-old golden retriever, in our July issue, she received a number of donations from readers for doggy treats. Nellie was very happy with the treats and is coming to work reinvigorated to fight for human rights with all of her doggy might, and would like to thank everyone who donated on her behalf.

With the holidays fast approaching, if you don't know what to get your friends or loved ones consider a *PLN* subscription or a book from our book store. *The Habeas Corpus Citebook* and *Prisoners' Self-Help Litigation Manual* are must-haves for the library of any jailhouse lawyer.

This issue of *PLN* includes the first column by Lance Weber, Chief Counsel for the Human Rights Defense Center, the non-profit parent organization that publishes *PLN*. Lance has been with us for a year now and it has been a pretty non-stop year for him. It has been a pleasure working with Lance and he has quickly been getting up to speed on the various censorship and public records challenges that we face, as well as handling select catastrophic injury cases for individual prisoners.

The saddest part of being the editor of *PLN* is noting the passing of our friends and allies, and the downside of publishing for 21 years is that we have had more of these moments than I would like. On September 10, 2011, William "Lefty" Gilday, 82, a long-time class war political prisoner, died in prison in Massachusetts. Lefty was one of *PLN*'s earliest subscribers and a long-time activist and jailhouse lawyer. He was politicized while in prison in the 1960s while serving time for armed robbery. Upon his release he attended college and was active in the student movements of the time, and in 1970 was involved in a bank robbery to raise funds for the anti-Viet Nam struggle, during which a policeman was killed. He had five other co-defendants: Susan Saxe, Katherine Power, Stanley Bond, Robert Valeri and Michael Fleischer. Bond died in prison in 1972 while Valeri and Fleischer testified against the others, Saxe served seven years in prison and Power did six years after more than two decades as a fugitive.

*PLN* reported on a number of successful cases filed by Lefty, and I corresponded with him over the years. Despite his sentence of death-by-incarceration, he was always cheerful and resolute in the struggle for justice and human rights. Lefty will be missed by his many friends and supporters.

On that sad note, I hope you enjoy this issue of *PLN* and either subscribe yourself if this is your first encounter with *PLN*, or encourage others to subscribe if you are already a subscriber. ◪

---

**New for 2011 -- 3ʳᵈ Edition**
**WINNING HABEAS CORPUS & POST CONVICTION RELIEF**

**Updated through 609 F.3d, over 575 pages!** Used by attorneys, judges, and inmates. Write briefs directly from the book. (Not a two line summary bite of the case but actual opinion.)

**Attorney Kent Russell** writes: "Now that I've been turned on to Winning Habeas Corpus, I always make sure that it's close at hand.

- A virtual law library in a single book, actual case quotes
- Habeas corpus procedures & Prac., § 2254, Rule 60(b)
- Sixth Amendment & IAC, Pretrial duty to investigate
- Recognized defenses, plea bargain process
- Jury instructions, sentencing, time bar, tolling
- Over 1300 cases cited, 10" x 7" format, 10 pt. font

**Inmates only $58.50**
To order send money order or institutional check to:
Fast Law Publishing Associates
P.O. Box 577, Upland, CA  91785
On line:  www.fastlaw.org          e-mail:  flpa@clearwire.net

PLN_0001196

# FDOC Pen Pal Advertising Ban Passes Constitutional Scrutiny

### *by David M. Reutter*

In January 2011, a federal district court granted summary judgment to the Florida Department of Corrections (FDOC) in a lawsuit challenging FDOC rule 33-210.101(9), Florida Administrative Code, which prohibits prisoners from advertising for pen pals or receiving correspondence from organizations that provide such services.

The suit was filed by Joy Perry, who operates non-profit pen pal services called Freedom Through Christ Prison Ministry and Prison Pen Pals, and by the for-profit Writeaprisoner.com, Inc. (WAP).

Perry's services are both religious and secular; her prison ministry is free, connecting prisoners and persons on the outside. The purpose of her ministry is to reach prisoners who desire to learn about the Gospel of Christ through the exchange of letters.

WAP charges $40.00 per year to place personal ads seeking pen pals on the Internet. The fee includes printing out any email correspondence sent to prisoners and forwarding it via U.S. mail. WAP also assists prisoners in successfully re-entering society by allowing them to post a résumé free of charge.

Perry and WAP alleged free speech violations under the First Amendment and due process violations under the Fourteenth Amendment. Freedom Through Christ Prison Ministry also claimed violations of the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Florida Religious Freedom Restoration Act of 1998.

After the parties had engaged in discovery, both moved for summary judgment. The FDOC argued that the plaintiffs' "free speech claims are nothing more than cleverly disguised attempts to assert a third party's (namely the prisoners') rights." The court held that insofar as any third parties' rights were asserted, the plaintiffs lacked standing to bring such claims.

However, the district court rejected the FDOC's argument that the plaintiffs had not suffered an injury-in-fact. It held that both prisoners and non-prisoners "have a First Amendment interest in correspondence sent to one another," and the FDOC's ban on mail sent from the plaintiffs to prisoners "established that a concrete, legally protected interest that they enjoy has been harmed."

The court applied the four-prong test in *Turner v. Safely*, 482 U.S. 78 (1987) to determine whether the "no pen pal" rule withstood constitutional scrutiny. The district court accepted the FDOC's argument that the rule was necessary to prevent prisoners from scamming the general public. The court noted that the FDOC had produced an "abundance of evidence" that prisoners' use of pen pal services had "led to widespread fraud schemes throughout the country." The court also credited the testimony of former FDOC employee Steven Arnold, who said "such scams were common in the FDOC system" before the rule's enactment in 2004. His testimony was accepted despite "Arnold's inability to point to a specific instance of a scam."

"Additionally, the large amounts of money that are collected by inmates through these scams threatens internal prison security," the district court wrote. "Indeed, it is not farfetched to envision a prison climate wherein large amounts of money was present and was rife with extortion, bribery and the purchasing of various 'services.'"

As such, the court decided the FDOC rule barring pen pal services had a "valid, rational connection" to a legitimate penological interest. It also found the plaintiffs could individually write to or visit prisoners, thus an alternative means of expression existed. Additionally, WAP could modify its return address to distinguish its résumé service, which was permissible, from its pen pal service, which was disallowed under the rule.

The district court further held that Perry had no standing to bring a RLUIPA claim because RLUIPA applies only to institutionalized persons, and that the FDOC was entitled to sovereign immunity on her state law claim. The court also found there were no due process violations in the procedures used to protest the FDOC's censorship of pen pal services.

The FDOC's motion for summary judgment was granted and the plaintiffs' motion was denied. Costs of $3,412.35 were assessed against Perry and WAP on July 15, 2011. This case is presently on appeal to the Eleventh Circuit. See: *Perry v. Hicks*, U.S.D.C. (M.D. Fla.), Case No 3:09-cv-00403-MMH-JRK. ◼



**Tired of waiting on pen pals?**
**Talk to a PHONE PAL**

•We provide a phone pal for you.
•It's more affordable than ever.
•Why write when you can call?

719-297-1909     Tele-Pal.com



# EXECUTIVE  CLEMENCY

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT
5928 HIXSON PIKE, STE. A-363
HIXSON, TENNESSEE, 37343
(423) 843-2235**

**(35-Years of Clemency & Parole Assistance)
(Transfers Under The Int'l Prisoner Treaty)**

PLN_0001197

# Human Rights Defense Center Litigation Update

## *by Lance Weber*

This month marks the beginning of my second year practicing law with the Litigation Project of the Human Rights Defense Center. The Litigation Project was envisioned by PLN founder Paul Wright as a complement to HRDC's principal project, Prison Legal News, for the purpose of engaging in litigation that advances the basic human rights of all prisoners – with the core focus being to ensure that prisoners can actually receive PLN's books and monthly publication. In recent years, the attempts to censor *PLN* have increased dramatically and have consumed ever-increasing staff resources.

The number of severe violations of constitutional rights I read about on a daily basis is almost overwhelming. Sometimes I feel like I am standing outside in a thunderstorm trying to catch all the rain in a teacup. Although I cannot respond to every letter we receive, each one is methodically recorded and catalogued in anticipation of future litigation. If specifically requested to do so, I will forward letters to other counsel who may be interested in assisting prisoners with the litigation of their claims.

Since its inception, HRDC has encouraged (through *PLN* and the books it distributes) individual prisoner self-help as the primary vehicle for improvement of conditions of confinement due to the overwhelming need coupled with a lack of resources, but today HRDC is also positioning itself for direct action. Due to our very limited resources we can only review cases involving the most egregious legal violations and we have limited our representation of individual prisoners to catastrophic injury claims involving those severely injured by the criminal justice system, the estates of prisoners killed by institutional deliberate indifference, and wrongful conviction cases where a court has reversed the conviction. More information about this particular aspect of the Litigation Project will be shared in the coming months.

Together, *PLN* and its readers continue to expand First Amendment freedoms for all prisoners and those who wish to communicate with them. As many of you know, *PLN* encounters no difficulty in gaining access to prisoners at professionally-run prisons and jails. Law-abiding wardens and their staff have nothing to fear from a well-informed prisoner population whose members are not only aware of their rights but also know how to get judicial relief when they are wronged.

However, prison and jail officials who habitually break the law are perpetually busy inventing new justifications to try to keep PLN's publications out of the hands of prisoners. Because PLN's continued vitality is essential to HRDC's mission, we have engaged a network of civil rights lawyers across the country to vigorously pursue the enforcement of PLN's constitutional rights whenever prison or jail officials implement policies that prevent prisoners from receiving PLN literature. As in-house counsel, I am involved in each of PLN's lawsuits and am responsible for ensuring that outside counsel is apprised of any new evidence relevant to patterns of censorship which are the focus of our First Amendment litigation.

At the moment, county jails are being much more problematic than state prisons. Some sheriffs and other officials in charge of county jails are still trampling on the First Amendment rights of prisoners and their correspondents with wild abandon almost 40 years after the U.S. Supreme Court held that the First Amendment applies to prisoner mail in *Procunier v. Martinez*, 416 U.S. 396 (1974) (striking down a California prison regulation which declared the use of mail by prisoners to be "a privilege, not a right").

Indicative of this phenomenon, 7 of PLN's 9 open and active censorship cases are pending in federal courts against the policy-makers of various jails. PLN needs your help to continue to right these wrongs and I want to encourage you to contact me if you learn about an illegal mail policy at one of these "troubled" facilities where *PLN* or its books are censored. We generally only have legal standing to act when PLN publications are censored.

Since there are about 3,800 jails in America, it is nearly impossible for us to learn which ones have illegal mail policies unless *PLN* readers let us know. Typically, a problem jail is brought to our attention by a *PLN* subscriber who submits a request for a change of address when he or she is transferred to a county jail for purposes of a new trial or some other proceeding that necessitates their presence at the county courthouse. When the next month's issue of *PLN* arrives at the jail, it is either returned to *PLN* after being marked "no magazines allowed" or a similar notation, or it simply gets thrown in the trash. Especially troubling is the fact that many of the jails engaging in these unlawful practices are very large facilities with sizeable populations where prisoners are housed for long periods of time.

Most of *PLN*'s subscribers are astute enough to file grievances when they happen to miss a monthly issue. It is critical to document the censorship of *PLN* materials when that occurs. When *PLN*'s readers send those grievances to me, I can begin to put together a case to vindicate the First Amendment rights of *PLN*, its readers, and all other prisoners and their correspondents. As we move on into this next year, I look forward to working with you to expand and solidify First Amendment protections by ensuring that prisoners at all detention facilities are able to receive *Prison Legal News* and the books and other literature that PLN distributes.

*Lance Weber is Chief Counsel of the Human Rights Defense Center's Litigation Project.*

---

### A Jailhouse Lawyer's Manual (9th ed.) and Immigration & Consular Access Supplement

**The JLM** released its **new 9th edition** in April 2011. The JLM explains prisoners' rights, and helps them to navigate the justice system using federal, state, and New York law. It can help prisoners:

- Learn the law and go to court
- Appeal their conviction or sentence
- Get conditional or early release
- Receive adequate medical care
- Protect their civil liberties
- Enforce their right to religious freedom

**The Supplement** explains the immigration law consequences of prisoners' convictions, and their right to contact their consulate.

Prisoners: The JLM is $30. The Supplement is $5. Prices include first class shipping.

Institutions & Lawyers: The JLM is $100 . The Supplement is $20. Prices exclude shipping.

We accept checks and money orders only. We cannot accept stamps or credit cards. We accept purchase orders from institutions only. Please note we cannot send free copies of the JLM nor can we provide legal advice.

**Send orders and questions to:**
Columbia Human Rights Law Review
ATTN: JLM ORDER
435 West 116th Street
New York, NY 10027
Or email: jlm.board.mail@gmail.com

The JLM is published by the *Columbia Human Rights Law Review* at Columbia University School of Law. Visit us online at:
http://www3.law.columbia.edu/hrlr/ejlm.php

---

PLN_0001198



*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - *ONLY* $20!

*"BEST DEAL ON THE POUND!"*

## Check your **5** magazines
and underline three backup choices (in case of unavailability)

- ☐ 4 Wheel & Off Road (12)
- ☐ Allure (12)
- ☐ American Photo (6)
- ☐ Arthritis Today (6)
- ☐ Automobile (12)
- ☐ Backpacker (9)
- ☐ Boating (10)
- ☐ Bon Appetit (12)
- ☐ Bowhunt America (9)
- ☐ Bridal Guide (6)
- ☐ Cabelas Outfitter Jrnl (6)
- ☐ Car & Driver (12)
- ☐ Complex Magazine (6)
- ☐ Conde Nast Traveler (12)
- ☐ Country (7)
- ☐ Cycle World (12)
- ☐ Detroit Home (6)
- ☐ Dirt Rider (12)
- ☐ Ebony (11)
- ☐ Elle (12)
- ☐ Elle Décor (10)
- ☐ Entrepreneur (12)
- ☐ ESPN (26)
- ☐ Esquire (11)
- ☐ Family Circle (15)
- ☐ Family Fun (10)
- ☐ Fast Company (10)
- ☐ Field & Stream (12)
- ☐ Fitness (10)
- ☐ Florida Sport Fishing (6)
- ☐ Fly Fishing in Salt Water (6)
- ☐ Flying (12)
- ☐ Four Wheeler (12)
- ☐ Freeskier (6)
- ☐ Golf Digest (12)
- ☐ Golf Tips (7)
- ☐ Glamour (12)

- ☐ Golf Week (45)
- ☐ Harpers Bazaar (11)
- ☐ Heart & Soul (6)
- ☐ Hispanic Business (10)
- ☐ Hot Bike (12)
- ☐ Hot Bike Baggers (12)
- ☐ Hour Detroit (12)
- ☐ Inc Magazine (12)
- ☐ Jet (36)
- ☐ Ladies Home Journal (11)
- ☐ Latina (10)
- ☐ Log Home Living (12)
- ☐ Los Angeles Magazine (12)
- ☐ Lucky (12)
- ☐ Marie Claire (12)
- ☐ Men's Fitness (10)
- ☐ Men's Journal (12)
- ☐ Motor Trend (12)
- ☐ Midwest Living (6)
- ☐ Motorcyclist (12)
- ☐ Muscle & Fitness (12)
- ☐ Muscle Mustangs & Fast Fords (12)
- ☐ Nylon (10)
- ☐ Off-Road (12)
- ☐ Old House Journal (6)
- ☐ Orange Coast Magazine
- ☐ Outdoor Life (12)
- ☐ Outdoor Photographer (11) No Renewal
- ☐ Outside (12)
- ☐ Parent & Child (9)
- ☐ Parenting Early Years (11)
- ☐ Parenting School Years (11)
- ☐ Parents (12)
- ☐ Plane & Pilot (12) No Renewal
- ☐ Popular Photography (12)
- ☐ Predator Xtreme (6)
- ☐ Prevention (12)

- ☐ Reader's Digest (11)
- ☐ Road & Track (12)
- ☐ Rolling Stone (26)
- ☐ Self (12)
- ☐ Shape (12)
- ☐ Siempre Mujer (6)
- ☐ Ski (7)
- ☐ Slam (10)
- ☐ Snowboard (6)
- ☐ Snowboarder (7)
- ☐ Spa (6)
- ☐ Spin (11)
- ☐ Sport Rider (10)
- ☐ Super Chevy (12)
- ☐ Surfer (12)
- ☐ Surfing (12)
- ☐ Taste of Home (8) No Renewal
- ☐ Teen Vogue (10)
- ☐ Tennis (10)
- ☐ Texas Monthly (12)
- ☐ The Atlantic (10)
- ☐ Timber Home Living (7)
- ☐ Transworld Skateboarding (12)
- ☐ Transworld Snowboarding (9)
- ☐ Transworld Surf (12)
- ☐ Urban Farm (6)
- ☐ Vibe (6)
- ☐ Waterfowl & Retriever (2)
- ☐ Weight Watchers (6)
- ☐ Whitetail Journal (6)
- ☐ Whole Living (10)
- ☐ Wired (12)
- ☐ Woman's Day (15)
- ☐ Wood (7)
- ☐ Working Mother (8)
- ☐ Yoga Journal (9)

**Send as many "5 for $20" orders as you like!**

**Tell your Friends and Families!**

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or *order online* and use credit card or PayPal.

| Name (please print): | Inmate #: |
|---|---|
| Address: | |
| City: | State: | Zip: |



# Inmate Magazine Service Inc.

*Make Copies! Share!*

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

PLN_0001199

# Economy Forces States to Rethink Juvenile Justice Policies, Priorities

The "tough on crime" movement of the 1990s ushered in a wave of harsh juvenile justice practices across the U.S., and the philosophy for dealing with juvenile offenders shifted from rehabilitative to punitive.

Children were tagged with dehumanizing labels like "super predator" and "incorrigible," and lawmakers quickly responded to an anticipated epidemic of juvenile crime by lowering the age at which youthful offenders could be tried as adults (in some states as low as 14 years old). Such juveniles were often dumped into overcrowded, violent adult prisons where they had two choices: become hardened and violent themselves or be preyed upon and victimized.

Of course this knee-jerk response to juvenile crime had devastating consequences for youths who were swept up in the juvenile justice and adult prison systems. Some children died in custody in well-publicized cases, while others, lacking rehabilitative opportunities, evolved from juvenile delinquents into adult criminals.

More recently, as states verge on the brink of financial collapse due to the economic downturn, saner minds appear to be prevailing as evidenced by a growing number of states rolling back many of the punitive juvenile justice policies of the 1990s, according to a March 16, 2011 report by the Campaign for Youth Justice (CYJ).

The CYJ report found that every year, approximately 250,000 offenders under age 18 are prosecuted as adults. In 2009 nearly 3,000 juveniles were confined in adult prisons, according to U.S. Bureau of Justice Statistics.

"Incarcerating youth in adult prison is the most expensive option that consistently produces the worst results," said CYJ report author Neelum Arya. Connecticut knows this all too well. In the wake of a 17-year-old prisoner's suicide in an adult facility, state lawmakers passed a law that defined anyone under age 18 to be a juvenile for purposes of prosecution. The law goes into effect in 2012.

In Illinois, 17-year-olds charged with misdemeanors will be prosecuted in juvenile court. Likewise, under a 2011 Mississippi law, offenders who are age 17 or younger will remain under juvenile court jurisdiction unless they are charged with murder, rape or armed robbery. Massachusetts, which considers 17-year-olds to be adults, and North Carolina – one of two states to automatically remand 16- and 17-year-olds to adult court – are considering similar reforms.

North Carolina's Department of Juvenile Justice and Delinquency Prevention, facing a 10 percent budget cut in FY 2012, has eliminated 75 beds from the state's seven juvenile facilities. In June 2011, Texas Youth Commission officials announced the closure of three juvenile facilities – the Al Price State Juvenile Correctional Facility, Crocket State School and Ron Jackson Unit II. Texas has worked to reduce and reform its juvenile justice system following a major sex abuse and conditions of confinement scandal in 2007. [See: PLN, July 2008, p.18; Feb. 2008, p.1].

Arizona, Colorado, Connecticut, Delaware, Illinois, Indiana, Nevada, Utah, Virginia and Washington have made it more difficult to transfer youths from juvenile to adult court, according to the CYJ report. Colorado, Maine, Pennsylvania and Virginia have enacted legislation barring the placement of juveniles in adult facilities while awaiting trial and sentencing.

Juvenile facilities cost more to operate than adult prisons because they must offer education, counseling and other rehabilitation programs, but they also produce lower recidivism rates and, therefore, lower long-term costs to the public, Arya

noted. On the other hand, studies have consistently shown that juveniles sent to adult prisons are far more likely to commit future crimes than those who remain in juvenile facilities.

Unfortunately, "there isn't a whole lot of evidence that state-run juvenile corrections systems can be anything other than very expensive, ineffective and scandalprone," said Bart Lubow of the Annie E. Casey Foundation, which promotes alternatives to incarceration for youthful offenders. It seems that budget-conscious lawmakers are starting to agree, since a growing number of states are seeking to push responsibility for their juvenile justice systems to the local level.

In California, for example, a 2007 law requiring the release of non-violent juvenile offenders resulted in a dramatic decrease in the number of incarcerated youths from 10,000 in 2005 to a mere 1,200 in 2011. Governor Jerry Brown's budget proposes closing the state's four juvenile facilities by 2014 and dividing the money among the state's 58 counties to operate local juvenile centers. An alternative proposal would leave a state-run facility open and allow counties to choose between running their own programs or paying to send juveniles to the state facility.

Several other states, including Illinois, Ohio, Oregon, New York and Pennsylvania, are following suit. Ohio has cut the number of youths in state juvenile facilities from 1,800 in 2007 to 736 in 2011. In Alabama, the average daily population for the state's Department of Youth Services dropped from 1,084 in 2007 to 582 in March 2011 – a 46 percent decrease.

The Florida Department of Juvenile Justice is seeking ways to reduce the amount of time that youths are incarcerated, "especially based upon current research indicating that longer stays in juvenile facilities do not appear to reduce offending, and for low-risk offenders, institutional placement increases recidivism."

New York has been under pressure to improve its juvenile justice system after a 2009 investigation by the U.S. Department of Justice following a 15-year-old boy's death found that youths in the state's juvenile facilities were subjected to excessive force. State and federal officials recently entered into a settlement agreement to make improvements. [See related article in this issue of PLN, p. 46].

...just call them at **888-828-8168** and they'll cut the cost of my phone calls from this place...

**FREE 60 Minute Trial Offer**

Helping Fed, State and Local Inmates Save $$$

**CallsFromWalls**
PO Box 459
New Milford, NJ 07646
www.callsfromwalls.com

New York had approximately 627 juveniles in state custody as of January 2011, down from 2,313 in 2000-2001. New York City accounts for more than half of those youthful offenders at an annual cost of $270,000 each. Governor Andrew Cuomo is pushing to close the state's juvenile facilities, over opposition due to the job losses that would result.

However, local leaders agree with Cuomo's plan. Local juvenile lockups with state funding would be more effective and maintain family and community ties for young offenders rather than sending them hundreds of miles upstate, noted John Feinblatt, the Criminal Justice Coordinator for New York City Mayor Michael Bloomberg. "Bringing kids back to the city does not mean bringing kids back to New York City streets," said Feinblatt. "It doesn't mean that there are some kids that won't be incarcerated. Some of them will be, because they need to be."

But the number of juveniles who need to be imprisoned is dwindling, in part because states have found it is simply too expensive to keep them in secure facilities. "There's a movement in the entire nation to not lock kids up," observed Adams County, Mississippi juvenile justice department director Glen Arnold.

A July 2011 report by the National Juvenile Justice Network, titled "Bringing Youth Home: A National Movement to Increase Public Safety, Rehabilitate Youth and Save Money," found that at least 16 states are closing or downsizing their juvenile justice facilities due to budget reductions, legislation, legal challenges and reform efforts. The report examined "states that have reduced their juvenile facility populations and are now not only reaping the rewards of new found funds that can be redirected into more effective community-based services for youth, but also seeing a better return on their investment in terms of juvenile rehabilitation and public safety."

The question remains as to what will happen when the economic crisis ends, budgets increase, and states once again have funds available to lock up more juvenile offenders. ◤

Sources: *USA Today, www.natchezdemocract.com, www.jjie.org, www.12newsnow.com, www.news-press.com*

# Are You Ready For A Career Change?

### Financial Mediators in private practice earn over $185,000/yr.
### What is a Mediator?  A neutral party and facilitator.

Mediators in private practice save their clients money on attorney fees and avoid the stress of court proceedings. Your role as a neutral party is important in settling disputes and conflicts, which is a less expensive option for your clients than going to court. Moreover, Financial Mediators in private practice bill an hourly rate of $200–$350 per hour!

Our dynamic, distance learning program is designed to prepare you for employment as a Mediator and/or to enter private practice. Law degrees are NOT REQUIRED to practice. There are NO RESTRICTIONS for ex-felons to practice in any state. According to the U.S. Dept. of Labor, Mediators earn an average salary of $50,660/yr. Those in private practice average $185,000/yr.

For brochure and application:

**St. Mark's School of Legal Studies**
**1840 Coral Way, Room 4-754**
**Miami, FL 33145**

In its annual list of Best Careers, *U.S. News & World Report* names Mediator as a Top Choice for 2011.

