# EXHIBIT 7

# PRISON
# Legal News

VOL. 22  No. 11

*ISSN 1075-7678*

*Dedicated to Protecting Human Rights*

November  2011

## New York's Sex Offender Civil Commitment Program Proves Expensive, Problematic

### by Matt Clarke

At an annual cost of $175,000 per civilly-committed sex offender, New York's civil commitment program is the second most expensive in the country (Washington state is first at a cost of $177,000 per prisoner). As of December 2010, the more than $40 million-per-year program, which has the ability to confine up to 230 civilly-committed sex offenders (CCSOs) in two facilities, was at maximum capacity. Further, with the addition of around 70 new CCSOs each year, the annual costs are expected to increase by $12 million a year – which does not include the cost of opening new facilities or the expense of litigation associated with the state's civil commitment statute.

The cost of the state's sex offender civil commitment program might have grown even faster, but a decision by the New York Court of Appeals – the state's highest court – limited the application of civil commitment to persons incarcerated or on parole for a current sex offense, and required that the petition that starts the commitment process be filed before an offender completes his or her sentence for a sex offense.

### Article 10

New York's Sex Offender Treatment and Management Act, article 10 of the Mental Hygiene Law, was enacted on April 13, 2007. Ironically it passed with the support of then-Governor Eliot Spitzer, who later reigned following a prostitution scandal. The statute requires civil commitment of "detained" sex offenders who suffer from a "mental abnormality" that renders them incapable of controlling their sexual impulses and are thus likely to reoffend. The first civil commitment took place in November 2007. Less than four years later, civil commitments are putting a heavy strain on an already stressed state budget.

CCSOs are held at the Central New York Psychiatric Center in Marcy and the St. Lawrence Psychiatric Center in Ogdensburg. Both are now at capacity. Plans are being made to convert office space in an unused building at Marcy into living quarters for 150 more CCSOs. Even if that takes place, it will only satisfy the need for housing newly-confined CCSOs for the next two years.

According to the state's Office of Mental Health (OMH), "the population growth [of civilly committed sex offenders] will continue unabated for many years and at costs that may well be unsustainable in an uncertain fiscal climate."

One might be tempted to blame the legislature for shortsightedness in passing article 10 without providing adequate funding, but that would be premature. Article 10 contains a bifurcated civil commitment process in which a court decides whether to place sex offenders in a secure facility or on Strict and Intensive Supervision and Treatment (SIST), a kind of super-parole that requires the CCSO to be placed on GPS monitoring and submit to periodic polygraph examinations. Activities that are not criminal, such as using alcohol, viewing pornography or calling telephone sex lines, are prohibited for offenders on SIST. Engaging in one of the prohibited activities can result in the CCSO being removed from SIST and confined in a secure facility.

### SIST Shortcomings

There are several problems with SIST. First and foremost, it isn't being used as often as anticipated. The legislature assumed that about two-and-a-half CCSOs would be placed on SIST for every one committed to a secure facility. In reality, the ratio is two-to-one in favor of offenders being sent to a secure facility. As a result the civil commitment program has become five times more expensive than expected.

Why is it less likely for CCSOs to be placed on SIST? In a word, politics.

## Inside

| | |
|---|---|
| From the Editor | 6 |
| Oregon Jail Suicides | 8 |
| PLN Sues New York DOCS | 12 |
| Corrupt Judges Sentenced | 14 |
| PLN Sues Kansas, Washington Jails | 16 |
| Lockdown Violates Court Access | 22 |
| California Proposition 115 Upheld | 24 |
| Disabled Prisoners Win Appeal | 28 |
| Bureau of Prisons IFRP "Voluntary" | 33 |
| CCA and ICE Settle Detention Suit | 38 |
| Prisons Increase Crime | 44 |
| PLRA Attorney Fee Ruling | 49 |
| News in Brief | 50 |

PLN_0001341

# INMATE TOLL BUSTERS

## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*

**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours: 888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.


  

# Great Self-Help Book Deals
## From Prison Legal News!



### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer

**Order from Prison Legal News**
Add $6 shipping for orders under $50

Prison Legal News
P.O. Box 2420
West Brattleboro, VT 05303
Phone: 802 579-1309
www.prisonlegalnews.org


The Criminal Law Handbook
$39.99


Represent Yourself in Court
$39.99


Legal Research
$49.99


Nolo's Deposition Handbook
$34.99

**NOLO** 
**YOUR LEGAL COMPANION**

PLN_0001342

PUBLISHER
**Rollin Wright**

EDITOR
**Paul Wright**

ASSOCIATE EDITOR
**Alex Friedmann**

COLUMNISTS
**Michael Cohen, Kent Russell, Mumia Abu Jamal**

CONTRIBUTING WRITERS
**Mike Brodheim, Matthew Clarke, John Dannenberg, Derek Gilna, Gary Hunter, David Reutter, Mike Rigby, Brandon Sample, Mark Wilson, Joe Watson**

RESEARCH ASSOCIATE
**Sam Rutherford**

ADVERTISING DIRECTOR
**Susan Schwartzkopf**

LAYOUT
**Lansing Scott/ Catalytic Communications**

CHIEF COUNSEL,
HRDC LITIGATION PROJECT
**Lance Weber**

***PLN* is a Monthly Publication**

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. *PLN* accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News
P.O. Box 2420
West Brattleboro, VT 05303
802-257-1342
info@prisonlegalnews.org
www.prisonlegalnews.org**

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without a SASE. Check our website or send a SASE for writers guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index*.

## NY Sex Offender Program (cont.)

Judges have to face the political and public relations consequences if they make a mistake. As noted by New York Supreme Court Justice Thomas Van Strydonck in a 2008 case over whether a man who had sexually assaulted a 7-year-old girl should be placed on SIST or confined, article 10 required that "the most dangerous are to be confined while offenders who pose a risk of harm, albeit lesser, are to be treated within the community" on SIST. Due to a lack of "clear and convincing" evidence that the defendant could not control his sexual impulses, Van Strydonck placed him on SIST – but not without reservations.

"How can it be said that anyone with this defined 'mental abnormality' is not likely to be a danger to others if not confined?" he asked. To be on the safe side, some judges are more likely to order confinement rather than release on SIST.

Among the 93 CCSOs placed on SIST between November 2007 and November 2010, 54 (about 58%) violated the terms of their supervision. A quarter of those committed the violation within the first month they were on community supervision. Eight (8.5%) were charged with new crimes and 21 (22%) were accused of non-criminal sex-related activities. This means that the majority of the infractions (69.5%) were neither criminal nor sex-related, giving rise to questions about the harshness of the SIST rules and their enforcement.

"SIST is all about public safety and treatment, so if the person appears to us to be ratcheting up or not being responsive to the requirements outlined by the court, we will take that person into custody," said Mary Osborne, assistant deputy director of the Division of Parole's sex offender management unit. A judge then decides whether to send the CCSO to a secure facility or return them to community supervision.

Another problem is the expense of SIST. At an annual cost of $10,000 to $12,000 per offender, it is around twice the cost of standard parole. Why the extra expense? SIST caseloads are smaller than parole caseloads, allowing for more intensive supervision and cooperation with sex offender treatment agencies to ensure that the CCSO is attending court-mandated appointments.

The alternative of committing a

CCSO to a secure facility is even more expensive. The initial annual cost was $225,000 per civilly committed sex offender. Personnel cuts brought the cost down to the current level of approximately $175,000 per CCSO, which is still about four times as expensive as incarcerating an offender in a state prison.

### Due Process

Before a detained sex offender can be civilly committed to SIST or confinement, the state must provide due process. The cost of the required investigations and trials are not included in the cost of the civil commitment program but constitute an additional related expense.

Article 10 proceedings begin when the agency having custody of a sex offender notifies the Attorney General (AG) and OMH that the sex offender is nearing release. OMH reviews the offender's records to see if he or she should be referred to a "case review team" for evaluation.

If the sex offender is referred to a case review team, notice is sent to the offender, who is designated the "respondent." Should the case review team decide that the respondent's records indicate a "mental abnormality," it notifies the respondent and the AG's office. The AG then reviews the case and decides whether to file a civil management petition.

After a petition is filed, an attorney is appointed for the respondent and a court must find probable cause that the respondent requires civil management. If probable cause is found, a trial is held and a unanimous jury must determine whether the AG has proven by clear and convincing evidence that the respondent is a sex offender with a mental abnormality. The respondent may waive the jury and have a judge make the decision.

Should the fact-finder conclude that the respondent is a sex offender with a mental abnormality, the judge determines whether to place the respondent on SIST or order confinement in a secure facility. To justify confinement, the judge must find that the state has proven by clear and convincing evidence that the respondent is a detained sex offender who is afflicted with "a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that [he or she] is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility for care, treatment, and control until such time as he or she no

PLN_0001343

## NY Sex Offender Program (cont.)

longer requires confinement." Otherwise, the respondent is placed on SIST.

### Civil Commitment Statistics

Of the 1,686 sex offender cases reviewed by OMH between November 2008 and October 2009, just 194 offenders (11.5%) were referred to the AG for possible civil commitment and only 63 (3.7%) were recommended for civil management. Of the 185 civil management petitions decided between April 13, 2007 and October 31, 2009, 171 sex offenders were found to have a mental abnormality and 99 of those were determined to be a dangerous sex offender requiring confinement. Currently, the civil commitment process results in about 70 new CCSOs per year at an additional annual cost of $12 million.

Other states have been hammered with high costs for civilly committing sex offenders, too. Over the past three years the cost of Minnesota's civil commitment program has tripled while only one committed sex offender has been released since 1994. Virginia is already nearing the maximum capacity of a new $62 million sex offender civil commitment facility that opened in 2008. Twenty states have civil commitment laws, though some use them more enthusiastically than others.

In these difficult budgetary times one has to wonder about the wisdom of such programs, especially in light of the questionable practice of incarcerating people who have completed their criminal sentences based on the possibility that they might commit future crimes – an argument that presumably could be applied to all convicted criminals, not just sex offenders.

### Civil Commitment Litigation

In a November 2010 decision, the highest court in New York held that a sex offender who had been released from parole the day before the AG filed a petition for civil management was not a "detained sex offender" for purposes of article 10 and therefore could not be civilly committed. The court also decided that because the respondent had not been serving time for a sex offense at the time he was released, he was not eligible for commitment.

Mustafa Rashid pleaded guilty to robbery, burglary, rape and sodomy resulting from a home invasion and gas station robbery. He was sentenced to 8 to 16 years. After being released on parole, he was arrested for and pleaded guilty to multiple robbery charges for which he was sentenced to 2 to 4 years, plus a misdemeanor weapons charge that resulted in a one-year sentence. The new sentences were concurrent to each other but consecutive to his previous sentence. The weapons charge was on the same indictment as a sex offense; however, as part of a plea agreement Rashid was not prosecuted for the sex offense.

Rashid was eventually paroled. While on parole he pleaded guilty to misdemeanor petty larceny and received a jail sentence, but his parole was not revoked. Four days after he was released from jail his parole expired. The next day, the AG filed a sex offender civil management petition under article 10 in Supreme Court (a New York trial court).

Rashid was confined while awaiting his civil commitment trial. At his probable cause hearing he pointed out that he had not been incarcerated when the petition was filed and had not been on parole for a sex offense. The AG argued that the proceedings had started when Rashid received notice of the civil commitment investigation, not when the petition was filed. The AG also contended that Rashid's subsequent sentences acted to extend his earlier sentence for a sex offense so that he was in effect on parole for a sex offense. The trial court held that Rashid was a detained sex offender and probable cause existed under article 10, without addressing the issue of whether he was "detained" at the time the proceedings were initiated.

Rashid filed a motion to dismiss the petition because he was on parole for a weapons charge, a class A misdemeanor, which was not a "designated felony" that allowed civil commitment under article 10. The trial court dismissed the petition but allowed the state to file a new petition in which it was alleged that his more recent sentences served to extend his original sex offense sentence. The trial court held that Rashid was not a "detained sex offender" because he had not been on parole for a sex offense but rather for his later, non-sex offense crimes. The state appealed and the Appellate Division affirmed. The state then appealed to the Court of Appeals.

The Court of Appeals held that a civil commitment proceeding begins at the time a petition is filed, not upon notice of a commitment investigation. Since the AG's petition was filed a day after Rashid's parole ended, he was not detained at the time of the petition and therefore was not a "detained sex offender" within the meaning of article 10.

Further, the Court of Appeals held that Rashid's later convictions and sentences following his sex offenses did not serve to extend his sentence for the sex offenses. Therefore, he was not on parole for a sex offense even at the earlier time when the state gave him notice of the civil commitment investigation. The decision of the Appellate Division was affirmed and the petition dismissed. Rashid was represented by attorney Sadie E. Ishee. See: *Matter of State of New York v. Rashid*, 16 N.Y.3d 1, 942 N.E.2d 225 (N.Y. 2010).

An important implication of the *Rashid* decision is that New York cannot attempt to civilly commit sex offenders

**CONVERT YOUR POSTAGE STAMPS**
to **MONEY ORDERS, WIRE TRANSFERS, PACKAGES**

**WE PAY THE HIGHEST REIMBURSEMENT RATES**

**COMPLETE OR PARTIAL BOOKS, STRIPS, OR SHEETS SINGLE STAMPS ACCEPTED 24-HOUR TURNAROUND**

**See Our Ad on Back Cover**
CLN, Box 687, Walnut CA 91788

**or Visit Our WEBSITE:**
**cash4urStamps.com**

**THE LEGAL HELP FOUNDATION**

> **Learn How to Write a 1983 Prison Lawsuit and How to Write a Motion for Pro-Bono Counsel, or We Can Write Them for You.**
> **Obtain Paralegal Courses.**
     **For a FREE**
     **45 Page Legal Info Catalog**
     **Put 5 Stamps on**
**1 Self Addressed Envelope to:**
     **PO Box 624 Main Ave**
     **Ocean Grove NJ 07756**
     No Stamps / No Catalog

PLN_0001344

who have discharged their sentences and are no longer incarcerated or on parole. The dissent in the Court of Appeals' ruling pointed out that if Rashid is as "impaired and dangerous" as alleged by the AG, "nothing prevents the State from seeking to have him involuntarily hospitalized under the Mental Hygiene Law article 9 as a mentally ill person who is in need of treatment and is a danger to society." Article 9 provides fewer procedural and substantive protections than article 10.

Using the non-sex offender mental health civil commitment law might have a downside, though, since many psychiatrists have balked at approving a clinical finding of "mental abnormality," which is not defined in the DSM-IV (the standard guidebook for mental disorders) and has no clear diagnosis or course of treatment.

In another case involving a respondent referred to only as "Maurice G.," on May 6, 2011 a Supreme Court in Bronx County, New York dismissed a civil management petition filed by the AG because the respondent had been reincarcerated on a parole violation and thus was not eligible for release. Since civil commitment proceedings can only be initiated when a sex offender is "about to be released into the community," the court dismissed the petition for lack of subject matter jurisdiction.

"Any such determination today as to Respondent's mental condition would be not only speculative and/or hypothetical as to what the Respondent's mental condition will be at the time he could be subject to civil management (when he is about to be released into the community), it also would be inconsistent with the intent and requirements of the statute," the court wrote. See: *State v. Maurice G*, 32 Misc.3d 380, 928 N.Y.S.2d 162 (N.Y.Sup. 2011).

### Conclusion

As New York officials continue to try to civilly commit sex offenders, even when they are no longer detained as required by statute, are not serving time for a current sex offense or have been reincarcerated and no longer meet the criteria for commitment, the state's litigation costs will continue to increase – in addition to the high costs of secure confinement and SIST supervision.

At some point, New York lawmakers will have to decide whether this is an effective use of taxpayer dollars. This is particularly true given that very few CCSOs held in secure facilities are released, which results in indefinite detention at a cost of $175,000 per offender annually – more than the four-year tuition at Yale University. Perhaps some of the money budgeted for civil commitment would be better spent on treatment for all sex offenders while they serve their criminal sentences, with the goal of decreasing the likelihood that they will reoffend following their release. ◼

Source: *www.democratandchronicle.com*

## LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check or money order to:
**Prison Legal News
PO Box 2420
West Brattleboro, VT 05303**
**(802) 257-1342**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*



# *Elegant Roses*

*J*ust because you're temporarily "away" doesn't mean you're not The Man. Send your special lady a dozen long-stem premium roses today.

- **All orders shipped SAME DAY**
- **Premium Long-Stem Roses**
- **Teddy Bears  • Box of Chocolates**
- **Priority overnight delivery**

*We cater to men with impeccable taste. Send SASE for brochure & order forms.*

**Elegant Roses**
PO Box 133342
Spring, TX 77393
(832) 618-2955

# From the Editor

## *by Paul Wright*

In April 1990, the month before *PLN* published its first issue, Washington state enacted the nation's first civil commitment law targeting sex offenders for indefinite imprisonment once they had completed their criminal sentences. Our results-oriented judiciary has upheld civil commitment against assorted legal challenges, finding it is a civil matter to confine people against their will for what they might do in the future based wholly on what they have done in the past.

It is telling that with rampant sexual predation by priests and prison guards, not a single one of those sexual abusers has been deemed a "sexually violent predator" fit for civil commitment. As the civil commitment fad has spread across the country, states have discovered the obvious: that it is expensive to lock people up indefinitely in a prison dressed up as a mental health facility.

*PLN* has reported on civil commitment issues around the country. This month's cover story fits squarely into that coverage with little in the way of surprises. Ironically, the costs associated with civil commitment seem to be the main factor in causing it to lose its luster; when push comes to shove, the mantra of "public safety" takes a back seat to fiscal reality.

Unfortunately, prisoners in New York state prisons will not be able to read this month's issue of *PLN*, as they have not read the previous 18 issues, because *PLN* is banned in all New York prisons due to the fact that we accept postage stamps from prisoners as payment for subscriptions and books. We filed suit on October 11 in federal court challenging the ban and hope to resolve this matter so that once again *PLN* is available to New York prisoners (see related article in this issue of *PLN*).

The ongoing efforts around the country to censor publications and prevent prisoners from receiving books and magazines – and even letters from loved ones – is a growing problem and one that is keeping Lance Weber, our litigation director, busy and working long hours. Ensuring that prisoners can actually receive our materials is a top priority for us and one which we take very seriously.

By now *PLN* subscribers should have received our annual fundraiser. Alas, our printer made a mistake printing the letter and has redone and remailed the fundraiser, so most subscribers will receive two fundraisers. We are sorry for the confusion, but please share the flyers with others who may be interested in what we have to offer. If you can afford to make an additional donation above and beyond the cost of a subscription, please do so. Advertising and subscription income do not cover all our expenses and we rely on your donations to make up the difference. And they make a big difference. Your support makes it possible for us to stand up and fight for the First Amendment rights of publishers and prisoners alike. We are the ONLY publisher in America that regularly challenges prison and jail censorship. No one else is doing it. If you believe in a free press, then this is your chance to support it.

Even if you can't make a donation yourself please encourage others to subscribe, buy books from us or make a donation. We recently sent out a large sample mailing of the October issue of *PLN*. Such mailings cost a lot of money for printing and postage as we reach out to new readers. If you know someone who might be interested in our content and coverage, let them know about *PLN* and encourage them to subscribe. It is easier for readers to reach out to their own social networks than for us to reach out to potential subscribers at random.

I would like to thank all of our readers who send us their verdicts and settlements to report. When you win a prison or jail case, please send us the complaint and the settlement or verdict sheet so we can report it and post the documents on our website.

Enjoy this issue of *PLN* and please make a donation if you can and encourage others to subscribe. ◼

# Texas Jail Guards Smuggle Contraband in Tacos, Ramen Noodles

When Bexar County jail guard Alfred Casas, 32, agreed to bring some tacos to prisoner Jacob Keller in violation of jail rules, he probably didn't think much of it. That changed when the tacos contained hacksaw blades intended for use in an escape attempt.

"It was one taco and I opened it and there was nothing in it," Casas said during a tearful interview with detectives. "I know it sounds stupid. I'm stupid for bringing those tacos. But it was a regular taco. I didn't know [about the hacksaw blade]."

The blades were found during a cell search that also uncovered bed sheets made into ropes, jail uniforms dyed to look like street clothes, and a cut window bar.

Casas was charged with accepting bribes and providing an implement for escape for smuggling the tacos, which he had picked up from Keller's girlfriend, Tiffany Contreras, in exchange for bottles of Xanax. Contreras testified against Casas at trial. "I said here's the food. The bottom three have the blades and the two tacos on top don't have them," she told the jury. Contreras and Keller were not charged.

Prosecutors claimed that Casas had a Xanax addiction which led him to agree to smuggle the hacksaw blade-laden tacos. He was found guilty on July 26, 2011 and sentenced to two years in prison and a $15,000 fine.

That was the third time a Bexar County jail guard was busted for smuggling contraband in food items. Another guard, William Douglas Hemphill, was sentenced to five years deferred adjudication on July 25, 2011 for smuggling a cell phone into the jail in a box of Ramen noodles, while in May 2011 former guard Robert Falcon received a six-year sentence for smuggling barbacoa tacos filled with heroin.

When sentencing Hemphill, State District Judge Sid Harle suggested that the jail re-think its policy of allowing jailers to bring in their own food. "We are looking at different options, but it has been difficult," stated deputy chief Roger Dovalina, who noted that guards do not get lunch breaks and thus many bring their meals with them.

Apparently the jail has not considered searching the guards when they arrive for work, including X-raying their lunch boxes. ◼

Sources: *www.mysanantonio.com, www.abcnews.go.com, www.crookedsapd.com*

PLN_0001346

# $725,000 Award in Negligent Medical Care Suit Involving Poisoned New York Prisoner

A New York Court of Claims has awarded $725,000 to the estate of a prisoner who died due to medical neglect after being poisoned at the Sing Sing Correctional Facility.

Rodney Williams, 20, was three weeks from being released after serving a sentence for car theft when he died on October 9, 2003. At around 3:30 a.m. that day, Williams informed guard Clifford Mayfield that he was vomiting. While waiting for a supervisor to gain entry to Williams' cell, Mayfield observed blood in the toilet and vomit on the side of the toilet and on the floor. Williams was incoherent, unable to stand without distress, and expressed a belief that his coffee had been poisoned by another prisoner.

Mayfield called Nurse Leacy J. Miller at Sing Sing's emergency room (ER) to report Williams' condition. She advised that he be taken to sick call at 7:00 a.m., but Mayfield convinced his supervisor that Williams "needed to get out of the cell ... we got to get him to that ER."

At 5:30 a.m., Mayfield carried Williams, who was unable to walk, down two flights of stairs. At the ER, Williams informed Nurse Miller that he thought "somebody put something in my coffee."

During trial in the lawsuit subsequently filed by Williams' estate, Miller said she thought Williams looked drunk. The court noted, however, that she did not smell alcohol and that if he was drunk his condition required assessment for alcohol poisoning. Neither Miller nor the infirmary nurse, Tensie Robinson, made such an assessment.

Miller only took Williams' vital signs and called a physician's assistant. At first, the physician's assistant, Po Kum Kwan, ordered Williams to be seen at sick call. However, when advised that he was unstable, urinating on himself, unable to sit up and thought he had been poisoned, she ordered him to be taken to the infirmary where she would see him later.

Williams arrived at the infirmary at 5:45 a.m. He was in a wheelchair and was lethargic and incontinent. He was placed in a room but Kwan was not allowed to treat him between 7:15 and 7:30 a.m. due to only one guard being available. Seeing he was not in distress in the dark room, she left without further examination beyond observing him through a window.

An examination was not attempted until between 8:30 and 9:00 a.m. when a doctor arrived, but by then Williams was dead. An autopsy revealed he had died from pulmonary edema caused by barium poisoning. Barium, which is used to kill rodents, can be found in the hair removal product MagicShave, which is commonly available in prison commissaries.

In its December 22, 2010 decision, the Court of Claims found that Sing Sing's medical staff was negligent and Williams' death could have been prevented. "Poison control should have been called, blood work should have been performed and IV fluids should have been administered," the court wrote.

Williams' estate was represented by attorneys Alan Fuchsberg and Elena Carter. See: *Hartley v. State of New York*, New York Court of Claims, UID No. 2010-010-060, Claim No. 111400.

Additional source: *New York Daily News*





**INMATE CONNECTIONS.com** & ConvictPenPals.com!
465 NE 181st, #308 Dept. PLN Portland OR 97230
Since 2002 – Write for FREE brochure!

**inmateMAGS.com** formerly MyMagstore.com
Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **50+ Page Full Catalog** ($3 Discount Coupon Included)

InmateMAGS.com        Mymagstore.com        www.inmateMAGS.com
4208 University Way NE   Info@mymagstore.com    Info@inmatemags.com
Seattle, WA 98105        877-324-7323           206-322-6397



# Earn an Adams State College Degree via Correspondence Courses

- Correspondence Courses via mail   • No internet access required
- Degree options available — Associate of Arts or Science, Accounting, Business Administration, Interdisciplinary Studies, Legal Studies, Management, Marketing, Paralegal Certificate Program
- Affordable tuition — $165/semester hour for correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 15+ years of experience serving incarcerated students
- FREE unofficial evaluation of previously earned credits



ADAMS STATE COLLEGE
C O L O R A D O
*Great Stories Begin Here*
EXTENDED STUDIES

Call or write to receive additional information — 800-548-6679
Office of Extended Studies, Box CC • Adams State College • 208 Edgemont Blvd. • Alamosa, CO 81102

PLN_0001347

# Alabama Sheriff Capitulates to ACLU in Challenge to Denial of Attorney Visits

The ACLU of Alabama has reached a settlement that allows its staff members to have consultation visits with prisoners at the Fayette County Jail (FCJ). The settlement was reached within six weeks after the ACLU sued the county.

The ACLU had been investigating allegations of serious violations of detainees' constitutional rights at county jails across Alabama. Its staff was gathering information through correspondence with detainees and former detainees, and by face-to-face interviews at jails.

Attempts to visit with prisoners at the FCJ were met with resistance by jail staff. Between July 2010 and January 2011, ACLU employees were refused opportunities to meet with two prisoners on multiple occasions.

FCJ detainee Felix Robinson contacted the ACLU by letter in May 2010 to request that he discuss with ACLU staff conditions at the jail. ACLU law fellow Jared Shepherd called the FCJ to schedule a visit with Robinson. However, he was advised that he could not visit with detainees unless he was on their visitation list or provided proof that he was the detainee's attorney of record. Sheriff Rodney Ingle did not respond to an ACLU letter concerning the matter.

ACLU legal director Allison Neal met similar resistance when trying to visit with FCJ detainee James Marion Tidwell in November 2010. Tidwell had made two efforts to contact the ACLU and Shepherd, and he only came to the ACLU's attention when a third party contacted the organization on his behalf.

Neal and Shepherd made several attempts to visit detainees by personally arriving at the jail in December. They were told Tidwell had been transferred to a state prison. They were also turned away upon trying to see Robinson, on the basis that "the schedule was full."

Once again, Sheriff Ingle did not reply to an ACLU letter regarding the lack of access to FCJ prisoners. A lawsuit that sought to vindicate the ACLU and Neal's rights under the First Amendment to speak with detainees seeking legal representation was filed on March 9, 2011. Ingle quickly capitulated, settling the case the following month.

The settlement provides that visitation arrangements will be made between the ACLU and a designated FCJ staff member. It establishes that visits will be made available seven days a week, with no time limit for such visits. Visitation will be allowed without ACLU staff needing to be on a detainee's visit list and the ACLU may meet with any prisoner who requests its assistance. The settlement also provides that FCJ staff will not interfere with mail sent by prisoners to the ACLU.

Detainees will not be forced to visit with the ACLU, but if FCJ staff claims that a prisoner refuses a visit, the ACLU may request the refusal in writing. Further, jail staff may not threaten or take retaliatory action against detainees who request the ACLU's assistance. Both parties agreed to bear their own attorney fees and costs. See: *ACLU v. Ingle*, U.S.D.C. (N.D. Ala.), Case No. 6:11-cv-00913-PWG. ◼

# Oregon Jail Suicides Lead Grand Juries to Fault Prevention Efforts, Staff Training

### by Mark Wilson

A January 3, 2011 grand jury report found that suicide prevention was a major concern at the Multnomah County Detention Center (MCDC) in Portland, Oregon. Seventeen days later that finding was tragically underscored by the jail's third suicide in 10 months.

On January 18, 2011, Michael J. Holmes, 37, was arrested on drug charges and booked into MCDC. The charges were dismissed the next day, but Holmes remained in custody on a parole violation warrant. He was segregated due to past fights with other prisoners.

Two days later a guard discovered Holmes' body during an 11:30 a.m. security check. He was hanging by the neck from a bed sheet tied to a window bar above his bunk.

"Anytime you have a suicide, it demands action," said Michael Shults, chief deputy of the corrections division. "This is unacceptable. It is a terrible tragedy. Anytime a loss of life happens, we need to take action."

On January 21, 2011, Multnomah County Sheriff Dan Staton asked the Oregon State Sheriff's Association to request that two commanders from outside agencies independently review MCDC's practices. He also asked a national suicide prevention expert to review the county's policies and procedures.

The MCDC's housing plan was changed so that all suicidal detainees would be held on the same floor, allowing for better observation by jail staff. Suicide prevention bars were installed on upper tiers to prevent detainees from jumping off the top level, and hooks were removed from showers to thwart hangings.

The grand jury report blamed the July 2009 move from two- to one-man cells at MCDC for an increase in suicides. In the four years prior to that change there was only one suicide at the jail, which occurred in a single cell. Two prisoners killed themselves within one year after the change.

"Although this might simply be a statistical aberration, mental health staff is concerned that it is not and that it represents a potential system flaw," the grand jury wrote.

MCDC officials plan to remove the metal from the unoccupied bunks that remain in the single cells and to seal up anything that could be used for hanging.

Chief Deputy Shults admitted that staff at the jail had not received suicide prevention training for years. "It's got to happen," he stated.

Meanwhile, just ten miles from MCDC at the Washington County Jail in Hillsboro, another detainee committed suicide one day after Holmes killed himself.

