# EXHIBIT 14

# PRISON
# Legal News

**VOL. 24  No. 2**

*ISSN 1075-7678*

*Dedicated to Protecting Human Rights*

February  2013

## LaSalle Corrections: A Family-Run Prison Firm

### *by Matt Clarke*

Unique circumstances have combined to make northern Louisiana a prime location for private prisons, as Louisiana sheriffs can profit by letting a private company build and operate facilities that house both local prisoners and prisoners from other jurisdictions. Meanwhile, other parish prisons – especially those in the densely-populated southern part of the state – and Louisiana's state prisons are severely overcrowded and provide a steady stream of prisoners to fill the for-profit facilities in the north.

Currently, over half of the state's approximately 40,000 prisoners are incarcerated in local parish prisons, which are operated by sheriffs or a private company.

## Inside

| | |
|---|---|
| From the Editor | 8 |
| Opening Prisons to Journalists | 10 |
| 2013 Private Prison Information Act | 14 |
| In Memory of a Jailhouse Lawyer | 18 |
| U.S. Imprisons the Most Women | 22 |
| Strickland Standard for Plea Bargains | 24 |
| No Prison Time for Prosecutor's Son | 32 |
| No Bivens Actions for Private Prisons | 36 |
| Idaho DOC Settles Class-action Suit | 40 |
| Prison Industry Leads to Job Losses | 42 |
| FCC Finally Moves on Phone Rates! | 46 |
| Johnny Cash and Prison Reform | 48 |
| News in Brief | 50 |

It costs the state an average $55 per day to house a prisoner in a state facility. Yet the state pays sheriffs a mere $24.39 per diem to house state prisoners in parish prisons. When factoring in private prison companies' need to generate profit from the meager per diem rate, plus a cut for the sheriffs, it is easy to see that despite the state spending $182 million annually to house prisoners in local facilities, very little of that amount is spent on rehabilitative programs and services for those prisoners.

Yet sheriffs, and the private prison companies they contract with, manage to make money by building facilities that are larger than needed and filling them with prisoners from other parishes, or sometimes other states.

### A Prison Company is Born

Warden Alan Cupp of the Richland Parish Detention Center (RPDC) in Mangham, Louisiana, a town with a non-prisoner population of 672, calls the approximately 800 beds in jail his "honey holes." When they are full the honey flows nicely – in a good year, the facility generates up to $700,000 in revenue.

But the RPDC almost wasn't built. Despite the need, a sheriff has no ability to raise taxes to pay for jail construction. Thus, when the economically disadvantaged parish was suffering from falling cotton prices, it must have seemed like a godsend when two groups of investors, including a local pastor, a pharmacist and a local businessman named Billy McConnell, came up with funding for a $3.5 million women's prison, which has

since expanded to include a men's unit and is now a cornerstone of the parish's economy.

McConnell seems an unlikely founder of a private prison firm. In the mid-1990s he was running a company owned by his family and the family of his brother-in-law, Pat Temple. That company had extensive experience in financing and building schools, fire stations and nursing homes. Then, a federal court ordered Louisiana officials to reduce the number of prisoners in its dismally overcrowded prison system, sparking a prison-building boom in northern Louisiana. This led McConnell to an epiphany.

"We realized that prisons are like nursing homes. You need occupancy to be high. You need to treat people fairly and run a good ship, but run it like a business, watch food costs, employee costs," said Billy's son, Clay McConnell, 37, an ordained minister who helps his father run the family's prison business.

This realization motivated Billy McConnell to successfully bid on the construction of a prison in Alexandria, Louisiana. That contract led to others and a decision to not just build but also operate correctional facilities. As a result, LaSalle Corrections was born.

When Jackson Parish Sheriff Andy Brown was first elected in 2004, the parish jail was the top floor of a courthouse built in the 1930s. He had run on a platform of building a new jail, and soon realized that the wisest move would be to build a large facility that housed more prisoners, to maximize the state's per diem payments. But Brown had no way to finance the construction of such a project.

PLN_0001572



# PASS

## Prisoner Assistance Scholastic Service

### The only national prisoner program of rehabilitation.

PASS is done through the mail. PASS confers a degree that can be used as evidence of rehabilitation before parole boards and with prison officials.

### COURSE INFORMATION:

- The program offers two semesters of study. Each semester takes 3-6 months to complete.

- The courses included are:
  1. Victim Awareness
  2. Anger Management
  3. Addiction & Substance Abuse
  4. Domestic Violence & Crimes Against Women
  5. Gang Diversion
  6. Conflict Resolution
  7. Parenting
  8. Non-violent Communication
  9. Re-entry into Society
  10. Living With Purpose

Courses come with complete work book and study guide and are graded by PASS professionals who offer prisoners feedback and grades.

## WHAT IS PASS?

### SELF HELP THROUGH THE MAIL

PASS provides educational materials nationally to prisoners in state and federal prisons and jails. PASS is the only nationally recognized program of its kind, and is assisted by a wide array of lawyers, educators, and mental health experts who have worked with prisoners for over 25 years. Prisoners who successfully complete the PASS program earn a degree in **Personal Psychological Development** which can be used as evidence of rehabilitation before parole boards and with prison officials.

### PASS IS GEARED TOWARD:

- Prisoners who need to prove their rehabilitation before a parole board.
- Prisoners who want to better present before a parole board.
- Prisoners who want to demonstrate their rehabilitation to correctional officials.
- Prisoners who want to demonstrate to family members, spouses, children or friends that they are actively engaged in their rehabilitation.
- Prisoners who want to use their time in prison wisely.
- Prisoners who want to get out of prison earlier and stay out of prison.

**PASS**
**POB 2009**
**San Francisco, CA 94126**

**passprogram.org**
**888-670-PASS**
**(888-670-7277)**

PLN_0001573

***PLN* is a publication of the Human Rights Defense Center.**

EDITOR
**Paul Wright**

MANAGING EDITOR
**Alex Friedmann**

COLUMNISTS
**Michael Cohen, Kent Russell, Mumia Abu Jamal**

CONTRIBUTING WRITERS
**Mike Brodheim, Matthew Clarke, John Dannenberg, Derek Gilna, Gary Hunter, David Reutter, Mike Rigby, Brandon Sample, Mark Wilson, Joe Watson**

RESEARCH ASSOCIATE
**Julie Etter**

ADVERTISING DIRECTOR
**Susan Schwartzkopf**

LAYOUT
**Lansing Scott**

HRDC LITIGATION PROJECT
**Lance Weber—General Counsel
Alissa Hull—Staff Attorney**

***PLN* is a Monthly Publication**

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. *PLN* accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. *PLN* is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News
P.O. Box 2420
West Brattleboro, VT 05303
802-257-1342
info@prisonlegalnews.org
www.prisonlegalnews.org**

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to **- The Editor -** at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index*.

## Family-run Prison (cont.)

LaSalle was Brown's answer to that dilemma. LaSalle Corrections built a $15 million, 1,147-bed facility, the Jackson Parish Correctional Center (JPCC). Since only government entities are allowed to hold state prisoners, LaSalle pays Brown $100,000 a year as a "sponsor fee" to operate the jail under his authority. The sheriff now has extra money and a convenient place to house his pretrial detainees.

Even more important to Brown, apparently, is political patronage. LaSalle pays the prison employees' salaries but Brown has the authority to hire and fire them. With around 130 staff members at the facility, that's a significant bonus in an impoverished parish with a population of 16,000. And it has paid off politically; Sheriff Brown was unopposed for reelection in 2011.

"There's a lot of patronage here by hiring all these people. It's good for a rural community," he said. "We were able to bring a facility to this community without using any tax dollars. We employ X number of people and don't spend any money, plus the $100,000 a year sponsor fee. I get the patronage."

He also gets to deal with headaches when things go wrong, though. On July 5, 2011, two JPCC prisoners, Arnol Suazo and Olvin Aguilar, scaled a razor wire-covered fence and fled when they were taking trash out in the morning. They were reportedly the 15th and 16th escapees from LaSalle-managed facilities since 2004. The pair was captured six days later.

"We had the dogs after them," said Billy McConnell, LaSalle's managing director, "and it rained and we lost the trail; if it hadn't been for the rain we would have caught them earlier."

### Profiting from Prisoners

The McConnell family has steadily expanded their business until now one in seven Louisiana prisoners is held in a LaSalle-owned or operated facility, including a quarter of all offenders incarcerated in parish prisons.

LaSalle's Louisiana facilities are concentrated in the northern part of the state. In addition to RPDC and JPCC, the company operates the Catahoula Correctional Center, Claiborne Parish Detention Center, LaSalle Correctional Center, Lincoln Parish Detention Center, Richwood Correctional Center and River Correctional Center. Two other private prison firms operate local correctional facilities in Louisiana, too – LCS Corrections and Emerald Prison Enterprises.

LaSalle also has four jails in Texas – the Burnet County Jail, Polk Street Jail, Johnson County Law Enforcement Center and Jefferson County Downtown Jail – which it operates under an affiliate, LaSalle Southwest Corrections. The company manages all but one of its facilities, which it leases to a law enforcement agency, and has a total capacity of about 7,700 beds. It is one of the nation's smaller private prison firms, holding an estimated 3.8 percent of the private prison market in 2011. [See: *PLN*, Oct. 2011, p.1].

Like many private prison contractors, LaSalle tends to build facilities in rural areas where they are used as a form of economic development and a source for jobs. For example, the largest revenue source in Richland Parish, Louisiana is a 1/2¢ sales tax. The second-largest is LaSalle Correction's RPDC.

"I hate to make money off the back of some unfortunate person," said former Sheriff McDonald, who left office in 2012. "The fact is, somebody's going to keep them, and it might as well be Richland Parish."

The impact RPDC has had in the local community cannot be overstated. There is always a backlog of applications for the 100 jobs at the prison, despite the fact that entry-level guards earn low wages. Literally everyone in Richland Parish knows someone who works at the facility, and the sheriff has used his cut of the profits to hire additional employees, purchase "more equipment than we know what to do with," including squad cars, shotguns and bulletproof vests, and amass an impressive $1.5 million surplus.

To keep the facility profitable, Warden Alan Cupp, like other northern Louisiana parish wardens, makes regular phone calls to customers, hoping to drum up business. His customers include the prisoner-rich, jail-bed poor urban Louisiana parishes where cities such as New Orleans, Baton Rouge and Shreveport are located.

Is the revenue that LaSalle Corrections and the sheriffs receive for operating for-profit jails beneficial to the prisoners as well? In a word, no. The low per diem rate paid by the state means that little money is spent on programs and resources to help prisoners learn skills that can keep them out of prison. This means that many of LaSalle's prisoners spend years

PLN_0001574

### Family-run Prison (cont.)

in warehouse-like conditions with little opportunity to partake in vocational, educational and life skills courses that could assist them upon their release.

"For the sheriffs, [the money from housing out-of-parish prisoners] became like heroin, that became a regular source of income for them," said Buck Foster, an expert on Louisiana's prisons and a former professor at the University of Louisiana-Lafayette. "The way they save money is not because the sheriffs are more efficient but because they have fewer staff and almost no services in terms of medical care or psychological assistance or rehab or educational classes."

Since local parish prisons don't hold violent criminals as long-term prisoners, people who have not been convicted of serious crimes have a small chance of landing at a state prison like Angola,



**INMATE** CONNECTIONS.com & ConvictPenPals.com!
465 NE 181st, #308 Dept. PLN Portland OR 97230
Since 2002 — Write for FREE brochure!

Hunt or Dixon, which offer rehabilitation programs and vocational training. Considering that 11,000 of the 15,000 prisoners released each year in Louisiana come from local facilities, that means most have not participated in educational or other rehabilitative programs while incarcerated. This in turn most likely contributes to higher recidivism rates, and helps to explain why Louisiana has the highest rate of incarceration in the nation.

Worse still, a state prisoner who has taken a vocational course might be traded by the state prison system to a local parish warden who needs a prisoner with that skill set. Thus, a prisoner who pursues vocational training in a state prison that could help him upon his release may be shuffled off to a rural parish facility with no programs, far from his family, where he is basically warehoused.

"I know it sounds crazy and impersonal, moving humans around, but we're stuck with this jail," said former Richland Parish Sheriff McDonald. "We can't walk away. We've got investors, employees." That sounds like a concise argument against private prisons, coming from someone who is professionally and economically dependent on one.

"It's not like just warehousing. We are providing a lot of programs for [the] $24.39 [in state per diem payments]," argued Michael Ranatza, director of the Louisiana Sheriffs' Association. However, "as costs continue to rise, that's what they're faced with – you're getting a lot of them operating right on the edge," he acknowledged.

Unfortunately, the current situation is unlikely to change in the foreseeable future. The sheriffs and local economies have simply become too dependent on the profit from parish prisons to permit a change. This even effects how the state prison and criminal justice system is run.

"It makes it hard to do reforms that lower the prison population, because you're affecting the local economic engines that they provide," noted national prison expert James Austin, who has conducted in-depth studies of the Orleans Parish Prison. "It would be different if everybody were in state facilities. It's a lot easier for the state to close a state facility than for a state to close several small local facilities that provide economic fuel at the local level."

While in office, Sheriff McDonald came up with an idea to keep him in the Louisiana DOC's good graces and ensure a flow of prisoners to RPDC – providing daily GED classes. RPDC also offers a 100-hour reentry curriculum that teaches prisoners how to manage money, behave during job interviews and deal with other situations they may face upon release. A similar program has long been standard fare in the state prison system but it is new for RPDC, where prisoners were previously released with only $10 and a bus ticket.

Unfortunately, rehabilitative programs in local parish prisons are the exception, not the rule. And the reasoning behind the GED and reentry classes at RPDC was McDonald's desire to maintain a good relationship with the DOC so

LAW OFFICES OF

## ELMER ROBERT KEACH, III
A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration*
*Medical Indifference Cases • Corrections and Police Brutality*
*Sexual Abuse and Assault • Illegal Strip Searches*
*Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals,
Post-Conviction Relief, Habeas Corpus

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED,
YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages.
DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS.
Make sure to exhaust your administrative remedies and comply with state law notice
requirements, if applicable, to preserve state law intentional tort/negligence claims.

PLN_0001575

they continued to send prisoners his way. State prison officials say they encourage sheriffs to offer such programs, but cannot compel them to do so and don't have the money to fund rehabilitative programs in local facilities that house state prisoners.

This lack of funding shows up in other areas, too. Former RPDC prisoners have criticized conditions at the facility and the fact that many of them are incarcerated hundreds of miles from their homes and families.

"They bird-feed you," said Jeremiah Kelly, 37, who was incarcerated for 3½ years at RPDC. He was a trusty and able to leave the facility daily to mow grass and perform other work, and thus fared much better than the average RPDC prisoner who is basically locked in a cell block all day. Regardless, he described the prison environment as one of "tear gas, Mace, fighting and rioting," all while "the sheriff acted like he knew nothing about it."

RPDC spends $1.48 per day to feed a female prisoner and $1.78 for a male.

This means that the diet largely consists of cheap staples like beans, rice and cornbread. McDonald denied any rioting at the facility but admitted there are fights.

"Any prison that has that many inmates is going to have problems at some point. I don't think we're out of line with anywhere else," he said.

### Problems in Private Prison Paradise

Compared to some of the issues LaSalle has had at other facilities, RPDC seems almost like a model prison. For example, the company's Burnet County Jail in Texas has had problems almost from the day it opened in April 2009.

Burnet County officials ignored broad opposition to constructing the $23 million, 587-bed jail when it initially negotiated with LaSalle Southwest Corrections. Four months after opening ceremonies were concluded, the facility experienced its first escape. Nuana Antonio Fuentes-Sanchez, 25, who was being held on home invasion charges, absconded

from the jail in August 2009, stole a gun from a nearby home and remained at large for two years.

An investigation into the circumstances of the escape led jail inspectors to discover that the facility was non-compliant with Texas jail standards and that LaSalle employees had shown "a lack of diligence, a lack of professionalism." Inspectors also found that LaSalle apparently had not been providing medical care to a pregnant prisoner, did not give prescribed medications to prisoners or provide them with recreation time, and had not submitted an emergency response plan.

"We went on to check the log to see if their concerns were valid," said Adan Munoz, then-executive director of the Texas Commission on Jail Standards (TCJS). "We couldn't even find a recreation log."

In 2011 there was another escape from the Burnet County Jail. This time, Johnny Angel Ybarra, 40, broke out by using a handicap hand-rail as a tool to chisel through the cinder block wall under

## WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

Thousands of the hottest and most scandalous Babes & Dudes found on the planet. Each catalog page has 120 beautiful Girls or Boys posing just for you! Order one catalog page for only $4.50 or for 10 US "Forever Stamps" with an SASE enclosed. We will send you Volume One.
Each additional volume the same price!

**HELP US TO HELP YOU!**
We are more than happy to answer E-mail inquires however, due to mailing cost at $0.45 Cents a letter, please enclose an SASE with your questions, OTHERWISE NO REPLIES!

**WHAT ABOUT OUR PRICES AND POLICIES**
Vivid 4x6 color prints as low as $0.35 Cents per print on orders over 500, shipped according to policy: 25 pictures per envelope every 24 hours.
S&H $2.00 per envelope.

**METHOD OF PAYMENT/CONTACT INFORMATION**
U.S. Postal Service Money Orders-State & Federal Correctional institutional checks payable only to: KRASNYA L.L.C.

**Equation for First Class U.S. Forever Stamps**
Brand New Flat Book for all orders at the rate of $6.00 per Flat Book.
We respond to our clients needs and try to help the best we can.
Our seasonal specials mean a kickoff of savings!

---

**COLOR CATALOG DISCOUNT SALE**
ONE COLOR CATALOG OF 120 BABES IN CLASSIC OR NUDE LINES $4.50
PLEASE INCLUDE
A SELF-ADDRESSED STAMPED
(2-FIRST CLASS STAMPS) ENVELOPE.

**QUANTITY BUYS:**
5-14 CATALOGS =10% OFF OUR REGULAR PRICE
15 CATALOGS =15% OFF OUR REGULAR PRICE
20 CATALOGS =20% OFF OUR REGULAR PRICE
25 CATALOGS =25% OFF OUR REGULAR PRICE
30 CATALOGS =30% OFF OUR REGULAR PRICE
35 CATALOGS =35% OFF OUR REGULAR PRICE
40 CATALOGS =40% OFF OUR REGULAR PRICE
45 CATALOGS =45% OFF OUR REGULAR PRICE
50 CATALOGS =50% OFF OUR REGULAR PRICE
BE SURE TO SPECIFY CLASSIC OR NUDE BABES!

70-VOLUMES OF KRASNYA BABES CLASSIC LINE
70-VOLUMES OF KRASNYA BABES NUDE LINE

---

**$24.95  S&H Free**
For Grab Bag of
50 photos
from all our catalogs
Specify race and main
area of your interests
We will pick
selection for you
Bonus: B&W Cat. Page

---

**LOOSE STAMPS FOR LOOSE BABES**
KRASNYA LOOSE STAMP GRAB BAG SPECIAL
10 LOOSE BABES.....................................30 STAMPS
25 LOOSE BABES.....................................75 STAMPS
50 LOOSE BABES...................................150 STAMPS
ALL STAMPS MUST BE 1St CLASS STAMPS
IN LIKE NEW CONDITION!
SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)
WE WILL PICK SELECTION FOR YOU

**KRASNYA BABES HAS SPRUNG SALE!**
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST
CLASS STAMPS!
PLEASE SPECIFY MALE OR FEMALE BABES

---

**3 BRAND NEW FLAT BOOKS OF FIRST CLASS STAMPS FOR:**
Grab Bag of 45 photos from all our catalogs
Specify race and main area of your interests
Plus your pick selection for you
Bonus B&W Catalog Page
PLEASE INCLUDE 6 FIRST CLASS STAMPS
FOR S&H

---

**KRASNYA L.L.C.**
P.O.BOX 32082
BALTIMORE,MD 21282
EMAIL AND CORRLINKS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM
KRASNYASTUDS@HOTMAIL.COM

---

## KRASNYA QUATERLY MAGAZINE
### THE CONNOISSEUR'S PORTFOLIO

**KRASNYA QUARTERLY MAGAZINE DEBUT BABES OR STUDS ISSUE AVAILABLE , PLEASE SPECIFY BOP-FRIENDLY OR NUDE**
*** JANUARY 2013 ***
EVERY THREE MONTHS YOU'LL RECEIVE OVER 220 BEAUTIES FROM OUR FINEST COLLECTION ALL CAPTURED IN VIVID APROX. 4X6 IMAGES DISPLAYING ALL THERE ENCHANTING RADIANCE
SPECTACULAR VALUE IS OUR GOAL!
OVER $100.00 WORTH OF BABES IN EACH MAGAZINE
KRASNYA QUATERLY'S 2013-2014 CALENDAR SAMPLER MAGAZINE
IF YOU BOUGHT THEM SEPARATELY!!!
WE DELIVER EXELLENT VALUE
WHERE OUR COMPETITION WON'T!!!

---

**ONLY $29.95 PER ISSUE**
(OR 5 FLAT BOOKS OF FIRST CLASS STAMPS)
PRICES INCLUDES SHIPPING AND HANDLING
***SPECIAL OFFER***
$99.95 FOR 1 YEAR SUBSCRIPTION
AND OUR BONUS OF THE SPECIAL CALENDAR ISSUE BELOW...

---

**THE BASIC CALENDAR WITH 48 NOT SO BASIC BABES**
BABES OR STUDS ISSUE AVAILABLE , PLEASE SPECIFY BOP-FRIENDLY OR NUDE
ALL TO DELIGHT YOU
THROUGHOUT THE YEAR!
$11.95 OR 2 FLAT BOOKS OF FIRST CLASS STAMPS
ALL ORDERS ARE FINAL!!!
PLEASE BE SURE TO KNOW
YOUR INSTITUTION POLICIES
ANY RETURNS WILL BE HELD FOR 30 DAYS.
CALENDAR AND MAGAZINE REQUIRES SASE
WITH 5 FIRST CLASS POSTAGE STAMPS
IN 8X11 MANILLA ENVELOPE
SEND YOUR ORDERS TODAY TO:

**KRASNYA L.L.C.**
CALENDAR SAMPLER MAGAZINE
P.O. BOX 32082
BALTIMORE, MD 21282

PLN_0001576

## Family-run Prison (cont.)

a sink; he then climbed to where he could exit the facility via a skylight. Ybarra left a lump under the blanket on his mattress and guards did not realize he was missing until they came to feed him breakfast.

Ybarra, who had recently received three life sentences, was recaptured just hours after he escaped.

Following that incident, Burnet County Sheriff W. T. Smith assigned former Harris County Sheriff's Department Captain Bill Eppler to monitor the jail; he was the only Sheriff's employee at the facility. The Burnet County Commissioners Court criticized Smith, but he promptly put the blame on LaSalle, and LaSalle officials agreed.

"It's on us," said Warden Bruce Zeller. "Like the sheriff said, the responsibility is on LaSalle Corrections, our facility, and our employees."

Texas state officials declined to renew their contract with LaSalle at the facility, and as of August 2011 it was operating at just 53% capacity.

The Burnet County Jail subsequently failed a state inspection in March 2012, which found it was "non-compliant" with security requirements. The TCJS noted there were "deficiencies" in concrete blocks and reinforcement bars in some of the cells used to house handicapped prisoners. Ybarra had escaped from one of those cells, where he had been placed due to overcrowding.

Until recently, officials in Harris County, Texas had an agreement with

LaSalle to house local Houston-area prisoners in one of the company's Louisiana prisons. For five years, the nation's third-largest jail system shipped up to 1,200 of its prisoners hundreds of miles away to the LaSalle facility and another for-profit jail operated by Emerald Prison Enterprises; in 2010 and 2011, Harris County spent $30 million to house prisoners in Louisiana and other facilities in Texas.

There was once a weekly chain bus between the Harris County Jail and the LaSalle Correctional Center in Louisiana, 238 miles away. After a five-hour drive, new prisoners from Texas would be swapped for those returning to Harris County, and the whole process would repeat itself. It was a seven-hour trip to the Emerald facility. What caused the chain bus route to stop at the end of 2011 was a drop in the Harris County jail system's daily population. Instead of an average daily population in excess of 12,000, the population decreased to below the maximum capacity of 9,434.

The jail population dropped 31% over a three-year period due to a decision by Harris County District Attorney Pat Lykos not to bring felony charges against people arrested for trace amounts of drugs, such as residue on a crack pipe. That alone reduced the average daily jail population by 400 prisoners.

Lykos and Harris County Sheriff Adrian Garcia also introduced an early release program for nonviolent prisoners who participated in educational or vocational programs, and created a diversion program for mentally ill prisoners.

The cancellation of Harris County's

contract with LaSalle Corrections hurt the company's bottom line. If it remains permanent, LaSalle will have to shop around for other customers. This is one example of how criminal justice policies that successfully reduce prison and jail populations can negatively impact private prison companies, which rely on a steady stream of prisoners to make money.

"We'll recoup, but it hit us pretty hard when they left," stated LaSalle Correctional Center Warden Jeff Windham. The company pays a $120,000 annual fee to LaSalle Parish, and thus needs to generate revenue to cover that cost as well as generate profit.

Beyond escapes and canceled contracts, LaSalle has experienced problems at its facilities related to employee misconduct. In November 2008, the warden of the LaSalle Correctional Center, Leroy Holliday, Sr., 55, was booked into the La-Salle Parish Jail on a malfeasance charge for allegedly using prisoners and prison employees for personal ventures. He was also LaSalle's regional warden for facilities in Catahoula, Concordia and Ouachita parishes. Holliday's law enforcement commission was revoked following his arrest. [See: *PLN*, July 2009, p.42].

On April 7, 2011, Joseph Taunton, 32, a former guard at the LaSalle Correctional Center, pleaded guilty to engaging in a sex act with a prisoner; he was sentenced in July 2011 to 10 months in prison and will have to register as a sex offender. Taunton admitted to entering the prisoner's cell while on duty and engaging in sexual activity.

And on July 14, 2011, LaSalle employee Amy Sue Lancaster, 40, was

## Support Prison Legal News with these beautiful gifts!

CALL **802-257-1342,** MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/

## Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

PLN_0001577

arrested after she confessed to investigators that she had engaged in sexual acts with a prisoner at the Johnson County Law Enforcement Center in Texas. She was charged with violating the civil rights of a person in custody.

### More Prisons, More Money

LaSalle Corrections has been trying to expand its private prison operations, and negotiated with Grayson County, Texas to build a new $34 million, 750-bed jail in 2009, although the deal didn't work out.

"I think it's time to stop the for-profit, private option and return to the basic concept of expanding the [public] jail downtown," stated Grayson County Sheriff Keith Gary, who initially supported privatizing the facility. He said he wanted to "avoid the pitfalls we have learned exist with a private corporation."

LaSalle recently obtained permission from the Johnson County, Texas Commissioners Court to build a 96-bed, $1.5 million expansion at the Johnson County Law Enforcement Center that will hold federal ICE detainees. LaSalle officials told the commissioners that the expansion would increase annual jail revenues by $600,000.

The company also recently tried to enter the Arizona market by submitting a bid for a contract with the Arizona Department of Corrections to house 1,500 state prisoners. Such a move might seem unlikely considering the fact that the three other private prison firms competing for the contract – CCA, GEO Group and MTC – are three to ten times larger than LaSalle. But the company has been nothing if not ambitious. The Arizona contract was ultimately awarded to CCA in August 2012.

Additionally, LaSalle is part of NH Hunt Justice Groups, a consortium of businesses, including construction, architectural and design firms, that bid on a proposed private prison in New Hampshire in 2012. Given a change in state leadership in the last elections, however, it appears that the proposed private prison contract will not go through, though it remains pending.

And when Louisiana Governor Bobby Jindal announced in 2011 that he wanted to sell off several of the state's prisons to private companies, LaSalle Corrections submitted a bid, although the legislature later nixed the idea. The company had reportedly made a prior $10,000 contribution to Jindal's campaign.

Clearly, a family-run private prison firm is just as bad as a large publicly-traded corporation such as CCA or GEO Group. It makes no sense to mix a profit motive into the governmental function of incarceration, which can only lead to worse treatment of prisoners, perversion of the public safety aspect of imprisonment, and a desire to put more people in prison in order to make more money. Nothing is free in this world, yet public officials seem to overlook that maxim when companies like LaSalle promise lucrative revenue in exchange for building and operating prisons and jails.

As LaSalle Corrections executive Clay McConnell put it, "I'm not running a nonprofit." ◼

Sources: *New Orleans Times-Picayune, American Friends Service Committee, Arizona Republic, Cleburne Times-Review, www.dailytrib.com, www.texasprisonbidness.com, www.kxan.com, www.kvue.com, Star-Telegram, www.nhbr.com, www.yourhoustonnews.com, www.lasallecorrections.com, www.kten.com, www.gritsforbreakfast.blogspot.com*





PLN_0001578

# From the Editor

### by Paul Wright

I would like to thank everyone who has donated to the Human Rights Defense Center/Prison Legal News annual fundraiser. As of mid-January 2013 we had raised a little over $29,000 of our $60,000 goal to continue the Campaign for Prison Phone Justice, and still need more support to be able to carry it through the rest of the year. We are making significant progress with the Federal Communications Commission (FCC), which on January 22, 2013 published a formal Notice of Proposed Rulemaking on interstate prison phone rates.

Our hard-fought efforts are paying off and we need your financial support to continue to keep the campaign going. The FCC has asked specific questions concerning the Notice of Proposed Rulemaking, and in the Phone Justice ad on page 37 we list information that you can submit to the FCC. One factor in motivating the FCC to act on this issue, after sitting on it for almost a decade, has been letters and submissions from prisoners and their families plus concerted actions by the Campaign for Prison Phone Justice.

