# EXHIBIT 16

 **Caution**
As of: January 11, 2018 10:24 PM Z

# Rezaq v. Nalley

United States Court of Appeals for the Tenth Circuit

April 20, 2012, Filed

No. 11-1069, No. 11-1072

**Reporter**
677 F.3d 1001 *; 2012 U.S. App. LEXIS 8063 **; 2012 WL 1372151

OMAR REZAQ, Plaintiff-Appellant, v. MICHAEL NALLEY; RON WILEY; MICHAEL MUKASEY; FEDERAL BUREAU OF PRISONS, Defendants-Appellees.MOHAMMED SALEH; EL-SAYYID A. NOSAIR; IBRAHIM ELGABROWNY, Plaintiffs-Appellants, v. FEDERAL BUREAU OF PRISONS, Defendant-Appellee.BEHAVIORAL SCIENTISTS; CRIMINOLOGISTS; FORMER CORRECTIONAL OFFICIALS; SOCIAL PSYCHOLOGISTS, Amici Curiae.

**Prior History:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO. (D.C. Nos. 1:07-CV-02483-LTB-KLM; 1:05-CV-02467-PAB-KLM; 1:06-CV-01747-PAB-KLM; and 1:07-CV-00021-PAB-KLM).

*Rezaq v. Nalley, 2010 U.S. Dist. LEXIS 132068 (D. Colo., Dec. 14, 2010)*
*Mohammed Saleh v. Fed. Bureau of Prisons, 2010 U.S. Dist. LEXIS 138642 (D. Colo., Dec. 29, 2010)*

## LexisNexis® Headnotes

Civil Procedure > ... > Justiciability > Mootness > General Overview

Constitutional Law > ... > Case or Controversy > Mootness > General Overview

**HN1**[ ] **Justiciability, Mootness**

Federal courts only have jurisdiction to consider live, concrete cases or controversies. A case becomes moot when factual developments render a claim no longer live and ongoing, such that a decision on the merits will not affect the behavior of the defendant toward the plaintiff. When a case becomes moot on appeal, the ordinary course is to vacate the judgment below and remand with directions to dismiss. The burden of demonstrating mootness is a heavy one.

Civil Procedure > ... > Justiciability > Mootness > General Overview

Constitutional Law > ... > Case or Controversy > Mootness > General Overview

**HN2**[ ] **Justiciability, Mootness**

The crux of the mootness inquiry in an action for prospective relief is whether the court can afford meaningful relief that will have some effect in the real world. When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law. Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. Similarly, in the context of an action for declaratory relief, a

677 F.3d 1001, *1001; 2012 U.S. App. LEXIS 8063, **1

plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant.

Civil Procedure > ... > Justiciability > Mootness > General Overview

Constitutional Law > ... > Case or Controversy > Mootness > General Overview

HN3[ ] **Justiciability, Mootness**

Generally speaking, the withdrawal or alteration of administrative policies can moot an attack on policies. And the mere possibility that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy.

Civil Procedure > ... > Justiciability > Mootness > General Overview

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > ... > Case or Controversy > Mootness > General Overview

HN4[ ] **Justiciability, Mootness**

A case is not moot when there is some possible remedy, even a partial remedy or one not requested by the plaintiff. Even the possibility of a partial remedy is sufficient to prevent a case from being moot. Even if that relief--such as new retroactive transfer hearings with adequate procedural protections--is unlikely to result in transfers to less-restrictive conditions, it is relief nonetheless.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

HN5[ ] **Summary Judgment Review, Standards of Review**

An appellate court reviews de novo a district court's entry of summary judgment, viewing the facts in the light most favorable to the nonmoving party.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Constitutional Law > Substantive Due Process > Scope

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

HN6[ ] **Standards of Review, De Novo Review**

The identification of the liberty interests that are protected by the Due Process Clause is a question of federal constitutional law that is reviewed de novo.

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

Constitutional Law > Substantive Due Process > Scope

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

HN7[ ] **Protection of Rights, Prisoner Rights**

The *Fifth Amendment* provides that no person shall be deprived of life, liberty, or property, without due process of law. *U.S. Const. amend. V*. A liberty interest may arise from the U.S. Constitution itself, by reason of guarantees implicit in the word liberty, or it may arise from an expectation or interest created by state laws or policies. In the penological context, not every deprivation of liberty at the hands of prison officials has constitutional

Lori Ruth

PLN_0001832

dimension. This is so because incarcerated persons retain only a narrow range of protected liberty interests. For example, the U.S. Supreme Court has recognized that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Substantive Due Process > Scope

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

HN8[↓] **Prisoner Rights, Confinement Conditions**

A protected liberty interest only arises from a transfer to harsher conditions of confinement when an inmate faces an atypical and significant hardship in relation to the ordinary incidents of prison life.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

HN9[↓] **Prisoner Rights, Confinement Conditions**

Extreme conditions in administrative segregation do not, on their own, constitute an atypical and significant hardship when compared to the ordinary incidents of prison life.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Substantive Due Process > Scope

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

HN10[↓] **Prisoner Rights, Confinement Conditions**

In determining whether a liberty interest exists, legitimate penological interests are a relevant consideration under settled Tenth Circuit precedent.

**Counsel:** Laura Rovner, (Rhonda Brownstein and Brittany Glidden, with her on the briefs) of the Student Law Office, University of Denver Sturm College of Law, Denver, Colorado, for Plaintiff-Appellant.

Juan G. Villaseñor, Assistant United States Attorney, (John F. Walsh, United States Attorney, with him on the brief), Office of United States Attorney, Denver, Colorado, for Defendants-Appellees.

