# EXHIBIT 18

# Prison Legal News

VOL. 24  No. 4
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

**April 2013**

# U.S. Immigration Policy:
# Dysfunctional, Profitable and Resistant to Reform

### by Derek Gilna

THE NATION'S ECONOMY REMAINS FRA-gile, U.S. troops continue to fight a losing war in Afghanistan, North Korea has recently threatened a nuclear attack, and in March 2013 Congress and President Obama failed to reach a compromise to prevent the "sequester," which mandates deep spending cuts on the federal level. Yet issues related to immigration – including immigration reform – still manage to dominate national headlines.

The results of the last presidential election, in which over 70% of Hispanics cast their ballots for Obama, have led many panic-stricken Republican politicians to seek ways to avoid electoral irrelevancy at the hands of an increasing number of His-panic voters. Consequently, immigration reform is getting serious play in Washington at a time when federal spending on immigration enforcement and border security – estimated at almost $18 billion in fiscal year 2012 according to a recent report by the Migration Policy Institute – totals more than the budgets of all other federal law enforcement agencies combined, including the FBI, DEA and ATF.

### Lawmakers Examine Immigration Reform

ON JANUARY 28, 2013, THE SO-CALLED "Gang of Eight," comprised of eight U.S. Senators – four from each party – released a Comprehensive Immigration Reform (CIR) proposal. Among other provisions, the CIR creates a path to citizenship for certain non-criminal immigrants residing in the U.S. illegally who pass a background check, learn English and pay fines and back taxes. The proposal would also require employers to verify the citizenship status of their workers; create a registration program for undocumented immigrants and a tracking system for immigrants who are legally in the U.S.; and increase border security, including the use of unmanned drones.

"Our legislation acknowledges these realities by finally committing the resources needed to secure the border, modernize and streamline our current legal immigration system, while creating a tough but fair legalization program for individuals who are currently here," the CIR proposal states. The Gang of Eight plans to introduce a bill based on their proposal in April 2013, while a bipartisan group of House members are also reportedly working on a plan for immigration reform.

President Obama has released a draft version of his own immigration reform proposal, which mirrors many of the recommendations made by the Gang of Eight, including a pathway for non-criminal immigrants to become citizens. Previously, in June 2012, Obama signed an executive order that provides two years of "deferred action" on deportation proceedings for undocumented immigrants who were under age 16 when they came to the U.S., have graduated from high school or obtained a GED, do not have a serious criminal record and meet other requirements.

The focus on immigration reform, including discussions about a pathway to citizenship, should be good news for the estimated 11 million undocumented immigrants currently living in the United States. Or perhaps not.

Other major government initiatives to address social problems haven't worked out so well. Prohibition, for example, or its more modern iteration, the "War on Drugs," which was sold to voters as a necessary means of ridding their communities of substance abuse and crime, but quickly morphed into overcrowded prisons, bloated corrections budgets, broken families and innumerable abuses by law enforcement agencies.

Just as marijuana legalization and decriminalization, criticism of mandatory minimums and harsh sentencing guidelines, and disgust with high rates of incarceration for minor non-violent crimes are becoming part of the public dialogue on criminal justice issues in the U.S., the federal government's ongoing battle against undocumented immigrants is taking center stage in political discourse.

## INSIDE

| | |
|---|---|
| From the Editor | 14 |
| Who was Clarence Earl Gideon? | 16 |
| Keeping the Press out of Control Units | 20 |
| CDCR Conceals Suicide Report | 22 |
| Illinois Hides Report on Solitary | 28 |
| CA Guard Union to Pay $4.96 Million | 36 |
| Law Man Book Review | 40 |
| FBI Crime Data is Flawed | 42 |
| Fourth SC Sheriff Indicted | 48 |
| Native Americans in Prison | 52 |
| CCA Excludes Shareholder Resolution | 54 |
| More Sex Abuse at Oregon Prison | 56 |
| News in Brief | 58 |



*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - ONLY $20!
+ $3.99 p&h

*"BEST DEAL ON THE POUND!"*

## Check your **5** magazines
and <u>underline</u> three backup choices (in case of unavailability)

- ☐ 4 Wheel & Off Road (12)
- ☐ 4 Wheel Drive & Sport Utility (12)
- ☐ Allure (12)
- ☐ American Photo (6)
- ☐ Arthritis Today (6)
- ☐ Automobile (12)
- ☐ Bicycling (11)
- ☐ Boating (10)
- ☐ Bon Appetit (12)
- ☐ Bowhunt America (9)
- ☐ Bowhunting World (9)
- ☐ Bridal Guide (6)
- ☐ Cabelas Outfitter Journal (6)
- ☐ Car & Driver (12)
- ☐ Car Craft (12)
- ☐ Charisma (12)
- ☐ Chevy High Performance (12)
- ☐ Circle Track (12 )
- ☐ Complex Magazine (6)
- ☐ Conde Nast Traveler (12)
- ☐ Cruising World (12)
- ☐ Cycle World (12)
- ☐ Detroit Home (6)
- ☐ Digital Photo (7)
- ☐ Dirt Rider (12)
- ☐ Ebony (11)
- ☐ Entrepreneur (12)
- ☐ ESPN (26) No Renewal
- ☐ Esquire (11)
- ☐ Family Circle (15)
- ☐ Family Fun (10)
- ☐ Fast Company (10)
- ☐ Field & Stream (12)
- ☐ Fitness (10)
- ☐ Florida Sport Fishing (6)
- ☐ Fly Fishing in Salt Water (6)
- ☐ Flying (12)

- ☐ Four Wheeler (12)
- ☐ Freeskier (6)
- ☐ Garden & Gun (6)
- ☐ Golf Digest (12)
- ☐ Golf Tips (7)
- ☐ Glamour (12)
- ☐ Golf Week (45)
- ☐ Hot Bike (12)
- ☐ Hot Bike Baggers (12)
- ☐ Hot Rod (12 )
- ☐ Hour Detroit (12)
- ☐ Inc Magazine (12)
- ☐ Jet (26)
- ☐ Ladies Home Journal (11)
- ☐ Latina (10)
- ☐ Log Home Living (9)
- ☐ Lucky (12)
- ☐ Marie Claire (12)
- ☐ Men's Fitness (10)
- ☐ Men's Journal (12)
- ☐ Motor Trend (12)
- ☐ Ministry Today (6)
- ☐ Midwest Living (6)
- ☐ Motorcyclist (12)
- ☐ Muscle Mustangs & Fast Fords (12)
- ☐ Nylon (10)
- ☐ Old House Journal (6)
- ☐ Outdoor Life (12)
- ☐ Outdoor Photographer (11) No Renewal
- ☐ Outside (12)
- ☐ Parent & Child (8)
- ☐ Parenting (11)
- ☐ Parenting School Years (11)
- ☐ Parents (12)
- ☐ Plane & Pilot (12) No Renewal
- ☐ Popular Photography (12)
- ☐ Popular Science (12)

- ☐ Predator Xtreme (6)
- ☐ Prevention (12)
- ☐ Reader's Digest (12)
- ☐ Red Bulletin Magazine (12)
- ☐ Road & Track (12)
- ☐ Rolling Stone (26)
- ☐ Self (12)
- ☐ Shape (12)
- ☐ Siempre Mujer (6)
- ☐ Ski (7)
- ☐ Slam (10)
- ☐ Snowboard (6)
- ☐ Snowboarder (7)
- ☐ Sound & Vision (8)
- ☐ Sport Rider (10)
- ☐ Super Chevy (12)
- ☐ Surfer (12)
- ☐ Surfing (12)
- ☐ Taste of Home (8) No Renewal
- ☐ Teen Vogue (10)
- ☐ Tennis (8)
- ☐ The Atlantic (10)
- ☐ Timber Home Living (6)
- ☐ Transworld Motocross (12)
- ☐ Transworld Skateboarding (12)
- ☐ Transworld Snowboarding (9)
- ☐ Transworld Surf (12)
- ☐ Truckin (13)
- ☐ Urban Farm (6)
- ☐ Vibe (6)
- ☐ Waterfowl & Retriever (2)
- ☐ Weight Watchers (6)
- ☐ Whitetail Journal (6)
- ☐ Wired (12)
- ☐ Working Mother (8)

### Send as many "5 for $20" orders as you like!

### Tell your Friends and Families!

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or *order online* and use credit card or PayPal.

| Name and Inmate # (please print, <u>maximum 24 characters</u>): | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Address: | | | | | | | | | | | | | | | | | | | | | | | | |
| City: | | State: | | | Zip: | | | | | | | | | | | | | | | | | | | |



# Inmate Magazine Service INC.

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

*OK to Copy!*

PLN_0001669

# ⚑ Prison Legal News

*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Mike Brodheim, Matthew Clarke,
John Dannenberg, Derek Gilna,
Gary Hunter, David Reutter,
Mike Rigby, Brandon Sample,
Mark Wilson, Joe Watson

**RESEARCH ASSOCIATE**
Julie Etter

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel
Alissa Hull—Staff Attorney

*PLN* is a monthly publication.

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
**PO Box 2420**
**West Brattleboro, VT 05303**
**802-257-1342**
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without a SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## U.S. Immigration Policy (cont.)

As a result, groups that have an interest in immigration issues – including financial interests – are becoming increasingly involved. Concerned stakeholders include labor unions, agribusiness companies, farmers, factory owners and advocacy groups on both sides of the immigration debate. Another group with a vested interest is the private prison industry, comprised of companies that operate immigration detention facilities.

Both the Gang of Eight's immigration reform recommendations and the draft proposal advanced by the White House include increased border security, which means apprehending and incarcerating more undocumented immigrants.

## Evolution of U.S. Immigration Policy

IMMIGRATION WAS NOT ALWAYS A NATIONAL priority. The Immigration and Naturalization Service (INS) was established in 1933 when the Bureau of Immigration and Bureau of Naturalization were merged. The INS, which became part of the U.S. Department of Justice in 1940, received minimal resources and manpower in comparison with other federal law enforcement agencies, even after Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act in 1996, which resulted in an increase in immigration detention.

This changed after 9/11, when the Homeland Security Act of 2002 opened the funding floodgates and the INS was folded into the newly-formed Department of Homeland Security (DHS) in 2003. At that time, INS became Immigration and Customs Enforcement (ICE). While the INS was known for an indifferent approach to apprehending undocumented immigrants, ICE became a bureaucratic superpower due to increased DHS funding and a mandate to protect the nation's borders from terrorists and other threats.

From an agency that was once the stepchild of the federal law enforcement community and lacked the respect afforded to the FBI and U.S. Marshals, ICE has grown into a powerhouse that is armed with the latest equipment, "virtual border fences," unmanned surveillance drones and the broad authority to detain, arrest and interrogate suspects under the Patriot Act. While other federal law enforcement agencies must make their case for more funding, ICE continues to receive almost everything it requests. Even in tight economic times, ICE's 2013 FY budget is $5.3 billion – which includes about $2 billion for detention operations.

What have such massive expenditures achieved? A failure to stem the tide of illegal immigration, apparently. According to the Pew Hispanic Center, the number of undocumented immigrants in the United States has steadily increased over the past decade to an estimated 11.1 million as of 2011. This represents a 32% increase since 2000 when the population of immigrants residing in the U.S. illegally was estimated at 8.4 million.

The number of people incarcerated for immigration-related offenses has likewise soared in the past decade, spurred by federal prosecutions for illegal entry and re-entry into the United States. Even the U.S. Sentencing Commission, in a recent report to Congress, has noted the increased prosecution of undocumented immigrants over the last several years. As of June 2011, Hispanics accounted for almost half the defendants sentenced to federal prison, largely due to immigration violations. [See: *PLN*, May 2012, p.26; Aug. 2009, p.26].

One of the drivers of increased prosecutions for immigration-related offenses is an initiative called "Operation Streamline," which went into effect in 2005 to combat the growing problem of illegal entries along the U.S.-Mexico border. Operation Streamline includes a fast-track system in which immigrants are herded into federal courts for mass hearings and guilty pleas.

"[Prior to 2005,] typically when someone was apprehended at the border they would be deported or dealt with in the civil immigration system," said Bob Libal, executive director of Grassroots Leadership. "What Streamline did was move those people into the criminal justice system and charge[] them with one of two crimes."

First-time immigration violators are usually charged with misdemeanors, provided they have no prior criminal history, under 8 U.S.C. § 1325. Defendants with criminal records, or who are caught illegally in the United States a second time or are smuggling other immigrants, can be charged with felonies under 8 U.S.C. § 1326. Illegally re-entering the United States after being deported carries a penalty of up to 20 years in federal prison.

PLN_0001670

## U.S. Immigration Policy (cont.)

U.S. Senator and Gang of Eight member John McCain, whose principal response to questions about immigration issues during his 2008 presidential campaign was "Build the damn border fence!," is one of the champions of Operation Streamline. Another is Senator Marco Rubio, also a Gang of Eight member.

One of the unforeseen consequences of Operation Streamline has been the virtual paralysis of the federal court system in many Southwestern states as courts try to process an unprecedented number of immigration violation arrests, prosecutions and sentencing hearings. Just five of the nation's 94 federal court districts, all along the U.S.-Mexico border, now handle more than 40% of all federal criminal cases due to immigration-related prosecutions. [See: *PLN*, May 2012, p.26; Feb. 2011, p.11].

Another ICE-sponsored program, Secure Communities, requires fingerprints from all persons arrested at the state and local levels to be sent to DHS to determine whether they are in the country illegally. If there is a fingerprint match, an arrestee can be held on an ICE detainer and is subject to deportation proceedings. [See: *PLN*, June 2011, p.42]. According to ICE, Secure Communities has expanded "from 14 jurisdictions in 2008 to more than 3,000 today, including all jurisdictions along the southwest border. DHS is on track to expand Secure Communities to all law enforcement jurisdictions nationwide during fiscal year 2013."

### Immigration Detention for Profit

AMERICA HAS HISTORICALLY WELCOMED people from other countries, and much of our nation was built by immigrants. Indeed, the United States was originally founded by immigrants who displaced (and largely eliminated) the Native American population. The U.S. has long been called a "melting pot" that has absorbed people of all nationalities.

However, most citizens are busy going about their private lives, trying to earn a living during one of the worst economic downturns in recent history. While they may feel strongly one way or the other about immigration-related policies, most have no personal stake in the issue and do not lobby members of Congress or make campaign contributions in an effort to influence the process. Undocumented immigrants do not have the ability to vote, of course, and thus they and their families have no political voice.

This leaves private businesses with substantial financial interests – and assets – to advocate for immigration policies that are most beneficial to their bottom lines. Such corporate interests, however, may not coincide with the greater societal interests at stake in our nation's immigration policies.

Many immigration reform advocates feel that the private prison industry is a primary driver of increased pressure to incarcerate more and more people for immigration violations. Indeed, private prison companies directly profit from practices that result in expanded immigration detention, as operating detention facilities has become a significant source of revenue for private prison firms like Corrections Corporation of America (CCA), GEO Group and Management and Training Corporation (MTC).

Contracts with ICE to operate immigration detention centers constituted 12% of CCA's gross revenue and 14% of GEO Group's gross revenue in 2011. According to the Associated Press, only 10% of all detained immigrants were housed in privately-operated facilities in 2002, but that figure is now around 50% – not including immigrants convicted of federal crimes who are held in privatized "Criminal Alien Requirement" prisons.

"Another factor driving growth ... for the private sector is in the area of immigration and illegal immigration specifically," stated GEO Group Chief Financial Officer Brian Evans in a 2011 earnings call.

In an apparent attempt to promote immigration policies that result in increased detention of undocumented immigrants – and thus larger profit margins – private prison companies have stepped up their already strong lobbying efforts on the federal level. On the other side of the immigration debate, private prison firms view policies that result in less detention as a threat to their business model.

As noted in CCA's 2011 annual report,

## Pen Pals for Prisoners

Your ad on the Internet worldwide:
One year for $9.95. Mail name & address for FREE order form or online:

www.PrisonerPal.com

PO Box 19689
Houston, TX 77224

# Earn an Adams State University Degree via Correspondence Courses



**Now Available:  Masters Degree in Business Administration**

- Correspondence Courses via mail    • No internet access required
- Degree options available — Associate of Arts or Science, Bachelor degrees in Accounting, Business Administration, Government, History, Interdisciplinary Studies, Legal Studies, Management, Marketing, Sociology, Paralegal Certificate Program, Masters degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 16+ years of experience serving incarcerated students
- FREE unofficial evaluation of previously earned credits



**ADAMS STATE UNIVERSITY**
C O L O R A D O
*Great Stories Begin Here*
**EXTENDED STUDIES**

Call or write to receive additional information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101

"The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts.... For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them."

GEO Group wrote in a 2011 SEC filing that "Immigration reform laws which are currently a focus for legislators and politicians at the federal, state and local level also could materially adversely impact us."

Consequently, working against the socially-beneficial goals of immigration reform and a reduction in the immigration detention system is a flood of money unleashed on elected officials by private prison corporations and their lobbyists. CCA and GEO Group took in combined gross revenue of $3 billion in 2011 alone, and are not shy about spending to influence public policy.

According to the Associated Press, the nation's three largest private prison companies, CCA, GEO and MTC, spent at least $45 million from 2000 to 2012 in campaign donations and lobbying expenditures on the state and federal levels.

A significant portion of that political largess has gone towards lobbying the Department of Homeland Security, ICE's parent agency, and to contributions to lawmakers who are key players in the immigration debate. For example, private prison firms have donated $71,000 to Senator John McCain and at least $27,300 to Senator Marco Rubio – both members of the Gang of Eight – and $63,000 to House Speaker John Boehner. U.S. Rep. Hal Rogers, who has criticized ICE for not filling all of its available immigration detention beds, and who heads the House Appropriations Committee, received around $59,000. Former Senator (and Republican Majority Leader) Bill Frist took in $58,500, while Senators Lamar Alexander and Bob Corker, who represent Tennessee, where CCA is headquartered, each received over $50,000.

In addition, approximately $450,000 in private prison money went to national and congressional Republican Party committees; Democratic Party committees took in less than half that amount.

"The private prison industry is swamping the Senate Budget and Appropriations Committees to try to buy them to keep Operation Streamline so they can incarcerate more immigrants in private prisons despite immigration reform," observed Peter Cervantes-Gautschi, director of Enlace, an alliance of low-wage worker centers, unions and community organizations in Mexico and the United States.

Private prison companies, primarily CCA and GEO, have also spent money on federal lobbying, reaching a high of $5 million in 2005 alone. According to lobbying disclosure statements, CCA lobbied the U.S. Senate, House of Representatives, Department of Homeland Security and Immigration and Customs Enforcement, among other federal agencies, on issues that included "immigration," "immigration reform," "immigration reform legislation" and "provisions & funding related to ICE."

Beyond campaign donations and lobbying, there is a connection between private prison firms and some of the more draconian anti-immigrant legislation, such as Arizona's SB 1070, which was filtered through the American Legislative Exchange Council (ALEC). CCA, a member



# INMATE TOLL BUSTERS
## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*

**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours: 888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.

VISA    MasterCard    DISCOVER NETWORK

PLN_0001672

## U.S. Immigration Policy (cont.)

of ALEC at the time, reportedly had a seat at the table when SB 1070 was drafted. [See: *PLN*, Nov. 2010, p.1].

This was despite the fact that CCA has an official corporate policy against "engaging in lobbying or advocacy efforts that would influence enforcement efforts, parole standards, criminal laws, and sentencing policies." Similarly, according to GEO spokesman Pablo E. Paez, "the GEO Group has never directly or indirectly lobbied or advocated to influence immigration policy." Like CCA, GEO was formerly a member of ALEC.

After SB 1070 was introduced in January 2010, 36 Arizona state senators joined as co-sponsors; within the next six months, 30 of those co-sponsors received campaign contributions from private prison firms, including CCA and GEO.

Additionally, there are documented cases of former immigration officials finding lucrative careers in the private prison industry after leaving their government positions. CCA board member Donna M. Alvarado previously served as counsel for the U.S. Senate Committee on the Judiciary's subcommittee on Immigration and Refugee Policy. And GEO Group vice president David J. Venturella is the former director of ICE's Secure Communities program; he has also served as acting director and assistant director of ICE's Office of Detention and Removal Operations.

There is further a lack of transparency, and thus public accountability, in privatized detention centers relative to those operated by the government: Privately-managed facilities that house detained immigrants are not subject to the Freedom of Information Act (FOIA). PLN managing editor Alex Friedmann and doctoral student Christopher Petrella are currently engaged in a campaign to have the Private Prison Information Act reintroduced during this Congressional session, which would extend FOIA to private prison contractors. [See: *PLN*, Feb. 2013, p.14].

It is apparent that our national policies on immigration have created what human rights organizations have termed a "detention industrial complex." The proliferation of immigration detention facilities – many of which are privately operated – has created perverse financial incentives to perpetuate programs like Operation Streamline and Secure Communities, which result in more immigrants being arrested and incarcerated.

This is despite the fact that most detained immigrants have not committed crimes other than immigration-related offenses, which previously were considered civil violations, and that many could be released and supervised in the community at much lower cost, such as by GPS monitoring, rather than being detained pending deportation hearings.

GEO Group, not incidentally, is now involved in GPS monitoring after the company acquired a firm called BI, which contracts with ICE to monitor more than 35,300 immigrants under community supervision. [See: *PLN*, Feb. 2012, p.12; April 2011, p.40].

### How the Immigration System Works – or Doesn't

INTERNAL RECORDS FROM ICE, OBTAINED via a Freedom of Information Act request, reveal a "bleak picture of the inside of the nation's immigration detention system," according to the *Houston Chronicle*. In order to detain growing numbers of undocumented immigrants, ICE relies on a national network of 250 detention facilities with around 33,400 beds, which it is mandated to keep full. Around half of the facilities are operated by private prison companies.

When U.S. citizens are arrested for criminal offenses they are usually transported to a relatively accessible police station or jail. They go before a judge in a timely manner, who sets bail in most cases. They are appointed an attorney if they cannot afford one. While not perfect, the system is fairly open and transparent.

Not so for immigrants, who are taken to a jail or detention center where they may or may not be able to contact their families. They are generally not granted bail, and are not appointed counsel; most immigrants must represent themselves in deportation proceedings. Until recently, with the launch of ICE's Online Detainee Locator System in July 2010, there was no easy way to determine where people arrested on immigration violations were being held; they basically "disappeared."

Another disturbing development in the immigration enforcement system is the proliferation of almost 200 ICE "subfield offices," which are used to detain and temporarily hold thousands of undocumented immigrants. Theoretically intended to confine detainees who are in transit to more permanent facilities, subfield offices often lack beds, showers, medical facilities or telephones. They are typically situated in plain office buildings with no signs to mark their presence. [See: *PLN*, Sept. 2010, p.22].

After being taken into custody and processed through either an ICE field or

## CA$H FOR YOUR STAMPS
## P. O. Box 687-P, Walnut, Ca. 91788
Get the HIGHEST return for ALL of your stamps!
Rapid processing and payment sent to your designee (No Package, Book, or Magazine Vendors Please)

**70% OF FACE VALUE** for Books and Sheets of "Forever" Stamps in new or excellent.*
**60% OF FACE VALUE** for Books and Sheets of Other Denominations in new or excellent condition.*
**50% OF FACE VALUE** for all books, sheets, or rolls that are not in new and complete condition.
*NEW CONDITION MEANS NO FOLDS, NO WRITING, AND ALL STICKERS IN TACT.
NO SINGLE STAMPS (GROUPS OF 2 OR MORE). Stamped envelopes must be #10 with no markings.
$15.00 Min. Money Orders. Damaged or Taped Stamps Not Accepted/Returned. Send SASE for Brochure.

PLN_0001673

subfield office, detained immigrants are frequently housed in county or municipal jails alongside criminal offenders. The jails receive per-diem payments from the Department of Homeland Security for holding ICE detainees, which is a financial bonanza for many local law enforcement agencies. [See: *PLN*, July 2010, p.33; April 2010, p.18; Oct. 2009, p.19]. Other detainees are transferred to facilities operated by private prison contractors such as CCA or GEO Group.

With such financial inducements in place, it is not surprising that the number of people held in immigration detention, and subsequently deported, has skyrocketed. Over 392,860 immigrants were deported in 2009, and that figure rose to 396,906 in 2010. [See: *PLN*, June 2011, p.42]. The number of deportations currently exceeds 409,800 annually – which is almost double the total prison population of the federal Bureau of Prisons. The average cost to hold an immigrant in detention is around $166 per day, as calculated by the Associated Press and confirmed by ICE.

Immigration officials have defended the large number of deportations and staggering costs of processing and detaining undocumented immigrants by alleging that half of those deported are convicted criminals. A closer examination of the Justice Department's figures, however, indicates that less than 10% of deported immigrants had committed forcible felonies or "major" drug offenses. Because ICE does not define what it considers a "major" drug violation, that category of offenses is open to interpretation. The fact remains that most immigrants who are deported are nonviolent, low-level offenders; for example, a 2009 report by Human Rights Watch found that only 28 percent of deportees had been convicted of violent crimes. [See: *PLN*, Aug. 2010, p.28].

Once they have been detained pending deportation hearings, immigrants are entitled to few procedural safeguards. They go before an immigration "judge," who is an administrative appointee of the Justice Department. Immigration judges have been criticized for "a pattern of biased and incoherent decisions in asylum cases," according to the *New York Times*. In one ruling, the Seventh Circuit Court of Appeals stated, "the adjudication of these cases at the administrative level has fallen below the minimum standards of legal justice." See: *Benslimane v. Gonzales*, 430 F.3d 828 (7th Cir. 2005).

There were around 260 immigration judges nationwide responsible for 323,725 cases as of January 2013 – a crushing caseload for even the most dedicated judicial officer. Most immigration hearings are held in detention centers or federal courthouses, outside the public's purview. In most of these cases an immigrant's fate is in the hands of an immigration judge – who is frequently a former ICE employee.

Some public officials, including Attorney General Eric H. Holder, Jr., the nation's chief law enforcement officer, have acknowledged problems with the U.S. immigration system. For example, along with New York City Mayor Michael Bloomberg and retired Supreme Court Justice John Paul Stevens, Holder has noted that immigrants represented by attorneys are at least five times more likely to prevail in their immigration cases than those who lack counsel. Which is disturbing since most people facing deportation proceedings do not have legal representation.

## Experienced California Post-Conviction Attorneys

### Orly Ahrony & Bruce Zucker
### Attorneys at Law




*Orly Ahrony*          *Bruce Zucker*

- *Appeals (State and Federal)*
- *Writs (Habeas Corpus & Mandamus)*
- *Lifer and Revocation Hearings*
- *Prison and Parole Issues*

*818-625-0807*
*Post Office Box 436*
*Agoura Hills, CA 91376*



**PRISONER ASSISTANT**
REHABILITATION AND REENTRY PLANNING

**Join Our Exclusive Membership, Open a Bank Account and Gain Access to Our Services!** MEMBERS ONLY
We only provide services to our clients, no exceptions.

Bank Account under your social security number. Deposits, Statements, Money Orders, Bank Checks, Green Dot, Stamp Exchange, Wire Transfers, Direct Deposit & PayPal.

**Prisoner Concierge** Internet Purchases, Gift Cards, Greeting Cards, Lottery, Sporting News & Current Events, People Search, Personal Shopper. "If It Can Be Done, We Will Try To Do It", see our catalog for more.

We can do any Graphic Design project. Printed Material, Musical Emails, Creative Writing, Photo Reproduction & Forwarding, Book Publishing, Book Cover Design, Press Releases, Portfolio Creation, and Website Building.

**Virtual Office** Mailboxes, Emails, Faxes, Texts, Scanning, Copies, Typing, Storage, Document Preparation, Internet Research, Prepaid, Contract, Computer Aided & Virtual Phones.

Place your profile on *prisonerassistant.com* and access our Special Features; Classifieds, Portfolios, Posts & Blogs, Market Place and Sponsor a Prisoner.

482 Summit Wind Drive, Ste. 704-AD1
Lake Harmony, PA 18624-0704
www.prisonerassistant.com
info@prisonerassistant.com
(570) 722-5800

For more information - send $4.50 to "Prisoner Assistant" for an Application Package and 56+ page color catalog. If you send an SASE you will only receive a brochure.

Credit Development   **JOIN NOW!**   Business Development

PLN_0001674

## U.S. Immigration Policy (cont.)

### Immigration Policy: Outcomes and Consequences

Currently, our federal immigration detention policies mirror the criminal justice and sentencing practices that led to an exponential increase in the U.S. prison and jail population over the past three decades. But unlike our nation's carceral population of 2.3 million, which has leveled off in recent years and actually posted a slight decline in 2011, the immigration detention system continues to grow.

"At the federal level, initiatives related to border enforcement and immigration detention with an emphasis on criminal alien populations as well as the consolidation of existing detainee populations have continued to create demand for larger-scale, cost efficient facilities," GEO Group CEO George Zoley said in 2011.

Beyond immigration-related issues being a hot-button topic and endless source of political debate, publicity surrounding the "War on Terror" has resulted in increased concerns about border security and, consequently, increased pressure on undocumented immigrants. Such pressure and a massive expenditure of federal funds to apprehend and incarcerate immigrants residing in the U.S. illegally have occurred with little regard to the societal and human rights consequences of our nation's immigration policies.

According to one lawsuit filed following an immigration raid, ICE officers "allegedly entered private residences without search warrants or consent, and arrested persons therein without arrest warrants or probable cause ... defendants detained all of the plaintiffs before learning about their immigration status ... did not inform the plaintiffs of their rights or why they were being seized ... [and] coerced them into signing English forms with no or minimal translation." The case settled in December 2011 for $350,000. [See: PLN, April 2012, p.40].

There has been a concurrent erosion of U.S. citizens' rights. Billions of dollars have been spent to create a colossal post-9/11 domestic surveillance infrastructure that includes warrantless wiretapping, security checkpoints where people are stopped and asked about their citizenship status, and dozens of "fusion centers" nationwide that collect and compile information for sharing among law enforcement agencies. [See: PLN, Aug. 2012, p.32].

An entire industry has evolved to service the demands of the "War on Terror," and the public has been misled to believe that terrorists and undocumented immigrants are somehow conflated, and that immigration violations are threats to national security. However, as noted by Benjamin Franklin, "They who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety."

What has the U.S. achieved as a result of its record number of deportations, billions of dollars spent on immigration enforcement and an archipelago of 250 ICE detention facilities scattered across the nation? While DHS and ICE have apprehended 663 undocumented immigrants from countries like Cuba, Iran, Syria, Sudan, Somalia, Afghanistan, Pakistan, Saudi Arabia and Yemen, to date none of those immigrants have been prosecuted for terrorist acts. ICE is not as anxious to publicize the millions of immigrants who have successfully entered the U.S. illegally without being caught.

Our nation's harsh immigration policies have drawn the attention of international human rights organizations, including the Inter-American Commission on Human Rights, an arm of the Organization of American States (OAS). After investigating six U.S. immigration detention centers, the Commission issued a report stating it was "deeply troubled by the continual and widespread use of [criminal] detention in immigration cases." It suggested the more liberal use of bail to reduce the number of people held in custody. The Commission also was troubled by ICE's 287(g) program, which "allows a state and local law enforcement entity to enter into a partnership with ICE, under a joint Memorandum of Agreement (MOA), in order to receive delegated authority for immigration enforcement within their jurisdictions."

The Commission concluded that "in many if not the majority of cases, detention is a disproportionate measure and the alternatives to detention programs would be a more balanced means of serving the State's legitimate interest in ensuring compliance with immigration laws."

Faced with criticism from some border-state officials who have sought more stringent enforcement of immigration statutes, the U.S. government has been slow to respond to human rights concerns. However, there is evidence to suggest that over the past several years the issue is being reframed.

In 2009, the United States began to shift from high-profile workplace immigration raids to less controversial auditing of I-9 forms (the documents that employees must submit indicating they have the legal status to work in the U.S.). This change came after several raids, including a noteworthy one in New Haven, Connecticut, resulted in federal civil rights lawsuits being filed against ICE agents who used tactics usually seen in major drug busts even though they were enforcing civil immigration laws.

The ACLU, long active in immigration reform efforts, has grudgingly noted some positive developments. David Shapiro of the ACLU National Prison Project stated that progress on immigration detention reform has been "halting."

"There were some positive reforms. But really, in terms of substantive improvements in conditions, a lot of them have just failed to materialize," he said. "Detainees are still held in facilities that really are

## Do you have diabetes?
### Is your diabetes under control?

Living with diabetes in prison is very difficult. Order your FREE copy of *Prisoner Diabetes Handbook: A Guide to Managing Diabetes — for Prisoners, by Prisoners.*

Order your FREE copy and start managing your diabetes and your health.

**ORDER FORM**
Fill out the information below, and send this order form to:

Prison Legal News
PO Box 2420
West Brattleboro, VT 05303

Name

ID number

Facility

Address

City          State          Zip



SPLC   Southern Poverty Law Center

*Handbook made possible by the Southern Poverty Law Center*

PLN_0001675

indistinguishable from prisons and jails ... and a lot of times, the conditions are really quite atrocious."

### Immigration Detention Facilities Decried

AN INCREASING NUMBER OF UNDOCU-mented immigrants are being criminally charged and held in jails and detention facilities under conditions similar or identical to those reserved for criminal defendants. While the increased criminalization of immigration-related offenses has been a financial boon for the private prison industry, it has been a human rights disaster for immigrants who enter the U.S. seeking jobs and better lives for themselves and their families.

