# EXHIBIT 21

Dedicated to the memory of William Van Poyck

# Prison Legal News

VOL. 24  No. 7
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

July 2013

# Arizona Prison System Plagued by Politics, Privatization and Prisoner Deaths

*by Joe Watson*

By the time Jan Brewer replaced Janet Napolitano as Arizona's governor in 2009, it had been 22 years since the Arizona Department of Corrections (ADC) built the first prison in the United States designed exclusively for permanent lockdown – a prison that became the prototype for supermax facilities across the country.

Even before Brewer assumed the governorship and brought Charles L. Ryan out of retirement to run the ADC, Arizona's prisons were known to be ruthless and inhumane. Few other prison systems can claim the dubious distinction of leaving a mentally ill prisoner in an outdoor cage for hours in scorching summer heat until she literally baked to death. [See: *PLN*, Feb. 2010, p.32].

Yet by playing politics, contracting with for-profit prison healthcare companies and kowtowing to private prison firms, Governor Brewer and ADC Director Ryan have taken a prison system already infamous for its draconian conditions and unfettered incompetence and made it deadlier and even more vindictive and profit-driven than ever before.

The ADC, with a $1.1 billion budget in 2012, will soon open a new maximum-security facility with 500 solitary confinement cells at a prison complex in Buckeye, at a cost of $50 million. In doing so, state officials ignored warnings by the American Civil Liberties Union (ACLU), Amnesty International, American Friends Service Committee (AFSC) and other human rights groups about the lasting, negative effects of long-term isolation.

On June 11, 2013, *Prison Legal News* sent copies of *PLN*'s October 2012 cover story on solitary confinement to members of the Arizona legislative Joint Committee on Capital Review, noting that "budget expenditures are a zero-sum game and money spent on prison beds is money not spent on health care, education, affordable housing, infrastructure and other services for the state's citizens." *PLN* observed that solitary confinement has an adverse impact both in terms of fiscal costs and higher recidivism rates for prisoners released after being held in solitary.

"These conditions are gratuitously cruel," David Fathi, director of the ACLU's National Prison Project, said of the ADC's Secure Management Units (SMUs), where prisoners are held in solitary confinement.

"There [is] no penological nor security justification for those kinds of conditions."

But ADC Director Ryan testified before the Joint Committee on Capital Review that "there are no solitary confinement cells in Arizona prisons," apparently based on his own peculiar notion of what constitutes solitary confinement. The Committee duly approved the 500-bed maximum-security facility, which is scheduled to open in October 2014.

"Director Ryan saying that ADC's maximum-security units aren't solitary confinement is like the CIA claiming waterboarding is not torture," observed Caroline Isaacs, program director for the AFSC's office in Tucson. "Whatever you want to call them, the conditions in these facilities are harmful to people's physical and mental health."

Since Governor Brewer took office, the suicide rate in Arizona's prison system has increased while drug overdoses, homicides and untreated medical conditions are responsible for other prisoner deaths. The ADC reported that 81 prisoners died in 2012 while 36 deaths occurred in the first half of 2013; most of the deaths were described as being due to "apparent natural causes" or "unknown causes."

Even after being sued by the ACLU for failing to provide adequate medical treatment to the state's more than 40,000 prisoners, the ADC has continued to contract prisoner healthcare to a for-profit company with a reputation for neglect and incompetence.

And to punctuate Arizona's merciless criminal justice system under Governor Brewer's leadership, she has granted only a handful of commutations and has not is-

## INSIDE

| | |
|---|---|
| From the Editor | 14 |
| PA Hepatitis C Lawsuit Filed | 16 |
| Slow Pace of Executions | 22 |
| OK DOC Employees Disciplined | 26 |
| Valley Fever in CA Prisons | 28 |
| Congress Amends PLRA | 30 |
| Prison Phone Justice Update | 34 |
| CCA Loses Four Contracts | 38 |
| PLN Sues CCA in Vermont | 42 |
| Jails Turn to Video Visits | 44 |
| VA DOC Changes Grooming Policy | 46 |
| MS Mayor Goes to Prison | 54 |
| News in Brief | 56 |

# DON'T LET THE TIME DO YOU. STAY CONNECTED!

**Guaranteed savings of up to 90%** on your long distance, out-of-state, and international calls from Federal prisons, county jails and State prisons.

### Best Rates and Plans

Multi-number Friends & Family Package for as little as $10.00/month

More plans & more numbers than any operator -

### No Hidden Fees

**What We Say Is What You Pay** – NO additional "fees", "charges" or "surcharges"

International calls are billed only on call acceptance. No bogus rounding

### No Contracts, No Penalties, No Hassles

No long term commitments – Service is always month – to – month. Cancel at anytime with NO penalties and NO cancellation fees with just a phone call or an e-mail.

### Fast and EZ Setup

We **ALWAYS** have numbers and can set up instantaneously online or on the phone.

# Special Commitment, Civil Detention & Halfway House

$0.40 connection charge from payphones lowest in the business

Voice Mail and Call Recording options

Call, write, e-mail or have your loved ones check out our website for more information.

SP Telecom
1220 Broadway - # 801-A
New York, NY 10001
www.inmatefone.com
e-mail: clients@inmatefone.com
Español: soporte@inmatefone.com
Call:      1(845)326-5300   (Collect calls are NOT accepted)
Español: 1(845)342-8110   (Llamadas por cobrar no se aceptan)

Some restrictions apply. Plan availability depends on the Institution

# NO PERMITA QUE EL TIEMPO LE SEPARE DE SU FAMILIA!

**Garantizamos ahorros de hasta el 90%** en sus llamadas de larga distancia,entre estados, y en las llamadas internacionales desde prisiones federales,estatales y locales.

### Los mejores Planes y Tarifas

Plan para familias y amigos con varios numeros por tan solo $10.00/ mes .

Mas planes y numerous que ningun otro operador .

### No hay letra pequeña

**Lo Que Ves Es Lo Que Pagas**, NO hay ningun otro cargo extra.

Las llamadas internacionales solo se facturan cuando es aceptada por el familiar al otro lado del hilo telefonico.

**No hay contrato , permanencia ni ningun tipo de travas** .

El servicio siempre se ofrece en base a un mes de duracion pudiendo renovar el mismo todo los meses sin ningun cargo por la terminacion del servicio  y lo puede solicitor con una simple llamada de telefono o con un correo electronico (E-MAIL)

### La solicitud se puede hacer rapida y muy facil .

Nosotros siempre tenemos numerous y podemos procesar to registro inmediatamente  en lines o por telefono.

**Detenidos civiles en carceles especiales y reclusos en camino a casas de medio camino le ofrecesmos los siguientes servicios.**

$0.40 de recarfo desde telefonos de prepago, la tarifa mas baja en el sector  .

Buzon de Voz  y la posibilidad de grabar las llamadas .



Inmatefone
Keeping You In Touch

PLN_0000752

**Prison Legal News**
*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Mike Brodheim, Matthew Clarke,
John Dannenberg, Derek Gilna,
Gary Hunter, David Reutter, Mike Rigby,
Brandon Sample, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News**
**PO Box 1151**
**Lake Worth, FL 33460**
**561-360-2523**
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

sued a single pardon – a dismal record that is unlikely to change during the remainder of her tenure.

With Brewer as governor and Ryan as director of Arizona's prison system, conditions for the state's prisoners have steadily deteriorated – though private prison companies have profited handsomely.

### Calls to Privatize More Prisons

To replace Dora Schriro – the state's prison chief under former Governor Napolitano before they both left for positions with the U.S. Department of Homeland Security – Brewer appointed Charles Ryan, who had retired as the ADC's director in 2003. Since his return, Ryan has parroted Brewer's calls for expanding prison privatization in Arizona.

At the time of his reappointment, five of the state's 15 prison complexes were already operated by private companies: two by Utah-based Management & Training Corporation (MTC), including a medium-security facility in Kingman, and three by Florida-based GEO Group, the nation's second-largest for-profit prison firm. Collectively those complexes house over 6,000 prisoners, or 15% of the state's prison population.

Around the same time, Corrections Corporation of America (CCA) and the American Legislative Exchange Council were collaborating with then-state Senator Russell Pearce to draft a xenophobic anti-immigration bill, SB1070, which was introduced in the state legislature in December 2009 and enacted into law the following year. [See: *PLN*, Nov. 2010, p.1].

SB1070 was expected to increase the number of people arrested due to immigration-related violations; this would potentially benefit CCA, which operates immigration detention facilities in Arizona.

Within Brewer's first year in office, she and Ryan called for privatization of the state's entire prison system. The legislature obliged but CCA, GEO Group and other for-profit prison companies shied away from wholesale privatization. [See: *PLN*, Sept. 2010, p.42]. Therefore, in January 2010, shortly after Senator Pearce

introduced SB1070, Ryan proposed a more modest addition of 5,000 new private prison beds to be opened within three years. To justify the estimated $585 million cost, the ADC used a combination of deceptive data and the anticipated impact of SB1070 to project a need for an additional 8,500 prison beds by 2017.

Not only were the projections wrong, the department never bothered to compare the costs and quality of services of privately-operated prison complexes with those run by the ADC, in violation of state law. According to the *Arizona Republic*, "Arizona statutes require [the ADC] to carry out a biannual performance study for every contract. The study analyzes costs, the security and safety of each prison, how inmates are managed and controlled, inmate discipline, programs, health and food services, staff training, administration and other factors and then compares these factors to other facilities."

The ADC had not conducted a private prison performance study since a state statute requiring such studies was enacted in 1987. Undeterred, prison officials proceeded with a request for proposals for 5,000 new private prison beds.

### Deadly Private Prison Escape

Governor Brewer and ADC Director Ryan's efforts to expand prison privatization in Arizona went mostly unchallenged until July 30, 2010, when prisoners John Charles McCluskey, Daniel Renwick and Tracy Province – with the help of McCluskey's cousin, Casslyn Mae Welch – escaped from a medium-security prison in Kingman operated by MTC. Over the following three weeks the escapees kidnapped a pair of truck drivers, had a shootout with police and evaded authorities during a multistate manhunt throughout the western U.S.

While on the run, McCluskey murdered two retirees, Gary and Linda Haas, in the back of their camper off an old ranch road in New Mexico. He and Welch then doused the bodies with an accelerant and torched the camper.

Five days after the escape, a team of state investigators fanned out across the Kingman prison complex to determine how it happened. They discovered that MTC staff had ignored a malfunctioning alarm – which had been going off hundreds of times a day for over two years – that sounded when the escapees cut through a fence.

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

The ADC also discovered eight burned-out perimeter lights, more broken security equipment and, according to the *Republic*, "a lax, high-turnover culture in which MTC's green, undertrained staff and rookie supervisors ignored alarms, left long gaps between patrols of the perimeter, left doors leading out of some buildings open and unwatched, didn't alert the state or local police until hours after the escape, and failed in all manner of basic security practices."

A report issued by state prison officials cited those and other problems at the MTC-run facility. [See: *PLN*, March 2011, p.24]. The ADC's on-site monitor at Kingman, who was later fired, admitted that he had failed to address security problems and had never even read the state's contract with MTC.

McCluskey, Province and Welch were ultimately captured and charged with the Haas' murders (Renwick was arrested after he split from the group a few days after the escape). Province pleaded guilty and received five life sentences, Welch pleaded guilty and awaits sentencing, Renwick was sentenced to 60 years and capital murder charges against McCluskey remain pending.

Following the escape and nationwide manhunt, Ryan and the ADC did damage control and made cosmetic changes to prison security statewide. Ryan temporarily suspended all prisoner transfers to Kingman and moved 238 supposedly high-risk prisoners out of the facility, and the complex's population dropped to 80% of capacity.

This presumably would result in financial losses for MTC but the company threatened to sue, citing its contract that guaranteed a minimum 97% bed occupancy, and state officials ended up paying over $3 million to MTC for empty prison beds. The company continues to operate the Kingman facility.

"It's disgusting but not surprising," said Caroline Isaacs. "Arizona is strapped for cash, and we don't have the political will or the legal muscle to go up against a corporation like that, so they can operate with something close to impunity." She added, "We're so desperate because of prison overcrowding. These companies have got the state over a barrel. When things go wrong, is [ADC Director] Ryan really going to cancel the contract? Probably not, and they know that."

In 2011, once the escape had faded from the headlines, Brewer and Ryan reintroduced their plan to privatize an additional 5,000 prison beds – even though the ADC's daily prisoner count had fallen in the previous year due to fewer felony arrests in Maricopa County (the state's population center) and fewer probation violations statewide, among other factors.

ADC officials downplayed their blatantly exaggerated earlier prison population estimates and instead projected 3,800 more prisoners entering the state's prison system by June 2015, though they failed to provide hard data to support those projections. The plan to privatize more prison beds was met with bipartisan, if not broad, criticism.

"The fact we're moving forward with this outdated plan is mind-boggling to me," said Democratic state Rep. Chad Campbell, Arizona's House minority leader. "I don't think there's a need for it," agreed state Rep. Cecil Ash, a Republican who had unsuccessfully pushed for sentencing reforms in the previous legislative session.

Regardless, Brewer and Ryan pressed ahead and four private prison companies responded to the ADC's request for proposals.

In the summer of 2011, ADC officials and representatives from CCA, GEO Group, MTC and LaSalle Corrections – the companies bidding on the 5,000-bed contract – went on a tour around the state, holding town hall-style meetings in communities from Winslow to Eloy to Coolidge. At each meeting the companies deflected criticism about escapes and costs, focusing instead on the promise of jobs and trotting out business leaders and loyal employees.

"I work with wonderful people," said Linda Gibson, an antique shop owner who



**PENACON.com**

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see. Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLN5OFF
FOR $5 OFF

# Earn an Adams State University Degree via Correspondence Courses



- Correspondence Courses via mail    • No internet access required
- Degree options available — Associate of Arts or Science, Bachelor degrees in Accounting, Business Administration, Government, History, Interdisciplinary Studies, Legal Studies, Management, Marketing, Sociology, Paralegal Certificate Program, Masters degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 16+ years of experience serving incarcerated students
- FREE unofficial evaluation of previously earned credits

**ADAMS STATE UNIVERSITY**
C O L O R A D O
*Great Stories Begin Here*
**EXTENDED STUDIES**

Call or write to receive additional information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101

**Now Available: Masters Degree in Business Administration**

is also employed by CCA, during a public meeting in Eloy, where CCA operates a facility that houses prisoners from other states. "We have a lot of single mothers who work at CCA, making good money, who have homes they wouldn't have if it wasn't for CCA."

Some communities, however, rejected the private prison dog-and-pony show, with GEO Group's proposal to build a facility in the City of Goodyear, outside Phoenix, running into a "buzz saw" of opposition according to the *Arizona Republic*. Mayor Thomas Schoaf of nearby Litchfield Park called the proposal "a slap in the face to our residents" and "a threat to the public welfare of our communities."

### Prisoners Driven to Suicide

Meanwhile, an April 2012 report from Amnesty International, titled "Cruel Isolation," examined Arizona's draconian Special Management Units at the Arizona State Prison Complex (ASPC) in Eyman and other maximum-security ADC facilities. Citing prisoner advocates, current and former prison staff and the ADC's own written policies, the report found that the ADC, which houses over 2,900 prisoners in maximum-security facilities, was "in violation of international law."

Amnesty concluded that "the cumulative effects of the conditions [in SMUs], particularly when imposed for a prolonged or indefinite period, constitutes cruel, inhuman, or degrading treatment." Even those prisoners considered especially dangerous, Amnesty argued, should be treated "with humanity and respect for the inherent dignity of the human person," pursuant to international standards related to the treatment of prisoners.

"Amnesty International recognizes that it may sometimes be necessary to segregate prisoners for disciplinary or security purposes. However, all measures must be consistent with international standards for humane treatment," Amnesty stated. "Article 10 of the International Covenant on Civil and Political Rights, which the USA has ratified, provides that 'all persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person,' a standard which the United Nations (UN) Human Rights Committee, the treaty monitoring body, has stressed is a 'fundamental and universally applicable rule.'"

But according to Amnesty's report, the ADC's Special Management Units – intended for prisoners who pose the greatest physical threat to prison employees and the public – are too often filled with mentally ill, nonviolent and vulnerable offenders.

Most prisoners held in SMUs have little to no human interaction. With just one or two hours out of their windowless cells each day, they must choose to either bathe themselves or spend their limited out-of-cell time in a small cage with 20-foot walls and a sliver of sky, which the ADC contends is sufficient "outdoor recreation." SMU prisoners cannot participate in work, rehabilitative or educational programs. If they protest their living conditions, guards ignore them or sometimes deliberately deny them food.

It is little surprise then, but no less tragic, that Arizona's prison suicide rate, according to a U.S. Bureau of Justice Statistics report released in December 2012, is higher than the national average. Meanwhile, Amnesty found that at least 14 of 43 suicides recorded in Arizona prisons



# INMATE TOLL BUSTERS
## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*
**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours:  888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.

VISA   MasterCard   DISCOVER

PLN_0000755

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

between October 2005 and April 2011 – almost 33% – occurred in SMUs, even though those units housed less than 9% of the state's total prison population.

"High rates of suicide in solitary units is a widespread problem; that's why many states no longer house mentally ill inmates in solitary," said Craig Haney, a psychologist at the University of California-Santa Cruz. "The severity of the conditions in those units ... most mentally healthy people who go in are adversely affected. People can become so despairing, so desperate that they take their own lives."

According to the ADC's critics, prisoner suicides are likely underreported. And of those that state prison officials publicly disclose, they do not specify whether a suicide occurred in an SMU or other solitary confinement unit.

A major deficiency in the SMUs is a lack of treatment for seriously mentally ill prisoners. Amnesty International found that "one prisoner diagnosed with [serious mental illness] spent two years in SMU without once seeing a psychiatrist despite his repeated requests and referrals by staff." Another prisoner had completed a seven-day mental health treatment program, Amnesty reported, "after which he was returned to isolation in SMU where he hanged himself the following day."

Approximately 10,000 state prisoners require ongoing mental health services, ac-

cording to the ADC, including prisoners in SMUs and general population units.

As part of an investigative series into the state's prison system, the *Arizona Republic* found there were 470 attempts of self-harm or suicide by ADC prisoners statewide over an 11-month period ending in May 2012.

In one earlier incident, Anthony Lester, 26, a mentally ill prisoner who had been diagnosed with schizophrenia, bled to death in his two-man cell at ASPC-Tucson in July 2010 after slashing his neck, wrist and groin with a razor blade. Prison staff stood by and watched him die without providing medical assistance. One of the guards, Orlando Pope, said he didn't help because he had never been trained on how to apply pressure to a wound.

"When Tony was on his meds, he was our Tony," said Lester's aunt, Patti Jones. "If he'd had access to care, he would have lived." Lester had been on suicide watch, but was removed two days before he killed himself. A guard had mistakenly given him shaving razors.

Just before the ADC provided suicide prevention training to 8,806 prison employees in March 2012, Lester's family filed a wrongful death claim against the state, seeking $3 million. Pope and four other guards received unpaid suspensions for failing to properly respond while Lester was bleeding to death.

More recent suicides in Arizona state prisons – three in one month – include the May 10, 2013 suicide of death row prisoner Milo Stanley, 50, who hung himself; Paul

Henderson, 22, who died from "an apparent suicide" on May 1, 2013; and prisoner Joaquin Tamayo, 41, serving a five-year sentence, who killed himself on April 22, 2013. All three deaths occurred at ASPC-Eyman. On February 12, 2013, ADC prisoner Christina Black, 52, serving a life sentence for murder, committed suicide at the Perryville prison complex in Goodyear.

### Other Deaths Due to Violence, "Gratuitous Cruelty"

SUICIDES, WHETHER IN SMUS OR OTHER units, aren't the only cause of unnecessary deaths in Arizona's prison system. Other prisoners have overdosed on drugs, been killed by fellow prisoners or died because they received inadequate medical care.

"Arizona's prison system has two death rows," the *Arizona Republic* proclaimed in its investigative series. "One is made up of the 126 inmates officially sentenced to death ... [and] the other death row, the unofficial one, reaches into every prison in Arizona's sprawling correctional system. No judge or jury condemned anyone in this group to death. They die as victims of prison violence, neglect and mistreatment."

Between 2010 and mid-2012, 37 Arizona prisoners died on Arizona's "other death row" – more than five times the number of condemned prisoners executed during the same time period, the *Republic* reported. The ADC conducts its own investigations into prisoners' deaths rather than an outside agency, and typically releases scanty information.

According to Carl ToersBijns, a re-



**Law Office of**
**TIMOTHY C. CHIANG-LIN, PLLC**

Representing Individuals
Sexually Abused in Washington
State's Foster Care, Group Home,
City, County Jail and Prison

2155 112th Ave NE, Bellevue, WA 98004

tim@chiang-lin.com        chiang-lin.com

**FIYA GIRLS. THE BEST EVER!!**
11 PIC SET#2! OF SPICY & FRIENDS $16.00 2 FREE PICS 2 FREE CATALOGS FREE [S/H]

**GET YOUR FREE NON NUDE WHOLESELL CAT #1 AND CAT #17 YOU MUST SEND 1 2 i  S.A.S.E.** IF YOU DONT SEND NOTHING ! YOU WONT GET NOTHING!  OPTION#2 TO RECEIVE THE i 7i CATALOG PACKAGE ALONG WITH 3 FREE PICS YOU MUST SEND $7.00 OR 40 STAMPS FREE S/H.

**GET 30 NON NUDE SW#1 SET** OF SLIM WHITE GIRLS COMES WITH A FREE NON NUDE CATALOG! THE SET AND THE CATALOG IS HOT!! YOU WILL LOVE THEM ! THE CATALOG HAS HUNDREDS TO CHOOSE ALL HOT AND SEXY GIRLS GET IT NOW FOR ONLY $25.00 FREE S/H

**GET THE ALL NEW SUPERSIZED** HIGH GLOSS COLOR VIP CATALOG #4 OVER THOUSANDS TO CHOOSE FROM ALL RACES! NON NUDE STRIPPERS, PORN STARS AN ALL! ONLY $15.00 [FREE S/H] INCLUDES 2 FREE PICS THE BIGGEST AND BEST CATALOG EVER!!

**ALL NUDE CAT #4 $15.00** [FREE S/H] COMES WITH FREE PICS

PLEASE MAKE ALL PAYMENTS TO:
**FIYA GIRLS**
P.OBOX 2545 DEPT-PN
HOUMA LA 70361

GET MAIL AND GET PAID INSTRUCTIONS STILL ONLY $10.00

PLN_0000756

tired former ADC deputy warden who worked at ASPC-Eyman, the lack of full disclosure with respect to prisoners' deaths is intentional.

"The cleanup starts the moment the incident is reported: eliminating flag words, eliminating individuals who may be relevant to the situation, cut back the witness list," ToersBijns said. "By the time it's finalized, the incident report is so clean and sterile you won't know what happened because it's already been filtered. The direction is given ... was it deliberate, accidental, suicide, homicide? They try to fix and create a summary for that report that they can defend.

"A lot of drug overdoses are [reported as] suicides," ToersBijns continued. "A lot of 'natural deaths' are people who have been suffering medical conditions but finally just expired. It's not reflected on those reports and never will be reflected in the news reports. Only the ones who were there know what happened."

But the *Republic* did manage to identify some of the causes of the 37 deaths, by filing public records requests. At least seven prisoners died after overdosing on heroin, for example.

"Nobody ever told me he could die in prison of illegal drugs," stated Cynthia Krakoff, whose 36-year-old son, Carlo, died from a heroin overdose at a Tucson prison on July 31, 2011. "If they can't clean up the prisons, they need to find a different way to

treat the drug addicts."

Unfortunately, substance abuse treatment programs in Arizona prisons are lacking. While around 75% of ADC prisoners report having drug and/or alcohol problems, only 1 in 13 of those prisoners received substance abuse treatment in fiscal year 2011.

Other deaths were due to homicides. Seven prisoners were killed by fellow prisoners between 2010 and mid-2012, including Eduardo Martinez, who was beaten to death by gang members at ASPC-Yuma in December 2011. He had been serving time for writing bad checks. Christian Frost, 38, was killed at ASPC-Tucson on February 22, 2013, while ASPC-Lewis prisoner John Jones, 63, was murdered on June 17, 2013. An investigation into Jones' death by the ADC's Criminal Investigation Unit is reportedly pending.

According to the Bureau of Justice Statistics, based on data from 2001-2010, Arizona has a prison homicide rate 25% higher than the national average.

With respect to deaths due to substandard medical care, on March 6, 2012 the ACLU – joined by the Berkeley, California-based Prison Law Office, the Arizona Center for Disability Law, and the law firms of Perkins Coie LLP and Jones Day – filed suit against the ADC for unconstitutionally denying prisoners adequate medical and mental health treatment. [See: *PLN*, Sept. 2012, p.34].

The federal lawsuit, which seeks declaratory and injunctive relief and calls for the state to improve prison healthcare and address conditions in SMUs, alleges that Arizona prisoners have suffered "serious, preventable injuries, disfigurements and death."

The complaint cites a prisoner who was ignored for two years until he died due to liver cancer. A pregnant prisoner was told by prison staff that her medical symptoms were "all in your head"; she was then left alone in her cell, where she miscarried. One prisoner was punished for administering CPR to another prisoner suffering a heart attack while guards stood by and refused to summon medical assistance.

"In recent years," the lawsuit claims, "Defendants ignored repeated warnings of the inadequacies of the healthcare system and of the dangerous conditions in their isolation units that they received from inmate grievances, reports from outside groups, and complaints from prison personnel, including their own staff."

The lawsuit also describes a prisoner who was denied treatment for a cancerous growth on his penis over a two-year period. His penis was eventually amputated, but not before the cancer had spread to his stomach. Another prisoner had most of his lip and mouth removed after waiting seven months for medical care.

"In two decades of prison litigation, this is one of the most broken systems I've



**PASS**

Prisoner Assistance Scholastic Service provides educational materials nationally to prisoners in state and federal prisons and jails.

Prisoners who successfully complete the PASS program earn a degree in Personal Psychological Development which can be used as evidence of rehabilitation before parole boards and with prison officials.

$500 for the entire course of study and degree.

◈ Victim Awareness
◈ Anger Management
◈ Addiction/Substance Abuse
◈ Domestic Violence
◈ Gang Diversion
◈ Conflict Resolution
◈ Parenting
◈ Non-violent Communication
◈ Re-entry in Society
◈ Living With Purpose

**10 COURSES**
**2 SEMESTERS**

Graded study - completed through the mail.

**FOR MORE INFO**

**1-888-670-7277**
**www.passprogram.org**
pass@passprogram.org
PASS Program, PO BOX 2009, San Francisco, CA, 94126



**connect with us...**

send an SASE for a free brochure to:

**inmate scribes**
**PO BOX 371303**
**Milwaukee,**
**WI 53237**

**Packages from only $8!**

**stay connected, stay involved, be heard...**
sick of subscription services that never work? using our patented credit-based system, we do what you want, when you want with no monthly/yearly fees. your credits never expire, and you can use them as frequently as you desire!
All new purchases will receive a free email account with this special, limited-time offer!

email - Facebook - Dating sites - Penpal sites social media - Research - Friend Finding - Lyrics & tabs personal gifts - photo editing - sexy photos and more!

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

seen," said ACLU National Prison Project director David Fathi. "The indifference to the needs of desperately ill people is shocking. And the gratuitous cruelty we see in Arizona's SMUs is unlike anything we've ever seen in other states' supermax prisons."

On March 5, 2013, the district court granted the plaintiffs' motion for class certification in the lawsuit. The court certified a class consisting of "All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC," and a subclass of "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day" or confinement in specified maximum-security units, including SMUs.

The case remains pending. See: *Parsons v. Ryan*, U.S.D.C. (D. Ariz.), Case No. 2:12-cv-00601-PHX-NVW.

---

## HARVEY COX, MS
### CORRECTIONS CONSULTANT

**40 Years Prison Employment**
*(includes: Federal, State, Private)*
**Warden at Three Institutions**

**PSR Review Prior to Finalization**
*(impacts on all Classification Issues)*
**Initial Prison Placement Requests**
**Have your Attorney Contact Me**

**Prison Transfers**
*(includes Treaty Transfers)*

**Administrative Remedies**
*(Disciplinary Reports)*

**Expert Witness (Court Cases)**
*(Affidavits and Appearance)*

**PO Box 1551**
**Weatherford, TX 76086**
**(817) 596-8457**
**FAX: (817) 594-7172**
**hrcox@yahoo.com**
**www.prisonconsultant.com**

## Privatizing the Healthcare Problem

GIVEN THE ADC'S KNOWN DEFICIENCIES in providing adequate medical and mental health care to prisoners, and having been criticized by human rights groups, targeted by the news media and hit with a class-action lawsuit, one would expect the ADC to make efforts to at least modestly improve its dysfunctional medical system.

Instead, in April 2012, state prison officials awarded Wexford Health Sources – a for-profit company with a history of incompetence and medical neglect – a three-year, $349 million contract to provide healthcare to Arizona prisoners. The Wexford contract went into effect in June 2012. [See: *PLN*, May 2012, p.36].

Less than four months later the company had made quite a first impression. On August 27, 2012, a vocational nurse employed by Wexford exposed more than 100 prisoners at ASPC-Lewis to hepatitis C by contaminating the prison's insulin supply.

Nurse Nwadiuto Jane Nwaohia, who was already under investigation by Arizona's Board of Nursing for undisclosed reasons, administered a routine dose of insulin to a diabetic prisoner who had hepatitis C, then inserted the same needle into another vial to draw more insulin for the same prisoner. The vial was placed among other vials of insulin in a medication refrigerator and used later that day to dispense insulin to 103 diabetic prisoners.

Medical staff quickly discovered the contamination and destroyed all the vials of insulin, and Nwaohia, according to a Wexford statement, was suspended for violating "basic infection-control protocols while



administering medication that day."

However, Wexford didn't notify the state or Maricopa County officials until eight days after the incident.

"It's extremely disturbing that something like this could happen. It calls for a thorough investigation to determine all of the surrounding causes of the mistake or the negligence," said Don Specter, director of the Prison Law Office.

Wexford tried to deflect responsibility for the insulin contamination by blaming a local staffing agency for assigning Nwaohia to the prison complex. But Ken Kopczynski, executive director of the Private Corrections Working Group, which opposes prison privatization, criticized state officials who contracted prisoner healthcare to Wexford and then failed to maintain proper oversight.

"This is a problem with privatization," Kopczynski noted. "[The ADC is] just accepting who Wexford will hire."

State prison officials threatened to fine Wexford a paltry $10,000 after the hepatitis C contamination incident, which followed other disturbing incidents.

A prisoner at ASPC-Florence attempted to commit suicide on August 23, 2012 after not receiving his psychotropic medication for an entire month. According to the ADC, Wexford's failure to provide the medication to the prisoner, who was found hanging from a sheet in his cell, was a "significant, non-compliance issue."

Ten days earlier, ADC mental health contract monitor Ben Shaw had issued a memo that described significant shortages among Wexford's mental health staff.

"Wexford's current level of psychiatry staffing is grossly insufficient to meet [its] contractual requirement," he wrote. "Further, this staffing level is so limited that patient safety and orderly operation of ADOC facilities may be significantly compromised.... Wexford currently has 14.85 psychiatry FTE's [full time employees] allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications. Wexford now employs a total of 5.95 FTE psychiatry providers (approximately 33% of their allocation) [with] 8.9 FTE's vacant (leaving a vacancy rate of 66%)."

Also in August 2012, a Wexford nurse at the women's prison in Perryville administered medication to a prisoner by having her "lick the powdered medication from her

own hand" rather than putting the meds in a cup of water, in violation of policy. Further, a number of prisoners at the facility, the state learned, "may not have been receiving their medications as prescribed due to expired prescription[s] and inappropriate renewals or refills."

On September 21, 2012 the ADC issued a "Written Cure Notification" to Wexford that detailed a litany of contract violations – including inadequate staffing levels, a decrease in routine institutional care, incorrect or incomplete medication prescriptions and refill procedures, inconsistent medical records documentation, lack of responsiveness to incident urgency and reporting requirements, and an unresponsive approach to prisoners' grievances.

ADC officials ordered Wexford to fix the staffing problems, properly distribute and document medication for prisoners and communicate more effectively when problems arise. ADC Director Ryan later said in a written statement that Wexford was being afforded a chance to "improve communications and ensure [that] the healthcare needs of the inmates incarcerated by the State of Arizona are being met."

Wexford, on the other hand, shifted blame back to the state. In a letter to Ryan the company stated the ADC "must recognize that the system that was in place" before Wexford's contract began was "extremely weak."

"This is more proof that privatization is not saving us money, not providing better services and is not any more efficient," said Caroline Isaacs with the AFSC. "While the state clearly had its problems, just inserting another layer to the bureaucracy is no way to address the problems, and it complicates the matter."

Doris Marie Provine, a justice studies professor at Arizona State University, noted that "When the state locks someone up, it assumes responsibility to provide safe and humane conditions of confinement. No amount of outsourcing will change that."

The ADC apparently thought otherwise; after terminating its contract with Wexford in January 2013 due to "both parties encountering unforeseeable challenges," state prison officials instead contracted with Corizon, another for-profit prison healthcare company with a history of abuses and neglect. Corizon began providing medical care to prisoners on March 4, 2013.

"Merely replacing one for-profit prison contractor with another will only prolong the crisis in Arizona's prisons," said Dan Pochoda, legal director of the ACLU of Arizona. "There is no reason to think that anything will change under Corizon, Inc."

## Shutting the Safety Valve of Justice

UNFORTUNATELY, ARIZONA PRISONERS with life-threatening medical conditions who apply for commutations of their sentences are largely out of luck, as Governor Brewer apparently doesn't like making clemency decisions. Or perhaps she simply doesn't like justifying them.

In April 2012, Brewer replaced three of the five members of Arizona's Board of Executive Clemency – board chairman Duane Belcher; Marilyn Wilkens, who was appointed in 2010; and Ellen Stenson, appointed by former Governor Napolitano in 2007.

According to Belcher, Governor Brewer was displeased by the board's 2009 majority recommendation to grant clemency to convicted murderer William Macumber, who had raised a strong claim





NEW FRIENDS, HIGHER EDUCATION, AND EMPLOYMENT & HOUSING UPON RELEASE THROUGH WRITEAPRISONER.COM PROFILES

Contact WriteAPrisoner.com & Start Looking Forward To Mail Call!

