# EXHIBIT 26

1

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 15-cv-02184-RM-STV
3   _____

4   DEPOSITION OF:  MARK COLLINS - April 19, 2018
                    (Designations Pending)
5   _____

6   PRISON LEGAL NEWS, a project of the Human Rights
    Defense Center,
7
    Plaintiff,
8
    v.
9
    FEDERAL BUREAU OF PRISONS,
10
    Defendant.
11  _____

12
              PURSUANT TO NOTICE, the deposition of
13  MARK COLLINS was taken on behalf of the Plaintiff at
    4711 North Elizabeth Street, Pueblo, Colorado 81008,
14  on April 19, 2018, at 8:01 a.m., before Barbara
    Birger, Registered Merit Reporter, Certified Realtime
15  Reporter and Notary Public within Colorado.

16

17

18

19

20

21

22

23

24

25

H+G

Hunter + Geist, Inc.

303.832.5966          1900 Grant Street, Suite 1025      ■ www.huntergeist.com
800.525.8490          Denver, CO 80203                   ■ scheduling@huntergeist.com

                      Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

A P P E A R A N C E S

For the Plaintiff:

        PETER A. SWANSON, ESQ.
        Covington & Burling L.L.P.
        850 Tenth Street, NW
        Washington, D.C. 20001

For the Defendant:

        CLAY C. COOK, ESQ.
        U.S. Department of Justice
        1801 California Street, Suite 1600
        Denver, Colorado 80202

Also Present:

        Kaitlin B. Turner
        Dan Marshall, Esq.
        (Appearing telephonically)

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

I N D E X

EXAMINATION OF MARK COLLINS:                    PAGE
April 19, 2018

By Mr. Swanson                                    4


                                              INITIAL
DEPOSITION EXHIBITS:                          REFERENCE

Exhibit 1   Expert Report of Mark Collins,         6
            3/23/18

Exhibit 2   Rebuttal Expert Report of Mark         6
            Collins, 4/6/18

Exhibit 3   Email to Fulham, Sandler,              7
            Shapanka and Swanson from Prose,
            4/6/18, Subject:  PLN - materials
            reviewed by Mark Collins

Exhibit 4   Institution Supplement, Incoming      29
            Publications, 2/2/16

Exhibit 5   Institution Supplement, Incoming      31
            Publications, 12/21/17

Exhibit 6   Handwritten notes with attachments   110

Exhibit 7   Defendant's First Supplemental       129
            Responses to Plaintiff's First
            Interrogatories

Exhibit 8   Defendant's Second Supplemental      129
            Responses to Plaintiff's First
            Interrogatories

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

1          Q.    Or any current personnel or the current

2     warden?

3          A.    I did not.

4          Q.    Are you offering an opinion in this case

5     as to whether the -- strike that.  Let me back up.

6                Are you aware that this case involves the

7     rejection of 11 issues of Prison Legal News at the

8     ADX?

9          A.    Yes.

10         Q.    Is that your understanding?

11         A.    Yes.

12         Q.    Are you offering an opinion in this case

13    as to whether those 11 issues were properly considered

14    security risks at the time?

15         A.    Can you say that again, please.

16         Q.    Sure.  Are you offering an opinion in

17    this case as to whether any of the 11 issues of PLN

18    that were rejected were properly considered a security

19    risk at the time?

20         A.    Yes.

21         Q.    Yes, you are offering an opinion?

22         A.    Yes.  Yes.

23         Q.    Where is that in your reports?

24         A.    And what specifically are you -- you're

25    asking for a specific opinion on -- that's in writing

1   in here?

2          Q.   Yeah.   Yeah.   I don't see anything in

3   these reports where you go through the issues, you

4   talk about the content of the 11 issues of PLN, and

5   you say, yes, that was a security risk at the time or

6   that was properly considered a security risk at the

7   time.

8          A.   Maybe I misunderstood your question.   I

9   did not go through and offer an opinion on each one

10  individually, no, I did not.

11         Q.   Okay.

12         A.   Mine is more based on the necessity for a

13  warden to have the flexibility and the capability to

14  make a good, sound correctional decision when it comes

15  to reviewing and possibly rejecting publications for

16  safety and security.

