# EXHIBIT 28



# Transcript of John Lee Dunkelberger, Designated Representative

**Date:** March 9, 2018
**Case:** Prison Legal News -v- Federal Bureau of Prisons

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3   - - - - - - - - - - - - - - x
 4   PRISON LEGAL NEWS, a          :
 5   project of the Human          :
 6   Rights Defense Center,        :
 7              Plaintiff,    : Civil Action No.
 8      v.                    : 15-cv-02184-RM-STV
 9   FEDERAL BUREAU OF PRISONS,   :
10              Defendant.    :
11   - - - - - - - - - - - - - - X
12
13      Deposition of THE FEDERAL BUREAU OF PRISONS
14      By and through its Designated Representative
15               JOHN LEE DUNKELBERGER
16                  Washington, DC
17              Friday, March 9, 2018
18                   7:53 a.m.
19
20
21
22
23   Job No.:  180129
24   Pages 1 - 84
25   Reported by:  Debra A. Whitehead
```

```
 1         Deposition of JOHN LEE DUNKELBERGER, held at
 2   the offices of:
 3
 4           COVINGTON & BURLING LLP
 5           One City Center
 6           850 Tenth Street, NW
 7           Washington, DC 20001
 8           (202) 662-6000
 9
10
11
12        Pursuant to notice, before Debra A. Whitehead,
13   an Approved Reporter of the United States District
14   Court and Notary Public of the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of John Lee Dunkelberger, Designated Representative
Conducted on March 9, 2018                                    3

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF:
 3         MATTHEW S. SHAPANKA, ESQUIRE
 4         COVINGTON & BURLING LLP
 5         One City Center
 6         850 Tenth Street, NW
 7         Washington, DC 20001
 8         (202) 662-6000
 9
10    ON BEHALF OF DEFENDANT:
11         CLAY COOK, ESQUIRE
12         ASSISTANT U.S. ATTORNEY
13         UNITED STATES DEPARTMENT OF JUSTICE
14         District of Colorado
15         1801 California Street
16         Suite 1600
17         Denver, Colorado 80202
18         (303) 454-0100
19
20
21
22
23
24
25
```

```
1                     C O N T E N T S
2    EXAMINATION OF JOHN LEE DUNKELBERGER              PAGE
3     By Mr. Shapanka                                   6
4
5                     E X H I B I T S
6                (Attached to the Transcript)
7    DEPOSITION EXHIBIT                                PAGE
8     Exhibit 1    Notice of Deposition of Defendant    7
9                  Federal Bureau of Prisons
10    Exhibit 2    Subchapter C - Institutional        18
11                 Management
12    Exhibit 3    Program Statement, OPE:  CPD/CPB;   21
13                 Number:  P5266.11; Date:
14                 November 9, 2011
15    Exhibit 4    Institution Supplement, OKPI:       25
16                 Correctional Systems; Number:
17                 FLM 5266.11E; Date:
18                 December 21, 2017
19    Exhibit 5    Exhibit 1, Supplemental             27
20                 Declaration of Jack Fox
21    Exhibit 6    6/2/17 E-mail From Ms. Miller to    37
22                 Info@prisonlegalnews.org
23    Exhibit 7    Memo To Whom it May Concern, From   38
24                 Cheshire Correctional Institution,
25                 Mail Room
```

```
 1         E X H I B I T S   C O N T I N U E D
 2    DEPOSITION EXHIBIT                              PAGE
 3     Exhibit 8    Letter to Prison Legal News,       40
 4                  From Publication Review Officer
 5     Exhibit 9    Sender Disapproval Notice,         41
 6                  Facility Medial Review Committee
 7     Exhibit 10   Defendant's Response to            58
 8                  Plaintiff's Second Interrogatories
 9     Exhibit 11   2/13/18 Verification of John       58
10                  Dunkelberger
11     Exhibit 12   Notification to Inmate and         64
12                  Publisher/Sender of Rejected
13                  Publications
14     Exhibit 13   Article, "No Death Penalty for     65
15                  Maine Prisoner," by Lance Tapley
16
17
18
19
20
21
22
23
24
25
```

1   institution supplement.
2       Is there anything in the institution
3   supplement at the ADX that would prohibit the ADX
4   from removing the objectionable portions?
5       A    I don't see where it says anything about
6   removing unacceptable portions.
7       Q    Again, the question is, does this policy
8   prohibit ADX from removing the unacceptable
9   portions?
10      A    No, it doesn't.
11      Q    I'd like to -- let's stick with Exhibit 4
12  for a few moments here.  I'd like to walk
13  through -- well, maybe let's come back to that.
14      You said that neither the institutional
15  supplement nor the program statement nor the CFR
16  specifically address the redaction or removal of
17  objectionable content.  Is that correct?
18      A    Yes.
19      Q    Has the BOP ever considered addressing
20  whether or not to remove content, objectionable
21  content from publications before delivering them
22  to inmates?
23      A    Not while I was in the capacity I'm in,
24  that I'm aware of.
25      Q    Did they ever -- did the BOP ever

