# EXHIBIT 32A

# Prison Legal News

VOL. 24  No. 9
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

September 2013

## Prison Rape Elimination Act Standards Finally in Effect, but Will They be Effective?

### by Alex Friedmann

*"Sexual abuse is not an inevitable feature of incarceration. Leadership matters because corrections administrators can create a culture within facilities that promotes safety instead of one that tolerates abuse."* – National Prison Rape Elimination Commission

A REPORT RELEASED BY HUMAN RIGHTS Watch in 2001, titled "No Escape: Male Rape in U.S. Prisons," served as a catalyst which, in conjunction with increased public awareness about the issue of prison rape, led numerous organizations to lobby for federal legislation to address the dilemma of sexual abuse behind bars.

Michael J. Horowitz, a senior fellow at the Hudson Institute, garnered sup-

port for the legislation from a number of conservative and evangelical organizations – particularly Prison Fellowship, founded by former special counsel to President Nixon (and ex-federal prisoner) Charles "Chuck" Colson.

Groups from opposite ends of the political spectrum joined together to back the bill, including Just Detention International (formerly Stop Prisoner Rape), the NAACP, Amnesty International, National Council of La Raza, Concerned Women for America, the Salvation Army, Penal Reform International and Focus on the Family.

For some, legislation to protect prisoners from sexual abuse was preferable to enlarging their legal rights. According to a 2002 article in the *National Review*, "While some on the left – most prominently the group Human Rights Watch – have proposed anti-prison-rape solutions such as expanding prisoners' rights to sue corrections officials, the new proposal represents a sensible middle-ground solution."

The lead sponsors of the bipartisan bill, entitled the Prison Rape Elimination Act (PREA), included Senator Jeff Sessions and Rep. Frank Wolf, both Republicans, and Democrats Senator Edward Kennedy and Rep. Bobby Scott.

When PREA was passed by Congress by unanimous consent and signed into law by President George W. Bush on September 4, 2003, some of the bill's supporters may have envisioned that it would provide a timely response to redress the serious problem of prison rape and sexual abuse.

Unfortunately it would be another ten years before the PREA standards went into effect.

### The Long Road to PREA Standards

GRANTED, DURING THE DECADE IT TOOK to implement PREA, much was done to formulate the standards to ensure they meet their laudable goal of eliminating prison rape. The eight-member National Prison Rape Elimination Commission (NPREC), chaired by District of Columbia U.S. District Court Judge Reggie B. Walton, was established in June 2004 – around seven months after the 60-day deadline specified by PREA, which is codified at 42 U.S.C. §§ 15601-15609.

While the Commission had subpoena power to collect information to fulfill its mandate to develop draft PREA standards, that power was not all-encompassing. When signing PREA into law, President Bush issued a signing statement that specified the executive branch of the federal government could "withhold information when its disclosure could impair deliberative processes of the Executive or the performance of the Executive's constitutional duties." This served as an exemption to the NPREC's "right of access to any Federal department or agency information it considers necessary to carry out its duties."

Over the next three years the Commission held eight public hearings and one public meeting that included testimony from "corrections leaders, survivors of abuse, health care providers, researchers, legal experts, advocates, and academics." Based on that testimony and information received during two public comment periods, the Commission released draft PREA standards for immigration detention facilities and adult prisons and jails on May 5, 2008, and draft standards for lockups, juvenile

## INSIDE

| | |
|---|---|
| Staff Sexual Abuse Continues | 17 |
| From the Editor | 22 |
| High-Tech, High-Risk Forensics | 26 |
| Prisoners and the ADA | 28 |
| Death Row Solitary Confinement | 32 |
| Habeas Hints: Actual Innocence | 34 |
| IL DOC Rehabilitation Act Claims | 38 |
| PLN Resolves Oregon Jail Lawsuit | 40 |
| FCC Orders Prison Phone Reforms! | 42 |
| NM Prison Doctor Fingered | 47 |
| CCA Victory Upheld by 7th Circuit | 53 |
| No Social Security for Prisoners | 54 |
| News in Brief | 56 |

# DON'T LET THE TIME DO YOU. STAY CONNECTED!

**Guaranteed savings of up to 90%** on your long distance, out-of-state, and international calls from Federal prisons, county jails and State prisons.

### Best Rates and Plans

Multi-number Friends & Family Package for as little as $10.00/month

More plans & more numbers than any operator -

### No Hidden Fees

**What We Say Is What You Pay** – NO additional "fees", "charges" or "surcharges"

International calls are billed only on call acceptance. No bogus rounding

### No Contracts, No Penalties, No Hassles

No long term commitments – Service is always month – to – month. Cancel at anytime with NO penalties and NO cancellation fees with just a phone call or an e-mail.

### Fast and EZ Setup

We **ALWAYS** have numbers and can set up instantaneously online or on the phone.

# Special Commitment, Civil Detention & Halfway House

$0.40 connection charge from payphones lowest in the business

Voice Mail and Call Recording options

Call, write, e-mail or have your loved ones check out our website for more information.

SP Telecom
1220 Broadway - # 801-A
New York, NY 10001
www.inmatefone.com
e-mail: clients@inmatefone.com
Español: soporte@inmatefone.com
Call:      1(845)326-5300   (Collect calls are NOT accepted)
Español: 1(845)342-8110   (Llamadas por cobrar no se aceptan)

Some restrictions apply. Plan availability depends on the Institution

# NO PERMITA QUE EL TIEMPO LE SEPARE DE SU FAMILIA!

**Garantizamos ahorros de hasta el 90%** en sus llamadas de larga distancia, entre estados, y en las llamadas internacionales desde prisiones federales, estatales y locales.

### Los mejores Planes y Tarifas

Plan para familias y amigos con varios numeros por tan solo $10.00/ mes .

Mas planes y numerous que ningun otro operador .

### No hay letra pequeña

**Lo Que Ves Es Lo Que Pagas**, NO hay ningun otro cargo extra.

Las llamadas internacionales solo se facturan cuando es aceptada por el familiar al otro lado del hilo telefonico.

**No hay contrato , permanencia ni ningun tipo de travas** .

El servicio siempre se ofrece en base a un mes de duracion pudiendo renovar el mismo todo los meses sin ningun cargo por la terminacion del servicio  y lo puede solicitor con una simple llamada de telefono o con un correo electronico (E-MAIL)

### La solicitud se puede hacer rapida y muy facil .

Nosotros siempre tenemos numerous y podemos procesar to registro inmediatamente  en lines o por telefono.

**Detenidos civiles en carceles especiales y reclusos en camino a casas de medio camino le ofrecesmos los siguientes servicios.**

$0.40 de recarfo desde telefonos de prepago, la tarifa mas baja en el sector  .

Buzon de Voz  y la posibilidad de grabar las llamadas .



**Inmatefone**
Keeping You In Touch

PLN_0000838

# ▊▊ Prison Legal News

*a publication of the*
**Human Rights Defense Center**
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Mike Brodheim, Matthew Clarke,
John Dannenberg, Derek Gilna,
Gary Hunter, David Reutter, Mike Rigby,
Brandon Sample, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

**Prison Legal News
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org**

*PLN* reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. *PLN* welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without a SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

*PLN* is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index*.

## PREA in Effect (cont.)

facilities and community corrections programs the following month.

Although the NPREC engaged in important work by holding hearings, accepting public input and creating the draft standards, some criticized the lengthy amount of time – over five years – it took the Commission to eventually complete its task.

As Mike Farrell, board president of Death Penalty Focus, wrote in 2008, "the National Prison Rape Elimination Commission meets periodically to 'study the impact of prisoner rape.' While they study, rape continues."

In fact, the process took so long that Congress had to pass legislation, included in the Second Chance Act, to extend the statutory life of the NPREC.

The Commission's work culminated on June 23, 2009 with a comprehensive 276-page final report that included nine findings and numerous proposed PREA standards, which was forwarded to Congress, Attorney General Eric Holder, President Obama and other federal and state officials.

"Protecting prisoners from sexual abuse remains a challenge in correctional facilities across the country," the NPREC wrote. "Too often, in what should be secure environments, men, women, and children are raped or abused by other incarcerated individuals and corrections staff."

Having fulfilled its purpose, the Commission then disbanded.

Although the U.S. Department of Justice (DOJ), through the Attorney General's office, was required to use the Commission's recommendations to develop a formal rule implementing the PREA standards within one year, the process took significantly longer.

An alliance of advocacy organizations, the Raising the Bar for Justice and Safety Coalition, launched a campaign in February 2010 to urge the Attorney General to act promptly to implement the PREA standards. The Coalition advocated for the "full, effective implementation of, and monitoring of compliance with, the United States PREA Standards in jails, prisons, juvenile detention facilities, immigration detention centers, and community confinement throughout the country."

Headed by Just Detention Interna-

tional, the Coalition was composed of more than 60 organizations, including the ACLU, American Legislative Exchange Council, Center for Constitutional Rights, National Gay and Lesbian Taskforce, National Immigrant Justice Center, Southern Center for Human Rights, Prison Fellowship and the Human Rights Defense Center, which publishes *Prison Legal News*.

The DOJ issued an Advance Notice of Proposed Rulemaking with respect to the draft PREA standards on March 10, 2010, followed by a 60-day public comment period. A proposed final rule was released on January 24, 2011 that included four sets of national PREA standards – for adult prisons and jails, juvenile facilities, community confinement facilities and lockups (e.g., holding cells in police stations). Immigration detention centers were not covered. Another 60-day public comment period followed.

The final rule implementing the PREA standards was issued by the Justice Department on May 17, 2012 – nearly two years after the statutory deadline.

The same day, President Obama directed "all agencies with federal confinement facilities that are not already subject to the Department of Justice's final rule" to develop rules that comport with the PREA standards. This included the Department of Homeland Security (which operates immigration detention facilities), the Department of the Interior (which operates jails in Indian Country through the Bureau of Indian Affairs), the Department of Defense (military prisons) and the Department of Health and Human Services (facilities that house certain juvenile immigration detainees).

"Sexual abuse should never be a penalty for any crime – and today's regulations are the first step to ending the shameful history of prison rape in our country," said ACLU National Prison Project senior staff counsel Amy Fettig.

The Justice Department's final rule was published in the Federal Register and became effective on August 20, 2012. The rule was "immediately binding on the Federal Bureau of Prisons," though there was a one-year implementation period for state and local corrections agencies and private contractors.

For example, they had a one-year period following the effective date of the rule to provide initial PREA training to current

PLN_0000839

## PREA in Effect (cont.)

employees. Also, the PREA standard governing annual compliance audits specified that the first audit cycle would not start until August 20, 2013 – requiring corrections agencies to have at least one-third of their facilities audited by August 20, 2014.

According to the PREA Resource Center, standards that impose "restrictions on cross-gender pat-down searches of female inmates in prisons, jails, and community confinement facilities ... do not go into effect until August 20, 2015, for facilities whose rated capacity is 50 or more inmates, and August 21, 2017, for facilities whose rated capacity does not exceed 50." Further, the PREA standard governing minimum staffing ratios in certain juvenile facilities goes into effect on October 1, 2017.

Thus, the PREA standards as implemented by the final rule issued by the DOJ will not become fully effective until *14 years* after PREA was signed into law.

### Criticism of the Proposed Standards

HUNDREDS OF PEOPLE AND ORGANIZATIONS submitted comments to the NPREC as the draft standards were being developed, and to the Department of Justice during the two public comment periods following the DOJ's release of the Advance Notice of Proposed Rulemaking and the proposed final rule.

The Justice Department received almost 2,000 public comments from various groups and stakeholders, including the American Correctional Association, National Women's Law Center, Prison Fellowship, National Sheriff's Association, American Probation and Parole Association, American Bar Association, Youth Law Center, Just Detention International, International Community Corrections Association, Human Rights Watch and Association of State Correctional Administrators.

Many of the comments included recommendations to strengthen the proposed PREA standards or expand them in certain areas. However, other comments, mainly from organizations representing corrections agencies and employees, expressed concerns as to how some of the standards would impact staff members and the operation of correctional facilities, and the effect the standards would have on labor contracts with unionized prison and jail employees.

"A particularly thorny issue in management-union relations, and one with significant repercussions in the area of sexual abuse, concerns management's authority to reassign or sanction staff," the NPREC noted in its final report.

Some critics, including former members of the National Prison Rape Elimination Commission, complained that the proposed PREA standards were being weakened by the Department of Justice – possibly because they would be too expensive to implement, or to accommodate the concerns of corrections officials.

Former NPREC member Pat Nolan said the Justice Department's proposed rule for implementing the PREA standards would "significantly weaken the standards that will hold prison officials accountable for eliminating rapes in their prison."

Cynthia Totten, senior program director for Just Detention International, added the DOJ's proposed rule had "watered down" the NPREC's draft standards.

The Human Rights Defense Center (HRDC) – the parent organization of *Prison Legal News* – submitted comments to the NPREC in July 2008 and to the Department of Justice on May 3, 2010 and April 4, 2011 during the public comment periods. *PLN* has taken a vigorous stand against prison rape and sexual abuse from its inception, and has reported extensively on the sexual victimization of prisoners, particularly by corrections staff, for the past 23 years.

HRDC made suggestions to strengthen the standards in specific areas and wrote "that the DOJ's proposed rules for the PREA standards are a hollow shell of what was originally envisioned by prisoners' rights advocates and others concerned about the issue of prison rape and sexual assault. If the intent is to provide the greatest possible protections for prisoners against being sexually assaulted and raped while in custody, then the watered-down rules proposed by the DOJ fail to reach that laudable goal. Rather, the proposed rules constitute weaker standards that are apparently designed to be more palatable to corrections officials, many of whom expressed opposition to the standards as developed by the Commission."

Specifically, HRDC addressed the following issues in its comments submitted to the Department of Justice, and several of HRDC's recommendations were incorporated into the DOJ's final rule.

### Costs to Implement PREA

When PREA was enacted it included language stating "the Attorney General shall not establish a national standard under this section that would impose substantial additional costs compared to the costs presently expended by Federal, State, and local prison authorities."

HRDC objected to this statutory provision, arguing it was unacceptable to "put a price tag on the trauma of rape and sexual abuse experienced by prisoners.... When Congress limited the PREA standards by specifying that measures to prevent prison rape must not 'impose substantial addi-



INMATE CONNECTIONS.com
& ConvictPenPals.com!
465 NE 181st, #308 Dept. PLN Portland OR 97230
Since 2002 – Write for FREE brochure!

inmateMAGS .com
formerly
MyMagstore.com

Buy 1200 **SINGLE** Copies of Magazines • 1200 **Subscriptions** • **VIP** Service
1800 **Newspapers** • Payment with **Stamps** • **Prepaid Accounts**
Send $3 or 10 Stamps for **60+ Page Full Catalog** ($3 Discount Coupon Included)

InmateMAGS.com
4208 University Way NE
Seattle, WA 98105

www.inmateMAGS.com
info@inmatemags.com
206-322-6397

PLN_0000840

tional costs,' it placed cost considerations above efforts to stop the sexual abuse and rape of prisoners. Consequently, the DOJ's proposed rules reflect the fact that we get only what we are willing to pay for."

Indeed, after the NPREC issued its final report, the Department of Justice hired consulting firm Booz Allen Hamilton to conduct a cost impact analysis of the draft PREA standards. The analysis, released on June 18, 2010, found that implementing the standards as proposed by the NPREC would result in substantial costs in terms of both upfront and ongoing expenses. The highest costs were associated with requiring correctional facilities to install additional monitoring equipment such as video cameras, staff supervision of prisoners, and limiting cross-gender observation and searches of prisoners by staff members. [See: *PLN*, July 2011, p.38].

But as noted by Lovisa Stannow, executive director of Just Detention International, "Booz Allen Hamilton only examined the cost of each proposed standard, without considering the benefits and cost-savings that would result from instituting these basic measures to improve safety

and decrease sexual violence in detention. Beyond the dramatic impact on the well-being of inmates, staff, and society at large, the prevention of prisoner rape will decrease costs of litigation, grievance petitions, staff turnover, and the need for medical and mental health treatment."

"If states don't want to pay the costs, then they have to reduce their prison populations," added Jamie Fellner, a senior advisor with Human Rights Watch and a member of the NPREC, addressing the correlation between prison overcrowding and increased rates of rape and sexual abuse. "If you are going to put them in prison, you have to keep them safe."

### PREA Enforcement Provisions

In its comments submitted to the NPREC and the Department of Justice, HRDC repeatedly cited problems with PREA's enforcement provisions, or rather the lack of same, since compliance by corrections agencies is voluntary.

As the DOJ acknowledged, "PREA does not require full nationwide compliance with the standards, nor does it enact a mechanism for the Department to direct

or enforce such compliance; instead, it provides certain incentives for State (but not local or privately-operated) confinement facilities to implement them."

The primary means by which PREA attempts to ensure compliance by the states is through a financial incentive: "For each fiscal year, any amount that a State would otherwise receive for prison purposes for that fiscal year under a [federal] grant program covered by this subsection shall be reduced by 5 percent, unless the chief executive of the State submits to the Attorney General – (A) a certification that the State has adopted, and is in full compliance with, the national [PREA] standards... or (B) an assurance that not less than 5 percent of such amount shall be used only for the purpose of enabling the State to adopt, and achieve full compliance with, those national standards...." 42 U.S.C. § 15607(c)(2).

That is, a state risks losing only 5% of federal grant funding "for prison purposes" if it fails to certify that it is in full compliance with PREA, which, as HRDC noted, "is an indication of the low priority that Congress placed on preventing prisoner rape – as the loss of 10 percent, 20 percent





PLN_0000841

## PREA in Effect (cont.)

or a higher percentage would have been a much more effective deterrent for states that fail to comply with PREA." In fact, for some states it might actually cost less *not* to abide by the PREA standards, as the cost of compliance could exceed the 5% loss of federal prison-related grant funding they receive.

According to the PREA Resource Center, the potential 5% loss of federal funds for non-compliance with the standards would likely apply to money received by the states from the Edward Byrne Memorial Justice grant program, the Juvenile Justice and Delinquency Prevention Act formula grant program and the Juvenile Accountability Block Grant program, based on fiscal year 2012 appropriations.

Yet a state not in compliance with the PREA standards will not lose 5% of its federal prison-related grant funding so long as the governor "submits an assurance that such five percent will be used only for the purpose of enabling the state to achieve and certify full compliance with the standards in future years."

Notably, for PREA enforcement purposes, the potential loss of federal prison-related grant funding only applies to the states – it is not applicable to local corrections agencies, the federal Bureau of Prisons or other federal agencies that operate detention facilities, nor to private prison contractors.

