# EXHIBIT 32B

# Solitary Confinement for Death Row Prisoners a Blot on U.S. Justice System

## by Derek Gilna

ALTHOUGH MORE AND MORE STATES have abolished the death penalty in recent years, with six states doing away with capital punishment since 2007, the death penalty still has strong support in certain elements of society, notably among lawmakers. However, there should be little dispute as to the growing body of evidence that indicates holding death row prisoners in solitary confinement is both dehumanizing and damaging.

According to a 14-page report released by the American Civil Liberties Union (ACLU) in July 2013, more than 3,000 death row prisoners nationwide are held in solitary confinement. Although the separation of death-sentenced prisoners from the general prison population is cloaked in the legitimacy of the judicial process and deemed acceptable by the courts and the rest of the justice system bureaucracy, the fact remains that placing death row prisoners in solitary for years or decades before executing them constitutes a sadistic form of "death before dying."

Even if condemned prisoners held in solitary are eventually exonerated and released – and 142 have been since 1973 – the long years of forced isolation take their toll on the physical and mental well-being of those on death row.

As the ACLU report puts it, "While many in the United States understand that part of the horror of the death penalty is living day in and day out with the threat of execution, most are unaware that the vast majority of death row prisoners also suffer under conditions of extreme isolation that compromise their physical and mental health and needlessly inflict pain and suffering."

Jails and prisons are by their very nature isolating and restrictive. Prisoners are confined because a judge or jury has determined that they must be separated from the rest of society. Thus, prisoners' contact with the outside world is severely limited in the name of security, and few courts feel compelled to overrule the policies and procedures instituted by corrections officials.

No one, including most prisoners, expect conditions of confinement to be other than Spartan, but even in the most basic correctional settings they can still expect to get at least one hour of "exercise" outside their cells, regular showers, two or three meals a day, basic medical care, some telephone access to the outside world, mail, a television, etc.

However, many of these limited amenities – a bare minimum of life's creature comforts – are denied to prisoners on death row, who are often housed in austere cells ranging from 36 square feet to just over 100 square feet, or the size of an average bathroom. They can expect "little human contact or interaction ... reduced or no natural light ... severe constraints on visitation, including the inability to ever touch friends or loved ones," according to the ACLU report.

The report raises several interesting points that often escape the notice of prisoners' rights advocates, in that it focuses not only on the hardship of solitary confinement, which has been well-documented in recent years [see, e.g., *PLN*, Oct. 2012, p.1], but also on what the ACLU terms the "double" punishment suffered by condemned prisoners, who must endure extra-judicial treatment not included in their death sentence. For example, the very nature of their confinement prevents most death row prisoners from working on potential appeals, exercising their religious rights, being employed in meaningful prison jobs or furthering their education.

The report also makes clear that with the exception of emergency medical treatment, a prisoner on death row lives almost his entire life within his cell. His bed is a thin pad over a steel bed frame or concrete slab; his toilet and sink a single formed piece of metal. His meals are passed through a "chuck hole," and the guards who deliver them may be the only other people he sees or speaks with the entire day.

Is it any wonder that many death row prisoners' hold on sanity is tenuous – including those who didn't already have mental problems before they were sentenced to death? In a 2003 article published by Human Rights Watch entitled "Ill Equipped: U.S. Prisons and Offenders with Mental Illness," a prison psychiatrist stated, "It's a standard psychiatric concept, if you put people in isolation, they will go insane.... Most people in isolation will fall apart." Health professionals have noted that in addition to psychiatric disorders, prisoners on death row also experience weight loss, appetite loss, heart palpitations, headaches, trouble sleeping, dizziness, self-mutilation, suicide attempts and a decline in brain function.

Even some corrections officials feel that the current treatment of death row prisoners is inhumane, including Jeanne Woodford, a former warden of San Quentin State Prison in California. "I know that safety for staff, prisoners, and the public is the utmost concern," she said. "But I also know we can do this in a humane way. Death rows should be designed to allow prisoners to leave their cells, participate in programs, and spend time on the yard without coming into physical contact with staff, but where they can be observed by staff visually. Where prisoners are well-behaved, 23/1 solitary is ridiculous."

Several state and federal judges, including Supreme Court Justices Stephen Breyer and John Paul Stevens, have addressed the inhumanity of the current death penalty process, where in many cases the only prisoners being put to death are those who "volunteer" to be executed by dismissing their appeals after enduring years of solitary confinement on death row.

"I saw guys who dropped their appeals because of the intolerable conditions," observed Anthony Graves, who spent 12 years on Texas' death row, mostly in solitary, until he was exonerated in 2010. "Before his execution, one inmate told me he would rather die than continue existing under these inhumane conditions. I saw guys come to prison sane, and leave this world insane, talking nonsense on the execution gurney. One guy suffered some of his last days smearing feces, lying naked in the recreation yard, and urinating on himself."

One wonders what it will take for the courts to acknowledge what most people familiar with conditions on death row already know: that extended solitary confinement constitutes "cruel and unusual punishment"

for condemned prisoners – and for all other prisoners held in solitary for that matter. ⁊

Source: *"A Death Before Dying: Solitary Confinement on Death Row,"* American Civil Liberties Union (July 2013), available at: www.aclu.org/files/assets/deathbeforedying-report.pdf

# Oklahoma's DNA Law Means Post-Conviction Testing Available in All 50 States

### by Christopher Zoukis

On May 24, 2013, Oklahoma Governor Mary Fallin signed into law a comprehensive post-conviction DNA review process for defendants in cases involving violent felonies or resulting in sentences of 25 years or more. Oklahoma thus became the final state to pass a post-conviction DNA testing statute.

Barry Scheck, co-director of the Innocence Project, which has championed DNA testing as a forensic tool, hailed the Oklahoma law as a victory. "Two decades ago, when we founded the Innocence Project, no state in the nation had a law on the books to help wrongly convicted people access DNA testing to prove their innocence. Today, every state in the country now has a law allowing wrongfully convicted people the legal means to request DNA testing."

At least 310 people have been exonerated by post-conviction DNA tests since 1989, when such testing became forensically feasible. Larry Peterson, for example, spent 16 years in New Jersey prisons after being falsely convicted of murder. Following the passage of New Jersey's DNA testing statute in 2002, Peterson was released when he was able to prove he was not the perpetrator of the crime.

Most recently, in Laramie County, Wyoming, charges of first-degree sexual assault and aggravated burglary against Andrew Johnson were dropped on July 19, 2013. Johnson, who had served 23 years, was exonerated following post-conviction DNA testing of evidence from the victim's sexual assault kit.

While some states have limitations on testing that exclude those who have pleaded guilty and other restrictions, Oklahoma's statute is considered a model according to Stephen Saloom, policy director at the Innocence Project. "I encourage lawmakers to look at Oklahoma's recently enacted law as an example of a statute that provides inclusive access," he said.

The Oklahoma law was the product of a recommendation issued by the Oklahoma Justice Commission in November 2012; the commission, an entity of the State Bar Association, is chaired by former State Attorney General Drew Edmondson. The DNA testing statute is one of several recommendations made by the commission intended to help prevent wrongful convictions in Oklahoma. ⁊

Sources: *www.innocenceproject.org, USA Today, www.wyomingnews.com*

## ~ THE SENZA COLLECTION ~

SENZA SPECIALIZES IN PROVIDING YOU SEVERAL CHOICES
ALL NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY  - OR -  NON NUDE 4X6 PRINTS IN STARTLING VIVID COLOR IMAGERY
WE HAVE DIVIDED OUR CATALOGS INTO THESE CATEGORIES:

**CAUCASIN/AFRICAN–AMERICAN/HISPANIC/ASIAN/MIXED HOTTIES**

EACH PAGE OF OUR CATALOGS HAS 99 GLORIOUSLY SEDUCTIVE LADIES POSING JUST FOR YOUR ENJOYMENT.
OVER 250 CATALOGS TO COLLECT AT JUST $2.50 PER CATALOG
HERE'S A LITTLE FREEBIE FROM SENZA TO YOU!!!
ORDER YOUR FREE SENZA "99 HOTTIES" SAMPLE CATALOG
JUST SEND US A SELF ADDRESSED STAMPED ENVELOPE TO:

**SENZA**
FREE CATALOG OFFER
**P.O. BOX 5840**
**BALTIMORE, MD 21282**

**AND FOR THOSE THAT JUST CANNOT WAIT...TAKE ADVANTAGE OF THIS LIMITED TIME OFFER**

**SENZA'S INTRODUCTORY SPECIAL   ***DIRTY DOZEN*****

$19.99 GETS YOU ALL THIS + FREE SHIPPING AND HANDLING
12 EYE POPPING CATALOGS! EACH CATALOG HAS 99 PICS TO CHOOSE FROM ON EACH PAGE
PLUS
12 4X6 PRINTS FROM OUR MIXED HOTTIES SELECTION TO SHOW OFF SENZA'S 4X6'S PRINT QUALITY.
**ALL FOR JUST $19.99**
**REMEMBER YOU MUST: SPECIFY NUDE OR NON–NUDE ON YOUR ORDER**
**SPECIFY YOUR INSTITUTIONS RESTRICTIONS AS TO THE NUMBER OF PRINTS ALLOWED IN ONE ENVELOPE.**

**SENZA  CORPORATE POLICIES – PLEASE REVIEW THEM CAREFULLY**

**ALL SENZA COLLECTION IMAGES ARE SOLD AT A FLAT PRICE OF 0.35 CENTS EACH.**

ANYONE WISHING TO PURCHASE 1000 + PRINTS AT ONE TIME WILL BE GIVEN A FLAT PRICE OF 0.30 CENTS PER IMAGE.
**SENZA HAS A MINIMUM ORDER REQUIREMENT OF: $15.00 THIS DOESN'T INCLUDE S&H CHARGES.**

**SHIPPING AND HANDLING CHARGES ARE AS FOLLOWS:**

**1 – 10 4x6 PRINTS – $1.00 PER ENVELOPE / 11 – 15 4x6 PRINTS – $1.50 PER ENVELOPE /16 – 25 4x6 PRINTS – $2.00 PER ENVELOPE**

YOU WILL NOTIFY SENZA ON THE ORDER FORM, THE MAXIMUM NUMBER OF PRINTS YOUR INSTITUTION WILL PERMIT IN EACH ENVELOPE
**SENZA WILL ACCEPT U.S. FIRST CLASS POSTAGE STAMPS AT THE RATE OF $5.00 FOR EACH BRAND NEW FLAT BOOK OF 20 STAMPS.**

YOU ARE REQUIRED TO KNOW  YOUR INSTITUTIONS POLICIES REGARDING WHAT IMAGES ARE ACCEPTABLE INTO YOUR FACILITY INSTITUTION.  THERE ARE NO EXCEPTIONS TO THIS POLICY. RETURNED/REJECTED MAIL - YOU WILL HAVE 15 BUSINESS DAYS TO SEND US A  SASE WITH A STREET ADDRESS IN WHICH TO MAIL YOUR RETURNED/REJECTED PRINTS.
AFTER 15 DAYS THE PRINTS ARE RETURNED TO OUR INVENTORY.
ALL SALES ARE FINAL/NO REFUNDS OR EXCHANGES

PLN_0000869

# Habeas Hints: Actual Innocence

## by Kent Russell

*This column provides "habeas hints" to prisoners who are considering or handling habeas corpus petitions as their own attorneys ("in pro per"). The focus of the column is on the Antiterrorism and Effective Death Penalty Act (AEDPA), the federal habeas corpus law which now governs habeas corpus practice in courts throughout the United States.*

In *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013), the U.S. Supreme Court held that "actual innocence," if proved, is a gateway through which a habeas petitioner can make it into federal court even though the AEDPA statute of limitations has run. *McQuiggin* is an important case because it potentially opens the door to the federal courthouse for prisoners who claim they are innocent but whose convictions are so old that they otherwise would have been barred by AEDPA's one-year statute of limitations. On the other hand, the standard of proof for actual innocence claims is so demanding that only a handful of prisoners will be able to satisfy it.

*McQuiggin* involved a habeas corpus petitioner (Floyd Perkins) who had been convicted of first-degree murder and sentenced to death in 1977. The prosecution's star witness at trial, Damarr Jones, was present at the scene of the crime but testified that Perkins alone had committed the murder while he looked on. Other prosecution witnesses testified that Perkins had told them he planned to kill the victim beforehand and admitted afterward to being the killer. Perkins, however, denied killing the victim, and testified at trial that he was not present when the victim was killed and had seen Jones later that night with blood on his hands.

Between the time that Perkins' conviction became final in 1997 and July 2002, he obtained three affidavits which pointed to Jones as the murderer. However, Perkins did nothing with them until June 2008, when he filed a federal habeas corpus petition alleging that the affidavits constituted "newly discovered evidence of actual innocence," and that his trial attorney had been ineffective in failing to present this exonerating evidence at trial.

The U.S. District Court denied Perkins habeas relief on two separate grounds.

First, as to the affidavits Perkins presented in support of his actual innocence claim, the court reasoned that, even assuming they qualified as newly discovered evidence of innocence, Perkins could only get past the AEDPA statute of limitations if he could establish *equitable tolling*. Equitable tolling, however, requires not only a showing of extraordinary circumstances justifying the delay in obtaining the new evidence, but also "diligence" in bringing the case to court promptly after its discovery. Because Perkins had waited 11 years from the time of his conviction and almost 6 years after the date of the most recent affidavit before filing his habeas corpus petition, he "had failed utterly to demonstrate the necessary diligence in exercising his rights." Therefore, the district court denied any relief from the statute of limitations because Perkins could not possibly satisfy the diligence requirement for equitable tolling.

Second, the court found that Perkins had failed to meet the strict standard by which pleas of actual innocence are measured because he had not shown that, taking into account all the evidence, it was "more likely than not that no reasonable juror would have convicted him."

Perkins appealed to the Sixth Circuit, which granted a certificate of appealability on the single issue embraced by the first reason for the district court's denial: Is reasonable diligence a pre-condition to relying on actual innocence as a gateway to adjudication of a federal habeas corpus petition on the merits? The Court of Appeals answered "no" to this question, and on that basis reversed the district court's dismissal of Perkins' habeas petition. The U.S. Supreme Court then granted review.

The Court began by reminding everyone that although it had never decided whether a prisoner can obtain habeas relief based on a "free-standing" actual innocence claim (that is, a petition arguing solely that the petitioner is innocent without any allegation that he was denied a specific right under the Constitution), the Court had permitted petitioners to overcome procedural barriers to relief under the "fundamental miscarriage of justice" exception, which applies where a constitutional violation "has probably resulted in the conviction of one who is actually innocent."

Applying this fundamental miscarriage of justice exception, which the Supreme Court equated with a claim of actual innocence, it had permitted petitioners to be heard on the merits who otherwise would have been barred from relief by procedural defaults, such as a violation of the successive petition rule, or being barred from an evidentiary hearing in federal court after failing to develop the claim fully in state court.

The *McQuiggin* court explained that, in these and other situations where the miscarriage of justice exception applied, Congress had specified additional requirements that had to be met in order to obtain relief: For example, to overcome the successive-petition rule or obtain an evidentiary hearing on an undeveloped claim, a petitioner also had to establish diligence and meet a higher standard of proof ("clear and convincing evidence" rather than just a probability). Yet Congress had not placed any additional requirements on overcoming the AEDPA statute of limitations. Thus, a petitioner could do *that* solely by alleging and establishing actual innocence. Conversely, lack of diligence was not a make-or-break requirement for relief from the statute of limitations, but rather a single factor to be considered in evaluating the overall sufficiency of the actual innocence claim.

In sum, *McQuiggin* held that a federal habeas court, faced with a first habeas petition that alleged actual innocence but which, on its face, showed that the AEDPA statute of limitations had run, should not treat lack of diligence as an absolute barrier to relief but rather as one factor to be taken into account in determining whether the petitioner had alleged and proved that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."

Applying this principle, the *McQuiggin* court found that the district court had erred by barring Perkins from entering the gateway to the federal courts on the basis that he had not shown diligence in bringing the newly discovered evidence to the court's attention. Nevertheless, the district court had also based its dismissal on Perkins' failure to meet the demanding actual inno-

PLN_0000870

cence standard – which requires "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error" – and the Supreme Court found no reason to question the district judge's decision in this regard. Thus the Supreme Court vacated the Sixth Circuit's reversal of the dismissal order and remanded the case, thereby reinstating the dismissal of Perkins' habeas petition in the district court.

In short, Perkins won on the law but lost his case on the facts.

### Habeas Hints

• *McQuiggin* carved out an actual innocence exception to the AEDPA statute of limitations that stands on its own, separate and apart from the exception that already exists based on equitable tolling. The difference between the two is that the *McQuiggin* exception does not require a diligence showing but does require actual innocence; whereas equitable tolling requires diligence but not a showing of actual innocence. However, keep in mind that it will be easier in many cases to demonstrate equitable tolling rather than actual innocence. Therefore, when you set out the facts and law that would justify the federal court hearing the petition on the merits despite the lapse of AEDPA's statute of limitations – which you will have to do in the petition itself and/or in response to the Attorney General's mo-

tion to dismiss for untimeliness – consider the following recommendations: 1) If you missed the statute of limitations because of prison restrictions or other outside impediments that made it impossible for you to file on time, and you were diligent in filing relatively soon after the restrictions ended, then seek to be heard based solely on equitable tolling and do not rely on *McQuiggin*. 2) If you were late because you hired an attorney for habeas corpus who took your money and never did anything for you, then allege that the default is excusable due to attorney "abandonment" [see: *Maples v. Thomas*, 132 S.Ct. 912 (2012)], a legitimate basis for equitable tolling, and don't bother with *McQuiggin*. 3) If you don't have any legally acceptable reason for waiting as long as you did to file for federal habeas relief (e.g., not having money to hire an attorney is not a valid legal excuse for delay), but you have a strong claim of actual innocence, then rely on *McQuiggin* and don't argue equitable tolling.

• The majority's reasoning in *McQuiggin* makes clear that actual innocence can be used not only to excuse a violation of the AEDPA statute of limitations, but also to overcome any other kind of procedural default as well. Hence, for example, if you filed a state habeas petition to exhaust but it was denied for violating some state procedural rule, this would ordinarily prevent you from being heard on the merits in federal court. However, under *McQuiggin* you could at-

tempt to avoid the state procedural default problem by alleging actual innocence in your federal petition even if you could not show diligence. Nevertheless, because the actual innocence standard is so hard to satisfy, you should only use *McQuiggin* as a last resort; i.e., in those situations where you cannot overcome the procedural default in any other way.

• *McQuiggin* did not invalidate current law, which provides that actual innocence cannot, standing alone, be the basis for a federal court to grant habeas corpus relief. See, e.g., *Herrera v. Collins*, 506 U.S. 390 (1993). Therefore, although *McQuiggin* does allow a petitioner to get to the door to the federal courthouse if he has a strong claim of actual innocence, it doesn't get him successfully through the door unless he also can allege a separate claim of prejudicial error arising from a violation of the Constitution. However, this challenge can almost always be met by alleging ineffective assistance of counsel (IAC), which is a recognized Constitutional violation under the Sixth Amendment, along with actual innocence to excuse the default in question. The reasoning proceeds as follows: "By definition, newly discovered evidence is evidence that was *not* obtained and presented at trial by trial counsel. Newly discovered evidence sufficiently compelling to meet the very difficult actual innocence standard was necessarily so vital to the defense that it certainly *should* have been located and

## Never Eat Baloney Again!

Taoists eat meat in its natural state but cannot consume processed meats.

