# EXHIBIT 33

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 15-cv-02184-RM-STV
 3    _____

 4    DEPOSITION OF:   TODD CHAPMAN
      _____
 5
      PRISON LEGAL NEWS,
 6    a Project of the Human Rights Defense Center,

 7    Plaintiff,

 8    v.

 9    FEDERAL BUREAU OF PRISONS,

10    Defendant.
      _____
11

12              PURSUANT TO NOTICE, the deposition of
      TODD CHAPMAN was taken on behalf of the Plaintiff at
13    1888 Sherman Street, Suite 370, Denver, Colorado
      80203, on January 17, 2017, at 8:26 a.m., before
14    Teresa Coogle, Registered Professional Reporter,
      Certified Realtime Reporter, and Notary Public within
15    Colorado.

16

17

18

19

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

## 1

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02184-RM-STV
_____
DEPOSITION OF:  TODD CHAPMAN
_____

PRISON LEGAL NEWS,
a Project of the Human Rights Defense Center,
Plaintiff,
v.
FEDERAL BUREAU OF PRISONS,
Defendant.
_____

            PURSUANT TO NOTICE, the deposition of
TODD CHAPMAN was taken on behalf of the Plaintiff at
1888 Sherman Street, Suite 370, Denver, Colorado
80203, on January 17, 2017, at 8:26 a.m., before
Teresa Coogle, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.
```

## 2

```
                 A P P E A R A N C E S
    For the Plaintiff:
            STEPHEN KIEHL, ESQ.
            MATTHEW S. SHAPANKA, ESQ.
            Covington & Burling, LLP
            One City Center
            850 Tenth Street, NW
            Washington, DC 20001-4956

    For the Defendant:

            SUSAN PROSE, ESQ.
            Assistant U.S. Attorney
            1225 17th Street, Suite 700
            Denver, Colorado 80202
    Also Present:
            Clay C. Cook, Esq.
```

## 3

```
                        I N D E X
EXAMINATION OF TODD CHAPMAN:               PAGE
January 17, 2017

By Mr. Kiehl                                6

By Ms. Prose                              155
                                         INITIAL
DEPOSITION EXHIBITS:                    REFERENCE

Exhibit 1   Declaration of Todd Chapman    23

Exhibit 2   Program Statement, 11/9/11     32

Exhibit 3   Program Statement, 1/10/03     38

Exhibit 4   Memorandum to Daly from        47
            Krist, 1/1/10, Subject:
            Inmate Mail Rejection -
            Blyther, Michael #31622-007

Exhibit 5   Notification to Inmate and     53
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, June 2010, Vol. 21,
            No. 6, Page 11

Exhibit 6   Prison Legal News, Vol 22,     56
            No. 10, with attachments

Exhibit 7   Notification to Inmate and     61
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, November 2011, Vol. 22,
            Pages 38 and 47

Exhibit 8   Notification to Inmate and     66
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, February 2013, Vol. 24,
            No. 2, Pages 8 and 9

Exhibit 9   Memorandum to Heim from Bier,  74
            4/19/13, Subject:  Inmate Mail
            Rejection - Lawrence, Desmond
            #83529-022
```

## 4

```
Exhibit 10  Memorandum to Heim from Krist, 78
            11/20/12, Subject:  Inmate Mail
            Rejection - Carl Knorr
            #13161-075

Exhibit 11  Notification to Inmate and     82
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, July 2013, Pages 36 and 37
Exhibit 12  Prison Legal News, with attachment  85
Exhibit 13  Institution Supplement, 8/1/07    93
Exhibit 14  Institution Supplement, 3/1/11   102
Exhibit 15  Institution Supplement, 1/24/13  106
Exhibit 16  Institution Supplement, 12/8/14  107
Exhibit 17  Institution Supplement, 2/2/16   108
Exhibit 18  ADX Florence - Incoming        121
            Publications Rejection Procedures,
            2/24/16
Exhibit 19  ADX Florence - Quarterly       122
            Incoming Publications Training
            Participants, 2/24/16
Exhibit 20  540.71 Procedures,             125
            with attachment

Exhibit 21  ADX Florence - Quarterly       132
            Incoming Publications Training,
            7/19/16

Exhibit 22  ADX Florence - Quarterly       133
            Incoming Publications Training,
            9/8/16

Exhibit 23  ADX Florence - Quarterly       136
            Incoming Publications Training,
            11/29/16