**Become A Financial Mediator**
All-Inclusive Tuition: $1,299
$99 down, 15 payments of $80/mo.

Tuition includes:
• All course materials
• Financial Mediator diploma
• Practitioner Alumni Card
• Course qualifies for certification
 (certification NOT required to practice)

**Areas of Practice**
• Divorce Resolution  • Elder Care
• Contract Non-Performance
• Employer/Employee Conflict Resolution
• Insurance Settlement Disputes
• Consumer Complaint Disputes

PLN_0001201

# California's Behavior Modification Programs – Abuse of Prisoners, Racism and Cover-Ups

Ill-conceived experiments in behavior modification by the California Department of Corrections and Rehabilitation (CDCR) have led to allegations of racism, abuse of prisoners, retaliation and cover-ups, plus a state Senate inquiry.

In 2005 and 2006, the CDCR initiated pilot programs in behavior modification at six facilities, including the High Desert State Prison (HDSP) in Susanville.

Behavior modification is linked to a school of psychological thought which holds that a person's behavior can be influenced by application of appropriately timed rewards and punishments. It is derived primarily from the early 20th century work of Russian psychologist Ivan Pavlov, and was later popularized by American psychologist B.F. Skinner. In behavior therapy, emotional problems are considered the consequences of faulty acquired behavior patterns or the failure to learn effective responses. The aim of behavior therapy, therefore, is to change negative behavior patterns.

There is little or no concern for unconscious processes (i.e., thoughts and feelings), which is the traditional focus of psychoanalysis, nor is there concern about achieving new insights or effecting fundamental personality changes.

In the Skinnerian approach, desired behavioral responses are reinforced by being rewarded while those that are not desired are punished. According to the theory, the frequency of rewarded behavior will increase; conversely, the frequency of behavior that is punished will decrease.

Using such techniques, Skinner was able to train laboratory animals to perform complex and sometimes amazing acts – in one striking example, he taught pigeons to play table tennis. Subsequent researchers employed electric shocks to condition animals to experience fear in situations that ordinarily would not have provoked anxiety.

In 1983, the CDCR implemented a relatively benign version of Skinnerian behavior modification techniques, the so-called "Inmate Work/Training Incentive Program" (IWTIP). Under the terms of the IWTIP, prisoners who worked or went to school received more sentence reduction credits than those who refused to participate in work or education/training programs. An intermediate amount of sentence reduction credits, on the other hand, was offered to prisoners willing to participate in such programs but who, due to the limited number of available positions, were not yet assigned.

A system of privileges was also built into the IWTIP. The idea was simple from a Skinnerian viewpoint: the more a prisoner participated in programs, the more he or she could enjoy certain privileges. Those privileges included overnight visits with spouses, parents, siblings and children; regular contact visits with family and friends; telephone access and access to the recreation yard.

The problem with the system of privileges, however, was that prison rules prohibited prisoners from visiting, using the phone or going to the yard during work or school hours. This was a sort of Catch-22 – in order to gain more privileges, one had to work or go to school. But if one went to work or school, one couldn't easily partake of those privileges.

The IWTIP thus came to be regarded by prisoners as a work "disincentive" program.

Gradually, over the years, the distinction between prisoner workers and non-workers, at least as far as privileges were concerned, disappeared. When the IWTIP began, visitation was offered every day of the week and family visits could be enjoyed by virtually every prisoner. Today, visits are offered only on weekends and family visits are available to only a small percentage of prisoners – those who are not excluded by virtue of their criminal and/or disciplinary histories.

Similarly, over time, as the public's appetite for longer sentences increased, the availability of sentence reduction credits decreased. Whereas the IWTIP once offered the majority of prisoners the opportunity to cut their sentences in half, it now makes that opportunity available to far fewer prisoners. To those now convicted of crimes deemed "serious" or "violent" under state law, the best the IWTIP can offer is the opportunity to cut sentences by just 15 percent.

Fast forward to 2005, when the U.S. Supreme Court held, in *Johnson v. California*, 543 U.S. 499 (2005) [*PLN*, July 2005, p.33], that California's de facto policy of using race to segregate prisoners by housing assignment was presumptively unconstitutional. The CDCR responded by adopting an integrated housing policy, now codified at Section 3269.1 of Title 15 of the California Code of Regulations. [See: *PLN*, April 2006, p.20].

Under that policy, a prisoner who refuses to be housed with a prisoner of a different race will be subject to disciplinary action. After a second refusal, a prisoner becomes eligible for placement in a more restrictive housing unit.

Knowing that resistance to the integrated housing policy would be difficult to overcome, the CDCR once again turned to Skinnerian behavior modification techniques. This time, prison officials focused on disincentives to bad behavior. That focus led to the development of a pilot program, the Behavior Modification Unit, which was later renamed the Behavior Management Unit (BMU) – no doubt to distance the program from some of the less savory implications historically associated with behavior modification techniques.

The BMU program is now codified at Section 3334 of Title 15 of the California Code of Regulations. Although originally designed to deal with prisoners who refused to comply with the CDCR's integrated housing policy, reasons for placing prisoners in the BMU now include engaging in a pattern of gang-related or otherwise disruptive activity. In practice, the BMU has been used to transition prisoners from confinement in Security Housing Units (SHUs) before returning them to general population status.

Conditions in the BMU have been so harsh, however, that in some cases BMU prisoners have assaulted staff in order to get

# TYPING
## SERVICES
### Provided since 1998

**Specifically designed, with special rates for the incarcerated person.**

**Black / Color Printing and Copying**

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

**LET MY FINGERS DO YOUR TYPING**
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

**Special Offer: $2.00 off first order.**
Special offer void after: 12/31/2011

PLN_0001202

transferred to more traditional disciplinary or administrative segregation (ad seg) units.

For starters, a prisoner is deprived of virtually all personal property upon placement in the BMU. While the same is also true upon placement in ad seg units, a prisoner in the BMU – unlike his ad seg counterpart – is constantly threatened with the possibility that because he has not complied with the BMU "step process," his property will be removed from temporary storage and sent home at his expense, or "donated" or destroyed.

An Individualized Treatment Plan (ITP) is developed for each prisoner placed in the BMU. The ITP may include a requirement to participate in "cognitive behavior programs," "life skills" such as anger management, and other self-help groups.

To get out of the BMU a prisoner must progress through a series of four steps with the goal of advancing from one step to the next every 30 days and thereby completing the ITP. Failure to progress in this step process constitutes grounds for rejection from the BMU program and, thus, loss of stored personal property.

"Rejection" from the BMU program further means that the prisoner is in a sort of purgatory. He cannot return to the general population without first completing the established ITP; therefore, after being rejected from the BMU program, a prisoner has no choice but to request reinstatement in the program. Unless, that is, he is willing to take more drastic measures such as assaulting a staff member to obtain placement in an ad seg unit.

In steps 1 and 2 of the BMU program, a prisoner is placed in privilege group "C" (the most restrictive privilege group designation). Consistent with that designation there are no family visits, no phone calls or packages, and the same amount of yard access and canteen as a prisoner in ad seg. Curiously, a prisoner in ad seg is entitled to receive one 30-pound personal property package per year – which is one more than a BMU prisoner.

In step 3 of the BMU program, a prisoner is upgraded to privilege group "B." Step 3 BMU prisoners receive privileges to the same extent as prisoners willing to work but, due to the limited number of positions available, have yet to be actually assigned. In practice this tends to be the same level of privileges afforded to privilege group "A" prisoners who work or go to school, except that a non-worker/non-student is allowed to buy only half the amount of canteen items that a prisoner worker or student can purchase.

In step 4 of the BMU program, a prisoner completes the ITP and is then returned to general population housing. Only then is his stored personal property returned.

At least that is the way the BMU operates on paper. In reality, before the parameters were codified in December 2008, the BMU program worked very differently. Indeed, according to a series of investigative reports from the *Sacramento Bee*, conditions in the BMU at HDSP were nothing short of "cruel and unusual."

In July 2007, the CDCR sent a team of state researchers to assess HDSP's BMU program. The team included sociologist Norman Skonovd, who also lectures at the University of California at Davis and has more than 25 years of corrections research experience. Skonovd and his colleagues uncovered allegations concerning mistreatment of prisoners, cruelty by guards and racism.

The allegations of abuse, obviously, came from prisoners. While recognizing that prisoners are not always the most reliable sources, Skonovd and his coworkers nonetheless found the prisoners credible due to the consistency of their stories, which were





PLN_0001203

## Cal. Behavior Mod. Programs (cont.)

recorded in separate interviews.

In one March 2007 incident, when prisoner Jason Brannigan did not return his food tray after two or three minutes – the time typically allotted for eating meals in the BMU – guards pepper-sprayed him directly in his face, then pulled him through the unit naked with his hands and feet shackled.

"They're walking me on the chain and it felt just like ... slaves again," recalled Brannigan, who is black, when later interviewed by the *Sacramento Bee*. "Like I just stepped off an auction block."

Brannigan's then-girlfriend, Brandy Frye, wrote a letter in June 2007 – accompanied by eight handwritten statements from BMU prisoners alleging specific instances of staff misconduct – alerting prison officials to the "excessive abuse" being inflicted on the men in the BMU at HDSP. In her letter, Frye alleged that some men were being given "wrong medications or wrong doses" of prescribed medications; that others had been extracted from their cells with "heavy doses of pepper spray and excessive force" for not returning their food trays in the allotted time frame; and that they were forcibly "stripped naked, handcuffed, waist/leg shackled, physically and brutally beaten" before being returned to their cells.

Frye's letter further claimed that prisoners' food was regularly contaminated with bird feces; that prisoners were not allowed outside for exercise, except as punishment; and that BMU prisoners were placed outside in the snow for periods of two hours, clad only in boxer shorts and shower shoes, for making too much noise.

Overall, Frye complained, the men in the BMU had been "stripped of their dignity and self worth." Many had responded by "resort[ing] to taking anti-psychotic drugs just to cope," and "now they walk around like zombies," she wrote.

Frye's letter elicited a series of pass-the-buck replies, first by a special agent from the CDCR's Office of Internal Affairs, who indicated that the warden at HDSP would "evaluate the complaint and determine ... if an investigation is required," and later by HDSP's then-Chief Deputy Warden Mike McDonald, who suggested – falsely – that the allegations of misconduct described in Frye's letter had in fact been investigated.

"All allegations of staff misconduct are taken seriously," McDonald wrote, "and many of the allegations you speak of in your letter have been investigated via the [prisoner] appeals process."

The investigation had determined, McDonald added, that "HDSP staff is following the policies of CDCR." McDonald suggested that a further "inquiry" would be conducted, but then added, "However, you will not be informed of the results of the inquiry or the nature of [any] corrective action [that may be] taken."

Yet when later questioned during a state Senate inquiry into the CDCR's response to the allegations raised in Frye's letter, McDonald admitted not only that HDSP had not investigated her allegations, but that any such internal investigation had to be referred to the Office of Internal Affairs – the very office that had referred Frye's letter to him in the first place.

A seven-month-long state Senate inquiry found that neither Frye's letter nor the dozens of grievances submitted by BMU prisoners at HDSP, nor even the efforts of Skonovd and another state researcher, who reported to CDCR supervisors the abuse allegations they had uncovered, triggered any sort of investigation.

"Legislators don't like being misinformed in such a fashion," said Senate Public Safety Committee chairman Mark Leno.

Also, according to the *Sacramento Bee*, CDCR Research Director Steven Chapman chastised Skonovd and his colleagues for highlighting the allegations of abuse in their report. Ultimately, at the direction of CDCR managers, those allegations were relegated to an appendix in the report in an effort "to hide the [abuse] findings."

For Skonovd, who came to believe that BMU guards viewed "behavior modification" as a license to make prisoners as miserable as possible and thereby to compel obedience, reporting the abuse allegations became a "matter of conscience." In the spring of 2008 he reported those allegations to the Office of the Inspector General (OIG), the agency charged with overseeing the CDCR's operations.

Chapman responded, according to Skonovd, by retaliating against him by denying him promotions that he deserved.

Subsequently, CDCR Undersecretary Scott Kernan discounted the abuse allegations as "typical inmate gripes." He criticized the *Bee* for making the jobs of CDCR staff more difficult with the paper's "one-sided" and "biased" reporting.

That reporting, between May and August 2010, exposed evidence that HDSP guards tried to provoke prisoners into attacking one another, spread human excrement on cell doors, conducted strip searches outside in the snow, and interfered with the grievance process by filing false reports, destroying prisoners' complaints and intimidating prisoners who filed grievances. It also exposed evidence that blacks were disproportionately targeted for placement in the BMU program at HDSP and that guards referred to the BMU as the "black monkey unit."

In the end, Senator Leno and Senate President Pro Tem Darrell Steinberg criticized the CDCR for responding to the allegations of misconduct in the BMU in ways that were "inadequate, ad hoc, and displayed the absence of a uniform and reliable system of response, referral and follow-through." They wrote that the CDCR's response failed "to ensure [that] corroborated abuses were addressed and corrected." The senators recommended changes "to ensure that allegations of abuse and misconduct in correctional institutions are addressed swiftly, systematically, and fairly for all involved."

Suggesting that those words were not empty rhetoric, Senator Leno said in a December 2010 interview with the *Sacramento Bee* that the Senate would use its budgetary and oversight powers to ensure that "meaningful change" occurs in the CDCR.

Importantly, Senators Steinberg and Leno also criticized the OIG for its "misguided assumption" that the CDCR effectively investigates and responds to complaints and allegations of misconduct. "[I]t is our view," they wrote, "that an essential and basic function of the OIG is to provide an independent assessment of CDCR operations, and not rely on the very systems it is supposed to monitor." In other words, that the OIG should do its job. The Senate inquiry was spurred by the *Bee's* news reporting and by advocacy efforts by prisoners' rights supporters, including the American Friends Service Committee.

The BMU at HDSP and two other California state prisons have been closed – reportedly due to budgetary reasons. ◾

Sources: *Sacramento Bee, letter from Senators Steinberg and Leno to CDCR Secretary Matthew Cate and OIG Inspector General David Shaw (December 1, 2010)*

**For every 2 subscriptions purchased @ $20 or more, get 2 subscriptions @ $10 Absolutely FREE!!!**

- We do not accept stamps as a form of payment
- We can route your magazine subscription at anytime anywhere in the US.
- $35.00 charge on all returned checks
- Each subscription is for a 1 year period. We are able to renew or extend any current subscriptions.
- %age of the proceeds are donated to 4 separate charities
- All Sales Are Final! No Refunds!!

All Magazines Subscriptions are for 1 year. Any additional years can be purchased. Just take the price and multiply by the number of years you would like to receive.

**FTWMAGS.COM**
Visit us on the WEB!!
**1-855-FTW-MAGS**
Call our toll FREE line!! (1-855-389-6247)



**Specializing in Magazine Sales to Inmates, Friends, and their Families.**
For a complete list of our Selection, send a self addressed stamped envelope to:

**FTW MAGS**
**Attn: Magazine List**
**505 Cornhusker Rd  # 181**
**Bellevue, NE 68005-7911**

In order to receive the 2 Free subscriptions you must purchase at least 2 separate subscriptions at $20.00 or more. You then have your choice of 2 subscriptions at $10.00, absolutely free of charge. Buy 4 of 20 or more, get 4 of 10 free.

**Please allow 30 to 90 days for your subscriptions to start. We assume no responsibility if your prison does not accept delivery of the magazines. Please Write Legibly!!! We are not responsible for your writing or errors.**

| Magazine | Price | Magazine | Price | Magazine | Price | Magazine | Price | Magazine | Price |
|---|---|---|---|---|---|---|---|---|---|
| 4 WHEEL & OFF ROAD | $10 | CAR AND DRIVER | $10 | FINALLY LEGAL | $40 | JUST 18 | $20 | SELF | $10 |
| ADVENTURE COMICS | $20 | CARIBBEAN TRAVEL & LIFE | $10 | FITNESS | $10 | KNITTING TODAY! | $20 | SHAPE | $10 |
| AGAINST THE CURRENT | $20 | CASINO PLAYER MAGAZINE | $40 | FLEX | $10 | KNIVES ILLUSTRATED | $30 | SIEMPRE MUJER | $10 |
| ALLURE | $10 | CATHOLIC DIGEST | $20 | FORBES | $10 | LADIES HOME JOURNAL | $10 | SKATEBOARDING | $10 |
| AMAZING SPIDERMAN | $40 | CBS WATCH! | $10 | FORUM | $40 | LATINA | $10 | SKEPTICAL INQUIRER | $30 |
| AMERICAN ARTIST DRAWING | $40 | CELEBRITY HAIRSTYLES | $30 | FOUR WHEEL & OFF ROAD | $10 | LEG ACTION | $20 | SLAM | $10 |
| AMERICAN CHEERLEADER | $10 | CELEBRITY SLEUTH | $20 | FOUR WHEELER | $10 | MARIE CLAIRE | $10 | SPIN | $10 |
| AMERICAN COWBOY | $10 | CESAR'S WAY | $16 | FOX | $40 | MENS FITNESS | $10 | SPORTING NEWS | $10 |
| AMERICAN INDIAN ART MAG | $40 | CHARISMA & CHRISTIAN LIFE | $20 | FUR FISH & GAME | $30 | MEN'S JOURNAL | $10 | SPORTS AFIELD | $30 |
| ANIMALS | $30 | CHEVY HIGH PERFORMANCE | $15 | GARDEN & GUN | $15 | MINI TRUCKIN | $10 | STEP BY STEP WIRE JEWELRY | $30 |
| ARTS & ACTIVITIES | $40 | COIN PRICES | $30 | GENESIS | $20 | MODIFIED MUSTANG & FORDS | $15 | STREET RODDER | $20 |
| ARTS & CRAFTS HOMES | $40 | COINS | $40 | GENTLEMENS QUARTERLY-GQ | $10 | MOTOR TREND | $10 | STREET TRUCKS | $30 |
| ASTRONOMY | $40 | COLLECTOR'S CROSSWORDS | $20 | GLAMOUR | $10 | MOTORCYCLIST | $10 | SUPER CHEVY | $10 |
| ATV MAGAZINE | $15 | COMICS BUYERS GUIDE | $40 | GOLF DIGEST | $10 | MUSCLE AND FITNESS | $10 | SUPER STREET | $15 |
| ATV WORLD | $15 | COMPLEX | $10 | GOLF WORLD | $15 | MUSCLE CAR REVIEW | $15 | SUPERB WORD FIND BONUS | $20 |
| AUTO ENTHUSIAST | $40 | CONSUMER REPORTS | $40 | GOLFWEEK | $16 | MUSCLE MAG INTERNATIONAL | $20 | SUPERGIRL | $20 |
| AUTOMOBILE | $10 | CROCHET! | $20 | GOOD HOUSEKEEPING | $15 | NAILPRO | $30 | SUPERMAN | $20 |
| AUTOWEEK | $20 | CUSTOM CLASSIC TRUCKS | $20 | GOOD TIME CROSSWORDS | $20 | NASCAR ILLUSTRATED | $10 | SUPERMAN/BATMAN | $20 |
| BASEBALL DIGEST | $20 | CYCLE WORLD | $10 | GOOD TIME VARIETY PUZZLES | $20 | NYLON | $10 | TODAY'S BLACK WOMAN | $20 |
| BASKETBALL TIMES | $30 | DELL HOROSCOPE | $30 | GOTHAM CITY SIRENS | $20 | NYLON GUYS | $10 | TRAVEL 50 & BEYOND | $15 |
| BASSMASTER | $10 | DELL LOGIC PUZZLES | $20 | GRAPPLING | $30 | O (OPRAH) | $30 | TRUCK TREND | $15 |
| BATMAN | $20 | DELL OFFICIAL WORD SEARCH | $20 | GUIDEPOSTS | $20 | OK! | $10 | TRUCKIN | $16 |
| BATMAN STREETS OF GOTHAM | $20 | DELL ORIGINAL SUDOKU | $20 | GUN WORLD | $30 | OUT MAGAZINE | $10 | TV Y NOVELAS | $20 |
| BEADSTYLE MAGAZINE | $40 | DOWN BEAT | $40 | GUNS OF THE OLD WEST | $40 | PLAYBOY | $10 | ULTIMATE MOTORCYCLING | $16 |
| BEADWORK | $40 | EBONY | $10 | HARPERS BAZAAR | $10 | POETS & WRITERS | $30 | USA CROSSWORDS JUMBO | $20 |
| BETTER HOMES & GARDENS | $10 | ENTREPRENEUR | $10 | HEART & SOUL | $10 | PREDATOR XTREME | $10 | VIBE MAGAZINE | $10 |
| BIKER | $40 | ESPN | $15 | HOROSCOPE GUIDE | $30 | READERS DIGEST | $10 | VOGUE | $16 |
| BLACK ENTERPRISE | $10 | ESQUIRE | $15 | HORTICULTURE | $10 | REBEL INK | $20 | WOLVERINE | $20 |
| BOATING | $10 | FANTASTIC FOUR | $30 | HOT BIKE | $10 | REDBOOK | $15 | WONDER WOMAN | $30 |
| BON APPETIT | $10 | FAVORITE EASY CROSSWORDS | $20 | HYPE HAIR | $30 | RIDER | $10 | WOOD | $10 |
| BREW YOUR OWN | $20 | FAVORITE FILL IN | $20 | INCREDIBLE HULK | $40 | ROAD & TRACK | $10 | WORLD OF WHEELS | $20 |
| BUDGET TRAVEL | $10 | FIDO FRIENDLY | $15 | INSTINCT | $10 | ROD & CUSTOM | $10 | WORSHIP LEADER | $15 |
| CAMARO PERFORMERS | $15 | FIELD & STREAM | $10 | IRON MAN (COMIC) | $40 | ROLLING STONE | $10 | WRITERS DIGEST | $30 |
| CAPTAIN AMERICA | $40 | FIGHT! MAGAZINE | $30 | JET | $10 | SAILING WORLD | $16 | YOGA JOURNAL | $10 |

Name _____

Inmate # _____

Address _____

_____

_____

Special Instructions _____

_____

**Different Ship to address please specify** _____

**Payment Options (Credit Card, Check, Money Order)**
**Credit Card        Visa   MC   Am Ex   Disc**

Exp Date ___/___        CVC Code _____

Card # ___/___ ___/___ ___/___

Name on card _____

Billing Address & Zip _____

**Magazine Selections**

Yrs ___/_____ Total_____

Yrs ___/_____ Total_____

Yrs ___/_____ Total_____

Yrs ___/_____ Total_____

Yrs ___/_____ Total_____

Yrs ___/_____ Total_____

TOTAL_____

**FTW MAGS is not responsible for any unaccepted magazines through the prison system. Please use the order form as a template . Hand written orders are accepted as long as all information is correct. Send Check or Money Order to the above address.  **Keep this form for future orders**    **All Orders are final and NO Refunds**

06172011

PLN_0001205

# D.C. District Court Partially Dismisses Lawsuit by BOP CMU Prisoners

A lawsuit filed by prisoners held in Communication Management Units (CMUs) at federal prisons in Terre Haute, Indiana and Marion, Illinois, which alleged violations of their Constitutional rights due to placement in the CMUs, as well as violations of the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, was partly dismissed on March 30, 2011 although some claims were allowed to go forward.

The ruling by the U.S. District Court for the District of Columbia noted factual differences regarding the circumstances of the prisoner plaintiffs in the case.

Prisoner Yassin Aref was serving a fifteen-year sentence for "money laundering, providing material support for terrorism, conspiracy, and making a false statement to the FBI." Initially classified as low security, he was eventually assigned to the CMU at Terre Haute and, after filing a grievance and requesting a transfer, was sent to the Marion CMU.

Avon Twitty, initially serving a sentence for murder and a firearms violation, was designated to the Terre Haute CMU but paroled in 2011, and his case was dismissed as being moot.

Prisoners Daniel McGowan and Jenny Synan, husband and wife, are accused of domestic terrorism; like Aref, McGowan was classified as low security. He was transferred to the Marion CMU, filed an administrative appeal and was then sent to the CMU at Terre Haute.

Kifah Jayyousi and Hedaya Jayyousi, another husband and wife pair, also were convicted of terrorism offenses and initially classified as low security by the Bureau of Prisons (BOP); they were transferred to the Terre Haute CMU.

Prisoner Royal Jones was convicted of solicitation of bank robbery and a probation violation, and despite his excellent disciplinary record was transferred to the Marion CMU. His administrative attempts to appeal the transfer were unsuccessful, but a lawsuit that he filed against the BOP convinced prison officials to transfer him out of the CMU into the general population at Marion.

A CMU is classified by the BOP as a "self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming...." A prisoner can be placed in a CMU for the following reasons: "current offenses of conviction, or offense conduct, including association, communication, or involvement, related to international or domestic terrorism...."

According to the district court, "With the exception of attorney visits, all visits with inmates housed in CMUs are 'non-contact' visits, meaning that the visit takes place in a room with a partition separating the inmate from the visitor, and both must communicate by telephone ... CMU inmates are currently afforded eight visitation hours per month, and no single visit may last more than four hours.... CMU inmates are entitled to at least one phone call per month lasting at least three minutes....With the exception of legal phone calls, CMU inmates are allowed two fifteen-minute calls per week...." Within five days of being transferred to a CMU, a prisoner may administratively appeal his or her transfer pursuant to BOP policy, as set forth in 28 C.F.R. §§ 542.10 to 542.18.

The plaintiffs alleged in their complaint, filed in 2010, that their "procedural due process rights were violated because they did not receive adequate Notices of Transfer or an opportunity to challenge their designation to the CMUs ... [they] also alleged that their substantive due process rights have been violated because the conditions at the CMU 'intentionally or recklessly interfer[e] with [their] interests in family integrity without legitimate penological purpose.'" They further raised equal protection violations, stating there was "a pattern and practice throughout the BOP of designating individuals, including Plaintiffs, to the CMU in retaliation for their protected political and religious speech and beliefs, and based upon their religion, national origin, and perceived political and/or ideological beliefs."