Alexander Jay, 40, had been held at the jail since December 2009. He was convicted of rape and other sex offenses in December 2010 and scheduled for sentencing at 1 p.m. on January 21, 2011. A guard discovered him unconscious in his cell at 11:34 a.m., according to Sheriff's spokesman Vance Stimler. Jay apparently bled to death after stabbing himself with

PLN_0001348

a pencil; attempts to revive him were unsuccessful and he was pronounced dead at the jail.

In Clackamas County, a 2010 corrections grand jury found that jailers lacked adequate training to respond to mentally ill prisoners. The report noted that other grand juries in 2008 and 2009 had called for jail staff to complete "crisis intervention training" (CIT), but it still had not occurred.

"The CIT training has not been completed for corrections deputies, with no completion date set, and there are no plans for additional training in dealing with the mentally ill," the grand jury report observed.

Clackamas County Sheriff Craig Roberts noted that the number of mentally ill prisoners had risen. Between 18 and 30 percent of prisoners suffer from severe mental illness, according to intake evaluations. As many as 50 to 80 percent may suffer from minor to moderate mental health problems, Roberts acknowledged. Detainee psychiatric medications cost the county more than $140,000 annually.

Roberts also claimed that staff training was a top priority. On February 29, 2011, just as the Clackamas County grand jury findings were released, the county launched a new weeklong crisis intervention class.

"Getting everyone through the 40-hour course is going to take time," said Roberts. "Class size is intentionally small because it is so intensive in the various scenarios they work through. But we certainly are committed to getting everyone through the training."

The jail's 24 lieutenant and sergeant supervisors have completed the course, according to Jail Commander Mike Alexander. "We had them go through first so that someone with that training would be on duty during every shift at the jail," he said. "Now, we're beginning to send the 69 floor deputies through the course, too." Unfortunately, suicides among detainees in Oregon jails persist. On March 6, 2011, prisoner Kit Milo Brittain, 29, was found unconscious at the Springfield Municipal Jail, where he had been held for eight days. He hung himself with a bed sheet and later died. "His behavior appeared to be normal [with] no signs of depression," said police chief Jerry Smith. Brittain was alone in his cell at the time he committed suicide; he had been arrested on misdemeanor charges of urinating in public, escape and resisting arrest.

And on July 17, 2011, a deputy at the Washington County jail found Ryan Douglas, 44, hanging in his cell from a bed sheet, one day after he was arrested on a number of charges that included a probation violation, reckless driving and escape from a community corrections center. 

Sources: *The Oregonian, www.kuik.com, www.registerguard.com*

# WILLIAM L. SCHMIDT
*Attorney at Law*

## Have you been seriously injured?
## Wrongly convicted? Denied parole?

Accidents § Appeals § Police Brutality

*Federal • State • Local*

Civil Rights, Writs, Parole Hearings, Transfers,
Classification, Visiting, Medical

*Providing Justice Throughout California by Plane*

377 W. FALLBROOK, SUITE 207, FRESNO, CA 93711
P.O. BOX 25001, FRESNO, CA 93729-5001
*legal.schmidt@gmail.com*
559.261.2222

## FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription!
Quarterly drawing **WINS $100!** **(Void in New York)**
(Last Quarter's winner from **Navasota, TX.**)
**TELL YOUR FRIENDS!  ACT NOW!!**

## PO Box 2063 • Fort Walton Beach FL. 32549
## www.InmateMagazineService.com

# Inmate Magazine Service Inc.

PLN_0001349

# Incapacitation Good Cause for Untimely Exhaustion Under PLRA

The Seventh Circuit Court of Appeals has held that physical incapacitation constitutes good cause for failure to exhaust administrative remedies within the time frame set by prison officials. As such remedies are not "available" within the meaning of the Prison Litigation Reform Act (PLRA) when a prisoner is physically unable to pursue them, the filing of a grievance when the prisoner can do so meets the PLRA's requirements.

The Seventh Circuit issued its decision in the appeal of Illinois prisoner Joseph R. Hurst, whose civil rights complaint alleged that prison medical staff had been deliberately indifferent to his serious medical needs. Hurst claimed that staff failed to promptly treat him after he suffered a stroke, violating his Eighth Amendment rights.

Under Illinois law a prisoner must file a grievance within 60 days of the event giving rise to the complaint. Hurst did not file a grievance until eight-and-a-half months after his stroke. He appealed the denial of his grievance, arguing that his untimely filing was the result of being "almost totally incapacitated" by the stroke "until just recently." That, Hurst argued, constituted "good cause" to excuse his late filing. Prison officials disagreed and denied his appeal.

In response to Hurst's subsequent lawsuit, prison officials moved for summary judgment for his failure to exhaust administrative remedies as required by the PLRA. The district court granted the motion. The court found that Hurst had failed to present evidence of his incapacitation either to prison authorities or in support of his lawsuit.

On appeal, the Seventh Circuit separated the two issues. As to the first, the appellate court noted that the "Illinois Administrative Code does not require a prisoner to attach evidence to a claim of good cause, any more than the Federal Rules of Civil Procedure require a plaintiff to attach evidence to his complaint." Prison officials could have required Hurst to demonstrate good cause, but they did not do so when they denied his appeal on the grounds that there was "no justification to justify an untimely filing."

The defendant prison officials, in their brief, refused to acknowledge that physical incapacitation is good cause for an untimely grievance. "The implication is that even if the plaintiff had been in a coma for 60 days after the allegedly willful failure to treat his stroke promptly, he would have forfeited his administrative remedies, thus blocking his access to the federal courts."

The Seventh Circuit agreed with other courts that had found administrative remedies are not available to a prisoner who is physically unable to pursue them. Still, the Court of Appeals ruled against Hurst. The Court emphasized that it was affirming the lower court not because Hurst had failed to present evidence to prison officials to prove his incapacitation, but because he did not present such evidence to the district court in response to the defendants' motion for summary judgment.

Hurst filed a petition for writ of certiorari to the U.S. Supreme Court on May 10, 2011, which is pending. See: *Hurst v. Hantke*, 634 F.3d 409 (7th Cir. 2011), *rehearing denied*. ◼

# Federal Court Rules on Exhaustion Issues for Joined Plaintiffs in Lawsuit Against CCA

On October 18, 2010, an Idaho federal court held that prisoners who were subjected to confusing rules and advice from prison officials regarding how to raise grievance issues had adequately exhausted their administrative remedies when they tried to raise those issues in disciplinary proceedings. The court also held that prisoners who joined the lawsuit had timely exhausted their administrative remedies when they completed the exhaustion process after the suit was filed but before joining.

Idaho state prisoner Marlin Riggs filed a civil rights action under 42 U.S.C. § 1983, alleging that prison officials at the Idaho Correctional Center (ICC), which is run by private prison firm Corrections Corp. of America (CCA), "failed to protect him from violence and were deliberately indifferent to his serious medical needs." Riggs sought monetary, declaratory and injunctive relief.

Later, six other prisoners joined Riggs' lawsuit based upon assaults that occurred after the case was filed. According to a 2008 study by the *Associated Press*, ICC had more reported violent assaults than at Idaho's seven state prisons combined. The joined plaintiffs sought only declaratory and injunctive relief. The prisoners, represented by the ACLU, filed a motion for certification as a class-action suit.

The defendants moved for summary judgment, arguing that the six joined plaintiffs had not properly exhausted their administrative remedies pursuant to the Prison Litigation Reform Act (PLRA) because they had not completed the process before the suit was filed and some had raised issues during disciplinary proceedings instead of through the grievance system. The defendants also sought dismissal of one plaintiff who had been transferred to another facility and one who had been released on parole.

According to the complaint, plaintiffs Andrew Ibarra, Joe Rocha and Joshua Kelly were incarcerated in ICC's North Wing when they were told to move to the West Wing. They informed prison officials that members of a rival gang were housed in that unit and they would be attacked if moved there. They were ordered to move anyway.

Two hours after they arrived in the West Wing, ten to fifteen rival gang members attacked and beat them during the evening meal. Plaintiffs Jose Piña and Ray Barrios, who were seated nearby, were also assaulted. Each of the five received disciplinary infractions for fighting even though they allegedly did not fight back. When they tried to grieve the failure of prison staff to protect them, they were told to raise the issue during their disciplinary proceedings.

The rules for filing grievances were confusing and also could be interpreted as instructing the prisoners to raise the failure to protect issue in disciplinary proceedings. Disciplinary officials refused to address the issue at the hearing or appellate stages. Only Kelly received any relief through the disciplinary process; he was found not guilty.

The district court held that, except for Rocha, all of the joined plaintiffs had sufficiently exhausted their administrative remedies because the confusing grievance rules and advice from prison officials led them to believe they had to raise the failure to protect issue in their disciplinary proceedings. Moreover, when they tried to

PLN_0001350

address that issue in grievances they were rebuffed by CCA staff.

Rocha, however, did not mention failure to protect during his disciplinary proceedings or in a grievance, so he did not exhaust his administrative remedies; also, none of the plaintiffs had raised inadequate post-assault medical care in their disciplinary proceedings, thus that claim was deemed not exhausted.

Another plaintiff, Randy Enzminger, was subjected to multiple serious beatings after he refused to pay "rent" to prisoners demanding payment in his housing unit. Prison staff had failed to move him after he reported threats and told them he feared for his safety. They still refused to move him after two beatings. Enzminger exhausted his administrative remedies on the failure to protect issue, then joined the lawsuit.

The district court held that the joined plaintiffs only had to exhaust their administrative remedies before joining the suit, not before the suit was filed. Therefore, Enzminger, Ibarra, Piña, Barrios and Kelly had properly exhausted the failure to protect claim. Ibarra, who had been released on parole, and Barrios, who was transferred to another prison, were allowed to continue as prospective class representatives, at least temporarily, because the circumstances in the case were inherently transitory – an exception to the rule that cases become moot when the circumstances no longer apply to a plaintiff who represents a class.

The court dismissed Rocha from the suit and dismissed the deliberate indifference to serious medical needs claims of all the remaining plaintiffs except Riggs (Riggs' medical care claim was later dismissed for failure to exhaust in a separate court order). Allowing Ibarra and Barrios to continue as prospective class representatives, the court ordered the plaintiffs to renew their motion for class certification. See: *Riggs v. Valdez*, U.S.D.C. (D. Idaho), Case No. 1:09-cv-00010-EJL; 2010 WL 4117085.

On April 27, 2011, the district court denied the plaintiffs' renewed motion for class certification and granted a motion to sever the damages claims in the case from the claims for declaratory and injunctive relief. The injunctive and declaratory relief claims were filed as a separate action in *Kelly v. Wengler*, U.S.D.C. (D. Idaho), Case No. 1:11-cv-00185-EJL. Both cases settled as this issue of *PLN* goes to press and will be reported on in an upcoming issue. ◼

Additional source: *www.aclu.org*

# California Appellate Ruling Holds Court Fee Inapplicable to Pre-2009 Convictions

The California Court of Appeal has held that a $30 to $35 court facilities fee imposed by a non-penal statute, Government Code § 70373, does not apply to cases in which the defendant pleaded guilty, or was found guilty by a jury, before the statute's effective date of January 1, 2009.

In June 2008, six months before Government Code § 70373 went into effect, Bruce Wayne Davis entered a plea of no contest to a charge of being a felon in possession of a firearm. He was not sentenced, however, until March 2009 – after the statute went into effect – and the court imposed a $30 facilities fee.

The Court of Appeal reversed the imposition of the fee on June 18, 2010, finding that the statute imposes a fee on "every conviction for a criminal offense," and that a "conviction" occurs when a defendant enters a plea of guilty or a jury returns a guilty verdict.

Since Davis' plea was entered before January 1, 2009 and new laws are presumed to operate prospectively only, the court facilities fee could not be assessed in his case. See: *People v. Davis*, 185 Cal. App. 4th 998, 112 Cal.Rptr.3d 70 (Cal. App. 2 Dist. 2010). ◼

**Tightwad Magazines**

100s of Popular Magazines.
Write for New Color **GIFT** Catalog
Discount Prices, Postage Stamps
Accepted for some Magazines.
**Tightwad Magazines (PLN)**
PO Box 1941 Buford GA 30515



TO GET YOUR NEW COLOR CATALOGS 14 AN 15 YOU MUST SEND A SELF ADDRESSED STAMPED ENVELOPE WITH 10 STAMPS INSIDE. NO EXCEPTIONS!

WHOLESELL CATALOG#1 IN LARGE PRINT ONLY $7.00 FREE S/H
OPTION 2: TO RECEIVE THE 7 CATALOG PACKAGE ALONG WITH 3 FREE PICS YOU MUST SEND $7.00 OR 40 STAMPS (FREE S/H)

GET THE ALL NEW SUPERSIZED HIGH GLOSS COLOR VIP CATALOG #4 OVER THOUSANDS TO CHOOSE FROM ALL RACES! NON NUDE STRIPPERS, PORN STARS AN ALL!! ONLY $15.00 [FREE S/H] INCLUDES 2 FREE PICS THE BIGGEST AND BEST CATALOG EVER!!

ALL NUDE CAT #4 $15.00 [FREE S/H] COMES WITH FREE PICS

PLEASE MAKE ALL PAYMENTS TO FIYA GIRLS P.O. BOX 2545 DEPT-PN HOUMA LA 70361

GET MAIL AND GET PAID INSTRUCTIONS STILL ONLY $10.00

*Dedicated To Helping Prisoners Get The Relief They Are Entitled To*

# CrackMotions.com

**For Less Than 100$,** Our Legal Professionals Will Help You File For A Sentence Reduction Based On The Retroactive Crack Amendment.

Have A Family Member, Friend, or Loved One Visit Our Website Today

*Price Does Not Include Sales Tax For Texas Orders.*

## PLN Files Censorship Suit Against NYDOCS

On October 11, 2011, Prison Legal News filed suit against New York State Department of Correctional Services officials, including NYDOCS Commissioner Brian Fischer.

The lawsuit, filed in the U.S. District Court for the Southern District of New York, alleges First and Fourteenth Amendment violations related to the unconstitutional censorship of PLN's monthly publication, books and correspondence at NYDOCS facilities statewide.

Specifically, PLN claims that the NYDOCS has an "unconstitutional policy of prohibiting inmates from receiving any and all books, magazines, letters and postcards distributed by Plaintiff, including letters from Plaintiff's attorney...," which "deprives Plaintiff, as well as its subscribers, of important First Amendment rights and serves no neutral, legitimate penological purpose."

According to PLN's complaint, NYDOCS maintains a list of "disapproved vendors" that are not allowed to send publications to prisoners and PLN has been placed on that list because it accepts payment for its monthly publication and books in the form of postage stamps. As a result, state prison officials unilaterally censor "PLN's monthly publications, books, subscription renewal letters, fundraising letters, informational brochures, routine subscription inquiry postcards and even letters from PLN's attorney."

"The actions of the New York Department of Correctional Services are unconstitutional, and blatantly so," said PLN editor Paul Wright. "State prison officials are using pretextual excuses to censor our publication and books, which inform prisoners how to vindicate their few remaining rights. The government should not be in the business of restricting what people can read even if those people are incarcerated."

Bob Keach, one of the attorneys representing PLN, added that "DOCS is censoring all PLN publications, including publications that PLN provides to prisoners for free, such as the *Prisoner Diabetes Handbook*. The ban on PLN publications has nothing to do with accepting stamps and everything to do with precluding prisoners from learning the valuable information contained in PLN publications, including, not incidentally, how to sue DOCS when their rights are violated."

PLN is seeking a declaration that NYDOCS's policy of censoring reading material sent to New York state prisoners is unconstitutional, as well as injunctive relief, actual and punitive damages, attorney fees and costs.

PLN is represented by Amsterdam, New York attorney Elmer Robert Keach III and Human Rights Defense Center chief counsel Lance Weber. See: *Prison Legal News v. Lee*, U.S.D.C. (S.D. NY), Case No. 7:11-cv-07118. ◾

## Ninth Circuit Holds Serious Risk to Prisoner's Health Posed by Year-Long Denial of Outdoor Exercise "Obvious" as a Matter of Law

### by Mike Brodheim

In a 42 U.S.C. § 1983 suit brought by a California prisoner who was denied outdoor exercise for 13 months and 25 days while he was housed in a maximum security unit, the Ninth Circuit held that the risk to the prisoner's health was serious and "obvious" to prison officials as a matter of law. The Court of Appeals further held that there was a genuine issue of material fact as to whether prison officials had acted reasonably under the circumstances in the case.

In July 2005, after two guards were stabbed and seriously wounded by a prisoner in Facility C at Salinas Valley State Prison (SVSP), prison officials placed the maximum security housing unit on lockdown. Nearly two months later they implemented a "modified program" that allowed non-contact visits but little else. In particular, the modified program denied prisoners all out-of-cell exercise.

After another month the Facility C Captain, G. Ponder, issued a memorandum explaining that the decision to return prisoners to "normal" programming would be made on a case-by-case basis. Under the terms of the memorandum, each prisoner would be interviewed, asked to commit in writing to participate in programs without violence, and then asked to sign a "pledge" form to that effect.

Otis Thomas, a Facility C prisoner who had no involvement in the July stabbings, was interviewed several times between August 2005 and June 2006. Each time he committed in writing to program non-violently, but balked when it came to signing a pledge. Because he refused to sign the pledge, prison officials refused to return Thomas to normal programming. He continued to be denied access to outdoor exercise until August 2006 when – tired, severely stressed and many pounds lighter – he reluctantly agreed to sign the non-violence pledge.

Subsequently transferred to Centinela State Prison, Thomas filed suit alleging that SVSP officials, including Captain Ponder, had violated his Eighth Amendment rights by denying him any opportunity for outdoor exercise for nearly 14 months. The defendant prison officials moved for summary judgment, which the district court granted.

On appeal, in a July 16, 2010 decision the Ninth Circuit agreed with the district court that the lengthy denial of outdoor exercise was "sufficiently serious" to satisfy the objective component of an Eighth Amendment claim. The Court of Appeals disagreed with the district court, however, that Thomas had fallen short with respect to the subjective component of his Eighth Amendment claim – i.e., whether prison officials had acted with "deliberate indifference."

Showing deliberate indifference, the Ninth Circuit noted, entails two steps. First, it must be shown that prison officials were aware of a "substantial risk of serious harm" to a prisoner's health or safety. Then it must be shown that the officials failed to act reasonably in light of all of the circumstances.

As to the first step, the appellate court held that as a matter of law, the potential consequences from extended deprivation of out-of-cell exercise were "obvious." As to the second step, the Court of Appeals was deeply skeptical that, on remand, prison officials would be able to justify as "reasonable" a nearly 14-month-long deprivation of outdoor exercise predicated solely on a prisoner's refusal to sign a pledge form. The district court's grant of summary judgment to the defendants was reversed and the case remanded for further proceedings. See: *Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010). ◾

PLN_0001352

# PLN FUNDRAISER 2011



### *Please Support Prison Legal News and the Human Rights Defense Center!*



Prison Legal News, a project of the non-profit Human Rights Defense Center, cannot fund its operations through subscriptions and book sales alone. We rely on donations from our readers and supporters like you!

PLN conducts one fundraiser a year, and this is it; we don't bombard our readers with donation requests, only ask that if you are able to contribute something to our important work, please do so. Every dollar counts and is greatly appreciated and will be put to good use.

## Where does your donation go? Here's some of what we've done in the past year:

- Celebrated our 20th Anniversary of publishing *Prison Legal News*, which is the longest-running publication devoted to prison, jail and criminal justice-related news in the U.S.
- Published our second in-house book, "The Habeas Citebook: Ineffective Assistance of Counsel," by Brandon Sample.
- Filed a wrongful death suit on behalf of the family of a prisoner who died due to medical neglect at a jail in Nashville, Tennessee.
- Filed censorship lawsuits against jails in New Orleans, Kansas, Michigan, Arizona, California and South Carolina. We settled censorship cases involving jails in Georgia, Louisiana and Texas, as well as censorship suits against the Virginia DOC and a CCA prison in Arizona.

## With your help we can do more! You can mail a check or money order to:

### Prison Legal News, P.O. Box 2420, W. Brattleboro, VT 05303

*Or* call PLN's office at 802-257-1342 and use your credit card to donate.
*Or* visit PLN's website at www.prisonlegalnews.org and click on the "Donations" link.

## PLN Support Gifts

### Gift option 1

As a token of our gratitude for your support, we are providing the PLN card when making a donation of $50. The card is hand  embroidered by women prisoners in Bolivia who are paid a fair wage for the cards to help support their families.

### Gift option 2

In recognition of your support, we are providing the PLN hemp tote bag when making a donation of at least $75. Handmade in Vermont using hemp fiber. Carry books  and groceries stylishly and help end the war on drugs!

### Gift option 3

To show our appreciation for your support, we are providing the following selection of books for you to choose from when making a donation of $100. Donations of $100 or more can choose one free title. Each $100 donation entitles you to another free title; i.e., donate $500 and you get five books! $1,000 and you get everything on the page! Please circle the books you want and send the corresponding donation amount.










### Gift option 4

As a thank you gift for your support, we are providing the entire PLN anthology of critically acclaimed books on mass imprisonment signed by editor Paul Wright! (The Ceiling of America, Prison Nation and Prison Profiteers) plus the PLN hemp tote bag to carry the books in when making a donation of $250 or more.





PLN_0001353

# Former Judges in "Cash for Kids" Scandal Sentenced

## *by Derek Gilna*

Two former Pennsylvania state court judges who were accused by federal prosecutors of running a multi-million dollar scheme to send juvenile offenders to privately-run prisons in exchange for bribes have been sentenced.

Former judge Mark A. Ciavarella, Jr., 62, who presided over the juvenile court system in Luzerne County, brought national attention to the "kids for cash" scandal and highlighted what many legal experts say is a dangerous practice in juvenile justice proceedings – children appearing in court and pleading guilty to crimes without representation by attorneys.

Prosecutors alleged that Ciavarella had sentenced thousands of juveniles to be confined in two private detention centers – PA Child Care and Western PA Child Care. He was paid almost $1 million for sending youths as young as ten years old to the facilities, many for first-time or minor offenses. The state of Pennsylvania has since expunged more than 5,000 juvenile criminal records in cases handled by Ciavarella. [See: *PLN*, June 2010, p.26; Nov. 2009, p.42; May 2009, p.20].

According to Laurence H. Tribe, a constitutional law expert, "It was a terrible lesson. It highlighted the dangers for juveniles who don't know their rights, haven't talked to a lawyer, and are urged by overburdened courts to take a plea. Once that happens, future opportunities for the child are essentially gone."

The U.S. Attorney's office, through Assistant U.S. Attorney Gordon Zubrod, described Ciavarella's actions over a seven-year period as a plot to enrich himself. The prosecution alleged that the judge had approached a Luzerne County lawyer and property developer about building a private detention center for the county, shutting off the flow of offenders to the existing county-operated juvenile facility.

Ciavarella was sentenced to 28 years in federal prison on August 11, 2011 after a jury convicted him of 12 counts of racketeering, bribery and conspiracy. He was acquitted of 27 other counts. Although defiant in arguing that he did nothing wrong, Ciavarella said he blamed "no one but myself" prior to being sentenced.

Another former Luzerne County judge, Michael T. Conahan, 59, who controlled the courthouse budget, cooperated with prosecutors and pleaded guilty in 2009 to racketeering conspiracy charges. He was accused of receiving around $1 million in bribes as part of the "kids for cash" scandal and was sentenced to 17½ years in federal prison on September 23, 2011. "The system is not corrupt," he stated. "I was corrupt." Which implies that the prosecutors, judges, criminal defense lawyers, county commissioners and court room personnel who witnessed the mass imprisonment of thousands of children and did nothing are blameless and not complicit in the matter. A system that ignores corruption at this level aids and abets the individual corruption.

Conahan and Ciavarella are also subject to a $2.8 million criminal forfeiture action. According to Zubrod, "They turned the Court of Common Pleas into a criminal enterprise." Robert Powell, an attorney who co-owned the private juvenile detention centers, and Robert Mericle, the developer who built them, have not yet been sentenced. ◾

Sources: *New York Times, Huffington Post, www.timesleader.com, www.rt.com, www.cbsnews.com*

# U.S. Supreme Court Holds Civil Contemptor Facing Incarceration Requires Procedural Safeguards Absent Counsel

The U.S. Supreme Court held on June 20, 2011 that counsel need not be provided to a person facing civil contempt for failure to pay child support so long as the state has "in place alternative procedures that assure a fundamentally fair determination of the critical incarceration-related question: whether the supporting parent is able to comply with the support order."

A South Carolina family court ordered Michael D. Turner to pay $51.73 weekly to Rebecca Rogers to help support their child. Turner repeatedly failed to do so, and was held in contempt five times as a result. For the first four contempt findings he was sentenced to 90 days in jail; of those he avoided jail twice by paying, and only spent a few days behind bars the other two times.

The fifth time he was found in contempt Turner served six months in jail, which put him in arrears of $5,728.76 on his child support obligations. After his release the family court clerk issued a new "show cause" order against him. At a hearing during which neither Turner nor Rogers had counsel, the court again found Turner in contempt and imposed a 12-month sentence.

The court did not make a finding as to his ability to pay and did not indicate on the contempt order form whether he was able to make support payments. Turner obtained pro bono counsel, who argued that he was entitled to an attorney at the contempt hearing. The South Carolina Supreme Court rejected his claim and the U.S. Supreme Court granted certiorari. [See: *PLN*, July 2011, p.40; May 2011, p.22].

The Supreme Court first held that although Turner had completed his sentence, the case was not moot because it was "capable of repetition" while "evading review." Specifically, the prison sentence that Turner received was "too short to be fully litigated" and there was a reasonable likelihood that he would again be "subjected to the same action" because he had regularly failed to make child support payments.

The Court noted its precedents provided no definitive answer as to whether the Due Process Clause grants an indigent defendant a right to state-appointed counsel in a civil contempt proceeding that may lead to incarceration. While such a right attaches to criminal cases, "the Sixth Amendment does not govern civil cases." Civil contempt seeks to "coerce the defendant to do" what a court has already ordered, and once a civil contemptor complies "he is purged of the contempt and is free."

Even in cases where a person faces incarceration, the Fourteenth Amendment's Due Process Clause does not automatically require that counsel be provided to an indigent noncustodial parent who is subject to a child support order. This is especially true when the opposing parent is unrepresented by counsel and the state provides alterna

tive procedural safeguards.

Although an attorney is not always required in civil contempt proceedings, a set of "substitute procedural safeguards" is necessary to significantly reduce the risk of an erroneous deprivation of liberty. Such safeguards include "(1) notice to the defendant that his 'ability to pay' is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information from him; (3) an opportunity at the hearing for [the defendant] to respond to statements and questions about his financial status; and (4) an express finding by the court that the defendant has the ability to pay."

The Supreme Court's decision did not address civil contempt proceedings where the underlying support payment is owed to the state, or the question of what due process is required in an unusually complex case in which a defendant "can fairly be represented by a trained advocate."

Turner's incarceration was found to violate due process. The Court noted that he had "received neither counsel nor the benefit of alternative procedures like those we have described. He did not receive clear notice that his ability to pay would constitute the critical question in his civil contempt proceeding."

The state court ruling was therefore vacated and the case remanded. Justices Thomas and Scalia filed dissenting opinions, in which Justices Roberts and Alito joined in part. See: *Turner v Rogers*, 131 S.Ct. 2507 (2011).

Part of the ongoing process that criminalizes poverty is the imposition of onerous and unpayable child support burdens on the poor which further increases the impact of mass imprisonment. Interestingly, in researching this article, there is no central source of statistics on how many people are imprisoned on a given day for failing to pay child support. ◾

# $370,000 in Annual Phone Revenue at Ohio Jail

At the Montgomery County jail in Dayton, Ohio, taking more than a half-million dollars annually from prisoners who want to call their loved ones is actually called "giving."

When asked by the *Dayton Daily News* about prisoners' telephone access in Montgomery County, Major Daryl Wilson explained, "We give them as many calls as they need to let people know where they are."

Of course all that giving has meant a windfall for Montgomery County and jail vendor Aramark Correctional Services, which will split more than $370,000 in revenue from sales of pre-paid phone cards.

The county's share of the sales – 42%, or about $156,000 annually – must be spent "to support the current jail inmate population," Wilson stated.

"We can't go out and buy new cruisers with that money," he said. "It has to be spent on the inmates, according to Ohio law."

The county will reap an additional $200,000 in 2011 from collect calls, which Wilson said is used to offset the cost for an operator and pays for maintenance to the jail's "heavy-duty telephones."

Montgomery County jail prisoners must wait three days after being booked before they are allowed access to the commissary. For $10 they can purchase a Global Tel*Link prepaid phone card that's good for three calls. Collect calls cost $2.75 plus $.20/minute. ◾

Sources: *Dayton Daily News, www.mcohio.gov*



**WELCOME TO KRASNYA BABES**

**WHY CHOOSE KRASNYA BABES?**
Thousands of the hottest and most scandalous babes found on the planet. Whatever your pleasure, KRASNYA delivers. Each catalog page has **120** beautiful girls posting just for you! Order one catalog page for only $3.00 +SASE or for 7 new First Class US Postage Stamps or US "Forever Stamps" with a SASE enclosed. We will send you Volume One. Each additional volume the same price! HELP US TO HELP YOU! We are more than happy to answer Email inquires however, due to mailing Cost at 0.44 Cents a letter, please enclose a SASE with your questions, **OTHERWISE NO REPLIES!**

**WHAT ABOUT OUR PRICES AND POLICIES**
Vivid 4x6 color prints as low as .50 cents per print on orders over 100, shipped in policy safe 25 picture packets.. If less than 100 pictures S & H is only $2.00 per packet.
**METHODS OF PAYMENT/CONTACT INFORMATION**
U.S. Postal Service Money Orders-State & Federal Correctional institutions checks payable to: **Krasnya L.L.C.**
NOW we accept Stamps as method of payment.
**Equation for First Class Forever Stamps**
Brand New Flat Book for all orders at the rate of $5.00 per book
We respond to our clients needs and try to help the best we can.
**Our seasonal specials mean a kickoff of savings!**
Offer included with catalog request!