If you can make a tax-deductible donation to support the campaign, please do so. Our opponents in this struggle are the powerful telecom industry and prison systems and jails that profiteer off the backs of prisoners and their families.

To follow the campaign online, go to www.phonejustice.org.

As this issue of *PLN* goes to press we are involved in two historic events. The first is a long-running lawsuit called *Judd v. AT&T*, which was scheduled to go to trial in King County Superior Court in Washington on January 22, 2013 over damages to be awarded due to the non-disclosure of the cost of phone calls from Washington prisoners between 1996 and 2000. On the morning of trial, after 13 years of litigation, defendant AT&T settled the case for $45 million to be paid to plaintiff class members who accepted collect calls from prisoners during the relevant time period.

To date this is the only lawsuit involving prison phone calls to make it past the dismissal stage, much less result in a settlement. We will report the results in an upcoming issue of *PLN*. I had investigated the facts underlying the complaint in this case while I was incarcerated in the mid-1990s in Washington State.

The second historic event is that on February 5, 2013, *Prison Legal News v. Colombia County* is scheduled for trial in Portland, Oregon, which will be the first case to go to trial that challenges the constitutionality of a jail postcard-only policy banning all mail except postcards. Currently, all cases challenging postcard-only policies have settled, or, when filed by pro se plaintiffs, have been dismissed. *PLN* is represented by the Seattle law firm of McDonald, Hogue and Bayless and the Portland law firm of Ransom and Blackman, as well as our general counsel Lance Weber and staff attorney Alissa Hull.

We hope to establish at trial the notion that Americans have a right to communicate by letter and the government cannot restrict prisoners' communications to postcards. It is a sad commentary that in 2013 we are still fighting to defend rights that were firmly established in 1776 when the U.S. was founded. We will report the outcome of the case at its conclusion.

Lastly, I would like to thank our many readers and supporters who sent their condolences over the recent death of my father and *PLN* publisher Rollin Wright, and who made donations in his memory to further our work. It is a tribute to the many years he dedicated to the cause of prisoners' rights in this country; without him, *Prison Legal News* would not exist.

Enjoy this issue of *PLN* and please encourage others to subscribe.



PENACON.com

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see. Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLN5OFF
FOR $5 OFF

# Tenth Circuit: Terrorism Prisoners Lack Liberty Interest in Transfer to ADX

### by Derek Gilna

Omar Rezaq, Mohammed Saleh, El-Sayyid Nosair and Ibrahim El-gabrowny, convicted of terrorism-related offenses and confined at the federal supermax ADX facility in Florence, Colorado, filed suit contending they had a liberty interest in "avoiding transfer without due process to the high-security prison." The district court denied relief, which was affirmed by the Tenth Circuit on April 20, 2012.

ADX, according to the Bureau of Prisons (BOP), serves two primary penological interests: 1) "maintaining the safety of both staff and inmates, while eliminating the need to increase the security of other penitentiaries," and 2) "confin[ing] prisoners under close controls while providing them opportunities to demonstrate progressively responsible behavior ... and establish readiness for transfer to a less secure institution."

In this case the plaintiffs were transferred to ADX from a U.S. Penitentiary, itself a high-security facility, but during the course of the litigation were moved from ADX to one of the BOP's two Communications Management Units (CMUs). The CMUs are located in Marion, Illinois and Terre Haute, Indiana. [See: *PLN*, Sept. 2012, p.26]. While CMUs are also highly-controlled, they include the added feature of heavily-restricted communications with the outside world.

The plaintiffs' complaints, later consolidated into one case before the Tenth Circuit, revolved around the lack of hearings before the plaintiffs were transferred to ADX. Subsequent to the filing of the lawsuits, the BOP regional director is-

sued new procedures for future transfers to ADX which included hearings. Those procedures provided for prisoners to receive notice of the transfer hearing, an opportunity to participate in the hearing, a written recommendation by the hearing officer and administrative review of the regional director's decision by the BOP's general counsel. Retroactive hearings were held with respect to the plaintiffs, all of which found their transfers to ADX to be appropriate.

The plaintiffs asserted due process violations and argued that the retroactive transfer hearings did not cure those violations. The defendants – including the BOP, the U.S. Attorney General, the BOP regional director and various other BOP officials – moved for summary judgment, which was granted by the district court.

Applying the four factors from *Estate of DiMarco v. Wyoming Department of Corrections*, 473 F.3d 1334 (10th Cir. 2007), the district court concluded that a liberty interest did not attach. The court found that the plaintiffs' transfers to ADX were for "legitimate safety issues," and that "conditions of confinement at ADX were not extreme." Distinguishing the case of *Wilkinson v. Austin*, 545 U.S. 209 (2005) [*PLN*, Aug. 2005, p.24], which the plaintiffs heavily relied upon, the court concluded that while highly restrictive, ADX did not have the same conditions at issue in *Wilkinson*, which involved Ohio's supermax facility.

The plaintiffs had supported their liberty interest claims by arguing that ADX was a facility that created an "atypical and significant hardship ... in relation to the ordinary incidents of prison life" pursuant to *Sandin v. Conner*, 515 U.S. 472, 484 (1995). They further averred that the district court had given too much weight to the BOP's penological interest; improperly compared the conditions of confinement in *Wilkinson* to those at ADX; and relied upon "inapposite precedent, thus 'erroneously elevating the standard for determining whether the challenged conditions were extreme,' and 'not considering the extraordinary length of [the plaintiffs'] segregation.'"

On appeal, the Tenth Circuit noted that "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies,' citing *Wilkinson*. "In the penological context, not every deprivation of liberty at the hands of prison officials has constitutional dimension ... because incarcerated persons retain only a 'narrow range of protected liberty interests,'" the appellate court wrote. "For example, the Supreme Court has recognized that the 'Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.'"

The Court of Appeals narrowed the issue to whether a prisoner suffers an "atypical and significant hardship ... in relation to the ordinary incidents of prison life," based on *Sandin*. The focus was not on the harshness of conditions at ADX, but "whether the segregation at issue mirrors that imposed on other inmates in the same segregation," citing *Gaines v. Stenseng*, 292 F.3d 1222, 1225-26 (10th Cir. 2002) [*PLN*, June 2003, p.24].

The appellate court recognized the divergence of other circuits on the issue, but held that "we continue to believe that the proper approach is a fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement. While the Supreme Court's assessment of the conditions in *Wilkinson* can be instructive in this endeavor, the conditions in that case may not serve as helpful comparator evidence in all cases.... Here, each of the plaintiffs was transferred to ADX for reasons of national security and institutional safety."

The Court of Appeals also concluded that, as in *DiMarco*, they must "remain mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." Accordingly, the Court held the plaintiffs "did not have a liberty interest in avoiding confinement at ADX," and "[b]ecause no liberty interest is implicated, we do not reach the question of whether the inmates received adequate process to justify their transfers to ADX."

The Tenth Circuit did, however, reject the BOP's argument that the underlying controversy was moot based on the fact that the plaintiffs were no longer housed at ADX when the case was decided, finding the BOP could still transfer them back to ADX at some future date. See: *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012).





FIYA GIRLS PRESENTS THE BIGGEST SPECIAL EVER!!!
(S.A.S.E FOR NON NUDE CATALOG #17)

#1 PIC SET OF SPICY & FRIENDS $16.00
2 FREE PICS
2 FREE CATALOGS FREE [S/H] JUST MADE 18!!

ONLY AVAILABLE IN THIS (PROMO NON NUDE CATALOG #1) ALL RACES $5.00 OR 23 STAMPS IT FEAUTRES A SUPER SPECIAL! U CHOOSE 40 PICS ONLY $17 FREE S/H U MUST SEND YOUR 2 S.A.S.E WITH 2 STAMPS ON EACH ENVELOPE! YOU MUST PURCHASE THE PROMO CATALOG #1 TO GET THAT SPECIAL!

GET THE ALL NEW SUPERSIZED HIGH GLOSS COLOR VIP CATALOG #4 OVER THOUSANDS TO CHOOSE FROM ALL RACES! ALL NUDE STRIPPERS, PORN STARS AN ALL!! ONLY $15.00 [FREE S/H] INCLUDES 2 FREE PICS THE BIGGEST AND BEST CATALOG EVER!!

HI! IT'S ME LONDON THE EXOTIC DANCER 10 PIC SET ONLY $15.00 COMES WITH 2 FREE CATALOGS & 3 FREE PICS

ALL NUDE CAT #4 $15.00
[FREE S/H] COMES WITH FREE PICS

PLEASE MAKE ALL PAYMENTS TO FIYA GIRLS
P.O. BOX 2545 DEPT-PN HOUMA LA 70361
GET MAIL AND GET PAID INSTRUCTIONS STILL ONLY $10.00

PRISON INMATES ONLINE
Lifetime Profile Listings

LIFETIME
Length of Sentence
Since 2000
MEMBERSHIPS
$5 MINI PROFILE
Prices good through 2012

Connected Across the Internet
Stay connected with family, friends, and pen pals. Reconnect with long lost friends who search for you on the web.

Share Your Creative Side:
Post 150 word blogs. ($5)
Post your Artwork ($5 for 5 images)
Post Poetry ($5 for 150 words)
Post YouTube Videos ($5 each)

Here's How to Get Started:
For FREE membership application send us a self addressed stamped envelope (Size 210) or (2) 1st Class postage stamps to the address below. We will mail you a Free Membership Application Card along with our brochure and application form for additional premium services.

We cannot send brochures to STATE inmates in FL, MO, or PA. Message Forwarding Service available in facilities that allow 3rd Party Mail. *Message Service Prohibited in NY State Prisons.

Length of Sentence Profile:
$50 - Length of Sentence Profile
Includes: Up to 5 photos.
300 word biography.
*1 Year of Message Forwarding Service.
$5 Mini Profile: Name, Address & 1 photo.

Got Corrlinks?:
Order our Message Forwarding Service and have messages sent from your profile on our site to your Corrlinks account. Add us on Corrlinks. Our address is info@prisonmates.com.

PrisonInmates

Prison Inmates Online – 8033 W Sunset Blvd. #7000 – Los Angeles CA 90048

PLN_0001580

# The Battle to Open Prisons to Journalists

### by Jessica Pupovac

Many states make it extremely difficult for journalists to visit their prisons, interview prisoners and report with any regularity or authority on what goes on inside America's prison system.

Take the case of Illinois.

In March 2012, after hearing reports of black mold, insect and vermin infestations, and busted-out windows at the Vienna Correctional Center, a minimum-security prison in the southernmost tip of Illinois, criminal justice and courts reporter Rob Wildeboer of Public Radio station WBEZ in Chicago began trying to arrange a tour of the facility.

His request was denied by the Illinois Department of Corrections' public information officer, the commissioner of the department and even the governor's office. He reported on his efforts regularly in an effort to exert pressure on the state, but to no avail.

"It isn't Club Med," Illinois Governor Pat Quinn told reporters. "Prisons are not country clubs. They're not there to be visited, and looked at, and toured by this, that and the other."

It wasn't until after lawyers took up WBEZ's case pro bono and met with the state's attorneys that the state caved—sort of.

### Media Tours

It announced that "due to increased interest," there would be media tours at a later date, although no cameras or recording devices would be allowed.

Then, before scheduling the media event, they allowed 25 community college students inside to tour one of their maximum-security facilities.

While the showdown in Illinois was particularly public and well-documented, it is nothing new.

Quieter battles are waged as a matter of course by reporters throughout the country attempting to report on how their states address criminal behavior, treat prisoners, work to preserve public safety, and spend the roughly $74 billion allotted annually to state, federal and local prisons and jails every year.

I recently completed a comprehensive study of state media access laws as part of my graduate work at the Missouri School of Journalism. I interviewed dozens of reporters, corrections officials and media liaisons.

What I found was a wide range of approaches to press inquiries, but one underlying theme: individual public officials, not laws or official policies, have the final word on how much the media—and thus the public—know about what happens inside America's prisons.

And too often those individuals deny journalists access not because of security concerns, but because they fear the anticipated content of a story.

"These PIOs [public information officers] are exercising unconstitutional control over access to prisons and to prisoners themselves," says Charles Davis,

a media law expert and professor at the University of Missouri School of Journalism. "At some point, I think there is a very real First Amendment and Fourteenth Amendment due process argument to make."

### Who Decides?

The chief of state departments of corrections (DOCs) govern media access policies during their administrations, and some prefer to simply keep the doors shut.

Brian Corbett, public information officer at the Alabama Department of Corrections, has served under four different commissioners. He says that the level of access they grant has "varied from personality to personality."

And while about a dozen states have explicit policies regarding what constitutes grounds for a denial, the majority simply leave it to the ill-defined "discretion" of an individual prison's warden.

*Wall Street Journal* reporter Gary Fields, who has covered prisons for many years, puts it this way: "Each prison has a fiefdom and the warden is at the top of the feudal system and the warden can actually reject your request to try to get in."

While security is typically the stated justification for a denial of access, other factors are often considered.

"I know that a lot of departments or agencies get burned by the media or have some bad reporting by the



**FREE! 12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive **1 FREE - 1 YEAR** magazine subscription! Quarterly drawing WINS $100! **(Void in New York)** (Last Quarter's winner from **Waynesburg, PA.**) TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549 www.InmateMagazineService.com

**Inmate Magazine Service Inc.**

PLN_0001581

media—sometimes deservedly so and sometimes not so deservedly so," said Brian Corbett of the Alabama Department of Corrections. "And because of that, they have become very gun-shy and skeptical and not trusting; and, yes, that can shape policy."

## Equal Protection

In 1972, the Supreme Court, invoking the equal protection clause in the 14th Amendment, ruled in *Police Dept. of Chicago v. Mosley* that there is an "equality of status in the field of ideas," meaning that government agencies cannot discriminate in practice or policy against groups or individuals whose points of view it disagrees with.

In 2001, Tori Marlan, a reporter with the *Chicago Reader*, a weekly alternative newspaper, tried to observe a program for incarcerated mothers at the Cook County jail, just weeks after she published an article about a lawsuit filed against the department that runs it.

Although she had been granted access in the past, this time she was denied. Lawyers for the *Reader* argued that the decision violated *Mosley* and the equal protection clause.

"A reporter might well tone down a critical article if she feared that jail officials might terminate, or even restrict, her future access," the court wrote. "That is exactly the type of chilling effect the First Amendment guards against."

The ruling continued: "The DOC may not have had a legal obligation to admit Marlan. But it may not refuse to do so because she exercised her First Amendment rights." See: *The Chicago Reader v. Sheahan*, 141 F.Supp.2d 1142 (N.D. Ill. 2001) [*PLN*, March 2003, p.23].

Radio reporter Wildeboer's attorneys invoked the same arguments to challenge his denial.

But several public information officers argue that security is a real concern. Given the limited resources they are working with, they see five alternatives.

"We're only at about 65 percent of our [full] staffing levels," said Corbett in Alabama. "We're pushing 200% over capacity. We're holding almost double the number we were designed to hold. And then really it becomes an issue just from a security standpoint."

## No Reality Shows

Almost every state spokesperson said that they have effectively banned reality shows from coming inside their facilities.

"There's no real value in that," said Tim LeMonds, then-spokesperson for the Wisconsin Department of Corrections.

"To have somebody set up shop for two whole days and we're paying the staff (or rather) taxpayers are? It isn't going to happen."

He said that the BBC proposed a more educational show that would have served a public safety purpose and the department "gave it serious consideration." Ultimately, however, it was denied due to staffing shortages.

The current law of the land, as decided by the Supreme Court in *Branzburg v Hayes* and then later in *Pell v. Procunier* and *Saxbe v. The Washington Post*, establishes that "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."

It should be noted that the Court's opinion suggests that those cases were decided in a very different climate, in which reporters were given broader access overall.

But the exact language of the ruling is often invoked by state prison officials to mean that the press has no right to enter a prison beyond the visitation room, no right to bring a pen and paper or recording devices and no right to have such visits facilitated by prison personnel.

In 2000, Bill Martin, then-director of the Michigan Department of Corrections, wrote in *Quill* magazine, a journalism trade publication, that when suicide-assisting doctor Jack Kevorkian came under his department's custody, the state was flooded with about 100 interview requests.



*Our Bodies, Ourselves* is a highly praised classic and vital resource for women of all ages with important information about every aspect of their health and well-being. This newly revised edition gives women everything they need for making key decisions about their health - from definitive information from today's leading experts to personal stories from other women just like them.

**$26 + $6 S&H for all orders under $50.**

*Order by mail, phone, or on-line from*
**Prison Legal News**
**PO Box 2420**
**West Brattleboro, VT 05303**
**Tel (802) 257-1342**
**www.prisonlegalnews.org**



**connect with us...**

send an SASE for a free brochure to:

**inmate scribes**
**PO Box 371303**
**Milwaukee, WI 53237**

*nmate* SCRIBES

packages from only **$8!**

stay connected, stay involved, be heard...

sick of subscription services that never work?
using our patented credit-based system, we do what you want, when you want with no monthly/yearly fees. your credits never expire, and you can use them as frequently as you desire!
all new purchases will receive a free email account with this special, limited-time offer!

email - facebook - dating sites - penpal sites
social media - research - friend finding - lyrics & tabs
personal gifts - photo editing - sexy photos and more!

## Open Prisons to Journalists (cont.)

For fear of being sued for allowing access to some and not others, Martin wrote, he opted to close the door completely.

### State Limits on Access

While at least five states (Arizona, Alabama, Georgia, Louisiana and Michigan) make any access the exception to the rule, several others limit the media in ways that make it extremely difficult to report on anything beyond news releases.

California, Kansas and Michigan, for example, do not arrange interviews with specific prisoners.

Florida, Kansas, Michigan, New York and New Hampshire all require prisoners to put reporters on their visitation or phone call list if they wish to speak to them, thus forfeiting a visit or call with family or friends.

Wyoming, meanwhile, reserves the right to screen all potential questions before a media interview, and to end an interview if it strays off of the approved subject matter.

A complete collection of media access policies is available on the Society of Professional Journalists' website (www.spj.org), although Wyoming explicitly did not give permission to share their policy online.

The University of Missouri's Charles Davis calls that and several other current restrictions "patently unconstitutional."

"The reporter must go before a government office and submit the idea of their writing for 'approval' from the government office they are covering in order to get access to the citizens who are incarcerated in the system," he explains.

"Let's not forget that these people are citizens still. They haven't lost their citizenship just because they are incarcerated."

"There is nothing in those Supreme Court decisions that gives those officials the right to predicate access on the basis of whether or not they approve of the story. There is just nothing in there that says that. But that's what is happening over and over again."

### When Restrictions Backfire

Some prison officials find the restrictive approach to work against them.

"Our experience is that if people don't see what is really happening inside prisons, the imagination fills the void and people get pretty distorted ideas," said A.T. Wall, director of the Rhode Island Department of Corrections.

Wall says he typically errs on the side of granting reporters' requests, although he shuts the door to reality shows.

He also said that he limits access to cell blocks where there are disciplinary problems, since just the presence of reporters might incite the prisoners to act out.

"It's that phrase that studying something changes it," he said. "People working inside might grumble about the amount of effort it takes, but we know that people outside want to understand, want to get a window of what goes on inside corrections agencies."

Alaska Department of Corrections spokesperson Richard Schmitz organizes regular "media academies," in which he invites reporters to tour facilities and learn about specific topics.

"Everyone agrees that they are off the record. We can say what we want and they can ask what they want," he explained. He said that they can then follow-up for more details and on-the-record quotes.

"There is a responsibility to the public and we have a unique situation because what we do is hidden by its nature. There are people from the public who can't come by and see how the prisons are doing. And as a result the media has a role in providing a public window on the prison activities and what goes on because it is taxpayer funded," he said.

The more open approach isn't popular with just small agencies.

Even Texas, one of the largest correctional systems in the country, has gotten more transparent in recent years in an effort to educate the public about reforms.

### Vienna Prison Opens Up

In Illinois, eight months after Rob Wildeboer's request, he was allowed to tour the Vienna Correctional Center with about a dozen other reporters, multiple security guards and the warden.

He was not allowed to bring any audio recording equipment or a camera.

He said that, as he arrived, workers were still busy putting a fresh coat of paint on a lamppost towards the front of the grounds.

He was able to walk inside one particularly notorious housing unit, where he had previously read of more than one hundred men in one room, spending their days and nights in bunk beds tightly packed together. The unit's broken windows were simply boarded up last winter, making it so that the men couldn't see outside for months, until spring finally arrived. But now the windows were repaired.

The warden admitted that the grounds were hastily improved before the tour. "You put your best foot forward," he told reporters.

To Wildeboer, that was enough proof that the small amount of sunlight was a good thing. "It's a step, but a step in the right direction," he said.

"These men were stuck in these rooms all day with nothing to do and no windows to even look out of. Now they actually, in the last couple months, have started replacing the broken panes of glass so that birds can't fly in there any more."

"This is an improvement that will last even after the reporters have left for the day," he said. 🖋

*Jessica Pupovac recently completed her master's degree in investigative journalism at the University of Missouri, where she conducted a national study of media access to prisons. She now works as digital and data coordinator at NPR's StateImpact project, where she helps train and guide reporters in finding and sharing the untold stories of state government using data and public records.*

*This article is reprinted with permission. An earlier version appeared in The Crime Report (www.thecrimereport.org), the nation's most comprehensive online criminal justice news and resource service.*

**Free Full Color Catalog**

**Start Earning Commissions Today!**
Ask Us About Our Inside Sales Program
Send SASE

All of our customers are respected and their business is greatly appreciated. We value all of your cares and concerns. We want to help those inside make their life a little better in any way we can, you matter to us. Stay strong, be safe and know you are not forgotten. We welcome ideas.

♦ Greeting Cards, Customized
♦ Card Value Assorted Packs
♦ Gifts, Calendars & Books
♦ Typing & Publishing Services
♦ Create An EBook
♦ If You Need It, We Will Try To Provide It, *Just Ask*

**SOCIAL MEDIA SERVICES**
*Coming Soon*

Freebird Publishers, Inc.

Post Office 541
North Dighton, MA 02764

Contact by Email
Diane@FreebirdPublishers.com
www.FreebirdPublishers.com

**We Will Service All Your Outside Needs With Inside Knowledge**

**Corcoran Sun**

Prison Yard Monthly Newsletter
News ♦ Entertainment ♦ Resources
Single Issue S2. MO or 6 Stamps

PLN_0001583

# Two Companies Acknowledge Exporting U.S. Prisoner-Made Goods to Canada

### by David M. Reutter

South Carolina-based Anderson Hardwood Floors formally announced in January 2012 that it had been violating Canadian law by exporting products partly manufactured by prisoners into Canada for the past 15 years. The announcement implicitly means the company also violated U.S. law by failing to clearly label the goods as being produced using prisoner labor.

Anderson, a division of Shaw Industries Group, which is owned by Warren Buffet's Berkshire Hathaway, Inc., wrote a memo to its customers advising them that "After 15 years of selling Anderson products in Canada, it only recently came to our attention that by bringing those products with prison inputs into Canada, Anderson was in contravention of Canada Border Services Agency (CBSA) Memorandum D9-1-6. This was discovered by the Shaw Export Department and was immediately voluntarily disclosed to the CBSA. As a result, Shaw/Anderson immediately and voluntarily stopped all shipments with any [prison-made] content into Canada."

Canadian border officials were unaware of the violation until after the disclosure, but Anderson was still required to comply with U.S. law. Under the Ashurst-Sumners Act, 18 U.S.C. §§ 1761-62, it is illegal to ship goods made using prison labor across state lines unless they are clearly marked with "the names and addresses of shipper and consignee, the nature of the contents, and the name and location of the penal or reformatory institution where produced." Other requirements for products made by prisoners for sale in interstate commerce are governed by the Prison Industry Enhancement Certification Program (PIECP).

"One provision PIECP participants are required to follow is that 'all prison made products should be clearly labeled,'" noted prison industry expert Bob Sloan. "So obviously, if they shipped products for that long and it was caught by an internal audit, they weren't in compliance with federally required labeling requirements."

Anderson's disclosure demonstrates the lack of regulation in U.S. prison industry programs. Oversight of PIECP was transferred in 1995 to the Department of Justice's Bureau of Justice Assistance, which provides funding to the National Correctional Industries Association (NCIA), a private trade organization.

"NCIA is made up of a membership comprised of individuals and administrators representing thirty-seven state prison industries, companies that supply raw materials to them, and companies using inmate labor for manufacturing," Sloan said. "They serve as the policy and technical assistance arm for the program, and as such, they conduct initial and continued compliance with PIECP requirements, investigate all complaints and determine changes in policy to this federal program. With a board consisting of top state prison industry officials controlling oversight and policy, there is virtually no federal oversight of the program. The 'fox guarding the hen house' scenario is an apt description of this government/private association partnership." [See: *PLN*, March 2010, p.1].

Laws barring the importation of prison-manufactured goods are not unusual, and indeed the U.S. has its own law that prohibits products made using prison labor in other countries. Aside from having to cease exportation of its prisoner-made flooring to Canada, Scott Sandlin, a vice president for Shaw Industries Group, said the company "is not anticipating any penalties or fines related to this issue."

"The way it's characterized and the way I've seen it characterized in some of the media releases is that this is tantamount to slave labor. It's not," said Jeff Levin, counsel for the Coalition for American Hardwood Parity (CAHP). "This is a federally statutory program. The workers are paid a prevailing wage." Anderson is a founding member of CAHP.

Although prisoners employed in PIECP programs are supposed to receive prevailing wages by statute, in practice they are paid minimum wage – which is subject to deductions of up to 80% for room and board, victim restitution, taxes, contributions to a mandatory savings account, etc.

State prisoners at the Northeast Correctional Complex in Tennessee and at the Allendale and Tyger River Correctional Institutions in South Carolina produce hardwood flooring for Anderson.

Another company, Mannington Wood Floors, also announced in January 2012 that it had stopped shipping goods produced using prison labor to Canada. According to Betsy Amoroso, Mannington's director of corporate communications, the products made by prisoners represent "a small percentage of what is sold into Canada." She added the company had "ceased shipment as soon as we became aware of the situation." ◼

Sources: *Wall Street Journal, Bloomberg News, www.hardwoodfloorsmag.com*



## Law Office of
# TIMOTHY C. CHIANG-LIN, PLLC

Representing All Individuals Who Suffered **Childhood Sex Abuse** in Washington & Oregon

**2155 112th Ave NE, Bellevue, WA 98004**

chiang-lin.com

**tim@chiang-lin.com**

GET THE 30 NON NUDE CAMELTOE TOE PICs/1 SET ALONG WITH THE HOT NONNUDE CATALOG/1 FOR ONLY 20$ FREE S/H NEVER REMOVE THIS ADD AT ALL!

**HOT DREAMS FAST SERVICE!** GET YOUR FREE NON NUDE CATALOG#1.YOU MUST SEND A S.A.S.E TO RECIEVE IT.IF YOU DONT SEND A S.A.S.E YOU WONT GET NOTHING!

**GET 15 SOAKIN WET CAMELTOE SHOWER SCENE PICS ALONG WITH NON NUDE CATALOG#1 FOR ONLY$17.00**

GET THE CAMELTOE#2 COMES WITH 15 PICS FOR ONLY $17.00 FREE S/H COMES WITH NONUDE CATALOG #1    **FREE S/H** FOR THE ALL NUDE CATALOG#1 SEND $5.00 AND A S.A.S.E THIS CATALOG COMES WITH A FREE PIC **PLEASE MAKE ALL PAYMENTS TO:**

WE ARE SHIPPING FAST! IF YOU ARE TIRED OF WAITING HOT DREAMS GONA TAKE CARE OF YOU ! FAREAL!! FAREAL!!    **- HOT DREAMS . P.O.BOX 652 DEPT PN RACELAND,LA 70394 NEVER REMOVE THIS ADD!!**

# Reintroducing the Private Prison Information Act: An Interview

## *by Mel Motel*

Christopher Petrella and Alex Friedmann are leading a coalition of organizations urging U.S. Representative Sheila Jackson Lee (D-TX) to reintroduce the Private Prison Information Act during the 113th Congress. I reached them both on the phone on a busy afternoon on January 9, 2013. Alex spoke from his office in Nashville, Tennessee while Christopher was on the road in Boston.

Christopher Petrella is a doctoral student in U.C. Berkeley's Department of African American Studies; his dissertation focuses on the intersection of race, class and prison privatization. He also teaches classes at San Quentin State Prison.

Alex Friedmann is the managing editor of *Prison Legal News*, associate director of the Human Rights Defense Center and president of the Private Corrections Institute, which opposes prison privatization. He spent ten years behind bars, including six years at a facility in Tennessee operated by Corrections Corporation of America (CCA).

• • •

**MEL MOTEL: So let's talk about this bill, the Private Prison Information Act (PPIA). Why is this bill important? Who should care about this issue?**

**ALEX FRIEDMANN**: The PPIA would apply to private prison contractors on the federal level – it would subject them to the same obligations under the Freedom of Information Act (FOIA) that apply to public corrections agencies. Currently, FOIA does not apply to privately-operated prisons. This is important as a transparency issue. It would put all federal facilities, both prisons and detention centers, public and private, on equal footing – it doesn't matter where people are housed, the facilities should still be subject to FOIA. So beyond it being an issue for just prisoners or people that are directly connected to prisoners, it's a public taxpayer issue.

**CHRISTOPHER PETRELLA**: Our question is fairly straightforward: How can private prisons operate free from FOIA obligations while receiving public dollars? The contradiction is glaring and it corrodes the notion of an open democracy.