Hope R. Metcalf, Detention and Human Rights Project, Allard K. Lowenstein International Human Rights Clinic, Yale Law School, New Haven, Connecticut, filed an amici curiae brief for the Behavioral Scientists, Criminologists, Former Correctional Officials, and Social Psychologists.

**Judges:** Before BRISCOE, Chief Judge, TYMKOVICH, Circuit Judge, and EAGAN[*], District Judge.

**Opinion by:** BRISCOE

## Opinion

 [*1004] **BRISCOE**, Chief Judge.

In these consolidated cases, plaintiffs-appellants Omar Rezaq, Mohammed Saleh, Ibrahim Elgabrowny, and El-Sayyid [**2] Nosair—all of whom are currently incarcerated in the federal

---

[*] Honorable Claire V. Eagan, District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

Lori Ruth

PLN_0001833

prison system—appeal the district court's grants of summary judgment in favor of appellee Federal Bureau of Prisons (BOP) and certain named officials in these actions brought pursuant to *28 U.S.C. §§ 1331*, *1343(a)(4)*, *1346*, *2201*, and *2202*.[1] Rezaq's action was filed in 2007, and the action by Saleh, Elgabrowny, and Nosair was filed in 2008. The plaintiffs contend that they have a liberty interest in avoiding transfer without due process to the Administrative Maximum Prison (ADX) in Florence, Colorado, where they were formerly housed. In separate orders, the district court rejected this argument and found that the plaintiffs lack a cognizable liberty interest in avoiding confinement at ADX. While the BOP agrees with this reasoning, it also contends that all of the plaintiffs' claims became moot when they were transferred to other prisons. Exercising jurisdiction under *28 U.S.C. § 1291*, we conclude that these cases are not moot and affirm on the merits.

I. Factual [**3] Background

The plaintiffs in these actions were all convicted of terrorism-related offenses. Rezaq was convicted on one count of aircraft piracy for his involvement in the 1985 hijacking of EgyptAir Flight 648, in which fifty-seven passengers were killed. See *United States v. Rezaq, 134 F.3d 1121, 1125-26, 328 U.S. App. D.C. 297 (D.C. Cir. 1998)* (upholding conviction). Saleh, Elgabrowny, and Nosair were convicted of crimes arising out of their assistance in the 1993 bombing of the World Trade Center and related terrorist plots. See *United States v. Rahman, 189 F.3d 88, 103 (2d Cir. 1999)* (upholding convictions).

The plaintiffs were initially assigned to general population units at United States Penitentiaries (USPs). Aplt. App. Vol. I(c) at 499; Vol. II(c) at 2063-64. They were each subsequently transferred to the general [*1005] population unit at ADX. Rezaq was transferred from USP-Leavenworth to ADX shortly after his conviction in 1996. Id., Vol. I(c) at 489, 498. The terrorist attacks of September 11, 2001, and ensuing national security concerns precipitated the other transfers. In the hours after the attacks, Saleh, Elgabrowny, and Nosair were placed in administrative segregation at their respective prisons and, [**4] over the course of the next two years, they were transferred to ADX, without notice or hearing. Id., Vol. II(c) at 2064. The BOP cited prison safety and national security as reasons for the transfers.

ADX is the most restrictive and secure prison operated by the BOP. Id. at 2058. As the only facility of its kind in the federal system, it is reserved for inmates who require "the highest custody level that can be assigned to an inmate." Id., Vol. I(b) at 367. Prisoners housed in the general population unit at ADX spend twenty-three hours a day confined to their cells. Id., Vol. II(c) at 2058. The typical cell at ADX measures eighty-seven square feet and contains a bed, desk, sink, toilet, and shower. Id. Inmates take their meals alone in their cells. Id. Although BOP policy provides for ten hours of recreation per week, recreation is frequently cancelled due to staff shortages, mass shakedowns, or adverse weather. Id. at 2059-60, 2205-2226.

According to the BOP, these carefully controlled conditions serve two primary penological interests. The stated missions of ADX include: (1) "maintaining the safety of both staff and inmates, while eliminating the need to increase the security of other [**5] penitentiaries"; and (2) "confin[ing] inmates under close controls while providing them opportunities to demonstrate progressively responsible behavior . . . and establish readiness for transfer to a less secure institution." Id., Vol. I(b) at 367.

Most inmates at ADX, like those in this case, were transferred there from other prisons. An inmate may be transferred because he poses a physical

---

[1] In Case Number 11-1069, Rezaq also brought a claim for judicial review of federal administrative action pursuant to *5 U.S.C. § 702*. See Aplt. App. Vol. I(a) at 20, 33-34.

threat to other inmates or staff, presents an escape risk, or requires "increased monitoring." Id., Vol. II(d) at 2363. Other inmates are transferred to ADX for reasons unrelated to their behavior. For example, some inmates "require high security but can't function in open population facilities due to cooperation with the government or other protection needs." Id. In some cases, the BOP may designate an inmate to ADX directly following conviction. Id.

While each of the plaintiffs was transferred from a USP to ADX, they were each transferred out of ADX during the course of this litigation to one of the BOP's two Communication Management Units (CMUs). CMUs are recently created facilities designed to monitor inmate communications with the outside world. Id., Vol. II(e) at 2750. These facilities are [**6] fully contained within USPs—specifically, USP-Marion and USP-Terre Haute—and are more restrictive than the general population units at the USPs. Id. But they are less restrictive than the general population unit at ADX. Id. Rezaq was transferred from USP-Leavenworth to ADX and later transferred to the CMU at USP-Marion. Id., Vol. I(a) at 23. Saleh and Elgabrowny were transferred from USP-Florence to ADX and later transferred to the CMU at USP-Marion. Id., Vol. II(d) at 2480, 2486. Nosair was transferred from USP-Pollock to ADX and later transferred to the CMU at USP-Terre Haute. Id. at 2484.