On November 15, 2012, Detention Watch Network (DWN) released a report naming the ten worst immigration detention centers in the nation. "At all ten of the facilities, people reported waiting weeks or months for medical care; inadequate, and in some cases a total absence, of any outdoor recreation time or access to sunlight or fresh air; minimal and inedible food; the use of solitary confinement as punishment; and the extreme remoteness of many of the facilities from any urban area which makes access to legal services nearly impossible."

Notably, four of the ten worst facilities cited in the DWN report are operated by private companies: two by CCA (the Houston Processing Center in Texas and Stewart Detention Center in Georgia), one by Community Education Centers (the Polk County Secure Adult Detention Facility in Texas) and one by Paladin Eastside Psychological Services, Inc. (the Tri-County Detention Center in Illinois).

According to Meghan Rhoad, a Human Rights Watch researcher, "A central premise of the detention reform was that stronger federal oversight [of private detention center contractors] would protect the welfare of detained immigrants. That was repeated over and over. But, clearly, oversight means more than just monitoring. It means taking action. There have to be consequences for facilities that repeatedly fail to meet the minimum standards."

Human Rights Watch, in a 2010 report titled "Deportation by Default," highlighted

## HARVEY COX, MS
## CORRECTIONS CONSULTANT

**40 Years Prison Employment**
*(includes: Federal, State, Private)*
**Warden at Three Institutions**

**PSR Review Prior to Finalization**
*(impacts on all Classification Issues)*
**Initial Prison Placement Requests**
**Have your Attorney Contact Me**

**Prison Transfers**
*(includes Treaty Transfers)*

**Administrative Remedies**
*(Disciplinary Reports)*

**Expert Witness (Court Cases)**
*(Affidavits and Appearance)*

**PO Box 1551**
**Weatherford, TX 76086**
**(817) 596-8457**
**FAX: (817) 594-7172**
**hrcox@yahoo.com**
**www.prisonconsultant.com**

# Great Self-Help Book Deals
# From Prison Legal News!

### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer



The Criminal Law Handbook
$39.99



Represent Yourself in Court
$39.99



Legal Research
$49.99



Nolo's Deposition Handbook
$34.99

**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
**P.O. Box 2420**
**West Brattleboro, VT 05303**
**Phone: 802 579-1309**
**www.prisonlegalnews.org**



**NOLO**
**YOUR LEGAL COMPANION**

PLN_0001676

## U.S. Immigration Policy (cont.)

how the U.S. immigration system has failed to safeguard immigrants in detention who have mental disabilities, estimated to be 15% of the ICE detainee population. The report documented how even U.S. citizens with mental disabilities, unable to prove their citizenship, have been deported, and cited other cases where immigrants were left in detention indefinitely without proper medical care.

A federal class-action lawsuit is currently pending that alleges immigrants with mental disabilities have been mistreated by ICE officials, denied proper mental health care and denied access to legal counsel to address their grievances. See: *Franco-Gonzalez v. Napolitano*, U.S.D.C. (C.D. Cal.), Case No. 2:10-cv-02211-DMG-DTB. The plaintiffs are represented by the Northwest Immigrant Rights Project, the ACLU, Public Counsel, Mental Health Advocacy Services and the Los Angeles law firm of Sullivan & Cromwell, LLP.

It was not until May 2011 that the Board of Immigration Appeals created guidelines for dealing with detained immigrants who are mentally ill.

*Prison Legal News* has reported numerous cases in which immigrants held in ICE detention facilities have been denied adequate medical treatment, including the case of Francisco Castaneda, whose penile cancer went untreated while he was in ICE custody, resulting in the amputation of his penis and his subsequent death. [See: *PLN*, June 2011, p.24; April 2010, p.46; Sept. 2008, p.32]. Medical care within the immigration detention system has been condemned by Physicians for Human Rights [See: *PLN*, Dec. 2011, p.40] and has resulted in successful lawsuits [See: *PLN*, Nov. 2011, p.38], while the number of immigrants who have died in ICE custody – and the failure of ICE and its private contractors to accurately disclose those deaths – has led to widespread criticism. [See: *PLN*, Nov. 2009, p.26; Feb. 2009, p.10; Sept. 2008, p.30].

Not to mention the sexual abuse of immigrants by detention facility employees. [See: *PLN*, Dec. 2011, p.42].

Additionally, in a November 2011 article, *Washington Post* writer Esther J. Cepeda commented on another black eye for the U.S. immigration system, highlighted in a report by the Applied Research Center titled "Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System."

The study, according to Cepeda, "is the first ... illustrating how frequently parents and children are separated when they're caught up in immigration detention systems." The report found that as a result of its detention policies, ICE separated more than 46,000 immigrant parents from their U.S. citizen children in the first six months of 2011, resulting in 5,100 children being placed in foster care. Cepeda called this policy evidence of "moral bankruptcy."

### Recent Developments and Future Reforms

Beginning in February 2013, something unusual happened: ICE began releasing hundreds of detained immigrants, totaling 2,228 nationwide – an unprecedented mass release. Was it because ICE had suddenly realized the folly of detaining, for lengthy periods of time, immigrants who had committed civil immigration violations or low-level offenses such as traffic infractions? Did the releases indicate a sudden shift in U.S. immigration policy? Unfortunately not.

Instead, the release of thousands of immigrants apparently was a gambit in the ongoing struggle between the White House and Congress over the looming sequester. Absent agreement on budget reductions, the sequester would require automatic, mandatory spending cuts for most federal agencies, including ICE. Immigration officials claimed that the releases, in advance of the sequester deadline, were to ensure that ICE could accommodate the mandatory budget cuts. ICE Director John T. Morton said the releases were for "solely budgetary reasons." However, critics contended they were used as a blunt bargaining tactic to force Congress to the table on a federal budget compromise.

If the mass releases from ICE detention facilities – which infuriated members of Congress, mostly Republicans – was a tactical ploy, then it failed. No compromise was reached and the sequester went into effect on March 1, 2013. But the releases did achieve the unintended goal of providing ammunition to advocates seeking a reduction in immigration detention.

"ICE's stated justification for the releases – that it had determined these individuals could be 'placed on an appropriate, more cost-effective form of supervised release' – raises a fundamental question, posed among others by [DHS] Secretary Janet Napolitano herself: why were these individuals detained in the first place?" asked the ACLU.

Which is a question that equally could be applied to thousands of other immigrants held in detention facilities pending deportation hearings despite having no criminal records and being low flight risks. Why haven't they been released on community supervision?

For decades our nation's immigration policies have been implemented with little or no regard for the resulting financial and social costs. With the economic downturn well into its fifth year, perhaps that will now change. Integral to reforming our immigration system is addressing the practice of using private, for-profit companies to operate detention facilities – particularly considering the amount of money these companies spend, through campaign donations and lobbying, to influence lawmakers who formulate immigration policy.

"I think that when people are being heavily lobbied and when there's financial interests involved and when our representatives are benefiting from those financial interests directly through lobbying, it compromises their ability to do what's right for taxpayers and immigrant families," noted María Rodriquez, executive director of the Florida Immigrant Coalition.

In short, effective immigration reform will require removing the financial incentives and profit motive from our immigration enforcement and detention system. Removing immigration issues from the arena of destructive politics would also be a major improvement, but even less likely to happen. ◼

Sources: *Detention Watch Network, New York Times, www.indystar.com, Houston Chronicle, Associated Press, New York Daily News, Mother Jones, Huffington Post, The Star-Ledger, www.nj.com, www.counterpunch, Atlanta Journal Constitution, www.colorlines.com, www.grassrootsleadership.org, www.truthdig.com, www.mclatchydc.com, www.cjr.org, www.truth-out.org, www.abcnews.go.com, www.federaltimes.com, www.pewhispanic.org, www.immigrationforum.org, www.californiawatch.org, www.aclu.org, www.inthesetimes.com, Washington Post, www.businessinsider.com, www.cnn.com, www.humanrightsfirst.org*

PLN_0001677

# Anti-Immigrant Arizona Sheriff Outed by His Mexican Ex-Boyfriend

Paul Babeu, Sheriff of Pinal County, Arizona and a former police officer, was a rising Republican star within the state in 2012 – crusading in support of the anti-immigrant legislation SB1070, co-chairing Arizona's campaign for Mitt Romney's presidential bid and espousing the so-called family values that appealed to his conservative base.

However, his status as a contender for a seat in Congress came to a screeching halt in February 2012, shortly after the *Phoenix New Times* published an exposé that alleged Babeu had threatened his Mexican ex-boyfriend with deportation for releasing details about their relationship – as well as photos of Babeu that were originally posted on a gay "hookup" website.

"I have decided to end our congressional campaign and seek re-election as Pinal County sheriff," Babeu said in a personal message to his friends and supporters on May 11, 2012. He postured that in Washington, D.C. he would be "just one of 435 voices" in the House of Representatives, while as sheriff of Pinal County – a mostly rural area about an hour southeast of Phoenix – he could have a greater impact.

Babeu made no mention of the news reports about his alleged threat to deport his former lover, Jose Orozco, which had made it nearly impossible for him to raise money to run for a seat representing Arizona's unshakably conservative 4th District, or to make public appearances without facing questions about his sexuality or the ongoing investigation into his ex-boyfriend's allegations.

"To use a position of authority ... and make legal threats opens a Pandora's box of ethics issues for any law enforcement person or any elected person. In this case, he's both," noted criminal defense attorney Antonio Bustamante.

Three months prior to bowing out of the congressional race, Babeu held a press conference outside the Pinal County Sheriff's Office, where he was surrounded by deputies, employees and campaign supporters. He spent most of the hour-long press conference denying that he threatened his Mexican-national ex-boyfriend, though he acknowledged he was gay.

He then complained that the media – specifically the *Phoenix New Times*, which has long been opposed to anti-immigration rhetoric from the likes of Babeu, Maricopa County Sheriff Joe Arpaio and ousted former state Senator Russell Pearce (the sponsor of SB1070) – had used "baseless" allegations to opportunistically disclose his sexual orientation.

"This whole rumor, this whole idea of who I am in my private life has been shopped around," Babeu told reporters in February 2012, a day after the scandal broke. "This was a way, the hook, of how this could be brought out, and to malign and attack a sheriff who does stand for conservative principles, who does enforce the law."

The accusations, he added, "are absolutely, completely false – except for the issues that refer to me as being gay. Because that's the truth, I am gay."

Jose Orozco, who had worked as a campaign volunteer for the sheriff from 2008 to 2011, managing Babeu's website and Facebook page, was in possession of several text messages and photos of Babeu wearing





## We Offer You Solutions
Taking care of basic services for you on the outside.

FINANCE & BUSINESS
ADVOCACY
PARALEGAL
ADMINISTRATIVE
HELP FROM OUTSIDE
INFORMATION
CREATIVE
PHONE

At **Help From Outside** we understand what you're going through because we have loved ones in prison, too. Our standards are very high: quality and timeliness are of utmost importance.

\* All requests will be considered with the exception of immoral, unethical or illegal actions.

**Don't see your service? Ask. We offer more services than listed.**

For a brochure and application please send a SASE to:
Help From Outside, 93 S. Jackson St. #40469, Seattle, WA 98104
or call 206-486-6042 || www.helpfromoutside.com



## BRANLETTES

**OUR SIMPLE POLICIES:**

**SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP FRIENDLY)**

Due to tremendous time and costs answering letters, unless you are placing an order or a question regarding your order, we will not reply to any other questions.

*SASE ARE REQUIRED FOR ANY INQUIRIES OR CONCERNS!*

You and you alone are responsible for your selections being allowed into your facility.

Know your institutions policies as to what image content is allowed. Returned orders are non-refundable. They will be held for 14 Calendar days in order for you to send self-addressed stamped; 3-First class stamps per envelope, *with a street address* for every 20 pictures. All returned images held after two weeks will be re-sold and we will return to our stock.

All payments are by Institutional Checks or U.S. Postal Service or Western Union Money Orders.

These payments are processed immediately and shipped in less than 3-4 weeks. Any other company Money Orders delay shipment 8-10 weeks or until that Money Order clears our Bank. Yes, we deal with people that are, while in prison, still trying nickel and dime scams...

**ALL SALES ARE FINAL!**

**EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM.**

| OUR PRICES ARE SIMPLE: |
| --- |
| 1-4999 4X6 PHOTO = .45 CENTS EACH |
| 5000+ 4X6 PHOTOS = 20%DISCOUNT |
| 1-9 CATALOGS : $3.00 EACH+SASE |
| 10 CATALOGS: $25.00+SASE(4Stamps) |

**SHIPPING&HANDLING:**

Due to various prison policies regarding how many pictures can be sent in one envelope, our policy is as follows:
1 - 5 Photo's-----$1.00 per envelope
10- 15 Photo's--$1.50 per envelope
20 -25 Photo's--$2.00 per envelope

### Branlettes Beauties
Select your favorite:
White Catalog (20 Vol.)
Black Catalog (20 Vol.)
Asian & Latino Catalog (20 Vol.)
Please state what style photo's:
**Provocative Poses -**
**Or- Nude Poses**

**FREE CATALOG???**

You read it right! Just send a self addressed stamped envelope to us at the address below and we'll send to you ONE SAMPLE CATALOG (One per costumer) with 84 gorgeous girls in full color. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!
BRANLETTES
FREE CATALOG OFFER
P.O. BOX: 5765
Baltimore, Md. 21282

REMEMBER: YOU BOUGHT IT, IT'S YOURS.
WHETHER IT GETS THROUGH YOUR MAILROOM OR NOT! NO REFUNDS OR EXCHANGES. IF YOUR PURCHASE IS RETURNED TO US AND REMAINS FOR 14 CALENDAR DAYS UNCLAIMED, WE WILL RETURN TO OUR STOCK.

BRANLETTES, P.O.Box 5765, Baltimore, MD 21282

PLN_0001678

**Arizona Sheriff Outed (cont.)**

only a pair of tight underwear – photos the sheriff had posted on www.adam4adam. com, a gay dating site. His user name was reportedly "studboi1." When Jose refused to sign a confidentiality agreement saying that he wouldn't disclose the details of his relationship with Babeu, the sheriff allegedly threatened to have him deported.

"You can never have business after this and you will harm me and many others in the process ... including yourself and your family," Babeu wrote in a text message to Jose in late 2011. He also told his ex-lover, "You have crossed the line. Better get an attorney. You [sic] brother will also be contacted." Their years-long relationship ended in September 2011 when Orozco thought that Babeu was cheating on him.

"Jose retained our law firm after he was contacted by Sheriff Babeu's attorney, because he felt intimidated and needed someone to help protect his rights," Phoenix lawyer Melissa Weiss-Riner said in a statement. Orozco was apparently in the U.S. legally on a visa, though Babeu's attorney incorrectly claimed the visa had expired.

Babeu gained a measure of national stature four years ago when he campaigned with U.S. Senator John McCain for a fence along Arizona's southern border to keep out illegal immigrants; he was also a minor figure in Romney's presidential campaign. But after Jose's allegations became public, Babeu quickly resigned from his position with the Romney camp.

Arpaio – the self-proclaimed "toughest sheriff in America" – was a longtime ally of Babeu, as both men have used the racial politics of the immigration issue, including SB1070, to further their careers and keep their jails filled with Mexican immigrants. But after Babeu was outed, Arpaio distanced himself.

"All I can say is he's the sheriff of Pinal County, and it's up to him to face his issues, not me," Arpaio said, adding that Babeu had been "begging" for an endorsement in the congressional primary for the 4th District before dropping out of the race.

On August 31, 2012, Arizona Attorney General Tom Horne's office announced that no charges would be filed against Babeu for threatening Orozco, or against Orozco, whom Babeu accused of stealing his online identify and hacking into his

websites. Horne had recused himself from the investigation, which was conducted by Solicitor General Dave Cole.

Babeu was re-elected Sheriff of Pinal County on November 6, 2012.

*Prison Legal News*, represented by the law firm of Rosen Bien Galvan & Grunfeld LLP, the ACLU of Arizona and Human Rights Defense Center general counsel Lance Weber, is currently suing Sheriff Babeu and Pinal County for censoring PLN at the county's jail. A spokesman for the Sheriff's office claimed that PLN's publications had been rejected by the jail's mailroom "in error." See: *Prison Legal News v. Babeu*, U.S.D.C. (D. Ariz.), Case No. 2:11-cv-01761-GMS [*PLN*, Oct. 2011, p.36]. ◼

Sources: *Phoenix New Times, Arizona Republic, www.huffingtonpost.com, www. myfoxphoenix.com, Associated Press*

# Report: Total State Prison Costs at Least $5.4 Billion Over Budget Nationwide

For decades, tough-on-crime rhetoric has convinced taxpayers to finance ballooning prison budgets with no questions asked. But the price tag of mass incarceration has so grossly surpassed state corrections budgets that legislators across the country have become adept at paying prison-related costs from other sources, thereby making their prison budgets seem smaller than they actually are.

A report from the Vera Institute of Justice illuminates this problem by revealing that states pay, on average, 14% more for prison-related expenses than reflected by corrections budgets. In 40 states surveyed by Vera researchers, total prison costs for fiscal year 2010 were $38.8 billion – $5.4 billion higher than the states' collective prison budgets.

"States' corrections spending – including prisons, as well as probation and parole – has nearly quadrupled in the past two decades," according to the Vera report. Those figures make incarceration the fastest-growing budget item on the state level after Medicaid.

Financial resources that could be used for K-12 education, health care, affordable housing and other community services instead find their way into prison coffers to pay for guards' pension plans, fringe benefits and retiree health plans, as well as other corrections costs.

"As states continue to deal with serious budget constraints, it's critical that policy makers, corrections officials, taxpayers and legislators know exactly what their prisons cost," noted Vera Institute director Michael Jacobson. "Many states are moving toward reserving incarceration for the most dangerous people and using proven strategies to improve public safety at a lower cost."

Funded by the Pew Center on the States' Public Safety Performance Project, Vera researchers calculated the total cost of prison operations by analyzing publicly available data and soliciting information from all 50 state corrections departments in August 2011. Ultimately, 40 states agreed to participate in the survey.

Connecticut topped the participating states by spending 34% more on its prisons than reflected in its corrections budget, which cost taxpayers an additional $316,169 in FY 2010. Five other states – Illinois, Missouri, New York, Pennsylvania and Texas – spent between 20% and 32.5% more on prisons than their corrections budgets.

Another 18 states, including California, were between 5% and 19.9% over budget; California's externalized prison costs amounted to over $969,000. Total prison expenses exceeded corrections budgets by less than 5% in sixteen other states, with Arizona's total costs (just over $1 billion) coming in at less than 1% over budget – the lowest of any of the survey respondents.

The Vera report found that 11 types of prison costs are not usually included in states' corrections budgets. Some costs, including employee benefits and taxes, prison construction and renovation, and contracts with private prison companies, are "budgeted centrally for administrative purposes." In many states, a portion of the costs for prisoner hospital care and prisoner education/vocational training are funded through other state agencies. And in 21 states, pensions for prison personnel are simply underfunded, as are retiree health care benefits in 30 states.

Among the states that participated in the survey – representing 1.2 million of the nation's 1.4 million state prisoners – Vera

PLN_0001679

found that the total annual per-prisoner cost to taxpayers averaged $31,166, ranging from $14,603 per year in Kentucky to $60,076 per year in New York.

The report's authors contend that the survey provides an "apples to apples" comparison of state prison costs because it standardizes the measure and counts the comprehensive costs to taxpayers in every state." The point is an important one because policy makers are apt to compare states' per-prisoner spending, and push for lowering costs in their own states accordingly.

Vera warned, however, that per-prisoner costs "do not measure how effective spending is. They merely measure spending itself." Lowering per-prisoner costs "may invite poorer outcomes in terms of safety and recidivism."

To cut costs while maintaining public safety, the Vera report recommended that policy makers trying to trim budgets look to states like Kentucky, Mississippi, Kansas and Hawaii for successful strategies.

In 2007, for example, Kansas and Texas employed a "justice reinvestment" initiative that reduced prison costs and reinvested part of the resulting savings into decreasing recidivism. [See: *PLN*, Nov. 2009, p.18]. In 2008, Mississippi took the drastic but commendable step of reducing the percentage of sentences that nonviolent offenders must serve before parole eligibility from 85% to 25%.

Hawaii's Opportunity Probation with Enforcement (HOPE) punishes parolees and probationers who fail drug tests or commit technical violations with a "swift and certain" short stint in jail rather than a trip back to prison, reducing new arrests and positive drug screens by 50%. And in 2011, Kentucky revised its sentencing laws for nonviolent offenses to distinguish between serious and non-serious crimes, including eliminating some sentence enhancements for subsequent drug possession offenses.

"Many of these reforms require some upfront investment, but present the greatest opportunities for budget savings over the long run while also enhancing public safety," stated Peggy McGarry, Director of Vera's Center on Sentencing and Corrections. "Knowing the taxpayer cost of any public safety option is important – especially now. But it is just as important to examine and weigh those costs against the benefits they promise to deliver."

Source: *"The Price of Prisons: What Incarceration Costs Taxpayers," Vera Institute of Justice (January 2012)*



FREE 30 Minute Trial Offer

PLUS 100 Minute Signup BONUS

200 Minute Referral Bonus

...call them for me at **888-828-8168** and they'll cut the cost of my phone calls from this place...

NO Monthly Fees!!!
NO Activation Fees!!!

Rates down to 3¢ per minute

Helping Fed, State and Local Inmates Save $$$

**CallsFromWalls**
PO Box 459
New Milford, NJ 07646
info@callsfromwalls.com



**ColdCrib**
#1 JAILHOUSE MAGAZINE
**ISSUE#3 OUT NOW!**
ONLY $10

3 FREE Non-Nude PHOTOS INCLUDED!
WITH PURCHASE
INMATES MUST SEND $10
TO GET YOUR OWN MULTI-PAGE CATALOG/MAGAZINE TO ORDER HUNDREDS OF LOVELY LADIES PHOTOS & OTHER SERVICES FOR THE INCARCERATED

THE TRUTH ABOUT SAVING ON JAIL CALLS
LEARN HOW TO GET FEMALE COMPANIONS ON THE OUTSIDE
*CORRECTIONAL FACILITY FRIENDLY*

**GET MAIL FROM FEMALE PENPALS**

GET LISTED ON OUR PENPAL SITE
www.COLDCRIB.com
Send your photo and info along with $30 for 1 FULL year membership
OR $30 for Pen-Pal List of up to 50 addresses of our registered female PenPals

REAL NAMES & ADDRESSES

**$17/mo Unlimited Calls**
+ $15 ONE TIME Activation Fee
ColdCrib communications
INMATES CALL CELL PHONES
Federal, State, County & Local Facility Inmates
Local Number Provided Same Day!

**NOW INMATES CAN ORDER THEIR OWN NUMBERS!**
**MAKE EVERY CALL HOME A LOCAL CALL**
NO MORE RUNNING OUT OF MINUTES!
SEND $3 FOR PHONE PLAN APPLICATION FORM
OR HAVE YOUR LOVED ONES ORDER ONLINE
www.ColdCribCommunications.com

SPECIAL OFFER
BEST 4X6
PHOTOS
VARIOUS BACKGROUNDS & POSITIONS
**SET OF 15 (NON-NUDE) SEXY PHOTOS**
ONLY $16
INMATES MUST SEND FACILITY CHECK OR MONEY ORDERS
**COLD CRIB**
PO BOX 682407
FRANKLIN TN 37068
MUST ADD $2 S/H FOR ALL ORDERS



**NEW FRIENDS, HIGHER EDUCATION, AND EMPLOYMENT & HOUSING UPON RELEASE THROUGH WRITEAPRISONER.COM PROFILES**

Contact WriteAPrisoner.com & Start Looking Forward To Mail Call!

AS SEEN ON
CNN, 20/20, Fox News, Dr. Phil, O Magazine, E! True Hollywood, and hundreds more!

**WriteAPrisoner.com...**
Simply the largest, highest ranked, & most visited website of its kind!*

• Pen-pal Profiles are affordably priced at $40 for the first year, $30 for renewing year
• Features a comprehensive search that allows viewers to find your profile by age, race, location, keywords, & more - 32 search options in all
• Your new friends can email their first message to you along with a photo
• Advertises non-stop on every major search engine with thousands of websites linking back to us
• Offers free Reintegration Profiles for inmates seeking employment and housing upon release and education during incarceration
• Translated into 51 languages & geared for international search engines
• Viewers can "subscribe" to your profile to be notified when your profile is updated, blog is added, artwork is posted, poetry is added, your release is near & much more
• Pen-pals have the option of helping you with a broad range of topics using WriteAPrisoner.com's free Self-Help Series

**Get Started Today!**
Friends & family can submit your entire 250 word profile, photo, and payment for you online by visiting
**www.writeaprisoner.com/post**

WriteAPrisoner.com
We'll see you at mail call!

Or for a FREE Brochure, Send a S.A.S.E. to:
WriteAPrisoner.com
PO Box 10-PLN
Edgewater, FL 32132 USA

Proud member of the Better Business Bureau of Central Florida & the Southeast Volusia Chamber of Commerce
*Our website traffic can be independently verified at www.quantcast.com/writeaprisoner.com

PLN_0001680

# From the Editor

## by Paul Wright

**A**S WE PUBLISH OUR SECOND ISSUE WITH PLN's new design, the feedback we have received so far has been overwhelmingly positive, including with respect to our expanded size. The additional pages are important as they allow us to include even more news and legal content.

I would like to remind readers who have direct or indirect Internet access that PLN's website, www.prisonlegalnews.org, is the most comprehensive site when it comes to detention facility litigation and news. Every issue of PLN is online and we have over 26,000 articles in our website database, including the largest collection of detention facility verdicts and settlements available anywhere. Our brief bank contains around 6,000 legal pleadings, from complaints and briefs to motions and more. With over 23 years of data, we have a substantial amount of information on prisons, jails and criminal justice-related topics.

The Campaign for Prison Phone Justice continues to move forward. As this issue goes to press more than 700 prisoners have contacted the FCC to request caps on interstate prison phone rates. Prisoners' family members have submitted many comments, too. The letters are eloquent in pointing out the inherent injustice and unfairness of the current status quo, in which prison phone companies profit while prisoners and their families suffer financially. PLN and several other organizations filed detailed comments with the FCC on March 25, 2013, asking that the FCC cap interstate prison phone rates at \$.05 per minute with no additional fees or surcharges.

We have devoted an enormous amount of time and effort to gathering the hard data required to support our FCC comment – including updated state-by-state prison phone rates and commission percentages and amounts – and putting it into an easily-digestible format. Only PLN and the telecom industry have such comprehensive, current data concerning prison phone calls, and the latter is not eager to share it. We hope to be able to declare a victory in the Campaign for Prison Phone Justice in the near future, then can begin to focus attention on individual states to lower the cost of in-state calls made from prisons and jails.

New subscribers should note that PLN also publishes books, and we currently have two titles in print: the *Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada* and *The Habeas Citebook: Ineffective Assistance of Counsel*. Both are written by current or former prisoners; see our book store list on pages 61-62.

We are seeking new titles to publish, specifically non-fiction self-help and reference books useful to prisoners. PLN pays the most competitive royalties in the publishing business. If you are a qualified author with a solid book proposal, or know one, please contact us and direct your proposal to Susan Schwartzkopf, our book project director. Keep the proposal to one page; if it's of interest we will respond with additional questions. Titles should be on topics that appeal to prisoners on a national level, and we require manuscript submissions in electronic format if we decide to publish the book.

Last, but certainly not least, prison and jail officials across the country continue to censor PLN. Ironically, the more successes we achieve in court when challenging unconstitutional censorship practices, the more we are censored. We take censorship of PLN and the materials we distribute very seriously. Often, prison and jail staff never bother to inform us that they have rejected our publications. If you are notified that anything sent to you by PLN or the Human Rights Defense Center has been censored or rejected, please mail us a copy of the notice you received and file grievances, appeals or other available administrative remedies, then send us any responses.

Last February we had a bench trial in Portland, Oregon challenging the Columbia County Jail's postcard-only policy. [See: *PLN*, March 2013, p.51]. We are also scheduled to go to trial in Florida in August 2013 in a lawsuit challenging a statewide ban on PLN, purportedly due to our advertising content. Even states that are currently under PLN consent decrees or injunctions, such as California, continue to be problematic. Therefore, please keep us informed if you are not receiving PLN's publications. It is pointless to publish a magazine that doesn't reach its target audience.

Enjoy this issue of PLN, and please encourage others to subscribe. ∎

## iNMATE SH♥PPER



**Yes, it's true, this is a real 200+ page publication, not a 7-sheet rip-off!**

EVERY ISSUE Contains *at least*:
• 800 Pen Pal resources
• 400 businesses friendly to prisoners
• 66 Gift Shops
• 360 Non-profit orgs for prisoners' issues
• 70 Contests for writers, poets & artists
• 63 Catalogs to order
22 Personal Assistants • 14 Typists
• 5 Publishing Services
• 15 Magazine Sellers • No Nudes *BOP Cool!*

Gigantic Exclusive
**Inmate Shopper Mall**
full of products made by prisoners
*FREE Ad Space* for inmate authors, crafters, and artists. Sell your items in our Mall. Complete directions for placing your products in the Mall are in every issue.

*ORDER FROM:*
• Amazon.com • Inmatebooks@yahoo.com
• Inmate Book Service
P.O. Box 142, Caratunk, ME 04925
• InmateMAGS, 4208 University Way NE
Seattle, WA 98105
\$17.99 + \$7 Priority Mail Shipping - Tracking Incl.



**PASS**
Prisoner Assistance Scholastic Service provides educational materials nationally to prisoners in state and federal prisons and jails.

⊛ Victim Awareness
⊛ Anger Management
⊛ Addiction/Substance Abuse
⊛ Domestic Violence
⊛ Gang Diversion
⊛ Conflict Resolution
⊛ Parenting
⊛ Non-violent Communication
⊛ Re-entry in Society
⊛ Living With Purpose

Prisoners who successfully complete the PASS program earn a degree in Personal Psychological Development which can be used as evidence of rehabilitation before parole boards and with prison officials.

**10 COURSES 2 SEMESTERS**
\$500 for the entire course of study and degree.

Graded study - completed through the mail.

**FOR MORE INFO**

**1-888-670-7277**     **www.passprogram.org**
pass@passprogram.org
PASS Program, PO BOX 2009, San Francisco, CA. 94126

PLN_0001681

# Los Angeles Jail Undersheriff Steps Down

**P**LN's MARCH 2013 COVER STORY detailed a long-standing pattern of abuse and corruption in the nation's largest jail system, operated by the Los Angeles County Sheriff's Department (LASD). Some of that misconduct was attributed to LASD Undersheriff Paul K. Tanaka, the right-hand man of Sheriff Leroy "Lee" Baca.

In fact, in its final report released in September 2012, the Citizens' Commission on Jail Violence stated that Tanaka, who has a tattoo representing a deputy "gang" called the Vikings, had "engaged in conduct that undermined supervision of aggressive deputies and promoted an environment of lax and untimely discipline of deputy misconduct."

"The troubling role of Undersheriff Tanaka cannot be ignored," the report added. "Not only did he fail to identify and correct problems in the jails, he exacerbated them. The Commission learned about his ill-advised statements and decisions from a wide array of witnesses and sources. Over the course of several years, the Undersheriff encouraged deputies to push the legal boundaries of law enforcement activities and created an environment that discouraged accountability for misconduct. His repeated statements that deputies should work in an undefined 'grey' area contributed to a perception by some deputies that they could use excessive force in the jails and that their aggressive behavior would not result in discipline."

Additionally, Undersheriff Tanaka was reportedly named in an investigation into efforts by LASD staff to transfer an incarcerated FBI informant to different jail facilities under different names, to conceal him from federal agents.

In his response to criticisms by the Commission, Sheriff Baca indicated that Tanaka would no longer have supervision over LASD jail operations. However, on March 6, 2013, to the shock of many LASD insiders who had known and worked under Tanaka for decades, Sheriff's Department officials announced that Tanaka was retiring effective August 1. He had served with the LASD for 33 years.

He has also served as the mayor of the City of Gardena, and was re-elected to a third term just days before announcing his retirement. Until recently, following the release of the Commission's report, both Tanaka and Baca had received campaign contributions from LASD employees, which had been criticized as a means of currying favor and political patronage, and creating conflicts of interest.

Tanaka said his departure from the Sheriff's Department was voluntary, though it was reportedly in conjunction with an "uneasy rift" with Sheriff Baca. LASD spokesman Steve Whitmore stated Tanaka's decision to step down was not related to violence and abuse by deputies in the county's jail system.

The Undersheriff will be missed – not by the prisoners and former prisoners who were brutalized by deputies under his command, but by LASD administrative officials who relied on Tanaka to manage the department's $2.5 billion annual budget.

Sources: *www.laobserved.com, Los Angeles Times, www.witnessla.com*



## William L Schmidt
### ATTORNEY at LAW, P.C.

**911CIVILRIGHTS@GMAIL.COM**

**559.261.2222**

**SEPTEMBER 21, 2012
Los Angeles, California**

**ANOTHER MULTIMILLION DOLLAR
EXCESSIVE FORCE VERDICT FOR A
CALIFORNIA CLIENT**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
---------------OUR CLIENTS GO HOME, HOW ABOUT YOU? -----------------
*Please submit a single page summary of your case. Due to the volume, we cannot return documents or respond to all inquires. We are not a low cost or pro bono law firm, but if you want results, contact us.*

P.O. BOX
25001
FRESNO, CA
93729

PLN_0001682

# A 'Nobody's' Legacy: How a Semi-literate Ex-con Changed the Legal System

*by M. Alex Johnson and Vidya Rao, NBC News*

If you've heard of Clarence Earl Gideon at all, it's probably because of a movie you had to watch in school. He deserves better, though, because 50 years ago he fundamentally changed the American legal system and your rights if you are accused of a state crime.