AS SEEN ON CNN, 20/20, Fox News, Dr. Phil, O Magazine, E! True Hollywood, and hundreds more!

WriteAPrisoner.com... Simply the largest, highest ranked, & most visited website of its kind!*

• Pen-pal Profiles are affordably priced at $40 for the first year, $30 for renewing year
• Features a comprehensive search that allows viewers to find your profile by age, race, location, keywords, & more - 32 search options in all
• Your new friends can email their first message to you along with a photo
• Advertises non-stop on every major search engine with thousands of websites linking back to us
• Offers free Reintegration Profiles for inmates seeking employment and housing upon release and education during incarceration
• Translated into 51 languages & geared for international search engines
• Viewers can "subscribe" to your profile to be notified when your profile is updated, blog is added, artwork is posted, poetry is added, your release is near & much more
• Pen-pals have the option of helping you with a broad range of topics using WriteAPrisoner.com's free Self-Help Series

Get Started Today!
Friends & family can submit your entire 250 word profile, photo, and payment for you online by visiting www.writeaprisoner.com/post

Or for a FREE Brochure, Send a S.A.S.E. to:

WriteAPrisoner.com We'll see you at mail call!

WriteAPrisoner.com PO Box 10- PLN Edgewater, FL 32132 USA

Proud member of the Better Business Bureau of Central Florida and the Southeast Volusia Chamber of Commerce *Our website traffic can be independently verified at www.quantcast.com/writeaprisoner.com

PRISONER ASSISTANT
REHABILITATION AND REENTRY PLANNING

Join Our Exclusive Membership, Open a Bank Account and Gain Access to Our Services! MEMBERS ONLY
We only provide services to our clients, no exceptions.

Bank Account under your social security number. Deposits, Statements, Money Orders, Bank Checks, Green Dot, Stamp Exchange, Wire Transfers, Direct Deposit & PayPal.

Internet Purchases, Gift Cards, Greeting Cards, Lottery, Sporting News & Current Events, People Search, Personal Shopper. "If It Can Be Done, We Will Try To Do It", see our catalog for more.

Prisoner Concierge

We can do any Graphic Design project. Printed Material, Musical Emails, Creative Writing, Photo Reproduction & Forwarding, Book Publishing, Book Cover Design, Press Releases, Portfolio Creation, and Website Building.

Mailboxes, Emails, Faxes, Texts, Scanning, Copies, Typing, Storage, Document Preparation, Internet Research, Prepaid, Contract, Computer Aided & Virtual Phones.

Virtual Office

Place your profile on prisonerassistant.com and access our Special Features; Classifieds, Portfolios, Posts & Blogs, Market Place and Sponsor a Prisoner.

482 Summit Wind Drive, Ste. 704-AD1 Lake Harmony, PA 18624-0704 www.prisonerassistant.com info@prisonerassistant.com (570) 722-5800

For more information - send $4.50 to "Prisoner Assistant" for an Application Package and 56+ page color catalog. If you send an SASE you will only receive a brochure.

Credit Development

JOIN NOW!

Business Development

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

of innocence. Wilkens also indicated that Brewer was dissatisfied with the way she had voted in a clemency case.

"It was expressed clearly that there was dissatisfaction with my vote on a particular issue, and that I had not voted the way they wished that I would have voted," she said. According to one source, that case was most likely the clemency board's January 26, 2012 unanimous recommendation to reduce 74-year-old Robert Flibotte's 90-year sentence for possession of child porn to five years plus lifetime supervision.

Governor Brewer overruled both clemency recommendations.

The clemency board's new members include Brian Livingston, a retired police officer and executive director of the Arizona Police Association; Melvin Thomas, a former Arizona warden who was employed by private prison firm GEO Group after working for the ADC for 21 years; and new board chairman Jesse Hernandez.

Hernandez had worked on some of Arizona's more recent high-profile conservative political campaigns, including leading a Republican Latino group's support for anti-immigrant legislation SB1070. Hernandez was also chairman of a group that tried to help state Senator Russell Pearce win his recall election in November 2011.

The replacement of the clemency board members didn't go smoothly, however. An attorney for death row prisoner Samuel Lopez challenged Brewer's appointment of the new board members in court, claiming the committee that had conducted interviews and made recommendations did not comply with the Open Meetings Law and other state statutes, and that the new members had not received required training before they began conducting hearings. Lopez's attorney refused to participate in an initial clemency hearing, saying the board wasn't authorized to act on clemency petitions. Lopez was executed on June 27, 2012.

Brewer's three new clemency board members, as gatekeepers to the clemency process, will help determine whether prisoners' commutation and pardon petitions are sent to her office for consideration.

"It's clear to me now that that they are trying in any way they can to manipulate the outcome of clemency hearings," said Belcher. "If the cases don't go before the governor, she doesn't have to say yes or no."

Not that prisoners seeking clemency have much of a chance anyway.

Between January 2009 and June 2013, Governor Brewer granted just 28 commutations due to prisoners' life-threatening medical conditions and 6 for non-medical reasons. Her poor record on granting clemency petitions mirrors that of prior Arizona governors, but she is the first governor in at least 35 years to not issue a single pardon, denying all of the board's pardon recommendations. She has never commuted a death sentence.

One noteworthy exception to Brewer's stingy clemency policy was her decision to commute the life without parole sentence of ADC prisoner Betty Smithey in August 2012, resulting in Smithey's immediate release after serving 49 years. [See: *PLN*, Dec. 2012, p.50].

In a state where the prison population has increased eight-fold over the past 30 years; where budget cuts have created a two-year backlog for the clemency board; and where more than 90% of Arizona's 76,000 felony criminal cases each year are settled by plea bargains driven by harsh mandatory minimums, the clemency process is considered the criminal justice system's safety valve.

Yet Brewer continues to deny most clemency applications, even those that apparently have merit. One particularly egregious case involved William Macumber, who was convicted of a double homicide in 1975 and sentenced to life.

Former state judge and public defender Thomas O'Toole told the clemency board in 2009 that another man, Ernest Valenzuela, had confessed the killings to him in 1967, but due to attorney-client privilege he didn't disclose the confession until after his client died in a prison fight. "There is no doubt in my mind that Ernesto Valenzuela committed those crimes," O'Toole said. However, the judge over Macumber's criminal case refused to allow O'Toole to testify about his client's confession, and the Arizona Supreme Court agreed that the trial court could assert attorney-client privilege on behalf of Valenzuela even though he was deceased.

In 2009, based on O'Toole's testimony and other evidence in the case – including evidence suggesting that Macumber had been framed by his ex-wife, who worked at the Maricopa County Sheriff's Office – the clemency board recommended that his sentence be commuted.

The board, then chaired by Duane Belcher, found not only that Macumber had served an excessive amount of time in prison and was not a threat to society, but that his conviction was a miscarriage of justice, stating, "the evidence that now exists certainly casts serious doubt on Mr. Macumber's conviction."



# CA$H FOR YOUR STAMPS
## P. O. Box 687-P, Walnut, Ca. 91788

Get the HIGHEST return for ALL of your stamps!
Rapid processing and payment sent to your designee (No Package, Book, or Magazine Vendors Please)

**70% OF FACE VALUE** for Books and Sheets of "Forever" Stamps in new or excellent.*
**60% OF FACE VALUE** for Books and Sheets of Other Denominations in new or excellent condition.*
**50% OF FACE VALUE** for all books, sheets, or rolls that are not in new and complete condition.
**\*NEW CONDITION MEANS NO FOLDS, NO WRITING, AND ALL STICKERS IN TACT.**
**NO SINGLE STAMPS** (GROUPS OF 2 OR MORE). Stamped envelopes must be #10 with no markings.
$15.00 Min. Money Orders. Damaged or Taped Stamps Not Accepted/Returned. Send SASE for Brochure.

PLN_0000760

Regardless, Governor Brewer denied the board's recommendation without explanation.

"Sometimes the law has a disproportionate impact and may be too rigid. That's what the pardon power is for," said P.S. Ruckman, an Illinois political science professor who runs a blog about clemency and pardons. "Brewer has the power and discretion to have a larger sense of justice and to do something about it. That's her duty."

But with Brewer failing in that duty the Arizona courts stepped in, scheduling an evidentiary hearing after Macumber filed a petition for post-conviction relief. Prosecutors offered a plea deal rather than proceed with the hearing, and on November 7, 2012, Macumber, now 77 years old, pleaded no contest to second-degree murder and was released on time served – over Brewer's public objection. He had spent 37 years in prison.

### Private Prison Contract Awarded

THE ADC's LONG-DELAYED PERFOR-mance study of the state's private prisons was finally released in December 2011, and predictably found, in a self-serving manner, that the state's private and publicly-operated prisons were comparable in both cost and quality of services. Yet according to the American Friends Service Committee, the ADC's study included "very little methodological information or supporting data, suffers from inconsistent data collection procedures, and overlooks important measures of prison safety."

The AFSC had filed a lawsuit challenging the state's proposed 5,000-bed private prison contract on September 12, 2011, seeking an injunction prohibiting the ADC from awarding the contract, but the suit was dismissed due to lack of standing.

The organization also filed an unsuccessful administrative challenge that served to delay the contracting process.

The ADC canceled its contract proposal for 5,000 new private prison beds in December 2011 and issued a revised proposal for 2,000 beds, which was later reduced to 1,000.

Never mind that Arizona's prison population had declined over the previous year, which indicated that additional prison beds were not needed. Never mind that, according to the ADC's own records, there were around 2,000 empty beds in the state's prison system at the time the ADC was soliciting a contract for 1,000 more private prison beds.

And never mind that a September 2010 report by the Arizona State Auditor's office, based on ADC data, noted that minimum- and medium-security private prisons in the state actually cost *more* to operate than government-run prisons, when comparable costs were taken into account. [See: *PLN*, July 2012, p.45].

In February 2012, the AFSC released a report titled "Private Prisons: The Public's Problem," which provided a quality assessment of privately-operated prisons in Arizona. The report found that the state did not need additional prison beds and was wasting money on prison privatization; that private prisons had "serious security flaws" and "serious staffing problems," and did not measure recidivism rates; and that private prison companies were "buying influence" through lobbying and political campaign contributions, and were not accountable to Arizona taxpayers. Overall, the report revealed "widespread and persistent problems in private facilities around safety, lack of accountability, and cost."

On August 31, 2012, the ADC announced that its 1,000-bed private prison

contract, worth $21.5 million annually, had been awarded to Corrections Corporation of America. The contract, for an initial period of ten years with options for two 5-year renewals, includes a 90% bed occupancy guarantee.

In fairness, CCA had worked hard to win the contract. The company employed a cadre of lobbyists, including Paul Senseman, Governor Brewer's one-time spokesman before leaving her administration in 2011, who worked for a lobbying firm hired by CCA, Policy Development Group. His wife, Kathryn Senseman, was also a CCA lobbyist. Additionally, CCA hired lobbying firm HighGround Public Affairs Consultants, a company founded by Chuck Coughlin, Brewer's former campaign manager and policy advisor. [See: *PLN*, July 2012, p.45].

"If you place two of your lobbyists at the right and left hand of the governor of the state and she has final say and oversight of the Department of Corrections, I would say that's a pretty smart business strategy," said Caroline Isaacs.

According to the AFSC, CCA had also made at least $35,000 in campaign contributions to Arizona candidates during the 2010 election cycle and donated $10,000 to Brewer's "Yes on 100" sales tax initiative. CCA's other political connections included former Arizona U.S. Senator Dennis DeConcini, who serves on CCA's board of directors; additionally, Governor Brewer

## Reputation Being Ruined ?
What Does Google Say About YOU ?
Remove Negative, Unwanted Postings !

### The Camelback Group
*Internet Public Relations*
**(602)535-1298**
1220 South Almar Circle    Mesa, AZ 85204
www.thecamelbackgroup.com    email: info@thecamelbackgroup.com



**Secrets of the Psalms**
Including 150 Psalms with practical Kabala, to become reconciled with an enemy, receive holy blessings, for luck, court cases, to escape danger and more. Use this book for personal help.

**Secretos de los Salmos**
Incluye 150 salmos con sabiduría de la Cabala para reconciliarse con enemigos, recibir bendiciones, buena suerte, casos de corte, escapar peligros y todo para ayuda personal.

ONLY **$10ea*** including shipping

FREE<-- book catalog with your order

We accept: Cash Money Order Personal Check USA Postal Stamps.

Aceptamos: Efectivo, Money Order, Cheque Personal o Estampillas de Correo de EU

-->GRATIS catalogo con su orden

PLEASE SPECIFY VERSION: *English
ESPECIFIQUE LA VERSIÓN: *Español

*Buy both books for $18⁰⁰* (shipping included)

JAGUAR www.MyJaguarBooks.com
6881 STANTON AVE #F BUENA PARK, CA 90621

PLN_0000761

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

had appointed former CCA employee and lobbyist Mark Brnovich as chairman of the state's Commission on Privatization and Efficiency.

CCA will open the first 500 contract beds at its prison complex in Eloy by January 2014, and the remaining 500 beds should be on line a year later. All of the beds are for medium-security prisoners.

The contract also gives CCA an option



Yes it's true, Inmate Shopper is a real 220 page publication. Not a 7 sheet rip-off. Every issue contains about 600 pen pal resources and FREE display ads for prisoners to sell their crafts, art and books they've written. (No pen pal ads - only products)

**EVERY ISSUE CONTAINS:**
Our Gigantic Exclusive Inmate Shopper Mall full of products made by prisoners.
600+ Pen Pal resources and pen pal abbreviations
400 businesses friendly to prisoners
250 non-profit org's for prisoners issues
70 contests for writers, poets & artists
66 Gift Shops
63 Catalogs to order
22 Personal Assistants
14 Typists
5 Publishing Services
15 Magazine Sellers
FREE ad space for inmate authors, crafter's, and artists. Sell your items in our Mall.
Complete directions and applications for placing your products in the mall, are in every issue.

**ORDER FROM:**
$17.99 + $7 Priority Shipping
**Inmate Book Service**
P.O. Box 142  Caratunk, ME 04925
207-672-4344   inmatebooks@yahoo.com
**Inmate Mags**
4208 University Wy, NE.  Seattle, WA 98105
877-324-7323  info@inmatemag.com

to operate another 1,000 prison beds after 2015 provided that there is an increase in the state's medium-security prison population, which – based on the ADC's classification system – can be easily manipulated by arbitrarily increasing scores on prisoners' security-risk assessments.

State Rep. Chad Campbell joined a group of Democrats, clergy members and civil rights organizations in asking Governor Brewer to rescind the state's private prison contract. Of course she declined.

"The bottom line is we need to protect safety while protecting taxpayer dollars," said Rep. Campbell, "and expansion of private prisons does neither."

The AFSC was more blunt, concluding in its February 2012 report that either "our state leaders are so ideologically wedded to the idea of privatization that they are unable or unwilling to face reality," or that "they are beholden to the for-profit prison industry and that this industry has such unmitigated power in Arizona that it has simply hijacked the democratic process."

### Conclusion

GOVERNOR BREWER AND ADC DIRECTOR Ryan's negative influence on Arizona's prison system will persist long after they depart from office unless criminal justice advocates, human rights groups and Arizona voters take action.

There have been some glimmers of hope, including an unprecedented recall campaign against former state Senator Russell Pearce, the author of SB1070, who was removed from office in November 2011. SB1070 was largely struck down by the federal courts after the U.S. Justice Department sued the state of Arizona, although the bill's "show me your papers" provision, which allows law enforcement officers to question people about their citizenship status based on reasonable suspicion, was upheld by the U.S. Supreme Court on June 25, 2012. See: *Arizona v. United States*, 132 S.Ct. 2492 (2012).

Also, in November 2012 the ADC released video of the events surrounding the 2010 suicide of Anthony Lester at ASPC-Tucson, resulting in public outrage. Prison officials had fought for two years against the release of the video, which showed multiple guards standing around for 23 minutes, doing nothing to help Lester as he bled to death. Channel 12 News KPNX had to file suit in state court to obtain the video foot-

age; the court found the ADC had wrongly refused a reporter's request for the video and ordered the ADC to pay $26,000 in attorney's fees to the news station.

After seeing the video, state Rep. Chad Campbell called for Ryan's resignation as ADC director. Predictably, that hasn't happened.

The class-action lawsuit filed by the ACLU and Prison Law Office over inadequate medical treatment in Arizona's prison system remains pending and hopefully will result in improved medical and mental health care, although the state still contracts with Corizon.

Neither Brewer nor Ryan is expected to be out of a job until at least January 2015, when Arizona's next governor is inaugurated. At least until then, the state's prison system will continue to suffer under their leadership.

More prisoners will needlessly die due to suicide, violence and medical neglect. The state's prison system will expand its use of solitary confinement. Private prison companies will continue to profit at the expense of taxpayers. And prisoners' clemency petitions will be largely ignored by the clemency board's new members appointed by Governor Brewer.

All of this should matter to Arizonans.

"This matters," according to a June 9, 2012 *Arizona Republic* editorial, "because tax dollars should buy secure prisons. It matters because inmates who survive a brutal system are unlikely to become good neighbors when they return to our communities. It matters because assuring the basic needs and safety of prisoners says a great deal more about us than it does about them."

It matters, but apparently not to most Arizona lawmakers who presumably have the power to improve the state's prison system. ◼

Sources: *Arizona Republic; "Cruel Isolation: Amnesty International's Concerns About Conditions in Arizona Maximum Security Prison," Amnesty International (April 2012); Center for Media and Democracy; www.prwatch.org; Rolling Stone; www.azfamily.com; http://tucsoncitizen.com; www.kpho.com; Phoenix New Times; Huffington Post; www.afsc.org; http://arizonaprisonwatch.blogspot.com; www.thinkprogress.org; www.pardonpower.com; www.businessinsider.com; http://azcapitoltimes.com; www.azcorrections.gov; www.kgun9.com*

PLN_0000762

# Louisiana Supreme Court Rejects Ex Post Facto Challenge in Sex Offender Supervision Case

*by Derek Gilna*

THE LOUISIANA SUPREME COURT HAS reversed the judgment of a state appellate court and reinstated the "lifelong supervision" of Rudy Trosclair, who had contested that condition on ex post facto grounds. At the time of Trosclair's conviction, La. Rev. Stat. Section 15:561.2 required any person convicted of a sex offense involving a victim under thirteen years of age to be placed on community supervision for five years following their release from custody. By the time that Trosclair was released in November 2010, the statute had been amended by 2008 La. Acts 672 to require lifelong supervision for such offenders.

Article I, Section 9 of the U.S. Constitution prohibits Congress from passing any ex post facto law, such that "the legal definition of the offense or ... the nature or amount of the punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused." *Beazell v. Ohio*, 269 U.S. 167, 169-170, 46 S.Ct. 68, 68-69 (1925).

The case turned on the issue of whether the lifelong supervision provision of the amended statute constituted "punishment." The Louisiana Supreme Court considered the seven factors set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169, 83 S. Ct. 554 (1963), including "whether [it] ... has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose."

In reviewing the facts, the Supreme Court found that the state appellate court had "placed disproportionate value under the *Mendoza-Martinez* framework on the punitive aspects of supervision, which is traditionally considered to be a lenient form of punishment, and insufficient value on the rational link between the [statute] at issue and the legislature's stated goal of protecting the public from the high risk of recidivism."

The Court concluded in its May 8, 2012 decision that "we find the provisions at issue here are predominantly nonpunitive in both intent and effect, and their retroactive application to this defendant does not violate the Ex Post Facto Clauses of either the United States or Louisiana Constitutions." Hence, Trosclair was required to be placed on lifelong community supervision. See: *State of Louisiana v. Trosclair*, 89 So.3d 340 (La. 2012). ✍

---

### Roget's Thesaurus

Can't think of the right word? Let Roget's help you! Over 11,000 words listed alphabetically. See page 61 for more information.

---



PLN_0000763

# From the Editor

### by Paul Wright

THE JUNE AND JULY ISSUES OF *PLN* ARE being mailed later than usual due to our move from Vermont to Florida; however, we expect to be back on schedule with the August issue. We apologize to our readers for any inconvenience, but this is a one-time event. We are excited about our relocation to Florida and being in an area with more organizational allies. Please note our new address and phone number; our email and website addresses remain the same. We always have opportunities for volunteers in our office in Lake Worth, so potential volunteers should contact us.

Ironically, while we are relocating to Florida, *PLN* remains subject to a statewide ban by the Florida DOC, ostensibly due to our advertising content. Our lawsuit challenging this blatant censorship is currently pending before the U.S. District Court in Tallahassee on cross-motions for summary judgment. Florida prison officials have censored *PLN* since 2009, claiming that our advertisements violate DOC policies. They had previously banned *PLN* over the same issue in 2002; after we filed suit, the Florida DOC changed its policy just before trial and told the court they would no longer censor *PLN* based on our ads. The court accordingly dismissed the case as being moot, which was affirmed by the Eleventh Circuit. [See: *PLN*, Nov. 2005, p.29].

Unsurprisingly, however, it turned out that the Florida DOC lied to the courts about its intentions and began censoring *PLN* again

due to our advertising content. We will report the outcome of our current censorship suit against Florida's prison system.

While we are on the topic of Florida, this issue of *PLN* is dedicated to William "Billy" Van Poyck. Billy, 58, was an early *PLN* subscriber, a prolific writer and an excellent jailhouse lawyer. He was convicted of killing Florida DOC guard Fred Griffis in June 1987 in West Palm Beach during a botched attempt to free prisoner James O'Brien, as O'Brien was being transported to an outside medical appointment. Griffis was shot and killed when he threw away the keys to the prison van in an effort to thwart the escape attempt. Another guard was slightly injured, and Billy and co-defendant Frank Valdes were subsequently convicted of Griffis' murder and sentenced to death. Frank was also an early subscriber to *PLN*.

Ultimately both Frank and Billy were killed by the state of Florida. Frank was beaten to death in 1999 by guards on death row at the Florida State Prison (FSP) near Starke, where he was housed in X-Wing. All of Frank's ribs were broken, his testicles were crushed and he had boot marks on his face; he had also been pepper sprayed, tear gassed and shocked with a stun shield. [See: *PLN*, Jan. 2000, p.5; Oct. 1999, p.1]. Seven guards were charged in connection with his murder but all were acquitted. [See: *PLN*, Jan. 2001, p.6; April 2000, p.8]. The state of Florida ultimately settled a civil rights lawsuit filed by Frank's family for $1.17 million. [See: *PLN*, March 2007, p.18].

Billy provided a eulogy for Frank, which we ran in the October 1999 issue of *PLN*. He wrote:

"*Far from being an 'animal,' Frank was an intelligent, thoughtful man, who never hesitated to stand up and speak his mind when he witnessed the physical abuses here. Frank's outspokenness earned him the wrath of these guards, who targeted him with contrived disciplinary reports in*

*order to keep him isolated on X-Wing. This was not the first time Frank was beaten, and his life had been threatened on more than one occasion. On July 17, 1999, Frank's refusal to be cowed and intimidated cost him his life when on that morning he once again voiced objections to the prisoners around him being beaten.*

"*Make no mistake about it, this was not an 'isolated incident.' Briefly now, the public spotlight is shining on FSP and the longstanding physical abuses going on here. But it will all be for naught unless fundamental, systemic changes are made, both in attitudes and policies. Staff at FSP, like all organizations, take their cue from the top down. For the past 18 months staff and prisoners alike have heard the message, loud and clear, that beatings are acceptable, encouraged and will not be investigated. This consistent failure to investigate complaints of beatings goes right to the DOC central office in Tallahassee. And, with prisoners' access to the courts severely restricted by state and federal legislation, combined with an increasingly hostile attitude by the judiciary towards 'prisoners' rights,' prisoners have no real recourse or remedy within the system.*"

Billy wrote several articles over the years for *PLN*, and he and I corresponded about a wide range of prisoners' rights issues. Recently, while preparing to ship my desk to Florida, I came across the last letter that Billy had sent me in April 2013. He said he thought he was going to be executed soon, and commented on the ongoing censorship of *Prison Legal News* by Florida prison officials and how much he missed reading *PLN*.

I never met Billy or talked to him on the phone. Instead, we exchanged numerous letters over two decades. As I sit writing this on Father's Day, I realize how little we discussed his death sentence or criminal appeals, other than in passing, as there were always more interesting and important things to discuss than the state of Florida's

## *We've moved!*

Prison Legal News and the Human Rights Defense Center have a new mailing address:

**P.O. Box 1151**
**Lake Worth, FL 33460**

Our new phone number is
**(561) 360-2523.**

---

### CORRECTION

In *PLN*'s August 2012 cover story, "Federal Sex Offender Civil Commitment Process Under Fire," we incorrectly identified the defendant in *United States v. Abregana*, 574 F.Supp.2d 1145 (D.Hawaii 2008) as Jed Abregana. The correct defendant was his brother, Jay Abregana. *PLN* regrets the error.

PLN_0000764

efforts to kill him, judicially or otherwise. Every time I received one of his letters I was always struck by, and envious of, his beautifully neat handwriting. His writing was always incisive and well-reasoned. Billy authored three books while on death row and his online blog, www.deathrowdiary.blogspot.com, is worth reading for those who have Internet access.

Billy was one of *PLN*'s early subscribers in the 1990s when we had fewer than 300 readers, virtually none outside Washington State at the time. Even though he was on death row, Billy paid for his subscription to *PLN* and donated books of stamps to assist in publishing the magazine. This was critical in our early years when postage was our largest expense after printing. I always thought it was emblematic of Billy's commitment to prisoners' rights that while on death row he would use his meager funds to support *PLN* when others who had far more gave, in proportion to their means, far less.

On June 12, 2013, Billy was taken to the execution chamber at the Florida State Prison and duly murdered by lethal injection. Per policy, no members of his family were allowed to witness his death. He refused a last meal and his final words were "Set me free." We never discussed religion, so I don't know if Billy believed in an afterlife or not, but he is now out of prison. He had spent almost 25 years on death row.

Paradoxically, as the American public increasingly shuns the death penalty, rejecting it as the racist, classist, error-prone barbarism that it is, politicians have become even more enamored of the machinery of death and, as juries impose fewer and fewer death sentences, lawmakers are increasingly eager to kill the thousands of condemned prisoners who populate our nation's death rows.

Sadly, like most stories concerning the U.S. criminal justice system, this one does not have a happy ending. We dedicate this issue of *Prison Legal News* to the memory of William Van Poyck. ◾

## Italian Prison Program Trains Female Prisoners in Fashion Industry

### by Derek Gilna

LEAVE IT TO THE ITALIANS to extend their love of fashion to a women's prison. At the Rebibbia facility in Rome, the well-known fashion house of Fendi is supporting a voluntary training program where women prisoners manufacture handbags.

Soon to be marketed under the Sigillo (Seal) brand, the handbags, which sell for up to 40 Euros each (around $53), provide valuable work experience that participants hope will land them jobs once they're released. Prisoners currently earn about 150 Euros per month for working three afternoons a week. As the program continues to grow, it is anticipated that participants will earn close to 600 Euros per month, comparable to wages in the private garment industry.

Italian Justice Minister Anna Maria Cancellieri has called her nation's prison system "not worthy of a civilized country," and observed that prisons are overcrowded and underfunded. Nanda Roscioli, a former justice ministry employee and current consultant for the Sigillo program, said the Italian prison system is geared more to the needs of male prisoners, leaving women to suffer conditions that are "harsher [and] more barbaric."

Roscioli sees hope in the new training program, though, noting that "the aim of the project is to give female detainees the tools to be in the marketplace once they are released.... As far as I know this program is unique." The project has 800,000 Euros in funding, half from the justice ministry and half from charitable groups.

Current participants, such as prisoner Kalu Uwaezuoke Chinedum Ike, indicated they enjoy the training program. "When I get out I want to have a more normal, a calmer life," she said. "With this job I'm sure everything will be okay with me. I've learned a lot here."

Another prisoner, identified only as Natalya, echoed that sentiment, stating, "For a time, we feel psychologically that we are not inside these walls.... Sigillo is also about personal satisfaction. When we create things, and they are sold, are appreciated, then we enjoy our work. When I get out of here, I would like to open a shop." ◾

Source: *http://english.ahram.org.eg*



**Thy Quest for Out-of-Print Games Endeth Here.**

NOBLE KNIGHT GAMES

Find those rare games and also save up to 50% on retail products! We buy, sell and trade for new and out-of-print RPGs, Miniatures and Wargames.

View our online inventory of over 75,000 products or write for a free catalog to
2242 Kennedy Rd. Janesville, WI 53545

Thousands of gamers can't be wrong! Satisfaction is guaranteed!

WWW.NOBLEKNIGHT.COM

### Do you have diabetes?
#### Is your diabetes under control?

Living with diabetes in prison is very difficult. Order your FREE copy of *Prisoner Diabetes Handbook: A Guide to Managing Diabetes — for Prisoners, by Prisoners.*

Order your FREE copy and start managing your diabetes and your health.

**ORDER FORM**
Fill out the information below, and send this order form to:
Prison Legal News
PO Box 1151
Lake Worth, FL 33460

Name

ID number

Facility

Address

City          State          Zip

SPLC ▲ Southern Poverty Law Center
*Handbook made possible by the Southern Poverty Law Center*

PLN_0000765

# Pennsylvania DOC's Hepatitis C Protocol Challenged in Class-action Lawsuit

*by Gregory Dober*

THERE IS AN OLD GAME KNOWN AS Thimblerig. Most people know it as the shell game. It's when a con man places a small round ball, about the size of a pea, under three shells and quickly shuffles them around. He then asks if anyone wants to place a wager and guess which shell contains the ball. In most cases the con man wins because the game is rigged.

Thimblerig describes the game that the Pennsylvania Department of Corrections (PDOC) is playing with state prisoners relative to hepatitis C (HCV) treatment – but unfortunately this game may cost some prisoners their lives.

On January 28, 2013, Jason E. Runkle, incarcerated at SCI Mercer, brought a class-action suit against the Commonwealth of Pennsylvania, the PDOC and various prison administrators and medical staff. Attorney John F. Mizner filed the case in the U.S. District Court for the Western District of Pennsylvania on behalf of Runkle and a class of similarly-situated state prisoners.

The complaint alleges violations of prisoners' constitutional rights by the PDOC and requests injunctive relief consisting of testing and treatment for HCV without regard to the length of a prisoner's sentence.

In July 2010, Runkle was sentenced to a minimum of eighteen months and a maximum of five years for various drug-related offenses. He received credit for six months at the York County Prison while awaiting sentencing. In September 2010, Runkle

**SMITH'S GUIDE to**
**HABEAS CORPUS RELIEF**
**for State Prisoners under 28 U.S.C. §2254**
Example pleadings from the initial
habeas corpus petition to the final
petition for a writ of certiorari.
Let Smith guide you step-by-step
through the federal courts with
confidence.         380 pages.

$24.95 + $6.95 shipping & handling. In CA
add $2.18 sales tax. Sent via USPS media mail
Money orders, personal or institutional checks
ONLY. Send $31.90 (In CA, $34.08) payable to
Roberts Company.
Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101
Huntington Beach, CA 92649**
*Also available on Amazon.com*

was sent to SCI Camp Hill for processing and intake into the state's prison system. A blood screen indicated he had elevated levels of AST, ALT and bilirubin, and a decrease in blood platelets. These results were consistent with a diagnosis of liver disease as well as HCV. One month later Runkle was transferred to SCI Mercer to serve out the remainder of his sentence.

Upon arriving at SCI Mercer he received another blood test and screening for HCV. The results were once again abnormal and consistent with liver disease and HCV. Runkle requested to see a physician to review the test results and discuss treatment options.

Depending on the particular genotype of the virus, HCV treatment can range from 24 to 48 weeks of powerful antiviral medications. A genotype is the genetic makeup of a cell or organism; a virus can have varying genotypes. The genotype of hepatitis C does not change over time and needs to be tested only once.

HCV genotype II or III requires a 24-week regimen of antiviral medications. For genotype I or IV, 48 weeks of antiviral treatment is prescribed. The PDOC's HCV protocol indicates that if a prisoner has a sentence greater then twelve months, he or she should at least be tested to determine the particular virus genotype. If the prisoner is found to have genotype I or IV, the 48-week treatment variety, and has a sentence of eighteen months or less, they will be excluded from HCV treatment.

Attorney Mizner stated in the lawsuit that "The hepatitis C protocol denies to those prisoners with sentences shorter than 12 months and those prisoners with genotype I or IV and sentences shorter than 18 months, the type of individualized treatment normally associated with the provision of adequate medical care."

On November 8, 2010, the staff physician at SCI Mercer indicated to Runkle that he had tested positive for HCV; the doctor also confirmed that Runkle's minimum sentence extended through June 2011. This was still approximately 33 weeks away, and would have allowed enough time for at least the 24-week treatment protocol if his HCV

were genotype II or III. However, the doctor did no genotype testing to determine if Runkle was an appropriate candidate for the 24-week treatment regimen.

In lieu of HCV treatment, Runkle was assigned to the Chronic Care Clinic. The Chronic Care Clinic relies on palliative rather than curative care; that is, it is intended to provide comfort, management and monitoring of a medical condition without treatment to cure the condition.

During late 2010 and early 2011, Runkle requested and was denied HCV treatment on several more occasions. Despite filing formal appeals requesting to be genotype screened and treated, the responses always stated that his minimum sentence remaining was less than a year, which made him ineligible for treatment and genotype testing.

During the spring of 2011, Runkle regularly visited the physician and each subsequent blood test indicated abnormal results related to his liver enzymes and blood platelets. Additionally, Runkle started to complain of many of the common physical symptoms of HCV such as right quadrant pain and fatigue. Despite these symptoms he was still refused treatment. Runkle repeatedly appealed the denial of treatment and each time was told that his remaining sentence did not fit the HCV protocol criteria.

As time passed, Runkle was still having complications from HCV but at least could look forward to his release in June 2011. His minimum sentence release date was the result of a decision made at his July 2010 sentencing hearing; the same minimum sentence release date had been used to deny him HCV treatment and genotype screening. The PDOC apparently had no qualms about releasing Runkle while he was still infected with HCV after refusing to treat him.

In July 2011, several days after his minimum sentence release date had passed, Runkle saw the doctor and again complained of right upper quadrant pain. Again, the physician did not order treatment or genotype screening for Runkle's condition. Instead, he was returned to the

PLN_0000766

Chronic Care Clinic.

Runkle received more bad news in October 2011 when the Board of Probation and Parole denied him parole and ordered him to serve out his maximum sentence. His new release date was now December 28, 2014 – approximately 164 weeks away. While the parole news was bad, it seemed that the math was now in Runkle's favor to receive HCV treatment and genotype screening.