17         Q.   And that's an opinion that would apply to

18  any publication?

19         A.   Any publication, that is correct.   I did

20  not specify anywhere regarding the 11 publications

21  that are identified in this case.

22         Q.   So you're not taking a position -- you're

23  not taking a position one way or the other as to

24  whether those 11 issues were properly rejected?

25         A.   I am not, that's correct.

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

1        Q.  Do you understand that Mr. Aiken, who is

2  PLN's expert, has offered an opinion that those 11

3  issues were not security risks at the time they were

4  mailed?

5        A.  I understand he did, yes.

6        Q.  So you're not disputing that opinion?

7        A.  I am not.  My understanding is that the

8  government has already agreed through a former warden

9  that those articles were no longer a threat to the

10  safety, security, or running of the institution, and

11  those articles have been agreed upon and delivered to

12  the inmates already, and that's why I'm not offering

13  an opinion on those.

14        Q.  And you're referring to the delivery of

15  those issues after the litigation was filed?

16        A.  Correct.

17        Q.  Okay.  Is it your understanding that BOP

18  has agreed that they were not security risks at the

19  time they were mailed?  So I'll try to clarify.

20        A.  Okay.

21        Q.  So the delivery of those issues occurred

22  after the litigation was filed, correct?

23        A.  That's my understanding.

24        Q.  And I believe it was maybe 2016 or 2017,

25  I'm not -- the case has gone on for a little while, I

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 13

1   don't remember the exact year, but is that --

2       A.   Yeah, it's my understanding that the

3   government has reconsidered the position on rejecting

4   those, and that after the further review it was

5   determined that they were not a threat to the safety,

6   security, or running of the institution, they were

7   therefore given to the inmates.

8       Q.   Those issues, though, were originally

9   mailed between 2010 and 2014, correct?

10      A.   Correct.

11      Q.   And that's when they were rejected,

12  correct?

13      A.   That's my understanding, that's correct.

14      Q.   Okay.  And so the government said as of

15  2016 or 2017 we don't consider them a security risk

16  and so they delivered them?

17      A.   Correct.

18      Q.   But is it your understanding the

19  government has conceded that, you know, as of the time

20  they were originally mailed between 2010 and 2014, it

21  was wrong to consider them a security risk at that

22  point in time?

23      A.   It's my understanding that that's why

24  they were not delivered at the time because it was

25  considered that they were a threat to the safety,

1      A.    That was Mr. Aiken's position?

2      **Q.    That's his position.**

3      A.    Yes.

4      **Q.    When you say that almost all of his**

5  **report focuses on practices that no longer exist at**

6  **the ADX, are you referring to that opinion of his?**

7      A.    Yes, of why those were rejected at the

8  time.  Because as I mentioned before, the practices

9  that have been addressed and have been heightened to

10  ensure a higher level of review to make sure the

11  publications are not being rejected unless it's for

12  sound correctional judgment reasons.  Try to avoid the

13  mistakes that the government identified before that we

14  talked about so that those don't happen again.

15      **Q.    And what are those changes that have been**

16  **made?**

17      A.    Well, it includes the review by folks in

18  the SIS office.  The special investigative staff are

19  involved in the review process, and so does the legal

20  services staff help out, and that information is

21  contained in an institution supplement, a new policy,

22  a local policy at the institutional level on incoming

23  publications and identifies the procedures in which

24  those publications will be reviewed and for

25  consideration for rejection.

1       Q.    So those changes are procedural in

2   nature?

3       A.    Yes.

4       Q.    Do any of those changes involve altering

5   the standard that is employed in determining whether a

6   publication constitutes a security risk?

7       A.    What do you mean by the standard?

8       Q.    The -- any of those changes involve, you

9   know, a change to the analysis of whether something is

10  a security risk?

11      A.    Probably the most important part of it is

12  the practice -- the previous practice of a name only

13  where it would identify a Bureau of Prisons staff

14  member or inmate only in making a rejection, that is

15  specifically lined out to say that will not be the

16  sole reason for rejecting a publication, there has to

17  be some sort of justification along with that before a

18  publication would be rejected.  There has to be some

19  substance as to what is the actual safe and security

20  concern.