```
 1   consider that before you entered your current
 2   capacity?
 3        A    Not that I'm aware of.
 4        Q    So just to be clear, your testimony is
 5   the BOP has never considered redacting or excising
 6   objectionable content from publications, rather
 7   than rejecting the entire publication?
 8        A    Yes, I'm saying that in the
 9   three-and-a-half years or so that I've been in
10   this capacity, I'm not aware of the Bureau of
11   Prisons ever considering redaction or removing
12   objectionable material from a publication in order
13   to give the publication to an inmate.
14        Q    Why not?
15        A    If we were to redact anything, we would
16   be altering or destroying something and handing it
17   to the inmate.  We're not supposed to do that.
18   Inmates are not allowed to have anything altered
19   or if it was destroyed they could, I would think,
20   legitimately come at us with a tort claim.
21             We would also have an awful lot of staff
22   time involved in redacting any information from
23   publications.  And where would that end?  Would we
24   just redact an article in its entirety, or would
25   we redact information that that article that we
```

```
 1   believed would be -- fall under those seven broad
 2   categories of what we wouldn't let into an
 3   institution.
 4        Q    Let's start with the liability piece.
 5             How is rejecting an article or a
 6   publication altogether not a deprivation of
 7   property, at the least?
 8        A    We would explain to the inmate in writing
 9   that he or she would not be allowed to receive
10   something that was sent to them.  That would make
11   them aware that they had a publication that came
12   in and we would specifically tell them why they
13   weren't allowed to have, receive that specific
14   issue of a publication.
15             Then they would have rights under the
16   administrative remedy program to appeal that in
17   order to get that back.
18             The publisher would also receive a copy
19   of that rejection notice saying, We're not letting
20   your publication into the institution based on,
21   you know, this content.  They also have appeal
22   rights.
23             If we were just to redact something and
24   say -- or censor, you know, black it out, or
25   photocopy it, or whatever method, and hand it to
```

Transcript of John Lee Dunkelberger, Designated Representative
Conducted on March 9, 2018

74

```
 1          Q    Yes.
 2          A    Yes.
 3          Q    Does BOP, or the specifically the ADX,
 4    approve -- have to approve those subscriptions?
 5          A    The Bureau of Prisons, I don't know.
 6          Q    Could -- does the ADX?
 7          A    I'm not aware.  I wouldn't think it would
 8    be any different than the Bureau of Prisons.
 9          Q    In terms of getting permission from an
10    inmate to redact their publications, is there an
11    intake process when prisoners arrive at the ADX?
12               MR. COOK:  Objection.  Beyond the scope.
13               THE WITNESS:  Yeah, I can answer that?
14          Q    If you know?
15               MR. COOK:  If you know.
16          A    Sure.  There's no redaction.  Inmates are
17    told -- when they come in, they will get a form, I
18    think it's called the Form 407 acknowledgment.
19    And they'll have -- if they want to receive their
20    mail or if they -- if they want to receive their
21    mail, they know that their regular mail is going
22    to be subject to search and being read.  There's
23    nothing about redaction.
24               If the inmate doesn't want to receive
25    their mail or wants to refuse mail, then he signs
```

Transcript of John Lee Dunkelberger, Designated Representative
Conducted on March 9, 2018

75

1  or she signs saying, we don't -- I don't want my
2  mail, send it to this address.
3       Q    Hypothetically a prisoner could sign a
4  line that grants the ADX permission to redact
5  their mail?
6            MR. COOK:  Objection.  Calls for
7  speculation.
8       A    Yeah, it would be a form.  Sure.
9            MR. SHAPANKA:  Could we just take five,
10 ten minutes.  And I think I'm close to wrapping
11 up.
12           (A recess was taken.)
13      A    Earlier you asked me something along the
14 lines of has redaction ever been considered in
15 policy, I think, through -- I left the time frame
16 to mean the three-and-a-half years I was in the
17 Bureau of Prisons.
18           I did consult with one of our staff who
19 have been in the office since 2008, and she
20 confirmed that, no, it has not, not since 2008.
21      Q    So to clarify, the testimony is that
22 since at least 2008, the BOP has never considered
23 redaction as an alternative to reject, wholesale
24 rejection of publications?
25      A    Yes.