As a form of disincentive for failure to comply with the standards, PREA provides that each year "the Attorney General shall publish a report listing each grantee that is not in compliance with the national standards...."

Presumably, inclusion in such reports will prove embarrassing and corrections agencies will thus endeavor to follow the standards.

HRDC wrote, however, that "Given the documented abuses that have been inflicted upon prisoners [by corrections officials], it is highly unlikely that including agencies that fail to comply with the PREA standards on a list, for the purpose of shaming them into compliance, would be successful. Some prison officials have already demonstrated that they engage in shameless conduct; others, through their reluctance to embrace necessary reforms, have shown they have no shame."

Some corrections officials, for example, have suggested that prisoners falsely reported incidents of sexual abuse because they were given "bags of cookies" by staff conducting the survey, while others have compared prison rape to "cultural delusions" such as UFO sightings. [See: *PLN*, April 2012, p.1].

Finally, the standards do not provide a private cause of action for enforcement purposes; i.e., prisoners who are raped or sexually abused due to the failure of corrections agencies to adopt or enforce PREA standards can not file suit against the agency based solely upon that failure (although such claims can still be brought under the 8th or 14th Amendments). Consequently, HRDC encouraged the Department of Justice "to lobby Congress to strengthen PREA by including a private cause of action for victimized prisoners when agencies do not follow the standards."

### Staff-related Issues

The DOJ's proposed standard for conducting criminal background checks of corrections employees stated that such checks should be conducted "at least every five years." HRDC observed that "[g]iven the sensitive security functions of correctional facilities, background checks conducted on a more frequent basis, such as annually or every two years, would be more appropriate. Otherwise, if staff engages in criminal sexual misconduct after being hired, which is not brought to the attention of the agency they work for, they could continue working in a correctional setting for up to five years before the misconduct is discovered under the proposed rule."

Additionally, the proposed PREA standards did not require agencies to discipline or sanction employees who fail to report knowledge, suspicion or information regarding an incident of sexual abuse. "Requiring staff to report such incidents, while failing to mandate any disciplinary measures for *not* making such reports, is insufficient," HRDC wrote. "Agencies should be required to impose disciplinary measures on staff who do not report their knowledge, suspicion or information related to sexual abuse."

This is already common practice for teachers, doctors and others who work with children, known as "mandated reporters," who face the loss of their jobs and professional licenses, and possible criminal prosecution, if they are aware of or suspect child abuse and fail to report it to the appropriate authorities. The proposed PREA standards did not extend similar penalties to corrections staff who are aware of or suspect sexual abuse of prisoners; this is especially troublesome given the "code of silence" prevalent among prison employees, who are reluctant to report coworkers guilty of misconduct.

# Law Offices of Bruce Zucker

### Post-Conviction Matters in California
✦ BPH Hearings (Lifer, MDO, SVP)
✦ Criminal Appeals
✦ Habeas Corpus Writs
✦ Custody Issues
✦ Reasonable Rates

### Experienced and Qualified
✦ Former U.S. Probation Officer
✦ Graduated Top 15%, Loyola Law School
✦ Author, Lecturer, and Professor on Post-Conviction Law
✦ Licensed California Attorney for 20 Years

**Post Office Box 436  ✦  Agoura Hills, CA 91376  ✦  www.zuckerlaw.net**

California Cases Only — Unsolicited Documents Will Not Be Returned
This is an Advertisement for Legal Services

PLN_0000842

### Private Contractors

HRDC noted that "private prison contractors differ in several material respects from public-sector corrections agencies," as they have a "profit motivation to minimize reporting of incidents that may subject them to contractual penalties, result in the cancellation or non-renewal of contracts, or have an adverse impact on their stock performance."

Thus, specific guidance as to monitoring private prison contractors was recommended. Further, such "[m]onitoring should be conducted by the same public agency staff responsible for reviewing PREA compliance at the agency's publicly-operated facilities, if applicable, or by staff retained specifically to ensure PREA compliance by the contractor," and "monitoring staff should have *no current or prior financial or employment relationship with the private prison contractor*."

Additionally, the DOJ's proposed standard related to disciplinary sanctions imposed on staff who engage in sexual misconduct apparently did not extend to private contractors and volunteers who engage in sexual abuse or harassment. "Contractors and volunteers should be subject to termination/dismissal and reporting to law enforcement agencies to the same extent as sexually abusive staff members," HRDC stated in its comments submitted to the Department of Justice.

HRDC further noted that the proposed standards defined "agency head" as being "the chief authority of a Federal, State, or local correctional or law enforcement system," which did not include the director or CEO of a corporate entity that operates correctional facilities. Thus, it was recommended that the definition of "agency head" be expanded to encompass corporate officers of private prison companies.

Also, as stated above, PREA's enforcement mechanism to elicit compliance with the standards – withholding 5% of a state's federal prison-related grant funding – does not apply to private contractors.

Thus, HRDC recommended that the "Standards should require federal, state and county/municipal corrections agencies to withhold 5% of funds paid to private prison contractors if such contractors fail to comply with the [PREA] Standards.

Alternatively, the Standards could require government agencies that contract with private prison companies to specify, as part of their contract, that the company must comply with the Standards or face a 5% reduction in its contractual payments."

The DOJ's final rule implementing the PREA standards did not extend financial penalties to private contractors, but did denote that a public agency "that contracts for the confinement of its inmates with private agencies or other entities ... shall include in any new contract or contract renewal the entity's obligation to adopt and comply with the PREA standards," and to monitor such compliance.

One possible reason that the PREA standards as initially proposed did not adequately address issues related to privately-operated correctional facilities may be related to the fact that Gustavus A. Puryear IV, then-general counsel for Corrections Corporation of America (CCA), the nation's largest for-profit prison firm, served as a member of the NPREC and was involved in creating the draft standards upon which the DOJ's proposed final rule was largely based.



**APRIL 2013
FRESNO, CALIFORNIA**
-CONFIDENTIAL SETTLEMENT
WITH CDCR
-$540,000 SETTLEMENT FOR A -
CALIFORNIA CLIENT
-2 PROP 36 CLIENTS RELEASED
-2 LIFERS RELEASED THROUGH
BPH HEARINGS

911CIVILRIGHTS@GMAIL.COM

**559.261.2222**

CIVIL RIGHTS-SECTION 1983-FEDERAL AND STATE
APPEALS AND WRITS- ONLY COMPLEX AND UNIQUE CASES
PRISON-TRANSFER-DISCIPLINE-VISITING-CLASSIFICATION-HOUSING
PROP. 36 RE-SENTENCING-3 STRIKES-MEDICAL-PAROLE HEARINGS
----------------OUR CLIENTS GO HOME, HOW ABOUT YOU? ----------------
*Please submit a single page summary of your case. Due to the volume, we
cannot return documents or respond to all inquires. We are not a low cost or
pro bono law firm, but if you want results, contact us.*

**PO Box 25001
Suite 205
Fresno, CA
93729**

PLN_0000843

## PREA in Effect (cont.)

The private prison industry has a particularly poor track record in terms of rape and sexual abuse of prisoners, and as an indicator of the lack of importance that Puryear placed on his duties as a member of the NPREC, he missed half of the Commission's public hearings. [See: *PLN*, May 2009, p.1; March 2009, p.6].

CCA has the dubious distinction of operating a facility – the Otter Creek Correctional Center in Kentucky – where two states withdrew all of their female prisoners due to repeated sexual abuse by the company's employees. [See: *PLN*, Sept. 2011, p.16; Oct. 2009, p.40]. Plus CCA strenuously – and successfully – objected to a shareholder resolution that would have

required the company to issue reports on its efforts to reduce incidents of rape and sexual abuse in CCA-operated prisons and jails. [See: *PLN*, June 2012, p.32; March 2012, p.18].

### Prison Litigation Reform Act

The application of the Prison Litigation Reform Act (PLRA) to victims of prison rape and sexual abuse was a matter of much contention during the drafting of the proposed PREA standards. PLRA provisions such as requiring exhaustion of administrative remedies and prohibiting prisoners from seeking compensatory damages for mental or emotional injuries in the absence of physical injury are especially problematic for incarcerated victims of sexual abuse. The PLRA also makes it difficult for prisoners to obtain counsel, and places restrictions on court-ordered injunctions to remedy unconstitutional practices or conditions in correctional facilities.

The NPREC's final report recommended that Congress amend the PLRA with respect to prisoners who have been sexually victimized, as the PLRA "has compromised the regulatory role of the courts and the ability of incarcerated victims of sexual abuse to seek justice in court."

Although PREA did not authorize the Attorney General's office to override the PLRA, a number of advocacy organizations, including HRDC, noted that prisoners who report sexual abuse may not have timely access to the grievance process in order to exhaust administrative remedies, and that the PLRA's physical injury requirement should not apply to victims of prison rape and sexual assault.

"[F]or purposes of administrative exhaustion under the PLRA, we do not believe

that victims of sexual abuse or harassment should have to file a formal grievance if other types of reporting put staff on notice of the sexual abuse or harassment," HRDC wrote. "Further, despite the DOJ's decision not to address the physical injury component of the PLRA, we submit that the standards should specify that the PLRA's requirement that prisoners show 'physical injury' before bringing suit for mental or emotional damages (42 U.S.C. § 1997e(e)) is inapplicable to acts of sexual abuse, or that prisoners who have been subjected to sexual abuse have *per se* satisfied the physical injury requirement of the PLRA."

Only recently has the PLRA's physical injury requirement been addressed relative to rape and sexual abuse claims involving prisoners. [See: *PLN*, July 2013, p.30]. It was addressed by Congress, not by the DOJ or the PREA standards.

### Compliance Audits

The DOJ's proposed final rule implementing the PREA standards required corrections agencies to be regularly audited to ensure compliance, with such audits to occur once every three years. HRDC and other organizations took issue with the length of time between audits, and suggested that "audits of 1/3 of the agency's facilities be conducted annually, with the facilities being selected randomly so they do not have advance notice they will be audited. Thus, over a three-year period, each of an agency's facilities will be audited at least once." For corrections agencies with a small number of facilities (such as jails and police lockups), annual audits were recommended.

Additionally, HRDC noted that "the proposed rule should include a provision



# Corcoran Sun

Full Color Prison Yard Monthly
News ♦ Entertainment ♦ Resources

**3 Month Special Subscription**

## 1 Book of FCS

**IN FULL COLOR** All new full color format deeper content, more exciting episodes of thrilling novels and sexy pics. We at Corcoran Sun are striving to become a top quality prison publication. Submit your writing, art, poetry etc., see your submission, name and contact info in print.

**New books only
No singles on specials
Offer Expires 9/30/13**

**1/2 Year Subscription (Special 2 Books FCS)**
**Full Year Subscription (Special 4 Books FCS)**
Payments to: Freebird Publishers
Box 541 - Dept. BK, North Dighton, MA 02764
*Email: Diane@FreebirdPublishers.com*

# MARILEE MARSHALL & ASSOCIATES, ATTORNEYS AT LAW

California State Bar Board of Specialization

**Certified Criminal Law and Appellate Law Specialist**

*If you have a California case you need a California lawyer!*

(213) 489-7715



**State and Federal Appeals and Writs, Lifer Parole Hearings and Related Writs**

**29 years of success**
523 West Sixth Street, Suite1109
Los Angeles, CA. 90014
marileemarshallandassociates.com

PLN_0000844

for an immediate or emergency audit if it is determined there are excessive reports of sexual abuse or sexual harassment at a given facility."

### Attorney General's Conflict of Interest

HRDC was one of few organizations to raise concerns regarding an apparent conflict of interest involving the U.S. Attorney General's office. Although the Attorney General was charged with developing a final rule to implement the PREA standards, it is also the agency that defends the federal government in lawsuits filed by prisoners who have been raped or sexually assaulted while in federal custody.

Thus, "the U.S. Attorney General's office has an inherent conflict of interest in regard to promulgating the PREA standards and with any monitoring of those standards," because the standards "may have an effect on civil cases in which the Attorney General's office represents federal prison staff accused of raping or sexually abusing prisoners."

Unsurprisingly, this issue was not addressed in the DOJ's final rule.

### Final Rule Implementing the Standards

DESPITE THE APPARENT SHORTCOMINGS of the PREA standards and the glacial pace at which they were promulgated, they indisputably include a number of useful

provisions that, if adopted and enforced, will have a significant impact on reducing prison rape and sexual abuse. Although separate sets of standards were developed by the DOJ for different types of correctional facilities – adult prisons and jails, police lockups, juvenile facilities and community confinement centers – most of the respective standards are similar.

First and foremost, the PREA standards require corrections agencies to have a "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining the agency's approach to preventing, detecting, and responding to such conduct."

Noteworthy areas covered by the DOJ's final rule are summarized below with respect to the PREA standards for adult prisons and jails.

### Sexual Abuse and Harassment Defined

The final rule defines prisoner-on-prisoner sexual abuse as being any of the following acts if the victim does not consent, is coerced by overt or implied threats of violence,



## Spirit of Good Luck Prayer Card $10ea*

ONLY including shipping

Carry the Spirit of Good Luck Talisman with you for fast luck & protection. (Prayer Card w/Gold Plated Amulet in Envelope.)

2"x3.5" Bilingual (English/Spanish) Prayer Card for Wallet Full Color with high gloss coating.

Brass 1" Amulet

PRAYER CARD WITH AMULET $10⁰⁰
PRAYER CARD ONLY $6⁰⁰
W/SHIPPING, HANDLING & CATALOG.

We accept:
Cash, Money Order, Personal Check & USA Postal Stamps.

FREE BOOK catalog with your order.

JAGUAR
www.MyJaguarBooks.com

6881 STANTON AVE #F BUENA PARK, CA 90621

## PREA in Effect (cont.)

or is unable to consent: 1) Contact between the penis and the vulva or anus, including any penetration; 2) Contact between the mouth and the penis, vulva or anus; 3) Penetration of the anal or genital opening of another person by a hand, finger, object or other instrument; and 4) Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh or the buttocks of another person, excluding contact incidental to a physical altercation.

Staff-on-prisoner sexual abuse (which includes sexual abuse by contractors and volunteers) is defined as: 1) Contact between the penis and the vulva or anus, including any penetration; 2) Contact between the mouth and the penis, vulva or anus; 3) Contact between the mouth and any body part where the staff member has the intent to abuse, arouse or gratify sexual desire; 4) Penetration of the anal or genital opening by a hand, finger, object or other instrument that is unrelated to official duties or where the staff member has the intent to abuse, arouse or gratify sexual desire; 5) Any other intentional contact, either directly or through the clothing, with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to official duties or where the staff member has the intent to abuse, arouse or gratify sexual desire; 6) Any attempt, threat or request by a staff member to engage in the activities described above;

7) Any display by a staff member of his or her uncovered genitalia, buttocks or breast in a prisoner's presence; and 8) Voyeurism – i.e., an invasion of a prisoner's privacy by staff for reasons unrelated to their official duties.

Sexual harassment constitutes: 1) Repeated and unwelcome sexual advances, requests for sexual favors or verbal comments, gestures or actions of a derogatory or offensive sexual nature by one prisoner directed toward another; and 2) Repeated verbal comments or gestures of a sexual nature made to a prisoner by a staff member, including demeaning references to gender, sexually suggestive or derogatory comments about a prisoner's body or clothing, or obscene language or gestures.

### Standards for Corrections Agencies

Corrections agencies, as defined in the final rule, must "designate an upper-level, agency-wide PREA coordinator" to develop, implement and oversee the agency's efforts to comply with the standards.

Correctional facilities shall ensure that staff members do not "conduct cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by medical practitioners." Nor shall cross-gender pat-down searches of female prisoners be permitted except in exigent circumstances – although that standard does not go into effect until August 20, 2015, or August 21, 2017 for facilities with a rated capacity of 50 beds or less. There

is no comparable PREA standard that prohibits cross-gender pat-down searches of male prisoners.

Additionally, prisoners shall be allowed to "shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Such policies and procedures shall require staff of the opposite gender to announce their presence when entering a housing unit."

Correctional facilities must "provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment, [and] retaliation by other inmates or staff for reporting sexual abuse and sexual harassment," including at least one way to report such incidents to an outside agency with the ability to remain anonymous.

Corrections agencies are required to collect data regarding allegations of sexual abuse that occur at their facilities, aggregate the data at least annually and make such aggregated data "readily available to the public."

### Standards Related to Corrections Staff

Each corrections agency is required to "make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse." Minimum staffing levels are not specified with the exception of certain secure juvenile facilities.



PLN_0000846

Corrections agencies shall not hire, promote or contract with anyone who has engaged in sexual abuse in a correctional facility or who has been convicted of engaging or attempting to engage "in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse." Agencies are required to conduct criminal background checks before hiring new employees or enlisting the services of contractors who may have contact with prisoners. Criminal background checks of existing employees and contractors must be conducted at least every five years.

Corrections staff who have contact with prisoners must undergo training on the agency's PREA-related policies, including prisoners' right to be free from sexual abuse and sexual harassment, and from retaliation for reporting such incidents. PREA training for current employees must be completed within one year of the effective date of the DOJ's final rule, with "refresher training every two years."

Staff members who conduct internal investigations shall receive training on investigating PREA-related incidents, and medical and mental health care employees must be trained to recognize and respond to incidents of sexual abuse.

Corrections staff are required to report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." The standards do not specify or require any penalties for staff who fail to make such reports.

The "presumptive disciplinary sanction" for staff members who engage in sexual abuse is termination, although the PREA standards do not require that such employees be fired. Importantly, "All terminations for violations of agency sexual abuse or sexual harassment policies, or resignations by staff who would have been terminated if not for their resignation, shall be reported to law enforcement agencies, unless the activity was clearly not criminal, and to any relevant licensing bodies."

### Standards Related to Contractors

When corrections agencies contract with private companies to house prisoners, they must "include in any new contract or contract renewal the entity's obligation to adopt and comply with the PREA standards."

Because this standard requires that PREA compliance be specified only in new contracts or contract renewals, *existing* contracts with private companies such as CCA and the GEO Group presumably do not have to include PREA compliance provisions until they are renewed or rebid – which is problematic as some existing private prison contracts extend for terms of 10 or even 20 years. [See: *PLN*, Nov. 2012, p.16].

Additionally, each corrections agency is required to "obtain incident-based and aggregated data from every private facility with which it contracts for the confinement of its inmates," to the same extent it collects sexual abuse data from its own facilities.