Taoists must have organic vegetables, one egg daily and green tea daily.

2 hours of outdoor rec is also required.

Prepackaged meals are available at: www.theorganicbistro.com

To exercise these and other religious rights under the 1st Amendment and RLUIPA, obtain explicit scriptural authority for Taoism from:

**THE HOLY BOOK OF MODERN TAOISM**, by Lao Xue

for sale now at: www.createspace.com



TOO CRUEL, NOT UNUSUAL ENOUGH
An anthology published by The Other Death Penalty Project

Preface by bestselling author Luis J. Rodriguez

Edited by Kenneth E. Hartman with John Purugganan and Robert C. Chan, Associate Editors

**The Other Death Penalty Project** is proud to announce the publication of *Too Cruel, Not Unusual Enough,* the first and only anthology of writings by and about life without parole prisoners!

Praised by notables including Professors Michelle Alexander, Austin Sarat, and Robert Johnson, *Too Cruel, Not Unusual Enough* won a gold medal for best anthology in the 2013 Independent Publisher Awards.

Buy your copy today—order now for the holidays! All proceeds from book sales support the vitally important work of The Other Death Penalty Project.

Visit www.createspace.com/3949760 or www.theotherdeathpenalty.org to order. The Other Death Penalty Project can be contacted by email at todp@live.com, or by regular mail at PO Box 1486, Lancaster CA 93584.

PLN_0000871

## Habeas Hints (cont.)

introduced at trial by competent defense counsel. Hence, counsel's failure to do so is IAC." In other words, in any case where you can credibly argue actual innocence based on newly discovered evidence pursuant to *McQuiggin*, you should also be able to allege, as a substantive habeas corpus claim, that trial counsel was ineffective in failing to obtain and present that evidence at trial.

• While *McQuiggin* potentially opens the door to consideration of old claims that otherwise would have clearly violated the statute of limitations, establishing actual innocence amounts to proving beyond a reasonable doubt that the petitioner is innocent. Put another way, to prove actual innocence, a defendant who has been found *guilty* despite the most demanding standard under American law – proof beyond a reasonable doubt – must establish his *innocence* according to that same tough standard, applied in reverse! Thus, in evaluating whether a *McQuiggin*-type claim has any real chance of success on habeas, remember that, although actual innocence breathes life into claims that before *McQuiggin* would have been DOA in federal court, as a practical matter only a very, very few petitioners will ultimately be able to make the extremely difficult showing that *McQuiggin* requires.

• Although I've repeatedly emphasized the immense difficulty of successfully making the showing of actual innocence required by *McQuiggin*, it may not be too much harder to do so than to succeed on a more conventional IAC claim. The Supreme Court has recently made federal habeas corpus relief for IAC so extremely difficult [see, e.g., *Harrington v. Richter*, 131 S.Ct. 770 (2011), requiring "double deference" to state-court denials of IAC claims and refusing to set them aside so long as *any* reasonable judge could have denied the claim for *any* reason], that one has to wonder whether, practically speaking, having habeas corpus granted on an IAC claim in federal court can ever be accomplished without ultimately showing, beyond a reasonable doubt, that the petitioner is "actually innocent." ◪

*Kent A. Russell specializes in habeas corpus and is the author of the* California Habeas Handbook, *which thoroughly explains state and federal habeas corpus under AEDPA. The*

*5th Edition, completely revised in September 2006 and updated in 2012, can be purchased for $49.99, which includes priority mail postage. An optional order form can be obtained from Kent's website (www.russellhabeas.com), or simply send a check or money order to: Kent Russell, "Cal. Habeas Handbook," 3169 Washington St., San Francisco, CA 94115.*

# Second Circuit Establishes Property Seizure Standards for Civilly Committed Persons

AS A MATTER OF FIRST IMPRESSION, THE Second Circuit Court of Appeals has undertaken a Fourth Amendment balancing analysis with regard to the right of a civilly committed person to be free from unreasonable seizures under the Fourth Amendment.

Karl Ahlers, a convicted sex offender, was civilly committed by the State of New York after serving 23 years in prison for multiple sex offenses involving children. He filed a civil rights complaint in 2008 alleging First and Fourteenth Amendment violations and denial of procedural due process after staff at the Manhattan Psychiatric Center (the Center) seized and withheld his personal DVDs and CDs and his incoming mail.

Over time, Ahlers had collected 163 DVDs and 86 CDs (collectively, discs) with the Center's permission. On April 21, 2008, staff entered his room without warning and seized all of his discs. Most were returned, but some were permanently confiscated for containing inappropriate sexual content. The district court dismissed Ahlers' complaint for failure to state a claim.

On appeal, the Second Circuit held the reasonableness of the seizure was dependent on a balancing of interests: the state's interest in order, security and treatment, and Ahlers' property interest in retaining his discs. The appellate court held it was not unreasonable to seize the discs to examine them for prohibited sexually explicit material, and the fact that the Center had permitted Ahlers to initially receive the discs did not diminish its interest in assuring they were appropriate.

The Court of Appeals, in reaching this conclusion, recognized that involuntarily committed persons are entitled "to more considerate treatment and conditions of confinement than convicted criminals" (even though, in practice, civil commitment facilities are often prison-like). Nevertheless, the state has an interest in maintaining order, security and treatment of people who are civilly committed.

Turning to Ahlers' procedural due process claim, the Second Circuit found his allegations were insufficient to support a claim that the Center's pre-deprivation procedures were constitutionally inadequate. The appellate court held the Center's interest "in quick and efficient searches militates against requiring that a detailed explanation or a written receipt be given at the time of seizure." Nor was a written policy concerning such seizures necessary, the Court of Appeals said. Further, the Court wrote that staff needed sufficient time to screen the discs, and Ahlers had failed to allege whether post-deprivation procedures were available to him.

The Second Circuit also noted that it had not articulated a standard to analyze censorship of mail in the civil commitment context. In doing so, it held that a "patient must show regular and unjustifiable interference with incoming legal mail; the actions of facility staff in restricting civilly committed individuals' access to legal mail are justified if they advance or protect the state's interest in security, order, or treatment and the restrictions imposed are no greater than necessary to advance the governmental interest involved."

The Court of Appeals did not establish a standard as to non-legal mail because Ahlers had not alleged that the interference with his non-legal mail was "regular" or "unjustifiable." Lastly, the Court construed Ahlers' complaint as one seeking damages and held the defendants were entitled to qualified immunity because they had reason to believe they were not violating Ahlers' rights.

Accordingly, the district court's order of dismissal was affirmed. See: *Ahlers v. Rabinowitz*, 684 F.3d 53 (2d Cir. 2012), *cert. denied.* ◪

# 500 Escape from Abu Ghraib and Taji Prisons in Iraq

*by Christopher Zoukis*

ON JULY 21, 2013, MILITARY-STYLE assaults at Iraq's notorious Abu Ghraib prison and another prison in Taji resulted in the escape of more than 500 prisoners, including an unknown number of al-Qaida members. Many of the prisoners were captured or killed the same day, said Hakim al-Zamili, an Iraqi lawmaker. Authorities believe an attack on the Taji prison was a diversion intended to facilitate the escape of hundreds of prisoners from Abu Ghraib, including al-Qaida leaders who had been sentenced to death.

Abuse of Iraqi prisoners at the hands of U.S. guards at Abu Ghraib became a source of international outrage after photos of the maltreatment became public in 2004. The Abu Ghraib and Taji facilities were operated by American military personnel until U.S. troops left Iraq in December 2011. Since then, prison escapes have been common. [See: *PLN*, Jan. 2013, p.23].

One year prior to the violent July 2013 jailbreak, al-Qaida's Iraqi arm, known as the Islamic State of Iraq and the Levant, launched a campaign called "Break the Walls" to free its incarcerated members.

"The first priority in this is releasing Muslim prisoners everywhere, and chasing and eliminating judges and investigators and their guards," an al-Qaida audio message stated.

The coordinated assault began when militants attacked the Taji prison with mortar rounds and explosives. A suicide car bomber rammed the facility's main gate and another suicide bomber blew himself up nearby, starting a two-hour firefight that involved Army helicopters and resulted in

several dozen deaths. The number of Taji prisoners who escaped is unknown.

Around the same time, a similar attack targeted Abu Ghraib. Insurgents fired dozens of mortar rounds and detonated suicide and car bombs; at least 29 police officers and soldiers were reportedly killed, and hundreds of prisoners escaped. A senior intelligence official said so many prisoners were able to

break out because they were in the prison yard for a communal meal for Ramadan, the Islamic holy month. Investigators believe the insurgents had inside help, according to the Interior Ministry. ▉

Sources: *www.correctionsone.com, www.thenewstribune.com, www.reuters.com, www.rt.com*

# LET US HELP GET YOU HOME!

D&D Worldwide Services LLC, is an Inmate Service Provider; we create parole plans and provide parole plan documentation services Worldwide. We are a team of Christian Professional Consultants with over 13 years' experience with the prison system. Our service(s) are intended to guide Pro-Se Client(s) in the "Right Direction" while assisting them during the parole review process.

We focus on showing the Parole Board a Real Person, the Positive Outcome of Incarceration, and we focus on showing you to be a Favorable Candidate for Parole!

We offer two service options - Full Service (Texas Only) & Standard Service (Worldwide)

*Although the Prison system may only see Prison Numbers...
We see "Faces" with "Names" with "Loving families" - "We See People"!*

## D&D Worldwide Services, LLC
P.O. Box 40081 Houston, TX 77240
Office: (281) 580-8844
Website: www.myparole.info

*Se Habla Español.*



PLN_0000873

# LEARN TO PROTECT YOUR RIGHTS

## YOU HAVE A RIGHT TO
- Adequate medical care
- Protection from assault
- Humane living conditions
- Safety from officer abuse

Learn how to defend your basic human rights with the comprehensive litigation guide, **Protecting Your Health and Safety**, 2nd edition, written specifically for prisoners who are unable to receive help from a lawyer.

Written by Robert E. Toone
Edited by Dan Manville
*A Project of the Southern Poverty Law Center\**

**COST** $16 total
($10 + $6 shipping/handling)
FREE shipping/handling for orders from Prison Legal News over $50

**ORDER A COPY**
Send a check
or money order to:
**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
561-360-2523

*Be sure to include your name, identification number (if any), and mailing address. We also accept VISA and Mastercard. If using a credit card, please include the type of card (VISA or Mastercard), card number, and expiration date.*

This book does not deal with legal defense against criminal charges or challenges to convictions that are on appeal. Edition last revised in 2009.

*\*Please do not send orders to the Southern Poverty Law Center.*

# Illinois DOC's Failure to Accommodate Disabled Prisoners States Rehabilitation Act Claim

In separate decisions, the Seventh Circuit Court of Appeals reversed the dismissal of two lawsuits filed by disabled state prisoners, finding that the Illinois Department of Corrections (IDOC) may have violated their rights under the Rehabilitation Act (RA), while skirting claims raised under the Americans with Disabilities Act.

In May 2010, Phillip E. Jaros was sent to the Vandalia Correctional Center (VCC) to serve a two-year sentence for driving on a suspended license.

Medical records indicated that Jaros suffered from several serious physical ailments, including advanced osteoarthritis and vascular necrosis in his right hip. He required a cane to walk, and walking for more than a few minutes made him tired. He suffered chronic, severe pain whether walking, sitting, standing or lying down. Private physicians had recommended a hip replacement.

VCC was not compliant with the Americans with Disabilities Act (ADA), and lacked grab bars for the physically disabled near toilets and in showers and walkways. Two days after his arrival at VCC, Jaros told Teanah Harter, a grievance coordinator, that he required such accommodations. She conceded that VCC was not ADA compliant but told Jaros "to just deal with it," because the prison's administrators "did not do" medical transfers. Harter recommended that the warden deny a grievance filed by Jaros on the grounds that he could not be transferred as he had less than a year left to serve.

VCC's failure to accommodate Jaros' disability caused him to miss some meals because he could not walk fast enough to the cafeteria. He also limited himself to four showers a month out of fear that he would fall. Further, he alleged he was not approved for work release due to a "medical hold" placed in his file due to his disability.

Following his release, Jaros brought claims under the RA, ADA and Eighth Amendment. The suit was dismissed at the screening stage for failure to state a claim, and he appealed.

The Seventh Circuit held that the district court had properly dismissed the Eighth Amendment claim because "the alleged conditions of Jaros's confinement did not deprive him of life's necessities." The Court of Appeals then turned to the RA and ADA claims.

The ADA claim raised a thorny question of sovereign immunity. As Jaros could have only one recovery, the appellate court said it would dispense with that claim and instead examine his RA claim. To state an RA claim, Jaros only needed to allege that 1) he is a qualified person, 2) with a disability, and 3) the IDOC had denied him access to a program or activity due to his disability.

The Seventh Circuit wrote that a refusal to make reasonable accommodations is "tantamount to denying access," and "although the Rehabilitation Act does not expressly require accommodation, 'the Supreme Court has located a duty to accommodate in the statute generally.'"

The Court of Appeals found Jaros' disability included a limitation on one or more major life activities. Incarceration itself is not considered a program or activity, but the meals and showers made available to prisoners are. Thus, VCC's refusal to accommodate Jaros prevented him from accessing meals and showers on the same basis as other, non-disabled prisoners.

The appellate court said the IDOC put Jaros in a "classic Catch-22." It would not add grab bars at VCC because other facilities accommodated handicapped prisoners, but he could not be transferred to one of those other facilities because he had less than one year remaining on his sentence. The Seventh Circuit held this presented a plausible RA claim; it also held that Jaros stated an RA claim for being denied work release because he walked with a cane, despite meeting all requirements for work release.

Accordingly, the district court's dismissal of the ADA and Eighth Amendment

**Dictionary of the Law**
Thousands of clear, concise definitions.
See page 61 for ordering information.

PLN_0000874

claims was affirmed and the case remanded for reinstatement of the RA claim. The Court of Appeals also recommended appointment of counsel. See: *Jaros v. Illinois Department of Corrections,* 684 F.3d 667 (7th Cir. 2012).

Following remand, on August 1, 2012 the district court ordered service on the IDOC, which was the only remaining defendant in the case. Counsel was appointed to represent Jaros. The IDOC filed a motion for summary judgment on January 4, 2013, which remains pending. See: *Jaros v. Illinois Department of Corrections,* U.S.D.C. (S.D. Ill.), Case No. 3:11-cv-00168-JPG-PMF.

In a separate ruling, the Seventh Circuit reversed a district court's dismissal of a wheelchair-bound Illinois prisoner's denial of outdoor exercise claim.

Prisoner Marc Norfleet is confined to a wheelchair due to an unspecified "nerve condition." He filed suit alleging that IDOC officials deprive disabled prisoners of outdoor exercise unless at least nine other disabled prisoners also want outdoor recreation. He claimed that due to this "quorum requirement" he was denied outdoor exercise for seven consecutive weeks, in violation of the Eighth Amendment and the ADA. The district court dismissed his suit sua sponte before the defendants responded.

The Seventh Circuit reversed, focusing exclusively on Norfleet's ADA claim. "The quorum rule seems arbitrary," the appellate court suggested, "especially since recreation, including aerobic exercises that cannot be performed in a cell ... is particularly important to the health of a person confined to a wheelchair."

Noting that the ADA was the only statute Norfleet cited, the Court of Appeals observed that the ADA "may not be available to him, because it is an open question whether state officers are immune from suits under that Act," citing *United States v. Georgia,* 546 U.S. 151 (2006) [*PLN,* March 2006, p.14].

As in *Jaros,* however, the Court found that "the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.,* is available to him, and courts are supposed to analyze a litigant's claims and not just the legal theories that he propounds." As such, his suit had been "dismissed prematurely."

Norfleet's appellate briefing incorporated by reference his brief seeking reconsideration in the district court, which, the Seventh Circuit observed, is forbidden and commonly fatal to an appeal. A close examination of Norfleet's briefing, however, led the Court of Appeals to excuse his rules violation because it was a technical violation that did not cause harm or prevent substantial compliance.

The appellate court also excused any pleading deficiencies under *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) [*PLN,* July 2009, p.18], finding that "as a pro se (as well as a prisoner and thus severely limited in his ability to conduct the kind of precomplaint investigation required by *Iqbal*), the plaintiff has pleaded enough to avert dismissal."

The case was remanded to the district court for further proceedings, where it remains pending. See: *Norfleet v. Walker,* 684 F.3d 688 (7th Cir. 2012).



chiang-lin.com

**Law Office of**
**TIMOTHY C. CHIANG-LIN, PLLC**

Representing Individuals Sexually Abused in Washington State's Foster Care, Group Home, City, County Jail and Prison

**2155 112th Ave NE**
**Bellevue, WA 98004**

tim@chiang-lin.com

## Do you have diabetes?
### Is your diabetes under control?

Living with diabetes in prison is very difficult. Order your FREE copy of *Prisoner Diabetes Handbook: A Guide to Managing Diabetes — for Prisoners, by Prisoners.*

Order your FREE copy and start managing your diabetes and your health.

**ORDER FORM**
Fill out the information below, and send this order form to:
Prison Legal News
PO Box 1151
Lake Worth, FL 33460

Name _____

ID number _____

Facility _____

Address _____

City _____ State _____ Zip _____

SPLC   Southern Poverty Law Center

*Handbook made possible by the Southern Poverty Law Center*

**Pen Pals for Prisoners**

Your ad on the Internet worldwide:
One year for $9.95. Mail name & address for FREE order form or online:

**www.PrisonerPal.com**

PO Box 19689
Houston, TX 77224



**PASS**

Prisoner Assistance Scholastic Service provides educational materials nationally to prisoners in state and federal prisons and jails.

◆ Victim Awareness
◆ Anger Management
◆ Addiction/Substance Abuse
◆ Domestic Violence
◆ Gang Diversion
◆ Conflict Resolution
◆ Parenting
◆ Non-violent Communication
◆ Re-entry in Society
◆ Living With Purpose

Prisoners who successfully complete the PASS program earn a degree in Personal Psychological Development which can be used as evidence of rehabilitation before parole boards and with prison officials.

$500 for the entire course of study and degree.

**10 COURSES 2 SEMESTERS**

Graded study - completed through the mail.

**FOR MORE INFO**

**1-888-670-7277**   www.passprogram.org
pass@passprogram.org

PASS Program, PO BOX 2009, San Francisco, CA, 94106

PLN_0000875

# PLN Resolves Censorship Suit Against Oregon County Jail for $51,000 Plus Fees and Costs

*by Alex Friedmann*

In August 2012, Prison Legal News accepted an offer of judgment made by officials in Umatilla County, Oregon to resolve a First Amendment censorship suit filed against the county, the sheriff's office and several sheriff's employees.