Exhibit 24  Notification to Inmate and     139
            Publisher/Sender of Rejected
            Publication, Soldiers of God
```

1 (Pages 1 to 4)

61

1  And I actually didn't -- missed that because I was
2  looking at page 20 and 21.  I'm, like, this means
3  nothing.  Why would we reject this?
4      **Q.  Right.**
5      A.  It's actually case law.
6      **Q.  All right.**
7          MR. KIEHL:  Maybe we'll look at one more,
8  and then take a break, if that sounds good.
9          MS. PROSE:  Whenever.
10         THE DEPONENT:  Sure.
11         MS. PROSE:  Whenever you'd like.
12         MR. KIEHL:  Are you okay?
13         THE DEPONENT:  Yeah, I'm fine.
14     **Q.  (BY MR. KIEHL)  Let's go to No. 7.**
15         (Deposition Exhibit 7 was marked.)
16     **Q.  So we're marking as Exhibit 7 a document**
17  **starting with the Bates BOP000215.**
18     A.  Okay.
19         MR. KIEHL:  And, Suzanne, just for your
20  reference, some of these have multiple copies of the
21  same rejection notice.
22         MS. PROSE:  Sure.
23         MR. KIEHL:  So I skipped some numbers so
24  I didn't have to print many, many pages of the same
25  thing.

62

1          MS. PROSE:  Thank you.
2      **Q.  (BY MR. KIEHL)  Okay.  And so it appears**
3  **that this is a rejection notice concerning Prison**
4  **Legal News, issue November 2011 signed by Blake Davis,**
5  **or somebody acting for him.  Does that all sound**
6  **correct?**
7      A.  Yes, it is someone acting for a warden,
8  Blake Davis.
9      **Q.  Okay.  Does that guy work?  And then if**
10 **we turn to page BOP000243 at paragraph 1, it says this**
11 **"Publication contains an article regarding a BOP**
12 **inmate who cooperated in an investigation who claims**
13 **he was assaulted by a BOP employee on page 38.  Also**
14 **contains an article regarding a BOP inmate whose**
15 **charges were dropped due to mishandling of evidence on**
16 **page 47."**
17         **So do you mind again taking a look at**
18 **this?**
19     A.  I do not mind.  Do you -- I don't know
20  which article.
21     **Q.  It sounds like on page 38, it's this top**
22 **article --**
23     A.  Okay.
24     **Q.  -- referencing --**
25     A.  And then the other article is this one on

63

1  the back.  Okay, yeah, BOP evidence -- yeah, okay.
2          (The deponent read the document.)
3      A.  I don't see any reason to reject this,
4  especially when they are referring to the inmate as
5  John Doe.  And then these inmates, the second story,
6  when it comes down to that, they were just upset that
7  the bureau mishandled evidence.  We would have no
8  reason to not let them have that.
9      **Q.  Right.  Okay.  So it appears that there**
10 **is no reason that this -- that the articles you**
11 **reviewed in this issue would be detrimental to the**
12 **security, good order, or discipline of the**
13 **institution?**
14     A.  With the present information I have,
15  without knowing any sort of back story, no, I do not
16  see any reason why.
17     **Q.  Okay.  Great.  Thank you.**
18         MR. KIEHL:  Maybe we'll take a brief
19  break.
20         (Recess taken, 9:58 a.m. to 10:02 a.m.)
21     **Q.  (BY MR. KIEHL)  We're back on the record.**
22 **Mr. Chapman, would you like to clarify a point?**
23     A.  Yes.  The point I would like to clarify
24  is that one of the attachments --
25     **Q.  Which one are you looking for?**

64

1      A.  The Program Statement 5266.11, I believe,
2  dated November 9, 2011, is, in fact, our current one.
3      **Q.  Okay.**
4      A.  So there has not been one released since
5  then.  I know -- I wasn't sure, but I made sure it is.
6      **Q.  Okay.  Great.  And I think that was**
7  **Exhibit 2, maybe.**
8      A.  Yes, sir, it is Exhibit 2.
9      **Q.  Okay.  And while you have that, I just**
10 **wanted to ask another question about Exhibit 2,**
11 **Program Statement 5266.11.  And this is the current**
12 **program statement on incoming publications, which is**
13 **issued by the Federal Bureau of Prisons in Washington,**
14 **as we discussed.**
15         **Does this set forth the overall standards**
16 **by which a warden evaluates incoming publications to**
17 **determine if they can be distributed in the**
18 **institution?**
19     A.  Yes, sir.  This is, like, a framework or
20  ground rules of --
21     **Q.  Okay.**
22     A.  -- this is typically what you should be
23  doing.
24     **Q.  Okay.**
25     A.  Yes.

16 (Pages 61 to 64)

TODD CHAPMAN - 1/17/2017
Prison Legal News v. Federal Bureau of Prisons