The plaintiffs argued that the "prolonged and complete denial of any opportunity for physical contact with their loved ones" constituted cruel and unusual punishment. They also alleged violations of APA rules governing notice and comment rulemaking prior to setting up the CMUs. According to the district court, "The plaintiffs seek a declaration that the defendants violated their First, Fifth and Eighth Amendment rights and the APA, an order requiring the defendants to transfer the plaintiffs out of the CMUs ... and an order requiring the defendants to provide the plaintiffs with the same communication privileges as 'all other general population prisoners.'"

The court held that plaintiff Jones had standing to pursue his claim, as he had been removed from a CMU and placed in general population, and "plainly stated facts that ... demonstrate a realistic threat that he might be redesignated to a CMU." However, the district court granted the defendants' supplemental motion for partial dismissal as to Twitty, based on the fact that Twitty had been released to a halfway house and was no longer in a CMU.

The court also granted the defendants' motion to dismiss the substantive due process claims, finding that the First Amendment does not provide a right to "family integrity" based upon restrictions on the plaintiffs' communications. The court applied the test set forth in *Turner v. Safley*, 482 U.S. 78 (1987), holding that "the plaintiffs have not adequately alleged that CMU restrictions are not rationally related to the legitimate penological interest in monitoring the communication of high-risk inmates...."

The district court did, however, rule in the plaintiffs' favor by agreeing that they plausibly alleged a liberty interest protected by procedural due process. As noted in *Hatch v. Dist. of Columbia*, 184 F.3d 846 (D.C. Cir. 1999) [*PLN*, Dec. 2000, p.31], "a deprivation in prison implicates a [government-created] liberty interest protected by the Due Process Clause only when it imposes an 'atypical and significant hardship' on an inmate in relation to the most restrictive confinement conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences."

The court noted the disparity in phone calls allowed to CMU prisoners in comparison with general population prisoners, and found the plaintiffs had plausibly alleged that they had a liberty interest in avoiding designation to a CMU and the restrictions resulting from such a designation. The district court also agreed that the plaintiffs had well-pleaded their contention that BOP administrative remedies and periodic reviews related to their CMU confinement were "illusory," and the BOP Notices of Transfer were "vague and generic" and

PLN_0001206

provided "no notice at all."

The court found that the plaintiffs' Eighth Amendment claims did not adequately allege that they had been denied "the minimum civilized measures of life's necessities" as required to sustain a claim for cruel and unusual punishment. Such necessities are typically "shelter, health care, and personal security," according to *Inmates of Occoquan v. Barry*, 844 F.2d 828 (D.C. Cir. 1988).

The court allowed the plaintiffs' retaliation claims to proceed, noting that they had adequately pleaded an inference that the alleged retaliatory acts occurred shortly after the filing of a grievance, and that the prisoner's disciplinary record until that point was clean. The court dismissed the plaintiffs' First and Fifth Amendment discrimination claims for failure to state a claim "that is plausible on its face." The APA claims were dismissed without prejudice.

The case remains pending on the plaintiffs' remaining claims. See: *Aref v. Holder*, 774 F.Supp.2d 147 (D.D.C. 2011). ◼

# Ninth Circuit: California Prisoner Need Not Appeal from Satisfactory Grievance Response in Order to Exhaust Administrative Remedies

## *by Michael Brodheim*

Clarifying "the boundaries of proper exhaustion" within the context of California's prison system, the Ninth Circuit Court of Appeals held that a prisoner "has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in order to exhaust administrative remedies."

In July 2004, Quillie Harvey, a prisoner at Salinas Valley State Prison, was extracted from his cell with pepper spray. He was charged with refusing to comply with a cell search.

Prison officials subsequently failed to hold a hearing on the charge within 30 days as required by policy. In January 2005, Harvey filed a grievance complaining about the delay and requesting alternative forms of relief – either that the charge be dismissed or that he be provided access to a videotape of the cell extraction, which he claimed would prove his innocence.

In a written decision, prison officials partially granted Harvey's appeal, agreeing to provide a hearing as well as access to the videotape. However, no hearing was held and no access to the video was granted. Thus, five months later, Harvey filed a "reminder" grievance which prison officials construed as an appeal of the earlier (partially-granted) grievance, and accordingly rejected as being untimely. "This screening action," Harvey was informed, "may not be appealed. "

Harvey filed suit in federal court alleging a violation of his due process rights. The district court granted the defendants' motion to dismiss on the ground that Harvey had failed to exhaust his administrative remedies.

On appeal, the defendants argued that Harvey should have appealed the grievance decision granting him a hearing and access to the videotape. The Ninth Circuit flatly rejected that argument, finding no merit to the suggestion that a prisoner should appeal a satisfactory grievance response or that it is a prisoner's responsibility to ensure that prison officials actually provide the relief they have promised.

Significantly, the Ninth Circuit also rejected the defendants' argument that Harvey should have appealed the decision rejecting his "reminder" grievance as being untimely. "Even if we were to agree that a prisoner has an obligation to appeal the rejection of a grievance that he has no obligation to file," the appellate court reasoned, "[t]here is no obligation to appeal from a decision when the rejection form states that the "action may not be appealed."

In a cautionary note to prisoners, however, the Ninth Circuit upheld the dismissal of another of Harvey's claims on the grounds that his administrative grievance related to that claim was in fact untimely filed and therefore not properly exhausted. See: *Harvey v. Jordan*, 605 F.3d 681 (9th Cir. 2010). ◼



**CENTER FOR HEALTH JUSTICE**
www.healthjustice.net

A NATIONAL HIV & HEPATITIS INFORMATION HOTLINE FOR PRISONERS

⇒ HAVE QUESTIONS ABOUT HIV OR HEPATITIS?

⇒ NEED INFORMATION ON MEDICATION?

⇒ NEED HELP IN ACCESSING SERVICES AFTER RELEASE?

CALL: (213) 229-0979
TUES/WED/THURS/FRI
9 A.M. TO 4 P.M. PACIFIC

We accept collect calls from Any prison or jail facility

# MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(213) 489-7715



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite 1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

PLN_0001207

# Massachusetts Prisoners Receive Expired Food Rejected by Schools

According to an April 2011 news report, the Massachusetts Department of Education set aside 11,000 cases of expired cheese, blueberries, frozen chicken and other food items for use in prison kitchens after an investigation discovered the out-of-date food was being served to Boston school children.

The action comes as no surprise to many prisoners, who are openly served canned desserts, packaged snacks and other food items that are as much as two or three years past the "best-by" date stamped on the packaging. In some prison warehouses it is not uncommon to come across cases of food destined for prisoner meals that are marked "Not to be used for human consumption."

Documents obtained by the *Boston Globe* revealed that the old food discarded by the Dept. of Education went to a state prison in Bridgewater, but a spokesman for the Massachusetts Department of Correction (DOC) said most of the food had been thrown out, including 2,000 cases of cheddar cheese.

According to Diane Wiffin, director of public affairs for the DOC, prisons rejected the out-of-date food and refused to pick up many of the items, which included cases of frozen chicken and frozen beef patties. The blueberries were served to prisoners, though.

The Hampden County Sheriff's Department said it often serves expired food from the school lunch program in its 1,600-bed county jail. "It's been a good way to serve good food very frugally in terms of the budget.... It's not rancid food. It's not spoiled food," explained jail spokesman Richard McCarthy.

The U.S. Department of Agriculture (USDA) maintains that properly stored or frozen food can remain safe after its expiration or "best-if-used-by" date, but that it loses nutritional value and taste. According to Wiffin, "If the food passes inspection, we incorporate it into our menu ... [which] saves taxpayer dollars.... We do not serve inmates food past its prime."

Leslie Walker, executive director of Prisoners' Legal Services, chafed at the idea of serving out-of-date food to prisoners. "I think it's disgusting. My clients are all too aware that they are on the bottom of the pecking order, but to get food that is unfit for school children to [eat] should make it unfit for any human

being to consume." Walker also noted that since expired food is often lacking in nutritional value, prisoners' health is at risk because they usually lack the resources or ability to supplement their diets. ■

Source: *The Boston Globe*

# Tennessee Jail Detainee Shackled During Childbirth Awarded $200,000

Juana Villegas won a $200,000 jury award in a § 1983 action against the Metro-Davidson County Sheriff's Office in Nashville, Tennessee for being shackling while she was in the final stages of labor during her pregnancy and past-partum recovery. Villegas had asserted that the shackling was in disregard of a physician's "no restraint" order, which violated her Fourteenth Amendment right "to be free from deliberate indifference to her serious medical condition." She had also argued that the post-delivery denial of a breast pump violated her rights.

Villegas, 35, was arrested on July 3, 2008 for driving without a valid license. Due to the July 4 holiday she did not go before a judge until July 5th. While still in custody on the driving violation, she was screened under the 287(g) program of Immigration and Customs Enforcement (ICE), and it was determined that she was in the United States illegally. Villegas was nine months pregnant at the time. ICE placed a federal detainer on her pending resolution of the traffic charges, which were later dropped.

At 10:00 p.m. on July 5, Villegas informed jail staff that her amniotic fluid had broken and "that she was having labor pains." She was taken to the jail infirmary, her condition verified and an ambulance summoned. She was then "placed on a stretcher and transported to Metro General Hospital (MGH) with her wrists restrained in front of her body and her legs restrained together...." Villegas testified that she was in pain from contractions during this time, "but she remained shackled until she was transferred to her hospital bed from the ambulance stretcher."

Nurses asked an accompanying jail officer to remove Villegas' handcuffs so she could change into a hospital gown, and the male officers turned their back. After the gown was on, the officers again restrained her hands and legs while she was in the hospital bed. Handcuffs were later removed but the leg shackles were

not. A doctor signed a "no restraint" order, and shortly before Villegas gave birth the restraints were removed. After the birth, an officer restrained one of her legs to the hospital bed. However, whenever she went to the restroom, walked or bathed during her post-partum recovery, both of her legs were restrained. No visitors or phone calls were permitted during her hospital stay. Villegas was not allowed to leave the hospital with a breast pump.

After Villegas filed suit, both parties retained medical experts regarding the issues raised in her complaint. One of the experts, Dr. Sandra Torrente, concluded that "the shackling of a woman who is in her third trimester and whose water has broken is extremely dangerous because of, among other things, a potential for the umbilical cord prolapse." The same expert also noted that "Medical personnel need constant unrestricted access to a woman in labor. There are a number of complications that can occur.... Placing a pregnant woman in leg irons ... increases her risk of developing a potentially life-threatening blood clot ... [it is] extremely unsanitary and unacceptable."

Other medical experts testified as to the psychological stress that Villegas suffered. "Unable to move or open her legs, she feared that her son would not be able to be delivered. She had to sit with the terror that her baby might die inside of her body.... She felt helpless." This resulted, in their medical opinion, in Post Traumatic Stress Disorder. Additionally, they were critical of the denial of the breast pump due to the risk of mastitis, an infection of the breast tissue that results in severe pain, fever and chills.

The defendants responded that shackling prisoners at the hospital was necessary to prevent escape or to prevent a prisoner from injuring herself or other people or damaging property. While claiming the shackling was done in "good faith" in Villegas' case, it violated the sheriff's policy for "Hospital

PLN_0001208

Inmate Security," which stated that "All inmates shall be restrained ... unless otherwise directed by the attending physician...."

In reviewing cross-motions for summary judgment, the district court noted that Villegas' claims were predicated on the Due Process Clause of the Fourteenth Amendment because she was a pretrial detainee, not a convicted prisoner. Although the court found that prison and jail officials are granted some latitude in the operation of their institutions, "here the recognized government interest in detention of illegal aliens is regulatory," that is, for the purpose of "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." *Zadvydas v. Davis*, 533 U.S. 678 (2001).

The court chose to follow *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Helling v. McKinney*, 509 U.S. 25 (1993) [*PLN*, Sept. 1993, p.1] in regard to Villegas' deliberate indifference claim, which, the district court wrote, "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such

a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."

The district court also cited the case of *Brawley v. State of Washington*, 712 F.Supp.2d 1208 (W.D. Wash. 2010) [*PLN*, Dec. 2010, p.10], which found "Common sense ... tells us that it is not good practice to shackle women to a hospital bed when they are in labor...." The court noted that Villegas had "not been convicted of a crime or engaged in violent conduct ... her shackling was medically and physically unnecessary and resulted in the infliction of excessive pain and a mental disorder." The court further noted that shackling pregnant prisoners was contrary to the policies of the American Medical Association and American College of Obstetricians, Rule 33 of the United Nations Minimum Standards for the Treatment of Prisoners, and clearly violated the Eighth Amendment.

Villegas' First Amendment claims were denied except for a breach of contract claim that was dismissed without prejudice for lack of subject matter jurisdiction. Villegas' state constitutional claims were left for resolution in state

court and dismissed without prejudice. The court granted Villegas' motion for partial summary judgment as to the shackling and denial of the breast pump, and granted the defendants' motion in part as to other claims. The case then proceeded to trial. See: Villegas *v. Metropolitan Government of Davidson County*, 2011 WL 1601480.

On August 18, 2011, a federal jury awarded Villegas $200,000 in damages after deliberating for about an hour. Davidson County Sheriff Daron Hall said the county would appeal. Following the verdict, Villegas petitioned the district court for permission to remain in the U.S. under a U-visa, which is intended for victims of crime who are in the country illegally.

"We think the level of misconduct has risen to such a high level that she deserves a U-visa for what she suffered," said Elliott Ozment, one of Villegas' attorneys. "She has been the victim of a terrible, terrible wrong." See: *Villegas v. Metropolitan Government of Davidson County*, U.S.D.C. (M.D. Tenn.), Case No. 3:09-cv-00219. █

Additional sources: *Tennessean, Nashville City Paper, CNN*

## PRISONER ASSISTANT
REHABILITATION AND REENTRY PLANNING

482 Summit Wind Drive – Suite 704 – Lake Harmony, PA – 18624-0704   (570)-722-5800

*Take advantage of our one of a kind Financial Concierge Service. We only serve our clients, so join us by opening a bank account today and enjoy the full range of services not offered anywhere else.*

*It is impossible to explain the scope of our services here. If you want more information please send $4.50 or one book of Forever stamps with a request for an Application Package (money orders should be made out to Prisoner Assistant / no personal checks are accepted). This package includes an introduction letter, Confidential Application & Management Agreement, brochure, frequently asked questions, Power of Attorney, 36 page color catalog and current newsletter. It is only by reading through the package that you can understand the depth of our commitment and the limitless possibilities that exist. We will send a brochure to those that include an SASE or $.44, and will not respond to inquiries without payment.*

*It costs $35 to open a checking, savings and email account, you will have to sign a limited Power of Attorney and pay for a Client Account Package which is a minimum of $4 per month. What you get is unlimited access to the most dynamic service ever offered to prisoners.*

**Bringing The World**

**To Your Fingertips**

### Most requested services

Money Orders     CDs & Money Markets   Internet Research    Email Monitoring
People Locator    Western Union        Parole Preparation   Virtual Office
Gift cards        Social Networks      Stamp Exchange       Travel Arrangements
Internet Purchases: Books, Flowers, Lingerie, Toys, Athletic Gear, Gifts etc...
Term Life Insurance  Credit Cards  Mailing Addresses   Resume & Logo Creation
Advertising  Cell Phone contracts  Credit Development  Business Development

\* *Self directed services* \*

### Your obligations as a client
*This is your professional service, we expect all communication to be courteous, brief and focused on the issue. Prisoner Assistant charges fees based on the time involved and the skill level required, Our minimum billing rate is $.40 per minute or $24 an hour. If we are working on your file for any reason, if you call us or email us, expect to be billed. You will be required to maintain a $100 balance at all times, you will be required to sign up for a Client Account Package which will cost a minimum fee of $4 per month for basic clients. This means a minimum fee of $48 per year, just to maintain the account. After considering the benefits if you think this fee is excessive, this is not the service for you.*

### What to expect from Prisoner Assistant
*Prisoner Assistant has designed the only financial concierge service available to prisoners. We provide professional services for our clients. These services are only limited by your imagination. Our slogan is "if it can be done, we will do it" and we mean just that. We spend a great deal of time setting up your file physically and electronically, considering how the use of your personal information will appear to the world. We create a presence for you that exists outside of your prison cell. We bring the world to your finger tips. That is our real commitment to each client. We will provide you with an account statement and a newsletter announcing updates and new services for our clients each month.*

**The banks have fully merged and we have updated our procedures.**

PLN_0001209

# California District Court Rips Feds for "False and Misleading Information" in FOIA Case, Then Does Nothing

In a lawsuit filed by six Islamic organizations and five individuals, the U.S. District Court for the Central District of California, Southern Division, found that the FBI and the U.S. government had "provided false and misleading information to the court" when they represented that their responses to the plaintiffs' Freedom of Information Act (FOIA) requests were complete when they were not. Notwithstanding that finding, the court agreed to withhold the requested FOIA records because they "could reasonably be expected to compromise national security."

The plaintiffs filed their FOIA requests in May 2006, asking for "information reflecting any investigation or surveillance of them" by the FBI. When they were not satisfied with the government's response, they filed suit in federal court in September 2007 seeking the requested information.

In 2009, the U.S. government represented in court filings that it had fully complied with the plaintiffs' FOIA requests. Following an *in camera* review of the FOIA records, however, the district court determined that the FBI's claims that "A significant amount of information within those documents was outside the scope of Plaintiff's FOIA request ... were then, and remain today, blatantly false.... The Government asserts that it had to mislead the Court regarding the Government's response to Plaintiffs' FOIA request to avoid compromising national security. The Government's argument is untenable. The Government cannot, under any circumstance, affirmatively mislead the court."

The district court further stated that "Numerous statutes, rules, and cases reflect the understanding that the Judiciary cannot carry out its essential function if lawyers, parties, or witnesses [hide] the facts."

The district court issued a sealed *ex parte* order regarding the government's deception, indicating that it intended to unseal the order and make its contents public. See: *Islamic Shura Council of Southern California v. Federal Bureau of Investigation*, U.S.D.C. (C.D. Cal.), Case No. 8:07-cv-01088-CJC-ANx.

The government argued that the order contained "sensitive national security and law enforcement information," and filed an interlocutory appeal to the Ninth Circuit to prevent the order from being unsealed.

In a March 30, 2011 decision, the Court of Appeals noted that the district court was "justifiably annoyed with the government's withholding of documents from the plaintiffs and the court." However, while the appellate court did "not necessarily endorse the government's conduct during the litigation, we agree with the government that the Sealed Order contains information that should not become public."

"Poor litigation strategy by the government is not an independent basis to make public information which, based upon our review of the record, should be kept within the privacy of the agencies that oversee it," the Ninth Circuit wrote. Accordingly, the district court's sealed order was vacated and the case remanded. See: *Islamic Shura Council of Southern California v. Federal Bureau of Investigation*, 635 F.3d 1160 (9th Cir. 2011).

Following remand, in an April 27, 2011 order, the district court continued to lambaste the government for concealing information. "The Government argues that there are times when the interests of national security require the Government to mislead the Court. The Court strongly disagrees. The Government's duty of honesty to the Court can never be excused, no matter what the circumstance."

Regardless, the district court held that the "Plaintiffs are not entitled to any further information regarding the Government's previous searches for [the requested FOIA] documents, and the Government does not need to conduct any additional searches for responsive documents." The FBI was not required to confirm or deny whether any of the plaintiffs were under investigation. So at the end of the day, government lawyers lie to the court and nothing happens, they win. This illustrates the poverty of the rule of law. See: *Islamic Shura Council of Southern California v. Federal Bureau of Investigation*, 2011 WL 1576476. ◪

# California Inspector General Expresses Concerns About Out-of-State Private Prisons

In December 2010, California Inspector General David Shaw sent a letter to the California Department of Corrections and Rehabilitation (CDCR), informing CDCR officials about concerns related to housing California prisoners in out-of-state privately-operated facilities.

The concerns arose when the Office of the Inspector General (OIG) visited five out-of-state facilities that house California prisoners. Those facilities included the Florence Correctional Center, La Palma Correctional Center and Red Rock Correctional Center in Arizona; the Tallahatchie County Correctional Facility in Mississippi; and the North Fork Correctional Facility in Oklahoma – all operated by CCA.

The state has since contracted with GEO Group to house prisoners at the North Lake Correctional Facility in Michigan, effective May 1, 2011. Presently, the CDCR contracts for approximately 12,800 private prison beds outside of California.

The out-of-state program was initiated in 2006 in an effort to address the problem of California's severely overcrowded prison system. With 33 adult facilities housing around 170,000 prisoners, roughly twice their design capacity, California's prisons are so dangerously overcrowded that former Governor Arnold Schwarzenegger deemed them a threat to the safety, security and well-being of both prisoners and guards.

Lawsuits were filed and the federal courts intervened, placing prisoner medical and mental health care under the control of a Receiver and special master, respectively. Ultimately, a three-judge panel determined that notwithstanding the efforts of the Receiver and special master, prisoner medical care remained constitutionally inadequate and that the primary cause of the inadequacy was overcrowding. The panel ordered state officials to reduce the prison overcrowding to what it considered a manageable level, and that order was upheld by the U.S. Supreme Court on May 23, 2011. [See: *PLN*, July 1, 2011].

Meanwhile, CDCR officials had started the California Out-of-State Correctional Facility (COCF) program, which is now codified at Section 3379(a)(9) of Title 15 of the California Code of Regulations (CCR). Every male state prisoner is potentially eligible for a COCF transfer, though the rules currently exclude "level IV" prisoners and those deemed to pose security concerns, as well as prisoners with serious medical or mental health conditions.

Significantly, prisoners transferred to an out-of-state facility remain under the legal custody of the CDCR and are subject to the rules, rights and privileges established in Division 3 of Title 15 of the CCR.

The purpose of the OIG's out-of-state facility inspections was to identify issues that, if left unaddressed, could develop into more significant problems. While OIG inspectors toured the out-of-state private prisons, interviewed management, employees and prisoners, and reviewed the terms of CCA's contract with the CDCR, the inspections were nonetheless considerably less extensive than an audit.

The OIG expressed concerns in four general areas: 1) denial of prisoner rights and privileges; 2) safety and security weaknesses; 3) unenforced rules, policies and practices; and 4) other "notable" issues. The OIG instructed the CDCR to assess the impact of the identified issues at each out-of-state facility, implement corrective action and report on its progress. The CDCR was urged to act quickly with respect to the denial of prisoner rights as well as safety and security issues identified by the OIG, which indicated that it would evaluate CDCR's corrective actions in future follow-up inspections.

In regard to prisoner rights and privileges, the OIG found that prisoners held in administrative segregation (ad seg) were kept there longer than necessary after being found not guilty of disciplinary charges, did not receive required staff assistance, and were not timely classified within ten days of placement in ad seg. Of particular concern, the OIG noted that because none of the out-of-state facilities were designed to house general population prisoners classified as level IV, prisoners who committed rule violations which resulted in an increase in their classification level to level IV status were being housed in ad seg without any of the programming opportunities they would likely receive in a level IV facility in California.

The CDCR speculated that some prisoners were deliberately committing rule violations in an attempt to get transferred back to California. However, due to a limited number of level IV beds in CDCR facilities, those attempts were proving to be largely ineffectual. The OIG was concerned that the CDCR was allowing level IV prisoners to remain out-of-state despite inadequate security provisions.

The OIG also expressed concern that CCA employees were not adequately trained to manage validated gang members. As a consequence, when security became an issue, Northern and Southern Hispanic prisoners were denied programming opportunities for unnecessarily prolonged periods of time.

The OIG observed cases where prisoners did not have identification cards, wore clothing similar to that worn by custody staff, and had unsupervised access to restricted areas.

The inspectors found that CCA did not adequately screen employees before hiring them; that evidence was not always properly handled, resulting in chain-of-custody problems; that significant incidents were not always investigated; and that employees did not always carry critical safety equipment such as whistles, pepper spray and handcuffs.

The OIG expressed concern that the CDCR had never approved CCA's use-of-force policy at the company's out-of-state facilities.

In Oklahoma, the OIG noted (with apparent incredulity) that gang affiliations of Inmate Advisory Committee members were posted on bulletin boards, while in Mississippi, boxes containing prisoners' letters and grievances were unsecured. At two of the CCA prisons, "custody staffing levels were insufficient to adequately monitor inmates." As a result, the inspectors observed "approximately 15 of 60 inmates move a barrier" to go around, rather than through, a metal detector when leaving their housing unit.

The report noted a number of other problems at the out-of-state prisons, ranging from poorly documented cell searches, outdated institutional rules and insufficient oversight of the Inmate Welfare Fund by the CDCR to a gap under an inner fence that "was large enough for a man to crawl through." ◾

Source: *OIG letter to CDCR Secretary Regarding Out-of-State Facilities (Dec. 2, 2010)*

## CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks. State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum). Free persons: $90.

*CLN*, **Box 687, Walnut, CA 91788**



# FBI Claims 2,500 Percent Increase in Child Porn Arrests

Although the number of prosecutions for child pornography is small in comparison with drug and immigration offenses, child porn cases have skyrocketed according to FBI statistics.

Arrests for such crimes are up 2,500 percent since 1996, largely due to technology that allows federal investigators to download images from home computers after users have logged onto certain websites. Another reason for the increase in arrests is the five-year mandatory minimum sentence for child porn crimes that is handed out in federal prosecutions.

According to the FBI more than 10,000 arrests for child pornography have been made since 1996. As arrests go up, however, so do the chances of ensnaring people accused of child porn offenses who may be innocent victims of malware, viruses and malicious hackers. [See: *PLN*, Nov. 2010, p.14].