**KRASNYA L.L.C.**
P.O. BOX 32082
BALTIMORE, MARYLAND 21282
E-MAIL AND CORRLINKS REQUESTS
ACCEPTED AT:
krasnyababes@hotmail.com

**Special Offer**

**Brand New Flat Book of 20 Forever Stamps**
Grab bags of 10 packs
We ～ pick up the selection for you
Send us Stamps and the following
Specify race and main area of interests



# Learn & Understand the Law

It can be a powerful influence in your life.

Whether you want to enhance your knowledge of the law, help others, or acquire a new skill — choosing Blackstone's independent study courses will put you on the road to a brighter future.

■ Learn Civil & Criminal Law
■ Learn Legal Research
■ 120 Years of Legal Training Experience
■ Study in Your Spare Time
■ Affordable Tuition, Easy Payment Plan

Only $59.00 Per Month

If you have a sponsor they must contact us by phone at: 1.800.826.9228

☐ **Yes!** I'd like to learn more
Please rush me FREE course information.

Name _____
Address _____
_____
City_____ State_____ Zip_____

☐ **Paralegal Course**
☐ **Advanced Paralegal Course**
• Civil Litigation
• Wills/Trusts/Estates
• Personal Injury/Torts
• Family Law
• Criminal Law

**Blackstone Career Institute**
SINCE 1890

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.

**P.O. Box 3717  •  Allentown, PA 18106**

PLN_0001355

# PLN Sues Jails in Louisiana, Washington State Over No-Publication Policies

On September 9, 2011, Prison Legal News filed separate lawsuits against the Orleans Parish jail in New Orleans, Louisiana and the Chelan County jail in Washington State over mail policy-related issues.

PLN's suit against Orleans Parish Sheriff Marlin Gusman, who oversees the Orleans Parish Prison (OPP) and its related correctional facilities, including the House of Detention, Old Parish Prison, Templeman V and Conchetta, alleges violations of the First and Fourteenth Amendments.

Beginning on September 15, 2010, PLN sent its monthly publication and copies of a book titled *Protecting Your Health and Safety* to 35 prisoners at OPP. However, pursuant to the jail's mail policy, the publications sent by PLN were censored and rejected. The Sheriff's website states that "No books, magazines, newspapers or periodicals of any kind" can be mailed to prisoners.

The mail policy specifies that books sent from publishers are to be reviewed by each facility warden to determine whether they are "acceptable." However, the policy provides no standards or criteria for censoring and excluding books, and books sent from distributors such as PLN (as opposed to publishers) are disallowed. Jail officials "are not making individualized determinations about the content of each publication before rejecting them in violation of clearly established First Amendment law," PLN claims.

According to PLN's lawsuit, the only books available for prisoners to purchase through the OPP commissary are the Bible, the Koran, a dictionary and ten mass market popular fiction novels which are described as "Best Seller 1," "Best Seller 2," etc. Books related to criminal justice, self-help, and civil and criminal legal topics, such as those offered by PLN, are excluded from the commissary list.

"Sheriff Gusman has plenty of problems on his plate right now," said PLN editor Paul Wright. "The jail continues to be under investigation for serious civil rights violations documented by the U.S. Department of Justice in a report released on September 11, 2009. The last thing the Sheriff should be doing is enforcing a policy that results in unconstitutional censorship in violation of the First Amendment, but that is exactly what's happening."

PLN is seeking a declaration that the jail's mail policy violates its rights under the First and Fourteenth Amendments, as well as injunctive relief, compensatory and punitive damages, attorney fees and costs. "We take our Constitutional rights seriously," said Wright.

PLN is represented by New Orleans attorneys Mary Howell, Elizabeth Cumming and John Adcock, and Human Rights Defense Center chief counsel Lance Weber. The case is *Prison Legal News v. Gusman*, U.S.D.C. (E.D. La.), Case No. 11-cv-02277.

PLN's lawsuit against Washington's Chelan County Regional Justice Center (RJC) and Sheriff Brian Burnett challenges a similar publications ban. According to PLN's complaint, the defendants "have adopted and implemented written mail policies and practices that unconstitutionally prohibit delivery to prisoners of periodicals or magazines, books, and other correspondence including but not limited to book catalogs, informational subscription brochures, and book offers."

Since December 2010, PLN mailed its monthly publication, books, book catalogs and informational brochures and subscription forms to numerous individual RJC prisoners. All of the publications sent from PLN were censored by jail staff pursuant to the facility's mail policy, and PLN did not receive "due process notice or an opportunity to appeal the censorship decisions."

According to the RJC's mail policy, "no subscriptions to any periodical or magazine will be allowed," and paperback books are banned. Prisoners at the facility can receive only one local newspaper. PLN argues that the jail's blanket ban on books, magazines and other reading material violates its rights under the First Amendment to send publications to RJC prisoners. Further, the lack of notice of censorship by jail staff violates PLN's due process rights under the Fourteenth Amendment.

PLN is seeking declaratory and injunctive relief plus nominal, compensatory and punitive damages and costs, including attorney's fees. PLN is represented by Jesse Wing and Katherine Chamberlain with the Seattle law firm of MacDonald Hoague & Bayless, and Human Rights Defense Center chief counsel Lance Weber. See: *Prison Legal News v. Chelan County*, U.S.D.C. (E.D. Wash.), Case No. 11-cv-00337-EFS. ◼

# Ninth Circuit Holds That Absconding Tolls Supervised Release for Federal Parolees

The time a released prisoner serves on supervised release is tolled when he or she absconds, the U.S. Court of Appeals for the Ninth Circuit held.

Manuel Ignacio Juarez was deported following completion of his federal prison sentence for bank robbery, but later illegally re-entered the United States. At the time he was deported and when he returned to the U.S., Juarez was still on three years supervised release following his federal prison term.

Upon re-entering the U.S., Juarez did not notify his probation officer that he had returned or where he was living. Two years passed and Juarez was convicted and sentenced to state prison in California for two robberies.

By then a federal warrant had been issued for violation of the conditions of his supervised release. After serving his state sentence, Juarez was taken into federal custody and his supervised release was revoked. He was sentenced to 18 months in federal prison following the revocation.

Juarez argued that the district court lacked jurisdiction to revoke his supervised release because the court's revocation warrant was issued after his period of supervised release had expired. The Ninth Circuit disagreed, holding that his supervised release was tolled once he returned to the U.S. and did not report to his probation officer.

"Fugitive tolling of a defendant's term of supervised release begins when the defendant becomes a fugitive," the appellate court wrote. See: *United States v. Juarez*, 601 F.3d 885 (9th Cir. 2010). ◼

PLN_0001356



**For every 2 subscriptions purchased @ $20 or more, get 2 subscriptions @ $10 Absolutely FREE!!!**

- We do not accept stamps as a form of payment
- We can route your magazine subscription at anytime anywhere in the US.
- $35.00 charge on all returned checks
- Each subscription is for a 1 year period. We are able to renew or extend any current subscriptions.
- %age of the proceeds are donated to 4 separate charities
- All Sales Are Final! No Refunds!!

All Magazines Subscriptions are for 1 year. Any additional years can be purchased. Just take the price and multiply by the number of years you would like to receive.

**FTWMAGS.COM**
Visit us on the WEB!!
**1-855-FTW-MAGS**
Call our toll FREE line!! (1-855-389-6247)

F T W MAGS

**Specializing in Magazine Sales to Inmates, Friends, and their Families.**
For a complete list of our Selection. send a self addressed stamped envelope to:

**FTW MAGS**
Attn: Magazine List
**505 Cornhusker Rd #181
Bellevue, NE 68005-7911**

In order to receive the 2 Free subscriptions you must purchase at least 2 separate subscriptions at $20.00 or more. You then have your choice of 2 subscriptions at $10.00, absolutely free of charge. Buy 4 of 20 or more, get 4 of 10 free.

**Please allow 30 to 90 days for your subscriptions to start. We assume no responsibility if your prison does not accept delivery of the magazines. Please Write Legibly!!! We are not responsible for your writing or errors.**

| Magazine | $ | Magazine | $ | Magazine | $ | Magazine | $ | Magazine | $ |
|---|---|---|---|---|---|---|---|---|---|
| 4 WHEEL & OFF ROAD | $10 | CAR AND DRIVER | $10 | FINALLY LEGAL | $40 | JUST 18 | $20 | SELF | $10 |
| ADVENTURE COMICS | $20 | CARIBBEAN TRAVEL & LIFE | $10 | FITNESS | $10 | KNITTING TODAY! | $20 | SHAPE | $10 |
| AGAINST THE CURRENT | $40 | CASINO PLAYER MAGAZINE | $40 | FLEX | $10 | KNIVES ILLUSTRATED | $30 | SIEMPRE MUJER | $10 |
| ALLURE | $10 | CATHOLIC DIGEST | $20 | FORBES | $30 | LADIES HOME JOURNAL | $10 | SKATEBOARDING | $10 |
| AMAZING SPIDERMAN | $40 | CBS WATCH! | $10 | FORUM | $10 | LATINA | $10 | SKEPTICAL INQUIRER | $30 |
| AMERICAN ARTIST DRAWING | $40 | CELEBRITY HAIRSTYLES | $30 | FOUR WHEEL & OFF ROAD | $10 | LEG ACTION | $20 | SLAM | $10 |
| AMERICAN CHEERLEADER | $10 | CELEBRITY SLEUTH | $20 | FOUR WHEELER | $10 | MARIE CLAIRE | $10 | SPIN | $10 |
| AMERICAN COWBOY | $40 | CESAR'S WAY | $16 | FOX | $40 | MENS FITNESS | $10 | SPORTING NEWS | $10 |
| AMERICAN INDIAN ART MAG | $40 | CHARISMA & CHRISTIAN LIFE | $20 | FUR FISH & GAME | $30 | MEN'S JOURNAL | $10 | SPORTS AFIELD | $30 |
| ANIMALS | $30 | CHEVY HIGH PERFORMANCE | $16 | GARDEN & GUN | $10 | MINI TRUCKIN | $10 | STEP BY STEP WIRE JEWELRY | $30 |
| ARTS & ACTIVITIES | $40 | COIN PRICES | $30 | GENESIS | $20 | MODIFIED MUSTANG & FORDS | $15 | STREET RODDER | $20 |
| ARTS & CRAFTS HOMES | $10 | COINS | $40 | GENTLEMENS QUARTERLY-GQ | $10 | MOTOR TREND | $10 | STREET TRUCKS | $30 |
| ASTRONOMY | $40 | COLLECTOR'S CROSSWORDS | $20 | GLAMOUR | $10 | MOTORCYCLIST | $10 | SUPER CHEVY | $10 |
| ATV MAGAZINE | $15 | COMICS BUYERS GUIDE | $40 | GOLF DIGEST | $10 | MUSCLE AND FITNESS | $10 | SUPER STREET | $15 |
| ATV WORLD | $15 | COMPLEX | $40 | GOLF WORLD | $15 | MUSCLE CAR REVIEW | $15 | SUPERB WORD FIND BONUS | $20 |
| AUTO ENTHUSIAST | $40 | CONSUMER REPORTS | $40 | GOLFWEEK | $15 | MUSCLE MAG INTERNATIONAL | $15 | SUPERGIRL | $20 |
| AUTOMOBILE | $10 | CROCHET! | $20 | GOOD HOUSEKEEPING | $15 | NAILPRO | $30 | SUPERMAN | $20 |
| AUTOWEEK | $20 | CUSTOM CLASSIC TRUCKS | $15 | GOOD TIME CROSSWORDS | $20 | NASCAR ILLUSTRATED | $10 | SUPERMAN/BATMAN | $20 |
| BASEBALL DIGEST | $20 | CYCLE WORLD | $10 | GOOD TIME VARIETY PUZZLES | $20 | NYLON | $10 | TODAY'S BLACK WOMAN | $20 |
| BASKETBALL TIMES | $30 | DELL HOROSCOPE | $30 | GOTHAM CITY SIRENS | $20 | NYLON GUYS | $10 | TRAVEL 50 & BEYOND | $15 |
| BASSMASTER | $10 | DELL LOGIC PUZZLES | $20 | GRAPPLING | $30 | O (OPRAH) | $30 | TRUCK TREND | $15 |
| BATMAN | $20 | DELL OFFICIAL WORD SEARCH | $20 | GUIDEPOSTS | $20 | OK! | $30 | TRUCKIN | $16 |
| BATMAN STREETS OF GOTHAM | $20 | DELL ORIGINAL SUDOKU | $20 | GUN WORLD | $30 | OUT MAGAZINE | $10 | TV Y NOVELAS | $20 |
| BEADSTYLE MAGAZINE | $40 | DOWN BEAT | $40 | GUNS OF THE OLD WEST | $40 | PLAYBOY | $10 | ULTIMATE MOTORCYCLING | $16 |
| BEADWORK | $40 | EBONY | $10 | HARPERS BAZAAR | $10 | POETS & WRITERS | $20 | USA CROSSWORDS JUMBO | $20 |
| BETTER HOMES & GARDENS | $10 | ENTREPRENEUR | $10 | HEART & SOUL | $10 | PREDATOR XTREME | $10 | VIBE MAGAZINE | $10 |
| BIKER | $40 | ESPN | $15 | HOROSCOPE GUIDE | $16 | READERS DIGEST | $10 | VOGUE | $16 |
| BLACK ENTERPRISE | $10 | ESQUIRE | $15 | HORTICULTURE | $30 | REBEL INK | $20 | WOLVERINE | $20 |
| BOATING | $10 | FANTASTIC FOUR | $30 | HOT BIKE | $10 | REDBOOK | $15 | WONDER WOMAN | $30 |
| BON APPETIT | $10 | FAVORITE EASY CROSSWORDS | $20 | HYPE HAIR | $30 | RIDER | $10 | WOOD | $10 |
| BREW YOUR OWN | $20 | FAVORITE FILL IN | $20 | INCREDIBLE HULK | $40 | ROAD & TRACK | $10 | WORLD OF WHEELS | $20 |
| BUDGET TRAVEL | $10 | FIDO FRIENDLY | $15 | INSTINCT | $15 | ROD & CUSTOM | $10 | WORSHIP LEADER | $15 |
| CAMARO PERFORMERS | $15 | FIELD & STREAM | $10 | IRON MAN (COMIC) | $40 | ROLLING STONE | $10 | WRITERS DIGEST | $30 |
| CAPTAIN AMERICA | $40 | FIGHT! MAGAZINE | $30 | JET | $10 | SAILING WORLD | $15 | YOGA JOURNAL | $10 |

Name ___
Inmate # ___
Address ___
Special Instructions ___
Different Ship to address please specify ___

**Payment Options (Credit Card, Check, Money Order)**
Credit Card    Visa   MC   Am Ex   Disc
Exp Date __/__    CVC Code ___
Card # ___
Name on card ___
Billing Address & Zip ___

**Magazine Selections**
Yrs __/__ ___ Total ___
Yrs __/__ ___ Total ___
Yrs __/__ ___ Total ___
Yrs __/__ ___ Total ___
Yrs __/__ ___ Total ___
Yrs __/__ ___ Total ___
TOTAL ___

**FTW MAGS is not responsible for any unaccepted magazines through the prison system. Please use the order form as a template . Hand written orders are accepted as long as all information is correct. Send Check or Money Order to the above address. **Keep this form for future orders** **All Orders are final and NO Refunds****

06172011

PLN_0001357

# Settlement Reverses Virginia DOC's Ban on Jailhouse Lawyers Handbook

### by David Reutter

A settlement agreement between the Virginia Department of Corrections (VDOC) and two civil rights organizations that publish the *Jailhouse Lawyer's Handbook* (JLH) overturned the VDOC's ban on *JLH* and requires that five copies of that publication be placed in each of the state's prison libraries. The settlement also provides for monetary damages and attorney fees totaling almost $13,000.

The lawsuit arose after a prisoner at the Coffeewood Correctional Center obtained approval to receive a copy of *JLH*, but the book was disapproved upon its arrival. The VDOC's Publication Review Committee (PRC) disapproved the "entire publication" because it allegedly contained "[m]aterial whose content could be detrimental to the security, good order, discipline of the facility, or offender rehabilitative efforts or the safety or health of offenders, staff, or others."

The *JLH* is jointly published by the National Lawyers Guild (NLG) and the Center for Constitutional Rights (CCR). Neither were provided with notice that the *JLH* had been disapproved or why it met the criteria for being censored.

Following the November 10, 2009 decision by the PRC to ban *JLH* in VDOC facilities, the NLG and CCR sued for violation of their First Amendment rights. A settlement agreement was reached in February 2011.

As a result of the settlement, *JLH* will not be considered a disapproved publication and VDOC staff will be informed that *JLH* is approved. Any future decision to ban *JLH* will be directly determined by the Office of the Deputy Director, who will promptly notify the NLG and CCR of the specific reasons for disapproval.

In addition to placing five copies of *JLH* in each VDOC prison library at the NLG and CCR's expense, prisoners in housing units without library access will be allowed to request a copy of the book subject to the usual prison rules applicable to obtaining library materials. Additionally, the VDOC "will designate the NLG and CCR as legitimate sources from whom publications may be purchased or received, including gift publications, without prior approval, review, or determination of any kind by VDOC, its agents or employees."

The settlement further requires the VDOC to pay the NLG and CCR $2,500 in damages and $10,230 in attorney fees and costs. "I'm happy with the result, but I don't think it's anything more than what we were entitled to expect for the placement of the copies in the law libraries of the institutions," said Jeffrey E. Fogel, a Charlottesville attorney who represented the NLG. "It was probably the most outrageous act of censorship in a prison in [the] United States to say you can't learn about your constitutional rights." See: *National Lawyers Guild v. Johnson*, U.S.D.C. (W.D. Vir.), Case No. 3:10-cv-00040-NKM-BWC.

Previously, the VDOC had settled separate, unrelated censorship lawsuits involving *Prison Legal News* and the Nation of Islam's publication, *The Final Call*. [See: *PLN*, June 2011, p.46; Nov. 2010, p.46]. ◄

Additional source: *Daily Progress*

# Summary Judgment for CCA Reversed in Filthy Jail Conditions Case

### by David Reutter

On April 15, 2011, the Sixth Circuit Court of Appeals reversed a district court's grant of summary judgment to Corrections Corporation of America (CCA) in a civil rights action alleging Eighth Amendment violations after CCA staff left a mentally ill prisoner in his squalid segregation cell for nine months.

The suit was filed by Mary Braswell, the conservator of prisoner Frank D. Horton, and raised claims based on the treatment Horton received at the CCA-managed Metro Davidson County Detention Facility (MDCDF) in Nashville. When Horton arrived at MDCDF he had a history of psychiatric treatment and behavioral problems that caused him to be considered a special needs prisoner. As a result, he was placed in segregation.

Sometime after 2006, Horton began refusing his daily opportunities to shower and exercise. CCA guards received approval to force Horton out of his cell to shower and for a mental health evaluation. He initially refused, but left the cell when "inflammatory agents" were used. It is unknown how many times that process was repeated.

It is clear, however, that after May 2007 no further attempts were made to remove Horton from his cell to take showers, clean his cell or receive mental health care. That is when Assistant Warden Michael Corlew came on the job.

MDCDF Captain Patrick Perry blew the whistle on January 31, 2008 by notifying the Davidson County Health Department that Horton had remained in his filthy cell for nine months, and providing them with copies of Horton's segregation activity logs. CCA then fired him for doing so. Perry had worked in Horton's unit; when he tried to talk to Horton, he found Horton had decompensated to the point that he would respond with "gibberish."

"Perry testified that Horton's cell was filthy, that there were several food trays on the floor and bacteria growing in the toilet, that Horton's beard and hair were 'matted' and 'out of control,' and it appeared Horton had not washed himself or had his cell cleaned for months," wrote the Sixth Circuit.

A court order resulted in Horton's transfer from MDCDF on April 11, 2008. He subsequently received a mental health due process hearing and was placed in a special needs facility to be treated for schizophrenia. With treatment his condition improved. Braswell, his conservator, filed suit against CCA.

CCA moved to dismiss, which the district court treated as a summary judgment motion. The court found that administrative exhaustion requirements under the PLRA were unavailable due to Horton's inability to speak coherently, and remained unavailable once he left CCA's custody. The Sixth Circuit agreed with that finding. The appellate court emphasized that not only must Horton have been

actually capable of filing a grievance, but his mental condition may have been so deteriorated that remedies were unavailable because he might not have been aware he required mental health care.

However, the Court of Appeals disagreed with the district court's finding that Horton's injuries were de minimus. The Sixth Circuit held that a prisoner who claims he has "languished in a filthy and unsanitary cell for nine consecutive months asserts more than a de minimus physical injury."

Finally, the appellate court found there was "a genuine issue of material fact as to whether a CCA policy or custom was responsible for the alleged violation of Horton's Eighth Amendment rights." When Corlew came to MCDCF in May 2007, he ordered that uses of force would be used only in emergencies, and the need to clean Horton's cell and give him a shower was not an emergency that warranted a cell extraction. So for the next nine months, guards simply marked "refused" on the segregation activity log when Horton declined shower and exercise opportunities.

The Court of Appeals said a policy or custom could be found by a jury. MCDCF Warden Brian Gardner "testified that CCA maintained records of each use of force incident, that officers had to forward incident reports to CCA's corporate office, and that use-of-force incidents could be used to determine annual bonuses and pay raises for CCA employees," wrote the appellate court.

"Viewing the evidence in the light most favorable to Braswell, CCA [guards]

thus had both a carrot and a stick – an incentive to minimize uses of force, and a corporate policy requiring them to do so," the Court of Appeals noted.

Finally, the Sixth Circuit cited several cases of other obviously mentally ill prisoners who were left to languish in their cells at MCDCF. For those reasons, the district court's grant of summary judgment to CCA was reversed and the case remanded for further proceedings, where it remains pending. See: *Braswell v. CCA*, 419 Fed.Appx. 622 (6th Cir. 2011) (unpublished). 

Additional source: *Associated Press*

# Hawaii Ex-prisoner Awarded $83,000 for Being Held 83 Days Past Release Date

Former Hawaii prisoner Wade T. Itagaki, who was held at the Oahu Community Correctional Center in Honolulu for 83 days after his sentence expired on Sept. 5, 2006, was awarded $83,000 by a federal jury in February 2011.

When prison officials realized their mistake, Itagaki, a homeless veteran, was quickly released without any preparation and no money.

According to his attorney, Myles Breiner, "They showed him out the door and said, 'See you later.' The result was he walked two miles out of the valley to the nearest bus stop. He had no money, even though he had money on his books he had earned while in prison."

Following the verdict, Breiner said the jurors were "very sympathetic ... [and] recognized there was responsibility that the Department of Safety has to anyone who is incarcerated, their responsibility to maintain the records, their responsibility to make sure a person is released in a timely fashion."

The Department of Public Safety argued that an error by a circuit court judge had resulted in the erroneous late

release. Both parties have cross-appealed, and their appeals remain pending.

Another of Itagaki's attorneys, Eric Seitz, noted that Itagaki had severe diabetes and uses a wheelchair. "I don't know if he'll live to see the money," he said. See: *Itagaki v. Frank*, U.S.D.C. (D. Hawaii), Case No. 1:09-cv-00110. 

Sources: *www.kitv.com, www.hawaiireporter.com*

## SMITH'S GUIDE to HABEAS CORPUS RELIEF
for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company

Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*



## Support Prison Legal News with these beautiful gifts!
CALL **802-257-1342,** MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/

## Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

PLN_0001359

# Requests for Hawaiian Prisoner Workers Soar Due to Poor Economy

## by David M. Reutter

As budgets for nonprofit groups, schools, churches and state and city agencies have been squeezed, requests for Hawaii prison work crews to help with repair and maintenance projects have increased exponentially.

Prison officials said they were limited in their ability to meet the explosion in requests for prisoner labor that have come in the wake of the economic downturn. "There has been a vast increase in requests in the past two years," said Francis X. Sequeira, warden at the Oahu Community Correctional Center (OCCC). "We can only address a finite amount of requests."

Hawaii Correctional Industries (HCI), an arm of the Department of Public Safety, is a "self-supporting, for-profit, quasi state agency." It receives no general funding from the state and instead relies on prison labor contracts. HCI was created in 1990 to provide prisoners with "meaningful" work. They are paid 25 cents an hour and receive a lunch from the agency or organization that has contracted for their labor.

"Just with the inmate labor alone, this is a huge cost savings," said HCI administrator Matthew Kaneshiro. "We know, whenever the economy goes down, our program goes up."

The largest group of prisoners on "work lines" come from the island of Oahu, which has about 300 prisoners from OCCC, the Women's Community Correctional Center, Waiawa Correctional Facility, and in some cases Halawa Correctional Facility who qualify to participate in the work projects.

Many of HCI's contracts are in the million dollar range or higher; the agency made around $5.7 million in fiscal year 2009. The State Department of Transportation pays $80,000 a month to HCI for five work lines, consisting of six to eight prisoners each weekday, who mostly clean freeways, highways and state roads. They also occasionally clear trash and debris from homeless encampments.

The State Department of Education (DOE) also contracts with HCI. There were concerns for child safety, however, when DOE signed a $1.07 million contract for HCI to replace playgrounds at elementary and middle schools. "We didn't want pedophiles or child molesters on campus, and they told me they don't let those prisoners out to work," said Monica Kaui Baron, DOE's playground coordinator. "They explained that these guys and women are already in the community doing work, and they were considered low-risk. These inmates are the lowest level of security and on their way out, to be released soon."

The 2009 contract resulted in 12 new school playgrounds on two islands. A $2.3 million contract between DOE and HCI will provide 38 more playgrounds at 28 schools. A third contract of $2.6 million will result in 41 playgrounds at 33 schools.

"They negotiate a lot better prices for us, which means we can double the size of the playgrounds," said Kaui Baron. "We were paying a lot of money for playgrounds, and the quality wasn't that good, in essence putting our kids at risk."

City officials raved about the prisoners' work and the low cost. "They cut grass, they weed-whack and perform other manual labor at various city parks, Monday through Friday," stated Pearl City spokeswoman Louise Kim McCoy. "The only expense is to provide a box lunch ... for each inmate."

Some prisoners see the work lines as a way to make a few dollars, enjoy the limited freedom outside and give something back. "I get to work and be in the community. It's way better than sitting in a cell 24/7 contemplating what you did to get there. Inside, you're just not going anywhere," said OCCC prisoner John Carvalho. ◾

Sources: *Star Advertiser, http://the.honoluluadvertiser.com*

# Boulder, Colorado Jail's Postcard-Only Correspondence Policy Ends with Settlement

The ACLU has settled a lawsuit on behalf of detainees at Colorado's Boulder County Jail, ending a policy that limited prisoners' personal correspondence to postcards. The policy went into effect in March 2010 and the ACLU filed suit five months later.

The jail enacted the policy due to an outcry by parents whose children had received letters from jailed sex offenders. The sex offenders obtained the children's names from a local newspaper and then looked up their last names in the phonebook. After writing letters to the children, they sent them to a third party to be remailed, in order to avoid having the envelope stamped to indicate it originated at the jail.

The parents confronted jail officials upon discovering the letters, resulting in implementation of the postcard-only correspondence policy. Paper and envelopes were provided only for official mail sent to attorneys, courts or doctors.

A Colorado federal district court approved class-action status for the lawsuit and appointed counsel in March 2011. The Boulder County Commission quickly moved to resolve the case, and a settlement was reached on April 12, 2011. In addition to rescinding the postcard-only policy, the ACLU will receive $65,000 in attorney's fees.

"It is a very good day for the First Amendment at the Boulder County Jail," said Mark Silverstein, legal director for the ACLU of Colorado.

The new mail policy at the jail requires outgoing letters and envelopes to be stamped to advise they came from a prisoner. When the postcard-only policy went into effect, Jail Division Chief Larry Hank said screening detainee mail was too labor intensive. Sheriff Joe Pelle stated that jail staff will now resume such screening. See: *Clay v. Pelle*, U.S.D.C. (D. Colo.), Case No. 1:10-cv-01840-WYD-BNB.

A number of jails across the U.S. have instituted postcard-only policies, and various legal challenges are pending. [See: *PLN*, Nov. 2010, p.22]. The El Paso County jail in Colorado suspended its postcard policy in December 2010 and later settled a lawsuit challenging the policy. [See: *PLN*, Oct. 2011, p. 33]. ◾

Additional sources: *Longmont Times-Call, www.gazette.com*

PLN_0001360



**The Habeas Citebook: Ineffective Assistance of Counsel**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

**$49.95**

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



**Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition**
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

**$49.95**

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



**Prisoners' Self-Help Litigation Manual, 4th Edition**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

**$45.95**

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook,
Ineffective Assistance of Counsel
$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
3rd edition
$49.95

☐ Prisoners' Self-Help
Litigation Manual
4th edition
$45.95

**Shipping included in all prices**

PUBLISHED BY

*Order by mail, phone, or on-line.*   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State ____ ZIP _____



**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 2420 · West Brattleboro, VT 05303
Tel [802] 257-1342 · www.prisonlegalnews.org

PLN_0001361

# Ninth Circuit Rules Right to Court Access Violated When Lockdown Prevents Prisoner from Researching Issues Related to Direct Appeal

### by Mike Rigby

In an amended opinion filed on November 19, 2010, the Ninth Circuit reversed a district court's dismissal of a prisoner's claims that 1) his constitutional right of access of the courts was violated when, during the limited time period in which he could have appealed his criminal conviction, he was denied use of the prison law library and not provided with any alternative means of doing legal research because his unit was on lockdown; and 2) prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by forcing him to choose between his constitutional right to exercise and his constitutional right of access to the courts when the prison was not on lockdown.

After being convicted of two counts of burglary pursuant to a plea bargain, California prisoner Paul Eric Hebbe received a prison sentence of 18 years and four months. Upon appealing his conviction, his pro bono appellate counsel filed a so-called Wende brief, indicating that he could find no legitimate issues to bring to the court's attention. The court then advised Hebbe that he could file a supplemental pro se brief to raise any issues that counsel might have overlooked. The court gave him 30 days to file the supplemental brief. However, because Hebbe's unit was on lockdown status as a result of a fight earlier that month, he could not access the prison law library for the entire 30-day period. He missed the deadline and his appeal was denied.