**MM: And why should this concern us at this particular moment?**

**CP**: We've reached a point where two opposing forces are beginning to collide. The first is a rapidly expanding mass of citizens disturbed by the lack of transparency and accountability within the private prison industry; a few years ago it seemed the only people concerned were those of us in smaller "social justice communities." Now, articles on prison privatization are popping up all over the place: the *New York Times, Washington Post, L.A. Review of Books*....

The second vector is what's best described as "concentrated growth." Although, according to a recent BJS [Bureau of Justice Statistics] study, the total U.S. prison population decreased over the last year, those in privately-operated federal facilities grew by 20%. It's the single largest area of corrections and detention growth in the country. My sense in speaking with people, including Alex, is that the public is hungry for answers and now has enough information at its disposal to start asking the right, tough questions.

**AF**: Right now the level of private prison involvement on the federal level is at an all-time high. CCA and GEO are getting upwards of 40% of their revenue from federal sources. As long as this is occurring, there is a greater need than ever for transparency. For example, in May 2012 there was a large-scale riot at a CCA-operated Bureau of Prisons facility in Mississippi, which resulted in the death of a CCA employee. With a public corrections agency, to find out what happened you'd file a FOIA request, get information on the riot and learn how this guy was killed. But since it's a CCA prison and FOIA does not apply, you can't easily obtain information about what happened.

**MM: Alex, you spent six of your ten years behind bars in a private prison operated by CCA. From your experience, what were some of the differences between the private prison and the state-run?**

**AF**: In the private prison there was an emphasis on cost-cutting: on security, the use of prison labor – which increased the bottom line of the company. There was rationing of blankets and toilet paper. There was high staff turnover – new guards were constantly coming in and replacing the ones who were leaving.

**MM: You've mentioned that "efforts to privatize federal detention facilities are on the rise" and that "populations held in privately-operated facilities have grown by nearly 20 percent over the past year." What do you understand to be the reasons behind this growth?**

**CP**: Well, the Migration Policy Institute recently released a report finding that the budget for ICE [Immigration and Customs Enforcement] ballooned by

---

# MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(213) 489-7715



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

---

PLN_0001585

87% since 2005, mostly as a result of "Operation Streamline," a policy that forces undocumented migrants through the federal criminal justice system and into U.S. prisons instead of routing non-violent individuals caught "crossing the border" into civil deportation proceedings. Just last year over 400,000 detainees passed through our federal immigration system, a system – I might add – in which a full 50% of detention facilities are contracted to private companies.

**MM: And who should care about this?**

**CP:** Though everyone loses when the democratic nature of our justice system is compromised, some lose more than others. People of color, for instance, are overrepresented in the private corrections industry, even relative to public corrections populations, in many of the largest states. The PPIA is therefore particularly important to communities of color that disproportionately interface with some of the most closed, secretive and anti-democratic social institutions around: private prisons.

**AF:** The PIPA also concerns policy makers, because they make public policy decisions based on private prison companies' track records. Unless they're getting accurate information, they're not making accurate decisions. You have to have a level playing field for providing equal information before you can make an informed and educated decision. Basically, everybody – taxpayers, policy makers, incarcerated people, families of prisoners – should be concerned about this. Just because a government agency contracts out prison operations, it cannot contract out the public's right to know what the government is doing and how taxpayer money is being spent.

• • •

On December 18, 2012, the Human Rights Defense Center submitted a joint letter to Rep. Jackson Lee urging her to reintroduce the PPIA, which she had previously introduced in each session of Congress since 2007 without success. The letter was signed by 34 criminal justice, civil rights and public interest organizations, including the ACLU National Prison Project, FedCURE, In the Public Interest, Justice Policy Institute, Justice Strategies, Southern Center for Human Rights, Southern Poverty Law Center, The Sentencing Project, Texas Civil Rights Project, Center for Constitutional Rights, National Immigrant Justice Center and YouthBuild USA, Inc.

The joint letter to Rep. Jackson Lee, which was coordinated by Christopher and Alex, noted that "Whereas the Federal Bureau of Prisons (BOP) and state departments of corrections are subject to disclosure statutes under the Freedom of Information Act and state-level public records laws, some state courts have held that private prison firms that contract with public agencies generally are not. This lack of public transparency is indefensible in light of the nearly $8 billion in federal contracts that Corrections Corporation of America (CCA) and the GEO Group (GEO) – the nation's two largest private prisons firms – have been awarded since 2007."

Individuals who want to support the reintroduction of the PPIA during the 113th Congress should contact Rep. Jackson Lee's office directly at 2160 Rayburn Building, Washington, DC 20515 (202) 225-3816. Organizations that want to support this effort are encouraged to contact Christopher at cpetrella@post.harvard.edu, or Alex at afriedmann@prisonlegalnews.org. For additional information, see: www.privateprisoninformationactof2013.com. ▟



**BRANLETTES**

**OUR SIMPLE POLICIES:**

**SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP FRIENDLY)**

Due to tremendous time and costs answering letters, unless you are placing an order or a question regarding your order, we will not reply to any other questions.

*SASE ARE REQUIRED FOR ANY INQUIRIES OR CONCERNS!*

**You and you alone are responsible for your selections being allowed into your facility.**

Know your institutions policies as to what image content is allowed. Returned orders are non-refundable.  They will be held for 14 Calendar days in order for you to send *self-addressed stamped;* 3-First class stamps per envelope, *with a street address* for every 20 pictures.  All returned images held after two weeks will be re-sold and we will return to our stock.

**All payments are by Institutional Checks or U.S. Postal Service or Western Union Money Orders.**

These payments are processed immediately and shipped in less than 3-4 weeks. Any other company Money Orders delay shipment 8-10 weeks or until that Money Order clears our Bank. Yes, we deal with people that are, while in prison, still trying nickel and dime scams...

**ALL SALES ARE FINAL!**

**EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM.**

| OUR PRICES ARE SIMPLE: | SHIPPING&HANDLING: |
|---|---|
| 1-4999 4X6 PHOTO = .45 CENTS EACH<br>5000+ 4X6 PHOTOS = 20%DISCOUNT<br>1-9 CATALOGS : $3.00 EACH+SASE<br>10 CATALOGS: $25.00+SASE(4Stamps) | Due to various prison policies regarding how many pictures can be sent in one envelope, our policy is as follows:<br>1 - 5 Photo's-----$1.00 per envelope<br>10- 15 Photo's--$1.50 per envelope<br>20 -25 Photo's--$2.00 per envelope |

**Branlettes Beauties**

**Select your favorite:**
White Catalog(20 Vol.)
Black Catalog(20 Vol.)
Asian & Latino Catalog(20 Vol.)
Please state what style photo's:
**Provocative Poses -
Or- Nude Poses**

**FREE CATALOG???**
You read it right! Just send a self addressed stamped envelope to us at the address below and we'll send to you ONE SAMPLE CATALOG (One per costumer) with 84 gorgeous girls in full color. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!
*BRANLETTES*
*FREE CATALOG OFFER*
*P.O. BOX: 5765*
*Baltimore, Md. 21282*

REMEMBER, YOU BOUGHT IT, IT'S YOURS, WHETHER IT GETS THROUGH YOUR MAILROOM OR NOT!  NO REFUNDS OR EXCHANGES.  IF YOUR PURCHASE IS RETURNED TO US AND REMAINS FOR 14 CALENDAR DAYS UNCLAIMED, WE WILL RETURN TO OUR STOCK.

BRANLETTES, P.O.Box 5765, Baltimore, MD 21282



We Bring The World To Your Fingertips

**PRISONER ASSISTANT**

482 Summit Wind Drive, Ste. 704-AD1  Lake Harmony, PA 18624
prisonerassistant.com - info@prisonerassistant.com - (570) 722-5800

**BANKING & FINANCE**
Open a Bank Account Today
Become a Member
& Prepare For Your Future

Gain access to hundreds of professional services that have never before been available to prisoners.

If it can be done, we will try to do it

You will be assigned an Executive Assistant to manage your life and provide personal attention to your requests in a professional & timely manner.

Prisoner Assistant has been providing financial concierge services to prisoners since 2008. We help enrich your life while in prison and give you the tools to prepare for reentry. You are required to open a bank account, carry a minimum balance of $150 and agree to pay a minimum monthly membership fee of $5 to use our services. For more information, please send $4.50 or 1 book of Forever stamps with a request for an *Application Package* that includes brochures, applications & 56 page color catalog (money orders made out to Prisoner Assistant - no personal checks accepted) or just send a $.65 SASE for the brochures & application. (Catalog will be sent when account is opened)

*Money Orders – Online Fund Transfers - Gift Cards - Green Dot - Internet Purchases
Internet Research - Virtual Office - Social Networks - Stamp Exchange - Email Monitoring
Photo Album Creation - Credit Development - Business Development - Secured Credit Cards
& Credit Reports - Mailing Addresses - Book Publishing - Find a Lawyer – Virtual Calling
Resume & Logo Creation - Cell Phone Contracts – Website Development - Graphic Design
We can also post Client Profiles, Classifieds, Portfolios, etc. on prisonerassistant.com*

PLN_0001586

# GAO Examines How BOP Can Reduce Prisoners' Time in Prison

## *by Derek Gilna*

The U.S. Government Accountability Office (GAO) has released a study on the Bureau of Prisons' authority to shorten a federal prisoner's sentence. The Bureau of Prisons (BOP) was found to have three principal authorities with respect to sentence reduction: prisoners can earn up to twelve months off for successfully completing the Residential Drug Abuse Treatment Program (RDAP); eligible prisoners can be transferred to community corrections for up to the final 12 months of their sentences; and prisoners can theoretically earn up to 54 days a year for good conduct while incarcerated.

Unfortunately, according to the GAO's review of data from 2009 to 2011, due to budgetary constraints, mismanagement or bureaucratic indifference, the BOP does not fully utilize all of the sentence-reduction resources at its disposal. As a result, federal prisoners spend more time away from their families and communities, which costs the taxpayers millions of dollars and contributes to prison overcrowding.

RDAP consists of coursework and counseling that addresses both drug and alcohol abuse. According to the GAO the problem of substance abuse among prisoners is staggering, as the "BOP esti-

mates that 40 percent [of those] entering federal custody have a substance abuse disorder...." Despite that fact, only 19,000 prisoners were able to participate in the program during the time period reviewed. The BOP currently houses approximately 217,000 prisoners and operates at 38 percent over capacity.

Due to overcrowding and other program inefficiencies, such as an inability to hire staff or fill vacancies in a timely manner, very few prisoners who complete RDAP receive the full 12-month sentence reduction authorized by statute and BOP program statements. According to the GAO, "during fiscal years 2009 through 2011, of the 15,302 [prisoners] ... who completed RDAP and were eligible for a sentence reduction, 2,846 (19 percent) received the maximum reduction and the average reduction was 8.0 months." BOP officials have acknowledged that most RDAP participants do not receive the full amount of time off because they have less than 12 months to serve on their sentences by the time they finish the program.

Interestingly, the BOP claimed that "during fiscal years 2009 and 2010 all eligible inmates who expressed interest in RDAP were able to participate in the program in time to complete it before their release from BOP custody." The GAO questioned this finding due to how the BOP tracks completion of RDAP, noting that prisoners whose program participation crosses over into the next

year are apparently "double-counted," and that only 6,875 complete the program in a year. Further, the GAO did not take into account prisoners who are discouraged from entering RDAP due to the limited amount of time off their sentences they would receive when they are finally able to enter the program.

The BOP, according to the GAO study, acknowledged that "Delays resulting from this system-wide demand can prevent timely inmate entry into RDAP and can reduce the number of eligible inmates receiving the maximum allowable sentence reduction...," due to lack of program capacity. The BOP's management of RDAP has been criticized as inconsistent and unnecessarily costly. [See: *PLN*, Aug. 2012, p.28].

The referral of federal prisoners to community corrections is a second option by which the BOP can reduce prisoners' time in prison. According to the Second Chance Act, which was touted as offering up to 12 months of halfway house placement prior to a prisoner's release, the public was led to believe that the BOP would utilize this option to reduce prison overcrowding. However, when the time came to issue rules and program statements for halfway house placement, 12 months became an average of well under six months, and generally 3.

The Second Chance Act also directed the BOP to "consider using home detention as part of an inmate's reintegration into the community." However, once again, until the BOP began to run into budget constraints and possible funding cuts, home detention placements were rarely made.



**SureShot Books a Premier Bookstore for Inmate's**

**Legal Law Books, Magazines, Newspaper Subscriptions, Sports, Urban Books & Career Education Books.**

( Largest Selection of Spanish Publications )

Contact us for a FREE catalog

SureShot Books, P.O. Box 924, Nyack, NY 10960
www.sureshotbooks.com

# Earn an Adams State University Degree via Correspondence Courses



• Correspondence Courses via mail   • No internet access required
• Degree options available — Associate of Arts or Science, Bachelor degrees in Accounting, Business Administration, Government, History, Interdisciplinary Studies, Legal Studies, Management, Marketing, Sociology, Paralegal Certificate Program, Masters degree in Business Administration
• Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
• Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
• 16+ years of experience serving incarcerated students
• FREE unofficial evaluation of previously earned credits

Now Available: Masters Degree in Business Administration

ADAMS STATE UNIVERSITY
C O L O R A D O
*Great Stories Begin Here*
EXTENDED STUDIES

Call or write to receive additional information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101

PLN_0001587

According to the GAO, in fiscal year 2010 "almost 29,000 inmates completed their sentences through community corrections," including 17,672 who were placed in residential reentry centers (RRCs), 11,094 placed in RRCs followed by home detention and 145 placed in home detention only. The average length of placement in community corrections was just 115 days. The average halfway house stay was 95 days in fiscal year 2010, significantly shorter than the allowable 365 days.

Finally, according to the BOP, most eligible prisoners receive all of their good time credit if they do not commit disciplinary infractions. Prisoners who are serving a term of more than one year may receive 54 days a year off their sentences if they have earned or are earning a high school degree or GED equivalent.

However, there have been objections to the manner in which the BOP computes the good time credit, as federal prisoners do not receive 54 days per year but rather get only 47 days. In *Barber v. Thomas*, 130 S.Ct. 2499 (2010) [*PLN*, Sept. 2010, p.46], the U.S. Supreme Court upheld this method of computation, with the net result that federal prisoners spend more time in prison, which increases incarceration costs for the BOP – and thus taxpayers – and contributes to overcrowding.

There are various other sentence-reduction options available to the BOP, but they are statistically insignificant and result in less than 1 percent of prisoners being found eligible.

Other than the usual bureaucratic inefficiencies found in most governmental agencies, the principal obstacle seems to be lack of community corrections and RRC space, which has been cited as a primary reason for RDAP participants not receiving their full sentence reduction. The GAO noted that the BOP currently does not have a "road map" for correcting this problem, had "not provided documentation" on its review process for certifying new RRC facilities and had set no time frames to remedy those deficiencies.

The GAO concluded by stating, "Federal inmate populations have been increasing and BOP is operating at more than a third over capacity. In addition, the absence of parole in the federal system and other federal statutes limit BOP's authority to modify an inmate's period of incarceration. Inmates, who earn their good conduct time, as most do, end up serving about 87 percent of their sentences. BOP's housing of inmates in community-based facilities or home detention is a key flexibility it uses to affect a prisoner's period of incarceration. However, BOP does not require its RRC contractors to separate the price of home detention services from the price of RRC beds. As a result, BOP lacks information on the price of home detention that could assist it in weighing the costs and benefits of alternative options for supervising inmates in home detention."

Thus, the GAO recommended that the BOP "establish a plan, including time frames and milestones for completion, for requiring [RRC] contractors to submit separate prices for RRC beds and home detention services" – data which the BOP does not currently collect, which would assist federal prison officials in making future community corrections placement decisions. ◼

Source: *"Report to Congressional Requesters, Bureau of Prisons, Eligibility and Capacity Impact Use of Flexibilities to Reduce Inmates' Time in Prison," GAO-12-320 (Feb. 7, 2012)*

---

## iNMATE SH♥PPER



**Yes, it's true, this is a real 200+ page publication, not a 7-sheet rip-off!**

EVERY ISSUE Contains *at least*:
- 800 Pen Pal resources
- 400 businesses friendly to prisoners
- 66 Gift Shops
- 360 Non-profit orgs for prisoners' issues
- 70 Contests for writers, poets & artists
- 63 Catalogs to order
- 22 Personal Assistants • 14 Typists
- 5 Publishing Services
- 15 Magazine Sellers • No Nudes *BOP Cool!*

Gigantic Exclusive
**Inmate Shopper Mall**
full of products made by prisoners
*FREE Ad Space* for inmate authors, crafters, and artists. Sell your items in our Mall. Complete directions for placing your products in the Mall are in every issue.

*ORDER FROM:*
- Amazon.com • Inmatebooks@yahoo.com
- Inmate Book Service
  P.O. Box 142, Caratunk, ME 04925
- InmateMAGS, 4208 University Way NE
  Seattle, WA 98105
$17.99 + $7 Priority Mail Shipping -Tracking Incl.

---

## T Y P I N G
### S E R V I C E S
**Provided since 1998**
Specifically designed, with special rates for the incarcerated person.

**Black / Color Printing and Copying**

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

LET MY FINGERS DO YOUR TYPING
**Sandra Z. Thomas (dba)**
**P O Box 4178**
**Winter Park, Florida 32793-4178**
**Phone: 407-579-5563**

Special Offer: $2.00 off first order.
Special offer void after: 12/31/2013

---



## CA$H FOR YOUR STAMPS
## P. O. Box 687-P, Walnut, Ca. 91788
Get the HIGHEST return for ALL of your stamps!
Rapid processing and payment sent to your designee (No Package, Book, or Magazine Vendors Please)

**70% OF FACE VALUE** for Books and Sheets of "Forever" Stamps in new or excellent.*
**60% OF FACE VALUE** for Books and Sheets of Other Denominations in new or excellent condition.*
**50% OF FACE VALUE** for all books, sheets, or rolls that are not in new and complete condition.
**\*NEW CONDITION MEANS NO FOLDS, NO WRITING, AND ALL STICKERS IN TACT.**
**NO SINGLE STAMPS** (GROUPS OF 2 OR MORE). Stamped envelopes must be #10 with no markings.
$15.00 Min. Money Orders. Damaged or Taped Stamps Not Accepted/Returned. Send SASE for Brochure.

PLN_0001588

# In Memory of Jon E. Yount (1938-2012)

## by Peter Wagner

Sometime in the early morning of April 26, 2012, in his cell in a remote Pennsylvania prison, a 74-year-old jailhouse lawyer serving a life sentence hung himself. He was a quiet man who avoided taking credit for his work, so many people in and outside of prison don't know about the debt they owe to Jon E. Yount.

I knew Jon well, although not as well as I'd have liked. We corresponded a few hundred times, with him writing more than me, and I visited him four or five times. Some might recognize Jon's name from the Prison Policy Initiative advisory board, but very few people know that Jon was the first person to recognize how the Census Bureau's prison miscount could distort state legislative redistricting.

In the late 1990s, Jon and filmmaker Tracy Huling, working independently, linked the Census Bureau's practice of counting incarcerated people as residents of the location where they were imprisoned to negative political and economic effects. Tracy and Jon's efforts started people talking about the issue, and it was this "rumor" that I initially set out to debunk. I was skeptical that the prison system was large enough for census counts of correctional populations to distort the federal budget or congressional districts. It turns out that the Census Bureau's prison miscount did have only a very tiny effect on the distribution of federal funds, but it was Jon's work that first drew my attention to the distortion on state legislative districting.

### The Offense and the Trials

Jon Yount committed a horrible murder in 1966 when he was 27 years old. In a few moments a young woman's life ended forever, and in the eyes of the state of Pennsylvania, those moments were to define the rest of Jon's life. He rejected the state's view and spent the rest of his life showing to himself and others that he was much better than his worst act.

After his death, I re-read some of the court decisions from his case. The experience was a stark reminder of how trials were once conducted in this country. Jon's first conviction was thrown out because the police had violated his constitutional rights. (The Supreme Court's landmark Miranda case protecting defendants from unconstitutional interrogation techniques came down after his arrest). At his second trial, 77% of the jury pool in the small rural community was familiar with the case and had already formed an opinion against him. Worse, 8 out of the 14 jurors stated their bias and were kept on the jury anyway. The judge refused to move the trial.

A federal magistrate thought that this trial, too, violated the Constitution. The district court disagreed, but a three-judge panel of the Third Circuit found that Jon "... has shown that the pretrial publicity caused actual prejudice to a degree rendering a fair trial impossible in Clearfield County. After examining the totality of circumstances, we hold that petitioner's [second trial] was not fundamentally fair." See: *Yount v. Patton*, 710 F.2d 956, 972 (3d Cir. 1983).

Unfortunately, by a 7-2 vote, the Supreme Court reversed the Third Circuit's decision. The Supreme Court's word was final, but Jon, ever cognizant of vote totals and trends, once summarized the point in a letter by stating, "Thus, by a narrow 7-6 margin, the federal judges who reviewed my case let the conviction stand."

### The Sentence and the Escape

Even though the highest court in the nation had upheld his conviction, Jon still had a realistic chance of seeing freedom again. Decades ago, a life sentence didn't necessarily mean a person would die in prison. When Jon was convicted, lifers served an average of about 12 years prior to commutation. He was a model prisoner and was recommended for a commutation after he had served 7 years. He didn't receive that commutation, nor did he receive any of the others he was recommended for in the first two decades of his sentence.

Frustrated, and with the number of commutations granted by the governor in free fall, Jon had had enough.

In 1986, he walked away from a work detail at SCI Rockview and traveled the West. He eventually settled in Boise, Idaho with a girlfriend he had met as a pen pal while incarcerated. Using the name Jim Forsgren, he was a model Boise citizen who literally fed the poor and visited the sick. Nearly two years later, after being featured on NBC's *Unsolved Mysteries,* Jon was arrested. Following his arrest, the *Idaho Statesmen* ran an article with the headline, "Friendly Idahoan caught as fugitive: Bad past catches up with 'good neighbor.'"

After his return to prison, Jon applied for commutation one more time with a request to move back to Idaho. The *Idaho Statesman* summarized, "Forsgren or Yount, he's liked: Friends say killer would be welcome." As his landlord's sister-in-law explained, "To me, although he murdered someone, Jon isn't a murderer.... If they ever were to come back to Idaho, they certainly would have a place to stay – here with us." Unfortunately, the state didn't agree and he remained, and ultimately died, in prison.

### The Jailhouse Lawyer

I never asked Jon if he was always interested in politics and the law, but I know that by the early 1990s he was using the legal skills he developed working on his own cases to benefit the larger population of incarcerated people. He strategically picked his cases for maximum impact. The two that I am most familiar with were *Mixon* and *T-Netix.*

*Mixon v. Commonwealth* challenged Pennsylvania's system of banning people in prison and people recently released from prison from voting, and separately challenged prison-based gerrymandering in state legislative districts. Jon prepared the lawsuit and it was filed by civil rights attorney Sam Stretton. The plaintiffs were several black and Latino men incarcerated in Pennsylvania prisons, and Maureen Williams, a black female voter from Philadelphia. *Mixon* was the first case to raise the issue of prison-based gerrymandering in the state legislative context, although that particular claim was quickly dismissed because it was a part of a re-enfranchisement suit and not a redistricting one.

When *Mixon* was filed, Pennsylvania disenfranchised two groups of people: People in prison couldn't vote, and people who had been released within the past 5 years couldn't register to vote. People who had been registered to vote prior to incarceration, however, could vote after they were released. The court struck down the latter restriction, stating, "We can conceive of no rationale for permitting those who were registered previous to incarceration to vote on their release, while those

who were not previously registered, cannot. Such a statute has the appearance of penalizing ex-incarcerated felons for their status." See: *Mixon v. Commonwealth*, 759 A.2d 442, 451-452 (Pa. Commw. Ct. 2000) [*PLN*, March 2002, p.19].

In 2005, the Pennsylvania legislature attempted to roll back this ruling and ban both probationers and parolees from the polls. Jon successfully organized against the law, which the *New York Times* called "a shameful step backward" ... "at a time when the rest of the country is moving in the opposite direction."

In *Yount v. T-Netix,* Jon brought the prison system's abusive telephone rates and billing practices before the Pennsylvania Public Utility Commission and won refunds in 2008.

The Department of Corrections (DOC) required all incarcerated people wishing to call their loved ones to use a particular company that charged exorbitant rates. The company, T-Netix, in exchange for the monopoly contract, would kick back $3 million a year plus 32 to 40% of the revenue from every prison phone call. Further increasing the cost to incarcerated people and their families, the phone system would arbitrarily disconnect calls, forcing them to pay another reconnection charge in order to continue their conversations.

The prison population is a significant market for telephone services and incarcerated people are the very definition of a captive market, carrying all of the associated potentials for abuse. As the Commissioners wrote in their order requiring T-Netix to refund the improper charges:

"We are troubled that T-Netix did not regard the inmates as customers, even when their calls were paid for using the inmates' prepaid accounts.... While the erroneous disconnections themselves are difficult for the inmates, the fact that T-Netix has done little or nothing to investigate complaints or to make refunds, when appropriate, is unacceptable." See: *Jon E. Yount, et. al. v. T-Netix, Inc. and T-Netix Telecommunications Inc.,* Penn. Public Utility Commission, Docket No. C-20042655.

Jon's successful work against the DOC's high telephone rates carried a high cost. The prison system retaliated. He was transferred from SCI Huntingdon in central Pennsylvania to the remote SCI Greene facility on the West Virginia border. At Huntingdon, where he had been confined for 16 years without a single disciplinary infraction, there was a large lifers group he worked with and his family and supporters could conveniently visit him. As Jon explained to me in the letter announcing his transfer, at Greene there were no "inmate organizations" and it was far more difficult for family and friends to visit.

I know I was only able to visit at Greene once. And I can report that unlike in Huntington, where the visiting room was always crowded with families, when I was at Greene shortly before Christmas in 2008, the visiting room was almost empty. That's not surprising, given the location. The state's prison population disproportionately comes from Philadelphia. The Huntingdon prison was 127 miles from Philadelphia, but SCI Greene was 330 miles away. I could see why Jon would quip in one letter that he had been transferred to "Siberia-South."

This article, though, is about Jon's accomplishments, not his struggles, so let me go back to how I met him.

### Prison-based Gerrymandering

When I was investigating the Census Bureau's prison miscount, I was inspired to focus on state legislative redistricting because of a short article by Robert T. Hoetzel that showed how 10% of a state house district could be incarcerated. The article framed this as a "one person one vote" issue, and explained:

"The advantage of incorporating a penitentiary or two in one's district is the best kept secret in politics. It's the newest form of gerrymandering. There's no reason for politicians to show any regard for inmates' concerns, views or political parties. A politician might represent them, but inmates have no power. They can't vote. For the 'host' district's office-holder, it's the best of all worlds!"

I naively assumed this article was just an isolated bit of brilliance and didn't think much more about it for a year. Over a year later, after I had completed my academic paper on prison populations and redistricting, I wrote to Mr. Hoetzel to share a copy of my report and politely inquire if he had done any other similar research or writing.

As it turned out, Mr. Hoetzel was to be paroled in under two weeks, so he shared my letter with the Pennsylvania Lifers' Association and one of their elect-

---

# CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks.  State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum).  Free persons: $90.

*CLN,* **Box 687, Walnut, CA  91788**

*2012 Fourth Edition*
### "WINNING HABEAS CORPUS & POST CONVICTION RELIEF", over 620 pages

Cases cited through 638 F.3d. Simply the best book for prisoners who are researching post conviction relief and Ineffective Assistance of Counsel. Habeas Hints, writer & **Attorney, Kent Russell** writes: *Now that I've been turned on to 'Winning Habeas Corpus', I always make sure that it's close at hand.*

- A virtual law library in a single book, actual case quotes.
- Habeas Procedures & Prac. § 2254, 2255 & Rule 60(b).
- Sixth Amendment & IAC, pretrial duty to investigate.
- Recognized defenses, plea bargain process.
- Jury Instructions, sentencing, time bar, & tolling.
- Over 1500 cases cited; 7' x 10" size & 10 pt. font.

**Price for Prisoners only $58.50**
Send money order or institutional check to:
**Fast Law Publishing Associates**
**P.O. Box 577, Upland, CA  91785**
On-Line Orders: www.fastlaw.org

PLN_0001590

## Jon E. Yount (cont.)

ed Trustees, Jon E. Yount. As I quickly learned, they had been working on census issues for some time. Jon had published a short thesis about felon disenfranchisement that addressed the census counts of prison populations, and had also raised that issue in the *Mixon* lawsuit. But having exhausted their remedies in state court, Jon and the Lifers' Association were stuck. They had a lot of ideas on next steps, but, as Jon told me many times, "there are limits to what you can do with a number after your name."

Jon asked me to run with the issue, and run with it we did. After a decade of work we made prison-based gerrymandering one of the central controversies of the 2010 Census. In 2010 and 2011, four states passed legislation ending prison-based gerrymandering within their borders. The Maryland and New York laws are already in effect and have been upheld by the courts. We're also making systemic progress at the Census Bureau. [See: *PLN*, Dec. 2012, p.1].

The Bureau squandered the planning time necessary to count incarcerated people at home in 2010, but it did agree to a critical interim step: changing how it publishes the data. This ultra-technical change made it easier for state and local governments – especially rural counties – to avoid engaging in prison-based gerrymandering by manually correcting the Census data to better reflect the actual population of an area.