The plaintiffs did not receive hearings before they were transferred to ADX. However, after this litigation was commenced, BOP regional director and codefendant Michael Nalley issued revised procedures for wardens to follow before referring an inmate to ADX. The parties [*1006] refer to the document outlining these procedures as the "Nalley Memorandum." Relying on the revised transfer procedures in the Nalley Memorandum, the BOP conducted retroactive transfer hearings for those inmates who were transferred to ADX prior to 2008. Id., Vol. II(f) at 2862. The procedures provided that the inmate being referred [**7] should receive notice of the transfer hearing, an opportunity to participate in the hearing, a written recommendation by the hearing officer, and administrative review of the regional director's decision by the BOP's general counsel. See Defs.-Aplees.' Mot. to Dismiss for Mootness at 23-25.

The plaintiffs allege that these hearings were provided solely as a result of this litigation. Aplt. Br. at 15. The BOP concedes the plaintiffs were prioritized in the hearing process because of the litigation. Aplt. App. Vol. II(f) at 2870. In the end, every retroactive hearing resulted in a recommendation of continued ADX placement. Id. at 2794. The plaintiffs allege that "[n]o prisoner has ever successfully appealed a retroactive transfer hearing decision."[2] Id. at 2762.

Inmates housed at ADX may improve their conditions of confinement by seeking admission to the Step-Down Program, a "stratified system of less-restrictive housing" that incentivizes inmates to adhere to the prison's expectations for their conduct. See id., Vol. II(d) at 2348. Once admitted to the program, ADX inmates may progress from the general population unit through the Intermediate, Transitional, and Pre-Transfer Units "with increasing degrees of personal freedom at each stage." Id. at 2349. ADX policy states that "[e]very inmate has the opportunity to demonstrate he may be housed in a less-restrictive unit." Id.

The plaintiffs were repeatedly denied admission to the Step-Down Program. Eventually, however, all of the plaintiffs were admitted to the program and later transferred to other prisons. None of the plaintiffs are still housed at ADX. Each is now

---

[2] In a motion to dismiss on mootness grounds filed in this court, the BOP argued that the procedures established by the Nalley Memorandum are no longer in force. See Defs.-Aplees.' Mot. to Dismiss for Mootness at 6. The BOP explained that the "Dodrill Memorandum," issued by BOP Assistant Director D. Scott Dodrill after summary judgment briefing in this case, revised the criteria for referring an inmate to ADX. Id. Under the procedures [**8] set forth in the Dodrill Memorandum, referrals to ADX are handled by the BOP's Designation and Sentence Computation Center ("DSCC"). Id. The inmate being referred receives a hearing that may be appealed to the DSCC chief and the BOP's general counsel. Id.

Lori Ruth

677 F.3d 1001, *1006; 2012 U.S. App. LEXIS 8063, **8

housed in one of the BOP's two CMUs. Id., Vol. II(e) at 2750.

## II. Procedural [**9] Background

*District Court Proceedings in Rezaq*

Rezaq filed suit in 2007 against the BOP and several named officials to challenge his transfer to ADX and his conditions of confinement under the *Due Process Clause.* Id., Vol. I(f) at 1341-42. He argued that he had a liberty interest in avoiding transfer to ADX without due process. Id. at 1341. He also argued that his retroactive transfer hearing did not comply with the requirements of procedural due process. Id.

The defendants moved for summary judgment, and the motion was referred to a magistrate judge. The defendants contended that because Rezaq did not have a liberty interest in avoiding the conditions of confinement at ADX, he was not entitled to due process in the transfer determination. Id. at 1342. They also argued that, [*1007] if a liberty interest did exist, Rezaq received sufficient process. Id.

The magistrate judge recommended that summary judgment be granted for the defendants. Id. at 1338, 1367. She agreed with the defendants that the conditions of confinement at ADX did not give rise to a liberty interest, noting that "to date no court in the Tenth Circuit has held" as much. Id. at 1350. Applying the four factors from *Estate of DiMarco v. Wyoming Department of Corrections, 473 F.3d 1334 (10th Cir. 2007)*, [**10] the magistrate judge concluded that a liberty interest was not implicated. Aplt. App. Vol. I(f) at 1364. First, she concluded that the BOP transferred Rezaq to ADX for a legitimate penological reason—namely, to manage the "legitimate safety issues" presented by an inmate with military training who is a member of terrorist organizations. Id. at 1351-55. Second, she determined that the conditions of confinement at ADX were not extreme compared to the conditions at issue in Wilkinson v. Austin, the Supreme Court case holding that inmates had a liberty interest in avoiding confinement at Ohio's supermax facility. Id. at 1355-60; see also *Wilkinson v. Austin, 545 U.S. 209, 224, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005)*. Third, she found no evidence that Rezaq's placement at ADX extended the length of his incarceration. Aplt. App. Vol. I(f) at 1361-62. Finally, she concluded that Rezaq's placement at ADX was not indefinite, even though he was not admitted to the Step-Down Program for almost thirteen years. Id. at 1363. In sum, the magistrate judge determined that all four DiMarco factors weighed against finding a liberty interest in avoiding confinement at ADX. Id. at 1364. As such, there was no need to consider whether Rezaq [**11] had received sufficient due process protections. Id. at 1367.

The district court considered Rezaq's objections to the recommendation and concluded that the recommendation was correct. Id. at 1472-73. The court entered judgment, and Rezaq filed a timely notice of appeal.