In *Gideon v. Wainwright*, a unanimous Supreme Court declared on March 18, 1963, that the states were required to provide legal counsel for defendants in felony cases who could not afford an attorney. In doing so, it accepted the reasoning of a poorly educated Florida gambler and ex-con who wrote out his habeas corpus petition to the court by hand.

Federal courts had been required to provide counsel for indigent defendants in felony cases since 1938. But over the next 25 years, the Supreme Court let several opportunities pass by to impose the same rule on state cases, which had discretion to develop their own ways to ensure a fair trial in cases that didn't involve the death penalty.

"If an obscure Florida convict named Clarence Earl Gideon had not sat down in prison with a pencil and paper to write a letter to the Supreme Court, and if the Supreme Court had not taken the trouble to look at the merits in that one crude petition among all the bundles of mail it must receive every day, the vast machinery of American law would have gone on functioning undisturbed," Robert Kennedy, then the U.S. Attorney General, said in an address in Boston later that year.

"But Gideon did write that letter," he said. "The court did look into his case. He was retried with the help of competent defense counsel, found not guilty and released from prison after two years of punishment for a crime he did not commit. And the whole course of legal history has been changed. I know of few better examples than that of a democratic principle in action."

Today, indigent defendants are legally guaranteed representation across the U.S. But in the 50 years since the decision, the quality of their representation has been called into doubt. In a new book timed to mark the anniversary, *Chasing Gideon*, author Karen Houppert argues that "we have not delivered on the promise of Gideon."

"These public defenders I talked to were looking at 200 felony cases or 225 misdemeanor cases for a single attorney," Houppert, a former staff writer for The Village Voice and media fellow at the Kaiser Family Foundation, said.

"As a result, they're forced to persuade people to plead guilty without investigating what actually happened, without talking to a single witness in the case," she said. "There are thousands of people languishing in jail without a lawyer – and thanks to budget constraints, people aren't really getting their day in court with a lawyer standing there defending them."

## A Court Looking for an Opening

Clarence Earl Gideon, 50, was arrested June 3, 1961, after about $5 in change and some beer and soda were stolen from a pool room in Panama City, Florida. Representing himself because the trial judge rejected his request for a court-appointed lawyer, Gideon was convicted August 4, 1961, of breaking and entering with intent to commit petty larceny. He was sentenced to five years in prison.

While in prison, Gideon read up on the law, and he became convinced that the federal requirement to provide counsel had to apply to the states through the 14th Amendment, which courts have long held extended the Bill of Rights to the states.

Hitting a roadblock when he sought help first from the FBI and then from the Florida Supreme Court, Gideon – probably with the assistance of his cellmate, Joseph Peel, a lawyer who had been convicted of killing a judge's wife – mailed a handwritten five-page petition in January 1962 to the U.S. Supreme Court, which agreed to hear his appeal.

(The case has gone down in memory as *Gideon v. Wainwright*, thanks to the book *Gideon's Trumpet* by Anthony Lewis and the 1980 TV movie of the same name starring Henry Fonda. But right up until the court reached its decision, it was actually called *Gideon v. Cochran* – Louie L. Wainwright became famous as the respondent only because he replaced H.G. Cochran as director of the Florida Division of Corrections after the court heard arguments on January 15, 1963).

Bruce Jacob, the assistant state attorney general who argued Florida's side, believed the court was looking for a chance to overturn a 1942 case called *Betts v. Brady*, in which it declined to impose an absolute rule requiring legal representation for every indigent criminal defendant in noncapital cases, he wrote in a 2003 paper for the Stetson University Law Review on the 40th anniversary of *Gideon*.

His goal, he wrote, was to limit the scope of whatever new standard the court came up with.

"We hoped ... that the new rule would not be made retroactive, because we did not want such a decision to result in the release of large numbers of prisoners from the state penitentiary who had been convicted without counsel," he wrote.

If there was any doubt about the court's objectives, it was likely erased when the



*From Florida State Archives*

PLN_0001683

justices appointed Abe Fortas, one of the most prominent lawyers in America, to represent Gideon. Fortas was Vice President Lyndon Johnson's personal lawyer and was appointed to the Supreme Court just two years later.

In a 1969 letter to the Harvard Law Record, Jacob wrote that it was "obvious, during the argument, how deeply the court was committed to the overthrow of *Betts v. Brady* and its progeny.

"Never in the eighteen cases which I had previously argued in the Florida Supreme Court and other appellate courts had I encountered anything like the zeal and emotion that emerged in the questioning. Anger seemed to characterize my most relentless questioner.... Florida's position was obviously hopeless; my ten months of work devoted to the case were of little avail."

The decision came down two months later, written by Justice Hugo Black, who had been on the losing side of the 1942 *Betts* decision.

"From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law," Black wrote. "This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him."

Five months later, Gideon was retried, this time with a court-appointed lawyer. The new jury acquitted him after only an hour of deliberation.

### 'He had the Guts to Say: "That's Not Fair"'

CLARENCE EARL GIDEON DIED OF CANCER in 1972, apparently without ever again running into serious trouble with the law.

As a result of *Gideon v. Wainwright*, more than 4,000 Florida inmates got retrials or were simply released, Florida corrections records show. (There's no reliable record of how many retrials ended in acquittals).

Jacob wrote in his 2003 law review article that even though he was on the losing side, it was clearly the right decision. Jacob went on to a distinguished legal career – which included stints as a public defender and as an advocate for legal reform. He taught at several law schools, including Harvard's, and served as dean of the Stetson University College of Law in DeLand, Florida.

Forty-seven of the 50 states now have statewide public defender offices, according to the National Center for State Courts (individual counties serve that function in Alabama, Maine and Utah).

Even if they're not always effective, those offices are a monumental legacy to Gideon, Houppert said.

"It's incredibly moving to read Gideon's letters – he was making such a good and sincere argument. And it's touching to me that he was somewhat illiterate – it's full of spelling mistakes and handwritten in pencil," she said.

"As Americans, it's moving to us to see someone take a stand against the big guys, that he had the guts to say: 'That's not fair. I'm an American, and this isn't right.'

"It's incredible, because he was nobody."

*This article was originally published by NBC News on March 18, 2013 (www.usnews.nbc-news.com); it is reprinted with permission.*



PLN_0001684

# Iowa Pays Almost $500,000 to Fired Parole, Prison Supervisors

*by Joe Watson*

Non-union membership in the Hawkeye State apparently has its privileges, at least for parole and prison officials in management positions.

Between August 2011 and early 2012, when Iowa's Public Employment Relations Board (PERB) ruled in their favor, 18 former prison and parole supervisors who claimed they were improperly laid off have collected nearly $500,000 in back pay.

The issue concerns "bumping rights," which means that since ascending the correctional hierarchy and becoming managers, the terminated employees argued their seniority should have made them immune to pink slips, and lower-ranking union workers should have been fired in their stead. The PERB agreed and ordered state officials to remedy the situation.

To date, the largest single payout – $205,000 in back wages and benefits – has gone to James Twedt, 60, a senior parole judge and 25-year state employee who was laid off in March 2010.

"I was employed with certain expectations and rights, and my rights were violated," said Twedt, who was reinstated to his job overseeing parole revocation hearings. "I would say that it turned out the way it should have."

Twedt and the other terminated employees had been members of the American Federation of State, County and Municipal Employees (AFSCME), Iowa's largest public employees union, until they accepted promotions to become managers and supervisors. A state rule and union contract provisions enabled them to maintain their seniority in the event of downsizing.

But then Governor Chet Culver, facing burdensome budget cuts, reached a deal with AFSCME to preserve hundreds of union jobs in exchange for unpaid furlough days and a suspension in contributions to worker pensions. The agreement also specified that supervisors facing layoffs wouldn't be able to bump union employees.

The prison and parole supervisors filed grievances after their layoffs, which began in December 2009, while AFSCME and the state argued that the renegotiated contract between Governor Culver and the union should have superseded previous rules. The PERB, however, sided with the former supervisors.

Culver's successor, Governor Terry Branstad, has refused to appeal the PERB ruling while state attorneys and a half-dozen other former correctional managers are still arguing their job termination cases.

Danny Homan, president of AFSCME Council 61, was peeved about Branstad's inaction as well as Twedt's $205,000 payout, which he called "a heck of a lot more than most of my members make."

"I'm disappointed the PERB board made the ruling they made," Homan added, "and I'm disappointed the current administration chose to accept the ruling instead of appealing." He said the prison and parole supervisors should have lost their bumping rights after they were promoted and no longer union members.

Source: *Associated Press*

# California: Thousands of Sex Offenders Remove GPS Monitors

Taking advantage of the lack of available bed space to house parole violators in California jails following the state's "realignment" initiative, thousands of paroled sex offenders fitted with GPS ankle bracelets have disabled or removed them – with few consequences.

Under Jessica's Law, sex offenders in California are subject to GPS monitoring for life. The monitor reports their position continuously to parole authorities; it also sounds an alarm at the parole office if a parolee strays too close to schools, parks or other prohibited areas.

Life is miserable for parolees on GPS monitoring. The device, worn on the ankle, is plainly visible if one is not wearing long pants. Even worse, its battery life is limited and requires recharging twice per day – which takes over an hour and requires an available electrical outlet. Failure to recharge the monitor means no signal is sent to the parole office, and a warrant for a parole violation can immediately issue.

Monitoring of paroled sex offenders is popular with members of the public, who have been brainwashed to believe that such offenders are ticking sexual time bombs just waiting to pounce on another female or child victim. In fact, only a very small percentage of released sex offenders – around 5% – are arrested for committing another sex offense.

While the failure of sex offenders to maintain their GPS devices is grounds for a parole violation, spending time in a county jail due to such violations is no longer a certainty. California jails are currently packed with offenders transferred from state prisons under the realignment initiative. As a result, technical parole violators, who have not committed a new criminal offense, are often simply released. Before realignment, sex offenders who violated their parole remained behind bars awaiting hearings that could result in up to a year in prison. Now the most severe penalty is 180 days in jail.

With the common knowledge that they likely won't serve time if they remove their GPS monitors, thousands of paroled sex offenders have done just that. More than 2,700 sex offenders have committed GPS monitoring violations since October 2011 after the state began referring parole violators to county jails instead of returning them to prison, the Associated Press reported in March 2013 – a 15% increase since the state's realignment initiative went into effect.

The *Los Angeles Times* calculated the number of arrest warrants issued for parolees who committed GPS violations at more than 3,400, which included both sex offenders and gang members. Most parole violators are quickly apprehended.

In San Joaquin County, a review of jail logs indicated that nine of the 15 sex offenders arrested for violating parole between December 2012 and January 2013 were released within 24 hours; seven immediately tampered with their GPS monitoring devices and disappeared. One, a convicted rapist, was arrested two weeks later on kidnapping charges.

Another sex offender with a history of beating women was released after serving 16 of the 180 days he was ordered to spend in jail. After he fled, police found his girlfriend, severely beaten and in a coma,

in her apartment where she had lain for days on the floor. She suffered severe brain damage and now has to use a wheelchair. The parolee was convicted of attempted voluntary manslaughter.

The problem has no easy solution. A state legislator has proposed that county parolees who tamper with their GPS devices be returned to prison for up to three years. But California state prisons are already filled to beyond the population cap mandated by the federal courts; there is no room for the thousands of sex offenders who abscond from GPS monitoring.

Parole authorities filed complaints with the California State Auditor's office against the California Department of Corrections and Rehabilitation (CDCR), accusing prison officials of failing to disclose the public safety problem of sex offenders removing their GPS monitors. The CDCR, in turn, said it had disclosed such information online, and had reached agreements with seven counties to evaluate sex offenders who commit parole violations to determine which should not be released early from jail.

According to a 2012 report by the National Institute of Justice, California sex offenders who are not subject to GPS monitoring are almost twice as likely to be re-arrested and nearly two-and-a-half times more likely to commit sex-related parole violations.

Sources: *Los Angeles Times; www.ocregister. com; "Monitoring High-Risk Sex Offenders With GPS Technology: An Evaluation of the California Supervision Program, Final Report," National Institute of Justice (March 31, 2012)*



connect with us...

send an SASE for a free brochure to:

**inmate scribes**
**PO BOX 371303**
**milwaukee,**
**WI 53237**

packages from only **$8!**

stay connected, stay involved, be heard...

sick of subscription services that never work? using our patented credit-based system, we do what you want, when you want with no monthly/yearly fees. your credits never expire, and you can use them as frequently as you desire! all new purchases will receive a free email account with this special, limited-time offer!

email - facebook - dating sites - penpal sites social media - research - friend finding - lyrics & tabs personal gifts - photo editing - sexy photos and more!

- Slaughtering the competition since 2012!
- All shots are 100% WATER PROOF
- All shots are 50¢ NO tax NO shipping
- Get your friends and family to order your shots on the website and pay only 35¢ each
- Mention this ad and code word: BATMAN and send us 2 First Class stamps for a Black/White catalog
- Request KSK gift cards from your friend or family

# American

- Need help with Facebook or E-mail service?
- Want to send someone flowers or a special gift?
- Interested in a pen-pal address catalog or getting placed on a Pen-Pal website?
- Send 2 First Class Stamps for a FREE catalog!!!



What's up Convicts!? We are the best in the biz!!! Created by inmates for inmates. Our next $300.00 Art Contest begins on May 1st. Send your art/entry before June 1st. Voting begins June 1st and ends on Aug. 1st. If you have ANY questions or suggestions shoot us a kite along with a SASE.

# KillShotKing.com

# Convict

- Are you looking for assistance getting your songs or books purchased or published?
- Searching for a long lost friend or family member?
- Looking for the latest Urban Novels?

- We sell Bricks of Flicks! Pick 200 shots from any combo of catalogs and pay only $75.00
- Get your friends and family to go to our website and download/print ALL of our catalogs for FREE
- Mention this ad and the code word: PEGASUS and get 15 FREE shots with your first order of 30 or more!
- Request special shots or models

**Kill Shot King**
**P.O. Box 81074**
**Corpus Christi, TX 78468**

# Connection.com

- Need Help with parole presentation or representation?
- Want something researched on the internet?

**American Convict Connection**
**P.O. Box 81002**
**Corpus Christi, TX 78468**

PLN_0001686

# Fortresses of Solitude

## by James Ridgeway

Supermax prisons and solitary confinement units are our domestic black sites – hidden places where human beings endure unspeakable punishments, without benefit of due process in any court of law. On the say-so of corrections officials, American prisoners can be placed in conditions of extreme isolation and sensory deprivation for months, years or even decades. At least 80,000 men, women and children live in such conditions on any given day in the United States. And they are not merely separated from others for safety reasons. They are effectively buried alive. Most live in concrete cells the size of an average parking space, often windowless, cut off from all communication by solid steel doors. If they are lucky, they will be allowed out for an hour a day to shower or to exercise alone in cages resembling dog runs.

Most have never committed a violent act in prison. They are locked down because they've been classified as "high risk," or because of nonviolent misbehavior – anything from mouthing off or testing positive for marijuana to exhibiting the symptoms of untreated mental illness. A recent lawsuit filed on behalf of prisoners in ADX, the federal supermax in Florence, Colorado, described how humans respond to such isolation over the long-term. Some "interminably wail, scream, and bang on the walls of their cells" or carry on "delusional conversations with voices they hear in their heads." Some "mutilate their bodies with razors, shards of glass, sharpened chicken bones, and writing utensils," or "swallow razor blades, nail clippers, parts of radios and televisions, broken glass, and other dangerous objects." Still others "spread feces and other human waste and body fluids throughout their cells [and] throw it at the correctional staff." While less than 5 percent of U.S. prisoners nationwide are held in solitary, close to 50 percent of all prison suicides take place there.

After three years of reporting on solitary confinement for Solitary Watch, a website I co-founded, I'm convinced that much of what happens in these places constitutes torture. How is it possible that a human-rights crisis of this magnitude can carry on year after year, with impunity?

I believe part of the answer has to do with how effectively the nature of these sites has been hidden from the press and, by extension, the public. With few exceptions, solitary confinement cells have been kept firmly off-limits to journalists – with the approval of the federal courts, which defer to corrections officials' purported need to maintain "safety and security." If the First Amendment ever manages to make it past the prison gates at all, it is stopped short at the door to the isolation unit.

As a reporter, I ran into solitary confinement three years ago when writing an article about Herman Wallace and Albert Woodfox, members of the so-called Angola 3, who have lived in solitary confinement in Louisiana since they were convicted of killing a prison guard in 1972. After writing an initial article about the case, based on public records, I sought permission to visit Angola and interview the two men. I was told by a deputy warden that the prison wanted nothing to do with me because officials didn't like what I had written. The ACLU of Louisiana took up my case, gathering evidence to show that while the prison denied me entrance it had welcomed many others, including press, politicians, religious figures, schoolchildren, tourist buses, Hollywood filmmakers, canoeists paddling past on the Mississippi and such notables as Miss Louisiana. Since Angola had such an open-door policy, its discrimination against me was actionable on First Amendment grounds. Warden Burl Cain backed off and granted me what turned out to be the standard guided tour of the plantation prison. It included numerous dormitories, chapels and even the death chamber – but not the solitary confinement units. Even the ACLU couldn't help me penetrate those fortresses of solitude.

It would be the first of many times I was turned away from such units. While reporting on solitary confinement in New York State, I was readily shown around Auburn Correctional Facility by the affable warden there. I saw all kinds of cells, yards and workshops – everything but the so-called Special Housing Unit (SHU) where prisoners are held in solitary. These units, I was told, are never shown to the media. At another New York prison, I managed to visit (under the watchful eye of a guard) with a man who has been in solitary for nearly 25 years. Since the Department of Corrections media policy forbids media visits to prisoners in "segregation," I had to withhold the fact that I was a reporter and sign in as his "friend."

Once I launched Solitary Watch, I learned of a handful of other reporters who were encountering the same restrictions – and working around them and in spite of them. "I was never able to get inside" a SHU in New York, Mary Beth Pfeiffer, a reporter for the *Poughkeepsie Journal*, wrote in an email. "In 2001, after I began writing about links between solitary confinement, mental illness and suicide, they refused even to let me into any of their prisons except through the visiting room. Even there, I once had my notes seized by prison officials who claimed note-taking was not permitted." Pfeiffer says she relied on "official reports of conditions and suicides there, and the accounts of former prisoners."

George Pawlaczyk and Beth Hundsdorfer of the *Belleville News-Democrat* authored a series of articles called "Trapped in Tamms," about the supermax prison in southern Illinois. The 2009 series, which won a George Polk award, revealed horrendous treatment of mentally ill prisoners and the cruel attitudes of prison officials, including doctors. Unable to secure a visit, Pawlaczyk says their reporting was based largely on court documents, mostly depositions, and the surprise finding that one Illinois county's mental health reports were filed and open to the public.

Susan Greene, the former *Denver Post* reporter who in 2012 wrote "The Gray Box," a blistering report focusing on ADX, for the Dart Society, says she couldn't even get close to the prison, which has been completely off-limits to the press since 9/11. "I have had absolutely no access to the place at all," she told me. When she pulled up in front of the driveway to the remote prison complex, she was chased away by armed guards. But in addition to public records, Greene based her reporting on correspondence with prisoners in extreme isolation, carried on for more than a year. Ironically, once her article was published, she could not send it to her correspondents in ADX due to a policy against allowing prisoners' names in

PLN_0001687

an article. "So I redacted all the prisoners' names," she said, "and then it came back saying something like, 'You can still see it if you hold it up to the light.' Out of frustration and wanting to be a pain in the ass, I Exacto-knifed out all the names and sent it, and it still didn't get through."

Shane Bauer, who wrote a 2012 exposé about solitary confinement in California for *Mother Jones*, also relied heavily on correspondence with dozens of prisoners in Pelican Bay and other state SHUs who had staged several highly-publicized hunger strikes after years or decades in isolation. Bauer spent more than two years in an Iranian prison after being captured on the Iran-Iraq border, including four months in isolation, and thus has the rare perspective of someone who has himself experienced solitary. He also succeeded in gaining access to Pelican Bay, though it was severely limited and carefully orchestrated. Bauer says he was taken to a unit full of men who had cooperated with prison officials by passing on information about prison gangs, "and was allowed to interview one inmate while the gang investigator stood by." Visits to the solitary cells were refused, as were interviews by the warden and top corrections officials.

Lance Tapley began writing about solitary confinement for the Portland *Phoenix* seven years ago, when a supermax prisoner named Deane Brown got in touch with him. Brown "wanted to expose to the outside world the torture he was experiencing and seeing in the Maine State Prison's Special Management Unit," Tapley wrote to me.

Initially denied access to SMU prisoners, Tapley was able to convince the governor's office to intervene. Then he was allowed to interview several men "in hand and foot shackles on the other side of a Plexiglas window." Those six interviews and a leaked official videotape of a cell extraction, plus interviews with the corrections commissioner, defense attorneys and others, formed the basis of his first supermax stories. Once those stories were published, Tapley was banned from the prison. And like many prisoners who talk to the press, Deane Brown faced retaliation: He was shipped to a prison out of state.

Where journalists have succeeded, one way or another, in penetrating the black sites, their reporting has undeniably had an impact. In Maine, it helped spark a grassroots movement and a legislative initiative which eventually spurred the prison system to reduce its use of solitary confinement. In New York, it became ammunition in a battle to keep mentally ill prisoners out of solitary. And in Illinois, it provided fuel for an effort that has convinced the governor to shut down the Tamms supermax prison.

The stories have been effective. But their scarcity also suggests that the lack of press access to solitary confinement units around the nation has stifled public debate on a significant issue of policy and human rights. "Solitary confinement is a brutal form of prison punishment that has claimed many lives and caused untold suffering," says Mary Beth Pfeiffer. "That is the story that officials do not want told."

Until we are allowed to tell it properly – until we can visit solitary units ourselves, and speak unhindered with prisoners and corrections officers – we cannot fulfill our duty as journalists to shine a light into society's darkest corners. ◼

*James Ridgeway has been a reporter for close to 50 years, writing for* The Village Voice, The New Republic *and* Mother Jones, *among others, and is the author of 16 books. He is co-editor, with Jean Casella, of the website* Solitary Watch *and a 2012 Soros Justice Media Fellow. This article was originally published by* Columbia Journalism Review *(www.cjr.org), and is reprinted with permission.*



PEN<sub>A</sub>C<sub>O</sub>N.com

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see. Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLNSOFF
FOR $5 OFF



FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription! Quarterly drawing WINS $100! (Void in New York) (Last Quarter's winner from **Waynesburg, PA.**) TELL YOUR FRIENDS! ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

Inmate Magazine Service inc.

PLN_0001688

# New York: Provision Requiring Independent Jail Oversight Board Ignored for 23 Years

*by Joe Watson*

FOR MORE THAN TWO DECADES, THE Nassau County Jail in East Meadow, New York has lacked accountability in the form of an oversight board. But that lapse may be coming to an end after prisoner advocates filed a lawsuit seeking court intervention.

Since 1990, the Nassau County Jail has failed to answer to an independent civilian oversight board as required by a provision in the county's charter. In fact, the board has never been fully formed or functional.

Considering the jail's disproportionately high rate of suicides over the years, as well as allegations of prisoner abuse and poor conditions, some local lawmakers said it was time for County Executive Edward Mangano to appoint the seven-member Correctional Center Board of Visitors, which would hear and investigate complaints concerning the jail and recommend reforms.

According to Nassau County's charter, the Board of Visitors is to consist of county residents who have some "working knowledge of the correctional system." It is required to have an office at the jail and access to the jail's records and books. Board members are to be appointed by the county executive and serve without pay.

"It is a legitimate concern and it's in the charter," said county legislator Judy Jacobs. "It deserves action."

The Nassau County Jail, which holds up to 1,500 prisoners, has experienced 15 suicides since 1990 with five occurring between January 2010 and March 2012. Overall, the jail's number of suicides represents more than a third of all suicides in county facilities statewide.

Further, the Nassau chapter of the New York Civil Liberties Union (NYCLU) has received hundreds of complaints from jail prisoners regarding issues related to medical care, safety, recreation and education programs. In 2011, the state cited the jail for violating minimum standards such as failing to maintain sanitary conditions and an over-reliance on solitary confinement.

Activists and some county lawmakers contend the Board of Visitors would provide ongoing oversight of problems at the jail and would supplement the work of the New York State Commission of Correc-tion, which employs a few dozen staffers to monitor over 100 jails and prisons, as well as hundreds of police lockups.

"It's the law, and the county is required to obey its own law," said Samantha Fredrickson, director of the NYCLU's Nassau chapter.

But Mangano – the third in a line of county executives to completely ignore the independent jail oversight provision in the county's charter – refused to commit, arguing that the Commission of Correction already provided sufficient accountability on the state level.

His response failed to satisfy advocates pushing for county officials to form the required Correctional Center Board of Visitors – including the NYCLU, which filed an Article 78 proceeding in Nassau County Supreme Court on March 21, 2012, seeking an order of mandamus to "compel County Executive Mangano to appoint seven members to a Board of Visitors pursuant to Nassau County Charter § 2004."

The case remains pending. See: *Marone v. Nassau County*, Supreme Court, County of Nassau (NY), Index No. 003630-2012. ◼

Source: *www.newsday.com*

# CDCR Tried to Conceal Report on Prisoner Suicides

A REPORT THAT LINKED OPPRESSIVE conditions in California prisons to preventable prisoner suicides was suppressed by the California Department of Corrections and Rehabilitation (CDCR), while the state tried to convince a federal judge that court oversight was no longer needed in an ongoing class-action lawsuit over deficiencies in mental health care at CDCR facilities.

The 15-page August 2011 report by Lindsay M. Hayes, Project Director of the National Center on Institutions and Alternatives, which had been commissioned by the state, concluded that the CDCR's suicide-watch practices actually *increased* the risk of prisoner suicides.

Hayes' report described suicidal prisoners being stripped of their clothes and possessions, dressed in a "safety smock" and held in small cells where in some cases they had to sleep on the floor. He found that such conditions induced prisoners to falsely claim they were no longer suicidal just so they could get out of the observation cells. Some took their own lives shortly thereafter.

State officials asked Hayes to create a redacted version of his report that omitted the damaging findings, for the limited purpose of providing it to a court monitor and the attorneys representing the prisoner class members in the lawsuit, *Coleman v. Brown*, U.S.D.C. (E.D. Cal.), Case No. CIV S-90-0520-LKK-JFM-P. Hayes did so. However, when the prisoners' attorneys obtained a copy of the full version of the report, the state had the temerity to ask the district court to destroy it. The judge declined.

Hayes' full report noted that the CDCR's handling of suicidal prisoners was "seemingly punitive" and "anti-therapeutic." That was partly because guards, and not mental health workers, controlled the conditions within suicide observation cells. Worse, the unabridged version of the report noted that CDCR employees sometimes falsified watch logs indicating when they checked on prisoners in the observation cells.

Specifically, the full report stated that out of 25 suicides reviewed, seven prisoners had killed themselves shortly after being released from suicide watch. Multiple lapses in adequate care, including failure to timely check on suicidal prisoners – and even failure to attempt CPR – characterized 68% of the 25 cases. Only after a prisoner died did prison officials earn high marks from Hayes, for covering themselves by creating exhaustive reports.

At the Mule Creek State Prison, the report stated that "[c]ells utilized to house

inmates on suicide observation generally had poor lighting, visibility, and sanitary conditions (i.e., dirty floors and walls, non-sanitized mattresses, etc.)."

At the Deuel Vocational Institution, the conditions "were quite bad, with poor lighting, visibility, and sanitation problems.... Many cells contained tile floors, with pieces of tile previously removed that could easily be utilized for self-injurious behavior."

The report further observed that at CSP-Sacramento, Outpatient Housing Units used to hold suicidal prisoners "had hazardous ventilation grates that were conducive to a suicide attempt by hanging."

Hayes also reported staffing shortages; at one prison hospital, employees had been working "under protest." Psychiatric doctors at Salinas Valley State Prison routinely juggled caseloads of up to 60 patients per day, with some units containing as many as 120 patients, he wrote. Hayes concluded that not hiring more psychiatrists may help to reduce the CDCR's budget woes, but inadequate staffing causes more employees to leave, which results in worsening conditions both for patients and remaining health care workers.

Hayes was hired in 2010 in response to the state's initial resolve to improve prison mental health care under duress of federal court oversight. Although his report was submitted on August 16, 2011, none of the follow-up reports and consultations called for in his contract occurred. Rather, his initial embarrassing report was "buried," according to Robert Canning, a prison official who oversaw Hayes' work.

Meanwhile, Governor Jerry Brown told the federal court that California's prison mental health care no longer amounted to unconstitutional cruel and unusual pun-

ishment, and the state sought to have the CDCR freed from judicial oversight. In a flurry of speeches in January 2013, Brown cited testimony from state-paid experts who said prisoners received timely and responsive mental health treatment. The state then moved to terminate prospective relief in the *Coleman* case, which was denied by the court pending the receipt of additional evidence. [See: *PLN*, March 2013, p.24].

It is now apparent that state officials attempted to deceive both the district court and the prisoners' attorneys by trying to suppress Hayes' unredacted report, which found that significant improvements were still needed with respect to mental health care in CDCR facilities.

Dr. Raymond Patterson, a mental health expert hired by the state to address prisoner suicides and review the CDCR's progress in making improvements, filed a report with the court on March 13, 2013 that essentially found the situation was hopeless.

Dr. Patterson and five other experts reviewed 15 of the 32 CDCR prisoner suicides that occurred in 2012, noting that

California's prison suicide rate of 24 per 100,000 population was significantly higher than the national average for state prisons of 16 per 100,000. Significantly, prisoners held in CDCR segregation units are 33 times more likely to commit suicide than those not in solitary confinement.

"Overall, defendants rely on the fact that they have a suicide-prevention program to refute claims of deliberate indifference to the problem of CDCR inmate suicides. While they have such a program, it is not effective," Dr. Patterson stated. "No matter how many times these recommendations are reiterated, they continue to go unheeded, year after year, while the suicides among CDCR inmates continue unabated, and is worsening."

He concluded that making any additional recommendations for improvements would be "a further waste of time and effort" given the unresponsiveness of prison officials.

Sources: *Los Angles Times, www.think-progress.org, www.scpr.org, "CDCR Suicide Prevention Consultation" report by Lindsay M. Hayes (Aug. 16, 2011)*



**Free Pic Club**
Send SASE (Self Addressed Stamped Envelope) for details FPC
PO Box 643, Arlington, Tx 76004

FREE PICS!

E'Nuf Said!

Free Pic Club
PO Box 643
Arlington, Tx 76004



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
**10954 NW 7th Ave**
**Dept: LN0413**
**Miami, FL 33168**

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com

**prism**
OPTICAL, INC.
Since 1959



# Appealing a Conviction? Hire an Appellate Attorney.

**Matthew Pinix**
*Appellate Attorney*

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, a **Wisconsin** law firm with experience handling **criminal cases** in all stages of **appeal**.

Law Office of Matthew S. Pinix, LLC | 1200 East Capitol Drive, Suite 220 | Milwaukee, WI 53211 | (414) 963-6164

PLN_0001690

# Calls for Better Pregnancy Care in Georgia Jails after Death of Prisoner's Baby

**A** LAWSUIT FILED AGAINST CLAYTON County, Georgia and the county's sheriff, Kem Kimbrough, has prompted human rights organizations and Georgia lawmakers to examine guidelines for the treatment of pregnant women held in jails across the state.

Georgia's Department of Corrections (GDOC) incarcerates all pregnant state prisoners at the Helms Transitional Center in Atlanta. There, according to GDOC officials, they receive 24-hour care from nurses, see an OB/GYN on a weekly basis and have access to on-site ultrasound equipment.

But in county facilities, which house most pregnant women who are awaiting trial, prenatal care varies from jail to jail and is often lacking.

A lawsuit filed in state court in June 2012 by DeShawn Nicole Balka, 25, who was 5½ months pregnant and jailed in Clayton County for a probation violation for misdemeanor marijuana possession, claims that jail officials could have prevented what happened to her and her unborn baby had she received adequate care for her high-risk pregnancy.

For days, Balka suffered from dehydration and cramping that she said was ignored by jail officials. Then, in the pre-dawn hours of April 28, 2012, she sat for hours on a toilet in her cell, complaining of nausea and stomach pain. She began screaming for a nurse when her baby was born in the toilet. Her cellmates banged on the bars to get the attention of guards, but DeShawn's baby, Inyx O'Neil Balka, did not survive.

Clayton County officials have said they provided adequate medical care, but none, including Sheriff Kimbrough, have stated anything else in light of the lawsuit. It is unknown whether Clayton County has specific guidelines on prenatal care for prisoners or a written policy on the controversial practice of using restraints on pregnant prisoners. Fewer than half the county jails in Georgia have such policies.

Some counties treat pregnant prisoners at least somewhat humanely. In Fulton County, jail medical staff can prescribe prenatal vitamins or bed rest. But in places like Cobb County and Cherokee County, pregnant prisoners are restrained with leg irons or handcuffs while being transported and forced to wear chain belts around their waists.

Cobb County Jail Col. Don Bartlett said restraints depend on a prisoner's charges and her behavior, but that "it comes down to common sense more than anything."

At least 17 states across the country have taken the "common sense" approach of banning the practice of shackling prisoners during labor. [See: *PLN*, Sept. 2012, p.14]. Florida began prohibiting shackles "during labor, delivery, and postpartum recovery" in July 2012, while legislation passed in California on September 28, 2012 expanded that state's ban on shackling pregnant prisoners to forbid the use of "leg irons, waist chains and handcuffs behind the body on women who are pregnant or who are in recovery following the birth of a child unless deemed necessary for the safety of the inmate, the staff, or the public."