However, like the old game of Thimblerig, the PDOC's HCV protocol is difficult to win because it's rigged. During the spring of 2012, Runkle was again denied HCV treatment and genotyping despite having to serve an additional three years in prison. On June 4, 2012, he received a response to one of his grievances from a Registered Nurse Supervisor.

The response stated, "I have reviewed your record and discussed your case with the infection control nurse in reference to DOC policy for the Hepatitis C treatment protocol. Given that you are past your minimum [sentence] and eligible for Parole, you do not have the required 12-18 months of time on your sentence for treatment completion. You are followed annually, per policy, for your Hepatitis C evaluation and your next evaluation in August, 2012."

Because Runkle was past his minimum sentence and was parole *eligible*, the PDOC continued to deny him treatment and genotype testing though he had more than 2½ years left to serve. Considering that the parole board had rejected his parole in October 2011 and recommended that he serve his maximum sentence, it appeared highly unlikely that Runkle would be paroled before his sentence expiration date in December 2014. Regardless, he was still considered ineligible for HCV treatment per PDOC policy.

Hypothetically, state prison officials can deny HCV treatment indefinitely once a prisoner passes his or her minimum sentence and is eligible for parole. Unfortunately, being eligible for a parole hearing doesn't necessary mean that parole will be granted; however, for the purposes of the PDOC's HCV protocol, it still equates to a denial of HCV treatment and genotyping.

Through the rest of 2012, Runkle continued to request treatment and was denied. Each response he received was the same: "You are past your minimum time and eligible for parole and do not have the required 12-18 months of time on your sentence for treatment completion." In an August 2012 response, the Chief Grievance Officer offered Runkle a deal if he deferred his parole until treatment was completed. The response indicated that if he didn't take the deal, then HCV treatment would be denied.

Thus, the "solution" that the PDOC offered was for Runkle to give up the possibility of parole, and thus his freedom, in exchange for the privilege of receiving adequate medical care.

The hypocrisy of the PDOC's HCV treatment policy is reflected in statements made by prison officials when the HCV treatment program was first initiated in 2000. *Correctional Newsfront*, a newsletter for the Pennsylvania Department of Corrections, proudly quoted a speech that former Corrections Secretary Jeffrey A. Beard gave at the American Correctional Association's conference held in Anaheim, California in 2002. In an excerpt from the speech, Beard proudly proclaimed:

"Some may wonder why we have taken such an aggressive approach [to HCV treatment]. There are a number of reasons. First, we must remember that 90% of our prisoners will return home someday; 600,000 nationwide, 11,000 in Pennsylvania each year. They return to our communities, our neighborhoods. Hepatitis represents a real public health threat especially since we know that about 23% of our prison population has hepatitis C alone.... Prevention, education and treatment can all reduce the potential impact on the community. Second, we have an obligation to our staff to do what we can to protect them from this disease.... Third, if we deal aggressively today with the problem, we will see less complications, less deaths, and have less costs in the future.... We need to also remember that while they are incarcerated, we have a captive audience. There is no other one place with such a concentration of hepatitis cases. So it is really important that we use this opportunity to educate and prevent the further spread of this disease."

He further noted that "Today we can treat prisoners for a cost of about $6,000 to $12,000 each. If we don't treat them today, most will end up having complications. The medical treatment of those complica-



FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!

Quarterly drawing WINS $100! (Void in New York) (Last Quarter's winner from **Houtzdale, PA.**)

TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

Inmate Magazine Service Inc.

PLN_0000767

tions can cost anywhere from $50,000 to $250,000 per person or more.... Last year [2001] seventeen percent of our prisoner deaths were a direct result of hepatitis C complications.... And in addition to preventing deaths from this disease, we also can work to help prevent the spread of the disease."

Thus, Beard acknowledged the public health danger that unsurprisingly results when prisoners with HCV are released without treatment. He recognized that prisoners are a captive population, that substantial numbers are infected with HCV and that deaths resulting from untreated HCV is a stark reality.

However, by 2013 those acknowledgments had lost meaning for the hundreds of prisoners afflicted with HCV and the thousands of Pennsylvania citizens at risk when untreated HCV-infected prisoners are released from the state's prison system.

While the PDOC is reducing in-prison healthcare costs by denying treatment to prisoners with HCV based on the department's current treatment protocol, a ten-fold increase in medical expenses for untreated prisoners who are released will be passed along to other government agencies and ultimately the taxpaying public.

Ironically, the Commonwealth of Pennsylvania swiftly entered into the Tobacco Master Settlement Agreement in the late 1990s, demanding that tobacco companies be held responsible for health-related problems related to tobacco use and held liable when the costs for those problems were shouldered by the general public.

Yet the PDOC is similarly endangering public health by arbitrarily refusing to treat prisoners with hepatitis C, with the costs of untreated HCV being shifted to the public. Allowing the PDOC to continue enforcing its HCV protocol will result in a shell game that has no winners.

As of June 2013, the Commonwealth and other defendants had filed motions to dismiss Runkle's lawsuit challenging the PDOC's HCV treatment protocol. The motions to dismiss remain pending, and the district court has not yet granted class-action status in the case. See: *Runkle v. Commonwealth of Pennsylvania*, U.S.D.C. (W.D. Penn.), Case No. 2:13-cv-00137-MPK. ◼

Greg Dober is a freelance writer in health-care ethics. He obtained his Master of Arts in Bioethics and Health Policy from Loyola University of Chicago in Illinois, is a member of the American Society of Bioethics and Humanity (ASBH), and has been a contributing writer for PLN since 2007.

# Sixth Circuit Reverses Dismissal of Suit Due to Non-Exhaustion and Statute of Limitations

THE SIXTH CIRCUIT COURT OF Appeals reversed a lower court's summary judgment order that erroneously dismissed a Michigan prisoner's lawsuit for non-exhaustion and because it was time-barred.

On November 30, 2005, Michigan state prisoner Samuel Surles filed suit in federal court, alleging that prison officials at the Gus Harrison Correctional Facility had confiscated his legal papers and computer disks on several occasions between April 4, 2004 and July 29, 2005.

The district court ordered Surles to show cause why his suit should not be dismissed for failure to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA). He submitted documents showing that he had exhausted his remedies but the court dismissed the case anyway, without prejudice.

Surles filed a second complaint on August 23, 2007, alleging that between January 16, 2004 and October 21, 2005, prison officials "confiscated his legal documents, damaged or destroyed legal and religious papers and property, deprived him of court access, violated his First Amendment rights, retaliated against him and conspired to violate his rights." He attached copies of eight grievances to his complaint; each had been denied as untimely.

The district court ignored Surles's claim "that his attempts to exhaust his administrative remedies were thwarted" by a prison official "who refused to process his grievances, placed him on modified access for three months, and interfered with his grievances."

Concluding that Surles's claims arising from events that occurred before August 23, 2004 were outside the applicable three-year statute of limitations, and that he had failed to exhaust his administrative remedies, the district court granted the defendants' motion for summary judgment. Surles appealed.

The Sixth Circuit reversed on May 8, 2012, noting that the "defendants bore the burden of proof on exhaustion" and "erroneously insist[ed] that they did not have to demonstrate exhaustion." See: *Jones v. Bock*, 549 U.S. 199 (2007) [*PLN*, May 2007, p.36] and *Napier v. Laurel County, Ky.*, 636 F.3d 218 (6th Cir. 2011). In short, "A PLRA defendant bears the burden of proving that a PLRA plaintiff has not exhausted his administrative remedies."

The Court of Appeals held that "the district court did not properly apply the *Bock* standard" in this case, because "an examination of the evidence presented on summary judgment confirms that Defendants did not show the absence of a genuine dispute of material fact as to Surles's exhaustion of administrative remedies. Therefore, the district court erred in granting summary judgment in favor of Defendants."

The appellate court explained that only when a "plaintiff contends that he was prevented from exhausting his remedies must the defendant present evidence showing that the plaintiff's ability to exhaust was not hindered." However, the "[d]efendants presented no proof that they did not interfere with Surles's ability to exhaust his administrative remedies."

Additionally, noting that *Brown v. Morgan*, 209 F.3d 595 (6th Cir. 2000) held that PLRA exhaustion tolls the statute of limitations, the Sixth Circuit found the district court had erred in granting summary judgment to the defendants on statute of limitations grounds. "A genuine dispute of fact exists as to how much time should be tolled while Surles was exhausting, or attempting to exhaust, his administrative remedies," the Court of Appeals wrote, as the defendants "were required to show that Surles's claims were untimely even after tolling for the period during which Surles was exhausting his administrative remedies." See: *Surles v. Andison*, 678 F.3d 452 (6th Cir. 2012).

The district court's grant of summary judgment to the defendants was therefore reversed, and the case remanded for further proceedings. Following remand, the court appointed counsel for Surles on October 31, 2012. The case remains pending. ◼

PLN_0000768

# Sixth Circuit: Failed Cancer Diagnosis Not Deliberately Indifferent

THE SIXTH CIRCUIT COURT OF APPEALS has reversed a lower court's denial of qualified immunity to a Michigan prison doctor and nurse accused of failing to diagnose a prisoner's bone cancer.

On February 13, 2007, Mound Correctional Facility prisoner Joshua Reilly complained of a headache and swelling above his left eye. Dr. Seetha Vadlamudi recommended applying a warm compress to the eye; three days later, Reilly was told to take Tylenol and drink coffee for his headache.

Reilly again complained of a bump over his left eye in June 2007. Nurse Phillip Payne "concluded the bump was an innocuous calcium nodule, and recommended no treatment." Payne referred Reilly to an optometrist on October 7, 2007.

Over two months later, Nurse Terry Smith saw Reilly for "an eleven-month history of left eye problems." She reported "a small nodule" under Reilly's left eyebrow, "recommended he take Tylenol, and told him to report back if he experienced continued vomiting" due to his severe headaches. Soon after this examination, Reilly was released from prison.

An April 2008 CT scan "revealed the nodule was cancerous, and doctors ultimately diagnosed [Reilly] with Ewing's Sarcoma, a rare form of cancer that develops in bone or soft tissue."

Reilly filed a federal lawsuit against Dr. Vadlamudi and nurses Payne and Smith, alleging that "surgery would have been sufficient to treat the disease had prison medical staff detected it earlier." However, due to the late diagnosis, Reilly had to undergo chemotherapy and radiation.

The defendants moved for judgment on the pleadings, raising the defense of qualified immunity. After the district court denied their motion, Vadlamudi and Payne filed an interlocutory appeal in which they argued that their involvement in Reilly's care was minimal and, therefore, did not support findings of deliberate indifference or gross negligence.

The Sixth Circuit agreed, noting that Dr. Vadlamudi had only a single contact with Reilly, who had no history of any symptoms suggesting cancer. The appellate court found that Reilly's complaint did not allege sufficient facts from which deliberate indifference could be inferred because "when Dr. Vadlamudi treated Plaintiff, there was no indication he was suffering from a rare form of bone cancer – only minor symptoms."

Likewise, Nurse Payne had had only two contacts with Reilly and ultimately referred him to an optometrist. The Court of Appeals found that "none of the allegations against Payne demonstrate an act or omission 'sufficiently harmful to evidence deliberate indifference to serious medical needs.'" In fact, Reilly's "most severe symptoms occurred after his contacts" with Payne and Vadlamudi.

Accordingly, the Sixth Circuit reversed the district court and ordered "the entry of judgment in favor of Dr. Vadlamudi and Payne." Nurse Smith did not join in the appeal. See: *Reilly v. Vadlamudi*, 680 F.3d 617 (6th Cir. 2012).



**William L Schmidt**
ATTORNEY at LAW, P.C.

911CIVILRIGHTS@GMAIL.COM

**559.261.2222**

**APRIL 2013
FRESNO, CALIFORNIA**
-CONFIDENTIAL SETTLEMENT
WITH CDCR
-$540,000 SETTLEMENT FOR A -
CALIFORNIA CLIENT
-2 PROP 36 CLIENTS RELEASED
-2 LIFERS RELEASED THROUGH
BPH HEARINGS

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------OUR CLIENTS GO HOME, HOW ABOUT YOU? ----------------
*Please submit a single page summary of your case. Due to the volume, we
cannot return documents or respond to all inquires. We are not a low cost or
pro bono law firm, but if you want results, contact us.*

P.O. BOX
25001
FRESNO, CA
93729

PLN_0000769

# Sixth Circuit Orders Judgment Against Three Defendants in Prisoner's Retaliation Case

THE SIXTH CIRCUIT COURT OF AP-peals vacated judgments in favor of three prison officials in a prisoner's lawsuit alleging a retaliatory transfer, and ordered that judgment be entered against them. The district court then awarded damages on remand.

Michigan Department of Corrections (MDOC) prisoner Kevin King actively participated in a 1988 state court class-action suit regarding prisoner property issues, *Cain v. MDOC*, Michigan Court of Claims Nos. 88-61119-AZ, 93-14975-CM and 96-16341-CM.

On September 17, 1999, King was transferred to the Earnest C. Brooks Correctional Facility from the Saginaw Correctional Facility, allegedly because he had attempted "to incite a demonstration amongst the prisoners." Seven days later, prison employee Sandra Naves issued a notice of intent to place King in segregation upon the order of Unit Manager Sharon Wells, who told Naves what to put in the notice even though Naves had no personal knowledge that King had been involved in inciting a demonstration or any other misconduct.

On March 31, 2000, guard Bonnie Lewis issued King a major misconduct ticket for "creating a disturbance." She later retracted her statement, and admitted in de-position testimony that Wells had asked her to write the ticket, which was dismissed.

On April 20, 2000, Wells submitted a memo requesting that King be transferred. Transfer Coordinator Curtis Chaffee sent an email to MDOC Classification Spe-cialist Chuck Zamiara, requesting King's transfer to another prison because he was creating "problems" by filing grievances and raising complaints with the Warden's Forum.

Zamiara responded by suggesting that King be sent to a higher-security level facility as a "disruptive prisoner who is ma-nipulating others to create unrest." Chaffee signed the transfer order on May 12, 2000, changing the order by hand to score King as Level III security, as "approved by Wells." King was transferred on May 17, 2000 to the Chippewa Correctional Facility, a Level III prison.

On June 14, 2000, Zamiara emailed the warden at Brooks about concerns raised by defense counsel in the *Cain* case, who warned "that 'the issue of retaliation' may be raised over the fact that King's transfer documents were edited by hand."

The following month, King filed suit in federal court against Wells, Chaffee, Zamiara and five other MDOC officials, alleging that they retaliated against him for participating in the *Cain* litigation and for helping other prisoners file grievances.

The district court granted summary judgment to the defendants, which was reversed by the Sixth Circuit. See: *King v. Zamiara*, 150 Fed.Appx 485 (6th Cir. 2005). The district court then granted the defendants' motion to dismiss based on qualified immunity, which also was reversed on appeal.

Following remand, the district court granted summary judgment to three of the defendants before finally appointing counsel for King. The case proceeded to trial and King called twelve witnesses, including himself and all five remaining defendants. Other than offering deposition testimony, the defendants called no witnesses. Follow-ing a two-day trial in June 2009, the district court ruled in favor of the defendants.

King appealed, representing himself pro se, and the Sixth Circuit reversed as to defendants Wells, Chaffee and Zamiara on May 22, 2012.

Finding that the lower court had applied the wrong legal standard, the Court of Appeals concluded "that the adverse action taken against King was proximately caused by the Wells memo." The appellate court found both legal and factual errors in the district court's conclusions. "Although the record is silent as to disruptive behavior by King, the record speaks volumes as to repeated attempts by Wells to punish King following his arrival at Brooks as a known participant in the *Cain* litigation."

Even affording "the district court's findings substantial deference," the Sixth Circuit held that "... the district court's find-ing regarding Wells's motivation was wholly unsupported by the record evidence; more problematically, this finding was specifically contradicted by uncontested documents and testimony from neutral parties establishing Wells's retaliatory motive. We are left with

the firm impression that on this evidence the district court committed clear error in finding that Wells's actions were not mo-tivated 'at least in part' by King's protected conduct."

The appellate court noted that "a person who sets in motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions."

Additionally, the district court's judg-ment in favor of Chaffee and Zamiara had "applied the wrong legal standard and made a key finding of fact unsupported by the record evidence and explicitly contradicted by other undisputed evidence."

As such, the Sixth Circuit vacated the district court's judgment in favor of Wells, Chaffee and Zamiara, and instructed the lower court to enter judgment against those defendants. The judgment in favor of the other two defendants was upheld. Judge Sandra Beckwith concurred in part and dissented in part, and would have found no retaliation claim based on an increase in King's security level. See: *King v. Zamiara*, 680 F.3d 686 (6th Cir. 2012), *cert. denied*.

Following remand, the district court entered judgment against defendants Wells, Chaffee and Zamiara on May 14, 2013, and proceeded to determine "what remedy is appropriate to provide relief for these Defendants' violation of Plaintiff's First Amendment rights when they transferred him from a Level II security facility to a Level III facility in retaliation for Plaintiff's participation" in *Cain v. MDOC.*

The district court provided a lengthy discussion of what damages were avail-able given the PLRA's limitation, under § 1997e(e), on compensatory damages for mental or emotional injuries in the absence of physical injury. The court awarded King $1,475 in compensatory damages, based on $5.00 per day for the time he was housed at the Level III prison. The district court declined to award punitive damages and found no basis to enter injunctive relief. The court also awarded King $2,212.50 in attorney fees, reflecting the fee cap of 150% of the damages award pursuant to 42 U.S.C. § 1997e(d). See: *King v. Zamiara*, U.S.D.C. (W.D. Mich.), Case No. 4:02-cv-00141; 2013 WL 2102655. ◪

PLN_0000770



*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - **ONLY $20!**
+ $3.99 p&h

*"BEST DEAL ON THE POUND!"*

## Check your **5** magazines
and underline three backup choices (in case of unavailability)

- ☐ 4 WHEEL DRIVE & SPORT UTILITY (12)
- ☐ ALLURE (12)
- ☐ AMERICAN PHOTO (6)
- ☐ ARTHRITIS TODAY (6)
- ☐ AUTOMOBILE (12)
- ☐ BACKPACKER (9)
- ☐ BETTER HOMES & GARDENS (12)
- ☐ BICYCLING (11)
- ☐ BLACK ENTERPRISE (12)
- ☐ BLACKBOOK (6)
- ☐ BOATING (10)
- ☐ BON APPETIT (12)
- ☐ BOWHUNT AMERICA (9)
- ☐ BOWHUNTING WORLD (9)
- ☐ BRIDAL GUIDE (6)
- ☐ CABELA'S OUTFITTER JOURNAL (6)
- ☐ CAR & DRIVER (12)
- ☐ CAR CRAFT (12)
- ☐ CHARISMA (12)
- ☐ CHEVY HIGH PERFORMANCE (12)
- ☐ CIRCLE TRACK (12)
- ☐ COMPLEX MAGAZINE (12)
- ☐ CONDE NAST TRAVELER (12)
- ☐ CRUISING WORLD (12)
- ☐ CYCLE WORLD (12)
- ☐ DETAILS - FASHION (10)
- ☐ DETROIT HOME (6)
- ☐ DIGITAL PHOTO (7)
- ☐ DIRT RIDER (12)
- ☐ EBONY (22)
- ☐ ELLE DECOR (10)
- ☐ ENTREPRENEUR (12)
- ☐ ESPN MAGAZINE (26)
- ☐ ESQUIRE (11)
- ☐ EVERY DAY WITH RACHAEL RAY (14)
- ☐ FAMILY CIRCLE (12)
- ☐ FAMILY FUN (10)
- ☐ FAST COMPANY (10)
- ☐ FIELD & STREAM (12)
- ☐ FITNESS (10)
- ☐ FLEX (24)

- ☐ FLORIDA SPORT FISHING (6)
- ☐ FLYING (12)
- ☐ FOUR WHEEL & OFF ROAD (12)
- ☐ FOUR WHEELER (12)
- ☐ FREESKIER (6)
- ☐ GARDEN & GUN (6) No Renewal
- ☐ GLAMOUR (12)
- ☐ GOLF DIGEST (24)
- ☐ GOLF TIPS (7)
- ☐ GOLFWEEK (40)
- ☐ HARPERS BAZAAR (10)
- ☐ HOT BIKE (12)
- ☐ HOT ROD (12)
- ☐ HOUR DETROIT (12)
- ☐ HOUSE BEAUTIFUL (10)
- ☐ INC (12)
- ☐ INSTRUCTOR K - 8 (6)
- ☐ ISLANDS MAGAZINE (8)
- ☐ JET (20)
- ☐ LADIES HOME JOURNAL (11)
- ☐ LATINA (10)
- ☐ LOG HOME LIVING (9)
- ☐ LUCKY (10)
- ☐ MARIE CLAIRE (12)
- ☐ MEN'S FITNESS (10)
- ☐ MEN'S JOURNAL (24)
- ☐ MIDWEST LIVING (6)
- ☐ MINISTRY TODAY (6)
- ☐ MORE (10)
- ☐ MOTOR TREND (12)
- ☐ MOTORCYCLIST (12)
- ☐ MUSCLE & FITNESS (12)
- ☐ MUSCLE MUSTANGS & FAST FORDS (12)
- ☐ NYLON GUYS (6)
- ☐ NYLON MAGAZINE (10)
- ☐ OLD HOUSE JOURNAL (6)
- ☐ OUTDOOR LIFE (12)
- ☐ OUTDOOR PHOTOGRAPHER (11) No Renewal
- ☐ OUTSIDE (12)
- ☐ PARENT & CHILD (8)
- ☐ PARENTS (12)

- ☐ PLANE & PILOT (12) No Renewal
- ☐ POPULAR PHOTOGRAPHY (12)
- ☐ POPULAR SCIENCE (12)
- ☐ PREDATOR EXTREME (6)
- ☐ PREVENTION (12)
- ☐ READER'S DIGEST (24)
- ☐ RED BULLETIN MAGAZINE (12)
- ☐ REDBOOK (12)
- ☐ ROAD & TRACK (10)
- ☐ SAVEUR (9)
- ☐ SELF (12)
- ☐ SEVENTEEN (10)
- ☐ SHAPE (12)
- ☐ SIEMPRE MUJER (6)
- ☐ SKI MAGAZINE (6)
- ☐ SLAM (30)
- ☐ SNOWBOARD (4)
- ☐ SNOWBOARDER (7)
- ☐ SOUND & VISION (8)
- ☐ SPORT RIDER (10)
- ☐ SUPER CHEVY (12)
- ☐ SURFER (12)
- ☐ SURFING (12)
- ☐ TEEN VOGUE (10)
- ☐ TENNIS (6)
- ☐ THE ATLANTIC MONTHLY (10)
- ☐ TIMBER HOME LIVING (6)
- ☐ TRANSWORLD MOTOCROSS (12)
- ☐ TRANSWORLD SKATEBOARDING (12)
- ☐ TRANSWORLD SNOWBOARDING (8)
- ☐ TRANSWORLD SURF (12)
- ☐ TRUCKIN (13)
- ☐ UPTOWN (6)
- ☐ W MAGAZINE (10)
- ☐ WATERFOWL & RETRIEVER (2)
- ☐ WEIGHT WATCHERS (6)
- ☐ WHITETAIL JOURNAL (4)
- ☐ WIRED (12)
- ☐ WORKING MOTHER (6)
- ☐ YOGA JOURNAL (9)

*"Tell your Friends and Families!"*

## Send as many "5 for $20" orders as you like!

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or *order online* and use credit card or PayPal.

| Name and Inmate # (please print, maximum 24 characters): | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Address: | | | | | | | | | | | | | | | | | | | | | | | | |
| City: | | State: | | | Zip: | | | | | | | | | | | | | | | | | | | |



# Inmate Magazine Service INC.

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

*OK to Copy!*

PLN_0000771

# A Prolonged Stay: The Reasons Behind the Slow Pace of Executions

*by Raymond Bonner, ProPublica*

STATES THAT IMPOSE THE DEATH PEN-alty have been facing a crisis in recent years: They are short on the drugs used in executions.

In California, which has the country's largest death row population, the chief justice of the state supreme court has said there are unlikely to be any executions for three years, in part due to the shortage of appropriate lethal drugs. As a result, state prosecutors are calling for a return of the gas chamber.

Ohio, which is second only to Texas in the number of executions carried out since 2010, said it will run out of the drug it uses in executions, pentobarbital, on September 30. The state has two men scheduled for execution in November, and eight more set to be killed after that. Every state's supply of pentobarbital, which has been the principal execution drug, expires at the end of November 2013.

The shortage has forced death penalty states to scramble on two fronts: They are hunting for new suppliers or different drugs to use, and enacting changes to public records laws to keep the names of suppliers and manufacturers of those alternative drugs secret.

The lack of lethal drugs, and the fight over keeping new ones secret, are partly the result of a remarkably effective campaign by opponents of the death penalty, who have, in effect, taken their efforts from the court room to the boardroom.

Each time a state has found a new source for a drug to use in executions, Reprieve, an anti-death penalty organization based in London, in collaboration with death penalty lawyers in the United States, has used freedom of information laws, the local news media and the powers of persuasion to compel the drug's manufacturer to cut off the supply.

"Who's easier to persuade? The Supreme Court or a corporation that has financial interests?" said Clive Stafford Smith, a British-American, who was a death penalty lawyer in the South for many years before founding Reprieve. "You can make it not worth their while to allow their drugs in executions."

The effectiveness of Reprieve's campaign might well be behind the action taken last year by the state of Texas, which leads the nation in executions.

When a reporter for the *Austin American-Statesman*, Mike Ward, using the state's Public Information Act, sought information about the drugs used in executions, the Texas Department of Criminal Justice fiercely resisted.

In one legal filing, Patricia Fleming, the agency's assistant general counsel, said revealing the information about the drugs and who made them would invite "financial intimidation and negative publicity," as well as "intensive lobbying" and "unrestrained harassment." Referring to death penalty opponents, Fleming asserted that "essential to their strategy is knowledge of the private companies" that supply the drugs used in lethal injections.

The state attorney general ruled against her, and the department disclosed that it had enough pentobarbital at the time for 23 executions, Ward reported.

Death penalty states are now taking measures to keep anti-death penalty activists, and journalists, from learning the identity of suppliers. A Georgia law enacted in March provides that any information about a "person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies or medical equipment" used in an execution shall be considered a "confidential state secret." Already this year, at least three other states – Arkansas, South Dakota and Tennessee – have amended their public records laws to exempt the names of suppliers from disclosure.

Lethal injection was first proposed as a method of execution in the 19th century by a New York doctor who argued it would be cheaper than hanging. It took 100 years or so for it to be used, but every state that set out to execute people eventually adopted it as the chosen method.

Generally, states have used a three-drug protocol. The first was an anesthetic, sodium thiopental, intended to render the prisoner unconscious so that he or she does not experience the pain and suffering from the drugs to come. The second drug, pancuronium bromide, paralyzes the diaphragm and lungs, making it impossible for the condemned to breathe. Finally, po-tassium chloride is injected, causing death by cardiac arrest.

In 2008, the Supreme Court, in *Baze v. Rees*, held that lethal injection did not run afoul of the Eighth Amendment's proscription on "cruel and unusual punishment."

But the Court recognized care had to be taken in the killing, so that it wasn't unconstitutionally "cruel." The most critical drug, it emphasized, is the anesthetic.

"It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is substantial, unconstitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride," Chief Justice John Roberts wrote.

The problems for death penalty states, and the opening for opponents of the death penalty, arose when the only company that had governmental approval to make the anesthetic, Hospira, announced in 2011 that it was suspending production because of manufacturing problems at its plant in North Carolina.

Arizona, with two executions pending in late 2011, managed to find another source of sodium thiopental, but it didn't want the public to know what it was or where it came from.

When lawyers for Jeffrey Landrigan, one of the men facing death, sought the name of the supplier, Arizona's state attorney general refused to say. Ultimately, on the eve of Landrigan's execution, the attorney general disclosed that the drug had come from Britain. He did so, he said, to allay fears that the drugs had been made in a Third World country and might be contaminated and unsafe.

Tennessee also acknowledged that one of its execution drugs had been made in Britain but refused to divulge the company's name.

At Reprieve, Maya Foa, head of the lethal investigation project, searched through medical and pharmaceutical directories to identify British companies that made sodium thiopental.

The British company selling sodium thiopental to Arizona, Tennessee and other states turned out to be a tiny wholesaler that operated out of the back of a driving

PLN_0000772

school in a working class neighborhood in West London.

It was called Dream Pharma, and it was basically a one-man operation. It also suddenly became more profitable, as states in America moved to improvise. Stafford Smith, Reprieve's director, wrote a letter to Dream Pharma.

"You have played a significant role and hold responsibility for the potential deaths of many people in the United States," he wrote.

Reprieve sent the letter, along with Dream Pharma's address and phone number, to journalists, and articles appeared in British newspapers and on the BBC. Dream Pharma shut down. The company has declined to comment on its battles with Reprieve or the sale of drugs to the U.S. for executions.

Reprieve then successfully lobbied the British government to ban exports of any drugs to the U.S. for executions. Capital punishment for murder was abolished in Britain in the early 1960s even though polls showed the public supported it.

With Hospira out of the business, states had become fairly desperate. That urgency was captured in government emails and documents obtained by death penalty defense lawyers.

"I have been given a task to obtain some Sodium Pentothal by any means available," the director of the pharmacy in the Nebraska department of corrections wrote to her counterparts in several states. "Does anyone know where I might start looking?"

She eventually found a small wholesaler in Mumbai, India, which operated out of two rooms on the ground floor of an apartment building; it had no air conditioning, raising doubts about the safety and efficacy of any drugs stored there.

Reprieve again went to work, alerting local reporters and holding a news conference in Mumbai. Officials from India's food and drug administration raided the offices. The company was quickly out of business.

In California, prison officials turned to hospitals throughout the state in search of sodium thiopental, without success. The warden at San Quentin explored buying some in Pakistan.

In the end, Arizona officials solved California's problems, supplying 12 grams of sodium thiopental from its limited supply, a happy exchange according to government emails unearthed by death penalty opponents.

"You guys in AZ are life savers," a California corrections officer wrote to his Arizona counterpart. "Buy you a beer next time I get that way."

Some death penalty states, looking to solve their drug supply problems in a more reliable way, switched drugs – opting for pentobarbital, an anesthetic commonly used in putting animals to sleep. The first state to use it for an execution was Oklahoma, in December 2010, and it quickly became one of the execution drugs of choice.

This time, however, Reprieve was not up against a small entity. Only one company had government approval to sell pentobarbital in the U.S., and it was a major international pharmaceutical company, Lundbeck Inc. Headquartered in Denmark, it had some 6,000 employees worldwide; its American plant was in Kansas.

When Reprieve approached Lundbeck in early 2011, the company said it was "adamantly opposed" to its drugs being used in executions – its primary use is in

## BRANLETTES BEAUTIES

**OUR SIMPLE POLICIES:**
**SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP FRIENDLY)**

Due to tremendous time and costs answering letters, unless you are placing an order or a question regarding your order, we will not reply to any other questions.

*SASE ARE REQUIRED FOR ANY INQUIRIES OR CONCERNS!*

**You and you alone are responsible for your selections being allowed into your facility:**

Know your institutions policies as to what image content is allowed. Returned orders are non-refundable.   They will be held for 14 Calendar days in order for you to send self-addressed stamped, 3-First class stamps per envelope, *with a street address* for every 20 pictures.  All returned images held after two weeks will be re-sold and we will return to our stock.

**All payments are by Institutional Checks or U.S. Postal Service or Western Union Money Orders.**

These payments are processed immediately and shipped in less than 3-4 weeks.  Any other company Money Orders delay shipment 8-10 weeks or until that Money Order clears our Bank.  Yes, we deal with people that are, while in prison, still trying nickel and dime scams...

**ALL SALES ARE FINAL!**

**EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM.**

| OUR PRICES ARE SIMPLE: | SHIPPING&HANDLING: |
|---|---|
| 1-4999 4X6 PHOTO = .45 CENTS EACH | Due to various prison policies regarding how many pictures can be sent in one envelope, our policy is as follows: |
| 5000+ 4X6 PHOTOS = 20%DISCOUNT | 1 - 5 Photo's----$1.00 per envelope |
| 1-9 CATALOGS : $3.00 EACH+SASE | 10- 15 Photo's--$1.50 per envelope |
| 10 CATALOGS: $25.00+SASE(4Stamps) | 20 -25 Photo's--$2.00 per envelope |

**Branlettes Beauties**
Select your favorite:
White Catalog(30 Vol.)
Black Catalog (30 Vol.)
Asian & Latino Catalog(30 Vol.)
Please state what style photo's:
**Provocative Poses -
Or- Nude Poses**

**FREE CATALOG???**
You read it right! Just send a self addressed stamped envelope to us at the address below and we'll send to you ONE SAMPLE CATALOG (One per customer) with 84 gorgeous girls in full color. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!
*BRANLETTES FREE CATALOG OFFER P.O. BOX: 5765 Baltimore, Md. 21282*

REMEMBER: YOU BOUGHT IT, ITS YOURS. WHETHER IT GETS THROUGH YOUR MAILBOOM OR NOT! NO REFUNDS OR CHANGES. IF YOUR PURCHASE IS RETURNED TO US AND REMAINS FOR 14 CALENDAR DAYS WE WILL RETURN TO OUR STOCK.

BRANLETTES, P.O. Box 5765, Baltimore, MD 21282

## We Offer You Solutions
Taking care of basic services for you on the outside.

$ FINANCE & BUSINESS
ADVOCACY
PARALEGAL
HELP FROM OUTSIDE
ADMINISTRATIVE
INFORMATION
PHONE
CREATIVE

At **Help From Outside** we understand what you're going through because we have loved ones in prison, too. Our standards are very high; quality and timeliness are of utmost importance.

*All requests will be considered with the exception of immoral, unethical or illegal actions.*

**DON'T SEE YOUR SERVICE? ASK. WE OFFER MORE SERVICES THAN LISTED.**

FOR A BROCHURE AND APPLICATION PLEASE SEND A SASE TO:
HELP FROM OUTSIDE, 93 S. JACKSON ST. #40469, SEATTLE, WA  98104
OR CALL 206-486-6042 || www.helpfromoutside.com

**Executions Slowed (cont.)**

the treatment of epilepsy – but it said it had no control over what happened after its products were sold to wholesalers or distributors.