21      Q.    You refer to the name-only practice here

22  on page 1 of your rebuttal report.

23      A.    Yes.

24      Q.    And you say the BOP also agrees with

25  Mr. Aiken that there was no sound security rationale

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

1    for the old name-only practice?

2           A.    Yes.

3           Q.    And do you agree with that?

4           A.    Yes.   This is my report.

5           Q.    Okay.   What is your understanding of the

6    name-only practice?

7           A.    That basically if it referenced an

8    inmate's name or a staff member's name at the complex

9    or at the institution that it was being rejected for

10   safety and security reasons.

11          Q.    Is it your understanding that the 11

12   issues of PLN at issue in this case were rejected

13   based on the name-only practice?

14          A.    I don't believe all of them were rejected

15   just for the name-only practice.

16          Q.    But some of them were?

17          A.    I would have to look at each one of them

18   individually again to refresh my memory, but I know

19   some of them weren't just for that.

20          Q.    But you think at least some might have

21   been rejected solely because --

22          A.    Yeah, without looking at each one of them

23   individually, I can't give you a solid number, but

24   there's possibly some of them were rejected for name

25   only and not -- but not all of them.

1          Q.   Let's assume for a moment that none of

2     the rejections were based solely on an inmate or staff

3     person's name, that the reasons went beyond that to

4     some other substance or content in the article.  If

5     that's the case, then why does eliminating the

6     name-only practice change the determination of whether

7     the 11 issues of PLN were a security risk at the time?

8          A.   You threw a lot in there.

9          Q.   You want me to break it down?

10         A.   Yeah.  Yeah, if you would, please.

11         Q.   So you said you weren't sure whether the

12    11 issues were rejected based on the name only or how

13    many were or were not.  So let's just assume for now

14    that none of them were rejected based on the name

15    only.

16         A.   Okay.

17         Q.   And we also talked a few minutes ago

18    about BOP's position in this case that at least for

19    most of the issues they were properly rejected at the

20    time, right?

21         A.   Yes.

22         Q.   So if the issues were not rejected based

23    on the name-only practice and BOP is contending that

24    they were properly rejected at the time, meaning there

25    was something else beyond just the name that was a

Page 68

1    consider?

2              A.    What do you mean by "purpose"?

3              Q.    **What message the publication is trying to**

4    **communicate.**

5              A.    Sure.

6              Q.    **So, you know, a newspaper, you know,**

7    **mainstream newspaper as opposed to, like, a**

8    **right-wing, left-wing manifesto?**

9              A.    That's a prime example, I would say,

10   right there.  Anything racially motivated or an

11   organization that puts out hate or racial

12   discrimination or that kind of information, sure, that

13   purpose absolutely should be taken into consideration.

14             Q.    **And do you agree that access to legal**

15   **information is important for inmates?**

16             A.    Absolutely.

17             Q.    **Does the warden have the ability to limit**

18   **an inmate's access to the law library?**

19             A.    Okay.  If the inmate goes into the law

20   library and does something inappropriate, then he can

21   limit his placement in the law library.  That doesn't

22   equate to limiting his access to legal material.  Do

23   you understand the difference?

24             Q.    **So inmates are allowed physically into**

25   **the law library?**

1          A.    Unless they do something while they are

2     in the law library, they would start tearing up the

3     books, they expose themselves and start engaging in a

4     sexual act, then we're not -- then they would not

5     place the inmate back in that area for a period of

6     time.

7               But that does not mean the inmate would

8     not have access to legal material.  There would be a

9     whole separate procedure for him to follow to get

10    access to material.  He would just have to do it in

11    his cell as opposed to going to the law library in the

12    housing where he's housed at.

13         Q.    Under those circumstances the inmate

14    would submit a written request for certain materials,

15    then get those materials delivered to his cell?

16         A.    Correct.  And once he's done he would

17    have to give the materials back to staff.

18         Q.    You have had a chance to look at Prison

19    Legal News?

20         A.    Yes.

21         Q.    Prison Legal News contains legal

22    information that may be relevant to prisoners; is that

23    right?

24         A.    Yes.

25         Q.    You agree that's important information to

**MARK COLLINS - 4/19/2018**
**Prison Legal News v. Federal Bureau of Prisons**

Page 70

1   give to inmates?