```
 1         Q    Thank you.
 2         A    The other thing, or another thing is --
 3    let's go back to Jack Fox.
 4         Q    Jack Fox.
 5         A    That was Exhibit 5?
 6         Q    Okay.
 7         A    Now, somewhere in here you said about how
 8    many -- yeah, the first quarter of last year with
 9    the total publications rejections, seven total.  I
10    wasn't sure, when you say seven total, does that
11    mean seven separate publications, like Magazines
12    A, B, C, D, E, F, G, or does that mean there were
13    only seven issues of one magazine that were
14    rejected?
15         Q    And I'm going to ask a couple more
16    questions about that.  So I take that to mean that
17    there are seven individual publications.  So a
18    magazine that may have multiple copies.
19         A    Okay.
20         Q    So each one is one.  So you'll have, you
21    know, New York Times comes in but you have ten
22    copies, that only counts as one.
23         A    Got you.
24         Q    And so, actually, I would like to ask
25    about that.
```

1  but they're not going to read all issues of the
2  same magazine.
3        Q   Right.  So with respect to content,
4  some -- that person will have looked at the whole
5  magazine in the first instance?
6        A   Yes.
7        Q   And then in order to check for contraband
8  or whatever else, they would flip through every
9  copy, as well?
10       A   Uh-huh.
11       Q   And so with respect to redacting, there's
12 no -- the burden of ripping, say ripping out a
13 page of the first issue can be easily replicated
14 for the other 20 once they know what page that is.
15           Right?
16       A   Yeah.  It would have to be set aside,
17 flagged, we'll have to do this for each one, sure.
18       Q   But if it's been identified as an
19 objectionable content, it's just a matter --
20       A   If Page 20 is the same Page 20 in the
21 next issue, then it would be, yes.
22       Q   Okay.  Do you have any other
23 clarifications?
24       A   One other thing.  And I have to pull
25 up -- you said earlier about does the policy

```
 1   specifically say that ...
 2           MR. COOK:  It's Exhibit 2.
 3       A   The warden may reject a publication, it
 4   says that throughout here, it refers to
 5   publication, publication.  You said the entire
 6   publication.
 7           We would consider the CFR language to
 8   mean the entire publication, that's how we
 9   interpret it, as far as policy.  But the entire
10   publication would be rejected.
11       Q   Okay.  So your testimony is that the
12   Federal Bureau of Prisons considers 28 CFR, 540.71
13   B, the warden may reject a publication only if it
14   is determined to be detrimental to the security,
15   good order, or discipline of the institution or if
16   it might facilitate criminal activity, the Federal
17   Bureau of Prisons interprets that to mean that the
18   warden must reject the full publication?
19       A   Yes.
20       Q   And may not redact?
21       A   Yes.
22       Q   And that's true at the ADX, as well?
23       A   Yes.
24       Q   Okay.  I'd like -- do you have any more
25   clarifications before I go on?
```

```
 1         A    No.
 2         Q    I just have a few more questions.
 3              I want to talk about the burden a little
 4    more, the administrative burden.  And I just want
 5    to clarify what you said.  And if there's, you
 6    know, anything.
 7              You listed off a few reasons that it
 8    would be more burdensome for BOP or specifically
 9    the ADX, but for staff to redact publications.
10    You said it would take longer to review.  You said
11    it would take -- there would be time involved in
12    the actual redaction of whether it's blacking out
13    or ripping.
14              It would take time, additional time to
15    prepare the rejection materials to send to the
16    warden for approval and to the inmate for
17    notification, and for the -- to the publisher for
18    notification.  And that there would also be
19    staffing issues that would require negotiations
20    with the unions.
21         A    Yes.
22         Q    Is there any other administrative burdens
23    that you can point to that would be added above
24    and beyond the existing process, if redaction were
25    to be permitted?
```