### Standards Related to Prisoners

Prisoners must be informed about a correctional facility's PREA policies, including

# WE NEED YOUR HELP!

**We are updating the Disciplinary Self Help Litigation Manual (Manville 2007) to help guide prisoners through the misconduct and disciplinary litigation process.**

**To effectively help inmates, we need case law and opinions from state courts that affect this process at the state level.**

**Please send us a copy of any decisions entered by a state court relating to prisoner misconduct/disciplinary actions.**
(if copy cannot be made, please send original and we will return it at your request)

send all material to:

## Professor Daniel Manville, MSU College of Law
## 610 Abbot Rd., East Lansing, MI 48823

(please <u>do not</u> send summaries, memos, or requests for representation)

PLN_0000847

## PREA in Effect (cont.)

its zero tolerance policy for sexual abuse and sexual harassment, during the intake process. Comprehensive education on prisoners' PREA-related rights must be provided within 30 days after intake.

Additionally, during the intake process or upon transfer to another facility, prisoners must be screened "for their risk of being sexually abused by other inmates or sexually abusive toward other inmates." The screening data shall be used with respect to housing, work, education and program assignments, with the goal of separating prisoners at high risk of being sexually victimized from those who are sexually abusive. Prisoners who sexually abuse other prisoners shall be subject to disciplinary sanctions or criminal charges, depending on the circumstances of the incident. The disciplinary process shall "consider whether an inmate's mental disabilities or mental illness contributed to his or her behavior."

Prisoners who report sexual abuse "in good faith based upon a reasonable belief that the alleged conduct occurred" shall not be subject to disciplinary charges for "falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation."

### Standards for Special Prisoner Populations

The PREA standards provide that correctional facilities "shall not search or physically examine a transgender or intersex inmate for the sole purpose of determining the inmate's genital status." Further, corrections agencies shall train security staff "in how to conduct cross-gender pat-down searches, and searches of transgender and intersex inmates, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs."

Correctional facilities must take appropriate steps to ensure that prisoners with disabilities – including those who are deaf or hard of hearing, blind or have poor vision, and who have intellectual, psychiatric or speech disabilities – have an equal opportunity "to participate in or benefit from all aspects of the agency's efforts to prevent, detect, and respond to sexual abuse and sexual harassment."

For prisoners with limited English proficiency, corrections agencies likewise "shall take reasonable steps to ensure meaningful access to all aspects of the agency's efforts to prevent, detect, and respond to sexual abuse and sexual harassment ... including steps to provide interpreters."

A number of the PREA standards are specific to juvenile detention facilities; additionally, adult prisons and jails that house juveniles must ensure they do not have "sight, sound or physical contact" with adult prisoners. Also, both male and female juveniles cannot be subjected to cross-gender searches, including pat-down searches, except in exigent circumstances.

### Prison Litigation Reform Act

To address concerns regarding the PLRA's administrative exhaustion requirement, correctional facilities that have grievance procedures "shall not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse," nor require prisoners who grieve such issues to use an informal resolution process.

However, prisoners are *still required* to exhaust available administrative remedies prior to filing a lawsuit in federal court that raises claims related to rape or sexual abuse, pursuant to the PLRA's exhaustion requirement.

The PREA standards also address procedures related to the filing of grievance appeals, third-party assistance in filing grievances and emergency grievances alleging that a prisoner is at imminent risk of sexual abuse.

### Standards for Responding to Sexual Abuse

The PREA standards specify that prisoners who are victims of sexual abuse shall be offered "access to forensic medical examinations, whether on-site or at an outside facility, without financial cost, where evidentiarily or medically appropriate." Correctional facilities shall also "attempt to make available to the victim a victim advocate from a rape crisis center. If a rape crisis center is not available to provide victim advocate services, the agency shall make available to provide these services a qualified staff member from a community-based organization, or a qualified agency staff member."

Further, prisoners who are sexually abused shall be provided access to medical and mental health care services, and corrections officials must ensure that prisoners do not face retaliation from staff or other prisoners for having reported incidents of rape or sexual abuse.

Corrections agencies are required to ensure that administrative or criminal investigations are completed for all alleged incidents of sexual abuse and sexual harassment, and that allegations involving potentially illegal acts are referred to an agency with the authority to conduct criminal investigations.



**SMITH'S GUIDE to HABEAS CORPUS RELIEF** for State Prisoners under 28 U.S.C. §2254

Example pleadings from the initial habeas corpus petition to the final petition for a writ of certiorari. Let Smith guide you step-by-step through the federal courts with confidence.      380 pages.

$24.95 + $6.95 shipping & handling. In CA add $2.18 sales tax. Sent via USPS media mail Money orders, personal or institutional checks ONLY. Send $31.90 (In CA, $34.08) payable to Roberts Company

Send name, address, prisoner #, and payment to:
**Roberts Company, 15412 Electronic Lane #101 Huntington Beach, CA 92649**
*Also available on Amazon.com*



# Appealing a Conviction? Hire an Appellate Attorney.

**Matthew Pinix**
*Appellate Attorney*

You wouldn't hire a **heart surgeon** to perform **brain surgery**. Don't hire a **trial attorney** to handle **your appeal**. Hire someone who focuses on **criminal appeals**.

Hire the **Law Office of Matthew S. Pinix**, a law firm with 10-years' experience handling **criminal appeals** in **Wisconsin** and **Illinois**.

**Law Office of Matthew S. Pinix, LLC** | 1200 East Capitol Drive, Suite 220 | Milwaukee, WI 53211 | (414) 963-6164

PLN_0000848

Following an investigation, prisoners who report incidents of sexual abuse shall be informed of the outcome.

### Annual Compliance Audits

Corrections agencies are required to conduct PREA compliance audits on an annual basis. During each one-year period beginning August 20, 2013, agencies must ensure that at least one-third of their facilities are audited, including facilities operated by private contractors.

The Department of Justice "may send a recommendation to an agency for an expedited audit if the Department has reason to believe that a particular facility may be experiencing problems relating to sexual abuse."

PREA auditors shall have full access to all facility areas and records, including surveillance video, and shall interview a representative sample of prisoners and staff members during each audit. Auditors must be a "member of a correctional monitoring body that is not part of, or under the authority of, the agency" being audited, and must be certified by the Department of Justice. Additionally, no PREA audit "may be conducted by an auditor who has received financial compensation from the agency being audited (except for compensation received for conducting prior PREA audits) within the three years prior to the agency's retention of the auditor."

If an audit finds that a correctional facility is not in compliance with any of the PREA standards, the facility shall have 180 days to initiate a corrective action plan to achieve compliance. PREA audit reports must be made publicly available.

When determining whether a state is in full compliance with the PREA standards for annual certification purposes pursuant to 42 U.S.C. § 15607(c)(2), the governor "shall consider the results of the most recent agency audits."

But as noted by the PREA Resource Center, there is little oversight with respect to a governor's certification that their state is in compliance with PREA: "Neither the PREA statute nor the PREA standards restrict the sources of information governors may use in deciding whether or how to certify compliance."

### Costs to Implement the Standards

The DOJ's final rule also addressed the costs of implementing the PREA standards. The Department of Justice estimated "that the costs of these standards to all covered facilities, assuming full nationwide compliance, would be approximately $6.9 billion over the period 2012-2026, or $468.5 million per year when annualized at a 7 percent discount rate." The average compliance cost per facility was estimated at $55,000 for prisons, $50,000 for jails, $24,000 for community confinement facilities, $54,000 for juvenile facilities and $16,000 for police lockups.

The Justice Department's cost estimate for implementation of the standards relied on the analysis performed by Booz Allen Hamilton plus a regulatory impact analysis conducted by the DOJ.

Certainly, $468.5 million in annual PREA compliance costs for the next 15 years is a significant sum. Consider, though, that according to the Department of Justice this represents *less than 1%* of the estimated $79.5 billion the U.S. spends annually on our nation's criminal justice system. Thus, the DOJ determined that full compliance with the PREA standards, as implemented by the final rule, would not cause corrections agencies to incur "substantial additional costs."

The DOJ also found that potential savings achieved through the reduction of prison rape and sexual abuse justify the expense of compliance. The Department of Justice estimated that "for the costs of full nationwide compliance to break even with the monetized benefits of avoiding prison rape, the standards would have to be successful in reducing the annual number of prison sexual abuse victims by about 1,671, for a total reduction from the baseline over fifteen years of about 25,000 victims.



**Learn & Understand the Law**

It can be a powerful influence in your life.

Whether you want to enhance your knowledge of the law, help others, or acquire a new skill — choosing Blackstone's independent study courses will put you on the road to a brighter future.

■ Learn Civil & Criminal Law
■ Learn Legal Research
■ 120 Years of Legal Training Experience
■ Study in Your Spare Time
■ Affordable Tuition, Easy Payment Plan

Only **$59.00** Per Month

If you have a sponsor they must contact us by phone at: 1.800.826.9228

☐ **Yes!** I'd like to learn more
Please rush me FREE course information.

Name _____

Address _____

City_____ State_____ Zip_____

☐ **Paralegal Course**
☐ **Advanced Paralegal Course**
• Civil Litigation
• Wills/Trusts/Estates
• Personal Injury/Torts
• Family Law
• Criminal Law

**Blackstone Career Institute**
Since 1890

Your tuition cost covers your entire program including all textbooks, study guides, exam and homework evaluation services, and your certificate.

**P.O. Box 3717  •  Allentown, PA 18106**



**PRISON INMATES ONLINE**
Lifetime Profile Listings

LIFETIME
Length of Sentence

Since 2000

MEMBERSHIPS

**$5 MINI PROFILE**
Prices good through 2012

**Connected Across the Internet:**
Stay connected with family, friends, and pen pals. Reconnect with long lost friends who search for you on the web.

**Share Your Creative Side:**
Post 150 word blogs. ($5)
Post your Artwork ($5 for 3 images)
Post Poetry ($5 for 150 words)
Post YouTube Videos ($5 each)

**Here's How to Get Started:**
For FREE membership application send us a self addressed stamped envelope (Size #10) or (2) 1st Class postage stamps to the address below. We will mail you a Free Membership Application Card along with our brochure and application form for additional premium services.

**Length of Sentence Profile:**
$50 - Length of Sentence Profile
Includes Up to 5 photos.
300 word biography.
*1 Year of Message Forwarding Service.
$5 Mini Profile: Name, Address & 1 photo.

**Got Corrlinks?**
Order our Message Forwarding Service and have messages sent from your profile on our site to your Corrlinks account. Add us on Corrlinks. Our address is info@prisoninmates.com.

We cannot send brochures to STATE inmates in FL, MO, or PA. Message Forwarding Service available in facilities that allow 3rd Party Mail.
*Message Service Prohibited in NY State Prisons.

**PrisonInmates**

Prison Inmates Online - 8033 W Sunset Blvd. #1000 - Los Angeles CA 90046

PLN_0000849

## PREA in Effect (cont.)

The Department believes it reasonable to expect that the standards, if fully adopted and complied with, would achieve at least this level of reduction in the prevalence of prison sexual abuse."

Some of the monetized costs that could be decreased include settlements and verdicts in lawsuits involving prison rape and sexual abuse – such as the $100 million settlement paid by the State of Michigan in 2009 to compensate thousands of female prisoners who endured years of systemic sexual victimization by prison employees. [See: *PLN*, Dec. 2009, p.30].

Other monetized costs include a reduction in the transmission (and subsequent treatment expenses) of communicable diseases spread via sexual abuse – particularly HIV – and related medical and mental health care costs.

"For too long prison rape has been accepted as a normal part of prison life, subjecting inmates, many of them nonviolent offenders, to brutal and repeated rapes that not only scar them physically and emotionally for life but in many cases expose them to AIDS, with a resulting death sentence," then-Prison Fellowship vice president Pat Nolan noted when PREA was enacted into law.

Plus there are costs related to higher recidivism rates of released prisoners who were sexually victimized while incarcerated.

"The [PREA] standards recognize that prisoners usually come back to their communities," said Amy Fettig with the ACLU's National Prison Project. "If they've been so brutalized that they can't become productive members of society, it hurts everyone. If prisoners are badly damaged, their pathologies grow, and this sometimes leads to a return to prison or bad public safety outcomes for the community."

"At worst, prison is a place where men and women pay for their crimes by being isolated from the world. At best, it is a place where they can rehabilitate themselves. Rape should not be part of the punishment, and it certainly doesn't assist in rehabilitation," added Barrett Duke, director of the Research Institute of The Ethics & Religious Liberty Commission of the Southern Baptist Convention. "The sexual brutalization of inmates exposes men and women to punishment that is not only cruel but that also severely impedes their opportunity to rehabilitate themselves to assume lives worthy of the dignity of their humanity."

According to the Department of Justice, "The total monetizable benefit to society of eliminating all prison rape and sexual abuse in the facilities covered by [PREA] is at least $52 billion annually," though such savings are unlikely to ever be realized.

Of course there are also the non-monetized costs of prison rape and sexual abuse to be considered, such as the long-term, life-altering trauma that victims experience, and the moral, ethical and legal obligations of corrections agencies to protect prisoners from sexual victimization.

### Continued Criticism

While most advocates for reducing prison rape and sexual abuse were somewhat satisfied with the DOJ's final rule implementing the PREA standards, or at least acknowledged the progress that it represented, not everyone was happy. For example, Stark County, Ohio Sheriff's Captain Brian Arnold said the PREA standards envision "a perfect world," but "there's not enough money for a perfect world." He expounded, "It's kind of created a monster. I don't know where the money is going to come from."

The American Action Forum (AAF), a non-profit "center-right policy institute," also complained about the cost of compliance with the PREA standards, stating that despite having an admirable goal, the final rule "imposes a costly, complicated regulatory framework on states currently battling recurring budget deficits, offers little assurance of success, and fails to explain this new burden to the states as required by the Unfunded Mandate Reform Act." The AAF further observed – correctly – that "There are no metrics for success. The DOJ itself admitted, 'a requirement for specific outcome measures would be impractical to implement.'"

### The Continuing Problem of Prison Rape

Although the PREA standards have only recently gone into effect, many corrections agencies and officials have been preparing PREA-related regulations over the



FREE! 12 FREE ISSUES!

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription!
Quarterly drawing WINS $100! (Void in New York)
(Last Quarter's winner from Houtzdale, PA.)
TELL YOUR FRIENDS!   ACT NOW!!

PO Box 2063 • Fort Walton Beach FL. 32549
www.InmateMagazineService.com

Inmate Magazine Service Inc.

PLN_0000850

past several years in anticipation of the release of the final rule – conducting staff training, implementing policies, setting up hotlines for prisoners to report sexual abuse, etc. Additionally, during that time period there has been a heightened awareness among corrections employees of the issue of prison rape and sexual assault, notably after the NPREC issued draft PREA standards in June 2009.

In spite of this awareness, rape and sexual abuse of prisoners – particularly by corrections employees – remains a persistent problem, and it is doubtful that sexual victimization in correctional facilities will ever be completely eradicated despite the Prison Rape Elimination Act's optimistic title. PREA was originally titled the Prison Rape Reduction Act.

In addition to mandating the promulgation of national standards, PREA required the Bureau of Justice Statistics (BJS) to compile information related to prison rape and sexual abuse. According to a May 2013 BJS report that surveyed over 106,500 adult prisoners in 600 correctional facilities nationwide, 4% of state and federal prisoners and 3.2% of jail detainees self-reported incidents of sexual victimization from 2011 to 2012. Staff-on-prisoner incidents of sexual abuse outnumbered prisoner-on-prisoner incidents – despite the fact that sexual contact between corrections employees and prisoners constitutes a crime in all 50 states, as prisoners cannot legally consent to sex acts. [See: *PLN*, March 2007, p.32].

Female state and federal prisoners reported being sexually abused at a rate more than four times higher than the average rate for male prisoners, while LGBT prisoners and prisoners with mental health problems were also at greater statistical risk of sexual victimization.

A separate BJS report issued in June 2013 found "an estimated 9.5% of adjudicated youth in state juvenile facilities and state contract facilities (representing 1,720 youth nationwide) reported experiencing one or more incidents of sexual victimization by another youth or staff in the past 12 months or since admission, if less than 12 months." Juvenile offenders were more than 3 times as likely to be sexually abused by a staff member than another juvenile. Almost 90% of the juveniles who were sexually victimized were male offenders who reported sexual contact with female employees.

The numbers are likely much higher – according to a BJS report released in May 2012, 9.6% of former state prisoners reported having been sexually victimized during their most recent period of incarceration. Also, according to a May 17, 2012 regulatory impact assessment prepared for the DOJ's final rule, "the Department estimates that in 2008 more than 209,400 persons were victims of sexual abuse (all forms) in America's prisons, jails, and juvenile confinement centers."

The prevalence of prison rape and sexual assault has remained fairly consistent since 2007, when the Justice Department began collecting comprehensive data through surveys of prisoners and corrections agencies. According to the BJS, "Using the same methodology since 2007, the change in rate of sexual victimization among state and federal prison inmates over the three surveys (4.5% in 2007, 4.4% in 2008-09, and 4.0% in 2011-12) was not statistically significant. Among jail inmates, the rate of sexual victimization was nearly unchanged – 3.2% in 2007, 3.1% in 2008-09, and 3.2% in 2011-12." [See: *PLN*, June 2011, p.40; March 2010, p.22].

Notably, the time period examined by the Bureau of Justice Statistics – 2007 to 2012 – was well after PREA had been enacted and while the PREA standards were being drafted by the NPREC and implemented by the Department of Justice. Examples of some of the more recent incidents of staff sexual victimization of prisoners, from 2012 to 2013, are detailed in the companion article that follows this cover story.

### The Start, Not the End

THE FINAL RULE ISSUED BY THE Department of Justice to implement the PREA standards represents the start, not the end, of efforts to curb prison rape and sexual abuse. Much more needs to be done to fully implement the standards and ensure meaningful and continual compliance monitoring.

"We are only going to get real change if people in communities around the country hold their local and state facilities accountable for living up to PREA," remarked Cecilia Chung, a civil rights leader and former chair of the San Francisco Human Rights Commission.