Approximately two months earlier, PLN had filed suit in federal court alleging that the Umatilla County Jail had "adopted and implemented written mail policies and practices that unconstitutionally: restrict correspondence to and from prisoners to postcards only; prohibit delivery of bulk mail and book catalogs, newspapers, and magazines to prisoners; prohibit delivery of books that have not been pre-approved by the government; and do not afford adequate due process."

Specifically, PLN claimed that from November 2010 to at least October 2011, the Umatilla County Jail rejected numerous publications that PLN had sent to prisoners, including paperback books (e.g., the *Prisoner Diabetes Handbook*), book brochures, copies of PLN's monthly publication, subscription forms and renewal letters, pursuant to the jail's mail policy.

That policy, adopted in February 2010, restricted prisoner correspondence to postcards only and specified that "No newspapers or magazines shall be permitted." The jail also refused to deliver bulk mail addressed to prisoners, and required prisoners to obtain "prior approval" before receiving books sent from publishers.

PLN alleged that this censorship interfered with its protected free speech rights under the First Amendment, and also violated PLN's due process rights because the jail had "failed to provide sufficient notice to PLN of the reason" for the rejection of its publications and correspondence.

PLN sought declaratory and injunctive relief, plus monetary damages – nominal, compensatory and punitive – and attorney fees and costs.

Umatilla County made an offer of judgment in the amount of $51,000 plus costs and attorney fees less than two months after the lawsuit was filed. PLN accepted the offer upon determining that the jail had already "abandoned most of the challenged policies and practices," and the district court entered judgment against the county on October 17, 2012.

The court subsequently awarded attorney fees and costs to PLN in the amounts of $31,983.80 and $799.89, respectively, on May 16, 2013.

PLN was represented by in-house counsel Lance Weber and Alissa Hull, attorneys Jesse Wing and Katherine Chamberlain with the Seattle law firm of MacDonald Hoague & Bayless, and Marc D. Blackman with the Portland firm of Ransom Blackman LLP. See: *Prison Legal News v. Umatilla County*, U.S.D.C. (D. Ore.), Case No. 1:12-cv-01101-SU.

PLN had filed an unrelated but similar lawsuit in January 2012 alleging unconstitutional censorship due to a postcard-only policy at the jail in Columbia County, Oregon. That suit resulted in a federal district court holding on April 24, 2013 that the jail's postcard-only policy was unconstitutional. [See: *PLN*, June 2013, p.42].

# Seventh Circuit: Indiana Tolling Provision May Excuse Time-Barred Suit; Rule 12(b)(6) Dismissal Improper

The Seventh Circuit Court of Appeals has reversed a district court's dismissal of an Indiana prisoner's lawsuit as being time-barred.

In January 2008, Pendleton Correctional Facility prisoner Danny R. Richards began complaining of abdominal pain and blood in his stool. Prison doctors dismissed his complaints, saying he was fine. They were wrong.

When Richards was finally sent to a specialist nine months later, he was diagnosed with ulcerative colitis. "By then," however, "it was too late to do anything but excise the colon and attempt some palliation." Richards underwent three surgeries to remove his colon and construct an ileo-anal pouch.

He filed suit in federal court in December 2010, alleging that prison officials had been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

Finding that Richards' claim had accrued no later than October 2008, the district court dismissed his suit because it was filed after the expiration of the two-year statute of limitations based upon state law.

Richards appealed and the Seventh Circuit reversed on August 9, 2012, finding that Indiana law provides a tolling provision for people who are physically incapacitated, which "prevents tortfeasors from escaping liability by injuring victims so badly they cannot sue in time." Conveniently, the defendants "seem[ed] to be unaware" of the state law tolling provision.

The appellate court held that Richards had alleged sufficient facts to avail himself of the tolling provision when he claimed "that the surgeries disabled him for extended periods, that when he was out of the hospital he was in constant pain and unable to walk, and that he filed suit as soon as he could muster the concentration and energy to do so." While those allegations "may or may not be true ... they are plausible – and no more is required of a pleading."

In fact, that was more than Richards was required to allege when defending against a Rule 12(b)(6) motion. "Judges should respect the norm that complaints need not anticipate or meet potential affirmative defenses," the Seventh Circuit wrote. A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, not whether an affirmative defense may exist or prevail. Since Richards' complaint stated a claim upon which relief may be granted, the Court of Appeals held "[i]t could not properly be dismissed under Rule 12(b)(6)."

The Seventh Circuit was unimpressed

PLN_0000876

with the district court's single-sentence declaration, upon dismissing the suit, that "Richards' explanations for the delay [in filing his complaint] are unpersuasive."

"That's it. No other analysis," the Court of Appeals observed. The district court "did not identify a *legal* obstacle to the suit; the judge just deemed the allegations 'unpersuasive.' But a judge cannot reject a complaint's plausible allegations by calling them 'unpersuasive.' Only a trier of fact can do that, after a trial."

The appellate court explained that "Once Richards has had an opportunity to produce evidence material to the tolling question, its sufficiency under Indiana law can be tested by a motion for summary judgment." Before that happens, the Seventh Circuit cautioned, "the district court should consider carefully whether to assist Richards in finding a lawyer who can muster the facts and, if necessary, secure medical experts." The case was accordingly reversed and remanded. See: *Richards v. Mitcheff*, 696 F.3d 635 (7th Cir. 2012).

Following remand, the district court granted summary judgment to the defendants on June 25, 2013, finding that Richards' suit was barred by the statute of limitations. Although Richards had argued that "the time to file his complaint was tolled while he was physically unable to sue despite the exercise of reasonable diligence," the court held the burden was on Richards to show he met the requirements for tolling.

The district court noted that "Indiana does not recognize incarceration as a legal disability precluding plaintiffs' ability to bring suit," and thus the mere fact of Richards' incarceration was insufficient. Further, because Richards was able to draft letters and submit health care request forms during the time he was suffering medical problems, the court found he was "not excused for failing to comply with the two-year statute of limitations for reasons of [physical] incapacity."

The district court concluded that "Richards, like many victims of malpractice, are required to 'engage in litigation while battling their medical condition, fatal or not. That is a decision the legislature has made.'" See: *Richards v. Mitcheff*, U.S.D.C. (S.D. Ind.), Case No. 1:10-cv-01583-SEB-MJD. ◾

## HARVEY COX, MS
### CORRECTIONS CONSULTANT

**40 Years Prison Employment**
*(includes: Federal, State, Private)*
**Warden at Three Institutions**

**PSR Review Prior to Finalization**
*(impacts on all Classification Issues)*
**Initial Prison Placement Requests**
**Have your Attorney Contact Me**

**Prison Transfers**
*(includes Treaty Transfers)*

**Administrative Remedies**
*(Disciplinary Reports)*

**Expert Witness (Court Cases)**
*(Affidavits and Appearance)*

**PO Box 1551**
**Weatherford, TX 76086**
**(817) 596-8457**
**FAX: (817) 594-7172**
**hrcox@yahoo.com**
**www.prisonconsultant.com**



Set of 20 Sexxxy Photos, all Thongs and G-strings 4X 6 $14.99

**Send $5.00** for a Full color catalog Brochure and our 252 sexxy girls Photo flyer. Plus 5 **Free** hot pics.

Send orders and payments to:
**J.M.E.C. ENTERTAINMENT LLC**
**P.O. BOX 714**
**LEE'S SUMMIT, MO  64063**

**Special JMEC Offer!!!**

Buy one catalog get One 1/2 off. Or buy 3 get one **FREE**

Special introductory offer!!! Send $49.99 for your VIP PLATINUM life time membership to our exclusive club, and receive a rewards package valued at over $100.00 in YUM-MO-LICIOUS exotic picture catalogs, photos and other merchandise

All catalogs are filled with, 70 hot sexxxy girls in thongs and G-strings     2 1/2" X 3 1/2"

ORDER YOUR CATALOG TODAY!!!!

**YUM!!!!**

| | |
|---|---|
| Bra & Panty | $6.99 |
| Yummy Asian Edition | $7.99 |
| The Sexiest Senoritas | $7.99 |
| Tropical Hotties | $7.99 |
| Bodacious over 40" Butts | $7.99 |
| Boomerang over 50" Butts | $7.99 |
| Rear View Nude Back Shots | $8.99 |
| Naked Desire Nudes | $8.99 |
| Hot Stuff Nudes | $8.99 |

PLN_0000877

# After Ten Years, FCC Votes for Prison Phone Reforms!

*by David Ganim*

On August 9, 2013, Federal Communications Commission (FCC) Chairwoman Mignon Clyburn presided over a historic vote by the Commission to reform the prison phone industry, and while doing so publicly acknowledged family members and prisoners' rights organizations that had influenced the FCC to finally make the "Wright" decision.

Thirteen years ago, the Center for Constitutional Rights co-counseled with the D.C. Prisoners' Legal Services Project and several other attorneys to file a lawsuit, *Wright v. Corrections Corporation of America*, U.S.D.C. (D. DC), Case No. 1:00-cv-00293-GK, challenging an exclusive prison phone contract that resulted in high phone rates. The district court referred the case to the FCC, and an initial petition for rulemaking, called the "Wright petition," was filed in 2003 by lawyers from the D.C. Prisoners' Legal Services Project and attorneys Steve Seliger and Frank Krogh. An alternative petition for rulemaking was submitted in 2007, seeking to cap prison phone rates at $.20/minute for debit calls and $.25/minute for collect calls. Attorney Lee Petro with the law firm of Drinker Biddle joined the case in 2009.

The lawsuit and subsequent FCC petition resulted after Martha Wright, an 87-year-old blind grandmother who lives in the District of Columbia, sought to lower the exorbitant cost of prison phone calls. Her grandson, Ulandis Forte, was serving a 20-year sentence and the primary way she stayed in touch with him during his incarceration was by phone.

What Mrs. Wright did not know at the time was that the prison phone industry is part of a small but lucrative market, mostly unregulated and dominated by companies with ties to such corporate giants as Goldman Sachs and private equity firms. Interstate (long distance) prison phone rates range up to $17.30 for a 15-minute call – based on a $3.95 connection fee and per-minute charges of $.89. A one-hour call once a week can cost over $270 per month. Mrs. Wright faced having to choose between paying for her own medications or having regular Sunday calls with her grandson.

As a result of the financial burden unfairly placed on prisoners' families due to the high cost of prison phone calls – in large part due to "commission" kickbacks paid by prison telecom companies to contracting government agencies – the national Prison Phone Justice Campaign was founded in 2011 by Prison Legal News, the Center for Media Justice/Media Action Grassroots Network (MAG-Net) and Working Narratives.

PLN has reported extensively on the Wright petition and prison phone-related issues [see, e.g., *PLN*, Aug. 2013, p.26; July 2013, p.34; Feb. 2013, p.46; Dec. 2012, p.44; Nov. 2012, p.20], and PLN's April 2011 cover story provided an in-depth examination of the prison phone industry, including a state-by-state assessment of phone rates and commissions. PLN submitted eight comments to the FCC and argued for a rate cap of $.05/minute for all categories of prison phone calls with no additional charges.

The Prison Phone Justice Campaign, which grew to include 55 supporting organizations and thousands of individual members, coordinated letter-writing actions involving prisoners and their families, and collected signatures on petitions submitted to the FCC. The Congressional Black Caucus, several state and federal lawmakers, and some state regulatory commissioners also voiced their support.

While prison phone companies argued that lowering phone rates and ending the commission kickbacks would compromise security in correctional facilities, eight states – California, Michigan, Missouri, Nebraska, New Mexico, New York, Rhode Island and South Carolina – had eliminated commissions, with a corresponding decrease in prison phone rates. Thus, advocates had "real world" examples of how reducing prison phone rates by ending commission kickbacks would not adversely affect security.

"Those eight states have completely done away with commissions from prison phone calls, and no one is arguing that the prisons are less safe because of it," noted Paul Wright, editor of *Prison Legal News* and executive director of the Human Rights Defense Center, PLN's parent organization. "Basically, the high cost of prison phone calls is a regressive tax that falls on the backs and wallets of our most vulnerable citizens," he continued. "The fundamental right of prisoners to communicate with their loved ones is being monetized by the government and its corporate allies. Just because someone is in prison does not mean the government has a right to price-gouge them and their families."

Quoting statistics compiled by *Prison Legal News* and recognizing the Campaign for Prison Phone Justice, Chairwoman Clyburn also reminded the FCC Commissioners that 2.7 million children have an incarcerated parent. "Studies have shown that having meaningful contact beyond prison walls can make a real difference in maintaining community ties, promoting rehabilitation, and reducing recidivism," she added.

The FCC Commissioners voted 2 to 1 to reform the prison phone industry. Commissioner Ajit Pai, appointed last year by President Obama, cast the dissenting vote. Although the final order has not yet been released, it will reportedly include the following provisions:

1. All interstate prison phone rates, including ancillary charges, must be based on the actual cost of providing phone services, including necessary security features; commission payments by prison phone companies "may not be included in any interstate rate or charge."

2. Interstate prison phone calls will have an interim rate cap of $.21/minute for debit and pre-paid calls and $.25/minute for collect calls, which will dramatically decrease the cost of long distance prison phone calls in most states. This creates a cap of $3.15 for a 15-minute debit or prepaid call, and $3.75 for a 15-minute collect call.

3. Rates up to $.12/minute for debit and prepaid interstate calls ($1.80 for a 15-minute call) and $.14/minute for interstate collect calls ($2.10 for a 15-minute call) will be considered by the FCC to be just, reasonable and cost-based, and are designated "safe-harbor" rates.

4. Prisoners and their family members who have hearing or speech disabilities and use Telecommunications Relay Services may not be charged higher phone rates.

5. There will be mandatory data collec-

PLN_0000878

tion and an annual certification requirement, plus enforcement provisions to ensure compliance with the FCC's order.

6. The FCC will seek public comments on related issues, including prison phone rates and practices for intrastate calls (calls within a state), fostering competition to reduce the cost of prison phone calls, and addressing the needs of prisoners who are deaf or hard of hearing.

The FCC's unprecedented order reforming the prison phone industry impacted the lives of so many people – including 2.2 million prisoners nationwide and their family members – that it generated extensive coverage by the mainstream media. For example, *Prison Legal News* was mentioned in news reports about the FCC's action in the *Los Angeles Times, Washington Post, USA Today, Rolling Stone* and several prominent Washington, D.C. blogs.

The FCC's order will not go into effect immediately; rather, it must first be published in the Federal Register and then will become effective 90 days later, according to the Associated Press. Further, during that time period prison phone companies or corrections officials may challenge the order in court, which would delay implementation of the reforms.

The decade-long struggle to obtain justice for people impacted by exorbitant prison phone rates has been hard fought. In addition to the Campaign for Prison Phone Justice, many others contributed to this important victory – especially the attorneys who represented Mrs. Wright in her petition before the FCC, including Lee Petro, Deborah Golden and Phil Fornaci.

Mel Motel, PLN's Prison Phone Justice Coordinator, played a pivotal role in gathering the comprehensive data relied upon by the FCC and many of the organizations that submitted comments concerning the Wright petition. PLN contributing writer John Dannenberg authored PLN's April 2011 cover story on the prison phone industry, which was the catalyst for founding the Campaign for Prison Phone Justice. PLN editor Paul Wright and managing editor Alex Friedmann both made trips to Washington, D.C. to educate the FCC about prison phone-related issues and press for much-needed reforms.

Additionally, Nick Szuberla and Paul VanDeCarr at Working Narratives designed the Campaign for Prison Phone Justice's website on the Nation Inside platform as a means to organize and mobilize people to take action. At the Center for Media Justice/MAG-Net, amalia deloney, Malkia Cyril, Steven Renderos and Betty Yu used their invaluable knowledge of the FCC regulatory process to guide and shape the campaign.

Numerous other organizations were actively involved in advocating for prison phone reforms, including Prison Fellowship, the Prison Policy Initiative, Prison Phone Rates Collaborative, HEARD, Color of Change, Sum of Us, the United Church of Christ's Office of Communication, National CURE and the Equitable Telephone Charges (eTc) Campaign, directed by Kay Perry of Michigan CURE.

"Finally, after 10 years, the FCC has decided to give that constituency which has no political voice relief," said PLN managing editor Alex Friedmann. "Rather than being the end of a very lengthy decade-long campaign," he added, "it's the beginning of a longer struggle to ensure additional reforms of the prison phone industry."

Now that the FCC has taken action to address the high costs of prison telephone calls, including imposing caps on interstate phone rates, the real work begins: Ensuring that the FCC's order is implemented and enforced, and extending similar reforms and rate caps to intrastate prison phone calls. ◾

Sources: *www.fcc.gov, www.prisonphonejustice.org, www.phonejustice.org, Associated Press, www.rollingstone.com, http://etccampaign.com, www.ccrjustice.org*



# Thy Quest for Out-of-Print Games Endeth Here.

NOBLE KNIGHT GAMES

Find those rare games and also save up to 50% on retail products! We buy, sell and trade for new and out-of-print RPGs, Miniatures and Wargames.

View our online inventory of over 75,000 products or write for a free catalog to
2242 Kennedy Rd. Janesville, WI 53545

Thousands of gamers can't be wrong! Satisfaction is guaranteed!

# WWW.NOBLEKNIGHT.COM

---

# Earn an Adams State University Degree via Correspondence Courses



**Now Available: Masters Degree in Business Administration**

- Correspondence Courses via mail  • No internet access required
- Degree options available — Associate of Arts or Science, Bachelors degrees in Business Administration, Government, History, Interdisciplinary Studies, Sociology, Paralegal Certificate Program, Masters degree in Business Administration
- Affordable tuition — $165/semester hour for undergraduate correspondence courses, $350/semester hour for Masters level correspondence courses Payment options include cashiers check, credit card, money order or verified personal check
- Accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools
- 16+ years of experience serving incarcerated students
- Veteran friendly
- FREE unofficial evaluation of previously earned credits



ADAMS STATE UNIVERSITY
C O L O R A D O ®
*Great Stories Begin Here*
**EXTENDED STUDIES**

Call or write to receive additional information — 800-548-6679
Adams State University
Office of Extended Studies, Suite 3000
208 Edgemont Blvd. Alamosa, CO 81101
www.adams.edu

---

PLN_0000879

# First Circuit: Rejection of Settlement Offer Does Not Justify Defendants' Attorney Fee Award

On September 7, 2012, the First Circuit Court of Appeals vacated a $59,787.50 attorney fee award to the defendants in a 42 U.S.C. § 1983 complaint, finding that the plaintiffs' rejection of a settlement offer did not render their claims unreasonable.

Three former employees of the Commonwealth of Puerto Rico filed suit in federal court in 2006, alleging that they were subjected to political discrimination in violation of the U.S. Constitution and the laws and Constitution of Puerto Rico. The plaintiffs sued three direct supervisors, Mayor Jaime H. Barlucea-Maldonado and the Municipality of Adjuntas for damages and declaratory and injunctive relief.

After some individual capacity claims were dismissed, the district court granted the supervisory defendants' motion for summary judgment, but denied the Mayor's and municipality's motions.