---

81

1  his -- his -- I would have to see who he testified
2  against, because if he testified against a nobody,
3  it's less of a risk than if he testified against a
4  gang member or gang leader.
5     He will always have a risk because he's
6  labeled a snitch; but depending on who he snitched
7  against, it gives a level of risk.  You know, I would
8  have to weigh -- I would have to do a lot of research
9  into this one to decide if I would let this one in
10 personally.
11    Q.  Okay.  Thank you.
12    A.  You're welcome.
13    Q.  All right.  Let's do one more.  And I
14 appreciate your patience.
15    A.  Oh, no problem.
16    (Deposition Exhibit 11 was marked.)
17    Q.  So this is a document we're marking as
18 Exhibit 11.  It begins with Bates No. BOP000386.  And
19 this appears to be a rejection notice for Prison Legal
20 News issue July 2013.  Does that appear correct,
21 Mr. Chapman?
22    A.  Yes, it does appear to be correct.
23    Q.  And who appears to have signed this
24 rejection notice?
25    A.  It appears to be someone acting in

---

82

1  capacity of Mr. Berkebile --
2     Q.  Okay.
3     A.  -- acting warden.
4     Q.  Someone acting for the warden signed this
5  apparently on July 31, 2013?
6     A.  Yes.
7     Q.  Okay.  And so this rejection notice
8  references at the top pages 36 to 37 of the July 2013
9  issue of Prison Legal News, and it says, "The
10 publication has been rejected because the referenced
11 pages discuss individuals incarcerated at ADX."
12    And so if we turn to pages 36 and 37,
13 there's an article that begins at the bottom of page
14 36 and continues on to page 37.  Would you take a
15 moment to read that and let us know why you think this
16 issue was rejected?
17    A.  Yes, sir.
18    (The deponent read the document.)
19    A.  Okay.
20    Q.  Okay.
21    A.  I have read this.  And the reason I would
22 reject it, if I rejected it, would be based on the
23 fact of his Sinaloa drug cartel, because we have a
24 very large Mexican national population in our federal
25 prisons.  And because we're putting that, Hey, this is

---

83

1  the person in charge of the Sinaloa cartel who killed
2  your entire family, beheaded them and threw the bodies
3  in the woods, they might be concerned of that.  And on
4  here, it says that between -- like a 17-month period,
5  he was in three places without incident.
6     We may have more information on that than
7  the inmate may have had.  Due to security reasons, we
8  may not have shared that.  So that could have been why
9  -- because it is very, very unusual for an inmate to
10 go to three prisons in 17 months.  That leads me to
11 believe there was a problem.  Normally inmates will
12 spend a year and a half to the rest of their life in
13 one prison.
14    Q.  Right.
15    A.  So the fact that he transferred that many
16 times in that short of a period of time, red flags all
17 over for me.  And a lot of our investigative material
18 and threats and stuff, we would not share with the
19 inmate, nor would we share with the public.
20    Q.  Okay.
21    A.  So if -- back story.  Knowing if that
22 would have been the case, and if I was working there
23 at that time, and this inmate was my inmate, I would
24 know that fact.
25    So if that was, in fact, the case, and

---

84

1  this came across my desk, very likelihood, especially
2  with our population, even at the ADX, the amount of
3  Mexican citizens we have could pose a threat to him,
4  because he may have murdered one of the family members
5  of one of the other inmates we have.  If we would not
6  have put the cartel information in there, I would have
7  seen no problem with it.
8     Q.  Okay.  It's -- so this article states
9  that this inmate is a leader in the Sinaloa cartel,
10 right?  That's what you were referencing?
11    A.  Yes.
12    Q.  And that could -- the identification of
13 him as a leader of that cartel could present safety
14 and security issues?
15    A.  Yes.
16    Q.  So you believe, based on the information
17 that you have, that this issue was properly rejected
18 under the policy in effect at the time?
19    A.  I'm speculating based on the movement.
20 To me, that brings up red flags.  So there was a
21 reason he was brought here because there are gang
22 leaders of drug cartels that are in other places.
23    So there was something about him that
24 brought him to us, because we don't randomly pick up
25 inmates who are not management problems and aren't

---

21 (Pages 81 to 84)