Child porn investigations are relatively inexpensive compared to other crimes, since evidence can be collected by an agent equipped with an Internet connection and peer-to-peer software used by millions of people worldwide, such as Limewire, to swap videos and other digital files. Locating child porn offenders has also been made easier due to computer technology, such as the ability to identify and track IP addresses.

Attorney Michael Whelan, who represents a child porn defendant, complained that the increased prosecutions fail to distinguish between hardcore producers of child pornography and individuals with a "bad habit" and a computer.

Some federal judges agree, partly because even first-time offenders, or offenders who only view or download images but do not produce or distribute child porn, end up serving lengthy sentences. Beyond the five-year mandatory minimum, U.S. Sentencing Commission guidelines often advise judges to impose longer prison terms than the minimum for child porn crimes.

New York U.S. District Court Judge Jack Weinstein stated that some child porn defendants who pose no risk to society need mental health treatment rather than lengthy prison sentences. Other judges have asked the U.S. Sentencing Commission for more flexibility in cases involving first-time child porn offenders.

"You must have tough penalties for child pornography – it's a horrible offense and you have to have stiff penalties – but you should be able to look at each case individually," said Louisiana U.S. District Court Judge Jay Zainey.

Several federal appellate courts, including the 11th Circuit, have taken a more hard-line approach, ordering child porn defendants to pay restitution to their victims when possible in addition to serving prison time and having to register as sex offenders. See: *United States v. McDaniel*, 631 F.3d 1204 (11th Cir. 2011).

However, the Second Circuit departed from that practice in a September 8, 2011 ruling, finding that child porn victims should not be able to recover restitution in cases where the defendant's actions were not a proximate cause of their injuries. In that case, a victim using the pseudonym "Amy" had sought restitution in over 250 child porn cases involving defendants who had viewed her image. See: *United States v. Aumais*, 2nd Cir. Court of Appeals, Case No. 10-3160-cr. The Ninth Circuit reached a similar conclusion in *United States v. Kennedy*, 643 F.3d 1251 (9th Cir. 2011).

Advocates for victims of child pornography, including the National Center for Missing and Exploited Children, argue that such serious crimes warrant harsh penalties. ◣

Sources: *www.denverpost.com, http://abcnews.go.com, USA Today*

# Oregon Aggravated Murder Statute Creates Liberty Interest

### by Mark Wilson

The Ninth Circuit Court of Appeals has held that Oregon's aggravated murder statute creates a protected liberty interest in parole eligibility.

In 1982, Oregon state prisoner Douglas Miller was convicted of aggravated murder and sentenced to life imprisonment with a 30-year minimum under ORS 163.105(1).

Prisoners convicted of aggravated murder are not eligible for parole while serving the judicially-imposed mandatory minimum sentence. After 20 years, however, such prisoners are entitled to a "rehabilitation hearing" – referred to by the Oregon Board of Parole and Post-Prison Supervision (Board) as a "Murder Review Hearing" – to determine whether they are likely to be rehabilitated within a reasonable period of time. "If the individual can make that showing, his sentence is converted to life imprisonment with the possibility of parole and he immediately becomes parole-eligible," the Ninth Circuit noted.

"To be clear," the provisions of ORS 163.105(3)-(4)(1981) "speak only to early eligibility for a parole hearing for persons convicted of aggravated murder; they promise nothing as far as being paroled after the hearing," the Court of Appeals wrote.

In 2004, the Board held a rehabilitation hearing for Miller. "At the hearing, the Board engaged Miller in an extended discussion of the circumstances of his crime," then "without elaboration" denied relief under ORS 163.105(4)(1981).

Miller's state court appeals of the Board's decision were rejected without comment. He then filed a federal habeas corpus petition under 28 U.S.C. § 2254. The district court rejected his claim that the Board's decision deprived him of due process of law because it was not supported by "some evidence" in the record.

On appeal, the Ninth Circuit first addressed "whether Miller has a liberty interest in becoming parole-eligible early, that is, before the expiration of the minimum term of his sentence." That issue turned upon the mandatory language of ORS 163.105.

The appellate court rejected the Board's argument that ORS 163.105 does not create a protected liberty interest because Oregon prisoners bear the burden of proving the likelihood of rehabilitation. The Court of Appeals found nothing in *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979), *Board of Pardons v. Allen*, 482 U.S. 369 (1987) or *McQuillion v. Duncan*, 306 F.3d 895 (9th Cir. 2002) which requires "that the evidentiary burden must be on the state to show that a prisoner is not entitled to parole – rather than on the prisoner to show that he or

she is – in order for a liberty interest in parole to arise."

Rather, the Court concluded, "the language of Oregon's murder review statute 'creates a presumption' in favor of early eligibility for a parole hearing 'when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest,'" citing *McQuillion*, 306 F.3d at 901.

The Ninth Circuit's January 18, 2011 decision was issued just 26 days after unanimous en banc Oregon Supreme Court rulings in *Janowski/Fleming v. Board of Parole*, 349 Or. 432,245 P.3d 1270 (Or. 2010) and *Severy/Wilson v. Board of Parole*, 349 Or. 461, 245 P.3d 119 (Or. 2010). Although the ruling in Miller's appeal does not make any reference to those state Supreme Court opinions, they clearly establish that the Ninth Circuit's liberty interest holding was correct.

The appellate court then turned to the merits of Miller's due process argument. Applying its recent rulings in *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) and *Pearson v. Muntz*, 625 F.3d 539 (9th Cir. 2010), the Ninth Circuit found that under Oregon law, due process requires that "substantial

evidence" – rather than "some evidence" – must support the Board's orders. However, that aspect of the appellate ruling was reconsidered following the U.S. Supreme Court's decision in *Swarthout v. Cooke*, 131 S.Ct. 1845 (2011) [*PLN*, March 2011, p.40].

Conducting a "substantial evidence" review of the Board's order, the Court of Appeals affirmed the adverse Board decision. "The record demonstrates that the Board was swayed by two factors," the Ninth Circuit stated. One of those factors was that "Miller's offense was particularly callous and depraved." Given "the callous nature of Miller's crime," the appellate court ultimately held that "a reasonable parole board could have concluded that he failed to demonstrate – by a preponderance of the evidence – that he was a suitable candidate for an early parole hearing."

The overlooked recent Oregon Supreme Court ruling in *Severy/Wilson*, however, reveals a critical flaw in the Ninth Circuit's reasoning. "The sole issue" at the hearing "shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time," the state Supreme Court wrote in *Severy/*

*Wilson*, citing ORS 163.105(2). "That determination pertains only to personal characteristics of the prisoner.... It does not focus ... on the offenses that the prisoner committed." As such, both the Board and the Ninth Circuit erroneously based their decisions on the "callous and depraved" nature of the offense Miller committed 22 years earlier. The appellate court's ruling was further undermined by its previous holdings in *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003) [*PLN*, June 2004, p.32] and its progeny, which held that reliance upon the immutable factor of the commitment offense may violate due process.

Following *Swarthout v. Cooke*, the Ninth Circuit issued a superseding opinion on April 25, 2011 that eliminated its "substantial evidence" analysis. The appellate court found, instead, that Miller had received all of the due process protections he was entitled to under *Greenholtz*. Once again, the Ninth Circuit ignored state court decisions that provided for greater protections than *Greenholtz* in the Oregon parole context, including *Stogsdill v. Board of Parole*, 342 Or. 332, 154 P.3d 91 (Or. 2007). See: *Miller v. Board of Parole*, 642 F.3d 711 (9th Cir. 2011).

**Prisoner Rights Attorney**
**CHARLES CARBONE, ESQ.**

*"Every case I take is given compassionate, thorough and vigorous representation with one goal in mind – Justice for the Incarcerated."*

*- Charles Carbone*

*Personally and professionally dedicated to fighting for prisoner rights and human rights for California prisoners and their families.*

**Charles represents prisoners in California's worst prisons on conditions of their confinement, including (but not limited to):**

❖ *Parole Lifer Hearings*
❖ *En banc & Rescission Lifer Hearings*
❖ *State & Federal Appeals of Parole Denials*
❖ *State & Federal Appeals of Criminal Convictions*
❖ *Indeterminate Gang Validations for SHU Prisoners*
❖ *Appeals of CDC 115s*

**15 years of experience in prison law (California cases ONLY)**

*For life inmate subscriptions to Quarterly*
**Parole Matters Newsletter**
*Please send $15/year for inmates or $25/year for family members*

PO Box 2809
San Francisco, CA 94126
(415) 981-9773
www.prisonerattorney.com



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
**10992 NW 7th Ave**
**Dept: LN1011**
**Miami, FL 33168**

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com

**prism**
OPTICAL, INC.
Since 1959

PLN_0001213

# Montana Jail Agrees to Provide Addiction Treatment for Pregnant Prisoners

The American Civil Liberties Union of Montana (ACLU) has reached a settlement with the Lake County Detention Center (LCDC) which requires LCDC to ensure that pregnant prisoners at risk of opiate withdrawal receive proper medical treatment.

The ACLU filed a federal civil rights lawsuit in November 2009 on behalf of Bethany Cajune, who was incarcerated at LCDC for nine days while four months pregnant and was denied medication essential for preventing the serious medical risks associated with opiate withdrawal, including miscarriage.

Cajune reported to LCDC to complete a 24-day jail sentence for a traffic violation. That sentence was interrupted after five days because Cajune went into early labor. Before turning herself in to serve the remainder of her sentence, Cajune consulted her Medically Assisted Treatment (MAT) counselor.

In 2008, Cajune had been diagnosed for an opioid addiction that required medical and psychosocial treatment. As part of her MAT program, Cajune began receiving Suboxone for her addiction, which is similar to methadone but is approved for office-based treatment.

While in the program, Cajune, 24, started to get control of her life. She began to take GED classes and stayed off drugs. Her treating physician, Dr. Kenneth Cairns, recommended that she continue Suboxone upon learning she was pregnant in late 2008 or early 2009. When Cajune arrived at LCDC on March 18, 2009, she informed the guards that she was pregnant and needed her prescribed Suboxone and Promethazine (for pregnancy-related nausea), which she had with her.

The next day she was given the Promethazine but denied the Suboxone. She continued to request Suboxone and began to suffer withdrawal effects without it. Dr. Cairns made several calls to Sheriff Leonard C. "Lucky" Larson and Dr. Stephen Irwin, LCDC's medical director, trying to ensure that Cajune received her prescribed medications.

Dr. Cairns informed Larson and Irwin that abrupt withdrawal from Suboxone is contraindicated for pregnant women, as it may cause the fetus to go into withdrawal and suffer from a lack of oxygen. There is also an increased risk of preterm labor, low birth weight and fetal death. Additionally, withdrawal is dangerous for the mother because it causes decreased blood flow through the placenta and typically results in diarrhea, vomiting and dehydration.

Despite being provided guidelines and policies from the federal Substance Abuse and Mental Health Services Administration and the National Commission on Correctional Health Care Standards for Health Services in Jails, Dr. Irwin refused to allow Cajune to receive her prescribed Suboxone.

On March 26, 2009, Cajune was taken to a hospital for an ultrasound that revealed her amniotic fluid index measured at the lower limits of the normal range. Dr. Cairns found that she was visibly sick, underweight and suffering from withdrawal.

A public defender filed a motion seeking an order for Cajune to receive her prescribed medication, which resulted in a state court ordering her release on March 27. She had lost ten pounds during her brief stay at LCDC and required intravenous fluids for treatment of dehydration after she was released.

The April 2011 settlement in Cajune's subsequent federal lawsuit requires LCDC officials to establish policies that require opiate-addicted pregnant women to be immediately referred to an obstetrical provider and to receive recommended treatment. The parties agreed to pay their own attorney fees and costs.

"Women don't give up their right to medical treatment or their right to have a healthy pregnancy when they are incarcerated," said ACLU staff attorney Jennifer Ann Giuttari. "Under this policy, pregnant women incarcerated at Lake County Detention Center cannot be denied the obstetrical care and medication they need. We are extremely hopeful that this change in practice at Lake County Detention Center means that no other pregnant women will be treated the way our client was treated." See: *Cajune v. Lake County*, U.S.D.C. (D. Mont.), Case No. 9:09-cv-00164-DWM-JCL. ◼

# Pennsylvania Councilman Takes Private Prison Company's Donation, then Opposes Detention Center

A $3,000 campaign contribution from a private prison firm GEO Group has put a spotlight on a county councilman in Pennsylvania. The contribution was made only days after Ron Angle, president of the Northampton County Council, urged his colleagues to explore a proposal from GEO in October 2010.

GEO Group proposed that Northampton County seek a contract with the Immigration and Customs Enforcement agency (ICE) to house immigration detainees. The detention contract would be farmed out to GEO.

Angle and other supporters of the project touted it as a way to bring jobs to the area and increase tax revenue for the Bangor Area School District without adding new students. GEO's donation to Angle came after the County Council authorized County Executive John Stoffa to act quickly in exploring the company's proposal.

"They didn't buy any influence," Angle said of the contribution from GEO's political action committee. "They bought my disinfluence." Angle said he spent $650 of GEO Group's donation to poll residents about their opinion on building the detention center on a 128-acre site in their community.

Local residents did not see a GEO-run facility as being a good neighbor. Based on that response, Angle urged the County Council in November 2010 to nix any action on the company's proposal. Stoffa rescinded his talks with ICE, and Essex County, New Jersey is reportedly in the process of getting the immigration detention contract.

GEO's donation to Angle, part of less than $5,000 he raised during that contribution reporting period, was properly listed in a report to the state. Angle, who is up for reelection, said he informed GEO representatives he would not support the detention center project if residents did not support it. He was the only councilman to receive a donation from the company. ◼

Sources: *www.tradingmarkets.com, http://lehighvalleyramblings.blogspot.com, The Morning Call*



# *Stamps for* CASH!

SOLID RATES YOU CAN COUNT ON! • RATES THAT DON'T CHANGE MONTHLY!

*Great Goods will buy your stamps!*

**70%** of Face Value: *Complete books or sheets of Forever Stamps,*

**65%** of Face Value: *Complete books, rolls, or strips of 44-cent stamps (10 stamps min.)*

WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

**Payment sent within 24 hours of receipt.**

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps. • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

# GREAT GOODS

**PO Box 399, West Chesterfield NH 03466**

STAMPS © USPS. ALL RIGHTS RESERVED.

# $10,000 Settlement in North Carolina Prisoner's Pepper Spraying

The North Carolina Department of Corrections (NCDOC) paid a prisoner $10,000 to settle a lawsuit claiming guards used excessive force by pepper spraying him.

Lanesboro Correctional Institution prisoner Bill Rayburn had been asking guards to move him away from another prisoner who had been taunting and threatening him. On the morning of January 13, 2009, Rayburn had a panic attack and began pounding on his cell door.

When guards responded a second time, they doused him with pepper spray. They also soaked his cell and bed with the spray. Rayburn said he screamed in pain and was taken by guards to wash off in a shower. Once finished, he was ordered to return to his cell.

Rayburn refused to comply, saying he would not be able to deal with the noxious fumes from the pepper spray that still permeated his cell. As he sat naked on the shower floor, a female guard "sprayed him all over his body, including his genitals," according to the complaint in his lawsuit. Upon emptying her can of pepper spray, the guard obtained another can and continued spraying him while laughing.

Rayburn was then left on the shower floor; he was unable to turn on the water to clean himself. It was not until the next shift of guards arrived that he was able to wash the chemicals off. State officials denied liability when agreeing to settle the case for $10,000 in June 2010. Rayburn was represented by North Carolina Prisoner Legal Services. See: *Rayburn v. Wall*, U.S.D.C. (W.D. NC), Case No. 3:10-cv-00084-RJC-DSC.

An investigation by the NCDOC found that the guards involved in the incident had violated the department's use-of-force policy, which allows staff to use pepper spray only when needed to deter "violent, threatening, or aggressive" prisoners or to defend against an assault. When pepper spray is used, prisoners are to be given "an immediate opportunity" to wash off the chemicals. The prison's administrator was replaced and five guards were disciplined following the NCDOC's investigation.

In April 2011, Lanesboro Correctional Institution administrator Richard L. Neeley, 52, was charged by the State Bureau of Investigation with obstructing justice, a felony, for allegedly ordering the destruction of a 2009 surveillance video that showed guards fighting with prisoners.

According to Stephanie Miller, a former sergeant at Lanesboro, Neeley ordered her to destroy the video footage because he thought it showed excessive force.

"I was instructed not to put the video in the felony file and to destroy it," she stated, adding that it "was basically a cover-up of the assault." Miller said she was harassed by supervisors at the prison after she turned the video over to the State Bureau of Investigation, and later resigned.

Sources: *Charlotte Observer, The News & Observer*

# Department of Justice Report on Sexual Victimization in Prisons and Jails

In January 2011, the U.S. Department of Justice's Bureau of Justice Statistics (BJS) released a report titled "Sexual Victimization Reported by Adult Correctional Authorities, 2007-2008." The report is based on the annual Survey of Sexual Violence mandated by the Prison Rape Elimination Act, 42 U.S.C. § 15601.

Survey forms were mailed to administrators for all federal, state, military and ICE facilities, plus a representative sample of local jails and privately-operated jails and prisons. The collected data covered 2.12 million prisoners in 2007 and 2.18 million in 2008.

The BJS survey dealt with a variety of sexual victimizations, which are defined as sexual contacts without consent or with a person who cannot consent. Sexual victimization perpetrated by a prisoner (PSV) includes nonconsensual sexual acts involving contact between the sexual organ or mouth of the perpetrator and the sexual organ, mouth or anus of the victim, or penetration of the anal or genital opening of the victim by a finger, hand or another object. Abusive sexual contact is considered less serious and includes intentional touching of the genitalia, anus, groin, breast, inner thigh or buttocks, even through clothing, and incidents of sexual exploitation.

Staff sexual misconduct (SSM) includes any sexual behavior, including a romantic relationship, involving a prisoner and staff member. This includes intentional touching of the genitalia, anus, groin, breast, inner thigh or buttocks with the intent to sexually abuse, arouse or gratify; completed, attempted, threatened or requested sexual acts; or indecent exposure, invasion of privacy or voyeurism for sexual gratification.

Staff sexual harassment (SSH) includes demeaning references to a prisoner's sex, derogatory comments about a prisoner's body or clothing, or repeated profane or obscene language or gestures.

The BJS survey recorded 763 substantiated incidents of sexual victimization in 2008 and 783 in 2007. Extrapolating from those figures, the estimated total number of substantiated sexual victimizations nationwide was 931 in 2008 and 1,001 in 2007. Substantiated incidents of sexual violence in prisons increased 28% from 459 in 2005 to 589 in 2008.

During that same time period the total number of alleged sexual victimizations increased from 6,241 (2.83 per 1,000 prisoners) to 7,444 (3.18 per 1,000 prisoners). Most of this was due to a 21% increase in sexual victimizations in prisons rather than jails. Much of the increase resulted from abusive sexual contacts initiated by prisoners, which rose from 611 in 2005 to 1,417 in 2008.

In 54% of substantiated incidents of sexual victimization the perpetrators were prisoners, while in 46% they were staff. Female prisoners were disproportionately victimized by both prisoners and staff. Women constitute only 7% of the prison population but accounted for 21% of PSV victims. Likewise, women represent 13% of jail prisoners but accounted for 32% of PSV victimization in jails. They were also 32% of SSM victims in prisons and 56% of SSM victims in jails.

Both victims (42%) and perpetrators (31%) of nonconsensual sexual acts were disproportionately younger than 25 compared to victims (33%) and perpetrators (21%) of abusive sexual contacts. Of PSV perpetrators in jails, 38% were under 25 years old whereas 17% in prisons were under 25.

About 12% of substantiated PSVs were committed by more than one perpetrator, and approximately 18% of substantiated PSVs resulted in an injury to the victim. Around a third of nonconsensual sexual acts occurred between midnight and 6 a.m. Over a third of

PLN_0001216

abusive sexual contacts occurred between noon and 6 p.m.

The most common sanction for PSV perpetrators was solitary confinement (77% in prisons, 67% in jails). In prisons, 26% of the perpetrators were subjected to legal action, such as arrest or referral for prosecution. A much higher percentage, 51%, was referred for legal action in jails.

About 61% of SSM perpetrators were male and 21% of SSH perpetrators were female. Over half of the victims of SSH (58%) reported the incidents to administrators, but only 21% of SSM victims reported such incidents.

The most common location for SSM was a program area such as the kitchen, storage area, commissary, laundry, cafeteria, hallway or workshop (38%), followed by the victim's living area (17%).

The BJS had previously released another report with statistical data related to sexual victimization in prisons and jails reported by prisoners from 2008 to 2009, which found that 4.4% of state and federal prisoners and 3.1% of jail prisoners reported at least one incident of sexual victimization by other prisoners or staff within the preceding 12 months. [See: *PLN*, June 2011, p.40].

The unfortunate conclusion one must draw from the BJS reports is that sexual victimization of prisoners – especially female prisoners – is still widespread in U.S. correctional facilities. Although the intent of PREA was noble, there continues to be a culture of permissiveness within both jails and prisons when it comes to sexual victimization. Some people consider such misconduct to be part and parcel of the

prison experience and, perhaps, even a necessary evil to deter crime.

Further, some guards still apparently view prisoners as their personal chattel with little purpose other than to satisfy their every whim – including their sexual desires. Until these cultural attitudes change, sexual victimization of prisoners will persist. 🖋

Source: *"Sexual Victimization Reported by Adult Correctional Authorities, 2007-2008," Bureau of Justice Statistics (NCJ 231172), available online at www.bjs.ojp.usdoj.gov*

# Los Angeles County Pays $400,000 to Settle Juvenile Jail Prisoner Wrongful Death Suit

The Los Angeles County Board of Commissioners has approved a $400,000 settlement to resolve negligence, civil rights and other claims related to the wrongful death of a juvenile offender held at the Los Padrinos Juvenile Hall. Tremayne Cole, 14, passed away less than a month after being arrested for violating conditions of his community detention program.

Cole began having headaches and toothaches four days following his arrest, and experienced high temperatures. He was given minor medications but was not seen by a doctor.

Apparently Cole had been placed on "bed rest" status, which nursing staff and guards at Los Padrinos interpreted as meaning that he could not leave his unit to see a doctor. Cole's condition deteriorated until he was finally transferred to a hospital. He went into a coma and died eight days later from bacterial meningitis, on March 4, 2008. He was 3'11" tall and weighed only 79 pounds.

Cole's family sued. A risk assessment by the county revealed several lapses in the medical care that Cole received, or the lack thereof. Patient interactions, for example,

were not always recorded; additionally, staff had misinterpreted "bed rest" to preclude visits with health care providers.

As a result the county agreed to a $400,000 settlement, which was finalized in August 2010. Cole's parents were represented by Los Angeles attorney Randy McMurray with The Cochran Firm. See: *Cole v. County of Los Angeles*, Los Angeles Superior Court (CA), Case No. VC 052 024. 🖋

Additional source: *LA Weekly*



**NEW** **PhotoService for Inmates**

You can send us your photo(s) and we can change or add:

✓ backgrounds (you can name any place in the world)
✓ clothes (you choose your outfit)
✓ add/delete people/items to/from existing photos
✓ combine several photos
✓ create photo greeting cards with your photos

➡ **Receive amazing photo prints for you and your loved ones.**

**Nearly everything is possible!**
Cost: $15 for your first, $12 for any additional photo, 9 cents per print and a one-off service & postage charge of $3.50.

**Order your free brochure to see examples and get all the information you need!**

Write to: Anna Sperber, Sturmstrasse 10, 90478 Nuernberg, GERMANY or servicephoto@rocketmail.com
**www.photoservice-for-inmates.com**



**FREE!** **12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription!

Quarterly drawing WINS $100! **(Void in New York)**

(Last Quarter's winner from **Navasota, TX.**)

TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
**www.InmateMagazineService.com**

**Inmate Magazine Service Inc.**

PLN_0001217

# 90% Remittitur of $750,000 Strip Search Verdict Vacated; Plaintiffs Accept $440,385.08 on Remand

### *by Mark Wilson*

On June 30, 2010, the Eighth Circuit Court of Appeals held that a district court had abused its discretion in reducing a $750,000 jury award to $75,000 in a case raising illegal strip search claims involving two retired school teachers who were arrested while protesting President George W. Bush and the Iraq war.

On September 3, 2004, the Republican National Committee held a campaign rally at Noel Ridge Park in Cedar Rapids, Iowa to support candidates for federal and state office. Retired school teacher Alice McCabe and now-retired teacher Christine Nelson attended a peaceful protest sponsored by the Linn County Democratic Party.

McCabe carried an 8½" x 11" piece of paper affixed to a small yard sign that stated "Bad War No More," with a "W" with a slash through it. Nelson did not have a sign but wore a small "Kerry Edwards" button.

Secret Service Agent Michael Parker ordered McCabe to move off the sidewalk. She and Nelson complied, moving to a strip of grass between the sidewalk and street. Several other people, including a man with a bucket who was collecting donations for Republicans, were in the same area.

Several minutes later, however, Parker ordered McCabe to move again. McCabe felt she was being singled out and asked Parker if he was going to tell everyone else to move as well. Parker radioed for assistance and Agent Bruce Macaulay responded. Macaulay ordered McCabe and Nelson to move. When they questioned him, Macaulay arrested them for trespassing. Iowa State Troopers Rich Busch and Troy Bailey as well as Sergeant Jim Loveland responded and participated in the arrest.