During subsequent months, the facility where Hebbe was housed was intermittently on and off lockdown status. During "regular" program times (roughly eight out of 15 months between November 1998 and February 2000), Hebbe was allowed out of his cell only eight hours per week; he could use that time, in two-hour daily increments four days a week, either to exercise outdoors or use the law library.

In February 2000, Hebbe filed suit pursuant to 42 U.S.C. § 1983. The district court dismissed two of his three claims and the third was decided by a jury in favor of the defendant prison officials.

On appeal, the Ninth Circuit first joined five other circuits in holding that pro se complaints should continue to be liberally construed, notwithstanding the recent Supreme Court decision in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) [*PLN*, July 2009, p.18], which raised the standard for pleadings generally.

As to Hebbe's access-to-court claim, the Ninth Circuit held that "Hebbe's claim that he was frustrated in his desire to use the law library facilities to research the pro se brief that he wished to file on direct appeal of his state court conviction plausibly alleges exactly the type of 'actual injury'" required by *Lewis v. Casey*, 518 U.S. 343 (1996) [*PLN*, Aug. 1996, p.1].

Regarding Hebbe's Eighth Amendment claim, the Court of Appeals, noting the "continu[ing] vitality" of the rule announced in *Allen v. City and County of Honolulu*, 39 F.3d 936, 940 (9th Cir. 1994) [*PLN*, May 1995, p.14], held that "'an inmate cannot be forced to sacrifice one constitutionally protected right solely because another is respected.'" The district court's dismissal of Hebbe's court access and Eighth Amendment claims was therefore reversed. See: *Hebbe v. Pliler*, 627 F.3d 338 (9th Cir. 2010).

# Nevada DOC's Ban on Male Supervisors at Women's Prison Invalidated

The Ninth Circuit Court of Appeals invalidated a Nevada prison policy barring male employees from holding certain supervisory positions at a women's prison. Circuit Judge Marsha S. Berzon delivered the opinion, holding that the ban violated Title VII of the Civil Rights Act of 1964.

The Southern Nevada Women's Correctional Facility (SNWCF) was operated by Corrections Corporation of America (CCA) when a male guard impregnated a female prisoner in September 2003. The prisoner claimed "that her relationship with the guard stemmed from CCA's refusal to provide the psychotropic medications she had long been prescribed to treat her schizophrenia."

Nevada Department of Corrections (NDOC) Director Jackie Crawford ordered the state's Inspector General (IG) to investigate. The IG interviewed approximately 200 prisoners, and "nearly all the inmates reported receiving substandard medical treatment." The IG found "that SNWCF had become an 'uninhibited sexual environment.'" He noted "frequent instances of inappropriate staff/inmate interaction," "flirtatious activities between staff and inmates," and "widespread knowledge" of "long term inmate/inmate sexual relationships." Staff routinely smuggled contraband like alcohol, narcotics, cosmetics and jewelry into the facility in exchange for sex, according to the IG. The prisoners' "sexual behavior – which they freely admitted

was designed to 'compromise staff and enhance inmate privileges' was ... 'predictable'" and due to "a lack of effective supervisory management oversight and control," the IG found.

The IG's report "ignited 'very high profile' media coverage and forced CCA to terminate its contract to operate SNWCF. The NDOC "faced intense political pressure to 'mitigate the number of newspaper articles' and to 'assure the State of Nevada that we would not be embarrassed like this again,'" according to Crawford. In response, Crawford restaffed the facility to ensure that 70% of the line staff were women. She also hired only women for SNWCF's three correctional lieutenant positions. The lieutenants, who served as shift supervisors, answered to wardens and assistant wardens. They were the most senior employees on duty 75% of the time.

"Although the correctional lieutenant posting specified that 'only female applicants will be accepted for these positions,' several males applied for the positions, which were eventually filled by three women." Four male NDOC employees who did not apply for the SNWCF lieutenant positions filed Equal Employment Opportunity Commission (EEOC) complaints, then brought a sex discrimination suit under Title VII. The district court granted summary judgment to the NDOC.

On appeal, NDOC officials conceded that the refusal to consider men for the positions was facially discriminatory.

They claimed, however, that over the course of four years, 29 of 37 NDOC correctional lieutenant positions were filled by men and, therefore, "the concededly discriminating policy of excluding men from the SNWCF ... positions had only a *de minimis* impact ... and did not violate Title VII." The appellate court rejected that argument, however, because it represented "a fundamental misunderstanding of the basic precepts of Title VII...."

The Court of Appeals determined that the NDOC's refusal to hire men for the correctional lieutenant positions violated Title VII because the NDOC could not satisfy its burden of demonstrating that gender was a "bona fide occupational qualification" for the positions. The Ninth Circuit observed that "NDOC administrators sought to 'reduce the number of male correctional employees being compromised by female inmates.' And that they believed the gender restriction ... would accomplish this because (1) male correctional lieutenants are likely to condone sexual abuse by their male subordinates; (2) male correctional lieutenants are themselves likely to sexually abuse female inmates; and (3) female correctional lieutenants possess an 'instinct' that renders them less susceptible to manipulation by inmates and therefore better equipped to fill the correctional lieutenant role."

The appellate court found, however, that the NDOC failed to prove any of those baseless theories. "The third theory – and, to a significant degree, the first two – relies on the kind of unproven invidious stereotype that Congress sought to eliminate from employment decisions when it enacted Title VII."

"Disturbingly, in suggesting that all men are inherently apt to sexually abuse, or condone sexual abuse of female inmates, NDOC relies on entirely specious gender stereotypes that have no place in a workplace governed by Title VII," wrote the Court of Appeals. "NDOC's third theory, that women are 'maternal,' 'patient,' and understand other women fails for the same reason. To credit NDOC's unsupported generalization that women 'have an instinct and innate ability to discern ... what's real and what isn't' and so are immune to manipulation by female inmates would violate 'the Congressional purpose to eliminate subjective assumptions and stereotyped conceptions regarding the ... ability of women to do particular work.'"

"Precluding men from serving in supervisory positions in women's prisons is not a substitute for effective leadership and enforcement of workplace rules," the Ninth Circuit concluded. Accordingly, the gender-based hiring policy for lieutenant positions at SNWCF violated Title VII.

According to Howard Skolnik, who was appointed director of the NDOC in February 2007, the discriminatory hiring policy at SNWCF no longer exists. "We have male lieutenants at that facility," he said. "It's been like that since I've been director." See: *Breiner v. Nevada DOC*, 610 F.3d 1202 (9th Cir. 2010). ◼



certain DAYS:
the **2012**
freedom for
**Political Prisoners**
Calendar

**COINTELPRO**
repression & resistance, then & now

$12 each ● $5 for prisoners
$8 each for bulk orders (10+)
+$3.50 shipping for one calendar, +$1 for each additional
Pay online or cheques payable to 'QPIRG Concordia'

Certain Days c/o QPIRG Concordia
1455 de Maisonneuve Blvd. O
Montreal, QC H3G 1M8 CANADA
**certaindays.org**

*A Jailhouse Lawyer's Manual*
**(9th ed.) and Immigration & Consular Access Supplement**

The JLM released its **new 9th edition** in April 2011. The JLM explains prisoners' rights, and helps them to navigate the justice system using federal, state, and New York law. It can help prisoners:
▪ Learn the law and go to court
▪ Appeal their conviction or sentence
▪ Get conditional or early release
▪ Receive adequate medical care
▪ Protect their civil liberties
▪ Enforce their right to religious freedom
The Supplement explains the immigration law consequences of prisoners' convictions, and their right to contact their consulate.

Prisoners: The JLM is $30. The Supplement is $5. Prices include first class shipping.

Institutions & Lawyers: The JLM is $100. The Supplement is $20. Prices exclude shipping.

We accept checks and money orders only. We cannot accept stamps or credit cards. We accept purchase orders from institutions only.
Send orders and questions to:
Columbia Human Rights Law Review
ATTN: JLM ORDER
435 West 116th Street
New York, NY 10027
Or email: jlm.board.mail@gmail.com

The *JLM* is published by the *Columbia Human Rights Law Review* at Columbia University School of Law. Visit us online at:
http://www3.law.columbia.edu/hrlr/ejlm.php



# Do you have diabetes? Is your diabetes under control?

Living with diabetes in prison is very difficult. Order your FREE copy of *Prisoner Diabetes Handbook: A Guide to Managing Diabetes — for Prisoners, by Prisoners.*

This handbook, written by prisoners, will explain:
• Facts about diabetes
• How to help yourself when you have diabetes
• Complications of diabetes
• The medical treatment you need to manage your health

"When a diabetic patient is serious and informed about his disease, health staff have to be on their toes. They pay more attention." —JAMES, A PRISONER LIVING WITH DIABETES

Order your FREE copy and start managing your diabetes and your health. Quantity is limited, so order today.

**SPLC** **Southern Poverty Law Center**
*Handbook made possible by the Southern Poverty Law Center*

**ORDER FORM**
Fill out the information below, and send this order form to:
Prison Legal News
PO Box 2420
West Brattleboro, VT 05303

Name
ID number
Facility
Address
City        State        Zip

PLN_0001363

# No Qualified Immunity for Guard Who Transported Prisoner in Dog Cage

The U.S. Court of Appeals for the Eighth Circuit affirmed a district court's denial of qualified immunity to an Arkansas jail guard who transported a prisoner in a K-9 cage covered with feces, urine and dog hair.

In February 2007, jail guard Armand Zefferi transported Thomas Edward Morris III from the Crawford County Jail to the Pulaski County courthouse for a court appearance.

Morris had escaped while being taken to court in the past, so Zefferi decided to transport him in a dog cage used to haul police K-9s. The cage was filthy, containing dog feces, dog urine and dog hair. Morris, who was shackled with a belly chain, ankle restraints and handcuffs, was forced to lie in the feces, urine and hair for the nearly ninety-minute ride. He complained afterward that the "restricted position [in the cage] caused [him] severe neck and hip pain which lasted for several weeks."

In August 2007, Morris filed a 42 U.S.C. § 1983 suit against Zefferi alleging that his constitutional rights had been violated. The district court denied qualified immunity to Zefferi, holding that "the type of humiliation and degrading treatment alleged by Morris" constituted a clearly established violation of his constitutional rights. Zefferi filed an interlocutory appeal to the Eighth Circuit.

The first issue on appeal was whether Morris had adequately alleged a constitutional violation. Zefferi attempted to piecemeal the repugnant conditions to which Morris was subjected, to show that there was no constitutional violation. The conditions Morris had to endure, though, did not occur "in isolation," the appellate court found.

Morris was "forced to crawl into a small cage littered with dog hair, excrement, and dried urine. He was then required to lie in an uncomfortable position while restrained by a waist belly chain, handcuffs and ankle restraints, for a ninety-minute car ride." Under the "totality of circumstances," the Court of Appeals wrote, "Zefferi's decision to transport Morris in this manner transgress[ed] today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency,'" citing *Hutto v. Finney*, 437 U.S. 678, 685 (1978).

Turning next to the issue of qualified immunity, the Eighth Circuit held that the district court did not err in concluding it "should have been obvious to Zefferi based both on common sense and prior general case law" that his conduct was unconstitutional. This remained true despite the absence of "factually on point" precedent disclaiming the practice of transporting prisoners in dog cages, the appellate court emphasized.

Under the Court of Appeals' recent en banc decision in *Nelson v. Corr. Med. Services*, 583 F.3d 522 (8th Cir. 2009) [*PLN*, April 2010, p.20], "[t]he obvious cruelty inherent" in certain practices give law enforcement all the notice they need that such behavior is "antithetical to human dignity."

"Transporting a pretrial detainee in a small, unsanitary dog cage for ninety minutes, with no compelling urgency and other alternatives available," the appellate court wrote, "sufficiently shows the possible infringement of a clearly established constitutional right to be free from improper punishment."

The judgment of the district court denying qualified immunity to Zefferi was accordingly affirmed. See: *Morris v. Zefferi*, 601 F.3d 805 (8th Cir. 2010). ◢

# Ninth Circuit Rules California's Proposition 115 Not Unconstitutional

The Ninth Circuit held that California's Proposition 115, known as the Crime Victims Justice Reform Act, does not violate a defendant's Sixth Amendment right to confront the witnesses against him.

Adopted by California voters in 1990, Prop. 115 added constitutional and statutory language to allow a probable cause determination at a preliminary hearing to be based on hearsay evidence presented by a qualified law enforcement officer.

Neil Peterson was charged in 2005 with statutory violations in connection with his ownership and operation of an automobile dismantling shop (a "chop shop"). A magistrate judge found probable cause to hold Peterson for trial based on the testimony of the lone prosecution witness at the preliminary hearing. That lone witness, the investigating officer, testified as to the hearsay statements of other witnesses against Peterson. Ultimately, a jury convicted Peterson of a number of misdemeanor charges.

Peterson subsequently filed suit pursuant to 42 U.S.C. § 1983, claiming that Prop. 115 violated his constitutional rights under the Fourth, Sixth and Fourteenth Amendments. He sought damages as well as injunctive and declaratory relief. The district court granted the defendants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

On appeal, Peterson dropped his Fourth Amendment claim. In a relatively straightforward opinion, the Ninth Circuit disposed of his remaining claims; to wit, that the admission of hearsay evidence at his preliminary hearing violated his rights under the Sixth Amendment's Confrontation Clause to confront the witnesses against him, and that in order to satisfy the requirements of due process a preliminary hearing must include the right of confrontation.

As to the Sixth Amendment claim, the Ninth Circuit noted that a preliminary hearing is not constitutionally required; therefore, there can be no constitutionally-required procedures at such a hearing. Moreover, the U.S. Supreme Court had repeatedly held that the right of confrontation (including cross-examination) exists primarily to give a jury the opportunity to weigh the demeanor of witnesses at trial, and distinguished a preliminary hearing as providing "a much less searching exploration into the merits of a case than a trial." *Barber v. Page*, 390 U.S. 719, 725 (1968).

As to Peterson's Fourteenth Amendment claim, the Ninth Circuit, noting that hearsay is admissible before a federal grand jury, reasoned that "[i]f the phrase 'due process of law' in the Fifth Amendment does not prohibit the use of hearsay in grand jury proceedings, then the same phrase in the Fourteenth Amendment cannot be read to prohibit the use of hearsay evidence at a preliminary hearing."

The dismissal of Peterson's suit was accordingly affirmed. See: *Peterson v. State of California*, 604 F.3d 1166 (9th Cir. 2010). ◢

PLN_0001364



*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - *ONLY* $20!

*"BEST DEAL ON THE POUND!"*

## Check your **5** magazines
and <u>underline</u> three backup choices (in case of unavailability)

- ☐ 4 Wheel & Off Road (12)
- ☐ Allure (12)
- ☐ American Photo (6)
- ☐ Arthritis Today (6)
- ☐ Automobile (12)
- ☐ Backpacker (9)
- ☐ Boating (10)
- ☐ Bon Appetit (12)
- ☐ Bowhunt America (9)
- ☐ Bridal Guide (6)
- ☐ Cabelas Outfitter Jrnl (6)
- ☐ Car & Driver (12)
- ☐ Complex Magazine (6)
- ☐ Conde Nast Traveler (12)
- ☐ Country (7)
- ☐ Cycle World (12)
- ☐ Detroit Home (6)
- ☐ Dirt Rider (12)
- ☐ Ebony (11)
- ☐ Elle (12)
- ☐ Elle Décor (10)
- ☐ Entrepreneur (12)
- ☐ ESPN (26)
- ☐ Esquire (11)
- ☐ Family Circle (15)
- ☐ Family Fun (10)
- ☐ Fast Company (10)
- ☐ Field & Stream (12)
- ☐ Fitness (10)
- ☐ Florida Sport Fishing (6)
- ☐ Fly Fishing in Salt Water (6)
- ☐ Flying (12)
- ☐ Four Wheeler (12)
- ☐ Freeskier (6)
- ☐ Golf Digest (12)
- ☐ Golf Tips (7)
- ☐ Glamour (12)

- ☐ Golf Week (45)
- ☐ Harpers Bazaar (11)
- ☐ Heart & Soul (6)
- ☐ Hispanic Business (10)
- ☐ Hot Bike (12)
- ☐ Hot Bike Baggers (12)
- ☐ Hour Detroit (12)
- ☐ Inc Magazine (12)
- ☐ Jet (36)
- ☐ Ladies Home Journal (11)
- ☐ Latina (10)
- ☐ Log Home Living (12)
- ☐ Los Angeles Magazine (12)
- ☐ Lucky (12)
- ☐ Marie Claire (12)
- ☐ Men's Fitness (10)
- ☐ Men's Journal (12)
- ☐ Motor Trend (12)
- ☐ Midwest Living (6)
- ☐ Motorcyclist (12)
- ☐ Muscle & Fitness (12)
- ☐ Muscle Mustangs & Fast Fords (12)
- ☐ Nylon (10)
- ☐ Off-Road (12)
- ☐ Old House Journal (6)
- ☐ Orange Coast Magazine
- ☐ Outdoor Life (12)
- ☐ Outdoor Photographer (11) No Renewal
- ☐ Outside (12)
- ☐ Parent & Child (9)
- ☐ Parenting Early Years (11)
- ☐ Parenting School Years (11)
- ☐ Parents (12)
- ☐ Plane & Pilot (12) No Renewal
- ☐ Popular Photography (12)
- ☐ Predator Xtreme (6)
- ☐ Prevention (12)

- ☐ Reader's Digest (11)
- ☐ Road & Track (12)
- ☐ Rolling Stone (26)
- ☐ Self (12)
- ☐ Shape (12)
- ☐ Siempre Mujer (6)
- ☐ Ski (7)
- ☐ Slam (10)
- ☐ Snowboard (6)
- ☐ Snowboarder (7)
- ☐ Spa (6)
- ☐ Spin (11)
- ☐ Sport Rider (10)
- ☐ Super Chevy (12)
- ☐ Surfer (12)
- ☐ Surfing (12)
- ☐ Taste of Home (8) No Renewal
- ☐ Teen Vogue (10)
- ☐ Tennis (10)
- ☐ Texas Monthly (12)
- ☐ The Atlantic (10)
- ☐ Timber Home Living (7)
- ☐ Transworld Skateboarding (12)
- ☐ Transworld Snowboarding (9)
- ☐ Transworld Surf (12)
- ☐ Urban Farm (6)
- ☐ Vibe (6)
- ☐ Waterfowl & Retriever (2)
- ☐ Weight Watchers (6)
- ☐ Whitetail Journal (6)
- ☐ Whole Living (10)
- ☐ Wired (12)
- ☐ Woman's Day (15)
- ☐ Wood (7)
- ☐ Working Mother (8)
- ☐ Yoga Journal (9)

**Send as many "5 for $20" orders as you like!**

**Tell your Friends and Families!**

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or *order online* and use credit card or PayPal.

| Name (please print): | | Inmate #: | |
|---|---|---|---|
| Address: | | | |
| City: | State: | | Zip: |



**Inmate Magazine Service INC.**

P.O. Box 2063, Fort Walton Beach, FL 32549    www.InmateMagazineService.com

*Make Copies! Share!*

**PLN_0001365**

# Ninth Circuit: California Prisoner Need Not Appeal from Satisfactory Grievance Response in Order to Exhaust Administrative Remedies

### by Michael Brodheim

Clarifying "the boundaries of proper exhaustion" within the context of California's prison system, the Ninth Circuit Court of Appeals held that a prisoner "has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in order to exhaust administrative remedies."

In July 2004, Quillie Harvey, a prisoner at Salinas Valley State Prison, was extracted from his cell with pepper spray. He was charged with refusing to comply with a cell search.

Prison officials subsequently failed to hold a hearing on the charge within 30 days as required by policy. In January 2005, Harvey filed a grievance complaining about the delay and requesting alternative forms of relief – either that the charge be dismissed or that he be provided access to a videotape of the cell extraction, which he claimed would prove his innocence.

In a written decision, prison officials partially granted Harvey's appeal, agreeing to provide a hearing as well as access to the videotape. However, no hearing was held and no access to the video was granted. Thus, five months later, Harvey filed a "reminder" grievance which prison officials construed as an appeal of the earlier (partially-granted) grievance, and accordingly rejected as being untimely. "This screening action," Harvey was informed, "may not be appealed."

Harvey filed suit in federal court alleging a violation of his due process rights. The district court granted the defendants' motion to dismiss on the ground that Harvey had failed to exhaust his administrative remedies.

On appeal, the defendants argued that Harvey should have appealed the grievance decision granting him a hearing and access to the videotape. The Ninth Circuit flatly rejected that argument, finding no merit to the suggestion that a prisoner should appeal a satisfactory grievance response or that it is a prisoner's responsibility to ensure that prison officials actually provide the relief they have promised.

Significantly, the Ninth Circuit also rejected the defendants' argument that Harvey should have appealed the decision rejecting his "reminder" grievance as being untimely. "Even if we were to agree that a prisoner has an obligation to appeal the rejection of a grievance that he has no obligation to file," the appellate court reasoned, "[t]here is no obligation to appeal from a decision when the rejection form states that the "action may not be appealed."

In a cautionary note to prisoners, however, the Ninth Circuit upheld the dismissal of another of Harvey's claims on the grounds that his administrative grievance related to that claim was in fact untimely filed and therefore not properly exhausted. See: *Harvey v. Jordan*, 605 F.3d 681 (9th Cir. 2010). ◾

# Report Blasts Sex Party at New York Juvenile Facility

An "ill conceived, poorly planned and uncontrolled" December 12, 2009 "Winter Social Dance" at a New York juvenile facility allowed offenders to engage in sexual misconduct with an underage girl and a suspected prostitute, according to a scathing report by the New York State Commission of Correction.

Investigators reported that in May 2009, administrators at the Goshen Secure Center (GSC) – a maximum-security juvenile detention facility for male offenders operated by the Office of Children and Family Services – proposed semiannual social events with "an atmosphere similar to a 'typical high school prom.'" The hope was "that the events would 'motivate youth behavior' and 'help stabilize some of the gang activity as well.'"

The events were initially intended for only "Honors" or "Transition" residents, but those limitations were soon discarded. Four violent offenders convicted of murder and armed robbery, who had extensive disciplinary records of violent conduct, destroying property, possessing contraband and other offenses, were the only residents to attend the Winter Social Dance in the GSC visiting room.

Officials knew nothing about the four female guests who were invited by the residents to attend the dance, but transported all of them to and from the event in state vehicles. The report suggested that one guest was a suspected prostitute; another was 16 years old.

On October 18, 2009, GSC resident Braden sent his guest, Michelle, a $100 check, claiming that he "owed her the money" for unspecified reasons. Michelle visited Braden on November 7, 2009 and identified herself as his sister. One month later she said she was his step-sister. Finally, at the December 12, 2009 social she described herself as his girlfriend.

The social began at 4:25 p.m. and, "as evidenced by the GSC security video, the ... sexual activity ... began almost immediately," according to the report.

Hopefully Michelle is neither Braden's sister or step-sister, given what they were caught on tape doing. At 4:31 p.m., Michelle was seen sitting on Braden's lap "with her legs straddling him. They are kissing." At 4:44 p.m. they were observed in the vending machine area, embracing and kissing.

Staff member Veronica Haynes came from the visiting room at 4:47 p.m., spoke to the couple and returned to the visiting room. Michelle then turned her back to Braden, "loosening her jeans and lowering them in the back enough to partially expose her buttocks." She quickly "pulled her jeans up again" and they continued kissing and embracing.

Michelle straddled Braden as he sat in a chair and he put his hands inside her shirt. Staff stood nearby but did not intervene.

At 5:26 p.m., Michelle again sat on Braden's lap with her back to him. As she leaned forward, she appeared to kiss her buttocks. She then stood up and posed suggestively in front of him before straddling him again, "moving in a sexually provocative manner that could be described as a 'lap dance.'" Meanwhile, staff sat just a few feet away. Twenty minutes later, Braden carried Michelle, "with her

PLN_0001366

buttocks exposed," directly past two staff members.

Another GSC resident, Arthur, and his guest Yolanda were also caught on tape at 5:27 p.m. "The couple appears to be engaging in oral sex," according to the report. Between 5:46 and 5:52 p.m. they were involved in some other sexual activity, but the camera's view was blocked, preventing investigators from identifying exactly what they were doing.

At 7:04 p.m., Assistant Director Gregory Joyner walked by Braden and Michelle as they embraced. Joyner was caught on video kissing Michelle on the cheek. He later attempted to justify his actions, claiming "that the girl was upset that the social was over so he kissed her to make her feel better." He was subsequently placed on administrative leave.

The Commission of Correction report blasted GSC's administrators, finding that "the Facility Director acted irresponsibly" and "the Assistant Director acted in a manner that was irresponsible and dishonest."

Supervisors and staff were also found to be "irresponsible when they failed to stop residents and guests from engaging in sexual activity," according to the report. "Although the line staff was placed in a difficult situation, any reasonable person would have recognized that the activity taking place ... was unacceptable in any setting," investigators found. As such, they "should have stepped in and stopped the event as a matter of common sense."

Commissioner Gladys Carrion, who authorized the socials, responded to the report by declaring that she had initiated disciplinary action against seven GSC employees, ranging from counseling to termination. The misconduct during the Winter Social Dance came to light after GSC guard Antonio Collado, 58, contacted the media; he was granted legal whistleblower status. At least one supervisor had reportedly tried to cover-up the incident.

Sources: *"In the Matter of a Resident Social Event at the Goshen Secure Center," New York State Commission of Correction (July 2010), available at www.scoc.state.ny.us/reports.htm; New York Post; www.recordonline.com*

# Are You Ready For A Career Change?

### *Financial Mediators in private practice earn over $185,000/yr.*
### What is a Mediator?  A neutral party and facilitator.

Mediators in private practice save their clients money on attorney fees and avoid the stress of court proceedings. Your role as a neutral party is important in settling disputes and conflicts, which is a less expensive option for your clients than going to court. Moreover, Financial Mediators in private practice bill an hourly rate of $200–$350 per hour!

Our dynamic, distance learning program is designed to prepare you for employment as a Mediator and/or to enter private practice. Law degrees are NOT REQUIRED to practice. There are NO RESTRICTIONS for ex-felons to practice in any state. According to the U.S. Dept. of Labor, Mediators earn an average salary of $50,660/yr. Those in private practice average $185,000/yr.

For brochure and application:

**St. Mark's School of Legal Studies**
**1840 Coral Way, Room 4-754**
**Miami, FL 33145**

**305-748-2099**

In its annual list of Best Careers, *U.S. News & World Report* names Mediator as a Top Choice for 2011.

### Become A Financial Mediator
All-Inclusive Tuition: $1,299
$99 down, 15 payments of $80/mo.

Tuition includes:
• All course materials
• Financial Mediator diploma
• Practitioner Alumni Card
• Course qualifies for certification
  (certification NOT required to practice)

### Areas of Practice
• Divorce Resolution  • Elder Care
• Contract Non-Performance
• Employer/Employee Conflict Resolution
• Insurance Settlement Disputes
• Consumer Complaint Disputes

PLN_0001367

# Ninth Circuit Holds California Prison Officials Responsible for Providing Reasonable Accommodations to Disabled Prisoners and Parolees Held in County Jails

In the latest chapter of a legal saga spanning 16 years, on September 7, 2010 the Ninth Circuit rejected a renewed attempt by California prison officials to shirk their responsibilities under the Americans with Disabilities Act (ADA), the Rehabilitation Act (RA) and the federal Due Process Clause to provide reasonable accommodations to disabled prisoners and parolees housed in county jails.

However, finding that the evidence upon which the district court relied was insufficient to justify the scope of the system-wide injunctive relief it had ordered, the Court of Appeals remanded the case to the district court to allow it to obtain additional evidence concerning the nature and extent of disability violations in the jails. In 1994, a class of all present and future California state prisoners and parolees with mobility, vision, hearing, kidney and learning disabilities (collectively referred to as the Armstrong plaintiffs) sued California state officials responsible for the operation of the Department of Corrections and Rehabilitation (CDCR) and the Board of Parole Hearings (BPH).

A series of decisions by the district court and the Ninth Circuit established that the ADA and RA applied to state prisoners, and that the defendants' policies and procedures were inadequate and violative of the rights of disabled prisoners and parolees. In 2001, the district court entered a permanent injunction directing enforcement of a remedial plan with respect to the CDCR defendants. [See: *PLN*, July 2003, p.14; Sept. 1998, p.13; Sept. 1997, p.3]. A year later, the court entered a comparable permanent injunction with respect to the BPH defendants. *PLN* readers should note that parallel class-action litigation began in 1996 with respect to prisoners with developmental disabilities. That litigation led in 2001 to a settlement agreement known as the Clark Remedial Plan (CRP). In July 2009, California officials moved to terminate the CRP. The district court denied the state's motion in September 2010. [See: *PLN*, April 2011, p.40]. In 2009, the Armstrong plaintiffs moved for an order requiring the defendants to create and implement a computerized system for tracking class members housed in county jails, to ensure that they received necessary

accommodations as they moved through the system and to ensure they had access to a workable grievance procedure (California houses state prisoners and parolees in county jails for a variety of reasons, sometimes related to parole violations, other times for in-custody drug treatment. The numbers are significant; Alameda and Sacramento County jails, for example, each hold an average of 1,000 parolees a day).

Relying on a regulation implementing the ADA, 28 C.F.R. § 35.130(b)(1), which explicitly prohibits a public entity from indirectly avoiding its ADA obligations by operating "through contractual, licensing, or other arrangements" with third parties, the district court granted the plaintiff's motion. On appeal, the defendants argued that they were not obligated to accommodate the needs of disabled prisoners and parolees held in county jails. Their principal contention was that the regulation relied upon by the district court was inconsistent with Congressional intent. The Ninth Circuit

had little difficulty in rejecting that argument as "baseless."