There is plenty of work still to be done on prison-based gerrymandering, especially in Jon's home state of Pennsylvania. In 2009, Elena Lavarreda and I released a report, *Importing Constituents: Prisoners and Political Clout in Pennsylvania,* which found that eight state house districts would not have met minimum population requirements without using prison populations as padding.

### Other Political and Social Issues

Beyond legal writing, Jon also wrote a lot of short columns for various publications about general criminal justice matters and political issues. While many of these articles were specific to Pennsylvania, we helped make some of his writings that spoke to a larger audience available on the web.

One of Jon's last big projects was a report that reviewed Pennsylvania's parole

policies and offered proposals for reform. He was concerned that incarcerated people were following the recommendations of the parole board to the letter only to be repeatedly denied at parole hearings. As a lifer, parole reform was something that he would never benefit from – his only possible way out of prison was via commutation. But Jon could recognize a systemic problem when he saw one, so he prepared a massive briefing for the state committee that was investigating the parole system.

His 2004 report, *Pennsylvania: Parole and Life Imprisonment,* was a history of parole policy in the state from 1911 to 2001. Critically, he explained that contrary to the present public understanding, parole was never intended as an act of clemency but as a valid disciplinary tool for those deemed capable of supervised rehabilitation outside prison walls. Over a period of 90 years that original intent was lost, replacing what was once intended as a rational determination of whether an incarcerated person is ready for release with a narrow fixation on what that person did years or decades ago that resulted in their prison sentence.

One point was a source of tension between Jon and myself. I was fond of writing things like, "Despite common misconceptions, most people in prison are serving short sentences, and very few incarcerated people are sentenced to life without parole." Jon didn't like my use of the term "short" to describe either the median imposed sentence of less than 3 years or the fact that the median time served before release in state prisons was less than 2 years. Jon's concern – ironic for a lifer – was that in both historical and international terms, modern American sentences are quite long for all types of offenses.

My intent was to distinguish, in the mind of the public, between the permanence of prison buildings and the transience of most of the people confined there. Jon thought, correctly, that I was normalizing the extreme sentencing policies in the U.S.

Other than emphasizing the unique statistic we found in New York – that the median time an incarcerated person has been at his or her current facility is 7.1 months – I'm still trying to figure out how to explain both contexts at the same time. Life sentences have always been rare, both when Jon went to prison in the 1960s and when he died in 2012. But Jon was incarcerated long enough to see firsthand how

the typical sentence for everyone else was getting longer.[1]

### Conclusion

Jon's story is exceptional, even apart from his accomplishments. His experience as a lifer who lost hope and died in prison is not the experience of nearly all of the estimated 16 million people who will cycle through state or federal prisons within their lifetimes.[2]

Most incarcerated people experience prison as a temporary – if permanently life-altering – experience. It is no accident that this constantly-shifting population has a hard time becoming politically engaged. Lifers like Jon are often a challenge to the system because they can develop the social, political and legal relationships on both sides of the walls that are necessary to make change happen.

The unfortunate reality is that society gave up on Jon Yount a long time ago, and never intended to let him be free. To his credit, Jon never gave up on society. He left this world having made major contributions to the lives of the poor, the sick and the incarcerated. Jon's long and productive life in prison shows just how wrong it is to assume that a single bad act can define someone forever.

And much to the regret of the prison system, Jon generally saw the system's efforts to disrupt his work as inspiration to strive even harder. As he explained to Howard Zehr for Zehr's book, *Doing Life: Reflections of Men and Women Serving Life Sentences*: "When something happens, I can't go in, close the door, turn on the television, and ignore it, like some people do. Me, I have to confront. If I don't like something, I have to deal with it. If it's filing a complaint, if it's filing a brief in court, if it's trying to change something within the prison system – when there's something that bothers me, that's the way I deal with things."

We are very glad that he did. ◪

*Peter Wagner is an attorney and executive director of the Prison Policy Initiative, which documents the impact of mass incarceration on individuals, communities and the national welfare in order to empower the public to improve criminal justice policy. This article, which is reprinted with permission, was originally published in a longer version on PPI's blog at: www.prisonersoftthecensus.org/news/2012/05/22/jon-e-yount. A small archive of Jon's writings is available at: www.prisonpolicy.org/scans/yount.*

## ENDNOTES

1 As the Prison Policy Initiative and the National Voting Rights Institute wrote in an amicus brief to the U.S. Court of Appeals for the Second Circuit:

"It is important to distinguish the rise in incarceration from the rise in crime. Incarceration rates reflect political and institutional decisions about the length of sentences and the extent to which arrests and convictions should result in prison terms rather than other interventions. As one researcher has written:

"Looking at the overall factors leading to the rise in incarceration, research has demonstrated that changes in criminal justice policy, rather than changes in crime rates, have been the most significant contributors leading to the rise in state prison populations. A regression analysis of the rise in the number of inmates from 1980 to 1996 concluded that one half (51.4 percent) of the increase was explained by a greater likelihood of a prison sentence upon arrest, one third (36.6 percent) by an increase in time served in prison, and just one ninth (11.5 percent) by higher offense rates."

Marc Mauer, *Race to Incarcerate* 34 (1999) (citing Alfred Blumstein and Allen J. Beck, "Population Growth in U.S. Prisons, 1980-1996," in 26 *Crime and Justice: A Review of Research* 43 (Michael Tonry & Joan Petersilia, eds., 2000)). Political choices, not an increased crime rate, largely control the tremendous increase in the numbers of persons incarcerated...."

2 In 1997, the Bureau of Justice Statistics estimated, in "Lifetime Likelihood of Going to State or Federal Prison," that if 1991 rates of incarceration held constant, 5.1% of people will go to state or federal prison in their lifetime. (The rate for African-American men is far higher, at 28.5%). Assuming that 1991 incarceration rates would hold constant was a necessary assumption that hasn't held up. Given that the 1991 rates of incarceration did not hold constant, rising 58% from 1991 to 2010 (313 per 100,000 to 497 per 100,000), it would be reasonable to assume that the Bureau of Justice Statistics would estimate a higher figure than a 5.1% lifetime likelihood of going to state or federal prison today. The Bureau's analysis did not include jails because the necessary data did not exist. This figure would further raise the 5.1% estimate. Our 16 million figure was calculated by multiplying 5.1% by the 2010 Census population in the U.S.

## Do you have diabetes?
### Is your diabetes under control?

Living with diabetes in prison is very difficult. Order your FREE copy of *Prisoner Diabetes Handbook: A Guide to Managing Diabetes — for Prisoners, by Prisoners.*

Order your FREE copy and start managing your diabetes and your health.

**ORDER FORM**
Fill out the information below, and send this order form to:

Prison Legal News
PO Box 2420
West Brattleboro, VT 05303

Name

ID number

Facility

Address

City                    State        Zip



**SPLC** Southern Poverty Law Center

*Handbook made possible by the Southern Poverty Law Center*

### Writing to Win

Need to Write better? Writing to Win will teach you the basics of how to compose clear and convincing written and oral legal arguments! 270 pages packed with solid, practical advice and tips.

$19.95 from PLN's Book Store!

# INMATE TOLL BUSTERS
## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*

**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours:  888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.

VISA   MasterCard   DISCOVER



PLN_0001592

# Supreme Court Extends Qualified Immunity to Private Attorney

The U.S. Supreme Court has extended qualified immunity to a private lawyer who was retained by a city to serve as an internal affairs investigator.

In August 2006, Rialto, California firefighter Nicholas Delia became ill while responding to a fire. His doctor ordered him to take three weeks off work, but his employer did not believe he was sick.

The city hired a private investigator to conduct surveillance on Delia. When he was observed buying several rolls of insulation and other building supplies, the city concluded that Delia was not ill but was taking time off to do home construction.

An internal affairs investigation was initiated and Delia was ordered to appear for an investigative interview.

City officials hired Steve Filarsky, an experienced employment lawyer who had represented the city in several previous investigations, to conduct the interview. During the interview, Filarsky asked Delia about the building materials. Delia admitted he had purchased the items but said he had not yet done any work on his house.

Filarsky and fire officials asked to enter Delia's home to view the unused building materials. Delia refused. Filarsky then asked Delia if he would bring the materials outside so his employer could see them without entering his residence. Delia again refused.

Filarsky ordered him to produce the materials but Delia's attorney objected and threatened to sue the city. Filarsky then prepared an order for the Fire Chief's signature, directing Delia to produce the building materials.

Fire officials accompanied Delia to his home. His attorney and union representative went into the house and returned with four rolls of insulation. Delia's employers thanked him and left.

Delia then sued the city, the Rialto Fire Department, three fire officials, Filarsky and ten unidentified defendants. The district court concluded that all the defendants were entitled to qualified immunity, and Delia appealed.

The Ninth Circuit Court of Appeals affirmed with respect to everyone except Filarsky. The appellate court concluded that since Filarsky was a private attorney rather than a city employee, he was not entitled to qualified immunity. See: *Delia v. Rialto*, 621 F.3d 1069 (9th Cir. 2010).

The U.S. Supreme Court granted cert and reversed, stating "that the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities."

Ultimately, the Court held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." Noting that the common law did not differentiate, the Court found "no justification for doing so under § 1983."

The Court distinguished other cases in which it had found that private parties were not entitled to raise a qualified immunity defense, including *Wyatt v. Cole*, 504 U.S. 158 (1992) and *Richardson v. McKnight*, 521 U.S. 399 (1997) [*PLN*, Sept. 1997, p.1].

Those cases "did not implicate the reasons underlying recognition of qualified immunity because the defendant ... had no connection to government and pursued purely private ends," the Court wrote. "*Richardson* involved the unusual circumstances of prison guards employed by a private company who worked in a privately run prison facility. Nothing of the sort is involved here, or in the typical case of an individual hired by the government to assist in carrying out its work."

Accordingly, the Ninth Circuit's decision was reversed. See: *Filarsky v. Delia*, 132 S.Ct. 1657 (2012). ◾

# U.S. Imprisons the Most Women, Tops International List

It's almost a cliché that the world's freest country imprisons by far the most people. And yet the pure mathematics of the issue remain cruelly ironic, especially for America's female prisoners.

The second edition of the World Female Imprisonment List, released in March 2012, reveals that the United States incarcerates almost a third of the more than 625,000 women and girls held in prisons and jails globally. In fact, the U.S. imprisons nearly as many women – 201,200, according to the most recent data compiled by the International Centre for Prison Studies (ICPS) at London's University of Essex – as do China (84,600), the Russian Federation (59,200), Brazil (35,596) and Thailand (29,175) combined.

The ICPS released the data absent extended analysis; however, the list included a few indicators showing that rates of imprisoning women aren't just trending upward in the U.S. but are rising worldwide.

For example, the total female prison population – for both pre-trial detainees and those convicted and sentenced – in 187 countries has collectively increased by more than 16%, "with the largest increase being in the Americas (up 23%)," since the first edition of the list was published in 2006. The smallest rise was in European countries, where the number of women prisoners rose 6%.

"The fact that the female prison population continues to rise, and indeed has risen by a considerable 16% since our last edition of the List in 2006, is a cause for serious concern," said ICPS director Peter Bennett. "Given the high financial and social cost of imprisoning women, the data should prompt policy makers in all countries to consider what they can do to limit the number of women in custody. Excessive use of imprisonment does nothing to improve public safety."

In most prison systems – about 80% of those surveyed – female prisoners account for 2% to 9% of the total population (8.8% in the U.S.). But in some countries as many as 1 in 5 prisoners are women. The highest such ratio is in Maldives, where women comprise 21.6% of the prison population, followed by Hong Kong (20%), Bahrain (18.5%), Macau (14.8%), Qatar (14.7%) and Thailand (14.6%).

The prevalence of imprisoned women and girls is lowest in Africa, where the ratio is 3 out of every 100 prisoners.

Roy Walmsley, the list's author and an ICPS consultant to the United Nations, wrote that he hoped "that this edition of the [list] will be found useful" by politicians, academics, criminal justice experts and "everyone who is interested in the extent of female imprisonment." ◾

Sources: "*World Female Imprisonment List 2012" (second edition), by Roy Walmsley, International Centre for Prison Studies; www.prisonstudies.org*

PLN_0001593



**The Habeas Citebook: Ineffective Assistance of Counsel**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

**$49.95**

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



**Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition**
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

**$49.95**

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



**Prisoners' Self-Help Litigation Manual, 4th Edition**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

**$45.95**

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

☐ Habeas Citebook,
Ineffective Assistance of Counsel
$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
3rd edition
$49.95

☐ Prisoners' Self-Help
Litigation Manual
4th edition
$45.95

**Shipping included in all prices**

**Order by mail, phone, or on-line.**   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address_____

City _____ State ____ ZIP _____

PUBLISHED BY

**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 2420 • West Brattleboro, VT 05303
Tel [802] 257-1342 • www.prisonlegalnews.org

PLN_0001594

# NY Federal Judge Deals Rare SHU Placement Defeat to BOP

### by Derek Gilna

Viktor A. Bout, a Russian international arms dealer ensnared in a DEA sting in 2008, extradited from Thailand and held in the Special Housing Unit (SHU) of the federal Metropolitan Correctional Center (MCC) in New York, won a court order compelling the Bureau of Prisons (BOP) to transfer him to general population.

U.S. District Court Judge Shira A. Scheindlin noted that Bout had been convicted on November 2, 2011 of conspiracy to kill United States nationals; kill officers and employees of the U.S.; acquire, transfer and use anti-aircraft missiles; and provide material support to a designated foreign terrorist organization – the Revolutionary Armed Forces of Colombia (FARC).

Bout's attorney had argued that his long SHU confinement at MCC was "both punitive and unnecessary." According to the court, "Bout is in solitary confinement residing in a one-man cell in which he eats, sleeps, and washes. He spends 23 hours a day in this cell and is taken out for one hour of exercise per day in a room only slightly larger than his cell. He is alone for his exercise period.... Other than visits with counsel, trips to court, a family visit once a week, or trips upstairs to access to electronic evidence ... he does not leave his cell." Bout's attorney also stated that the prolonged solitary confinement may have a serious adverse effect on Bout's mental health.

In a hearing ordered by the judge, the BOP, through the warden of the MCC, alleged that Bout had "access to mass amounts of money and weapons and to a large criminal organization." Further, he was "reported [to have] a leadership role [which] can result in undue influence among other inmates," and his case had "received broad publicity, which could place [him] at risk and abuse by other inmates."

The district court observed that the standard for determining whether prison regulations impinge on a convicted prisoner's constitutional rights is set forth in *Turner v. Safley*, 482 U.S. 78 (1987). A court must determine whether the regulation is "reasonably related" to legitimate penological objectives, or is instead an "exaggerated response" to those concerns.

The four-part *Turner* test includes: (1) whether there is a "valid, rational connection" between the regulation and the government justification for it; (2) whether there are alternative means for the prisoner to exercise the right at issue; (3) the impact that the desired accommodation will have on guards, other inmates and prison resources; and (4) the absence of "ready alternatives."

Judge Scheindlin further noted that although the U.S. Supreme Court has stated that courts are "ill-equipped to deal with the increasingly urgent problems of prison administration and reform," it has also held that "prison walls do not form a barrier separating prison[ers] ... from the protections of the Constitution ... [and] when a prison ... practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."

Applying the *Turner* test, the district court concluded there was "no 'valid, rational connection' between the BOP's decision to keep Bout in the SHU for more than fourteen months and any 'legitimate governmental interests put forward to justify it.'"

In a February 24, 2012 ruling, the court therefore granted Bout's request to be transferred from the SHU to the general population at MCC. See: *United States v. Bout*, 860 F.Supp.2d 303 (S.D.N.Y. 2012).

Less than two months later, however, Bout was sentenced to 25 years in federal prison; he was subsequently transferred to USP Marion in June 2012. 🔳

Additional sources: *BBC, http://english.ruvr.ru*

# Supreme Court Adopts *Strickland* Prejudice Standard for Rejected Plea Bargains

### by Derek Gilna

The U.S. Supreme Court, in a 5-4 ruling, has extended *Strickland* guarantees of effective legal representation to defendants entering into plea bargains. According to Justice Anthony Kennedy, who delivered the majority opinion of the Court, "The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities ... that must be met to render the adequate assistance of counsel that the Sixth Amendment requires."

According to Justice Kennedy, "criminal justice today is for the most part of pleas, not a system of trials.... Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." [See: *PLN*, Jan. 2013, p.20]. The two cases considered by the Supreme Court, *Missouri v. Frye* and *Lafler v. Cooper*, both involved claims in which all parties agreed that defense counsel had failed to properly represent their clients.

In the case of Galin Frye, his attorney never advised him of a plea offer by Missouri prosecutors that would have resulted in ten days in jail for driving with a revoked license. Instead, he later pleaded guilty and was sentenced to three years in prison. The case of Anthony Cooper involved a charge of assault with intent to murder. Cooper was offered a deal of 51 to 85 months in prison in return for a guilty plea, but turned it down when his counsel allegedly told him he could not be found guilty of the intent to murder charge because he had shot his victim below the waist. At trial, he was convicted and sentenced to 15 to 30 years.

In *Strickland v. Washington*, 466 U.S. 668 (1984) and *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court had found that under the Sixth Amendment, criminal defendants have a constitutional right to competent counsel. *Strickland* specifically holds that the performance of defense counsel must not fall below an objective "standard of reasonableness."

According to Justice Kennedy, to "establish *Strickland* prejudice, a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' In the context of pleas a defendant must show the outcome of the plea process

PLN_0001595

would have been different with competent advice ... here the ineffective advice led not to an offer's acceptance but to its rejection.... In these circumstances a defendant must show that but for the ineffective advice of counsel there is reasonable probability that the plea offer would have been presented to the court..." (internal citations omitted).

The Court cited *United States v. Wade*, 388 U.S. 218 (1967), requiring effective assistance of counsel at critical stages of a criminal proceeding, and *Halbert v. Michigan*, 545 U.S. 605 (2005) [*PLN*, Sept. 2005, p.28], requiring effective assistance of counsel on appeal. Additionally, *Glover v. United States*, 531 U.S. 198 (2001) extended the right to competent counsel during sentencing.

According to Justice Kennedy, the government's main argument against extending the *Strickland* doctrine to the plea bargaining process was that "A fair trial wipes clean any deficient performance by defense counsel during plea bargaining. That position ignores the reality [of] the criminal justice [system] today...."

Twenty-seven states submitted a brief urging the Supreme Court not to extend the constitutional guarantee of effective assistance of counsel to plea bargains. According to Connecticut Assistant State's Attorney Michael J. Proto, "There are a lot of unanswered questions, and it is going to spawn a lot of litigation." Margaret Colgate Love, who helped write an American Bar Association brief that supported extending *Strickland* to plea bargains, noted, "What makes these cases so important is the Supreme Court's full-on recognition of the centrality of plea bargaining in the modern criminal justice system and its extension of constitutional discipline to the outcome of the plea process."

In his dissent, Justice Scalia wrote that "*Strickland* stated a rule of thumb for measuring prejudice, which applied blindly and out of context, could support the Court's holding today...." Interestingly, Scalia, the consummate advocate for the supremacy of the federal government's role in many aspects of society, cited with favor the European practice of not utilizing plea-bargaining in many criminal cases. See: *Lafler v. Cooper*, 132 S.Ct. 1376 (2012).

Then again, Justice Scalia might just as well have noted that the United States has a higher incarceration rate than any other nation in the world, that U.S. prosecutors wield enormous power and that prison sentences in the U.S. tend to be much higher than in Europe – which may explain why plea bargaining has become such a significant issue in America's criminal justice system.

For a detailed examination of how prisoners can potentially use *Cooper* and the Supreme Court's related ruling in *Missouri v. Frye*, 132 S.Ct. 1399 (2012) in habeas petitions, see the Habeas Hints column in the Sept. 2012 issue of *PLN*. ◼

## Pen Pals for Prisoners

Your ad on the Internet worldwide:
One year for $9.95. Mail name &
address for FREE order form or online:
www.PrisonerPal.com
PO Box 19689
Houston, TX 77224



## We Offer You Solutions
Taking care of basic services for you on the outside.

At **Help From Outside**
we understand what
you're going through
because we have loved
ones in prison, too. Our
standards are very high;
quality and timeliness are
of utmost importance.

" All requests will be considered with
the exception of immoral, unethical
or illegal actions.

**DON'T SEE YOUR SERVICE? ASK. WE OFFER MORE SERVICES THAN LISTED.**

FOR A BROCHURE AND APPLICATION PLEASE SEND A SASE TO:
HELP FROM OUTSIDE, 93 S. JACKSON ST. #40469, SEATTLE, WA 98104
OR CALL 206-486-6042 || www.helpfromoutside.com

## *Experienced California Post-Conviction Attorneys*

### *Orly Ahrony & Bruce Zucker Attorneys at Law*

  

*Orly Ahrony*        *Bruce Zucker*

- *Appeals (State and Federal)*
- *Writs (Habeas Corpus & Mandamus)*
- *Lifer and Revocation Hearings*
- *Prison and Parole Issues*

*818-625-0807*
*Post Office Box 436*
*Agoura Hills, CA 91376*

# Oregon Jail Guard Convicted of Assaulting Prisoner, Gets 30 Days in Jail

On April 6, 2012, a jury convicted a former Oregon jail guard of assaulting a prisoner. The following month he was sentenced to 30 days in jail and a two-year term of probation.

One day before his 65th birthday, in August 2010, Gary Willis Baumgardner was arrested for DUI and booked into the Clackamas County Jail. His blood-alcohol content was .22 percent – nearly three times Oregon's legal limit of .08. He was so drunk, belligerent and uncooperative that jail guards locked him in an isolation cell to sleep it off.

About four hours later, veteran guard Troy Alan Steiner, 44, entered the cell, awakened Baumgardner and escorted him down the hall. At 230 pounds, Steiner weighed almost twice as much as Baumgardner, whose movement was limited by a broken rib.

Steiner later filed a "use of force report" indicating he had had a struggle with Baumgardner, which triggered an internal investigation and Steiner's December 10, 2010 indictment on several misdemeanor charges. He was arrested, placed on administrative leave and subsequently "medically laid off" due to a non-work related injury, according to a sheriff's spokesman.

"We've got a set of standards to uphold," said Undersheriff David Kirby, who runs the county's corrections division. "We're trying to hold our people accountable."

Noting that Steiner was the third jail guard to face criminal charges in two years, Kirby said the case against him was part of Sheriff Craig Roberts' efforts to improve professionalism in the jail.

At trial, Steiner testified that Baumgardner was aggressive and threatened to physically harm him. Unfortunately for Steiner, however, if a picture is worth a thousand words then a video is worth much more.

Silent jail video footage showed Baumgardner slowly shuffling out of his cell. He stopped in the corridor and glanced back. Steiner then assaulted Baumgardner, who had his back turned.

Steiner "slammed [Baumgardner] into a concrete wall like a rag doll and threw him down to the floor," stated Deputy District Attorney Scott Healy.

"This was a very violent attack on a very feeble old man."

Naturally, defense attorney Steven L. Myers characterized the encounter much differently, claiming that Steiner was merely using leverage to control Baumgardner, who suffered cuts and bruises during the incident. Myers argued that Baumgardner simply tripped and fell because he was still drunk and had poor balance.

The jury wasn't convinced. After 2½ days of conflicting testimony, the jurors deliberated two hours before convicting Steiner of assault in the fourth degree, official misconduct in the first degree and harassment – all misdemeanors.

Having previously received commendations and absent a prior criminal record, it seemed unlikely that Steiner would face jail time. Yet after the jury verdict, Clackamas County Judge Ronald D. Thom suggested otherwise. "Mr. Steiner, I was fully prepared to take you into custody today," he said. "And there is a high likelihood that you will be taken into custody when you return to court."

When Steiner appeared for his May 7, 2012 sentencing, the judge made good on his earlier statement, imposing a 30-day jail sentence and a two-year term of probation.

Judge Thom noted that law enforcement officials must deal with difficult people all the time. "Lippy drunks are probably the most disagreeable," Thom acknowledged. "What is troubling to me ... is you lost it." Thom told Steiner his sentence could have been less severe had he been honest about his actions. Instead, said Thom, "you came to court and lied about it."

The Board of Public Safety Standards and Training is expected to revoke Steiner's law enforcement certification, ending his 10-year career as an Oregon jail guard.

Baumgardner had filed a federal civil rights lawsuit against Steiner and Clackamas County officials, but the case was dismissed in March 2012 due to lack of prosecution. ◢

Source: *The Oregonian*

# Texas Court of Criminal Appeals Sets Aside Convictions Based on Actual Innocence

### by Matt Clarke

In a 7-0 opinion with two judges not participating, the Texas Court of Criminal Appeals held on February 15, 2012 that a former prisoner who claimed exculpatory evidence was withheld in his case, and who raised a free-standing claim of actual innocence based on the recantation of the prosecution's primary eyewitness and deficient forensics evidence, had proven that he was actually innocent.

Richard Ray Miles, Jr. was convicted of murder and attempted murder in 1995, and sentenced to forty years in prison. During the trial an eyewitness identified him as the person who shot and killed one victim and wounded another, and a forensic expert testified that he had gunshot residue on his hands when arrested about 25 minutes after the shooting at a Dallas gas station. The fact that Miles' clothing did not match that of the shooter, and that he was left-handed while the shooter was right-handed, did not deter the prosecution. Miles filed an appeal alleging tainted identification by the eyewitness. His initial state habeas action was based on the withholding of a police report which identified other people as the potential shooter. Both were denied.

Centurion Ministries, a non-profit organization that works on wrongful convictions, became involved in Miles' case. They filed a public records request with the Dallas Police Department for information related to the shooting. In the records that were produced they discovered two police reports which had been previously suppressed both at trial, despite a defense request for exculpatory information, and in response to two previous records request filed by Miles and his father. In one of the reports, a woman identified her former boyfriend as the shooter and said he had confessed the crime to her. The other police report detailed an armed confrontation between

PLN_0001597

the victims and a third man, who was not Miles, five days before the fatal shooting occurred.

A criminalist reviewed the forensic expert's trial testimony and determined she had twice stated that substances found on Miles' hand – antimony and barium – were unique to gunshot residue. In fact, about 10% of the population has such residue without having fired a gun, as it can come from handling matches, car batteries or a gun that was previously fired and not cleaned.

Miles filed a subsequent state application for a writ of habeas corpus pursuant to Article 11.07, Texas Code of Criminal Procedure, raising grounds of failure to produce the suppressed police reports, new standards for testing gunshot residue that rendered the original expert testimony unreliable, and actual innocence. The state stipulated to a *Brady* violation regarding the suppressed reports (*Brady v. Maryland*, 373 U.S. 83 (1963)), but continued investigating the other claims. The eyewitness then recanted his identification of Miles, saying he had told the prosecutor he could not identify the shooter but was instructed by the prosecutor to identify Miles and was told where

Miles would be sitting in the courtroom. The state then stipulated that Miles was entitled to a new trial and did not oppose his petition seeking habeas relief based on actual innocence.

The appellate court held that Miles was entitled to file a subsequent writ application because the discovery of the suppressed police reports was new evidence discovered after he filed his initial application. The forensic expert who testified at trial admitted that her testimony was incorrect based on current standards, and that she would testify today that there was no gunshot residue. The court held that the suppressed reports were a *Brady* violation and that Miles had proven he was "actually innocent" of the crimes. Accordingly, his convictions were set aside. See: *Ex parte Miles*, 359 S.W.3d 647 (Tex. Crim.App. 2012).

While the appellate court's ruling established Miles' innocence, he had already been released on his own recognizance on October 19, 2009, based on the exculpatory evidence uncovered by Centurion Ministries. A week after the ruling by the Texas Court of Criminal Appeals, District Judge Andy Chatham formally announced at a hearing that Miles was a

"free man."

"I want to thank my mom," Miles said during the court hearing. "Every month for 15 years she came to see me."

Miles' attorney, Cheryl Wattley, is expected to file a complaint against Tom D'Amore, the former prosecutor who allegedly told the eyewitness to identify Miles at trial. "My life was taken because of malicious acts by a prosecutor and I can't just let that go by," Miles stated.

He is now eligible to receive compensation under a Texas statute that provides $80,000 and an annuity in an equal amount for each year he was incarcerated as a result of his wrongful conviction. ▉

Additional sources: *www.wfaa.com, www.centurionministries.org*

---

### Actual Innocence

Explains how the innocent are convicted by faulty eyewitness testimony, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$16.00 from PLN's Book Store!
See page 53 for more information.

---



## William L Schmidt
### ATTORNEY at LAW, P.C.

**911CIVILRIGHTS@GMAIL.COM**

**559.261.2222**

**SEPTEMBER 21, 2012**
**Los Angeles, California**

**ANOTHER MULTIMILLION DOLLAR EXCESSIVE FORCE VERDICT FOR A CALIFORNIA CLIENT**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------OUR CLIENTS GO HOME, HOW ABOUT YOU? ----------------
*Please submit a single page summary of your case. Due to the volume, we cannot return documents or respond to all inquires. We are not a low cost or pro bono law firm, but if you want results, contact us.*

P.O. BOX 25001 FRESNO, CA 93729

PLN_0001598

# The Collapse of American Criminal Justice, by William J. Stuntz
# (Belknap Press of Harvard University Press, 2011). 432 pages, $35.00

### Book review by Derek Gilna

The late William J. Stuntz, a Harvard law professor who conducted extensive research into the "rule of law" in American society, authored a tome that attempts to explore how the U.S. justice system has arrived at its current state. His posthumously published book, *The Collapse of American Criminal Justice*, probes how the concept of justice has virtually disappeared from the courtroom, and suggests some solutions.