*District Court Proceedings in Saleh*

Saleh, Elgabrowny, and Nosair, who are represented by the same counsel as Rezaq, brought similar procedural due process claims against the BOP in a 2008 consolidated complaint. See id., Vol. II(a) at 1525-26; Vol. II(g) at 3292. They challenged both their transfers to the general population unit at ADX and their repeated denials of admission to the ADX Step-Down Program. Id., Vol. II(g) at 3206-07. In a motion for summary judgment, the BOP argued that the claims were moot because all of the plaintiffs had received retroactive transfer hearings and had been admitted to the Step-Down Program. Id. at 3207. The BOP also argued that, even if the claims were not moot, the plaintiffs did not have a liberty interest in avoiding confinement at ADX or in being admitted to the Step-Down Program. Id.

The case was referred to the same magistrate judge who handled Rezaq. The magistrate judge rejected

Lori Ruth

PLN_0001836

[**12] the BOP's mootness arguments, but she determined that the plaintiffs did not have a liberty interest and recommended granting summary judgment in favor of the BOP. Id. at 3236. The district court considered objections to the recommendation filed by both the plaintiffs and the BOP and adopted the magistrate judge's recommendation. Id. at 3302. The court concluded that the transfer claim was not moot because the plaintiffs' "ADX placement continues to affect the conditions of . . . confinement despite . . . transfer out of the institution." Id. at 3294. Applying the DiMarco factors, the court determined that the plaintiffs did not have a protected liberty [*1008] interest in avoiding the conditions of confinement at ADX. Id. at 3302. The court entered judgment for the BOP, and this appeal followed.

### III. Mootness

As a threshold matter, we must address the BOP's contention that the plaintiffs' due process claims are moot. At different points in the course of this litigation, all four of the plaintiffs were admitted to the Step-Down Program and ultimately transferred out of ADX. After these appeals were filed, the BOP filed a motion to dismiss on mootness grounds because (1) plaintiffs are no longer [**13] housed at ADX, and (2) the challenged transfer procedures (the Nalley Memorandum) are no longer in effect. The BOP argues that these developments mooted plaintiffs' challenges to their transfers to ADX ("the transfer claims") and their denials of admission to the Step-Down Program ("the Step-Down Program claims"). Plaintiffs now concede the mootness of the Step-Down Program claims. But they maintain that they still have a cognizable interest in the transfer claims because they have not been returned to their pre-ADX prison conditions, which is part of their requested relief.

HN1[] Federal courts only have jurisdiction to consider live, concrete cases or controversies. Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1109 (10th Cir. 2010). A case becomes moot when factual developments render a claim "no longer live and ongoing," such that a decision on the merits will not "affect[] the behavior of the defendant toward the plaintiff." McAlpine v. Thompson, 187 F.3d 1213, 1216 (10th Cir. 1999) (quotations omitted). "When a case becomes moot on appeal, the ordinary course is to vacate the judgment below and remand with directions to dismiss." Kan. Judicial Review v. Stout, 562 F.3d 1240, 1248 (10th Cir. 2009). [**14] The burden of demonstrating mootness "'is a heavy one,'" Los Angeles Cnty. v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632-33, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)), and it falls upon the BOP to carry that burden in this case.

HN2[] The crux of the mootness inquiry in an action for prospective relief is whether the court can afford meaningful relief that "'will have some effect in the real world.'" See Rio Grande, 601 F.3d at 1110 (quoting Wyoming v. U.S. Dep't of Agric., 414 F.3d 1207, 1212 (10th Cir. 2005)). When prospective equitable relief is requested, the requesting party must show an ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law. Jordan v. Sosa, 654 F.3d 1012, 1024 (10th Cir. 2011) (citing O'Shea v. Littleton, 414 U.S. 488, 502, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." O'Shea, 414 U.S. at 495-96. "Similarly, in the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." Jordan, 654 F.3d at 1025.

The [**15] BOP's first mootness rationale is that plaintiffs' transfers out of ADX render it speculative that they would again be subject to the same transfer policies, especially because the challenged policies were superseded by revised

policies. HN3[ ] Generally speaking, the "'[w]ithdrawal or alteration of administrative policies can moot an attack on those policies.'" *Rio Grande, 601 F.3d at 1117* (quoting *Bahnmiller v. Derwinski, 923 F.2d 1085, 1089 (4th Cir. 1991)*) (alteration in original). "And the 'mere possibility' that an agency might [*1009] rescind amendments to its actions or regulations does not enliven a moot controversy." Id. (quoting *Ala. Hosp. Ass'n v. Beasley, 702 F.2d 955, 961 (11th Cir. 1983))*.

The BOP is correct that the procedures that controlled plaintiffs' initial transfers are no longer in force. But this point places undue focus on the policies themselves, which detracts from the real issue: whether the BOP has sufficiently mitigated the effects of any harm caused by the old policies. Even though the new transfer policies may provide adequate process, the case is not moot if the BOP made decisions under the old policies that have ongoing, long-term consequences for the plaintiffs that [**16] could be mitigated by an award of prospective relief. See *Colvin v. Caruso, 605 F.3d 282, 295-96 (6th Cir. 2010)* (concluding that claim by transferred inmate was not moot where transferor prison's removal of inmate from kosher-meal status and its subsequent refusal to reinstate him had long-term, post-transfer consequences for the inmate within the same prison system); *Randolph v. Rodgers, 170 F.3d 850, 857 (8th Cir. 1999)* (holding that transferred inmate's claim for injunctive relief against state prison system was not moot when inmate "claimed he is exposed to an actual future threat under the control of the Department of Corrections").

The BOP also argues that any pronouncement we make on the issues raised would amount to an advisory opinion because all four plaintiffs have been transferred from ADX to other facilities. Even though all four plaintiffs are now housed in less-restrictive facilities when compared to ADX, they maintain that their current conditions are still more restrictive than their pre-ADX conditions.