A similar bill introduced in Georgia in 2011 would have applied to pregnant women held in county jails, but the legislation didn't get out of committee.

Balka and prisoner advocates, including the ACLU of Georgia, noted that public safety must be balanced with providing a healthy environment for pregnant women. Prisoners "should always be treated like a human," Balka said, adding that Clayton County officials had failed to properly document her pregnancy, supply adequate nutrition or perform proper fetal monitoring.

Her attorney, Michael Mills, said that Inyx's death was due to "fundamental flaws in the system."

"For anybody to have their baby die because of a misdemeanor pot charge is completely ludicrous," he added. "Clearly, this is a problem, and something is wrong." Balka's lawsuit against the county and Sheriff Kimbrough, which was removed to federal court on July 27, 2012, remains pending. See: *Balka v. Clayton County*, U.S.D.C. (N.D. Ga.), Case No. 1:12-cv-02599-ODE. ◼

Sources: *Atlanta Journal-Constitution, www.correctionsone.com, Huffington Post*

# Life on the Inside and Death on the Outside: Complexities in Health Disparities Inside and Outside U.S. Prisons

*by Evelyn J. Patterson, Ph.D.*

**A** S A SCHOLAR OF CRIMINOLOGY AND demography (the study of how and why populations change), I seek to contribute to the discourse on inequality through researching different issues in the demography of incarceration. One astonishing thing that I discovered some time ago was the difference in mortality levels of black men inside versus outside of prison.

At every age during a person's working years, black men outside of prison die at a higher rate than black men in prison. Further, at every age during working years, black men not in prison die at a higher rate than white men outside of prison. However, in the period of 1996-98, black men inside prison had comparable death rates to white men outside of prison.

The most common explanation for this trend is that black men are safer when incarcerated. While part of the story, particularly in people's younger working years, this is not *the* story. That is, it does not completely explain the disparity in life expectancy. Rather, some of it likely has to do with access to adequate nutrition and health care. Another piece has to do with the unequal lives that black and white men experience outside of prison.

As stated in a 2010 article I authored:

*From these results, scholars and policy-makers could reach the conclusion that because mortality is lower in prison, we help people, especially African Americans, when we incarcerate them. However, I caution against such an interpretation because studies on prison morbidity suggest that prisoners are at risk for more diseases before, during, and after interaction with the criminal justice system.... In contrast, what the findings do suggest is that even in hostile environments such as prison, there is potential to greatly reduce racial and sex disparities*

PLN_0001691

in mortality. Such findings speak to the depth of deprivation some groups suffer in U.S. society – a place with such deprivation that prison, in some cases, is a lesser enemy in life.[1]

One of my recent studies, published in the *American Journal of Public Health* in March 2013, speaks to a different piece of the equation.[2] What happens when a person is released from prison? I looked at parolees in New York and examined the relationship between the length of time they served in prison and their life expectancy. Although there were many factors that I wanted to include in this investigation, such as post-release social and financial support, I was unable to do so. Nevertheless, the findings were shocking.

The study indicated that, on average, every year served in prison was accompanied by a two-year reduction in life expectancy. Moreover, while the risk of death declines over time once a person is released, it takes approximately two-thirds of the length of time served for someone to eliminate the life expectancy deficit. For example, after exiting prison, the life expectancy of a 30-year-old male who served 5 years is decreased by 10 years. The current life expectancy of males in

the United States is 76;[3] based on the study findings, the life expectancy of a former prisoner who served 5 years would be only 66 years. Nevertheless, during the 7 years after his release, his risk of death will decline to pre-incarceration levels.

The increase in likelihood of death post-incarceration and the finding that black men in prison have death rates very similar to white men not in prison are truths we must continue to research and understand. One finding suggests hope in terms of eliminating disparities, while the other poses a rather large challenge to sentencing practices and the very core of how we define and apply punishment to those convicted of crimes. As a society, we have the privilege to ignore our past and even the facts of the present – including the fact that people sent to prison have diminished life expectancies upon their release. The use of that privilege, however, is not only a crime; it is the very definition of inhumanity.

*Evelyn Patterson is an Assistant Professor of Sociology at Vanderbilt University; she provided this article exclusively for Prison Legal News.*

### ENDNOTES

1 Patterson, Evelyn J. 2010. "Incarcerating Death: Mortality in U.S. State Correctional Facilities, 1985-1998." *Demography* 47(3): 587-607.

2 Patterson, Evelyn J. 2013. "Living Beyond Confinement: An Examination of the Dose Response of Prison on Parole Mortality in New York, 1989-2003." *American Journal of Public Health* 103(3): 523-528.

3 Miniño AM. "Death in the United States, 2011." NCHS data brief, no 115. Hyattsville, MD: National Center for Health Statistics, 2013.

## SMITH'S GUIDE to HABEAS CORPUS RELIEF
for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence. 380 pages.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail. Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company

Send name, address, prisoner #, and payment to: **Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649** *Also available on Amazon.com*



## *Stamps for* **CASH!**

*Great Goods will buy your stamps!*

**70%** of Face Value: *Complete books or sheets of Forever Stamps*

**65%** of Face Value: Complete books, sheets, or rolls of 45-cent stamps

**60%** of Face Value: Complete books or sheets of high denomination stamps above 45-cent

### Payment sent within 24 hours of receipt.



WE WILL SEND your funds as a money order, electronic payment to anywhere you designate. Great Goods can also send payment to an approved vendor. Please provide complete name and address of where to send your funds. Also include any required forms or special instructions.

Minimum money order of $20. • No quantity of stamps too big. • No taped or stapled stamps. • Used, damaged, torn stamps not accepted and cannot be returned. • Stamps MUST be on original postal backing. • Only new stamps accepted. • No singles or partials will be accepted and they cannot be returned.

## GREAT GOODS
**PO Box 399, West Chesterfield NH 03466**
**www.greatgoods.org**

STAMPS © USPS. ALL RIGHTS RESERVED.

PLN_0001692

# Colorado Pays for Unneeded Private Prison Beds to Subsidize Local Jobs

*by John E. Dannenberg*

Even amid a declining prison population, Colorado is paying million of dollars to private prison contractors for unneeded cells in order to protect the economic base of small, rural communities that have become dependent on the jobs that for-profit prisons provide.

With Colorado's prison population in decline since 2009, five prisons, both public and private, already have closed in the state, including the Fort Lyon Correctional Facility. [See related article on page 43 of this issue]. It is estimated that in the near future, two to ten more closures could follow. After a study is concluded in June 2013, recommendations will be made as to which facilities will be shuttered.

Colorado currently has 20 state-owned prisons with 1,000 empty beds – a number that is rising by around 100 more vacancies each month. Another four prisons are privately-owned, including three Corrections Corporation of America (CCA) facilities and one GEO Group prison that house minimum-to-medium-security prisoners from Colorado and other jurisdictions.

Private prisons originally were used by the state as an "overflow" measure. In 2012, Colorado contracted with CCA to house 3,300 prisoners, at a cost of about $20,000 each, for the fiscal year that ends June 2013. CCA reported that the agreement was part of its "flexibility to manage [the] changing needs" of the state. However, the main benefit that Colorado politicians sought to preserve was the 600 jobs in the rural communities of Olney Springs, Burlington and Las Animas, where CCA prisons are located.

When responding to several Open Records Act requests, Governor John Hickenlooper's office did not produce a single record related to details of how the 3,300-bed contract with CCA was reached. The Governor's office referred all questions to the legislature, notwithstanding that the Governor's own office calendars indicated his staff had met with CCA executives and their Colorado lobbyist, Mike Feeley, on the morning of March 28, 2012.

That same day, in the afternoon, the legislature's Joint Budget Committee took up CCA's threat to close its Kit Carson Correctional Center if the company didn't receive help – i.e., more money from the state. Without approximately $10-$15 million, CCA complained it could not keep all of its facilities operational; the company had already shut down its 752-bed Huerfano County Correctional Center in Walsenburg in 2010 due to lack of prisoners. Feeley remarked that "CCA really feels we're in a partnership with the state," when commenting on the contract negotiations. The legislature subsequently approved the payments to CCA.

The reality, however, is that prison closures are unavoidable. Colorado's prison population is dropping faster than projected, meaning that its contract with CCA is costing more than expected. The state's prison population, which was projected to decrease by between 160 and 1,256 prisoners by mid-2013, had already fallen by 1,700 as of February 2013.

The slide in the number of state prisoners reflects a one-third drop in Colorado's crime rate over the past decade. Part of the reduction also resulted from the legislature changing the state's sentencing structure, including granting prisoners more good time credits. In light of this trend, CCA's future prospects in Colorado do not look encouraging unless the state decides to continue using privately-operated prisons as a means of maintaining the existing jobs those facilities provide.

"We can find no aspect of incarceration, a necessary evil, that serves as legitimate economic development," stated a March 12, 2013 editorial in the Colorado Springs *Gazette*. "Some individuals must lead part or all of life behind bars and that may never change. While incarcerated, a person lives as a liability to the public. A person in prison costs an economy more wealth than a prisoner can possibly produce. If prisons benefit the economy, we should build more of them immediately. They do not."

Sources: *Colorado Public News, www.gazette.com, www.chieftain.com*

# Seventh Circuit Reverses Dismissal of Case Challenging Conditions in Illinois Jail where Mentally Ill Prisoner Died

*by David M. Reutter*

On March 20, 2012, the Seventh Circuit Court of Appeals reversed a district court's grant of summary judgment to the defendants in a case claiming inhumane conditions of confinement at a county jail; the appellate court also reversed the dismissal on collateral estoppel grounds of a related suit raising state law claims.

The case involved two lawsuits filed by the estate of Nicholas D. Rice, 21, who died in the Elkhart County, Illinois jail on December 18, 2004, nearly fifteen months after he was booked into the facility pending trial on a charge of attempted bank robbery. Rice suffered from schizophrenia, and 11 days before his death was found incompetent to stand trial and ordered admitted to a psychiatric hospital.

The conditions at the jail and the treatment (or lack thereof) that Rice received are extensively detailed in the lengthy appellate opinion in this case. In sum, the record indicated that although Rice was seen by mental health staff while incarcerated, he "frequently refused to take his prescribed medications, cooperate with medical personnel at the jail, eat his meals, or bathe himself." Medical care at the jail was provided by Correctional Medical Services (CMS), a private company now known as Corizon.

In an April 30, 2004 note, jail staff wrote "that Rice was unable to stand, that his entire body was jaundiced, that he had a large, three-inch area of dark skin over his coccyx, and that when officers picked him

PLN_0001693

up, dead skin cells sloughed off his body in large numbers. He refused to speak."

Rice was briefly hospitalized at psychiatric and other medical facilities on several occasions during the period of his confinement. He died in an administrative segregation cell at the jail as a result of psychogenic polydipsia (excessive water drinking), which is a disorder known to manifest in some people afflicted with schizophrenia.

The district court granted the defendants' motion for summary judgment, finding that they had not consciously disregarded Rice's medical needs and that the ultimate cause of his death was not a foreseeable outcome. Rice's estate then filed a second federal lawsuit that included state law claims against CMS which had been dismissed without prejudice in the first case, invoking the district court's diversity jurisdiction. The court, with a different judge, dismissed the suit based on collateral estoppel due to the determination in the first lawsuit that the cause of Rice's death "was not reasonably foreseeable to the defendants."

Of the two causes of action that the Seventh Circuit found merited reversal, the first contended that jail officials and staff were deliberately indifferent to the inhumane conditions in which Rice was held at the jail. The Court of Appeals concluded that such conditions presented a disputed material fact that must be resolved at trial.

Although Rice himself had created the unsanitary conditions, that did not foreclose the claim because prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive behavior. While the record indicated that staff had showered Rice and cleaned his cell on multiple occasions, it also showed that "his cell was often filthy and unsanitary, that uneaten food was left to rot there, that his

skin was sometimes caked with his own feces, that he had an extremely foul body odor owing to the long periods of time during which he went unbathed, and that he either developed or was on the verge of developing bed sores on multiple occasions...."

The appellate court held a jury could find the defendants should have made a more conscientious effort to bathe Rice and clean his cell, noting "there were significant periods of time during which the jail's staff members simply turned their back on the condition of Rice's person and cell, knowing that he was living in his own filth." The jury could also conclude those conditions exceeded mere discomfort and were constitutionally unacceptable.

"We conclude, contrary to the district court, that whether jail officials were deliberately indifferent to Rice's conditions of confinement presents a material dispute of fact that the factfinder must resolve at trial," the Court of Appeals wrote. "That Rice himself created the unsanitary conditions of which his Estate complains certainly is a fact relevant to this claim.... But given Rice's mental condition, it by no means forecloses the claim, as the district court appears to have assumed."

The appellate court affirmed the dismissal of other claims raised by Rice's estate, including claims related to his placement in administrative segregation, excessive force and failure to protect.

In addition to reversing the dismissal of the conditions of confinement claim, the Seventh Circuit found the dismissal of the state law claims raised by Rice's estate in the second lawsuit was in error. That dismissal was based on the district court's finding that the cause of Rice's death was not foreseeable in determining whether the defendants were deliberately indifferent to his medical needs. As the foreseeability issue was not necessary to determine delib-

erate indifference – which required different standards than those applied to state law negligence claims – the Court of Appeals held that the foreseeability determination in the first case did not provide preclusive effect to dismiss the state law claims raised in the second lawsuit.

Accordingly, the appellate court reversed in part, affirmed in part and remanded the cases for further proceedings. See: *Rice v. Correctional Medical Services*, 675 F.3d 650 (7th Cir. 2012).

---

**Pretrial & Post-Conviction Research Center,**
*Joe Allan Bounds, Office Manager*
204 Jackson Street, Monroe, Louisiana 71201.
Phone (318) 737-8944.
FREE monthly email, Post-Conviction Newsletter. Email for a subscription at postconvictionnewsletter@yahoo.com

The Center is dedicated to assisting State and Federal prisoners challenging the constitutionality of their conviction and sentence. Customized briefing for State & Federal Habeas Corpus petitions. *28 U.S.C. §§2241, 2254 & 2255* Petitions, Memorandum Briefs, Appellate Briefs, and Petitions for writ of certiorari.

Bookstore: *Self Help Post-Conviction Handbook,* provides the "Secret Tools" to obtain documents, prepare post-conviction motions, memorandum briefs, habeas corpus petitions, appeals, sample form letters, motions, with habeas statutes and rules etc. $54.95, plus $5.15 S&H by Joe Bounds.. Book Size: 8.5" x 11", 444 pages. www.postconvictionhandbook.co

*The Post-Conviction Citebook:* A quick reference book covering over 740 ineffective assistance of counsel and other constitutional claims with favorable case law on almost any subject in the field of post-conviction remedies. A 16-page table of contents designed to assist the user in finding favorable case law by topic and in chronological order as a criminal proceeding may unfold $54.95, plus $5.15 S&H. Book Size: 8.5" x 11", 324 pages. Write for FREE BROCHURES! ORDER NOW! www.postconvictionresearchcenter.com



Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **50+ Page Full Catalog** ($3 Discount Coupon Included)

| InmateMAGS.com | Mymagstore.com | www.inmateMAGS.com |
| 4208 University Way NE | Info@mymagstore.com | Info@inmatemags.com |
| Seattle, WA 98105 | 877-324-7323 | 206-322-6397 |

PLN_0001694

# Illinois: Scathing Study on Solitary Buried by Politics

## by Adam Klasfeld, Courthouse News

REELING FROM CRITICISM OF ITS LAST effort at prison reform, Illinois buried its study of the ineffectiveness of long-term solitary confinement.

As Gov. Pat Quinn struggled to hold onto the seat he acquired from the ousted Rod Blagojevich, his office drew fire for measures such as "Meritorious Good Time" (MGT), which revoked a requirement calling for prisoners to spend at least 60 days in prison.

Reform advocates had long contended that the old policy made "61-day wonders" out of low-level offenders, but the Associated Press reported that the so-called "MGT Push" put dangerous criminals back on the streets.

As Quinn stepped back and inched through the 2010 election, his then-corrections chief Michael Randle bore the brunt of the blame for the program and resigned months later, ostensibly to revisit his old job as Ohio's prison chief.

Although the AP story created political shockwaves, a program director at Northwestern University School of Law later decried the report as shoddy and sensational journalism.

"Contrary to media reports, MGT-Push has not been responsible for an illegal or premature release of a dangerous criminal or for the commission of additional violent crime," Malcolm Young said. "MGT-Push did not cut prison sentences by months or years. It did not add to the public risk or endanger public safety. And it was not 'secret.'"

Between the re-election and his resignation, Randle signed a May 11, 2010 "memorandum of understanding" obligating the New York-based Vera Institute of Justice to conduct a study of solitary confinement in Illinois prisons, under strict terms of confidentiality.

The memo begins by noting the documented mental health risks of long-term isolation, and says solitary cells can cost 50 percent more to operate than those in the general population.

"For these reasons, many states such as Illinois have begun to consider alternatives to housing large numbers of prisoners in segregation units," the memo states.

Two pages later, eight paragraphs on the "protection of confidentiality" describe elaborate screening, storage and training processes to keep the study under wraps.

Apparently upholding that secrecy, Vera never disclosed the findings on its website, and did not respond to a request for comment.

Courthouse News obtained access to the state-commissioned study through a Freedom of Information Act request, 1½ years after its unannounced publication.

Researchers Suzanne Agha, James Austin and Angela Browne published the study, titled "Qualitative Findings on the Use and Outcomes of Segregation in IL DOC," on September 28, 2011.

They analyzed all Illinois prisoners released from segregated cells in 2008 and followed them for a year in their transition to the general population. Those who finished their terms before that year ended were excluded from the study.

The remaining subset included 10,219 prisoners, who spent roughly two months in isolation on average.

The study concluded: "Prisoners who spent *less time* in segregation were not more likely to commit new violations during the first 12 months of release into general population.... In addition, prisoners who committed *more serious* incoming violations were not more likely to commit new violations during the first 12 months of release into general population" (emphasis in original).

Researchers found that 85 percent of the population committed 300- to 400-class violations, using Corrections Department terminology for less serious offenses. These include unauthorized movement, insolence, violation of rules, disobeying of a direct order and failure to report.

"Contraband property," another 300-class violation, accounted for 8 percent of all segregation offenses. The report distinguishes this infraction from "dangerous contraband," a 100-class offense cited in only 1 percent of cases.

Despite its stated goal to reform prison segregation, the Illinois Department of Corrections never published these results, though the study was brought up at a public meeting in a prison in early 2012.

The minutes of that meeting were tucked away in a quiet corner of the department's website.

John Maki, director of the John Howard Association of Illinois, a nonprofit advocacy group, declined to speculate about whether politics is responsible for the secrecy surrounding the study.

Still, he noted that the "MGT fallout" created a "toxic" environment that marginalized reformers.

"Nobody wanted to talk about changing the system," he said. "It made all reforms more necessary but also more difficult."

He lamented that the Vera study took so long to see the light of day.

"I think it would have added fuel to [the reformers'] fire to make the argument against long-term segregation," he said.

Most discussion about reforming solitary confinement centered on politically safe austerity arguments, rather than public policy debate, he added.

Illinois tried to cut costs recently by shutting down the Tamms Correctional Center, a supermax prison filled with solitary cells; Dwight Correctional Center, home of the state's only "death row" for women; and two post-release transition centers in Chicago and Peoria.

While the John Howard Association welcomed shuttering Tamms on humanitarian grounds, the nonprofit opposed the other closures on the grounds that they would worsen prison overcrowding.

"The answer to this can't be to pack up more people into less space," Maki said.

Another state-commissioned report, written by University of Illinois Professor Geoffrey Hewings, investigated how closing the facilities affected local economies. The impact statement was dated February 2012, five months after the completion of the Vera study.

According to the impact statement, the state would lose tens of millions of dollars in direct wages and incur indirect ripple effects if employees laid off from their jobs at the facilities were not relocated.

The next month, Illinois Corrections Department director Salvador "Tony" Godinez projected that the approximately 796 staffers left unemployed by prison closings could fill 594 vacancies in the state's prison system.

Godinez had rosy projections about the ability of the remaining state prisons

PLN_0001695

to relocate the Tamms prisoners.

"There will be sufficient space to establish elevated-security wings and safely house and accommodate the 186 existing Tamms Correctional Center C-Max inmates at Pontiac and Menard Correctional Centers," he wrote.

But the John Howard Association says overcrowding remains a problem.

The group's most recent estimates from February 2013 place the state's prison population at 49,255. Before the closures,

the Illinois prison system was designed to hold 34,000 people.

With the election pressure behind him in 2012, Gov. Quinn has also reinstated an amended version of the MGT Push policies.

Meanwhile, the federal Bureau of Prisons recently announced that it would start studying how to reform solitary confinement nationwide. The American Civil Liberties Union signaled that the study would draw from the lessons learned by

states around the country.

Besides Illinois, Vera has conducted similar investigations in Ohio, Mississippi and Maryland.

A Bureau of Prisons spokesman told Courthouse News that a contractor has not yet been selected for the nationwide study.

*This article was originally published by Courthouse News (www.courthousenews. com) on March 13, 2013, and is reprinted with permission.*

## Louisiana Public Service Commission Postpones Prison Phone Reforms

### by Mel Motel

AFTER HEATED HEARINGS AND A POSTponement, on December 12, 2012, the Louisiana Public Service Commission (LPSC) voted to lower the cost of phone calls made from Louisiana prisons and jails by cutting the rates of most calls by 25% and prohibiting costly surcharges. [See: *PLN*, Jan. 2013, p.14; Feb. 2012, p.36]. The LPSC's order was a victory for 40,000 Louisiana prisoners and their loved ones. Unfortunately, however, some of the policy changes have been postponed.

At its December hearing, the LPSC decided that telecom companies must lower the rates of most prison and jail phone calls by 25%, starting whenever their current contracts ended or in 2014. The rate reduction did not apply to all calls, but only to calls made by prisoners to family members, clergy, legal aid organizations and certain government agencies.

The part of the LPSC's order ending unauthorized prison phone surcharges went into effect on February 28, 2013. At that time the telecom companies that contract

with Louisiana prisons and jails were supposed to have stopped charging the extra fees, such as fees to set up phone accounts and issue refunds on unused account balances. The LPSC, however, learned that four companies were acting in violation of the new rules by continuing to collect the unauthorized surcharges.

LPSC Commissioner Foster Campbell, who was the leading force behind the reforms, noted that one of the companies, City Tele Coin, was warned against charging extra fees on calls made by Louisiana prisoners as far back as 2006.

"This company, City Tele Coin, did not comply then, and now we've learned they – and three other jail phone providers – are still illegally padding the bills of families paying to speak to their relatives in jail," said Campbell.

On March 15, 2013, the LPSC cited City Tele Coin (CTC) and Securus Technologies, accusing them of continuing to charge the unauthorized fees and noting that, if determined to be in violation, they

could be fined up to $10,000. Telecom companies Global Tel*Link and Intellicall Operator Services also were not complying with the LPSC's order regarding the surcharges, though they have not been cited.

In response, CTC and Securus requested that the LPSC overturn its December 2012 policy changes related to prison and jail phone calls. New LPSC chairman Eric Skrmetta also requested a rehearing on the issue.

On March 25, 2013, the LPSC met to revisit the prison phone reforms. At the recommendation of Commissioner Lambert Boissiere III, the Commission voted 3-2 to postpone its order prohibiting surcharges. For the next six months, companies that provide prison and jail phone services in Louisiana will be allowed to collect the extra fees, but will hold them in an escrow account until the LPSC makes a "final decision" on the legality of the surcharges.

Sources: *www.nola.com, press release from Louisiana Public Service Commissioner Foster Campbell (March 17, 2013), www.theadvocate.com*

**Webster's Spanish/ English Dictionary**
It's a quick and easy language reference for avid readers. Provides English and Spanish abbreviations with a clear and easy-to-read typeface. Contains valuable pronunciation tables and guides. 194 pages. Published by Kappa Books, 2011 edition. $2.75 ea. (or 6 Forever stamps) FREE SHIPPING U.S. Territories.

**Reading Glasses with Metal Frame:**
Full-size lens, spring template, soft-coated nose pads for better fit and comfort, full frame. Use: Good for everyday use. Material: Steel frame & templated and glass lens. Unisex. Color: Gold-finish frame / Black temple covers. Length: 2.1/8" each lens. Width: 1.5/16" each lens. Magnifications available: 1.0x, 1.25x, 1.5x, 1.75x, 2.0x, 2.25x, 2.5x, 2.75x, 3.0x, 3.25x, 3.5x, 3.75x, 4.0x. $4.95 for 3 pairs assorted (or 11 Forever stamps). **For complete BROCHURE send 2 forever stamps or get it free with order** FREE SHIPPING U.S. Territories.

ORDER TO: MARA WORLDWIDE, 115 W. CALIFORNIA BLVD. STE. 424-P, PASADENA, CA 91105

**EXECUTIVE CLEMENCY**

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT**
**3907 N. Federal Highway, # 151**
**Pompano Beach, FL 33064**
**954-271-2304**

**(35-Years of Clemency & Parole Assistance)**
**(Transfers Under The Int'l Prisoner Treaty)**

# No Free Speech Protection for Prisoners Who Copy Excerpts from Books

*by Christopher Zoukis*

PRISONERS WHO COPY "ARGUABLY INflammatory" or "incendiary" passages from the books they check out from a prison library or are allowed to purchase are not entitled to rely on the First Amendment to protect them from disciplinary punishment, the U.S. Court of Appeals for the Seventh Circuit held on August 2, 2012.

In dismissing Wisconsin state prisoner Toni Toston's free speech claims brought under 42 U.S.C. § 1983, Circuit Judge Richard A. Posner wrote that Toston could face disciplinary sanctions for possessing a handwritten copy of the "Ten-Point Program" included in books about the Black Panther Party, notwithstanding that the passage appeared in two books he had checked out from the prison library and a book he was allowed to order from an outside vendor.

Toston filed suit alleging free speech and due process violations when he was sent to segregation for 90 days for "possessing gang literature" after a guard found his handwritten copy of the Ten-Point Program in his locker. The offending passage, from *To Die for the People: The Writings of Huey P. Newton* (1972), states:

*1. We want freedom. We want power to determine the destiny of our Black Community. 2. We want full employment for our people. 3. We want an end to the robbery by the white man of our black community. 4. We want decent housing fit for shelter of human beings. 5. We want education for our people that exposes the true nature of this decadent American society. We want education that teaches us our true history and our role in the present-day society. 6. We want all Black men to be exempt from military service. 7. We want an immediate end to POLICE BRUTALITY and MURDER of Black people. 8. We want freedom for all black men held in federal, state, county and city prisons and jails. 9. We want all Black people brought to trial to be tried in court by a jury of their peer group or people from their Black communities, as defined by the Constitution of the United States. 10. We want land, bread, housing, education, clothing, justice and peace.*

Prison officials theorized that the "likeliest reason" why Toston had copied the passage "was to show it to inmates whom he hoped to enlist in a prison gang, a local cell as it were of the Black Panthers; the Ten-Point Program would be the gang's charter."

While the Court of Appeals admitted that the defendants' reasoning was "merely a supposition," it noted that the "plaintiff is a black man in a state prison and the Black Panthers were implicated in many acts of violence, including murder." Further, Mr. Newton "himself may have killed a police officer," and there was even a Black Panthers coloring book that "depicted children murdering police officers."

The appellate court focused on Point 8: "We want freedom for all black men held in federal, state, county and city prisons and jails." The Seventh Circuit acknowledged that "[i]n context, Point 8 is less inflammatory than when read in isolation." Indeed, the Court added that in Newton's explanatory notes that followed each point in his book, there was the following "innocuous" explanation: "We believe that all Black people should be released from the many jails and prisons because they have not received a fair and impartial trial." Nonetheless, the Court of Appeals found that "this underscores the difference between a book as a whole and an arguably inflammatory nugget plucked from it." The Court did not endeavor to explain which part of Point 8 might be considered inflammatory.

In a passing reference to *Turner v. Safley*, 482 U.S. 78 (1987), the appellate court remarked that the free speech of a prisoner "is of course limited by the prison's legitimate concerns with security." It did not, however, engage in the usual *Turner* four-part analysis as to the reasonableness of prison officials' actions and whether alternative options might exist. The Court of Appeals found that the defendants' position that a prisoner "might form a gang" using the Ten-Point Program was "not so implausible that we can dismiss as groundless the prison's concern with the plaintiff's possession of a copy of the Ten-Point Program."

As such, the Seventh Circuit deferred to the prison administrators' judgment. Besides, the Court of Appeals commented, the confiscation of the materials – and, apparently, Toston's punishment of three months in segregation – limited his free speech rights "only very slightly." While admitting that freedom of speech does imply freedom to read, citing *Stanley v. Georgia*, 394 U.S. 557, 567 (1967), the Court questioned whether it could "imply freedom to copy." The answer, apparently, is "no" within the prison context.

Toston had also raised a due process claim, arguing he had not been given fair notice of prohibited conduct. There was no reference to "gang literature" in the Wisconsin Administrative Code that would "have alerted him to the unlawfulness of copying the Ten-Point Program from a book he was permitted to buy." The case was remanded on this point to determine whether Toston's disciplinary punishment amounted to a "deprivation of liberty" that would support a due process challenge. *Wilkinson v. Austin*, 545 U.S. 209, 221-24 (2005) (assessing whether conditions in segregation were sufficiently "unusually harsh" to create a liberty deprivation) [*PLN*, Aug. 2005, p.24].

Despite the mostly adverse ruling, the Seventh Circuit did quote from another First Amendment prison case, *King v. Federal Bureau of Prisons*, 415 F.3d 634 (7th Cir. 2005) [*PLN*, May 2006, p.36]: "Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free speech clause to protect." But evidently the freedom of prisoners to read does not encompass the right to copy what they have read – at least not based on the facts in this case. See: *Toston v. Thurmer*, 689 F.3d 828 (7th Cir. 2012).

Toston's lawsuit remains pending on remand, on cross motions for summary judgment. ◪

**Hepatitis & Liver Disease: A Guide to Treating & Living with Hepatitis & Liver Disease**
Revised ed. By Dr. Melissa Palmer
See page 61 for more information.

#  Save with Sentel! 

Sentel is a local and international call provider. Inmates use our service to save on expensive prison calls. We have calling packages and per minute plans. With our calling packages, the longer you prepay the more savings you enjoy. For example, if you prepay for one year for 300 minutes each month for one line at $119.99, your effective cost for the line is $9.99 per month. At the end of your one year plan, you don't have to pay $119.99 to renew. Yeah, that's right, you just pay $9.99 monthly to renew for the lifetime of the account. If, however, you cannot prepay for the whole year, you can still enjoy low cost calling for $14.99 monthly for 300 minutes.

Sentel also offers low cost international calling with our per minute plan. Our rates start as low as 10 cents per minute for Mexico. Most other international calls start at 22 cents per minute. You can have several lines and all of them can share the minutes.

Below is a summary of the Great plans we offer:

**Packages:**
1 Month 300 mins USA for $14.99 or (4.99 cents/min)
3 Months 300 mins USA for $13.99 or (4.66 cents/min)
6 Months 300 mins USA for 11.99  or (3.99 cents/min)
12 Months 300 mins USA for $9.99 or (3.33 cents/min)
1 Month 1000 mins USA for $34.99 (Great for State Prisoners)
1 Month 300 mins for Mexico and Dominica Republic for $39.99
1 Month 300 mins for Colombia for $44.99
Additional lines are priced @ $2.5 per Month
Additional minutes are priced @ 5 cents per minute

**Per Minute Plan:**
All calls inside the United States are billed at 6 cents per minute
All calls to Canada, Puerto Rico and US Virgin Islands are 8 cents per minute
All calls to a landline in Mexico are 10 cents per minute
Calls to a landline in Dominican Republic are 12 cents per minute
Calls to a landline or mobile phone in Colombia are 15 cents per minute
All calls to Nigeria are just 22 cents per minute
Most international calls are just 22 cents per minute for landline
Activation fee per line is $1
Monthly fee per line is 75 cents

Using our service will save you 35% to 80% with your calls. The calls from your facility will be billed the local rate which is 6 cents for federal facilities plus our service fee for your respective plan.

Contact info:  **Sentel**
**9550 S. Eastern Ave., Ste. 253**
**Las Vegas, NV 89123**
**Ph: 702-430-9445**
**Email:  sentel.nv@gmail.com**
**Website:  www.sentelinmatecall.com**

PLN_0001698

# ADX Prisoner Not Allowed to Communicate with Family Members or Receive Publications under SAMs

### by Christopher Zoukis

IN ANOTHER OF A SERIES OF COURT RULINGS upholding the use of Special Administrative Measures (SAMs), a prisoner at the federal Bureau of Prisons ADX supermax facility in Florence, Colorado was prohibited from receiving certain publications and communicating with his nieces and nephews.

The federal Bureau of Prisons' use of SAMs originated in a regulation promulgated in 1996 – 28 C.F.R. § 501.3 – that was amended in the wake of the 9/11 terrorist attacks and finalized in 2007. See: 72 FR 16271, 16275 (April 4, 2007). The regulation, titled "Prevention of Acts of Violence and Terrorism," provides that "upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury."

Imposed pursuant to a request by a "federal law enforcement agency or the head of a member agency of the United States intelligence community," SAMs can be used to house prisoners in restricted confinement and to curtail or eliminate their ability to communicate with others – including the public, the media, other prisoners and family members. Seemingly mundane activities such as "carrying of religious materials, recreation, and exercise time" have been restricted by SAMs. See: *Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001) [*PLN*, March 2002, p.11]. Even attorney-client communications may be monitored pursuant to SAMs, if deemed "reasonably necessary for the purpose of deterring future acts of violence or terrorism."