Reprieve ratcheted up the pressure. Every time Lundbeck's pentobarbital was used in an execution, it issued a press release.

Anti-death penalty activists campaigned against Lundbeck on Twitter and Facebook, shareholders raised questions at the company's annual meeting, a pension fund sold its shares and the company's place on an annual ranking of Denmark's best companies fell from 17 to 40.

Lundbeck then did what it had said it couldn't do: It devised a distribution system that would keep its pentobarbital from the states that conducted executions.

Last month, Hospira announced that it was putting controls in place so that three of its drugs – pancuronium bromide, potassium chloride and propofol – would not be used in executions.

Once again, that has left states trying to figure out what to do. In Colorado, a man who killed three teenagers and their boss in a pizza restaurant in 1993 is set to be executed in August. But the state does not have the proper drugs, causing the director of prisons to send an urgent plea to the state's compounding pharmacies. At "compounding pharmacies," pharmacists mix, or compound, the ingredients for drugs on site.

Last October, South Dakota became the first state to use a compound drug in an execution, and it did so twice.

Lawyers for one of the men to be executed, Robert Moeller, who had kidnapped, raped and murdered a 9-year-old girl, filed a lawsuit to obtain information about the supplying pharmacy. The state resisted, and a federal judge sided with the state.

South Dakota was among the states to recently pass a law exempting the names of suppliers of lethal injection drugs from its public records law. The change was necessary, said South Dakota state Senator Jean Hunhoff, "because there's been harassment that has occurred against non-protected manufacturers and pharmacists, thereby causing difficulty for the state in obtaining the necessary chemicals for the lethal injection."

South Dakota's law passed in the state senate without opposition, and in the house by a lopsided 60-8. ◼

*Raymond Bonner, a lawyer and former* New York Times *reporter, is the author of "Anatomy of Injustice: A Murder Case Gone Wrong." This article was originally published by ProPublica (www.propublica.org) on May 22, 2013 and is reprinted with permission. For more about the shortage of lethal injection drugs and the states' scramble for alternatives, see:* PLN, *Nov. 2012, p.44; June 2011, p.1.*

# Seventh Circuit: Summary Judgment Partially Reversed in Jail Death Caused by Medication Withdrawal

On May 25, 2012, the Seventh Circuit Court of Appeals reversed a grant of summary judgment to two defendants in a case involving a jail detainee who died after his prescribed medication was abruptly discontinued.

Wisconsin's La Crosse County Jail contracts with a private company, Health Professionals, Ltd. (HPL), to provide prisoner medical care. On-site doctor visits occurred only 2-4 hours, one day a week. The company's on-call physician, Dr. Stephen Cullinan, was based nearly 300 miles away in Peoria, Illinois.

John King suffered from serious health problems, including asthma, diabetes, a heart condition, high blood pressure, seizures, severe anxiety and other mental health issues when he was booked into the La Crosse County Jail on April 7, 2007.

King was taking "a daily regimen of medications that included five milligrams of alprazolam, a benzodiazepine." He entered the jail with "two grocery bags full of his medications, including a bottle with 115 one-milligram tablets of alprazolam."

Nurse Karen Mondry-Anderson called Dr. Cullinan because alprazolam was excluded from HPL's formulary of preferred drugs. "Obviously unable to examine King, and not bothering to obtain the details about [his] prescription," Dr. Cullinan ordered King to be weaned off the alprazolam in three days.

This was "a dangerously rapid reduction," given the dosage of medication that King was taking. "Abrupt withdrawal from alprazolam can be life-threatening. Associated symptoms include agitation, elevated blood pressure, elevated pulse, tremors, delusions, hallucinations, and seizures. The severity of such symptoms requires medical providers to monitor the patient closely, preferably in a hospital."

However, jail staff did not monitor King's withdrawal and his health quickly deteriorated. On April 11, 2007 he requested medical attention, but wasn't seen until six days later. A doctor "noted that King had pressured speech and flights of ideas with manic insomnia."

At about 10:30 a.m. on April 18, 2007, jail guards William Olson and Jennifer Koby-Gobel "found King convulsing on the floor, screaming and foaming at the mouth."

When Nurse Sue Kramer was notified, she told three nursing students who were with her at the time that prisoners fake seizures. King was shaking so badly that Kramer was unable to get a blood pressure reading. Consistent with seizures, he did not react to smelling salts and his face turned blue.

Nurse Kramer and the guards left King lying on the floor of his cell because they were convinced he was faking. They did not contact the on-call physician or summon an ambulance.

"Kramer was aware that King was being tapered off alprazolam and understood that alprazolam withdrawal can cause seizures, hallucination, and death." However, when another prisoner reported that King had another seizure an hour later, "Kramer again chose not to contact Dr. Cullinan or emergency medical services." Instead, she moved King to a single, padded cell and did nothing else.

Later that evening, Nurse Kramer told Mondry-Anderson that King had faked a seizure and responded to smelling salts. Neither was true.

At about 5:30 p.m., King called on his cell intercom but couldn't be understood. He was found unresponsive when Mondry-Anderson arrived to give him his medication two hours later, and was pronounced dead at 7:58 p.m.

King's widow, Lisa King, filed a wrongful death suit against Olson, Koby-Gobel,

PLN_0000774

Kramer, Mondry-Anderson and La Crosse County, alleging deliberate indifference to King's serious medical needs. The district court granted summary judgment to all the defendants.

On appeal, the Seventh Circuit held that Olson, Koby-Gobel and Mondry-Anderson were entitled to summary judgment. Nurse Sue Kramer was not so entitled, however, because there was "a question of material fact whether Kramer's actions were so far afield from an appropriate medical response to King's seizures that they fell outside the bounds of her professional judgment." The Court of Appeals noted that "Kramer's statements to the nursing students suggest that she had already decided that King was faking

seizures even before she saw him."

The appellate court also found that La Crosse County was not entitled to summary judgment because the plaintiff had "pointed to significant evidence that the County's policies violated [King's] constitutional rights." Therefore, the district court's grant of summary judgment was affirmed in part and reversed in part. See: *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012).

Following remand, the case went to trial in January 2013 and the jury entered a verdict for the defendants. The following month, La Crosse County filed a bill of costs seeking $30,397.17 from King's estate and Nurse Kramer sought $34,120.74 in costs. The district court has not yet ruled on their requests for costs. ◼

## Oregon: Post-Escape Conduct Justifies Enhanced Escape Sentence

THE OREGON COURT OF APPEALS HAS held that criminal conduct committed after an escape justifies the imposition of an enhanced sentence on the escape conviction.

Donald A. Bennett was an Oregon Department of Corrections (ODOC) prisoner when he escaped from the South Fork Forest Camp, a minimum-security facility. After absconding, Bennett committed a burglary and was re-arrested.

He pleaded guilty to burglary in August 2008 and to second-degree escape in July 2009. When Bennett was sentenced on the escape conviction, the court found that the presumptive sentence was 25-30 months but imposed a 50-month upward departure sentence based on the aggravating factor that he had committed a burglary while on escape status.

Bennett argued on appeal that the sentencing court erred in considering "conduct that occurs after the crime of conviction in determining whether there are substantial

and compelling reasons to depart."

The Court of Appeals disagreed, finding that Bennett's argument was "not supported by the text of [OAR 213-008-0002(1)] or the relevant caselaw." Noting that the list of mitigating and aggravating sentencing factors is a non-exclusive list, the appellate court observed that it had previously held in *State v. Ceballos*, 162 Or.App 477, 986 P.2d 680 (Or. App. 1999) that the sentencing court may consider, as a departure factor, similar offenses committed after the current offense for which a sentence is being imposed.

"Necessarily then, the list of factors in OAR 213-008-0002(1) cannot be read to prohibit consideration of a defendant's post-offense conduct," the Court of Appeals held. Therefore, the sentencing court "did not err in relying on defendant's burglary conviction in support of the departure sentence." See: *State v. Bennett*, 249 Or.App 379, 277 P.3d 586 (Or.App. 2012), *review denied*. ◼



INMATE CONNECTIONS.com
& ConvictPenPals.com!
465 NE 181st, #308 Dept PLN Portland OR 97230
Since 2002 – Write for FREE brochure!

**Federal Writs**
• • •
**Texas Parole**
• • •
**Texas Writs**

We will fight endlessly for your rights and to secure your freedom.

Time is of the essence for many remedies, so please contact our office today.

You do not have to accept this. You CAN keep fighting.

Is your freedom worth it?

Surprisingly affordable.

Law Office of
**David Rushing**
723 Main St. Ste. 816
Houston, TX 77002
713-877-1300

ADVERTISEMENT



**inmateMAGS** .com formerly MyMagstore.com

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **60+ Page Full Catalog** ($3 Discount Coupon Included)

InmateMAGS.com
4208 University Way NE
Seattle, WA 98105

www.inmateMAGS.com
Info@inmatemags.com
206-322-6397

PLN_0000775

# Oklahoma Prison Employees Disciplined

*by Matt Clarke*

An investigation by the *Tulsa World* newspaper revealed that more than 130 disciplinary actions were taken against Oklahoma Department of Corrections (DOC) employees at men's prisons from 2009 through mid-2011. Most of the disciplined employees received a few days suspension without pay, though for 40 the misconduct was serious enough to justify termination.

The newspaper had previously reported 23 disciplinary actions involving staff members at the DOC's three women's facilities. In addition, a number of prison doctors and other medical employees were found to have disciplinary records.

The investigation was triggered by a 2011 fire near the dog kennels at the Howard McLeod Correctional Center (HMCC), which revealed a more serious problem. The fire damage did not concern DOC officials so much as the coolers full of wild hog meat, stores of salt and flour, and knives and other tools which were evidence of feral hogs being trapped and butchered by prisoners at the minimum-security facility.

"These guys I guess just took it upon themselves to hunt these wild hogs," said HMCC Warden Bruce Howard. "How they were planning to cook it, I really don't know."

They were probably planning to use a barbecue grill that was discovered by fire crews near the kennels. Howard stated there was no danger to public safety, but that ignored the fact that prisoners were able to trap hogs and cook them with at least the tacit approval of DOC employees. One guard was disciplined and suspended without pay for one day for having knowledge about the hog trapping and butchering.

"The officer should have stopped them," said Howard, adding that the unit was under closer supervision.

DOC guards have been suspended for other minor violations such as bringing a fork into the prison in their lunch sacks, failing to place their food items in clear baggies and accidentally bringing their own cell phones into the prison.

But some DOC employees have been involved in much more serious incidents. For example, prisoner Paul Duran, Jr. was murdered at the Oklahoma State Penitentiary in March 2009 after guards moved him into a cell with another prisoner he had testified against in a murder trial. This violated orders to keep the two separated. According to a lawsuit filed in 2010 by Duran's sister, her brother was intentionally placed in the cell as part of a "gladiator system" used to punish prisoners and provide entertainment for guards. [See: *PLN*, Sept. 2009, p.33].

The DOC fired unit security manager Leroy Henry and suspended prison employee Darrell Wilson for five days without pay in connection with Duran's murder. Wilson was later terminated for unrelated violations, including failing to report contraband and asking a subordinate for a loan.

In another incident, a DOC sergeant was demoted to corporal for having sexual relations with the girlfriend of another guard. In that case the relationship had become common knowledge among prisoners, who were making fun of the guard. The Merit Protection Commission, in upholding the demotion, found that the sergeant had failed "to afford respect due a fellow corrections officer," noting that "trust is everything in a correctional facility and using good judgment is critical for a sergeant because it is a leadership position."

A DOC transportation guard was suspended without pay for eight days after he stopped at a McDonald's while transporting community work center prisoners from medical appointments at the Joseph Harp Correctional Center back to their community work centers. The guard left the prisoners unattended while he went inside to order food and use the restroom. The prisoners left the transport van and used the opportunity to smoke and go inside the McDonald's and place food orders. Customers complained about the prisoners being at the eatery without apparent supervision.

One guard was suspended for 8 days without pay for sending sexually-explicit texts to a female co-worker, then later terminated for sending another co-worker a racially-offensive text. Another DOC employee, at the Madill Work Center, was suspended without pay for failing to notice a prisoner had placed a dummy in his bunk during an escape attempt.

A maintenance employee was suspended for failing to timely install security cameras which sat unused at the Northeast Oklahoma Correctional Center for almost two months, while other DOC employees were disciplined for using prison computers to surf websites such as Facebook and Craigslist.

One guard was fired for punching a prisoner and then kicking him in the face while he was on the ground, breaking his eye socket. Yet another guard was fired for pepper spraying a prisoner he was handcuffing and then punching the prisoner multiple times after he was cuffed.

More recently, four DOC guards were fired after prisoner Julius Parker set fire to the mattress in his cell at the Oklahoma State Penitentiary on July 28, 2012 and died due to smoke inhalation. The guards had noticed smoke coming from Parker's cell but failed to take action for over an hour. According to DOC spokesman Jerry Massie, they "did not recognize the magnitude of the situation."

Additionally, 23 employees at the DOC's women's facilities – the Mabel Bassett Correctional Center, Dr. Eddie Warrior Correctional Center and Altus Work Center – were disciplined between January 2009 and June 2011, according to the *Tulsa World*. Twelve of those employees were fired.

The misconduct which resulted in discipline ranged from inappropriate relationships with prisoners and arguing with other staff members to conducting an unauthorized bomb drill – the latter resulting in a 10-day suspension.

The chaplain at Mabel Bassett, Stephen D. Billingslea, was terminated in 2009 following his arrest at a park for lewd behavior; he had previously been disciplined, including for once bringing knives into a prison.

Other disciplinary actions involving employees at the DOC's women's facilities were due to misconduct that included failing to report missing keys, DUI arrests and falling asleep while on perimeter patrol.

Mabel Bassett corporal David Heath Juber, 38, was charged in February 2012 with second-degree rape and forcible sodomy; additional charges were filed in June 2012 related to sex acts involving a

different female prisoner. The two prisoners involved knew details about Juber's body, including that he had a tattoo on his chest and pierced nipples. He previously had been suspended for having inappropriate contact with prisoners.

In November 2012, former Mabel Bassett guard Jamie Baker, 43, was charged with 9 counts of second degree rape, 4 courts of sexual battery and one count each of forcible sodomy and first degree rape by force and fear – all felonies – for engaging in sexual misconduct with female prisoners. District Attorney Richard Smotherman said Baker had "used his position of absolute power to force himself on multiple women." Following his arrest he was released on $10,000 bond.

Another former guard at Mabel Bassett, Richard DeHaven, 56, was charged with one count of sexual battery for "groping a female inmate." DeHaven and Baker were both fired in September 2012.

A number of DOC physicians and medical employees have disciplinary histories too, according to an October 6, 2012 investigative report by *The Oklahoman*. Sometimes the discipline was due to incidents that predated their DOC employment, and sometimes it was for prison-related incidents.

For example, Dr. Joel B. McCurdy at the Joseph Harp Correctional Center has a history of alcohol abuse dating back to 2005, which caused him to lose his medical license for three years prior to his employment with the DOC. Ross Lane Fisher, a physician at the Lexington Assessment and Reception Center, has a record of two DUI arrests and was placed on probation for five years.

Dr. Josпeh Balogh, employed at Joseph Harp, admitted to an addiction to pain medications and cocaine use; the Oklahoma Bureau of Narcotics and Dangerous Drugs noted that Dr. Balogh said he was "diverting drugs of patients by requiring patients to bring all medications to an appointment, then taking 'handfuls' of the drugs for himself." He was fined $10,000 by the Bureau and is currently on probation.

The DOC's excuse for employee misconduct resulting in discipline was that prison staff members have been simultaneously stressed by budget cuts and understaffing. DOC employees were facing involuntary furloughs and hiring freezes in 2011 while the department was staffed at only 65%, which resulted in high staff turnover that added stress to the remaining employees.

"People have to stay when someone doesn't show up for their shift, and over time, that's going to wear you down," said Massie. "We end up burning people out." Concurrently, it is hard to find people interested in working for the DOC, often at prisons located in remote areas.

But even if true, such circumstances hardly excuse DOC employees' misconduct with respect to physically and sexually abusing prisoners, smuggling contraband or sexually harassing fellow staff members – or colluding with prisoners to hunt, butcher and cook feral hogs on prison grounds.

The DOC's staffing problem has since improved, with an end to unpaid furloughs and increased recruiting efforts to address understaffing. Presumably, based on the excuses provided by prison officials, this will result in less employee misconduct. ◢

Sources: *Tulsa World, Washington Examiner, The Oklahoman, www.newson6.com, www.kjrh.com*



## Stay Connected with **myJailbird.com**

Tell your friends and family to go to **www.myjailbird.com** to create a **FREE support community** just for you!

**PROFILE**
Displays inmate name, ID and exact contact information to make communication easy for everyone.

**MESSAGE WALL**
Family and friends post updates, reminders and news to keep everyone involved.

**PRIVATE, CONFIDENTIAL PROFILE**
Pages are secure and private to sponsors and invited friends only. Nothing is visible to the general public.

**COMMUNICATION CENTER**
Family and friends can easily send greeting cards, custom photo cards, wire money, get low-cost phone service or order books and magazines for an inmate.

My Jailbird is a free, confidential, support page that makes it easy for family and friends to stay connected to you during your incarceration.

- It is not a pen pal service.
- We do not sell anything directly to inmates.
- No monthly fees.

Call or write your family and friends and ask them to go to **www.myjailbird.com** to **sign up today!**

**myJailbird**
keeps you connected

51 Harvey Road, Unit C
Londonderry, NH 03053

**www.myjailbird.com**

PLN_0000777

# Valley Fever Declared a Public Health Emergency at Two California Prisons; Court Orders Prisoner Transfers

*by John E. Dannenberg*

On April 25, 2013, Dr. John Galgiani, an expert hired by attorneys representing prisoners in the long-running *Plata v. Brown* class-action lawsuit over medical care in the California Department of Corrections and Rehabilitation (CDCR), filed an 80-page affidavit with the federal court overseeing the case in which he described conditions at Central California facilities where prisoners have been afflicted by a disease known as Valley Fever.

Valley Fever (coccidioidomycosis) is a potentially fatal fungal infection that causes flu-like symptoms. It is contracted by inhaling spores from infected soil, but is not contagious once a person is infected. The spores frequent the southwestern United States, with about a quarter of reported infections occurring in California and over 70 percent in Arizona, according to the Centers for Disease Control and Prevention.

The disease has been an ongoing problem at the CDCR's Pleasant Valley and Avenal State Prisons, where the soil contains Valley Fever spores that are spread through dust and when the dirt is disturbed. [See: *PLN*, July 2010, p.22; June 2008, p.22; Aug. 2007, p.1]. Other state prisons are located in the area where Valley Fever is prevalent but have not experienced as many infections; those facilities include the California Correctional Institution, CSP Corcoran, Kern Valley State Prison, North Kern State Prison, SATF at Corcoran and Wasco State Prison.

The CDCR reported 640 cases of Valley Fever in 2011, including 535 at the Pleasant Valley and Avenal facilities. There is no vaccination to protect against the disease. At least eleven prisoners have filed Valley Fever-related claims with the state's Victims Compensation and Government Claim Board; all have been rejected.

Dr. Galgiani, a professor of medicine at the University of Arizona who founded a center where the disease is researched, stated in his affidavit that the prevalence of Valley Fever at the Pleasant Valley and Avenal facilities is a "public health emergency."

"Prison officials should be, but apparently are not, acting in a manner consistent with a situation where the lives of individuals are at substantial risk," he said after reviewing records of four prisoners who died due to Valley Fever, finding that prison medical staff had delayed for months before testing for the disease.

Galgiani stated in his affidavit that 62 state prisoners died from Valley Fever between 2006 and January 2013. He did not indicate how many of the deaths occurred at Pleasant Valley and Avenal, but noted that those facilities had by far the highest rates of the disease – with Pleasant Valley's infection rate being 1,000 times greater than the statewide average and Avenal having an infection rate 189 times higher.

Valley Fever pervades the communities surrounding the prisons in the southern San Joaquin Valley as well, but Dr. Galgiani observed that the infection rates at both the Pleasant Valley and Avenal facilities are notably higher than in the local community. A pernicious characteristic of the disease is that blacks and Filipinos are particularly vulnerable; 71 percent of the prisoners who died of Valley Fever between 2006 and 2011 were black.

Galgiani stated, "In my opinion African-American prisoners should be excluded from these two prisons along with Filipinos, Inuits, persons with diabetes, HIV, or any immuno-compromising condition, and that decision should be implemented immediately. Not to do so will keep these groups at risk of severe complication from new Valley Fever infection. Moreover, there should be no transfers of any inmates with these ethnicities or medical conditions to either Pleasant Valley State Prison or Avenal State Prison for the same reasons."

On April 29, 2013, Medical Receiver J. Clark Kelso, appointed by the federal court to oversee healthcare in California prisons, ordered prisoners with an increased susceptibility to Valley Fever to be transferred from the two facilities. Kelso directed the CDCR to remove non-white and non-Latino/Hispanic prisoners, as well as prisoners with certain medical risk factors and prisoners over age 55 because they are at higher risk of contracting the disease.

Joyce Hayhoe, a spokeswoman for the Receiver's office, noted that in addition to causing prisoner deaths, Valley Fever has hospitalized about 40 percent of the more than 8,200 prisoners housed at the Avenal and Pleasant Valley facilities.

She added, "The state of California has known since 2006 that segments of the inmate population were at a greater risk for contracting Valley Fever, and mitigation efforts undertaken by CDCR to date have proven ineffective.... As a result, the Receiver has decided that immediate steps are necessary to prevent further loss of life."

Those steps include a mass transfer of an estimated 3,250 susceptible prisoners out of Pleasant Valley and Avenal, and refilling the beds with presumably less-vulnerable prisoners who still will be at risk of Valley Fever infections. While falling short of conceding they will select prisoners by race, that is tantamount to what the CDCR will likely have to do to keep the facilities full.

Governor Jerry Brown's administration wasted no time in objecting to the Receiver's order, complaining, "It is premature to move more than 3,000 inmates out of two state prisons until more is known about an airborne fungus that is being blamed for nearly three dozen inmate deaths and hundreds of hospitalizations."

CDCR Secretary Jeffrey Beard claimed that the transfers may result in increased racial violence within California's prison system, presumably because the prisoner transfers from Pleasant Valley and Avenal would be partly based on race.

State officials further argued that transferring prisoners was premature until they could learn whether other steps taken by the CDCR would be effective in limiting the exposure of prisoners and staff to the disease. To that end, the CDCR stated it was trying to control dust during construction, is supplying surgical masks to prisoners and employees who ask for them, and is providing educational materials about Valley Fever. Prison officials are also installing air filters and considering ways to cover up and screen out dusty areas, and agreed to move 600 high-risk prisoners by August 2013.

Apparently not wanting to wait to determine the effectiveness of the CDCR's efforts while prisoners continue to contract Valley Fever, sometimes fatally, the U.S. District Court in the *Plata* litigation entered an order on June 24, 2013 directing state prison officials to comply with the Re-

PLN_0000778

ceiver's directive to transfer increased-risk prisoners out of the Pleasant Valley and Avenal facilities. The CDCR was ordered to complete the transfers within 90 days.

The district court rejected the state's argument that an order to transfer prisoners from Pleasant Valley and Avenal constituted a "prisoner release order" under the Prison Litigation Reform Act, and noted that the CDCR had admitted it was "aware that Valley Fever presents a serious risk to inmate health."

However, the court limited the Receiver's directive by removing Inuit prisoners, prisoners over the age of 55 and prisoners who had already been infected with Valley Fever from the list of offenders to be transferred from the two facilities. "Perhaps at one point, Defendants' wait-and-see approach might have been reasonable. Under current conditions, however, they are not.... An exclusionary policy is now the only reasonable response," the district court wrote. See: *Plata v. Brown*, U.S.D.C. (N.D. Cal.), Case No. 3:01-cv-01351-TEH.

"The order is absolutely necessary to preserve people's lives and health because state officials have been simply unwilling to take appropriate action when there's a clear and imminent danger to prisoners' lives. It's the most recent example of the state's inability to protect the health of prisoners," said Don Specter, director of the Prison Law Office, which represents prisoners in the *Plata* litigation.

The Centers for Disease Control and Prevention and the affiliated National Institute of Occupational Safety and Health have agreed to study problems related to Valley Fever at the Avenal and Pleasant Valley prisons; however, there is no projected completion date for their review, which amounts to more government stalling. They could save themselves both time and money – and perhaps prisoners' lives – by simply reading Dr. Galgiani's affidavit and taking heed of the findings of the Medical Receiver and the district court. ◼

Sources: *Huffington Post*, *Associated Press*, *Los Angeles Times*, *ABC News*, *www.wsws.org*

# Corcoran Sun

Full Color Prison Yard Monthly
News ♦ Entertainment ♦ Resources

**3 Month Trial Subscription**

**Only $5** (money orders only)



### IN FULL COLOR

All new full color format deeper content, more exciting episodes of thrilling novels and sexy pics. We at Corcoran Sun are striving to become a top quality prison publication. Submit your writing, art, poetry etc., see your submission, name and contact info in print.

**Single Issues ($3 money order or 8 FCS)**

**Yearly Subscription ($30 money order or 96 FCS)**

Payments to: Freebird Publishers
Box 541 North Dighton, MA 02764
Email: Diane@FreebirdPublishers.com



**SureShot Books**
a Premier Bookstore for Inmates

**Legal Law Books, Magazines, Newspaper Subscriptions, Sports, Urban Books & Career Education Books.**
( Largest Selection of Spanish Publications )

New Catalog will ship in June. Request NOW ! Do Not Request Twice

**sureshot** books

**SureShot Books, P.O. Box 924, Nyack, NY 10960**
**www.sureshotbooks.com**

# WE NEED YOUR HELP!

We are updating the Disciplinary Self Help Litigation Manual (Manville 2007) to help guide prisoners through the misconduct and disciplinary litigation process.

To effectively help inmates, we need case law and opinions from state courts that affect this process at the state level.

Please send us a copy of any decisions entered by a state court relating to prisoner misconduct/disciplinary actions.
(if copy cannot be made, please send original and we will return it at your request)

send all material to:

## Professor Daniel Manville, MSU College of Law
## 610 Abbot Rd., East Lansing, MI 48823

(please <u>do not</u> send summaries, memos, or requests for representation)

PLN_0000779

# Congress Amends PLRA Physical Injury Requirement for Sexual Abuse Cases

### by John Boston

THE FEDERAL VIOLENCE AGAINST Women Act (VAWA) was renewed and broadened in February 2013, after much controversy involving Republican opposition to provisions extending certain of the statute's protections to LGBT persons, Native Americans living on reservations and undocumented immigrants.

Lost in those debates was the fact that the broadened VAWA also included a significant amendment to the physical injury requirement of the Prison Litigation Reform Act (PLRA).

As initially enacted, the PLRA, 42 U.S.C. § 1997(e), provided that "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

Courts have held that this provision does not actually bar claims that do not involve physical injury, but prevents the plaintiff from recovering compensatory damages for those claims. See, e.g., *Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002) [*PLN*, May 2003, p.27]. A few courts have held that it bars both compensatory and punitive damages. See, e.g., *Al-Amin v. Smith*, 637 F.3d 1192, 1199 (11th Cir. 2011).

The effect of the PLRA's physical injury requirement has been unclear in sexual assault cases, among many others, because the statute does not include a definition of "physical injury." The courts have not been much help, agreeing that physical injury must be more than *de minimis* but not otherwise defining the term. Since sexual assault may or may not result in actual damage to tissue, which is arguably the everyday understanding of what physical injury means, the question has remained open.

A majority of decisions has held that sexual assault does constitute physical injury. For example, the Second Circuit found that "alleged sexual assaults" by staff "qualify as physical injuries as a matter of common sense" and "would constitute more than *de minimis* injury." *Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999) [*PLN*, Dec. 2000, p.17]. The "assaults" in *Liner* were also described as "intrusive body searches."

A Florida district court addressed Congressional intent more explicitly, stating that sexual assault, "even if considered to be *de minimis* from a purely physical perspective, is plainly 'repugnant to the conscience of mankind.' Surely Congress intended the concept of 'physical injury' in § 1997(e) to cover such a repugnant use of physical force." *Kemner v. Hemphill*, 199 F.Supp.2d 1264, 1270 (N.D.Fla. 2002) (citation omitted) [*PLN*, July 2003, p.16].

Nonetheless other cases have held sexual assault *not* to constitute physical injury, and therefore not to be compensable in federal civil actions. See, e.g., *Hancock v. Payne*, 2006 WL 21751, *1, 3 (S.D.Miss., Jan. 4, 2006) (holding prisoners who alleged they were "sexually battered ... by sodomy" did not satisfy § 1997(e)). [See: *PLN*, July 2009, p.1].

The Violence Against Women Act has now largely resolved this question by declaring that § 1997(e) "is amended by inserting before the period at the end the following: 'or the commission of a sexual act (as defined in section 2246 of title 18, United States Code).'" VAWA similarly amended 28 U.S.C. § 1346(b), the PLRA section imposing the physical injury requirement on the Federal Tort Claims Act for persons convicted of a felony and awaiting sentencing or serving a sentence. Pub.L. No. 113-12, 127 Stat. 54, § 1101 (Sexual Abuse in Custodial Settings).

Thus, for both PLRA provisions, the relevant phrase is now "without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18)." In cases involving such acts, it is no longer necessary to determine whether the plaintiff suffered physical injury.

So what is a "sexual act" as defined in 18 U.S.C. § 2246? The statute is quite specific, defining sexual act as:

*(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;*

*(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;*

*(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or*

*(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; ...*

Thus, under the VAWA amendment, questions about anal, vaginal and oral sex are resolved. Manual or other non-penetrative sexual touching of another person, compelled or otherwise, is not included except for intentional, unclothed touching of persons under 16 years old; nor are acts involving the touching of women's breasts. Nor does the amendment include cases in which prisoners are compelled or persuaded to perform sexual acts or displays for the titillation of others.

The amendment would therefore exclude some cases that previously have been decided favorably for prisoners. See, e.g., *Duncan v. Magelessen*, 2008 WL 2783487, *2, *4 (D.Colo., July 15, 2008) (stating "unwanted sexual contact, alone, is a physical injury for which there may be compensation" in a case where the plaintiff alleged an officer "played" with his penis repeatedly). Indeed, it is possible that the "intrusive body searches" referred to in *Liner v. Goord* would be excluded unless they involved actual vaginal or anal penetration, or the prisoner was under 16 years old.

Does the VAWA amendment mean that a sexual act that does not fall under the provisions of 18 U.S.C. § 2246 cannot be the basis for a damages award in federal litigation brought by a prisoner? In most cases, probably yes. However, sexual acts of any sort that inflict physical injury in the conventional sense of tissue damage certainly remain compensable, as, presumably, do other injuries inflicted in connection with a sexual act or assault.

It remains an open question whether acts that are merely painful – such as the practice reported in some prison systems of yanking men's underwear during searches to cause genital pain – inflict physical injury within the meaning of the PLRA, although some lower court decisions in other types of cases have held pain by itself to be noncompensable. See, e.g., *Jones v. Cowens*, 2010

WL 3239286, *2 (D.Colo., Aug. 12, 2010) ("Physical pain, standing alone, however, is deemed to be a *de minimis* injury...").

An important question that the VAWA amendment does not address is whether it applies to conduct pre-dating its enactment which is the subject of pending litigation or may become the subject of future litigation.

The standard rule when Congress does not spell out a statute's "temporal reach" is that "the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994).

Defense counsel can be expected to argue that the amendment to the PLRA's physical injury requirement "increase[s] a party's liability for past conduct" by removing a rule that arguably would have barred recovery in certain lawsuits filed by prisoners prior to the amendment.

But there is a different way to view the question, in my view a correct one. As already noted, the majority rule in the courts before the enactment of the VAWA amendment was that serious sexual assault *does* constitute physical injury, so in most such cases the amendment will not in fact increase a defendant's liability. Rather, the amendment can be construed as confirming the majority view of the physical injury requirement and making clearer where the line is drawn between those sexual assaults that are deemed to inflict physical injury and those that are not.

There is substantial authority that clarification of the law, as opposed to a substantive change in the law, does not have retroactive effect within the meaning of the *Landgraf* rule. That means it can be applied to cases involving pre-enactment conduct. *See, e.g.*, *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) ("when an amendment alters, even significantly alters, the original statutory language, this does not necessarily indicate that the amendment institutes a change in the law") (internal quotation marks omitted); *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283 (11th Cir. 1999) ("[C]oncerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify relevant law rather than effect a substantive change in the law"); "Statutes may be passed purely to make what was intended all along even more unmistakably clear." *Brown v. Thompson, id.* (citation omitted).

In view of decisions like *Kemner v. Hemphill*, holding that Congress never intended that the physical injury requirement bar recovery for serious sexual abuse, it can be argued that Congress has now made that point explicit and spelled out what kinds of sexual abuse should be unaffected by the physical injury requirement. That is, the amendment clarifies the PLRA rather than amending it. Plaintiffs can therefore plausibly contend in cases addressing pre-amendment conduct that the VAWA amendment ends any dispute over whether prisoners can recover damages for the kinds of sexual abuse specified in 18 U.S.C. § 2246.

Remember that the PLRA's physical injury provision, like most others, applies only to cases that are brought by a prisoner – that is, cases filed when the plaintiff was incarcerated. Once a prisoner is released, on parole or otherwise, he or she is no longer subject to most PLRA provisions. *See, e.g.*, *Harris v. Garner*, 216 F.3d 970, 976-80 (11th Cir. 2000) (en banc) [*PLN*, July 2001, p.23]; *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998) [*PLN*, Oct. 1998, p.14].

Therefore, if it is possible to wait to file a federal lawsuit, including one for sexual abuse, until after a prisoner is released, it may be wise to do so to avoid application of the physical injury requirement as well as other provisions of the PLRA – provided that the suit can still be filed within the applicable statute of limitations.

*John Boston is director of the Prisoners' Rights Project of the New York City Legal Aid Society and co-author of the* Prisoners' Self-Help Litigation Manual. *He provided this article exclusively for PLN.*

---

**Flipping Your Conviction:**
State Post-Conviction Relief
for the Pro Se Prisoner
by Ivan Denison

Softcover, 8.5 x 11, 500 pages, c. 2013

Step-by-step instructions on how to successfully challenge a state conviction.

Analysis and framing of legal issues; subclaims under ineffective assistance; state appeals; 33 forms; 15 sample filings; court rules; over 500 case cites.