2          A.   Access to legal information, I do.  I do.

3          Q.   **Should the fact that a publication is not**

4   **censored at another BOP institution factor into the**

5   **warden's analysis?**

6          A.   No.  He's not going to know that

7   information.  He's concentrating on what's going on at

8   the ADX, again in the dynamics and inmate population

9   and how that can be detrimental to the safety of an

10  inmate, staff member, or that institution.

11         Q.   **We talked earlier about inmates**

12  **communicating with inmates in other BOP facilities.**

13         A.   They try to.

14         Q.   **Are they ever successful?**

15         A.   I'm sure they are.

16         Q.   **If they are successful in communicating**

17  **with inmates in other institutions and a publication**

18  **is not censored in those other institutions, then**

19  **doesn't that undermine the rationale for censoring it**

20  **at the ADX?**

21         A.   You're assuming the inmates did get that

22  information passed.  I said they try, I didn't say

23  they were successful.  So they will always try to

24  defeat security to try to pass information.  Sometimes

25  I'm sure they are successful, but I think the vast

1    majority of the times they are not, at least I would

2    like to think they are not.

3           **Q.   We also talked about inmates transferring**

4    **into the ADX and bringing information with them that**

5    **they have learned in other institutions?**

6           A.   That is correct.

7           **Q.   Again, is that something that it would**

8    **cut against censoring information at the ADX given**

9    **that you've constantly got an influx of new inmates**

10   **that are bringing information that might not have been**

11   **censored at other institutions?**

12          A.   You have to keep in mind, too, you don't

13   know what those inmates know, you don't know what they

14   don't know.  You don't know if they know who is at the

15   institution or if that information is even to any

16   value to inmates at the ADX.  So you can't really --

17   you can't sit and make a decision, am I going to let

18   this publication in because Inmate Jones is going to

19   be here in three weeks and he might have access to

20   that information.  You can't factor it in that way.

21               You have to look at your population, you

22   have and make a determination based on the information

23   at hand, all the circumstances we've talked about up

24   to this point, and the timing of the information you

25   have at the time.

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 124

1   that has no idea how detrimental that could be to that

2   institution, to the safety of the inmate that's noted

3   in that article.  It's serious.

4           Q.   If PLN prints an article that has only

5   information contained in a published federal court

6   decision, should that be the basis for censorship?

7           A.   Depends.  Depends on what information is

8   in it.  That's what I'm trying to explain to you, the

9   information that they get from the electronic law

10  library doesn't have as much information as what PLN

11  puts in its article.

12          Q.   What if what PLN puts in an article has

13  nothing beyond what the inmate can access in the

14  electronic library?

15          A.   Then what would be the -- I can't think

16  of an issue off the top of my head.  But with that

17  said, just because it's something that's available

18  through the electronic law library, not every inmate

19  uses the electronic law library.  So you can't just

20  sit here and blanketly assume because it was a court

21  decision, it's in the public domain, it's available in

22  an electronic law library.  You can't assume every

23  inmate knows about it.

24                But if you walk around and hand them a

25  copy of something, that's where it's a very difficult

Page 125

1   situation for a warden to make the determination.  If

2   you know, it says right here, now can inmates get

3   access in other ways?  We already said they can.

4              There are ways they will find to do it.

5   It might be three or four years down the road, but at

6   the time right now you don't want the inmates to have

7   access to that because somehow, some way it becomes

8   detrimental.

9              Kind of like the television situation I

10  talked about.  Immediate events, you shut the TV off

11  now.  It's public information, everybody else gets to

12  see it, what's the big deal?  You don't understand how

13  it could affect.  I'm not saying it will 100 percent

14  of the time, but there is potential there that it

15  could affect.

16       Q.   I thought you said earlier it was never

17  proper to cut off access to the law library?

18       A.   I didn't, and I'm not saying that.

19       Q.   You are saying there might be

20  circumstances where an inmate should be denied access

21  to a published federal court decision?

22       A.   No.  It just depends on what the

23  information that's in -- that's contained in the

24  publication or in the context of it says.