As noted above, in May 2012 President Obama directed all federal agencies with

LAW OFFICES OF

# ELMER ROBERT KEACH, III
*A PROFESSIONAL CORPORATION*

Law Offices of Elmer Robert Keach, III, PC
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010
518.434.1718
www.keachlawfirm.com

Attorney Bob Keach
NITA Master Advocate
Member, Multi-Million Dollar Advocates Forum
Outside Counsel, Prison Legal News
National Practice

**Experienced Civil Rights Attorney dedicated to seeking justice for those who are incarcerated**

*Custodial Death Cases • Wrongful Arrest and Incarceration
Medical Indifference Cases • Corrections and Police Brutality
Sexual Abuse and Assault • Illegal Strip Searches
Class Actions • First Amendment Litigation (Northeast Only)*

Reasonable Hourly Rates for: Criminal Defense, Appeals, Post-Conviction Relief, Habeas Corpus

**WHEN YOU OR A LOVED ONE HAVE BEEN WRONGED, YOU HAVE A VOICE.**

Attorney Keach prefers all inquiries by mail to be typed, and limited to five pages.
DO NOT SEND ORIGINAL DOCUMENTS OR ORIGINAL MEDICAL RECORDS.
Make sure to exhaust your administrative remedies and comply with state law notice requirements, if applicable, to preserve state law intentional tort/negligence claims.

PLN_0000851

## PREA in Effect (cont.)

confinement facilities not already subject to the DOJ's final rule to develop equivalent rules that comport with the PREA standards – including the Department of Homeland Security, Department of the Interior, Department of Defense (DOD) and Department of Health and Human Services.

To date only one of those agencies has issued a proposed rule to implement the PREA standards. On December 6, 2012, the Department of Homeland Security (DHS) released a Notice of Proposed Rulemaking for PREA-based standards applicable to immigration detention facilities, which largely mirrored the DOJ's standards for adult prisons and jails.

Just Detention International called the proposed rulemaking "a vital step toward protecting the health and dignity of the nearly 400,000 immigration detainees held by DHS each year. Sexual abuse in detention is devastating to survivors, with physical and emotional effects that often last for years. Immigration detainees are especially vulnerable to this type of violence."

DHS provided a public comment period for its proposed rule that ended on February 26, 2013 and resulted in more than 1,700 comments being filed. No final rule implementing the standards for DHS facilities has yet been released.

With respect to the Department of Defense, it admittedly may be difficult for the DOD to establish PREA standards for all of its detention facilities, particularly overseas facilities that hold "enemy combatants." As a May 20, 2013 *Slate* article observed, sexual abuse has been used by the U.S. military as an interrogation and torture technique – and also, apparently, as a means of amusement, as demonstrated by the widely-distributed photos of prisoners who were stripped naked and sexually humiliated at the then-U.S. controlled Abu Ghraib prison in Iraq.

In response, Pentagon spokesman Lt. Col. Jeff Pool stated, "The Department is committed to ensuring that captured enemy forces are held in safe, humane, detention facilities. Although the PREA doesn't technically apply to such facilities, the Department has robust mechanisms in place to ensure the health and safety of all detainees, which are consistent with the PREA."

Then again, "doesn't technically apply" may not be the best starting point when discussing standards intended to prevent rape and sexual abuse.

Like the DOD, the Department of the Interior and Department of Health and Human Services have not issued proposed rules to comply with the PREA standards, more than a year after being directed by the President to take such action.

Further, and ironically, PREA standards do not apply to secure civil commitment facilities that house sex offenders who have completed their prison sentences. Nor do the standards apply to probation and parole agencies – even though numerous cases of parole and probation officials engaging in sexual misconduct have been documented.

Once all corrections agencies required to do so have adopted rules to implement the standards, those rules must then be rigorously enforced and monitored on an ongoing basis. Effective oversight of the standards – even though they could have been stronger and more comprehensive – will undoubtedly reduce PREA-related incidents.

Regardless, the fact remains that during the 3,638 days from when PREA was signed into law in September 2003 to when the DOJ's final rule implementing the PREA standards went into effect for most corrections agencies on August 20, 2013, hundreds of thousands of prisoners suffered rape and sexual abuse.

According to the Department of Justice, approximately 209,400 prisoners were victims of sexual abuse in 2008 alone, including those held in prisons, jails and juvenile detention facilities, with a conservative "lower bound" estimate of 149,200. Assuming those numbers have remained consistent over time, during the decade since PREA was enacted an estimated 1.49 million to 2 million prisoners in U.S. correctional facilities have been sexually victimized.

If justice delayed is justice denied, then those prisoners who were raped and sexually abused while the long-delayed PREA standards remained pending have been denied justice in the most egregious, inexcusable manner possible. ◼

Sources: *"Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12," U.S. DOJ, Bureau of Justice Statistics, NCJ 241399 (May 2013); "Sexual Victimization in Juvenile Facilities Reported by Youth, 2012," U.S. DOJ, Bureau of Justice Statistics, NCJ 241708 (June 2013); "Sexual Victimization Reported by Former State Prisoners," U.S. DOJ, Bureau of Justice Statistics, NCJ 237262 (May 2012); "Regulatory Impact Assessment: National Standards to Prevent, Detect, and Respond to Prison Rape Under the Prison Rape Elimination Act," U.S. DOJ, Docket No. OAG-131, RIN 1105-AB34 (May 17, 2012); "Criminal Victimization in the United States, 2008," U.S. DOJ, Bureau of Justice Statistics, NCJ 227669 (March 2010); "The Prison Rape Elimination Act of 2003: A Primer," by James E. Robertson, 40 No. 3 Criminal Law Bulletin 5 (May 2004); www.asca.net; www.bjs.gov; www. prearesourcecenter.org; www.dhs.gov; www. slate.com; www.corrections.com; www.hrw. org; www.sbcbaptistpress.org; Huffington Post; http://georgewbush-whitehouse.archives. gov; www.afp.com; www.justdetention.org; www.krqe.com; www.raisingthebarcoalition. org; Columbus Dispatch; New York Review of Books; New York Times; www.reason.com; www.cnbc.com; www.ojp.usdoj.gov; www. old.nationalreview.com*

### Editor's Note by Paul Wright:

*Sexual abuse of prisoners by corrections staff and other prisoners is so endemic to our nation's criminal justice system that it is fair to say it is an integral part of U.S. prison and jail management. Only with the tacit acceptance of corrections officials could a problem so pernicious and widespread persist. The lack of meaningful enforcement provisions for the PREA standards, and the opposition of corrections agencies and officials to more stringent*

# TYPING

### SERVICES
Provided since 1998

**Specifically designed, with special rates for the incarcerated person.**

Black / Color Printing and Copying

*SEND A SASE FOR A "FREE" PRICE LIST AND MORE INFORMATION TO:*

LET MY FINGERS DO YOUR TYPING
Sandra Z. Thomas (dba)
P O Box 4178
Winter Park, Florida 32793-4178
Phone: 407-579-5563

**Special Offer: $2.00 off first order.**
Special offer void after: 12/31/2013

*standards, evince the implicit role that rape and sexual abuse play in controlling our nation's overcrowded prisons and jails.*

*Indeed, former Virginia Attorney General Mark Earley once said that prison officials "turn their back on unspeakable acts in order to maintain 'peace' – allowing aggressive predators to have their way," and Eli Lehrer wrote in the* National Review *in 2002 that "While inmate rapists bear the ultimate responsibility for their crimes, prison administrators are complicit in the prison-rape epidemic. A divided inmate population living in fear [] is easier for administrators to manage. Some hugely negligent prisons even encourage rape...."*

*The mainstream media is complicit in this state of affairs, too. According to the Department of Justice, in 2008 an estimated 164,240 women (excluding prisoners) were victims of rape or sexual assault, based on the National Crime Victimization Survey. In a nation of around 300 million people that is a horrifying number. However, the Justice Department also reported that in that same year up to 209,400 prisoners were raped or sexually abused in a criminal justice system with a population of 2.2 million – which is even more horrific yet rarely reported.*

*To listen to the media it is only prisons in the Balkans that are referred to as "rape camps," and the silence of mainstream news agencies with respect to the ongoing outrage of prison rape and sexual abuse makes it clear that prisoners are generally viewed as an expendable, and rapeable, population. Also, unlike sexual assault victims outside of prison, incarcerated victims often – literally – have no way to escape their attackers, especially when they are raped or abused by corrections employees.*

*PREA is a valuable first step and should be recognized as exactly that: A first step. There is a reason why no one talks about the Civil Rights Act of 1957, which did not accomplish much of what it purported to do, such as to ensure African Americans could exercise their right to vote. But the Act's obvious shortcomings and toothlessness set the stage for the Civil Rights Act of 1960 and then the Civil Rights Act of 1964 – which forever changed the American social and political landscape.*

*Similarly, PREA requires successive legislation to give incarcerated victims of rape and sexual abuse real rights with enforceable remedies. Only then can it be said that our government is actually doing something to reduce sexual victimization in prisons and jails, and that laws such as PREA are more than mere symbolic legislative gestures.*

# Prisoners Raped and Sexually Abused while PREA Standards Pending

As described in this issue's cover story, in May 2012 the U.S. Department of Justice issued a final rule adopting national standards pursuant to the Prison Rape Elimination Act (PREA). The rule was published in the Federal Register and became effective on August 20, 2012; however, state and local corrections agencies were given one year to provide PREA-related training to current employees. Likewise, the first PREA audit cycle, to ensure compliance with the standards, didn't begin until a year after the rule's effective date.

Therefore, during the one-year period ending August 20, 2013, state and local corrections officials finalized policies to comply with the PREA standards and trained staff members on PREA-related issues, including "zero-tolerance [policies] for sexual abuse and sexual harassment" and "[h]ow to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures."

Concurrently, prison and jail employees nationwide continued a long-standing pattern of raping and sexually assaulting prisoners – a pattern that *Prison Legal News* has documented extensively. [See, e.g.: *PLN*, April 2012, p.1; May 2009, p.1; Aug. 2006, p.1].

The following are examples of rape and sexual abuse involving corrections staff reported from August 20, 2012 – when the PREA standards became effective – to August 20, 2013, the start of the first PREA audit cycle. Apparently, these prison and jail employees didn't pay attention during their PREA training.

## Alabama

On June 19, 2013, two Russell County jail guards were arrested for engaging in sexual misconduct with female prisoners. Jacob Brent Phelps and James Blain were charged with felony sexual misconduct with an inmate; another guard, Charles Tarver, was fired for having "inappropriate conversations" of a sexual nature with prisoners. Phelps and Blain were released on $10,000 bond.

## Arizona

Two separate incidents of sexual abuse involving female detainees at the Mohave Valley Sheriff's Office substation resulted in the arrest of a former jail guard. In late January 2013, Shannon Correll, 25, was indicted and charged with unlawful sexual intercourse with a 24-year-old prisoner in a shed outside the substation. Six months earlier, he had been arrested on one count each of unlawful sexual conduct and false imprisonment for a sexual encounter with a different prisoner in the same shed.

## Delaware

A female prisoner reported having sexual

## TEXAS ONLY

**Post-conviction State and Federal Habeas Corpus**

**Parole Representation**

**Family Law**

### Ashley Burleson

Attorney and Counselor at Law
1001 Texas Avenue, Suite 1400
Houston, Texas 77002

## INCARCERATED ENTREPRENEURS WANTED!

Be a Freight Broker.
Own your own business!
New training course provides
you a job upon release.
*S.A.S.E for more information.*

### LONE WOLF ENTREPRENEURIAL INSTITUTE

**1015 Townsend Dr. Suite C
Pocahontas, AR 72455**

*Make unlimited income!*

**1-870-222-0270
Lonewolfbusiness.com**

PLN_0000853

## While PREA Standards Pending (cont.)

contact with Larry R. Clinkscale, 40, a guard at the Delores J. Baylor Women's Correctional Institution, on August 27, 2012. Delaware State Police were contacted by DOC Internal Affairs investigators, and Clinkscale was arrested and charged with sexual misconduct in a detention facility. The prisoner said she was told to go to a staff restroom while on floor cleaning duty, then was taken to a nearby closet where Clinkscale had sexual relations with her. Clinkscale turned himself in and was released on $10,000 unsecured bond.

### Florida

On February 5, 2013, Baker County jail guard Tarrece Givens, 27, was arrested and charged with sexual battery on a person older than 12 by a correctional officer. He is accused of receiving oral sex from a female prisoner at the Baker County Detention Center. Givens, a former state prison guard, was jailed with bond set at $100,000.

### Georgia

In unrelated incidents, two former Chatham County Sheriff's Department employees found themselves on the wrong side of the law on April 24, 2013. Both are accused of sexually assaulting a person in custody. Shelton Crowder, 55, was indicted on five counts including public indecency and making false statements in addition to the sex abuse charges. Crowder, a corporal assigned to the Corrections Bureau, worked for the sheriff's department from 1996 until his termination on September 19, 2012. Former jail guard Lewis Lane, 34, also accused of sexual assault, surrendered to authorities and was placed in protective custody at the Chatham County jail.

### Hawaii

On July 1, 2013, former federal prison guard Richard Seaman was sentenced to 20 months in prison and a $3,000 fine for sexually abusing a female prisoner at the Federal Detention Center in Honolulu. He also must serve three years on supervised release. Seaman had pleaded guilty last year to one count of sexual abuse of a ward; a prisoner working under his supervision in the commissary saved his DNA on her shirt and turned it over to investigators as evidence of the sex acts.

### Idaho

On July 29, 2013, a state court judge sentenced former Pocatello Women's Correctional Center guard Kim Russel Rogers to eight years of probation after prosecutors agreed to a reduced charge of attempted sexual contact with a prisoner. Rogers initially had been charged with felony sexual contact. The judge also imposed a suspended sentence of three to seven years in prison should Rogers fail to complete his term of probation.

### Indiana

A prison nurse stands accused of performing a sexual act on a prisoner at the Pendleton Correctional Facility after a guard walked in on the encounter in the prison's infirmary on April 21, 2013. Colette Ficklin, 39, allegedly told the prisoner to fake chest pains in order to be alone with her in the infirmary. Ficklin was arrested on June 19, 2013 and charged with sexual misconduct by a service provider, a felony. She was employed by private medical contractor Corizon.

### Kansas

Reno County sheriff's deputy Jonathan Diaz, 30, is accused of engaging in illegal sexual activity at the county jail. Sheriff Randy Henderson announced charges against Diaz on May 21, 2013 after two prisoners accused him of misconduct. He was arrested on two counts of unlawful sexual relations with an inmate, two counts of aggravated intimidation of a victim and two counts of bribery. The Kansas Bureau of Investigation was involved in the investigation.

### Louisiana

Routine telephone surveillance led to the March 6, 2013 arrest of 48-year-old Karen Watts, who was employed at the Concordia Parish Work Release facility in Vidalia. Watts was fired and charged with malfeasance for alleged inappropriate sexual contact with a work release prisoner under her supervision. Sheriff Kenneth Hedrick said the prisoner may also face criminal charges.

### Minnesota

On November 29, 2012, law enforcement officials took state prison guard James Allen Bongaarts, 57, into custody for repeatedly having sex with a female prisoner at MCF-Togo. Investigators spoke with the prisoner and Bongaarts during the investigation, and both acknowledged they had engaged in sexual contact. Bongaarts was charged with seven counts of felony sexual misconduct; he pleaded guilty and was sentenced on May 13, 2013 to 65 months in prison plus lifetime conditional release supervision.

### Missouri

A 29-year-old female prisoner at the St. Louis Justice Center reported to authorities that former jail guard Tony West, 36, had pressured her to have sex in a second-floor janitor's closet and told her he could make her charges "go away." West was sentenced on December 13, 2012 to 3½ years in prison for the sexual assault. He had denied the accusations and asked the court to consider his desire to care for his wife and young children, but Circuit Court Judge John Garvey said if West wanted to do the right thing by his family he needed to acknowledge his criminal acts. Garvey called the crime "disgusting" because West had used his authority to prey on a vulnerable victim.

### Montana

Tisha Ann Brunell, 45, a former prison nurse, pleaded not guilty to 53 charges on March 8, 2013. She was charged with 43 counts of misdemeanor unauthorized communications, 6 counts of felony transfer of illegal articles and four counts of felony sexual intercourse without consent. Brunell worked as a licensed practical nurse at two facilities – one for parole violators and one for DUI offenders – operated by Community, Counseling, and Correctional Services (CCCS), a private non-profit organization. She reportedly had inappropriate encounters with three prisoners.

### Nevada

Florence McClure Women's Correctional Center guard Eugenio Dimas, 51, was charged in February 2013 with official misconduct and voluntary sex with a prisoner after other prisoners accused him of having sexual relations with a woman serving a life sentence for murder. Prisoner Monique Maestas, 26, initially denied having an affair with Dimas but later changed her story, telling investigators she had sex with Dimas, received gifts from him and talked with him on the phone. Dimas pleaded guilty to one count of felony misconduct

PLN_0000854

of a public officer on June 5, 2013; he has not yet been sentenced.

## New Mexico

Twice last year, employees at the Bernalillo County Juvenile Detention Center were charged with having sex with prisoners. In August 2012, video surveillance caught jailer Lara Sterosky allegedly performing a sex act on a male teenager. Deputies say Sterosky had oral sex with a 17-year-old resident in a closet at the facility. Although the teen told investigators he initiated the sexual contact, he turned her in because she later "took away his privileges and started treating him differently," according to a KOAT Channel 7 news report. Sterosky was charged with criminal sexual penetration of a juvenile inmate.

In a separate incident, detention center guard Edward Edmon, 42, was charged in December 2012 with raping and impregnating a juvenile resident at the facility. The juvenile, identified as "Shauna H.," filed a lawsuit against Bernalillo County claiming that she had sex with Edmon "five or six times," and did so because she saw Edmon retaliate against another female prisoner

who refused his advances.

## New York

Donald Schermerhorn, 43, was terminated from his job as a Greene County jail guard while a co-worker, Earnest Dunn, 26, was suspended and later fired after an extensive investigation by the New York State Police found the two guards had engaged in sexual misconduct with prisoners. Evidence uncovered during the investigation led to the arrest of Schermerhorn and Dunn on December 18, 2012. Schermerhorn faces several misdemeanor charges and Dunn faces both felony and misdemeanor charges. A lawsuit filed by one of the prisoners over the sexual abuse settled on August 2, 2013 for $65,000; another suit remains pending.

No policy changes were made at the jail as a result of the sexual misconduct by Schermerhorn and Dunn. "They violated our regular policies, so we're not going to change something that there's really no need to," said Greene County Sheriff Gregory Seeley. "You do something stupid, you get fired for it. Simple as that. It's not because a policy was wrong."

## North Carolina

Kristin Earp was arrested on July 29, 2013 and charged with sexual activity by a custodian. The 23-year-old guard had worked for less than a year at the Western Youth Institution in Morganton, which houses male youthful offenders. Officials began an investigation after receiving a tip about Earp having sexual contact with a prisoner in January 2013, and she resigned four days after the alleged incident.