On January 19, 2010, the first day of trial, the municipality and Mayor offered to enter into settlement negotiations. Those negotiations ultimately failed and the case proceeded to trial. On January 27, 2010, the jury returned a verdict in favor of the remaining defendants.

The municipality then moved for an attorney fee award pursuant to 42 U.S.C. § 1988(b), claiming that the plaintiffs' claims were "totally unfounded" and "frivolous." The district court held that the claims against the Mayor and municipality were not frivolous or unreasonable under *Sullivan v. Sch. Bd.*, 773 F.2d 1182 (11th Cir. 1985). Nevertheless, the court awarded attorney fees of $59,787.50, apparently finding that once the plaintiffs had refused "to accept what the district court characterized as a 'sound settlement offer,'" the plaintiffs' claims "became unreasonable."

On appeal, the First Circuit noted that "Parties to civil litigation are generally responsible for their own attorney's fees under the so-called 'American Rule.' However, '[f]or private actions brought under 42 U.S.C. § 1983 and other specified measures designed to secure civil rights, Congress established an exception'" with respect to claims that are "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."

The appellate court held, "The mere failure to accept even a 'sound settlement offer' does not convert a reasonable claim into a frivolous one. Neither the municipality nor the district court explained why the reasonable claims ... had become unreasonable or groundless by the time trial approached." Therefore, the Court of Appeals concluded that the defendants' attorney fee award "constituted 'a clear error of judgment.'"

The district court's order was vacated and the case remanded for a determination of any attorney fee award applicable to two of the plaintiffs' claims that the First Circuit found were frivolous or unreasonable at the time the complaint was filed. See: *Torres-Santiago v. Municipality of Adjuntas*, 693 F.3d 230 (1st Cir. 2012).

This ruling may be useful for prisoners who refuse to accept the often extremely low settlements offered by corrections officials, then subsequently lose their case and face a motion for an award of the defendants' attorney fees. ◼

# Pennsylvania: Parole Board May Expound on Court-ordered Probation Conditions

On September 7, 2012, the Pennsylvania Supreme Court held that a lower court had incorrectly reversed a probation revocation that was premised on the violation of a probation condition imposed by the Pennsylvania Board of Probation and Parole (Board), rather than by the trial court.

Robert C. Elliott, Jr. was convicted of child sex offenses and sentenced to prison followed by a 5-year term of probation. He was also adjudicated a Sexually Violent Predator under Megan's Law. While incarcerated, Elliott was turned down for parole four times for failing to complete a sex offender treatment program. Following his release after serving his entire sentence, he met with Board officials who notified him of his probation conditions.

Several weeks later Elliott was observed watching young children in a park. He later "admitted that he regularly went to the park to watch the children and that he was sexually aroused by the girl in the red bathing suit," though he never had any contact or direct interaction with the children. His probation was revoked and he was sentenced to 5 to 10 years in prison.

Elliott appealed, arguing that the revocation could not stand because the conditions of his probation, which included a provision prohibiting him from entering or loitering "within 1,000 feet of areas where the primary activity at such locations involve persons under the age of 18," had been set by the Board. Only a judge, he argued, had authority to impose the terms and conditions of his probation. The

Superior Court reversed the revocation on appeal, and the state sought review.

The Pennsylvania Supreme Court agreed that "the Board and its agents cannot impose any condition of supervision it wishes, *carte blanche*," because doing so "would, of course, interfere with the court's well-established sentencing authority." As such, the Court held that Megan's Law does not give "the Board independent authority to impose any condition of supervision it wishes upon a probationer subject to sex offender provisions merely because of his status as a sex offender."

Nevertheless, the Supreme Court held that a trial court may impose generalized probation conditions and the Board "may impose conditions of supervision that are germane to, elaborate on, or interpret any conditions of probation that are imposed by the trial court," provided that "those supervision conditions are in furtherance of the trial court's conditions of probation."

In Elliott's case, the Supreme Court wrote, "what apparently occurred here is that the Board felt it necessary to expound upon the trial court's no contact order." As such, the Board did not exceed its legal authority and the Superior Court erred in concluding otherwise. Since the Superior Court had not addressed Elliott's separate argument that there was insufficient evidence to support his probation revocation, the case was reversed and remanded for the Superior Court to examine the sufficiency of the evidence. See: *Commonwealth of Pennsylvania v. Elliott*, 50 A.3d 1284 (Pa. 2012). ◼

PLN_0000880



### The Habeas Citebook: Ineffective Assistance of Counsel

**\$49.95**

Brandon Sample
ISBN: 978-0-9819385-1-6
Paperback, 224 pages

The Habeas Citebook: Ineffective Assistance of Counsel is the first in a series of books by Prison Legal News Publishing designed to help pro-se prisoner litigants identify and raise viable claims for potential habeas corpus relief. This book is an invaluable resource that identifies hundreds of cases where the federal courts have granted habeas relief to prisoners whose attorneys provided ineffective assistance of counsel.



### Prisoners' Guerrilla Handbook to Correspondence Programs in the United States and Canada, 3rd Edition

~~**\$49.95**~~
**\$35**
*(on sale until 2014)*

Jon Marc Taylor
ISBN: 978-0-9819385-0-9
Paperback, 224 Pages

The greatly anticipated and newly updated third edition of the Prisoner's Guerrilla Handbook to Correspondence Programs in the United States and Canada has finally arrived! Author Jon Marc Taylor's brand new version is the latest in this unique and highly successful guidebook for the prisoner-student. This invaluable tool and how-to handbook provides the reader with step-by-step instructions to find the appropriate education program for correspondence high school, vocational, paralegal, undergraduate, and graduate courses offered in the U.S. and Canada today.



### Prisoners' Self-Help Litigation Manual, 4th Edition

**\$45.95**

John Boston & Dan Manville
ISBN: 978-0-1953744-0-7
Paperback, 960 pages

Prisoners' Self-Help Litigation Manual, in its much-anticipated fourth edition, is an indispensable guide for prisoner litigants and prisoner advocates seeking to understand the rights guaranteed to prisoners by law and how to protect those rights. Clear,comprehensive, practical advice provides prisoners with everything they need to know on conditions of confinement, civil liberties in prison, procedural due process, the legal system, how to actually litigate, conducting effective legal research, and writing legal documents. It is a roadmap on how to win lawsuits.

☐ Habeas Citebook,
   Ineffective Assistance of Counsel
   \$49.95

☐ Prisoners' Guerrilla Guide to
   Correspondence Programs
   3rd edition
   \$49.95

☐ Prisoners' Self-Help
   Litigation Manual
   4th edition
   \$45.95

***Shipping included in all prices***

*Order by mail, phone, or on-line.*   Amount enclosed _____

By: ☐ check ☐ new postage stamps ☐ credit card ☐ money order

Name _____

DOC/BOP Number _____

Institution/Agency _____

Address_____

City _____ State ____ ZIP _____

PUBLISHED BY



**PRISON LEGAL NEWS**
Dedicated to Protecting Human Rights

PO Box 1151 • Lake Worth, FL 33460
Tel 561-360-2523 • www.prisonlegalnews.org

PLN_0000881

# Seventh Circuit Retires "De Minimis" Standard for Use of Physical Force

THE SEVENTH CIRCUIT COURT OF Appeals has reversed a district court's application of a "de minimis harm" standard in dismissing a Wisconsin detainee's claim that he was sexually groped.

In April 2008, James Washington, Jr. was a pretrial detainee at a Wisconsin jail when a guard, John P. Hively, allegedly fondled his "testicles and penis through [his] clothing" during a pat down, "then while strip searching him fondled his nude testicles for two or three seconds." Washington filed a federal lawsuit against Hively, who denied the allegations.

The district court granted Hively's motion for summary judgment. The court correctly recognized that it could not resolve the factual disputes on summary judgment. However, even presuming "that the defendant grabbed the plaintiff's genitals in a way that was not related to penological interests," the district court found Hively was entitled to summary judgment because Washington "presented evidence of only de minimis injury" and had "suffered at most an assault and battery."

Washington appealed and the Seventh Circuit reversed, finding that "the judge's references to 'de minimis injury' and 'assault and battery' inappropriately invoked excessive force cases," which held "that 'de minimis uses of force are non-actionable.'"

The Court of Appeals found that "an unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the 'force' exerted by the assailant is significant."

As such, the appellate court held "it is therefore time that the formula of 'de minimis uses of physical force' was retired, as we suggested recently in *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012)."

In *Guitron*, the court wrote that "Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable. When a physical injury occurs as the result of force applied in the course of prison operations, as happened in Guitron, the courts should approach the matter as

*Whitley* [*v. Albers*, 475 U.S. 312, 106 S. Ct. 1078 (1986)] and *Hudson v. McMillian* [503 U.S. 1, 112 S. Ct. 995 (1992)] direct, rather than trying to classify injuries as de minimis."

In Washington's case, the Seventh Circuit observed that "Sexual offenses forcible or not are unlikely to cause so little harm as to be adjudged de minimis, that is, too trivial to justify the provision of a legal remedy. They tend rather to cause significant distress and often lasting psychological harm."

While the Court of Appeals noted that Washington could not obtain compensatory damages if he proved his claim against Hively due to 42 U.S.C. § 1997e, as he had not suffered a physical injury, nominal and punitive damages remained available to him. See: *Washington v. Hively*, 695 F.3d 641 (7th Cir. 2012).

Washington's lawsuit remains pending before the district court on remand. ◼

# Washington Community Custody, Sex Offender Registration and Release Conditions Modified

ON SEPTEMBER 13, 2012, THE WASHington Court of Appeals, Division Three, instructed a lower court to clarify a sex offender's length of community custody, correct his registration requirement, revise prohibitions regarding dating relationships and strike conditions related to Internet use, mental health treatment and substance abuse treatment.

Jerry D. Sheehan was convicted of molesting his 12-year-old step-daughter and sentenced to 22 years in prison followed by 13 years of community custody. The trial court also imposed post-release crime-related conditions, including prohibiting Sheehan from dating or forming relationships without prior approval and from possessing pornography. The court further ordered Sheehan to participate in mental health and substance abuse treatment and placed restrictions on his Internet usage.

Pursuant to RCW 9.94A.701(9), if an offender's standard range of confinement, combined with community custody, exceeds the statutory maximum sentence, the community custody period shall be reduced. When "a sentence of confinement and community custody could possibly exceed the statutory maximum for the crime, the appropriate remedy is to remand to the trial court to amend the judgment and sentence."

The Court of Appeals held that "While Mr. Sheehan's total term of confinement and community custody does not exceed the statutory maximum for the combined offenses ... the judgment and sentence should

clearly state the exact term of community custody for each count." Therefore, the appellate court remanded the case "to clarify the length of confinement and/or community custody for each count within the statutory maximum." Sheehan's exceptional sentence was upheld, however, as "the trial court correctly found as a matter of law that substantial and compelling reasons existed for imposing an exceptional sentence."

Under RCW 9A.44.140(2), Washington sex offenders are required to register for 15 years following their release from prison. However, the trial court ordered Sheehan to register for a total of 50 years. Accepting the state's concession that the "registration requirement should end 15 years after his release," the Court of Appeals remanded "to correct the judgment."

Citing *State v. Bahl*, 164 Wn.2d 739, 757-58, 193 P.3d 678 (Wash. 2008), the appellate court recognized that "a general restriction on accessing or possessing pornographic materials implicates First Amendment rights and is unconstitutionally vague." Given the state's concession that the pornography ban imposed on Sheehan was vague, that prohibition was struck down.

Likewise, recognizing a First Amendment right to freedom of association under *State v. Moultrie*, 143 Wn.App 387, 399, n.21, 177 P.3d 776 (Wash. Ct. App. 2008), the Court of Appeals agreed that "the prohibition against dating or forming relationships without prior approval is overbroad and unreasonable because it does

PLN_0000882

not accurately describe the class of persons that Mr. Sheehan is not allowed to contact, based on his crime." Although Sheehan had victimized a child, the prohibition barred "platonic relationships with childless adults," and thus was "not reasonably related to the State's essential need to protect children." The appellate court held that "a more focused prohibition is required" and instructed the lower court "to revise the prohibition to limit Mr. Sheehan from forming relationships with persons having minor children."

The state also conceded that the trial court did not follow RCW 9.94A.505(9) in imposing a condition requiring Sheehan to undergo a mental health evaluation and treatment. The trial court was directed to strike that condition because it lacked the authority to impose it without first following the required statutory procedure.

Finally, the Court of Appeals struck the substance abuse treatment and Internet usage conditions, because the state admitted that Internet and substance abuse "were not implicated in Mr. Sheehan's crime and are not crime related." See: *Washington v. Sheehan*, 2012 Wash. App. LEXIS 2143 (Wash. Ct. App. Sept. 13, 2012) (unpublished).

# New Mexico Prison Doctor Fingered in Lawsuits

Two lawsuits filed in March 2013 seek compensatory and punitive damages against former prison physician Mark E. Walden, GEO Group, Corizon, wardens Erasmo Bravo and Timothy Hatch, and health administrator Sherry Phillips. The suits allege that numerous prisoners were fondled or received intrusive rectal exams by Dr. Walden, a Corizon employee, at the GEO Group-operated Guadalupe County Correctional Facility in Santa Rosa and New Mexico Detention Facility in Clayton.

Suspicions arose due to a substantial increase in unnecessary, prolonged rectal exams, including some conducted without gloves, and Walden's refusal to have a nurse or other third party present during the exams. In one case, a prisoner with a knee injury received a rectal exam; in another, a prisoner claimed that Walden penetrated his anus using his entire hand.

A third lawsuit was filed against Dr. Walden, GEO Group, Corizon and various prison officials on July 12, 2013, alleging that Walden had "sexually abused at least 25 victims" by performing unnecessary rectal exams or fondling them. The suits remain pending. See: *F.M. v. Walden*, U.S.D.C. (D. NM), Case No. 1:13-cv-00264-ACT-RHS; *R.J. v. The GEO Group*, U.S.D.C. (D. NM), Case No. 1:13-cv-00265-ACT-RHS; *H.R. v. The GEO Group*, U.S.D.C. (D. NM), Case No. 1:13-cv-00647-ACT-KBM.

The New Mexico Medical Board is investigating Dr. Walden for having "touched or attempted to touch these inmates in an inappropriate, sexual manner," and his medical license has been suspended.

Additional source: *Associated Press*

***Hepatitis & Liver Disease:
A Guide to Treating & Living
with Hepatitis & Liver Disease***
**Revised ed. By Dr. Melissa Palmer**
See page 61 for more information.

# INMATE TOLL BUSTERS
## Discount Inmate Telephone Calling Services

*Serving: Federal & State Prisons, County Jails and INS Detention Centers Nationwide*

**FREE Same Day Installation, Only $1.25 Per Month and 6¢ Per Minute**

## PAY ONLY FOR MINUTES YOU USE

### www.InmateTollBusters.com
### Call 24 Hours:  888-966-8655

We Send Calls To Cell Phones.
International Call Services Available.
Call For Rates. Se Habla Español.

VISA   MasterCard   DISCOVER NETWORK



PLN_0000883

# Qualified Immunity for NY Prison Officials who Failed to Award Parole Jail Time

THE SECOND CIRCUIT COURT OF Appeals held on August 7, 2012 that prison officials who failed to properly award parole jail time (PJT) credits to two prisoners serving concurrent prison and jail sentences were entitled to qualified immunity because it was not clearly established at the time that they were required to award the credits.

The appellate ruling was entered in consolidated lawsuits filed by Terence Sudler and Timothy Batthany. Both were on parole after serving state prison sentences and were arrested for parole violations and new misdemeanor charges. They pleaded guilty to the violations and were sentenced to serve the remainder of their original prison terms.

They also subsequently pleaded guilty to the new misdemeanor offenses. Sudler received a nine-month jail sentence while Batthany received six months. In each case, the judge ordered the jail sentence to be served concurrently with the parole violation sentence.

When their jail sentences expired, Sudler and Batthany were transferred from Rikers Island to the custody of the New York State Department of Corrections and Community Supervision (NY DOCCS). Prison officials determined that neither was entitled to PJT for the time served on their jail sentences.

Both Sudler and Batthany complained. Sudler got nowhere with his complaints and served about six months longer than if he had been awarded PJT. Batthany, however, who had help from counsel at Prisoners' Legal Services of New York, secured his release after showing the NY DOCCS a copy of his Sentence and Commitment form. Batthany served six weeks longer than he would have had he received a timely PJT award.

Sudler and Batthany filed suit in federal court, alleging their constitutional rights had been violated. Their cases were consolidated and the district court granted the defendants' motion to dismiss and motion for summary judgment on qualified immunity grounds.

The Second Circuit declined to resolve the questions of state law or application of federal case law that the parties asserted were applicable. Rather, the appellate court held the defendants were entitled to quali-

fied immunity on the plaintiffs' claim that their due process rights had been violated when NY DOCCS officials failed to properly apply PJT credits for the time served on their concurrent jail sentences.

As to Sudler's case, the Court of Appeals held that at the time his sentence was calculated it was not clearly established in law that a custodial sentence could not be extended except by a judge. While that right was clearly established in *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006) [*PLN*, April 2010, p.46] with respect to post-release supervision, *Earley* did not become final until after Sudler's release; thus, the defendants did not have notice that failure to promptly award PJT credits was unconstitutional.

Batthany's sentence was calculated 19 months after the ruling in *Earley*. However, the Second Circuit found that New York courts struggled with the implications of *Earley* and issued conflicting rulings until April 2008, when the issue was resolved by the New York Court of Appeals. The Second Circuit said that under those circumstances, "we cannot fairly say that the illegality of failing to afford such [PJT] credit should have been apparent to reasonable prison officials."

Because the defendants were entitled to qualified immunity, the district court's order of dismissal was affirmed. Sudler and Batthany filed a petition for writ of certiorari with the U.S. Supreme Court, which was denied on June 3, 2013. See: *Sudler v. City of New York*, 689 F.3d 159 (2d Cir. 2012), *cert. denied*. ◼

# Minnesota: Remedies for Civil Commitments are Limited

THE MINNESOTA SUPREME COURT HAS held that a person who is indeterminately civilly committed as a Sexually Dangerous Person (SDP) or Sexual Psychopathic Personality (SPP) may not bring a motion seeking transfer or discharge from their commitment under Minn.R.Civ.P. 60.02, but may bring a Rule 60.02 motion to void a commitment for lack of jurisdiction, ineffective assistance of counsel and other limited claims that do not specifically request a transfer or discharge.

The state Supreme Court issued its ruling in the combined appeals of Peter G. Lonergan, an SDP, and Robert A. Kunshier, an SPP. Both filed a motion with the Dakota County District Court under Rule 60.02, which allows a court to "relieve a party or the party's legal representative from a final judgment ... order, or proceeding." The district court denied their motions, which was affirmed by the Court of Appeals.

The first question addressed by the Supreme Court was whether the Commitment Act (Minn. Stat. § 253B (2010)) conflicted or was inconsistent with Rule 60.02. The Act permits civil commitment of 1) the chemically dependent, 2) mentally ill, 3) developmentally disabled, 4) mentally ill

and dangerous to the public, 5) an SPP, or 6) an SDP. Persons committed under one of the first three categories may petition the court for release under Minn. Stat. § 253B.17, subd. 1 (2010).