McCabe and Nelson were arrested on a simple misdemeanor trespass charge. However, there was no lawful basis for the charge because rally organizers did not obtain formal approval to hold the rally or to close the streets and sidewalks for exclusive use of the event. Even so, the women were booked into the Linn County Jail and subjected to a "full strip search" in violation of jail policy.

Both women were required to strip naked and submit to a visual body cavity search, which required them to "bend over and spread their buttocks and allow an officer to inspect their rectal area. The visual body cavity search also included an inspection of the women's vaginas. While Nelson was searched, the top half of a Dutch door to the room in which the search took place was open and male jailers passed by the open door during the search."

The trespass charges were dismissed three months after the rally. Nelson and McCabe then filed suit in federal court, alleging that numerous state and federal officials had violated their constitutional rights by subjecting them to the unlawful arrest and strip searches. They also alleged a nationwide conspiracy on the part of the Bush administration to target and suppress protesters for exercising their First Amendment right to oppose Bush's policy on the Iraq war.

Most of the claims in the suit were dismissed. The Iowa State Troopers who participated in the arrest reached a settlement prior to trial and testified as witnesses instead of defendants. Deputy Michelle Mais, who performed the strip and visual body cavity searches at the jail, conceded liability and only contested damages. Her conduct violated both jail policy and Iowa law, which prohibits strip searches for simple misdemeanor arrests absent probable cause.

The only claims that proceeded to trial were against Macaulay for the unlawful arrests and against Mais for the damages portion of the Fourth Amendment claims arising from the strip and visual body cavity searches at the jail. The jury found in favor of Macaulay, but awarded $250,000 to McCabe and $500,000 to Nelson on the search claims.

The district court granted Mais' motion for a new trial, finding that the damage award was excessive and shocked the court's conscience. The court gave the plaintiffs the option of accepting a 90% remittitur in the amount of $25,000 for McCabe and $50,000 for Nelson in lieu of a new trial, which they rejected. Mais then made an offer of judgment under Fed.R.Civ.P. 68 in the same amounts. Both plaintiffs rejected the offer and proceeded to a second damages trial, where the jury awarded $10,002 to McCabe and $45,802 to Nelson. [See: *PLN*, July 2009, p.31].

On appeal, the Eighth Circuit held the district court did not abuse its discretion in concluding that the original $750,000 jury award was excessive. The appellate court found error, however, with the 90% remittitur. The Court of Appeals explained, "once a district court decides to employ a damage comparison approach," as in this case, "and thereafter identifies a range of reasonable jury awards in similar cases, it is not at liberty to remit an award to the low end of the range, or even somewhere in the middle of the range. A district court's only choice is to remit to the maximum amount identified as within the reasonable range."

The Eighth Circuit found that "the district court appears to have identified the low end of the range as being the nominal damages approved in *Hunter v. Anger*, 672 F.2d 668, 672 (8th Cir. 1972), and the high end of the range as being the $75,000 awarded to one plaintiff in *Joan W. v. City of Chicago*, 771 F.2d 1020, 1025 (7th Cir. 1985)."

The appellate court noted that *Joan W.*, which involved a single female plaintiff who was subjected to a strip and body cavity search in 1978, "was the key case under the maximum recovery rule and therefore should have been used as the benchmark for determining the proper amount of remittitur." Yet the remittitur amount the district court selected – $25,000 for McCabe and $50,000 for Nelson – was below the $75,000 identified as reasonable for a single plaintiff in *Joan W.*, the Eighth Circuit found. As such, "the amounts selected by the district court are inconsistent with the maximum recovery rule, and reflect a clear abuse of discretion."

The Court of Appeals also found the district court had abused its discretion by failing to calculate how much a $75,000 award in 1978 dollars was worth for an incident that occurred in 2004 after adjusting for inflation. The case was therefore remanded to calculate an appropriate remittitur for both plaintiffs.

Finally, the appellate court refused to attribute 40% of the plaintiffs' attorney's fees to their successful strip search claims.

PLN_0001218

The Eighth Circuit found no abuse of discretion in the district court's decision to attribute only 15% of the attorney's fees to the strip search claims. However, as the district court's remittitur was held to be inadequate, McCabe and Nelson were also "entitled to recover all reasonable fees incurred in the second trial." See: *McCabe v. Parker*, 608 F.3d 1068 (8th Cir. 2010).

Following remand, on October 5, 2010 the district court ordered a new remittitur for McCabe and Nelson in the amount of $75,000 each. Adjusted for inflation since the 1978 ruling in *Joan W.*, which served as the benchmark for the remittitur, the court offered $217,292.94 to each plaintiff. Nelson was awarded an additional $5,799.20 for medical expenses. The plaintiffs accepted the new remittitur and filed a stipulation dismissing the case. See: *McCabe v. United States Secret Service*, U.S.D.C. (N.D. Iowa), Case No. 1:05-cv-00073-LRR (2010 WL 3938383).

## Postcard-Only Mail Policy Enjoined at Colorado Jail

On December 20, 2010, Chief U.S. District Court Judge Wiley Y. Daniel issued a preliminary injunction against a postcard-only mail policy instituted at the El Paso County Jail in Colorado Springs, Colorado.

The injunction resulted from a class-action lawsuit filed by a group of El Paso County prisoners who alleged that the jail's policy of restricting outgoing correspondence to 4" x 6" postcards violated their rights under the First and Fourteenth Amendments and Colorado's Constitution.

The El Paso County Jail's postcard-only policy is part of an increasing trend by jails across the country to limit prisoner correspondence. [See: *PLN*, Nov. 2010, p.22]. Jail officials claim that restricting prisoners to postcards cuts down on contraband and reduces staff time in processing incoming mail.

The infamous Sheriff Joe Arpaio of Maricopa County, Arizona implemented the first postcard-only policy, which withstood a legal challenge in a prisoner's pro se lawsuit on Sept. 29, 2009. The court held in that case that jail officials had "shown that the mail policy is reasonably related to legitimate penological objectives." See: *Covell v. Arpaio*, U.S.D.C. (D. Ariz.), Case No. 2:07-cv-02453-PHX-DGC. This is a dubious ruling since it is unlikely that a pro se prisoner litigant can muster the resources to conduct discovery which is generally needed to win these censorship cases. The El Paso County Jail's mail policy limits prisoners to "less writing space than is available in a two or three-page, double-sided letter," according to a stipulation entered into by the parties.

The postcard-only policy also bars prisoners from enclosing drawings, newspaper or magazine clippings, religious literature or writings they may want to share with their correspondents.

Additionally, because prisoners are prohibited from using envelopes, the parties stipulated that prisoners cannot "write a letter-to-the-editor, seek spiritual guidance from clergy, provide information to investigative reporters, or submit their own writing to such periodicals as the *Colorado Springs Independent* or *Prison Legal News*."

El Paso County decided to stipulate to the injunction days before a hearing was scheduled on the plaintiffs' motion for a preliminary injunction.

The injunction bars El Paso County from enforcing its "postcard-only policy, or any other policy that limits prisoners' outgoing mail to postcards." Further, the injunction requires the jail to immediately "re-supply [its] inventory of paper and envelopes for use by prisoners for outgoing correspondence."

The parties subsequently agreed to a settlement in which the district court would issue a permanent injunction against the postcard-only policy at the jail, and the plaintiffs' attorneys, from the ACLU of Colorado and the ACLU National Prison Project, would receive $60,000 in fees and costs. The settlement was approved on June 7, 2011. See: *Martinez v. Maketa*, U.S.D.C. (D. Col.), Case No. 1:10-cv-02242-WYD-KLM.

The injunction and settlement in the suit against the El Paso County Jail's postcard-only policy is a first. Lawsuits challenging similar policies in other jurisdictions remain pending. *PLN* recently filed suit against a jail in Livingston County, Michigan over a postcard-only policy that resulted in the censorship of *PLN*'s monthly publication, correspondence and book orders. [See: *PLN*, Sept. 2011, p.19].



**INMATE** CONNECTIONS.com & ConvictPenPals.com!
465 NE 181st, #308 Dept. PLN Portland OR 97230
Since 2002 – Write for FREE brochure!

## Earn an Adams State College Degree via Correspondence Courses



- Correspondence Courses via mail    • No internet access required
- Degree options available — Associate of Arts or Science, Accounting, Business Administration, Interdisciplinary Studies, Legal Studies, Management, Marketing, Paralegal Certificate Program
- Affordable tuition — $165/semester hour for correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 15+ years of experience serving incarcerated students
- FREE unofficial evaluation of previously earned credits



ADAMS STATE COLLEGE
C O L O R A D O
*Great Stories Begin Here*
EXTENDED STUDIES

Call or write to receive additional information — 800-548-6679
Office of Extended Studies, Box CC •
Adams State College • 208 Edgemont Blvd. • Alamosa, CO 81102

PLN_0001219

# Former Florida Prison Guard Sues for Reinstatement Under Whistleblower Act

The Florida Department of Corrections (FDOC) has been sued for retaliation under the state's whistleblower act by a former guard. The suit, filed by lawyers for John Pisciotta, seeks back pay, reinstatement of his job, damages and attorney fees.

Pisciotta's employment problems began on May 21, 2008. He was one of eight guards involved in the cell extraction of prisoner Kelly Bradley at the Charlotte Correctional Institution (CCI); when the incident was over, one of Bradley's eyes was hanging from its socket.

Pisciotta was the only prison employee to report that another guard, William Hamilton Wilson, had gouged Bradley's eye out. Only one other guard even noted in his report that Bradley was injured; the others testified at Wilson's 2009 federal criminal trial that they didn't see how the injury occurred.

"It took a lot of courage to come forward in that environment," said one of Pisciotta's attorneys, Jason Gunter. "The corruption is pretty shocking. It's scary that this can happen."

Only hours after Wilson was sentenced to six years in federal prison and three years supervised release, Pisciotta was fired by the FDOC. His lawsuit details several events that led up to his termination on January 11, 2010.

Following the incident involving Bradley, Pisciotta told the other guards and the prison inspector that he would not be involved in a cover-up. Shortly after Wilson's arrest in June 2008, fellow guards called Pisciotta a coward and a snitch, and someone spray painted the word "coward" on his home. The FDOC transferred him from CCI to the Fort Myers Work Camp.

Despite having two days of preapproved leave to care for a sick child, Pisciotta received a written reprimand and 10-day suspension for failing to report for emergency duty due to Hurricane Ike in September 2008.

He was also suspended following an allegation in April 2009 that he kneed prisoner Anthony Williams in the face while transporting Williams to the Miami-Dade County Jail. Those allegations were made by guards Brandy Lindsay and Rafael Montes-Lebron, but 13 others who were nearby said they didn't observe anything

unusual and three medical exams failed to find injuries on Williams.

The Florida Commission on Human Relations determined in June 2010 that the FDOC had retaliated against Pisciotta. However, the Florida Department of Law Enforcement's Criminal Justice Standards & Training Commission – which determines misconduct issues affecting professional licenses for law enforcement – found that there was probable cause the incident involving Williams had occurred.

Pisciotta's lawyer believes the FDLE will reinstate him after a rehearing. "This guy's a hero and the evidence against him is weak," said attorney Bill Amlong. "It shows how morally bankrupt the Department of Corrections is."

Bradley, who has since been released and is seeking compensation for his eye injury, is supportive of Pisciotta in his retaliation case against the FDOC. See: *Pisciotta v. FDOC*, Charlotte County Circuit Court (FL), Case No. 11000983CA. ◾

Sources: *www.news-press.com, www.marcoislandflorida.com*

# Prisons Are Breeding Ground for Terrorists?

## *by Mark Wilson*

"Prisons are often described as 'hotbeds' of terrorism," but they can also become important "net contributors in the struggle against terrorism" according to a July 2010 joint study by the London-based International Centre for the Study of Radicalisation and Political Violence (ICSR) and the National Consortium for the Study of Terrorism and Response to Terrorism (START).

The 64-page report was the result of the first study "to examine policies on prison radicalisation and deradicalisation in 15 countries across the globe." Researchers "aimed to develop a more sophisticated understanding of the role prisons can play in radicalizing people and reforming them," according to the report.

"Prisons are 'places of vulnerability,' which produce 'identity seekers,' 'protection seekers,' and 'rebels' in greater number than other environments," the study found. "They provide near-perfect conditions in which radical, religiously framed ideologies can flourish." Noting that the extent of this problem is difficult to discern, the researchers wrote that "the potential for prison radicalization is significant" and must be addressed.

Among the problems noted by the researchers was a "security first" approach to prison management. "Many prison services seem to believe that the imperatives of security and reform are incompatible," the report said. "In reality, though, reform does not need to come at the expense of security. Prison services should be more ambitious in promoting positive influences inside prison, and

develop more innovative approaches in facilitating prisoners' transition back into mainstream society."

Moreover, "over-crowding and under-staffing amplify the conditions that lend themselves to radicalization." As such, "the first and most important recommendation is to improve general conditions, avoid over-crowding, train staff, and provide meaningful programming that allows prisoners to develop stable inmate identities," the report stated. "Prison imams [Islamic religious leaders] are important in denying religious space to extremists, but they are not a panacea."

The report found that "one size does not fit all," and successful programs cannot simply be "copied and pasted." Rather, for programs to be effective, "their scope, structure and instruments must reflect local contexts and conditions."

"In bringing together the experiences of 15 countries, the report has attempted to show the diversity of policy and practice across the world," the researchers stated. Taken together, the lessons learned "demonstrate the enormous possibilities for prisons to make a positive and significant contribution to countering terrorism."

The potential religious radicalization of prisoners has struck a chord in the U.S., too – particularly in regard to Islamic radicalization. Republican U.S. Rep. Peter King held a hearing on that topic in June 2011. King cited at least five examples since 2002 of ex-prisoners who adopted radical Islamic beliefs and became involved with terrorist groups – including Kevin James, a

PLN_0001220

former California prisoner who converted to Islam and plotted to attack military facilities and synagogues. That these plots have been foiled by FBI informants beg the question of whether actual militants are being bred or instead patsies for the "war on terror" are being created. No examples are provided where American prisoners converted to Islam and actually carried out any acts of resistance.

"We have seen cases in which inmates have been radicalized at the hands of already locked-up terrorists or by extremist imam chaplains," King stated. "We will focus on a number of the serious cases in which radicalized current and former inmates have planned and launched attacks or attempted to join overseas Islamic terrorist organizations."

In 2003, the FBI created a program to collect intelligence information about and disrupt terrorist recruiting in prisons and the radicalization of prisoners. "Prisons continue to be fertile ground for extremists who exploit both a prisoner's conversion to Islam while still in prison, as well as their socioeconomic status and placement in the community upon their release," FBI Director Robert Mueller said during a Senate Committee hearing in 2005.

Rep. King and Rep. Frank Wolf took specific issue with the writings and messages of Nation of Islam leader Louis Farrakhan, and recently asked Bureau of Prisons (BOP) acting director Thomas Kane to ban all Nation of Islam material from federal prisons.

"We ask you to immediately remove all written, audio and video materials produced by the Nation of Islam and Louis Farrakhan from all BOP facilities," Reps. King and Wolf wrote in a letter to Kane. "We also request that you launch an immediate and comprehensive audit of all other Islamic texts and sermons made available to inmates in BOP facilities, including a review of your procedures for vetting such materials."

"I am committed to conducting thorough oversight of BOP to ensure that our prisons are not breeding grounds for terrorism," Rep. Wolf stated.

Yet given the very few examples of prisoners who have turned to guerrilla warfare after being "radicalized" by Islam while incarcerated, and the fact that white prisoners who are "radicalized" by racist white supremacist beliefs are largely ignored, it appears that the current witch-hunt relative to Islam in prison is little more than political posturing.

Sources: *"Prisons and Terrorism Radicalisation and De-radicalisation in 15 Countries," ICSR/START (July 2010), available at www.icrs.info; www.humanevents.com; www.usnews.com; www.msnbc.msn.com*



**inmateMAGS**.com formerly MyMagstore.com

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **50+ Page Full Catalog** ($3 Discount Coupon included)

InmateMAGS.com
4208 University Way NE
Seattle, WA 98105

Mymagstore.com
Info@mymagstore.com
877-324-7323

www.inmateMAGS.com
Info@inmatemags.com
206-322-6397

## WILLIAM L. SCHMIDT

*Attorney at Law*

# Have you been seriously injured?
# Wrongly convicted? Denied parole?

Accidents § Appeals § Police Brutality

*Federal • State • Local*

Civil Rights, Writs, Parole Hearings, Transfers, Classification, Visiting, Medical

*Providing Justice Throughout California by Plane*

377 W. FALLBROOK, SUITE 207, FRESNO, CA 93711
P.O. BOX 25001, FRESNO, CA 93729-5001
*legal.schmidt@gmail.com*

559.261.2222

PLN_0001221

# Prison Legal News Sues Arizona Jail Over Restrictive Mail Policy

On September 7, 2011, Prison Legal News, represented by the American Civil Liberties Union of Arizona (ACLU) and the law firm of Rosen, Bien & Galvan, LLP, filed a federal lawsuit challenging the constitutionality of a Pinal County, Arizona jail policy that prohibits prisoners from receiving any magazines, hardcover books or letters of more than one page in length.

The lawsuit, which was filed against the county and Sheriff Paul Babeu, argues that the "postcard-only" mail policy amounts to censorship and prevents prisoners from receiving *Prison Legal News* and other reading material.

"Publishers have a well-established First Amendment right to send their publications and books to prisoners, and it is unfortunate that rather than respect the rights of publishers to communicate with prisoners Sheriff Babeu continues to try to defend the indefensible by banning our books and magazines," said PLN editor Paul Wright.

According to the complaint, paperback books (limited to 3) are the only exception to the jail's mail policy and they must be sent from "an approved publisher." Over a six-month period, Pinal County jail officials refused to deliver several PLN publications, including *Prison Legal News* and other informational brochures, citing "not allowed," "only 1-page letters allowed" or "not from an approved publisher," and also failed to deliver copies of PLN's paperback books. Those publications provide prisoners with information on matters of concern, ranging from addressing their basic health and safety needs to litigating civil rights claims.

"As implemented by Sheriff Babeu, the postcard-only policy is clearly unconstitutional and serves as an excuse to censor books and magazines for no good reason," stated ACLU of Arizona Legal Director Dan Pochoda. "Jail officials who are serious about lowering recidivism and increasing public safety recognize that cutting inmates off from the outside world and denying them access to periodicals is counterproductive."

PLN is asking the court to order Sheriff Babeu to cease the unconstitutional practice of censoring PLN and limiting prisoner mail to short messages on postcards, and to compensate PLN for past and continuing injuries caused by such censorship. In addition to Dan Pochoda,

PLN is represented by Ernest Galvan and Kenneth M. Walczak of Rosen, Bien & Galvan, LLP in San Francisco, and Lance Weber, in-house counsel for the Human Rights Defense Center, PLN's parent organization. See: *Prison Legal News v. Babeu*, U.S.D.C. (D. Ariz.), Case No. 2:11-cv-01761-GMS. ◼

# Budget Cuts Threaten Oregon Juvenile Offenders

Even in the face of a $3.5 billion short-fall in the 2011-2013 biennial budget cycle which began on July 1, 2011, Oregon Governor John Kitzhaber refused to touch the $1.5 billion budget of the Oregon Department of Corrections (ODOC). Instead he turned his budget knife on every other state agency, cutting to the bone as he tried to find about $200 million in savings. One of the agencies slated for cuts was the Oregon Youth Authority.

"The Oregon Youth Authority (OYA) was not singled out," noted the governor's Communications Director, Tim Raphael. Kitzhaber proposed slashing $34.5 million from OYA – one fifth of its general fund budget – and wanted the Department of Education to eliminate schooling for kids in state custody, saving another $1.6 million.

Juvenile system administrators recognized the daunting economic challenges facing the state, but criticized the governor's plan to impose "draconian" cuts on OYA's budget as being harmful to children in the short-term and self-defeating in the long-run.

"These cuts will cause a major shift in the way we handle juvenile justice in Oregon," noted Scott Taylor, director of the Multnomah County Community Justice Department. "It's a huge change," agreed Deb Patterson, Crook County Juvenile Department Director.

At its peak in 2001, OYA had 1,131 "close custody" beds – the juvenile equivalent of adult prison beds – and currently operates 887 close custody beds. Forecasts estimate that 962 beds will be needed going forward, but the state would have less than half that many under Kitzhaber's budget reduction plan, which eliminates 412 beds.

OYA presently has about 1,866 youths under its supervision – 1,633 boys and 233 girls. Fifty-five percent (1,032) are on juvenile parole and 834 are in custody. Kitzhaber's plan would shift some close custody youths to less secure community programs, bumping children from those programs early to make room, according to juvenile authorities.

"If these services worked for those kids, they would not be going to close custody," observed Torri Lynn, director of the Linn County Juvenile Department. "The kids failed at that lower level."

In the past ten years the number of criminal referrals to juvenile authorities has dropped one-third as OYA has worked diligently to make the system smarter and more focused, catching juveniles earlier and rehabilitating even seemingly incorrigible youth. Those who work in the field expressed fear that their hard work would be undone with one fatal blow of the budget axe.

With fewer juvenile offenders offered full state services, more would end up in community treatment programs. Worse, Kitzhaber's plan threatened to cut about $6 million in payments to juvenile services on the county level.

According to Taylor, that cut alone would force reductions in an intensive drug and alcohol program that currently treats fifteen juveniles at a time in Multnomah County. "This is the last stop," said Taylor. "If we can't get a change in their behavior, their next step will be the Youth Authority."

The number of juveniles sentenced to state custody is projected to remain steady at 2,000 a year, which, under Kitzhaber's plan, would force officials to release one juvenile offender every time another is sentenced.

"That means youth in OYA's facilities will be released before completing treatment, which increases their likelihood to commit new crimes," stated OYA director and former ODOC administrator Collette Peters. On that point everyone agreed. "We'll be seeing more kids committing more crimes, and victims being re-victimized," predicted Patterson.

"We're in a business to reduce the failure rate and make the community safer," Taylor stated. "Its going to be harder and harder to achieve that end. A higher failure rate [for juveniles] just feeds the adult system." Which would be a short-sighted

October 2011

Prison Legal News

PLN_0001222

approach that achieves only short-term savings, as juvenile offenders who become adult criminals will cost the state more in future incarceration costs.

Fortunately, the budget blow to the OYA was not as bad as Governor Kitzhaber initially proposed. The state legislature decided to cut the agency's budget by about $11 million, resulting in a net loss of only

around 50 beds. The OYA will have to cut 119 job positions and close 150 close custody beds, but would add 103 lower-security beds. Most of the bed reductions would be at the Hillcrest, MacLaren and Oak Creek facilities. No juvenile facilities will be closed and the proposed cuts to county juvenile programs were rescinded.

"Our hope is that we're able to pre-

serve public safety and better serve these kids," said Peters.

Lawmakers also imposed modest budget cuts on the ODOC, amounting to $4 million out of a total $1.5 billion budget for the state's prison system. ◪

Sources: *The Oregonian, www.oregon.gov, www.safetyandjustice.org*

# Congressional Budget Resolution Cuts Some DOJ Programs

The April 2011 vote in Congress that passed a resolution for continued federal funding until the end of the current fiscal year on June 30 included 17 percent cuts for various Department of Justice (DOJ) programs, including the Second Chance Act.

The Second Chance Act, Mentally Ill Offender Treatment Program and Justice Reinvestment program were all reduced seventeen percent. Unaffected were the budgets for the Office of Violence Against Women, National Institute of Justice, Bureau of Justice Statistics, Regional Information Sharing Systems, Justice for All and National Center for Missing and Exploited Children.

The DOJ's total budget was funded at $27.4 billion – 8% less than requested for FY 2011. In the category of State and Local Law Enforcement Activities, $2.8 billion was provided, which will be used to provide grants to local and state law enforcement agencies and crime victims. The bill provides $1.12 billion for state and local law enforcement assistance, $276 million for juvenile justice programs, $496 million for COPS grants, $235 million for

Justice Assistance programs, $419 million for domestic violence and sexual assault grants, and $187 million for grant management and administration.

The FBI received $7.8 billion for salaries and expenses while the Bureau of Prisons received $6.3 billion, slightly above its 2010 budget but $239 million less than the amount requested for FY 2011. The Office of the Federal Detention Trustee received $1.52 billion and the DOJ's general legal activities received $865.1 million. The Justice Information-Sharing Technology program, National Drug Intelligence Center, Law Enforcement Wireless Communications and 9/11 Victims Compensation Fund Administration all received funding at amounts below what had been requested.

The DOJ's FY 2011 budget includes the first noticeable and significant cuts to law enforcement on the federal level in the past decade, but retains the core functions of the DOJ at funding levels comparable to the agency's 2010 budget. Grants to states and local governments received the brunt of the cuts, but prisoner re-entry and treatment programs also suffered.

It is hard to contemplate how halfway houses and other re-entry programs that are already bursting at the seams and under severe financial pressure will deal with the reduced funding at a time when more and more prisoners are seeking post-release services due to the continuing economic downturn and high unemployment rates. Unfortunately, in the budget-cutting atmosphere that now pervades Congress, it will be difficult for programs like the Second Chance Act to make their case for additional funding.

Nevertheless, federal legislation has been introduced, S.1231, for reauthorization of the Second Chance Act. The bill is supported by a number of organizations including the American Correctional Association, Association of State Correctional Administrators, Families Against Mandatory Minimums, National Criminal Justice Association, The Sentencing Project and Prison Fellowship. It remains pending in the Senate. ◪

Sources: *www.resourcecenter.org, http://consensusproject.org*



TO GET YOUR NEW COLOR CATALOGS 14 AN 15 YOU MUST SEND A SELF ADDRESSED STAMPED ENVELOPE WITH 10 STAMPS INSIDE. NO EXCEPTIONS!