"[E]ven in the absence of a regulation explicitly saying so," the Court of Appeals held, "a State cannot avoid its obligations under federal law by contracting with a third party to perform its functions. The rights of individuals are not so ethereal nor so easily avoided." On the other hand, calling it a "close question," the Ninth Circuit concluded that the district court had abused its discretion by granting system-wide relief on the basis of evidence it viewed as "composed largely of single incidents that could be isolated." Still, the state's failure to track class members housed in county jails – what the Ninth Circuit characterized as a system-wide deficiency – "took plaintiffs much of the way towards a showing sufficient to justify ... system-wide relief." While it was "not enough in itself," the appellate court held, "not much more evidence" was needed. See: *Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010). ◾

# New York Court Sentences Rabbi to Four Years in Prison

In a case that garnered widespread publicity, Milton Balkany, a Brooklyn, New York rabbi, received a four-year federal prison sentence for extortion. U.S. District Court Judge Denise L. Cote found that Balkany, 64, dean of the Bais Yaakov day school, had tried to extort $4 million from hedge fund SAC Capital Advisors, LP.

Despite the dollar amount involved, Judge Cote imposed a sentence of 48 months, well below the 87-108 months suggested by the sentencing guidelines. Citing Balkany's "lifetime of good work" and "generosity of spirit," Cote nevertheless voiced concern that "the defendant has never come to terms with any of his criminal violations of the law." Balkany must also serve three years of supervised release.

Balkany had contacted SAC's attorney and threatened to disclose alleged insider trading in 2004, unless SAC agreed to pay his school and another school $2 million each. The attorney recorded Balkany's phone calls and meetings, and Balkany was arrested after receiving two SAC checks totaling $3.25 million. De-

spite his statements about insider trading, no evidence regarding such trading was disclosed at trial. He was convicted by a federal jury in November 2010.

Balkany told the judge at sentencing that he was the father of 13 children and grandfather of 35, and used his money to help the poor and forgotten; he also noted that his schools accepted poor children rejected by other institutions. He denied any other wrongdoing beyond the extortion charges.

For example, Balkany rejected claims that he had tried to bribe federal officials for better treatment of Jewish prisoners. "I never gave a toothpick to a public official in my life," he said.

Judge Cote ordered that Balkany be taken into custody at his February 2011 sentencing hearing, citing concerns that he may flee if he remained free on bond. See: *United States v. Balkany*, U.S.D.C. (S.D. NY), Case No. 1:10-cr-00441-DLC. ◾

Sources: *www.bloomberg.com*, *Village Voice*, *New York Post*



## *Stamps for* CASH!

SOLID RATES YOU CAN COUNT ON! • RATES THAT DON'T CHANGE MONTHLY!

*Great Goods will buy your stamps!*

**70%** of Face Value: *Complete books or sheets of Forever Stamps,*

**65%** of Face Value: *Complete books, rolls, or strips of 44-cent stamps (10 stamps min.)*

**60%** of Face Value: *High or Low Denomination stamps (above/below 44-cents) 10 stamps min.*

WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

### Payment sent within 24 hours of receipt.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps. • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

# GREAT GOODS

**PO Box 399, West Chesterfield NH 03466**
**www.greatgoods.org**

STAMPS © USPS, ALL RIGHTS RESERVED.

PLN_0001369

# Iowa Supreme Court Rules That Sex Offender Treatment Program Requires Due Process Protections

The Iowa Supreme Court held in two companion cases that the Iowa Department of Corrections' (IDOC) Sex Offender Treatment Program (SOTP) deprived prisoners of due process of law.

Before 2001, Iowa prisoners "were eligible for a sentence reduction of one day for each day of good conduct and …could earn a further reduction of up to five days per month for satisfactory participation in certain programs, including treatment programs" under Iowa Code § 903A.2(1)(a) (1999). Effective January 1, 2001, the law was amended to make prisoners "eligible for a reduction of sentence equal to one and two-tenths days for each day the inmate demonstrates good conduct and satisfactorily participates in any program or placement status identified by the director to earn the reduction." Iowa Code § 903A.2(1)(a) (2001).

Under the 2001 amendment, if a prisoner refused to attend SOTP he would lose ninety days of earned time but retain the ability to accrue future earned sentence reductions. *Holm v. Iowa Dist. Ct.*, 767 N.W.2d 409, 415 (Iowa 2009). Section 903A.2(1)(a) was again amended in 2005 to provide that "an inmate required to participate in a sex offender treatment program shall not be eligible for a reduction of sentence unless the inmate participates in and completes a sex offender treatment program established by the director."

Under an IDOC policy applying the 2005 amendment, a prisoner "will no longer accrue any earned time after refusing to attend SOTP, but will not lose any previously accrued earned time." The Iowa Supreme Court held in *Holm* that "the 2005 amendment was merely a clarification of the 2001 amendment."

In 2005, John Dykstra was convicted of a felony offense for "dependent adult abuse" and a misdemeanor simple assault offense which "was pled down from an original charge of sexual abuse in the third degree."

His simple assault sentence expired on October 9, 2005, but Dykstra remained in prison on the dependent abuse sentence. On December 15, 2005 the IDOC recommended that Dykstra participate in SOTP "based on the alleged circumstances of the simple assault as well as Dykstra's previous convictions and his inclusion on the

sex offender registry." The IDOC found "that Dykstra's wife, who lived in a nursing home because of multiple sclerosis, reported she was forced to perform oral sex on Dykstra against her will." Prison officials also noted "a 1983 indecent exposure conviction, a 1994 indecent exposure charge, a 1995 burglary conviction for stealing a neighbor's lingerie and sexually explicit photos, [and] a 2000 prostitution solicitation charge."

Dykstra objected to the requirement that he attend SOTP; he "maintained that any sexual contact with his wife was consensual, and argued the simple assault did not contain a sexual element." On January 27, 2006, Dykstra failed a polygraph concerning the facts of the simple assault. He signed an SOTP refusal form on February 16, 2006. Under the 2005 amendment to § 903A.2, the "IDOC determined Dykstra was no longer eligible for earned time credit," and moved his sentence discharge date from January 20, 2008 to May 12, 2010.

The Iowa Supreme Court held that "Dykstra was entitled to due process because his liberty interest in earned time was affected by his classification as required to participate in SOTP." Noting that "Dykstra argues his due process rights were violated because he did not receive the protections of" *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963 (1974), the Court held that Dykstra was correct since the "IDOC relied on unadmitted factual allegations that did not result in a sex-offense conviction...." Dykstra was denied basic due process protections, including "written ... or even verbal notice," "an opportunity to present witnesses or documentary evidence" and "a written statement of the specific evidence relied upon and the reasons for his own classification." The Iowa Supreme Court was unable to determine on the record before it "whether the decision maker was sufficiently impartial."

The Court also recognized that while "due process does not prohibit use of polygraph examinations in all contexts, there may be circumstances where use of a polygraph examination would likely violate a prisoner's due process rights." Although it ultimately left "the decision to admit polygraph evidence at a classification hearing to the discretion of IDOC,"

the Supreme Court observed that the "IDOC likely cannot replace procedural protections with a polygraph examination or rely solely on a polygraph examination without violating due process." See: *Dykstra v. Iowa Dist. Court for Jones County*, 783 N.W.2d 473 (Iowa 2010).

In a companion case issued the same day, the Iowa Supreme Court held that removing a prisoner from SOTP based solely on the results of a polygraph examination violated his due process rights.

Rory Reilly was convicted of a sex offense involving a child and began serving his sentence in December 2005. The IDOC determined that he "was required to participate in SOTP. As part of the treatment, IDOC administered a specific issue polygraph examination to Reilly because Reilly's account of his sexual offense differed in some way from his victim's account. Reilly failed the polygraph examination, and IDOC removed him from SOTP because of the failed polygraph test."

As a result, Reilly lost his ability for earned time sentence reductions under § 903A.2 (2005), moving his discharge date from March 20, 2008 to June 13, 2010. "Reilly was later reinstated into SOTP, and his discharge date was changed to May 27, 2008. Therefore, his temporary removal from SOTP added approximately two months to Reilly's sentence."

The Court concluded that "although removal from SOTP implicates a liberty interest, it is a lesser interest than the initial classification decision requiring an inmate to participate in SOTP." As held in *Dykstra*, the latter requires the due process protections articulated in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963 (1974), but in this case the Court concluded that the former requires only the lesser protections mandated by *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 99 S.Ct. 2100 (1979). That is, the "IDOC must provide (1) advance notice allowing the inmate time to secure documents or prepare a statement, (2) an opportunity to present documentary evidence, letters, or make statements before the decision-maker, and (3) an explanation for the reasons behind any removal decision. Additionally, although not contested in *Greenholtz*, it is a fundamental element of due process

that the decision-makers be 'sufficiently impartial.'"

The Supreme Court found that the process employed by the IDOC to remove Reilly from SOTP failed to comply with "three of the four" required safeguards. He was not given advance notice, allowed to present documentary evidence or make a statement to the decision-makers, and

the IDOC did not fully explain the reason for his removal from the program. Therefore, Reilly's due process rights were violated.

Noting that *Dykstra* had held "that use of a polygraph substitute for procedural protections or as the sole evidence for deprivation of a liberty interest may implicate constitutional concerns," the

Iowa Supreme Court found that "decisions or hearings regarding removal from SOTP may consider polygraph examinations as a factor influencing the removal decision because polygraph examinations serve a rehabilitative purpose within treatment." See: *Reilly v. Iowa Dist. Court for Henry County*, 783 N.W.2d 490 (Iowa 2010). ◼

## Colorado Prison Culinary Program Caters to Local Community

Prisoners at Colorado's Sterling Correctional Facility (SCF) are catering local events as part of a culinary training program at the prison. Their cuisine has such a fine reputation that in March 2011 students at one high school asked SCF to cater their prom.

Community groups seeking an affordable, quality caterer regularly turn to the prisoners at SCF. "It's just quite common around here," said Darcy Garretson, the superintendent and principal at Haxtun High School. "It's kind of surprised me that it's drawn attention. I'm just thinking, wow, a lot of community groups in town use them. It's just not that unusual."

Many of the students had already sampled prison-catered meals through banquets for the National Honor Society. According to Garretson, the prisoners also make tasty cinnamon rolls that are provided at town functions.

The culinary program has benefited both prisoners and the community that surrounds SCF. Prisoners are exposed to training and experience that can translate into a career in the food industry, while the community is able to cater

events at lower cost.

"In a small town like what we are, there's not a lot of catering services," said Jeff Plumb, an agricultural teacher at the high school who helped organize the prom. "So they're one of the options that a lot of communities use, not just Haxtun."

The order to cater the prom called for serving about 110 meals, including the 40 students and their guests who were expected to attend the event. Each meal costs $8.00 and includes chicken alfredo, a side of vegetables or salad, and cheesecake.

The food is reportedly good, too. "That's why we use them," Plumb said. "Several of the students have had the chicken alfredo before through them and they really liked it. They said, 'We ought to do it again.'"

The prom is a big event in Haxtun. "Sometimes we get 600 or 700 people," said Garretson, "in a town of 600 ... come up to see the kids all dressed up." The prisoners who prepared the food, however, didn't get to attend; a student's father who works as a guard at SCF delivered the

meals from the prison to the prom. ◼

Sources: *www.thedenverchannel.com, www.9news.com*



# FREE BOOK CATALOG

**HUNDREDS OF BOOKS:**
·FICTION ·NON FICTION, ·NOVENAS, ·RELIGIOUS CARDS, ·PASTIMES, ~ENGLISH & SPANISH~

**CIENTOS DE LIBROS:**
·RELATO ·HÁGALO USTED MISMO, ·NOVENAS, ·ESTAMPAS RELIGIOSAS, ·PASATIEMPOS, ~INGLÉS & ESPAÑOL~

**WRITE CLEARLY:**
Name, Address, City, State & Zip Code, Booking Number and Prison.

For shipping expenses, SEND one dollar or three .44 cent US stamps for EACH catalog you order to:

*CATALOG will NOT fit in #10 SASE. 40-Page, Full Color, Letter Size, Magazine type Catalog.*

Para recibir un CATÁLOGO DE LIBROS en Inglés y Español, ENVÍE SUS DATOS JUNTO CON UN DÓLAR o 3 estampillas de correo de .44 cents para gastos de envío a:

www.myjaguarbooks.com
**JAGUAR**
**7271 GARDEN GROVE BLVD #E GARDEN GROVE, CA 92841**



FREE! **12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription! Quarterly drawing **WINS $100!** **(Void in New York)** (Last Quarter's winner from **Navasota, TX.**) TELL YOUR FRIENDS!   ACT NOW!!

**PO Box 2063 • Fort Walton Beach FL. 32546**
**www.InmateMagazineService.com**

**Inmate Magazine Service Inc.**

PLN_0001371

# Ten Years of Sham Segregation Reviews Result in $4,846 Damage Award for Arkansas Prisoner

An Arkansas state prisoner has been awarded $4,864 in damages for spending almost ten years in administrative segregation (ad seg).

David Williams is no angel. While serving time for murder, he was convicted of killing another prisoner.

Over the course of the next 17 years, though, Williams pretty much stayed out of trouble. He had minor disciplinary infractions but none that involved violence.

Nevertheless, in June 1999, Williams was placed in ad seg after returning to the Arkansas Department of Corrections (ADOC) following a three-year stint in a Utah prison pursuant to an interstate compact agreement.

ADOC rules require annual classification reviews for prisoners held in ad seg. The reviews are supposed to assess whether the prisoner would pose a "serious threat to life, property, self, staff, or other inmates" if released to the general population.

More importantly, though, the Eighth Circuit has held that such classification reviews must be "meaningful" and not focus on the prisoner's "past conduct in reviewing his ongoing ad seg status." See: *Williams v. Norris*, 277 Fed.Appx. 647, 650 (8th Cir. 2008).

However, Arkansas prison officials just couldn't get the fact that Williams had killed another prisoner out of their minds. Each year they refused to release him into the general population, asserting he was a security threat.

Williams sued claiming violation of his due process rights. Following a bench trial, the district court ruled in his favor on June 14, 2010.

"The Court finds in this case that defendants improperly relied on the plaintiff's distant past in rendering their decision to retain him in ad seg, and failed to support their belief that he was a continuing threat by setting forth specific reasons for their decisions," the district court wrote.

In so holding, the court noted that the defendants had "presented no specific documentary evidence to support their continued conclusions that plaintiff was a threat to the security and good order of the institution."

As such, the district court concluded that the annual reviews Williams received "were not 'meaningful' and therefore, that plaintiff's due process rights were violated by his continued incarceration in [ad seg] from 1999-2009."

The court awarded Williams $4,846 in damages, which translates to $1.36 a day for the near-decade he spent in ad seg. Cross-appeals have since been filed and remain pending. See: *Williams v. Norris*, 721 F.Supp.2d 824 (E.D. Ark. 2010). ◼

# Conditions at New York Juvenile Facilities Deficient; State and Federal Officials Settle Lawsuit

On July 14, 2010, the U.S. Department of Justice (DOJ) and the State of New York settled a three-year investigation into conditions of confinement at four New York juvenile facilities.

The DOJ began investigating conditions of confinement at the Finger Lakes Residential Center and Lansing Residential Center in Lansing, NY, and the Tryon Residential Center and Tryon Girls Center in Johnstown, NY on December 17, 2007.

DOJ investigators conducted four site visits between June and November 2008. Then-Governor David Patterson responded to the investigation in September 2008 by convening a task force charged with taking independent steps to remedy deficiencies at the four facilities.

On August 14, 2009 the DOJ issued a findings letter, pursuant to 42 U.S.C. § 1997(a)(1), describing numerous systemic violations.

### Use of Force and Restraints

"Staff at the four facilities consistently used a high degree of force to gain control in nearly every type of situation," the investigators wrote. "Anything from sneaking an extra cookie to initiating a fistfight may result in a full prone restraint with handcuffs. This one-size-fits-all control approach has not surprisingly led to an alarming number of serious injuries to youth, including concussions, broken or knocked-out teeth, and spiral fractures." Staff interviews "revealed that they do not believe that they have options to respond to youth's behaviors," so they "consistently respond to what appear to be, at least initially, minor incidents with a high degree of force."

Investigators also found that "restraints are used frequently and result in a high number of injuries." At Lansing, for example, restraints were used 698 times in 2007 – an average of 58 restraints per month. That year, 123 youth suffered restraint-related injuries including bruises, concussions, knocked out teeth, fractures and separated shoulders.

Tryon staff also employed an intentionally harmful type of restraint known as the "hook and trip," in which the youth's arms are restrained behind the back and staff then kick "the youth's legs so they fall to the floor face first."

The report further found that many use-of-force investigations "were inadequate, both by agency and generally accepted professional standards." Some investigations were superficial and failed to include relevant evidence while others "were not conducted by detached investigators, which calls their reliability into question."

"Contrary to generally accepted professional standards," even when investigations occurred, management was found to "take no action, impose actions that are inconsistent with the seriousness of the violation, or fail to impose action in a timely manner."

### Inadequate Mental Health Care

Investigators determined that mental health care at the facilities "substantially departs from generally accepted professional standards." Specifically, investigators found: "1) inadequate behavioral management has led to an over-reliance on restraints and other forms of punishment to control youth's behaviors; 2) evaluation and diagnoses are inadequate; 3) the facility follows poor medication administration; 4) treatment planning is inadequate; and 5) substance abuse treatment is insufficient."

PLN_0001372

## Custodial Sexual Abuse

Investigators reviewed past incidents of custodial sexual misconduct, but found "no current systemic constitutional deficiencies in this area." Rather, they concluded that "in the wake of custodial sexual misconduct charges," staff had "taken multiple steps, including ... installing video cameras, increased staff accountability, and additional training" to protect youth from sexual abuse.

## State Quickly Settles

The federal investigators concluded their August 14, 2009 findings letter with a warning to state officials that failure to reach a resolution of the deficiencies within 49 days could result in litigation under 42 U.S.C. § 1997b(a)(1) to correct the problems identified at the juvenile facilities.

Almost a year later, on July 14, 2010, state and federal officials signed a 32-page settlement agreement that detailed comprehensive provisions for protection from harm, use of restraints, use of force, reporting and investigating incidents, mental health care, use of psychotropic medications, training, quality assurance and improvements to policies, procedures and practices.

The settlement requires implementation of all necessary reforms within 23 months of the effective date of the agreement. It also calls for routine compliance reviews to be conducted by a monitoring team every six months. The terms of the agreement allow for judicial enforcement if the state fails to substantially comply with its obligations. On the other hand, "the Agreement will terminate in its entirety when the United States certifies that the State is in substantial compliance with all provisions of this Agreement for

twelve (12) consecutive months."

The settlement was filed on July 14, 2010 in the U.S. District Court for the Northern District of New York, simultaneously with a Complaint, Joint Motion to Enter Settlement Agreement and proposed Order Entering Settlement Agreement. The court approved the settlement 5 days later.

"It is New York's fundamental responsibility to protect juveniles in its custody from harm and to uphold their

constitutional rights," said Thomas E. Perez, Assistant Attorney General for the Civil Rights Division. "We have worked cooperatively with New York officials to craft an agreement to ensure that the constitutional rights of juveniles at the four facilities are protected, and we commend New York ... for their willingness to work aggressively to remedy these problems." See: *United States v. State of New York*, U.S.D.C. (N.D. NY), Case No. 1:10-cv-00858-FJS-DRH. ◼

# Courts Cannot Order Federal Prisoners to Participate in IFRP

A federal criminal defendant cannot be ordered to participate in the Bureau of Prisons' (BOP) Inmate Financial Responsibility Program (IFRP) as part of his or her sentence, the U.S. Court of Appeals for the Seventh Circuit held on June 11, 2010.

Shabaka K. Boyd was sentenced to 334 months imprisonment and ordered to pay a $500 fine and $300 special assessment. At sentencing, Boyd was ordered to pay the fine and special assessment through the BOP's IFRP. The IFRP allows BOP staff to collect monthly payments from prisoners toward their financial obligations. Payment schedules are set on an arbitrary basis, and prisoners who refuse to participate in the IFRP lose the ability to work in UNICOR slave industry programs, can not receive furloughs, are paid only $5.25 a month, and can only spend $25 a month for commissary. Despite all of these sanctions for non-participation, the IFRP is regarded by the BOP as "voluntary."

Boyd appealed, arguing that the district court's order mandating participation in the IFRP was erroneous and should

be vacated. Reviewing for plain error, the Seventh Circuit agreed.

"The IFRP can be an important part of a prisoner's efforts toward rehabilitation, but strictly speaking," the appellate court wrote, "participation in the program is voluntary." As such, the district court "overstepped its bounds when it ordered [Boyd] to participate in the IFRP," the Seventh Circuit concluded. "Boyd's participation, like that of all imprisoned defendants, must remain voluntary, though subject to the loss of privileges identified in 28 C.F.R. § 545.11(d)."

The judgment of the district court was accordingly affirmed, as modified, with the clarification that Boyd's participation in the IFRP was "voluntary". See: *United States v. Boyd*, 608 F.3d 331 (7th Cir. 2010), *cert. denied*. ◼

---

Hepatitis & Liver Disease
A Guide to Treating & Living with
Hepatitis & Liver Disease. Revised Ed.
By Dr. Melissa Palmer
See page 53 for order information

---

## EXECUTIVE CLEMENCY

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT
5928 HIXSON PIKE, STE. A-363
HIXSON, TENNESSEE, 37343
(423) 843-2235**

**(35-Years of Clemency & Parole Assistance)
(Transfers Under The Int'l Prisoner Treaty)**

**Introducing The First and Only Service of Its Kind...
Every Inmate MUST Know About**
If you're bored with writing pen-pals, then drop the pen and call a phone-pal.
•It's like having a pen-pal without all the writing and waiting for her to write back.
•You get 30 minutes FREE when you start.
•20-30% off Thanksgiving specials until Nov 30.

For info, write: Key/Telepal    P.O. Box 422232
San Francisco, CA 94142    Call 719-297-1909
Tele-Pal.com    Must be over 18 with no sex offenses

PLN_0001373

# Ohio Prisoner Escape and Hostage-Taking Results in Lawsuit Against CCA, Settlement

Corrections Corporation of America (CCA) has agreed to a confidential settlement in a negligence suit following an escape from one of the company's private prisons.

On April 2, 2007, prisoner Billy Jack Fitzmorris, held at the CCA-run Northeast Ohio Correctional Center, was taken to a hospital in Youngstown after he suffered a head injury.

Fitzmorris used toe nail clippers to cut plastic flex cuffs used to restrain him to a hospital bed. He then overpowered a CCA guard, stole a car, robbed two banks and broke into an accounting business where he took an employee, Karen Zappitelli, hostage. He eventually released Zappitelli and surrendered to authorities after the police brought him a pizza. Zappitelli sued CCA, arguing that the company was negligent in allowing Fitzmorris to escape.

Zappitelli claimed that she suffered anxiety, sleeping problems and nightmares as a result of the hostage-taking incident, which lasted three hours, and was now afraid of being alone.

In the middle of a jury trial in state court, after 16 witnesses had testified, CCA agreed to settle the suit on confidential terms.

Zappitelli's attorney, Rex Elliot, with the Columbus law firm of Cooper & Elliott LLC, said the settlement would allow Zappitelli and her husband "to close the book on this chapter in their lives." A CCA spokesperson stated the company was "satisfied with the settlement agreement." See: *Zappitelli v. CCA*, Franklin County Court of Common Pleas (OH), Case No. 07CVC06-8311.

Fitzmorris was sentenced in 2009 to 80 years in prison for the two bank robberies and taking Zappitelli hostage. He will not start serving that sentence until he finishes his current 35-year sentence for drug and weapons offenses.

CCA has faced other lawsuits resulting from escapes, including a similar case in Tennessee after Hardeman County Correctional Facility prisoner Mike Settle escaped from a hospital in August 1999. Settle overpowered a guard and took a hospital employee hostage, leading police on a high-speed chase. That case resulted in a $500,000 damage award against CCA, which was upheld on appeal. [See: *PLN*, Sept. 2006, p.16].

More recently, in November 2010, CCA was sued in state court in Nashville, Tennessee by a police officer who was shot five times by an escapee from the CCA-run Delta Correctional Facility in Mississippi. Police Sgt. Mark Chesnut survived the June 2009 shooting by prisoner Joseph Jackson, Jr., who had escaped from a doctor's office with the assistance of his cousin, Courtney Logan. [See: *PLN*, Dec. 2009, p.50; Nov. 2009, p.50].

Chesnut argued in his lawsuit that CCA was responsible for security failures that resulted in the escape and shooting. The case was resolved by a confidential settlement in August 2011. Sgt. Chesnut was represented by Nashville attorney David Raybin. See: *Chesnut v. CCA*, Circuit Court of Davidson County (TN), Case No. 09C-3841. ◾

Sources: *Columbus Dispatch; www.ohio.com*

# Tenth Circuit Rules Denial of Halal Diet May Violate RLUIPA

### by Mike Brodheim

The denial of a halal diet to a Muslim prisoner may violate the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5, the Tenth Circuit held on April 2, 2010.

Proceeding pro se, Oklahoma state prisoner Madyun Abdulhaseeb (a/k/a Jerry L. Thomas) filed suit in federal court in 2005, alleging 17 claims pursuant to RLUIPA and 42 U.S.C. § 1983 concerning his conditions of confinement. The district court dismissed eight of those claims for failure to exhaust administrative remedies, then granted summary judgment to the defendants on the remaining claims.

On appeal, the Tenth Circuit appointed counsel for the purpose of supplemental briefing on the issue of what constitutes a "substantial burden" on religious exercise in the RLUIPA context. After oral argument, the Court of Appeals vacated the district court's judgment with respect to two of Abdulhaseeb's RLUIPA claims – that he was denied his requests 1) for a halal diet by officials at the Oklahoma State Penitentiary (OSP) and 2) for halal meat for an Islamic feast (Eid al-Adha) by officials at the Great Plains Correctional Facility (GPCF).

With respect to those claims, on which the district court had granted summary judgment to the defendants, the Tenth Circuit found the record insufficient to determine whether the burden on Abdulhaseeb's religious exercise was – as required to defeat a claim brought under RLUIPA – 1) justified by a compelling governmental interest and 2) the least restrictive means of furthering that interest.

The appellate court, noting that Abdulhaseeb remained in the custody of the Oklahoma Department of Corrections (ODOC), that he had sued (among others) the ODOC Director, and that the denial of his requests for halal food was based on ODOC policies, rejected the suggestion that Abdulhaseeb's claims had been mooted by his transfer from both GPCF and OSP.

The Tenth Circuit also rejected the suggestion that Abdulhaseeb's rights were not violated because he could have either purchased or obtained donated halal foods. First, Abdulhaseeb was indigent. And if he weren't, he couldn't be forced to make what the Court of Appeals construed as a Hobson's choice; i.e., choosing between essentials (such as medical treatment, for which ODOC prisoners are required to pay) on the one hand, and following the tenets of his faith on the other hand. In any event, ODOC policy mandated that food be brought in only by approved vendors, and the ODOC had not approved any vendors from which Abdulhaseeb could have purchased or obtained halal food.

Noting that RULIPA defines religious exercise to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and that the sincerity of Abdulhaseeb's beliefs had not been questioned, the

PLN_0001374

Tenth Circuit held, critically, that the issue before it was not whether a halal diet was compelled for Muslims generally but whether its denial substantially burdened Abdulhaseeb in particular.

Defining "substantial burden" on religious exercise to include the government's placing substantial pressure on a religious adherent to engage in or refrain from conduct contrary to a sincerely held religious belief, the Tenth Circuit, construing Abdulhaseeb's complaint liberally, concluded that forcing him to choose between eating a non-halal diet or not eating at all constituted a substantial burden to his sincerely held religious beliefs. The district court was instructed to appoint counsel for Abdulhaseeb on remand. See: *Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010), *cert. denied*.

Following remand, the district court appointed Oklahoma City attorney Donald J. Gutteridge, Jr. to represent Abdulhaseeb. However, on February 22, 2011 the court granted Abdulhaseeb's motion to remove Gutteridge as counsel.

The district court noted that Gutteridge had not disputed Abdulhaseeb's complaint that "Gutteridge gave him no warning that he was to be deposed by the defendants in December 2010 or on January 24, 2011. Gutteridge has likewise not specifically disputed Abdulhaseeb's contention that he (Gutteridge) has neither written nor talked to his client since September 2010, or Abdulhaseeb's assertion that Gutteridge has 'kept ... [him] ignorant of the developments of the case and [has] ... not provided [him] ... with copies of important documents filed in the case.'"

This case remains pending before the district court. See: *Abdulhaseeb v. Calbone*, U.S.D.C. (W.D. Okla.), Case No. 5:05-cv-01211-W. ◼

**Prisoner Rights Attorney**

**CHARLES CARBONE, ESQ.**

*"Every case I take is given compassionate, thorough and vigorous representation with one goal in mind – Justice for the Incarcerated."*

*- Charles Carbone*

*Personally and professionally dedicated to fighting for prisoner rights and human rights for California prisoners and their families.*

Charles represents prisoners in California's worst prisons on conditions of their confinement, including (but not limited to):

❖ *Parole Lifer Hearings*
❖ *En banc & Rescission Lifer Hearings*
❖ *State & Federal Appeals of Parole Denials*
❖ *State & Federal Appeals of Criminal Convictions*
❖ *Indeterminate Gang Validations for SHU Prisoners*
❖ *Appeals of CDC 115s*

15 years of experience in prison law
(California cases ONLY)

For life inmate subscriptions to Quarterly
**Parole Matters Newsletter**
*Please send $15/year for inmates or $25/year for family members*

PO Box 2809
San Francisco, CA 94126
(415) 981-9773
www.prisonerattorney.com

Revealing the Secrets of Kabbalah
Watch Your Life Make Sense

Studying Kabbalah is a fascinating journey. It changes our perspective on the world and the people around us, revealing aspects within us that we never knew existed. Kabbalah states very simply that when we need to know how to connect to the Upper Force, we will find our inner compass. This is the goal of Kabbalah – to help us make and sustain direct contact with the Creator. When we do, we will need no further guidance.

Free interactive correspondence course.