Stuntz's examination starts with the premise that the criminal justice system in America has "unraveled." The facts he cites speak for themselves: approximately one in a hundred Americans are incarcerated in county, state or federal facilities, and this does not include tens of thousands of undocumented aliens who are imprisoned while awaiting deportation and removal proceedings. The rate of incarceration in the U.S. is higher than that in Russia under Stalin. How did this happen?

The plight of African-American males is considered. "For black males, a term in the nearest penitentiary has become an ordinary life experience, a horrifying truth that wasn't true a mere generation ago ... discrimination against both black suspects and black crime victims grew steadily worse ... black drug offenders are punished in great numbers, even as white drug offenders are usually ignored ... [and] blacks victimized by violent felonies regularly see violence go unpunished...."

Stuntz also tracks punishment and trends, with special emphasis on the past sixty years, noting that "in the late 1960's and early 1970's, the United States had one of the most lenient justice systems in the world. By century's end, that [same] justice system was the harshest in the history of democratic government."

The book describes how law enforcement officials define the law that they enforce, which allows them to be selectively severe in terms of choosing what charges they file. "Prosecutors now decide whom to punish and how severely. Almost no one accused of a crime will ever face a jury. Inconsistent policing, rampant plea bargaining ... overcrowded courtrooms, and ever more draconian sentencing have

produced a gigantic prison population...," Stuntz writes.

Students of jurisprudence interested in historical developments in the American justice system will find much in this book to interest them. Early U.S. criminal justice was virtually all local in nature, with the federal government having no meaningful involvement in law enforcement. This changed in the 1920s with the advent of Prohibition: "Prohibition's enforcers imprisoned those who manufactured and sold alcoholic beverages, not those who bought and drank them," Stuntz notes. After failing to accomplish much more than harass the former and not concerning themselves with the latter, the federal government declared the war on alcohol lost and repealed the Prohibition laws.

Today, Professor Stuntz explains that prosecutions for selling illegal drugs are unusual in many jurisdictions; instead, "prosecutors charge either simple possession or 'possession with intent to distribute,' meaning possession of more than a few doses of the relevant drug."

Those easily proved drug offenses are used as cheap substitutes for harder-to-prove distribution charges. Worse, in some jurisdictions, drug possession charges have become one of the chief means of punishing violent felons. Proof of homicide, robbery and assault is often difficult because it requires the cooperation of witnesses who may be reluctant to testify in court. But "[i]f the police find drugs or an unregistered weapon on the defendant's person or in his home, [the] witnesses need not be called and those harder-to-prove offenses can be ignored."

Stuntz cites other examples of how criminal charges can be manipulated by prosecutors. "Convicting Martha Stewart of insider trading proved impossible, but no matter; Stewart could be punished for hiding the inside-trading-that-wasn't ... the law defines a menu of options for police officers and prosecutors to use as they see fit."

Professor Stuntz also writes about a recurring trend in America, which he terms "pendulum justice." From 1950 to the mid-1960s, the rate of imprisonment fell by more than 20% while the

murder rate, "a decent proxy for the rate of violent felonies and felony theft more generally," doubled. That trend toward lenity was followed by an even sharper turn toward severity: "Between 1972 and 2000, the nation's imprisonment rate quintupled.... Prisons that had housed fewer than 200,000 inmates in Richard Nixon's first year in the White House held more than 1.5 million as Obama's administration began. Local jails contained another 800,000."

The book faults broad delegation of power to prosecutors, stating that the equal protection guarantee is "all but meaningless when applied to criminal law enforcement, one reason why both drug enforcement and enforcement of laws banning violent felonies are [enforced] so differently in black communities than in white ones...." Jury trials are now a "rare event," with most cases ending via plea bargain. This shifts power from the citizens who sit in jury boxes to the less visible assistant district attorneys who decide whom to punish and how severely. Further, federal and state lawmakers have repeatedly cashed the "tough-on-crime check" to garner votes, without regard for the long-term social and economic consequences of harsher criminal justice policies.

Stuntz is not optimistic about this trend ending anytime soon, but asks for "a revival of the ideal of equal protection of the laws." He also seeks a return to the concept of the "local democracy that once controlled American criminal justice ... [and] fewer guilty pleas and more jury trials."

He closes with a plea not for more laws but "for a better brand of politics, one that takes full account of the different harms crime and punishment do to those who suffer them, and one that gives those sufferers the power to render their neighborhoods more peaceful, and more just." ◾

Roget's Thesaurus
Can't think of the right word?
Let Roget's help you! Over 11,000
words listed alphabetically.
$8.95 see page 53 for more details

PLN_0001599

LEGAL NOTICE

# If you received a local collect telephone call from an inmate at Clallam Bay, Washington Correction Center for Women (Purdy), Coyote Ridge, Olympic Corrections or Pine Lodge Work Pre-Release between February 3, 1997 and December 31, 2000, your rights may be affected by a class action settlement.

A $1,412,500 settlement has been reached in a class action lawsuit against AT&T and T-Netix. The Court previously certified the lawsuit as a class action and is now considering whether to approve the settlement. This notice summarizes the settlement, your rights, and how to file a claim for a share of the settlement if it is approved by the Court.

**Who's included?** You may be a member of the class if you accepted a local collect call from an inmate at Clallam Bay, Washington Correction Center for Women (Purdy), Coyote Ridge, Olympic Corrections Center, and/ or Pine Lodge Work Pre-Release between February 3, 1997 and December 31, 2000.

**What's this about?** This lawsuit claims that AT&T and/ or T-Netix failed to provide certain legally required rate information on collect calls placed by inmates from Washington Department of Corrections facilities. It alleges that AT&T and/or T-Netix must pay statutory damages to persons who accepted or paid for those calls, which the Court has defined as $200 per person plus the cost of the collect calls accepted. This settlement resolves a portion of these claims: collect local calls from the Clallam Bay, Washington Correction Center for Women (Purdy), Coyote Ridge Corrections Center, Olympic Corrections Center and Pine Lodge Work Pre-Release facilities.

An earlier notice in this case advised you that a class had been certified against AT&T for collect calls from Washington DOC facilities. No resolution has been reached regarding those claims. This settlement applies only to local calls from the five facilities listed above and has no affect on claims against AT&T for non-local calls.

**What does the settlement provide?** The settlement provides: (1) a $1,412,500 settlement trust account which will be distributed to class members after the payment of court-approved attorneys' fees, litigation costs, administrative expenses, and case contribution award; (2) attorneys' fees of up to 30% of the settlement amount and approximately $100,000 for litigation costs and expenses; (3) a $20,000 case contribution award to the Named Plaintiff, Columbia Legal Services; and (4) release of T-Netix and AT&T from all obligations and liability arising for local collect calls from the five facilities. A copy of the Settlement Agreement may be found at www.ratedisclosure.com.

**How do you get an award and how much will it be?** You can submit a claim online at www.ratedisclosure.com or by using the QR code below. To use the QR code, take a picture of the image below with a QR app on a smartphone. This will take you directly to the claim page of the website. Enter the information requested to complete your claim and submit it. Your claim must be submitted by **April 1, 2013**. A class member's payments will be based on the cost of all local collect calls they accepted during the Class Period from the five identified facilities, plus $200. If, after the payment of fees, costs, expenses and a case contribution award, insufficient funds remain to fully pay all claims then each claim will be subject to a pro rata deduction. If the Court does not approve the Settlement Agreement, then the case will return to litigation which may, or may not, result in a recovery.

**What are your rights?** If you are a member of the class, you have the right to object to, comment on, or support the Settlement Agreement or the request for payment of attorneys' fees, costs, expenses or case contribution award. You must submit your written comments by **April 1, 2013** to: (1) the Clerk of the Court, Re: Judd v. AT&T, T-Netix, Cause No. 00-2-17565-5 SEA, KING COUNTY SUPERIOR COURT, 516 Third Avenue, Seattle WA, 98104; (2) Chris R. Youtz and Richard E. Spoonemore, Class Counsel, SIRIANNI YOUTZ SPOONEMORE, 999 Third Avenue, Suite 3650, Seattle, WA 98104; and (3) Don Paul Badgley and Duncan Turner, T-Netix's Counsel, BADGLEY-MULLINS LAW GROUP PLLC, 701 Fifth Ave., Suite 4750, Seattle, WA 98104.

You or your own lawyer may also attend the Settlement Approval Hearing at your own expense, but you are not required to.

**How can I get more information?** You may receive more information at www.ratedisclosure.com, or by calling 1-877-271-5522.



The class action case is titled *Judd, et al. v. American Telephone and Telegraph Co., et al.*, King County Cause No. 00-2-17565-5 SEA.

PLN_0001600

# Pay-to-Stay Jail Programs Growing

Due in part to stressed government budgets, "pay-to-stay" fees imposed on prisoners in county jails are becoming more prevalent. Two counties, one in Ohio and the other in California, are now collecting incarceration costs from detainees.

After Keller Blackburn became prosecutor for Athens County, Ohio, the county achieved its largest monthly total collected under its pay-to-stay jail program. In January 2012 it collected $23,927 from prisoners, which exceeded the $20,739 collected for the entire previous year. The money is paid into the county's general fund.

Blackburn "has made it a priority to hold defendants accountable for their actions and to reduce the burden on the public treasury by ordering defendants to pay for their own incarceration," his office said in a press release. He later clarified that the "pay-to-stay" requirement applies only to "convicted felons" and not "defendants," as the amount each prisoner must pay is determined during plea negotiations in their criminal cases.

Prisoners who are incarcerated under the jurisdiction of Athens County are housed at the Southeastern Ohio Regional Jail, which provides 76 beds for the county under a contract worth $1.4 million annually, or $18,615 per day, which works out to about $51 per diem per detainee.

Riverside County, California also has decided to recoup its incarceration costs from prisoners. Around 60,000 people cycle through the county's jails each year, and County Supervisor Jeff Stone proposed the idea based on estimated annual revenue of $3-5 million. The approved pay-to-stay policy charges prisoners $142.42 per day – more than local hotels.

A case-by-case review of a prisoner's ability or inability to pay has to be made. "In order to be reimbursed, the court must determine that the defendant has the ability to pay all or a portion of these costs," county counsel Pamela Walls wrote in a legal memo. "Many defendants who are incarcerated lack the financial means, after the payments of fines and penalties, to reimburse these costs." The court will also weigh the prisoner's family support obligations against the jail fees.

Such pay-to-stay programs are not popular with everyone. "Prison[ers'] rights groups underscore that it's the relatives of the inmates that end up shouldering this high financial burden. These families – often disproportionately women – are typically already impoverished and struggling to make ends meet," a post on the Real Cost of Prisons blog site noted. "Critics of the pay-to-stay system argue that in essence, the government is seizing the assets of some of the poorest families in the country."

Will Matthews, a spokesman for the ACLU, pointed out that most prisoners are indigent, thus "it begs the question as to how they're going to be paying" the fees, and whether they (ironically) will be "forced into jail for failure to pay their fine." He added that "[p]rograms like this certainly do raise very serious Constitutional questions. We're seeing it increasingly in jurisdictions around the country."

Indeed, *PLN* has previously reported on pay-to-stay fees that have been imposed by jails in Idaho, Ohio, Oregon, Illinois and various other states, with mixed results. [See, e.g.: *PLN*, March 2012, p.43; Sept. 2010, p.30; July 2010, p.1]. In Michigan, a bill signed into law in May 2012 allows counties to charge convicted prisoners for the cost of their incarceration. However, for a pay-to-stay program at a Massachusetts jail that didn't work out as expected, see the article on page 30 of the January 2013 issue of *PLN*.

Sources: *CNN, Athens News, Lansing State Journal*

# Illinois: Current Insurer Must Pay Wrongful Conviction Award after Exoneration

The Seventh Circuit Court of Appeals has affirmed a federal district court's determination "that, under Illinois law, the issuer of the policy in force on the date a convict is exonerated must defend and indemnify an insured whose law-enforcement personnel violate the constitution (or state law) in the process of securing a criminal conviction."

The ruling came in an appeal by two insurance companies that sought to avoid liability for a verdict of approximately $9 million against Paul Hendley of the Waukegan, Illinois police department. That substantial award, to S. Alejandro Dominguez, was based on claims related to malicious prosecution and concealment of exculpatory evidence in his 1990 wrongful conviction in a home invasion and sexual assault case. [See: *PLN*, Jan. 2010, p.34; July 2007, p.28].

Dominguez was released on parole in 1993. He was exonerated by DNA evidence in 2002, and pardoned by the governor three years later. When Dominguez filed suit, the current and former insurance carriers for Waukegan refused to defend or indemnify the city, each claiming the other was responsible for doing so. Waukegan was left to "its own devices" to defend against the lawsuit, but when the $9 million verdict was rendered, American Safety Casualty Insurance – Waukegan's insurer at the time of Dominguez's exoneration – sued the city to avoid liability. Waukegan countersued and brought in other insurance carriers.

The district court concluded that *National Casualty Co. v. McFatridge*, 604 F.3d 335 (7th Cir. 2010) determined which insurance policy applied. *McFatridge* held that to prevail on claims for malicious prosecution or constitutional wrongs that led to a conviction, the plaintiff must be exonerated. That conclusion was supported by *Security Mutual Casualty Co. v. Harbor Insurance Co.*, 65 Ill.App.3d 198 (1978), which held that under Illinois law, the victim has no claim until exoneration, as that is the relevant "occurrence" for the purpose of determining insurance coverage.

The Seventh Circuit noted that the *Security Mutual* decision "has now stood unquestioned for 34 years," and it would not take a different view. The appellate court said insurance companies are free to "adjust their exposure by changing the language in their policies, defining the 'occurrence' as the misconduct rather than the completed tort." That, however, would subject the companies to "trigger rulings," such as those in asbestos litigation, that subject them to liability for years after policies expire.

Thus, under the city's insurance policy at the time of Dominguez's exoneration, American Safety Casualty Insurance was

liable. The district court's ruling was affirmed and the Seventh Circuit criticized the company for its "unreasonable and vexatious treatment" of Waukegan by failing to defend against the wrongful conviction suit. See: *American Safety Casualty Insurance Co. v. City of Waukegan, Illinois*, 678 F.3d 475 (7th Cir. 2012), *rehearing and* *rehearing en banc denied.* 

Additional source: *www.courthousenews. com*

# Nevada DOC Audit: Doctors Work 5 Hours, Get Paid for 10

The Nevada Department of Corrections (DOC), which houses 12,750 prisoners, employs 23 full-time physicians who are paid a salary that presumes they work four 10-hour shifts per week. Accordingly, they receive their full wages regardless of the hours they actually put in. The DOC's eight part-time doctors work two 10-hour shifts per week.

However, a December 2012 audit report revealed that the DOC's full-time physicians worked an average of only 5.31 hours per shift, while those employed part-time put in just 5 hours per shift. The report estimated that the compensated but unworked hours translated into a \$1.9 million cost to taxpayers in fiscal year 2012.

The audit, by the Nevada Department of Administration, covered the DOC's 12 physicians, 6 dentists and 3 psychiatrists employed full-time. While the audit report tracked the on-duty hours worked by about half the doctors, it did not address whether they conducted any work during their off hours such as completing paperwork.

The audit noted that "establishing a defined work schedule and tracking doctors' attendance will help ensure that doctors' actual hours worked are consistent with hours claimed," and concluded that "Based on our sample, 45 percent of the salaries paid to full-time doctors and 57 percent of the salaries paid to part-time doctors were not supported by attendance logs."

The report did not delve into the quality of medical, dental and psychiatric care in the DOC's seven facilities, nor correlate such services with physician job attendance. Nevada prisoners submit an average of 8,274 medical requests per month, resulting in 16,027 prison clinic visits plus 210 outside clinic visits. Approximately 70 prisoners per month are admitted to prison infirmaries, 73 go to outside hospitals or regional medical facilities and another 74 are admitted to mental health units.

Nevada DOC Director Greg Cox said the department would begin tracking the hours actually worked by prison doctors. However, he noted that attempting to saddle medical staff with attendance reporting, or privatizing DOC medical services as suggested by the audit, might subject the state to litigation that could cost more than the estimated \$1.9 million in unsupported payroll expenditures.

The audit report also addressed several other areas, including issues related to enhancing the DOC's prison industry programs and expediting its hiring process for new employees. 

Sources: *www.lasvegassun.com; State of Nevada, Dept. of Administration, Audit Report No. 13-03 (December 2012)*




# Idaho Supreme Court Affirms Firing of PHS Medical Director

The Idaho Supreme Court has upheld a lower court's dismissal of a prison doctor's challenge to his job termination, stemming from his abusive treatment of a prisoner.

Dr. John F. Noak was the medical director for Prison Health Services (PHS), which provided medical care for the Idaho Department of Correction (IDOC).

On January 30, 2004, Noak treated South Boise Women's Correctional Center (SBWCC) prisoner Norma Hernandez. While leaving the examination room, Hernandez appeared as though she was about to faint and certified Medical Specialist Jana Nicholson moved to help her.

Noak "came out of the exam room and 'aggressively' inserted himself between [Nicholson] and the patient," according to Nicholson. "Noak forced Hernandez to 'walk briskly' down the hall." Hernandez reported that Noak required her to walk on her "tippy toes," while threatening to transfer her to a different prison if she did not "heal quickly."

Hernandez filed a complaint against Noak, alleging that he battered her. IDOC Lieutenant Christie Presley then barred Noak from SBWCC.

On February 12, 2004, IDOC Director Tom Beauclair banned Noak from all IDOC facilities and PHS placed him on administrative leave pending an investigation into Hernandez's complaint. IDOC officials referred the battery allegations to the county sheriff but prosecutors declined to prosecute Noak.

On March 9, 2004 the IDOC demanded that PHS replace Noak as medical director, and the company fired him the next day. IDOC officials then lodged a complaint against Noak with the Idaho Board of Medicine but no further action was taken.

On December 15, 2006, Noak sued the IDOC, PHS and individual defendants in state court, alleging breach of the covenant of good faith and fair dealing, intentional and negligent infliction of emotional distress, defamation per se, tortuous interference with contract or prospective economic advantage, and conversion.

Noak's conversion claim was dismissed after he conceded it was meritless. The court then granted summary judgment to the IDOC and IDOC employees on all of the remaining claims, and award-ed attorney fees to the state. The court denied summary judgment to PHS and Noak later settled his claims against the company.

On appeal, the Idaho Supreme Court affirmed the grant of summary judgment to the IDOC on Noak's claim of breach of the covenant of good faith and fair dealing. Noting that "Noak's concession that he had no contract" with the IDOC was "indeed dispositive," the Court explained that it "has said time and again that, to the extent the covenant exists, it is only breached when one party to a contract prevents another party to the contract from realizing a benefit of their mutual agreement."

The Supreme Court also held that Noak's remaining claims against the IDOC were time-barred. Under Idaho law, Noak had two years from his March 10, 2004 job termination to bring suit, but he did not file his complaint until December 15, 2006, "well beyond the two-year statute in I.C. § 6-911."

The Court also rejected Noak's contention that the statute of limitations was tolled by 23 U.S.C. § 1367(d), which grants federal courts supplemental jurisdiction over certain state law claims. Relying upon *Raygor v. Regents of the University of Minnesota*, 534 U.S. 533 (2002), the Court held "that 23 U.S.C. § 1367(d) did not toll the two-year limitations."

Finally, the Idaho Supreme Court held that the lower court did not err in awarding $18,000 in attorney fees to the IDOC. The Court also awarded attorney fees on appeal, given the IDOC's successful defense of the lower court's summary judgment order. See: *Noak v. Idaho Department of Correction*, 152 Idaho 305, 271 P.3d 703 (Idaho 2012), *rehearing denied.* 🔳

# Oregon Prosecutor's Son Escapes Mandatory Prison Time for Sexual Assault

Commit sexual abuse in Oregon and you face a mandatory prison sentence of 75 months – unless your father happens to be a prosecutor, apparently.

In December 2011, Jacob Frasier, 17, the son of Coos County District Attorney Paul R. Frasier, and four other co-defendants were arrested on allegations that they had sex with a 13-year-old girl. Jacob claimed that the girl told him she was fifteen and said the sex was consensual.

Under Oregon law, Frasier's conduct constituted the offense of Sexual Abuse in the First Degree under Measure 11, which carries a mandatory minimum sentence of 75 months in prison with no sentence reduction eligibility.

Interestingly, however, Frasier escaped the fate of other Oregon offenders who have been sentenced to mandatory prison time for the same type of misconduct. He was instead charged in juvenile court with third-degree rape and two counts of second-degree sexual abuse.

The case was resolved quickly, with Frasier pleading guilty to second-degree sexual abuse in February 2012. Retired Douglas County Circuit Court Judge Charles Luukinen handled the case due to a conflict of interest for Coos County judges, who work with Jacob's father on a daily basis.

The court accepted Frasier's guilty plea and sentenced him to a three-year term of probation. And to ensure that his life wouldn't be ruined – unlike other sex offenders who do not happen to have fathers employed as prosecutors – the judge further ordered that Frasier will not be required to register as a sex offender if he successfully completes his probation.

Judge Luukinen said that Jacob was "a good person," described his participation in the sex crime as "an isolated incident" and noted that state prosecutors had "stuck their neck out for you." Ironically, Paul Frasier wrote in a press release that "[e]ven though I am the district attorney, neither myself or members of my family are above the law."

It's just that the same law doesn't apply to them, evidently.

The other four defendants, who did not happen to have family members employed in the district attorney's office, did not fare as well. Spencer Shimota, 19; Chay Gilbert, 18; Wayne A. Smith, 30; and his brother, William A. Smith, 26, were all indicted on sex offenses related to the same 13-year-old victim.

Wayne Smith pleaded guilty in July 2012 and received a prison sentence with an earliest release date in April 2018. William Smith was sentenced to a 15-month

prison term for having sex with the victim and another 13-year-old girl, while Shim-

ota and Gilbert both received 30 days in jail and five years of probation.

Sources: *Associated Press, www.salem-news.com, http://theworldlink.com*

# *Life After Murder: Five Men in Search of Redemption,* by Nancy Mullane (Public Affairs Books, 2012). 384 pages, $26.99 (hardcover)

### *Book review by John E. Dannenberg*

With a gripping meld of investigative journalism and personal involvement, author Nancy Mullane digs into the true meaning of "life with the *possibility* of parole" for California murderers. Tracking the cases of five lifers who have done much more time than their minimum sentences, and whose families unswervingly supported them for decades in hope of their eventual release, Mullane learns what it takes to get paroled from a life sentence in California. Visiting the men weekly at San Quentin State Prison, she earns the respect of prison staff and the trust of the lifers, and is allowed to conduct meetings in cell blocks, the chapel and the prison yard.

None of the five life-sentenced prisoners is certain that the Board of Parole Hearings will ever find him "suitable" and fix a parole release date, much less that

the governor will not reverse the Board's decision. Delving into the difficult story of each man's crime; getting to know their family members on the streets; interviewing their attorneys; querying staff – from guards to seasoned prison administrators – Mullane takes the pulse of every facet of the parole process.

More than just reporting on the status of parole hearings, Mullane learns the intimate details of self-help programs the men depend on for rehabilitation, how prison disciplinary reports can ruin one's hopes for a parole hearing, and how the prisoners and their families deal with the repeated disappointments of parole denials and reversals.

Mullane makes effective use of the "flashback" writing style, adding an element of suspense to her book that mirrors what the lifers and their families

go through. All are eventually paroled (a rarity for California lifers), and Mullane follows them home to chronicle the moments of joy of the families and the men as they first taste freedom following decades of confinement. Importantly, Mullane continues to follow their lives as the five struggle to reintegrate into society.

*Life After Murder* serves a need for public understanding of what California's lifer parole process really involves. It also serves the dual purpose of reporting that the recidivism rate of such paroled lifers is less than 1%, which in turn informs readers that releasing the "worst of the worst" prisoners – murderers – is an important win-win solution for California's financially strapped prison system and the state's 10,000 parole-eligible lifers and their families.




## *Stamps for* CASH!

*Great Goods will buy your stamps!*

**70%** of Face Value: *Complete books or sheets of Forever Stamps*

**65%** of Face Value: Complete books, sheets, or rolls of 45-cent stamps

**60%** of Face Value: Complete books or sheets of high denomination stamps above 45-cent

### Payment sent within 24 hours of receipt.

WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved package vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps. • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

## GREAT GOODS
**PO Box 399, West Chesterfield NH 03466**
**www.greatgoods.org**

STAMPS © USPS. ALL RIGHTS RESERVED.

PLN_0001604

# Former California Prison Guard Resentenced Following Assault Conviction

The Ninth Circuit Court of Appeals has vacated a 51-month sentence imposed on a former California prison guard convicted of assaulting two prisoners, on the ground that during sentencing the district court had relied on unreliable allegations made by a jailhouse informant in violation of the guard's due process rights.

Robert McGowan, 42, was indicted on two counts of violating 18 U.S.C. § 242 for assaulting two prisoners at the California Institution for Men at Chino, thereby depriving them of their constitutional right to be free of cruel and unusual punishment. After being convicted at a jury trial, McGowan moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c), which was granted. [See: *PLN*, June 2008, p.38].

The government appealed and the Ninth Circuit reversed, reinstating McGowan's conviction and holding that the evidence was sufficient to allow a jury to conclude that he had "used force against two inmates for the sole purpose of causing them harm." The case was remanded for resentencing before a different judge.

On resentencing, to counter the probation office's characterization of McGowan as a "productive and law-abiding member of his community" who deserved probation and home detention, the government introduced evidence that he had used methamphetamine and smuggled drugs to prisoners in Chino. The evidence consisted of two documents recounting claims made by Ricky Seevers, a jailhouse informant who served time at Chino when McGowan worked at the prison. The judge found the evidence credible and sentenced McGowan to 51 months.

On appeal, the Ninth Circuit held the district court had abused its discretion in finding that Seevers' claims were reliable. The appellate court noted that the sentencing judge had had no opportunity to personally observe Seevers to assess his credibility, and that no one representing McGowan's interests had had an opportunity to cross-examine Seevers. As a jailhouse informant, the Court of Appeals observed, Seevers "presumably provided information to the FBI in the hope of being granted some sort of leniency"; moreover, he had "everything to gain and nothing to lose" by implicating McGowan. Thus, the Ninth Circuit vacated the 51-month prison sentence. See: *United States v. McGowan*, 668 F.3d 601 (9th Cir. 2012).

Following remand, McGowan filed a motion for a new trial, which was denied. He was resentenced on April 16, 2012 to 41 months in federal prison and three years of supervised release, with fines waived. He has since appealed his new sentence and was released on bail pending the outcome of his appeal. See: *United States v. McGowan*, U.S.D.C. (C.D. Cal.), Case No. 2:07-cr-00113-MMM. 🖎

# Texas Supreme Court Rules Compensation Required in *Schlup*-type Innocence Cases

## by Matt Clarke

On May 18, 2012, the Supreme Court of Texas held that a former prisoner whose murder conviction was reversed due to ineffective assistance of counsel after he proved that he was likely actually innocent was entitled to compensation.

Billy Frederick Allen was convicted of a double homicide in 1984 and sentenced to 99 years. At his trial, a police officer, who was present with one of the fatally-wounded victims and two emergency medical technicians (EMTs), testified that the victim had identified the shooter as "Billy Allen." Allen, who knew the victim, did not discover until many years after his conviction that the EMTs had heard a middle name, and one of them recalled it was "Wayne," not Frederick. There was in fact a "Billy Wayne Allen" living in the area at the time of the murders; he was known as a violent drug dealer and had ties to the victim.

Based on this newly-discovered evidence, Allen filed multiple pro se petitions for a writ of habeas corpus without success, even when the trial court determined that his conviction should be reversed because it no longer had confidence in the verdict. Finally, Allen filed a habeas petition with the pro bono assistance of Austin attorney Roy Greenwood. In reversing Allen's conviction, the state's highest criminal court, the Texas Court of Criminal Appeals, stated "it is not surprising that the habeas court found that the newly discovered evidence 'of innocence [was] so strong that [it could not] have confidence in the outcome of the trial.' We agree."

Allen's claim of innocence was not a *Herrera*-type claim – based on *Herrera v. Collins*, 506 U.S. 390 (1992) – which requires the petitioner to show "by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence." Instead, Allen used his claim of actual innocence as a gateway through the procedural bar preventing the hearing of subsequent petitions for a writ of habeas corpus. That type of innocence claim is referred to as a *Schlup*-type claim, after *Schlup v. Delo*, 513 U.S. 298 (1995); it required that he show actual innocence by a preponderance of the evidence and that a constitutional error, which otherwise would have been procedurally barred, likely resulted in the conviction of an actually innocent person. [See: *PLN*, March 2003, p.16].

Allen alleged ineffective assistance of counsel due to his defense attorney's failure to interview the EMTs before trial as his constitutional claim, and the Court of Criminal Appeals granted habeas relief on that basis. See: *Ex parte Allen*, 2009 WL 282739 (Tex.Crim.App. 2009). The district attorney's office later dismissed the charges in 2011, and Allen filed for compensation under the Tim Cole Act (TCA), § 103.001, Texas Civil Practice & Remedies Code.

The TCA provides for compensation if a person has served time in a Texas prison for a criminal offense, then was exonerated and released based on a judicial finding that he was "actually innocent"

of the crime. Allen had served almost 26 years in prison, but because his habeas petition was based on ineffective assistance of counsel, the Texas Comptroller refused to provide compensation.

Represented by attorneys Greenwood, Kristopher Edwin Moore and Kevin Glasheen, Allen filed a petition for a writ of mandamus in the Texas Supreme Court, the state's highest civil court, seeking to compel the Comptroller to authorize compensation pursuant to the TCA.