We conclude that the case is not moot for two reasons. First, the plaintiffs' transfers to CMUs did not "completely and irrevocably eradicate[] the effects of the alleged [**17] violation" because they have never been returned to their pre-ADX placements in USP-GPs. See *Davis, 440 U.S. at 631*. The inmates are now held in CMUs, which the BOP operates as fully contained facilities within the USPs in Terre Haute, Indiana, and Marion, Illinois. The record indicates that, other than ADX, the CMUs are the most restrictive facilities in the federal system. If the inmates' current conditions are a byproduct of their initial transfers to ADX, then long-term consequences may persist and an injunction may serve to "eradicate the effects of [the BOP's] past conduct." See 13C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.7 (3d ed. 2008); cf. *Davis v. New York, 316 F.3d 93, 99 (2d Cir. 2002)* (inmate's action claiming cruel and unusual punishment by exposure to second-hand smoke was not mooted by his transfer or the implementation of a new smoking policy because the same problems persisted).

Second, some prospective relief remains available. Assuming, only for purposes of deciding whether the cases are moot, that the plaintiffs have a liberty interest in avoiding transfer to ADX without due process and their retroactive transfer [**18] hearings were constitutionally deficient, this court could award meaningful relief in the form of additional process. The BOP has failed to show that new due process hearings could not result in the plaintiffs' return to general population conditions. As the district court wrote in Saleh, the transfer claims "challenge[] the process by which plaintiffs were placed at ADX. . . . Were the Court to order the BOP to provide plaintiffs additional process to determine whether their transfers to ADX were proper, this new process could result in a finding that plaintiffs [*1010] were not properly placed in ADX in the first place and thus should be restored to their pre-ADX status and corresponding placements." Aplt. App. Vol. II(g) at 3294. Along the same lines, the magistrate judge wrote in Rezaq that "the heart of Plaintiff's request for relief is for

transfer to a less-restrictive facility. This remedy has not been provided to him and therefore, prospective relief remains available."³ Id., Vol. I(f) at 1345. We agree. HN4[] A case is not moot when there is some possible remedy, even a partial remedy or one not requested by the plaintiff. See Church of Scientology of Cal. v. United States, 506 U.S. 9, 12-13, 113 S. Ct. 447, 121 L. Ed. 2d 313 (1992) [**19] ("While a court may not be able to return the parties to the status quo ante[,] . . . a court can fashion some form of meaningful relief in circumstances such as these."). Even the possibility of a "partial remedy" is "sufficient to prevent [a] case from being moot." Id. at 13. Even if that relief—such as new retroactive transfer hearings with adequate procedural protections—is unlikely to result in transfers to less-restrictive conditions, it is relief nonetheless.

In sum, if plaintiffs prevail on appeal, we could grant meaningful prospective relief. Even though they are no longer housed at ADX, plaintiffs retain "a legally cognizable interest in the final determination of the underlying questions of fact and law." Davis, 440 U.S. at 631. Therefore, we will proceed to address on the [**20] merits whether plaintiffs have a liberty interest in avoiding confinement at ADX.

## IV. Liberty Interest/Due Process Claim

Plaintiffs argue that they have a protected liberty interest in avoiding the conditions of confinement at ADX—a facility that, they maintain, creates an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Aplt. Br. at 17 (citing Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)). Plaintiffs contend that the district court erred when addressing whether a liberty interest existed: (1) by giving weight to the BOP's asserted penological interest; (2) by improperly comparing the conditions of confinement in this case to those at the state supermax prison at issue in Wilkinson instead of "the ordinary incidents of prison life" in the federal system; (3) by improperly relying on inapposite precedent, thus "erroneously elevating the standard for determining whether the challenged conditions were extreme"; and (4) by "not considering the extraordinary length of their segregation" as a factor in determining whether a liberty interest existed. Aplt. Br. at 17-18. They also argue that the district court improperly granted summary judgment to [**21] the defendants because there were genuine disputes of material fact as to key factors used by the district court in the liberty interest analysis.

HN5[] This court reviews de novo a district court's entry of summary judgment, viewing the facts in the light most favorable to the nonmoving party. McCarty v. Gilchrist, 646 F.3d 1281, 1284 (10th Cir. 2011). Additionally, HN6[] "'[t]he identification of the liberty interests that are protected by the Due Process Clause is a question of federal constitutional law that we review de novo.'" DiMarco, 473 F.3d at 1339 n.3 (quoting Harper v. Young, 64 F.3d 563, 566 (10th Cir. 1995)).

HN7[] [*1011] The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson, 545 U.S. at 221 (internal citation omitted). In the penological context, not every deprivation of liberty at the hands of prison officials has constitutional dimension. This is so because incarcerated persons retain only a "narrow [**22] range of protected liberty interests." Abbott v. McCotter, 13 F.3d 1439, 1442 (10th Cir. 1994) (quoting Hewitt v. Helms, 459 U.S. 460, 467, 103 S.

---

³ Of course, Rezaq now resides in a less-restrictive facility. But to the extent that a retroactive transfer hearing could result in a determination that he should never have been transferred to ADX in the first place, the BOP could decide to return him to his pre-ADX placement. So while the current circumstances differ from those that the magistrate judge confronted, prospective relief is still available.

Ct. 864, 74 L. Ed. 2d 675 (1983)) (internal quotation marks omitted). For example, the Supreme Court has recognized that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Wilkinson, 545 U.S. at 221 (citing Meachum v. Fano, 427 U.S. 215, 225, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976)).