While 28 C.F.R. § 501.3 requires that a prisoner be given written notice of the imposition of SAMs and the "basis of the restrictions," there are no hearings when a prisoner is placed on SAMs, though they must be reviewed annually.

Mohamed Rashed Al-Owhali, serving life plus 40 years for his role in the August 7, 1998 bombing of the U.S. embassy in Nairobi, Kenya, is housed at the ADX and has been subject to SAMs since he was incarcerated in 1998.

In 2004, Al-Owhali was informed that his right to correspond with family members was being curtailed; up to that time, he had been corresponding with his nieces and nephews without incident. As the basis for the new SAMs, Al-Owhali was merely advised that his conviction for acts of terrorism demonstrated a "proclivity for violence," and that federal prison officials were concerned that his "communications or contacts with persons could result in death or serious bodily injuries to persons."

Further, Al-Owhali's subscriptions to two Arabic-language newspapers were prohibited on the basis that barring the publications would prevent him "from receiving and acting upon critically-timed information coded in a potentially undetectable manner." He was also allegedly prohibited from receiving a book titled *Palestine: Peace, Not Apartheid*, by former President Jimmy Carter. The SAMs imposed on Al-Owhali were reapproved annually and extended in 2008, which prompted him to file suit.

Unfortunately for Al-Owhali, the lack of due process protections when SAMs are imposed apparently carries little weight in the courts, because his challenge to the SAMs was reviewed under the usual standards applicable to prisoner lawsuits, including *Turner v. Safley*, 482 U.S. 78 (1987) and the pleading requirements set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) [*PLN*, July 2009, p.18].

The district court granted the Bureau of Prisons' motion to dismiss, holding that Al-Owhali had not presented facts to support his claims and had failed to show "that there are alternative means of exercising plaintiff's rights in question, the lack of impact accommodation of the asserted rights will have on guards and other inmates and on allocation of prisoner resources generally, and finally the absence of ready alternatives." [See: *PLN*, Aug. 2011, p.27].

In affirming the dismissal on August 7, 2012, the Tenth Circuit held that it was Al-Owhali's "burden to demonstrate that there is no legitimate, rational basis for the increased communications restriction." As such, he "simply needed to plead some plausible facts ... that the ban on communicating with his nieces and nephews did not serve the purpose of preventing future terrorist activity."

The Court of Appeals found that Al-Owhali had failed to demonstrate that barring communication with his family members was not rationally connected to preventing terrorist acts. As to the restriction on Al-Owhali's newspaper subscriptions, the appellate court merely noted that such restrictions were common and that he had failed to rebut the government's "logical safety rationale for limiting his access to Arabic-language media – namely the need to prevent Al-Owhali from acting upon contemporary information or receiving coded messages." Regarding the book by former president Carter, the Court held that "Al-Owhali's sparse pleadings on this claim fail to allege a plausible constitutional violation," as his "vague allegation[s]" lacked factual context.

As a final matter, the Tenth Circuit disposed of Al-Owhali's claim that the SAMs violated his "equal protection of the law," by commenting on the lack of specificity in his pleadings, which did not clearly indicate he was raising a Fifth Amendment due process claim. "It is not ours to piece together Al-Owhali's arguments for him.... We do not engage in guessing games to determine which arguments Al-Owhali might be asserting," the Court of Appeals wrote.

Al-Owhali's circumstances are not unique. Federal case law is replete with rulings involving SAMs, which now encompass not only restrictions imposed on terrorists but also on other prisoners deemed management problems by federal prison officials, such as gang members. See, e.g., *Mills v. Davis*, U.S.D.C. (D. Col.), Case No. 1:11-cv-03165-PAB; 2012 WL 1657367 (SAMs applied to Aryan Brotherhood leader housed at ADX).

As the use of SAMs has increased, so has the use of Special Management Units and Communications Management Units within the Bureau of Prisons. [See: *PLN*, Sept. 2012, p.26]. Concurrently, due process concerns such as those raised in this case have increased as well, with little apparent interest or intervention by the federal courts. See: *Al-Owhali v. Holder*, 687 F.3d 1236 (10th Cir. 2012).

# FOR KRASNYA CLIENTS WHO WORK THE YARDS; HAVE WE GOT A GREAT OPPORTUNITY FOR YOU...
## GRAB BAG

## MR. HUSTLE GRAB BAG BARGAIN DAY$

ONLY **$0.25** CENTS PER BABE

**5** GRAB BAG MINIMUM PURCHASE REQUIRED

**$2.00** SHIPPING AND HANDLING PER BAG

**25** AWESOME BABES PER BAG AT ONLY **$6.25** PER BAG

YOU MUST BUY AT LEAST **5** GRAB BAGS OR **50** GRAB BAGS.

THIS***GRAB BAG BARGAIN*** IS NOT GOING TO BE OFFERED AGAIN THIS YEAR.   *SO STOCK UP NOW!*
<u>THIS SALE ENDS MAY 31, 2013</u>
AS YOU KNOW YOU GET AN ARRAY OF 25 GORGEOUS BABES

## YOU CAN ONLY CHOOSE EITHER MALES OR FEMALES, ALL NUDES OR BOP SAFE...
THE INDIVIDUAL SELECTIONS COME FROM OUR BEST CATALOGS!!!
YOU MAY WANT TO SIT DOWN FOR THIS BONUS BARGAIN!

## OUR BABES CATALOGS SPECIAL OF THE DECADE
— 5 COLOR CATALOGS FOR  $6.00 —
— 10 COLOR CATALOGS FOR  $12.00 —
— 15 COLOR CATALOGS FOR  $18.00 —
— 20 COLOR CATALOGS FOR  $24.00 —
WHEN YOU PURCHASE THE 5 GRAB BAG MINIMUM
THIS PRICE INCLUDES FREE SHIPPING ON THE CATALOGS
BECAUSE OF SHIPPING TERMS ALL CATALOGS SOLD IN MULTIPLES OF 5 FOR $6.00 ONLY.
YOU CHOOSE EITHER MALE OR FEMALE CATALOGS

### WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

Thousands of the hottest and most scandalous Babes & Dudes found on the planet. Each catalog page has 120 beautiful Girls or Boys posing just for you! Order one catalog page for only $4.50 or for 10 US " Forever Stamps" with a SASE enclosed. We will send you Volume One. Each additional volume the same price!
<u>HELP US TO HELP YOU!</u>
We are more than happy to answer E-mail inquires however, due to mailing cost at $0.45 Cents a letter, please enclose an SASE with your questions, OTHERWISE NO REPLIES!
<u>WHAT ABOUT OUR PRICES AND POLICIES</u>
Vivid 4x6 color prints as low as $0.35 Cents per print on orders over 500, shipped according to policy: 25 pictures per envelope every 24 hours.
S&H $2.00 per envelope.
<u>METHOD OF PAYMENT/CONTACT INFORMATION</u>
U.S. Postal Service Money Orders-State & Federal Correctional Institutional checks payable only to: KRASNYA L.L.C.
<u>Equation for First Class U.S. Forever Stamps</u>
Brand New Flat Book for all orders at the rate of $6.00 per Flat Book. We respond to our clients needs and try to help the best we can. Our seasonal specials mean a kickoff of savings!

### KRASNYA QUATERLY MAGAZINE
THE CONNOISSEUR'S PORTFOLIO

KRASNYA QUARTERLY MAGAZINE DEBUT BABES OR STUDS ISSUE AVAILABLE , PLEASE SPECIFY BOP-FRIENDLY OR NUDE
*** JANUARY 2013 ***
EVERY THREE MONTHS YOU'LL RECEIVE OVER 220 BEAUTIES FROM OUR FINEST COLLECTION ALL CAPTURED IN VIVID APROX. 4X6 IMAGES DISPLAYING ALL THERE ENCHANTING RADIANCE
SPECTACULAR VALUE IS OUR GOAL!
OVER $100.00 WORTH OF BABES IN EACH MAGAZINE
KRASNYA QUATERLY'S 2013-2014 CALENDAR SAMPLER MAGAZINE
IF YOU BOUGHT THEM SEPARATELY!!!
WE DELIVER EXELLENT VALUE WHERE OUR COMPETITION WON'T!!!

ONLY $29.95 PER ISSUE
(OR 5 FLAT BOOKS OF FIRST CLASS STAMPS)
PRICES INCLUDES SHIPPING AND HANDLING
***SPECIAL OFFER***
$99.95 FOR 1 YEAR SUBSCRIPTION
AND OUR BONUS OF THE SPECIAL CALENDAR ISSUE BELOW...

### COLOR CATALOG DISCOUNT SALE
ONE COLOR CATALOG OF 120 BABES IN CLASSIC OR NUDE LINES $4.50
PLEASE INCLUDE
A SELF-ADDRESSED STAMPED
(2-FIRST CLASS STAMPS) ENVELOPE.
<u>QUANTITY BUYS:</u>
5-14 CATALOGS =10% OFF OUR REGULAR PRICE
15 CATALOGS =15% OFF OUR REGULAR PRICE
20 CATALOGS =20% OFF OUR REGULAR PRICE
25 CATALOGS =25% OFF OUR REGULAR PRICE
30 CATALOGS =30% OFF OUR REGULAR PRICE
35 CATALOGS =35% OFF OUR REGULAR PRICE
40 CATALOGS =40% OFF OUR REGULAR PRICE
45 CATALOGS =45% OFF OUR REGULAR PRICE
50 CATALOGS =50% OFF OUR REGULAR PRICE
BE SURE TO SPECIFY CLASSIC OR NUDE BABES!

70-VOLUMES OF KRASNYA BABES CLASSIC LINE
70-VOLUMES OF KRASNYA BABES NUDE LINE

### LOOSE STAMPS FOR LOOSE BABES
KRASNYA LOOSE STAMP GRAB BAG SPECIAL
10 LOOSE BABES..............................30 STAMPS
25 LOOSE BABES..............................75 STAMPS
50 LOOSE BABES.............................150 STAMPS
ALL STAMPS MUST BE 1St CLASS STAMPS
IN LIKE NEW CONDITION!
SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)
WE WILL PICK SELECTION FOR YOU

### KRASNYA BABES HAS SPRUNG SALE!
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST CLASS STAMPS!
PLEASE SPECIFY MALE OR FEMALE BABES

### THE BASIC CALENDAR WITH 48
NOT SO BASIC BABES
BABES OR STUDS ISSUE AVAILABLE , PLEASE SPECIFY BOP-FRIENDLY OR NUDE
ALL TO DELIGHT YOU THROUGHOUT THE YEAR!
$11.95 OR 2 FLAT BOOKS OF FIRST CLASS STAMPS
ALL ORDERS ARE FINAL!!!
PLEASE BE SURE TO KNOW YOUR INSTITUTION POLICIES
ANY RETURNS WILL BE HELD FOR 30 DAYS.
CALENDAR AND MAGAZINE REQUIRES SASE WITH 5 FIRST CLASS POSTAGE STAMPS
IN 8X11 MANILLA ENVELOPE
SEND YOUR ORDERS TODAY TO:

### $24.95  S&H Free
For Grab Bag of
50 photos
from all our catalogs
Specify race and main
area of your interests
We will pick
selection for you
Bonus: B&W Cat. Page

### 3 BRAND NEW FLAT BOOKS OF FIRST CLASS STAMPS FOR:
Grab Bag of 45 photos from all our catalogs
Specify race and main area of your interests
We will pick selection for you
Bonus B&W Catalog Page
PLEASE INCLUDE 6 FIRST CLASS STAMPS FOR S&H

KRASNYA L.L.C.
P.O.BOX 32082
BALTIMORE,MD 21282
EMAIL AND CORBLINKS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM
KRASNYASTUDS@HOTMAIL.COM

KRASNYA L.L.C.
CALENDAR SAMPLER MAGAZINE
P.O.BOX 32082
BALTIMORE, MD 21282

PLN_0001700

# Oregon: Grand Jury Cites Problems at Multnomah County Jails

A Corrections Grand Jury report released on December 18, 2012 made recommendations to remedy problems in Multnomah County's jail system, adding to suggestions the Grand Jury had previously made in 2011.

In its most recent report, the Grand Jury noted there was a 121% increase in the number of emergency prisoner releases from the county's jails for the one-year period that ended in August 2012. The report recommended opening additional jail dorms to increase bed space. Three dorms at the Inverness Jail had been closed due to budget cuts over the past few years; the county's jail system presently has 1,310 available beds.

The emergency releases occur when the jails are at 95% capacity, according to the Sheriff's office, in order to make room for other detainees charged with more serious crimes. Over 900 prisoners were released early from Multnomah County jails in 2012 – eight times the number of emergency releases in 2010 and 2011 combined.

The Grand Jury report also cited the need to address staff vacancies; due to expected retirements among corrections employees, the Sheriff's office needs to hire up to 85 new staff members before June 30, 2013, the Grand Jury found. "Recruitment practices will need to change dramatically in order to keep up with these retirement projections."

In its previous report released in December 2011, the Corrections Grand Jury had recommended that the Multnomah County jail system expand suicide prevention training, house suicidal prisoners in dorms and hire more guards to reduce overtime costs.

The Grand Jury applauded the Sheriff's office for implementing an 8-hour suicide prevention training program in 2011, following three jail suicides within a year. Even so, guards receive a "bare minimum" of 16-24 hours of suicide prevention training annually when 40 hours is recommended, according to the Grand Jury's 2011 report. Jail officials responded that budget cuts and limited staffing precluded more extensive training.

The Grand Jury further recommended altering the practice of posting a guard, 24 hours a day, outside suicidal prisoners' cells. "Evidence suggests that when inmates are housed together, suicide attempts drop, likely due to the fact that someone else is present," the report observed. As such, the Grand Jury suggested that suicidal prisoners be housed in open dorms.

"That's good for those who are not violent towards other people," responded Chief Deputy Michael Shults. "But we also get very violent suicidal people." He said the jail's suicide watch committee would consider the recommendation.

Issues related to suicidal prisoners remain problematic, however. Jail prisoner Westley Wilson, 29, was left a quadriplegic following a May 10, 2012 suicide attempt when he jumped from the second floor at the Multnomah County Detention Center and landed on his head. Jail staff had not placed him on suicide watch despite indications he had mental health problems. Wilson filed a $12 million lawsuit against the county in February 2013, claiming jail employees failed to prevent him from harming himself. ◪

Source: *The Oregonian*

# Lawsuit Filed Against Solitary Confinement of 800 "Seriously Mentally Ill" Prisoners in Pennsylvania

*by Sal Rodriquez*

On March 11, 2013, the Disability Rights Network of Pennsylvania (DRNP) filed a lawsuit against John E. Wetzel, Secretary of the Pennsylvania Department of Corrections, charging that the confinement of prisoners in Restricted Housing Units (RHUs) amounts to "cruel and unusual punishment" of those diagnosed as "seriously mentally ill." The suit seeks an end to long-term segregation of such individuals and seeks an order that DOC prisoners "receive constitutionally adequate mental health care."

According to the lawsuit, prisoners in the RHUs are "locked in extremely small cells for at least 23 hours a day on weekdays and 24 hours a day on weekends and holidays. Typically, the lights are on in the cell all the time. The prisoners are denied adequate mental health care and prohibited from working, participating in educational or rehabilitative programs, or attending religious services."

Prisoners in the RHU are generally held alone, notes the complaint, though even in cases when prisoners are assigned a cellmate, this may be "as deleterious to their mental health as solitary confinement" if the cellmate is "psychotic or violent."

Placing people in such conditions can create a "Dickensian nightmare," in which prisoners "are trapped in an endless cycle of isolation and punishment, further deterioration of their mental illness, deprivation of adequate mental health treatment, and inability to qualify for parole."

The lawsuit provides profiles of 12 men housed in the RHU, which serve to illustrate the widespread use of solitary confinement against prisoners who have been diagnosed as having "serious mental illnesses." A man identified as "Prisoner #1" is described in the lawsuit as having been diagnosed with a delusional disorder with paranoid features and a borderline intellectual disability. Initially placed in a Special Needs Unit, in which prisoners receive psychiatric treatment, he was frequently put in the RHU following incidents precipitated by delusions. Despite expressing suicidal thoughts before and during his confinement in the RHU, he remained in the RHU until he committed suicide by hanging on May 6, 2011.

"Prisoner #8" is a 28-year-old man at State Correctional Institution-Green (SCI-Green) who has been diagnosed with paranoid schizophrenia, a psychotic disorder, a paraphilia and a personality disorder. According to the lawsuit, he claims to receive "messages from the television and from dead people." The complaint states that he has expressed suicidal ideation and has been placed in the RHU after being deemed by the Department of Corrections a "danger to himself and others."

The lawsuit charges that Wetzel "knows or is deliberately indifferent to the fact that the DOC's treatment of prisoners with mental illness, including the practice of segregating them for long periods of time

in RHUs, can cause grave harm to their mental health."

While it is unclear what DSM-Axis I mental disorders fall under the scope of "serious mental illness," the lawsuit argues that the current disciplinary system within Pennsylvania prisons fails to "consider a prisoner's serious mental illness and the impact of isolation in assessing whether to sanction the prisoners."

Pennsylvania prisoner Ricardo Noble, who has spent over five years in the RHU, has written to Solitary Watch about the nature of life in the isolation units: "In the RHU life is intense. Especially in the beginning weeks or months. As time passes your mind begins to become clouded with mixed emotions, anger, guilt, hate, paranoia, hopelessness, loneliness, and other frustrations. Some who fail to productively channel their frustrations tend to take it out on those closest to them (mainly other prisoners) or even themselves because they can't lash out on the ones (the Administration) who can affect change of the physical aspects of their harsh condition."

Approximately 1/3 of prisoners in the RHUs, which as of February 28, 2013

housed 844 prisoners in long-term Administrative Custody and an additional 1,417 in shorter term Disciplinary Custody, have been described by DRNP as "seriously mentally ill." The DRNP cited the position of the American Psychiatric Association, which in December 2012 declared that "prolonged segregation of adult inmates with serious mental illness, with rare exceptions should be avoided due to the potential harm to such inmates."

The lawsuit, which seeks "appropriate declaratory and injunctive relief to stop the constitutional violations described above and to ensure that DOC prisoners receive constitutionally adequate mental health care," is *Disability Rights Network of Pennsylvania v. Wetzel*, U.S.D.C. (M.D. Penn.), Case No. 1:13–cv–00635–JEJ. The prisoner plaintiffs are represented by DRNP, the ACLU of Pennsylvania, the Pennsylvania Institutional Law Project, and the law firms of Covington & Burling LLP and Kairys, Rudovsky, Feinberg and Messing LLP. ◼

*This article was originally published by Solitary Watch (www.solitarywatch.com), and is reprinted with permission.*



*Our Bodies, Ourselves* is a highly praised classic and vital resource for women of all ages with important information about every aspect of their health and well-being. This newly revised edition gives women everything they need for making key decisions about their health - from definitive information from today's leading experts to personal stories from other women just like them.

**$26 + $6 S&H for all orders under $50.**

*Order by mail, phone, or on-line from*
**Prison Legal News
PO Box 2420
West Brattleboro, VT 05303
Tel (802) 257-1342
www.prisonlegalnews.org**



PLN_0001702

# CA Prison Guards' Union Loses Appeal, Must Pay $4.96 Million Judgment

A FEDERAL LAWSUIT FILED AGAINST THE California Correctional Peace Officers Association (CCPOA), the union that represents state prison guards, resulted in a $12.5 million damages award in October 2010. The award was reduced by the district court to $4.96 million and the CCPOA appealed, placing $3 million in an escrow account and putting up its headquarters building in West Sacramento as collateral pending the disposition of the appeal.

The suit resulted after Brian Dawe, a board member of a non-profit organization for prison guards called Corrections USA (CUSA), was summarily discharged based on allegations of misconduct – including misuse of CUSA funds for personal gain. Dawe sued for breach of contract and defamation of character, claiming that CCPOA and CUSA officials had ruined his reputation and livelihood; he was joined by two other plaintiffs who were dismissed from CUSA, Richard Loud and Gary Harkins, as well as Flat Iron Mountain Associates, a business entity owned by Dawe.

On October 18, 2010, a federal jury awarded $2,591,409 in compensatory damages and $10,085,000 in punitive damages against CUSA and the CCPOA. The district court reduced the punitive damages award to $2,368,406 and left the compensatory award intact. See: *Dawe v. Corrections USA*, U.S.D.C (E.D. Cal.), Case No. 2:07-cv-001790-LKK-EFB; 2011 WL 1047638. The defendants appealed the jury verdict and damages award, while Dawe and the other plaintiffs appealed the court's remittitur of the punitive damages.

Representing over 30,000 California prison guards and parole agents who pay monthly dues, the CCPOA had been flush enough for decades to generously fund statewide election campaigns to support elected officials willing to approve prison construction, increase wages for prison staff and boost their retirement benefits, thereby protecting the interests of the union's members. However, in the most recent elections the CCPOA was strangely silent, possibly due to the potential financial impact of the multi-million-dollar jury award.

That impact became apparent on February 1, 2013, when the Ninth Circuit Court of Appeals upheld the district court's reduced total award of $4.96 million. The appellate court found that the defendants' defamatory statements were not subject to litigation privilege under state law; that a statute of limitations defense had not been properly preserved; that Dawe was not a "limited purpose public figure"; that there was sufficient evidence for the jury's finding of tortious interference with Flat Iron Mountain Associates' contract; and that there was no double recovery based on the plaintiffs' breach of contract and tortious interference claims.

The Court of Appeals also rejected the defendants' argument that the compensatory and punitive damages award "against CUSA is unconstitutional because it is nearly four times the organization's 'net worth,'" noting that "[t]here is no constitutional prohibition of awards in excess of a party's net worth."

On the cross-appeal by Dawe and the other plaintiffs, the Ninth Circuit declined to reverse the district court's remittitur of the jury's $10.08 million punitive damages award, finding that the reduction was proper. "Plaintiffs did not suffer physical harm and CCPOA's conduct did not evince a reckless disregard of bodily health. Further, four defamatory publications within the context of the same dispute do not evidence a high level of recidivism," the appellate court wrote.

Accordingly, the jury verdict and reduced $4.96 million award were affirmed. See: *Dawe v. Corrections USA*, Ninth Circuit Court of Appeals, Case No. 11-16284 (Feb. 1, 2013); 2013 WL 388769 (unpublished).

CCPOA spokesman JeVaughn Baker stated that the union would pay the award and that it had the funds to do so. According to Baker and Dawe's attorney, as of March 2013 the parties were in the process of negotiating the payment. Dawe is also seeking payment of costs in the amount of $25,386.28. ◼

*Additional source: Sacramento Bee*

# Former Pennsylvania DOC Director Hired to Run CDCR

JEFFREY A. BEARD, AN ALMOST 40-YEAR veteran of the Pennsylvania Department of Corrections, and most recently that state's Corrections Secretary, was hired by California Governor Jerry Brown in December 2012 to become the new head of the California Department of Corrections and Rehabilitation (CDCR). Beard, 65, replaces Matthew Cate, who resigned as Secretary of the CDCR to become executive director of the California State Association of Counties.

Beard's decade-long stint as Pennsylvania's Corrections Secretary saw a dramatic increase in that state's prison population, from 38,000 in 2001 to more than 51,300 by 2010. His actions mirrored the same type of expansionist tough-on-crime approach that eventually brought California's prison system to its knees under a federal court order due to unconstitutional overcrowding. [See: *PLN*, July 2011, p.1].

When faced with overcrowding in Pennsylvania, Beard chose not to advocate for prison reforms; rather, he shipped thousands of prisoners to privately-operated facilities in Michigan and Virginia while asking the state legislature for hundreds of millions of dollars to build three new prisons.

In 2000, Beard opened Long Term Segregation Units in the Pennsylvania DOC – the most restrictive form of isolation – closely modeled on the Security Housing Units at California's Pelican Bay State Prison. Just one year after Beard left the Pennsylvania DOC, the U.S. Department of Justice (DOJ) launched an investigation into allegations of abuse at the SCI Pittsburgh and SCI Cresson state prisons.

The DOJ announced it was addressing claims that the facilities "provided inadequate mental health care to prisoners who have mental illness, failed to adequately protect such prisoners from harm, and subjected them to excessively prolonged periods of isolation" – similar failings that led to federal court oversight in California. Beard, who is also a psychologist, should have known the importance of providing adequate mental health care to prisoners,

as well as the mental health effects of long-term solitary confinement.

Bret Grote, an investigator with the Pennsylvania-based Human Rights Coalition, noted that ongoing isolation policies began during Beard's tenure and paralleled his expansion of the state's prison system. Grote alleged that he had documented "hundreds upon hundreds of human rights violations" related to prisoners held in long-term solitary confinement in Pennsylvania prisons.

Another critic of Beard's policies, attorney Angus Love, director of the Pennsylvania Institutional Law Project, said he frequently "butted heads" with Beard over the use of solitary confinement, particularly as to the "atmosphere" inside the prison system that allowed abuses to occur.

Alarm bells also sounded from Dan Berger, a prison historian at the University of Washington, who sharply criticized Beard's record on prison expansion, overcrowding and solitary confinement. Berger opined that by hiring Beard, Governor Brown had signaled his unwillingness to pull back from California's decades of inaction on its prison crisis.

But Brown defended Beard. "The new secretary has just the experience California needs," the governor stated. "He's been a prison warden, led the correctional system in Pennsylvania, and more recently participated in the federal oversight of California's prisons, visiting the majority of our institutions. In the face of a plethora of federal court decisions and the bold realignment enacted by the legislature, Jeff Beard has arrived at the right time to take the next steps in returning California's parole and correctional institutions to their former luster."

However, Beard's early comments indicated a resistance to complying with the federal court's CDCR population reduction mandate. He told the Associated Press in January 2013 that "any further federally-ordered reduction of the California prison population is unnecessary and a threat to public safety."

He further said the CDCR had cut its prisoner population by nearly 46,000 since 2006 while improving medical and mental health care. Because state prisoners convicted of less serious crimes are now placed in county jails under California's new realignment program, only serious, violent and sex offenders go to state prisons. That makes it more difficult to identify remaining prisoners who can be released safely, Beard stated.

Attorneys representing California prisoners in the ongoing class-action overcrowding lawsuit argued that the CDCR still fails to provide adequate health care and that many prisoners still held in state prisons could be released without endangering the public. While conditions have arguably improved, they said, prisoners still die due to medical neglect.

The numbers continue to tell a sad story. California's incarceration rate is 595 per 100,000 adults in state prison – the eighteenth highest rate in the nation, according to the Public Policy Institute of California. Fighting the federal court-ordered prison population reduction, as Beard has announced, casts him in the same stiff-necked role that characterized the buildup of Pennsylvania's prison population during his tenure as Corrections Secretary in that state – which does not bode well for the future of California's penal system.

Sources: *Los Angeles Times, East Bay Express, www.ppic.org, www.ivn.us*

# LEARN TO PROTECT YOUR RIGHTS

**YOU HAVE A RIGHT TO**
- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, *Protecting Your Health and Safety*, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News
PO Box 2420
West Brattleboro, VT 05303
(802) 257-1342**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

# MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(213) 489-7715



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

PLN_0001704

# Second Circuit: Continuing Violations Exhausted with Single Grievance

THE SECOND CIRCUIT COURT OF Appeals held on May 16, 2012 that a New York district court had incorrectly concluded that a prisoner failed to exhaust his administrative remedies before bringing a religious freedom suit.

Muslim prisoner Neil Johnson was confined at the Federal Correctional Institution in Otisville, New York (FCI Otisville). In 2005, an FCI Otisville policy limited congregational prayers to once a day. However, Johnson's Islamic religious beliefs required group prayer five times daily.

In February 2005, Johnson exhausted an administrative grievance concerning the limitation on congregational prayer. Although prison officials denied the grievance, they coincidentally stopped enforcing the policy.

After a new warden took over at FCI Otisville in April 2007, the congregational prayer policy was reimplemented and consistently enforced, limiting Muslim prisoners to group prayer once a day, five days a week, in the facility's chapel.

On April 12, 2007, Johnson and several other Muslim prisoners were performing congregational prayer in their housing unit when a guard stopped them. Johnson was threatened with disciplinary action if he continued to engage in group prayer in violation of institutional policy.

Johnson filed suit in federal court on July 24, 2007, alleging that the limitation on congregational prayer violated his rights under the First Amendment and Religious Freedom Restoration Act (RFRA). He also raised a retaliation claim. He had not, however, filed a new grievance challenging the renewed 2007 enforcement of the policy related to group prayer.

On April 21, 2009, the district court granted partial summary judgment to the defendants, finding that Johnson had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA).

The Second Circuit reversed, holding "that Johnson's 2005 grievance was sufficient to exhaust his administrative remedies with respect to the continuing limitations on congregational prayer at FCI Otisville."

"Although the District Court and the defendants framed the action as concerning 'a wholly different set of circumstances' than those raised in the 2005 grievances," the appellate court found "the issue that Johnson would have raised in 2007 – the inadequacy of the spaces and times allotted for congregational prayer – was *identical* to the issue he exhausted in 2005" (emphasis in original). Three other circuits had previously held that no further grievances were necessary under such circumstances. See, e.g., *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010); *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008) [*PLN*, March 2010, p.47]; and *Johnson v. Johnson*, 385 F.3d 503, 521 (5th Cir. 2004) [*PLN*, April 2005, p.37].

The Court of Appeals made clear, however, that its "holding is necessarily limited to cases in which a prior grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit."

See: *Johnson v. Killian*, 680 F.3d 234 (2d Cir. 2012). In general, prisoners should fully exhaust their administrative remedies with respect to all issues they plan to litigate.

Following remand, the district court granted the defendants' motion to dismiss Johnson's congregational prayer claims on January 9, 2013. The court held that his claims for declaratory and injunctive relief were moot because he had since been transferred to another facility, and as a pro se plaintiff he could not represent other prisoners as a class.

With respect to Johnson's damages claims, the district court granted qualified immunity to the defendants "because it was not 'clearly established' in 2007 that Muslim inmates were entitled to participate in group prayer anywhere in the correctional facility, including in their housing units." See: *Johnson v. Killian*, U.S.D.C. (S.D.N.Y.), Case No.1:07-cv-06641-NRB; 2013 WL 103166. ◾

# Federal Court Enters Interim Fee Award Against BOP in FOIA Suit

THE FEDERAL BUREAU OF PRISONS (BOP) began 2013 with an adverse ruling from the U.S. District Court for the District of Oregon, after the BOP had spent several years refusing to disclose allegedly confidential information that was, in fact, already public.

In May 2009, Stephen Raher, then a law student and former co-coordinator of the Colorado Criminal Justice Reform Coalition, filed a lawsuit against the BOP that alleged the agency had improperly withheld documents requested under the Freedom of Information Act (FOIA). Raher had requested various records concerning the BOP's contracts with private prison companies, including the contracts themselves, contractor proposals and internal BOP emails.

Under the BOP contracts, private prison companies are paid a designated amount per day for each prisoner they house ("per diem" pricing). The BOP initially argued that it could not release the contractors' proposals because they contained confidential commercial information and security details. BOP officials also claimed they could not release the number of beds they had contracted for, or the per diem prices.

The BOP argued that a wide variety of information concerning private prison operations was confidential commercial information, protected by FOIA's Exemption 4 (5 U.S.C. § 552(b)(4)), because it revealed proprietary details about how companies like Corrections Corporation of America (CCA) and GEO Group operate their facilities. The BOP supported its argument with testimony from Matthew Nace, chief of the BOP's acquisition office, who stated that per diem prices were confidential and could not be released under FOIA.

In response, Raher presented expert testimony from a professional economist. The economist described the business model of the private prison industry and explained why release of the contractor proposals and pricing information would not cause a substantial competitive disadvantage to private prison firms.

In 2011, U.S. Magistrate Judge Janice

Stewart ruled that general private prison operating information and the number of contracted beds could not be withheld under Exemption 4. [See: *PLN*, Dec. 2011, p.36]. She further held that the court would need further evidence before it could rule on whether the per diem pricing information was exempt from disclosure.

Following that decision, Raher discovered two important pieces of information. First, Reeves County, Texas (the owner and nominal contractor for a private prison that is actually operated by GEO Group) had published the per diem prices from its BOP contract.

Second, Raher obtained several internal emails from Nace. In 2006, following the award of one of the private prison contracts, Nace had written to a superior and other BOP officials, informing them of the per diem prices and stating that the prices could be included in a press release because they were "public information."

In light of Reeves County's publication of its per diem pricing, the BOP voluntarily released the per diem prices for all of the contracts included in Raher's FOIA request, but refused to compensate him for the cost of his expert witness. Raher then moved for an interim fee award of $21,393, citing the district court's 2011 ruling in his favor on some of the records he had requested, the BOP's voluntary release of the per diem pricing and Nace's misleading statements in light of his 2006 emails.

The court granted Raher's motion on January 2, 2013, finding that he had "substantially prevailed" and that the BOP "did not have a reasonable basis for withholding documents under Exemption 4." Judge Stewart wrote that, "for whatever reason, BOP apparently relied on its two primary submitters (CCA and GEO Group) to supply reasons for withholding information under Exemption 4 and never thoughtfully re-examined its position in response to the evidence and arguments made by Raher."

Additionally, the district court concluded that a fee award was justified because the release of information about private prison operations benefited the public, and because the BOP had prolonged the litigation by being "slow to comply with this court's orders and often unable to answer questions posed during court-ordered conferences." The court noted that "Raher also has consistently complained that BOP either has not answered his attempts to negotiate or has ignored his informal requests for information (necessitating more cumbersome formal discovery)."