**$49.99 on Amazon.com**

---

## MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(213) 489-7715



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

PLN_0000781

# Tennessee Judge Convicted Following Drug and Sex Scandal

During courtroom recesses, a Tennessee judge had sex with and bought drugs from his mistress, who was a felon on probation, according to a report by the Tennessee Bureau of Investigation.

Judge Richard Baumgartner, 66, who became a Criminal Court Judge in Knoxville in 1992, was one of three Knox County judges who heard criminal cases. Suffering from pancreatitis due to chronic alcoholism, Baumgartner eventually became addicted to prescription painkillers.

Many people did not realize that Baumgartner had a problem until he stepped down from the bench in March 2011, entered drug treatment, was disbarred and pleaded guilty to a single count of official misconduct. A special state court judge later imposed a sentence that allowed Baumgartner to avoid jail time, keep his pension and have the conviction expunged if he avoided further legal trouble. [See: *PLN*, Sept. 2012, p.50].

It wasn't until the results of an investigation were released in November 2011 that the full extent of Baumgartner's drug problem was revealed. That investigation raised questions about whether Baumgartner had been sober enough to sit as a judge during his final two years on the bench, and led to federal charges being filed against him in May 2012.

Meanwhile, another judge threw out the convictions in a high-profile murder case that Baumgartner had presided over, and ordered new trials in other cases. The county is now facing a flood of new trial requests by offenders whose criminal cases were handled by Baumgartner.

County officials fear those requests may overwhelm the local criminal justice system. "We're getting pleadings almost daily now from people in the penitentiary," stated Knox County District Attorney General Randy Nichols, who said prisoners are "filing habeas corpus [petitions] saying, 'Let me out too.'"

In November 2012, Baumgartner was found guilty in federal court of five counts of misprision of a felony; he was sentenced on April 10, 2013 to six months in prison plus one year of supervised release. The charges stemmed from lies he told to cover up his drug addiction and schemes to get drugs. He was obtaining painkillers from – and having a sexual relationship with

– Deena Castleman, a felon on probation under his court's supervision. Baumgartner was married at the time.

"The evidence presented at trial demonstrated that the defendant made material misrepresentations to various officials concerning Deena Castleman in efforts to conceal her participation in a federal prescription drug trafficking conspiracy," the U.S. Attorney's office stated. "The evidence showed that his motive involved her continued participation in the conspiracy so she could provide drugs and sexual favors to him."

Castleman testified at Baumgartner's trial and said the former judge had paid her $250 to $300 for painkillers, including Hydrocodone and Roxycodone, two or three times a week. She stated he also helped her with legal problems, by lying about a urine test she had failed and vouching for her as a good candidate for a drug court program.

At his sentencing hearing, Baumgartner said he was "greatly ashamed that I've had an adverse effect on the judiciary system." He reported to the Bureau of Prisons to begin serving his six-month sentence on May 29, 2013. ⬛

Sources: *Associated Press, www.wate.com, www.knoxnews.com, www.wbir.com*

# $737,500 Settlement after Seventh Circuit Finds No Qualified Immunity for Prisoner's Suicide

The Seventh Circuit Court of Appeals has upheld a district court's partial denial of qualified immunity in a case involving the suicide of a Wisconsin prisoner.

"Jessie Miller led a tragically short and troubled life. Exposed to cocaine while in utero, Miller was born into a broken home on December 3, 1987. He soon became a ward of the state and spent his childhood years rotating through 54 foster homes," where he was physically and sexually abused. At sixteen, Miller tried to kill himself by jumping from a three-story building. This marked the beginning "of what would become a veritable obsession with suicide attempts and ideation."

While incarcerated at the Dane County Jail, Miller attempted suicide on November 10, 2007. He tried again at the Dodge Correctional Institute on June 4, 2008. The Wisconsin Department of Corrections (WDOC) transferred Miller to the Wisconsin Resource Center, a mental health facility, due to his suicide attempts. While there he "continued to harm himself by swallowing razor blades and other sharp objects and banging his head against the walls."

Despite his threat to commit suicide if returned to a WDOC facility, Miller was transferred to the Columbia Correctional Institute on June 19, 2009. Three days later he refused his medication, and that night the troubled 22-year-old hanged himself with a bedsheet.

Miller's minor siblings filed suit in federal court, alleging that WDOC employees had been deliberately indifferent to his risk of suicide. The district court granted qualified immunity to 17 of the 26 defendants and denied qualified immunity to the others.

On May 24, 2012, the Seventh Circuit affirmed the denial of qualified immunity to the defendants who sought interlocutory appeal. Viewing the facts in the light most favorable to the plaintiffs, the appellate court found "it is plausible that each of the defendants-appellants were subjectively aware of Miller's serious medical condition (i.e., that he was a suicide risk) and either knowingly or recklessly disregarded it."

"Having established that plaintiff has alleged facts that, if proven, show the defendants violated a constitutional right," the Court of Appeals cited *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001) [*PLN*, Nov. 2002, p.26] in support of its conclusion that the appellants were not entitled to qualified immunity, as "the right to be free from deliberate indifference to suicide" had already been clearly established. See: *Estate of Miller v. Tobiasz*, 680 F.3d 984 (7th Cir. 2012), *rehearing and rehearing en banc denied*.

Following remand, the case settled in February 2013 with the state agreeing to pay $737,500 to Miller's estate "to resolve all plaintiffs' claims in their entirety." ⬛

KRASNYA IS PROUD TO INTRODUCE AT FANTASTIC INTRODUCTORY PRICES
THE CONNOISSEUR'S COUTURE "CACHE TWO-FIVE COLLECTION"
OF INTERNATIONAL ADULT FILM STARS
TWELVE PACKAGES OF 25 NUDE AND NON-NUDE POSES,
AVAILABLE ONLY IN OUR "CACHE TWO-FIVE" COLLECTION.
"CACHE TWO-FIVE"
"CACHE TWO-FIVE"  IS AVAILABLE IN TWELVE (12) SPECIALLY PRICED PACKAGES
OF 25 POSES IN NUDE AND NON-NUDE POSES.
PLEASE SPECIFY ON YOUR ORDERS IF YOU WANT NUDE OR NON-NUDE PACKAGES
AND WHAT COLLECTION NUMBER YOU'D LIKE.
COLLECTIONS ARE NUMBERED 01-12 FOR EXAMPLE ON YOUR ORDER YOU'D WRITE:
***NUDE CACHE TWO-FIVE PACKAGE 01 & 02***
REMEMBER THERE ARE TWELVE (12) COMPLETELY DIFFERENT PACKAGES OF 25 BABES,
THERE ARE NO DUPLICATES IN ANY OF THE 12 PACKAGES.
600 BEGUILING BEAUTIES, ALL BRAND NEW ADDITIONS TO OUR LINE AND AVAILABLE ONLY
IN OUR CACHE "TWO-FIVE" PACKAGES!  300 NUDES AND 300 NON-NUDE BEAUTIES
CAPTURE YOUR OWN COLLECTION OF KRASNYA'S "CACHE TWO-FIVE" SELECTIONS IN
INDIVIDUALIZED PACKAGING OF 25 RARE AND EXQUISITE BREATH-TAKING BEAUTIES.
THE CONNOISSEUR'S COUTURE COLLECTION OF "CACHE TWO-FIVE" BRINGS YOU
25 BEAUTIES IN EACH "CACHE TWO-FIVE" PACKAGE FOR ONLY $17.95 PER PACKAGE
LIMITED TIME SPECIAL ***** $99.95*****
PLUS S&H FOR 6 "CACHE TWO-FIVE" PACKAGES OF THE NUDE OR NON-NUDE COLLECTIONS
150 BEAUTIES
IMAGINE 150 OF THESE EXCITING AND EXQUISITE BEAUTIES
FOR A RIDICULOUSLY LOW PRICE OF
*****$99.95***** PLUS $12.00 SHIPPING AND HANDLING CHARGE.
ADD $2.00 FOR SHIPPING AND HANDLING PER "CACHE TWO-FIVE" PACKAGE ORDERED.
YOU MUST SPECIFY NUDE OR NON-NUDE PACKAGES
IF NOT SPECIFIED NON-NUDE WILL BE SHIPPED AUTOMATICALLY
ALL OF OUR NORMAL POLICIES APPLY

FOR KRASNYA CLIENTS WHO WORK THE YARDS; HAVE WE GOT A
GREAT OPPORTUNITY FOR YOU...GRAB BAG
MR. HUSTLE GRAB BAG BARGAIN DAY$
ONLY $0.25 CENT$ PER BABE
5 GRAB BAG MINIMUM PURCHASE REQUIRED
$2.00 SHIPPING AND HANDLING PER BAG
25 AWESOME BABES PER BAG AT ONLY $6.25 PER BAG
YOU MUST BUY AT LEAST 5 GRAB BAGS OR 50 GRAB BAGS.
THIS***GRAB BAG BARGAIN*** IS NOT GOING TO BE OFFERED
AGAIN THIS YEAR.    SO STOCK UP NOW!!
THIS SALE ENDS JULY 31, 2013
AS YOU KNOW YOU GET AN ARRAY OF 25 GORGEOUS BABES
YOU CAN ONLY CHOOSE EITHER MALES OR FEMALES,
ALL NUDES OR BOP SAFE...
THE INDIVIDUAL SELECTIONS COME FROM OUR
BEST CATALOGS!!!
YOU MAY WANT TO SIT DOWN FOR THIS BONUS BARGAIN!
OUR BABES CATALOGS SPECIAL OF THE DECADE
—  5 COLOR CATALOGS FOR  $6.00 —
— 10 COLOR CATALOGS FOR  $12.00 —
— 15 COLOR CATALOGS FOR  $18.00 —
— 20 COLOR CATALOGS FOR  $24.00 —
WHEN YOU PURCHASE THE 5 GRAB BAG MINIMUM
THIS PRICE INCLUDES FREE SHIPPING ON THE CATALOGS
BECAUSE OF SHIPPING TERMS ALL CATALOGS SOLD IN
MULTIPLES OF 5 FOR $6.00 ONLY.
YOU CHOOSE EITHER MALE OR FEMALE CATALOGS

WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

Thousands of the hottest and most scandalous Babes & Dudes found on the
planet. Each catalog page has 120 beautiful Girls or Boys posing just for you!
Order one catalog page for only $4.50 or for 10 US " Forever Stamps"
with a SASE enclosed. We will send you Volume One.
Each additional volume the same price!
HELP US TO HELP YOU!
We are more than happy to answer E-mail inquires however, due to mailing cost at
$0.45 Cents a letter, please enclose a SASE with your questions,
OTHERWISE NO REPLIES!
WHAT ABOUT OUR PRICES AND POLICIES
Vivid 4x6 color prints as low as $0.35 Cents per print on orders over 500, shipped
according to policy: 25 pictures per envelope every 24 hours.
S&H $2.00 per envelope.
METHOD OF PAYMENT/CONTACT INFORMATION
U.S. Postal Service Money Orders-State & Federal Correctional institutional
checks payable only to: KRASNYA L.L.C.
Equation for First Class U.S. Forever Stamps
Brand New Flat Book for all orders at the rate of $6.00 per Flat Book.
We respond to our clients needs and try to help the best we can.
Our seasonal specials mean a kickoff of savings!

KRASNYA  CALENDAR MAGAZINE
THE CONNOISSEUR'S PORTFOLIO

KRASNYA CALENDAR SAMPLER MAGAZINE
DEBUT BABES OR STUDS ISSUE AVAILABLE
PLEASE SPECIFY
BOP-FRIENDLY OR NUDE
*** 2013 ***
YOU'LL RECEIVE OVER 48 BEAUTIES FROM
OUR FINEST COLLECTION ALL CAPTURED IN
VIVID APROX. 4X6 IMAGES DISPLAYING ALL
THERE ENCHANTING RADIANCE
SPECTACULAR VALUE IS OUR GOAL!
OVER $25.00 WORTH OF BABES IN EACH CALENDAR
CALENDAR SAMPLER MAGAZINE
WE DELIVER EXELLENT VALUE
WHERE OUR COMPETITION WON'T!!!

THE BASIC CALENDAR
WITH 48 NOT SO BASIC BABES
BABES OR STUDS ISSUE AVAILABLE
THROUGHOUT THE YEAR!
$11.95 OR 2 FLAT BOOKS OF FIRST
CLASS STAMPS
ALL ORDERS ARE FINAL!!!
PLEASE BE SURE TO KNOW
YOUR INSTITUTION POLICIES
ANY RETURNS WILL BE HELD FOR 30 DAYS.
CALENDAR REQUIRES SASE
WITH 5 FIRST CLASS POSTAGE STAMPS
IN 8X11 MANILLA ENVELOPE
SEND YOUR ORDERS TODAY TO:

COLOR CATALOG DISCOUNT SALE
ONE COLOR CATALOG OF 120 BABES
IN CLASSIC OR NUDE LINES $4.50
PLEASE INCLUDE
A SELF-ADDRESSED STAMPED
(2-FIRST CLASS STAMPS) ENVELOPE.
QUANTITY BUYS:
5-14 CATALOGS =10% OFF OUR REGULAR PRICE
15 CATALOGS   =15% OFF OUR REGULAR PRICE
20 CATALOGS   =20% OFF OUR REGULAR PRICE
25 CATALOGS   =25% OFF OUR REGULAR PRICE
30 CATALOGS   =30% OFF OUR REGULAR PRICE
35 CATALOGS   =35% OFF OUR REGULAR PRICE
40 CATALOGS   =40% OFF OUR REGULAR PRICE
45 CATALOGS   =45% OFF OUR REGULAR PRICE
50 CATALOGS   =50% OFF OUR REGULAR PRICE
BE SURE TO SPECIFY CLASSIC OR NUDE BABES!
70-VOLUMES OF KRASNYA BABES CLASSIC LINE
70-VOLUMES OF KRASNYA BABES NUDE LINE

LOOSE STAMPS FOR LOOSE BABES
KRASNYA LOOSE STAMP GRAB BAG SPECIAL
10 LOOSE BABES..................................30 STAMPS
25 LOOSE BABES..................................75 STAMPS
50 LOOSE BABES................................150 STAMPS
ALL STAMPS MUST BE 1St CLASS STAMPS
IN LIKE NEW CONDITION!
SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)
WE WILL PICK SELECTION FOR YOU

KRASNYA BABES HAS SPRUNG SALE!
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST
CLASS STAMPS! 1 CAT PER CUSTOMER
PLEASE SPECIFY MALE OR FEMALE BABES

$24.95  S&H Free
For Grab Bag of
50 photos
from all our catalogs
Specify race and main
area of your interests
We will pick
selection for you
Bonus: B&W Cat. Page

3 BRAND NEW FLAT BOOKS OF FIRST
CLASS STAMPS FOR:
Grab Bag of 45 photos from all our catalogs
Specify race and main area of your interests
We will pick selection for you
Bonus B&W Catalog Page
PLEASE INCLUDE 6 FIRST CLASS STAMPS
FOR S&H

KRASNYA L.L.C.
P.O.BOX 32082
BALTIMORE,MD 21282
EMAIL AND CORRLINKS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM
KRASNYASTUDS@HOTMAIL.COM

KRASNYA L.L.C.
CALENDAR SAMPLER MAGAZINE
P.O.BOX 32082
BALTIMORE, MD 21282

PLN_0000783

# Prisoners Respond to Call for Prison Phone Justice; SCI-Huntingdon Delivers!

## by Mel Motel

In June 2012 we posted the first advertisement for the Campaign for Prison Phone Justice in *Prison Legal News*. We asked you, our readers, to send letters to the Federal Communications Commission (FCC) describing how you and your families have been impacted by the high cost of prison telephone calls.

One year later, close to 100,000 people and organizations have submitted comments or signed on to petitions filed with the FCC asking the Commission to act on the "Wright Petition" to lower the cost of interstate prison phone calls.

Between July 2012 and June 2013, prisoners submitted or signed on to 1,754 letters or comments filed with the FCC regarding the Wright Petition.* It is clear that many prisoners have been hard at work, organizing to inundate the FCC with stories of unfair phone rates, financial hardship and the struggle to maintain connections with their families.

Pennsylvania prisoners contributed more than 540 letters to the FCC, making up almost a third of the total prisoner filings. Pennsylvania was the only state where more than one letter was submitted per 100 prisoners statewide.

The most filings of any prison or jail came from SCI-Huntingdon in Huntingdon, PA, with 174 letters submitted to the FCC. In their comments, many prisoners at SCI-Huntingdon called for "no connection fees," "no commissions" and "a 10 minute free call for all inmates daily," among other recommendations.

Prisoners at SCI-Greene in Waynesburg, PA came in second with 147 letters submitted. The third-highest number of letters, 72, came from prisoners at the Thumb Correctional Facility in Lapeer, Michigan.

Overall, the states with the highest numbers of prisoner filings were Pennsylvania (542), Michigan (179), Virginia (154), California (125), Illinois (99), West Virginia (49) and Tennessee (43).

However, those are mostly states with high prisoner populations. Taking into account the number of letters filed relative to the size of a state's prison population, prisoners in several other states made notable contributions: Alaska (19), Colorado (28), Iowa (18), Kansas (14), Nevada (22) and Washington (27).

Kudos go to the Huttonsville Correctional Center in West Virginia, where 36 prisoners signed on to a letter to the FCC (representing approximately .5% of West Virginia's entire prison population). Each prisoner contributed personal comments to the joint letter.

When we first encouraged our readers to contact the FCC in the June 2012 issue of *PLN*, we said "the prison facility which registers the most letters will be highlighted on the campaign website and will get a co-producer credit on our national radio program addressing the high cost of prison phone calls."

Thus, we will highlight the efforts of prisoners at SCI-Huntingdon on our Campaign website and give them a shout-out on the Campaign's national radio program. Congratulations for submitting the most letters regarding the Wright Petition!

We also want to thank the Prison Policy Initiative, Sum of Us, Justice Fellowship, CREDO Mobile and Color of Change for collectively obtaining around 90,000 signatures on petitions and comments filed with the FCC between November 2012 and March 2013.

On behalf of the Campaign for Prison Phone Justice, we thank everyone who has sent letters to the FCC sharing your stories and standing up for change. The comment period on the Wright Petition is now closed and the FCC is currently reviewing thousands of submissions – including those filed by prison phone companies, civil rights organizations, law firms, and prisoners and their family members. Stay tuned for updates on the Campaign.

*\* This number is approximate. As it can take several weeks for the FCC to post filings on its website, the number is probably low. Also, many of the comments posted on the FCC's docket had incomplete identifying information, so some submissions could not be credited to a specific individual or prison facility.*

# Ninth Circuit: Enemy Combatant Detention/Torture Not Clearly Established

Last year, the Ninth Circuit Court of Appeals held that recent U.S. Supreme Court precedent compelled it to conclude that federal officials were entitled to qualified immunity for the treatment of enemy combatants detained after the September 11, 2001 terrorist attacks, because the law was not clearly established at the time.

In May 2002, Jose Padilla, also known as Abdullah al-Muhajir, was detained on a material witness warrant. President George W. Bush then issued a June 9, 2002 order declaring Padilla an "enemy combatant" for allegedly plotting a "dirty bomb" attack. As a result, Padilla was held in military custody for three-and-a-half years. He was denied all contact with family and legal counsel for 21 months.

Padilla was later tried on federal criminal charges unrelated to the "dirty bomb" allegations used to justify his military detention. A jury convicted him in August 2007 and the Eleventh Circuit affirmed his conviction but vacated his 208-month prison sentence as being "unreasonably low." See: *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011).

Meanwhile, in February 2007, Padilla and his mother, Estela Lebron, filed a federal lawsuit against former Secretary of Defense Donald Rumsfeld, former Attorney General John Ashcroft and 11 other government officials. The district court granted qualified immunity to the defendants in *Lebron v. Rumsfeld*, 764 F.Supp.2d 787 (D.S.C. 2011), and the Fourth Circuit affirmed in *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012).

Additionally, in January 2008, two years after Padilla's military detention ended, he and his mother filed a similar lawsuit against Deputy Assistant Attorney General John Yoo in a California federal court.

They alleged that Padilla was imprisoned without charge or the ability to defend himself. Padilla also claimed that he was

PLN_0000784

subjected to "gross physical and psychological abuse upon the orders of high-ranking government officials as part of a systematic program of abusive interrogation mirroring the alleged abuses committed at Guantanamo Bay, including extreme isolation; interrogation under threat of torture, deportation and even death; prolonged sleep adjustment and sensory deprivation; exposure to extreme temperatures and noxious odors; denial of access to necessary medical and psychiatric care; substantial interference with his ability to practice his religion; and incommunicado detention for almost two years, without access to family, counsel or the courts."

The complaint alleged that Yoo, now a professor at UC Berkeley School of Law, had "publicly acknowledged in his book, *War by Other Means*, that he stepped beyond his role as a lawyer to participate directly in developing policy in the war on terrorism."

The district court denied Yoo's motion to dismiss on qualified immunity grounds, finding "that the complaint alleged violation of clearly established constitutional and statutory rights." See: *Padilla v. Yoo*, 633 F.Supp.2d 1005 (N.D. Cal. 2009).

On appeal, the Ninth Circuit first elected "to treat the Fourth Circuit's decision [in *Lebron*] as persuasive precedent rather than affording it preclusive effect."

The appellate court then noted that "[t]he outcome of this appeal is governed by the Supreme Court's decision in *Ashcroft v. al-Kidd*, 131 S.Ct. 2074 (2011)," which was decided after the district court's order on Yoo's motion to dismiss.

In *Ashcroft*, the Court noted that a "Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"

The *Ashcroft* ruling found that the defendant in that case, former Attorney General John Ashcroft, "did not violate clearly established law by allegedly authorizing federal prosecutors to use material witness arrest warrants, supported objectively by reasonable suspicion, as a pretext for detaining terrorism suspects."

The Ninth Circuit ultimately held that the law was not sufficiently clear at the time of Padilla's military detention that he "was entitled to the same constitutional protections as an ordinary convicted prisoner or accused criminal."

Padilla argued that "the Fifth Amendment's prohibition on government conduct that 'shocks the conscience' is violated when the government tortures a United States citizen designated as an enemy combatant," even in the absence of case law that clearly establishes the wrongfulness of such conduct. However, the Court of Appeals found that Yoo was entitled to qualified immunity because it was not clearly established at the time that Padilla's treatment constituted torture.

"[W]e cannot say that any reasonable official in 2001-03 would have known that the specific interrogation techniques allegedly employed against Padilla, however appalling, necessarily amounted to torture," the Ninth Circuit wrote. "Thus, although we hold that the unconstitutionality of torturing an American citizen was beyond debate in 2001-03, it was not clearly established at that time that the treatment Padilla alleges he was subjected to amounted to torture."

Accordingly, the district court's denial of Yoo's motion to dismiss was reversed. See: *Padilla v. Yoo*, 678 F.3d 748 (9th Cir. 2012).







Matthew Pinix
*Appellate Attorney*

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, a law firm with 10-years' experience handling **criminal appeals** in **Wisconsin** and **Illinois**.

**Law Office of Matthew S. Pinix, LLC** | 1200 East Capitol Drive, Suite 220 | Milwaukee, WI 53211 | (414) 963-6164




*Our Bodies, Ourselves* is a highly praised classic and vital resource for women of all ages with important information about every aspect of their health and well-being. This newly revised edition gives women everything they need for making key decisions about their health - from definitive information from today's leading experts to personal stories from other women just like them.

**$26 + $6 S&H for all orders under $50.**

*Order by mail, phone, or on-line from*
**Prison Legal News**
**PO Box 1151**
**Lake Worth FL 33460**
**561-360-2523**
**www.prisonlegalnews.org**



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
**10954 NW 7th Ave**
**Dept: LN0713**
**Miami, FL 33168**

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com



Since 1959

# Illinois: Conditions Lawsuit Filed by Civilly Confined Sex Offenders Dismissed

*by Derek Gilna*

CIVILLY COMMITTED SEX OFFENDERS confined pursuant to Illinois' Sexually Violent Persons Commitment Act, 725 ILCS 207/1-99, filed suit in federal court in 2007 under 42 U.S.C. § 1983, challenging the conditions of their confinement at the Rushville Treatment and Detention Center (Rushville).

After the district court dismissed their claims, the Seventh Circuit Court of Appeals considered two issues: whether due process required input from health professionals prior to restricting personal contact among detainees at the facility, and whether the First Amendment entitled detainees to use the internal mail system at Rushville to exchange letters with other detainees. Finding no genuine dispute as to material facts, the appellate court affirmed the dismissal.

The Court of Appeals noted that "persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," citing *Youngberg v. Romeo*, 457 U.S. 307 (1982). According to the Seventh Circuit, this case appeared to arise due to "dissatisfaction with Rushville's basic setup," as civil detainees previously "were held at a facility in Joliet that allowed them to mix more freely."

Rushville is divided into six units, with patients separated by type of detainee and treatment requirements. Opportunity for mixing between the units is restricted; the only place where the separate units mingle is during an hour or two of outdoor "yard time." Detainees can pass letters within their units, but must use the U.S. mail to write detainees in other units. The plaintiffs alleged that these restrictions were too severe and fell below minimum standards for sex offender treatment.

In reviewing the applicable law, the Court of Appeals acknowledged that "professional judgment [must] be exercised" when making decisions about conditions of confinement. The *Youngberg* ruling, which specifically pertained to people with mental disabilities, was extended by the Seventh Circuit to recognize that "(a) committed persons are entitled to some treatment,

and (b) what that treatment entails must be decided by mental-health professionals." See: *Allison v. Snyder*, 332 F.3d 1076, 1081 (7th Cir. 2003).

The plaintiffs contended that under *Youngberg*, security decisions had to be made by a health professional. The appellate court rejected that argument, however, stating, "Security decisions do not violate *Youngberg* just because they restrict treatment options. As here, where there has been no showing ... that a security decision is unjustified on security grounds, we will not leap to the conclusion that its impact on treatment is enough to make it a treatment decision subject to *Youngberg's* rule."

The Court of Appeals also rejected the plaintiffs' claim related to the internal mail system at Rushville. The detainees had asked the court to follow the rule set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987): "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate

penological interests." The Seventh Circuit found there was no "impingement," but only a demand for a "better way" to communicate with detainees in other units other than the U.S. mail. "As maligned as the United States Postal Service may be, there is no First Amendment right to a means of sending letters superior to the one it provides." The district court's order of dismissal was therefore affirmed.

One appellate judge dissented, stating, "Even if security concerns trump almost all other constitutional interests of convicted criminals, the same is not true of those suffering from a mental disorder.... I do not believe that the naked incantation of the term 'security' is enough to relieve the staff at the Rushville Treatment and Detention Center of its duty to exercise professional judgment when it makes decisions that affect the rehabilitative aims of the facility. I would reverse the district court's grant of summary judgment on this point...." See: *Lane v. Williams*, 689 F.3d 879 (7th Cir. 2012).

# Tenth Circuit: No § 2241 Jurisdiction for BOP Supermax Challenge; Claims Must be Brought as *Bivens* Action

THE TENTH CIRCUIT COURT OF APPEALS held on May 1, 2012 that a federal prisoner's transfer to supermax custody must be brought as a *Bivens* action rather than as a federal habeas corpus petition under 28 U.S.C. § 2241.

Jesus Hector Palma-Salazar, a Mexican citizen, was indicted on drug charges by a California federal court in December 1995.

Mexican authorities arrested Palma-Salazar in June 2002 and extradited him to the United States five years later. He pleaded guilty in February 2008 and was sentenced to 16 years in prison plus a five-year term of supervised release.

Between January 2007 and June 2008, Palma-Salazar resided in three U.S. prisons without incident. On June 18, 2008, however, the Bureau of Prisons (BOP) notified him of his pending transfer to the Administrative Maximum Prison (ADX), a

supermax facility in Florence, Colorado.

The notice alleged that Palma-Salazar's leadership in the Sinaloa Cartel and his previous involvement in serious cartel-related crimes posed a threat to prison security.

At his June 24, 2008 transfer hearing, Palma-Salazar "claimed there was no evidence to support the allegations made in the notice." Nevertheless, the next day he received a BOP report that concluded he satisfied ADX placement criteria and recommended his transfer. The BOP's Regional Director accepted the recommendation on June 27, 2008, but Palma-Salazar did not receive notice of that decision. He was transferred to ADX almost a month later.

After Palma-Salazar's appeal of the transfer decision was denied on March 26, 2009, he filed a petition for writ of habeas corpus under 28 U.S.C. § 2241, alleging that his ADX confinement violated the

U.S. Constitution and an extradition treaty between the United States and Mexico.

The district court denied his petition, concluding that it lacked jurisdiction under § 2241 to consider his constitutional claims and holding that those claims must be brought under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The court reached the merits of Palma-Salazar's treaty claim but held that his ADX confinement did not violate the treaty.

On appeal, the Tenth Circuit affirmed the dismissal of Palma-Salazar's § 2241 petition, concurring that "his challenge is properly construed as a challenge to the conditions of his confinement and must be brought pursuant to *Bivens*."

The Court of Appeals also concluded that the district court lacked jurisdiction under § 2241 to consider Palma-Salazar's treaty violation claim. "Like his [constitutional] claims, Palma-Salazar's claim that his confinement at ADX violates the extradition treaty between the United States and Mexico is properly construed as a challenge to the conditions of his confinement," the Tenth Circuit held. That claim

"must be brought pursuant to *Bivens*." See: *Palma-Salazar v. Davis*, 677 F.3d 1031 (10th Cir. 2012).

Following remand, the district court dutifully dismissed Palma-Salazar's § 2241 petition for lack of jurisdiction.

# Arkansas: Sentencing Court Cannot Order Prison Treatment

THE ARKANSAS SUPREME COURT HAS held that a sentencing court lacks authority to order a defendant to complete sex offender treatment in prison.

In 2011, Chad Lee White was convicted of rape and second-degree battery for anally penetrating a neighbor's two-year-old son while babysitting him. The trial court imposed a life sentence and ordered White to complete a sex offender treatment program while incarcerated.

Relying on its earlier decision in *Richie v. State*, 2009 Ark. 602, 357 S.W.3d 909 (Ark. 2009), the Arkansas Supreme Court agreed with White that the sentencing court erred in ordering him to complete sex offender treatment in prison.

The Court observed that in *Richie*, it held that "pursuant to Ark. Code Ann. § 5-4-303, a circuit court may clearly place

conditions on a defendant when the court suspends the imposition of sentence or places the defendant on probation, but that 'there is no similar provision in section 5-4-104(d) that would allow a court to place specific conditions on a sentence of incarceration.'" The *Richie* decision explained that the Department of Corrections, not the court, had authority "to determine any conditions of incarceration, such as whether the defendant will undergo ... treatment."

As such, the Supreme Court held that the sentencing court's sex offender treatment order was illegal, and remanded the case "for the circuit court to strike the unlawful condition and enter a corrected judgment and commitment order." The Court rejected White's other arguments regarding his conviction and sentence. See: *White v. Arkansas*, 2012 Ark. 221 (Ark. 2012); 2012 WL 1877322.



## Learn & Understand the Law

It can be a powerful influence in your life.

Whether you want to enhance your knowledge of the law, help others, or acquire a new skill — choosing Blackstone's independent study courses will put you on the road to a brighter future.

- Learn Civil & Criminal Law
- Learn Legal Research
- 120 Years of Legal Training Experience
- Study in Your Spare Time
- Affordable Tuition, Easy Payment Plan

Only $59.00 Per Month

If you have a sponsor they must contact us by phone at: 1.800.826.9228

☐ **Yes!** I'd like to learn more
*Please rush me FREE course information.*

Name _____

Address _____

_____

City _____ State ____ Zip ____

☐ Paralegal Course
☐ Advanced Paralegal Course

- Civil Litigation
- Wills/Trusts/Estates
- Personal Injury/Torts
- Family Law
- Criminal Law

**Blackstone Career Institute**
SINCE 1890

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.

P.O. Box 3717 • Allentown, PA 18106

ORDER THE NEW PRISON OFFICIAL CATALOG - ONLY $10

**PRISON OFFICIAL**

INMATES #1 RECOMMENDED

ISSUE#1 OR ISSUE#2
5 FREE HOT MODEL PHOTOS INCLUDED WITH PURCHASE

CORRECTIONAL FACILITY APPROVED

GET MAIL ✉ DONT DELAY

**ORDER THE NEW PEN PAL LIST OF 50 REAL ADDRESSES TO FEMALES WAITING TO CORRESPOND TO PRISONERS**
**RECENT PHOTOS INCLUDED!**
**SEND $49.95**

Inmates post your profile on our Pen Pal website
**www.PrisonOfficial.com**
2 year membership -Send $30
250 word limit send S.A.S.E for return of your photo

Send Facility Checks/Money Orders To:
MUST ADD $2 S/H TO ALL ORDERS
**PRISON OFFICIAL**
**P.O. BOX 1427**
**WARRENVILLE IL 60555**

PLN_0000787

# California: Eastern District Jury Pool Alleged to be Biased Against Prisoners

DEFENSE ATTORNEYS REPRESENTING two prisoners accused of murdering a federal prison guard have argued that the jury pool in the region – the Central Valley of California – is biased against prisoners due to the numerous correctional facilities that dot the landscape.

The Fresno Division of the U.S. District Court for the Eastern District of California is home to 20 state and federal facilities plus three large county jails, the attorneys noted. The District's Sacramento Division includes 11 state and federal prisons as well as the headquarters of the California Correctional Peace Officers Association – the union that represents state prison guards.

"All this means the Eastern District has among the largest, if not the largest, concentration [of] prisons, jails, detention centers, and corrections administration offices in the nation," the defense attorneys wrote in a March 28, 2013 court filing.

"There is a significant demographic bias in the Eastern District of California that manifests itself in litigation involving correctional officers and the operation of prisons," said the attorneys for federal prisoners Joseph Cabrera Sablan and James Ninete Leon Guerrero. Charged with capital murder, Sablan and Leon Guerrero are accused of killing prison guard Jose Rivera, 22, at USP Atwater in June 2008. [See: *PLN*, Aug. 2009, p.10; Jan. 2009, p.50].

As evidence of jury pool bias, the defense attorneys cited the 2010 acquittal of former Atwater Lt. Eric A. McEachern, who was charged with assaulting a prisoner with a flashlight, and a 2003 lawsuit involving several guards who were found not liable for arranging the rape of a prisoner at the California State Prison at Corcoran. [See: *PLN*, March 2000, p.12]. A jury pool "with this history" must be taken into consideration when ruling on a request for a change of venue, the attorneys argued.