25       Q.   I want to clarify this one point.  So is

Page 126

1   there ever a circumstance in which the warden can say,

2   I'm not going to allow an inmate access to this

3   published court decision?  I'm not talking about the

4   issue of PLN, I'm just talking about --

5           A.   Not that I'm aware of.  Not that I'm

6   aware of.

7           Q.   So if PLN prints an issue -- let's say

8   the only thing in that issue is a reprint of a

9   published court decision of a federal court, would

10  there be any basis to censor that?

11          A.   I don't know.  I would have to look at

12  the -- again, it goes back to a case-by-case basis.

13  There could be something in there that I can't think

14  of off the top of my head that at the time being we

15  may not want the inmate to have access to it at that

16  time.

17          Q.   I'm just trying to reconcile the two

18  things I hear you saying.  On the one hand I hear you

19  saying that the warden can't prevent an inmate from

20  getting access to a published court decision, but on

21  the other hand if PLN reprints a published court

22  decision, the warden might be able to censor that?

23          A.   I guess what I'm trying to explain to you

24  is PLN provides more information than what the inmates

25  get through the electronic law library.  Sometimes it

1   will have more detailed information in there.  That's

2   the detailed information that I'm referring to that

3   the warden needs to make a determination, hey, this is

4   public, this part of it is public, and there might be

5   a few pieces in here that's in addition to that PLN

6   gets from wherever it gets its information from.

7   There might be a portion of that that somehow, some

8   way, somebody can determine that's going to get that

9   guy hurt if it gets into the wrong hands.  That's all

10  I'm trying to say.

11           **Q.   I think if I hear you right, you're**

12  **saying if PLN says more than what's in the court**

13  **decision that could be a problem, right?**

14           A.   It just depends on what the information

15  is.

16           **Q.   Right, depends on what the information**

17  **is?**

18           A.   Correct.

19           **Q.   But hypothetically, if all PLN does is**

20  **they reprint the court decision without adding a**

21  **single word to it, then there would be no reason to**

22  **censor that, right?**

23           A.   Unless somehow, some way the warden can

24  justify letting that information in would somehow pose

25  a risk to the safety of the inmate or the safe,

1  secure, and orderly running of the institution.

2          Q.   Can you think of any circumstance?

3          A.   Not off the top of my head I cannot.

4          Q.   You agree the warden couldn't deny an

5  inmate from actually getting a copy of that published

6  court decision, right?

7          A.   I'm sorry?

8          Q.   And you agree that the warden could not

9  deny an inmate from obtaining a copy of the published

10 court decision?

11         A.   No.

12         Q.   I just want to go back to the rejection

13 notices briefly.

14         A.   Can we take a break for a minute?

15         Q.   Absolutely.

16              (Recess taken, 11:13 a.m. to 1:27 p.m.)

17              (Deposition Exhibits 7 and 8 were

18 marked.)

19         Q.   (BY MR. SWANSON)  Welcome back.

20         A.   Thank you.

21         Q.   So we had been talking a little bit about

22 the rejection notices and the language in the

23 rejection notices.  And one of the issues we talked

24 about was -- or one of the points you made was in your

25 report that BOP must be able to protect the methods

MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 129

1    and techniques it uses for identifying threats or

2    risks, right?

3            A.    Yes.

4            Q.    Those, in your opinion, should not be

5    disclosed in a rejection notice?

6            A.    Correct.  Yes.

7            Q.    So I've marked two additional exhibits

8    here, Exhibits 7 and 8.  You guys have copies there.

9    Have you seen these before?

10           A.    I believe so.

11           Q.    Okay.  These are two sets of

12   interrogatory responses provided by BOP.  It's

13   their -- Exhibit 7, for the record, is BOP's first

14   supplemental responses to plaintiff's first

15   interrogatories, and Exhibit 8 is the second

16   supplemental responses to plaintiff's first

17   interrogatories.

18               You said you think you've seen both of

19   these before?

20           A.    I was just -- I would have to read it

21   again to -- I apologize, I'm not sure that I have.

22           Q.    Okay.  Well, why don't you turn to page 2

23   of Exhibit 7.  And I can represent this is a response

24   that BOP provided to an interrogatory in which PLN

25   asked BOP to provide the reasons why it thought the