## Ohio

Richard Rodgers, 47, an Ohio Department of Rehabilitation and Correction dietary employee, was charged with a single count of sexual battery for receiving oral sex from a male prisoner at the Lorain Correctional Institution. An initial incident summary stated the "[i]nmate performed sexual favors for an employee in return for goods." The type of goods were not specified. Rodgers, who had been placed on voluntary leave, was arrested March 22, 2013 and released on bond. An internal investigation has been placed on hold pending the resolution of the criminal charges.



**Save on Prescription Eyeglasses & Shades**

Send for a **FREE** Catalog
Money Back Guarantee

**Prism Optical, Inc.**
10954 NW 7th Ave
**Dept: LN0913**
Miami, FL 33168

Inquiries from Friends and Family Welcome
1-800-637-4104
www.prismoptical.com
contact@prismoptical.com

*prism* OPTICAL, INC.
Since 1959



# BRANLETTES BEAUTIES

## OUR SIMPLE POLICIES:

SPECIAL REQUESTS ARE NOT PERMITED AND ALL MODELS ARE OF LEGAL AGE (BOP-FRIENDLY). DUE TO TREMENDOUS TIME AND COST ANSWERING LETTERS, UNLESS YOU ARE PLACING AN ORDER OR A QUESTION REGARDING YOUR ORDER, WE WILL NOT REPLY TO ANY OTHER QUESTIONS. SASE ARE REQUIRED FOR ANY INQUIRES OR CONCERNS!

YOU AND YOU ALONE ARE RESPONSIBLE FOR YOUR SELECTIONS BEING ALLOWED INTO YOUR FACILITY:

KNOW YOUR INSTITUTIONS POLICIES AS TO WHAT IMAGE CONTENT IS ALLOWED. RETURNED ORDERS ARE NON-REFUNDABLE. THEY WILL BE HELD FOR 14 CALENDAR DAYS IN ORDER FOR YOU TO SEND SELF-ADDRESSED STAMPED; 3 FIRST CLASS STAMPS OR WITH A STREET ADDRESS FOR EVERY 20 PICTURES. ALL RETURNED IMAGES HELD AFTER TWO WEEKS WILL BE RE-SOLD AND WE WILL RETURN TO OUR STOCK.

ALL PAYMENTS ARE BY INSTITUTIONAL CHEACKS OR U.S. POSTAL SERVICE OR WESTERN UNION MONEY ORDERS.

THESE PAYMENTS ARE PROCESSED IMMEDIATELY AND SHIPPED IN LESS THAN 3-4 WEEKS. ANY OTHER COMPANY MONEY ORDERS DELAY SHIPMENT 8-10 WEEKS OR UNTIL THAT MONEY CLEARS OUR BANK. YES, WE DEAL WITH PEOPLE THAT ARE, WHILE IN PRISON, STILL TRYING NICKEL AND DIME SCAMS...

ALL SALES ARE FINAL! EACH CATALOG HAS 84 GORGEOUS LADIES TO CHOOSE FROM HIGH QUALITY PRINTS ON 4X6 GLOSSY PHOTO PAPER

| OUR PRICES ARE SIMPLE: | SHIPPING & HANDLING: |
|---|---|
| 1-4999 PHOTOS = 0.45 CENTS EACH<br>5000+ PHOTOS = 20% DISCOUNT<br>1-9 CATALOGS : $3.00 EACH ( +SASE )<br>10 CATALOGS: $25.00+SASE (4 STAMPS ) | DUE TO VARIOUS PRISON POLICIES REGARDING HOW MANY PICTURES CAN BE SENT IN ONE ENVELOPE, OUR POLICY IS AS FOLLOWS:<br>01 - 5 PHOTOS---$1.00 PER ENVELOPE<br>06 - 15 PHOTOS--$1.50 PER ENVELOPE<br>16 -25 PHOTOS---$2.00 PER ENVELOPE |

**BRANLETTES BEAUTIES**
SELECT YOUR FAVORITE:
WHITE CATALOGS (50 VOLUMES)
BLACK CATALOGS (50 VOLUMES)
ASIAN&LATIN CATALOGS (50 VOLUMES)
PLEASE STATE WHAT STYLE PHOTOS'S:
PROVOCATIVE POSES OR NUDE

→ **FREE CATALOG???** ←

YOU READ IT RIGHT!
JUST SEND A SELF ADDRESSED ENVELOPE TO US. AND WE WILL SEND TO YOU ONE BOP-FRIENDLY SAMPLE CATALOG (ONE PER CUSTOMER) WITH 84 GORGEOUS GIRLS IN FULL COLOR. ACT NOW AS THIS OFFER WILL NOT BE AROUND LONG!!

**BRANLETTES**
P.O.BOX 5765
BALTIMORE, MD
21282

PLN_0000855

## While PREA Standards Pending (cont.)

### Oklahoma

In March 2013, several female prisoners filed a lawsuit alleging that detention guards at the Comanche County Jail "routinely" engaged in rape, sexual abuse and assault. Sixteen women are listed as plaintiffs in the suit against the Comanche County Facilities Authority (CCFA), a private company that runs the jail, and several jailers. Among the complaints are allegations that a guard requested oral sex from a prisoner in exchange for a food tray; a prisoner was forced to shave her pubic hair after being told "the guard likes it that way"; women were made to walk to the jail's shower areas naked; a prisoner "suffered repeated rapes and sodomy"; and one prisoner's genitals were photographed during the intake process and the pictures shared with jail employees and trustees.

The Association of County Commissioners of Oklahoma refused to cover the legal expenses of defending against the federal lawsuit, requiring CCFA to hire its own attorneys. See: *Blueberry v. Comanche County Facilities Authority*, U.S.D.C. (W.D. Okla.), Case No. 5:13-cv-00278-M.

### Oregon

Benjamin Carl Patterson, 56, a food service coordinator at the Coffee Creek Correctional Facility, resigned on January 27, 2013 after investigators found evidence that resulted in his arrest on charges of custodial sex misconduct, official misconduct and supplying contraband. Patterson pleaded guilty in March 2013 to one count of custodial sex misconduct involving a female prisoner; the other charges were dismissed. He was sentenced to 30 days in jail and two years of probation, and ordered to undergo mental health and sex offender evaluations and treatment, and to have no contact with his victim.

### Pennsylvania

In a case investigated by the U.S. Department of Justice's Office of Inspector General and officials at FDC Philadelphia, Lamont Lucas, 47, was arrested on April 11, 2013 and accused of having sex with a prisoner and attempting to aid in her escape. Lucas had been a prison guard for 18 years and was a supervisor in the facility's

tool shop. According to the indictment, he gave the prisoner sterling silver earrings, had sexual contact with her and assisted in planning her escape, which did not occur. Lucas pleaded not guilty and was released on his own recognizance.

### South Carolina

The South Carolina Department of Corrections announced that three female employees at the Kershaw Correctional Institution were terminated on June 4, 2013, several days after turning themselves in to law enforcement authorities in Lancaster County. The three women, Crystal C. Haynes, 56, Charthenia B. Smith, 55, and Darcy A. Meade, 53, were charged with sex offenses involving prisoners at the medium-security men's prison.

### Tennessee

On June 11, 2013, the Tennessee Bureau of Investigation arrested 42-year-old Wendy Deshay Carter, a former Macon County jail guard, for allegedly having sex with a prisoner. Carter reportedly exchanged nude photos with the prisoner and arranged sexual encounters via a contraband cell phone she had given him. Investigators said she began the relationship around January 2012 and that it continued for approximately one year. Carter reportedly engaged in sexual acts with the prisoner by finding locations in the jail without security cameras or by disabling the cameras. She was indicted on five counts of sexual contact with inmates and five counts of official misconduct.

### Texas

Laketh Bernard McKinney, Sr., 36, a Brazos County detention officer, was arrested on June 5, 2013 on charges of having a sexual relationship with a male prisoner. An investigation was launched following reports that McKinney was bringing contraband (pornographic materials) into the jail, and he was suspended on May 31, 2013 after investigators obtained evidence that he had a sexual relationship with a prisoner. The prisoner told investigators that McKinney had sexual encounters with him at least four times. McKinney was charged with violating the civil rights of a person in custody by sexual contact, and released on $10,000 bond. He is reportedly married with children and serves as a pastor at the Cedar of Lebanon

Church of God in Christ.

### Virginia

On May 31, 2013, hours after Henrico County authorities launched an investigation into alleged sexual misconduct involving Jermaine A. Burton and a female prisoner at the Henrico County Jail East, the 30-year-old deputy shot and killed himself at his home. The alleged sexual encounter occurred in the jail's instruction work area; the investigation began when another deputy reported that he had heard about the sexual activity.

### Washington

Sex scandals at the Airway Heights Corrections Center led to an investigation involving two female staff members. Sarah Brooks, a sex therapist, was found "in a state of undress" in a room with a sex offender she had agreed to treat. Further evidence of inappropriate letters and phone calls between Brooks and the prisoner was uncovered during the investigation. Brooks resigned in April 2013 and pleaded not guilty to three counts of custodial sexual misconduct on May 29, 2013.

In an unrelated incident at Airway Heights, textile shop supervisor Siri A. Crain was accused of having phone sex with a prisoner, with at least 92 calls being placed by the prisoner to a number believed to belong to Crain. She was also accused of having sex with the prisoner in a staff bathroom and giving him nude photos. Crain was placed on paid leave pending the investigation, which began in May 2013, and may face felony charges.

### West Virginia

Buddy Lee Leary, 41, a former Tygart Valley Regional Jail guard, was arrested and accused of forcing a female prisoner to engage in sexual acts. According to the criminal complaint and a recorded interview, the victim told investigators that Leary asked her to disrobe, entered her cell and began to touch her genitals, then instructed her to perform a sex act on him. After "several minutes," Leary abruptly left the prisoner's cell. When asked why she waited two months to report the incident, the woman replied she was afraid of repercussions. Leary admitted during a February 21, 2013 interview that he had sexual relations with the victim. He was indicted on June 24, 2013 on two felony

PLN_0000856

counts of imposition of sexual acts on an incarcerated person.

### Wisconsin

A former guard employed in the food service unit at the New Lisbon Correctional Institution was sentenced on April 4, 2013 to 60 days in jail with work release privileges on a reduced charge of 4th degree sexual assault. Jane Hill, 47, told police she was going through a difficult personal time when she began exchanging letters and phone calls with prisoner Frank J. Burt, Jr. Their relationship became sexual, with multiple encounters occurring in a cooler and storage areas at the facility. They were discovered when Hill's voice was recognized during routine monitoring of prison phone calls. ◼

Sources: *www.cbs42.com, www.al.com, www.lvrj.com, http://sbynews.blogspot.com, www.staradvertiser.com, www.wane.com, www.ksn.com, www.katc.com, www.grandrapidsmn.com, www.stltoday.com, http://mtstandard.com, www.lasvegassun.com, www.krqe.com, Associated Press, New York Daily News, www.wsoctv.com, www.10tv.com, http://chronicle.northcoastnow.com, http://newsok.com, www.oregonlive.com, www.thetimes-tribune.com, www.nbcphiladelphia.com, www.gantdaily.com, www.tribune-democrat.com, www.sfgate.com, www.newschannel5.com, www.theeagle.com, www.wacotrib.com, www.wtvr.com, www.komonews.com, www.krem.com, www.union-bulletin.com, www.theintermountain.com, www.wrjc.com, www.abqjournal.com, www.jacksonville.com*

## U.S. Supreme Court Denies Stay of California Prisoner Release Order

IN A 6-3 DECISION ISSUED AUGUST 2, 2013, the U.S. Supreme Court denied California Governor Jerry Brown's request for a stay of a three-judge court's order requiring the state to comply with a December 31, 2013 deadline to reduce California's in-state prison population to approximately 110,000, or 137.5% of design capacity. [See: *PLN*, Aug. 2013, p.20].

Justices Alito, Scalia and Thomas would have granted the stay. In an acerbic dissent, Justice Scalia reasserted his opinion in the Court's May 23, 2011 ruling upholding the release order, stating the order "violated the clear limitations of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A) – 'besides defying all sound conception of the proper role of judges.'" [See: *PLN*, July 2011, p.1].

The three-judge court's release order, according to Scalia, was a "bluff" to gain compliance from the state while allowing state officials to decide how to accomplish the prison population reduction. In his dissent, Scalia lamented, "The bluff has been called, and the Court has nary a pair to lay on the table." He sided with Governor Brown's argument asserting the substantial progress the state had made to simultaneously reduce prison overcrowding and improve medical care, as demonstrated by California's current prison population of 120,000 as well as the timely opening of a 1,750-bed hospital prison in Stockton.

The denial of the stay by the Supreme Court means the only remaining choices for Governor Brown are to follow the order of the three-judge court or risk being held in contempt. The state can further reduce its prison population by sending more prisoners to out-of-state facilities, moving additional prisoners to in-state county jails, transferring more prisoners to fire camps, reducing the number of parole violators returned to prison, increasing good-conduct credits for certain offenders, or various combinations of those options.

California prison officials quickly announced that they intend to transfer at least 4,000 prisoners to county jails, in-state privately-operated community corrections facilities and private prisons in other states. Additionally, some elderly and infirm prisoners may be released on medical parole.

Following the Supreme Court's denial of the stay, state officials formally appealed the three-judge court's order. Regardless, by the end of the day – and December 31, 2013 will be the last day – California's in-state prison population cannot exceed 137.5% of design capacity. See: *Plata v. Brown*, U.S.D.C. (N.D. Cal.), Case No. C01-1351 TEH and *Coleman v. Brown*, U.S.D.C. (E.D. Cal.), Case No. 2:90-cv-0520 (three-judge court). ◼

Additional source: *Los Angeles Times*

### Support Prison Legal News with these beautiful gifts!

CALL **561-360-2523**, MAIL ORDER OR USE WEB FORM HTTP://WWW.PRISONLEGALNEWS.ORG/

### Hand Embroidered Greeting Cards

Made by women prisoners in Cochabamba, Bolivia. Each card is individually made, no two are identical. The prisoners are paid a fair wage for each card and keep 100% of the pay to support themselves and their families. Local fair trade non-profits in Bolivia supply the materials for the cards. **$6.**

**Hand Made Hemp Tote Bag** All natural hemp tote bag hand made in Vermont with the Prison Legal News logo on both sides, in red and black. Great for carrying books, groceries, and more! Stamped on the inside that no sweatshop, prison or child labor was used in its manufacture. **$12.**

$6 shipping and handling for orders under $50.

PLN_0000857

# From the Editor

## by Paul Wright

THE MONTH OF AUGUST WAS FAIRLY eventful from a criminal justice perspective. New York City's "stop and frisk" policy, under which police officers stopped and searched hundreds of thousands of predominantly black and Hispanic men, was found to be unconstitutional. U.S. Attorney General Eric Holder, Jr. announced that federal prosecutors would no longer seek mandatory minimum sentences for certain low-level, nonviolent drug offenders. And most importantly, the Federal Communications Commission (FCC) finally acted on the Wright petition and voted to cap the cost of interstate prison and jail phone calls nationwide.

In regard to the latter development, as reported in greater detail in this issue of *PLN*, more than ten years ago Martha Wright filed a lawsuit over the high cost of prison telephone calls, which resulted in a petition for rulemaking being submitted to the FCC. The FCC's recent order capping interstate prison phone rates is a victory directly attributable to the hard work and efforts of Deborah Golden, Phil Fornaci and Lee Petro, the attorneys who filed the lawsuit and pursued the FCC petition, who have steadfastly advocated for justice for Mrs. Wright.

Kudos also go to the Campaign for Prison Phone Justice, founded in 2011 by Working Narratives, the Center for Media Justice and Prison Legal News with the singular goal of mobilizing and organizing mass support to move the FCC to act on the Wright petition – which had languished for over a decade. Additionally, FCC Chairwoman Mignon Clyburn took special interest in this issue and was instrumental in having the FCC order a cap on prison phone rates. PLN has been engaged in the struggle against exorbitantly-priced prison phone calls since 1992, including a meeting with Chairwoman Clyburn and presenting at a recent FCC workshop on prison phone-related issues. [See: *PLN*, Aug. 2013, p.26].

The hundreds of prisoners and their family members who contacted the FCC about the high cost of prison phone calls also deserve credit [see: *PLN*, July 2013, p.34], as do the many other organizations and individuals who advocated for reform of the prison phone industry. The success of the Wright petition campaign shows that with sufficient resources and involvement, significant change can be accomplished even with respect to difficult issues that do not have widespread public support.

While the FCC's cap on interstate prison phone calls is important, it's not the end of the struggle but rather the beginning, since interstate calls (those that cross state lines) comprise less than 20% of all prison and jail phone calls. Most calls are local and intrastate. Also, eight states have eliminated "commission" kickbacks by prison phone companies, which means 42 have not – and even in states that forgo kickbacks, that generally only applies to state prisons, not local jails.

We hope that the FCC's order capping the cost of interstate prison phone calls will spur state public utility commissions across the country to take action on the issue of intrastate prison and jail calls, and cap those rates or eliminate the kickbacks that prison telecom companies give to government agencies in exchange for lucrative monopoly contracts.

In other news, we are finally getting settled into PLN's new office in Florida and are caught up on book orders. We apologize for any delays or inconvenience caused by our move. We ask that when you contact PLN, please keep your correspondence brief and to the point. It takes staff time to read the letters we receive and determine what the issues are, and it's easier to miss things like address change requests or subscription inquiries in long, meandering letters.

We periodically conduct sample mailings to introduce potential new subscribers to PLN. Sometimes people do not realize they have received a sample issue, then contact us to inquire why they are not getting additional issues. To continue receiving PLN you need to order a paid subscription. If the label on your issue of PLN has no subscriber code, then it's a free sample copy and you are not a subscriber. We apologize for any confusion.

Lastly, as the holiday season approaches we have added a new title to PLN's bookstore: the *Guide to GED Preparation*. We are also offering the *Prisoners' Guerrilla Handbook to Correspondence Courses in the U.S. and Canada* (3rd ed.) at a holiday discount. Buy it between now and the end of the year for only $35.00 instead of $49.99 (plus $6.00 shipping unless your book order is over $50.00). Each copy of the *Guerrilla Handbook* comes with an updated supplement that indicates any changes since the book was published; e.g., if schools have gone to online courses only, new contact addresses, etc. This title makes a great holiday gift for prisoners who want to learn how to further their education.