Those in the other three categories must seek a "reduction of custody," which the statute defines as a "transfer out of a secure treatment facility, a provisional discharge, or a discharge from commitment." To seek a transfer or discharge, an SDP or SPP must petition a three-member Special Review Board. The Board then conducts a hearing and issues a recommendation to a three-member Judicial Appeal Panel. The SDP or SPP may seek a rehearing or reconsideration of the recommendation. The Panel then either issues an order adopting the Board's recommendation or sets the matter for hearing. The Panel's order may be appealed.

The Minnesota Supreme Court concluded that relief under the Commitment Act is narrower than that provided via Rule 60.02. The Act is the "exclusive remedy" for SDPs and SPPs seeking a transfer or discharge from civil commitment, thus to seek that relief they must follow the Act's procedures.

Relief under Rule 60.02 may be sought by SDPs and SPPs if it does not interfere

PLN_0000884

with a patient's rehabilitation or place public safety at risk. Rule 60.02 motions that seek to cure a procedural or jurisdictional defect during the commitment process fit within that category, but not motions seeking transfer or release from custody.

The Supreme Court concluded that an SDP or SPP cannot use Rule 60.02 to seek a transfer or discharge, or to raise a claim that would present a "distinct conflict" with the Commitment Act or "frustrate the purpose" of the Act. However, a Rule 60.02 motion seeking, for example, to cure a procedural or jurisdictional defect during the commitment process, such as a claim for ineffective assistance of counsel or lack of subject matter jurisdiction, would not necessarily conflict with the purpose of the Act.

Therefore, Lonergan's and Kunshier's appeals were remanded to the Court of Appeals to determine what, if any, non-discharge claims they raised in their Rule 60.02 motions. See: *In re Civil Commitment of Peter Gerard Lonergan,* 811 N.W.2d 635 (Minn. 2012).

On October 9, 2012, the Court of Appeals concluded "that Lonergan may raise adequacy- or denial-of-treatment claims by a rule 60.02(e) motion," and remanded the case to the district court for consideration of those claims. The appellate court found that Lonergan's other claims had been properly dismissed or would be more appropriately raised "in a section 1983 action or a habeas corpus petition." See: *In re Civil Commitment of Lonergan,* 2012 Minn.App. Unpub. LEXIS 979 (Minn. Ct. App. Oct. 9, 2012).

In a separate ruling, the Court of Appeals affirmed the district court's dismissal of Kunshier's Rule 60.02 motion challenging his civil commitment, finding that his claims "are essentially claims for discharge, not an attempt to vindicate a right to treatment.... As such, they fall within the supreme court's prohibition against making transfer or discharge claims in a rule 60.02 motion." Although Kunshier had also raised an ineffective assistance of counsel claim, the appellate court found it was "both untimely and lacking in merit." See: *In re Civil Commitment of Kunshier,* 2012 Minn.App.Unpub. LEXIS 987 (Minn. Ct. App. Oct. 9, 2012). 

## BETTER JOBS FASTER PAROLE

**The only affordable 2-yr and 4-yr college programs available to inmates**

New Freedom College is designed for inmates, so our 2-yr & 4-yr programs offer a wide range of classes & majors that can all be completed in prison. At only $33-$50/credit, NFC will save you over $20,000 compared to traditional schools like Adams State ($165/credit + books = about $25,000 for 120 cr).

**New Freedom has:**
- majors you want like Business & Psych
- multi-class & referral discounts
- lots of feedback
- flexibility to meet your needs & openness to your ideas
- low rates that include books, study guides, etc.

College Diploma

4-yr diploma as low as $3,960

**Want to save thousands?** We will accept all your **Adams State** credits and most from other colleges, as well. $$$$$

... Write for info guide & enrollment form:

**New Freedom College**
1957 W. Burnside St. #1660
Portland, OR 97209
NewFreedomCollege.org



**iNMATE SHOPPER**

Yes it's true, Inmate Shopper is a real 220 page publication. Not a 7 sheet rip-off. Every issue contains about 600 pen pal resources and FREE display ads for prisoners to sell their crafts, art and books they've written. (No pen pal ads - only products)

**EVERY ISSUE CONTAINS:**
Our Gigantic Exclusive Inmate Shopper Mall full of products made by prisoners.
600+ Pen Pal resources and pen pal abbreviations
400 businesses friendly to prisoners
250 non-profit org's for prisoners issues
70 contests for writers, poets & artists
66 Gift Shops
63 Catalogs to order
22 Personal Assistants
14 Typists
5 Publishing Services
15 Magazine Sellers
FREE ad space for inmate authors, crafter's, and artists. Sell your items in our Mall. Complete directions and applications for placing your products in the mall, are in every issue.

**ORDER FROM:**
$17.99 + $7 Priority Shipping
**Inmate Book Service**
P.O. Box 142 Caratunk, ME 04925
207-672-4344 inmatebooks@yahoo.com
**Inmate Mags**
4208 University Wy, NE. Seattle, WA 98105
877-324-7323 info@inmatemag.com



## CA$H FOR YOUR STAMPS
### P. O. Box 687-P, Walnut, Ca. 91788

Get the HIGHEST return for ALL of your stamps!
Rapid processing and payment sent to your designee (No Package, Book, or Magazine Vendors Please)

**70% OF FACE VALUE** for Books and Sheets of "Forever" Stamps in new or excellent.*
**60% OF FACE VALUE** for Books and Sheets of Other Denominations in new or excellent condition.*
**50% OF FACE VALUE** for all books, sheets, or rolls that are not in new and complete condition.
***NEW CONDITION MEANS NO FOLDS, NO WRITING, AND ALL STICKERS IN TACT.**
**NO SINGLE STAMPS** (GROUPS OF 2 OR MORE). Stamped envelopes must be #10 with no markings. $15.00 Min. Money Orders. Damaged or Taped Stamps Not Accepted/Returned. Send SASE for Brochure.

PLN_0000885

# Wrongful Immigration Detention Suit Reinstated by Second Circuit, Dismissed on Remand

## by Derek Gilna

VITERBO LIRANZO, BORN IN THE Do-minican Republic, was a U.S. citizen through section 321 of the Immigration and Naturalization Act, which conferred derivative citizenship on children of U.S. citizens. He was required to apply for a certificate of citizenship, but did not do so. Instead, he applied for and received a resident alien card (or "green card") to remain in the United States. Federal immigration records mistakenly indicated he was a lawful permanent resident.

In 2005, Liranzo was convicted of criminal sale of a controlled substance, a felony, which subjected him to possible deportation. He was detained by immigration agents after he told them he was a citizen of the Dominican Republic, and held in custody for seven months beyond his release date. He was then transported to the Federal Detention Center in Oakdale, Louisiana, where his attorney convinced the government that he was, in fact, a U.S. citizen based on his entitlement to derivative citizenship.

Liranzo exhausted his administrative remedies with the Department of Homeland Security and filed suit in U.S. District Court in New York in 2008, seeking dam-



ages for "false arrest and imprisonment" and other tortious conduct. Following two years of discovery, the government raised the defense of sovereign immunity based on the limited nature of the Federal Tort Claim Act's sovereign immunity waiver. "Absent a waiver, sovereign immunity shields the federal Government and its agencies from suit.... The waiver extends only to claims for which a private analogue exists – that is, the waiver extends only to claims that could be brought against a 'private individual under like circumstances.'"

The government argued that since immigration detention is an exclusively federal function there could be no private analogue, and hence no waiver of sovereign immunity. The district court adopted that argument and dismissed Liranzo's suit in 2010 for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(h)(3).

On appeal, the Second Circuit described the history of the Federal Tort Claims Act and noted that a 1974 amendment waived sovereign immunity for "any claim arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h). The appellate court also found the case of *Indian Towing Co. v. United States*, 350 U.S. 61 (1955) had expanded the breadth of government liability, stating, "To say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analogue exists." The Court of Appeals wrote that "the proper analogy seems to us to be a person who, entirely in his or her private capacity, places someone under arrest for an alleged violation of the law – a so-called 'citizen's arrest.'"

Acknowledging the ambiguity in federal case law that recognized the "special status" of immigration agents, the Second Circuit turned to applicable state case law for assistance, and tried to reconcile that with cases such as *United States v. Muniz*, 374 U.S. 150 (1963) and *Feres v. United States*, 340 U.S. 135 (1950). "The fact that a complained of action occurs in a quintessentially federal context, moreover, does not

necessarily mean that no private analogue exists.... The case before us is ... more closely akin to *Muniz* than *Feres*. In sum, it does not follow from the fact that immigration is a quintessentially federal function that immigration detention is without a private non-federal analogue. Even for alleged torts occurring in quintessentially federal contexts, the question remains whether analogous private liability exists under state law – and here, we conclude that it does."

The Court of Appeals thus remanded the case to the district court for further proceedings, specifically to consider "which federal standards govern the determination of whether the government official's actions here were privileged." The appellate court upheld the dismissal of Liranzo's Fourth Amendment claim. See: *Liranzo v. United States*, 690 F.3d 78 (2d Cir. 2012).

Following remand, a bench trial was held before a U.S. Magistrate Judge in March 2013, and findings of fact and conclusions of law were entered by the court on April 22, 2013. The court found, "There is no question that ICE filed an immigration detainer based on their justified belief that Liranzo was deportable as a non-citizen convicted of a felony because he had signed a form in which he identified himself as a citizen of the Dominican Republic.... The evidence at trial makes clear that Liranzo did so because he did not realize he was entitled to derivative citizenship until removal proceedings were initiated against him in 2006."

Liranzo further failed to prove that the government had unreasonably delayed his release by delaying "investigating the authenticity of his claim until they were in receipt of original documents." Additionally, he failed to establish his claims of assault, battery and negligent infliction of emotional distress.

Therefore, the district court granted the government's motion for a directed verdict at the close of Liranzo's case at the bench trial, and dismissed his lawsuit. See: *Liranzo v. United States*, U.S.D.C. (E.D. NY), Case No. 08-cv-02940; 2013 U.S. Dist. LEXIS 59333. ◾

**PENACON.com**

Helping the incarcerated community gain connections around the world!

Post your profile on an easy to navigate website for millions of viewers to see. Gain new penpals and look forward to receiving mail!

One Year Ad Only $35
Until Release Date Ad $95

Request a form today!
Send a S.A.S.E. to:
Penacon.com
P.O. Box 1037
Edna, TX 77957

USE CODE
PLN5OFF
FOR $5 OFF

PLN_0000886

*Stay in touch with a good Magazine!*

# Get 5 Full One Year Subscriptions - ONLY $20!
+ $3.99 p&h

*"BEST DEAL ON THE POUND!"*

## Check your **5** magazines
and <u>underline</u> three backup choices (in case of unavailability)

- ☐ 4 WHEEL DRIVE & SPORT UTILITY (12)
- ☐ ALLURE (12)
- ☐ AMERICAN PHOTO (6)
- ☐ ARTHRITIS TODAY (6)
- ☐ AUTOMOBILE (12)
- ☐ BACKPACKER (9)
- ☐ BETTER HOMES & GARDENS (12)
- ☐ BICYCLING (11)
- ☐ BLACK ENTERPRISE (12)
- ☐ BLACKBOOK (6)
- ☐ BOATING (10)
- ☐ BON APPETIT (12)
- ☐ BOWHUNT AMERICA (9)
- ☐ BOWHUNTING WORLD (9)
- ☐ BRIDAL GUIDE (6)
- ☐ CABELA'S OUTFITTER JOURNAL (6)
- ☐ CAR & DRIVER (12)
- ☐ CAR CRAFT (12)
- ☐ CHARISMA (12)
- ☐ CHEVY HIGH PERFORMANCE (12)
- ☐ CIRCLE TRACK (12)
- ☐ COMPLEX MAGAZINE (12)
- ☐ CONDE NAST TRAVELER (12)
- ☐ CRUISING WORLD (12)
- ☐ CYCLE WORLD (12)
- ☐ DETAILS - FASHION (10)
- ☐ DETROIT HOME (6)
- ☐ DIGITAL PHOTO (7)
- ☐ DIRT RIDER (12)
- ☐ EBONY (22)
- ☐ ELLE DECOR (10)
- ☐ ENTREPRENEUR (12)
- ☐ ESPN MAGAZINE (26)
- ☐ ESQUIRE (11)
- ☐ EVERY DAY WITH RACHAEL RAY (10)
- ☐ FAMILY CIRCLE (12)
- ☐ FAMILY FUN (10)
- ☐ FAST COMPANY (10)
- ☐ FIELD & STREAM (12)
- ☐ FITNESS (10)
- ☐ FLEX (24)

- ☐ FLORIDA SPORT FISHING (6)
- ☐ FLYING (12)
- ☐ FOUR WHEEL & OFF ROAD (12)
- ☐ FOUR WHEELER (12)
- ☐ FREESKIER (6)
- ☐ GARDEN & GUN (6) No Renewal
- ☐ GLAMOUR (12)
- ☐ GOLF DIGEST (24)
- ☐ GOLF TIPS (7)
- ☐ GOLFWEEK (40)
- ☐ HARPERS BAZAAR (10)
- ☐ HOT BIKE (12)
- ☐ HOT ROD (12)
- ☐ HOUR DETROIT (12)
- ☐ HOUSE BEAUTIFUL (10)
- ☐ INC (12)
- ☐ INSTRUCTOR K - 8 (6)
- ☐ ISLANDS MAGAZINE (8)
- ☐ JET (20)
- ☐ LADIES HOME JOURNAL (11)
- ☐ LATINA (10)
- ☐ LOG HOME LIVING (9)
- ☐ LUCKY (10)
- ☐ MARIE CLAIRE (12)
- ☐ MEN'S FITNESS (10)
- ☐ MEN'S JOURNAL (24)
- ☐ MIDWEST LIVING (6)
- ☐ MINISTRY TODAY (6)
- ☐ MORE (10)
- ☐ MOTOR TREND (12)
- ☐ MOTORCYCLIST (12)
- ☐ MUSCLE & FITNESS (12)
- ☐ MUSCLE MUSTANGS & FAST FORDS (12)
- ☐ NYLON GUYS (6)
- ☐ NYLON MAGAZINE (10)
- ☐ OLD HOUSE JOURNAL (6)
- ☐ OUTDOOR LIFE (12)
- ☐ OUTDOOR PHOTOGRAPHER (11) No Renewal
- ☐ OUTSIDE (12)
- ☐ PARENT & CHILD (8)
- ☐ PARENTS (12)

- ☐ PLANE & PILOT (12) No Renewal
- ☐ POPULAR PHOTOGRAPHY (12)
- ☐ POPULAR SCIENCE (12)
- ☐ PREDATOR EXTREME (6)
- ☐ PREVENTION (12)
- ☐ READER'S DIGEST (24)
- ☐ RED BULLETIN MAGAZINE (12)
- ☐ REDBOOK (12)
- ☐ ROAD & TRACK (10)
- ☐ SAVEUR (9)
- ☐ SELF (12)
- ☐ SEVENTEEN (10)
- ☐ SHAPE (12)
- ☐ SIEMPRE MUJER (6)
- ☐ SKI MAGAZINE (6)
- ☐ SLAM (30)
- ☐ SNOWBOARD (4)
- ☐ SNOWBOARDER (7)
- ☐ SOUND & VISION (8)
- ☐ SPORT RIDER (10)
- ☐ SUPER CHEVY (12)
- ☐ SURFER (12)
- ☐ SURFING (12)
- ☐ TEEN VOGUE (10)
- ☐ TENNIS (6)
- ☐ THE ATLANTIC MONTHLY (10)
- ☐ TIMBER HOME LIVING (6)
- ☐ TRANSWORLD MOTOCROSS (12)
- ☐ TRANSWORLD SKATEBOARDING (12)
- ☐ TRANSWORLD SNOWBOARDING (8)
- ☐ TRANSWORLD SURF (12)
- ☐ TRUCKIN (13)
- ☐ UPTOWN (6)
- ☐ W MAGAZINE (10)
- ☐ WATERFOWL & RETRIEVER (2)
- ☐ WEIGHT WATCHERS (6)
- ☐ WHITETAIL JOURNAL (4)
- ☐ WIRED (12)
- ☐ WORKING MOTHER (6)
- ☐ YOGA JOURNAL (9)

*"Tell your Friends and Families!"*

**Send as many "5 for $20" orders as you like!**

Send a copy of this page to us. Please make your address as short as possible. **Current customers - Please update your address!**
Allow 6-8 weeks for delivery. Pay by check, money order or **order online** and use credit card or PayPal.

| Name and Inmate # (please print, <u>maximum 24 characters</u>): |
|---|

| Address: |
|---|

| City: | State: | Zip: |
|---|---|---|



# Inmate Magazine Service inc.

P.O. Box 2063, Fort Walton Beach, FL 32549   www.InmateMagazineService.com

*OK to Copy!*

PLN_0000887

# California Supreme Court: Cutting Through Fences May Not Constitute Attempt to Escape

In a July 2012 unpublished decision, the California Supreme Court upheld a published opinion of the Court of Appeal dismissing the "three strikes" conviction of a prisoner, Robin Bailey, who was charged with escaping from the Correctional Training Facility in Soledad in 2008.

Both courts found the trial evidence insufficient as a matter of law to support a conviction for escape from a state prison, where the record established merely that Bailey, while cutting through four fences, had managed only to "saw his way further into the facility" but did not breach a wall or perimeter fence.

The question reviewed by the Supreme Court was whether, under the circumstances presented, an appellate court could reduce Bailey's conviction from one of escape to attempted escape. The Supreme Court agreed with the appellate court that it could not do so because, counter-intuitively, attempt to escape is not a lesser included offense of escape; the former contains a specific intent element not present in the latter, as the Court discussed at length.

The appellate court had held that "[a]n inmate who remains within the bounds of the prison has not escaped that prison *even if* he has broken out of his cell and breached interior security barriers." Thus, since there

was insufficient evidence that Bailey had "escaped" based on the legal definition of that term, his conviction and 25-years-to-life three strikes sentence were reversed. See: *People v. Bailey*, 187 Cal. App. 4th 1142 (Cal. App. 6th Dist. 2010).

On review, the Supreme Court convincingly illustrated the need for a specific intent finding for a charge of attempted escape by considering the example of a prisoner – like Bailey – who stole a pair of wire cutters from a prison shop. Whether that act constituted an escape attempt would obviously depend, the Supreme Court noted, on what the prisoner intended to do with the cutters. Intending to use them to cut through the prison's outer perimeter

fence could support a conviction for attempt to escape, while planning to use them, for example, as a weapon would not.

The jury in Bailey's trial was instructed only on the elements of escape, which has no specific intent requirement. As the jury therefore made no finding of specific intent (and because the record relative to that issue was susceptible to differing interpretations), the Supreme Court held the Court of Appeal was correct when it determined that it could not modify Bailey's escape conviction to attempted escape, and thus reversed his conviction. See: *People v. Bailey*, 54 Cal. 4th 740, 279 P.3d 1120 (Cal. 2012).