WHOLESELL CATALOG#1 IN LARGE PRINT ONLY
$7.00 FREE S/H
OPTION 2: TO RECEIVE THE 7 CATALOG PACKAGE ALONG WITH 3 FREE PICS YOU MUST SEND $7.00 OR 40 STAMPS (FREE S/H)

GET THE ALL NEW SUPERSIZED HIGH GLOSS COLOR VIP CATALOG #4
OVER THOUSANDS TO CHOOSE FROM ALL RACES! NON NUDE STRIPPERS, PORN STARS AN ALL!! ONLY $15.00 [FREE S/H] INCLUDES 2 FREE PICS THE BIGGEST AND BEST CATALOG EVER!!

ALL NUDE CAT #4 $15.00
[FREE S/H] COMES WITH FREE PICS

PLEASE MAKE ALL PAYMENTS TO
FIYA GIRLS
P.O. BOX 2545 DEPT-PN
HOUMA LA 70361

GET MAIL AND GET PAID INSTRUCTIONS STILL ONLY $10.00

Dedicated To Helping Prisoners Get The Belief They Are Entitled To

## CrackMotions.com

**For Less Than 100$,** Our Legal Professionals Will Help You File For A Sentence Reduction Based On The Retroactive Crack Amendment.

Have A Family Member, Friend, or Loved One Visit Our Website Today

*Price Does Not Include Sales Tax For Texas Orders.

PLN_0001223

# Fugitive Oregon DOC Food Manager Getting Homesick in Iran

"I would love to come back to my country ... but unfortunately they want to fry me for my mistake," wrote international fugitive and former Oregon Department of Corrections (ODOC) Food Service Administrator Farhad ("Fred") Monem, in emails sent to *The Oregonian* newspaper in March 2011. "I know it wasn't right what I did but I never heard [hurt] any one," he explained.

As previously reported in *PLN*, in addition to his $77,000 annual salary, Monem, 52, pocketed at least $1.2 million in kickbacks from food distributors between 2000 and 2006 while serving ODOC prisoners "distressed" or expired food. [See: *PLN*, Sept. 2010, p.24; July 2009, p.20; August 2008, p.1].

Monem didn't like the plea deal offered by federal prosecutors because it would have had him eating prison food for a long time. "They want to give me 6 to 8 years and that would mean I will die there," he wrote. So in June 2007 he disappeared, leaving his American wife, Karen, holding the bag.

Four food venders who gave bribes to Monem pleaded guilty and served up to 3 months in prison. After Fred fled, Karen Monem pleaded guilty in 2009 to participating in the scheme and was sentenced to a year in federal prison. The date she was required to report to prison was repeatedly postponed to allow her to care for her ailing mother and teenage son, who suffered an onset of schizophrenia shortly after his father skipped town.

On March 3, 2011, a federal judge adopted the prosecution's recommendation to excuse Karen from reporting to prison and instead allow her to serve probation and four months of home confinement.

"Karen Monem has complied with all the requirements that the court imposed since she accepted responsibly," said Assistant U.S. Attorney Chris Cardani.

Federal officials have long believed that Monem returned to his father's home in his birth country of Iran, which does not have an extradition treaty with America. They derisively claimed he was employed as a sheep herder (perhaps implying he was "on the lamb"). It seems they were right regarding his location, at least.

"Yes, I am in Iran. No, I don't work with sheeps," wrote Monem. "Yes ... life is very hard down here, it would have been easier if I went to jail."

Despite pulling off the largest public corruption scandal in Oregon's history, Monem still didn't see any problem with his actions.

"I never take anything from taxpayer of state. I never did anything to hurt anybody," Monem stated. "I got money from them because I new how much they are making from us. I always done my job right. I just take some of their profit."

"They was happay to do that. State was happy with me job and it was win win situation," he said. "Please tell me what would you do if you were in my place."

Monem's attempts to talk federal prosecutors into giving him a lighter sentence, more fitting of his "mistake," fell on deaf ears.

"I always had the state best interst in mind. I would come back and face the court if they give me the same thing the[y] offer others," Monem wrote. "But because they toke everything I work 28 years for, I don't have here money to gat the lowyear. They want to send me to jail for 20 years. I try to talk to them but they don't want to hear."

"Mr. Monem is not in a position where he can negotiate terms with the government after he abandoned the state of Oregon, and abandoned his own family, knowing that he was being investigated for public corruption," said Cardani.

"I would love to come back to my country. I grow up their. I never had any problem there. I love everyone there," said Monem. Federal prosecutors think that's a great idea, and have a prison cell ready and waiting for him. "We welcome Mr. Monem's return," Cardani stated.

*Editor's Note: The spelling and grammatical errors are quoted exactly as written by Fred Monem in his emails.*

Source: *The Oregonian*

# Oregon Juvenile Who Attempted Suicide Settles Negligence Suit for $192,500

An Oregon juvenile offender has settled a negligence suit against county officials for $192,500. In June 2010, Michael J. Stephens, 16, was detained at Lane County's John Serbu Youth Campus in Eugene, Oregon. He was on suicide watch due to "extreme emotional disturbance and temporary mental illness," according to his mother.

When an employee left him unattended, Stephens walked out of his room, climbed nearby stairs to the second floor and threw himself over a railing. He landed on his head and shoulders, and sustained "catastrophic injuries" that will cause him to permanently suffer from pain, discomfort and disability.

Stephens and his family sued the county and an unnamed employee for negligence, seeking $2 million. "It was mind-bogglingly inattentive" to leave Stephens unattended while he was on suicide watch, said Greg Kafoury, one of the family's attorneys.

County officials agreed to settle the lawsuit in April 2011 for $192,500; the county also agreed to pay $10,000 to the Oregon Department of Human Services to resolve possible claims for the state's expenses in treating Stephens' injuries.

See: *Stephens v. Lane County*, Lane County Circuit Court (OR), Case No. 16-10-13405.

In an unrelated incident, on January 3, 2011, 33-year-old Gene Preston Stewart was detained at the Douglas County Jail in Roseburg, Oregon on a probation violation. While being escorted back to his cell from a court appearance, Stewart climbed over a barrier and leaped from the third tier, falling to a concrete floor about 40 feet below.

He was rushed by ambulance to a hospital emergency room. Two days later, he was listed in fair condition with a broken pelvis and elbow. Jail staff were uncertain whether Stewart's jump was a suicide attempt.

"I have been here 17 years, and this is the first person that I believe we have ever had jump off the tiers," said jail commander Mike Root.

*PLN* recently reported another case involving an Alaskan prisoner who jumped to his death from a second-tier balcony at an Anchorage jail. [See: *PLN*, Sept. 2011, p.41].

Sources: *The Register-Guard, The News-Review, www.kpic.com, The Oregonian*

PLN_0001224

# Sexual Misconduct Topples Two Oregon Prosecutors

The elected District Attorney of a small Oregon county lost his job after being accused of using his office for sexual misconduct and then trying to cover it up.

In August 2010, a female employee of the Umatilla County District Attorney's office, Dawn Wilson, accused DA Dean Gushwa of physically, sexually and emotionally abusing her both on- and off-duty between December 2008 and April 2010.

Gushwa denied the claim but took a leave of absence soon after the allegations became public. While he was on leave, the Oregon Department of Justice (DOJ) managed the DA's office. However, Gushwa still continued to draw his $7,363 monthly salary and $2,205 in monthly insurance and retirement benefits during his absence.

On November 10, 2010, Gushwa was charged with five Class A misdemeanor counts of official misconduct related to the sexual abuse allegations.

The next day Gushwa told a reporter he was innocent of wrongdoing, pointing out that the charges had not been reviewed by a grand jury. Rather, they were just the opinion "of someone sitting in an office somewhere in Salem."

Gushwa pleaded not guilty on November 23, 2010 and asked the court to allow him to return to work as a prosecutor. The DOJ objected, but a judge granted him limited access to his office. Ten counts of contempt of court were later added after Gushwa was accused of violating a court order not to have contact with former employees.

Gushwa eventually acknowledged having sexual relationships with three employees in the DA's office, which he termed "stupid" but consensual. He agreed to plead guilty to one count of official misconduct related to using his government job to obtain an unauthorized $6.00 discount on a hotel room, and was sentenced to three years probation. He resigned on May 11, 2011.

The Oregon Bureau of Labor and Industries dismissed a complaint filed by Wilson against Gushwa, finding that their sexual relationship was consensual and she only complained after she learned Gushwa was having a relationship with another female employee.

Regardless, Wilson filed a $5 million federal lawsuit against Gushwa, Umatilla County and state officials in August 2011, claiming that Gushwa had sexually harassed and assaulted her and threatened to have her fired if she told anyone. See: *Wilson v. County of Umatilla*, U.S.D.C. (D. Ore.), Case No. 3:11-cv-01061-PK.

Gushwa isn't the only Oregon prosecutor to face prosecution for sexual misconduct. In November 2009, Sheila L. Snyder filed a sexual harassment complaint against Lincoln County Deputy DA Rand E. Overton, 59.

Overton was attempting to collect child support from Snyder, who alleged that he asked her to come see him while "not wearing my underwear." District Attorney Rob Bovett placed Overton on administrative leave the same day, and Overton later attempted suicide by taking an overdose of Xanax.

Overton admitted to the Oregon State Bar that he made inappropriate comments to Snyder during a telephone conversation after she wore a "rather revealing dress" to court, and said there was no excuse for his "vulgar" remarks.

He was charged with four counts of official misconduct and two counts of attempted coercion. On December 14, 2010, the DOJ announced that Overton had pleaded guilty to two counts of first-degree official misconduct. He was sentenced to 30 days in jail and two years probation, and is reportedly facing a bar complaint. He cannot work as a government attorney while on probation.

Snyder filed a civil rights suit against Overton and various state and county defendants in May 2011. See: *Snyder v. State of Oregon*, U.S.D.C. (D. Ore.), Case No. 3:11-cv-00623-MO. The following month Overton was sued by another woman, Kim Brethauer, who accused him of sexual harassment. According to Brethauer's complaint, "On two occasions, Overton sent via Lincoln County email a picture of his penis that he had taken at his desk in his office chair" to Brethauer, and asked her to send him explicit photos in return. She is seeking unspecified damages. See: *Brethauer v. Lincoln County*, U.S.D.C. (D. Ore.), Case No. 6:11-cv-06233-SI. ■

Sources: *Associated Press, The Oregonian, www.courthousenews.com*

---

## Support Prison Legal News with these beautiful gifts!

CALL **802-257-1342,** MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/

**PRISON LEGAL NEWS**

## Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

PLN_0001225

# Taser International Settles Product Liability Lawsuit for $2.85 Million

## by Mike Brodheim

Using tactics reminiscent of those once employed by tobacco companies, Taser International has for years engaged in a high-stakes campaign designed to deceive the public into believing that the stun guns it manufactures, known formally as Electronic Control Devices, are non-lethal and safe.

At least that's the picture that emerges after Taser agreed, in August 2010, to pay $2.85 million to settle a product liability suit brought by the brother and conservator of Steven Butler, who suffered anoxic brain injury after a police officer shot him in the chest with a Taser Model X26 when he refused to get off a bus in Watsonville, California in October 2006. Butler's heart rhythm was disrupted for about 18 minutes after he was Tasered, and he stopped breathing.

By financing scientific and medical research purporting to show the absence of serious adverse effects from Taser-delivered electric shocks, Taser has, until recently, successfully defended itself in lawsuit after lawsuit filed by people who have suffered debilitating injuries after being shot with a Taser, or by the survivors of those who have died. Tasers are used extensively by police and sheriff's departments, and also by prison and jail staff. [See, e.g.: *PLN*, Dec. 2010, p.34; Oct. 2006, p.1; June 2005, p.1].

Taser's invincibility in the courtroom is beginning to show signs of weakening, however. The settlement with Butler, who now needs 24-hour medical care, is the first time that Taser has agreed to settle a product liability lawsuit, according to G. Dana Scruggs, Butler's lead attorney. In 2008, Taser lost a product liability case that was taken to trial by the family of Robert Heston, Jr., who died after being Tasered several times by a Salinas police officer in February 2005. The Heston case marked the first time a Taser victim had succeeded in holding the company liable at trial. [See: *PLN*, Aug. 2009, p.25; Oct. 2008, p.36].

In settling the Butler lawsuit, Taser did not admit to any liability. The amount of the settlement agreement was made public after Santa Cruz County Superior Court Judge Jeff Almquist, citing the "therapeutic value" of leaving the court's business open to public scrutiny, rejected attempts by Taser's lawyers to keep the court documents sealed. The terms of the settlement are otherwise subject to a confidentiality agreement.

According to Scruggs, Taser decided to settle because "they were going to lose this case. We understood the science and medicine. We retained experts that understood the science and medicine. They were going to explain exactly what happened and how the Taser caused it to happen."

Taser has since changed its training instructions to specify that suspects should not be Tasered in the chest. See: *Butler v. Taser International*, Santa Cruz Superior Court (CA), Case No. CV 161436. ◾

Additional sources: *Santa Cruz Sentinel, www.allbusiness.com*

# U.S. Supreme Court: State P&A Can Sue Another State Agency for Records

## by David Reutter

The U.S. Supreme Court held on April 19, 2011 that sovereign immunity does not apply when one agency of a state sues another for violation of federal law. The ruling applies only to obtaining injunctive relief; it does not apply to payment of funds from the state treasury.

The case began when the Virginia Office for Protection and Advocacy (VOPA) filed suit in federal district court seeking an injunction against James Stewart, Commissioner of the Virginia Department of Behavioral Health and Developmental Services, requiring him to provide access to records concerning two patient deaths and an injury at state mental hospitals.

VOPA's suit was brought pursuant to the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act) and the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act). The DD Act provides federal funds to states to improve community services, such as medical care and job training, for people with developmental disabilities. To receive that funding, however, a state must establish a protection and advocacy (P&A) system "to protect and advocate for the rights of individuals with developmental disabilities." The P&A system "shall ... have the authority to investigate incidents of abuse and neglect ... if the incidents are reported to the system or if there is probable cause to believe" they occurred. P&A agencies advocate for people with mental disabilities in state hospitals and schools, and, sometimes, in state prison systems.

Subject to statutory requirements, the P&A must be given access to "all records" related to persons who may have been abused, as well as "other records that are relevant to conducting an investigation." The PAIMI Act also allows the P&A system to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of" people with mental disabilities.

States may designate an entity to be a P&A and may not change that selection absent "good cause." Virginia is one of only eight states that designate a government entity as its P&A system. VOPA opened an investigation in 2006 into two deaths and an injury at state-run mental hospitals. Stewart refused to provide risk-management or mortality reviews related to those patients, arguing that such records were protected by state law.

After VOPA filed suit in the U.S. District Court for the Eastern District of Virginia for an injunction to obtain the records, Stewart moved to dismiss under the Eleventh Amendment. The district court denied the motion, but the Fourth Circuit reversed. The appellate court said VOPA's lawsuit was an "intramural contest" that "encroaches more severely on the dignity and sovereignty of the state than an *Ex parte Young* [209 U.S. 123 (1908)] action brought by a private plaintiff." See: *Virginia v. Reinhard*, 568 F.3d 110 (4th Cir. 2009).

The Supreme Court had explained in *Young* that when an unconstitutional legislative enactment is "void," a state official trying to enforce that enactment is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." The state cannot impart immunity to the official in such cases.

The *Young* doctrine has existed alongside sovereign immunity jurisprudence for

PLN_0001226

over a century. It allows a federal court to vindicate federal rights, empowering the court to command a state official to refrain from violating federal law. It does not apply "when the state is the real, substantial party in interest," as when the "judgment sought would expend itself on the public treasury or domain, or interfere with public administration."

In *Verizon Maryland, Inc. v. Public Service Comm'n of Md.*, 535 U.S. 635 (2002), the Supreme Court held that when "determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"

In this case, the Supreme Court found that VOPA's suit satisfied that inquiry. Stewart conceded that if VOPA was a private organization rather then a state agency, it could proceed with the lawsuit. The Court did not see a reason for a different outcome here, as the "general criterion for determining when the suit is in fact against the sovereign is the effect of the relief sought."

Since VOPA was seeking an injunction to obtain records that it was entitled to receive under federal law, the state's dignity was not offended by the maintenance of the suit. The Fourth Circuit's decision was therefore reversed and the case remanded for further proceedings. See: *Virginia Office for Protection and Advocacy v. Stewart*, 131 S.Ct. 1632 (2011). ◢

# PLN Sues Kansas Jail Over No-Publication Policy

On August 31, 2011, Prison Legal News filed a federal lawsuit against the Board of Commissioners for Shawnee County, Kansas and Richard Kline, Director of the Shawnee County Department of Corrections.

PLN's suit alleges First Amendment violations due to a policy at the Shawnee County Jail that prohibits prisoners from receiving books and other publications sent to them through the mail. According to the Shawnee County Dept. of Corrections' website, "No packages, newspapers, magazines, books, or other personal property is to be mailed to the facility."

As a result of that policy, PLN's monthly publication and books sent to prisoners at the jail were censored. PLN consequently filed suit in the U.S. District Court for the District of Kansas, arguing the policy unconstitutionally infringes on its right under the First Amendment to send reading material to prisoners at the jail.

According to PLN's complaint, "since at least November 2010, Plaintiff has sent copies of the monthly publication *Prison Legal News*, subscription renewal letters, informational brochures and soft-cover books such as *Protecting Your Health and Safety* to a number of individuals confined in the Shawnee County Jail." All of the reading material was censored pursuant to the facility's mail policy.

"The policy at the Shawnee County Jail that restricts prisoners from receiving *any* books or other publications is an egregious violation of the First Amendment," said PLN editor Paul Wright. "One would think that law enforcement officials would be in the business of upholding the Constitution, not violating it on a daily basis by enforcing such ill-conceived policies."

PLN is seeking a declaration that the jail's no-publication policy violates its rights under the First and Fourteenth Amendments, as well as compensatory and punitive damages, attorney fees and costs.

PLN is represented by Doug Bonney, chief counsel and legal director for the ACLU Foundation of Kansas and Western Missouri, as well as Kansas City attorneys Fred Slough and James D. Jenkins, and Human Rights Defense Center chief counsel Lance Weber. The case is *Prison Legal News v. Board of Commissioners of Shawnee County*, U.S.D.C. (D. Kan.), Case No. 2:11-cv-02497-WEB-KGG. ◢

**THE LEGAL HELP FOUNDATION**

> Learn How to Write a 1983 Prison Lawsuit and How to Write a Motion for Pro-Bono Counsel, or We Can Write Them for You.
> Obtain Paralegal Courses.
  For a FREE
  45 Page Legal Info Catalog
  Put 5 Stamps on
1 Self Addressed Envelope to:
  PO Box 624 Main Ave
  Ocean Grove NJ 07756
No Stamps / No Catalog

**FREE! 12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! (Void in New York)
(Last Quarter's winner from **Navasota, TX.**)
TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

**Inmate Magazine Service Inc.**

PLN_0001227

# Florida's Prison Industry Criticized for Failing in Mission

## by David Reutter

Florida's prison industry program is "making a few people very wealthy while operating ... in a manner entirely inconsistent with its mission," according to advisors to Governor Rick Scott, in a transition report released in December 2010.

The mission of Prison Rehabilitative Industries and Diversified Enterprises (PRIDE) is to operate as a non-profit corporation that trains prisoners in job skills they can use upon their release. *PLN* has previously reported on the cozy relationships between PRIDE board members and the for-profit companies the agency cooperates with. [See: *PLN*, March 2010, p.1; May 2007, p.11; Jan. 2005, p.12].

PRIDE pays its president $207,724 annually and its general counsel receives $238,276. The agency also retains several high-priced lobbyists. Meanwhile, prisoners earn from 20 to 55 cents an hour.

Still, the positions are highly coveted. Aside from PRIDE jobs, the only other option for Florida state prisoners to earn a wage is as one of the few canteen operators. Only 1.6 percent of Florida prisoners have received PRIDE job training.

A new focus on education and transition is targeting prisoners with 10 years or less to serve. For now, prisoners with longer sentences are being grandfathered in, but their numbers are expected to dwindle through attrition. About 28 percent of PRIDE's prisoner workers have at least ten years to serve, including 16 percent serving life sentences.

Those with longer terms typically have the most seniority and experience; as a result, they are usually employed in the more technical positions. Critics of PRIDE say this is part of the problem. Having experienced prisoner workers in the most critical job positions may contribute to PRIDE's profitability, but that practice fails to meet the agency's mission of providing usable job skills to prisoners who are closest to being released.

"I call it 'seductively incompetent' because there isn't anybody watching the bottom line, typically," said Ed Connor of Volusia Tax Reform. "Well, it says that there's nobody watching the store is what it says."

Actually, PRIDE is being watched but the legislature has repeatedly failed to act. There have been at least four previous state reports criticizing PRIDE's operation and business structure. The recommended overhauls have done nothing but sit in filing cabinets while those overseeing Florida's prison industry continue to enrich themselves.

"Unfortunately, PRIDE has been able to obstruct and quell all legislative efforts at reforming or replacing PRIDE," the transition report noted.

Governor Scott's advisors recommended that PRIDE not be allowed to hire prisoner workers who have life sentences or more than five years remaining to serve. Further, they suggested putting PRIDE's contract out for competitive bidding. Not surprisingly PRIDE objected to some of the findings in the transition report.

Governor Scott's transition team also slammed the Florida Department of Corrections, calling it "broken" and "lacking leadership, vision and courage," and criticized the Florida Police Benevolent Association, the union that represents state prison guards. ◾

Sources: *"Department and Policy Review Florida Dept. of Corrections," Governor-Elect Rick Scott, Law and Order Transition Team; WFTV; www.tampabay.com*

# Jail Guitar Doors, USA Offers Free Musical Instruments to Prisons

## by Bruce Reilly

Long before words there was the drum, the beat, the foundation of all communication. Some drummers and musicians communicate through the most finely crafted instruments of their day. For the prisoner it is typically the sound of a metal desk or bunk diversified by the slap, the fist, the click-clack of a plastic coffee mug. But it doesn't have to be only the primitive beat, as a rising program aims to get fine instruments into the darkest corners of our penal system.

Jail Guitar Doors, USA is a foundation dedicated to bringing musical instruments into prisons, and has had success from Sing Sing in New York to facilities in Texas and Southern California. The organization's founder, Wayne Kramer, got the idea from the success of his friend Billy Bragg, a rock legend doing similar work in the U.K. Bragg named the effort after a 1978 Clash song of the same name, with lyrics about a guy named "Wayne" going to prison for involvement with drugs. That would be the same Wayne Kramer, guitarist for the storied Detroit punk band MC5.

"Music and songwriting is a way to process your problems in a way that is internal," Kramer told *PLN* in a recent interview. "It's a way to begin seeing yourself as an artist, as someone who can contribute something to the world, and can ignite someone to have a change of heart." Kramer sees music as one vocabulary, but ultimately people need to be able to express their ideas as a non-musician, as a human being.

Prison is a place where many people write their first lyrics, whether for self-expression or entertainment of others. A beat gives it depth and vibrancy, while guitar strings offer rhythm. Music goes by many names, in many forms, and years of stripped-to-the-bone prison lyrics can hone an intellect, capture emotions and help make sense of one's surroundings. Whether it's a rap battle, music room, crooner in the shower or a church band, some form of music happens in every prison. The best of these environments can be summed up by a British warden (and supporter of Jail Guitar Doors) who said, "Once we had guitars, everything changed."

One powerful example of Jail Guitar Doors comes through Wayne's experience in Nevada, where he received a request for new instruments for a prison program. The warden set up a special concert in the yard with bleachers, eight bands and 350 people. The styles ranged from Tejano, R&B and Christian Metal to Punk and Gospel. The bands' diversity broke down traditional walls of segregation. Black, white, Chicano, young and old came together as people sat in on other bands and set a strong example for building a positive community.

In California, home to nearly 10% of the nation's prisoners, state officials

studied their Arts In Corrections programming and found that participants had fewer disciplinary problems while inside and fewer returns to prison once released. What studies often cannot show is just what "success" looks like: the peace of mind and sense of purpose that accompanies someone who is managing their difficult situation. One former auto mechanic learned to build and play guitars while in prison. Now, not only is his primary identity as an "artist," but his children also learned to play guitar; music was their primary touchstone through the prison years, rather than all the negative aspects of incarceration. These are the turning points in people's lives that create a new cultural norm.

The American prison system is currently the number one service provider for people with mental illnesses, and corrections officials have been increasingly vocal about their inability to properly handle that population in a rehabilitative way. "Art therapy," however, has long been a mode of engaging those with developmental disabilities, and history is filled with great artists who were otherwise dysfunctional. The musical arts, and Jail Guitar Doors, are methods to generate growth

and meaning among the most disenfranchised, potentially saving them from "losing it," hurting themselves or others, and ultimately never being released.

Jail Guitar Doors provides a clear path to developing and embracing the humanity of people who are incarcerated, and perhaps more importantly, developing the humanity among those not incarcerated in terms of the way they view prisoners

and former prisoners. Expression builds understanding, and this ultimately builds a community.

To contact Jail Guitar Doors, USA about providing instruments to prisons, write or email:

Jail Guitar Doors
842 North Fairfax
Los Angeles, CA 90046
contact@jailguitardoors.org 🔳

# Oregon Prison Guard Guilty of Contraband Smuggling

On March 21, 2011, former Oregon prison guard Tara Martinmaas, 34, pleaded guilty to a felony charge of supplying contraband. She was sentenced to a two-year term of probation and ordered to pay over $1,500 in fees and have no contact with Oregon Department of Corrections (ODOC) facilities or prisoners.