*Please send your letters to:*
Kabbalah Research Institute
2009 85th St., Suite 51
Brooklyn, NY 11214
Ph: 800-540-3234

**TYPING**
**S E R V I C E S**
Provided since 1998
Specifically designed, with special rates for the incarcerated person.
**Black / Color Printing and Copying**
*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*
LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563
Special Offer: $2.00 off first order.
Special offer void after: 12/31/2011

# Tenth Circuit Rules Oklahoma Prisoner Exhausted Administrative Remedies

The U.S. Court of Appeals for the Tenth Circuit reversed the dismissal of an Oklahoma prisoner's civil rights lawsuit against prison officials for refusing to provide him with a vegetarian diet consistent with his faith. In reversing the district court, the Court of Appeals held the prisoner had exhausted his administrative remedies as required by the Prison Litigation Reform Act (PLRA).

While incarcerated at the Mack Alford Correctional Center (MACC) in 2006 and 2007, Oklahoma state prisoner Gary Little requested a strict vegan diet in accordance with his religious practices as a Seventh Day Adventist. A vegan diet consists of plant foods only and does not contain any animal byproducts such as eggs or milk. Instead, because the prison provided only "meat free," "pork free" and "kosher" as options for religious diets, the warden approved Little for a "meat free" diet.

Little filed a grievance, claiming that he often went hungry because the no-meat diet contained animal byproducts that he could not eat. Little's grievance was returned, stating he would be placed on a no-meat diet with double portions of vegetables, peanut butter and fruit if available. Little appealed the warden's decision to the "Administrative Reviewing Authority" (ARA), the last step available in the Oklahoma DOC's grievance process. The ARA returned Little's grievance unanswered, saying it was improperly filed because he included "more than one issue."

On June 15, 2007, Little filed a pro se 42 U.S.C. § 1983 complaint in the U.S. District Court for the Eastern District of Oklahoma, claiming MACC officials had denied him a vegan diet in violation of his rights under the First Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment. The district court dismissed the suit for failure to exhaust administrative remedies as required by the PLRA, as the ARA had returned Little's grievance unprocessed. He appealed.

The Tenth Circuit reversed, finding that Little had exhausted his administrative remedies. The appellate court noted that "where prison officials prevent, thwart or hinder a prisoner's efforts to avail himself of an administrative remedy they render that remedy 'unavailable' and a court will excuse the prisoner's failure

to exhaust," citing *Lyon v. Vande Krol*, 305 F.3d 806, 808 (8th Cir. 2002) (en banc) [*PLN*, July 2003, p.36].

In Little's case, the ARA had returned Little's grievance unprocessed – which it lacked the authority to do – effectively rendering that step of the grievance process unavailable. The case was remanded for further proceedings. See: *Little v. Jones*, 607 F.3d 1245 (10th Cir. 2010). ◼

# Eighth Circuit Upholds Denial of Qualified Immunity on Medical Claims Against CMS

On July 20, 2010, the Eighth Circuit Court of Appeals affirmed in part a district court's denial of summary judgment to prison officials on the medical claims of two Arkansas state prisoners.

Arkansas Department of Corrections (ADOC) prisoner Mack Langford, who is in his eighties, "suffers from a variety of physical maladies and shows signs of mild mental retardation and dementia."

In April 2003, Langford's repeated complaints of severe stomach pain, vomiting blood and other symptoms were dismissed as "gas" and "treated" with antacid tablets. After he was found unconscious, Langford was hospitalized and "doctors discovered a problem with [his] gallbladder, ... and found cysts in both his kidneys." After he was released from the hospital he continued to experience back and stomach pain.

"Starting in November 2004, Langford was examined at least sixteen times by Dr. Nnamdi Ifediora, an employee or contractor of Correctional Medical Services, Inc. ('CMS'), the company that provides medical services in Arkansas prisons. Dr. Ifediora ... referred Langford to specialists, from whom he sought diagnostic recommendations."

In August 2005, imaging tests "revealed a possible mass in one of Langford's kidneys and cysts in both kidneys." Langford again complained of stomach pain on November 28, 2005 but was not treated. After passing out a second time, he was again hospitalized. "There, doctors diagnosed him with pancreatitis and again found cysts in both his kidneys." Prison officials failed to treat his cysts or "possible renal failure."

John Hardin, a 66-year-old insulin-dependent diabetic ADOC prisoner, broke his ankle in February 2004. He was prescribed a wheelchair but never received one. Dr. John Lytle, a private orthopedic

surgeon, surgically repaired Hardin's ankle; however, within three months Hardin felt severe pain in the ankle. A prison doctor admitted in July 2004 that "there was something seriously wrong" with Hardin's "misshapen and deformed" ankle. Several months later, Dr. Ifediora noted Hardin's ankle deformity, severe pain and difficulty walking. Ifediora again ordered a wheelchair and referred Hardin for an "orthopedic consult" with Lytle.

In October 2004, Dr. Lytle diagnosed Hardin with "Charot foot," a sudden softening of the bones experienced by people who have significant nerve damage (neuropathy). "The bones are weakened enough to fracture, and with continued walking the foot eventually changes shape. As the disorder progresses, the arch collapses and the foot takes on a convex shape, giving it a rocker-bottom appearance, making it very difficult to walk."

Dr. Lytle noted "significant deterioration" in Hardin's bones and determined that reconstructive surgery may not be an option. He "suggested that amputating Hardin's leg below the knee might give him the best chance to regain mobility." In February 2005, "Lytle noted his concerns about 'progressive deformity' in Hardin's ankle and about Hardin's inability to bear weight on the injured leg." He "prescribed a padded tennis shoe and a cane, and suggested that Hardin might need a brace for his foot." However, Hardin did not receive a brace or a properly fitting padded shoe. He became wheelchair-bound and was denied other treatment options.

Langford and Hardin filed suit against several ADOC and CMS defendants, alleging deliberate indifference to their serious medical needs in violation of the Eighth Amendment. They also alleged violations of the due process and equal protection clauses, the Americans with Disabilities Act (ADA), the Rehabilitation

PLN_0001376

Act and state law torts.

The district court rejected the defendants' argument that the plaintiffs had failed to exhaust their administrative remedies, "finding that Hardin had exhausted and that there was a genuine issue of material fact about whether Langford had exhausted available remedies." The court denied qualified immunity and "found that there were genuine issues of material fact concerning the plaintiffs' deliberate indifference claims." It also "found that genuine issues of material fact precluded summary judgment on the plaintiffs' claims under the ADA and the Rehabilitation Act, as well as the state law negligence and outrage claims." The district court denied statutory immunity to the defendants on the state law claims.

The defendants filed an interlocutory appeal on the exhaustion and qualified immunity rulings. The Eighth Circuit dismissed the appeal as to exhaustion and issues raised by the CMS defendants, for lack of jurisdiction. The appellate court found, however, that it could address the qualified immunity and statutory immunity arguments because they were "purely legal" issues.

Turning to the qualified immunity ruling, the Court of Appeals applied the "adverse inference rule" to prison officials who failed to produce letters that the plaintiffs had sent them. Under that rule, the "failure to produce the letters ... permitted the district court to infer that the evidence contained in those letters would undermine" the defense. Ultimately, the Eighth Circuit affirmed the denial of qualified immunity on the plaintiffs' deliberate indifference claims.

The appellate court then analyzed the district court's ruling that the defendants were not entitled to statutory immunity on the plaintiffs' state law claims. Noting that the "plaintiffs ignore the issue, and the state

defendants treat it as an afterthought," the Court of Appeals reversed, finding the plaintiffs had failed to offer allegations or factual support of the requisite "willful, wanton, or otherwise malicious conduct" of the defendants. The case was remanded for further proceedings. See: *Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010).

Following remand, on September 20, 2011 the district court adopted a magistrate's report and recommendation to grant summary judgment to Dr. Ifediora and the CMS defendants with respect to the ADA and Rehabilitation Act claims. This case remains pending. See: *Langford v. Ifediora*, 2011 WL 4369359 (E.D.Ark. 2011). ◼

# Florida Jail Offers Video Visits to Profiteer More From Prisoner Families

A video visitation system has been installed at Florida's Charlotte County Jail. Using money from the Inmate Welfare Fund, which is derived from profits from the canteen and other services to prisoners, the jail installed a system that allows virtual visits over the Internet.

The technology is the first of its kind in Florida and was installed by Montgomery Technology, Inc., which hopes it will catch on and generate more business in other jails and prisons.

"If somebody is incarcerated here but their grandma is in Ohio, they can actually visit them in Ohio via their computers," said Charlotte County Sheriff Bill Cameron, who said his staff will be monitoring the visits to prevent such things as virtual conjugal visits. "My staff will be having a screen that shows all the visits that are going on at any given moment so they can be watching."

Revenue generated from the video visitation will be split between Montgomery Technology and the Inmate Welfare Fund. The cost to schedule a visit is about $33 – a fairly hefty fee. The jail has also implemented a program that generates revenue by running ads on the video visitation screens while prisoners and their families are waiting to connect. [See: *PLN*, Jan. 2010, p.22]. A similar program

is being considered at the jail in Walton County, Florida.

Sheriff Cameron had previously turned the jail's retention pond into a catfish hatchery to feed prisoners, and has also set up vegetable and worm gardens to save money. "So far, everything we have tried has been very successful," said Cameron. "I think [video visits] will be the same." This is part of the ongoing trend to monetize mass imprisonment and further profit from the poor. ◼

Sources: *www.winknews.com, Miami Herald*



CENTER FOR
HEALTH
JUSTICE
www.healthjustice.net

A NATIONAL HIV & HEPATITIS
INFORMATION HOTLINE FOR PRISONERS

⇒ HAVE QUESTIONS ABOUT HIV OR HEPATITIS?

⇒ NEED INFORMATION ON YOUR RIGHTS?

⇒ NEED HELP IN ACCESSING SERVICES AFTER RELEASE?

CALL: (213) 229-0979
TUES/WED/THURS/FRI
9 A.M. TO 4 P.M. PACIFIC

We accept collect calls from
Any prison or jail facility

Center For Health Justice
900 Avila St. #205
Los Angeles, CA 90012

---

# MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(213) 489-7715



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

PLN_0001377

# Eleventh Circuit Reverses Dismissal of BOP Failure to Protect Suit

The U.S. Court of Appeals for the Eleventh Circuit reversed the dismissal of a failure to protect suit filed by a federal prisoner who claimed that he was attacked by a guard for participating in a prison investigation.

"John Doe" sued Harley Lappin, then the Director of the Bureau of Prisons (BOP), and Rick Stover, a Senior Designator, after Doe was allegedly attacked by an "Officer Wooten" at the U.S. Penitentiary (USP) in Atlanta, Georgia for participating in an investigation of a BOP guard.

Doe claimed that Lappin and Stover violated his Eighth Amendment rights by failing to protect him. He sought an order enjoining the defendants from "transporting Mr. Doe to or through any BOP facility in Atlanta," and prohibiting the defendants "from incarcerating Mr. Doe in a high security BOP facility and requiring the transfer of Mr. Doe to an appropriate and safe housing placement such as a medium or low security BOP facility or a state correctional facility."

The district court dismissed Doe's official capacity claims against Lappin and Stover, holding that both were entitled to sovereign immunity. Doe appealed.

In a per curiam unpublished opinion, the Eleventh Circuit reversed. Disagreeing with the district court, the Court of Appeals held that "a plaintiff may be able to obtain injunctive relief against a federal officer acting in his official capacity when the officer acts beyond statutory or constitutional limitations," citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) and *Saine v. Hosp. Auth.*, 502 F.2d 1033, 1036-37 (5th Cir. 1974). Further, the appellate court concluded that Doe's alleged Eighth Amendment violations were "within the types of actions by prison officials that may, if proved, warrant injunctive relief."

On remand, the Eleventh Circuit directed the district court to determine "whether the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm." The Court of Appeals explained that "the burden to be considered is the burden that the record demonstrates would be imposed by the relief requested by this Plaintiff and the harm to be considered is that harm that the record demonstrates this Plaintiff would suffer absent the requested relief."

The judgment of the district court was accordingly vacated, and the case remanded for further proceedings. See: *Doe v. Wooten*, 376 Fed.Appx. 883 (11th Cir. 2010).

Following remand, the district court determined that Doe had properly exhausted his administrative remedies and that the requested injunctive relief – including prohibiting the BOP from transferring him through USP Atlanta and assigning him to a lower-security facility – did not impose an intolerable burden on prison officials. See: *Doe v. Wooten*, 2010 WL 2821795 (N.D. Ga. 2010). ■

# ICE, CCA Settle ACLU Lawsuit Regarding Health Care for Immigration Detainees

### by Derek Gilna

A lawsuit filed by the American Civil Liberties Union that alleged deficiencies in health care at the San Diego Correctional Facility (SDCF) in Otay Mesa, California has been settled, according to a December 16, 2010 press release issued by the ACLU.

The suit named as defendants the Immigration and Customs Enforcement agency (ICE), a branch of the U.S. Department of Homeland Security, as well as officials and employees of ICE and Corrections Corporation of America (CCA), the private company managing SDCF.

Originally filed in 2007 by the ACLU, the ACLU of San Diego and Imperial Counties, and the law firm of Cooley LLP, the lawsuit alleged that detainees at SDCF were routinely subjected to long delays before receiving treatment, denied necessary medication for chronic illnesses and refused essential referrals prescribed by medical staff.

According to the ACLU, "the lawsuit specifically cited the cases of 11 detainees, including several whose bipolar disorders and depression went untreated, a man who was forced to wait more than eight months for eye surgery and nearly suffered permanent disfigurement, and detainees who never received medical attention despite suffering from a variety of maladies including Type 2 diabetes, hypercholesterolemia, hypertension, abscessed and broken teeth, and severe chest pains."

David Blair-Loy, legal director of the ACLU of San Diego and Imperial Counties, noted that "Immigration officials must ensure that immigration detainees do not suffer or die unnecessarily." According to Anthony Stiefler of Cooley LLP, "It is at odds with our American values to allow people to suffer long-term health consequences or even death because authorities refuse to treat them."

The plaintiffs sought class certification, which was denied by the district court. They appealed to the Ninth Circuit, which referred the case to mediation. The parties then worked out a settlement agreement in December 2010 and the district court certified a settlement class on April 21, 2011.

Although not conceding any wrongdoing, the defendants agreed to a broad-ranging series of improvements that the ACLU felt would bring health care at SDCF up to acceptable standards. The defendants agreed to provide health care "that meets or exceeds the following NCCHC standards as set forth in Standards for Health Services in Jails (2008)": Access to Care, Medical Autonomy, Staffing, Pharmaceutical Operations, Medication Services, Receiving Screening, Initial Health Assessment, and a host of other provisions required by prison health care guidelines.

The settlement also provides that the federal defendants "shall expand the provision of mental health care professionals for Class Members by providing the equivalent of one full-time additional psychiatrist and four full-time additional psychiatric nurses.... If ICE requires a Treatment Authorization Request ('TAR'), then a TAR prepared by a medical practitioner for off-site non-emergency medical treatment for a Class Member shall be [acted upon] within five business days...."

Additionally, the defendants "shall take all reasonable steps to ensure that authorized off-site medical treatment commences within a clinically appropriate period of time...," and the federal defendants "shall maintain a tracking system for pending off-site appointments for Class Members." Under the agreement the term "emergency services" will no longer be required for prisoners to receive health

care, if to deny treatment "would cause deterioration of the detainee's health or uncontrolled suffering...." The clear intention of the settlement is to address all "serious medical need(s), regardless of whether such medical condition requires emergency or urgent treatment."

Pursuant to the agreement, "Defendant CCA shall also ensure that appropriate training, policies, and/or practices shall continue to be implemented at SDCF, or, as applicable, shall be implemented, to provide reasonable assurances that SDCF CCA staff carry out directives from medical staff related to treatment of Class Members."

The agreement further required the defendants to produce various documents, including information related to current medical and mental health staffing; the status of hiring efforts; lists of new medication orders, including documents showing when each patient received medication; medical emergency logs; audits or evaluations conducted by any third parties regarding medical or mental health care; and all policy and procedure manuals and local operating procedures governing dental, medical, mental health and vision care.

The defendants were also required to provide the plaintiffs with a copy of all medical records for prisoners who die "during their confinement at SDCF during the time that the Agreement is effective." Additionally, the parties agreed that on the one-year anniversary of the settlement agreement they "shall stipulate to dismiss this action with prejudice" unless the defendants are in non-compliance.

According to Elizabeth Alexander, former director of the ACLU National Prison Project and lead counsel in the case, "For the first time, ICE has committed to providing all necessary health care to immigration detainees beyond just emergency care. For too long ICE's own policies allowed it to provide detainees with nothing beyond a narrow definition of emergency. This settlement is recognition that it is unconstitutional not to provide people in government custody with all necessary health care."

The district court retained jurisdiction to oversee disputes among the parties arising from interpretation and enforcement of the terms of the settlement agreement. The parties agreed to pay their own costs and attorney fees. See: *Woods v. Myers*, U.S.D.C. (S.D. Cal.), Case No. 3:07-cv-01078-DMS-PCL. 

Additional sources: *ACLU of San Diego and Imperial Counties, ACLU National*

# California: New Postsentence Rehabilitation Credits Inapplicable to Sentences of Convicted Murderers

The California Court of Appeal held on June 22, 2010 that a new state statute, which authorizes postsentence credit against a determinate term of imprisonment for successful completion of approved rehabilitative programs, does not apply to an indeterminately sentenced convicted murderer whose sentence also includes a consecutive determinate component.

Prisoner Manuel Jose Maes, Jr. was convicted of second-degree murder in 2004 and subsequently sentenced to an indeterminate term of 15 years to life, plus one year for use of a deadly weapon and four years for a probation violation, with the latter determinate terms to be served first, consecutive to the indeterminate term.

Effective January 25, 2010, Penal Code § 2933.05 authorized sentence-reducing credits for a prisoner's successful completion of approved rehabilitative programs. Effective on the same date,

however, Penal Code § 2933.2 barred accrual of credits under § 2933.05 for prisoners convicted of murder.

The California Department of Corrections and Rehabilitation determined that Maes, as a convicted murderer, was ineligible to receive postsentence credit under § 2933.05. Maes, however, contended that he was entitled to earn such credits against the determinate portions of his sentence.

Construing the statutory language, the Court of Appeal concluded that § 2933.2 bars accrual of postsentence conduct credits under § 2933.05 "on all determinate terms a murderer serves on a single period of custody either before or concurrent with the service of his or her indeterminate life term for murder." See: *In re Maes*, 185 Cal.App.4th 1094, 110 Cal.Rptr.3d 900 (Cal.App. 3 Dist. 2010), *review denied.* 



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog Money Back Guarantee

**Prism Optical, Inc.**
**10992 NW 7th Ave**
**Dept: LN1111**
**Miami, FL 33168**

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



PLN_0001379

## Pennsylvania Councilman Takes Private Prison Company's Donation, then Opposes Detention Center

A $3,000 campaign contribution from private prison firm GEO Group has put a spotlight on a county councilman in Pennsylvania. The contribution was made only days after Ron Angle, president of the Northampton County Council, urged his colleagues to explore a proposal from GEO in October 2010.

GEO Group proposed that Northampton County seek a contract with the Immigration and Customs Enforcement agency (ICE) to house immigration detainees. The detention contract would be farmed out to GEO.

Angle and other supporters of the project touted it as a way to bring jobs to the area and increase tax revenue for the Bangor Area School District without adding new students. GEO's donation to Angle came after the County Council authorized County Executive John Stoffa to act quickly in exploring the company's proposal.

"They didn't buy any influence," Angle said of the contribution from GEO's political action committee. "They bought my disinfluence." Angle said he spent $650 of GEO Group's donation to poll residents about their opinion on building the detention center on a 128-acre site in their community.

Local residents did not see a GEO-run facility as being a good neighbor. Based on that response, Angle urged the County Council in November 2010 to nix any action on the company's proposal. Stoffa rescinded his talks with ICE, and Essex County, New Jersey is reportedly in the process of getting the immigration detention contract.

GEO's donation to Angle, part of less than $5,000 he raised during that contribution reporting period, was properly listed in a report to the state. Angle, who is up for reelection, said he informed GEO representatives he would not support the detention center project if residents did not support it. He was the only councilman to receive a donation from the company. ◾

*Sources: www.tradingmarkets.com, http://lehighvalleyramblings.blogspot.com, The Morning Call*

## "Public Concern" Test Does Not Apply to Prisoner Retaliation Claims; Speech Must be Consistent with Status as a Prisoner

### by Brandon Sample

The "public concern" test does not apply to prisoner claims of retaliation, the U.S. Court of Appeals for the Seventh Circuit held on March 31, 2010. Nonetheless, to be entitled to First Amendment protection, a prisoner's speech must not be inconsistent with his or her status as a prisoner, the appellate court found.

The ruling resulted from an appeal by Barbara Kasper, an Indiana Department of Corrections (DOC) librarian. Kasper was sued by Charles Watkins, a prisoner law clerk at the Miami Correctional Facility (MCF), who accused Kasper of retaliating against him.

During a meeting with Kasper, Watkins and other MCF law clerks, Watkins spoke out against a policy that Kasper had instituted which prohibited him and the other law clerks from assisting prisoners with their legal work. The next day, Kasper threw away some of Watkins' personal belongings that he had failed to remove after being told to do so.

In addition, Kasper wrote a negative job evaluation and misconduct report, citing Watkins' failure to remove his personal materials from the library. Watkins was subsequently removed from his law library job. Further, for 13 days, Kasper allegedly directed that Watkins not be given a pass to the law library, denying him access.

Watkins confronted Kasper several weeks later, complaining about some of his legal materials being missing and other prisoners being allowed to rummage through his legal work that was left on a table. Watkins used a "loud and boisterous voice" when speaking with Kasper during this encounter, and employed numerous "exaggerated hand gestures." Kasper wrote another misconduct report after this confrontation charging Watkins with intimidation, which was later reduced to disorderly conduct.

Watkins sued Kasper under 42 U.S.C. § 1983 in 2005, alleging retaliation in violation of the First Amendment. He claimed that Kasper threw away his legal materials, wrote misconduct reports against him and denied him access to the library due to his objections to her policies and behavior. The case went to trial and a jury found in favor of Watkins, awarding him $150 in compensatory damages plus $1,000 in punitive damages. Kasper appealed.

The first issue considered by the Seventh Circuit was whether the so-called "public concern" test should apply to prisoner retaliation claims. The "public concern" test was created by the Supreme Court to address claims of First Amendment retaliation by government workers. Under the test, a public employee claiming retaliation must show that their speech was related to a matter of "public concern," as opposed to a "personal interest." Without such a test, the government's operations would become unworkable, according to the Supreme Court, because every employment disagreement would become a "constitutional matter." *Connick v. Myers*, 461 U.S. 138, 147 (1983).

After careful consideration, the Seventh Circuit decided to "completely jettison the public concern test from [its] prisoner free speech jurisprudence." Rather, "the dynamics of the government's relationships with prisoner-employees and with public employees are too dissimilar to transfer the public concern test to the prison context," the appellate court wrote. Accordingly, "the public concern test developed in the public employment context has no application to prisoners' First Amendment claims, even in the case of speech by a prisoner-employee."

With the public concern test out of the way, the Court of Appeals turned next to whether Watkins' speech itself was entitled to First Amendment protection. In conducting its analysis, the appellate court was guided by the Supreme Court's four-part test set forth in *Turner v. Safley*, 482 U.S. 78 (1987).

Applying *Turner* to Watkins' objections to Kasper's policy prohibiting MCF law clerks from assisting other prisoners with legal work, the Seventh Circuit held

that Watkins' objections were not entitled to First Amendment protection because he "openly challeng[ed] Kasper's directives in front of other prisoner law clerks, [thereby] imped[ing] [her] authority and her ability to implement library policy."

While Watkins had a First Amendment right to object to Kasper's policies, he had to "do so 'in a manner consistent with his status as a prisoner,'" the appellate court emphasized. For example, "Watkins could have taken the less disruptive approach of filing a written complaint." He did not do so, though, and as a result his "public challenge to Kasper's directives was inconsistent with her legitimate interests in discipline and library administration, [making Watkins'] speech unprotected as a matter of law under *Turner*."

Watkins' second encounter with Kasper also was not entitled to First Amendment protection. According to the Court of Appeals, "the confrontational, disorderly manner in which Watkins complained about the treatment of his personal property removed his grievance from First Amendment protection." Watkins "did not confine himself to a formal, written grievance or a courteous, oral conversation with Kasper about the placement of his legal materials." As such, his speech was not consistent with his status as a prisoner.

The jury's verdict in favor of Watkins was accordingly reversed and the case remanded with instructions to enter judgment for Kasper. See: *Watkins v. Kasper*, 599 F.3d 791 (7th Cir. 2010), *rehearing denied*. The lesson from this case is clear – prison-ers should communicate in writing when dealing with prison officials, if possible, and should keep copies of all such communications, including grievances. It is fully consistent with their legal status as "slaves of the state." 

# Prospect of Prison Rape Used to Deter DUIs in South Africa

## *by Brandon Sample*

A South African ad campaign intended to prevent drinking and driving has garnered the ire of human rights groups.

The ads – the idea of Brandhouse Beverages – show a group of men talking about the qualities they look for in a partner.

"I'm looking for a special person," says one. "Someone who can handle heavy situations with a smile," another states. A third man then says, "These hands will never let you go."

As the camera zooms out, it becomes clear that the men are prisoners in a cell.

The message "They'd love to meet you. Never drink and drive" then appears at the bottom of the screen.

Lukas Muntingh of the Civil Society Prison Reform Initiative was critical of the ads, which began airing in late 2010.

"What is distressing is the near acceptance of sexual violence in prison and the fact that men are raped in prison. It is [now being] used to keep the public in fear of drinking and driving," said Muntingh, who noted that if an ad directed at women used rape as a scare tactic, it would result in a public outcry.

Norman Reyneker, Brandhouse's public relations director, said critics were taking the ads out of context.

"We wanted to create a campaign which didn't simply create awareness but changed consumer behavior so that they never drink and drive again," Reyneker stated. "The campaign is not about prison life. It is about the consequences of drunk driving."

While implying that one of those consequences is prison rape, apparently. Reyneker claimed the ad, which was endorsed by the Road Traffic Management Organisation and the National Transport Department, had received over 30,000 hits on YouTube.

Perhaps not surprisingly, with the end of the apartheid regime in 1994 the number of prisoners in South Africa has dramatically increased and prison conditions have worsened. In 1992 South Africa had 104,790 prisoners, or 285 prisoners for every 100,000 citizens. Apartheid ended in 1994 with the African National Congress assuming power which it has held ever since. As of 2010, South Africa held 164,793 prisoners, or 331 prisoners per 100,000. South Africa has the largest prison population in Africa and the seventh largest in the world. 

Source: *www.iol.co.za*

## CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks. State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum). Free persons: $90.

### *CLN*, Box 687, Walnut, CA 91788

# PRISON INMATES ONLINE
Prison Inmate Directory

LIFETIME
Length of Sentence          Since 2000          MEMBERSHIPS

FREE INMATE PROFILE

Connected Across the Internet
Stay connected with family, friends and pen pals. Reconnect with long lost friends who search for you on the web.

Share Your Creative Side:
Post 150 word blogs ($5)
Post your Artwork ($5 for 5 images)
Post Poetry ($5 for 150 words)

Here's How to Get Started:
For FREE membership application send us a self addressed stamped envelope (Size #10) or (2) 1st Class postage stamps to the address below. We will mail you a Free Membership Application Card along with our brochure and application form for additional premium services.

We cannot send brochures to STATE inmates in FL, MO, or PA. Message Forwarding Service available in facilities that allow 3rd Party Mail. Message Service Prohibited in NY State Prisons.

Build the Profile You Want:
FREE - Post your name and address.
$5 - Add photos (Up to 5 for $5)
$5 - Bio Section
$15 - 300 Word Biography
$15 - Message Forwarding Service (Annually)

Got Corrlinks?:
Order our Message Forwarding Service and have messages sent from your profile on our site to your Corrlinks account. Add us as Corrlinks. Our address is info@prisoninmates.com.

PrisonInmates

Prison Inmates Online - 8033 Sunset Blvd. #1000 - Los Angeles CA 90046

PLN_0001381

# Washington Community Custody Violators Entitled to Time Served

The Washington State Court of Appeals has held that prisoners are entitled to credit for all time spent in custody on alleged community custody violations.

On June 30, 2003, Anthony Bakari Louis Bovan was sentenced to 73.5 months in prison and community custody on four robbery charges. The Washington Department of Corrections (DOC) released Bovan to community custody on March 1, 2007, but he violated the conditions of his release three times.

He was arrested for the first violation in January 28, 2008. Bovan remained in custody 13 days before a DOC hearings officer found him guilty of the violation and sanctioned him to time served on February 11, 2008.

On May 4, 2008, Bovan was arrested for his second community custody violation. A hearings officer found him guilty, imposed a 30-day sanction and granted 10 days credit for time served from May 4, 2008 to May 14, 2008.

Bovan was arrested for his third community custody violation on August 6, 2008. He was found guilty on August 18, 2008 and his release was revoked, requiring him to return to prison until his sentence expired. The hearings officer granted 13 days of credit for time served in custody from August 6, 2008 to August 18, 2008. Bovan was denied credit for the 13 days he served on the first violation and the 10 days he served on the second violation.

Bovan filed a personal restraint petition, claiming that he was entitled to credit for "the total amount of time he ... spent in detention awaiting his three disposition hearings" for the community custody violations.

The action was "technically moot" because Bovan was released while the case was still pending. However, the court agreed with the parties that it should address the issue because it was an issue of continuing and substantial interest which was likely to evade judicial review.

The court first determined that the 2002 version of RCW 9.94A.737 applied because that version was in effect at the time of Bovan's 2003 offenses. Interpreting the plain language of the statute, the court determined that it "requires DOC to give Bovan credit for 'every' and 'all' time spent awaiting disposition hearings for alleged violations of the terms of community custody." The failure to grant Bovan credit for time served on the first two violations "was contrary to the plain language of former RCW 9.94A.737(1) (2002)," the court held.