The Supreme Court held that the TCA required compensation under either a *Herrera*-type or *Schlup*-type claim of actual innocence. Further, the language of the Court of Criminal Appeals opinion granting habeas relief clearly stated that Allen was actually innocent, and any grant of relief on a *Schlup*-type claim requires an implicit finding of actual innocence before the petitioner can have the otherwise procedurally-barred constitutional claim heard.

Therefore, the writ was conditionally granted and the Comptroller ordered to compensate Allen under the TCA. Allen was consequently eligible to receive over $2 million plus an annuity and other benefits. See: *In re Allen*, 366 S.W.3d 696 (Tex. 2012).

"Now that we have helpful guidance from the Supreme Court, we have immediately started the process of paying Billy Allen approximately $2 million for wrongful-imprisonment compensation," stated R.J. DeSilva, a spokesman for the Texas Comptroller's office. "The court's decision will also help us pay any other exonerees with similar circumstances to Mr. Allen." 

Additional sources: *Los Angeles Times, www.forejustice.org*

# FBI Loses Prisoner's Property but Sovereign Immunity Foils Recovery

### *by Derek Gilna*

On May 29, 2012, the Ninth Circuit Court of Appeals barred Galo Alejandro Ordonez from compensation after the FBI and the federal government acknowledged that property that had been previously seized from him and ordered returned was "presumed to be lost or destroyed." The appellate court held the government had not waived its sovereign immunity, and therefore was immune from suit even for an admitted wrong.

Ordonez was arrested in January 1993 on a federal drug charge, and at that time "several items ... of personal property were seized and inventoried...," according to the ruling. He was convicted and sentenced to 480 months in prison, then on June 11, 2007 he filed a pro se motion for the return of his property pursuant to Federal Rule of Criminal Procedure 41(g). According to the appellate court, "there was no clear inventory of his belongings, and the government was unable to locate several items listed in the original inventory items."

Although Rule 41(g) gave Ordonez a cause of action, "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction," the Court of Appeals wrote, citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Immunity from suit may be waived, but the waiver "must be unequivocally expressed in statutory text ... and will not be implied."

Ordonez relied upon the case of *United States v. Martinson*, 809 F.2d 1364 (9th Cir. 1987), in which the government destroyed property after the claimant had already filed suit, and the claimant was allowed to seek monetary damages. However, the Ninth Circuit distinguished *Martinson* because it did not directly reach the issue of sovereign immunity.

"We recognize that there are many valid reasons why one should in fairness be able to pursue a claim for money damages against the government when it wrongfully loses, destroys, or otherwise disposes of seized property," the appellate court stated. "Application of Rule 41(g) – as we are compelled to construe it – can work an injustice to someone losing valuable goods, since there may be no remedy to cure even a flagrant destruction of those goods."

Regardless, the Ninth Circuit upheld the district court's order of dismissal, noting that "No matter how compelling the circumstances ... Rule 41(g) contains no express and unequivocal waiver of the government's sovereign immunity, [and] money damages are not a permitted form of relief," even though this resulted in a "wrong without a remedy." Eight other circuit courts have reached a similar conclusion. See: *Ordonez v. United States*, 680 F.3d 1135 (9th Cir. 2012). 

**CHRISTIAN MUSIC CDS**
by the legendary
**MARY RICE HOPKINS**
who has been a congregation worship leader for millions around the USA. Her career spans 30 plus years and counts over 25 albums.

**$15.00 ea.** or **3 for $40**
**FREE SHIPPING**
SEND $1.00 OR 2 FOREVER STAMPS FOR BROCHURE (no stamps, no brochure) OR GET IT FREE WITH ORDER

**"CANCIONES PARA TODA LA FAMILIA"** (Spanish/English lyrics)
11 songs including: Fue Dios (God Did) - En Mi Corazón (Down in My Heart) - Milagrito (Little Miracle) - En Mi Huerto (In My Garden) - Bueno Es (It is Good)

**"WHISPERING WIND"** 13 songs including: You Are My God - Dance of Life - You Are Light - Jesus - Right to My Heart - To Reign With Majesty - Bread of Life - Will of the Father - A Father's Love - I Will Listen To You

**"WENDY & MARY COLLECTION"** 12 songs including: The Wind Came Singing - Lion and Lamb - Just a Prayer - Welcome Home - Instant Breakfast - A New Song - Voice of Joy - Wedding Prayer - We Really Do Need Each Other - This Little One - Keep On

ORDER TO: MARA WORLDWIDE, 116 W. CALIFORNIA BLVD. STE. 424-P, PASADENA, CA 91105

**EXECUTIVE CLEMENCY**

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT**
**5928 HIXSON PIKE, STE. A-363**
**HIXSON, TENNESSEE, 37343**
**(423) 843-2235**

**(35-Years of Clemency & Parole Assistance)**
**(Transfers Under The Int'l Prisoner Treaty)**

PLN_0001606

# Supreme Court: No *Bivens* Actions for Federal Prisoners in Private Prison

## *by Matt Clarke*

In an 8-1 decision, the U.S. Supreme Court has held that federal prisoners housed in privately-managed prisons may not file *Bivens*-style federal lawsuits against private prison employees alleging lack of medical care in violation of the Eighth Amendment.

Richard Lee Pollard was a federal prisoner incarcerated in a California facility operated by Wackenhut Corrections (now GEO Group) when he slipped on a cart left in the doorway to the butcher shop in the prison's food service department, fell and was injured. He was X-rayed at the prison. Because prison medical staff believed he had fractured both elbows, he was taken to an outside clinic for orthopedic evaluation. He later had surgery.

Pollard filed an action in federal court under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging that guards had caused him severe pain by requiring him to put on a jumpsuit for transportation outside the prison when he could not extend his arm, and by placing him in arm restraints that caused him great pain. He also alleged that prison medical personnel failed to provide a splint, physical therapy and medical studies recommended by the outside clinic and provided insufficient pain medication, leaving him in so much pain that he could not sleep. Further, he claimed that prison officials did not make provisions for basic hygienic care and nourishment, and as a result he was unable to bathe or receive meals from the food service department for two weeks. Finally, he alleged that prison officials ordered him to return to work before his injuries had healed.

The district court dismissed Pollard's suit after agreeing with the magistrate judge that the Eighth Amendment did not provide for a *Bivens* action against employees of a privately-managed prison. The Ninth Circuit reversed the dismissal on appeal, finding that the Eighth Amendment did provide such an action. The defendants filed a petition for writ of certiorari in the Supreme Court, which was granted.

The Court held that the first step in deciding whether to recognize a *Bivens* action is to determine whether an alternative process exists that protects the constitutionally-recognized interest at issue. If such an alternative exists, no *Bivens* action should be recognized. In this case, an adequate state tort remedy existed; therefore, the *Bivens* action should not have been recognized.

The Supreme Court noted that it had allowed the estate of a deceased federal prisoner to sue for deliberate indifference to his serious medical needs in *Carson v. Green*, 446 U.S. 14 (1980). However, that suit involved federal employees at a federal prison against whom no state tort claim could be brought. Thus, it did not control in this case.

California "state tort law provides for ordinary negligence for actions based upon 'want of ordinary care or skill,' for actions based upon 'failure to diagnose or treat,' and for actions based upon failure of one with a custodial duty to care for and protect that other from 'unreasonable risk of physical harm,'" the Court noted. State law imposes similar general tort duties of reasonable care on private prison employees "in every one of the eight States where privately managed secure federal facilities are currently located."

Thus, no federal prisoner in a private facility could file a lawsuit challenging prison conditions covered by those torts in federal court. It did not matter that the state remedy might be less than that provided by a *Bivens* action so long as the remedy was sufficient to protect the interest at issue. As the Supreme Court concluded that a federal prisoner could not assert an Eighth Amendment *Bivens* claim for damages against private prison employees, the judgment of the Ninth Circuit was reversed. See: *Minneci v. Pollard*, 132 S.Ct. 617 (2012). ◄

# Pregnant Woman Suffers Needless Death in Oklahoma Jail

Jamie Lynn Russell (a.k.a. Jamie Fisher), 33, who was pregnant and experiencing severe abdominal pain, sought medical care at a hospital in Pauls Valley, Oklahoma on January 3, 2013. She was difficult and "not cooperating," according to nurses, who summoned a nearby police officer to assist.

Medical staff decided to discharge Jamie because she was noncompliant due to her pain, and while the officer was helping her gather her things, he said he found two pill bottles in her possession that contained alprazolam and oxycodone. Since the medication was not prescribed to her, Jamie was arrested on a felony drug charge and transported to the Garvin County jail.

Jamie's family suspected she may have taken the pills from a family member in an attempt to relieve her excruciating pain. Her family was outraged that the police would pursue a drug possession charge ahead of Jamie's obviously serious medical condition, and that the hospital would release her so she could be incarcerated.

Unfortunately things only got worse. After taking Jamie to the jail at 8:30 p.m., she was placed in a holding area. Around two hours later, jail deputies noticed she was unresponsive and called for medical attention. She was pronounced dead a short time later.

The Medical Examiner subsequently determined that Jamie had died due to a ruptured ectopic pregnancy – an extremely painful condition.

"There is nothing my staff in the jail could've done differently," said Garvin County Sheriff Larry Rhodes. He asked the Oklahoma State Bureau of Investigation to investigate, and the OSBI quickly found no criminal wrongdoing by jail employees.

Sadly, the police's decision to prioritize a drug arrest over a pregnant woman's need for medical treatment resulted in her death, and it is unlikely that anyone will be held accountable.

"Jamie's needless death shows us where our priorities lie, misplaced: chasing down minor drug offenders in service of a failed war on drugs is more important [than] human life and dignity," said Farah Diza-Tello, staff attorney for National Advocates for Pregnant Women. ◄

Sources: *www.kfor.com, www.gcnews-star.com, www.koco.com, www.rhrealitycheck.org*

PLN_0001607



## CAMPAIGN FOR PRISON PHONE JUSTICE

  

# JOIN THE CAMPAIGN FOR PRISON PHONE JUSTICE!

After nearly a decade, the Federal Communications Commission (FCC) has finally issued a "Notice of Proposed Rulemaking" to lower the cost of prison phone calls! The FCC is now seeking input regarding problems with the prison phone system and how to make phone rates "just and reasonable."

You have until **March 25, 2013** to submit public comments to the FCC. Even if you have sent comments before, you can resubmit them or submit new information. Please write to the FCC, addressing any of the following topics:

- **Costs and Experiences:** How much do you and/or your family pay in prison phone bills per month? What has been your experience with collect calls, debit calls and/or prepaid accounts?

- **Call Charges:** How much do you or your family pay in connection charges and per-minute rates for phone calls? Do you and/or your family have to pay extra fees to make or accept calls, such as costs to set up, add money to or cancel an account?

- **Dropped Calls:** How often are calls dropped or disconnected? Does it happen on a regular basis? Do you pay connection fees twice if the call is dropped and you call right back?

- **Call Frequency:** How often do you use the prison phone system to communicate with loved ones? Would you talk with them more often if the phone rates were lower?

- **Free Calls:** The FCC is seeking comments on whether they should mandate a certain amount of "free calling" time per prisoner each month. How would that impact you, your family and/or children?

- **Disabilities Access:** What type of access do prisoners who are deaf and hard of hearing experience while incarcerated? Are the rates for TTY calls the same as for regular prison phone calls?

**Comments sent through the U.S. Postal Service should be mailed to:**

Marlene H. Dortch, Secretary
Federal Communications Commission
445 12th Street, SW; Room TW-B204
Washington, DC 20554

Address the letter "Dear Secretary Dortch," and please speak from your own personal experience. You must state the following at the top of the letter: "This is a public comment for **WC Docket Number 12-375**." Your comments will be made part of the public docket.

We also need your help organizing on the outside. Ask your family members to sign up for the Campaign for Prison Phone Justice at www.phonejustice.org. They can also register their comments online, directly with the FCC, at http://apps.fcc.gov/ecfs/upload/display.action?z=nyy6z. Enter Proceeding Number "**12-375**."

**Only with your support will we end the abusively high costs of prison phone calls. Encourage others to join us in this struggle!**

PLN_0001608

# Seventh Circuit Approves Illinois Prison's Rejection of PDR and Drug Guide

On March 9, 2012, the Seventh Circuit Court of Appeals affirmed the dismissal of a prisoner's civil rights action that alleged violation of his constitutional rights due to the censorship of two books by prison officials.

James Munson, an Illinois state prisoner serving a life sentence, suffers from a chronic medical condition and a variety of other ailments that require he take several prescription medications. He once became ill because medical personnel had accidently given him another prisoner's medicine for twelve days. To educate himself about his medications and other ways to treat himself, such as his diet, Munson ordered several books from a prison-approved store.

Prison officials screened his books and rejected the *Physicians' Desk Reference* and the *Complete Guide to Prescription and Nonprescription Drugs 2009*. The rejection form stated the basis for the censorship was that the books were on a list of disapproved publications, as they posed a threat to security because they deal with "drugs."

After exhausting his administrative remedies, Munson filed suit. The Illinois federal district court screened his complaint under 28 U.S.C. § 1915A(a) and dismissed it with prejudice for failing to state a cause of action. The dismissal counted as a strike under the Prison Litigation Reform Act, and Munson appealed.

"[T]he attachments to Munson's complaint provided the prison's legitimate penological interest in restricting his access," wrote the Seventh Circuit. "Quite simply, the prison gave the books' drug-related content as one of the reasons justifying its decision to restrict Munson's access to the books, and we don't need to look beyond the books' title and the content to know the books contain information about drugs."

The appellate court found that prison officials had properly reviewed each book, and had let Munson receive four other books that did not deal with drugs. Further, he had another alternative to read the censored books as they were available in the prison library – prison officials just did not want prisoners "to have the books in [their] cells or have personal ownership of the books."

The Court of Appeals found no Eighth Amendment or Fourteenth Amendment violations. Rejecting the two books was not deliberate indifference to Munson's serious medical needs, and he had no liberty interest in receiving the books. The Seventh Circuit also found no First Amendment violation, and thus affirmed the district court's dismissal of the complaint. See: *Munson v. Gaetz*, 673 F.3d 630 (7th Cir. 2012).

# Alabama Law Meant to Ensure Transparency in Judicial Elections Not Enforced for 16 Years

### by Derek Gilna

An Alabama law that became effective in 1996, designed to remove any appearance of impropriety in the funding of judicial election campaigns, has languished while all three branches of state government have failed to implement the statute, codified at Alabama Code §§ 12-24-1 and 12-24-2.

According to the *Birmingham News*, "The law is not complicated. Judges who accept significant campaign contributions from someone who has a case in their court would have to step down from hearing the case. The limits are $2,000 for circuit judges and $4,000 for appellate judges. If the law were enforced, it would be one of the most strict judicial campaign finance laws in the country and likely would have a dramatic effect on how judges in Alabama raise money for their campaigns."

The statute also requires judges to file with the Secretary of State a list of their campaign contributors and the amounts of their donations. A report issued by the Brennan Center for Justice indicated that from 2000 to 2009, candidates for the Alabama Supreme Court spent almost double the amount spent by judicial candidates in the second-highest state.

Despite that anomaly, Alabama's Attorney General has said he cannot act until the state Supreme Court adopts rules for enforcement of the law. The Supreme Court, however, has refused to issue the rules pending preclearance of the statute by the U.S. Department of Justice, and the Alabama Administrative Office of Courts will not enforce the law until rules are adopted. The state legislature has thus seen the law it enacted over 16 years ago effectively sidelined as a result.

According to state Senator Roger Bedford, who was chairman of the state Senate Judiciary Committee in 1995 when the statute was passed, "The purpose of the law was to try to remove the stigma of people giving contributions to judges and getting favorable results.... In our system of justice, there should never be such a concern."

The initial roadblock to enforcement of the law was a question as to whether it was required to be pre-cleared by the U.S. Department of Justice under § 5 of the Voting Rights Act. The Alabama Attorney General initially submitted the law to the Justice Department but later withdrew it, asserting that the statute was not directly related to voting and thus did not require preclearance.

"The State of Alabama will enforce [the law], and the Attorney General of Alabama will not submit this law for preclearance," the Attorney General's office wrote at the time. That was also the position of subsequent Alabama Attorney General William H. Pryor, Jr., who now serves as a federal appeals judge in the Eleventh Circuit.

The Justice Department, in turn, advised then-Attorney General Jeff Sessions, now a U.S. Senator, that it "respectfully disagree[d]" and argued the statute must be submitted for review, though it was never resubmitted.

The federal courts have not been helpful, either. In June 2011, a three-judge federal district court panel noted that the statute had "not been enforced, not even once" since it was enacted. In dismissing a lawsuit challenging preclearance of the law by the Department of Justice, the panel held that it

did not have subject matter jurisdiction and thus dismissed the case. See: *Little v. Strange*, 796 F.Supp.2d 1314 (M.D.Ala. 2011).

Adam Skaggs, of the Brennan Center for Justice, said that laws that trigger automatic recusal of judges are difficult to enforce and should include a waiver that allows the other party to say they don't think the judge should step down.

Another point, raised by Tommy Wells, past president of the American Bar Association, was that the statute would not be as effective without better disclosure requirements for all campaign contributions. "Unless you've got transparency, you can just walk around the [donation] limits," he said. He also noted that the law would likely relieve attorneys who are constantly approached by judges asking them for campaign contributions and, further, would relieve judges from having to make decisions about whether or not they should recuse themselves from a case.

Only four other states require judges to recuse themselves if they have received a specified amount in campaign contributions from a party, including California, Arizona, Utah and New York.

The process in Alabama to ensure transparency in judicial elections has taken more than 16 years and is still unresolved, which clearly indicates there is no easy solution to the problem – nor will there be so long as there is no political will or interest by the state's Attorney General, Supreme Court or legislature.

Sources: *Birmingham News, www.ajs.org, www.americanprogress.org, www.gavel-togavel.us*

---

**Pretrial & Post-Conviction Research Center,**
*Joe Allan Bounds, Office Manager*

204 Jackson Street, Monroe, Louisiana 71201.
Phone (318) 737-8944.

FREE monthly email, Post-Conviction Newsletter. Email for a subscription at postconvictionnewsletter@yahoo.com

The Center is dedicated to assisting State and Federal prisoners challenging the constitutionality of their conviction and sentence. Customized briefing for State & Federal Habeas Corpus petitions. *28 U.S.C. §§2241, 2254 & 2255* Petitions, Memorandum Briefs, Appellate Briefs, and Petitions for writ of certiorari.

Bookstore: **Self Help Post-Conviction Handbook,** provides the "Secret Tools" to obtain documents, prepare post-conviction motions, memorandum briefs, habeas corpus petitions, appeals, sample form letters, motions, with habeas statutes and rules etc. $54.95, plus $5.15 S&H by Joe Bounds.. Book Size: 8.5" x 11", 444 pages. www.postconvictionhandbook.co

**The Post-Conviction Citebook:** A quick reference book covering over 740 ineffective assistance of counsel and other constitutional claims with favorable case law on almost any subject in the field of post-conviction remedies. A 16-page table of contents designed to assist the user in finding favorable case law by topic and in chronological order as a criminal proceeding may unfold $54.95, plus $5.15 S&H. Book Size: 8.5"x 11", 324 pages. Write for FREE BROCHURES! ORDER NOW! www.postconvictionresearchcenter.com



## Stay Connected with **myJailbird.com**

Tell your friends and family to go to **www.myjailbird.com** to create a **FREE support community** just for you!

**MESSAGE WALL**
Family and friends post updates, reminders and news to keep everyone involved.

**PROFILE**
Displays inmate name, ID and exact contact information to make communication easy for everyone.

**PRIVATE, CONFIDENTIAL PROFILE**
Pages are secure and private to sponsors and invited friends only. Nothing is visible to the general public.

**COMMUNICATION CENTER**
Family and friends can easily send greeting cards, custom photo cards, wire money, get low-cost phone service or order books and magazines for an inmate.

My Jailbird is a free, confidential, support page that makes it easy for family and friends to stay connected to you during your incarceration.

- **It is not a pen pal service.**
- **We do not sell anything directly to inmates.**
- **No monthly fees.**

Call or write your family and friends and ask them to go to **www.myjailbird.com** to **sign up today!**

**myJailbird**
keeps you connected

51 Harvey Road, Unit C
Londonderry, NH 03053

**www.myjailbird.com**

PLN_0001610

# Idaho DOC Settles 30-year-old Class-action Lawsuit

Idaho officials first tried to suppress what they called an "inflammatory" and "libelous" report filed by a court-appointed expert in a longstanding suit involving the state's prison system. They then finally agreed to settle the 30-year-old litigation based upon the report's findings.

In 1981, a flood of federal lawsuits was filed by prisoners at the Idaho State Correctional Institution (ISCI) in Boise, alleging that they were victims of violence and rape by fellow prisoners, had been denied adequate medical care and were subjected to extreme overcrowding.

A judge combined all the cases into a single class-action lawsuit which became known as the *Balla* litigation after lead plaintiff Walter Balla.

Over the next three decades, Idaho prisoners secured several major victories in the case, including court orders requiring state prison officials to stop overcrowding; reduce levels of violence; provide warm clothing; improve medical and mental health treatment and rehabilitative programs; and take other measures to ensure that ISCI would cease being "an extremely violent place to live," as former U.S. District Court Judge Harold Ryan once described the facility.

Despite these important victories, however, prison officials continued to deprive prisoners of adequate medical treatment. This prompted U.S. District Court Judge B. Lynn Winmill to issue an order in July 2011 appointing Dr. Marc Stern, a correctional health care expert, to review the medical system in the Idaho Department of Correction (IDOC).

Prison officials did not like what Dr. Stern had to say and didn't want anyone to see his February 2012 report. They moved to seal the report in March 2012, claiming it was "inflammatory," "libelous" and might spark an "unjustified public scandal."

"The public, and the inmate class members in particular, will likely not understand that at this stage of the proceedings the Report is merely a communication which does not constitute an opinion of the Court," claimed Idaho Deputy Attorney General Colleen Zahn.

Dr. Stern's report contained "serious deficiencies" which "resulted in inflammatory and unsupported legal findings accusing the Department and its third-party medical contractor, Corizon, Inc., of serious constitutional violations," Zahn wrote. She even claimed that dissemination of Stern's findings would amount to libel.

However, lead plaintiffs' attorney Allison Blackman noted that the state failed to offer any compelling reason to seal the report other than the fact they didn't like what it had to say.

"In reality, it appears defendants bring their motion based on fear that unsealing the report might subject them to embarrassment, incrimination, or additional litigation," Blackman wrote.

Dr. Stern stated in his report, which was unsealed on March 19, 2012, that he found significant problems with medical care in the IDOC – including nursing mistakes that may have resulted in some prisoners' deaths; overcrowding at the pharmacy site where prisoners receive their daily medications; and terminally ill prisoners sometimes being denied food, water and pain medication, and left lying in soiled linens.

Although the IDOC and its Brentwood, Tennessee-based medical contractor, Corizon, claimed that Dr. Stern's report was inaccurate, it apparently brought them to their senses. That, and perhaps the fact that in 2010 and 2011 the state had fined Corizon, then operating as Correctional Medical Services, over $382,500 for failing to meet contractual obligations related to the provision of medical care.

On May 15, 2012, the plaintiffs and IDOC officials signed an agreement designed to finally end the 30-year-old case, contingent upon legislative approval of more than $1.6 million in staffing increases and other state prison system costs.

The agreement requires more nurses and other medical staff at ISCI, as well as improvements to the prison pharmacy and increased oversight. The IDOC is expected to add approximately 12 full-time staff positions while Corizon will add the equivalent of more than 10 full-time positions. Corizon's contract with the IDOC will cover the cost of the additional employees; the company was not a defendant in the case.

IDOC Director Brent Reinke said he was confident the state legislature would approve the budget increase. "I think they're going to be quite supportive once we explain to them why it's important and what we're trying to accomplish in this settlement," he stated.

The district court will retain oversight of other rulings in the case, including an order imposing prison population caps. See: *Balla v. Idaho State Board of Corrections*, U.S.D.C. (D. Idaho), Case No. 1:81-cv-01165-BLW.

Separately, on April 17, 2012, the Ninth Circuit Court of Appeals upheld the district court's award of $76,185.60 in attorney fees, $1,249.20 in costs and $46.94 for postage and office supplies in *Balla*.

During the protracted litigation, in an effort to relieve overcrowding, Idaho had transferred hundreds of state prisoners to facilities in Texas, Oklahoma and Minnesota. [See, e.g., *PLN*, March 2010, p.34; Nov. 2006, pp.38, 27]. Idaho subsequently terminated the Texas contract in October 2008 in order to return 300 of its out-of-state prisoners. To make room for them, IDOC officials elected to convert an old prison warehouse into a dormitory.

After reading newspaper accounts of the warehouse plan, the law firm of Stoel Rives, which served as class counsel in *Balla*, informed the state that its plan would violate the district court's injunction in the case.

The IDOC implemented the plan anyway, moving 200 prisoners into the warehouse and requiring them to share four toilets, three urinals and four sinks. They had to be transported to other units for showers. Warehouse conditions were worse than in other units, and prisoners were not allowed to retain valuable property due to a lack of secure storage space.

"The State's plan failed immediately, even before the prisoners returning from Texas arrived," the appellate court noted. On January 2, 2009, "within a few hours of being moved to the warehouse, the 200 inmates rioted. The prison lost control. The riot 'tore the place apart.'"

Even though the prison was overcrowded and the warehouse destroyed, the 300 state prisoners housed in Texas were flown back to Idaho anyway.

On January 5, 2009, the state admitted to class counsel and the district court that it was in violation of the injunction. The defendants asserted that it was "'reasonable' and 'realistic' considering 'the realities of prison management'" to take at least two months to correct the violation.

Class counsel disagreed and moved to hold the state in contempt on January 16, 2009. "Evidently, what was 'realistic' considering 'the realities of prison management' changed when the state received

the contempt motion," the Ninth Circuit wrote. The state brought itself into compliance with the injunction by the date of the contempt hearing, so the district court did not hold the defendants in contempt or impose sanctions for their admitted violations.

Class counsel moved to recover its costs for dealing with the injunction violations and for two years of monitoring the case, from December 11, 2007 through June 22, 2009. In all, Stoel Rives sought $77,608.20 in attorney fees, $2,249.20 in costs and expenses, and $269.10 in postage and office supplies for the class representative. The district court reduced the requested amounts and awarded $76,185.60 in attorney fees, $1,249.20 in costs and $46.94 for postage and supplies.

The Ninth Circuit affirmed on appeal, rejecting the state's argument that the district court had abused its discretion by awarding fees related to the contempt motion when the court denied that motion. "The object of the motion was to obtain compliance, not to win an order hopefully leading to compliance," the appellate court explained. "The object was attained. If in a battle to take a hill, the adversary flees instead of fighting to a bloody defeat, the taking of the hill makes the battle a victory."

As such, the Court of Appeals held that "the district court acted within the bounds of its discretion in awarding fees in a reasonable amount for bringing about the conformity with the injunction." See: *Balla v. Idaho,* 677 F.3d 910 (9th Cir. 2012). Since the resolution of the case, class counsel has filed a motion seeking another $182,640.10 in attorney fees and $1,994.29 in costs, which remains pending. ◪

Additional sources: *Associated Press, www.therepublic.com, Washington Examiner*

# New York Jail Profits from TV Ads

## *by Joe Watson*

How does a small business like Chico's Bail Bonds increase its odds of reaching its target demographic? By advertising to people who have just been arrested and jailed, of course.

While being booked and photographed within hours of their arrest, prisoners at the Erie County Holding Center in Buffalo, New York are now exposed to TV commercials from defense attorneys and bail bondsmen thanks to Metrodata Services, a company that sells the ads for about $40 a week.

"What do people want when they're in the Holding Center? They want to get out. And they don't want to get convicted. So they want bail. And an attorney," Metrodata director Anthony N. Diina told the *Buffalo News.* "This is the ultimate captive audience."

Erie County will get about a third of the profits from such "captive ads," which will also be aired on a TV in the lobby where families wait to visit detainees. Diina estimates the county's share will be $8,000 to $15,000 a year, which is slated for the general fund.

Nor is Erie County alone; as previously reported in *PLN*, a jail in Florida is generating revenue by running ads on video visitation screens while families wait to connect with prisoners. [See: *PLN*, Jan. 2010, p.22].

But according to criminal defense attorney James Auricchio, the county and Metrodata have gone too far to make a buck.

"I wouldn't [buy captive advertising] even if I was subsisting on Ramen noodles," said Auricchio, a former prosecutor. "It's just poor taste in my mind. It strikes me as inserting a commercial aspect into something when I don't feel there is any place for it."

The idea for captive ads at the Holding Center was purportedly hatched during a "culture change" meeting of county employees, including Diina's nephew, who happens to work in Erie County's Jail Management Division.

Now that the ads are turning a profit, Rev. Eugene L. Pierce, vice chairman of Erie County's Community Corrections Advisory Board, wants the county's share of the revenue to be used for "betterment programs" for prisoners rather than reverting to the general fund.

"Inmates should not be used to generate funds for the county's jail operations," said Pierce, who added that the booking-area TVs could also advertise the Board's contact information so prisoners can file complaints about mistreatment. ◪

Sources: *www.buffalonews.com, www. huffingtonpost.com*

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
● Adequate medical care
● Protection from assault
● Humane living conditions
● Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, ***Protecting Your Health and Safety***, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center*\*

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News
PO Box 2420
West Brattleboro, VT 05303
(802) 257-1342**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

PLN_0001612

# Federal Prison Industries Contract Leads to Freeworld Job Losses

The loss of a $45 million contract to produce military clothing has caused Tennessee-based Tennier Industries to lay off around 100 workers. The contract was awarded to Federal Prison Industries (FPI), also known as UNICOR, which will use prisoner slave labor to manufacture the clothing that otherwise would have been made by freeworld employees. [See: *PLN*, May 2012, p.1].