HN8[ ] A protected liberty interest only arises from a transfer to harsher conditions of confinement when an inmate faces an "'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" Id. at 223 (quoting Sandin, 515 U.S. at 484). Courts have struggled to identify the appropriate baseline for assessing what constitutes an "atypical and significant hardship" on inmates. Our own cases have taken two different approaches to the baseline question in assessing conditions in segregated confinement. For example, this court has explained that it is proper to consider whether the segregation at issue mirrors that imposed on other inmates in the same segregation. Gaines v. Stenseng, 292 F.3d 1222, 1225-26 (10th Cir. 2002) (suggesting [**23] that a due process claim may be dismissed at the summary judgment phase when "there is sufficient evidence to establish that [the plaintiff's] segregation mirrors conditions imposed upon inmates in administrative segregation and protective custody"). In another case, we compared conditions in segregated confinement to conditions in the general prison population. Penrod v. Zavaras, 94 F.3d 1399, 1407 (10th Cir. 1996) ("Even though the conditions in Living Unit II were more restrictive than those imposed upon the general population, it offered inmates all of the same privileges as the general population inmates.").

Our sister circuits are certainly not in agreement regarding the correct approach. While some circuits compare the conditions of confinement at issue to those in the general prison population, see, e.g., Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997); Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996), amended by 135 F.3d 1318 (9th Cir. 1998), others compare them to the conditions typically found in administrative segregation, see, e.g., Wagner v. Hanks, 128 F.3d 1173, 1175-76 (7th Cir. 1997), or "the most restrictive conditions that prison officials, exercising their [**24] administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences," Hatch v. District of Columbia, 184 F.3d 846, 847, 337 U.S. App. D.C. 266 (D.C. Cir. 1999). Wilkinson recognized the divergent views on this issue among the circuit courts, but the Court declined to resolve the baseline question because the conditions at issue in that case "impose[d] an atypical and significant hardship under any plausible baseline." 545 U.S. at 223.

Most recently, in DiMarco, we similarly declined to make "a rigid either/or [*1012] assessment" of proper comparator evidence, opting instead to outline four potentially relevant, nondispositive factors.[4] 473 F.3d at 1342. We noted that

> [r]elevant factors might include whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in Wilkinson; and (4) the placement is indeterminate (in Wilkinson the placement was reviewed only annually).

Id. While courts in this circuit have used these factors to guide the liberty interest analysis, see, e.g., Matthews v. Wiley, 744 F. Supp. 2d 1159, 1171-73 (D. Colo. 2010); [**25] Silverstein v. Fed.

---

[4] In an even more recent case, an inmate in the Colorado state prison system claimed to have a liberty interest in avoiding prolonged confinement in administrative segregation. See Toevs v. Reid, 646 F.3d 752 (10th Cir. 2011), amended on reh'g by 685 F.3d 903, 2012 U.S. App. LEXIS 7994, 2012 WL 1085802 (10th Cir. 2012). While Toevs involved a somewhat similar due process claim to those presented here, we ultimately decided the case on qualified immunity grounds without determining whether a liberty interest in fact existed. See 2012 U.S. App. LEXIS 7994, [WL] at *4.

Bureau of Prisons, 704 F. Supp. 2d 1077, 1091 (D. Colo. 2010), we have never suggested that the factors serve as a constitutional touchstone.[5] Rather, we continue to believe that the proper approach is a fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement. While the Supreme Court's assessment of the conditions in Wilkinson can be instructive in this endeavor, the conditions in that case may not serve as helpful comparator evidence in all cases. The "ordinary incidents of prison life" will differ depending on a particular inmate's conviction and the nature of nonpunitive confinement routinely imposed on inmates serving comparable sentences. See Hatch, 184 F.3d at 856 ("'[A]typicality' . . . depends in part on the length of the sentence the prisoner is serving."). In cases involving placement in nondisciplinary administrative segregation, it is appropriate to compare the conditions at issue with those ordinarily experienced by inmates with similar records and sentences. In making this assessment, we are mindful that nondisciplinary administrative segregation "is the sort of confinement that inmates [**26] should reasonably anticipate receiving at some point in their incarceration." Hewitt, 459 U.S. at 468, overruled on other grounds by Sandin, 515 U.S. at 479-83.

We are not constrained to apply the four factors that the DiMarco court considered potentially relevant, but we are satisfied that a similarly guided inquiry is appropriate under the facts of this case. And while we also are not bound to give more or less weight to any given factor, we recognize that Wilkinson called the conditions of confinement in the Ohio supermax prison "sever[e]" and "synonymous with extreme isolation" but ultimately placed [*1013] the weight of its analysis on the indeterminate duration of confinement and the effect the placement had on an inmate's parole eligibility. See Wilkinson, 545 U.S. at 214; see also Townsend v. Fuchs, 522 F.3d 765, 772 (7th Cir. 2008) ("Wilkinson did not determine that the conditions in the Supermax prison created a liberty interest by themselves. . . . [T]he Court based its holding largely on the fact that placement was indefinite and disqualified otherwise eligible inmates [**28] from consideration for parole."). Thus, we read Wilkinson to say that HN9[↥] extreme conditions in administrative segregation do not, on their own, constitute an "atypical and significant hardship" when compared to "the ordinary incidents of prison life." Sandin, 515 U.S. at 484.

### 1) The Segregation Relates to and Furthers the BOP's Legitimate Penological Interests

The district court concluded that the BOP's legitimate interests in prison safety and national security justified plaintiffs' placements at ADX. Rather than question the legitimacy of the BOP's asserted interests or the rationality of segregation in relation to those interests, the plaintiffs dismiss the factor itself as "not relevant to the liberty interest inquiry." Aplt. Br. at 24.