According to Raher, the BOP has released the majority of the documents he requested and he continues to negotiate with BOP officials over some emails that were redacted. "There are only a few issues remaining in the case," he said, "but the fee award was a major victory – the court has told the BOP that if it takes unreasonable positions to frustrate people who file FOIA requests, there will be consequences." See: *Raher v. Federal Bureau of Prisons*, U.S.D.C. (D. Ore.), Case No. 3:09-cv-00526-ST. ◼



**THE LAW OFFICES OF JACKSON & REED**

Compassionate defense, parole, and post-conviction work.

601 Sawyer, Ste. 105
Houston, Texas 77007
(713) 429-1405
www.jacksonandreed.com
Parole Representation from $1500.

---

Freebird Publishers Presents

## Corcoran Sun

### Prison Yard Monthly

News ♦ Entertainment ♦ Resources
Featuring
**Outcast**



**IN FULL COLOR**
All new format with deeper content, more exciting episodes of thrilling novels and sexy pics. Corcoran Sun is a top quality prison publication, order today.

FREE ISSUE
Send 3 FCS
*New Readers Only*

**Single Issues ($3 money order or 8 FCS)**
**Yearly Subscription ($30 money order or 96 FCS)**
Payments to: **Freebird Publishers**
Box 541 North Dighton, MA 02764
Email: ***Diane@Freebirdpublishers.com***

---

LAW OFFICES OF

**ELMER ROBERT KEACH, III**
A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration*
*Medical Indifference Cases • Corrections and Police Brutality*
*Sexual Abuse and Assault • Illegal Strip Searches*
*Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals, Post-Conviction Relief, Habeas Corpus

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED, YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages. DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS. Make sure to exhaust your administrative remedies and comply with state law notice requirements, if applicable, to preserve state law intentional tort/negligence claims.

PLN_0001706

# Law Man: My Story of Robbing Banks, Winning Supreme Court Cases, and Finding Redemption, by Shon Hopwood and Dennis Burke
## (Crown, August 2012). 320 pages, $25.00 hardcover

*Book review by Lisa McElroy*

IN THE SPRING OF 2003, THE PHONE ON Seth Waxman's desk rang. "Will you accept a call from federal prison?" the caller asked. Waxman sighed. It might have been his fifth prisoner call that day. As the former Solicitor General of the United States and a prominent member of the Supreme Court bar, he was on the must-contact list for those looking for representation before the Court. In almost all of these cases, Waxman wanted to help, but he was just one person. And – whether fair or not – petitions by prisoners stood little chance of capturing the Court's attention.

But this call, it would turn out, was different. This call was from a prisoner named John Fellers. And not only did Fellers have a case for Waxman, but the Court had already granted this prisoner's petition. The one he had filed pro se. The one for which he had filled out an *in forma pauperis* ("IFP") request. The one for which he now had no lawyer, because his "lawyer" at the cert. stage had been a fellow prisoner, a guy whose prison job was working in the law library, a guy who had no college education and no expertise in anything but robbing banks.

That jailhouse lawyer's name was Shon Hopwood. And that self-taught "law man" had just achieved the near-impossible – he had written a petition, filed it in his friend's name, and received notice from the Supreme Court of the United States that it would hear his case.

A lot has been written about Hopwood's story of how he beat the odds, and deservedly so. His new page-turner of a memoir, *Law Man,* would be a compelling read even if the book were only a gripping story with an engaging plot. But less attention has been paid to part of the story that is about justice. "Equal Justice Under Law" [*Ed. note: the inscription on the front of the U.S. Supreme Court building*] comes to life in this book in a way that is too often absent from the cert. petition process.

Let's step back from this story for a minute and reflect. Supreme Court watchers know that it is rare for the Supreme Court to grant certiorari in cases in which a lower court simply made a mistake. In its "Guide to Prospective Indigent Petitioners for Writs of Certiorari," the Clerk's office emphasizes that "[t]he primary concern of the Supreme Court is not to correct errors in lower court decisions, but to decide cases presenting issues of importance beyond the particular facts and parties involved." In a word? The Court looks for circuit splits, and it's clear about that – in its own rules and in the same guide just quoted, which indicates that "[i]mportant considerations for accepting a case for review include the existence of a conflict between the decision of which review is sought and a decision of another appellate court on the same issue. An important feature of the Supreme Court is to resolve disagreements among lower courts about specific legal questions."

John Fellers' case was a question of lower court error: in his pro se petition, he argued that the Eighth Circuit had erred when it held that Mr. Fellers' right to counsel was not violated when police talked to him in his home without counsel present, after a grand jury had indicted him. The court had also erred, Fellers asserted in the brief authored by Hopwood, by failing to hold that statements Fellers made later at the jail should have been suppressed as "fruits of the poisonous tree" because they flowed from the original, illegally obtained home interview. Because the federal courts had not previously spoken to this complicated issue, Shon Hopwood could not – and did not – cite to a circuit split in his cert. petition for Fellers.

As if asking for a grant of certiorari in a case of lower court error was not enough, Hopwood was also filing Fellers' petition for him pro se, *in forma pauperis.* His chances even if the case had involved a circuit split? About one-tenth of one percent. In fact, in its October Term 2002, the Court received 7,209 IFP petitions but granted only eight. Law clerks in the cert. pool – a group of law clerks, working for the Justices who choose to participate, who "pool" their efforts to divide up the massive body of cert. petitions and attempt to identify meritorious cases – know to look for circuit splits. And even when a circuit split exists, IFP petitions are unlikely to get a close look, in part because they are often drafted by non-lawyers and can be difficult to understand, in part because they are so numerous that it is difficult for even the highly diligent law clerks to separate the wheat from the chaff. And law clerks are worried about their reputations and future careers; most will only recommend a grant when a case satisfies numerous "cert.-worthy" criteria (circuit split, big name on the petition, paying client, issue they've been told to keep an eye out for), lest they raise eyebrows among their colleagues.

So how did Fellers' case get granted? Given the tight secrecy around the cert. process, we can only speculate: Either a clerk went out on a very narrow limb, taking on the risk that she would recommend a grant and be shot down by her co-clerks and the Justices, or Justice Stevens (then the only Justice who did not participate in the cert. pool) was flipping through a pile of cert. petitions and lighted upon Fellers' case, or a clerk mentioned the admittedly thought-provoking petition to her Justice and the Justice took it from there.

But Shon Hopwood did not know that his chances were slim to none. He just knew that his friend, John Fellers, was in prison even though it appeared that the police had messed up. Hopwood was getting into this law thing: as he told me on the phone, "I really enjoyed the challenge of the law."

He wanted to help. And he had nothing but time – he would eventually serve a sentence of almost a decade. And so, Shon says, "There were a couple of guys in the law library who had been there for a long time – a couple of decades – and they would show me how to do legal research." When John Fellers asked, the "Law Man" – Shon's proud prison moniker – agreed to see what he could do for him. He wrote a cert. petition. And when it was granted, Shon still did not know that he had achieved the unachievable. He just wondered how they were going to get the case argued.

Luckily, finding a lawyer to argue the case was not a problem. Once cert. was granted, there were certainly lawyers at the

PLN_0001707

ready, lawyers who probably would not have given Fellers the time of day back when his was just one of the 7,200 prisoner petitions in the pool of about eight thousand petitions per Term. The cert. grant? It made all the difference. At least ten had called Fellers, offering to represent him for free. But Fellers got some good advice. "Go for the guy who hasn't called, the guy who knows what he's doing but is too busy enough to call you up." That guy turned out to be Seth Waxman. And, luckily for him, Waxman took his call that spring day in 2003.

When Waxman read the petition, he was more than impressed. "This was a petition written by a prisoner, and it was really clear," Waxman told me in a phone interview. "It was a darn good cert. petition, better than what you would see from most lawyers."

Awfully high praise for someone of Waxman's stature.

The rest of the story is the stuff of movie scripts, blockbuster films starring Matt Damon or Matthew McConaughey. The former Solicitor General of the United States takes the case, but only on the condition that the jailhouse lawyer stay involved. The great Supreme Court advocate wins, calls the jailhouse lawyer and the client in prison, and congratulates them on a great, unanimous, almost unheard-of victory. The jailhouse lawyer gets out of prison, stays in touch with his old mentor, and eventually (with encouragement and backing) goes to law school. And, even while he is in law school, he starts to pay it back. Out of his apartment – with his wife and two young

children in the background – he continues to help prisoners who, practically, have little other hope. "I get a lot of mail from prisoners," Hopwood says. "And some of their cases have merit. When they do, I send them a letter and tell them that I will try to find them an attorney."

Hopwood is a one-man show, an individual example of "Equal Justice Under Law." He's trying to help the people whose cert. petitions are least likely to be granted, in part because the documents are filed from prison, in part because the people filing them rarely have law degrees, in part – according to Hopwood – because standard electronic database searches don't retrieve their cases. And indeed, the opinions by the courts below may not mention a circuit split even where one exists.

And so *Law Man* does more than entertain. It makes us question the very process that brings cases to the Supreme Court, and think hard about that slogan above the front door. It makes us cheer for the Law Man, but only because his case is an outlier, an anomaly, almost an impossibility in today's Supreme Court world, with its limited docket and its cautious-to-a-fault law clerks. And it makes us stop and think: think of all the other prisoners, all of the other Americans who have neither the resources, nor the knowledge, nor the connections, nor the chutzpah to call Seth Waxman.

It's a great story. It's made for a book. And that's why *Law Man* is a must-read for Supreme Court watchers and anyone else who cares about justice. ◼

*Lisa McElroy is an associate professor of law at Drexel University's Earle Mack School of Law. This book review was originally published on SCOTUSblog (Supreme Court of the United States blog – www.scotusblog.com), and is reprinted with permission.*







### Support Prison Legal News with these beautiful gifts!

CALL **802-257-1342,** MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/

### Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

PLN_0001708

# Ninth Circuit Vacates Federal Prison Sentence Imposed by Non-trial Judge

*by Derek Gilna*

Federal prisoner William Harris' 188-month sentence for assaulting a prison guard was reversed by the Ninth Circuit Court of Appeals on May 25, 2012, based on a violation of Federal Rule of Criminal Procedure 25(b) "with prejudice."

Harris, 35, a member of the Salt River-Maricopa Indian Tribe, had a long history of depression, mental problems and substance abuse, and suffered from schizophrenic behavior that was aggravated by a 2001 automobile accident. While incarcerated on an assault charge, and intoxicated after "drinking homemade wine," he participated in a brawl with federal prison guards Brian Fitzgerald and Noel Pasillas, throwing chairs and stabbing Pasillas with a homemade knife.

After a plea bargain negotiated by defense counsel and the U.S. Attorney's office was rejected by an Arizona federal district court, Harris went to trial and was found guilty. Sentencing was scheduled for February 1, 2011, but the trial judge was not present. In her stead was visiting judge Linda Reade, Chief Judge of the Northern District of Iowa, who imposed a 188-month sentence.

On appeal, Harris first argued the trial judge should not have rebuffed his plea agreement. The appellate court rejected that argument, stating, "[A] district court properly exercises its discretion when it rejects a plea agreement calling for a sentence the court believes is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case," citing *In re Morgan*, 506 F.3d 705, 708 (9th Cir. 2007).

Harris had better luck with his second argument, which was based on a Rule 25(b) violation. While the rule provides for another judge to conduct sentencing if the trial judge is absent due to death, sickness or other disability, there was no compelling reason why the trial judge could not have sentenced Harris upon her return.

The Ninth Circuit held that a defendant should be sentenced by the "judge who presided at trial," quoting Rule 25(b), "Because only that judge has had the opportunity to observe every aspect of the trial and to take into account in sentencing what has been observed." The appellate court further stated, "Sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person ... the visiting judge was not sufficiently familiar with the record, [and] the visiting judge abused her discretion by conducting [the] sentencing."

Harris' 188-month prison sentence was thus vacated and the matter remanded to the original trial judge for resentencing. See: *United States v. Harris*, 679 F.3d 1179 (9th Cir. 2012).

Following remand, on August 23, 2012 the district court sentenced Harris to 120 months with credit for time served, plus 60 months of supervised release. ◾

# FBI's National Crime Data Found to be Flawed, Manipulated

As it turns out, the FBI's annual reports on crime in the United States are only slightly more credible than campaign promises and Big Foot sightings.

An August 2012 investigative analysis by the *Milwaukee Journal-Sentinel* found that the overwhelming majority of data published in the FBI's "Crime in the United States" report each year is non-verified, self-reported information from police agencies that are sometimes politically motivated to under- or over-report crimes and arrests in their jurisdictions.

Although the FBI began auditing local police departments in 1997 to ensure that crime statistics are accurately reported, the *Journal-Sentinel* discovered that less than 1% of about 17,000 law enforcement agencies nationwide that report data to the FBI have been audited in each of the last five years. Only about one-third of police departments in the 30 largest cities in the U.S. have been audited during that same time period, and data from six of those departments – including Seattle and Philadelphia – have never been reviewed since the FBI's auditing program began.

"[Crime data] is a tool that politicians and police leaders use, yet the system is so incentivized to cast a favorable light and there [are] very little checks and balances to make sure it's accurate," stated Eli Silverman, professor emeritus at New York City's John Jay College of Criminal Justice. "Most people assume the data comes with a certain grain of authenticity because they are FBI statistics. But in reality they are not really FBI stats, but those of the actual police department."

Additionally, some elected officials have been accused of manipulating crime data to argue that communities are safer under their leadership. In Milwaukee, for example, Mayor Torn Barrett and Police Chief Edward Flynn touted four straight years of declining crime numbers before the *Journal-Sentinel* reported in May 2012 that 500 "serious assaults" had been misclassified as minor offenses by police officials from 2009 to 2012.

The Milwaukee Police Department released its own internal audit a month later that uncovered more than 5,300 under-reported aggravated assaults since 2006. In June 2012, the department sent almost 70 employees from various police divisions to attend a two-day training session on crime reporting procedures.

"If you're saying your crime numbers are really low, but meanwhile they are really high and you aren't hiring cops, you are going to exacerbate the problem of criminality," noted John Eterno, director of the graduate criminal justice program at New York's Molloy College.

Problems with misreporting crime data are nothing new. A 2001 scandal involving the Detroit Police Department revealed that the city's statistics for rape arrests were erroneously high – so much so that they skewed national crime numbers. The city's homicide arrest statistics likewise had been improperly elevated. The discrepancies were uncovered by the *Detroit Free Press*.

Politicians may also misrepresent crime trends to further their own agendas, includ-

PLN_0001709

ing increased funding for certain programs or their re-election campaigns. In defense of Arizona's xenophobic anti-immigrant law, SB 1070, Governor Jan Brewer and former state Senator Russell Pearce claimed that, due to human smuggling, Phoenix had become the "kidnapping capital of the world." They blamed immigrants for higher rates of violence and property crimes – claims that were later discredited.

Further, research by both Silverman and Eterno has identified problems with crime reporting systems like CompStat, which is used by Milwaukee police and hundreds of other police agencies across the country. Traffic officers and homicide detectives alike are required to enter codes into the CompStat system to record arrests, unsolved crimes and other data. To meet certain performance quotas, police officials might be motivated to intentionally fudge the numbers.

Flynn, the Milwaukee police chief, insisted that his department's crime reporting problems were due to human and computer errors, not data manipulation. An FBI audit of the Milwaukee Police Department, released in August 2012, reviewed a mere 60 incidents; comparably, the city's police officers report around 93,440 criminal incidents and citations annually.

Richard Rosenfeld, former president of the American Society of Criminology, described the FBI's audit as being "far too small for drawing meaningful conclusions." Still, the audit found 5 underreported incidents out of the 60 reviewed, or around an 8.3% error rate.

In 1929, the FBI created the voluntary Uniform Crime Reporting Program to ensure consistency in the crime data compiled from law enforcement agencies across the country. The Uniform Crime Reports are considered one of two primary statistical tools for tracking crime trends in the United States, the other being the National Crime Victimization Survey by the Department of

Justice. [See: *PLN*, Jan. 2013, p.17].

As a result of the FBI's auditing program that began in 1997, the agency's current policy is to conduct an audit of police departments in each state – usually between six and nine departments – once every three years. However, according to Dan Bibel, who directs the crime reporting unit for the Massachusetts State Police, the FBI's audit team is short-staffed and only reviews a small number of agencies each year.

"I don't want to say they're doing a bad job," said Bibel, a former president of the Association of State Uniform Crime Reporting Programs. "They're doing the best they can with what they have."

Which, apparently, isn't much.

Sources: *Milwaukee Journal-Sentinel, www. womensenews.org*

## Colorado Seeks New Use for Empty Prison

WHEN COLORADO GOVERNOR JOHN Hickenlooper announced the closure of the Fort Lyon Correctional Facility in Las Animas, Brent County officials became despondent. The prison was an economic mainstay of the tiny county.

"There's no question the jobs leaving the community are some of the highest-paying jobs we have," said County Commissioner Bill Long, who is also a member of the Brent County Economic Development Foundation (BCEDF). "We already have a child-poverty rate of 37%."

That's why the BCEDF, which is funded both by public and private sources, decided to pay $12,000 a month to lobbying firms to find another sustainable use for the facility. They have contacted other states with overcrowded prison systems, such as California, as well as the Bureau of Indian Affairs and U.S. Department of Veterans Affairs – the original owner of the facility, which was given to the state in 2001.

Colorado is facing a $1 billion budget shortfall; it spent about $6 million on the prison each year, not including staff salaries. The decision to close the facility was a reaction to the financial crisis. Nonetheless, Hickenlooper has "made a commitment" to help Brent County find a new use for the prison, which closed in March 2012.

In May 2012, news reports indicated that state officials were considering providing funding to repurpose the prison from Colorado's share of a nationwide $25 billion settlement resulting from the mortgage crisis.

The state may use the vacant Fort Lyon prison for transitional veteran housing – which is ironic, given that veterans are overrepresented among prison populations. State Rep. Sal Pace is pushing for $5 million to repurpose the facility for housing veterans, which would also create jobs. Given the ongoing economic downturn, however, pouring millions of dollars into the empty prison is a hard sell.

The experience of other communities that have tried to sell vacant private prisons has demonstrated that there are few things more worthless and costly than an empty correctional facility. [See: *PLN*, Feb. 2012, p.32].

Sources: *Denver Post, Huffington Post*



**SureShot Books a Premier Bookstore for Inmate's**

**Legal Law Books, Magazines, Newspaper Subscriptions, Sports, Urban Books & Career Education Books.**
( Largest Selection of Spanish Publications )

Contact us for a FREE catalog

**SureShot Books, P.O. Box 924, Nyack, NY 10960**
www.sureshotbooks.com

### CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks. State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum). Free persons: $90.

*CLN,* **PO Box 277, Rancho Cordova, CA 95741**

# Pennsylvania Officials Link Halfway House Payments to Recidivism Rates

### by Derek Gilna

COMMUNITY CORRECTIONS CENTERS, also known as halfway houses, receive a great deal of money to help prepare prisoners to reenter society. Unfortunately, according to a recent study in Pennsylvania, the state's 38 halfway houses with 4,313 beds have not been particularly successful in that mission, as prisoners assigned to the facilities are more likely to return to prison than those released on parole directly to the street.

State officials think they have found a solution to that problem. According to a February 2013 announcement by the Pennsylvania Department of Corrections, the state's contracts with privately-operated halfway houses will be renegotiated to directly link pay with performance. If the recidivism rate of prisoners released from halfway houses declines, those facilities will receive higher payments.

Previous recidivism statistics indicate that about 40% of Pennsylvania prisoners return to prison within three years after their release. Now, however, when the state measures recidivism, it counts arrests as well as re-incarcerations, bringing the total recidivism rate to almost 60% according to a report released on February 28, 2013.

"We call it the Department of Corrections, and apparently, it's not correcting anything," noted Allegheny County Common Pleas Judge Jeffrey A. Manning.

Bret Bucklen, director of planning, research and statistics for the Pennsylvania Department of Corrections, said the state's private halfway house contractors "should be held to a better standard.... We're playing the probability game, and there are things they can do to decrease the probability of inmates committing another crime." He added, "[t]o put it another way, I like to gamble: if I'm card counting, I may still lose a hand of Blackjack, but my chances of winning are significantly higher."

Tying halfway house payments to performance, as measured by recidivism rates, will hopefully reduce taxpayer expenses by providing a financial incentive for halfway house operators to offer the kind of environment and services that make it less likely for released prisoners to re-offend.

The new performance-based contracts are expected to be in place by July 2013. Halfway houses that fail to demonstrate a recidivism rate of 60% or less risk losing their contracts. Those that achieve recidivism reductions of at least 10% will receive higher per-prisoner payments, according to Bucklen. Corrections Secretary John Wetzel said he thought the initiative was the first of its kind in the nation.

Sources: *The Patriot-News, www.post-gazette.com, www.philly.com*

# Forcible Cutting of Illinois Prisoner's Dreadlocks Found Unconstitutional

THE SEVENTH CIRCUIT COURT OF Appeals has held that an Illinois prison guard violated the First Amendment rights of a prisoner by ordering his dreadlocks to be forcibly shorn. The appellate court further held the guard was not entitled to qualified immunity.

Illinois prison policy allows prisoners "to have any length of hair" they desire so long as it "do[es] not create a security risk." Harold Schuler, a guard at the Big Muddy Correctional Center (BMCC), ordered prisoner Omar Grayson's dreadlocks to be cut off on the grounds that they posed a security risk, though he did not explain why.

Grayson, a member of the African Hebrew Israelites of Jerusalem, complained to the chaplain, who informed him that only prisoners who are Rastafarians are allowed to wear dreadlocks. Grievances on the issue were denied based upon the chaplain's opinion. Grayson filed a federal lawsuit in 2009, but the district court granted Schuler's motion for summary judgment and the case was dismissed.

On appeal, the Seventh Circuit began its opinion by noting that since Grayson had been released from prison, only his personal-capacity damages claim under 42 U.S.C. § 1983 remained at issue. Turning to the merits, the appellate court included in its ruling a photo of the late Jamaican musician Bob Marley (a Rastafarian) to show that dreadlocks can attain "a formidable length and density."

"One can see why prison officials might fear that a shank or other contraband could be concealed in an inmate's dreadlocks, or why they might want inmates to wear their hair short because inmates with long hair can more easily change their appearance, should they escape, by cutting their hair," the Court of Appeals wrote. "The case law indicates that a ban on long hair, including dreadlocks, even when motivated by sincere religious belief, would pass constitutional muster."

However, the Seventh Circuit found that this case involved "outright arbitrary discrimination rather than a failure merely to 'accommodate' religious rights." BMCC would be "hard pressed" in defending a rule that only Rastafarians may wear dreadlocks "unless it were certain no other sect, and not even any individual prisoner's private faith, considers wearing dreadlocks a religious observance...." While Rastafarians could wear dreadlocks at BMCC, Schuler had failed to articulate a security risk if Grayson also was allowed to keep his dreadlocks.

The appellate court found there was a scriptural basis for Grayson's religious observance of wearing dreadlocks, known as the Nazirite vow. That some members of Grayson's religion may not observe the vow did not negate his right to that observance, nor did he "forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents and prodigal sons?" the Court of Appeals observed. Further, "[p]rison chaplains may not determine which religious observances are permissible because [they are deemed] orthodox."

As Schuler did not order Grayson's dreadlocks to be shorn due to a reasonable belief that Grayson was insincere in his religious observances or because there was a security threat, he was not entitled to qualified immunity. The district court's summary judgment order was accordingly reversed and the case remanded for further proceedings, where it remains pending. See: *Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012).



**The Habeas Citebook: Ineffective Assistance of Counsel**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

**$49.95**

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



**Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition**
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

**$49.95**

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



**Prisoners' Self-Help Litigation Manual, 4th Edition**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

**$45.95**

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

---

☐ Habeas Citebook,
Ineffective Assistance of Counsel
$49.95

☐ Prisoners' Guerrilla Guide to
Correspondence Programs
3rd edition
$49.95

☐ Prisoners' Self-Help
Litigation Manual
4th edition
$45.95

***Shipping included in all prices***

PUBLISHED BY

*Order by mail, phone, or on-line.*   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address _____

City _____ State ____ ZIP _____



**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 2420 • West Brattleboro, VT 05303
Tel [802] 257-1342 • www.prisonlegalnews.org

PLN_0001712

# Defendants Must Challenge Joint and Several Liability for Attorney Fees on Initial Appeal or Issue is Waived

O**N MAY 22, 2012, THE NINTH CIRCUIT** Court of Appeals held that defendants found liable for civil rights violations had failed to challenge in their initial appeal an order that they were jointly and severally liable for attorney's fees, and thus had "waived their ability to challenge that order subsequently."

Anthony Albert Jimenez sued ten Los Angeles County deputy sheriffs under 42 U.S.C. § 1983 for violating his constitutional rights while he was held as a pretrial detainee at a Los Angeles County jail in 1998. The allegations involved four separate incidents of excessive force that took place over three days.

The jury returned a verdict in favor of Jimenez as to four of the defendants. The district court awarded damages against those defendants as follows: John Franklin, $1; Gilbert Duron, $5,000 in compensatory damages and $10,000 in punitive damages; Ryan Bergner, $50,000 in compensatory damages and $50,000 in punitive damages; and Gabriel Frank Gonzalez, $100,000 in compensatory damages and $150,000 in punitive damages, totaling $365,001.

The district court then awarded $505,671.40 in attorney's fees and $24,595.94 in costs. Jimenez was ordered to pay $5,000 of the attorney fee award, leaving the balance of $500,671.40 owed by the defendants. The district court ordered "the payment of the fees to be joint and several to insure that Plaintiff's counsel is paid."

Los Angeles County, which represented the defendants, "intimated that [it] may decide to not indemnify Defendant Gonzalez ... because, in the County's view, he is in prison and is judgment proof."

Duron, Franklin, Bergner and Gonzalez appealed the judgment but did not appeal the district court's order holding them jointly and severally liable for Jimenez's attorney fees. The Ninth Circuit upheld the judgment in October 2009. See: *Jimenez v. Franklin*, 333 Fed.Appx. 299 (9th Cir. 2009). On remand, the district court awarded an additional $41,830.10 in attorney's fees, bringing the total fee award to $547,501.50, which was 150% of the damages awarded to Jimenez. This kept the fee award to the limit set by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(d)(2).

The county eventually paid the compensatory awards for all four defendants as well as the punitive damages, except for the $150,000 award against Gonzalez. The county also paid all but $225,000 of the attorney fee award, which was the amount it deemed attributable to Gonzalez.

After the county paid $2.50 on Franklin's behalf ($1.00 in damages plus $1.50 in attorney fees), he moved for an order stating he had fully satisfied the judgment against him, arguing that § 1997 capped his portion of the attorney fees at 150% of the damages award. The district court granted his motion and entered a satisfaction of judgment, and the parties stipulated such an order would similarly apply to Duron and Bergner. Jimenez appealed.

The Ninth Circuit held that § 1997 "limits the award, not simply the collection of the award." Any argument that the attorney fee award against each defendant exceeded 150% of the damages award was deemed waived, as it had not been raised by the defendants in their initial appeal.

"Defendants became liable for the entire fee award as soon as the district court entered that award and ordered that the liability be joint and several," the Court of Appeals wrote. "Each defendant's liability exceeded 150 percent of his individual damages from that point forward," because each defendant was jointly and severally liable for the entire attorney fee award.

If the defendants "wanted to challenge the joint and several liability, they should have done so" during their initial appeal. As they had failed to make that argument, the issue was waived. Accordingly, the Ninth Circuit vacated the district court's satisfaction of judgments. See: *Jimenez v. Franklin*, 680 F.3d 1096 (9th Cir. 2012). ◪

# Delaware Court Decides Financial Dispute Involving Prison Healthcare Company

*by Derek Gilna*

A **COMPLAINT BROUGHT IN THE COURT** of Chancery of Delaware to appraise the value of a prison healthcare company inadvertently shed light on the big business of providing contracted correctional services.

Certain shareholders of Just Care, Inc., a privately-held Delaware corporation, filed the complaint to determine the fair value of the company in an appraisal action following its acquisition by GEO Care, Inc. (formerly a subsidiary of private prison firm GEO Group). According to the complaint, GEO Care "provides government out-sourced services specializing in the management of correctional, detention, and mental health and residential treatment facilities" in the United States and abroad.

One of the disputes in the case was the value of projected cash flows from payments anticipated from the states of South Carolina and Georgia, both of which had business relationships with Just Care. At the time of the merger, Just Care operated a single facility – the 374-bed Columbia Regional Care Center in Columbia, South Carolina, which provides medical services to prisoners and detainees from South Carolina, Georgia, the U.S. Marshals Service, and Immigration and Customs Enforcement (ICE).

Georgia had not finalized plans with the company to build a facility in that state; Just Care had hoped to renovate the Bostick State Prison and turn it into a prison medical center, though that never occurred.

On April 30, 2012, as a result of the court's deliberations, which included reports from various financial experts, the fair value of Just Care was found to be $34,244,570 rather than the $55.2 million claimed by the petitioners. The court discounted the value of Just Care's potential contract with Georgia as being "too speculative." GEO Care had acquired Just Care on September 30, 2009 for $40 million, with $6 million being "held in escrow to pay claims against the Company arising during the two-year period following the close of the merger, including appraisal claims and costs."

This case is instructive in that it demonstrates the tremendous amount of cash involved when correctional services are outsourced. In this particular case, a 374-

bed facility was found to be worth over $34 million, or more than $91,000 per bed. The value was based partly on the virtually guaranteed flow of taxpayer dollars to the company through government contracts.

Thus, it is not difficult to comprehend why private prison contractors like Corrections Corporations of America and GEO Group, and prison healthcare companies such as Just Care, are big money makers. The question is whether or not it is an efficient use of taxpayer funds for such companies to provide services that, until recently, had always been within the province of the public sector.

Contracting out correctional services to private, for-profit companies serves only to monetize our criminal justice system – in this case, in the amount of $34.2 million. See: *Gearreald v. Just Care, Inc.*, Court of Chancery of the State of Delaware, C.A. No. 5233-VCP; 2012 WL 1569818. ◾

Additional source: *www.thegeogroupinc.com*

# Court Upholds California Prison Guard's Termination for Telling Prisoner to Hang Herself

IN MARCH 2012, THE CALIFORNIA COURT of Appeal, 4th District, affirmed a lower court's judgment that reinstated the termination of a former state prison guard, Thomas Norton, who had told a mentally ill female prisoner to hang herself and then pressured another guard to keep him from reporting what had happened.

On November 23, 2006, while working the night shift in the Support Care Unit at the California Institution for Women, Norton responded to the cell of a prisoner who was screaming because she was hearing voices and hallucinating. He refused to turn on her cell light after she told him that she was afraid of the dark, and then flippantly replied "'go ahead,' or go ahead and hang yourself, or words to that effect" when she stated she might commit suicide.

After the unidentified prisoner did try to hang herself, Norton embarked on a campaign of intimidation against another guard, Ryan Campos, who worked with him in the Support Care Unit and was a potential witness, by referring to Campos as a "snitch," a "pussy," a "rat," a "punk" and a liar. Campos didn't state in his initial report that the prisoner had told Norton she might kill herself, or mention Norton's callous response, as he did not "want to let [him]self out there to be ostracized by [his] peers."

Norton was fired six months later, in May 2007; one of the reasons cited for his termination was his failure "to report or respond to a suicidal statement" made by the mentally ill female prisoner. When he appealed his job termination, the State Personnel Board (SPB) reduced his punishment to a 30-day suspension.

The California Department of Corrections and Rehabilitation then filed a petition in superior court for a writ of administrative mandamus. The court granted the petition, finding that the reduction in punishment was an abuse of discretion, and ordered the SPB to reinstate Norton's job termination.

That finding was upheld by the Court of Appeal on March 12, 2012. "We conclude the SPB abused its discretion by reducing Norton's punishment from termination to a 30-day suspension," the appellate court wrote. "We therefore affirm the judgment of the trial court." See: *Cate v. California State Personnel Board*, 204 Cal.App.4th 270, 138 Cal.Rptr.3d 691 (Cal.App. 4 Dist. 2012). ◾

# T Y P I N G
## S E R V I C E S
### Provided since 1998

Specifically designed, with special rates for the incarcerated person.

**Black / Color Printing and Copying**

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

**LET MY FINGERS DO YOUR TYPING**
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

Special Offer: $2.00 off first order.
Special offer void after: 12/31/2013





PLN_0001714

# South Carolina Sheriff Indicted; Fourth Sheriff to Face Criminal Charges in Three Years

*by Christopher Zoukis*

A SOUTH CAROLINA SHERIFF HAS BEEN removed from office following his indictment on criminal charges of misconduct and furnishing contraband to prisoners.

Chesterfield County Sheriff Sanford ("Sam") Marion Parker, Jr. was suspended by Governor Nikki Haley on March 20, 2013 after the charges were announced by the Attorney General's Office. Following his arrest, Sheriff Parker was released on a $150,000 personal recognizance bond.

In a 20-page indictment, Parker was accused of using two state prisoners assigned to his custody to work on his home and personal property; in return, the prisoners were allowed to effectively reside outside the jail, go on shopping trips (some of them out-of-state), have access to guns and sheriff's vehicles, and have unsupervised visits with women, among other perks.

Further, Parker allegedly gave firearms owned or seized by the county to private citizens, including an M-14 rifle and a sniper rifle. He was accused of using a boat purchased with county funds as a personal shrimping boat, and keeping county vehicles at his home for personal use – including a five-ton military truck, a trailer and a John Deere "Gator" vehicle.

 Prosecutors also accused Parker of appointing deputies and "Reserve Officers" who never received state-mandated training or certification required under South Carolina law. They were allowed to wear Sheriff's Department uniforms and badges, which, according to the indictment, "improperly conveyed that they possessed the authority to enforce the law within Chesterfield County." These actions also violated South Carolina Code provisions related to records that must be filed with the State Criminal Justice Academy.