The case against the defendants is already highly charged, with extensive local media coverage. Citing video footage and eyewitness accounts at USP Atwater, government officials claim Leon Guerrero tackled Rivera and held him while Sablan repeatedly stabbed the guard with a shank. Both prisoners were allegedly drunk on pruno at the time.

Seeking a change of venue by alleging jury bias against prisoners is an unusual tactic. The defense attorneys, Richard Novak and Salvatore Sciandra for Leon Guerrero, and federal defender Tivon Schardl for Sablan, have engaged an expert to bolster their argument. Media coverage is one area of alleged bias, while another "is the existence of a significant bias in the community that arises out of the Eastern District's saturation by local, state and federal correctional institutions and their employees and the families of the employees," they argued.

In addition to jury pool bias, the defense attorneys intend to argue "that the management of USP Atwater knowingly tolerated the manufacture, sale and consumption of alcohol by inmates; that possession of weapons by inmates was known by [Bureau of Prisons] management to be an ongoing and pervasive problem at the institution; that protocols for the housing of inmates were not followed at USP Atwater ... and that the grand jury was presented with materially false testimony concerning the alleged 'motive' behind the assault on Officer Rivera and concerning the evidence of premeditation."

The Central Valley region of California is a Republican stronghold, noted for its conservative, tough-on-crime legislative representatives. Whether prisoners who are facing the death penalty for killing a prison guard can get a fair trial in the U.S. District Court's Eastern District remains to be seen.

Sablan and Leon Guerrero are scheduled to go to trial in July 2014. ◪

Source: *Sacramento Bee*

# CCA Loses Four Private Prison Contracts in One Month

ON JUNE 18, 2013, THE IDAHO BOARD of Correction voted not to renew the state's $29.9 million contract with Corrections Corporation of America (CCA) – the nation's largest for-profit prison company – to operate the 2,104-bed Idaho Correctional Center (ICC). The state's contract with CCA will be rebid once it expires on June 30, 2014, though the Idaho Department of Correction will not be allowed to submit its own bid.

The Board's decision to let the contract expire marks the fourth private prison contract that CCA has lost since mid-May, including two in Texas and one in Mississippi.

On June 10, 2013, CCA was notified by the Texas Department of Criminal Justice that the state would not renew contracts to house prisoners at the company's 2,216-bed Dawson State Jail and 2,103-bed Mineral Wells Pre-Parole Transfer Facility, effective August 31, 2013. The Texas legislature had cut $97 million from the state's budget in anticipation of removing prisoners from the facilities. [See: *PLN*, June 2013, p.1].

The Dawson State Jail has been a source of controversy for CCA after several prisoners died amid allegations of medical neglect. Pam Weatherby, serving a one-year sentence, died at Dawson in May 2010; her parents said she had not received adequate treatment for her diabetes. The family of Ashleigh Parks, 30, who died of pneumonia in 2008 while serving an 18-month sentence, stated her death could have been prevented had she received antibiotics. Also, in June 2012, Dawson staff ignored prisoner Autumn Miller's requests for medical care. Miller, who was six months pregnant, gave birth in a toilet at the jail; her baby, Gracie, lived just four days. Once Miller returned to the Dawson State Jail from a hospital she was put in solitary confinement.

According to the *Texas Observer*, "A January 2012 audit of Dawson health services by the Texas Department of Criminal Justice found multiple systemic failures: noncompliance more than half the time in areas of preventative, gynecological, dental, HIV and elder care. They even failed the basics: conducting inspections, having enough first aid kits, providing medically

**Dictionary of the Law**
Thousands of clear, concise definitions.
See page 61 for ordering information.

appropriate diets to sick prisoners, and keeping adequate records."

CCA's Mineral Wells Pre-Parole Transfer Facility had a history of contract violations and security deficiencies – including sexual misconduct by CCA staff, a riot involving hundreds of prisoners, contraband smuggling and escapes.

Additionally, on May 17, 2013, CCA lost its contract to operate the 1,000-bed Wilkinson County Correctional Facility in Mississippi after the state awarded the contract to rival private prison company MTC, effective July 1. The facility houses Mississippi state prisoners. In April 2013, a riot at WCCF resulted in nine prisoners being sent to outside hospitals; one, Demond Flowers, 21, was stabbed to death.

"CCA's loss of four contracts in quick succession indicates that the bloom is off the private prison rose," noted *PLN* managing editor Alex Friedmann, who also serves as president of the Private Corrections Institute (PCI), a non-profit watchdog organization that opposes prison privatization.

CCA's most recent loss of the ICC contract closes a particularly sordid chapter in the company's history. In 2011, CCA settled a federal class-action lawsuit filed by the ACLU that alleged high levels of violence at ICC; the facility was known as a "gladiator school" due to excessive violence. A 2008 report by the Idaho Department of Correction found the ICC had four times the number of violent incidents as all Idaho state prisons combined. As part of the settlement, CCA agreed to make numerous changes to reduce violence at the facility.

CCA also settled a lawsuit filed by prisoner Hanni Elabed, who was brutally beaten by another prisoner at ICC while CCA guards watched from a control room but did not intervene. Elabed suffered severe injuries as a result of the assault, which was videotaped; CCA strongly opposed the release of the video, which showed its employees failing to stop the violent attack. [See: *PLN*, Feb. 2012, p.30].

In November 2012, eight ICC prisoners filed a lawsuit against CCA claiming the company's employees were colluding with incarcerated gang members to operate the facility, including with respect to housing assignments and as a means of controlling the prison population. The lawsuit, which remains pending, also alleges understaffing at the ICC. See: *Castillon v. CCA*, U.S.D.C. (D. Id.), Case No. 1:12-cv-00559-EJL.

And on April 11, 2013, CCA acknowledged that ICC employees had falsified staffing records from at least May through November 2012. As a result, the state paid CCA for almost 4,800 staffing hours for positions that were vacant during that time period. The Idaho State Police is conducting a criminal investigation into understaffing at ICC. [See: *PLN*, May 2013, p.22].

"Either due to fiscal reasons or CCA's record of misconduct, states are realizing that they can do better than contracting with CCA or no longer have a need for the company's privately-operated facilities," Friedmann stated. "This reflects a trend in which states are reducing their prison populations and, thus, have less incentive to contract with for-profit prison firms."

CCA's loss of the four contracts in Idaho, Texas and Mississippi represents a loss of over 7,400 of the company's prison beds, or nearly 10% of CCA's currently occupied beds nationwide. ◾

Sources: *PCI press release (June 19, 2013); Associated Press*

## Federal Writs

• • •

## Texas Parole

• • •

## Texas Writs

We will fight endlessly for your rights and to secure your freedom.

Time is of the essence for many remedies, so please contact our office today.

You do not have to accept this. You CAN keep fighting.

Is your freedom worth it?

Surprisingly affordable.

Law Office of
### David Rushing
723 Main St. Ste. 816
Houston, TX 77002
713-877-1300

ADVERTISEMENT

**Webster's Spanish/ English Dictionary**
It's a quick and easy language reference for avid readers. Provides English and Spanish abbreviations with a clear and easy-to-read typeface. Contains valuable pronunciation tables and guides. 194 pages. Published by Kappa Books, 2011 edition. $5.99 ea. (or 13 Forever stamps) FREE SHIPPING U.S. Territories.

**Reading Glasses with Metal Frame:**
Full-size lens, spring template, soft-coated nose pads for better fit and comfort, full frame. Use: Good for everyday use. Material: Steel frame & templated and glass lens. Unisex. Color: Gold-finish frame / Black temple covers. Length: 2.1/8" each lens. Width: 1.5/16" each lens.
Magnifications available:
1.0x, 1.25x, 1.5x, 1.75x, 2.0x, 2.25x, 2.5x, 2.75x, 3.0x, 3.25x, 3.5x, 3.75x, 4.0x. $7.95 for 3 pairs assorted (or 17 Forever stamps).
**For complete BROCHURE send 2 forever stamps or get it free with order** FREE SHIPPING U.S. Territories.

ORDER TO: MARA WORLDWIDE, 115 W. CALIFORNIA BLVD. STE. 424-P, PASADENA, CA 91105

# EXECUTIVE CLEMENCY

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT**
**3907 N. Federal Highway, # 151**
**Pompano Beach, FL 33064**
**954-271-2304**



**(35-Years of Clemency & Parole Assistance)**
**(Transfers Under The Int'l Prisoner Treaty)**

# Collateral Consequences Weighed for Corporations, Not for Individuals

### by Russell Mokhiber

IN CASE YOU HAD ANY DOUBT THAT FEDeral prosecutors favor corporations over individuals, check out Mythili Raman's testimony before a House hearing on May 22, 2013.

Raman is the acting chief of the Criminal Division at the Department of Justice. She appeared before the Oversight and Investigations Subcommittee of the House Financial Services Committee.

The title of the hearing – "Who Is Too Big to Fail: Are Large Financial Institutions Immune from Federal Prosecution?"

In a nutshell, the answer is – Yes they are immune from federal prosecution.

But it's not just them.

It's the vast majority of major corporate criminals, which now are granted deferred and non-prosecution agreements when twenty years ago they were forced to plead guilty.

This sea change in corporate crime practice was ushered in by then-Deputy Attorney General Eric Holder in 1999 when he drafted the Principles of Federal Prosecution of Business Organizations. (Holder has been through the revolving door since – over to Covington & Burling to defend the corporations he's now charged with prosecuting, then back to the Justice Department as Attorney General under President Obama. And no doubt, soon back to Covington).

Under the subsequent rewrites of the Holder memo, federal prosecutors must now take into consideration the collateral consequences of a criminal prosecution on a major corporation, including "whether there is disproportionate harm to shareholders, pension holders, employees, and others not proven personally culpable, as well as impact on the public arising from the prosecution."

And this, along with the eight other factors that prosecutors must take into account before prosecuting a corporation, tilts the balance away from prosecution and toward deferred and non-prosecution agreements.

Raman made it a point to emphasize twice during her testimony that individuals are not given the same consideration.

"For individuals, collateral consequences never enter into the equation," Raman said.

Why not?

After all, collateral consequences for individuals can be devastating.

According to the American Bar Association Task Force on Collateral Consequences, the individual convict "may be ineligible for many federally-funded health and welfare benefits, food stamps, public housing, and federal educational assistance."

"His driver's license may be automatically suspended, and he may no longer qualify for certain employment and professional licenses. If he is convicted of another crime he may be subject to imprisonment as a repeat offender. He will not be permitted to enlist in the military, or possess a firearm, or obtain a federal security clearance. If a citizen, he may lose the right to vote. If not, he becomes immediately deportable."

And Raman says that federal prosecutors can't take these into consideration, but must take the collateral consequences of a corporate conviction into consideration.

Why the difference?

Because the corporate crime lobby has marinated the justice system. And morphed our criminal justice system from one that was meant to deliver equal justice for all to one where corporate criminals reign supreme.

"You can imagine why, when I see some of the biggest banks in the world, who get a slap on the wrist, for laundering drug money from the drug cartels, and [their executives] are not going to jail," Congresswoman Maxine Waters (D-California) told Raman at the hearing. "And then we have all of these young people getting arrested, some of them not criminal, just stupid, getting involved with small amounts of cocaine. And yet we have some of the richest, most powerful banks in the world laundering drug money from the drug cartels. Why don't they [the bank executives] go to jail?"

Raman started to answer and Waters cut her off.

"We know what you do," Waters said. "It's what you do that we don't like. What you do is – they get fined. And it's a cost of doing business." ▮

*Russell Mokhiber is the editor of the Corporate Crime Reporter (www.corporatecrimereporter. com), which published this article on May 24, 2013; it is reprinted with permission.*

# Seventeen Years Pending Re-trial Fails to State Speedy Trial Violation under § 1983

THE SIXTH CIRCUIT COURT OF APPEALS has held that a pretrial detainee did not suffer a violation of his Sixth Amendment right to a speedy trial despite being imprisoned for 17 years after a state appellate court reversed his conviction and remanded the case to the trial court.

In 1988, Buxton Craig Heyerman was found guilty in Calhoun County, Michigan of one count of first-degree criminal sexual conduct. He was sentenced to 20 to 40 years in prison, but the Michigan Court of Appeals reversed his conviction on June 8, 1989. Heyerman was advised of the ruling by his appellate counsel, and the trial court and prosecutor were informed by the appellate court the day the opinion was released.

However, nothing further occurred with Heyerman's case until he filed a habeas petition in 2007. Court and prosecutorial officials had no idea the case had slipped through the cracks of the judicial system. In the wake of his petition, Heyerman was appointed counsel and his attorney moved to dismiss the charge on speedy trial grounds. Following a series of hearings, the trial court entered an order on May 11, 2007 that found Heyerman's speedy trial rights had been violated, and the criminal charge was dismissed with prejudice.

With the assistance of counsel, Heyerman filed a 42 U.S.C. § 1983 action on May 9, 2009, naming several defendants. Only Calhoun County and Susan Mladenoff, the county's prosecuting attorney from January

2001 through 2008, remained as defendants at the summary judgment stage, and the district court granted summary judgment in their favor. Heyerman appealed.

While the Sixth Circuit said it was not relevant to the disposition of Heyerman's § 1983 action, the appellate court described, for the interest of readers, why neither Heyerman nor his criminal defense attorney had brought his case to the attention of the trial court or prosecutor's office during the 17-year period after his conviction was reversed. Heyerman's attorney, in hearings before the trial judge, testified that he advised Heyerman "to stay put and quiet like a mouse" until the statute of limitations had expired, as both thought that Heyerman likely would be convicted at a re-trial.

Heyerman initially agreed to this plan, but then pushed his counsel to bring his case to the trial court's attention when his attorney "started ... hemming and hawing about the more time [served] the better." Heyerman eventually got fed up and quit speaking to his lawyer, "who to his discredit, apparently abandoned his client."

That strategy did not work out very well. Heyerman's counsel had incorrectly determined the statute of limitations was ten years but then took no action after a decade had passed. Such inaction proved to be costly. A disciplinary board suspended Heyerman's attorney from the practice of law for 33 months and Heyerman won a $95,000 settlement in a legal malpractice claim.

As to Heyerman's § 1983 suit, the Sixth Circuit found that summary judgment had

been properly granted to the defendants. There was no showing that the county had a custom, policy or practice – as required to hold the county liable – that resulted in Heyerman's lengthy stay in prison after his conviction was reversed.

Additionally, the claim against Mladenoff essentially amounted to municipal liability or respondeat superior liability; the former failed due to the lack of a county policy, custom or practice, while the latter failed as a matter of law because respondeat superior does not apply in § 1983 cases.

"Undoubtedly, the judicial system – to say nothing of the criminal defense system – has not functioned as it should when a criminal defendant remains imprisoned for seventeen years after his or her conviction has been reversed and no further action has been taken," the Court of Appeals wrote. "Section 1983 liability, however, does not necessarily attach to any entity and/or individual as a result of this breakdown."

Circuit Judge Jeffrey Sutton wrote a concurring opinion in which he explained a speedy trial violation under the Sixth Amendment could not be proven in this case, as such a claim requires a showing of "state lethargy *and a state trial.*" No subsequent re-trial had ensued after Heyerman's conviction was reversed. Judge Sutton said the facts might support a claim for unreasonable detention under the Fourth Amendment or a violation of due process under the Fourteenth Amendment, but such claims were not before the court.

He also noted, "It is not often that an

inmate seeks refuge from the prosecutorial arm of the State by laying low for seventeen years in prison in order to avoid the risk of a new trial that, if all goes badly, will lead to: incarceration. And it is not often that a State abets this strategy by failing to realize that it is housing an individual whose conviction has been reversed. One suspects that Heyerman and his attorney will not try this again, and one hopes that Michigan will not let this happen again."

The district court's grant of summary judgment to the defendants was affirmed. See: *Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012). ◆



## INCARCERATED ENTREPRENEURS WANTED!

Be a Freight Broker.
Own your own business!
New training course provides you a job upon release.
*S.A.S.E for more information.*

## LONE WOLF ENTREPRENEURIAL INSTITUTE
**1015 Townsend Dr. Suite C Pocahontas, AR 72455**
*Make unlimited income!*
**1-870-222-0270**
**Lonewolfbusiness.com**

LAW OFFICES OF

# ELMER ROBERT KEACH, III

A PROFESSIONAL CORPORATION

Law Offices of Elmer Robert Keach, III, PC
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

## Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated

*Custodial Death Cases • Wrongful Arrest and Incarceration*
*Medical Indifference Cases • Corrections and Police Brutality*
*Sexual Abuse and Assault • Illegal Strip Searches*
*Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals,
Post-Conviction Relief, Habeas Corpus

### WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED, YOU HAVE A VOICE.

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages.
DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS.
Make sure to exhaust your administrative remedies and comply with state law notice
requirements, if applicable, to preserve state law intentional tort/negligence claims.

# PLN Files Public Records Suit Against CCA in Vermont

On June 7, 2013, Prison Legal News, represented by the ACLU of Vermont, filed a lawsuit in state court after submitting a public records request seeking information about legal settlements involving Corrections Corporation of America (CCA) – the nation's largest for-profit prison firm. The Vermont Department of Corrections contracts with CCA to house hundreds of Vermont prisoners in out-of-state facilities.

As part of its reporting on conditions in private prisons, PLN had submitted a public records request to CCA in the fall of 2012 that sought information about the resolution of lawsuits filed by Vermont prisoners housed in CCA-operated prisons. The company ignored the request as well as a subsequent administrative appeal.

"The public needs to know how prisoners are treated and to understand how the for-profit prison industry works," said PLN editor Paul Wright. "By reviewing CCA's litigation settlements, Prison Legal News can report on the ways in which Vermont prisoners are being injured at CCA facilities and suffering violations of their constitutional rights, and how much CCA is willing to pay for the misconduct of its employees."

"This is an important case for Vermont public records law," stated Allen Gilbert, executive director of the ACLU of Vermont. "States and municipalities are contracting out more and more of their responsibilities, and it's vital that Vermonters don't lose the ability to see what's being done in their names and with their tax dollars."

Wright noted that Prison Legal News has filed similar lawsuits against private prison companies. PLN successfully sued CCA in Tennessee, where the company is headquartered, for failing to comply with that state's public records statute. [See: *PLN*, June 2013, p.14]. PLN recently filed a similar public records suit against CCA in Texas [*PLN*, June 2013, p.46], and successfully sued private prison firm GEO Group under Florida's public records law. [See: *PLN*, June 2010, p.29]. Further, PLN sued Prison Health Services for failing to produce public records in Vermont; the company settled and produced the requested records. [See: *PLN*, Dec. 2012, p.16].

"As far as we're concerned, a private corporation that is playing the role of a state agency through a privatization contract is the functional equivalent of a state agency and is thus accountable to the public," Wright stated.

ACLU of Vermont staff attorney Dan Barrett agreed. "A contractor cannot exercise the power of the state to hold human beings in prison cells and then turn around and say that the company is not subject to public scrutiny. We think that Vermont's public records law applies equally to CCA when it stands in the shoes of the state Department of Corrections."

PLN's lawsuit, filed in Vermont Superior Court in Montpelier, seeks a court order requiring CCA to disclose the requested records. See: *Prison Legal News v. CCA*, Superior Court, Civil Division, Washington Unit (VT), Docket No. 332-5-13 WNCV. ◪

# Re-incarceration Not Grounds to Dismiss Wisconsin Civil Commitment Petition

On June 29, 2012, the Wisconsin Supreme Court held that Wisconsin Statutes chapter 980 (2005-06), the state's sex offender civil commitment law, does not require that a pending commitment petition be dismissed when the person subject to civil commitment is re-incarcerated due to revocation of their parole or extended supervision.

The Court issued its ruling in consolidated appeals filed by Carl C. Gilbert, Jr. and Price T. Hunt, who were convicted of second- and third-degree sexual assault, respectively. Hunt also was convicted of misdemeanor battery. Gilbert received a ten-year prison sentence while Hunt was sentenced to five years in prison and five years extended supervision.

The day before Gilbert was released on parole, the state's petition to have him civilly committed was granted. When paroled the next day, Gilbert was sent to the Wisconsin Resource Center (WRC), a civil commitment facility operated by the Department of Health Services, pending the outcome of the petition. Likewise, Hunt was transferred to the WRC to complete his extended supervision after the state's civil commitment petition was granted.

Gilbert and Hunt violated the terms of their supervised release, were returned to prison due to the violations, and were subsequently ordered to be involuntarily civilly committed. However, they both stayed in prison until the completion of the remainder of their sentences before being returned to the WRC.

The Court of Appeals affirmed the trial courts' civil commitment orders (*Wisconsin v. Gilbert*, 333 Wis.2d 157, 798 N.W.2d 889 (Wis. Ct. App. 2011)), and Gilbert and Hunt petitioned for review.

In examining the merits of the appeal, the state Supreme Court noted that chapter 980 is not punitive, as its purpose is to provide treatment to sexually violent persons "who are at a high risk to reoffend in order to reduce the likelihood that they will engage in such conduct in the future."

The Court concluded that chapter 980 does not require dismissal of a civil commitment petition upon an offender's re-incarceration because it: 1) does not contain language allowing for dismissal under such circumstances; 2) does not set a time period for execution of a civil commitment order; and 3) states that an individual may be simultaneously committed under chapter 980 and incarcerated at a state prison.

Accordingly, the Wisconsin Supreme Court found that Gilbert and Hunt had been properly civilly committed and affirmed the orders of the lower courts.

Justice Ann Walsh Bradley issued a lengthy and detailed dissenting opinion.

"The majority determines that the commitment orders in this case are valid based upon its conclusion that a circuit court is permitted to 'enter a commitment order ... well before the sexually violent person [is] released from DOC [Department of Corrections] incarceration,'" she wrote. However, "[a]llowing an involuntary commitment order to be entered 'at any time' unconstitutionally divorces the findings of mental illness and dangerousness from the time the commitment is actually 'executed.'" See: *Wisconsin v. Gilbert*, 342 Wis.2d 82, 816 N.W.2d 215 (Wisc. 2012), *cert. denied*. ◪

PLN_0000792



# DISCOUNT FEDERAL PRISON CALLS

**Sentel** is a local and international call provider for **FEDERAL INMATES ONLY.**

Inmates use our service to save on expensive prison calls.

We have calling packages and per minute plans.

Here is a summary of the great plans we offer:

## MONTHLY PACKAGES (USA ONLY):

    1 Month 300 mns USA for $14.99

    3 Months 300 mns USA for $13.99

    6 Months 300 mns USA for 11.99

    12 Months 300 mns USA for $9.99

    Additional lines are priced @ $2.50 per Month

    Additional minute are priced @ 5 cents per minute

    DISCOUNT APPLIES FOR PREPAYMENTS MORE THAN 3 MONTHS.

## PAY AS YOU GO PLAN:

    *All calls inside the United States are billed at 6 cents per minute.*

    **Calls to Canada are 6 cents per minute.**

    **All calls to Mexico landline are 10 cents per minute.**

    **Calls to Dominica Republic landline are 12 cents per minute.**

    **Calls to Colombia landline and Mobile 15 cents per minute.**

    **All calls to Nigeria are just 22 cents per minute.**

    *Additional lines are 50 cents each.*

Using our service will save you 35% to 80 % with your calls.

The calls from **FEDERAL FACILITIES** will be billed the local rate of 6 cents per minute plus our service fee.

Contact info:    **Sentel**
                       **9550 S. Eastern Ave., Ste. 253**
                       **Las Vegas, NV 89123**
                       **Ph: 702-430-9445**
                       **Email:  sentel.nv@gmail.com**
                       **Website:  www.sentelinmatecall.com**

PLN_0000793

# Some Jails Turning to Video Visitation Only

*by Matt Clarke*

THE WEBER COUNTY JAIL IN OGDEN, Utah has joined a growing trend – moving to video visits for prisoners – and has also started charging prisoners' families for "extra" visitation time.

In 2009 the jail replaced in-person, no-contact visits with video visits, using visitation and scheduling programs provided by Renovo Software. According to Renovo's website, the company "has provided over 100 correctional facilities with an innovative and comprehensive set of tools to manage, schedule, and automate their inmate visitation environments."

The arrangement at the Weber County Jail requires visitors to access the Internet to register and schedule a visit. The jail allows one or two free 25-minute video visits per week depending on a prisoner's classification level, not including attorney visits, which are still in-person visits. Prisoners participate in video visitation via terminals located throughout the jail.

In 2011, Renovo Software developed a pay-to-visit option, and approached jail officials with the idea of allowing additional visits for a fee.

"As a result of using our visitation management system, Weber's jail has become so efficient that they are able to generate revenue by offering extra personal visits for a fee – this is a common theme among our customers," said Brian Peters, Renovo's product and marketing director. "With a jail population of about 700, Weber averages 500 free visits per week. This means that some inmates are reaching their quotas while others are not."

In November 2011 the jail began allowing additional video visits for $10 each. "The process to set up paid visits is the same as a free one – visitors must register and schedule visits as before, the only difference is that they use their credit, debit or Visa/AMEX gift card to pay for the extra visit," Peters stated.

Renovo provided the pay-to-visit software and training to jail employees at no extra cost, and the county receives a "commission" of approximately two-thirds of the revenue generated by the visitation fees – along the same business model as prison phone companies.

"We absolutely have far less complaints from inmates on visitation issues ... and overall, I believe inmate discipline problems in general are down, although I don't have exact statistics on that," said Weber County Sheriff Terry Thompson. "I feel their overall demeanor is better, and no question the video system contributes to that."

Early data indicated an average of seven paid visits per day with growing usage as more people became aware of the option. Just seven paid visits per day would generate revenue of more than $25,000 a year. By March 2012 the paid video system had reached 330 visits per month, generating $4,000 in monthly commissions.

Some county residents expressed concern at the concept of charging visitors to see prisoners, even for additional visitation time.

"We understand the perception that we are charging the families for access to their loved ones," said Peters. "But we want to be clear that the inmates are allowed to have the same number of free visits as before and this gives families extra opportunities to visit their loved ones."

But doesn't this also give jails an incentive to reduce free visitation, or at least a disincentive to expand the number or length of free visits?

"Each correctional facility has the ability to set different rates and visitation lengths that are appropriate to the laws of the local community – all of which will result in different revenue potential," Peters stated. In other words, more free visits equates to less revenue.

There are also concerns about requiring visitors to have Internet access and to use credit, debit or gift cards to pay for extra visits with their incarcerated loved ones. Some prisoners' families do not have Internet access or credit or debit cards, and have to pay additional fees to obtain gift cards to fund the visits.

If the use of video visitation and scheduling software has made visitation so much more efficient, then jail officials should be offering extra free visits, not looking for ways to charge visitors. The pay-for-visitation model – even in addition to free visits – is simply another way to monetize our criminal justice system at the expense of prisoners and their family members, who

are least able to afford such costs.

In March 2012, the Weber County Jail added a few feature provided by Renovo: an email system that allows people to send electronic messages to prisoners. For a fee, of course. The emails cost about $.60 each and can be no longer than one page; prisoners can not respond via email. As with video visitation, the county gets a commission from the revenue generated by the email system.

The Weber County Jail is just one of many nationwide that use video visitation systems in lieu of or in addition to in-person visits, including jails in Idaho, Minnesota and Florida. [See: *PLN*, Aug. 2012, p.50; Nov. 2011, p.37]. Some jails charge fees ranging from $.35 to $.55 per minute for video visits. Several state prison systems use video visitation too, such as in Virginia and Indiana. [See: *PLN*, May 2013, p.1; Sept. 2012, p.42; Jan. 2010, p.22]. Companies that specialize in correctional video visits include Renovo, JPay and iwebvisit.com.

The District of Columbia jail has jumped on the video visitation bandwagon, transitioning to video visits on July 25, 2012. Visitors now have to use video monitors at a building at the former D.C. General Hospital Complex located near the jail. While male prisoners can only receive video visits, women prisoners and juveniles still have contact visitation.

The D.C. jail's video system was provided by prison phone company Global Tel*Link, with software by Renovo. Although the visits are free, there was a backlash by prisoners' advocates and family members.

"This practice is not exactly being well received," noted Philip Fornaci, director of the D.C. Prisoners' Project. "If it were a supplement to personal visits, that would be one thing," he said. "But it's not, and already people who are visitors to the jail are humiliated and treated poorly. To me, this is just another sign of the disrespect."

Some family members, however, said video visitation is more convenient and avoids the long waits in line that were typical for in-person visits. Jail officials argued that video visitation is safer, less expensive, provides more visitation time and avoids problems associated with in-person visits, such as searching visitors.

PLN_0000794

"For visitors, it's more comfortable here than in the jail," said Thomas P. Hoey, acting deputy director of the D.C. Department of Corrections. "Everyone on both sides is more quiet." He added, "We don't have to pat down a 4-year-old." 

Sources: *www.prweb.com, www.renovosoftware.com, www.washingtonpost.com*, New York Times, *www.naco.org*

## Washington Sex Offender's Conviction for Failure to Report Reversed

T HE EN BANC WASHINGTON STATE Supreme Court has reversed a defendant's conviction for failure to report as a sex offender, finding that the reporting statute was ambiguous and the evidence presented was insufficient to support the conviction.

Prior to 2010, Washington law required all Level II or III sex offenders to report to the county sheriff every 90 days pursuant to RCW 9A.44.130(7). Failure to report was a felony offense.

Michael Edward Caton registered as a sex offender with the Lewis County Sheriff's Office on May 19, 2009. He was notified of the 90-day reporting requirement and received a June 16, 2009 reporting date.

On June 9, 2009, Caton was arrested for a driving offense. After he was released from jail the following day, Caton reported to the sheriff's office because he believed "that as a registered sex offender he was required to report to the sheriff after his release from confinement for any offense." However, his June 16, 2009 reporting date remained unchanged.

When Caton reported on June 17, 2009 instead of June 16, he was charged with failing to report. The superior court found him guilty of violating RCW 9A.44.130(7)

for "knowingly and unlawfully ... failing to report in person to the Lewis County Sheriff's office on the required day for the 90 day reporting requirement," and imposed a 50-month prison sentence. The appellate court affirmed the conviction.

Caton petitioned for review, and the Washington state Supreme Court held that whether he had violated the sex offender reporting requirement turned upon the proper interpretation of RCW 9A.44.130(7).

"The gravamen of the offense is failure to report every 90 days, not failure to report on a specific date," the Court explained. "To the extent the statute can be read as making it an offense to not report on the sheriff's specified date, even if the offender reports within the 90-day period, it is ambiguous." The Supreme Court also concluded that "it is further ambiguous as to the event triggering the 90-day reporting period."

Given that Caton had reported on June 10 and June 17, 2009, and both of those dates were well within 90 days of his initial May 19, 2009 registration, the Court held the state had failed to prove that he violated RCW 9A.44.130(7). See: *State of Washington v. Caton*, 174 Wash.2d 239, 273 P.3d 980 (Wash. 2012) (en banc). 

# LEARN TO PROTECT YOUR RIGHTS

## YOU HAVE A RIGHT TO
● Adequate medical care
● Protection from assault
● Humane living conditions
● Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, *Protecting Your Health and Safety*, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News
PO Box 1151
Lake Worth, FL 33460
561-360-2523**

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

# Texas Only

Post-conviction State and Federal Habeas Corpus

Parole Representation

Family Law

**Ashley Burleson**
Attorney and Counselor at Law
1001 Texas Avenue, Suite 1400
Houston, Texas 77002

## THE LAW OFFICES OF JACKSON & REED
Compassionate defense, parole, and post-conviction work.
601 Sawyer, Ste. 105
Houston, Texas 77007
(713)429-1405
www.jacksonandreed.com
Parole Representation from $1500.

# California: Probation Condition Cannot Prohibit Court Access

THE CALIFORNIA COURT OF APPEAL has held that a condition of probation barring a juvenile offender's access to the courthouse was unconstitutionally overbroad in violation of the First Amendment.

In 2010, California juvenile offender Jose N. was made a ward of the juvenile court when he admitted to participating in a criminal street gang. When Jose subsequently committed first-degree burglary, he was continued as a ward of the court on April 5, 2011.

One of the conditions of his probation, described as the "courthouse prohibition," directed that he was "not to appear in or about any court" unless he was a party to a proceeding or subpoenaed to appear at a hearing. The purpose of the condition apparently was to prevent gang members from trying to intimidate witnesses who appear in court.

Although Jose did not object to the condition when it was imposed, he argued on appeal that it was unconstitutionally overbroad and violated the California Constitution. The Court of Appeal, Fifth Appellate District, noted that the state did not argue that Jose had waived his argument by failing to object. The state also agreed that a narrower condition was warranted.

The appellate court found the parties' "primary disagreement" to be the exact language of a modified probation condition and whether the juvenile court or the Court of Appeal should change the condition.

Ultimately, the Court of Appeal found it "appropriate ... to strike the courthouse prohibition condition and remand the matter for imposition of a narrower probation condition by the juvenile court in the first instance." The juvenile court was directed to "seek to establish a probation condition that has the least impact on the right of access to the court for legitimate purposes consistent with the rehabilitation and reformation of the juveniles who are subject to the condition." See: *In re Jose N.*, California Court of Appeal, Fifth Appellate District, Case No. F062244 (App Ct., 5th Dist., April 23, 2012) (unpublished).

The Court of Appeal reached the same conclusion in a separate case involving a juvenile who had been subjected to a similar "courthouse prohibition" as a condition of probation. See: *In re Francisco J.*, California Court of Appeal, Fifth Appellate District, Case No. F064179 (Cal.App. 5 Dist., July 18, 2012) (unpublished); 2012 WL 2918464.

California trial courts apparently continue to impose such unconstitutional conditions on probationers despite prior appellate rulings on this precise issue – including a 2009 decision that struck down a condition of probation that barred an adult defendant from being within 500 feet of a courthouse. See: *People v. Perez*, 176 Cal. App.4th 380, 97 Cal.Rptr.3d 632 (Cal.App. 2 Dist. 2009) [*PLN*, March 2011, p.27]. ▨

# Fourth Circuit Reverses Dismissal of Case Challenging Virginia DOC Grooming Policy

RETIRED SUPREME COURT JUSTICE Sandra Day O'Connor joined a panel of the Fourth Circuit Court of Appeals, by designation, in finding that a district court had erred in upholding a Virginia prison grooming policy that prohibited prisoners from wearing beards.

In 1999, the Virginia Department of Corrections (VDOC) adopted a grooming policy that forbid prisoners from wearing beards. The policy stated that "beards ... could conceal contraband; promote identification with gangs; create a health, hygiene, or sanitation hazard; or could significantly compromise the ability to identify an offender."