Enjoy this issue of *PLN* and as always, please encourage others to subscribe. ◪

---

## We've moved!

Prison Legal News and the Human Rights Defense Center have a new mailing address:

**P.O. Box 1151**
**Lake Worth, FL 33460**

Our new phone number is
**(561) 360-2523.**

---

**WHEN IT IS YOUR FAMILY'S FUTURE, EXPERIENCE MATTERS**
STATE AND FEDERAL POST-CONVICTION AND APPEALS

Licensed since 1995, hundreds of appellate briefs and habeas petitions,
capital qualified for habeas and appeals in Texas and U.S. Southern District of Texas,
Motions for New Trial, Rule 35 and 60b motions, re-sentencing and arrest of judgment.
Call or write the Law Offices of Patrick F. McCann, 713-223-3805.
909 Texas Ave, Ste 205, Houston, Texas 77002 • writlawyer@justice.com
**Serious financial inquiries only.**

PLN_0000858

# Employee Disciplinary Problems Persist at Houston Jails

*by Matt Clarke*

Misconduct by employees in the Harris County jail system in Houston, Texas remains persistent and problematic.

A *Houston Chronicle* review of employee disciplinary actions from 2008 through 2010 found there was an average of 67 disciplinary cases annually, totaling more than 200 during the three-year period.

In 2011, 88 jail employees were disciplined, including seven who used excessive force against prisoners – an increase of 31% over the three-year average. From January to April 1, 2012, Harris County Sheriff Adrian Garcia fired nine staff members.

Employees were punished for offenses such as having sex with prisoners, excessive use of force, mistakenly releasing prisoners, sleeping on the job, destroying prisoners' mail and leaving an assigned post to play a game of dominos.

A June 2009 report by the U.S. Department of Justice (DOJ) had criticized a "flawed" use of force policy at the jail and "systemic deficiencies" in employee training, which exposed prisoners to harm. DOJ investigators found a significant number of cases in which jail employees had used excessive force – including choke holds and hog-tying prisoners, both of which can cause death by suffocation. [See: *PLN*, Jan. 2010, p.14; Oct. 2009, p.1].

"It strikes to the fundamental problem the jail has, and that's a lack of professionalism," said Houston NAACP chapter head Fred Cooper. "The details of the complaints clearly show there's a lack of discipline" and a "gross misappropriation of authority," he stated.

One such incident occurred in May 2010 when Harris County jail guard Nikolaus Laliotitis, 34, pulled prisoner Herman Young, 68, who was terminally ill, off a gurney. He then punched him in the stomach and dragged him across the floor. Young died the next day. His death was listed as being due to natural causes, but his family wasn't informed of the abuse by Laliotitis.

"They never told us nothing about it, and I was his next of kin," said Young's niece, Kim Young. "All they told me was that he took sick. I'm very shocked nobody ever told me."

A Sheriff's Office spokesman said prisoners' families are only informed about incidents of violence at the jail if they result in a prisoner's death, and apparently it wasn't clear whether Laliotitis' actions had caused Young's death.

Laliotitis resigned, was later indicted and pleaded guilty to misdemeanor official oppression. He received a sentence of one day in jail plus a $1,000 fine. A jail sergeant who investigated the incident was suspended for three days without pay for failing to conduct a thorough investigation. Young's family filed a wrongful death suit against the Harris County Sheriff's Office in May 2012.

Another incident of employee misconduct involved jailer Martha L. Anderson, who was suspended for ten days after she made a cellblock of 24 women prisoners stand naked for half an hour during a strip search in July 2010, because none would admit to having left a used sanitary napkin in the shower. She made the prisoners show her their sanitary napkins during the search.

More recently, Sheriff Garcia announced in October 2012 that six jail employees had been fired, including a supervisor, while a deputy resigned and another supervisor retired in connection with a sex scandal involving "numerous" female prisoners. "This kind of conduct has always been wrong," Garcia stated. "I will not hesitate to punish those few employees who break the law or egregiously violate the rules." One of the fired deputies, Tony Richards, was indicted on a charge of improper sexual activity with a person in custody, arrested and released on $2,000 bond.

The investigation into sexual misconduct involving jail employees began after a female prisoner was found with a pair of contraband tennis shoes.

And on November 7, 2012, the *Houston Chronicle* reported that two Harris County deputies and a jailer had been terminated for failing to help a mentally-ill prisoner who was left bleeding in a cell.

Norman Ford Hicks, Sr., 72, died due to a heart attack on January 22, 2011. Six days earlier he had been punched in face by jail guard Christopher S. Pool, 25, after Hicks caused a disturbance and then defecated and urinated on the floor. The punch apparently broke Hicks' nose and caused him to fall and hit his head on a bench. Pool was fired but not criminally charged; deputy Joseph P. Jameson and guard Christopher L. Taylor were also fired, for failing to provide aid to Hicks and failing to report the incident. All three are appealing their job terminations.

Sources: *Houston Chronicle, www.mytexasdefenselawyer.com, www.houston.cbslocal.com*

## LAWSUIT TO REFORM NEW YORK'S PUBLIC DEFENSE SYSTEM

Were you convicted in ONONDAGA, ONTARIO, SUFFOLK, SCHUYLER or WASHINGTON counties since 2007 and represented by a court-appointed attorney?

If your lawyer missed hearings, didn't visit you in jail, or didn't return your calls –
If you were asked to pay for a lawyer when you couldn't afford one –
If your lawyer did not fight for you in court –

**We want to hear from you.**

For information, call or write:
Kristie Blase | Schulte Roth & Zabel LLP | 919 Third Avenue | NY, NY 10022 | 212.705.1900
Noah Breslau | NYCLU | 125 Broad St, 19th Floor | NY, NY 10004 | 212.607.3381

*The New York Civil Liberties Union and the law firm Schulte Roth & Zabel have a class-action lawsuit to improve public defense in New York State. The lawsuit does NOT seek any money or damages and we do NOT represent people in their individual criminal cases or appeals.*


NYCLU

PLN_0000859

# How Privatization Destroyed an Illinois Jail's Award-winning Suicide Prevention Program

*by Brian Dolinar*

SEVERAL YEARS AGO, WHILE WORKING at our local Books to Prisoners, I met a volunteer who was formerly a mental health counselor in the local jail in Champaign County, Illinois. This was just after there had been three jail suicides within a six-month period in 2004. She recalled a time when she worked with the "Crisis Team," a nationally-recognized mental health program which for 20 years prevented any suicides at the jail. In response to the three suicides, Sheriff Dan Walsh outsourced mental health services to Health Professionals Ltd. (HPL), a private company based in Peoria, Illinois. Yet this has not stopped suicides and other deaths at the jail.

There is a current debate in Champaign County, where the twin cities of Champaign-Urbana are home to the University of Illinois, about whether to allocate millions of dollars toward a new jail. Sheriff Walsh has frequently cited the large percentage of those with mental illness (as much as 20 percent of the daily population) and argued for the need to expand the jail's mental health facilities. More than just bricks and mortar, this issue demands that we look into quality of services provided by the private company HPL. We have something to learn from looking back at the Crisis Team, a local success story of how we can effectively treat prisoners with mental illness.

## Worth Their Weight in Gold

IN AUGUST 1980, THE DOWNTOWN JAIL opened on the north side of Main Street in Urbana, replacing an antiquated facility from the 1890s. Within the first 18 months after the new jail opened, there were three prisoner suicides. Then superintendent of the jail, Captain David Madigan, lobbied the county board to approve a 1983 contract with the Mental Health Center of Champaign County to form what would become known as the "Crisis Team."

The Crisis Team was so successful that it was featured as "A Model Suicide Prevention Program" in a 1990 newsletter out of Mansfield, Massachusetts. According to the article, the responsibilities of the Champaign County jail were taken over in 1985 by Captain Gary Turner, who formally outlined a program for the Crisis Team. "A correctional officer must be more caring," Turner said, "almost displaying a social work approach to the job."

David Madigan, who was elected sheriff in December 1990, said that such mental health programs were "worth their weight in gold," providing important services but also saving taxpayers millions in potential lawsuits.

I was recently able to track down the woman who first told me about the Crisis Team, Heidi Reible, who worked at the jail from 1992 to 2002. According to Reible, they had a "stellar" program. During the time she was at the jail there were no successful suicide attempts. In April 2000, Reible was presented an award by U.S. Attorney General Janet Reno for her work.

## New Sheriff in Town

IN 2002, LOCAL ATTORNEY AND FORMER Urbana police officer Dan Walsh, a Republican, won an uncontested race for sheriff, replacing Madigan, who had retired. In 2004, three prisoners committed suicide at the jail – Joseph Beavers, Marcus Edwards and Terrell Layfield. In response, Sheriff Walsh put out a request for proposals (RFP) to expand the jail's mental health services. In 2005, he abandoned the not-for-profit Mental Health Center in favor of a private company, Health Professionals Ltd., a company that was already providing medical services at the jail. HPL offered 3.5 positions at a cost of $225,000 per year. The Mental Health Center had made two proposals for even more staff, but the sheriff chose HPL because they were cheaper.

Despite the change in providers there have still been several deaths at the jail. In 2006, Quentin Larry died after ingesting a bag of cocaine. In 2007, Janet Hahn died due to a diabetic emergency. In 2009, Todd Kelly was on suicide watch but managed to hang himself. In 2011, Jesse Masengale committed suicide the night after he was given a 30-year sentence.

Meanwhile, Sheriff Walsh quietly cut back the staffing hours for mental health services after the recent economic downturn. Currently, the contract includes 84 hours of mental health counseling – a significant rollback from the original contract which provided for 140 hours.

## Jail Industrial Complex

HOW WERE CONDITIONS IN THE JAIL FOR those with mental illness allowed to deteriorate in such a short time? There was a convergence of several factors – mass incarceration, a shrinking safety net and the emergence of a private corrections industry – that led to the current crisis at the Champaign County jail.

In the last three decades we have seen the rise of mass incarceration, with some 2.2 million people locked up in the United States. Locally, the daily population in the Champaign County jail went from 115 in 1985 to 158 in 1989. This growing demand led to the construction of a second jail which was built in 1996. The population continued to grow so that in 2005 there were 325 people held in both the downtown and satellite jails.

These were also the years when we saw an erosion of the social safety net – the restructuring of public housing, cuts to public health and welfare reform/deform. There was the shuttering of two mental health facilities in central Illinois, leaving only the McFarland Mental Health Center in Springfield, which has 118 beds, for the entire region.

The term "prison industrial complex" captures the nexus of publicly-funded prisons and private companies that are profiting from the current prison boom. The increasing number of privately-run prisons has gained much attention. Yet most county jails are still publicly operated. Lesser known are the many jail services which have been privatized, what might be called the "jail industrial complex." At the Champaign County jail, Aramark has a contract for food and laundry services, and Evercom [Securus] provides the phone system.

There are several motivations for outsourcing jail services. For example, private companies claim they can free public bodies of legal responsibility. Nevertheless, the sheriff has still been sued. In the case of Quentin Larry, it cost $57,710 in attorney fees to fight the case, which ended in an

out-of-court settlement of $40,000. While there has been no settlement in the Janet Hahn case, it cost $132,993 to litigate. The bulk of these expenses went to the Urbana law firm of Heyl, Royster, Voelker & Allen, which currently charges $185 an hour. The belief that privatization saves money may not, in the end, prove to be true.

HPL's founder and chief physician, Dr. Stephen A. Cullinan, has had some 30 lawsuits filed against him in Illinois alone, plus HPL has faced litigation in other states. [See, e.g.: *PLN*, July 2013, p.24]. In March 2013, Cullinan, who recently retired, received a 60-day suspension of his medical license in a case involving a man who died from a bleeding ulcer in the Sangamon County jail. He previously had been fined or reprimanded in three other cases from 2009 to 2012 in both Illinois and Michigan.

HPL is a good example of the rapidly expanding private corrections industry. Founded in 1995, today HPL has contracts with more than 100 jails and prisons. In 2007, HPL was purchased by Correctional Healthcare Companies (CHC). According to the firm's website, two of CHC's top executives, Don Houston and Wendy Dunegan, came from The GEO Group, one of the largest private prison corporations in the world.

In December 2012, CHC was subsumed by GTCR, a multi-billion dollar private equity firm in Chicago. Today, mass incarceration is big business.

#### You Get What You Pay For

IT APPEARS THERE'S A GROWING CONSENSUS in Champaign County that mental health services should not be outsourced. I spoke with Diane Zell, president of the local chapter of the National Alliance on Mental Illness (NAMI). "We need to return to local pro-

viders at our jails," she said. "We need people who are likely to have contact with those who end up in the jail." Zell believes we must find funding. "You get what you pay for," she stated. "Doing something because it's cheaper is the worst reason to do something."

There is recent good news. On May 22, 2013, the Champaign County Mental Health Board passed a resolution to extend more services to those who get caught up in the criminal justice system. Two job positions have been posted and a drop-off center has opened.

Dr. Deloris Henry, President of the Champaign County Mental Health Board, spoke optimistically: "It's going to really be a nice start. It's not the panacea of all the needs we have but it's a step in the right direction." ◪

*Brian Dolinar is an independent media journalist based in Urbana-Champaign, Illinois. This article was crowdfunded by contributions from nine individuals totaling $425. A longer version is posted at www.ucimc.org, where it was first published.*

## Missouri: Arrestees Billed for Cost of Police Tasers

### by Christopher Zoukis

POLICE OFFICERS IN ST. JOSEPH, MISSOURI have successfully recouped payments from defendants for the cost of "tasing" them during an arrest. It costs $24.99 for a Taser cartridge and about $1.05 in battery use each time an officer tases a suspect, according to the police department's Taser instructor, Brendan McGinnis.

Between March and December 2012, the department sought restitution in 64 cases where Tasers were used, representing approximately $2,000 in costs and resulting in payments totaling about $700. Within the first five months of 2013, 28 Taser deployments resulted in another $790 in restitution being requested by prosecutors, who petition the courts to impose the sanction. A state law allows police departments to recover general arrest costs, said McGinnis.

While there have been numerous civil actions alleging wrongful deaths related to Taser use by law enforcement officers [see, e.g.: *PLN*, Feb. 2013, p.46; Jan. 2012,

p.42; Oct. 2011, p.40], McGinnis sees no conflict in viewing Taser deployments in the same light as DWI cases, in which restitution for police expenditures also has been sought.

"We're spending about $4,000 a year for Taser usage, a cost we will never recover," he noted. "The department makes no money, it just replenishes the cost that we use." McGinnis said that seeking restitution from suspects who are tased is the fairest way to recover the costs, instead of passing the bill on to taxpayers.

According to Amnesty International, over 500 deaths were associated with Tasers in the United States from 2001 to 2011 alone. [See: *PLN*, April 2012, p.26]. Presumably, it is only a matter of time before the St. Joseph police department starts charging suspects for the cost of the bullets used in police shootings. ◪

Sources: *www.newspressnow.com, http://crammlawfirm.com*

| **Webster's Spanish/English Dictionary** | **Reading Glasses with Metal Frame:** |
|---|---|
| It's a quick and easy language reference for avid readers. Provides English and Spanish abbreviations with a clear and easy-to-read typeface. Contains valuable pronunciation tables and guides. 194 pages. Published by Kappa Books, 2011 edition. $5.99 ea. (or 13 Forever stamps) FREE SHIPPING U.S. Territories. | Full-size lens, spring template, soft-coated nose pads for better fit and comfort, full frame. Use: Good for everyday use. Material: Steel frame & templated and glass lens. Unisex. Color: Gold-finish frame / Black temple covers. Length: 2.1/8" each lens. Width: 1.5/16" each lens. Magnifications available: 1.0x, 1.25x, 1.5x, 1.75x, 2.0x, 2.25x, 2.5x, 2.75x, 3.0x, 3.25x, 3.5x, 3.75x, 4.0x. $7.95 for 3 pairs assorted (or 17 Forever stamps). **For complete BROCHURE send 2 forever stamps or get it free with order** FREE SHIPPING U.S. Territories. |

ORDER TO: MARA WORLDWIDE, 116 W. CALIFORNIA BLVD. STE. 424-P, PASADENA, CA 91105

# EXECUTIVE CLEMENCY

**For Info. On Sentence Reduction through Executive Clemency:**

**NATIONAL CLEMENCY PROJECT**
**3907 N. Federal Highway, # 151**
**Pompano Beach, FL 33064**
**954-271-2304**



**(35-Years of Clemency & Parole Assistance)**
**(Transfers Under The Int'l Prisoner Treaty)**

PLN_0000861

# High-Tech, High-Risk Forensics

## by Prof. Osagie K. Obasogie

When the police arrived last November at the ransacked mansion of the millionaire investor Raveesh Kumra, outside of San Jose, California, they found Mr. Kumra had been blindfolded, tied and gagged. The robbers took cash, rare coins and ultimately Mr. Kumra's life; he died at the scene, suffocated by the packaging tape used to stifle his screams. A forensics team found DNA on his fingernails that belonged to an unknown person, presumably one of the assailants. The sample was put into a DNA database and turned up a "hit" – a local man by the name of Lukis Anderson.

Bingo. Mr. Anderson was arrested and charged with murder.

There was one small problem: the 26-year-old Mr. Anderson couldn't have been the culprit. During the night in question, he was at the Santa Clara Valley Medical Center, suffering from severe intoxication.

Yet he spent more than five months in jail with a possible death sentence hanging over his head. Once presented with Mr. Anderson's hospital records, prosecutors struggled to figure out how an innocent man's DNA could have ended up on a murder victim.

Late last month, prosecutors announced what they believe to be the answer: the paramedics who transported Mr. Anderson to the hospital were the very same individuals who responded to the crime scene at the mansion a few hours later. Prosecutors now conclude that at some point, Mr. Anderson's DNA must have been accidentally transferred to Mr. Kumra's body – likely by way of the paramedics' clothing or equipment.

This theory of transference is still under investigation. Nevertheless, the certainty with which prosecutors charged Mr. Anderson with murder highlights the very real injustices that can occur when we place too much faith in DNA forensic technologies.

In the end, Mr. Anderson was lucky. His alibi was rock solid; prosecutors were forced to concede that there must have been some other explanation. It's hard to believe that, out of the growing number of convictions based largely or exclusively on DNA evidence, there haven't been any similar mistakes.

In one famous case of crime scene contamination, German police searched for around 15 years for a serial killer they called the "Phantom of Heilbronn" – an unknown female linked by traces of DNA to six murders across Germany and Austria. In 2009, the police found their "suspect": a worker at a factory that produced the cotton swabs police used in their investigations had been accidentally contaminating them with her own DNA.