Additional source: *Monterey Herald*

# Ninth Circuit Requires Notice to Pro Se Prisoner Litigants for Motions to Dismiss for Failure to Exhaust

The Ninth Circuit Court of Appeals held on September 19, 2012 that district courts must give pro se prisoners notice of their rights and duties when responding to a motion to dismiss for failure to exhaust administrative remedies.

In 2008, Washington state prisoner Donald L. Stratton was assaulted by a fellow prisoner and required hospitalization. He later filed suit in federal court against prison nurse Dale Brown and a doctor who examined him at the hospital, alleging they had improperly deprived him of pain medication.

The district court granted Brown's motion to dismiss under Fed.R.Civ.P. 12(b) for failure to exhaust administrative remedies, and Stratton appealed.

The Ninth Circuit first noted that it had held in *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) [*PLN*, April 1999, p.19] "that a pro se prisoner litigant is entitled to 'fair notice of the requirements and consequences of the summary judgment rule.'"

Because "an unenumerated Fed.R.Civ.P. 12(b) motion to dismiss based on the failure to exhaust administrative remedies is closely analogous to a motion for summary judgment," the Court of Appeals had previously

held in *Wyatt v. Terhune*, 315 F.3d 1108 (9th Cir. 2003) [*PLN*, March 2003, p.24] that "if the district court looks beyond the pleadings in deciding the motion," it "'must assure that [the pro se prisoner plaintiff] has fair notice of his opportunity to develop a record.'"

Given the complexity of a motion to dismiss for failure to exhaust administrative remedies, the appellate court recognized that "a pro se prisoner lacking legal sophistication is unlikely to understand how to respond to" the motion. Therefore, "when a district court will consider materials beyond the pleadings in ruling upon a defendant's motion ... the pro se prisoner plaintiff must receive a notice, similar to" the notice required by *Rand* for summary judgment motions.

Such notice "must be provided to pro se prisoner plaintiffs at the time the defendants' motions are filed." It also "must be phrased in ordinary, understandable language calculated to apprise an unsophisticated prisoner of his or her rights and obligations" under Fed.R.Civ.P. 12(b).

At a minimum, the notice shall explain "the motion to dismiss for failure to exhaust administrative remedies is similar to a motion for summary judgment in that the district court will consider materials beyond the pleadings; the plaintiff has a

*Oprah Winfrey*

*PenPals.com*

*An upscale pen pal site suited for those of you with style, class and Swagger.*

*Join today, meet that special someone!*

*NEW MEMBER SPECIAL
$39.95, 1-year membership
250 words and one (1) photo
Special offer void after 12/31/13*

*Send S.A.S.E. for Brochure to:
Celebrity Spotlight Entertainment
P.O. Box 80724
Bakersfield, CA  93380*

PLN_0000888

'right to file counter-affidavits or other responsive evidentiary materials'; and the effect of losing the motion."

Accordingly, the Ninth Circuit reversed the dismissal of Stratton's suit, finding that the district court's failure to provide the described notice was not harmless error. See: *Stratton v. Buck*, 697 F.3d 1004 (9th Cir. 2012).

Following remand, the district court dismissed the case without prejudice on May 13, 2013, finding that Stratton had failed to properly exhaust his administrative remedies as required by the Prison Litigation Reform Act.

# Seventh Circuit Upholds CCA's Victory in Indiana Jail Conditions Suit

ON SEPTEMBER 14, 2012, THE SEVENTH Circuit Court of Appeals affirmed a district court's class certification and summary judgment orders in a jail conditions case involving the Marion County Correctional Center (MCCC) in Indianapolis, Indiana, also known as the Marion County Jail II, operated by Corrections Corporation of America (CCA).

In 2008, MCCC prisoners were subjected to overcrowded living conditions in which upwards of 150 prisoners were forced to share a single toilet and sink; deprived of food and water for extended periods of time; housed in trash, mold and insect-infested living conditions; and required to reveal confidential medical information in the presence of other prisoners.

MCCC prisoners Alan Kress and Randy Carr filed suit in April 2008 alleging inadequate medical care and inhumane living conditions. The federal district court granted their motion for class certification and named them as class representatives, but dismissed several claims that failed to satisfy class certification requirements. The court subsequently granted CCA's motion for summary judgment on the remaining claims and dismissed the case in 2011. [See: *PLN*, May 2012, p.46].

On appeal, the Seventh Circuit first upheld the district court's finding that the plaintiffs had failed to satisfy the class certification typicality requirement for claims challenging CCA's reduction of medication calls from three to two times a day.

"Though some similarities may exist between the two cases," the Court of Appeals found that the district court did not abuse its discretion in failing to follow the class certification decision in *Smentek v. Sheriff of Cook County*, 2010 U.S. Dist. LEXIS 122145 (N.D. Ill. 2010), because "the district court's decision in *Smentek* was based on fact-specific findings that differ from the instant case."

The Seventh Circuit also affirmed the district court's grant of summary judgment to CCA, noting that CCA had "presented an affidavit from 2011 in which the jail warden testified that measures had been taken to remedy the ... problems in 2008 and 2009, after [plaintiffs] had left the jail." The plaintiffs failed to offer any evidence that such remedial measures had not been taken and, therefore, failed to establish an ongoing constitutional violation warranting injunctive relief. See: *Kress v. CCA*, 694 F.3d 890 (7th Cir. 2012).





PLN_0000889

# California: Victim's Post-Death Economic Losses Not Subject to Mandatory Restitution

THE CALIFORNIA SUPREME COURT HAS reversed a restitution order assessed against a defendant who, while driving intoxicated, killed another driver in a freeway collision. The Court held that 1) the estate of the accident victim (who died without heirs) was not itself a "direct victim" of a crime; 2) the executor of the decedent's estate is nonetheless entitled to collect mandatory restitution on the decedent's behalf for economic losses the decedent personally incurred *before* death as an actual victim of the defendant's criminal conduct; but 3) post-death economic losses are not subject to mandatory restitution.

The Supreme Court reached this conclusion notwithstanding the "Victims' Bill of Rights" incorporated in California's Constitution, as amended by Proposition 9 (Marsy's Law), which specifies that a crime victim is entitled to restitution and defines "victim" as including "a lawful representative of a crime victim who is deceased."

After being convicted of gross vehicular manslaughter while intoxicated and sentenced to six years in prison, Paul Dean Runyan was ordered to pay restitution totaling $446,486 to the estate of Donald Benge, the other driver he killed in April 2007. The restitution amount was assessed pursuant to the mandatory restitution statute, Penal Code Section 1202.4, and was based on economic losses sustained by Benge's estate.

Runyan appealed the restitution order, arguing that under Section 1202.4 restitution was available only to a "direct victim" of his crime, and that because the estate was not a "direct victim" and Benge had died without heirs, there was no identifiable "victim" entitled to restitution. Believing that the legislature could not have intended such a result, the Court of Appeal upheld the restitution order. See: *People v. Runyan*, 188 Cal. App. 4th 1010 (Cal. App. 2d Dist. 2010).

The Supreme Court reversed, determining that after the actual victim of a crime has died, he or she does not incur, or continue to incur, personal economic losses subject to mandatory restitution. Because no portion of the restitution award upheld by the Court of Appeal represented an economic loss incurred prior to Benge's death as a result of Runyan's crime, the

Court found there was no valid basis for any of the restitution amounts awarded to Benge's estate.

"We are mindful of the concern, expressed by both the trial court and the Court of Appeal, that denial of restitution to a deceased victim's estate under the circumstances presented here produces a perverse result the Legislature cannot have intended – i.e., that a criminal defendant may minimize his or her restitutionary obligation by instantly killing a victim, rather than by causing mere nonfatal injury," the Supreme Court wrote. "But a rule against postdeath restitution on a deceased victim's personal behalf is consistent with the rule of damages that has applied by statute for more than 60 years in analogous civil cases of wrongful death."

Consequently, the Court of Appeal's judgment, and thus the restitution order imposed on Runyan, was reversed. See: *People v. Runyan*, 54 Cal. 4th 849, 279 P.3d 1143 (Cal. 2012).

# Second Circuit: No Social Security Payments for Prisoners

LAST YEAR, THE SECOND CIRCUIT COURT of Appeals held that the "No Social Security Benefits for Prisoners Act (the Act), Pub. L. No. 111-115, 123 Stat. 3029 (2009), bars the Social Security Administration (SSA) from making any payments to incarcerated individuals covered by the Act, "regardless of when the underlying obligation to pay the individual arose."

In April 2002, Felipe O. Fowlkes filed a pro se complaint in federal district court in New York against two SSA officials and an SSA administrative law judge. He alleged that his Supplemental Social Security (SSI) benefits had been improperly suspended based on the erroneous conclusion that he was a fugitive felon, and the suspension constituted a violation of his due process rights.

The district court granted the defendants' motion to dismiss. The Second Circuit affirmed the dismissal of Fowlkes' due process claim, but remanded the case because the lower court should have construed the remainder of his complaint as a petition for review of an adverse SSA determination. The Court of Appeals held that Fowlkes' SSI benefits could only be suspended when a warrant or order issues from a court on a finding that he had fled or was fleeing from justice, which had not occurred. See: *Fowlkes v. Adamec*, 432 F.3d 90 (2d Cir. 2005).

Fowlkes subsequently prevailed with the SSA, as there was no evidence that he was a fugitive felon at the time his SSI benefits were suspended. On December 12, 2007, the U.S. Treasury sent Fowlkes, who was incarcerated, a refund check for $9,785.32.

Prison officials intercepted the check, advising Fowlkes that he had to endorse and deposit it into his prisoner account. Fowlkes refused, insisting that the check be sent to a person or bank outside the prison. Prison officials returned the check to the SSA, which declined Fowlkes' request to reissue the check because he was incarcerated.

Fowlkes filed a post-judgment motion with the district court in November 2010, for an order directing the SSA to reissue his refund check. The court denied his motion and Fowlkes appealed.

The Second Circuit found the text of the Act makes it clear that "an incarcerated individual who has been underpaid social security benefits may not receive payment of those benefits until he or she is released from prison." This restriction applies "even if the underlying obligation to pay predates the Act," as was the case here.

In affirming the district court's denial of Fowlkes' motion, the Second Circuit held the Act is not impermissibly retroactive. See: *Fowlkes v. Thomas*, 667 F.3d 270 (2d Cir. 2012).

### *Actual Innocence*

Explains how the innocent are convicted by faulty eyewitness testimonies, police perjury, expert witnesses, prosecutorial misconduct, etc., and how DNA testing is used to free the innocent.

$16.00 from PLN's Book Store!
See page 61 for more information.

PLN_0000890

ARE YOU AN **UNDOCUMENTED IMMIGRANT** OR **AMERICAN CITIZEN** CURRENTLY INCARCERATED IN A **PRIVATE PRISON?**

HAVE YOU BEEN A VICTIM OF A **BATTERY, RAPE, OR SEXUAL ASSAULT?**

HAVE YOU BEEN PLACED IN **SOLITARY CONFINEMENT** WITH **NO MEDICAL CARE?**



HAVE YOU BEEN A VICTIM OF **MENTAL ABUSE, TORTURE, PRISON RIOTS OR CRUEL, INHUMANE, AND DEGRADING TREATMENT?**

# IF YOUR ANSWER IS <u>YES</u>, YOU MAY BE ELIGIBLE FOR AN AWARD OF DAMAGES

CONTACT THE LAW FIRM OF

## KHORRAMI BOUCHER
## SUMNER SANGUINETTI, LLP



**444 S. Flower Street – 33rd Floor Los Angeles, CA 90071**
**Tel. 866.546.7266 Fax. 866-546-7377**

PLN_0000891

# News in Brief

**Arizona**: "The debt one pays to society for having engaged in criminal activity does not include being subjected to sexual assault by prison staff," said Acting U.S. Attorney Ann Birmingham Scheel. Two prisoners at FCI Phoenix were subjected to such sexual assaults, and on June 18, 2012, a federal grand jury indicted former prison employee Jose "Joe" Martinez, 48, on five counts of aggravated sexual abuse and eight counts of sexual abuse of a ward. He was found guilty by a federal jury of six counts of sexual abuse of a ward on May 28, 2013 and awaits sentencing.

**California**: In March 2013, California parole officials caught up with a parolee who had eluded them for over three decades. Richard Bradford had been living under the name of James Edward Heard when he was finally captured; a search of his home uncovered evidence of both names. Bradford had been sentenced to life for first-degree murder in 1971, was paroled in 1978 and absconded from parole supervision in 1980. He was on the run for 32 years, and owned a drug rehab facility and other properties in the Pasadena area at the time of his arrest.

**California**: Steve Whitmore, a spokesman for the Los Angeles County Sheriff's Department, confirmed that guards had fired hard rubber "sting balls" and pepper spray to stop a racially-charged brawl that erupted at the Twin Towers Correctional Facility on April 2, 2013. The altercation between Hispanic and black prisoners was "something that does occur throughout our jail system from time to time," Whitmore said. The underlying cause of the fight was under investigation.

**California**: On January 16, 2013, a former prison guard at the California Institution for Women was sentenced to two years in the county jail for sexually abusing and impregnating a prisoner. Prosecutors alleged that Gary Swatzell abused the prisoner over a six-month period beginning in July 2010 and tried to cover up the pregnancy. The prisoner's child was delivered by emergency C-section in August 2011, and she has filed a federal lawsuit against Swatzell and the state.

**District of Columbia**: Jonathan Womble was arrested in April 2013 after a drug-sniffing dog detected marijuana inside his employee locker at the Central Detention Facility. Recorded phone conversations revealed that Womble was smuggling pot and other drugs to a prisoner known as "Freaky," who then resold them. An accomplice outside the jail packaged the drugs and gave them to Womble, who handed them off in the shower area of the facility where there were no video cameras.

**Florida**: Glenn Routhier, 54, was arrested on April 2, 2013 following an investigation into an incident at the Lake County Detention Center. Routhier, who had been employed by the sheriff's office since April 2005, was charged with battery against a prisoner and suspended pending a disciplinary review. Witnesses said they saw Routhier repeatedly pushing the prisoner, Joshua Hiebler, against a wall and slamming his head against a glass window.

**Georgia**: Two Cobb County Sheriff's deputies were arrested within a two-week period for unrelated incidents involving sexual abuse of a prisoner. Sgt. Alvin Sutherland was arrested on January 18, 2013 and charged with four felonies, including aggravated sodomy, aggravated sexual battery, sexual assault by a member of law enforcement and violation of oath of public office. Sgt. Kristopher Travitz was arrested on February 1, 2013 on nearly identical charges. Both deputies had worked for the sheriff's office for more than 10 years.

**Georgia**: Jerry Byrd, 42, a former lieutenant with the Georgia Department of Juvenile Justice, allegedly used a fuel card to make gasoline purchases in exchange for cocaine, according to state officials. He also used the card to buy gas for a private vehicle and for drug dealers. Byrd pleaded guilty to theft-by-taking charges and was sentenced in April 2013 to five years probation, 200 hours of community service, substance abuse treatment and $1,000 in restitution to the state.

**Indiana**: Around 4:30 a.m. on April 16, 2013, Franklin Rice, 27, escaped from the St. Joseph County Jail by commandeering a bread truck that had the keys left in the ignition. Rice drove the truck through the jail gates to a waiting car, then fled with two female accomplices. His prison uniform was found in the street. Police arrested Rice later the same day, along with his girlfriend, Phetsamone Kaviyakone, 27. Priscilla Minjarez, 21, was brought in for questioning and admitted her involvement in the incident. All three were charged with escape; additional charges may follow.

*Pretrial & Post-Conviction Research Center,* has sponsored a Petition to Increase Federal Good Time online at www.pcronline.com. We need a million signatures on this proposal and it will be mailed to every United States House of Representatives and United States Senator to introduce a bill to retroactively Increase Good Time for federal offenders, to wit: Title 18 U.S.C. A § 3624(b)(1) is amended as follows: by striking the number "54" in the first sentence as it appears and inserting in lieu thereof: Five days per month for sentences between six months and one year that the prisoner serves without bad behavior; Ten days per month for sentences exceeding one year that the prisoner serves without bad behavior; Meritorious good time limited to five days a months; and in the same sentence, by striking "prisoner's term of imprisonment" and inserting in lieu thereof "term of sentence imposed." This Amendment is retroactive.[End]. Please get your family and friends to sign this Petition. @www.pcronline.com Post-Conviction Research Center, PO Box 552, Electra, Texas 76360. Or Post-Conviction Research Center Monroe, LA 71201.

## Alexander Byrd Optics

Single Vision Transitions eyeglasses

**$119.95** + S&H

with Lifetime Frame Warranty

To receive order form and details write to:

2150 Wise St. #4769
Charlottesville, VA 22905

or have someone go to:

abyrdoptics@gmail.com
www.abyrdoptics.com

PLN_0000892

**Illinois**: A former Illinois Department of Corrections guard was sentenced to more than 43 years in federal prison on August 28, 2013 after pleading guilty to sexual exploitation of a minor and child pornography-related charges. Steven L. Carson, 46, admitted that in January 2000 he engaged in sexually explicit conduct with a child, which he videotaped. He also admitted responsibility for having over 2,300 images and 40 videos of child porn involving pre-adolescent boys on his home computers.

**Maryland**: On April 4, 2013, former state prison guard Walter Steele pleaded guilty to federal conspiracy charges stemming from the beating of a prisoner at the medium-security Roxbury Correctional Institution in March 2008. In total, fifteen guards were charged after prisoner Kenneth J. Davis was brutally beaten in retaliation for scuffling with an officer during a routine cell check. [See: *PLN*, Aug. 2009, p.20]. Davis was hospitalized for four days following the assault for injuries that included a broken nose and fractures in his back and ribs. He was serving a 19-year sentence for robbery at the time of the assault and has since been released from prison.

**Michigan**: Alesia Ann Wisniewski, 54, a guard at the Lake County Sheriff's Department Residential Re-entry Program, was responsible for overseeing prisoners who had violated parole and been assigned to the program. The Michigan State Police opened an investigation into Wisniewski after allegations arose that she had been involved in an "inappropriate relationship" with a male prisoner. She was charged with two felony counts of second-degree criminal sexual conduct and arraigned on April 17, 2013.

**Mississippi**: Kenny McLaughlin, 35, was sentenced on June 26, 2013 to one year in federal prison and ordered to pay restitution of $6,000 for violating a prisoner's civil rights. The former guard at the Stone County Regional Correctional Facility had pleaded guilty to arranging the beating of a prisoner by two other prisoners in the shower area at the facility. According to court documents, McLaughlin was aware of the assault as it was happening but did not notify other guards or medical staff. The victim suffered cuts to his face, bruises to his chest and fractured ribs. Gregory K. Davis, U.S. Attorney for the Southern District of Mississippi, said McLaughlin's actions were "inexcusable."