Martinmaas was hired by the ODOC in 2007 and worked at the Oregon State Penitentiary (OSP). She was accused of smuggling tobacco into the prison between September and November 2010 for a prisoner with whom she had a romantic relationship.

A misdemeanor custodial sexual

misconduct charge for "sexual touching" – intercourse is a felony under state law, everything else is a misdemeanor – was dismissed as part of the plea agreement. Thus, Martinmaas will not have to register as a sex offender. 🔳

Source: *The Statesman Journal*

Hepatitis & Liver Disease
A Guide to Treating & Living with Hepatitis & Liver Disease. Revised Ed.
By Dr. Melissa Palmer
See page 53 for order information



**WELCOME TO KRASNYA BABES**

**WHY CHOOSE KRASNYA BABES?**
Thousands of the hottest and most scandalous babes found on the planet. Whatever your pleasure, KRASNYA delivers. Each catalog page has **120** beautiful girls posting just for you! Order one catalog page for only $3.00 +SASE or for 7 new First Class US Postage Stamps or US "Forever Stamps" with a SASE enclosed. We will send you Volume One. Each additional volume the same price! HELP US TO HELP YOU! We are more than happy to answer Email inquires however, due to mailing Cost at 0.44 Cents a letter, please enclose a SASE with your questions, **OTHERWISE NO REPLIES!**

**WHAT ABOUT OUR PRICES AND POLICIES**
Vivid 4x6 color prints as low as .50 cents per print on orders over 100, shipped in policy safe 25 picture packets. If less than 100 pictures S & H is only $2.00 per packet.
**METHODS OF PAYMENT/CONTACT INFORMATION**
U.S. Postal Service Money Orders-State & Federal Correctional institutions checks payable to: **Krasnya L.L.C.**
NOW we accept Stamps as method of payment.
**Equation for First Class Forever Stamps**
Brand New Flat Book for all orders at the rate of $5.00 per book
We respond to our clients needs and try to help the best we can.
**Our seasonal specials mean a kickoff of savings!**
Offer included with catalog request

KRASNYA L.L.C.
P.O. BOX 32082
BALTIMORE, MARYLAND 21282
E-MAIL AND CORRLINKS REQUESTS ACCEPTED AT:
krasnyababes@hotmail.com

**Special Offer**
$24.95 S&H Free
Grab bags of 50 packs from all our catalogs
Send $25.00 and the following
Specify race and main area of interests

# Learn & Understand the Law

It can be a powerful influence in your life.

Whether you want to enhance your knowledge of the law, help others, or acquire a new skill — choosing Blackstone's independent study courses will put you on the road to a brighter future.

- Learn Civil & Criminal Law
- Learn Legal Research
- 120 Years of Legal Training Experience
- Study in Your Spare Time
- Affordable Tuition, Easy Payment Plan

Only **$59.00** Per Month

If you have a sponsor they must contact us by phone at: 1.800.826.9228

☐ **Yes!** I'd like to learn more
*Please rush me FREE course information.*

Name _____
Address _____
_____
City_____ State_____ Zip_____

☐ **Paralegal Course**
☐ **Advanced Paralegal Course**
• Civil Litigation
• Wills/Trusts/Estates
• Personal Injury/Torts
• Family Law
• Criminal Law

**Blackstone Career Institute**
SINCE 1890

Your tuition cost covers your entire program including all textbooks, study guides, and all homework evaluation services, and your certificate.

P.O. Box 3717 • Allentown, PA 18106

PLN_0001229

# Report Finds Federal Prisoners Exposed to Toxic Metals in Recycling Jobs

A four-year study by the U.S. Department of Justice's Office of the Inspector General (OIG), released in October 2010, found that prisoners and employees at ten federal prisons were exposed to hazardous metals and materials while handling electronic waste in recycling programs.

The study was initiated following complaints by Leroy Smith, Jr., a Bureau of Prisons (BOP) safety manager at USP Atwater in California. Federal investigators found examples of "serious misconduct," including "carelessness or indifference" to prisoner safety in the electronics recycling programs at Atwater and other federal prisons, as well as "numerous violations of health, safety, and environmental laws, regulations, and BOP policies." OIG investigators examined recycling programs at ten federal facilities, including Leavenworth, KS, Lewisburg, PA and Tucson, AZ.

The BOP, which operates prison industry programs through Federal Prison Industries, also known as UNICOR, has used prisoners to recycle computers, monitors and other electronic equipment since 1997. The recycling process can be dangerous because cathode ray tubes (CRTs) in computer monitors can contain up to five pounds of lead. The recycling process normally involved breaking the CRTs, which would release lead dust into the air. Smith, while safety manager at Atwater, became concerned in 2001 and 2002 about the airborne toxic dust. [See: *PLN*, July 2009, p.21; Jan. 2009, p.1; March 2007, p.1].

OIG investigators noted that prior to 2003, when recycling procedures were changed, prisoners had been exposed to levels of cadmium and lead "far higher" than allowed by federal workplace standards. The 433-page study also cited "numerous instances of staff misconduct and performance failures" that "included actions that endangered staff and inmates: dishonesty, dereliction of duty, and theft, among others."

According to the OIG study, criminal prosecutions of BOP and UNICOR staff in Ohio and New Jersey were considered but not pursued due to "various evidentiary, legal, and strategic concerns." The OIG investigators recommended disciplinary action against several BOP and UNICOR officials, including Lawrence Novicky, general manager of UNICOR's Recycling Business Group, and Atwater associate warden Samuel Randolph; however, most of the officials, including Novicky and Randolph, had already retired and no action could be taken.

Not surprisingly, Smith and others who were exposed to hazards in the UNICOR recycling programs called the BOP's response inadequate. Smith's attorney, Mary Dryovage of San Francisco, said BOP officials were "washing their hands" of prisoner health concerns. "There have been no repercussions for any of the wrongdoing," she said, adding that Smith, despite receiving whistleblower status, had suffered negative career repercussions.

Although Smith filed suit against federal officials, the case was dismissed; an appeal to the Eleventh Circuit was dismissed in April 2010 for lack of prosecution. See: *Smith v. United States*, U.S.D.C. (N.D. Fla.), Case No. 5:08-cv-00084-RS-AK. Smith, who is still employed with the BOP, had received an "outstanding whistleblower" award from the Office of Special Counsel in 2006.

Meanwhile, the BOP stated that "changes already implemented in our operations and the changes planned will ensure that all of our operations continue to operate as safely as possible," according to spokeswoman Traci Billingsley. "We are committed to ensuring compliance with all applicable health, safety, and environmental requirements," she added.

The UNICOR recycling programs are still in operation at various BOP facilities, including Atwater. In 2009, UNICOR workers reportedly processed 39 million pounds of electronic waste. See: "A Review of Federal Prison Industries' Electronic-Waste Recycling Program," U.S. Dept. of Justice, Office of the Inspector General (Oct. 2010).

Additional sources: *www.miamiherald.com, www.nytimes.com, www.mcclatchydc.com*

# ICE, CCA Settle ACLU Lawsuit Regarding Health Care for Immigration Detainees

### by Derek Gilna

A lawsuit filed by the American Civil Liberties Union that alleged deficiencies in health care at the San Diego Correctional Facility (SDCF) in Otay Mesa, California has been settled, according to a December 16, 2010 press release issued by the ACLU.

The suit named as defendants the Immigration and Customs Enforcement agency (ICE), a branch of the U.S. Department of Homeland Security, as well as officials and employees of ICE and Corrections Corporation of America (CCA), the private company managing SDCF.

Originally filed in 2007 by the ACLU, the ACLU of San Diego and Imperial Counties, and the law firm of Cooley LLP, the lawsuit alleged that detainees at SDCF were routinely subjected to long delays before receiving treatment, denied necessary medication for chronic illnesses and refused essential referrals prescribed by medical staff.

According to the ACLU, "the lawsuit specifically cited the cases of 11 detainees, including several whose bipolar disorders and depression went untreated, a man who was forced to wait more than eight months for eye surgery and nearly suffered permanent disfigurement, and detainees who never received medical attention despite suffering from a variety of maladies including Type 2 diabetes, hypercholesterolemia, hypertension, abscessed and broken teeth, and severe chest pains."

David Blair-Loy, legal director of the ACLU of San Diego and Imperial Counties, noted that "Immigration officials must ensure that immigration detainees do not suffer or die unnecessarily." According to Anthony Stiefler of Cooley LLP, "It is at odds with our American values to allow people to suffer long-term health consequences or even death because authorities refuse to treat them."

The plaintiffs sought class certification, which was denied by the district court. They appealed to the Ninth Circuit, which referred the case to mediation.

PLN_0001230

The parties then worked out a settlement agreement in December 2010 and the district court certified a settlement class on April 21, 2011.

Although not conceding any wrongdoing, the defendants agreed to a broad-ranging series of improvements that the ACLU felt would bring health care at SDCF up to acceptable standards. The defendants agreed to provide health care "that meets or exceeds the following NCCHC standards as set forth in Standards for Health Services in Jails (2008)": Access to Care, Medical Autonomy, Staffing, Pharmaceutical Operations, Medication Services, Receiving Screening, Initial Health Assessment, and a host of other provisions required by prison health care guidelines.

The settlement also provides that the federal defendants "shall expand the provision of mental health care professionals for Class Members by providing the equivalent of one full-time additional psychiatrist and four full-time additional psychiatric nurses.... If ICE requires a Treatment Authorization Request ('TAR'), then a TAR prepared by a medical practitioner for off-site non-emergency medical treatment for a Class Member shall be [acted upon] within five business days...."

Additionally, the defendants "shall take all reasonable steps to ensure that authorized off-site medical treatment commences within a clinically appropriate period of time...," and the federal defendants "shall maintain a tracking system for pending off-site appointments for Class Members." Under the agreement the term "emergency services" will no longer be required for prisoners to receive health care, if to deny treatment "would cause deterioration of the detainee's health or uncontrolled suffering...." The clear intention of the settlement is to address all "serious medical need(s), regardless of whether such medical condition requires emergency or urgent treatment."

Pursuant to the agreement, "Defendant CCA shall also ensure that appropriate training, policies, and/or practices shall continue to be implemented at SDCF, or, as applicable, shall be implemented, to provide reasonable assurances that SDCF CCA staff carry out directives from medical staff related to treatment of Class Members."

The agreement further required the defendants to produce various documents, including information related to current medical and mental health staffing; the status of hiring efforts; lists of new medication orders, including documents showing when each patient received medication; medical emergency logs; audits or evaluations conducted by any third parties regarding medical or mental health care; and all policy and procedure manuals and local operating procedures governing dental, medical, mental health and vision care.

The defendants were also required to provide the plaintiffs with a copy of all medical records for prisoners who die "during their confinement at SDCF during the time that the Agreement is effective." Additionally, the parties agreed that on the one-year anniversary of the settlement agreement they "shall stipulate to dismiss this action with prejudice" unless the defendants are in non-compliance.

According to Elizabeth Alexander, former director of the ACLU National Prison Project and lead counsel in the case, "For the first time, ICE has committed to providing all necessary health care to immigration detainees beyond just emergency care. For too long ICE's own policies allowed it to provide detainees with nothing beyond a narrow definition of emergency. This settlement is recognition that it is unconstitutional to provide people in government custody with all necessary health care."

The district court retained jurisdiction to oversee disputes among the parties arising from interpretation and enforcement of the terms of the settlement agreement. The parties agreed to pay their own costs and attorney fees. See: *Woods v. Myers*, U.S.D.C. (S.D. Cal.), Case No. 3:07-cv-01078-DMS-PCL. ◄

Additional sources: *ACLU of San Diego and Imperial Counties, ACLU National*

**POST CONVICTION FILINGS**
**In Pro Per any State or Federal**

Appeals          Writs
Petitions        Placement
Forfeitures      Crack Law

**Jeffrey S. Blanck, Esq.**
**485 W 5th St., Reno, NV 89503**
**775 324-6640**
jblanck@jeffreyblancklaw.com



**NEW WEB SITE**

**Prisoners** 🌐 **Network**

**We aim to provide the best web-site experience for your family and friends**

⭐⭐⭐⭐⭐

✓ **World Wide Pen Pals**
✓ **Family Support Services**
✓ **Inmate Pro le Search**
✓ **3 Picture/500 word ads**
✓ **Community Forum**
✓ **Pre-Release Services**
✓ **Free Job Referrals**
✓ **Money Back Guarantee**

**We Provide Four Profile Subscriptions:**

1. **Basic Subscription Plan**
   · $30.00/6 month
   · 1 Picture/250 words
2. **Premium Subscription Plan**
   · $40. 00/12 months
   · 3 Pictures/500 words
3. **Legal Ads**
   · $40.00/12 months
   · 1 Picture/550 words
4. **Personalized Website (Blogger)**
   · $125.00 per year
   · 1 large/5 picture carousel
   · 500 words per month
   · $75.00 renewal per year
$30.00 renewal fee Basic, Premium, Legal

At prisonersnetwork.com we take our commitment to our members seriously. We will provide the best customers support for you, your family and friends, or your money back guarantee. No hassle and no tricks...just good service!

**FREE BROCHURE**
Send **SASE** for bro/applica on
**Call or Write Today**

Prisoners Network          Toll Free:
P.O. Box 147               1-888-402-2011
Hughesville, PA 17737      1-570-584-2088

Prisonersnetwork.com

# CCA Psychiatrist's License Restricted for Sexual Misconduct with Florida Female Prisoners

Florida's Department of Health (FDH) issued an emergency order in March 2011 that placed restrictions on a psychiatrist accused of sexual misconduct while treating female prisoners at the Hernando County Jail (HCJ). At the time of the alleged misconduct the jail was managed by Corrections Corporation of America (CCA); since August 2010, HCJ has been operated by the county.

In a March 22, 2011 order, the FDH found that the actions of Dr. James A. Yelton Rossello "regarding his patients were egregious and constitute a threat to the public health and safety." The order restricted him from providing medical, mental health or psychiatric treatment to patients, specifying that he may treat female patients only under the supervision of a third-party licensed medical professional.

Each of the prisoners Rossello was accused of preying upon in his window-less office at the CCA-run jail were in their early to late 20s. While interviewing a 24-year-old patient identified as "C.A.," he told her he had been married for about 24 years and was "faithful 98 percent of the time," but that when confronted with women like her "he became a bad boy."

In early 2009, Rossello asked C.A. to allow him to see her topless. She refused and tried to leave, but consented to give him a hug. Rossello then became aggressive, pushing her against a wall, kissing her neck and lips, and putting his hand between her legs.

When Rossello asked another prisoner, "S.B.," to see her breasts, she complied. At his final meeting with the 24-year-old, they kissed and he said he would take her shopping when she was released from jail. She believed he was offering her goods in exchange for sex.

Rossello had at least two interviews with 21-year-old "T.A." At a March 2010 meeting, he asked about her job as an exotic dancer and said he would like a "lap dance" from her. After inquiring if she would have sex with him upon release, he made her sit on his lap. Around July 2010, Rossello asked to see T.A. naked and inferred he would prescribe her medications only if she complied. When she pulled down her pants, Rossello grabbed her underwear. She pulled away and left the room. He later asked to see her socially, to

receive her phone number and for a kiss, which she refused before being kissed on the cheek.

The end for Rossello began at an August 3, 2010 meeting with 29-year-old "T.W." He asked her to pull down her pants, which she refused. He also asked to see her upon release, implying that he would trade prescription anxiety medication for sex. She informed a guard after the meeting, which led to an investigation.

CCA placed Rossello on administrative leave. "I think the conclusion was that the allegations were serious enough and credible enough," said CCA spokesman Steve Owen, "that we did not want to keep his services." CCA later fired Rossello.

Rossello operates a private practice in Gainesville and held the title of assistant clinical professor at the University of Florida. Upon being informed about the sexual misconduct allegations, a university spokesperson said they intended to revoke his title.

"The most important thing for [Dr. Rossello] is preserving his license, and that's the only thing we're focused on," stated Jesse Smith, Rossello's attorney. "The only accusations he's ever faced as far as I know are related to those inmates in Hernando County."

Three of the prisoners Rossello is accused of molesting have since filed a civil suit against him and CCA in Hernando County Circuit Court. One of the prisoners claimed that CCA placed her in solitary confinement after she reported Rossello's misconduct. Another said Rossello would bring her lunch, but wouldn't let her eat unless she sat on his lap.

Prosecutors are awaiting the outcome of the FDH's investigation to determine if criminal charges are appropriate. Florida law requires penetration to charge a doctor with sexual battery against a patient. "His acts, while reprehensible, do not violate those statutes. It might have been bargained for, but it wasn't against their will," said prosecutor Brian Trehy. "I don't know whether he's broken Florida laws at this point. I have to wait on the experts to tell me that."

Of course, it doesn't take an expert to know that if the allegations against Rossello are proven, he has no business treating female prisoners – or anyone else for that matter. See: *Dept. of Health v. Rossello*, Florida Dept. of Health Administrative Complaint, Case No. 2010-23877. ◪

Sources: *St Petersburg Times, Hernando Today, www.tampabay.com, www. baynews9.com*

# Sixth Circuit: Prisoner Must be Allowed Direct Appeal When Prison Delayed Appeal Mailings

*by Matt Clarke*

The Sixth Circuit held that Michigan had to allow the appeal of a prisoner's criminal conviction when prison officials had delayed the mailing of his appeal documents until after the filing deadline had expired.

Following his criminal conviction in state court, John Andrew Dorn, a Michigan prisoner, refused appointed appellant counsel and told the trial judge that he would retain appellate counsel himself. Having not yet secured an attorney and being responsible for filing his claim of appeal, Dorn requested disbursement of the filing fee from his prison account on June 11, 1998.

On June 15, 1998, he gave the same prison official his claim of appeal, to be notarized and mailed with the disbursement. The filing deadline was June 22; however, the prison official waited until June 23, 1998 to mail the documents. Consequently, the state appellate court dismissed Dorn's claim for lack of jurisdiction due to the late filing of his appeal.

Dorn filed a motion to reconsider or reinstate, explaining the facts to the court of appeals. His motion was summarily denied "for lack of merit in the grounds presented." He appealed that decision to the Michigan Supreme Court, but his ap-

plication for leave to appeal was denied because the state Supreme Court "was not persuaded that the questions presented should be reviewed."

Dorn filed for state post-conviction relief. His petition was denied with the notation that he was "rearguing issues that were brought in his various motions and applications for leave to appeal." Dorn's motion for leave to appeal the post-conviction decision was denied because it "fail[ed] to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." The Michigan Supreme Court also declined to hear Dorn's appeal.

Dorn then filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in federal district court. The court denied his petition, but certified an appeal as to whether he was denied an appeal of right.

The Sixth Circuit appointed Columbus, Ohio attorney Gene Crawford to represent Dorn. The Court of Appeals reviewed the case de novo, finding that there had been no adjudication of Dorn's claims on the merits in state court.

The Sixth Circuit noted that U.S. Supreme Court precedent placed on prison officials "an affirmative obligation to assure all prisoners meaningful access to the courts," and relief had been granted when a prison's ban on sending papers from the facility resulted in the dismissal of a prisoner's appeal of right. See: *Dowd v. United States ex rel. Cook*, 340 U.S. 206, 208 (1951).

Finding that Dorn had given prison officials a reasonable amount of time to mail his appeal documents prior to the filing deadline, the Sixth Circuit found that the prison official's actions amounted to a complete denial of Dorn's right to appeal in violation of his constitutional right of access to the courts.

The Court of Appeals held that the "denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right, ... demands a presumption of prejudice." Further, Dorn had shown actual prejudice because his subsequently-filed appellate and post-conviction motions "contained additional hurdles that a prisoner must jump [through] before receiving consideration of his claims" that were not present in a direct appeal of right.

Therefore, the Sixth Circuit reversed and remanded the case to the district court with instructions to enter an order giving Michigan officials a reasonable time to provide Dorn his direct appeal, "failing which he shall be discharged" from custody. See: *Dorn v. Lafler*, 601 F.3d 439 (6th Cir. 2010). ◣

---

**Roget's Thesaurus**
Can't think of the right word?
Let Roget's help you! Over 11,000 words listed alphabetically.
$8.95 see page 53 for more details

---

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
● Adequate medical care
● Protection from assault
● Humane living conditions
● Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News
PO Box 2420
West Brattleboro, VT 05303
(802) 257-1342**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

---



# *Elegant Roses*

*J*ust because you're temporarily "away" doesn't mean you're not The Man. Send your special lady a dozen long-stem premium roses today.

• **All orders shipped SAME DAY**
• **Premium Long-Stem Roses**
• **Teddy Bears** • **Box of Chocolates**
• **Priority overnight delivery**

*We cater to men with impeccable taste.
Send SASE for brochure & order forms.*

**Elegant Roses**
PO Box 133342
Spring, TX 77393
(832) 618-2955

# Louisiana Sex Offender Agrees to Surgical Castration

### by David Reutter

What should be done with sex offenders who are not prison guards, cops or priests is an emotionally-charged issue. Most states have adopted some form of civil commitment, but others have adopted the more drastic option of chemical and surgical castration. An incarcerated Louisiana child molester recently volunteered for an even more extreme approach, agreeing to be surgically castrated in exchange for his freedom.

Castration, either surgical or chemical, is on the law books of eight U.S. states; according to 2006 data the procedure is authorized in California, Florida, Georgia, Louisiana, Montana, Oregon, Texas and Wisconsin. That form of punishment, however, is rarely used.

For example, of Florida's approximately 102,000 prisoners, more than 11,100 have been convicted of sex crimes. Only 15 prisoners are scheduled for castration upon their release, according to the Florida Department of Corrections. Whether it is chemical or surgical castration is the prisoner's choice; chemical castration usually involves ongoing treatment with Depo-Provera, which reduces testosterone levels.

"That's an awful draconian step to take," said University of Florida professor Bob Dekle, a former prosecutor. "I personally would have been reluctant to ask for it. And I think most judges I've appeared before would be reluctant to order it unless it was off the Richter scale for awful."

As most offenders who qualify for castration are serving life sentences, the procedure is largely unnecessary. "It's something on the books, but appears to be ignored," said Dekle. "It's not uncommon that you occasionally run across something that you say, 'How long's that been on the books?' Laws like that are probably not needed."

One Louisiana prisoner convicted of three counts of molesting girls age 6 to 12 found castration preferable to spending the rest of his life in prison. As part of a plea agreement for a 27-year sentence in 1999, Francis Phillip Tullier, 78, agreed to surgical castration. Various medical problems prevented the 10-minute hospital procedure from occurring until March 3, 2011.

Upon being told that he would remain in prison until 2024 unless he agreed to be castrated, Tullier said, "I lost my house, I lost my wife, and now y'all trying to take my manhood." The judge replied, "It's time to give Caesar what Caesar is owed." Tullier was released from prison after the procedure, which he had to pay for himself, and must now register as a sex offender having given Caesar his testicles for his relative freedom.

"They had enough to send him up for two or three life sentences," said Nathan Fisher, Tullier's attorney. "He had no chance of getting out of prison unless we did something unusual."

In Florida, civil commitment is the tool most often used by state officials to protect the public from sex offenders. There are around 700 residents at the Florida Civil Commitment Center awaiting trial to determine if they qualify as sexual predators. It costs about $100 a day to house them, or $25 million annually. This is despite the fact that civil commitment is of dubious value in terms of protecting the public, as opposed to providing effective sex offender treatment programs and community monitoring. As reported in *PLN*, when the sex offenders are prison or jail guards and the victims are prisoners, the punishment tends to consist of probation, suspended sentences and short jail sentences. ◪

Sources: *www.news-press.com, CBS News, Daily Mail, Connecticut Office of Legislative Research report (Feb. 21, 2006), Washington Post*

# CORRECTIONS
## To Danny Trejo Interview in August 2011 *PLN*

Prison Legal News always strives to get things right. Last August, our cover story was an interview with former prisoner and famous actor Danny Trejo. The interview was conducted live, in person, and transcribed to print. Unfortunately, due to difficulties with the audio transcription process, some mistakes were made. We are therefore running the following corrections to our August 2011 cover story:

Page 3 – First column, first paragraph. Mr. Trejo did not say his son is a rap singer; rather, he is a punk/rock fan.

Page 4 – Third column, at the top. Mr. Trejo worked for Jimmy Gene at the Narcotics Prevention Project, not Danny Lebatoff. The corrected paragraph should read, "Yeah, and I was also just doing a lot of volunteer work. You know, talking at schools, doing whatever I could. And this organization called the Narcotics Prevention Project heard about me and a guy named Jimmy Gene who was also an ex-convict offered me a job. So I went to work for him and they saw that I was kind of articulate and I was the court liaison for a while, then I was the hospital coordinator. And the NPP was one of the first substance abuse programs here in LA other than Synanon and those beat-you-down kinds of...."

Page 6 – First column, first full paragraph. "Rap jacket" should be "rat jacket."

Page 6 – Middle column, halfway down. Mr. Trejo said, "International Tattoo Magazine says it's the most recognizable tattoo in the world."

Page 7 – First column, 4th paragraph from the top. Mr. Trejo's answer was, "Exactly. I think society in general don't care as long as you do the work."

Page 8 – First column, 2nd full paragraph from the bottom. "I go to Hawaii and I say..." should instead read, "I go to CYA [California Youth Authority] and I say...."

Page 8 – Middle column, at the top. This sentence should read, "The teachers' union, the teachers' union is probably the best thing that ever happened to teachers, probably the worst thing that ever happened to students."