As such, "Bovan was entitled to a total of 23 days credit for time spent awaiting his first two disposition hearings for alleged violations of conditions of release to community custody. That total should have been credited against his remaining sentence following his transfer to a more restrictive confinement status to serve his remaining sentence." Deciding the issue on statutory grounds, the court declined to reach Bovan's ex post facto argument. See: *In re PRP of Bovan*, 157 Wash.App. 588, 238 P.3d 528 (Wa.Ct.App. 2010). ◢

# Second Circuit Holds BOP Correct in Not Granting Good Conduct Credits for Time Spent in State Custody

### *by Brandon Sample*

On March 26, 2010, U.S. District Court Judge Richard J. Holwell granted a habeas corpus petition filed by a federal prisoner challenging the refusal of the federal Bureau of Prisons (BOP) to award good conduct time (GCT) for time spent in state custody on a related state sentence. That ruling, however, was later reversed by the Second Circuit.

On June 19, 2008, Frank Lopez was sentenced by Judge Holwell to a federal prison term for conspiracy to distribute crack cocaine. By then Holwell had served about eight years in state prison for a state drug charge stemming from the same conduct that resulted in the federal charges. Pursuant to U.S.S.G. § 5G1.3(b), Judge Holwell ordered that Lopez be given credit for all the time he had spent in state and federal custody since August 11, 2000. He also ordered Lopez's federal sentence to run concurrent with his state prison sentence.

After completing the related state sentence, Lopez entered the BOP and noticed that the BOP had failed to award him GCT for the time he spent in state custody. He filed a habeas petition arguing that he was entitled to GCT for the time he served during his state prison sentence pursuant to 18 U.S.C. § 3624(b). The BOP argued that Lopez was not eligible for GCT because, among other things, he had already received similar credit on his state sentence.

Judge Holwell sided with Lopez, ordering the BOP to "recalculate Lopez's GCT ... based on a term of imprisonment that began when [Lopez] was arrested on August 11, 2000." In so holding, Judge Holwell interpreted the phrase "term of imprisonment" in 18 U.S.C. § 3624(b) "to encompass all of the time a prisoner serves for the federal offense, whether before or after the sentence date, and, if before the sentence date, whether credited under 18 U.S.C. § 3585(b) or U.S.S.G. § 5G1.3."

Judge Holwell's decision was influenced largely by the BOP's policy of awarding GCT based on pre-trial confinement in other situations. "[I]f an absurd result is to be avoided," Judge Holwell wrote, "§ 3624 must be interpreted to allow [Lopez] and other prisoners who receive credit under § 5G1.3(b) to earn GCT for time spent in presentence custody." See: *Lopez v. Terrell*, 697 F.Supp.2d 549 (S.D. NY 2010).

On appeal, however, the Second Circuit found that Lopez was "not eligible for good conduct time (GCT) for time spent in state and federal custody on his state conviction," because his "presentence custody had already been credited against his state sentence." In a July 13, 2011 ruling, the Court of Appeals held that it was persuaded by the BOP's interpretation of 18 U.S.C. § 3624(b) as to how GCT should be applied to Lopez's state and federal prison sentences.

The district court's grant of habeas relief was therefore reversed. See: *Lopez v. Terrell*, ___ F.3d ___ (2d Cir. 2011); 2011 WL 2708924. ◢

## Writing to Win

Need to Write better? Writing to Win will teach you the basics of how to compose clear and convincing written and oral legal arguments! 270 pages packed with solid, practical advice and tips.

$19.95 from PLN's Book Store!

# Incarceration Alone Insufficient to Terminate Parental Rights in Michigan

In addition to finding that a lower court committed legal errors in terminating a prisoner's parental rights, the Michigan Supreme Court held that incarceration alone is not a sufficient reason for termination of parental rights.

While serving a prison sentence for drunk driving and theft charges, the two sons of Michigan prisoner Richard Mason were taken into state custody after their mother, Clarissa Smith, allowed one of the children, who was three years old, to wander outside the home unsupervised.

A service plan was established by Michigan's Department of Human Services (DHS). Pursuant to Smith's request, the children were placed with their paternal aunt and uncle. When Mason's prison sentence did not end as expected and Smith failed to fulfill her obligations under the service plan, DHS moved to terminate their parental rights.

Several court hearings ensued, with Mason only being allowed to participate in the first and last hearings telephonically, missing participation in five other hearings. When the court terminated his parental rights, Mason appealed. The lower court's judgment was affirmed on appeal and the state Supreme Court granted review.

The Supreme Court held on May 26, 2010 that Mason had a right to participate in the parental rights termination proceedings by phone pursuant to MCR 2.004. He also had a right to participate in the service plan, which entitled him to services to help him comply with the plan.

The Court noted that "the state's failures in this case (which are all too common in this type of case) appear to stem primarily from the fact of [Mason's] incarceration." Instead, the focus should have been on the statutory criteria in MCL 712A.19b(3)(h), which sets three conditions that must be met for termination of parental rights.

"The combination of the first two criteria – that a parent's imprisonment deprives a child of a normal home for more than two years *and* the parent has not provided proper care and custody – permits a parent to provide for a child's care and custody *although the parent is in prison*; he need not *personally* care for the child," the Court wrote. "The third necessary condition is forward-looking; it asks whether a parent 'will be able to' provide proper care and custody within a reasonable time."

Mason had participated in prison programs to comply with the service plan, had arranged for the children to be cared for by relatives, and had arranged for a job and housing to care for his children upon his release on parole, which came less than a year after his parental rights were terminated.

The Supreme Court reversed the lower court's judgment and remanded the case for further proceedings, finding that the lower court "erred by terminating [Mason's] rights under each of the grounds alleged." See: *In re Mason*, 486 Mich. 142, 782 N.W.2d 747 (Mich. 2010).





PLN_0001383

# Does Less Punishment Mean Less Crime?

The fiscal crisis facing virtually all state governments has brought to the forefront of public debate the following question: When do longer prison sentences and harsher punishment become counterproductive? Has the clock finally run out after four decades during which politicians at all levels of government built their careers by being "tough on crime"? In the state of New York, both lawmakers and voters are reaping the fiscal and societal benefits of a lower incarceration rate, a lower crime rate and less money expended on corrections as a result of criminal justice reform measures. Only time will tell if this trend is embraced by other states and the federal Bureau of Prisons (BOP).

In the past, politicians seeking to build their constituencies hailed high rates of incarceration as the sole reason for falling crime rates. The states and federal government, with few financial constraints, quadrupled the incarceration rate in the United States since 1970. The U.S. was not alone in this trend, with Britain doubling its incarceration rate and Japan increasing its rate by half. The U.S., however, distinguished itself during this time period by ratcheting up punishments for low-level drug crimes so that now 10- to 15-year sentences for such offenses are not uncommon. Further, by exploiting sentencing "guidelines" that boost prison terms and by threatening multiple-count indictments, federal prosecutors can easily win guilty pleas that result in lengthy sentences for even non-violent crimes.

The state of New York, however, has started to turn its back on draconian criminal justice policies and has begun to reap the benefits from doing so. In an environment where many states have learned they do not have the funds to incarcerate all offenders for lengthy prison terms, the Empire State found a more cost-effective way to deal with crime. New York has set aside the mistaken presumption that drug-related activity is the most dangerous threat to modern society and deserving of its own "war."

The U.S. government's own statistics from 2007, the most recent year available, clearly refute that presumption. Of the 2.42 million deaths that year, more than 1.8 million were due to disease. Accidents killed another 123,706, including 43,945 motor vehicle fatalities. Drug overdoses and drug-related deaths trailed at 38,371 (not including alcohol-related deaths, which numbered 23,199), slightly more than the 34,598 suicides that year. What's wrong with this picture? No one denies the tremendous societal cost of drug addiction and drug-related crime, but does it require its own "war," which is more a war on citizens who use certain drugs than a war on drugs themselves? New York has decided that it does not.

Compare the situation in New York with that of Alabama, which still considers itself a "get-tough" state and is now paying the price. According to a report by Justice Strategies, a criminal justice research organization, Alabama prisons are "dangerously" overcrowded with a 13,403-bed system crammed with more than 26,000 prisoners. The state's prison system is underfunded and Corrections Commissioner Richard Allen stated, "We have cut just about all we can cut." The shortfall in financing for prison operations means there is little money left to fund alternative forms of punishment.

According to Justice Strategies, the problem arose from the toughness of Alabama's drug laws. "Drug felony caseloads have been driven by drug possession rather than more serious drug offenses such as distribution, trafficking, or manufacturing of a controlled substance. Between October 2005 and September 1008, three in four Alabamians sentenced for a felony drug offense were convicted of simple possession of marijuana (13 percent) or other drugs (64 percent). Drug offenses represent the largest single category of prison admissions, responsible for 36 percent of prison admissions in fiscal year 2008."

Alabama's laws do not adequately distinguish between drugs for personal use and those for distribution. "[F]irst time possession of marijuana for personal use is a Class A misdemeanor ... subsequent conviction[s] [for possession are] considered possession in the first degree – a Class C felony punishable by up to 10 years in prison.... More people entered prison in fiscal year 2007 for first-degree marijuana possession (448) than for first-and second-degree assaults combined (368)."

Although crime rates have dropped in Alabama, mirroring a national trend, they have not dropped as much as in other states like New York, which have reformed their drug laws. In fact, Alabama has fallen behind the nation as a whole in terms of crime rates, indicating that tough sentencing laws are not the answer to curtailing crime, especially when weighed against their heavy societal costs.

Since 2000, New York's violent crime rate has dropped 25 percent and its property crime rate has decreased 22 percent; specifically, murder is down 16 percent, robbery down 25 percent, burglary down 27 percent and auto theft down 49 percent. Alabama, in contrast, has suffered sharp increases in murder (up 20 percent), robbery (up 25 percent), burglary (up 8 percent) and auto theft (up 7 percent). The same FBI uniform crime reports show that violent crime for the nation as a whole has dropped 8 percent and property crime has decreased 10 percent, while the incarceration rate rose 3 percent.

What accounts for the wide disparity in the FBI's statistics? Recent reviews of deterrence research, which examine the relationship between sentencing severity and crime deterrence, have found no evidence that harsher sentences result in lower crime rates. The studies also showed the limitations of "incapacitation," when incarcerated people are prevented from committing crimes during the duration of their prison sentences.

Based upon crime rate statistics from New York and Alabama, there appears to be no direct relationship between incarceration rates and crime rates. It is highly probable, according to the book *The Crime Drop in America*, edited by Alfred Blumstein and Joel Wallman, that incarceration accounts for approximately 25 percent of the decline in violent crimes. Other factors, such as population demographics, drug abuse patterns, more police and different policing tactics, and employment levels have a greater influence on crime rates. One economist, Steven Levitt, in *Freakonomics*, theorized that legalized abortion led to a drop in crime because fewer unwanted babies grew up to be criminals. Sociologist John Conklin wrote in *Why Crime Rates Fell* that half of the decrease in crime rates could be attributed to increased incarceration.

"Increased sentencing in some communities has removed entire generations of young men" from their communities, noted San Francisco police chief George Gascón. "Has that been a factor in lowering crime? I think it probably has. I think it also probably has had a detrimental effect on those communities."

"We now incarcerate four times as many people as we did 20 years ago," stated John Roman, director of the Dis-

PLN_0001384

trict of Columbia Crime Policy Institute. "Just by sheer size you've removed a lot of potential offenders from the street. I don't think that's very popular in many circles but it's very hard to argue with."

Incapacitation through incarceration doesn't completely explain the drop in crime rates, though, particularly since the vast majority of prisoners are eventually released, at the rate of over 680,000 a year from state and federal prisons. Thus, while incarceration may postpone crimes that would have been committed by offenders were they not in prison, it does not prevent future crimes – as evidenced by the nation's high recidivism rate, which was estimated at 43.3 percent in an April 2011 report by The Pew Center on the States, based on data from 2004-2007.

New York has led the way in promoting drug treatment, reductions in sentencing and other reforms that have helped decrease both the state's prison population and financial outlays for incarceration. New York has experienced a remarkable decline in its prison population over the past ten years. The U.S. Bureau of Justice Statistics reported that New York prisons held 72,899 prisoners in 1999 and 62,211 by June 2008. This

reversed a trend of more prisoners and more prison construction that began in 1973 under Governor Nelson Rockefeller, who enacted the infamous Rockefeller drug laws. Those laws mandated minimum sentences for drug offenses, increased drug-related incarcerations from 470 in 1970 to 8,521 in 1999, and helped fuel a prison population increase from 12,144 in 1972 to the 72,899 figure in 1999.

In 2001, New York was already experiencing some of the financial difficulties that only recently have begun to catch up with the rest of the country. With falling tax revenues and increased expenditures for corrections and basic social services whipsawing the state budget, legislators struggled to cut prison spending and called for a halt to new prison construction. There were also non-fiscal reasons for the decline of the prison population. Studies showed that a public health approach to the problems of drug abuse and related criminal activity produced far better outcomes for public safety (and public coffers) than increased prison sentences.

A study by RAND Corporation concluded that money spent on treatment for people prosecuted on federal cocaine charges would reduce serious violent and

property crimes about 15 times more effectively than incarceration.

A U.S. Department of Health and Human Services evaluation of clients in publicly-funded treatment programs found that drug use dropped by 41 percent in the year after treatment, and the proportion of clients selling drugs dropped 78 percent. The percentage of people arrested on any charge following treatment also dropped, by 64 percent.

The California Drug and Alcohol Treatment Assessment (CALDATA) study found that for every tax dollar invested in substance abuse treatment, taxpayers saved seven dollars in future crime and health-related costs. A Washington State Institute for Public Policy cost/benefit report indicated that for those convicted of drug offenses, a dollar invested in imprisonment produced just $.37 in crime reduction benefits while the state's drug courts produced $1.74 in benefits for each dollar spent.

Closer to home for New Yorkers, the Brooklyn District Attorney's Drug Treatment Alternative to Prison (DTAP) program found that even individuals with serious criminal histories benefited from the program. Those in the DTAP program were 26 percent less likely to be arrested and 67

# PRISONER ASSISTANT

REHABILITATION AND REENTRY PLANNING

482 Summit Wind Drive - Suite 704 - Lake Harmony, PA - 18624-0704  (570)-722-5800

*Take advantage of our one of a kind Financial Concierge Service. We only serve our clients, so join us by opening a bank account today and enjoy the full range of services not offered anywhere else.*

*It is impossible to explain the scope of our services here. If you want more information please send $4.50 or one book of Forever stamps with a request for an Application Package (money orders should be made out to Prisoner Assistant / no personal checks are accepted). This package includes an introduction letter, Confidential Application & Management Agreement, brochure, frequently asked questions, Power of Attorney, 36 page color catalog and current newsletter. It is only by reading through the package that you can understand the depth of our commitment and the limitless possibilities that exist. We will send a brochure to those that include an SASE or $.44, and will not respond to inquiries without payment.*

*It costs $35 to open a checking, savings and email account, you will have to sign a limited Power of Attorney and pay for a Client Account Package which is a minimum of $4 per month. What you get is unlimited access to the most dynamic service ever offered to prisoners.*

**Bringing The World**

**To Your Fingertips**

## Most requested services

| | | | |
|---|---|---|---|
| Money Orders | CDs & Money Markets | Internet Research | Email Monitoring |
| People Locator | Western Union | Parole Preparation | Virtual Office |
| Gift cards | Social Networks | Stamp Exchange | Travel Arrangements |

Internet Purchases: Books, Flowers, Lingerie, Toys, Athletic Gear, Gifts etc..
Term Life Insurance  Credit Cards   Mailing Addresses   Resume & Logo Creation
Advertising   Cell Phone contracts   Credit Development   Business Development

*  Self directed services  *

### Your obligations as a client

*This is your professional service, we expect all communication to be courteous, brief and focused on the issue. Prisoner Assistant charges fees based on the time involved and the skill level required, Our minimum billing rate is $.40 per minute or $24 an hour. If we are working on your file for any reason, if you call us or email us, expect to be billed. You will be required to maintain a $100 balance at all times, you will be required to sign up for a Client Account Package which will cost a minimum fee of $4 per month for basic clients. This means a minimum fee of $48 per year, just to maintain the account. After considering the benefits if you think this fee is excessive, this is not the service for you.*

### What to expect from Prisoner Assistant

*Prisoner Assistant has designed the only financial concierge service available to prisoners. We provide professional services for our clients. These services are only limited by your imagination. Our slogan is "if it can be done, we will do it" and we mean just that. We spend a great deal of time setting up your file physically and electronically, considering how the use of your personal information will appear to the world. We create a presence for you that exists outside of your prison cell. We bring the world to your finger tips. That is our real commitment to each client. We will provide you with an account statement and a newsletter announcing updates and new services for our clients each month.*

**The banks have fully merged and we have updated our procedures.**

PLN_0001385

## Less Punishment, Less Crime? (cont.)

percent less likely to return to prison than offenders in a matched comparison group.

Like many other prison reform efforts, the changes in New York started quietly. Former Governor George Pataki, an otherwise conservative bastion of Republican politics, inserted two drug reform provisions in the state's 634-page budget bill in 2003, ostensibly as a budget-cutting move. One measure provided that prisoners serving a mandatory sentence under the Rockefeller drug laws could receive a "merit time" reduction of one-third of their minimum prison term for good behavior and participation in work or treatment programs. A second measure expanded the DOC's "earned eligibility" program under which certain prisoners who completed work and/or treatment program assignments could earn a certificate that made release on parole presumptive at their first hearing unless the parole board decided otherwise. Non-violent prisoners with a clean prison record and no prior violent felony record could apply to the DOC commissioner for a "presumptive release" after serving five-sixths of their minimum term, with no need to go before the parole board.

In 2004, the New York legislature doubled the drug amounts that triggered mandatory minimum prison sentences, which granted hundreds of prisoners the right to petition for early release under the new sentencing provisions. In 2005 the Rockefeller drug laws were again changed, providing for a "merit time" allowance for prisoners to petition for resentencing for certain offenses. Judges were given more latitude to determine sentences and increased discretion in handling resentencing decisions. Finally, in 2009, as a result of efforts by a statewide coalition of service providers, policy and prisoners' rights advocates, and treatment and medical professionals, the Rockefeller drug laws were again modified to remove mandatory minimum sentences, resulting in estimated savings of $250 million annually.

"I can't think of a criminal justice strategy that has been more unsuccessful than the Rockefeller drug laws," New York Governor David A. Paterson said in his State of the State address in January 2009. Paterson had been arrested in 2002 when he was Senate Minority Leader for protesting the Rockefeller drug laws in an act of civil disobedience.

Under new state laws, prisoners suffering from a serious and permanent medical disability who do not pose a threat to public safety will be eligible for medical parole after serving half of their sentence. Prisoners who take college courses, enroll in state-approved apprenticeships or work as a prison hospice aide can qualify for increased "merit time" credits. More defendants convicted of non-violent crimes are being recommended for short-term "shock prison camp" instead of receiving lengthy prison sentences. Efforts are underway to transfer some of the savings into work release and increased training programs for prisoners.

These money-saving reforms are now running into opposition, not from people who challenge the efficacy of the programs but from those who risk losing the economic benefits that their communities gained from the state's prison-building boom – mainly in the form of prison jobs. Newly-elected Governor Andrew M. Cuomo, in his first annual address to the legislature, vowed that underused prisons would no longer serve as "an employment program" for upstate New York. "If people need jobs, let's get people jobs. Don't put other people in prison to give some people jobs. Don't put other people in juvenile justice facilities to give some people jobs. That's not what this state is about," he said.

The exact reasons for declining crime rates in New York and nationally are unknown, particularly in light of the economic downturn, which was expected to lead to an increase in crime. "As the economy started shedding jobs in 2008," stated Heather Mac Donald, with the Manhattan Institute, "criminologists and pundits predicted that crime would shoot up, since poverty, as the 'root causes' theory holds, begets criminals. Instead, the opposite happened. Over 7 million lost jobs later, crime has plummeted to its lowest level since the early 1960s." It is safe to say, though, that focusing on drug treatment, reentry and recidivism reduction rather than harsher prison sentences is a contributing factor to lower crime rates.

New York is not alone in enacting criminal justice policy reforms. Since 2000, state legislators in more than half the states have taken steps to modify or repeal mandatory sentencing laws, to shorten prison sentences, to increase the rate at which low-risk prisoners are released from confinement, and to reduce the number of parolees returned to prison for committing "technical" violations. In 2008, 26 states decreased their prison populations, which resulted in the first drop in the overall state prison population in almost 40 years and spurred a number of prison closures. [See: *PLN*, April 2009, p.1]. This decreasing reliance on incarceration has coincided with declining crime rates. According to FBI statistics, the number of violent crimes in the U.S has continued to drop, including murder, aggravated assault, forcible rape and robbery. In 2009, New York City had the lowest number of murders since the FBI started keeping detailed records in 1963.

Now, for the first time in recent memory, the federal government is experiencing the same fiscal pressures that the states, nominally required to balance their budgets, have faced. Will budget cuts and pressure from the declining economy accomplish what a chorus of policy experts and studies have been unable to convince the Justice Department and BOP to do, given that the federal prison population has continued to increase apace? Certainly, it would not be hard to implement or expand criminal justice reform measures on the federal level, and the BOP's drug treatment programs, including RDAP, which provides reduced sentences for completion of a residential drug treatment program, is an apparent success.

Has the time finally arrived when the federal government and the rest of the states will recognize that primary reliance on incarceration as crime reduction strategy and drug control policy is neither effective nor economical, as compared to the sentencing and correctional reforms that New York has embraced?

We can only hope to answer that question in the affirmative. As stated by John Roman, director of the District of Columbia Crime Policy Institute, "You can make the case that mass incarceration hastened the end of the crime wave. You would have a much more difficult time making the case that a continuation of that mass incarceration is necessary. The benefit from preventing crime, since crime rates are so much lower, is a lot smaller than it used to be and the costs continue to go up. We're investing more and more in prison and getting a smaller and smaller return." ◼

Sources: *"Children on the Outside: Voicing the Pain and Human Costs of Parental Incarceration," Justice Strategies (Jan. 2011); New York Times; The Economist; www.cdc.gov; Time Magazine; www.pewcenteronthestates.org; www.guardian.co.uk; www.timesunion.com*

# BOP Evidence-Handling "Grave Miscarriage of Justice"; Charges Dismissed by Federal Judge

On March 18, 2011, a federal judge in Oregon dismissed criminal charges against a federal prisoner due to mishandling of evidence by the U.S. Bureau of Prisons (BOP).

In August 2009, BOP prisoner Jose Sanchez-Arce, 32, and another prisoner fought with a guard at a medium-security federal facility in Sheridan, Oregon. Both were charged with assaulting a United States government employee. The other prisoner pleaded guilty but is likely regretting that decision based on what happened in Sanchez-Arce's case.

Sanchez-Arce's three-day trial began on March 15, 2011 before U.S. District Court Judge Michael W. Mosman, Oregon's former U.S. Attorney and a judge who has a reputation for siding with law enforcement.

Not this time, however. As the trial moved toward jury deliberations, evidence that should have been provided to the defense and prosecutors continued to trickle in from the BOP.

Harold McCloux, one of Sanchez-Arce's attorneys, argued that the evidence undermined the credibility of government witnesses, and some of the evidence was not disclosed until 30 minutes after the jury began deliberating.

Mosman spoke with one juror who was in tears about what to do and how to proceed after the additional evidence came in. Prosecutors then moved to dismiss the case and Mosman dismissed the charges with prejudice, preventing a retrial.

In so doing, he blasted the BOP's mishandling of the evidence, calling their actions "sloppy," "abysmal," "unjustified" and "a grave miscarriage of justice."

Mosman said the BOP's actions were the worst performance by a federal agency that he had ever witnessed in his years on the bench and as U.S. Attorney.

The BOP's mishandling of the evidence caused "a radiating circle of harm," not only due to the time and money wasted at trial but to the jurors, federal prosecutors, defendant and his counsel, said Mosman.

"This is a trial that never should have happened," Judge Mosman declared. "It was an agency debacle that could have unfairly blighted the prosecuting attorneys" and created an "abiding uncertainty about what wasn't in the record."

Mosman faulted the BOP for treating all the parties in the case "with cavalier disregard." The jurors experienced "uncertainty on what to do about gaps in the record," said Mosman. "It was confusing for them."

BOP spokesman John McCafferty declined to comment on Mosman's ruling but the U.S. Attorney's office had plenty to say. According to Assistant U.S. Attorney Kent Robinson, second in command in the office, all BOP criminal referrals were suspended.

"We are concerned about what happened with this case," said Robinson. The suspension will remain in effect "until we can assure ourselves and the court these problems won't be repeated."

The number of criminal referrals from the BOP prison in Sheridan is relatively small, but two outstanding assault cases remain pending, Robinson noted. See: *United States v. Sanchez-Arce*, U.S.D.C. (D. Ore.), Case No. 3:09-cr-00397-MO-1. ◾

Additional source: *The Oregonian*

### Actual Innocence
Explains how the innocent are convicted by faulty eyewitness testimony, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$16.00 from PLN's Book Store!
See page 53 for more information.

## ATTENTION VETERANS

The Texas Civil Rights Project can now help veterans in prison by offering two new programs, free of charge for qualifying applicants.

**Discharge Upgrades** – help to upgrade from "less than honorable" to "honorable," status to help you get access to veterans' benefits from the DVA. To learn more, please write to us with your (1) current discharge status; (2) circumstances of your discharge; (3) expected length of prison sentence.

**Medical Parole** – for eligible inmates who are physically disabled, terminally ill, or elderly. To learn more, please send us a detailed description of: (1) your medical condition; (2) disciplinary history; (3) any parole violations.

ALL applicants, for either program, should also describe: (1) branch of service; (2) years of service; (3) the charges for which you are imprisoned.

**For more information, write to:**
*Justice for Veterans Campaign*
1405 Montopolis Dr., Austin, TX 78741

*We cannot assist with criminal appeals or time calculation.*

### New for 2011 -- 3rd Edition
### WINNING HABEAS CORPUS & POST CONVICTION RELIEF

**Updated through 609 F.3d, over 575 pages!** Used by attorneys, judges, and inmates. Write briefs directly from the book. (Not a two line summary bite of the case but actual opinion.)

**Attorney Kent Russell** writes: "Now that I've been turned on to Winning Habeas Corpus, I always make sure that it's close at hand."

- A virtual law library in a single book, actual case quotes
- Habeas corpus procedures & Prac., § 2254, Rule 60(b)
- Sixth Amendment & IAC, Pretrial duty to investigate
- Recognized defenses, plea bargain process
- Jury instructions, sentencing, time bar, tolling
- Over 1300 cases cited, 10" x 7" format, 10 pt. font

**Inmates only $58.50**
To order send money order or institutional check to:
Fast Law Publishing Associates
P.O. Box 577, Upland, CA 91785
On line: www.fastlaw.org e-mail: flpa@clearwire.net

PLN_0001387

# *PLN* Wins Partial Victory, Attorneys Fees in FOIA Video Tape Suit Against U.S. Attorneys' Office

### by Brandon Sample and Derek Gilna

In a lawsuit brought under the Freedom of Information Act (FOIA), Prison Legal News was awarded attorneys fees by a U.S. District Court in Colorado after the federal government agreed to release some of the records requested by PLN. On appeal, the Tenth Circuit Court of Appeals denied additional relief, ruling that the remaining records, which included graphic crime scene video and autopsy photos of a prisoner murdered at the U.S. Penitentiary in Florence, Colorado, need not be released. The total amount of attorneys fees awarded was $13,779.20.

The Executive Office for United States Attorneys (EOUSA) had withheld all video, audio tapes and transcripts related to the prison murder, but released many of the requested records prior to the appellate court's decision. The Tenth Circuit ruled that the disclosure of the remaining crime scene materials "could reasonably be expected to constitute an unwarranted invasion of personal privacy of the victim's family," citing 5 U.S.C. § 552(b)(7)(C). A motion for rehearing en banc was denied.

Prisoner Joey Jesus Estrella was murdered in his cell by his two cellmates, William Sablan and Rudy Sablan, in October 1999. A Bureau of Prisons (BOP) official filmed the crime scene, including the interior of the cell, Estrella's mutilated body and the extraction of the Sablans from the cell. Autopsy photos of Estrella's body were also taken. The Sablans were accused of killing and disemboweling Estrella after getting drunk on homemade wine.

PLN had originally filed a FOIA request for the audiovisual records related to the crime, including the videotapes and autopsy photos that were introduced as evidence at the trial of William Sablan. The EOUSA denied the request, the U.S. Department of Justice (DOJ) denied PLN's administrative appeal and PLN then filed a complaint in federal court to obtain the records.

The district court entertained cross-motions for summary judgment, and ordered the release of part of the video showing the Sablans' removal from the cell plus the audio of BOP officials' voices in the first portion of the video that was not released. [See: *PLN*, March 2010, p.36]. Both PLN and the EOUSA appealed, but the EOUSA withdrew its appeal and

released another part of the video, along with the audio tapes of the first portion of the video, with four of the Sablans' statements redacted. The only remaining materials withheld by the EOUSA, which were the subject of PLN's appeal to the Tenth Circuit, included the first part of the video showing the bloody crime scene in the cell, four redactions of the audio from the video and the autopsy photos.

The Court of Appeals, in its de novo review, scrutinized the EOUSA's use of FOIA exemption 7(C), which allows an agency to exclude from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(B)(7)(C).

In reviewing the facts, the Tenth Circuit found that the "relevant privacy interests are the interests of Estrella's family." The appellate court noted the graphic nature of the video and photographs of Estrella's body, stating the government bore the burden of showing that the requested records fell within a FOIA exemption. PLN argued that the Estrella family had no expectation of privacy because the images were taken in a prison cell and were introduced into evidence at the Sablans' public trials, and the government did not seek to seal those exhibits during the trials. PLN requested an evidentiary hearing to determine whether Estrella's family objected to the release of the records.