Tennier is located in a depressed area of Tennessee; its main line of business is military clothing manufacturing. The federal prisoners who will perform the work under the FPI contract will be paid from $.23 to $1.15 per hour. "Our government screams, howls and yells how the rest of the world is using prisoners or slave labor to manufacture items, and here we take the items right out of the mouths of people who need it," stated Tennier CEO Steven W. Eisen.

Some federal lawmakers see a problem with FPI. "If China did this – having their prisoners work at subpar wages in prisons – we would be screaming bloody murder," said U.S. Representative Bill Huizenga, the lead sponsor of legislation to overhaul FPI. "This is a threat not to just established industries; it's a threat to emerging industries."

Huizenga was part of a bipartisan coalition of lawmakers behind a bill introduced in Congress in December 2011, the Prison Industries Competition in Contracting Act (H.R. 3634), designed to change the way FPI operates. Under current policy, FPI has preferential status that requires federal agencies to purchase prisoner-made goods if FPI offers them with comparable price, quality and time of delivery to that of private sector businesses (with certain exceptions). While FPI does not always quote the lowest price, it is often able to underbid private companies.

H.R. 3634 sought to limit FPI's sales to the federal government by removing the agency's preferential status, allowing private companies to provide more products to the government, and toughening price requirements on prisoner-made goods to make them more competitive. The bill would have increased prisoner wages to $2.50 per hour and imposed federal work-safety standards on FPI.

"As the system is currently set up, if UNICOR wants a contract from the federal government it gets it," Rep. Huizenga stated. "More often than not UNICOR is given a contract, not because other companies do not produce the product or service requested, but because UNICOR receives preferential treatment when it provides services to other branches and agencies of the federal government. This process takes jobs away from hardworking men and women that are currently employed, has a negative impact on economic growth and does not guarantee the highest quality product or best use of taxpayer dollars."

U.S. Senator Mitch McConnell introduced another bill, the Federal Prisons Accountability Act of 2012 (S. 2169), that would require the director of the Bureau of Prisons (BOP) to be appointed by the president with the consent of the Senate. The bill noted that the BOP's director "serves as the chief operating officer for [FPI] ... that directly competes against the private sector, including small businesses, for Government contracts." Senator McConnell filed the bill after he was contacted by several Kentucky companies, including Campbellsville Apparel and Ashland Sales and Service, that were at risk of losing contracts to FPI.

"Our company believes that FPI should be more accountable to the public by never taking a job that is currently done by an American taxpaying citizen," stated Campbellsville Apparel president Chris Reynolds. "My employees just cannot believe the fact that a prisoner who should be paying a debt to society is being promoted through the federal government to a job from an American taxpaying citizen."

The bills introduced by Rep. Huizenga and Senator McConnell both died in committee in 2012; they have not yet been reintroduced in the current session of Congress.

Meanwhile, FPI is moving into production of solar panels and other energy technologies to help the government meet mandates for using renewable energy sources. Up to 400 federal prisoners are assembling solar panels at FPI plants in Otisville, New York and Sheridan, Oregon. [See: *PLN*, Jan. 2011, p.46]. FPI said its purpose is to "provide inmates with job skills in a new and growing market," according to spokeswoman Julie Rozier.

FPI industry programs have "been important to the Federal Bureau of Prisons for a long time," added George Keiser, a former official at the National Institute of Corrections. "It's one of the areas where they can demonstrate a high correlation between people who work in prison industries and who eventually, as they return to their communities, have a higher-than-average success rate at not being rearrested, not being reconvicted and not returning to prison."

The BOP reports that prisoners employed in FPI programs are 24 percent less likely to return to prison and have a 14 percent greater chance to find work upon release. FPI does have a financial cost, though, as it lost $1.8 million in 2011 – an improvement from the $56.3 million the agency lost the year before, largely due to a recall of defective military helmets. [See: *PLN*, Jan. 2011, p.20].

Tennier Industries filed a bid protest with the U.S. Government Accountability Office (GAO) over its loss of the $45 million military clothing contract to FPI. The company noted that the contract was issued as a Historically Underutilized Business Zone (HUBZone) set-aside, which, according to government regulations, is intended "to provide Federal contracting assistance for qualified small business concerns located in historically underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in those areas."

However, Tennier's complaint was denied on June 29, 2012, even though FPI is not a HUBZone business and despite the company's argument that allowing FPI to compete for the contract defeated the purpose of the HUBZone program. The GAO determined that federal statutes and regulations "specifically allow[ed] FPI to participate in the procurement," and that because FPI was not a HUBZone small business it did not have to comply with the rules applicable to such businesses. ◼

Sources: *New York Times, http://smallgovcon.com, www.louisville.com, www.acquisition.gov, www.gao.gov*

**Dictionary of the Law**
Thousands of clear concise definitions
See page 53 for ordering information

PLN_0001613

*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - ONLY $20!
+ $2.99 p&h

*"BEST DEAL ON THE POUND!"*

## Check your 5 magazines
and underline three backup choices (in case of unavailability)

- ○ 4 Wheel & Off Road (12)
- ○ Allure (12)
- ○ American Photo (6)
- ○ Arthritis Today (6)
- ○ Arthur Frommer's Budget Travel (8)
- ○ Automobile (12)
- ○ Bicycling (11)
- ○ Boating (10)
- ○ Bon Appetit (12)
- ○ Bowhunt America (9)
- ○ Bowhunting World (9)
- ○ Bridal Guide (6)
- ○ Cabelas Outfitter Journal (6)
- ○ Car & Driver (12)
- ○ Charisma (12)
- ○ Complex Magazine (6)
- ○ Conde Nast Traveler (12)
- ○ Country (7)
- ○ Cruising World (12)
- ○ Cycle World (12)
- ○ Detroit Home (6)
- ○ Digital Photo (7)
- ○ Dirt Rider (12)
- ○ Discover (10)
- ○ Ebony (11)
- ○ Entrepreneur (12)
- ○ ESPN (26)
- ○ Esquire (11)
- ○ Family Circle (15)
- ○ Family Fun (10)
- ○ Family Handyman (11
- ○ Fast Company (10)
- ○ Field & Stream (12)
- ○ Fitness (10)
- ○ Florida Sport Fishing (6)
- ○ Fly Fishing in Salt Water (6)

- ○ Flying (12)
- ○ Four Wheeler (12)
- ○ Freeskier (6)
- ○ Garden & Gun (6)
- ○ Golf Digest (12)
- ○ Golf Tips (7)
- ○ Glamour (12)
- ○ Golf Week (45)
- ○ Hot Bike (12)
- ○ Hot Bike Baggers (12)
- ○ Hour Detroit (12)
- ○ Inc Magazine (12)
- ○ Jet (26)
- ○ Ladies Home Journal (11)
- ○ Latina (10)
- ○ Log Home Living (9)
- ○ Lucky (12)
- ○ Marie Claire (12)
- ○ Men's Fitness (10)
- ○ Men's Journal (12)
- ○ Motor Trend (12)
- ○ Ministry Today (6)
- ○ Midwest Living (6)
- ○ Motorcyclist (12)
- ○ Muscle Mustangs & Fast Fords (12)
- ○ Nylon (10)
- ○ Old House Journal (6)
- ○ Outdoor Life (12)
- ○ Outdoor Photographer (11) No Renewal
- ○ Outside (12)
- ○ Parent & Child (8)
- ○ Parenting Early Years (11)
- ○ Parenting School Years (11)
- ○ Parents (12)
- ○ Plane & Pilot (12) No Renewal
- ○ Popular Photography (12)

- ○ Popular Science (12)
- ○ Predator Xtreme (6)
- ○ Prevention (12)
- ○ Reader's Digest (12)
- ○ Road & Track (12)
- ○ Rolling Stone (26)
- ○ Self (12)
- ○ Shape (12)
- ○ Siempre Mujer (6)
- ○ Ski (7)
- ○ Slam (10)
- ○ Snowboard (6)
- ○ Snowboarder (7)
- ○ Sound & Vision (8)
- ○ Sport Rider (10)
- ○ Super Chevy (12)
- ○ Surfer (12)
- ○ Surfing (12)
- ○ Taste of Home (8) No Renewal
- ○ Teen Vogue (10)
- ○ Tennis (8)
- ○ The Atlantic (10)
- ○ Timber Home Living (6)
- ○ Transworld Motocross (12)
- ○ Transworld Skateboarding (12)
- ○ Transworld Snowboarding (9)
- ○ Transworld Surf (12)
- ○ Urban Farm (6)
- ○ Vibe (6)
- ○ Waterfowl & Retriever (2)
- ○ Weight Watchers (6)
- ○ Whitetail Journal (6)
- ○ Whole Living (10)
- ○ Wired (12)
- ○ Working Mother (8)

### Send as many "5 for $20" orders as you like!          Tell your Friends and Families!

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or *order online* and use credit card or PayPal.

| Name and Inmate # (please print, maximum 24 characters): |  |
| --- | --- |
| Address: | |
| City: | State: | Zip: |



# Inmate Magazine Service Inc.

*OK to Copy!*

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

PLN_0001614

# New Hampshire: $450,000 Settlement in Suit Over Prisoner's Opiate Detoxification Death

On August 9, 2011, Hillsborough County, New Hampshire settled a lawsuit filed by the parents of a jail prisoner who died due to dehydration while undergoing unsupervised opiate detoxification.

Kevin McEvoy, 24, was arrested in August 2008 on two misdemeanor shoplifting charges for stealing video games; unable to post $3,000 bail, he was incarcerated at the Valley Street jail in Manchester. McEvoy was a heroin addict and immediately began to show signs of opiate detoxification. One of the signs was repeated vomiting.

Persistent vomiting can result in dehydration and kidney failure, which can be fatal. That is what happened to McEvoy, who lost 24 pounds during the five days he was held at the jail, writhing and moaning on his bunk much of the time.

The state medical examiner performed an autopsy and concluded that McEvoy's death was the accidental result of "severe dehydration and acute renal failure due to protracted vomiting caused by heroin withdrawal."

McEvoy's parents, Richard and Shelagh, filed a civil rights suit in federal court claiming their son had been denied medical care. Court documents alleged that guards had ignored other prisoners' repeated attempts to get medical help for McEvoy, and that a nurse "joked" that he was "faking an illness." On August 25, 2008, the last day of his life, two guards reportedly dragged and carried McEvoy from his cell to another cell because he was unable to walk by himself. Nonetheless, they refused to get him medical attention.

Court pleadings also alleged that "the Hillsborough Department of Corrections did not have a written policy or protocol on opiate detoxification" at the time of McEvoy's death. By contrast, they did have a written policy on alcohol detoxification that "included a 'Detox Flow Sheet' to be completed by medical personnel, which required the monitoring and recording of, among other things, the inmate's blood pressure, whether the inmate was vomiting and whether the inmate was weak." Prisoners who were detoxifying from alcohol were also monitored by staff every fifteen minutes, with staff recording the prisoner's activities on a watch sheet and providing the watch sheet to medical staff.

Hillsborough County agreed to settle the suit without admitting fault. The attorney who represented McEvoy's parents, Joseph F. McDowell III, said he could not reveal the amount of the settlement but that his clients, who sued in the name of McEvoy's estate, were pleased.

"I'm glad it's over, but it doesn't bring Kevin back," said his mother. "Nothing's going to bring him back, but we just felt that he was owed. The way he went out, there were so many questions."

*PLN* filed a public records request and obtained a copy of the settlement agreement in January 2013, which revealed that county officials had paid $450,000 to McEvoy's estate to settle the lawsuit. Hillsborough County has since adopted a written protocol for prisoners experiencing opiate withdrawal. See: *McEvoy v. Hillsborough County*, U.S.D.C. (D. NH), Case No. 1:09-cv-00431-SM. ◼

Additional source: *www.nashuatelegraph.com*

# California: Denial of Kosher Diet to Messianic Jew Violates RLUIPA

The California Court of Appeal, Third District, has held that the denial of a prisoner's request to participate in the state prison system's Jewish Kosher Diet Program (JKDP), on the sole ground that he was a Messianic Jew, violated the prisoner's rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*

In July 2009, California state prisoner Margarito Jesus Garcia, incarcerated at Mule Creek State Prison, submitted a form requesting inclusion in the JKDP. On the form, Garcia identified himself as a practitioner of Messianic Judaism – a sect of Judaism whose adherents are followers of Jesus – and indicated that his faith required him to keep a kosher diet. His request was denied by Mule Creek's Jewish Chaplain, who determined that Garcia's Messianic beliefs were not consonant with the tenets of traditional Judaism. Garcia then filed a petition for writ of habeas corpus in state court.

The denial of Garcia's request for kosher meals was consistent with prison regulations (Cal. Code Regs., tit. 15 § 3054.2), which explicitly limit participation in the JKDP to prisoners deemed traditional Jews "by a Jewish Chaplain." However, the Court of Appeal noted that "those regulations might just as readily have opened participation to all Jews or to all non-Christians or limited participation to Jews with red hair."

Under RLUIPA, which prohibits imposition of a substantial burden on a prisoner's religious exercise – and which defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" – the primary issue was "not whether [the prisoner] is a Jew but whether his system of religious beliefs includes maintaining a kosher diet," the court wrote.

In this case, prison officials did not dispute the sincerity of Garcia's religious beliefs or his belief that he must maintain a kosher diet, nor did they demonstrate that the burden imposed on Garcia's religious beliefs by virtue of his exclusion from the JKDP furthered a compelling governmental interest and was the least restrictive means of furthering that interest, as required by RLUIPA.

Thus, the Court of Appeal granted the habeas petition and ordered prison officials to allow Garcia to participate in the JKDP, or to transfer him to another facility where the JKDP was available. See: *In re Garcia*, 202 Cal.App.4th 892, 136 Cal.Rptr.3d 298 (Cal.App. 3 Dist. 2012).

Previously, California prison officials had agreed to provide a Muslim prisoner with access to the JKDP pending the implementation of a Religious Meat Alternate Program consistent with Islamic dietary requirements. [See: *PLN*, Jan. 2012, p.47]. ◼

---

**Writing to Win**

Need to Write better? Writing to Win will teach you the basics of how to compose clear and convincing written and oral legal arguments! 270 pages packed with solid, practical advice and tips.

$19.95 from PLN's Book Store!

---

# Ohio Supreme Court Sides with Defendant in Sex Offender Registration Case

### *by Derek Gilna*

On May 8, 2012, the Ohio Supreme Court ruled in favor of Wesley Lloyd, who was convicted of a sex offense in Texas and then moved to Ohio in 2005. He was arrested and convicted in Ohio for failing to register as Tier III sex offender "within three days" of his move to that state and "at least 20 days before moving" to his new Ohio residence.

According to the Supreme Court, "This case highlights the reasons why a court cannot assume that a defendant is under a duty to register merely because law enforcement claims that he is. After all, the courts are still the independent venue for sorting out law enforcement's allegations, on the basis of actual proof."

The Supreme Court was critical not only of the Fifth District Court of Appeals, from which the appeal was taken, but also the Ohio legislature. "The legislature did not explain the analysis that courts must undertake in determining whether an out-of-state offense is 'substantially equivalent' to a listed Ohio offense," the Court wrote.

Under R.C. 2950.04(E), defendants convicted of certain sex offenses are required to register with the appropriate county officials both before and after they change their residence. The Ohio Supreme Court analyzed the application of that statute by using the "federal modified-categorical approach" set forth in *Taylor v. United States*, 495 U.S. 575 (1990). Under that approach, courts attempt to arrive at a generic interpretation of a crime from another jurisdiction before applying it to the new jurisdiction. The Court held that Lloyd's aggravated sexual assault conviction in Texas was "substantially equivalent to rape" under Ohio law.

Hence, the Supreme Court found that Lloyd had been convicted of a sexual offense in Texas that would have required registration had it been committed in Ohio. However, "the [Ohio] General Assembly imposes a duty to register on a person who has been convicted ... in another jurisdiction only if, at the time he moves to Ohio, he had a duty to register in the other jurisdiction as a consequence of the conviction." The state therefore had to prove that when Lloyd moved to Ohio he was under a duty to register as a sex offender in Texas.

Yet Ohio prosecutors had failed to do so. "In its case-in-chief, the state failed to produce any evidence whatsoever that at the time Lloyd moved to Ohio, he was under a duty to register in Texas as a result of the conviction in that state. The state failed to produce any evidence that Lloyd had registered as a sex offender in Texas or that he had been given notice by any Texas authority that he was under a duty to register in Texas. It failed to produce any judgment entry that reflected that Lloyd had been adjudicated a sex offender in Texas."

Thus, although Lloyd was a convicted sex offender who was in fact required to register in Texas – and therefore register in Ohio when he moved to that state – prosecutors failed to prove the elements of the offense for his failure to properly register in Ohio. Consequently, the Supreme Court vacated Lloyd's convictions. See: *State v. Lloyd*, 132 Ohio St.3d 135, 970 N.E.2d 870 (Ohio 2012), *reconsideration denied.* ◖

Hepatitis & Liver Disease
A Guide to Treating & Living with Hepatitis & Liver Disease.  Revised Ed.
By Dr. Melissa Palmer
See page 53 for order information

## Banking and Financial Management Educational Course



This educational course focuses on the fundamentals of banking and financial management. It offers perspectives on how it works in society when you are released as well as how you can start now by opening an account through Prisoner Assistant while incarcerated.

**Prisoner Assistant**
482 Summit Wind Drive, Ste 704-ED
Lake Harmony, PA 18624–0704
(570) 722-5800

The course is an 8 X 11, soft-covered book illustrated in full color and includes a test in each section.  The Prisoner Assistant Application Package & Catalog are also included, over 110 pages total.



- Order from Amazon.com directly $65.00 + shipping

- Order from Prisoner Assistant $80.00 Money Order sent & payable to Prisoner Assistant address on left.

- Grading, Official transcript & Certificate $20.00

The Grading, Official Transcript & Certificate are free if you open an account with Prisoner Assistant.



## Save on Prescription Eyeglasses & Shades

Send for a **FREE** Catalog
Money Back Guarantee

## Prism Optical, Inc.
**10954 NW 7th Ave**
**Dept: LN0213**
**Miami, FL 33168**

Inquiries from Friends
and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com

**prism**
OPTICAL, INC
Since 1959

PLN_0001616

# TASER Liability Verdict Upheld, but Remittitur Granted

A North Carolina U.S. District Court has held, in ruling on a post-trial motion, that a jury's liability verdict against TASER International related to the death of a juvenile shocked by one of the company's TASER devices was reasonable, but granted remittitur of the $10 million jury award after finding it to be excessive.

The products liability case against TASER involved the March 20, 2008 death of Darryl Turner, 17, who died shortly after being hit in the chest with a TASER Model X26 Electronic Control Device (ECD). Earlier that day, Turner was confronted about stealing food from the Food Lion store where he worked as a bagger-cashier; he was fired for insubordination.

Turner refused to leave the store, and police were called after he became defiant and confrontational. When Charlotte Mecklenburg Police Department officer Jerry Dawson arrived, he found Turner yelling and cursing at the store manager. Prior to Dawson's arrival, Turner had shoved a Western Union display off a counter, threw an umbrella at the manager and advanced on him.

Witness recollections of what Dawson said to Turner were in dispute, but all agreed that when Turner moved towards Dawson the officer fired his X26 ECD, hitting Turner in the chest with a 37-second jolt of electricity. He continued to walk towards Dawson and grabbed a small rack that he threw on the floor before collapsing.

When Turner failed to move or respond to another officer's command to put his hands behind his back, Dawson activated the X26 again for a five-second shock. Turner went into ventricular fibrillation (VF) sometime after being Tased. Efforts at CPR and defibrillation failed, and he was pronounced dead at a local hospital. His family filed suit in federal court.

In July 2011, following a six-day trial, the jury awarded $10 million to Turner's estate. [See: *PLN*, Jan. 2012, p.42]. TASER then filed a Rule 50 motion for judgment notwithstanding the verdict or for a new trial or remittitur. Many of TASER's arguments had been rejected in pretrial motions, and the district court upheld its prior rulings.

One of those rulings was the court's refusal to allow TASER to present a contributory negligence defense, as established law precluded that defense because Turner had not used the TASER himself.

Next, the district court rejected TASER's causation argument.

At trial, the cause of Turner's death was cited as the 37-second TASER shock. The court found that the evidence showed VF occurred in animals and a human with a pacemaker when they were Tased for 24 to 25 seconds, and "[f]or further human case studies, TASER need look no further than the unfortunate facts surrounding Turner's death."

The district court further rejected TASER's argument that its warnings at the time the TASER was sold to the Charlotte Mecklenburg Police Department, and at the time of Turner's death, were adequate. Despite the fact that studies had shown there was a danger of ECD shocks to the chest, TASER's training materials instructed officers to aim for the "center of mass" and depicted chest shots as examples.

The court also upheld its rulings to exclude Turner's use of marijuana, which was raised because he had some on his person at the time of his death, because there was no evidence that he had used it. Having found that TASER's liability was properly decided by the jury, the district court turned to whether the $10 million award was excessive.

Despite TASER's efforts to prove otherwise, the evidence showed Turner to be a "very promising" young man. Nevertheless, the court found the jury award to be excessive and reduced it to a present value of $6.1 million. It then reduced that award by $625,000 – the amount Turner's estate received from the City of Charlotte – and by the $40,000 received from Food Lion's workers' compensation plan. Thus, the remittitur judgment against TASER totaled $5,491,503.65.

Turner's estate accepted the reduced award on April 20, 2012. TASER has since filed an appeal with the Fourth Circuit, which remains pending. See: *Fontenot v. TASER International*, U.S.D.C. (W.D. NC), Case No. 3:10-cv-00125-RJC-DCK. ◼

# FCC Finally Moves on Wright Petition After Almost a Decade of Inaction

On December 28, 2012, the Federal Communications Commission (FCC) took a major step in a process that could lead to "just and reasonable" interstate phone rates for calls made from prisons, jails and other detention centers.

"Today, we officially answer the call from tens of thousands of consumers who have written, emailed and, yes, phoned the Commission, pleading for relief on interstate long distance rates from correctional facilities," said FCC Commissioner Mignon Clyburn, a supporter of the Campaign for Prison Phone Justice.

Nearly ten years after the "Wright Petition" landed at the FCC – named after petitioner Martha Wright, who had accepted phone calls from her incarcerated grandson – the Commission issued a "Further Notice of Proposed Rulemaking" (NPRM), that was published in the Federal Register on January 22, 2013. This opens up a sixty-day period, until March 25, 2013, to submit public comments on the NPRM to make the cost of prison phone calls more affordable to consumers.

Before the FCC Commissioners decide whether and how to lower prison phone rates, they want to hear more about the experiences of prisoners and their families with the prison telephone system, and ideas for changing it.

In the past six months more than 700 letters have arrived at the FCC from prisoners, their family members and other people concerned about this issue, describing the personal and financial costs of high prison phone rates.

"When Global Tel Link took over phone services [in Mississippi] the prices skyrocketed," wrote Michael Herrin, at SMCI in Leakesville, Mississippi. "My sister and mother live in Alabama. In order for us to speak $50.00 must be paid up front for 30 minutes. $8.50 is initially deducted leaving a credit of $41.50 for which I can only talk for approximately 20 minutes. No family can afford to spend $50.00 for a 20 minute conversation."

"Mothers, fathers, brothers, and sisters as well as children are being torn apart because it is impossible to talk to one another," he added.

"I delivered my daughter while incarcerated and I am yearning to bond with her in any way possible, especially via telephone where she can hear and learn to recognize her mother's voice," said Jodie Cobb, at Lee Arrendale State Prison in Alto, Georgia. "If only the rates for collect

PLN_0001617

calls in the state penitentiary were more affordable to the working, struggling and often very poor classes then I might get the privilege of hearing my daughter say, 'Hello, Mommy' or a simple 'I love you.' This is a big deal to prisoners such as myself who do not get visits."

Interstate calls from Georgia prisons are among the most expensive in the country. Upon accepting an interstate collect call, the recipient pays a $3.95 connection fee plus $.89 per minute. A 15-minute long distance collect call from Georgia costs $17.30. Calls from county jails are no different; as of 2012, the Clayton County Jail, Cobb County Jail, DeKalb County Jail, Fulton County Jail and Dougherty County Jail charged the same $3.95 connection fee plus $.89 per minute rate for collect interstate calls. Phone calls from Georgia jails are also riddled with service fees, such as a $6.00 charge that people have to pay to deposit funds into their account using credit or debit cards by telephone.

"My wife and family struggle to make ends meet outside of prison so they very rarely have any money to place on a phone account so I can call them," wrote Keith Connors, at SCI-Mahanoy in Frackville, Pennsylvania. "It costs over five dollars for a fifteen-minute phone call, my family can't afford it and I most certainly can't afford it.... When I sit out in the dayroom and look over at the phones I imagine myself on one of them speaking to my children reassuring them that daddy is fine and that I'll be home soon."

It is important to keep pressure on the FCC to act on the Wright Petition, especially now that the Commissioners have indicated they will consider taking action. Please see the Campaign for Prison Phone Justice flyer on page 37 of this issue of *PLN* for updated instructions on how to submit a comment to the FCC. Prison Legal News is a partner organization in the Campaign for Prison Phone Justice, along with MAG-Net and Working Narratives.

*PLN* wants to acknowledge prisoners

at the following facilities, where, based on the volume of comments submitted to the FCC, it is clear they have been doing serious organizing around prison phone issues: Sussex II State Prison in Waverly, VA; SCI-Dallas in Dallas, PA; SCI-Albion in Albion, PA; SCI-Forest in Marienville, PA; SCI-Somerset in Somerset, PA; SCI-Huntingdon in Huntingdon, PA; Women's Huron Valley Correctional Facility in Ypsilanti, MI; Thumb Correctional Facility in Lapeer, MI; Buckingham Correctional

Facility in Dillwyn, VA; Anamosa State Penitentiary in Anamosa, IA; and Stateville Correctional Center in Joliet, IL. A special acknowledgment goes to prisoners at SCI-Greene in Waynesburg, PA, who have submitted more than 80 letters to the FCC in support of the Wright Petition.

It is only through such concerted efforts that we can make a difference and effect change, and PLN extends our thanks to everyone who has contacted the FCC concerning this issue. 🔳

# New York Court Limits Costs to $.25 per Page for Prison Medical Records Requests

A New York appellate court has upheld a lower court's decision that the cost for medical records requested by prisoners or their representatives under the Freedom of Information Law (FOIL) is no more than $.25 per page.

The Legal Aid Society (LAS) sought disclosure of certain medical records from the New York State Department of Correctional Services (NYSDOCS) under FOIL, which specifies a statutory limit on costs of $.25 per page. The NYSDOCS agreed to disclose the records, but only under Public Health Law § 18, and imposed a copying fee of $.50 per page. The LAS filed a CPLR article 78 proceeding in state court to compel production of the medical records pursuant to FOIL at a cost of no more than $.25 per page.

The Supreme Court of Dutchess County ordered production of the records at a cost not to exceed $.25, and NYS-DOCS appealed.

The Supreme Court of New York, Appellate Division, Second Judicial Department upheld the lower court, finding there was no statutory exemption under FOIL for medical records, even if they could also be obtained under section 18 of the Public Health Law.

"FOIL imposes a broad standard

of open disclosure upon agencies of the government [and][d]ocuments in the possession of public agencies are presumptively discoverable under FOIL, unless the agency can point to a specific statutory exemption," the appellate court wrote. "Here, there is no such statutory exemption. The fact that an individual 'could obtain his records ... pursuant to section 18 [of the Public Health Law] does not diminish his right to obtain them under FOIL.'"

Following the decision, NYSDOCS issued a Memorandum dated January 6, 2012 that updated its copying policies and ordered that all medical records requests be assessed a copying charge of $.25 per page regardless of which law the request was made under. The memo also stated that access to medical records cannot be denied due to inability to pay, referring to Directive 2788.

New York attorney Steven Banks represented the Legal Aid Society on appeal. See: *Legal Aid Society v. New York State Department of Correctional Services*, 88 A.D.3d 793, 930 N.Y.S.2d 887 (N.Y.A.D. 2 Dept. 2011). 🔳



**inmateMAGS** .com
formerly
MyMagstore.com

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **50+ Page Full Catalog** ($3 Discount Coupon Included)

| InmateMAGS.com | Mymagstore.com | www.inmateMAGS.com |
| --- | --- | --- |
| 4208 University Way NE | Info@mymagstore.com | Info@inmatemags.com |
| Seattle, WA 98105 | 877-324-7323 | 206-322-6397 |

**SMITH'S GUIDE to HABEAS CORPUS RELIEF**
for State Prisoners under 28 U.S.C. §2254
Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence.     380 pages.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company
Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*

PLN_0001618

# Johnny Cash and His Prison Reform Campaign

### by Danny Robins

On July 26, 1972, three grizzled-looking men dressed uneasily in suits gave evidence at a U.S. Senate subcommittee on prison reform. Two of the men were former prisoners of some of the toughest prisons in the U.S. – the third was the country and western singer, Johnny Cash.

Cash's famous live albums recorded at Folsom Prison and San Quentin are the stuff of music legend – likely to feature on any critic's list of defining albums of the 1960s.

But it's much less well-known that these were only two of many prison concerts Cash played over the course of almost 30 years.

Fitting the gigs in around his relentless touring schedule, the "Man in Black" performed for prisoners all over the U.S., always unpaid, and in the process became a passionate and vocal spokesman for prisoners' rights.