This court has upheld an inmate's placement in segregation, even for an extended period of time, for safety reasons. See DiMarco, 473 F.3d at 1342 (deferring to Wyoming prison's determination that "DiMarco might be a risk if introduced to the general population of the prison"). Here, each of the plaintiffs was transferred to ADX for reasons of national security and institutional safety. See Aplt. App. Vol. I(f) at 1354; Vol. II(g) at 3298. The BOP transferred [**29] Rezaq to ADX because of the nature of his offense, his weapons and bomb-

---

[5] Plaintiffs argue that the DiMarco factors are inconsistent with the Supreme Court's rulings in Sandin and Wilkinson. See Aplt. Br. at 22-36. Because we are bound by prior panel decisions absent superseding en banc review or Supreme Court decisions, we need not address these arguments. See United States v. Meyers, 200 F.3d 715, 720 (10th Cir. 2000). We pause to note, however, that DiMarco did not establish a rigid framework for determining whether a liberty interest exists. The opinion merely outlined "a few key factors, [**27] none dispositive, as the Supreme Court did in Wilkinson." DiMarco, 473 F.3d at 1342. The four factors, which are not necessarily exhaustive, are in accord with the Supreme Court's direction to consider the nature and indeterminate duration of the challenged prison conditions.

making training, and his affiliation with terrorist organizations. Id., Vol. I(f) at 1353-54. The BOP transferred Saleh, Nosair, and Elgabrowny, who were each convicted of terrorism-related offenses, in the wake of the September 11 attacks because it wanted to better monitor their communications with the outside world. Id., Vol. II(c) at 2312. The district court in Rezaq observed that providing "more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Id., Vol. I(f) at 1359 n.13.

The First Circuit engages in a similar, albeit more stringent, inquiry when it determines whether "the central condition—isolation from other prisoners—was essential to its purpose." See Skinner v. Cunningham, 430 F.3d 483, 487 (1st Cir. 2005). Because "administrative segregation is the sort of confinement . . . inmates should reasonably anticipate receiving at some point in their incarceration," Hewitt, 459 U.S. at 468, we have not engaged in such exacting scrutiny. See DiMarco, 473 F.3d at 1343 (suggesting an inquiry into whether "the segregation relates to [**30] and furthers a legitimate penological interest" (emphasis added)); Jordan, 191 F. App'x at 652 (inquiring into the reasonable relationship between segregated detention and legitimate penological interests and security concerns).

Plaintiffs argue that it is improper for the court to consider penological interests in determining whether a liberty interest exists. They contend that any inquiry into the necessity of restrictive confinement should be made at a due process hearing, not in determining at the outset whether a liberty interest exists. Aplt. Br. at 23. We disagree. HN10[↑] Legitimate penological interests are a relevant consideration under settled Tenth Circuit precedent. [*1014] See DiMarco, 473 F.3d at 1342-43. And unlike plaintiffs, we do not read Wilkinson to suggest the inquiry is inappropriate. In Wilkinson, the Supreme Court observed that the Ohio supermax prison's "harsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners," but "necessity . . . does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance." 545 U.S. at 224. That statement, read in [**31] concert with the Court's earlier admonition that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment," Sandin, 515 U.S. at 482, does not foreclose our consideration of the relationship between the means chosen—segregated confinement—and the ends asserted. As in DiMarco, we remain "mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." 473 F.3d at 1342. The BOP should not have to prove segregated confinement is essential in every case. Instead, it is sufficient to show a reasonable relationship between isolation and the asserted penological interests.

The government opened ADX to house inmates who, like plaintiffs, pose unusual security and safety concerns. These concerns stem from a uniquely federal penological interest in addressing national security risks by segregating inmates with ties to terrorist organizations. The BOP established that continued placement of these inmates in general population units could compromise prison safety or, given the unique criminal backgrounds of these plaintiffs, national security. We [**32] conclude that segregated confinement relates to and furthers the penological interests asserted in this case.

### 2) ADX Conditions Are Not Extreme

The district court next considered whether the conditions of confinement at ADX are extreme. Plaintiffs primarily challenge the district court's use of the Ohio supermax facility, at issue in Wilkinson v. Austin, as a basis for comparison. Aplt. Br. at 26. They contend that the appropriate comparison is ordinary prison life in the "particular prison

system," which would foreclose consideration of a state supermax facility in a case involving federal inmates. Id. at 27. Plaintiffs also contend that, even if the facility in Wilkinson is used as a comparator, the conditions at ADX are not materially different than those at the Ohio supermax prison. See Aplt. Reply Br. at 13-14 (chart comparing conditions at the two facilities).

As we have noted, it is appropriate to compare the nature of the challenged conditions to the type of nonpunitive confinement routinely imposed on inmates serving comparable sentences. A comparison to the conditions at issue in Wilkinson can also be instructive when considering conditions in segregated confinement.

The conditions [**33] at ADX are undeniably harsh. When they were housed at ADX, plaintiffs had control over the lights in their cells, the opportunity for outdoor recreation, regular contact with staff, and the ability to occasionally communicate with other inmates.[6] Aplt. App. Vol. I(a) at [*1015] 207-10. Their cells, while unquestionably small and stark, contained a television that aired black-and-white educational and religious programming. Id., Vol. II(c) at 2061. The inmates spent twenty-three hours per day in their cells. Id. at 2058. When they were permitted outdoor recreation, the inmates remained alone in fenced-in areas slightly larger than their cells. Id. at 2059. The inmates were permitted five "no contact" social visits and two fifteen-minute phone calls per month. Id. at 2060-61.