Michael Lee, who was serving a 15-year sentence for felony arson, was one of the prisoners involved in Sheriff Parker's alleged misconduct. According to the indictment, Lee was transferred to Chesterfield County in 2007 under the state's Designated Facilities Program, and stayed there until August 17, 2012, when, at Parker's request, he was returned to state custody.

Lee, a trained engineer, reportedly lived at the Weapons Armory, which he helped refurbish, where he was allowed access to computers, a TV and Sheriff's Department vehicles and firearms, and had "unsupervised visits" with female visitors. He also hosted dinners and parties at the Armory and at Parker's home, and spent holidays with the Sheriff's family. He frequently traveled to North Carolina to shop and even traveled "in a private aircraft piloted by a Sheriff's Deputy" for a family visit. Further, he allegedly used drugs and alcohol.

Another state prisoner, William Skipper, serving a seven-year sentence for drug trafficking, also was transferred to Chesterfield County under the Designated Facilities Program and remained in Parker's custody for three years, ending in February 2012 when he was released. He too lived at the Armory and enjoyed many of the same privileges as Lee, including out-of-state personal trips. A licensed general contractor and HVAC repairman, Skipper reportedly built a recreation building at Parker's home and was allowed to "[t]ake HVAC materials belonging to Chesterfield County for his personal use" upon his release.

Parker had worked in law enforcement for over four decades prior to his indictment and had been Chesterfield County's Sheriff since 2003. According to his attorney, Parker's career was spotless. "In all his time in law enforcement, you won't find anyone with a better reputation than Sam Parker," said attorney Johnny Gasser.

Parker engaged in activities that law enforcement agencies have allowed rural sheriffs to do for decades, Gasser stated: "No one ever came to the sheriff and told him he was doing anything wrong." Parker simply "got tripped up by confusing regulations," he added. "Sam Parker is not a criminal."

Parker's claim that he was unaware of the criminal nature of his interactions with prisoners Lee and Skipper will face tough scrutiny, however, given that other South Carolina sheriffs have been convicted for engaging in similar conduct in recent years.

Former Saluda County Sheriff Jason Booth pleaded guilty to misconduct in office in August 2012, for using a prisoner to build a "party shed" and other structures on his land. The prisoner was also allowed to spend nights outside the jail, eat at restaurants and attend parties on Booth's property. Booth was sentenced to a year in prison, suspended to five months of probation, and fined $1,000. [See: *PLN*, Nov. 2012, p.50].

Former Abbeville County Sheriff Charles Goodwin resigned in January 2013 and was sentenced to 10 years, suspended to five years' probation, plus $4,445 in restitution after admitting he took kickbacks from a vehicle repair shop and used a prisoner to perform personal work. And former Lee County Sheriff E.J. Melvin is currently serving 17 years in federal prison following his November 2010 conviction on drug conspiracy and racketeering charges, making Parker the fourth South Carolina sheriff in three years to face prosecution.

The South Carolina Sheriffs' Association announced in March 2013 that it would hold a training session to inform sheriffs about their conduct while in office.

"Some of the allegations that've been made may just be misinterpretations of the law," said Newberry County Sheriff Lee Foster. "The other ones, such as [prisoners] working on private property or doing private work, there's no misinterpretation of that and nobody condones that. But the other thing that we're concerned about as sheriffs is getting a little bit more definitive answer about what you can and you can't do." 🖎

Sources: *Associated Press, Charlotte Observer, Augusta Chronicle, www.foxcharlotte.com, www.wjbf.com*

### Writing to Win

Need to write better? *Writing to Win* will teach you the basics of how to compose clear and convincing written and oral legal arguments! 270 pages packed with solid, practical advice and tips.

$19.95 from PLN's Book Store! See page 61 for more information.

# Utah: Prisoners' Education Should be Cheaper, More Efficient, Report Says

Secondary education classes for Utah prisoners are wasting tax dollars and, more importantly, wasting educational resources, according to an August 2012 report by the state's Legislative Auditor General.

Utah lawmakers wanted to know how efficient and effective are high school education programs offered in the state's prisons and jails, which help offenders earn a diploma or G.E.D., or learn English as a second language.

Auditor General John Schaff reported that Utah's State Office of Education (USOE), with a $5.4 million budget in 2011, educated 5,268 prisoners at 23 jails and both state prisons. It cost more to teach prisoners ($512 per student) than to educate adult students on the outside ($346 per student). One reason, according to the report, is that some prisoners take hundreds of class "contact" hours without graduating, while others who graduate continue to attend classes but only sit around and do nothing, consuming resources that could be helping other prisoners.

"Programs should not be designed to take longer, simply because an inmate has more time available," the report said. The Auditor General also noted that "[b]y spending more on inmates, fewer funds are available for the traditional adult education program" for non-incarcerated students.

Utah's jails, according to the report, are more efficient at achieving educational outcomes than state prisons. Jail programs averaged 26 hours per student to advance an academic level or reach graduation, while prison programs averaged 55 hours per student – twice as long, resulting in twice the cost.

Utah Department of Corrections (UDOC) officials argued that state prisoners "are at a lower functioning level than inmates in jail programs when they enter the program, and therefore require more educational services."

However, the Auditor General's report refuted that claim, finding that in 2011, 85% of prisoners in both jails and state prisons "entered with an educational functioning level below a ninth-grade level."

UDOC officials further argued that prisoner education programs are not only about education but also address safety and security issues, as they help to "manage the incarcerated population by keeping inmates engaged and diverting problem behavior."

The report recommended that the USOE establish guidelines for a reasonable number of "contact" hours for students to achieve certain educational outcomes, and to limit classroom time used by prisoners who have graduated. The Auditor General also recommended that the USOE and UDOC evaluate post-release employment benefits that result from providing education programs to prisoners, and give educational priority to prisoners who are scheduled to be released within five years. ◼

Sources: *"A Performance Audit of Inmate High School Education," Utah Auditor General, No. 2012-11 (August 2012); Salt Lake Tribune*

---

# WE NEED YOUR HELP!

**We are updating the Disciplinary Self Help Litigation Manual (Manville 2007) to help guide prisoners through the misconduct and disciplinary litigation process.**

**To effectively help inmates, we need case law and opinions from state courts that affect this process at the state level.**

**Please send us a copy of any decisions entered by a state court relating to prisoner misconduct/disciplinary actions.**
(if copy cannot be made, please send original and we will return it at your request)

send all material to:

## Professor Daniel Manville, MSU College of Law
## 610 Abbot Rd., East Lansing, MI 48823

(please do not send summaries, memos, or requests for representation)

---

PLN_0001716

# Florida Innocence Commission Makes Recommendations to Prevent Wrongful Convictions

THE FLORIDA INNOCENCE COMMISSION's final report, presented to the Florida Supreme Court on June 25, 2012, included a number of recommendations to address issues related to wrongful convictions in the Sunshine State.

Due to having one of the highest rates of wrongful convictions in the nation, the Florida Supreme Court established the 25-member blue-ribbon panel in July 2010 to determine the causes of wrongful convictions and what can be done to prevent them.

Specifically, the Florida Innocence Commission was formed to "provide a mechanism to recommend to the Supreme Court of Florida solutions to eliminate or significantly reduce the causes for wrongful or erroneous convictions." The Commission held meetings in Tallahassee, Tampa, Jacksonville and Orlando; heard testimony from experts; and reviewed several wrongful conviction cases.

The Commission identified five primary factors that contribute to wrongful convictions: Unreliable jailhouse snitch testimony, eyewitness misidentification, false confessions, invalidated or improper scientific evidence, and professional responsibility and accountability of both prosecutors and defense attorneys. Another, more general contributing factor identified by the Commission was the "underfunding of the criminal justice system in Florida."

According to the Innocence Project, a New York-based nonprofit that works to free the innocent, jailhouse informants were a contributing factor in 15% of wrongful convictions; in murder cases, jailhouse snitches were involved 50% of the time.

One such case in Florida involved Chad Heins, who served almost 11 years of a life sentence for a murder he did not commit. At trial, the sole evidence against him consisted of the testimony of two jailhouse snitches who lied and claimed Heins had confessed to killing his sister-in-law. He was exonerated in December 2007 based on DNA evidence.

In two other unrelated Florida cases, William Dillon was convicted of murder and Wilton Dedge of rape due, in large part, to testimony from jailhouse snitches. Both were cleared by DNA evidence – Dil-

lon after spending 27 years in prison and Dedge after serving eight years. [See: *PLN*, Aug. 2011, p.30].

To attract scientific evidence at trial, Florida's criminal procedure rules require a pretrial reliability test before such evidence is admitted, noted Henry "Hank" Coke III, a Jacksonville attorney, Commission member and former president of the Florida Bar. The rules should also require a similar test for something as "critically important" as jailhouse informant testimony, he said.

The Commission considering having the credibility of jailhouse snitches, including witnesses with pending criminal charges, determined by a judge. That would be similar to Illinois law, which is the only state that requires a judge to determine whether a jailhouse informant's testimony is reliable enough to be admissible – but even then, the law only applies in death penalty cases.

At a reliability hearing, the judge would review the jailhouse snitch's criminal record, if there was a promise or reward for his or her testimony, whether the informant had given such testimony in the past, and whether he or she had previously recanted testimony. Ultimately, however, the Florida Innocence Commission voted against recommending that the state legislature enact a statute requiring pretrial admissibility hearings for jailhouse snitch testimony.

Instead, the Commission recommended "the adoption of a jury instruction regarding the testimony of persons who have been labeled by the Commission as an 'informant witnesses.'" The proposed instruction would inform jurors that they "must consider some witnesses' testimony with more caution than others. For example, paid informants, witnesses who have been promised immunity from prosecution, or witnesses who hope to gain more favorable treatment in their own cases, may have a reason to make a false statement in order to strike a good bargain with the State."

Additionally, the Commission suggested an amendment to the Florida Rules of Criminal Procedure that would ensure "information regarding the possible testimony of an informant witness is disclosed to the defense."

Texas and California require jailhouse

snitch testimony to be corroborated, but the Florida Innocence Commission declined to make that recommendation.

In its interim report filed with the Florida Supreme Court on June 6, 2011, the Commission recommended a new jury instruction to address issues related to eyewitness identification, but made no further recommendations in its final report. This is in spite of the Innocence Project's finding that "eyewitness misidentification has played a role in more than 75% of convictions subsequently overturned through DNA testing."

With respect to scientific evidence, among other suggestions the Commission recommended the certification of crime scene technicians; that "the Florida Legislature reevaluate the salaries and staffing of the biology section of the [Florida Dept. of Law Enforcement] crime laboratories in order for FDLE to be more competitive and able to hire and retain trained personnel"; that more funding be provided for DNA testing; and that the Florida Judicial College provide annual education classes to judges on the admissibility of expert testimony.

In regard to false confessions, the Commission suggested that the "Florida Legislature adopt a statute mandating the electronic recording of statements of suspects during a custodial interrogation," and that the Supreme Court Committee on Standard Jury Instructions in Criminal Cases approve a companion jury instruction that would inform jurors they must weigh the credibility of a confession that was not electronically recorded by law enforcement officers.

As to the professional responsibility of prosecutors and defense counsel, the Commission recommended funding for "a series of on-line training courses that are available to all government attorneys practicing in the criminal law area," amending or creating a new Rule of Criminal Procedure requiring "any attorney who is practicing law in a felony case [to have] completed at least a two-hour course regarding the law of discovery and *Brady* responsibilities," and having appellate courts consider identifying attorneys who engage "in serious misconduct, whether defense or prosecution, that

results in a reversal of a conviction."

Lastly, in terms of criminal justice funding, the Commission wrote that it "recognizes the experience and stability of staffing in the state attorney, public defender, attorney general, and regional conflict counsel offices, reduce the likelihood of wrongful convictions and increase the likelihood of effective assistance of counsel," and therefore recommended legislation to provide funding for student loan assistance for prosecutors and public defenders. Also, as the Commission determined that the current funding process for private court-appointed counsel for criminal defendants "invites ineffective assistance of counsel and [thus] wrongful convictions," the Commission suggested that the legislature change the funding methodology for court-appointed counsel.

"As is evident by an examination of the reports produced by the Commission, a number of sound recommendations have been offered that if implemented, could lessen the likelihood of individuals enduring wrongful convictions in Florida," wrote Committee Chairman Belvin Perry, Chief Judge of the Ninth Judicial Circuit. "However, we cannot ignore the fact that if these recommendations are not given serious consideration, thoroughly vetted and implemented in some form, then the problems suffered in the past of wrongful convictions and innocent people sentenced to prison will continue to occur."

Unfortunately, many of the Commission's recommendations were largely window-dressing or toothless, and failed to address important aspects of the criminal justice process – including mistaken eyewitness identification and tighter controls over jailhouse snitch testimony – that would result in more meaningful reforms. Thus, even if the Commission's suggestions are adopted and implemented, wrongful convictions in Florida are still likely to persist. 

Sources: *Orlando Sentinel; "Final Report to the Supreme Court of Florida," Florida Innocence Commission (June 25, 2012)*

# California: Condition of Parole Restricting Parolee from Residing Near Victim's Next of Kin Held Invalid

THE CALIFORNIA COURT OF APPEAL has held that Penal Code section 3003(f), which limits a parolee convicted of certain offenses from living within 35 miles of the victim or witness to the crime – if, among other conditions, the victim or witness has requested the physical separation – may not be invoked when the victim's next of kin (as opposed to the victim) makes the request.

Terrance R. David was convicted in 1989 of second-degree murder for killing two people while driving under the influence. Paroled in 2010, he was subsequently restricted from living within 35 miles of the sister of one of the victims, pursuant to her request.

David wanted to live with and care for his sick mother, who resided within 35 miles of the victim's sister, and he filed a habeas petition challenging the residency restriction.

After initially ordering a stay of the restriction, the Superior Court ultimately denied habeas corpus relief, finding that the word "victim" in section 3003 was defined expansively by California's Constitution to include the next of kin of a decedent victim. David appealed.

The Court of Appeal, Second District, held that as a matter of statutory construction, the word "victim" in section 3003 was unambiguous and did not include the victim's next of kin. Thus, in the case of a murder where there is no witness, section 3003 simply does not apply.

The appellate court noted that while Article I, section 28, subdivision (b) of the California Constitution – part of a voter initiative known as the "Victims' Bill of Rights" – did define "victim" expansively, that definition, by the constitutional provision's express terms, extended no further than "this section."

The Court of Appeal further held that while the parole board could impose a reasonable residency restriction as a condition of parole, because such a condition had no relationship to David's crime and would not deter future criminality, doing so in David's case would violate his due process rights. See: *In re David*, 202 Cal.App.4th 675, 135 Cal. Rptr.3d 855 (Cal.App. 2 Dist. 2012). 

### 2012 Fourth Edition
#### "WINNING HABEAS CORPUS & POST CONVICTION RELIEF", over 620 pages

Cases cited through 638 F.3d. Simply the best book for prisoners who are researching post conviction relief and Ineffective Assistance of Counsel. Habeas Hints, writer & **Attorney, Kent Russell** writes: *Now that I've been turned on to 'Winning Habeas Corpus', I always make sure that it's close at hand.*

- A virtual law library in a single book, actual law quotes.
- Habeas Procedures & Prac. § 2254, 2255 & Rule 60(b).
- Sixth Amendment & IAC, pretrial duty to investigate.
- Recognized defenses, plea bargain process.
- Jury Instructions, sentencing, time bar, & tolling.
- Over 1500 cases cited; 7" x 10" size & 10 pt. font.

**Price for Prisoners only $58.50**
Send money order or institutional check to:
**Fast Law Publishing Associates**
**P.O. Box 577, Upland, CA 91785**
**On-Line Orders: www.fastlaw.org**

Law Office of
**TIMOTHY C. CHIANG-LIN, PLLC**

Representing All Individuals Who Suffered **Childhood Sex Abuse** in Washington & Oregon

**2155 112th Ave NE, Bellevue, WA 98004**

tim@chiang-lin.com     chiang-lin.com

PLN_0001718

# Native Americans Overrepresented in Prison; Problems with Tribal Police Cited

THE TRAIL OF TEARS LIVES ON. IT STILL winds its way through dilapidated Native American villages on reservations across the United States that are impoverished, starved of resources and pockmarked by dysfunction and discrimination.

Almost two centuries after indigenous Americans were uprooted from their tribal lands and driven west, the Trail now leads to places like the Rosebud Sioux reservation in Todd County, South Dakota – a vast grassland that covers hundreds of miles, where the tribe sees too many of its members end up in prison.

"I think every family on this reservation has [a relative] in prison," Rose Bear Robe, 56, a member of the Rosebud Sioux, told CNN in an August 2012 special report. "It's beginning to be normal now, when people used to be ashamed of it."

While the U.S. Census Bureau doesn't provide firm numbers on the Native American population, grouping "American Indian" and "Alaska Native" into one category, 8.9% of South Dakota's population was reported to be Native American. Yet according to the state's Department of Corrections, Native Americans represented 29% of South Dakota's prison population and 38% of its juvenile offenders in 2011.

In Montana, the Native American population is about 7%, but 19% of the state's male prison population and 33% of its female prison population is Native American. While in Minnesota, the latest Census numbers indicate that 1.3% of the state's residents are Native American; in January 2012, the Minnesota DOC reported that 9% of its prisoners were "American Indian."

These disparities and the high rate of incarceration for Native Americans are troubling to all tribes, including the Rosebud Sioux.

"I don't know how to explain it," said Rose Bear Robe, who is raising her 4-year-old grandson while his father is incarcerated. "But the kids really suffer because of their fathers being in prison."

Over-representation among prison populations exists with other racial and ethnic demographics, including blacks and Hispanics. But Native Americans, who represent just 2% of the overall U.S. population, have reasons to believe that the criminal justice system – especially outside of tribal courts – is overly punitive towards them.

"Tribes and tribal people often feel they're discriminated against," said John Dossett, general counsel to the National Congress of American Indians. "Someone will leave the reservation, go to town, get drunk, do something dumb and if a white kid had done it, they'd call their parents and take them home. But if it's some strange Native kid, they'll put them in jail." He noted that tribal members wanted to find other ways besides prison to deal with what he termed "social dysfunction."

Marc Mauer, executive director of the Washington, D.C.-based Sentencing Project, said the disparity is partly explained by higher crime rates on reservations. But since major crimes and most felonies committed on tribal land are prosecuted in the federal court system, and crimes involving Native Americans committed off reservations are prosecuted in state courts, he thinks racial bias may be involved.

Poverty rates on the Rosebud Sioux reservation are also a contributing factor. Nearly half the people in Todd County – the second-poorest county in the U.S. – live under the federal poverty line. Unemployment within the tribe is over 80%. The connection between race and poverty has been well documented by sociologists, and Mauer believes those factors also have an impact on incarceration rates.

"A lot of factors go into this," he said. "But still we see a lot of very direct racial outcomes even in the theoretically race-neutral court system."

The federal government's response to this issue has been to give money to tribal authorities – to build more jails. [See: PLN, April 2010, p.28; Dec. 2008, p.43]. Some Native American-owned companies have even cashed in on federal funding by acting as fronts to obtain lucrative U.S. Department of Homeland Security contracts to operate immigration detention facilities, which they then subcontract to other companies. [See: PLN, Nov. 2010, p.38].

Bear Robe and other tribal members who spoke with CNN, including a former Rosebud Sioux police officer, also blame the culture of tribal police agencies for higher incarceration rates for Native Americans.

"They use the word around here, 'target,'" Bear Robe stated. "They target individuals so the cops will go after them."

One tribal member who was targeted, according to Bear Robe, was her son, Eric King, who is serving a 20-year sentence after pleading guilty to biting his then-pregnant girlfriend in 2007 and assaulting a tribal police officer who responded. But it was the officer who targeted her family and attacked King, Bear Robe said.

According to Bear Robe and a Rosebud Sioux Tribal Council member who visited King in jail after his arrest, King suffered a black eye, bruises, a cut lip and possibly a broken rib during the incident.

The officer was later terminated from the tribal police department, though police officials wouldn't disclose why he was fired or if he had a personal issue with King. Another officer, who was fired several weeks before CNN began investigating, said personal vendettas certainly existed within the tribal police force. He also claimed he was fired because he began blowing the whistle on cases of police brutality and civil rights and due process violations.

"You're talking [about] … spraying handcuffed suspects with pepper spray," said Calvin "Hawkeye" Waln, the ex-tribal police officer. "Physical police brutality where the officers end up injuring or breaking bones themselves from assaulting somebody."

There is no question that misconduct involving tribal police officers sometimes occurs. On June 27, 2011, former Rosebud police officer Justin Arthur Beardt, 28, was indicted in federal court on charges of sexual abuse and aggravated sexual abuse, following an investigation by Rosebud Sioux Tribe Law Enforcement Services and the FBI. Beardt pleaded guilty and was sentenced in January 2013 to 132 months in federal prison and five years of supervised release.

An article in the *Sicangu Sun Times* stated that Rosebud Tribal Police Chief Grace Her Many Horses, at a 2011 Tribal Council meeting, "reported that two police officers were being investigated by Bureau of Indian Affairs Internal Affairs. According to a source familiar with the investigations, a total of five officers were

actually under investigation."

And in the past four years the Rosebud Sioux Tribal Council, which is semi-autonomous, has fired two police chiefs who were under investigation for corruption, including Her Many Horses. When CNN was on the reservation for its special report, it interviewed then-acting police chief Edwin Young, who denied Bear Robe's and Waln's allegations.

"I don't see the corruption," he stated, adding that some accusations against the tribal police force are "just a misunderstanding or misinformation." Young, who is from the reservation and has been with the Rosebud police department for 16 years, admitted that the police files prior to two years ago, including those related to King's case, are now missing or have been destroyed.

"I have no idea what happened to those files. That was the previous administration, the previous police chief," he said. "And all those, those are gone now ... somehow they destroyed all the paperwork."

In July 2012, Rosebud Sioux Tribal President Rodney Bordeaux reinstated Her Many Horses as police chief after she had been dismissed 51 days earlier by the Tribal Council due to corruption allegations, including claims that police officers under her command had harassed tribal members and violated their civil rights.

"I would like to change the image of the Rosebud Police Department to a more positive one but this is a challenge because we are not here to be your best friend but we do have to protect you," Her Many Horses said when she was hired in 2010.

Following her reinstatement, she declined to be interviewed for CNN's report.

Sources: *www.cnn.com, www.sicangusuntimes.com, www.justice.gov, www.lakotacountrytimes.com*

# Utah Potentially Liable for Juvenile's Death; Incarceration Exception to State's Immunity Inapplicable

THE UTAH SUPREME COURT HAS HELD that the "incarceration exception" to the state's waiver of sovereign immunity does not apply to a juvenile offender's placement in an unsecured community-based proctor home.

Sixteen-year-old Dillon Whitney was charged with several crimes and adjudicated a juvenile delinquent. The trial court ordered the Division of Juvenile Justice Services to transfer Dillon to a community-based placement, during which time he was not allowed to stay with either of his parents.

Dillon was sent to Quest Youth Services, which placed him "in the community-based proctor home of H. Kaufusi. Dillon lived in the basement of the proctor home with another proctor teen, while Kaufusi lived upstairs with his two children."

Dillon and the other proctor teenager were allowed to come and go at will and roam freely in the community.

After an approved Thanksgiving family visit with his father in November 2007, Dillon went to the apartment of Victor Hernandez instead of returning to his proctor home.

While at Hernandez's apartment, Dillon got drunk, fell down a flight of stairs and was placed on a couch. The next morning, Hernandez believed that Dillon was dead and moved him to a stairwell.

Dillon was not dead, however, and neighbors called for help. Unfortunately, while en route to the hospital, Dillon died from injuries sustained in the fall. Although he had not returned to his proctor home following his approved Thanksgiving visit, no state or Quest employees had tried to find him.

Dillon's parents filed a state negligence action against the Division of Juvenile Justice

Services, the State of Utah, Quest Youth Services and other defendants. The defendants removed the action to federal court and filed a motion to dismiss, arguing that they were immune under the "incarceration exception" to Utah's Governmental Immunity Act.

After the district court denied the motion, the defendants filed an interlocutory appeal. The Tenth Circuit Court of Appeals asked the Utah Supreme Court to answer a certified question as to whether the incarceration exception to Utah's waiver of sovereign immunity applied.

The state Supreme Court ultimately held that "a juvenile who is placed in an unsecured community-based proctor home is not incarcerated in a place of legal confinement. Accordingly, the incarceration exception to the State's waiver of its sovereign immunity does not apply and the State remains potentially liable for damages related to Dillon Whitney's death." See: *Whitney v. Division of Juvenile Justice Services*, 274 P.3d 906 (Utah 2012).

Based on the Utah Supreme Court's ruling, the Tenth Circuit held on April 6, 2012 that the incarceration exception did not apply, and that the state had waived its alternate argument that Dillon's death arose from his incarceration "at other place[s] of legal confinement," such as juvenile facilities, because the state had failed to raise that argument before the district court. See: *Whitney v. Division of Juvenile Justice Services*, 468 Fed.Appx. 871 (10th Cir. 2012) (unpublished). ◾

Additional source: *www.deseretnews.com*



**loveaprisoner**.com

VISIT WWW.LOVEAPRISONER.COM

FOR ONLY $25.00 A YEAR GET YOUR PIC AND 250 WORD BIO POSTED ON OUR WEBSITE AND FACEBOOK!!!!!

For brochure application you must send a S.A.S.E.

Please make all payments to:
Loveaprisoner.com
P.O.Box 5563
Thibodaux, LA 70302

## WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS
### STATE AND FEDERAL POST-CONVICTION AND APPEALS

Licensed since 1995, hundreds of appellate briefs and habeas petitions, capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas, Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment.
Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**

PLN_0001720

# Seventh Circuit: Cost Bond Improper Tool to Address Prisoner's Frivolous Filings

On May 30, 2012, the Seventh Circuit Court of Appeals reversed an Illinois federal district court's order that imposed a cost bond on an indigent prisoner which the court knew he could not afford, holding that such an order is not one of the tools available for dismissing or discouraging frivolous lawsuits.

The appellate ruling was issued in a case involving Tamms Correctional Center prisoner Anthony Gay, whom, the Court of Appeals noted, has mental health problems and a long history of self-mutilation. He also has been very litigious, having filed more than 30 civil cases between October 1996 and January 2011.

Gay lost two of his lawsuits at trial, settled two others and lost or withdrew the rest. At least four cases were dismissed as frivolous, leading Gay to "strike out" under the Prison Litigation Reform Act (PLRA). Having lost his right to proceed in forma pauperis unless he is "under imminent danger of serious physical injury," Gay continued to litigate in two ways. One was to invoke the imminent danger exception in an attempt to avoid the PLRA's three-strikes rule for frivolous filings.

Gay used another method in this case, in which he sued three Tamms mental health professionals alleging constitutionally inadequate treatment and retaliation for a prior lawsuit. He circumvented the PLRA's three-strikes rule by filing suit in state court, which the defendants then removed to federal court.

After the district court screened Gay's complaint under 28 U.S.C. § 1915A, the defendants moved to require him to post a $1,000 bond to cover the costs they could recover under Fed.R.Civ.P. 54(d) if they prevailed in the lawsuit. They noted that Gay had failed to pay $2,100 in costs in a previous case he lost. The district court granted the motion, although everyone understood that Gay lacked the means to post the bond. In denying Gay's motion to rehear, the district court acknowledged it knew virtually nothing about the merits of his claim.

On appeal, the Seventh Circuit said it had never addressed directly whether a court must consider a party's ability to afford a bond before requiring one as a con-dition of prosecuting a lawsuit, but found case law from other circuits supported Gay's argument that a court may not ignore an indigent litigant's inability to pay.

As such, the Court of Appeals found the district court had abused its discretion in failing to consider Gay's ability to post the required bond, as his indigency "did nothing to ensure that the defendants would recoup their costs if they prevailed. All it ensured was the end of Gay's suit."

In a footnote, the Seventh Circuit wrote that "a court must also consider the probable merits of the case before dismissing a suit based upon a plaintiff's failure to pay a fee. If the suit has likely merit, then the value of the suit itself may reduce the need to insist on a separate payment from the plaintiff."

Finally, the appellate court discussed the available tools to address frivolous litigation. Although the PLRA's three-strikes rule does not apply in state court, federal district courts can impose both monetary and non-monetary sanctions under Fed.R.Civ.P. 11 for filing or maintaining claims for an improper purpose or without adequate legal or factual support. Courts may also place a party "under penalty of perjury" by requiring the submission of verified pleadings.

As a last resort, the Seventh Circuit noted that a court may bar a party from filing future lawsuits until outstanding fines have been paid. On remand in this case, the district court may "decide in the first instance whether Gay's litigation history and refusal to pay outstanding debts justifies the sanction of a filing bar"; however, if such a sanction is imposed, the Court of Appeals specified it "can apply only to future proceedings."

Accordingly, the district court's order of dismissal was reversed and the case remanded for further proceedings, where it remains pending. See: *Gay v. Chandra*, 682 F.3d 590 (7th Cir. 2012). ◪

# Time for Sentencing Reform

## *by George Gascón*

From the Capitol to the courtrooms, prosecutors can chart a new path on public safety by championing at both local and state levels one of the biggest ways we can transform our justice system in this generation – sentencing reform.

Right now, the U.S. puts more people in prison and jails than any other nation in the world. The costs associated with incarceration are staggering. California alone spends more than $9 billion per year on prisons.

Despite all of these costs – economic, social and systemic – the rate of people returning to a life of crime even after serving time remains all too high, with almost 65 percent of California's prisoners re-offending after being released.

While California's Realignment effort represents a major change in our state's sentencing practices, it is primarily intended to impact system costs and incarceration rates – not public safety.

So further change is needed.

Sentencing reform is one of the most important ways we can reduce recidivism and keep our communities safe. We can use two innovative strategies – sentencing commissions and alternative sentencing practices – to achieve our goals.

Most criminal law is developed legislatively through the political process, with mandatory minimum sentences and sentence enhancement laws changing every year. Often, this process is influenced by political reactions to high-profile cases or attempts to be "tough on crime."

The challenge of politically-driven sentencing schemes is that the resulting hodgepodge of criminal laws is largely disconnected from the most effective strategies to prevent or reduce crime. If, for example, reducing recidivism were a major goal of the development and design of sentencing schemes, they would look very different than they do now.

Other states are using nonpartisan governmental entities, called sentencing commissions, to assess existing sentencing schemes and propose alternate approaches. Several of these commissions have succeeded at revamping major penal code sections and bringing consistency and clarity to the

jurisdictions' approach to sentencing.

In San Francisco, the District Attorney's office led an effort to establish the first county-level sentencing commission in California, with the explicit purpose of assessing the impact on recidivism of current approaches to sentencing. Our commission can serve as a model for other state and local efforts.

While the commission is not empowered to change state law, it will be able to make recommendations and build consensus among criminal justice agencies, service agencies, victims and other stakeholders about the most effective strategies to reduce recidivism among various categories of offenders and offenses.

By holding these important discussions in a public forum, the commission can demystify sentencing laws and practices.

In addition to pushing for meaningful legislative change, prosecutors also can innovate our sentencing practices. Across the country, prosecutors evaluate criminal cases at three stages: charging, securing a plea or verdict, and sentencing.

At this third stage, prosecutors must determine what they think the case is "worth" in order to determine the punishment they will advocate for in the plea bargaining process or in court. This assessment traditionally involves focusing on the strength of the evidence in the case and the maximum allowable punishment.

Often, what's missing is an assessment of the most appropriate punishment in order to reduce the likelihood the offender will reoffend. A "recidivism reduction analysis" asks questions that go beyond the strength of the evidence and the penal code punishment guidelines. In other words, this analysis focuses on not just the offense, but also the person who committed it.

Studies on recidivism show that the longer a medium- to low-risk person is incarcerated, the higher the chance they will reoffend. So, if we are committed to improving public safety, understanding the risk level of each offender is critical to determining the most appropriate length of incarceration for that person.

The emerging science on recidivism reduction is a sea change in the criminal justice system. [*Ed. note*: See article in this issue of *PLN*, p.44]. It identifies what is known about behavioral and situational patterns and how they relate to the frequency of re-offending.

Reducing recidivism then becomes an exercise in identifying an individual's "risk and protective" factors, from the offender's criminal history to alcohol and drug issues, mental-health issues, family history of involvement in criminal activity and other factors such as employment, education, parenthood or other family responsibilities, and stable housing.

Prosecutors then can pinpoint the sanctions that most likely can motivate that person, to eliminate the risk factors and enhance the protective factors. Studies on a wide variety of programs point to sanctions, both punishment- and rehabilitation-oriented, that work better or worse with individuals at different risk levels.

This new alternative approach to sentencing – taking the science of recidivism into consideration – already is underway in the San Francisco DA's office.

We recently created the nation's first "alternative sentencing planner" position in a district attorney's office to support prosecutors in court. The ASP evaluates cases to review what is known about the risk level and protective factors of the offenders and then makes sentencing recommendations that will reduce the likelihood that the person reoffends.

In addition, the ASP acts as an investigator, conducting site visits to programs to determine their effectiveness in reducing recidivism, and also provides training for all staff so that the recidivism reduction approach can be integrated into the fabric of all case prosecutions.

Applying this surgical approach to our most scarce and expensive resource – jail – has allowed us the space in our system to properly deal with the violent and serious offenders.

As law enforcement leaders, we must have the courage to face the fact that lock-ing everyone up is not winning. Recognizing that jails and prisons are not the answer to every crime or every offender is a paradigm shift that flies in the face of assumptions that we have built upon for many years.