If a Virginia state prisoner grew a beard in violation of the policy, he was first ordered to shave. If he refused, he was placed in segregation and then transferred to a different facility where he suffered the loss of privileges, including "access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time."

The only exception to the VDOC's beard ban was a medical exemption, which allowed prisoners with a physician's "No Shave Pass" to maintain a one-fourth-inch beard.

VDOC prisoner William R. Couch, a Sunni Muslim, claimed that "his religion requires that he grow a beard." Prior to 1999 when the grooming policy went into effect, "he continuously maintained a beard in compliance with his faith." However, Couch apparently complied with the beard ban between 1999 and 2009.

In December 2009, "Couch requested permission to grow a one-eighth-inch beard in order to comply with his religious obligations." He cited the one-fourth-inch medical exemption as evidence that a one-eighth-inch religious exemption would not cause any problems.

After VDOC officials denied Couch's requests and grievances, he filed suit in federal court, alleging that the beard ban violated the Religious Land Use and Institutionalized Persons Act (RLUIPA) and his First Amendment free exercise rights. The district court granted summary judgment to the defendants and Couch appealed.

Relying on Couch's testimony "that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork," the Fourth Circuit found "that maintaining a beard is a qualifying religious exercise under RLUIPA."

Although RLUIPA does not define the "substantial burden" that prison officials may not place on a prisoner's religious exercise, the appellate court determined that the consequences of non-compliance with the VDOC's beard ban "fit squarely within the accepted definition of 'substantial burden.' ... Therefore, Couch has satisfied his obligation of showing a substantial burden on his religious exercise."

As a result, the burden shifted to prison officials to "prove that the challenged policy is the least restrictive means of furthering a compelling governmental interest."

Giving deference to the "experience and expertise" of VDOC Deputy Director of Operations John M. Jabe, the Court of Appeals found "that the Policy, which prohibits Couch from growing a beard, is in furtherance of compelling governmental interests," citing *DeMoss v. Crain*, 636 F.3d 145 (5th Cir. 2011) (prison grooming policy furthered compelling interests based on security concerns such as easy identification of prisoners, gang affiliation and the ability to conceal contraband within a beard).

However, the Fourth Circuit noted that prison officials "must also establish that the Policy is the least restrictive means of furthering the compelling governmental interests that they identify," under 42 U.S.C. § 2000cc-2(a)(2). And citing its decision in *Smith v.*

*Ozmint*, 578 F.3d 246 (4th Cir. 2009) [*PLN*, Feb. 2011, p.42], the appellate court observed it has "required that the government, consistent with the RLUIPA statutory scheme, acknowledge and give some consideration to less restrictive alternatives."

The Court of Appeals explained that in *Smith*, it had found an affidavit filed by prison officials "to be deficient, in part, because it was general and did not indicate consideration of less restrictive alternatives." It also "failed to explain how the prison could accommodate other exceptions to the grooming policy but could not accommodate a religious exception." In Couch's case, the Fourth Circuit found that the defendants' affidavits "suffer from many of the same deficiencies identified in *Smith*."

Ultimately, the appellate court held that the defendants "did not satisfy their burden of showing that the Policy was the least restrictive means of furthering the identified compelling interests." As such, the district court's grant of summary judgment to the defendants was reversed. See: *Couch v. Jabe*, 679 F.3d 197 (4th Cir. 2012).

Following remand, the case settled in September 2012 with the VDOC agreeing to make changes to its grooming policy. Couch was allowed to "grow and maintain a ¼ inch beard consistent with the provisions of [VDOC] Operating Procedure 864.1 effective October 1, 2012." The amended grooming policy allows all Virginia state prisoners to maintain a beard of ¼ inch maximum length, and "no prior approval or shave pass is required."

Further, the VDOC agreed to pay $28,562.97 in Couch's attorney fees and expenses. He was represented by Charlottesville, Virginia attorney Jeffrey E. Fogel. See: *Couch v. Jabe*, U.S.D.C. (W.D. Vir.), Case No. 5:10-cv-00072. 

# Three New Mexico Jail Guards Convicted of Assault, Obstruction of Justice

A S PREVIOUSLY REPORTED IN *PLN*, PRISoner Christopher Shields was beaten by guards at the Bernalillo County Metropolitan Detention Center (MDC) on December 21, 2011. [See: *PLN*, April, 2012 p.50].

Five MDC guards were arrested in connection with the assault or the subsequent attempted cover-up, including three charged in federal court.

Shields, who had been arrested for DUI, was verbally uncooperative during the booking process, which resulted in the beating. He was taken to a shower area where there were no cameras; later, another prisoner had to clean blood from the walls and floor of the shower room.

MDC guard Demetrio Juan Gonzales, 40, who had choked and assaulted Shields, pleaded guilty and was sentenced in January 2013 to 33 months in federal prison.

Former guard Matthew Pendley, 26, pleaded guilty on February 20, 2013 to obstruction of justice charges for lying during an investigation into the assault. He was sentenced on July 2, 2013 to five years probation.

A third MDC guard, Kevin James Casaus, 25, went to a jury trial on March 4, 2013 and was convicted of obstruction of justice and falsification of records. He had also lied about

the incident, and was accused of hitting and shoving Shields in the shower area. Casaus is scheduled to be sentenced on August 6, 2013. See: *United States v. Gonzalez*, U.S.D.C. (D. NM), Case No. 1:12-cr-01553-WJ-2.

"When those who are sworn to uphold the law and protect others instead abuse their power and position, they undermine the public's confidence in the justice system and our government institutions," stated U.S. Attorney Kenneth J. Gonzales. 

Additional source: *U.S. Dept. of Justice press release (March 7, 2013)*

---

# TYPING
### S E R V I C E S
**Provided since 1998**

Specifically designed, with special rates for the incarcerated person.

**Black / Color Printing and Copying**

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

**LET MY FINGERS DO YOUR TYPING**
**Sandra Z. Thomas (dba)**
**P O Box 4178**
**Winter Park, Florida 32793-4178**
**Phone: 407-579-5563**

Special Offer: $2.00 off first order.
Special offer void after: 12/31/2013

---

## Support Prison Legal News with these beautiful gifts!

CALL **561-360-2523**, MAIL ORDER OR USE WEB FORM
HTTP://WWW.PRISONLEGALNEWS.ORG/



## Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

s6 shipping and handling for orders under s50.

PLN_0000797

# South Carolina Sex Offender Registration Amendment Requires Actual Notice

THE SOUTH CAROLINA SUPREME COURT has reversed a sex offender's conviction for failing to register, because the state did not provide actual notice of new registration requirements.

In 2002, Zeb Eron Binnarr was convicted of sex crimes in South Carolina and required to register annually under the state's Sex Offender Registry Act (SORA).

Binnarr registered in February 2006 and was given notice of his obligation to register again the following year. Effective July 1, 2006, however, SORA was amended to require biannual registration, requiring Binnarr to re-register in August 2006.

Binnarr did not register in August 2006 and he was arrested in March 2007 for failing to register biannually.

At trial the state called Detective Denise Catlett, who testified that she managed the county's sex offender registry and was responsible for notifying offenders of the 2006 SORA amendment. Catlett claimed that the amendment was "all over the news" and "in the newspaper" for months, and "that she 'generally' sent letters via first-class mail to ... more than 800 registered sex offenders." She claimed Binnarr's letter "was not returned as undeliverable," though "the State failed to produce a copy of the actual letter."

Binnarr testified that he "did not receive any notice of the change in the law" and "denied receiving any of the letters sent by Catlett."

A jury found Binnarr guilty of failing to register as a sex offender and he was sentenced to a statutorily-mandated 90-day jail term. The Court of Appeals affirmed Binnarr's conviction because the legislature did not require the state to notify offenders about the SORA amendment.

The Supreme Court reversed, however, agreeing with Binnarr "that the Court of Appeals erred in declining to recognize that a defendant must have actual notice of the reporting requirements before he can be convicted of violating" the law. Given the "lack of direct or substantial circumstantial evidence" of "actual notice," the Court held that reversal was required.

"Because the change in the law imposed an additional registration requirement for sex offender registrants, who were formerly required to register annually," the Supreme Court found that "the Sheriff's Office needed to do more than passively rely on an unreturned letter to ensure compliance with the change in the law." See: *State v. Binnarr*, 400 S.C. 156, 733 S.E.2d 890 (S.C. 2012), *rehearing denied*. ◼

# Ninth Circuit: Idaho Ordered to Allow Viewing of all Stages of Execution

*by David M. Reutter*

IN REVERSING AND REMANDING AN IDAHO federal district court's denial of a preliminary injunction, the Ninth Circuit Court of Appeals directed the lower court to enter an order requiring the State of Idaho to allow witnesses to observe a prisoner's execution "from the moment [he] enters the execution chamber through, to and including, the time [he] is declared dead."

The June 8, 2012 ruling came in the appeal of a 42 U.S.C. § 1983 suit filed by the Associated Press and a coalition of other media organizations after Idaho issued a warrant for the execution of death row prisoner Richard A. Leavitt. Prior to filing suit the plaintiffs had asked Idaho officials to alter the state's execution procedure, without success.

The procedure only allowed witnesses to view the final portion of an execution, "beginning with the reading of the death warrant and concluding with the pronouncement of death." It did not let witnesses see the first part of the execution process, including the insertion of intravenous lines for the lethal injection drugs.

The plaintiffs asserted that as media organizations they were surrogates for the public and had a First Amendment right to witness all stages of executions conducted by the state. Citing *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002) [*PLN*, October 2003, p. 30], which addressed the same issue, the Ninth Circuit found the district court had abused its discretion in denying the plaintiffs' motion for a preliminary injunction.

"Nearly a decade ago, we held in the clearest possible terms that 'the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber,'" the Court of Appeals wrote. "[T]he First Amendment protects the public's right to witness all phases of Leavitt's execution, including the portion the State now shields from view."

The appellate court rejected the "legitimate penological objectives" set forth by Idaho officials to justify the existing execution procedure, including an assertion that the state was "protecting the dignity of condemned prisoners and the sensibilities of their family and fellow inmates." The Court of Appeals said it harbored "significant doubt" about that argument, as Idaho "already offends the dignity of condemned inmates and the sensibilities of their families and fellow inmates by allowing strangers to watch as they are put to death."

The state also raised concerns about preserving the anonymity of members of the medical team participating in executions. The Ninth Circuit said the use of medical garb was a practical alternative to conceal the identities of the team members. Moreover, Idaho failed to provide any support "for its speculation that it may be unable to recruit and retain medical team members to participate in executions" should witnesses be allowed to see the entire execution procedure.

The Court of Appeals noted that the plaintiffs would suffer irreparable harm if they were not permitted to view Leavitt's execution in its entirety, and that it was in the public's interest that they be allowed to do so. The State of Idaho "missed opportunity after opportunity to bring its execution procedures into compliance with the clear law of the Circuit," the appellate court wrote.

Instead, Idaho "persisted in its intransigence" even after the Ninth Circuit had "suggested at oral argument that a voluntary amendment (like the one Arizona recently

PLN_0000798

adopted) might avert the need for an injunction."

On remand, the district court was ordered to enter an "injunction forthwith, and in any event prior to the impending execution of Richard Leavitt." In addition to the Associated Press, the plaintiffs in the case included the Idaho Press Club, *The Idaho Statesman*, Pioneer Newspapers, TPC Holdings, Cowles Publishing Company, Lee Enterprises, *The Spokesman-Review* and Idahoans for Openness in Government. They were represented by Lewiston, Idaho attorney Charles A. Brown. See:

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012).

Leavitt, 53, was executed on June 12, 2012 – just four days after the Ninth Circuit's ruling was released. For the first time in Idaho, media representatives were able to witness an execution from beginning to end. Leavitt had previously professed his innocence but did not make a final statement as he was put to death. The execution team wore surgical masks to protect their identities.

"I am grateful that we have four media witnesses here to tell you what they saw.

Our goal was to make this as professional as possible with dignity and respect, and I believe we met that mark," said Idaho DOC director Brent Reinke.

Of course, if state officials were truly grateful for the media scrutiny, that makes one wonder why the state resisted changing its execution procedure for years, requiring media organizations to file a lawsuit which the state then contested. ◤

Additional sources: *www.rcfp.org, www. foxnews.com, www.acluidaho.org, Huffington Post*

# California Guard Fights Prisoner, Faces Charges for Falsifying Reports

A CALIFORNIA PRISON GUARD WHO challenged a prisoner to a fight, then engaged in a cover-up to avoid getting in trouble, is now facing criminal charges for filing false reports.

In April 2012, state prison guard Christopher Cruse, 41, pleaded not guilty to six felony charges arising from a February 23, 2011 fight with prisoner Frances Allen on the "hard yard" of Facility D at Kern Valley State Prison. Cruse was charged with filing a false peace officer's report, as well as filing false insurance claims after going on stress leave following the incident.

An internal affairs investigation found that Cruse had challenged Allen to fight following a brief argument. A tower guard allowed them onto the yard, where they

exchanged blows. Cruse quickly found himself on the losing end of the brawl.

A second guard, identified only as "Officer Murphy," then stepped in to stop the fight. When Cruse and Murphy realized that others had witnessed the incident, and that Cruse's injuries would be hard to explain, they tried to frame Allen by tackling him in an empty hallway and reporting that he had attacked Cruse without provocation.

Allen, facing a possible life sentence for a "third strike" conviction, disputed Murphy and Cruse's self-serving lies.

A subsequent investigation revealed that a sergeant had participated in an initial cover-up of the fight, ordering a guard to scrub Cruse's blood off the yard with a brush and bleach. Additionally, a report

concerning the fight had been deleted from the prison's computer system.

Cruse resigned on February 21, 2012. Following his arrest, he was released on $60,000 bond. Two unidentified prison employees were fired in connection with the fight and attempted cover-up, another staff member received a two-year suspension without pay, and a lieutenant and guard received salary reductions.

Allen was charged with a disciplinary offense for fighting with Cruse, but did not face criminal charges; he had 90 days added to his sentence as a result of the disciplinary violation. ◤

Sources: *www.kget.com, www.bakersfield-californian.com*

---

## CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks. State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum). Free persons: $90.

*CLN,* PO Box 277, Rancho Cordova, CA 95741

*Pretrial & Post-Conviction Research Center,* has sponsored a Petition to Increase Federal Good Time online at www.pcrconline.com. We need a million signatures on this proposal and it will be mailed to every United States House of Representatives and United States Senator to introduce a bill to retroactively Increase Good Time for federal offenders, to wit: Title 18 U.S.C. A § 3624(b)(1) is amended as follows: by striking the number "54" in the first sentence as it appears and inserting in lieu thereof: Five days per month for sentences between six months and one year that the prisoner serves without bad behavior; Ten days per month for sentences exceeding one year that the prisoner serves without bad behavior; Meritorious good time limited to five days a months; and in the same sentence, by striking "prisoner's term of imprisonment" and inserting in lieu thereof "term of sentence imposed." This Amendment is retroactive.[End]. Please get your family and friends to sign this Petition. @www.pcrconline.com Post-Conviction Research Center, PO Box 552, Electra, Texas 76360. Or Post-Conviction Research Center Monroe, LA 71201.

PLN_0000799

# Third Circuit: Prison Officials Liable for Failing to Protect Informant

THE THIRD CIRCUIT COURT OF APPEALS held on September 24, 2012 that prison officials may be held liable for failing to protect an informant held in a Special Housing Unit (SHU). The appellate court affirmed in part and reversed in part a Pennsylvania federal district court's order on a motion to dismiss.

The appeal was filed by employees of the Federal Detention Center (FDC) in Philadelphia. At issue was a 108-page, 19-count second amended complaint filed by former FDC prisoner Peter Bistrian. The first five counts alleged violations of Bistrian's Fifth Amendment substantive and procedural due process rights, counts six through nine related to Eighth Amendment violations, count ten was a First Amendment retaliation claim and counts 11 through 19 were brought under the Federal Tort Claims Act.

The district court dismissed 13 of the 19 counts, which Bistrian did not challenge. Moreover, he streamlined the case on appeal by reducing his claims to five counts involving 13 defendants. That left the Third Circuit to consider four Fifth Amendment claims – two for failure to protect, one for punitive detention and one for procedural due process violations – plus the First Amendment retaliation claim.

Bistrian, a federal pretrial detainee, became an orderly while held in the SHU at FDC Philadelphia from January to December 2006. Another SHU prisoner, Steve Northington, asked Bistrian to pass notes to fellow prisoner Kaboni Savage. Northington and Savage were gang members with violent criminal histories.

Bistrian agreed to pass the notes but later advised Lt. J.A. Gibbs and Senior Officers Bowns, Jezior and Bergos that he had done so. They consulted with the FBI, which expressed an interest in the notes because Northington and Savage were defendants in an ongoing drug gang prosecution that involved "substantial witness intimidation, death threats to witnesses and law enforcement, and a firebombing that killed six family members of the Government's chief cooperating witness."

Over the next few weeks, Bistrian continued to pass notes between Northington, Savage and other prisoners. He took each note to the Special Investigative Services Office at FDC Philadelphia, where they were reviewed, copied and sometimes forwarded to the FBI. On one occasion, however, the photocopy of a note was erroneously placed in an envelope and delivered instead of the original note. And on several occasions the notes were not returned to Bistrian, so he was unable to deliver them.

Those incidents led Northington and other prisoners to believe that Bistrian was cooperating with prison officials, and they repeatedly threatened him. Bistrian informed the defendants about the threats both verbally and in writing, but they failed to ensure his safety. On June 30, 2006, Bistrian was attacked by Northington and other prisoners in the SHU's recreation yard. By the time that guards intervened, Bistrian had a dislocated left shoulder, broken teeth and multiple contusions to his head and face that required sutures.

He was again attacked on the recreation yard on October 12, 2006 by a prisoner wielding a razor-type weapon, and required 52 sutures for cuts to his face and body. That attack apparently was unrelated to the note-copying scheme.

Bistrian filed suit in federal court in June 2008. The district court granted in part and denied in part the defendants' motion to dismiss, which argued that Bistrian had "failed to exhaust his administrative remedies, that his claims were untimely, and that he failed to allege sufficient facts to state claims that overcome their entitlement to qualified immunity." The defendants appealed the court's refusal to dismiss the six remaining counts in Bistrian's complaint.

Addressing the pleading standard, the Third Circuit quoted *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) [*PLN*, July 2009, p.18]: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

The Court of Appeals rejected the defendants' argument that "[prison] officials can better protect inmates when they are in the SHU rather than the general population," and thus placing an informant in the SHU shielded them from liability.

The appellate court held that the basis of a failure-to-protect claim can be formed where officials are deliberately indifferent to a particular risk an informant faces in the SHU.

The Third Circuit found it was reasonable to infer that the defendants' familiarity with the note-copying scheme, Northington's known history of violence and the threats made to Bistrian meant they were aware he was at risk. Bistrian suffered harm when the defendants failed to act on that risk, and he pleaded causation because he was attacked by other prisoners "because he cooperated with prison officials, not for some other reason."

While the appellate court held that Bistrian's first failure-to-protect claim should proceed, it found his claim related to the second SHU attack should not. That claim was based upon a speculative risk of placing Bistrian in an area with a prisoner with a history of violent assaults. The second attack had occurred for unknown reasons and, according to the Court of Appeals, was apparently "unprovoked, inexplicable, and unrelated to [Bistrian's] participation in the note-copying operation."

The appellate court allowed Bistrian's deliberate indifference claim against Senior Officer Jezior to proceed, based upon allegations that Jezior had delaying intervening to stop the first SHU attack until other guards arrived. Bistrian's claim related to punitive SHU detention for a total of 447 days also was allowed to proceed, as was his procedural due process claim related to his placement and continued detention in the SHU. Finally, the Court of Appeals held that Bistrian's First Amendment retaliation claim could proceed, in which he alleged that he was returned to the SHU after his attorney challenged his previous SHU placements.

The district court's ruling on the defendants' motion to dismiss was therefore affirmed in part and reversed in part, with the Third Circuit dismissing Bistrian's claim related to the second SHU assault while allowing his remaining four claims to proceed. See: *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012).

The case remains pending before the district court on remand, with a settlement conference scheduled for September 4, 2013.

PLN_0000800



**The Habeas Citebook: Ineffective Assistance of Counsel**
Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

**$49.95**

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



**Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition**
Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

**$49.95**

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



**Prisoners' Self-Help Litigation Manual, 4th Edition**
John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

**$45.95**

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

☐ Habeas Citebook, Ineffective Assistance of Counsel $49.95
☐ Prisoners' Guerrilla Guide to Correspondence Programs 3rd edition $49.95
☐ Prisoners' Self-Help Litigation Manual 4th edition $45.95

*Shipping included in all prices*

*Order by mail, phone, or on-line.* Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order
Name _____
DOC/BOP Number _____
Institution/Agency _____
Address _____
City _____ State ___ ZIP ___

PUBLISHED BY

**PRISON LEGAL NEWS** Dedicated to Protecting Human Rights | PO Box 1151 • Lake Worth, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

PLN_0000801

# Third Circuit Discusses FRCP 17(c) Guardian Appointment; Evidence of Incompetency Requires Sua Sponte Inquiry

THE THIRD CIRCUIT COURT OF APPEALS has held that "a court is not required to conduct a sua sponte determination whether an unrepresented litigant is incompetent unless there is some verifiable evidence of incompetence."

Federal Rule of Civil Procedure (FRCP) 17(c) requires the appointment of a guardian ad litem to protect an incompetent, unrepresented litigant. However, few courts have considered the issue. FRCP 17(c) sets forth a duty of inquiry but the factors that trigger that duty are unclear.

Pennsylvania prisoner Kevin Powell filed a federal lawsuit in December 2007. He was granted numerous extensions of time and filed ten motions for appointment of counsel, citing "his rudimentary education and his difficulties obtaining legal assistance while in prison."

Powell was charged with threatening the President while the case was pending, and the district court over his criminal case ordered him to be sent to a psychiatric facility for four months. A court-appointed psychiatrist found Powell delusional, unable to control his conduct and of "somewhat limited cognitive abilities." The psychiatrist also stated that Powell's "persistent serious mental illness ... chronically alters his reality and his ability to conduct himself within the confines of the law." As a result, the criminal court granted the government's motion to dismiss the indictment.

When Powell was sent to the psychiatric hospital, he sought additional time to respond to the defendant's motion for summary judgment in his civil case. The district court denied the motion and said no further extensions would be granted. Powell did not respond to the summary judgment motion.

The district court noted the criminal court's rulings and its own concerns about Powell's competence. While declaring that it preferred to appoint counsel, the court did not do so because "it is difficult to find counsel willing to represent prisoners in civil rights cases." Without considering the appointment of a guardian ad litem under FRCP 17(c), the court then granted summary judgment to the defendant.

In a separate case, Delaware prisoner Detlef F. Hartmann filed a federal lawsuit and submitted eight motions for appointment of counsel, asserting unspecified "mental disabilities" and "limited access to legal materials." He also submitted a psychiatrist's letter indicating that he was being treated "for Major Depression and Attention Deficit Disorder." The doctor opined that Hartmann was not "competent ... to represent himself in court," and recommended appointment of counsel. The district court did not appoint an attorney or explicitly discuss its obligations under FRCP 17(c), and subsequently granted summary judgment to the defendants.

The Third Circuit consolidated the cases on appeal to "decide whether the District Courts erred in failing to sua sponte inquire whether Powell or Hartmann were incompetent under Federal Rule of Civil Procedure 17(c)(2) or in declining to appoint counsel or some representative for them."

Noting that "the federal courts are flooded with pro se litigants with fanciful notions of their rights and deprivations," the appellate court agreed with the Second Circuit's decision in *Ferrelli v. River Manor Health Care Center*, 323 F.3d 196 (2d Cir. 2003), *cert. denied* and the Fourth Circuit's holding in *Hudnall v. Sellner*, 800 F.2d 377 (4th Cir. 1986), *cert. denied*, concluding that "a court is not required to conduct a sua sponte determination whether an unrepresented litigant is incompetent unless there is some verifiable evidence of incompetence."

Given the extensive evidence of Powell's incompetence, the Court of Appeals directed the district court "to appoint a representative or counsel to proceed with the case" following remand. Although "the evidence of incompetency" was not as strong with respect to Hartmann, the Third Circuit held "that the district court abused its discretion in failing to at least consider the possible application of Rule 17(c)," and ordered the lower court to determine, on remand, whether Hartmann was competent within the meaning of Rule 17(c). See: *Powell v. Symons*, 680 F.3d 301 (3d Cir. 2012).

# Deadly Prison Fire Kills Hundreds in Honduras

THEY SCREAMED FROM THEIR DILAPI-dated cells as a scorching fire swept through the prison where they were held. But the cries of prisoners burning alive inside the overcrowded Comayagua National Penitentiary in Honduras on February 14, 2012 were met by gunshots fired by guards trying to prevent their escape from the inferno.

"There was no mechanism to extinguish fires, no evacuation plan. The firefighters were not allowed to get there quickly and the guards, instead of acting appropriately, only fired shots in the air, supposedly because that is the established procedure in case of escapes," said prosecutor German Enamorado.

The final body count totaled 362 – mostly prisoners, but also family members participating in conjugal visits and a woman who was inside the facility illegally. Many bodies were burned beyond recognition; other victims died due to smoke inhalation. The Comayagua blaze was the world's worst prison fire in a century.

Investigators initially speculated that the fire was started either by a prisoner who set his mattress alight or by a short circuit in the facility's electrical system. Some prisoners and their families, however, said the fire was neither an accident nor the work of an individual, telling reporters they thought it was to facilitate an escape by members of Mara Salvatrucha (MS-13), one of Honduras' most violent gangs.

But no matter the origin of the fire, the underlying cause of so many deaths was the prison itself.

Like the rest of Honduras' 24 prisons, the Comayagua facility – about 55 miles north of the capital Tegucigalpa – was overcrowded and in disrepair. Honduras' prison population of around 12,000 is more than 60% over capacity, and Comayagua held more than double its capacity of 400 prisoners at the time of the fire. About half of the prisoners at the facility had not been convicted and were awaiting trial.

One prisoner who died in the blaze,

Nelson Avila-Lopez, 20, was just 16 when he fled Honduras to avoid being recruited into a gang. He crossed into the U.S. and was living in Los Angeles until he was wrongly deported in October 2011.

According to U.S. officials, Avila-Lopez was granted an automatic stay to argue for permanent residency but was returned to Honduras by Immigration and Customs Enforcement (ICE), which said in a statement that his deportation was likely the result of miscommunication between ICE and the immigration court.

The prisoners at Comayagua died when some of the guards fled during the fire and others delayed in releasing them from their cells. Prisoner Marco Antonio Bonilla found a set of keys and freed hundreds of fellow prisoners. It reportedly took up to 40 minutes for firefighters to respond; some of the prisoners who escaped the blaze did so by breaking through a roof and jumping to safety.

"We couldn't get them out because we didn't have the keys and couldn't find the guards who had them," stated Comayagua fire department spokesman Josue Garcia.

In the aftermath of the fire, prisoners' family members gathered at the facility while lists of the names of the dead were read; some tried to force their way into the prison to reclaim the remains of their loved ones and were repulsed by police officers who used tear gas.

Amid calls from human rights groups and the United Nations for an inquiry into the cause of the Comayagua fire, Honduran President Porfirio Lobo suspended several top prison officials. Political opposition parties blamed the incident on "criminal negligence."

"We are going to review the conditions in all the penitentiary centers to see how we can improve the overcrowding conditions that exist in many of our prisons," Lobos stated.

As of February 2013, the one-year anniversary of the conflagration, no criminal charges had been filed, the investigation into the blaze remained open and the prison was being rebuilt. According to a review by the Honduran Office of Human Rights, there was "no evidence of criminality in the origin of the fire."

Bonilla, the prisoner who had released other prisoners from their cells, thereby saving their lives, was promised a presidential pardon. However, Honduran law did not permit commutation of his murder conviction and he remains incarcerated.

The Comayagua fire was the third fatal prison fire in Honduras since 2003. [See: *PLN*, Jan. 2005, p.8].

Sources: *Associated Press, Reuters, AFP, McClatchy Newspapers, www.msnbc.com, CNN, New York Times*

# Former Maryland Governor Acknowledges Politics Behind "Life Means Life" Policy

PARRIS GLENDENING, WHO SERVED as Maryland's governor from 1995 through 2002, has acknowledged, around a decade later, the role that politics played in his adoption of a "life means life" policy that effectively ended early release for prisoners sentenced to life with parole. [See: *PLN*, June 1996, p.7].

In an e-mail and interview with *The Baltimore Sun*, Glendening, a Democrat, expressed a measure of regret over his lifer policy, at least to the extent that he had "made it absolute." Glendening explained that the perception among legislators and the public at the time was that criminals sentenced to life or long terms of incarceration were being released after serving only a few years, and then threatening the same people they had originally victimized. He acknowledged, however, there was little hard evidence that that had actually occurred.

Glendening's comments came in response to an editorial supporting a measure to take the governor – and politics – out of the parole process, leaving such decisions to the Maryland Parole Commission. Maryland is one of three states where the governor can overturn parole recommendations for lifers. Glendening indicated he would "not have a problem" with such a change in state law. "Bottom line, you are correct that the parole system must be reformed and made far less political," he said.

The former governor also stated that his views on the death penalty had changed over the years and he now "strongly opposes" capital punishment, viewing it as a "terrible vestige of a different time in our history." Glendening, who oversaw two executions as governor, ordered a moratorium on executions in May 2002 shortly before leaving office. He said his "life means life" policy was also intended to promote life without parole as an alternative to capital punishment.

On May 2, 2013, current Maryland Governor Martin O'Malley signed into law a bill that repealed the state's death penalty, though the bill does not apply to prisoners already on death row. [See: *PLN*, June 2013, p.44]. During his tenure, Governor O'Malley has declined to grant parole to any life-sentenced prisoners – a dismal track record that he should reconsider given Glendening's comments on that issue.

Source: *The Baltimore Sun*

## WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS
### STATE AND FEDERAL POST-CONVICTION AND APPEALS
Licensed since 1995, hundreds of appellate briefs and habeas petitions, capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas, Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment. Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**

## Pen Pals for Prisoners
Your ad on the Internet worldwide: One year for $9.95. Mail name & address for FREE order form or online:
www.PrisonerPal.com
PO Box 19689
Houston, TX 77224

PLN_0000803

# Former Mississippi Mayor Sent to Prison

A FEDERAL JUDGE IN MISSISSIPPI HAS sentenced William Grady Sims, 61, the former mayor of Walnut Grove who also served as warden of a privately-operated correctional facility, to 7 months in federal prison for telling a prisoner to lie to investigators about a sexual encounter.

Sims served as mayor of Walnut Grove, population of about 1,900, on a part-time basis from his 1981 election until his forced resignation upon pleading guilty to federal charges. The February 14, 2012 plea bargain bars Sims from ever holding public office again.

His plea to a charge of witness intimidation also resulted in the dismissal of a sexual assault charge stemming from when Sims was employed as warden of the Walnut Grove Transition Center, which was operated by private prison firm GEO Group at the time.

On or about November 26, 2009, Sims took a female prisoner at the facility to a hotel in the nearby town of Carthage and had sex with her. The woman's name was not revealed; Sims was secretly recorded in March 2010 telling her "to lie to investigators," which led to the witness intimidation charge. [See: *PLN*, Aug. 2012, p.45; April 2012, p.1].

At his April 24, 2012 sentencing hearing, Sims informed the district court that he had lost his job as mayor and his personal vending business, and had "suffered shame and disgrace."

"I am ashamed and sorrowful to be here ... I have been a Christian for many years and I fell away from God," he told the court.

In asking for mercy, his attorney, Chris Collins, said there are times when "it just takes a moment of being selfish or self-gratifying to lose everything. He's lost a lot already."

"Sometimes good men and good people do bad things," federal judge David Bramlette acknowledged. Still, he noted that "the truth is always the best resolution, no matter how bitter the truth may be."

In addition to 7 months in prison, Sims was ordered to serve six months on house arrest followed by two years of supervised release.

"Those who hold public office have a duty to serve with integrity. The Department of Justice will continue to prosecute those who choose to violate the public trust by putting their personal interests ahead of the public's interest," stated U.S. Attorney Gregory K. Davis.

Meanwhile, the Mississippi Office of the State Auditor said Sims had not paid more than $31,500 for using city employees and city equipment to perform work at the Walnut Grove facility and on other private property.

Sources: *The Clarion Ledger, Associated Press, U.S. Attorney's press release (April 24, 2012)*

# Seventh Circuit Reverses Dismissal of Illinois Prisoner's Lawsuit Related to Shooting

T HE SEVENTH CIRCUIT COURT OF APpeals has held that a lower court erred in dismissing an Illinois prisoner's excessive force, deliberate indifference and retaliation claims.

On May 16, 2009, an unidentified Stateville Correctional Center guard fired two rounds from a 12-gauge shotgun to break up a fight between two unarmed prisoners.

Raul C. Gomez, his cellmate and another prisoner were not involved in the altercation but were hit with shotgun pellets.

Gomez was struck in the right upper arm, causing bruising and bleeding. Shortly after the incident, a medical technician (MT) examined the wound and asked to treat Gomez in the infirmary. The prison was on lockdown, however, and guards refused to move Gomez so he could receive medical treatment.

The MT said she would bring Gomez some medical supplies, but never returned. Eight hours later, Gomez saw the MT again and asked about the medical supplies. She said she wanted to help him but security staff did not want to document any prisoner medical treatment for gunshot wounds. When Gomez asked for her name, she laughed and walked away, according to an emergency grievance that he filed.

Gomez washed the wound himself and removed a small piece of metal from his arm. He wrapped the wound with a torn piece of bed sheet.

Four days later, Gomez was finally given a tetanus shot and his wound was photographed, cleaned and bandaged. His arm was X-rayed two days later.

An internal affairs (IA) investigator tried to intimidate Gomez into dropping his grievance. He searched Gomez's cell and took the shirt he was wearing when he was shot. The investigator claimed the hole in the shirt was not caused by a shotgun pellet. Gomez refused to submit to a polygraph unless the MT and guard also were polygraphed.

The IA investigator threatened to transfer Gomez to Menard Correctional Center, where he had known enemies. One day before the transfer, Gomez told a different IA investigator that he would not pursue his grievance or file a lawsuit if he could stay at Stateville. The investigator said it was "too late," and Gomez was sent to Menard. Prison officials denied Gomez's grievance in July 2009.