Contamination is not the only way DNA forensics can lead to injustice. Consider the frequent claim that it is highly unlikely, if not impossible, for two DNA profiles to match by coincidence. A 2005 audit of Arizona's DNA database showed that, out of some 65,000 profiles, nearly 150 pairs matched at a level typically considered high enough to identify and prosecute suspects. Yet these profiles were clearly from different people.

There are also problems with the way DNA evidence is interpreted and reported to juries. In 2008, John Puckett – a California man in his 70s with a sexual assault record – was accused of a 1972 killing, after a trawl of the state database partially linked his DNA to crime scene evidence. As in the Anderson case, Mr. Puckett was identified and implicated primarily by this evidence. Jurors – told that there was only a one-in-1.1 million chance that this DNA match was pure coincidence – convicted him. He is now serving a life sentence.

But that one-in-1.1 million figure is misleading, according to two different expert committees, one convened by the FBI, the other by the National Research Council. It reflects the chance of a coincidental match in relation to the size of the general population (assuming that the suspect is the only one examined and is not related to the real culprit). Instead of the general population, we should be looking at only the number of profiles in the DNA database. Taking the size of the database into account in Mr. Puckett's case (and, again, assuming the real culprit's profile is not in the database) would have led to a dramatic change in the estimate, to one in three.

One juror was asked whether this figure would have affected the jury's deliberations.

"Of course it would have changed things," he told reporters. "It would have changed a lot of things."

DNA forensics is an invaluable tool for law enforcement. But it is most useful when it corroborates other evidence pointing to a suspect, or when used to determine whether any two individual samples match, like in the exonerations pursued by the Innocence Project.

But when the government gets into the business of warehousing millions of DNA profiles to seek "cold hits" as the primary basis for prosecutions, much more oversight by and accountability to the public is warranted. For far too long, we have allowed the myth of DNA infallibility to chip away at our skepticism of government's prosecutorial power, undoubtedly leading to untold injustices.

In the Anderson case, thankfully, prosecutors acknowledged the obvious: their suspect could not have been in two places at once. But he was dangerously close to being on his way to death row because of that speck of DNA. That one piece of evidence – obtained from a technology with known limitations, and susceptible to human error and prosecutorial misuse – might mistakenly lead to execution at the hands of the state should send chills down every one of our spines. The next Lukis Anderson could be you. Better hope your alibi is as well documented as his. ◼

*Osagie K. Obasogie, a professor of law at the University of California, Hastings, and a senior fellow at the Center for Genetics and Society, is the author of the forthcoming book "Blinded by Sight: Seeing Race Through the Eyes of the Blind." This article was originally published in the New York Times on July 24, 2013; it is reprinted with permission of the author. For more on the shortcomings of DNA evidence, see: PLN, Aug. 2013, p.40; Oct. 2010, p.1 and Jan. 2009, p.24.*

**Roget's Thesaurus**

Can't think of the right word? Let Roget's help you! Over 11,000 words listed alphabetically. See page 61 for more information.

# WELCOME TO KRASNYA BABES & KRASNYA STUDS WORLD

TENS OF THOUSANDS OF THE HOTTEST AND MOST SCANDALOUS BABES&DUDES FOUND ON THE PLANET.
EACH CATALOG PAGE HAS 120 BEAUTIFUL GIRLS OR BOYS POSING JUST FOR YOU!
ORDER ONE CATALOG PAGE FOR ONLY $4.50 OR FOR 10 U.S. FOREVER STAMPS WITH AN SASE ENCLOSED.
WE WILL SEND YOU VOLUME ONE.  EACH ADDITIONAL VOLUME THE SAME PRICE!

## HELP US TO HELP YOU!
WE ARE MORE THAN HAPPY TO ANSWER E-MAIL INQUIRES HOWEVER, DUE TO MAILING COST AT $0.46 CENTS
A LETTER, PLEASE ENCLOSE AN SASE WITH YOUR QUESTIONS, OTHERWISE NO REPLIES!

## WHAT ABOUT OUR PRICES AND POLICIES
COLOR PRINTS ON  4x6 GLOSSY PHOTO PAPER AS LOW AS $0.35 CENTS PER PRINT ON ORDERS OVER 500
SHIPPED ACCORDING TO POLICY: 25 PICTURES PER ENVELOPE EVERY 24 HOURS. S&H $2.00 PER ENVELOPE.

## METHOD OF PAYMENT/CONTACT INFORMATION
U.S. POSTAL SERVICE MONEY ORDERS-STATE & FEDERAL CORRECTIONAL INSTITUTIONAL CHECKS
PAYABLE ONLY TO: KRASNYA L.L.C.
EQUATION FOR FIRST CLASS U.S. FOREVER STAMPS
BRAND NEW FLAT BOOK FOR ALL ORDERS AT THE RATE OF $6.00 PER FLAT BOOK.
WE RESPOND TO OUR CLIENTS NEEDS AND TRY TO HELP THE BEST WE CAN.
OUR SEASONAL SPECIALS MEAN A KICKOFF OF SAVINGS!!

### COLOR CATALOG DISCOUNT SALE
ONE COLOR CATALOG OF 120 BABES
IN CLASSIC OR NUDE LINES $4.50
PLEASE INCLUDE
A SELF-ADDRESSED STAMPED
(2-FIRST CLASS STAMPED) ENVELOPE.
QUANTITY BUYS:

5-14 CATALOGS =10% OFF OUR REGULAR PRICE
15 CATALOGS =15% OFF OUR REGULAR PRICE
20 CATALOGS =20% OFF OUR REGULAR PRICE
25 CATALOGS =25% OFF OUR REGULAR PRICE
30 CATALOGS =30% OFF OUR REGULAR PRICE
35 CATALOGS =35% OFF OUR REGULAR PRICE
40 CATALOGS =40% OFF OUR REGULAR PRICE
45 CATALOGS =45% OFF OUR REGULAR PRICE
50 CATALOGS =50% OFF OUR REGULAR PRICE
BE SURE TO SPECIFY CLASSIC OR NUDE BABES!

130 VOL. OF KRASNYA BABES CLASSIC LINE
130 VOLUMES OF KRASNYA BABES NUDE LINE

### LOOSE STAMPS FOR LOOSE BABES
KRASNYA LOOSE STAMP GRAB BAG SPECIAL
10 LOOSE BABES.................................30 STAMPS
25 LOOSE BABES.................................75 STAMPS
50 LOOSE BABES...............................150 STAMPS
ALL STAMPS MUST BE 1ST CLASS STAMPS
IN LIKE NEW CONDITION!
SPECIFY NUDE OR BOP-SAFE (NO VISIBLE NUDITY)
WE WILL PICK SELECTION FOR YOU

### KRASNYA BABES HAS SPRUNG SALE!
FREE SAMPLE CATALOG FROM KRASNYA!
120 BABES IN EACH CATALOG
ENCLOSE ONE SASE WITH TWO FIRST
CLASS STAMPS! 1 CAT PER CUSTOMER
PLEASE SPECIFY MALE OR FEMALE BABES
NUDE OR BOP-FRIENDLY

### $24.95  S&H FREE
FOR GRAB BAG OF
50 PHOTOS
FROM ALL OUR CATALOGS
SPECIFY RACE AND MAIN
AREA OF YOUR INTERESTS
WE WILL PICK SELECTION
FOR YOU
BONUS ONE COLOR
CATALOG PAGE

### 3 BRAND NEW FLAT BOOKS OF FOREVER
STAMPS FOR GRAB BAG OF 45 PHOTOS
FROM ALL OUR CATALOGS. SPECIFY RACE
AND MAIN AREA OF YOUR INTERESTS
WE WILL PICK SELECTION FOR YOU
BONUS B&W CATALOG PAGE
PLEASE INCLUDE 6 FOREVER STAMPS WITH
YOUR ORDER FOR S&H

### KRASNYA L.L.C.
P.O.BOX 32082
BALTIMORE, MD 21282
EMAIL AND CORLIMNS REQUESTS ACCEPTED AT:
KRASNYABABES@HOTMAIL.COM

### KRASNYA  CALENDAR MAGAZINE
THE CONNOISSEUR'S PORTFOLIO OF EXOTIC BEAUTIES

KRASNYA CALENDAR SAMPLER MAGAZINE
DEBUT BABES OR STUDS ISSUE AVAILABLE
PLEASE SPECIFY BOP-FRIENDLY OR NUDE
*** 2013 & 2014 ***
YOU'LL RECEIVE OVER 48 BEAUTIES FROM OUR
FINEST COLLECTION ALL CAPTURED IN VIVID
APROX. 4X6 IMAGES DISPLAYING ALL THERE
ENCHANTING RADIANCE
SPECTACULAR VALUE IS OUR GOAL!
OVER $25.00 WORTH OF BABES IN EACH CALENDAR
CALENDAR SAMPLER MAGAZINE
WE DELIVER EXELLENT VALUE
WHERE OUR COMPETITION WON'T!!!
THE BASIC CALENDAR WITH 48 NOT SO BASIC
BABES OR STUDS ISSUE AVAILABLE
THROUGHOUT THE YEAR!
$11.95 or 2 FLAT BOOKS OF FOREVER STAMPS
ALL ORDERS ARE FINAL!!!

PLEASE BE SURE TO KNOW
YOUR INSTITUTION POLICIES
ANY RETURNS WILL BE HELD FOR 30 DAYS.
CALENDAR REQUIRES SASE
WITH 5 FIRST CLASS POSTAGE STAMPS
IN 8X11 MANILLA ENVELOPE
SEND YOUR ORDERS TODAY

KRASNYA IS PROUD TO INTRODUCE AT FANTASTIC INTRODUCTORY PRICES
THE CONNOISSEUR'S COUTURE "CACHE TWO-FIVE COLLECTION"
OF INTERNATIONAL ADULT FILM STARS
TWELVE PACKAGES OF 25 NUDE AND NON-NUDE POSES,
AVAILABLE ONLY IN OUR "CACHE TWO-FIVE" COLLECTION.
"CACHE TWO-FIVE"
"CACHE TWO-FIVE"  IS AVAILABLE IN TWELVE (12) SPECIALLY PRICED PACKAGES
OF 25 POSES IN NUDE AND NON-NUDE POSES.
PLEASE SPECIFY ON YOUR ORDERS IF YOU WANT NUDE OR NON-NUDE PACKAGES
AND WHAT COLLECTION NUMBER YOU'D LIKE.
COLLECTIONS ARE NUMBERED 01-12 FOR EXAMPLE ON YOUR ORDER YOU'D WRITE:
***NUDE CACHE TWO-FIVE PACKAGE 01 & 02***
REMEMBER THERE ARE TWELVE (12) COMPLETELY DIFFERENT PACKAGES OF 25 BABES,
THERE ARE NO DUPLICATES IN ANY OF THE 12 PACKAGES.
600 BEGUILING BEAUTIES, ALL BRAND NEW ADDITIONS TO OUR LINE AND AVAILABLE ONLY
IN OUR CACHE "TWO-FIVE" PACKAGES! 300 NUDES AND 300 NON-NUDE BEAUTIES
CAPTURE YOUR OWN COLLECTION OF KRASNYA'S "CACHE TWO-FIVE" SELECTIONS IN
INDIVIDUALIZED PACKAGING OF 25 RARE AND EXQUISITE BREATH-TAKING BEAUTIES.
THE CONNOISSEUR'S COUTURE COLLECTION OF "CACHE TWO-FIVE" BRINGS YOU
25 BEAUTIES IN EACH "CACHE TWO-FIVE" PACKAGE FOR ONLY $12.95 PER PACKAGE
LIMITED TIME SPECIAL ***** $59.95*****
PLUS S&H FOR 6 "CACHE TWO-FIVE" PACKAGES OF THE NUDE OR NON-NUDE COLLECTIONS
150 BEAUTIES
IMAGINE 150 OF THESE EXCITING AND EXQUISITE BEAUTIES
FOR A RIDICULOUSLY LOW PRICE OF
*****$59.95***** PLUS $12.00 SHIPPING AND HANDLING CHARGE.
ADD $2.00 FOR SHIPPING AND HANDLING PER "CACHE TWO-FIVE" PACKAGE ORDERED.
YOU MUST SPECIFY NUDE OR NON-NUDE PACKAGES
IF NOT SPECIFIED NON-NUDE WILL BE SHIPPED AUTOMATICALLY
ALL OF OUR NORMAL POLICIES APPLY

### FOR KRASNYA CLIENTS WHO WORK THE YARDS;
HAVE WE GOT A GREAT OPPORTUNITY FOR YOU...GRAB BAG
MR. HUSTLE GRAB BAG BARGAIN DAY$
ONLY $0.25 CENTS PER BABE
5 GRAB BAG MINIMUM PURCHASE REQUIRED
$2.00 SHIPPING AND HANDLING PER BAG
25 AWESOME BABES PER BAG AT ONLY $6.25 PER BAG
YOU MUST BUY AT LEAST 5 GRAB BAGS OR 50 GRAB BAGS.
THIS***GRAB BAG BARGAIN*** IS NOT GOING TO BE OFFERED
AGAIN THIS YEAR.      SO STOCK UP NOW!
AS YOU KNOW YOU GET AN ARRAY OF 25 GORGEOUS BABES
YOU CAN ONLY CHOOSE EITHER MALES OR FEMALES,
ALL NUDES OR BOP SAFE...THE INDIVIDUAL SELECTIONS COME
FROM OUR BEST CATALOGS!!!
YOU MAY WANT TO SIT DOWN FOR THIS BONUS BARGAIN!
OUR BABES CATALOGS SPECIAL OF THE DECADE
—— 5 COLOR CATALOGS FOR  $6.00 ——
—— 10 COLOR CATALOGS FOR  $12.00 ——
—— 15 COLOR CATALOGS FOR  $18.00 ——
—— 20 COLOR CATALOGS FOR  $24.00 ——
OUR CATALOGS SPECIAL AVAILABLE WHEN YOU PURCHASE
THE 5 GRAB BAG MINIMUM!
THIS PRICE INCLUDES FREE SHIPPING ON THE CATALOGS
BECAUSE OF SHIPPING TERMS ALL CATALOGS SOLD IN
MULTIPLES OF 5 FOR $6.00 ONLY.
YOU CHOOSE EITHER MALE OR FEMALE CATALOGS
AND IF YOU WANT NUDE OR BOP SAFE!!

PLN_0000863

# The Americans with Disabilities Act and Prisoners

## by Thomas Weiss

THE LANGUAGE OF TITLE II OF THE Americans with Disabilities Act (ADA) is succinct: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

In *Pennsylvania DOC v. Yeskey*, 524 U.S. 206 (1998) [*PLN*, Sept. 1998, p.1], the Supreme Court held that the ADA applies to people in prison. Title II of the ADA defines "public entity" to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). In *Yeskey*, Justice Scalia wrote, "The text of the ADA provides no basis for distinguishing these programs, services, and activities from those provided by public entities that are not prisons." Thus, Title II of the ADA extends to prisoners.

### DOJ Investigates Pennsylvania Prison

ON MAY 31, 2013, THE U.S. DEPARTMENT of Justice (DOJ) issued a findings letter that detailed the results of an investigation into the use of solitary confinement on prisoners with serious mental illnesses at the State Correctional Institution at Cresson in Cambria County, Pennsylvania. The Justice Department found that Cresson's use of long-term and other forms of solitary confinement on prisoners with serious forms of mental illness, a number of whom also experience intellectual disabilities, violates their rights under the ADA as well as the Eighth Amendment. The investigation determined that Cresson consistently locked prisoners with serious mental illnesses in their cells for 22-23 hours a day for months or years, denied them basic necessities, and subjected them to harsh and punitive conditions including excessive use of force.

The DOJ concluded that Cresson's misuse of solitary confinement on prisoners with serious mental illnesses led to serious harms that included mental decompensation, clinical depression, self-mutilation, psychosis and suicide.

Cresson was also found to rely on solitary confinement as a means of warehousing prisoners with serious mental illnesses due to deficiencies related to the prison's mental health services. Such systemic deficiencies included a fragmented and disorganized mental health program, marginalization of mental health staff members, disciplinary procedures that resulted in punishment of disability-related behaviors and placement of psychotic prisoners in solitary confinement. Further, Cresson's oversight system did not analyze suicides or other crucial information.

Roy Austin, Deputy Assistant Attorney General for the DOJ's Civil Rights Division, stated, "We found that Cresson often permitted its prisoners with serious mental illness or intellectual disabilities to simply languish, decompensate, and harm themselves in solitary confinement for months or years on end under harsh conditions in violation of the Constitution. These practices have serious public safety consequences because many of these individuals are [eventually] returned to the community."

The Justice Department began its investigation in December 2011 under the Civil Rights of Institutionalized Persons Act (CRIPA), which prohibits a practice or pattern of deprivation of constitutional rights of individuals who are confined in state or local government-run correctional facilities. The investigation also involved findings under the ADA and provided information to the department that justified an expanded inquiry under both CRIPA and the ADA.

### The Supreme Court and *Tennessee v. Lane*

FOLLOWING THE SUPREME COURT'S decision in *Tennessee v. Lane*, 541 U.S. 509 (2004) [*PLN*, Sept. 2004, p.26], the court system was forced to examine the application of Title II of the ADA to prisoners with disabilities who face discrimination in state-run prisons. Title II regulates public services by requiring reasonable modifications be made for people with disabilities, and permits private lawsuits seeking monetary damages to be brought against states not in compliance with the ADA. Title II also provides recourse for state and local prisoners with disabilities (the ADA does not apply to federal executive branch agencies, including the Bureau of Prisons, but

section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), applies to such agencies).

In *Tennessee v. Lane*, the Supreme Court's holding was limited to the application of Title II to cases that implicated "the fundamental right of access to the courts," which it considered a valid exercise of the Fourteenth Amendment's section 5 enforcement power. Section 5 gives Congress the authority to enforce the amendment through appropriate legislation. The Supreme Court also held that a state's Eleventh Amendment immunity from suits involving monetary damages brought by citizens in federal court could be abrogated by section 5. That holding was based upon Congress' constitutional authority to provide access to the courts under the Fourteenth Amendment's due process clause. The Court declined to consider application of Title II beyond access to the courts, which was the issue raised in *Tennessee v. Lane*.

### The ADA and Discrimination

THE ADA BROADLY DEFINES THE TERM "disability" to cover people faced with a number of different forms of discrimination. Generally, the ADA bars public entities from denying services to people with disabilities or failing to provide services such as those offered to others who are not disabled. Each of the ADA's five titles targets specific areas in which people with disabilities face discrimination.