**New Jersey**: A guard at the Central Reception and Assignment Facility in Trenton was arrested on March 21, 2013 for allegedly tricking prostitutes into giving him free sex by impersonating a police officer. Juan R. Stevens, 50, would typically arrange sexual encounters with escorts, then flash a badge and speak into a cell phone that resembled a police radio, simulating a police sting. On at least four occasions, Stevens coerced the women into having sex by carrying out the ruse and promising not to arrest them if they complied. He was charged with second-degree sexual assault and third-degree criminal restraint.

**New Mexico**: Poor treatment was the reason behind a "peaceful" protest at the privately-operated Cibola County Correctional Center, which lasted over 12 hours on March 27, 2013 and involved about 250 to 500 prisoners who refused to return from the recreation yard. This was not the first protest at the CCA-run facility, which houses immigration detainees. In April 2001, around 700 prisoners at the Cibola County Correctional Center held a similar day-long protest in the recreation yard, which ended after guards dispersed tear gas.

**New York**: Convicted sex offender Matthew Matagrano pleaded guilty on July 27, 2013 to impersonating a jail employee and sneaking into the Manhattan Detention Complex in February 2013, and was sentenced to 10 years in prison. Matagrano, 36, was accused of sexually assaulting a prisoner, stealing a $2,500 walkie-talkie and handing out cigarettes during his 7-hour visit at the jail. The *New York Post* reported that Matagrano said the people inside were "nice" and made him "feel important." City authorities said he had tried to get into other lockups, including Rikers Island. Matagrano had been convicted in 2004 for posing as a New York City Board of Education official, entering two public schools and inspecting confidential student files.

**New York**: Christopher J. Ley, 52, a guard at the Lakeview Correctional Facility in Brocton, was arrested on April 18, 2013 on a misdemeanor charge of official misconduct as a result of his involvement in a cigarette exchange scheme with prisoners at the facility. Ley was under investigation by the State Police and Chautauqua County District Attorney's office for two months prior to his arrest.

**FREE! 12 FREE ISSUES!**

Send self-addressed, stamped envelope to address below and receive 1 FREE - 1 YEAR magazine subscription! Quarterly drawing WINS $100! **(Void in New York)** (Last Quarter's winner from **Houtzdale, PA.**) TELL YOUR FRIENDS!   ACT NOW!!

**PO Box 2063 • Fort Walton Beach FL. 32549**
www.InmateMagazineService.com

**Inmate Magazine Service Inc.**

## News In Brief (cont.)

**Ohio**: On May 6, 2013, two prisoners, Siddique Abdullah Hasan (formerly Carlos Sanders) and Gregory Curry, ended a hunger strike protesting the state's refusal to allow them on-camera interviews with the media. Hasan was sentenced to death and Curry sentenced to life for their roles in the murder of guard Robert Vallandingham during the infamous April 1993 Lucasville prison riot. Their hunger strike, led by members of the "Lucasville Five," began on the 20th anniversary of the riot. Hasan said the protest drew media attention and Warden David Bobby had bargained in good faith, but top Department of Rehabilitation and Correction officials maintained that such interviews violated departmental policy. A dozen staff members were taken hostage during the 11-day riot, which resulted in 10 deaths – including Vallandingham, who was strangled.

**Ohio**: A threatening Facebook post directed at the governor of Ohio cost Jessie Hubbard his job as a guard at the Lebanon Correctional Institution in January 2012, but an arbitrator ruled in March 2013 that he should be reinstated. Hubbard had been a prison guard for 14 years and was twice named corrections officer of the month – until he posted a comment on his Facebook page that said, "OK we got Bin Laden ... let's get [Governor] Kasich next ... who is with me?" Hubbard's termination sparked a debate about free speech and social media in the workplace. Although he won back his job he will not receive back pay, which he estimated at $60,000.

**Oregon**: On April 8, 2013, a 55-year-old wheelchair-bound transient, Terry Lee Barnes, slashed his throat in front of the judge who had just sentenced him to 180 days in jail for theft. Barnes had managed to sneak a small piece of razor blade past courthouse security. He had been arrested 19 times since 1991 on charges that included failure to register as a sex offender. A new conviction would revoke Barnes' probation and he would face a prison sentence as long as 7½ years. When Judge Michael C. Wetzel handed down the sentence, Barnes turned to him and said, "You just killed

me, judge," then cut his own throat. He was taken to a local hospital and listed in fair condition.

**Pennsylvania**: Two prisoners at FCI McKean were charged on March 27, 2013 with orchestrating the sale of a large quantity of methamphetamine. Federal prosecutors say Jose Cardenas-Covarrubias and Donaciano Contreras-Monje schemed to deliver 13 pounds of meth to undercover officers posing as drug dealers, with the assistance of outside accomplices. Cardenas-Covarrubias, Contreras-Monje and two accomplices were charged with conspiracy and drug-related offenses.

**Pennsylvania**: An adult basic education teacher at SCI Houtzdale was charged on February 15, 2013 with having a "personal and romantic relationship" with a male prisoner. Rebecca J. Williams, 55, faces two counts of institutional sexual assault and two counts of official oppression. The sexual encounters, which occurred in a classroom, included Williams touching and kissing the prisoner's penis. Williams also sent the prisoner notes with sexual content, as well as partially nude pictures of herself.

---

## ◇ PLN Classifieds ◇

**AMBLER DOCUMENT PROCESSING**
Type, Design and Prepare
Manuscripts for Self-Publishing
Reasonable Rates!-Accept all Genres!
P.O. Box 938, Norwalk, CT 06852

**Triple J Enterprises**
Your Erotic Picture Specialist
Pics, calendars, stories and more
PO Box 994 Washington, NC 27889
triplejent2011@gmail.com

**CHRISTIAN PRISON PEN PALS**
PO Box 333 Inverness, FL 34451
Personal Ads Start at:
Photo & address $10
Photo, Desc., 400 word bio $25

**2 FREE PenPals Paid Orders Only!**
Photo Duplications (Nudes OK) 10-
4x6 $8, 2-5x7 $8, 1-8x10 $8. ADD
$3S/H. Info Only-$2.Simply Photos
10 Bungalow Ct, Newton, IA 50208

**JOIN OUR FAM! (PEN PAL SITE)
SASE TO:**
www.InmateNHouselove.com
4001 Inglewood Ave
Suite 101 Dept 144
Redondo Beach, Ca.90278

**The VOICES.CON Newsletter – Free**
Written by lifers for lifers. For info on how
to receive Voices.Con monthly, send
SASE to: PO Box 361, King City, CA 93930.
On the web at: VoicesDotCon.org;
Email: Publisher@VoicesDotCon.org

**WANT QUALITY PICTURES OF
QUALITY BABES?** 4x6 High Res pics
Send SASE for a free catalog!
PHOTO TRYST
PO Box 103, Dept. P
Chapmansboro, TN 37035

**MIDNIGHT EXPRESS SERVICE**
Typing Services
Legal docs, manuscripts, etc.
Send copy w/SASE for return
To get a quote.
POBox 69, Berryville, AR 72616

**Education Behind Bars Newsletter**
A free, educational newsletter
of interest to incarcerated
students. Write to be added to
the mailing list: EBBN Editor
3900 Pelandale Avenue, Box 319
Modesto, CA 95356
www.PrisonEducation.com

**#1 PHOTO FORWARDING SERVICE**
**\*\*SPECIAL\*\*** $25.00 for 60 Photos!
Email & Text your photos 2 us
We Print & Mail them 2 YOU!
www.Infolincs.com (4 more info)
Email: infophoto@infolincs.com
Check/$$ Order : InfoLINCS, LLC
PO Box 672 Eagle Point, OR 97524

**LOCAL PHONE NUMBERS $2.50/MO.**
USA anywhere 5¢/min. To MX 15¢
Great rates all over the world!
No signup fee, no hidden fees!
Refer new cust, 300 free mins!
www.FreedomLine.net to sign up
or write FreedomLine, Box 7-WCB
C'ville IN 47331. Save BIG $$$!

PLN_0000894

**Puerto Rico:** The FBI is investigating the third death of a detainee this year in ICE custody at the Metropolitan Detention Center (MDC) in Guaynabo. Glaston Smith, 51, was "awaiting removal from the United States" at the MDC, a Bureau of Prisons facility, when he was stabbed multiple times in the back and head by other prisoners on April 6, 2013. "Smith was evaluated by the institution medical staff and was transported by ambulance to the Puerto Rico medical center, where he was pronounced dead," an ICE spokesperson stated.

**South Carolina:** A guard at the Broad River Correctional Institution was arrested on March 17, 2013 on charges of criminal domestic violence, according to the Lexington County Sheriff's Department. James David Morgan, 38, allegedly restrained his wife by the neck and threw her onto a couch during an argument about her whereabouts after she returned home late; two children were home at the time and witnessed the incident. Morgan was jailed at the Lexington County Detention Center on $5,000 bond.

**South Carolina**: On March 27, 2013, Tyson Maurice Milhouse, 37, was arrested and charged with giving contraband to a prisoner and misconduct in office. He faces up to 20 years in prison if convicted and was suspended from his job as a state Probation, Parole and Pardon Services agent. Milhouse is accused of furnishing a cell phone to a prisoner at the Barnwell County Detention Center. Pete O'Boyle, a spokesman for the Department of Probation, Parole and Pardon Services, said Milhouse's future employment with the agency will depend on the outcome of their investigation.

**South Dakota:** Slick roads reportedly contributed to a rollover accident on March 18, 2013 that injured a guard and six prisoners. The officer was transporting the prisoners from the Rapid City Minimum Unit to a work site when the Chevy Suburban slid into a ditch and rolled. One prisoner used the vehicle's radio to report the accident and all of the prisoners remained on the scene until officers arrived. The guard was transported to a nearby hospital where he was treated and released. One prisoner was airlifted to Rapid City Regional Hospital, while the others were treated for minor injuries. The accident is being investigated by the South Dakota Highway Patrol.

**Tennessee:** A search warrant for the home of Dexter Lavon Mason and his wife Mary, both 66, revealed computers that contained more than 100 images of prepubescent children engaged in sexual or simulated sexual activities. Mason was charged with 21 counts of sexual exploitation of a minor, one count of tampering with evidence and four counts of aggravated sexual battery; his wife was charged with one count of tampering with evidence. Both were indicted in February 2013. Dexter Mason had recently retired as a state probation and parole manager.

**Texas:** Travis County District Attorney Rosemary Lehmberg issued a statement after she was released from jail on April 13, 2013 following a drunken driving arrest. "I am truly sorry to have let the citizens of Travis County down," the statement said. "I deeply regret my actions and take full responsibility. As I continue to carry out my responsibilities as district attorney, I hope that the community will forgive my mistake." Lehmberg is not the first Texas district attorney to face DUI charges. Three years ago, former Kaufman County District Attorney Rick Harrison was sentenced to 12 months probation following a drunken driving arrest; also, Tim Cole, the District Attorney for Montague, Clay and Archer counties, resigned after pleading guilty to DUI charges in Oklahoma in 2006.

**BB Vol 4 Extreme Freak Ed. $5.00**
Buy Cats 1,2,3,4 & 5th 1 free $20
Full Color Cats, 1000s of options
Non-nude - all shapes & races
Send 11 stmps per cat or$20 MO
To: On Demand Inmate Services
PO BOX 81 - PLN, Chelt, PA 19012
Pen pal list $15.00 MO no stamps

**Kelly Typing Service**
Manuscript & Legal Material
$1.75 per page w/ Editing
Reliable and Prompt Service
Send SASE for a brochure
Phone number: (804) 787-3932
Email: kellyenterprise@gmail.com
PO Box 13170 Richmond,VA 23225

**SURROGATE SISTERS**
Celebrating 18+Years in Business
No Games. We Sell Photos of Sexy
Women, Gifts for Loved Ones,
Erotic Stories & Pen-Pal Service
Free Info & Flyer Send SASE to:
Surrogate Sister – PN
PO Box 95043, Las Vegas NV 89193

**ELIJAHRAY.COM Gift Service**
Center. Brand new catalog 120
Gifts.Send $2 or four stamps to
ELIJAHRAY.COM PO Box 3008
La Grande, OR 97850. Real Gold,
Toys,Bath Sets,and MORE! No One
Does It Like We Do! Sending
Home a Little 1 Gift at a Time.

**Are you ready to come home?**
We work hard to get Freedom, Justice, &
Equality for you.
We desire for you what we desire for ourselves.
Our service WILL fit your needs over time!
360 MAGNETIC Parole Solutions
P.O. Box 1418 Walkertown, NC 27051
336.926.8848

**Contingent Fee Federal Lawyer**
Gabriel B. Galloway, Esquire
Excess Force - Delib Indifference
Conditions of Confinement
3281 Wrightwood Chicago IL 60647
773 230 8105 - gabegalloway.com

**\*\*LEGAL SERVICES\*\***
PCR-Habeas-Civil Rights-Other
Attorney Craig H. Durham
10 years as a federal law clerk
Licensed in ID, KS, & 9th Cir.
405 S 8th St., Suite 372
Boise, ID 83702
chdlawoffice.com

**IF YOU WANT THE BEST TRY EPS!**
Legal Research & Forms, Internet
& People Searches, Amazon Books,
Erotic Photos, PenPals, Special
Requests and More. Send SASE to:
Elite Paralegal & Prisoner Services
PO Box 2131, Appleton, WI 54912

**A DEGREE/ORDINATION FROM PRISON**
Correspondence Courses via mail
INT'L CHRISTIAN COLLEGE&SEMINARY
PO BOX 530212 Debary, FL 32753-0212
Associates thru PhD credit for
Life Experience \*ACCREDITED\*
Tuition as Low as $19.95 a month
Send SASE for a Free Evaluation

PLN_0000895

## News In Brief (cont.)

**United Kingdom**: Prisoners are on waiting lists to get a copy of the novel *Fifty Shades of Grey* from prison libraries. The bestseller, known as "mommy porn," has become extremely popular among female prisoners, and the interest in the book is seen by some as a positive development. "A huge number of prisoners struggle with reading. Better they read this than nothing at all," a spokesperson for the Prison Service was quoted as saying in an April 3, 2013 news report.

**Washington**: A woman charged with vehicular homicide faces additional charges of promoting prostitution while in the Kitsap County Jail. Lorena Llamas, 29, also known as Angelica Lorena Dibella-Lira, was charged on April 16, 2013 with allegedly grooming fellow prisoners to become prostitutes and having her former boyfriend, Anthony Dewayne Parker, bail them out. Parker then put money that the women earned into Llamas' jail account. Parker was charged with human trafficking after police learned he had bailed a woman out, held her against her will and forced her into prostitution.

**West Virginia**: On February 22, 2013, a former guard at the James "Tiger" Morton Juvenile Detention Center avoided prison time when she was sentenced to 18 months probation and 20 hours of community service for writing sexually explicit letters to a 15-year-old male resident at the facility. Latersha Allen, 30, pleaded guilty to use of obscene matter to seduce a minor. Investigators found about eight letters written by Allen to the teenager; four were described as obscene and explicit. ◆

# Criminal Justice Resources

### ACLU National Prison Project
Handles state and federal conditions of confinement claims affecting large numbers of prisoners. Publishes the NPP Journal (available online at: www.aclu.org/national-prison-project-journal-fall-2011) and the Prisoners' Assistance Directory (write for more information). Contact: ACLU NPP, 915 15th St. NW, 7th Fl., Washington, DC 20005 (202) 393-4930. www.aclu.org/prisons

### Amnesty International
Compiles information about prisoner torture, beatings, rape, etc. to include in reports about U.S. prison conditions; also works on death penalty issues. Contact: Amnesty International, 5 Penn Plaza, New York NY 10001 (212) 807-8400. www.amnestyusa.org

### Center for Health Justice
Formerly CorrectHELP. Provides information related to HIV in prison – contact them if you are not receiving proper HIV medication or are denied access to programs due to HIV status. Contact: CHJ, 900 Avila Street, Suite 102, Los Angeles, CA 90012. HIV Hotline: (214) 229-0979 (collect calls from prisoners OK). www.centerforhealthjustice.org

### Centurion Ministries
Works to exonerate the wrongfully convicted, in both cases involving DNA evidence and those that do not. Centurion only takes 1-2 new cases a year involving actual innocence. They do not consider accidental death or self-defense murder cases, he said/she said rape cases, or child abuse or child sex abuse cases unless there is physical evidence. All case inquiries must be from the prisoner involved, in writing. Contact: Centurion Ministries, 221 Witherspoon Street, Princeton, NJ 08542 (609) 921-0334. www.centurionministries.org

### Critical Resistance
Seeks to build an international movement to abolish the Prison Industrial Complex, with offices in Florida, California, New York, Texas and Louisiana. Publishes The Abolitionist newsletter. Contact: Critical Resistance, 1904 Franklin Street #504, Oakland, CA 94612 (510) 444-0484. www.criticalresistance.org

### The Exoneration Project
The Exoneration Project is a non-profit organization dedicated to working to free prisoners who were wrongfully convicted. The Project represents innocent individuals in post-conviction legal proceedings; typical cases involve DNA testing, coerced confessions, police misconduct, the use of faulty evidence, junk science and faulty eyewitness testimony, and ineffective assistance of counsel claims. Contact: The Exoneration Project, 312 North May Street, Suite 100, Chicago, Illinois 60607 (312) 789-4955. www.exonerationproject.org

### Family & Corrections Network
Primarily provides online resources for families of prisoners related to parenting, children of prisoners, prison visitation, mothers and fathers in prison, etc. Contact: F&CN, 93 Old York Road, Suite 1 #510, Jenkintown, PA 19046 (215) 576-1110. www.fcnetwork.org

### FAMM
FAMM (Families Against Mandatory Minimums) publishes the FAMMGram three times a year, which includes information about injustices resulting from mandatory minimum laws with an emphasis on federal laws. Recommended donation of $10 for a subscription. Contact: FAMM, 1612 K Street NW #700, Washington, DC 20006 (202) 822-6700). www.famm.org

### The Fortune Society
Provides post-release services and programs for prisoners in the New York City area and occasionally publishes Fortune News, a free publication for prisoners that deals with criminal justice issues, primarily in New York. Contact: The Fortune Society, 29-76 Northern Blvd., Long Island City, NY 11101 (212) 691-7554. www.fortunesociety.org

### Innocence Project
Provides advocacy for wrongly convicted prisoners whose cases involve DNA evidence and are at the post-conviction appeal stage. Maintains an online list of state-by-state innocence projects. Contact: Innocence Project, 40 Worth St., Suite 701, New York, NY 10013 (212) 364-5340. www.innocenceproject.org

### Just Detention International
Formerly Stop Prisoner Rape, JDI seeks to end sexual violence against prisoners. Provides counseling resources for imprisoned and released rape survivors and activists for almost every state. Contact: JDI, 3325 Wilshire Blvd. #340, Los Angeles, CA 90010 (213) 384-1400. www.justdetention.org

### Justice Denied
Although no longer publishing a print magazine, Justice Denied continues to provide the most comprehensive coverage of wrongful convictions and how and why they occur. Their content is available online, and includes all back issues of the Justice Denied magazine and a database of more than 3,000 wrongly convicted people. Contact: Justice Denied, P.O. Box 68911, Seattle, WA 98168 (206) 335-4254. www.justicedenied.org

### National CURE
Citizens United for Rehabilitation of Errants (CURE) is a national organization with state and special interest chapters that advocates for rehabilitative opportunities for prisoners and less reliance on incarceration. Publishes the CURE Newsletter. $2 annual membership for prisoners. Contact: CURE, P.O. Box 2310, National Capitol Station, Washington, DC 20013 (202) 789-2126. www.curenational.org

### November Coalition
Publishes the Razor Wire, a bi-annual newsletter that reports on drug war-related issues, releasing prisoners of the drug war and restoring civil rights. A subscription is $10 for prisoners and $30 for non-prisoners. Contact: November Coalition, 282 West Astor, Colville, WA 99114 (509) 684-1550. www.november.org

### Prison Activist Resource Center
PARC is a prison abolitionist group committed to exposing and challenging all forms of institutionalized racism, sexism, able-ism, heterosexism and classism, specifically within the Prison Industrial Complex. PARC produces a free resource directory for prisoners, and supports activists working to expose and end the abuses of the Prison Industrial Complex and mass incarceration. Contact: PARC, P.O. Box 70447, Oakland, CA 94612 (510) 893-4648. www.prisonactivist.org

PLN_0000896

# Prison Legal News Book Store

Fill in the boxes next to each book you want to order, indicating the quantity and price. Enter the Total on the Order Form on the next page. **FREE SHIPPING** on all book / index orders **OVER $50** (effective 9-1-2013 until further notice). $6.00 S/H applies to all other book orders.