*PLN* apologizes for these errors, and we're pleased to make the above corrections and set the record straight. The article has been corrected on our website. ◪

Dictionary of the Law
Thousands of clear concise definitions
See page 53 for ordering information

PLN_0001234



The Habeas Citebook: Ineffective Assistance of Counsel
**\$49.95**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



Prisoners' Guerrilla Handbook to Correspondence Programs
**\$49.95**
in the United States and Canada, 3rd Edition
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



Prisoners' Self-Help Litigation Manual, 4th Edition
**\$45.95**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook,
Ineffective Assistance of Counsel
\$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
3rd edition
\$49.95

☐ Prisoners' Self-Help
Litigation Manual
4th edition
\$45.95

***Shipping included in all prices***

**Order by mail, phone, or on-line.**   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address_____

City _____ State ____ ZIP _____

PUBLISHED BY

**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 2420 • West Brattleboro, VT 05303
Tel [802] 257-1342 • www.prisonlegalnews.org

PLN_0001235

# News In Brief:

**Alaska**: On June 29, 2011, a federal pretrial detainee, Sabil Mujahid, 54, was convicted of a dozen charges related to raping and threatening three other prisoners at the Anchorage Correctional Center. Mujahid was accused of preying on smaller, younger prisoners who had cognitive disabilities. He was being held at the facility on sex trafficking charges, and is scheduled to go to trial in that case in October.

**California**: Avenal State Prison guard Randy Motl was sentenced to three years on June 13, 2011 for felony bribery charges. Motl was convicted of accepting money and electronics equipment from prisoners and their families in exchange for smuggling cell phones and other contraband into the facility. The offenses occurred between December 2008 and August 2009, and Motl received over $10,000 in cash and electronics during that time period – including a DVD player, a laptop and toys for his children.

**California**: A report by the State Controller's office released in July 2011 revealed that more than 500 state employees earned over $240,000 in 2010. At least nine employees made over $500,000, mostly prison doctors. The top earner was an unidentified surgeon at the High Desert State Prison, who made $777,423 last year. The earnings cited in the report included salaries, bonuses, "back pay adjustments" and retirement payouts for accumulated paid time off. California is currently experiencing a budget deficit of around $10 billion.

**Colorado**: In June 2011, following a federal trial in Denver, four prisoners were convicted of beating another prisoner to death at FCC Florence. Jose Augustin Pluma, Juan Martin Ruelas, Mark Rosalez and Justin Hernandez were convicted of murdering Pablo Zuniga-Garcia, 33, allegedly due to a "disrespect" issue involving the Surenos gang. The four assailants were members of the prison gang. They were sentenced in August 2011; Hernandez received a 40-year prison term, Rosalez received 25 years, Pluma was sentenced to 35 years and Ruelas received 20 years.

**Colorado**: A June 2011 four-count indictment charged prison guard Chris Turner, 29, a member of the SORT team at the federal supermax prison in Florence, with stealing equipment from the facility's armory to sell on the black market. Turner is accused of removing flash-bang grenades from the prison between August 2009 and December 2010, and then selling them. "A trusted member of the Bureau of Prison's elite Special Operations Response Team has violated the public trust by stealing these destructive devices," said U.S. Attorney John Walsh.

**Florida**: Cross City Correctional Institution sergeant James Leslie Cassidy, 47, was fired on June 9, 2011, hours after being arrested for battery, criminal mischief, disorderly intoxication and corruption. Cassidy was accused of being thrown out of the Dawg House bar, twice, for fondling two women; he also reportedly slashed tires on cars in the bar's parking lot (which was caught on surveillance video) and threatened to kill a deputy's family while being transported to jail, where he was placed in a restraint chair. Cassidy had worked for the Florida Dept. of Corrections for almost 24 years.

**Florida**: According to a July 1, 2011 news report, two Hall County jail employees were suspended following a December 2010 uprising at the facility. Captain Mark Bandy was suspended for one day for unbecoming conduct, and jail guard Dustin Charlton received a 5-day suspension for conduct unbecoming an officer and

## PLN Classifieds

**Sexy / Erotic Glossy Photos**
SASE Gets Free Catalog: Urben Life PO Box 752 Renton WA 98057

---

Hate Global Tel Link? Securus? PrisonerConnect.com Can Help Serving All Federal, State Jails Lowest Inmate Calls Available Rollover Minutes If Not Used Call 1-866-855-8224 www.PrisonerConnect.com Member Of Better Business Bureau

---

**NEW! YOUR WISH IS OUR COMMAND!**
Personal letter w/pic of sexy girl Pen pal lists/sexy pics/web posts + more.Over 20 services offered Send S.A.S.E. for a catalog to: Genie's Lamp P.O. Box 161421, San Diego, CA 92176

---

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

---

**Diamonds Beyond The Wall**
by Miss Veronica. Poems & essays on prison life from a woman's view. Positive & uplifting. Mail check or money order for $18.50 to Crusade4hope, PO Box 27231 Raleigh, NC 27611.
Or send SASE for more info.

---

**FROM-INSIDE OUT**
5730 N. 1st ST #105-255
Fresno, CA 93710
Send your love from-inside out
Flowers from $19.99, Bears $8.99
Choco.Covered berries $19.99
Personal fortune cookies $12.99
Shpng 10$ send your order today
SASE for more info

---

**LOVE TO TYPE MANUSCRIPTS!**
No Legal Documents.
Will type, design & lay out pages
Accurate and dependable
Reasonable Rates!
Ambler Document Processing
P.O. Box 938, Norwalk, CT 06852

---

**Education Behind Bars Newsletter**
A free publication focused on prison education is seeking submissions between 500 and 2500 words in length. More online at: http://www.PrisonEducation.com EducationBehindBars@yahoo.com PO Box 69, Berryville, AR 72616

---

EARN YOUR DEGREE BY MAIL
Associates to PhD - Low Cost
Pastoral Ministry & Counseling
CCBC, 17955 Arlington Ct.
Anderson, CA 96007
530-710-2210
christschurchbiblecollege.org
-Ask About Ordainment-

unnecessary use of force. Charlton was accused of striking a restrained prisoner in the face while Bandy had "tapped" several prisoners on the head with his foot, according to surveillance footage. The suspensions were not publicly reported and only came to light after a local newspaper filed an open records request.

**Florida**: Due to changes in state law, a free GED program at the Volusia County Branch Jail will likely be discontinued, county officials said in June 2011. Under new state requirements, students must pay tuition fees and the school must verify their residency status – which was not previously required. Most prisoners are unable to pay tuition or the cost of taking the GED test.

**Georgia**: A June 2011 shooting at the Fulton County Jail left one prisoner with a gunshot wound to the hand. Kortez Hurt reportedly broke out of his cell on a maximum-security floor of the facility, went to the cell of another prisoner, Curtis Glanton, and fired multiple shots at him through a slot in the cell door. Jail officials were later informed that the incident was staged, with a potential negligence lawsuit filed by Glanton being the motivation for the shooting. Not explained was how Hurt managed to get a gun into the jail or how he got out of his cell.

**Illinois**: Shaun M. Smith, 21, already convicted of six financial crimes, was charged in June 2011 with stealing around $4,500 from a Special Inmate Fund at the DuPage County Jail, where he had been incarcerated. Smith received a check from the jail for his remaining funds after he was transferred to prison; upon his release, he used the account numbers on the check to raid the jail account. As a result, he now faces prosecution for another financial crime that carries up to a 10-year prison sentence.

**Illinois**: A federal prison guard and a prisoner at FCI Greenville were indicted in June 2011 in connection with a smuggling scheme. According to the U.S. Attorney's Office, guard Druex Perkins is accused of lying to the FBI when he denied smuggling cigarettes into the facility, while prisoner Khalat Kalama was charged with bribery of a federal official and conspiracy to bribe a federal official.

**India**: A doctor was killed by prisoners at a jail in north Bihar's Gopalganj district on May 30, 2011. The physician, Buddhadev Singh, was at the facility to treat a prisoner with chicken pox when he was confronted and fatally assaulted by a group of prisoners serving life terms. According to prison officials, Dr. Singh was attacked because he had refused to issue fake medical certificates that would have allowed the prisoners to be moved out of the jail. Other doctors in Gopalganj went on a one-day strike in protest following Dr. Singh's death, and lawmakers announced they would move forward with a bill to protect doctors from violence.

**Kansas**: Officials at the El Dorado Correctional Facility are notifying visitors that they have to be fingerprinted before leaving the prison, using a print scanner. The practice is to ensure that prisoners do not manage to sneak out pretending they are visitors, though some visitors have complained about the practice. Presumably, people who are visiting criminals do not want to be treated like criminals themselves.

**Massachusetts**: Deacon William Emerson, 66, who served as a chaplain at the Middlesex County House of Correction in Billerica, was removed from that position

---

Inmate Calls Breaking the Bank?
Save up to 80% on Inmate Calls
Stop paying long distance fees!
www.Inmatecallssavings.com
Call 305-900-3093 11a-8p EST.

---

Inmate Web Research, Girlie Pics
Photocopies. Free Info Send SASE
Or $5 for Color Catalog. Pay To
REEL HIGH MEDIA No Personal Chk
P.O. Box 1352 Stockton, CA 95201

---

**Prison Connection Pen-Pal Serv**
SPECIAL $20/2years. Buy NOW!
It Won't Last! More Info Send SASE
Prison Connection PO Box 18489
Cleveland Heights OH 44118

---

**ELITE PRISONER SERVICES**
(FKA Elite Paralegal Services)
Legal Research & Forms, Internet,
People Searches, Books, MySpace,
Facebook, Penpals, Erotic Photos,
Special Requests. Send SASE for
Brochure to: EPS, PO Box 2131,
Appleton, WI 54912

---

**Friendly Connections** offers pen
pal services, internet searches,
publications, photo/document
copies and so much more at the
absolute lowest price possible!
Send SASE to receive brochure.
Friendly Connections
PO BOX 5845 Aloha, OR 97006

---

Prisonworld Magazine Mail Blasts
Join our Email List for Updates
dawahinternationalllc@gmail.com
Prisonworld Radio Hour Exposure
Wrongly Convicted Plead YourCase
*PUBLICITY PACKAGES for
Authors*
Print*Radio*BLOG*Social Network
PO Box 380 Powder Sprgs GA 30127

---

**OWN PIX OF YOUR FAVORITE
♥STAR♥**
MindEscapePix.com Famous Photos!
Order catalog 1 or 2-$4.00 m/o ea or
10-1st class stamps + SASE
Send To: Mind Escape Pix,LLC
1800N. Bristol St. #C605
Santa Ana, CA  92706 or email
INFO@MINDESCAPEPIX.COM

---

**Auntie Love Back with More Love**
SASE 4 New Pen Pal Site - Hurry!
PO Box 1987 Lancaster CA 93539

---

**ARE YOU THE VICTIM**
of an unfair Guilty Plea? Free
info. Just send 3 fresh stamps
or 3 fresh stamped, unaddressed
envelopes:The New Law Center, PO
Box 482 Greenville SC 29602-0482

---

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on
how to receive Voices.Con monthly, send
SASE to: PO Box 5425, Sonora, CA
95370. On the web at: VoicesDotCon.org;
Email: Publisher@VoicesDotCon.org

---

**Surrogate Sisters**
Services to the Incarcerated.
No games. In business 14+ years.
We sell photos of sexy women,
gifts for loved ones, & other services.
For more info send a SASE to:
Surrogate Sisters - PN
PO Box 95043, Las Vegas NV 89193

---

Prison Legal News                                   51                                   October  2011

## News in Brief (cont.)

on March 3, 2011 after being accused of smuggling drugs into the facility. He faces three charges related to the drug smuggling but failed to show up in court at his arraignment. Emerson was also suspended from his position as a deacon at a church in Tewksbury, "in light of concerns that have come to our attention regarding his ministry as a prison chaplain," a church official stated.

**Mexico**: When Maria del Mar Arjona, 19, left a prison in Chetumal following a conjugal visit with her incarcerated boyfriend, guards noticed that she was nervous and pulling a large, bulky wheeled suitcase.

Upon closer inspection her boyfriend, Juan Ramirez Tijerina, was found curled up inside the luggage. Arjona was arrested for trying to help Tijerina escape.

**New York**: According to a policy that took effect in March 2011, visitors to New York City jails who wear scanty clothing or clothes that are torn or display expletives will have to wear XXL bright green T-shirts to cover up their offending garments. Jail officials purchased 800 of the T-shirts at a cost of $5,000. The visitation dress code also forbids gang symbols, swimwear, low-cut tops and short skirts.

**South Carolina**: State prison Lt. Esther Quattlebaum, employed at the Kirkland Correctional Facility, was charged in June

2011 with 16 counts of fraudulent acquisition of food stamps, 15 counts of financial transaction card fraud and forgery, and two counts of official misconduct. She was placed on administrative suspension; no other details were made available.

**Texas**: On June 7, 2011, former Texas state prison guard Albert James Turner, Jr., 46, was sentenced to death after being convicted of killing his wife and mother-in-law. He reportedly cut the victims' throats in front of two of his children. Turner went on the run in late December 2009 while being sought in connection with the double homicide; he was captured in a shopping mall in Concord, North Carolina on March 5, 2010 and returned to Texas.

---

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners, as well as sexual assaults against prisoners. Publishes the bi-annual NPP Journal and the online Prisoners' Assistance Directory. Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in California, New York and New Orleans. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: Stop Prisoner Rape, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine

and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### Partnership for Safety and Justice

Publishes Justice Matters three times a year, which reports on criminal justice issues in Oregon. Free to Oregon prisoners, $7 for other prisoners and $25 for non-prisoners. Contact: PS&J, 825 NE 20th Avenue #250, Portland, OR 97232 (503) 335-8449. www.safetyandjustice.org

### The Sentencing Project

The Sentencing Project is a national policy research and advocacy organization that works for a fair and effective criminal justice system by promoting sentencing reform and alternatives to incarceration. They produce excellent reports on topics related to sentencing policy, racial disparities, drug policy, juvenile justice and voting rights/disenfranchisement, which are available online. Contact: The Sentencing Project, 1705 DeSales St. NW, 8th Fl., Washington, DC 20036 (202) 628-0871. www.sentencingproject.org

---

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book / index orders OVER $50** (effective May 1, 2010 until further notice). **$6.00** S/H applies to all other book orders.

SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE **ONE BONUS!**
1. SIX (6) FREE ISSUES FOR 54 TOTAL! OR
2. PRISON PROFITEERS (A $24.95 VALUE!) OR
3. WITH LIBERTY FOR SOME (AN $18.95 VALUE!)

**Prison Profiteers,** edited by Paul Wright and Tara Herivel, 323 pages. $24.95. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. 1063

**With Liberty for Some: 500 Years of Imprisonment in America,** by Scott Christianson, Northeastern University Press, 372 pages. $18.95. The best overall history of the American prison system from 1492 through the 20th Century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years. 1026

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. $35.95. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. 1041

**The Celling of America, An Inside Look at the U.S. Prison Industry,** edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. $22.95. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. 1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada,** updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. $49.95. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college correspondence courses. 1071

**The Criminal Law Handbook: Know Your Rights, Survive the System,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. $39.99. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format. 1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. $39.99. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc. 1037

**Law Dictionary,** Random House Webster's, 525 pages. $19.95. Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law. 1036

**The Blue Book of Grammar and Punctuation,** by Jane Straus, 110 pages. $14.95. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. 1046

**Legal Research: How to Find and Understand the Law,** by Stephen Elias and Susan Levinkind, 568 pages. $49.99. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. 1059

**Deposition Handbook,** by Paul Bergman and Albert Moore, Nolo Press, 352 pages. $34.99. How-to handbook for anyone who conducts a deposition or is going to be deposed. 1054

**Finding the Right Lawyer,** by Jay Foonberg, ABA, 256 pages. $19.95. Explains how to determine your legal needs, how to evaluate a lawyer's qualifications, fee payments, and more. 1015

SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE **ONE BONUS!**
1. FOUR (4) FREE ISSUES FOR 40 TOTAL! OR
2. PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)

**Protecting Your Health and Safety,** by Robert E. Toone, Southern Poverty Law Center, 325 pages. $10.00. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. 1060

**Spanish-English/English-Spanish Dictionary,** Random House. $8.95. Two sections, Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage. 1034

**Writing to Win: The Legal Writer,** by Steven D. Stark, Broadway Books/Random House, 283 pages. $19.95. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. 1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right,** updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. $16.00. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct. 1030

**Webster's English Dictionary,** Newly revised and updated, Random House. $8.95. 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms. 1033

**Everyday Letters for Busy People,** by Debra Hart May, 287 pages. $18.99. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters. 1048

**Roget's Thesaurus,** 717 pages. $8.95. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. 1045

**Beyond Bars, Rejoining Society After Prison,** by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. $14.95. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. 1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.,** by Mumia Abu Jamal, City Lights Publishers, 280 pages. $16.95. In *Jailhouse Lawyers,* Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners. 1073

**Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It,** by Terry Kupers, Jossey-Bass, 245 pages. *Hardback only; prisoners please include any required authorization form.* $32.95. Psychiatrist writes about the mental health crisis in U.S. prisons and jails. Covers all aspects of mental illness, prison rape, negative effects of long-term isolation in control units, and more. 1003

**The Habeas Citebook: Ineffective Assistance of Counsel,** by Brandon Sample, PLN Publishing, 200 pgs. $49.95. This is PLN's second published book, which covers ineffective assistance of counsel issues in federal habeas petitions. Hundreds of case cites! 1078

**\* ALL BOOKS ARE SOFTCOVER EXCEPT *PRISON MADNESS* \***

PLN_0001239

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95**. Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow, exercises to perform, and a bibliography.                1031

**Crime and Punishment In America,** by Elliott Currie, 230 pages. **$16.95**. Effective rebuttal to right-wing proponents of prison building. Fact-based argument shows that crime is driven by poverty. Debunks prison myths and discusses proven, effective means of crime prevention.                1019

**Prison Writing in 20th Century America,** by H. Bruce Franklin, Penguin Books, 368 pages. **$17.00**. From Jack London, Malcolm X and Jack Henry Abbott to George Jackson and Edward Bunker, this anthology provides a selection of some of the best writing describing life behind bars in America, from those who have been there.                1022

**Soledad Brother: The Prison Letters of George Jackson,** by George Jackson, Lawrence Hill Books, 339 pages. **$18.95**. Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 40 years ago.                1016

**Marijuana Law,** by Richard Boire, Ronin, 271 pages. **$17.95**. Examines how to reduce the probability of arrest and prosecution for people accused of the use, sale or possession of marijuana. Info on legal defenses, search & seizures, surveillance, asset forfeiture and drug testing.                1008

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!                1077

**Ten Men Dead: The Story of the 1981 Irish Hunger Strike,** by David Beresford, Atlantic Monthly Press, 334 pages. **$16.95**. Story of IRA prisoners at Belfast's Long Kesh prison.                1006

**10 Insider Secrets to a Winning Job Search,** by Todd Bermont, 216 pages. **$15.99**. Roadmap on how to get a job even under adverse circumstances—like being an ex-con. Includes how to develop a winning attitude, write attention-grabbing résumés, prepare for interviews, networking and much more!                1056

**The Politics of Heroin: CIA Complicity in the Global Drug Trade,** 2003 Ed. by Alfred McCoy, 734 pages. **$34.95**. Exposé of the government's involvement in drug trafficking.                1014

**Lockdown America: Police and Prisons in the Age of Crisis,** by Christian Parenti, 290 pages. **$21.95**. Analyzes the war on the poor via the criminal justice system. Well documented and has first-hand reporting. Covers prisons, paramilitary policing, SWAT teams and the INS.                1002

**The Prison and the Gallows: The Politics of Mass Incarceration in America,** by Marie Gottschalk, Cambridge University Press, 451 pages. **$28.99**. Great political analysis of the confluence of events leading to 2.3 million people behind bars in the U.S.                1069

**Women Behind Bars, The Crisis of Women in the U.S. Prison System,** by Silja J.A. Talvi, Seal Press, 295 pages. **$15.95**. Best book available that covers issues related to imprisoned women, based on interviews with hundreds of women behind bars.                1066

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.                1075

**PLN Cumulative Index. $22.50** each. PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

### Subscription Rates

| | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** (Attorneys, agencies, libraries) | $90 | $180 | $270 | $360 |

### Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 53

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 53

(All subscription rates and bonus offers are valid as of 7-31-2011)

Purchase with Visa, MasterCard, AmEx or Discover by phone: **802-257-1342**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 2420
W. Brattleboro, VT 05303

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by prison policies.*

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News**                 **$ Amount**

6 month subscription (prisoners only) - $18                 _____

1 yr subscription (12 issues)                 _____

2 yr subscription (2 bonus issues for 26 total!)                 _____

3 yr sub (*write below which FREE book you want*)
or 4 bonus issues for 40 issues total!                 _____

4 yr sub (*write below which FREE book you want*)
or 6 bonus issues for 54 issues total!                 _____

Sample issue of **Prison Legal News** - $3.50 each                 _____

**Books or Index Orders** (No S/H charge on
3 & 4-year sub free books OR book orders OVER $50!)   **Qty.**

_____   ___   _____

_____   ___   _____

_____   ___   _____

**Add $6.00 S/H to** Book **Orders UNDER $50**                 _____

VT residents ONLY add 6% to Total Book Cost                 _____

**Total Amount Enclosed:**                 _____

*\* No refunds on PLN subscription or book / index orders after orders have been placed \**

PLN_0001240

# ARE PRISON PHONE RATES KEEPING YOU LOCKED DOWN?

We guarantee savings of up to 90% on your long distance, out-of-state, and international calls from all Federal prisons, county jails and State prisons.

Call, write, e-mail or check out our website for more information!

TO CELEBRATE PLN'S 21st ANNIVERSARY WE'RE OFFERING TWO SPECIAL PROMOTIONS; ONE FREE MONTH OF SERVICE TO ALL NEW SUSCRIBERS TO OUR US DOMESTIC PLANS -- (PROMO CODE: PLNUSA) -- AND/OR 100 FREE INTERNATIONAL MINUTES FOR NEW INTERNATIONAL SUBSCRIBERS --(PROMO CODE: PLNINTL).

Garantizamos ahorro de hasta el 90% en tus llamadas de larga distancia inter-estales e internacionales desde todas las cárceles federales, locales y estatales.

Para contactar con nosotros: Llame, escriba o entre en nuestra pagina web para mas información.

PARA CELEBRAR EL PLN´S 21 ANIVERSARIO, ESTAMOS OFRECIENDO DOS PROMOCIONES ESPECIALES, SERVICIO GRATIS POR UN MEZ A TODOS LOS NUEVOS CLIENTES QUE SE SUSCRIBANA NUESTRO PLAN DOMESTICO --( CODIGO DE PROMOCION: PLNUSA)- Y/O 100 MINUTOS GRATIS PARA NUEVOS CLIENTES QUE SUSCRIBAN EL PLAN INTERNACIONAL --(PROMO CODE: PLNINTL)

Spain Telecom, Inc.
1220 Broadway - #803
New York, NY 10001
www.inmatefone.com
clients@inmatefone.com
Call:      1(845)326-5300
Español: 1(845)342-8110

Start Saving Today!



Inmatefone
Keeping You In Touch



## PRISONLEGALNEWS.org

**Dedicated to Protecting Human Rights**    >>FREE Data Search

| Decisions | Investigations | Audits | Publications | | Cases | | Verdicts | Settlements |

**If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!**

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

**Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

▶ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▶ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▶ Full text decisions of thousands of court cases, published and unpublished.

▶ All content is easy to print for downloading and mailing to prisoners.

▶ Most complete collection of prison and jail related verdicts and settlements anywhere.

▶ Order books, print subscriptions and make donations on line.

▶ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▶ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▶ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▶ Search free, pay only if you find it!

▶ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online! http://www.prisonlegalnews.org**

PLN_0001241



# Prison Legal News
**P.O. Box 2420**
**West Brattleboro, VT 05303**

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

---

### Subscription Renewal

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2006, then the subscription expires after the February 2006 issues is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 10/2011** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

### Change of Address

If you move or are transfered, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

---

## *We Pay* CA$H FOR YOUR STAMPS

**Get the HIGHEST REIMBURSEMENT RATES for ALL of your stamps from the ONLY stamp service continuously serving inmates for 9 years.**

### WE BUY COMPLETE AND PARTIAL BOOKS, SHEETS, STRIPS AND ROLLS OF ALL DENOMINATIONS AND QUANTITIES OF POSTAGE STAMPS IN GOOD CONDITION

Within 24 Hours we will send a Money Order, Cashier's Check, or Electronic Payment to wherever you designate, or we will pay an approved vendor for a package or gift.

### REIMBURSEMENT RATES

**75%**
of Face Value (33¢ per stamp) for **Forever Stamps** in complete books or sheets

**65%**
of Face Value for **44¢ Stamps** in complete books, sheets, strips or rolls

**55%**
of Face Value for 44¢ Stamps in **partial books, sheets or strips** (minimum 4 each)

**50%**
of Face Value for all **other** denominations or stamped envelopes

- $15 minimum money order.
- Designate where your funds are to be sent.
- Please provide any necessary forms & instructions.
- Used, worn, damaged, or taped stamps are not accepted or returned.

SEND FOR FREE BROCHURE
(This offer void where prohibited by state regulations)

\* SPECIAL RATES FOR PLN SUBSCRIBERS - TEAR OFF AND SEND THIS PAGE (with your mailing address on it) (no photocopies please) TO:

**CLN, P.O. Box 687-PN, Walnut, CA 91789**     Or visit OUR Website: *www.cash4urStamps.com*