The Court of Appeals held that Estrella's "status as a prisoner does not bear on his family's privacy interest in not having gruesome images of his body publicly disseminated," citing *National Archives, et al. v. Favish*, 541 U.S. 157 (2004). The appellate court also ruled that the "family's failure to object at the time of trial is also not sufficient to waive their own privacy interests under FOIA." The Tenth Circuit based its decision on the fact that the images "were displayed only twice (once at each Sablan trial); only those physically present in the courtroom were able to view the images; and the images were never reproduced for public consumption beyond these trials."

The Court of Appeals found that exemption 7(C) was applicable, stating "the test [of exemption] is an objective one and does not depend on the affected individuals' statements of objection or their personal views of the harm they might suffer."

PLN argued that disclosure of the records would "shed light on the BOP's performance of its duty to protect prisoners from violence perpetrated by other prisoners, including its obligations to provide adequate conditions of confinement and to prevent prisoners from falling under the influence of alcohol and other prohibited substances." PLN's second argument was that disclosure would help the public understand the prosecution's decision to seek the death penalty in the Sablans' murder cases – a decision that significantly increased the cost of their prosecution. While both Sablans were convicted of killing Estrella, the juries declined to sentence them to death.

PLN's "public domain" argument – that the records had already been released publicly at the Sablans' trials and thus should be disclosed – had previously been upheld in the D.C. Circuit in *Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999). However, the Tenth Circuit distinguished *Cottone* based upon the materials sought. According to the appellate court, "[t]he public domain doctrine is limited and applies only when the applicable exemption can no longer serve its purpose."

In a footnote, the EOUSA was granted the right to file the unreleased records with the district court, under seal. PLN filed a petition for writ of certiorari on June 14, 2011, seeking review of the Tenth Circuit's ruling by the Supreme Court and asking the court to resolve the circuit split regarding the public domain doctrine. See: *Prison Legal News v. Executive Office for United States Attorneys*, 628 F.3d 1243 (10th Cir. 2011).

A number of media and criminal justice organizations joined amicus briefs in support of PLN's petition, including Allied Daily Newspapers of Washington, Inc., the Associated Press, Pioneer Newspapers, Inc., the Society of Professional Journalists, the Washington Newspaper Publishers Association, the Washing-

ton State Association of Broadcasters, Westword, Columbia Legal Services, the Florida Justice Institute, Inc., the Legal Aid Society of New York, the Prison Law Office, Prisoners' Legal Services, Prisoners' Legal Services of New York, the Southern Center for Human Rights, the Texas Civil Rights Project, the Uptown People's Law Center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs.

On October 17, 2011, the U.S. Supreme Court denied review in the case without comment. *PLN* was ably represented in the district and appeals court by Gail Johnson of Brennan and Johnson in Denver, Colorado. The *PLN* supreme court team consisted of Paul Clement of Bancroft LLC, Zachary Tripp of King and Spalding, Neil Siegel of Duke Law School and Human Rights Defense Center chief counsel Lance Weber. The media amici were represented by Lisa Blatt, Kristin Hicks and Dirk Phillips at Arnold and Porter. The criminal justice amici were represented by Christopher Wimmer and Hillary Richard of the firm Brune and Richard. *Prison Legal News* and the Human Rights Defense Center are grateful for the top notch legal representation received in this case and the support of the amicus, their counsel and our supreme court team. ◾

Additional sources: *www.denverpost.com, Westword*

## Ninth Circuit: PLRA Precludes Award of Attorney Fees Where Violation of Prisoner's Rights is Not Affirmatively Established

The Ninth Circuit held that the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d)(1), precludes an award of attorney fees in cases where a prisoner obtained relief but did not affirmatively establish a violation of protected rights.

Proceeding pro se, state prisoner Clark Allen Kimbrough filed a complaint in federal court alleging that a 1997 California Department of Corrections grooming regulation, codified at 15 Cal. Code Regs. § 3062(e), which required prisoners to maintain their hair no longer than three inches in length, violated his First Amendment right to free exercise of religion.

After the district court granted summary judgment to the state defendants, the Ninth Circuit enjoined enforcement of the grooming regulation. The appellate court then remanded the case to the district court to consider whether the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*, which was passed by Congress while Kimbrough's appeal was pending, applied to his case.

On remand, Kimbrough filed a second amended complaint alleging violations of his rights under RLUIPA and successfully moved for several extensions of the preliminary injunction that enjoined enforcement of the challenged grooming regulation.

In November 2003, the U.C. Davis School of Law, King Hall Civil Rights Clinic, was appointed to represent Kimbrough; however, he was released on parole approximately seven months later, effectively mooting the case.

King Hall subsequently moved for an award of attorney fees in the amount of $47,497.18, which the district court ultimately granted. The state appealed the fee award, arguing that no actual violation of Kimbrough's rights had been established.

Relying on several precedents, principally *Siripongs v. Davis*, 282 F.3d 755 (9th Cir. 2002) [*PLN*, June 2003, p.13], the Ninth Circuit held that the PLRA precluded the award of attorney fees because the statutory language of 42 U.S.C. § 1997e(d)(1)(A) restricts such awards to cases in which an "actual violation" of rights was proven.

In Kimbrough's case, although he received temporary relief in the form of a preliminary injunction (indicating he was reasonably likely to succeed on the merits), he was paroled before the district court ruled on his motion for a permanent injunction. Thus, there was no affirmative finding that Kimbrough's rights had been violated. See: *Kimbrough v. CDCR*, 609 F.3d 1027 (9th Cir. 2010).

*PLN* readers should note that the grooming regulation at issue in this case was subsequently changed to allow prisoners to maintain their hair at any length. ◾

**FREE! 12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! (Void in New York)
(Last Quarter's winner from **Navasota, TX.**)
TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

**Inmate Magazine Service** Inc.

PLN_0001389

# News In Brief:

**California**: A woman believed to have robbed as many as 20 banks in Montana, Oregon and Washington while wearing wigs, which earned her the nickname "Bad Hair Bandit," turned out to be a former prison nurse. Cynthia Van Holland, 47, was arrested on August 15, 2011 along with her husband, Christopher Scott Alonzo, following a bank robbery in Auburn, California. Van Holland and Alonzo apparently met while Alonzo was serving time in an Idaho state prison and Van Holland worked as a contract nurse for Correctional Medical Services.

**Florida**: Lake County jail prisoner Larry Stone, 32, managed to bond himself out after exploiting a glitch in the facility's phone system, according to a July 28, 2011 news report. The phone system was designed to refund charges when a call did not go through, but due to a software error it provided double refunds. Stone simply made calls and hung up until the refunds totaled more than $1,250 and he could post his own bond. He was re-arrested shortly after his release when jail officials figured out the problem with the phone system. The glitch has since been fixed.

**Hawaii**: When Perry Jay Griggs was incarcerated at mainland federal prisons with prisoners from Hawaii, he pitched them and their families on investing in the Aloha Trading investment program, which Griggs operated with his wife, Rachelle. Seventeen people, most from Hawaii, invested over $4 million in the program, which turned out to be a Ponzi scheme. Griggs and his wife went on the run after he was released from prison; they were captured in December 2010 and Griggs pleaded guilty to federal mail and wire fraud charges in April 2011. He was sentenced on August 5, 2011 to 87 months in prison, three years supervised release and more than $1.9 million in restitution. Rachelle Griggs received a 48-month sentence.

**Illinois**: Janet M. Collins, 47, a nurse administrator at the Great Meadow Correctional Facility, was charged in July 2011 with first degree falsifying business records for allegedly falsifying her time cards. Collins was suspended by the Department of Corrections following her arrest. She is accused of filing time cards between October and June 2011 that indicated she had worked at times she did not.

**Iraq**: On August 5, 2011, two prisoners and a guard were killed during an escape from the Hillah prison in central Iraq. Five other people were reportedly injured in the incident, though it was unclear whether they were prisoners or prison employees. At least one prisoner escaped according to Justice Ministry spokesman Haider al-Saadi, who said four prisoners and four guards were under investigation in connection with the prison break.

**Maine**: A social worker who smuggled drugs, porn and nude pictures of herself into the Maine State Prison was sanctioned by the Board of Social Worker Licensure following a hearing in May 2011. Jaime Dale Semple Harnett, 34, received a public reprimand and a $4,500 fine; the Board also stated it would have revoked her social workers license had it not already lapsed. Harnett, who was employed at the Maine State Prison from 2001 to 2010, reportedly had a personal relationship with an unidentified prisoner serving a 25-year sentence. She was accused of smuggling contraband, including suboxone, pornographic DVDs and a cell phone with her nude photos. Harnett had resigned on June 1, 2010; she was not prosecuted.

## PLN Classifieds

**Auntie Love Back with More Love**
SASE 4 New Pen Pal Site - Hurry!
PO Box 1987 Lancaster CA 93539

Hate Global Tel Link? Securus?
PrisonerConnect.com Can Help
Serving All Federal, State Jails
Lowest Inmate Calls Available
Rollover Minutes If Not Used
Call 1-866-855-8224
www.PrisonerConnect.com
Member Of Better Business Bureau

**QUESTIONABLE CONVICTION?**
* Use technology to get noticed
* Send your case files to 100's
* Faster response times from Attorneys
* No more postage & copy fees
Send SASE to: InAd Tech LLC
233 SW Greenwich Dr. #167
Lees Summit, MO 64082

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**Diamonds Beyond The Wall**
by Miss Veronica. Poems & essays
on prison life from a woman's
view. Positive & uplifting. Mail
check or money order for $18.50
to Crusade4hope, PO Box 27231
Raleigh, NC 27611.
Or send SASE for more info.

**FROM-INSIDE OUT**
5730 N. 1st ST #105-255
Fresno, CA 93710
Send your love from-inside out
Flowers from $19.99, Bears $8.99
Choco.Covered berries $19.99
Personal fortune cookies $12.99
Shpng 10S send your order today
SASE for more info

**LOVE TO TYPE MANUSCRIPTS!**
No Legal Documents.
Will type, design & lay out pages
Accurate and dependable
Reasonable Rates!
Ambler Document Processing
P.O. Box 938, Norwalk, CT  06852

**Education Behind Bars Newsletter**
A free publication focused on
prison education is seeking
submissions between 500 and 2500
words in length. More online at:
http://www.PrisonEducation.com
EducationBehindBars@yahoo.com
PO Box 69, Berryville, AR 72616

**Surrogate Sisters**
Services to the Incarcerated.
No games. In business 14+ years.
We sell photos of sexy women,
gifts for loved ones, & other services.
For more info send a SASE to:
Surrogate Sisters - PN
PO Box 95043, Las Vegas NV 89193

**Nevada**: On July 29, 2011, Clark County Detention Center prisoner Carl Guilford, 18, who was being held on charges of murdering his 6-year-old nephew, beat, choked and used a pencil to stab his cellmate to death. Guilford will face additional murder charges for killing fellow prisoner Francesco Sanfilippo, 39. Guilford claimed that Sanfilippo had made sexual advances to him, but later said the devil told him to kill his cellmate. Guilford had previously completed a psychiatric evaluation and was declared safe.

**New York**: Ronald Tackman, 57, escaped from Manhattan Criminal Court in 2009 by posing as an attorney. Apparently not amused at his disrespect for the justice system, Tackman was sentenced to 28 years for the escape on July 21, 2011; the stiff sentence also includes time for a series of robberies he committed in 2007 and 2008. Tackman was wearing a suit when he was at the criminal court in 2009, though he had jail-issued orange sneakers. He covered the sneakers with black socks, walked down to another floor when left unattended, and exited the courthouse by pretending to be an attorney. Lawyers must now show ID to court staff.

**North Carolina**: On July 14, 2011, 10 to 15 death row prisoners at the Central Prison in Raleigh held a peaceful protest after another condemned prisoner, William Bowie, was allegedly beaten by a prison guard while handcuffed. The prisoners participating in the protest stood up in the chow hall and spoke out about the abuse; the next day they were placed in administrative segregation. On August 14, 2011, more than 30 people gathered outside the Central Prison to protest in solidarity with the death row prisoners and in support of prisoners in California conducting a hunger strike.

**North Dakota**: In July 2011, former Burleigh County jail guard Corey Wiege, 40, pleaded guilty to a misdemeanor assault charge and was sentenced to one year deferred imposition of sentence. Wiege was charged with assaulting prisoner Carlos Mendez by putting him in a headlock, kneeing him in the groin and pushing his head against an elevator wall. The abusive acts were recorded on surveillance cameras and came to light after Mendez complained and the North Dakota Bureau of Criminal Investigation conducted a review. In addition to being prosecuted, Wiege was fired.

**Ohio**: State prisoner David A. McComb, Jr., 26, was scheduled to be released from the Ohio State Penitentiary (OSP) in March 2011 after serving an 8-year sentence for burglary and aggravated robbery, but received an additional six-month prison term the same day of his release. The extra time was for assaulting an OSP guard and threatening another.

McComb pleaded guilty to taking pepper spray from one guard during an October 2008 incident and threatening a second guard several days later.

**Ohio**: Michael Greer, 35, was sentenced to 30 days in jail on theft charges in July 2011 for trying to steal an auger valued at $28,000. Ironically, the auger was located on the grounds of the Lebanon Correctional Institution, and Greer and an accomplice, Thomas Pusey, were caught after prison guards noticed them loading the auger into a truck. Pusey pleaded guilty in June 2011 and received a six-month sentence for breaking and entering.

**Philippines**: Communist rebels are suspected of freeing a prisoner in July 2011 and taking four guards hostage. The rebels, wearing army uniforms, set up a roadblock on a remote road in Quezon in Bukidnon province, and stopped two jail vans transporting prisoners to a national prison facility in Davao City. The ten guards escorting the prisoners were disarmed, and the rebels left with convicted communist rebel Dennis Rodenas and four guards. Communist insurgents have been fighting the Philippine government for over 40 years.

**Texas**: Two guards at the Webb County jail, Esteban Paez, Sr. and Juan Enrique Villarreal, were charged in July 2011 with tampering with government records. Both are accused of falsifying

Inmate Calls Breaking the Bank?
Save up to 80% on Inmate Calls
Stop paying long distance fees!
www.Inmatecallsavings.com
Call 305-900-3093 11a-8p EST.

**ARE YOU THE VICTIM**
of an unfair Guilty Plea? Free info. Just send 3 fresh stamps or 3 fresh stamped, unaddressed envelopes: The New Law Center, PO Box 482 Greenville SC 29602-0482

**Prison Connection Pen-Pal Serv**
SPECIAL $20/2years. Buy NOW!
It Won't Last! More Info Send SASE
Prison Connection PO Box 18489
Cleveland Heights OH 44118

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how to receive Voices.Con monthly, send SASE to: PO Box 5425, Sonora, CA 95370. On the web at: VoicesDotCon.org; Email: Publisher@VoicesDotCon.org

Roget's Thesaurus
Can't think of the right word?
Let Roget's help you!  Over 11,000 words listed alphabetically.
$8.95 see page 53 for more details

**Friendly Connections** offers pen pal services, internet searches, publications, photo/document copies and so much more at the absolute lowest price possible!
Send SASE to receive brochure.
Friendly Connections
PO BOX 5845 Aloha, OR 97006

Prisonworld Magazine Mail Blasts
Join our Email List for Updates
dawahinternationalllc@gmail.com
Prisonworld Radio Hour Exposure
Wrongly Convicted Plead YourCase
*PUBLICITY PACKAGES for Authors*
Print*Radio*BLOG*Social Network
PO Box 380 Powder Sprgs GA 30127

**OWN PIX OF YOUR FAVORITE ♥STAR♥**
MindEscapePix.com Famous Photos!
Order catalog 1 or 2-$4.00 m/o ea or 10-1st class stamps + SASE
Send To: Mind Escape Pix,LLC
1800N. Bristol St. #C605
Santa Ana, CA  92706 or email
INFO@MINDESCAPEPIX.COM

**ELITE PRISONER SERVICES**
(FKA Elite Paralegal Services)
Legal Research & Forms, Internet, People Searches, Books, MySpace, Facebook, Penpals, Erotic Photos, Special Requests. Send SASE for Brochure to: EPS, PO Box 2131, Appleton, WI 54912

PLN_0001391

## News in Brief (cont.)

records after prisoner Charles Gabriel Johnson hung himself at the jail. Paez, the watch commander, allegedly told Villarreal to fabricate entries on a log sheet to make it look as though cell checks were performed. Both Paez and Villarreal were released on $10,000 bond following their arrests.

**United Kingdom:** Soon after Louisa Cunningham, 33, married prisoner Myles Conlon, who was held at the Swaleside jail on the Isle of Sheppey, she realized she had made a mistake. The day after the couple's December 2010 nuptials, Louisa told a friend – Barrie Renton, one of Myles' former cellmates – about her doubts. Barrie then expressed his love for her, they had an affair and Louisa became pregnant. She is now waiting until she can have her marriage annulled so she can marry Barrie. Myles, meanwhile, remains in jail serving a four-year sentence for threatening to kill a man with an imitation gun. "He is fully aware that me and [his former cellmate] are together," Louisa stated. "I'll be a bit nervous when he comes out. I'm not sure what his frame of mind is."

**Virginia:** Cold Springs prison guard Thomas Harris, 37, was fired, arrested for accepting a $20 bribe to smuggle tobacco to a prisoner, and pleaded guilty to a reduced misdemeanor charge on July 25, 2011. Harris, who had worked as a guard for 16 years, received a 12-month suspended sentence and 100 hours of community service.

**Washington:** In June 2011, Lakewood resident Michael A. Tharp was charged in federal court with possession of child pornography; he is also suspected of sending child porn to civilly committed sex offenders held at the Special Commitment Center on McNeil Island. According to federal investigators, several residents at the commitment center said they had paid Tharp to send them child porn. Tharp, who is being held at a detention facility in SeaTac, has denied the allegations. ◾

# Criminal Justice Resources

### ACLU National Prison Project
Handles state and federal conditions of confinement claims affecting large numbers of prisoners, as well as sexual assaults against prisoners. Publishes the bi-annual NPP Journal and the online Prisoners' Assistance Directory. Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International
Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice
Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Critical Resistance
Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in California, New York and New Orleans. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### Family & Corrections Network
Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM
FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society
Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project
Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International
Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: Stop Prisoner Rape, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied
Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE
Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### Novamber Coalition
Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### Partnership for Safety and Justice
Publishes Justice Matters three times a year, which reports on criminal justice issues in Oregon. Free to Oregon prisoners, $7 for other prisoners and $25 for non-prisoners. Contact: PS&J, 825 NE 20th Avenue #250, Portland, OR 97232 (503) 335-8449. www.safetyandjustice.org

### The Sentencing Project
The Sentencing Project is a national policy research and advocacy organization that works for a fair and effective criminal justice system by promoting sentencing reform and alternatives to incarceration. They produce excellent reports on topics related to sentencing policy, racial disparities, drug policy, juvenile justice and voting rights/disenfranchisement, which are available online. Contact: The Sentencing Project, 1705 DeSales St. NW, 8th Fl., Washington, DC 20036 (202) 628-0871. www.sentencingproject.org

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book / index orders OVER $50 (effective May 1, 2010 until further notice).** $6.00 S/H applies to all other book orders.

SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE **ONE BONUS!**
1. SIX (6) FREE ISSUES FOR 54 TOTAL! OR
2. PRISON PROFITEERS (A $24.95 VALUE!) OR
3. WITH LIBERTY FOR SOME (AN $18.95 VALUE!)

**Prison Profiteers,** edited by Paul Wright and Tara Herivel, 323 pages. $24.95. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how. 1063

**With Liberty for Some: 500 Years of Imprisonment in America,** by Scott Christianson, Northeastern University Press, 372 pages. $18.95. The best overall history of the American prison system from 1492 through the 20th Century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years. 1026

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. $35.95. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S. 1041

**The Celling of America, An Inside Look at the U.S. Prison Industry,** edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. $22.95. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system. 1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada,** updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. $49.95. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college correspondence courses. 1071

**The Criminal Law Handbook: Know Your Rights, Survive the System,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. $39.99. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format. 1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. $39.99. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc. 1037

**Law Dictionary,** Random House Webster's, 525 pages. $19.95. Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law. 1036

**The Blue Book of Grammar and Punctuation,** by Jane Straus, 110 pages. $14.95. A guide to grammar and punctuation by an educator with experience teaching English to prisoners. 1046

**Legal Research: How to Find and Understand the Law,** by Stephen Elias and Susan Levinkind, 568 pages. $49.99. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises. 1059

**Deposition Handbook,** by Paul Bergman and Albert Moore, Nolo Press, 352 pages. $34.99. How-to handbook for anyone who conducts a deposition or is going to be deposed. 1054

**Finding the Right Lawyer,** by Jay Foonberg, ABA, 256 pages. $19.95. Explains how to determine your legal needs, how to evaluate a lawyer's qualifications, fee payments, and more. 1015

SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE **ONE BONUS!**
1. FOUR (4) FREE ISSUES FOR 40 TOTAL! OR
2. PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)

**Protecting Your Health and Safety,** by Robert E. Toone, Southern Poverty Law Center, 325 pages. $10.00. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation. 1060

**Spanish-English/English-Spanish Dictionary,** Random House. $8.95. Two sections, Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage. 1034

**Writing to Win: The Legal Writer,** by Steven D. Stark, Broadway Books/Random House, 283 pages. $19.95. Explains the writing of effective complaints, responses, briefs, motions and other legal papers. 1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right,** updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. $16.00. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct. 1030

**Webster's English Dictionary,** Newly revised and updated, Random House. $8.95. 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms. 1033

**Everyday Letters for Busy People,** by Debra Hart May, 287 pages. $18.99. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters. 1048

**Roget's Thesaurus,** 717 pages. $8.95. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words. 1045

**Beyond Bars, Rejoining Society After Prison,** by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. $14.95. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more. 1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.,** by Mumia Abu Jamal, City Lights Publishers, 280 pages. $16.95. In *Jailhouse Lawyers,* Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners. 1073

**Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It,** by Terry Kupers, Jossey-Bass, 245 pages. *Hardback only; prisoners please include any required authorization form.* $32.95. Psychiatrist writes about the mental health crisis in U.S. prisons and jails. Covers all aspects of mental illness, prison rape, negative effects of long-term isolation in control units, and more. 1003

**The Habeas Citebook: Ineffective Assistance of Counsel,** by Brandon Sample, PLN Publishing, 200 pgs. $49.95. This is PLN's second published book, which covers ineffective assistance of counsel issues in federal habeas petitions. Hundreds of case cites! 1078

**\* ALL BOOKS ARE SOFTCOVER EXCEPT *PRISON MADNESS* \***

PLN_0001393

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95**. Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow, exercises to perform, and a bibliography. 1031

**Crime and Punishment In America,** by Elliott Currie, 230 pages. **$16.95**. Effective rebuttal to right-wing proponents of prison building. Fact-based argument shows that crime is driven by poverty. Debunks prison myths and discusses proven, effective means of crime prevention. 1019

**Prison Writing in 20th Century America,** by H. Bruce Franklin, Penguin Books, 368 pages. **$17.00**. From Jack London, Malcolm X and Jack Henry Abbott to George Jackson and Edward Bunker, this anthology provides a selection of some of the best writing about imprisonment and its bars in America, from those who have been there. 1022

**Soledad Brother: The Prison Letters of George Jackson,** by George Jackson, Lawrence Hill Books, 339 pages. **$18.95**. Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 40 years ago. 1016

**Marijuana Law,** by Richard Boire, Ronin, 271 pages. **$17.95**. Examines how to reduce the probability of arrest and prosecution for people accused of the use, sale or possession of marijuana. Info on legal defenses, search & seizures, surveillance, asset forfeiture and drug testing. 1008

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95**. The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended! 1077

**Ten Men Dead: The Story of the 1981 Irish Hunger Strike,** by David Beresford, Atlantic Monthly Press, 334 pages. **$16.95**. Story of IRA prisoners at Belfast's Long Kesh prison. 1006

**10 Insider Secrets to a Winning Job Search,** by Todd Bermont, 216 pages. **$15.99**. Roadmap on how to get a job even under adverse circumstances—like being an ex-con. Includes how to develop a winning attitude, write attention-grabbing résumés, prepare for interviews, networking and much more! 1056

**The Politics of Heroin: CIA Complicity in the Global Drug Trade,** 2003 Ed. by Alfred McCoy, 734 pages. **$34.95**. Exposé of the government's involvement in drug trafficking. 1014

**Lockdown America: Police and Prisons in the Age of Crisis,** by Christian Parenti, 290 pages. **$21.95**. Analyzes the war on the poor via the criminal justice system. Well documented and has first-hand reporting. Covers prisons, paramilitary policing, SWAT teams and the INS. 1002

**The Prison and the Gallows: The Politics of Mass Incarceration in America,** by Marie Gottschalk, Cambridge University Press, 451 pages. **$28.99**. Great political analysis of the confluence of events leading to 2.3 million people behind bars in the U.S. 1069

**Women Behind Bars, The Crisis of Women in the U.S. Prison System,** by Silja J.A. Talvi, Seal Press, 295 pages. **$15.95**. Best book available that covers issues related to imprisoned women, based on interviews with hundreds of women behind bars. 1066

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99**. While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents. 1075

**PLN Cumulative Index. $22.50** each. PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

---

## Subscription Rates

| | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** (Attorneys, agencies, libraries) | $90 | $180 | $270 | $360 |

## Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 53

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 53

(All subscription rates and bonus offers are valid as of 7-31-2011)

---

**VISA   MasterCard**   Purchase with Visa, MasterCard, AmEx or Discover by phone: **802-257-1342**   **AMEX   DISCOVER**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

---

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 2420
W. Brattleboro, VT 05303

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by prison policies.*

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News** | **$ Amount**
6 month subscription (prisoners only) - $18 | _____
1 yr subscription (12 issues) | _____
2 yr subscription (2 bonus issues for 26 total!) | _____
3 yr sub (*write below which FREE book you want*) or 4 bonus issues for 40 issues total! | _____
4 yr sub (*write below which FREE book you want*) or 6 bonus issues for 54 issues total! | _____
Sample issue of **Prison Legal News** - $3.50 each | _____

**Books or Index Orders** (No S/H charge on 3 & 4-year sub free books OR book orders OVER $50!)   **Qty.**

_____   ___   _____
_____   ___   _____
_____   ___   _____
_____   ___   _____

Add **$6.00** S/H to **Book** Orders UNDER $50 | _____
VT residents ONLY add 6% to Total **Book** Cost | _____
**Total Amount Enclosed:** | _____

*\* No refunds on PLN subscription or book / index orders after orders have been placed \**

54

# ARE PRISON PHONE RATES KEEPING YOU LOCKED DOWN?

We guarantee savings of up to 90% on your long distance, out-of-state, and international calls from all Federal prisons, county jails and State prisons.

Call, write, e-mail or check out our website for more information!

TO CELEBRATE PLN'S 21st ANNIVERSARY WE'RE OFFERING TWO SPECIAL PROMOTIONS; ONE FREE MONTH OF SERVICE TO ALL NEW SUSCRIBERS TO OUR US DOMESTIC PLANS – (PROMO CODE: PLNUSA) – AND/OR 100 FREE INTERNATIONAL MINUTES FOR NEW INTERNATIONAL SUBSCRIBERS –(PROMO CODE: PLNINTL).

Garantizamos ahorro de hasta el 90% en tus llamadas de larga distancia inter-estales e internacionales desde todas las cárceles federales, locales y estatales.

Para contactar con nosotros: Llame, escriba o entre en nuestra pagina web para mas información .

PARA CELEBRAR EL PLN´S 21 ANIVERSARIO, ESTAMOS OFRECIENDO DOS PROMOCIONES ESPECIALES, SERVICIO GRATIS POR UN MEZ A TODOS LOS NUEVOS CLIENTES QUE SE SUSCRIBANA NUESTRO PLAN DOMESTICO –( CODIGO DE PROMOCION: PLNUSA)- Y/O 100 MINUTOS GRATIS PARA NUEVOS CLIENTES QUE SUSCRIBAN EL PLAN INTERNACIONAL –(PROMO CODE: PLNINTL)

Spain Telecom, Inc.
1220 Broadway - #803
New York, NY 10001
www.inmatefone.com
clients@inmatefone.com
Call:      1(845)326-5300
Español: 1(845)342-8110

Start Saving Today!


Inmatefone
Keeping You In Touch

## PRISONLEGALNEWS.org

**Dedicated to Protecting Human Rights**    >>FREE Data Search

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!**

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

**Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online! http://www.prisonlegalnews.org**

PLN_0001395



**Prison Legal News**
P.O. Box 2420
West Brattleboro, VT 05303

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

### Subscription Renewal

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2006, then the subscription expires after the February 2006 issues is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 11/2011** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

### Change of Address

If you move or are transfered, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



We Pay **CA$H FOR YOUR STAMPS**

Get the HIGHEST REIMBURSEMENT RATES for ALL of your stamps from the ONLY stamp service continuously serving inmates for 9 years.

**WE BUY COMPLETE AND PARTIAL BOOKS, SHEETS, STRIPS AND ROLLS OF ALL DENOMINATIONS AND QUANTITIES OF POSTAGE STAMPS IN GOOD CONDITION**

Within 24 Hours we will send a Money Order, Cashier's Check, or Electronic Payment to wherever you designate, or we will pay an approved vendor for a package or gift.

**REIMBURSEMENT RATES**

**75%**
of Face Value (33¢ per stamp) for **Forever Stamps** in complete books or sheets

**65%**
of Face Value for **44¢ Stamps** in complete books, sheets, or rolls

**55%**
of Face Value for 44¢ Stamps in **partial books, sheets or strips** (minimum 4 each)

**50%**
of Face Value for all **other** denominations or stamped envelopes

- $15 minimum money order.
- Designate where your funds are to be sent.
- Please provide any necessary forms & instructions.
- Used, worn, damaged, or taped stamps are not accepted or returned.

SEND FOR FREE BROCHURE
(This offer void where prohibited by state regulations)

* SPECIAL RATES FOR PLN SUBSCRIBERS - TEAR OFF AND SEND THIS PAGE (with your mailing address on it) (no photocopies please) TO:
**CLN**, P.O. Box 687-PN, Walnut, CA 91789      Or visit OUR Website: www.cash4urStamps.com