"He always identified with the underdog," says Tommy Cash, Johnny's youngest brother. "He identified with the prisoners because many of them had served their sentences and had been rehabilitated in some cases, but were still kept there the rest of their lives. He felt a great empathy with those people."

The roots of Cash's empathy lie as far back as 1953, when as a 21-year-old radio operator in the U.S. Air Force, he saw the film *Inside the Walls of Folsom Prison* and was inspired to write a song.

Folsom Prison Blues, released two years later, after Cash had signed to Sun Records, turned the young singer into a star.

The song, and in particular the now-notorious line "I shot a man in Reno, just to watch him die," was sung with such raw menace that many assumed Cash knew what he was talking about.

"There's people today that you can talk to and they will believe that he actually did that," says W.S. "Fluke" Holland, Johnny's larger-than-life former drummer.

"Johnny Cash shot a man to watch him die. He was a mean dude," he chuckles then shakes his head. "The only time he was in prison is when we played in them."

This is one of the ironies of Cash's prison reform crusade. The very thing that made convicts connect with him, and U.S.

senators hang on his every word – the air of authenticity that stemmed from the belief he had served hard time himself – was in reality a misconception.

"Cash had been behind bars," says his biographer Michael Streissguth. "But these were one-night stays in jail after drunk and disorderly arrests."

His popularity, fueled by the desperado image, made him a refreshing antidote to the clean-cut pop stars of the era. Cash did little to dispel the growing myth around him.

One result was that he began to receive invitations to perform in prisons. He played his first prison concert in 1957 at the Huntsville State Prison in Texas. Many more followed.

The unique energy of these appearances was captured in 1968 on the At Folsom Prison recording. The album cemented Cash's outlaw image and reignited his career, which had been floundering in the mid-60s as he battled drug addiction.

Columbia Records, which had only reluctantly agreed to Cash's request to record at the prison and then half-heartedly marketed the release, was taken aback. But Cash had undeniably caught the public mood.

The growing civil rights movement had put the thorny issue of how to deal with America's huge prison population firmly on the agenda.

"In the 1960s in America, there was a growing realization that prisons were ineffective," says Streissguth. "They were merely training inmates to be better criminals. So the recidivism rate, people coming back to incarceration, was very high."

Cash, an ardent believer in the power of rehabilitation over punishment, became the go-to voice for the media on this new hot topic.

"I think Cash had a feeling that somehow he had been endowed with this fame in order to do something with it, and one of the ways he could do something with it was talking about prison reform," says Streissguth, who also believes Cash's deeply-held religious beliefs were a factor in his championing of the cause. "He connected with the idea that a man could be redeemed."

If American prisons were failing, nowhere was this more true than in Cash's home state of Arkansas.

By 1970, the entire state penal system had been declared "unconstitutional" by a federal judge after a series of scandals throughout the 60s involving the physical and sexual abuse of prisoners, torture, inadequate living conditions, and the outdated and corrupt "trustee system."

"Trustees were prisoners guarding other prisoners," says Colin Woodward from the UALR Center for Arkansas History and Culture. "It really echoed the way people worked under slavery. Under slavery a lot of the time the slave drivers were actually slaves themselves and that's what's replicated here."

Clearly, a system where armed prisoners policed their fellow prisoners in the absence of any civilian guards was massively open to abuse.

"It was the closest thing to hell this side of hell," says Daniel Merry, a folk singer in his own right, as he remembers life in Cummins, then the worst of Arkansas' prisons and arguably one of the worst in the world at that time.

Merry, now in his 60s, was sent to Cummins for eight months in 1969 for the crime of marijuana possession. "I'd say life down there on a daily basis was pretty scary," he says.

"I seen a lot of inmates get killed. One of their favorite ways was to give you what they call a 'blanket party.' When you go to sleep, a bunch of old things run up and throws a blanket over you and sticks a bunch of homemade knives in you."

When Johnny Cash and his touring roadshow arrived to perform at Cummins in April 1969, it must have seemed like a rare ray of light to prisoners such as Daniel Merry.

Cash came at the invitation of Winthrop Rockefeller, a scion of the wealthy American family, who had been elected state governor in 1966 with a mandate to overhaul the corrupt and abusive prison system.

Rockefeller was the first-ever Republican governor of Arkansas. Cash was from a family of Democrats, but saw something he liked in Rockefeller and joined him in 1968 on his re-election campaign trail, playing concerts and promoting their mutual call for reform.

By the time of the Cummins concert, Cash was close to the peak of his career. In February 1969 he had recorded the

PLN_0001619

follow-up to Folsom Prison, Live at San Quentin, which would go on to sell even better than its predecessor, and ABC had just commissioned the weekly Johnny Cash Show which would turn him into a prime time TV star.

As well as singing for the prisoners, Johnny used the platform of the concert, which was being filmed for local TV, to put his money where his mouth was, offering to donate $5,000 of his own money to build a prison chapel – and publicly challenging Governor Winthrop Rockefeller to match his donation.

"Old Winthrop, that day he wrote a check for five grand and put it in the chapel fund," smiles Daniel Merry, savoring the memory.

Cummins today is a very different place than the "dark and evil world" a federal judge declared unconstitutional in 1970. It's a modern prison focused on reforming prisoners and preparing them for a return to society.

The chapel for which Cash had campaigned so passionately is one of the lasting legacies, not only of Cash's visit to Cummins but of his entire prison reform crusade. It is durable concrete evidence of Cash's interest in and commitment to the men he met behind bars.

Wilson Banks, the present-day chaplain, tells me there are still two or three lifers at Cummins who were there over 40 years ago when the Man in Black came to visit. "They say that he touched their lives."

Cash's conversations with the men he met at Cummins clearly touched him, too. At the 1972 U.S. Senate hearing, Cash relayed stories of some of the worst abuses he had heard of on his prison visits, including the harrowing tale of a 15-year-old boy who died of injuries caused by his rape at an Arkansas prison.

Former prisoner Daniel Merry says he remembers the boy and there were "many more like him."

Cash not only outlined to the senators on Capitol Hill what he thought was wrong with the American penal system, he also told them how he believed it could be improved.

His proposals included the separation of first-timers and hardened criminals, the reclassification of offenses to keep minor offenders out of prison, a focus on rehabilitation rather than punishment, and counseling to prepare convicts for the outside world and reduce the possibility of them reoffending.

At a time when countries around the world are still wrestling with the question of how to handle those they incarcerate, many of the issues Cash raised that day feel just as relevant today.

The fact that we are still debating them 40 years later suggests Cash failed. But did he?

The sweeping reforms he advocated to politicians may not have come into force in his lifetime, and some have still not been achieved even now, but, using the power of his celebrity, he took the debate from politicians' offices and the inside pages of broadsheet newspapers, into public hearts and minds.

Cash himself said during the U.S. Senate hearing, "people have got to care for prison reform to come about." His greatest legacy is that he made people care, through his public statements, but most powerfully and effectively, through his music.

For the average person, listening to one of Cash's prison albums, with their songs of prison life, interspersed with convicts' shouts, warders' tannoy announcements and rattling keys, was to be transported into a world that was, until then, largely unknown or ignored.

It's unlikely the changes at Cummins and other American prisons – and the push towards a view of imprisonment that tempers punishment with rehabilitation – would have come about without this shift in public perception.

Cash successfully humanized the prison population and gave them a voice. He had a unique ability to get inside the heads of these forgotten and ignored men and understand the problems facing them – the roar from the prisoner audience that can be heard on Live at San Quentin when he launches into the provocative angry title track is testimony to this.

Perhaps Cash's impact is best summed up in the words of Senator Quentin N. Burdick, one of the men he addressed at the U.S. Senate in 1972.

Having heard Cash's testimony, Burdick said, quite simply: "We need more Johnny Cashs, I guess."

*Danny Robins is a presenter, writer, journalist and comedian; his website is www. dannyrobins.com. This article was originally published by the BBC World Service on January 22, 2013; it is reprinted with permission.*

# FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! (Void in New York)
(Last Quarter's winner from **Waynesburg, PA.**)
TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

## Inmate Magazine Service Inc.

PLN_0001620

# News in Brief

**Florida**: When Jack Bates Rider III signed up for a training class to become a corrections officer, he likely didn't expect to be arrested. He should have, though, as he was wanted in connection with the 2007 strangulation death of a woman in Arizona. The U.S. Marshals Service said Rider, 32, was taken into custody on a fugitive warrant after leaving the training class. He was booked into the Escambia County Jail on October 30, 2012.

**Ireland**: A Northern Ireland Prison Service guard was ambushed and killed on November 1, 2012 in County Armagh. David Black, who was close to retirement after serving more than 30 years in Ireland's prison system, was shot to death as he drove to the Maghaberry jail, where several prominent republican prisoners are held. According to unconfirmed witness reports, his assailant used an automatic weapon in the drive-by shooting. "Prison officers and police officers alike are aware of the deadly threat from dissident terrorists who won't face up to the fact that Northern Ireland has moved on and will not go back to its awful past. We must all be totally vigilant about our personal safety," said Terry Spence, who chairs the Police Federation of Northern Ireland.

**Kentucky**: Senior Judge Martin McDonald, 54, was removed from a death penalty case on October 24, 2012 by order of Chief Justice John D. Minton, Jr. McDonald had threatened to strangle Assistant Public Advocate David Barron, and called Barron's case "ridiculous," "disgusting" and a "huge waste of time." The case involved an appeal by death row prisoner Roger Dale Epperson based on claims of ineffective assistance of counsel. Judge McDonald, a former deputy sheriff, referred to Epperson as a "carcass." McDonald had been removed from an unrelated civil case in September 2012 after he reportedly demonstrated bias and did not disclose a conflict of interest.

**Louisiana**: Jason Cantrell, 43, a part-time New Orleans city attorney, was more than embarrassed when a joint fell out of his pocket in October 2012. While he was in court. In front of police officers. He was cited for simple possession of marijuana, and suspended without pay. Cantrell handled cases in traffic court; his wife, who was running for city council, said he should seek "professional help." He resigned following the joint-dropping incident.

**Nebraska**: Twelve people at the Lancaster County jail, including prisoners, were taken to a hospital on October 21, 2012 after they began vomiting and said they felt light-headed. According to Lincoln Fire and Rescue Battalion Chief Leo Benes, the jail's cafeteria was contaminated with carbon monoxide due to an equipment malfunction. No serious injuries were reported.

**Pennsylvania**: On October 24, 2012, former Colwyn police officer Trevor Parham, 40, was found not guilty of using a Taser on a juvenile offender who was handcuffed and shackled in a cell. Parham admitted that he had Tasered Da'Qwan Jackson, 17, who had been arrested for disorderly conduct, after Jackson became agitated and began cursing. Parham also admitted that he sent a text message to his girlfriend, another officer, which said Jackson "got tased in the cell. lol." He did not file a use of force report regarding the incident. Nevertheless, he was acquitted of simple assault and official oppression charges following a bench trial. "I'm not a bad officer; I've never been accused of being a bad officer," said Parham. "It was just some bad political circumstances." He said he would appeal his job termination.

**Pennsylvania**: Bedford County prison guard Ryan Scott Clapper was fired in September 2012 after being accused of putting handcuffs and leg shackles in a freezer before placing them on a female prisoner. He was issued a non-criminal citation for the incident, which was described as "harassment" in a state police report. There was no reported explanation for Clapper's sadistic use of the frozen shackles.

**Rhode Island**: On Sept. 7, 2012, Kevin R. Allard, 38, a guard at the privately-operated Wyatt Detention Center, pleaded guilty to child molestation charges involving a 12-year-old girl. He was sentenced to 25 years with 13 suspended, and will have to register as a sex offender after his release.

**Scotland**: According to an October 2, 2012 news report in the *Daily Record*, Scots prisoners were receiving free, taxpayer-funded Viagra to use during home visits. Prison officials reportedly confirmed a "limited number" of prisoners had been prescribed the drug. "The SPS policy was to only make it available under prescription, following clinical assessment, for prisoners undertaking periods of home leave," said Tom Fox, head of corporate affairs for the Scottish Prison Service.

**South Africa**: Three prisoners were killed and 14 injured in October 2012 when an explosion damaged a police transport van en route to Johannesburg Central Prison. "There was an explosion in one of our vehicles at the traffic light in front of the facility," said police spokesman Neville Malila. Two prisoners attempted to escape following the blast; one was shot and both were captured. "We believe the explosion was the result of an escape attempt," stated Cluster Commander Major General Oswald Reddy. Officials think prisoners in the van used a bomb or a grenade.

**South Dakota**: On October 15, 2012, state prisoner Eric Robert, 50, was executed by lethal injection for killing a prison guard during an unsuccessful April 2011 escape attempt. Robert assaulted guard Ronald "RJ" Johnson, 63, with a pipe, then covered his head in plastic wrap while trying to escape from the State Penitentiary in Sioux Falls with fellow prisoner Rodney Berget, 50. [See: *PLN*, Dec. 2011, p.50; July 2011, p.50]. Robert had asked to be sentenced to death and waived his appeals. Berget, who also received a death sentence, remains on death row while another prisoner, Michael Nordman, 47, was sentenced to life for providing items used in Johnson's murder.

**Tennessee**: Former state court judge James F. Taylor pleaded guilty to felony theft charges on September 20, 2012. He was accused of forging records seeking payment for legal work he did not perform. [See: *PLN*, Sept. 2012, p.50]. Taylor received a 3-year prison sentence plus 10 years on probation, and was ordered to repay $33,000 to the Administrative Office of the Courts.

**Texas**: On September 10, 2012, six employees at the Rio Grande Detention Center, which is operated by private prison company GEO Group, pleaded guilty to federal firearms-related charges. Abel Robles, Hugo Enrique De La Rosa, Ramiro Adolfo Rodriguez III, Hugo Ubaldo Castillo, Jr. and Leticia Adriana Zamora were charged with acting as "straw buyers" to obtain firearms for other people, including defendant Angel Chavez. They have not yet been sentenced.

**Utah**: In October 2012, the Centers for Disease Control and Prevention reported

PLN_0001621

that a several-weeks-old baked potato was the cause of a botulism outbreak at the Draper Prison in Salt Lake County a year before. The potato was used to make a batch of pruno, or homemade alcohol, and the resulting outbreak made 13 prisoners sick – including 8 who were diagnosed with botulism. Some are still experiencing symptoms. Botulism can cause double vision, difficulty swallowing, muscle weakness and paralysis, and can sometimes be fatal. Following the outbreak at Draper, which cost the state almost $500,000 in hospital bills, prison officials posted flyers to inform prisoners about the dangers of botulism and its link to pruno.

**Washington**: Two members of the Emergency Response Team (ERT) at the Monroe Correctional Complex – Lt. Jerry Long and guard Rodney Hopf – are under investigation in connection with an October 2012 fight outside a Seahawks game. The fight was videotaped; Long and Hopf were suspended while prison officials determine if they violated any policies. Department of Corrections spokesman Chad Lewis said ERT members are held to a higher standard of conduct.

**Washington**: On September 18, 2012, Patrick Drum, 34, was sentenced to life without parole for murdering two registered sex offenders. Drum killed his roommate, Gary Blanton, 28, on June 2, 2012; the next day he murdered Jerry Ray. When questioned by a detective, Drum said he killed the men "because they were sex offenders." Blanton was convicted of rape when he was a teenager, while Ray had pleaded guilty to raping two young children. Drum reportedly said he would have killed more sex offenders had he not been caught.

## PLN Classifieds

**HotFlixx- Prison Friendly Photos**
*** Free Catalog ***
Specify Male or Female Models
SASE to PO Box 137481
Fort Worth TX, 76136

**JOIN OUR FAM! (PEN PAL SITE)**
SASE TO:
www.InmateNHouselove.com
4001 Inglewood Ave
Suite 101 Dept 144
Redondo Beach, Ca.90278

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet & People Searches, Amazon Books, Erotic Photos, PenPals, Special Requests and More. Send SASE to:
Elite Paralegal & Prisoner Services
PO Box 2131, Appleton, WI 54912

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare Manuscripts for Self-Publishing Reasonable Rates!-Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**A DEGREE/ORDINATION FROM PRISON**
Correspondence Courses via mail
INT'L CHRISTIAN COLLEGE&SEMINARY
PO BOX 530212 Debary, FL 32753-0212
Associates thru PhD credit for
Life Experience *ACCREDITED*
Tuition as Low as $19.95 a month
Send SASE for a Free Evaluation

www.HoosierWheelDaddy.com and www.ViciousStyles.com Sponsors FREE Wrongfully Convicted Ads @ www.OutlawsOnline.com
PO Box 17802
Indianapolis, IN 46217
NEW ChristianPrisonPenPals.org

GB & DJ Educations
Certificate Courses
Now Available: Victim Advocacy & Anger Management
For more info, send SASE to:
GB & DJ Educations
PO Box 11
Brimfield, IL 61517-0011

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games.  We Sell Photos of Sexy Women, Gifts for Loved Ones, Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how to receive Voices.Con monthly, send SASE to: PO Box 361, King City, CA 93930. On the web at: VoicesDotCon.org; Email: Publisher@VoicesDotCon.org

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**InfoLINCS, LLC**
Daily sports lines & updates
Photo Forwarding- family to you
Gifts & Flowers- sent from you
Daily stock quotes – 5stocks
FREE Horoscopes & Quotes
FREE Legal news
SIGN UP NOW INFO@INFOLINCS.COM

**Let us help w/Your Parole Review**
13 years of helping those in Prison obtain another chance.
Our Parole Plan show you as a Favorable Candidate for Parole!
D&D Worldwide Services, LLC.
PO Box 40081 Houston, TX. 77240
281-580-8844 / www.myparole.info

Lonley? Feeling Forgotten?
Angel's Kite's is the answer! For under 65 cents a day
be reconnected to the world.
Let us "plug" you back into civilization. Interested?
Send a SASE to the address below
Angel's Kite's
P.O. Box 16796, Houston, Tx 77222

**Desirae's email service,** photo duplications and more.info send SASE and 1 f/c loose stamp to: DESIRAE, POB 9 Mitchellville IA 50169. All paid orders receive one free penpal address.

**San Mateo, CA Former Juveniles:**
Journalist looking for juveniles evaluated by Dr. William Ayres in San Mateo, CA. Ayres was arrested for molesting patients
Contact: Victoria Balfour
151 College Ave, Apt. 1
Poughkeepsie, NY 12603

PLN_0001622

## News in Brief (cont.)

**West Virginia**: Four prisoners at the Western Regional Jail in Barboursville were criminally charged in September 2012 for forcibly tattooing another prisoner. Bradrick A. Napier, 38; Stacy C. Hatten, 35; Frank R. Floyd, 27 and Matthew G. Haynes face charges of malicious wounding as a result of the incident; they are accused of threatening and restraining the victim, and tattooing a picture of a penis and a phrase on his back. The phrase was not identified in news reports but most likely was not flattering.

**West Virginia**: On October 28, 2012, the *Charleston Gazette* reported that William Roy Wilson, 29, a former guard at the Southern Regional Jail, collected $3,100 in severance pay while incarcerated at the same facility for allegedly sexually abusing three female prisoners. State law requires that employees receive their severance pay within 15 days after they are terminated. The state police, which investigated Wilson, said he gave the prisoners cigarettes in exchange for sex. He is being held on a $75,000 bond and has not yet gone to trial.

**Wisconsin**: Jerry Friedl, 27, a former Monroe County jail guard charged with four felony counts of sexual assault for having a sexual relationship with a 33-year-old female prisoner, pleaded no contest to a reduced charge and was sentenced on October 29, 2012 to six months in jail and four years of probation. He will also have to register as a sex offender. Friedl wrote letters to the prisoner, kissed and fondled her in areas outside the view of security cameras, and gave her candy. "That's not just inappropriate behavior," said Assistant Attorney General Karie Cattanach. "It's criminal. It's exploitative. And it's wrong." ◼

---

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: Stop Prisoner Rape, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### The Sentencing Project

The Sentencing Project is a national policy research and advocacy organization that works for a fair and effective criminal justice system by promoting sentencing reform and alternatives to incarceration. They produce excellent reports on topics related to sentencing policy, racial disparities, drug policy, juvenile justice and voting rights/disenfranchisement, which are available online. Contact: The Sentencing Project, 1705 DeSales St. NW, 8th Fl., Washington, DC 20036 (202) 628-0871. www.sentencingproject.org

---

PLN_0001623

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book / index orders OVER $50 (effective May 1, 2012 until further notice). $6.00 S/H applies to all other book orders.**

**SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!**
1. **SIX (6) FREE ISSUES FOR 54 TOTAL!** OR
2. **PRISON PROFITEERS (A $24.95 VALUE!)** OR
3. **WITH LIBERTY FOR SOME (AN $18.95 VALUE!)**

**Prison Profiteers**, edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it.   1063

**With Liberty for Some: 500 Years of Imprisonment in America**, by Scott Christianson, Northeastern University Press, 372 pages. **$18.95**. The best overall history of the American prison system from 1492 through the 20th Century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years.   1026

**Prison Nation: The Warehousing of America's Poor**, edited by Tara Herivel and Paul Wright, 332 pages. **$35.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.   1041

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.   1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada**, updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95**. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college correspondence courses.   1071

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.   1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.   1037

**Law Dictionary**, Random House Webster's, 525 pages. **$19.95**. Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.   1036

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 110 pages. **$14.95**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners.   1046

**Legal Research: How to Find and Understand the Law**, by Stephen Elias and Susan Levinkind, 568 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.   1059

**Deposition Handbook**, by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed.   1054

**Finding the Right Lawyer**, by Jay Foonberg, ABA, 256 pages. **$19.95**. Explains how to determine your legal needs, how to evaluate a lawyer's qualifications, fee payments and more.   1015

**SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!**
1. **FOUR (4) FREE ISSUES FOR 40 TOTAL!** OR
2. **PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)**

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.   1060

**Spanish-English/English-Spanish Dictionary**, Random House. **$8.95**. Two sections, Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.   1034

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers.   1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right**, updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. **$16.00**. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.   1030

**Webster's English Dictionary**, Newly revised and updated, Random House. **$8.95**. 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms.   1033

**Everyday Letters for Busy People**, by Debra Hart May, 287 pages. **$18.99**. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters.   1048

**Roget's Thesaurus**, 717 pages. **$8.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words.   1045

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95**. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.   1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95**. In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.   1073

**A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series)**, by Bryan A. Garner, 768 pages. **$39.00**. This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to navigate your way through the maze of legal language in criminal cases.   1088

**The Habeas Citebook: Ineffective Assistance of Counsel**, by Brandon Sample, PLN Publishing, 200 pgs. **$49.95**. This is PLN's second published book, which covers ineffective assistance of counsel issues in federal habeas petitions. Hundreds of case cites!   1078

**\* ALL BOOKS ARE SOFTCOVER / PAPERBACK \***

PLN_0001624

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95.** Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.          1031

**10 Insider Secrets to a Winning Job Search,** by Todd Bermont, 216 pages. **$15.99.** Roadmap on how to get a job even under adverse circumstances—like being an ex-con. Includes how to develop a winning attitude, write attention-grabbing résumés, prepare for interviews, networking and much more!          1056

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95.** This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.          1083

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95.** Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.          1084

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95.** The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!          1077

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99.** While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.          1075

**The Redbook: A Manual on Legal Style,** by Bryan A. Garner, 2nd edition, 544 pages. **$48.00.** This book provides a comprehensive guide to the essential elements of legal writing, including grammar and style, with a discussion of writing rules and exceptions. 1089

**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$38.00.** This guide provides an overview of criminal law. Expert discussion explores punishment, specific crimes, special defenses, the burden of proof and much more.          1086

**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$38.00.** This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication.          1090

**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$38.00.** Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure. 1085

**High Court Case Summaries on Criminal Law,** Keyed to Johnson, 7th edition. **$38.00.** Extensive criminal case law analyses, including procedural basis, facts, decision and rationale.          1087

**Soledad Brother: The Prison Letters of George Jackson,** by George Jackson, Lawrence Hill Books, 339 pages. **$18.95.** Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 40 years ago.          1016

**PLN Cumulative Index. $22.50 each.** PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

## Subscription Rates

| | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** (Attorneys, agencies, libraries) | $90 | $180 | $270 | $360 |

## Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 53

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 53

(All subscription rates and bonus offers are valid as of 7-31-2011)

**VISA   MasterCard   AMEX   DISCOVER**

Purchase with Visa, MasterCard, AmEx or Discover by phone: **802-257-1342**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 2420
W. Brattleboro, VT 05303

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by prison policies.*

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

### Subscribe to Prison Legal News                              $ Amount

6 month subscription (prisoners only) - $18
1 yr subscription (12 issues)
2 yr subscription (2 bonus issues for 26 total!)
3 yr sub (*write below which FREE book you want*)
    or 4 bonus issues for 40 issues total!
4 yr sub (*write below which FREE book you want*)
    or 6 bonus issues for 54 issues total!
Sample issue of **Prison Legal News** - $3.50 each

**Books or Index Orders** (No S/H charge on 3 & 4-year sub free books OR book orders OVER $50!)   **Qty.**

| | | |
|---|---|---|
| | | |
| | | |
| | | |

Add **$6.00** S/H to Book Orders UNDER $50

VT residents ONLY add 6% to Total Book Cost

**Total Amount Enclosed:**

*\* No refunds on PLN subscription or book / index orders after orders have been placed \**

# ARE PRISON PHONE RATES KEEPING YOU LOCKED DOWN?

**We guarantee savings of up to 90%** on your long distance, out-of-state, and international calls from all Federal prisons, county jails and State prisons.

Call, write, e-mail or have your loved ones check out our website for more information!

WE'RE OFFERING TWO SPECIAL PROMOTIONS TO PLN SUBSCRIBERS: **ONE FREE MONTH** OF SERVICE TO ALL NEW SUSCRIBERS TO OUR US DOMESTIC PLANS – (PROMO CODE: PLNUSA) – OR **100 FREE INTERNATIONAL MINUTES** FOR NEW INTERNATIONAL SUBSCRIBERS – (PROMO CODE: PLNINTL). Some restrictions apply.

Spain Telecom, Inc.
1220 Broadway - #803
New York, NY 10001
www.inmatefone.com
clients@inmatefone.com
Call:     1(845)326-5300
Español: 1(845)342-8110

**Garantizamos ahorro de hasta el 90%** en tus llamadas de larga distancia inter-estales e internacionales desde todas las cárceles federales, locales y estatales.

Para contactar con nosotros: Llame, escriba o entre en nuestra pagina web para mas información.

ESTAMOS OFRECIENDO DOS PROMOCIONES ESPECIALES PARA SUSCRIPTORES PLN: SERVICIO **GRATIS POR UN MEZ** A TODOS LOS NUEVOS CLIENTES QUE SE SUSCRIBANA NUESTRO PLAN DOMESTICO – ( CODIGO DE PROMOCION: PLNUSA) – O **100 MINUTOS INTERNACIONALES GRATIS** PARA NUEVOS CLIENTES QUE SUSCRIBAN EL PLAN INTERNACIONAL – (PROMO CODE: PLNINTL) Se aplican restricciones!

*Start Saving Today!*



# Great Self-Help Book Deals
## From Prison Legal News!



**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
P.O. Box 2420
West Brattleboro, VT 05303
Phone: 802 579-1309
www.prisonlegalnews.org

### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer


The Criminal Law Handbook $39.99


Represent Yourself in Court $39.99


Legal Research $49.99


Nolo's Deposition Handbook $34.99


**NOLO**
**YOUR LEGAL COMPANION**

PLN_0001626



# Prison Legal News
**P.O. Box 2420**
**West Brattleboro, VT 05303**

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

---

**Subscription Renewal**

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2006, then the subscription expires after the February 2006 issue is mailed. Please renew at least 2 months before the expiration date. **IF THE LABEL SAYS EXPIRES: 02/2013** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

**Change of Address**

If you move or are transfered, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

# 3RD STRIKE? WRONGLY CONVICTED? ?ERRORS?

**ATTENTION!!   CA 3RD STRIKERS DON'T BE LEFT OUT OR WAIT FOR THE SYSTEM. WE CAN HELP!**

## INMATE LEGAL HELP 411 FREEDOM ANGELS

Brian P – "They helped me remove 4 life sentences
"Big" D McGowen – Back into Court,.. And SET FREE
Tyron S. – 38 years deducted.. FREE NOW!

**PERSONALIZED & REASONABLY PRICED**




**ADVANCED LEGAL SERVICES**
**SUCCESSFUL WINNING STRATEGIES**

## EVEN YOUR ODDS
We find the **MISSING**
facts & information that were never considered or heard in your case originally.

**OUR GOAL= Evidentiary Hearing for YOU!**
**MAKE FREEDOM A PRIORITY?**
**HAVE FAMILY / FRIENDS CALL NOW**
PLANHELP@411FreedomANGELS.com
HABEAS Booklet ~ $20 PayPal or Stamps

### WRITS~MOTIONS~BRIEFS
- 3RD STRIKERS GO to TOP of the List
  - **Post Conviction Relief Assistance**
    - Writ Of Habeas Corpus-State / Federal
  - **Sentence Modifications**
  - **Pre-Post Parole Board**
  - **In House Legal Investigators**
  - **Resolve Warrants on pending cases**
  - **MANY Other Legal Services**

**JACKSON & ASSOCIATES LAW CENTERS**
402 W. Broadway 4th Fl., San Diego, CA 92101
www.**411FreedomANGELS**.com
AGGRESSIVE REPRESENTATION to PROTECT YOUR RIGHTS
**24/7 call NOW! 1*855*411*ANGELS (2643)**