There [**34] are some similarities between the conditions at ADX and those at the Ohio supermax prison in Wilkinson. Because the conditions at issue in Wilkinson imposed an atypical and significant hardship on inmates "under any plausible baseline," it is clear that the Supreme Court did not intend for courts to make side-by-side comparisons of challenged conditions and the conditions in that case. But we must take note of the facts that led the Court to its conclusion. For example, in Wilkinson, the Court found that "almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell." 545 U.S. at 223-24. There is some evidence that plaintiffs in the present cases had to shout through doors to communicate with other inmates, and that they were not permitted to do so. Aplt. App. Vol. I(e) at 1155. But there is also evidence that plaintiffs could communicate with other inmates. Id., Vol. II(g) at 3300. Second, the inmates in Wilkinson were restricted to "indoor recreation cells" when they were permitted to leave their cells. 545 U.S. at 214. The inmates at ADX are permitted outdoor recreation. Aplt. App. Vol. II(g) at 3300.

But we need not draw fine distinctions [**35] based on these comparisons. The conditions at ADX, like those at the Ohio supermax prison in Wilkinson, do not, in and of themselves, give rise to a liberty interest because they are substantially similar to conditions experienced in any solitary confinement setting. See Wilkinson, 545 U.S. at 224 ("Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities . . . ."). The conditions at ADX are comparable to those routinely imposed in the administrative segregation setting. We conclude that the conditions in the general population unit at ADX are not extreme as a matter of law.

Finally under this factor, we must address plaintiffs' contention that the district court improperly incorporated *Eighth Amendment* and substantive due process precedent to determine whether the challenged conditions were extreme. Aplt. Br. at 27-29. While the district court used the phrase "the basic necessities of life," which is drawn from *Eighth Amendment* precedent, it is clear that the court did not import a different standard to the

---

[6] While there is a factual dispute over the degree of human contact permitted at ADX, see Aplt. Br. at 38-41; Aplee. Br. at 39-43, this dispute does not affect our determination that the conditions are not extreme. Even viewing the disputed facts in the light most favorable to plaintiffs, the limitations on human contact were not "especially severe" in relation to most solitary confinement facilities. See Wilkinson, 545 U.S. at 223-24.

677 F.3d 1001, *1015; 2012 U.S. App. LEXIS 8063, **35

liberty interest analysis. The district court's analyses were consistent with our approach [**36] in *DiMarco.*

### 3) ADX Placement Does Not Increase the Duration of Confinement

Transfer to a higher security facility may lengthen an inmate's period of incarceration if the transfer "disqualifies an otherwise eligible inmate for parole consideration." *Wilkinson, 545 U.S. at 224*. This factor counseled in favor of finding a liberty interest in *Wilkinson*, where the Court found that transfer to the Ohio supermax prison caused inmates who were "otherwise eligible for parole [to] lose their eligibility [*1016] while incarcerated" there. *Id. at 215*. In *DiMarco*, we concluded that the state's placement decision did not extend the term of the inmate's confinement. *473 F.3d at 1343*. Similarly, this factor does not weigh in favor of finding a liberty interest in these cases. There is no evidence that confinement at ADX lengthened plaintiffs' sentences.

### 4) The Plaintiffs' Placements in ADX Were Not Indeterminate

Finally, the duration and indeterminacy of a placement in extreme conditions is often a critical consideration in liberty interest analysis. See *Wilkinson, 545 U.S. at 224* (considering the indefinite duration of the confinement and the frequency of reviews); *DiMarco, 473 F.3d at 1343-44*; see also *Harden-Bey v. Rutter, 524 F.3d 789, 792 (6th Cir. 2008)* [**37] (concluding that "most (if not all) of our sister circuits have considered the nature of the more-restrictive confinement and its duration in determining whether it imposes an 'atypical and significant hardship'").

Plaintiffs argue, essentially under this factor, that the duration of segregated confinement itself is atypical and significant. This argument has some support in Tenth Circuit precedent. See, e.g., *Trujillo v. Williams, 465 F.3d 1210, 1225 (10th Cir. 2006)* (reversing the 12(b)(6) dismissal of prisoner's § 1983 claim, reasoning that where "the prisoner is subjected to a lengthy period of segregation, the duration of that confinement may itself be atypical and significant" (emphasis added)). Several other courts have determined that prolonged placements in administrative segregation can constitute "atypical and significant hardship." See, e.g., *Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000)* (concluding that "eight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life"). While duration is certainly an important consideration, *Wilkinson* emphasized that duration is properly [**38] considered in tandem with indeterminacy. In considering duration, the Court observed that "placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually." *Wilkinson, 545 U.S. at 224*.

Here, the periodic review process at ADX included opportunities for plaintiffs to participate. While plaintiffs were housed at ADX for many years, they were given regular reevaluations of their placement in the form of twice-yearly program reviews. See Aplt. App. Vol. I(f) at 1362-63; Vol. II(g) at 3301. These periodic reviews included procedural protections, including the chance to appeal decisions through an administrative process. Importantly, however, it is not necessary for us to closely review the process at this stage. See *DiMarco, 473 F.3d at 1343* (concluding that confinement was not indefinite where prisoner had reevaluations every ninety days and had the opportunity to be heard at the meetings). The availability of periodic reviews merely suggests that the confinement was not indefinite. See *Wilkinson, 545 U.S. at 224* (noting that, after an initial thirty-day review, an inmate's placement was only reviewed annually). This factor weighs against finding a liberty [**39] interest.

### 5) Summary of *DiMarco* Factors

Lori Ruth

PLN_0001844

The totality of these factors indicate that the inmates did not have a liberty interest in avoiding confinement at ADX. Because no liberty interest is implicated, we do not reach the question of whether the inmates received adequate process to justify their transfers to ADX.

 [*1017]  V. Conclusion

Because this case presents a live controversy in which the court could afford meaningful prospective relief, we DENY both the motion to dismiss and the amended motion to dismiss filed by defendants. Yet the inmates lack a cognizable liberty interest in avoiding the conditions of confinement at ADX, so no due process protections were required before they were transferred to that facility. We therefore AFFIRM the judgments of the district court.

End of Document