Yet by grounding our work in a commitment to improving public safety, prosecutors can lead the way in reforming our sentencing laws and practices. ◼

*George Gascón is the District Attorney of San Francisco. He served as chief of the San Francisco Police Department from 2009–2011. This article originally appeared in Justice in California, a publication of the Rosenberg Foundation, and is reprinted by permission of the author.*

---

### Actual Innocence

Explains how the innocent are convicted by faulty eyewitness testimonies, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$16.00 from PLN's Book Store!
See page 61 for more information.



**Email Services** : Our email service allows you to send and receive emails. We print out your emails and mail them to you (Text only) We take your written messages and send them to the recipient. No restrictions on who you can email with our service. Email plans starting at $12/month.

**Phone Services** : Through our network we can reduce your phone cost by up to 75%.

Amazon Book Ordering: Total Cost + 20%

Facebook Monitoring Starting at $20/month

Pen Pal Listing on Craigslist and Pen Pal World $10/each

WE accept special withdrawals, Money Orders and Checks. Made out to:
WE Group
870 Barksdale St
Pensacola, Fl 32514
Send SASE
info@getwegroup.com
(850) 658 - 8419
May be contacted through Corrlinks

PLN_0001722

# California Prison Industry Authority Loses $24 Million in Last Two Years but Reduces Recidivism

IN JANUARY 2013, CALIFORNIA'S PRISON Industry Board (PIB) submitted its annual report to the state legislature regarding the activities and financial status of the California Prison Industry Authority (CALPIA), the agency it is charged with overseeing. CALPIA operates industry programs that employ approximately 7,000 prisoners annually in "manufacturing, service, and consumable factories" at 24 facilities statewide.

Much like a corporate board of directors, the PIB sets general policy for CALPIA and monitors the performance of its industries. Among other responsibilities, it ensures that CALPIA enterprises are "self-sufficient and that they do not have a substantial adverse effect upon the private sector."

The PIB's previous report to the legislature, released in January 2012, had noted that after years of profitability, CALPIA experienced a loss of $15.3 million in net assets in fiscal year (FY) 2010-11. The loss was reportedly the result of four factors: 1) a $17.4 million (9.6%) drop in operating revenues; 2) an $8.6 million expense for the anticipated settlement of three lawsuits filed by employee unions seeking back pay for state-imposed mandatory furloughs; 3) a $6.3 million obligation to pay for post-employment benefits such as retiree healthcare; and 4) one-time costs of $2.8 million associated with CALPIA factory closures.

Revenues had declined largely due to a reduction in government expenditures, reflective of the sluggish economy. Most of the goods and services provided by CALPIA go to governmental agencies. By far, the largest consumer of CALPIA products is the California Department of Corrections and Rehabilitation (CDCR), which accounted for 57% of CALPIA's sales in FY 2011-12. Other major customers include the Department of Motor Vehicles, the Department of State Hospitals, the Department of Transportation, the Department of Health Care Services and the California Highway Patrol.

CALPIA also operates joint venture programs in which "private businesses may set up business operations inside California correctional facilities and hire offenders. This includes only those businesses that are starting a new company, expanding an existing business, or relocating to California."

The January 2013 PIB report indicated that CALPIA had suffered another loss in net assets for FY 2011-12, in the amount of $8.86 million. The main cause of the fiscal loss was reportedly a $6.26 million charge for depreciation on equipment; other factors included an increase in the cost of raw materials and a 7.87% decrease in sales of products and services to the CDCR – largely due to the state's realignment initiative, which has shifted thousands of state prisoners to county jails.

The report noted that over the past five years, "CALPIA's revenues have declined 17.5 percent from $209.5 million in FY 2007-08 to $172.7 million in FY 2011-12."

Despite the agency's financial woes, the PIB report noted that prisoners who participate in CALPIA industry programs have significantly lower recidivism rates than those who do not. Based on FY 2009-2010 data, the one-year recidivism rate for prisoners employed in CALPIA programs prior to being paroled was 23.61%, compared with 45.7% for non-CALPIA prisoners. The two-year recidivism rate, using FY 2008-2009 data, was 38.55% for CALPIA parolees and 56.9% for other prisoners, while the three-year recidivism rate, based on FY 2007-2008 data, was 46.8% for CALPIA parolees and 63.7% for non-CALPIA prisoners.

However, a report by the California State Auditor released in May 2011 had concluded that "although one of its primary responsibilities is to offer inmates the opportunity to develop effective work habits and occupational skills, the California Prison Industry Authority (CALPIA) cannot determine the impact it makes on post-release inmate employability because it lacks reliable data."

The State Auditor's report also noted, "Although we found that the recidivism rate for parolees who worked for CALPIA were consistently lower than the rates of the general prison population, CALPIA overstated by $546,000 the savings it asserts result from the lower recidivism rate. Further, CALPIA did not acknowledge that factors other than participating in one of its work programs may have contributed to the lower recidivism rates among its parolees."

Sources: *Sacramento Bee; www.calpia.ca.gov; California Prison Industry Authority, reports to the legislature for fiscal years 2010-2011 and 2011-2012*

# More Oregon Prison Employees Accused of Sexual Abuse

AS PREVIOUSLY REPORTED IN *PLN*, between 2006 and 2009, employees at Oregon's only women's prison were charged with sexually abusing more than a dozen female prisoners. [See: *PLN*, Nov. 2010, p.18; July 2009, p.47]. The abuse continues unabated, with at least five prison staff members accused of sexual misconduct last year.

In 2005, Oregon became the 49th state to enact a custodial sexual abuse law, following a high-profile 2004 sex scandal at Coffee Creek Correctional Facility (CCCF).

Before the law was enacted, Oregon guards who sexually abused prisoners got off lightly. For example, in the 2004 CCCF case, prisoner Amanda Durbin accused Lt. Jeffrey Barcenas and food services coordinator Christopher Randall of sexually assaulting her. [See: *PLN*, April 2004, p.42]. Both resigned and pleaded guilty to misdemeanor charges; Barcenas was sentenced to six months in jail, while Randall served just 45 days.

Under Oregon's current custodial sexual misconduct law, an Oregon Department of Corrections (ODOC) employee or contractor commits a felony by engaging in sexual intercourse with a prisoner. Any other sexual contact is custodial sexual misconduct in the second degree, a misdemeanor. Prisoners are not subject to prosecution and consent is not a defense due to the power differential between prisoners and prison employees.

Following the law's enactment, CCCF physical plant grounds crew supervisor Paul W. Golden, plumber Richard Kaleo Rick, maintenance worker Troy Bryant Austin,

and guards Darcy Aaron Macknight and Richard Mitchell were prosecuted for sexually abusing prisoners.

In June 2009, Golden pleaded guilty to 15 counts of sexual custodial misconduct and one count of supplying contraband. He then rolled the dice by going to a bench trial on other charges, where Judge Rick Knapp found him guilty of 14 additional counts of sexual abuse. "He's a serial sex offender. There's no question about it," Judge Knapp declared when he sentenced Golden to 11½ years. The other CCCF employees were convicted and received sentences ranging from probation to three years in prison. [See: *PLN*, Nov. 2010, p.18].

The sexual abuse of female prisoners at CCCF occurred "in cleaning closets, utility tunnels, toolsheds, woodlands and under a firetruck," according to an article in *The Oregonian*.

Apparently, the administration and staff at the prison didn't learn from previous incidents of sexual misconduct.

According to the *Statesman Journal*, between 2009 and 2012, 37 incidents of sexual abuse were reported by female prisoners at CCCF while male prisoners reported 34 incidents. Although CCCF primarily holds women, it has a small classification unit for male prisoners. The vast majority of the claims were deemed "unsubstantiated" or "unfounded" by prison officials.

Verified incidents of sexual abuse often resulted in litigation, and as of March 2012 the state had paid $1.2 million to 17 current and former prisoners in lawsuits alleging sexual misconduct by CCCF employees.

Nor have such incidents stopped since then.

On March 21, 2012, CCCF maintenance employee Jeremy J. Veelle, 35, was arrested on charges related to sexual misconduct with a prisoner, including second-degree custodial sexual misconduct and first-degree official misconduct.

Another CCCF maintenance worker, Schawn Jacob Riley, 38, was jailed in April 2012 and charged with custodial sexual misconduct following a four-month investigation. He pleaded guilty to one count of second-degree custodial sexual misconduct and was sentenced in September 2012 to 30 days in jail and two years' probation.

Riley's victim filed a lawsuit alleging the ODOC had failed to protect her from the sexual abuse, which included oral sex, kissing and groping. The unnamed prisoner also alleged in the suit that she had been sexually abused by another prison employee, identified only as "Mr. Jacques."

The lawsuit was filed by Salem attorney Brian Lathen, who has represented a number of other prisoners in sexual abuse complaints. "When I heard these new incidents were fairly recent, I was really surprised, because [prison officials] were swearing up and down that they had made changes so it wouldn't happen again," he stated.

"We put as many checks and balances in place as we can," said ODOC Director Colette S. Peters, who was appointed in February 2012. "Unfortunately, there were still areas these activities occurred and boundaries that were still crossed."

Apparently the checks and balances weren't enough. On September 21, 2012, former CCCF food services coordinator Benjamin Carl Patterson, 55, was arraigned on charges of first-degree official misconduct, custodial sexual misconduct and supplying contraband, and booked into the Washington County Jail. He is accused of engaging in sexual misconduct with a female prisoner.

And on October 22, 2012, an unidentified CCCF prisoner filed a $1.1 million lawsuit against the state, accusing kitchen supervisor Brian Molsberry of sexually assaulting her. The victim alleged that Molsberry made sexual remarks and touched her breasts, buttocks and vagina; the incidents occurred in an area of the kitchen not covered by functional security cameras. According to the ODOC, Molsberry resigned in August 2012. It is unknown whether he was criminally charged; the Oregon State Police reportedly investigated the abuse allegations, then closed the investigation.

"It really now is an epidemic," said Lathen. "The whole culture there at the facility is one that needs to be changed." ◾

Sources: *Statesman Journal, The Oregonian, Associated Press*

---

### Roget's Thesaurus

Can't think of the right word?
Let Roget's help you! Over 11,000
words listed alphabetically.
See page 61 for more information.

---

## 12 FREE ISSUES!

**FREE!**

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! **(Void in New York)**
(Last Quarter's winner from **Waynesburg, PA.**)
TELL YOUR FRIENDS!   ACT NOW!!

**PO Box 2063 • Fort Walton Beach FL. 32549**
www.InmateMagazineService.com

# Inmate Magazine Service Inc.

# News in Brief

**Maryland**: Jerod Pridget, 29, incarcerated at the Western Correctional Institution, died on November 28, 2012 after being severely beaten by another prisoner and transferred to an outside medical facility. Pridget was serving an 18-month sentence; his family said he was "unrecognizable" due to the injuries to his head and face.

**Mexico**: A December 18, 2012 riot and escape attempt at a prison in Gómez Palacio in the state of Durango resulted in 23 deaths, including 9 guards. The violent disturbance occurred when prisoners tried to escape through fences and an underground tunnel, then fought with prison staff when they were discovered. Some of the prisoners reportedly used firearms against the guards, who were unarmed. Mexican prisons, which are filled with drug cartel members, have high levels of violence and have experienced numerous escapes in recent years.

**New Hampshire**: When the Carroll County Board of Commissioners voted to suspend three county corrections officers on November 2, 2012 for hosting an underage drinking party, Carroll County DOC Captain Michael Fowler was not happy. He filed a complaint against the commissioners, saying they had "jeopardized the safety and security of the Carroll County Department of Corrections by leaving it understaffed without any recommendations on how to safely operate the facility." The suspended guards, William Lewis, 26, Taylor Goddard, 21, and Michael Medina, 22, were charged with prohibited sales of alcohol for hosting the drinking party at Medina's house. After the suspensions, "staff members have been forced to work 16 hours straight and report to work the following morning," Fowler stated.

**New York**: A vehicle accident claimed the lives of two New York City jail guards on December 16, 2012. Tiffany Underwood, 31, and Africaque Smith, 43, employed at Rikers Island, were off-duty when their SUV slammed into another SUV driven by Sheldon White, 23, an off-duty police officer. A can of Four Loko, a caffeinated alcoholic beverage, was reportedly found in Underwood and Smith's vehicle.

**North Carolina**: Six prisoners at the Sampson Correctional Institution sent a letter to the U.S. District Court in Greensboro in November 2012, claiming that they had been forced to drink hot sauce and rub it on their genitals, simulate having sex with each other while nude and kiss snakes while working on a work crew, to entertain prison guards. The prisoners claimed they received better work assignments and were rewarded with food, alcohol and tobacco for cooperating. As a result of the allegations, Sampson Correctional Institute administrator Lafayette Hall was suspended and another staff member reassigned.

**Ohio**: Cleveland corrections officer Jennifer Korb was suspended for 15 days after she failed a drug test following an accident when she was transporting prisoners in a van. An investigation by Channel 3 News revealed that at the time, Korb was living with Tracy Bunch, a former prisoner with a lengthy arrest record who was on probation for menacing and weapons-related charges. The couple reportedly met when Bunch was incarcerated at the Cleveland House of Corrections. City rules do not prohibit corrections officers from dating or cohabitating with former prisoners.

**Oregon**: On December 5, 2012, former state prison transportation guard Michael Wilson Yann, 40, was found guilty of two counts of attempted aggravated murder and two counts of unlawful use of a firearm, stemming from an April 2012 incident in which he shot at police officers, which resulted in a four-hour standoff at his home.

---

## PLN Classifieds

**HotFlixx- Prison Friendly Photos**
*** Free Catalog ***
Specify Male or Female Models
SASE to PO Box 137481
Fort Worth TX, 76136

**JOIN OUR FAM! (PEN PAL SITE)**
**SASE TO:**
www.InmateNHouselove.com
4001 Inglewood Ave
Suite 101 Dept 144
Redondo Beach, Ca.90278

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare
Manuscripts for Self-Publishing
Reasonable Rates!-Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**InfoLINCS, LLC**
Daily sports lines & updates
Photo Forwarding- family to you
Gifts & Flowers- sent from you
Daily stock quotes – 5stocks
FREE Horoscopes & Quotes
FREE Legal news
SIGN UP NOW INFO@INFOLINCS.COM

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games. We Sell Photos of Sexy
Women, Gifts for Loved Ones,
Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how to receive Voices.Con monthly, send SASE to: PO Box 361, King City, CA 93930. On the web at: VoicesDotCon.org; Email: Publisher@VoicesDotCon.org

**Let us help w/Your Parole Review**
13 years of helping those in
Prison obtain another chance.
Our Parole Plan shows you as a
Favorable Candidate for Parole!
D&D Worldwide Services, LLC.
PO Box 40081 Houston, TX. 77240
281-580-8844 / www.myparole.info

Lonley? Feeling Forgotten?
Angel's Kite's is the answer! For under 65 cents a day
be reconnected to the world.
Let us "plug" you back into civilization.
Interested?
Send a SASE to the address below
Angel's Kite's
P.O. Box 16796, Houston, Tx 77222

**Desirae's email service,** photo duplications and more.info send SASE and 1 f/c loose stamp to: DESIRAE, 10 Bungalow Ct., Newton, Ia. 50208. All paid orders receive one free penpal address.

---

April 2013

Prison Legal News

PLN_0001725

[See: *PLN*, Aug. 2012, p.50]. Yann, who had been drinking at the time of the incident, was sentenced to 10 years in prison.

**Pennsylvania**: Winlaw Muzirwa, 38, a guard employed by Community Education Centers (CEC) at the George W. Hill Correctional Facility in Delaware County, turned himself in to the police on December 5, 2012 after killing his wife, Daisy Janbawo. The couple had a history of domestic violence; Muzirwa claimed he tried to kill himself after shooting his wife to death, but the gun misfired. He was charged with first-degree murder.

**Puerto Rico**: The Department of Corrections is allowing three prisoners to use Twitter to send messages about their experiences in jail, in an effort to dissuade people on the outside from committing crimes. The prisoners, two of whom are serving time for murder, can send tweets while under the supervision of prison staff; they reportedly have over 5,000 followers. The program is called "Follow me so you don't follow me."

**South Carolina**: On December 12, 2012, J. Reuben Long Detention Center guard Dennis Fenstamaker was fired after being charged with destruction of property. Fenstamaker, 41, reportedly was arguing with his girlfriend when he punched out the rear window of a car parked at Captain Poo's Bar and Grill in North Myrtle Beach. He then left the scene but was later arrested.

**South Carolina**: A male prisoner was placed in a cell with a female detainee at the York County Detention Center on June 9, 2012, resulting in a sexual assault. "The detention officers who were in the booking area that morning failed to check to see if they were putting this individual into a cell that was empty," said Kristie Jordan, general counsel for the Sheriff's Office. James Henry Richardson, 33, was charged with second-degree assault and battery for groping a female prisoner who was sleeping in the cell. The guards who failed to properly check the cell were suspended with pay.

**Sri Lanka**: In November 2012, a gunfight at the Welikada prison in the capital city of Colombo left at least 27 people dead and 59 injured. The disturbance lasted throughout the night and resulted in some prison employees being taken hostage. The army was called in to regain control. Apparently, the prisoners had obtained firearms, including machine guns, from the prison's armory. The facility houses Tamil rebels from the Liberation Tigers of Tamil Eelam movement, though it was unclear whether any of the former rebels were involved in the gunfight.

**Tennessee**: Sgt. Wanda Smith, employed at the Hamilton County Jail, resigned on November 20, 2012 following an internal affairs investigation into her use of a prisoner's food stamp card to purchase groceries. Investigators obtained video footage of Smith taking the food stamp card belonging to Gregory Sciance when he was booked into the jail; she later tried to use the card in a different county. Smith potentially faces criminal charges. "I did wrong, I went to jail," Sciance stated. "I served all my time. She's no better than me. She should do the same thing."

**Tennessee**: Charges were dismissed against former McMinn County jailer Justin Swafford in December 2012; although he was charged with inappropriate conduct with a female prisoner, the alleged victim could not be located. Absent the victim's testimony, prosecutors could not proceed with the case. Swafford was fired from his position at the jail after being indicted in May 2012.

**Texas**: Former Texas Department of Criminal Justice guard David Wayne Green, 42, was sentenced on November 7, 2012 to five life sentences. Green was convicted of repeatedly sexually assaulting a child over a

**New Photos!** 50+ flyers of sexy girls. Real photos, not from internet. Pls send SASE for sample black and white flyer to F.O.S. P.O. Box 42922, Phoenix, AZ 85080

**2 FREE PenPals Paid Orders Only!** Photo Duplications (Nudes OK) 10-4x6 $8, 2-5x7 $8, 1-8x10 $8. ADD $3S/H. Info Only-$2.Simply Photos 10 Bungalow Ct, Newton, IA 50208

**~ Just your Type ~** Manuscript Typing & Internet Research Send SASE for rates and info PO Box 432 Bernardston, MA 01337-0432

**IF YOU WANT THE BEST TRY EPS!** Legal Research & Forms, Internet & People Searches, Amazon Books, Erotic Photos, PenPals, Special Requests and More. Send SASE to: Elite Paralegal & Prisoner Services PO Box 2131, Appleton, WI 54912

www.HoosierWheelDaddy.com and www.ViciousStyles.com Sponsors FREE Wrongfully Convicted Ads @ www.OutlawsOnline.com PO Box 17802 Indianapolis, IN 46217 NEW ChristianPrisonPenPals.org

**KRASNYA SPRING HAS SPRUNG SALE!** FREE CATALOG FROM KRASNYA! 120 BABES IN EACH CATALOG ENCLOSE ONE SASE WITH 2 FIRST CLASS STAMPS! KRASNYA L.L.C. PO Box 32082 BALTIMORE MD 21282 PLEASE SPECIFY MALE OR FEMALE BABES

**MIDNIGHT EXPRESS BOOKS** With 10 yrs experience, we are devoted to helping inmate authors of all skill levels get their work ready for self-publlishing. POBox 69 Berryville AR 72616 Email: MEBooks1@yahoo.com

**Sticky Booty Bounce 16pgs $5.00** Battle of the Camel Toe $5.00 Full Color Cats, 1000s of Options Non-Nude - All Shapes & Races Send $10.00 M/O or 22 stamps to: On Demand Inmate Services PO BOX 81 - PLN, Chelt, PA 19012 Ask How To Get Free Pen Pal List

**A DEGREE/ORDINATION FROM PRISON** Correspondence Courses via mail INT'L CHRISTIAN COLLEGE&SEMINARY PO BOX 530212 Debary, FL 32753-0212 Associates thru PhD credit for Life Experience *ACCREDITED* Tuition as Low as $19.95 a month Send SASE for a Free Evaluation

**LOCAL PHONE NUMBERS $2.50/MO.** USA anywhere 5¢/min. To MX 15¢ Great rates all over the world! No signup fee, no hidden fees! Refer new cust, 300 free mins! www.FreedomLine.net to sign up or write FreedomLine, Box 7-WCB C'ville IN 47331. Save BIG $$$!

PLN_0001726

## News In Brief (cont.)

two-year period, beginning when she was 12 years old. "There is no other sentence but life, and I am sentencing you to life on each of the five counts of sexual assault. The sentences are to run consecutively," stated District Court Judge Deborah O. Evans. Green, who was employed at the Coffield Unit, had impregnated his victim when she was 14. He confided in a prisoner, who informed another prison official which led to Green's arrest.

**Virginia**: On November 20, 2012, Johnathan Montgomery, 26, walked out of the Greensville Correctional Center after serving four years for a sexual assault he did not commit. Governor Bob McDonnell issued a conditional pardon and called Montgomery's conviction and 7½-year sentence a "travesty of justice" after his supposed victim, Elizabeth Paige Coast, recanted and said she had falsely accused Montgomery. The main evidence against Montgomery had been Coast's testimony; she was arrested for perjury and released on bond. She was working as a clerk for the Hampton police department when she recanted. Regardless, the Attorney General's office initially blocked Montgomery's release,

claiming the trial court lacked jurisdiction, which led Governor McDonnell to issue the conditional pardon. "This has severely degraded my faith in the system," Montgomery's father stated.

**Wisconsin**: Kim Hoenisch, 41, a former probation officer, was charged on December 21, 2012 with misconduct in office and felony drug possession. She is accused of stealing Vicodin and oxycodone from probationers while they were taking drug tests during office meetings and house visits. Hoenisch reportedly confessed her misconduct to investigators from the state Department of Justice.

---

# Criminal Justice Resources

### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago,

Illinois 60607 (312) 789-4955. www.exoneration-project.org

### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: Stop Prisoner Rape, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### The Sentencing Project

The Sentencing Project is a national policy research and advocacy organization that works for a fair and effective criminal justice system by promoting sentencing reform and alternatives to incarceration. They produce excellent reports on topics related to sentencing policy, racial disparities, drug policy, juvenile justice and voting rights/disenfranchisement, which are available online. Contact: The Sentencing Project, 1705 DeSales St. NW, 8th Fl., Washington, DC 20036 (202) 628-0871. www.sentencingproject.org

---

PLN_0001727

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING on all book / index orders OVER $50** (effective May 1, 2012 until further notice). **$6.00** S/H applies to all other book orders.

**SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!**
1. **SIX (6) FREE ISSUES FOR 54 TOTAL!** OR
2. **PRISON PROFITEERS (A $24.95 VALUE!)** OR
3. **WITH LIBERTY FOR SOME (AN $18.95 VALUE!)**

**Prison Profiteers**, edited by Paul Wright and Tara Herivel, 323 pages. **$24.95.** This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how.                                    1063

**With Liberty for Some: 500 Years of Imprisonment in America,** by Scott Christianson, Northeastern University Press, 372 pages. **$18.95.** The best overall history of the American prison system from 1492 through the 20th Century. It is a must-read for understanding how little things have changed in U.S. prisons over hundreds of years.                                    1026

**Prison Nation: The Warehousing of America's Poor,** edited by Tara Herivel and Paul Wright, 332 pages. **$35.95.** PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.                                    1041

**The Celling of America, An Inside Look at the U.S. Prison Industry,** edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95.** PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.                                    1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada,** updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95.** Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college correspondence courses.                                    1071

**The Criminal Law Handbook: Know Your Rights, Survive the System,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99.** Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.                                    1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case,** by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99.** Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.                                    1037

**Law Dictionary,** Random House Webster's, 525 pages. **$19.95.** Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.                                    1036

**The Blue Book of Grammar and Punctuation,** by Jane Straus, 110 pages. **$14.95.** A guide to grammar and punctuation by an educator with experience teaching English to prisoners.                                    1046

**Legal Research: How to Find and Understand the Law,** by Stephen Elias and Susan Levinkind, 568 pages. **$49.99.** Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.                                    1059

**Deposition Handbook,** by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99.** How-to handbook for anyone who conducts a deposition or is going to be deposed.                                    1054

**Finding the Right Lawyer,** by Jay Foonberg, ABA, 256 pages. **$19.95.** Explains how to determine your legal needs, how to evaluate a lawyer's qualifications, fee payments and more.                                    1015

**SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!**
1. **FOUR (4) FREE ISSUES FOR 40 TOTAL!** OR
2. **PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)**

**Protecting Your Health and Safety,** by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00.** This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.                                    1060

**Spanish-English/English-Spanish Dictionary,** Random House. **$8.95.** Two sections, Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.                                    1034

**Writing to Win: The Legal Writer,** by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95.** Explains the writing of effective complaints, responses, briefs, motions and other legal papers.                                    1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right,** updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 403 pages. **$16.00.** Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.                                    1030

**Webster's English Dictionary,** Newly revised and updated, Random House. **$8.95.** 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms.                                    1033

**Everyday Letters for Busy People,** by Debra Hart May, 287 pages. **$18.99.** Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters.                                    1048

**Roget's Thesaurus,** 717 pages. **$8.95.** Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words.                                    1045

**Beyond Bars, Rejoining Society After Prison,** by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95.** *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.                                    1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.,** by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95.** In *Jailhouse Lawyers,* Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.                                    1073

**A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series),** by Bryan A. Garner, 768 pages. **$39.00.** This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to navigate your way through the maze of legal language in criminal cases.                                    1088

**The Habeas Citebook: Ineffective Assistance of Counsel,** by Brandon Sample, PLN Publishing, 200 pages. **$49.95.** This is PLN's second published book, which covers ineffective assistance of counsel issues in federal habeas petitions. Hundreds of case cites!                                    1078

**\* ALL BOOKS ARE SOFTCOVER / PAPERBACK \***

PLN_0001728

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95.** Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.                              1031

**10 Insider Secrets to a Winning Job Search,** by Todd Bermont, 216 pages. **$15.99.** Roadmap on how to get a job even under adverse circumstances—like being an ex-con. Includes how to develop a winning attitude, write attention-grabbing résumés, prepare for interviews, networking and much more!                              1056

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95.** This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.                              1083

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95.** Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.                              1084

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95.** The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!                              1077

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99.** While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.                              1075

**The Redbook: A Manual on Legal Style,** by Bryan A. Garner, 2nd edition, 544 pages. **$48.00.** This book provides a comprehensive guide to the essential elements of legal writing, including grammar and style, with a discussion of writing rules and exceptions.                    1089

**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$38.00.** This guide provides an overview of criminal law. Expert discussion explores punishment, specific crimes, special defenses, the burden of proof and much more.                              1086

**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$38.00.** This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication.                              1090

**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$38.00.** Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure.   1085

**High Court Case Summaries on Criminal Law,** Keyed to Johnson, 7th edition. **$38.00.** Extensive criminal case law analyses, including procedural basis, facts, decision and rationale.                              1087

**Soledad Brother: The Prison Letters of George Jackson,** by George Jackson, Lawrence Hill Books, 339 pages. **$18.95.** Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 40 years ago.                              1016

**PLN Cumulative Index. $22.50 each.** PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

---

## Subscription Rates

|                                                    | 1 year | 2 years | 3 years | 4 years |
|----------------------------------------------------|--------|---------|---------|---------|
| **Prisoners**                                      | $30    | $ 60    | $ 90    | $120    |
| **Individuals**                                    | $35    | $ 70    | $105    | $140    |
| **Professionals** (Attorneys, agencies, libraries) | $90    | $180    | $270    | $360    |

## Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 53

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 53

(All subscription rates and bonus offers are valid as of 7-31-2011)

---

**VISA   MasterCard**   Purchase with Visa, MasterCard, AmEx or Discover by phone: **802-257-1342**   **AMEX   DISCOVER**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

---

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 2420
W. Brattleboro, VT 05303

**All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes,** *if allowed by prison policies.*

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

| **Subscribe to Prison Legal News**                                   | **$ Amount** |
|----------------------------------------------------------------------|--------------|
| 6 month subscription (prisoners only) - $18                          |              |
| 1 yr subscription (12 issues)                                        |              |
| 2 yr subscription (2 bonus issues for 26 total!)                     |              |
| 3 yr sub (*write below which FREE book you want*) or 4 bonus issues for 40 issues total! |    |
| 4 yr sub (*write below which FREE book you want*) or 6 bonus issues for 54 issues total! |    |
| Sample issue of **Prison Legal News** - $3.50 each                   |              |

**Books or Index Orders** (No S/H charge on 3 & 4-yr sub free books OR book orders OVER $50!)   **Qty.**

_____

_____

_____

_____

**Add $6.00** S/H to Book Orders **UNDER $50**

VT residents ONLY add 6% to Total Book Cost

**Total Amount Enclosed:**

*\* No refunds on PLN subscription or book / index orders after orders have been placed \**

# ARE PRISON PHONE RATES KEEPING YOU LOCKED DOWN?

**We guarantee savings of up to 90%** on your long distance, out-of-state, and international calls from all Federal prisons, county jails and State prisons.

Call, write, e-mail or have your loved ones check out our website for more information!

WE'RE OFFERING TWO SPECIAL PROMOTIONS TO PLN SUBSCRIBERS: **ONE FREE MONTH** OF SERVICE TO ALL NEW SUSCRIBERS TO OUR US DOMESTIC PLANS – (PROMO CODE: PLNUSA) – OR **100 FREE INTERNATIONAL MINUTES** FOR NEW INTERNATIONAL SUBSCRIBERS – (PROMO CODE: PLNINTL). Some restrictions apply.

Spain Telecom, Inc.
1220 Broadway – #803
New York, NY 10001
www.inmatefone.com
clients@inmatefone.com
Call:      1(845)326-5300
Español: 1(845)342-8110

**Garantizamos ahorro de hasta el 90%** en tus llamadas de larga distancia inter-estales e internacionales  desde todas las cárceles federales, locales y estatales.

Para contactar con nosotros: Llame, escriba o entre en nuestra pagina web para mas información.

ESTAMOS OFRECIENDO DOS PROMOCIONES ESPECIALES PARA SUSCRIPTORES PLN: SERVICIO **GRATIS POR UN MEZ** A TODOS LOS NUEVOS CLIENTES QUE SE SUSCRIBANA NUESTRO PLAN DOMESTICO – ( CODIGO DE PROMOCION: PLNUSA) – O **100 MINUTOS INTERNACIONALES GRATIS** PARA NUEVOS CLIENTES QUE SUSCRIBAN EL PLAN INTERNACIONAL – (PROMO CODE: PLNINTL) Se aplican restricciones!

*Start Saving Today!*



**Inmatefone**
Keeping You In Touch



# PRISONLEGALNEWS.org

**Dedicated to Protecting Human Rights**          >>FREE Data Search

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**I**f you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**

Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.

▸ PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.

▸ Publications section has numerous downloadable government reports, audits and investigations from around the country.

▸ Full text decisions of thousands of court cases, published and unpublished.

▸ All content is easy to print for downloading and mailing to prisoners.

▸ Most complete collection of prison and jail related verdicts and settlements anywhere.

▸ Order books, print subscriptions and make donations on line.

▸ Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.

▸ Links to thousands of prison, jail, criminal justice and legal websites around the world.

▸ Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.

▸ Search free, pay only if you find it!

▸ The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org

PLN_0001730



**Prison Legal News**
PO Box 2420
West Brattleboro, VT 05303

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

## Subscription Renewal

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2006 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 04/2013** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

## Change of Address

If you move or are transfered, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!

"Talk more for less"

**ICCALLS, LLC**

**ARE YOU FRUSTRATED BECAUSE OF THE HIGH COST OF YOUR PHONE CALLS?**

Our company **ICCALLS** is here to provide you **excellent service** at very **low rates**.

We have different plans to accommodate for the one that best fits your needs.

Right now we have a promotion of one month **absolutely FREE** for new subscribers. Just provide us the promo code: **PLNICCALLS\***
Please contact **ICCALLS** to find out how this special promotion works, for either **US** or **INTERNATIONAL** calls. If you are already a customer, contact us to find out how to earn points by referring new customers to the service and get **FREE minutes** every month.

**ICCALLS** also provides you the service of money transfers directly to your commissary's account. You can receive up to **$300.00** per transaction paying only **$9.95** using your Debit/Credit Card or your Pay Pal Account.

**DO NOT WAIT ANY LONGER AND CONTACT US:**

| | | | |
|---|---|---|---|
| Phone: | 1(888)718-1595 | Monday to Friday | **LLAMENOS Y COMIENCE** |
| Fax: | 1(323)210-7458 | 9:00 AM to 5:00 PM CT | **A AHORRAR DINERO EN** |
| E-mail: | c.service@iccalls.com | We will be able to assist you | **SUS LLAMADAS!!!!!!!!** |
| | support@iccalls.com | in English, Spanish, Portuguese, | |
| | www.iccalls.com | and Hebrew. | |
| Mail to: | ICCALLS, LLC | | |
| | P.O. Box 3674 | | |
| | Huntington Park, CA 90280 | | |



\*RESTRICTIONS APPLY                    2010-2012 ICCALLS, LLC