On March 15, 2011, Gomez filed suit in federal court alleging excessive force, deliberate indifference and retaliation claims. The district court appointed William A. Barnett, Jr. to represent Gomez.

But on August 8, 2011, "Barnett filed a motion to withdraw as Gomez's attorney ... Barnett stated that he had withdrawn from the active practice of law and would withdraw from the trial bar of the district court once relieved of his appointment as Gomez's attorney."

Barnett went even further, though, informing the court that "Plaintiff's claims are not warranted under existing law and cannot be supported by good faith argument for extension, modification or reversal of existing law." He claimed "the statute of limitations ran on May 16, 2011," and the MT and the guard who fired the shotgun could not be identified.

The district court allowed Barnett to withdraw and dismissed Gomez's complaint based upon Barnett's representations. Gomez appealed.

The Seventh Circuit reversed, first finding that the district court had prematurely dismissed Gomez's excessive force claim because it "failed to recognize that 'the limitations period is tolled while a prisoner completes the administrative grievance process,'" citing *Walker v. Sheahan*, 526 F.3d 973, 978 (7th Cir. 2008), and because it could be inferred from Gomez's factual allegations "that the unidentified officer

acted maliciously in using deadly force against inmates who were not involved in the ongoing altercation."

The appellate court also held "that, at this early stage in the proceedings, Gomez's complaint asserts sufficient factual allegations to state" a deliberate indifference claim. Although the district court did not address Gomez's retaliation claim, the Seventh Circuit found that his complaint stated a cognizable claim in that regard, too.

The case was therefore remanded to the district court for further proceedings, where it remains pending. See: *Gomez v. Randle*, 680 F.3d 859 (7th Cir. 2012). ◼

# South Dakota Non-profits Lose Cheap Prison Labor

### *by Derek Gilna*

**M**ANY STATES HAVE GOTTEN THE MESsage that there are viable alternatives to incarceration that cost less and are equally effective in terms of reducing crime rates, but some non-profits like the Salvation Army are suffering because declining prison populations mean fewer low-or-no-cost prisoner workers.

Most state DOCs have work release programs whereby low-security prisoners are released during the day for job assignments outside the facility, and then return in the evening; most prisons also provide work crews for local communities.

*Prison Legal News* has previously reported on companies objecting to the use of prisoner labor to produce goods and services, as prisons enjoy an unfair advantage by paying low wages and providing no benefits to prisoner workers. [See, e.g., *PLN*, March 2013, p.14; Feb. 2012, p.38; May 2012, p.1; March 2010, p.1].

However, declines in prison populations have negatively impacted non-profit organizations that rely on low-cost prisoner labor.

For example, in the northern Great Plains, oil-related jobs have absorbed many formerly unemployed or under-employed workers, creating a labor shortage that non-profits are hard pressed to deal with.

According to Sioux Falls, South Dakota Major Betty Bender, "Normally, in the [Salvation Army] thrift store, we would have seven inmates and today we have three, and some days with one. I think a few days without any, when we're not able to get any, which is really hard for the thrift store. We kind of depend upon these workers to sort and hang [clothes], with the truck, and move things around."

The South Dakota Department of Corrections recently sent letters to non-profits in the Sioux Falls area, informing them about a shortage of prisoner workers. In addition to the Salvation Army, other affected organizations include the Feeding South Dakota Food Bank, Habitat for Humanity, Humane Society, Furniture Mission and Hope Haven.

Apparently, non-profits that have come to depend on free or low-cost prisoner labor will have to start competing for more expensive freeworld workers, just like other businesses. ◼

Source: *www.kfsy.com*

*Experienced California Post-Conviction Attorneys*

*Orly Ahrony & Bruce Zucker Attorneys at Law*




*Orly Ahrony*          *Bruce Zucker*

- *Appeals (State and Federal)*
- *Writs (Habeas Corpus & Mandamus)*
- *Lifer and Revocation Hearings*
- *Prison and Parole Issues*

*818-625-0807*
*Post Office Box 436*
*Agoura Hills, CA  91376*



# News in Brief

**Arizona**: Approximately 400 prisoners were involved in a March 3, 2013 fight that resulted in a lockdown at the Arizona State Prison Complex-Tucson. Guards quickly responded to stop the mass brawl in the Whetstone Unit, according to Arizona DOC spokesman Bill Lamoreaux. Two staff members suffered minor injuries and 5 prisoners were reportedly transported to local hospitals.

**Australia**: An infection and immunity study by researchers from the Kirby Institute at the University of New South Wales examined a practice performed by prisoners that involves the placement of foreign objects under the skin of their penises. A survey revealed that almost 6% of male prisoners in Queensland and New South Wales correctional facilities had penile implants – made of melted toothpaste caps, buttons, dice and even deodorant roller balls. The study, published in January 2013, concluded that "Penile implants appear to be fairly common among prisoners and are associated with risky sexual and drug use practices. As most of these penile implants are inserted in prison, these men are at risk of blood borne viruses and wound infection."

**California**: Tickets to an LA Kings hockey game, gift certificates for spas and restaurants, introductions to women and VIP treatment at local cafés were just some of the bribes that led to the February 7, 2013 arrest of Orange County Sheriff's Deputy David Lloyd Cass. Cass, 38, is accused of developing a relationship with prisoner Stephenson Choi Kim, a violent offender sentenced to life plus 255 years, and accepting bribes to allow Kim's wife to enter the Orange County Jail without being searched in order to smuggle contraband and engage in sex acts.

**California**: On February 19, 2013, attorney Erubey Lopez spent four hours in a San Diego-area jail after being locked in a holding cell and forgotten by jail staff while trying to visit a client. Lopez attempted to use an intercom to call for help, but later learned that it had been broken for eight months. He then began screaming and pounding on the cell door. "[What] if I was unhealthy ... had a heart attack? What if I had diabetes and had a sugar issue?" Lopez asked. "If they hadn't heard me with the screaming and banging ... there was no other way they were going to hear me."

**Colorado**: Former police officer Josh Carrier was sentenced on February 22, 2013 to 70 years to life after being convicted of more than 100 counts involving child sex crimes. He had pleaded guilty in October 2012 to sexual assault on a child, enticement of a child and unlawful sexual contact. Additionally, he was found guilty in an earlier trial of more than 20 counts of child exploitation and pornography. Carrier was a resource officer and volunteer wrestling coach at a Colorado Springs middle school.

**Colorado**: Suzette Parsons was sentenced in March 2013 to a year and a day in federal prison plus three years of supervised release after pleading guilty to bribery of a public official. Investigators said that over a three-month period, Parsons received more than $14,000 in bribes for smuggling tobacco and synthetic marijuana to prisoners at the Federal Correctional Institution in Florence, where she had worked as a library technician before resigning in August 2011.

**Florida**: Sgt. Angeleatha L. Chestnut, 47, a Miami-Dade corrections officer, was arrested in February 2013 and charged with attempted second-degree murder and aggravated battery after shooting her husband, Daryle, during a heated argument. The couple was reportedly arguing about Daryle staying out late at night when Chestnut fired a handgun, striking him in the left-upper shoulder and leaving him in critical but stable condition. Chestnut, employed in the Miami-Dade Corrections Department's internal affairs unit, was released on $20,000 bond.

**Florida**: A former Charlotte County Jail guard, Janeene Lea Jones, 49, was dubbed the "Black Widow" after she tried



**JailCallsUSA**

$9.95 per month

*UNLIMITED JAIL CALLS*

"WE BEAT ALL OUR COMPETITORS"

**SWITCH TO US TODAY!!**
No Contracts
No Credit Checks
No Equipment to buy

LOWER THE CALL RATES FOR:
GLOBAL TEL LINK
SECURUS
V-CONNECT
PAYTEL
ICSOLUTIONS
VAC
PLUS MORE

FEDERAL * STATE * COUNTY
SAME DAY ACTIVATION - NO PER MINUTE CHARGES ON OUR END. JUST $9.95 A MONTH!

**GET A LOCAL NUMBER TODAY**
888-776-2012

**www.JailCallsUSA.com**
Online Payments Accepted PayPal VISA

### PelicanCalls.com Voice Messaging Coming Soon!

Introducing **PelicanCalls.com**, a new inmate calling and messaging system featuring **two way voice messaging** and local phone number forwarding to any long distance number anywhere in the United States.

**Save Time and Money!**

Take advantage of our limited time offer: 30 days free voice messaging by signing up for our market test.
This is an invitation only offer. Ask your friends and family to sign-up for your invitation at **PelicanCalls.com**

to hire an undercover detective to kill her current husband and a tenant for $8,000. She was arrested on February 25, 2013 and charged with two counts of solicitation to commit murder. Sarasota police received tips that Janeene's third husband, Max Jones, had died under mysterious circumstances in 2011, and are now investigating that death. Her previous husbands, Albert Campbell and Phillip Wallace, could not be reached for comment. Janeene had been employed at the Charlotte County Jail in the late 1990s before resigning amid allegations that she was having an inappropriate relationship with a prisoner.

**Florida**: Robin Pagoria, a former Polk County jail guard, had a "deep dark secret." In February 2013, a judge sentenced her to 20 years in prison followed by 20 years of probation for her role in sexually abusing children. "She was into the dominant, submissive fetish, and the spanking fetish," stated Sheriff Grady Judd. Investigators said she stripped two children naked, tied them up and spanked them on camera. Pagoria was allegedly acting on the orders of her online Australian boyfriend, Christopher Lobban, who has been arrested and is currently fighting extradition to the U.S.

**Georgia**: On February 12, 2013, Atlanta area police sergeants Victor Middlebrook and Andrew Monroe were arrested as part of a group of officers that served as bodyguards during staged drug deals, according to federal agents. ATF investigators said the dirty cops used their uniforms and patrol cars to ensure the drug dealers would not be robbed by other criminals or come under police scrutiny. Five civilians were also arrested in the sting operation.

**Georgia**: Jeshon Burden, 33, was released on $2,613.50 bond after being charged with battery and violation of oath of office. The Spalding County deputy, an 11-year veteran with the Sheriff's Office, is accused of assaulting a prisoner in the booking area of the Spalding County Detention Center on February 11, 2013.

**Haiti**: The latest project by U.S. narcotics agents at the American Embassy in Haiti is prison-building. According to a February 20, 2013 article by *Black Agenda Report*, the U.S. is constructing two prisons for the island nation – one for men and another for women – at a cost of $5-10 million. Although government officials said the project is a humanitarian response to violence, overcrowding and disease in Haiti's prisons, the U.S. has never paid much attention to international standards and the American criminal justice system is a poor model to export to other countries.

**Illinois**: A rumor concerning a stolen telephone personal identification number (PIN) led to Shamikia L. Massie, 29, facing charges for assaulting another female prisoner at the Racine County Jail. Massie told police she was "so mad she wasn't able to control herself" when she threw a cup of hot coffee into the other woman's face on February 17, 2013. The other prisoner had accused Massie of making phone calls using a third prisoner's PIN.

**Illinois**: Walter Unbehaun, 73, had spent most of his adult life behind bars and "felt more comfortable in prison than out," so on February 9, 2013, he walked into a suburban Chicago bank, lifted his coat to reveal a silver revolver and left with $4,178. A post-arrest interrogation found that Unbehaun wanted to spend the rest of his life in prison and committed the robbery in hopes of getting caught. If convicted he faces up to 20 years – which, given his age, would likely amount to a life sentence.

**Maine**: The NAACP of Portland has met with prisoner Renardo Williams, who was assaulted by a guard at the Maine State Prison after questioning why black prisoners were treated differently than other prisoners. NAACP chapter president Rachel Talbot Ross said that Williams, who was handcuffed at the time of the incident, did nothing to provoke the beating by Capt. David Cutler, who was arrested on February 20, 2013 and faces misdemeanor assault charges.

**Massachusetts**: A former Suffolk County Sheriff's Department corrections officer, Paul Mahan, 42, has been charged with workers' compensation fraud and larceny by false pretenses. Mahan collected tens of thousands of dollars in retirement, workers' compensation and disability benefits for an on-the-job injury while earning unreported income by operating car dealerships and other businesses. Attorney General Martha Coakley announced the charges on February 20, 2013.

**Minnesota**: Federal prisoners Ira L. Goodwin, Michael S. Luedtke and Edward

# 12 FREE ISSUES!

**FREE!**

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!

Quarterly drawing WINS $100! **(Void in New York)**

(Last Quarter's winner from **Houtzdale, PA.**)

TELL YOUR FRIENDS!   ACT NOW!!

**PO Box 2063 • Fort Walton Beach FL. 32549**

www.InmateMagazineService.com

# Inmate Magazine Service INC.

PLN_0000807

## News In Brief (cont.)

M. Robinson have been indicted for a February 8, 2013 ambush attack on two guards at the Sherburne County Jail, which rents the majority of its bed space to the federal government. A chair was used during the assault on guards Jesse P. Kipka and Jesse J. Overlie, and Kipka suffered a concussion when he was hit on the head with his own can of pepper spray. Both guards were "extensively bruised," said U.S. Attorney's Office spokeswoman Jeanne Cooney.

**Mississippi:** Robert Kale Johnson, 38, was sentenced to 15 months in prison and 3 years of supervised release on February 26, 2013 after pleading guilty to accepting a $5,000 bribe while employed as a guard at the Yazoo City Federal Correctional Complex. "The integrity of our federal prison system depends upon the honesty and

commitment to duty of correctional personnel," noted Special Agent in Charge T.M. Gulotta-Powers with the Department of Justice's Office of the Inspector General.

**New Jersey:** Former Trenton State Prison guard Sterling Duckett, 46, received a 5-year sentence on February 15, 2013 as part of a plea deal with the Mercer County prosecutor's office; he was initially charged with official misconduct, bribery and contraband smuggling. Duckett's attorney said the 14-year corrections veteran was "manipulated" by prisoners and had a lapse of judgment when he smuggled cell phones, drugs and escape tools into the prison. Duckett, who had no prior criminal record, is immediately eligible to seek parole.

**New Mexico:** An investigation is being conducted into possible wrongdoing related to the association between Santa Fe jail employee Dennis Roybal and the co-owner of a local bonding company, Miguel Lucero,

who happens to be his brother-in-law. Roybal was placed on paid administrative leave on February 19, 2013 following complaints from two other bonding firms that accused him of steering jail detainees to Lucero's business, A-Bonding Company. Lucero said he didn't believe his brother-in-law "would ever do something like that," and claimed his company had "never solicited aid from any public employees."

**New Mexico:** A tip led to a lockdown at the New Mexico State Penitentiary and an internal investigation after state officials found guards sleeping and in possession of banned items such as electronics, cooking equipment, DVDs and cell phones. Corrections Secretary Gregg Marcantel told reporters in February 2013 that the guards will likely be disciplined and there will be more frequent, random checks of prison staff.

**New York:** In March 2013, Chad Seegars sued the city of New York, the

## PLN Classifieds

**Prison Grievances**
Graphic novel entertains and informs.
5th-grade vocab, great art.
Checklists, calendar, PLRA info.
Adapts to jails, federal and state prison systems.
$9 at Amazon.com.

**JOIN OUR FAM! (PEN PAL SITE)**
SASE TO:
www.InmateNHouselove.com
4001 Inglewood Ave
Suite 101 Dept 144
Redondo Beach, Ca.90278

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare
Manuscripts for Self-Publishing
Reasonable Rates!-Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**A DEGREE/ORDINATION FROM PRISON**
Correspondence Courses via mail
INT'L CHRISTIAN COLLEGE&SEMINARY
PO BOX 530212 Debary, FL 32753-0212
Associates thru PhD credit for
Life Experience *ACCREDITED*
Tuition as Low as $19.95 a month
Send SASE for a Free Evaluation

**InfoLINCS, LLC**
Daily sports lines & updates
Photo Forwarding- family to you
Gifts & Flowers- sent from you
Daily stock quotes – 5stocks
FREE Horoscopes & Quotes
FREE Legal news
SIGN UP NOW INFO@INFOLINCS.COM

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games. We Sell Photos of Sexy
Women, Gifts for Loved Ones,
Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how
to receive Voices.Con monthly, send
SASE to: PO Box 361, King City, Ca 93930.
On the web at: VoicesDotCon.org;
Email: Publisher@VoicesDotCon.org

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

**Let us help w/Your Parole Review**
13 years of helping those in
Prison obtain another chance.
Our Parole Plan shows you as a
Favorable Candidate for Parole!
D&D Worldwide Services, LLC.
PO Box 40081 Houston, TX. 77240
281-580-8844 / www.myparole.info

**Lonley? Feeling Forgotten?**
Angel's Kite's is the answer!
For under 65 cents a day
be reconnected to the world.
Let us "plug" you back into civilization.
Interested?
Send a SASE to the address below
Angel's Kite's
P.O. Box 16796, Houston, Tx 77222

**Desirae's email service,** photo
duplications and more.info send
SASE and 1 f/c loose stamp to:
DESIRAE, 10 Bungalow Ct., Newton, Ia.
50208. All paid orders receive
one free penpal address.

**Gillins Typing Service**
Typing Manuscript & Legal Material
$1.75 per page w/ Editing
Reliable and Prompt Service
Send SASE for a Brochure
Phone number: (718) 607-9688
229-19 Merrick Blvd Suite 228
Laurelton, NY 11413

PLN_0000808

NYC Department of Corrections and an unnamed Riker's Island jail guard after the guard posted a photo of Seegars on Facebook. While Seegars was in the Riker's Island visitors' area, a stranger slashed his face and the resulting eight-inch wound required 90 stitches. His lawsuit claims that the photo posted by the guard, which showed Seegars' facial injury, was distressing and humiliating.

**Ohio**: Theresa L. Daniel, 60, a guard at the Allen Oakwood Correctional Institution in Lima, was placed on administrative leave without pay one day after a January 18, 2013 incident in which she allegedly failed to follow prison policies. Daniel, who has worked in the prison system for 17 years, is accused of placing a handcuffed prisoner in a segregation cell with another prisoner who raped and beat him. "There is both an internal investigation as well as one being conducted by the state Highway Patrol," said Ohio prison system spokeswoman JoEllen Smith.

**Ohio**: At least four incidents involving staff sexual misconduct have plagued the Lebanon Correctional Institution since 2009, and last year yet another scandal led to the demotion of warden Tim Brunsman and the firing of health care administrator Amy Weiss. The pattern continued with the resignation of a third shift nurse, Karen Hall, on February 8, 2013 after evidence surfaced that she had an inappropriate relationship with a prisoner. Hall resigned before officials could question her about the allegations.

**Ohio**: Aramark kitchen worker Mildred Hensley, 59, was arrested on February 6, 2013 on charges of bringing contraband into the Erie County Jail. According to Erie County Sheriff's Office Chief Deputy Jared Oliver, Hensley admitted bringing alcohol, tobacco and a pair of scissors meant to cut a prisoner's hair into the jail to give to trustee kitchen workers. Oliver said Hensley had carried the items in her purse, and jail security screening policies are being reviewed.

**Oklahoma**: Christie Dawn Harris, 28, reluctantly submitted to a strip search after being arrested on drug charges on March 4, 2013. During the search a female officer discovered the handle of a five-shot Freedom Arms revolver protruding from Harris' vagina. When the weapon was retrieved, jail officials found it was loaded with three live rounds and one spent shell. Investigators also discovered plastic baggies containing methamphetamine secreted between Harris' buttocks.

**Pennsylvania**: On February 21, 2013, a former federal prison guard pleaded guilty to theft of government property. Fred Hagenbuch, 52, was employed as a Senior Office Specialist at USP Lewisburg when he illegally removed property from FCC Allenwood, including electrical conduit, mesh fencing and fence posts. Hagenbuch was sentenced on June 11, 2013 to one year of probation and ordered to pay $1545.76 in restitution.

**Pennsylvania**: On April 29, 2013, Craig Lewis, Jr., a former prisoner, was sentenced to 7½ to 15 years for shooting an off-duty prison guard who had worked in the same York County Prison cell block where Lewis had previously served time. The two happened to meet at a bar and a fight ensued, which spilled outside. It was then that Lewis, 21, shot the guard, David Whitcomb, in the abdomen. Lewis was convicted of attempted assault but acquitted of attempted murder in the shooting.

**Pennsylvania**: Federal prison guard Eric Williams was murdered at USP Canaan on February 25, 2013. Williams was working in a housing unit at the

**BB Vol 4 Extreme Freak Ed. $5.00**
Buy Cats 1,2,3,4 & 5th 1 free $20
Full Color Cats, 1000s of options
Non-nude - all shapes & races
Send 11 stmps per cat or $20 MO
To: On Demand Inmate Services
PO BOX 81 - PLN, Chelt, PA 19012
Pen pal list $15.00 MO no stamps

**Kelly Typing Service**
Manuscript & Legal Material
$1.75 per page w/ Editing
Reliable and Prompt Service
Send SASE for a brochure
Phone number: (804) 787-3932
Email: kellyenterprise@gmail.com
PO Box 13170 Richmond, VA 23225

**WRITER's RESOURCE**
Books to help improve your
writing skills. Send SASE.
PO Box 32, Berryville AR 72616
Email: info@writersresource.co

**2 FREE PenPals Paid Orders Only!**
Photo Duplications (Nudes OK) 10-
4x6 $8, 2-5x7 $8, 1-8x10 $8. ADD
$3S/H. Info Only-$2.Simply Photos
10 Bungalow Ct, Newton, IA 50208

**ELIJAHRAY.COM Gift Service**
Center. Brand new catalog 120
Gifts.Send $2 or four stamps to
ELIJAHRAY.COM PO Box 3008
La Grande, OR 97850. Real Gold,
Toys,Bath Sets,and MORE! No One
Does It Like We Do! Sending
Home a Little 1 Gift at a Time.

**KRASNYA SPRING HAS SPRUNG SALE!**
FREE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH 2
FIRST CLASS STAMPS !
KRASNYA L.L.C. PO Box 32082
BALTIMORE MD 21282
PLEASE SPECIFY MALE OR FEMALE BABES

**CHRISTIAN PRISON PEN PALS**
PO Box 333 Inverness, FL 34451
Personal Ads Start at:
Photo & address $10
Photo, Desc., 400 word bio $25

**Inmate Services, Great Prices!**
Photos of models, penpal, copy
service, we buy stamps for cash,
VIP services, gifts to friends
& family, newsletters, we sell
your art (fee), copy your photos,
internet searches. Send SASE ATS
Box 530367, Henderson, NV 89053

**MIDNIGHT EXPRESS BOOKS**
With 10 yrs experience, we are
devoted to helping inmate authors
of all skill levels get their work
ready for self-publlishing.
PO Box 69
Berryville AR 72616
Email: MEBooks1@yahoo.com

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet
& People Searches, Amazon Books,
Erotic Photos, PenPals, Special
Requests and More. Send SASE to:
Elite Paralegal & Prisoner Services
PO Box 2131, Appleton, WI 54912

PLN_0000809

### News In Brief (cont.)

high-security facility near Scranton when prisoner Jessie Con-Ui, 36, attacked him with a homemade weapon. Williams was stabbed multiple times and hit on the head; he was rushed to a hospital where he was pronounced dead. On June 25, 2013, Con-Ui was charged with first-degree murder and possession of contraband. He has since been transferred to the ADX supermax facility in Florence, Colorado.

**South Carolina**: On February 25, 2013, Robin E. Smith, 38, charged with assault and battery, was released on a $20,000 personal recognizance bond and immediately fired from his job as a guard at the Alvin S. Glenn Detention Center. Smith is accused of stomping a 52-year-old homeless prisoner who had been arrested on trespassing charges. The prisoner, who was not identified, suffered a fractured vertebrae, collapsed lung, two broken ribs and internal injuries as a result of the February 11, 2013 incident, and was hospitalized in critical condition. Prosecutors are seeking a higher bond for Smith.

**Tennessee**: A search warrant for the home of Dexter Lavon Mason and his wife Mary, both 66, revealed computers that contained more than 100 images of prepubescent children engaged in sexual or simulated sexual activities. Mason was charged with 21 counts of sexual exploitation of a minor, one count of tampering with evidence and four counts of aggravated sexual battery; his wife was charged with one count of tampering with evidence. Both were indicted in February 2013. Dexter Mason had recently retired as a state probation and parole manager. ◾

---

# Criminal Justice Resources

#### ACLU National Prison Project

Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

#### Amnesty International

Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

#### Center for Health Justice

Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

#### Centurion Ministries

Works to exonerate the wrongfully convicted, in both cases involving DNA evidence and those that do not. Centurion only takes 1-2 new cases a year involving actual innocence. They do not consider accidental death or self-defense murder cases, he said/she said rape cases, or child abuse or child sex abuse cases unless there is physical evidence. All case inquiries must be from the prisoner involved, in writing. Contact: Centurion Ministries, 221 Witherspoon Street, Princeton, NJ 08542 (609) 921-0334. www.centurionministries.org

#### Critical Resistance

Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612  (510) 444-0484. www.criticalresistance.org

#### The Exoneration Project

The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

#### Family & Corrections Network

Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046  (215) 576-1110. www.fcnetwork.org

#### FAMM

FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006  (202) 822-6700). www.famm.org

#### The Fortune Society

Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

#### Innocence Project

Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

#### Just Detention International

Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: JDI, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010  (213) 384-1400. www.justdetention.org

#### Justice Denied

Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

#### National CURE

Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

#### November Coalition

Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

#### Prison Activist Resource Center

PARC is a prison abolitionist group committed to exposing and challenging all forms of institutionalized racism, sexism, able-ism, heterosexism and classism, specifically within the Prison Industrial Complex. PARC produces a free resource directory for prisoners, and supports activists working to expose and end the abuses of the Prison Industrial Complex and mass incarceration. Contact: PARC, P.O. Box 70447, Oakland, CA 94612 (510) 893-4648. www.prisonactivist.org

---

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING** on all book / index orders OVER $50 (effective Jan. 1, 2013 until further notice). $6.00 S/H applies to all other book orders.

**SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE ONE BONUS!**
1. SIX (6) FREE ISSUES FOR 54 TOTAL! OR
2. PRISON PROFITEERS (A $24.95 VALUE!) OR
3. WITH LIBERTY FOR SOME (AN $18.95 VALUE!)

**Prison Profiteers**, edited by Paul Wright and Tara Herivel, 323 pages. **$24.95.** This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how.                   1063

**With Liberty for Some: 500 Years of Imprisonment in America**, by Scott Christianson, Northeastern University Press, 372 pages. **$18.95.** The best overall history of the American prison system from 1492 through the 20th Century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years.                   1026

**Prison Nation: The Warehousing of America's Poor**, edited by Tara Herivel and Paul Wright, 332 pages. **$35.95.** PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.                   1041

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95.** PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.                   1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada**, updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$49.95.** Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college correspondence courses.                   1071

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99.** Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.                   1029

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99.** Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.                   1037

**Law Dictionary**, Random House Webster's, 525 pages. **$19.95.** Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.                   1036

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 110 pages. **$14.95.** A guide to grammar and punctuation by an educator with experience teaching English to prisoners.                   1046

**Legal Research: How to Find and Understand the Law**, by Stephen Elias and Susan Levinkind, 568 pages. **$49.99.** Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.                   1059

**Deposition Handbook**, by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99.** How-to handbook for anyone who conducts a deposition or is going to be deposed.                   1054

**Finding the Right Lawyer**, by Jay Foonberg, ABA, 256 pages. **$19.95.** Explains how to determine your legal needs, how to evaluate a lawyer's qualifications, fee payments and more.                   1015

**SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE ONE BONUS!**
1. FOUR (4) FREE ISSUES FOR 40 TOTAL! OR
2. PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00.** This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.                   1060

**Spanish-English/English-Spanish Dictionary**, Random House. **$8.95.** Two sections, Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.                   1034

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95.** Explains the writing of effective complaints, responses, briefs, motions and other legal papers.                   1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right**, updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 405 pages. **$16.00.** Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.                   1030

**Webster's English Dictionary**, Newly revised and updated, Random House. **$8.95.** 75,000+ entries. Includes tips on writing and word usage, and has updated geographical and biographical entries. Includes recent business and computer terms.                   1033

**Everyday Letters for Busy People**, by Debra Hart May, 287 pages. **$18.99.** Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters.                   1048

**Roget's Thesaurus**, 717 pages. **$8.95.** Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words.                   1045

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95.** *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.                   1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95.** In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.                   1073

**A Dictionary of Criminal Law Terms (Black's Law Dictionary® Series)**, by Bryan A. Garner, 768 pages. **$39.00.** This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to navigate your way through the maze of legal language in criminal cases.                   1088

**The Habeas Citebook: Ineffective Assistance of Counsel**, by Brandon Sample, PLN Publishing, 200 pgs. **$49.95.** This is PLN's second published book, which covers ineffective assistance of counsel issues in federal habeas petitions. Hundreds of case cites!                   1078

**\* ALL BOOKS ARE SOFTCOVER / PAPERBACK \***

PLN_0000811

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95.** Describes symptoms and treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography.    1031

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95.** Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges.    1084

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95.** The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended!    1077

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99.** While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents.    1075

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits,** by Lewis Laska, 336 pages. **$39.95.** Written for victims of medical malpractice/neglect, to prepare for litigation. While this book is not written with prisoners in mind, it is useful when dealing with malpractice and medical negligence claims.    1079

**Criminal Law in a Nutshell,** by Arnold H. Loewy, 5th edition, 387 pages. **$38.00.** This guide provides an overview of criminal law. Expert discussion explores punishment, specific crimes, special defenses, the burden of proof and much more.    1086

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95.** This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves.    1083

**Soledad Brother: The Prison Letters of George Jackson,** by George Jackson, Lawrence Hill Books, 339 pages. **$18.95.** Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 40 years ago.    1016

**PLN Cumulative Index. $22.50 each.** PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

---

## MORE BOOK TITLES TO BE ADDED SOON!

---

### Subscription Rates

| | 1 year | 2 years | 3 years | 4 years |
|---|---|---|---|---|
| **Prisoners** | $30 | $ 60 | $ 90 | $120 |
| **Individuals** | $35 | $ 70 | $105 | $140 |
| **Professionals** | $90 | $180 | $270 | $360 |
| (Attorneys, agencies, libraries) | | | | |

### Subscription Bonuses

**2 years** - 2 bonus issues for 26 total issues

**3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 61

**4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 61

(All subscription rates and bonus offers are valid as of 1-01-2013)

**VISA** **MasterCard**    Purchase with Visa, MasterCard, AmEx or Discover by phone: **561-360-2523** Or buy books and subscriptions online: **www.prisonlegalnews.org**    **AMEX** **DISCOVER**

**Mail Payment and Order to:**

> Prison Legal News
> P.O. Box 1151
> Lake Worth, FL 33460

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by prison policies.*

Please **Change** my Address to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

**Subscribe to Prison Legal News**    **$ Amount**

6 month subscription (prisoners only) - $18    _____

1 yr subscription (12 issues)    _____

2 yr subscription (2 bonus issues for 26 total!)    _____

3 yr sub (*write below which FREE book you want*) or 4 bonus issues for 40 issues total!    _____

4 yr sub (*write below which FREE book you want*) or 6 bonus issues for 54 issues total!

Sample issue of **Prison Legal News** - $3.50 each    _____

**Books or Index Orders** (No S/H charge on 3 & 4-year sub free books OR book orders OVER $50!)    **Qty.**

_____ ___ _____

_____ ___ _____

_____ ___ _____

_____ ___ _____

**Add $6.00 S/H to Book Orders UNDER $50**    _____

FL residents ONLY add 6% to Total Book Cost    _____

**Total Amount Enclosed:**    _____

*\* No refunds on PLN subscription or book / index orders after orders have been placed \**

PLN_0000812

# Great Self-Help Book Deals
## From Prison Legal News!



**Order from Prison Legal News**
Add $6 shipping for orders under $50

Prison Legal News
PO Box 1151
Lake Worth, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org

### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer



The Criminal Law Handbook
$39.99



Represent Yourself in Court
$39.99



Legal Research
$49.99



Nolo's Deposition Handbook
$34.99



**NOLO**
**YOUR LEGAL COMPANION**

---

# PRISONLEGALNEWS.org
## Dedicated to Protecting Human Rights
>>FREE Data Search

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**


**Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

- PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.
- Publications section has numerous downloadable government reports, audits and investigations from around the country.
- Full text decisions of thousands of court cases, published and unpublished.
- All content is easy to print for downloading and mailing to prisoners.
- Most complete collection of prison and jail related verdicts and settlements anywhere.
- Order books, print subscriptions and make donations on line.

- Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.
- Links to thousands of prison, jail, criminal justice and legal websites around the world.
- Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.
- Search free, pay only if you find it!
- The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month • $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org

PLN_0000813



**Prison Legal News**
PO Box 1151
Lake Worth FL 33460

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

## Subscription Renewal

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2015 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 07/2013** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

## Change of Address

If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!


"Talk more for less"
ICCALLS, LLC

**ARE YOU FRUSTRATED BECAUSE OF THE HIGH COST OF YOUR PHONE CALLS?**

Our company **ICCALLS** is here to provide you **excellent service** at very **low rates**.

We have different plans to accommodate for the one that best fits your needs.

Right now we have a promotion of one month **absolutely FREE** for new subscribers. Just provide us the promo code: **PLNICCALLS***
Please contact **ICCALLS** to find out how this special promotion works, for either **US** or **INTERNATIONAL** calls. If you are already a customer, contact us to find out how to earn points by referring new customers to the service and get **FREE minutes** every month.

**ICCALLS** also provides you the service of money transfers directly to your commissary's account. You can receive up to **$300.00** per transaction paying only **$9.95** using your Debit/Credit Card or your Pay Pal Account.

**DO NOT WAIT ANY LONGER AND CONTACT US:**

| | | |
|---|---|---|
| Phone: | 1(888)718-1595 | Monday to Friday |
| | 1(310)496-8292 | 9:00 AM to 5:00 PM CT |
| Fax: | 1(323)210-7458 | We will be able to assist you |
| E-mail: | c.service@iccalls.com | in English, Spanish, Portuguese, |
| | support@iccalls.com | and Hebrew. |
| | www.iccalls.com | |
| Mail to: | ICCALLS, LLC | |
| | P.O. Box 3674 | |
| | Huntington Park, CA 90255 | |

**LLAMENOS Y COMIENCE**
**A AHORRAR DINERO EN**
**SUS LLAMADAS!!!!**





**2010-2013 ICCALLS, LLC**
***RESTRICTIONS APPLY**

PLN_0000814