Title II of the ADA is the one under which a prisoner would file suit to address discrimination against a qualified individual with a disability by a public entity. Title II, as applied to discrimination against prisoners with disabilities, has been a congruent and proportional response to actual and threatened constitutional violations. The Supreme Court's holding in *Tennessee v. Lane* that Title II is unquestionably valid, "as it applies to the class of cases implicating the accessibility of judicial services," was profound. It demonstrated that prisons must be accessible for prisoners with disabilities.

Title II of the ADA provides that state and local governments:

• May provide special benefits, beyond those required by the regulation, to individuals with disabilities.

PLN_0000864

• May not refuse to allow a person with a disability to participate in a service, program or activity simply because the person has a disability.

• Must provide programs and services in an integrated setting, unless separate or different measures are necessary to ensure equal opportunity.

• Shall operate their programs so that, when viewed in their entirety, they are readily accessible to and usable by individuals with disabilities.

• Must furnish auxiliary aids and services when necessary to ensure effective communication, unless an undue burden or fundamental alteration would result.

• Are required to make reasonable modifications in policies, practices and procedures that deny equal access to individuals with disabilities, unless a fundamental alteration in the program would result.

• Must eliminate unnecessary eligibility standards or rules that deny individuals with disabilities an equal opportunity to enjoy services, programs or activities unless "necessary" for the provisions of the service, program or activity.

• May not place special charges on individuals with disabilities to cover the costs of measures necessary to ensure nondiscriminatory treatment, such as making modifications required to provide program accessibility or providing qualified interpreters.

The question then becomes one of who is considered to be a "qualified individual with a disability" under Title II, as far as prisoners are concerned. Pursuant to the ADA, an "individual with a disability" is a person who: 1) has a physical or mental impairment that substantially limits a "major life activity," 2) has a record of such an impairment, or 3) is regarded as having such an impairment.

What constitutes a "major life activity"? A major life activity includes functions such as performing manual tasks, walking, seeing, speaking, hearing, learning, breathing, working or caring for oneself. A "qualified" individual with a disability is a person who meets the essential eligibility requirements for a program or activity offered by a public entity, irrespective of their disability.

State and local governments are required to ensure that prisoners with disabilities are not excluded from services, programs and activities because prison buildings are not accessible. They are not required to remove physical barriers such as stairs in all existing buildings so long as they make programs and services accessible to prisoners who are unable to use an inaccessible existing facility. State and local governments can provide services, programs and activities to prisoners with disabilities through alternative means or methods if physical barriers are not removed.

State and local governments are not required to take any actions that would result in fundamental alterations in the nature of services, programs or activities, or in undue financial or administrative burdens. Public entities must, however, take other available actions that would not result in a fundamental alteration or undue burden but would ensure that prisoners with disabilities receive access to services, programs or activities.

While compensatory damages are available in ADA suits, the Supreme Court has held that punitive damages may not be awarded for violations of the ADA and Rehabilitation Act, overturning a $1.2 million punitive damages award in favor of a wheelchair-bound arrestee who was injured while being transported to a police station.





PLN_0000865

See: *Barnes v. Gorman*, 536 U.S. 181 (2002) [*PLN*, Oct. 2002, p.12].

## Private Prisons and the ADA

PRISONERS HELD IN FACILITIES OPERATED by the government have been able to file lawsuits under the ADA arguing that they were discriminated against based on their disabilities in terms of participation in programs provided by a public entity. However, at least one federal appeals court has held that due to the explicit language of the ADA, it does not apply to privately-operated prisons. That case, *Edison v. Douberly*, 604 F.3d 1307 (11th Cir. 2010), *rehearing denied*, involved a legally blind Florida prisoner held in a privately-operated facility who sued three employees of the company, seeking relief and damages for disability discrimination under Title II of the ADA.

The Eleventh Circuit held the private prison corporation was not a public entity merely because it had entered into a contract with a public entity to provide services. An instrumentality of the state is a government unit or unit created by a government unit; as such, no Title II ADA claim was applicable. Relevant decisions by other courts have supported the same conclusion: the ADA does not apply to private prisons.

However, the *Jailhouse Lawyer's Manual*, published by Columbia Law School, suggests that private prisons can still be sued under the ADA based on DOJ regulations that state Title II extends "to prisons operated by public entities directly or through contractual or other relationships." 28 CFR 35.152(a). Alternatively, private prisons could be sued under Title III of the ADA to the extent that they provide "public accommodations" (although only injunctive relief is available under Title III, not monetary damages).

## Conclusion

THERE IS CURRENTLY MUCH DISCUSSION about ratifying the Convention on the Rights of Persons with Disabilities, an international convention to which the U.S. is a signatory. One has to wonder what ratification of this Convention would mean for prisoners in America. Article 13 of the Convention says that States Parties "shall ensure effective access to justice for persons with disabilities on an equal basis with others, including through the provision of procedural and age-appropriate accommodations, in order to facilitate their effective role as direct and indirect participants, including as witnesses, in all legal proceedings, including at investigative and other preliminary stages."

Article 13 also states that in order to help ensure effective access to justice for persons with disabilities, States Parties shall promote appropriate training for those working in the field of administration of justice, including police and prison staff. Until the Convention is ratified and enforced, however, the ADA remains the primary means by which prisoners with disabilities can address discriminatory treatment.

Justice Scalia observed in *Yeskey* that the ADA has breadth, and the Department of Justice apparently agrees. The ADA was designed to remedy the serious and pervasive disability-based discrimination that exists throughout society as documented by Congress when the ADA was enacted. It was intended to ensure equal protection of the rights of all persons with disabilities, including prisoners according to the Supreme Court, and to relegate the existence of a disability to a non-issue.

The Fourteenth Amendment reads, in part, "No State [can] deny to any person within its jurisdiction the equal protection of the laws." The Fourteenth Amendment, in conjunction with the ADA, ensures that prisoners with disabilities have the means with which to protect their rights. ◄◄

*Thomas Weiss is a 40% rated veteran with disabilities. He graduated with a Masters in Systems Theory/Design and Organizational Psychology in 2003. For more than 24 years, he provided hands-on care for people with a variety of forms of disabilities as a Certified Nursing Assistant. Since 2008 he has been writing for www.disabled-world.com, where a shorter version of this article was first published.*

# Michigan County Sanctioned for Defrauding Federal Court in Prisoner Death Case

## *by David M. Reutter*

ON APRIL 4, 2012, A MICHIGAN federal district court imposed sanctions against Wayne County for committing fraud and misrepresentation upon the court and opposing counsel in a prisoner's wrongful death suit.

The lawsuit was filed by the personal representative of John C. Fahner, who was murdered at the Wayne County Jail on June 27, 2006 by another prisoner. With the exception of Nurse Bernadine Tuitt-Hill (Tuitt), an ex-county employee against whom a default judgment was entered, the district court had granted summary judgment to all of the remaining defendants.

The whereabouts of Nurse Tuitt had become a "great mystery" since the court permitted the plaintiff to file an amended complaint on February 12, 2010, which added Tuitt as a defendant. On June 28, 2010, the court held a hearing on a motion to compel Wayne County to disclose whatever information it had to solve that mystery and locate Tuitt so she could be served.

The Magistrate Judge asked the county's attorney, Karie H. Boylan, what she knew about Nurse Tuitt's whereabouts. "I do not know. I have no idea where she is...," Boylan responded. "I have heard she's in Trinidad and Tobago. I've heard she's out of state. I've heard she's here. I've heard she's in Canada."

Following the hearing, the district court entered an order authorizing substitute service upon Tuitt's sister's residence in Brooklyn, New York, where Tuitt was thought to be living. Tuitt never responded to that service.

At a July 13, 2010 hearing convened at Boylan's request, she informed the court that her supervisor, Robert Gazall, had spoken with Tuitt by phone subsequent to the hearing on the motion to compel.

Boylan explained to the Magistrate Judge that Tuitt had refused to disclose her location or address, but did provide her phone number "with explicit instructions that the number not be given to anyone." According to Boylan, Gazall had informed

Tuitt "in no uncertain terms" that she was a party in the case, that she was trying to be found to effect service and that she should contact Boylan. Boylan said she believed she had an ethical obligation not to disclose Tuitt's phone number, even though she did not represent her because, pursuant to the county's Collective Bargaining Agreement, Tuitt was first required to complete certain forms and request representation.

As part of the plaintiff's continuing efforts to locate Tuitt, Wayne County Corporation's lead litigation counsel, Robert S. Gazall, was deposed in November 2011. Gazall confirmed "that in fact he had been contacted by Nurse Tuitt in June, 2010, that he believed at the time that she was out of the country and that she left a Trinidad, Tobago phone number where she could be reached by return phone call." The phone call was memorialized in a memo, but the memo was not disclosed to plaintiff's counsel until just before Gazall's deposition.

Although Boylan was aware that Tuitt had provided a "telephone number in Trinidad, Tobago just days earlier, Ms. Boylan continued to permit the Court and the parties to believe that Ms. Tuitt was just as likely in Brooklyn, New York as anywhere else" during the July 13, 2010 hearing, the district court noted.

Further, contrary to what Boylan had represented to the court, Gazall had told Tuitt that she was not a party to the lawsuit but if she became a defendant the county would represent her. Subsequently, Gazall "never called Ms. Tuitt back to tell her she

was a party, never asked her to come in and cooperate and didn't recall telling Karie Boylan to do so," which the district court called "unconscionable."

"Gazall's deposition testimony illustrates that Boylan failed to present all relevant facts" to the Magistrate Judge with respect to Tuitt's whereabouts at the July 13, 2010 hearing, the court stated, which was "obstructive of justice and outrageous."

The district court castigated the county for misleading both the court and opposing counsel, which resulted in a lengthy and costly search for Tuitt plus the court granting the plaintiff's motion to effect substitute service on Tuitt in New York.

In ruling on the plaintiff's motion for sanctions against the county, the court wrote, "It seems clear that the information that the Wayne County legal department, and specifically Karie Boylan and her boss Robert Gazall, possessed in June and July, 2010, a year prior to this Court's Opinion and Order on Summary Judgment, and failed to disclose to Plaintiff and the Court, prevented Plaintiff from presenting her case 'fairly and fully.'"

Consequently, as a sanction, the district court set aside its prior order granting summary judgment to the county and the remaining defendants in the case, and directed Wayne County "to accept service ... on behalf of Nurse Tuitt and take whatever steps necessary to answer or otherwise respond to the Amended Complaint on her behalf." While the court noted that this "may seem a harsh result, the County's conduct in this case merits harsh treatment."

The county moved for reconsideration, which was denied on June 8, 2012. The case remains ongoing with the county filing a renewed motion for summary judgment on July 5, 2013, which is currently pending. See: *Fahner v. County of Wayne*, U.S.D.C. (E.D. Mich.), Case No. 2:08-cv-14344-PDB-MKM. ◼



THE BESTSELLING CLASSIC, INFORMING AND INSPIRING WOMEN ACROSS GENERATIONS

# OUR BODIES, OURSELVES

*Our Bodies, Ourselves* is a highly praised classic and vital resource for women of all ages with important information about every aspect of their health and well-being. This newly revised edition gives women everything they need for making key decisions about their health - from definitive information from today's leading experts to personal stories from other women just like them.

**$26 + $6 S&H for all orders under $50.**

*Order by mail, phone, or on-line from*
**Prison Legal News**
**PO Box 1151**
**Lake Worth FL 33460**
**561-360-2523**
**www.prisonlegalnews.org**

## CALIFORNIA LIFER NEWSLETTER

*CLN*: A comprehensive newsletter mailed every 6-8 weeks. State and federal cases, parole board news, statistics, legislation and articles on prison, parole and correctional issues of interest to inmates and their families.

*CLN* also provides services such as copying and forwarding federal and state cases, articles and news and materials available on the Internet.

**SUBSCRIPTIONS:** Prisoners: $25 (or 80 stamps) per year (6 issues minimum). Free persons: $90.

*CLN*, PO Box 277, Rancho Cordova, CA 95741

# FIYA GIRLS. THE BEST EVER!!
GET YOUR FREE NON NUDE
WHOLESELL CAT #1 AND CAT #17
YOU MUST SEND ì 2ì S.A.S.E.
IF YOU DONT SEND NOTHING ! YOU WONT
GET NOTHING! OPTION#2 TO RECEIVE THE
ì 7ì CATALOG PACKAGE ALONG WITH 3 FREE PICS
YOU MUST SEND $7.00 OR 40 STAMPS
FREE S/H.

11 PIC SET#2! OF SPICY & FRIENDS $16.00 2 FREE PICS 2 FREE CATALOGS FREE [S/H]

GET 30 NON NUDE SW#1 SET OF SLIM WHITE GIRLS COMES WITH A FREE NON NUDE CATALOG! THE SET AND THE CATALOG IS HOT!! YOU WILL LOVE THEM ! THE CATALOG HAS HUNDREDS TO CHOOSE ALL HOT AN SEXY GIRLS GET IT NOW FOR ONLY $25.00 FREE S/H

GET THE ALL NEW SUPERSIZED HIGH GLOSS COLOR VIP CATALOG #4 OVER THOUSANDS TO CHOOSE FROM ALL RACES! NON NUDE STRIPPERS, PORN STARS AN ALL!! ONLY $15.00 [FREE S/H] INCLUDES 2 FREE PICS THE BIGGEST AND BEST CATALOG EVER!!

ALL NUDE CAT #4 $15.00 [FREE S/H] COMES WITH FREE PICS
PLEASE MAKE ALL PAYMENTS TO:
**FIYA GIRLS**
P.OBOX 2545 DEPT-PN
✉ HOUMA LA 70361 ✉
GET MAIL AND GET PAID INSTRUCTIONS STILL ONLY $10.00

PLN_0000867

# Solitary Confinement for Death Row Prisoners a Blot on U.S. Justice System

*by Derek Gilna*

Although more and more states have abolished the death penalty in recent years, with six states doing away with capital punishment since 2007, the death penalty still has strong support in certain elements of society, notably among lawmakers. However, there should be little dispute as to the growing body of evidence that indicates holding death row prisoners in solitary confinement is both dehumanizing and damaging.

According to a 14-page report released by the American Civil Liberties Union (ACLU) in July 2013, more than 3,000 death row prisoners nationwide are held in solitary confinement. Although the separation of death-sentenced prisoners from the general prison population is cloaked in the legitimacy of the judicial process and deemed acceptable by the courts and the rest of the justice system bureaucracy, the fact remains that placing death row prisoners in solitary for years or decades before executing them constitutes a sadistic form of "death before dying."

Even if condemned prisoners held in solitary are eventually exonerated and released – and 142 have been since 1973 – the long years of forced isolation take their toll on the physical and mental well-being of those on death row.

As the ACLU report puts it, "While many in the United States understand that part of the horror of the death penalty is living day in and day out with the threat of execution, most are unaware that the vast majority of death row prisoners also suffer under conditions of extreme isolation that compromise their physical and mental health and needlessly inflict pain and suffering."

Jails and prisons are by their very nature isolating and restrictive. Prisoners are confined because a judge or jury has determined that they must be separated from the rest of society. Thus, prisoners' contact with the outside world is severely limited in the name of security, and few courts feel compelled to overrule the policies and procedures instituted by corrections officials.

No one, including most prisoners, expect conditions of confinement to be other than Spartan, but even in the most basic correctional settings they can still expect to get at least one hour of "exercise" outside their cells, regular showers, two or three meals a day, basic medical care, some telephone access to the outside world, mail, a television, etc.

However, many of these limited amenities – a bare minimum of life's creature comforts – are denied to prisoners on death row, who are often housed in austere cells ranging from 36 square feet to just over 100 square feet, or the size of an average bathroom. They can expect "little human contact or interaction ... reduced or no natural light ... severe constraints on visitation, including the inability to ever touch friends or loved ones," according to the ACLU report.

The report raises several interesting points that often escape the notice of prisoners' rights advocates, in that it focuses not only on the hardship of solitary confinement, which has been well-documented in recent years [see, e.g., *PLN*, Oct. 2012, p.1], but also on what the ACLU terms the "double" punishment suffered by condemned prisoners, who must endure extra-judicial treatment not included in their death sentence. For example, the very nature of their confinement prevents most death row prisoners from working on potential appeals, exercising their religious rights, being employed in meaningful prison jobs or furthering their education.

The report also makes clear that with the exception of emergency medical treatment, a prisoner on death row lives almost his entire life within his cell. His bed is a thin pad over a steel bed frame or concrete slab; his toilet and sink a single formed piece of metal. His meals are passed through a "chuck hole," and the guards who deliver them may be the only other people he sees or speaks with the entire day.

Is it any wonder that many death row prisoners' hold on sanity is tenuous – including those who didn't already have mental problems before they were sentenced to death? In a 2003 article published by Human Rights Watch entitled "Ill Equipped: U.S. Prisons and Offenders with Mental Illness," a prison psychiatrist stated, "It's a standard psychiatric concept, if you put people in isolation, they will go insane.... Most people in isolation will fall apart." Health professionals have noted that in addition to psychiatric disorders, prisoners on death row also experience weight loss, appetite loss, heart palpitations, headaches, trouble sleeping, dizziness, self-mutilation, suicide attempts and a decline in brain function.

Even some corrections officials feel that the current treatment of death row prisoners is inhumane, including Jeanne Woodford, a former warden of San Quentin State Prison in California. "I know that safety for staff, prisoners, and the public is the utmost concern," she said. "But I also know we can do this in a humane way. Death rows should be designed to allow prisoners to leave their cells, participate in programs, and spend time on the yard without coming into physical contact with staff, but where they can be observed by staff visually. Where prisoners are well-behaved, 23/1 solitary is ridiculous."

Several state and federal judges, including Supreme Court Justices Stephen Breyer and John Paul Stevens, have addressed the inhumanity of the current death penalty process, where in many cases the only prisoners being put to death are those who "volunteer" to be executed by dismissing their appeals after enduring years of solitary confinement on death row.

"I saw guys who dropped their appeals because of the intolerable conditions," observed Anthony Graves, who spent 12 years on Texas' death row, mostly in solitary, until he was exonerated in 2010. "Before his execution, one inmate told me he would rather die than continue existing under these inhumane conditions. I saw guys come to prison sane, and leave this world insane, talking nonsense on the execution gurney. One guy suffered some of his last days smearing feces, lying naked in the recreation yard, and urinating on himself."

One wonders what it will take for the courts to acknowledge what most people familiar with conditions on death row already know: that extended solitary confinement constitutes "cruel and unusual punishment"

PLN_0000868