SUBSCRIBE TO PLN FOR 4 YEARS AND CHOOSE **ONE BONUS!**
1. SIX (6) FREE ISSUES FOR 54 TOTAL! OR
2. PRISON PROFITEERS (A $24.95 VALUE!) OR
3. WITH LIBERTY FOR SOME (AN $18.95 VALUE!)

**Prison Profiteers**, edited by Paul Wright and Tara Herivel, 323 pages. **$24.95**. This is the third book in a series of Prison Legal News anthologies that examines the reality of mass imprisonment in America. *Prison Profiteers* is unique from other books because it exposes and discusses who profits and benefits from mass imprisonment, rather than who is harmed by it and how.   1063

**With Liberty for Some: 500 Years of Imprisonment in America**, by Scott Christianson, Northeastern University Press, 372 pages. **$18.95**. The best overall history of the American prison system from 1492 through the 20th Century. A must-read for understanding how little things have changed in U.S. prisons over hundreds of years.   1026

**Prison Nation: The Warehousing of America's Poor**, edited by Tara Herivel and Paul Wright, 332 pages. **$35.95**. PLN's second anthology exposes the dark side of the 'lock-em-up' political agenda and legal climate in the U.S.   1041

**The Celling of America, An Inside Look at the U.S. Prison Industry**, edited by Daniel Burton Rose, Dan Pens and Paul Wright, 264 pages. **$22.95**. PLN's first anthology presents a detailed "inside" look at the workings of the American justice system.   1001

**Prisoners' Guerrilla Handbook to Correspondence Programs in the U.S. and Canada**, updated 3rd ed. by Jon Marc Taylor, Ph.D. and edited by Susan Schwartzkopf, PLN Publishing, 221 pages. **$35.00**. Written by Missouri prisoner Jon Marc Taylor, the *Guerrilla Handbook* contains contact information and descriptions of high school, vocational, paralegal and college courses by mail. *Holiday Special!*   1071

**The Criminal Law Handbook: Know Your Rights, Survive the System**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 608 pages. **$39.99**. Explains what happens in a criminal case from being arrested to sentencing, and what your rights are at each stage of the process. Uses an easy to understand question-and-answer format.   1038

**Represent Yourself in Court: How to Prepare & Try a Winning Case**, by Attorneys Paul Bergman & Sara J. Berman-Barrett, Nolo Press, 528 pages. **$39.99**. Breaks down the civil trial process in easy-to-understand steps so you can effectively represent yourself in court. The authors explain what to say in court, how to say it, etc.   1037

**Law Dictionary**, Random House Webster's, 525 pages. **$19.95**. Comprehensive up-to-date law dictionary explains more than 8,500 legal terms. Covers civil, criminal, commercial and international law.   1036

**The Blue Book of Grammar and Punctuation**, by Jane Straus, 110 pages. **$14.95**. A guide to grammar and punctuation by an educator with experience teaching English to prisoners.   1046

**Legal Research: How to Find and Understand the Law**, by Stephen Elias and Susan Levinkind, 568 pages. **$49.99**. Comprehensive and easy to understand guide on researching the law. Explains case law, statutes and digests, etc. Includes practice exercises.   1059

**Deposition Handbook**, by Paul Bergman and Albert Moore, Nolo Press, 352 pages. **$34.99**. How-to handbook for anyone who conducts a deposition or is going to be deposed.   1054

**Criminal Law in a Nutshell**, by Arnold H. Loewy, 5th edition, 387 pages. **$43.95**. Provides an overview of criminal law, including punishment, specific crimes, defenses & burden of proof.   1086

SUBSCRIBE TO PLN FOR 3 YEARS AND CHOOSE **ONE BONUS!**
1. FOUR (4) FREE ISSUES FOR 40 TOTAL! OR
2. PROTECTING YOUR HEALTH AND SAFETY (A $10.00 VALUE!)

**Protecting Your Health and Safety**, by Robert E. Toone, Southern Poverty Law Center, 325 pages. **$10.00**. This book explains basic rights that prisoners have in a jail or prison in the U.S. It deals mainly with rights related to health and safety, such as communicable diseases and abuse by prison officials; it also explains how to enforce your rights, including through litigation.   1060

**Spanish-English/English-Spanish Dictionary**, 2nd ed. Random House. **$15.95**. Spanish-English and English-Spanish. 60,000+ entries from A to Z; includes Western Hemisphere usage.   1034a

**Writing to Win: The Legal Writer**, by Steven D. Stark, Broadway Books/Random House, 283 pages. **$19.95**. Explains the writing of effective complaints, responses, briefs, motions and other legal papers.   1035

**Actual Innocence: When Justice Goes Wrong and How to Make it Right**, updated paperback ed., by Barry Scheck, Peter Neufeld and Jim Dwyer, 405 pages. **$16.00**. Describes how criminal defendants are wrongly convicted. Explains DNA testing and how it works to free the innocent. Devastating critique of police and prosecutorial misconduct.   1030

**Webster's English Dictionary**, Newly revised and updated, Random House. **$8.95**. 75,000+ entries. Includes tips on writing and word usage, and recent business and computer terms. Includes standard geographical and biographical entries.   1033

**Everyday Letters for Busy People**, by Debra Hart May, 287 pages. **$18.99**. Hundreds of sample letters that can be adapted for most any purpose, including letters to government agencies and officials. Has numerous tips for writing effective letters.   1048

**Roget's Thesaurus**, 717 pages. **$8.95**. Helps you find the right word for what you want to say. 11,000 words listed alphabetically with over 200,000 synonyms and antonyms. Sample sentences and parts of speech shown for every main word. Covers all levels of vocabulary and identifies informal and slang words.   1045

**Beyond Bars, Rejoining Society After Prison**, by Jeffrey Ian Ross, Ph.D. and Stephen C. Richards, Ph.D., Alpha, 240 pages. **$14.95**. *Beyond Bars* is a practical and comprehensive guide for ex-convicts and their families for managing successful re-entry into the community, and includes information about budgets, job searches, family issues, preparing for release while still incarcerated, and more.   1080

**Jailhouse Lawyers: Prisoners Defending Prisoners v. the U.S.A.**, by Mumia Abu Jamal, City Lights Publishers, 280 pages. **$16.95**. In *Jailhouse Lawyers*, Prison Legal News columnist, award-winning journalist and death-row prisoner Mumia Abu-Jamal presents the stories and reflections of fellow prisoners-turned-advocates who have learned to use the court system to represent other prisoners.   1073

**The Habeas Citebook: Ineffective Assistance of Counsel**, by Brandon Sample, PLN Publishing, 200 pages. **$49.95**. This is PLN's second published book, written by federal prisoner Brandon Sample, which covers ineffective assistance of counsel issues in federal habeas petitions. Includes hundreds of case citations!   1078

**Complete GED Preparation**, by Steck-Vaughn, 922 pages. **$24.99**. This useful handbook contains over 2,000 GED-style questions to thoroughly prepare students for taking the GED test. It offers complete coverage of the revised GED test with new testing information, instructions and a practice test.   1099

**\* ALL BOOKS SOLD BY PLN ARE SOFTCOVER / PAPERBACK \***

PLN_0000897

**Hepatitis and Liver Disease: What You Need to Know,** by Melissa Palmer, MD, 457 pages. **$17.95.** Describes symptoms & treatments of hepatitis B & C and other liver diseases. Includes medications to avoid, what diet to follow and exercises to perform, plus a bibliography. 1031

**Arrested: What to Do When Your Loved One's in Jail,** by Wes Denham, 240 pages. **$16.95.** Whether a defendant is charged with misdemeanor disorderly conduct or first-degree murder, this is an indispensable guide for those who want to support family members, partners or friends facing criminal charges. 1084

**Prisoners' Self-Help Litigation Manual,** updated 4th ed. (2010), by John Boston and Daniel Manville, Oxford Univ. Press, 960 pages. **$39.95.** The premiere, must-have "Bible" of prison litigation for current and aspiring jail-house lawyers. If you plan to litigate a prison or jail civil suit, this book is a must-have. Highly recommended! 1077

**How to Win Your Personal Injury Claim,** by Atty. Joseph Matthews, 7th edition, NOLO Press, 304 pages. **$34.99.** While not specifically for prison-related personal injury cases, this book provides comprehensive information on how to handle personal injury and property damage claims arising from accidents. 1075

**Sue the Doctor and Win! Victim's Guide to Secrets of Malpractice Lawsuits,** by Lewis Laska, 336 pages. **$39.95.** Written for victims of medical malpractice/neglect, to prepare for litigation. Note that this book addresses medical malpractice claims and issues in general, not specifically related to prisoners. 1079

**Advanced Criminal Procedure in a Nutshell,** by Mark E. Cammack and Norman M. Garland, 2nd edition, 505 pages. **$43.95.** This text is designed for supplemental reading in an advanced criminal procedure course on the post-investigation processing of a criminal case, including prosecution and adjudication. 1090

**Our Bodies, Ourselves,** by The Boston Women's Health Book Collective, 944 pages. **$26.00.** This book about women's health and sexuality has been called "America's best-selling book on all aspects of women's health," and is a great resource for women of all ages. 1082

**Arrest-Proof Yourself,** by Dale Carson and Wes Denham, 288 pages. **$14.95.** This essential "how not to" guide written by an ex-cop explains how to act and what to say when confronted by the police to minimize the chances of being arrested and avoid additional charges. Includes information on basic tricks that police use to get people to incriminate themselves. 1083

**Soledad Brother: The Prison Letters of George Jackson,** by George Jackson, Lawrence Hill Books, 339 pages. **$18.95.** Lucid explanation of the politics of prison by a well-known prison activist. More relevant now than when it first appeared 40 years ago. 1016

**Criminal Procedure: Constitutional Limitations,** by Jerold H. Israel and Wayne R. LaFave, 7th edition, 603 pages. **$43.95.** Intended for use by law students, this is a succinct analysis of constitutional standards of major significance in the area of criminal procedure. 1085

**A Dictionary of Criminal Law Terms** (Black's Law Dictionary® Series), by Bryan A. Garner, 768 pages. **$33.95.** This handbook contains police terms such as preventive detention and protective sweep, and phrases from judicial-created law such as independent-source rule and open-fields doctrine. A good resource to help navigate your way through the maze of legal language in criminal cases. 1088

**PLN Cumulative Index. $22.50 each.** PLN Article Indexes provide detailed information about all PLN articles, including title, author, issue, page number, topics covered, citations, and if it is state, BOP or jail specific. Can be searched on over 500 subjects such as medical neglect or sexual assault. Circle the index(es) you are ordering: **1990-1995, 1996-1998, 1999-2001, 2002-2004** (more recent indexes not yet available)

| | **Subscription Rates** | | | | **Subscription Bonuses** |
|---|---|---|---|---|---|
| | 1 year | 2 years | 3 years | 4 years | |
| **Prisoners** | $30 | $ 60 | $ 90 | $120 | **2 years** - 2 bonus issues for 26 total issues |
| **Individuals** | $35 | $ 70 | $105 | $140 | **3 years** - 4 bonus issues (40 total) or a bonus book as listed on pg. 61 |
| **Professionals** | $90 | $180 | $270 | $360 | **4 years** - 6 bonus issues (54 total) or a bonus book as listed on pg. 61 |
| (Attorneys, agencies, libraries) | | | | | |

(All subscription rates and bonus offers are valid as of 9-1-2013)

**VISA  MasterCard**   Purchase with Visa, MasterCard, AmEx or Discover by phone: **561-360-2523**   **AMEX  DISCOVER**
Or buy books and subscriptions online: **www.prisonlegalnews.org**

**Mail Payment and Order to:**

Prison Legal News
P.O. Box 1151
Lake Worth, FL 33460

All purchases must be pre-paid. Prisoners can pay with new first-class stamps (strips or books only, no loose stamps) or pre-stamped envelopes, *if allowed by institutional policies.*

Please **Change my Address** to what is entered below ☐

**Mail Order To:**

Name: _____

DOC #: _____

Suite/Cell: _____

Agency/Inst: _____

Address: _____

City/State/Zip: _____

| **Subscribe to Prison Legal News** | **$ Amount** |
|---|---|
| 6 month subscription (prisoners only) - $18 | |
| 1 yr subscription (12 issues) | |
| 2 yr subscription (2 bonus issues for 26 total!) | |
| 3 yr sub (*write below which FREE book you want*) or 4 bonus issues for 40 issues total! | |
| 4 yr sub (*write below which FREE book you want*) or 6 bonus issues for 54 issues total! | |
| Random sample issue of **PLN** - $3.50 each | |

**Books or Index Orders** (No S/H charge on 3 & 4-year sub free books OR book orders OVER $50!) **Qty.**

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Add **$6.00** S/H to **Book** Orders **UNDER $50**

FL residents ONLY add 6% to Total **Book** Cost

**Total Amount Enclosed:**

*\* No refunds on PLN subscription or book / index orders after orders have been placed \**

PLN_0000898

# Great Self-Help Book Deals
## From Prison Legal News!

**NOLO**



### How to Win Your Personal Injury Claim
$34.99

*How to Win Your Personal Injury Claim* shows you how to handle almost every accident situation, and guides you through the insurance claim process, step by step. Learn how to:

- protect your rights after an accident
- determine what your claim is worth
- handle a property-damage claim
- deal with uncooperative doctors, lawyers and insurance companies
- counter the special tactics insurance companies use
- prepare a claim for compensation
- negotiate a full and fair settlement
- stay on top of your case if you hire a lawyer

**Order from Prison Legal News**
Add $6 shipping for orders under $50

**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
Phone: 561-360-2523
www.prisonlegalnews.org



The Criminal Law Handbook
$39.99



Represent Yourself in Court
$39.99



Legal Research
$49.99



Nolo's Deposition Handbook
$34.99



**NOLO**
**YOUR LEGAL COMPANION**

# PRISONLEGALNEWS.org

## Dedicated to Protecting Human Rights

>>FREE Data Search

| Decisions | Investigations | Audits | Publications | Cases | Verdicts | Settlements |

**If you need to know about prisons and jails or are litigating a detention facility case, you can't afford not to subscribe to our website!**

**Online subscribers get unlimited, 24-hour a day access to the website and its content!**


**Sign up for PLN's FREE listserv to receive prison and jail news and court rulings by e-mail.**

- PLN's website offers all issues of PLN in both searchable database and PDF formats. Issues are indexed and posted as soon as they go to press.
- Publications section has numerous downloadable government reports, audits and investigations from around the country.
- Full text decisions of thousands of court cases, published and unpublished.
- All content is easy to print for downloading and mailing to prisoners.
- Most complete collection of prison and jail related verdicts and settlements anywhere.
- Order books, print subscriptions and make donations on line.

- Brief bank with a wide assortment of winning motions, briefs, complaints and settlements.
- Links to thousands of prison, jail, criminal justice and legal websites around the world.
- Thousands of articles and cases, all fully indexed by more than 500 subjects, searchable by case name, case year, state of origin, court, author, location, case outcome, PLN issue and key word search.
- Search free, pay only if you find it!
- The highest quality, most comprehensive prison litigation news and research site in the world.

**Affordable rates to meet your budget**
**$19.95 per month · $149.95 per year**

**Subscribe to Prison Legal News Online!** http://www.prisonlegalnews.org

PLN_0000899



## Prison Legal News

PO Box 1151
Lake Worth FL 33460

Change Service Requested

Non-Profit Org.
U.S. Postage
PAID
Portland OR
Permit No. 3142

### Subscription Renewal

Subscriptions expire after the issue shown on the label is mailed. For example, if the label says: EXPIRES 02/2015, then the subscription expires after the February 2015 issue is mailed. Please renew at least 2 months before the expiration date. IF THE LABEL SAYS **EXPIRES: 09/2013** THIS IS YOUR LAST ISSUE. Please renew immediately to avoid missing any issues.

### Change of Address

If you move or are transferred, please notify PLN as soon as possible so your issues can be mailed to your new address! PLN only accepts responsibility for sending an issue to the address provided at the time an issue is mailed!



"Talk more for less"

ICCALLS, LLC

**ARE YOU FRUSTRATED BECAUSE OF THE HIGH COST OF YOUR PHONE CALLS?**

Our company **ICCALLS** is here to provide you **excellent service** at very **low rates**.

We have different plans to accommodate for the one that best fits your needs.

Right now we have a promotion of one month **absolutely FREE** for new subscribers. Just provide us the promo code: **PLNICCALLS1\***
Please contact **ICCALLS** to find out how this special promotion works, for either **US** or **INTERNATIONAL** calls. If you are already a customer, contact us to find out how to earn points by referring new customers to the service and get **FREE minutes** every month.

**ICCALLS** also provides you the service of money transfers directly to your commissary's account. You can receive up to **$300.00** per transaction paying only **$9.95** using your Debit/Credit Card or your Pay Pal Account.

**DO NOT WAIT ANY LONGER AND CONTACT US:**

| | | |
|---|---|---|
| Phone: | 1(888)718-1595 | Monday to Friday |
| | 1(310)496-8292 | 9:00 AM to 5:00 PM CT |
| Fax: | 1(323)210-7458 | 9:00 AM to 5:00 PM CT |
| E-mail: | c.service@iccalls.com | We will be able to assist you |
| | support@iccalls.com | in English, Spanish, Portuguese, |
| | www.iccalls.com | and Hebrew. |
| Mail to: | ICCALLS, LLC | |
| | P.O. Box 3674 | |
| | Huntington Park CA 90255 | |

**LLAMENOS Y COMIENCE A AHORRAR DINERO EN SUS LLAMADAS!!!!**

2010-2013 ICCALLS, LLC

**\*RESTRICTIONS APPLY**

