# EXHIBIT 36

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

    Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

    Defendant.

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S SECOND INTERROGATORIES**

---

    Pursuant to Fed. R. Civ. P. 33, Defendant Federal Bureau of Prisons ("Defendant" or "BOP"), through undersigned counsel, hereby responds to Plaintiff's Second Set of Interrogatories as follows:

**RESPONSES**

    **Interrogatory No. 17:** Identify the number of appeals filed by prisoners or publishers challenging the decision of the Warden to reject a Publication at the ADX from January 2009 to the present, and the number of rejections that have been overturned on appeal during that period. For each rejection that has been overturned on appeal during this period, state the grounds upon which such rejection has been overturned and the individual responsible for overturning such rejection.

**RESPONSE:** Objection. First, the BOP objects to the interrogatory to the extent it may seek privileged information, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Second, the BOP objects that

the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case, for multiple reasons: (1) the time period exceeds the six-year statute of limitations for injunctive relief claims against an agency of the United States, *see* 28 U.S.C. § 2401(a); only the processing and rejection of *Prison Legal News*, not other publications generally, is at issue in this case; (3) in order to respond to the interrogatory as written, the BOP would be required to conduct a search of the individual files of every current or former ADX inmate for a period of almost over nine years; and (4) in order to respond to the interrogatory as written, the BOP would be required to conduct an individual search of the files maintained by the North Central Regional Office, for a period of over nine years, in order to determine which publisher appeals originated from a rejection of an incoming publication at the ADX.  Third, the BOP objects to this interrogatory as compound, consisting of at least four separate interrogatories.

While the BOP maintains an electronic database that would allow it to search for administrative remedies filed by ADX inmates since January 2009, there is no such electronic database available to search publisher appeals records at the North Central Regional Office.  The BOP has not conducted a hand search of individual inmate files in preparing its response to this interrogatory, but has conducted a hand search of all available North Central Regional Office files.

Subject to, and without waiving these objections, the BOP incorporates here its previous responses to Interrogatory No. 1 with respect to any appeals filed by PLN regarding prior *Prison Legal News* rejections at the ADX from 2010 to 2014.

Insofar as the interrogatory requests information about administrative remedies and/or appeals filed by ADX inmates since January 2009, the following information is current as of December 31, 2017:

2009: 38 BP-9s (appeals to the Warden, three of which were granted in whole or in part); 37 BP-10s (appeals to the Region, none of which were overturned on appeal); and 32 BP-11s (appeals to Central Office, none of which were overturned on appeal).

For the three appeals of rejected publications to the Warden that were granted in whole or in part, the Warden granted two of the remedy requests, and the publications were returned to the inmate. For the appeal of the third rejection, the Warden provided an additional explanation for the rejection, but declined to overturn the rejection of the publication. For one of these appeals to the Warden, the hard files have been purged pursuant to records retention policies and verification of the reasons and who approved it are not available. As to the second, during the BP-9 review, the inmate requested the reason for the rejection, which was granted. The inmate also requested that the rejection be reversed, which was denied. Warden Wiley signed the BP-9 response. For the third appeal, an inmate on Special Administrative Measures ("SAMs") requested permission to receive two specific magazines. Warden Wiley granted the request, as reflected on the BP-9 response.

2010: 27 BP-9s (zero overturned on appeal); 17 BP-10s (zero overturned on appeal); and 10 BP-11s (zero overturned on appeal)

2011: 18 BP-9s (one appeal granted); 4 BP-10s (zero overturned on appeal); and 4 BP-11s (zero overturned on appeal)

The appeal to the Warden that was granted was for a rejection of the October 2011 and November 2011 issues of *Prison Legal News*. *See* BOP 1077-1079. The original BP-9 was denied by Dennis Stamper, acting for Warden Berkebile. The inmate appealed to the North Central Regional Director (BP-10), and the BP-9 was remanded to the institution for reconsideration. An amended BP-9 response states that the October 2011 and November 20122 issues of *Prison Legal News* were improper. The amended BP-9 response was signed by Dennis Stamper, acting for Warden Berkebile.

2012: 21 BP-9s (one remedy granted); 12 BP-10s (zero overturned on appeal); and 5 BP-11s (zero overturned on appeal)

One of the administrative remedies was granted with respect to a rejection of an incoming publication. The original BP-9 was denied by Dennis Stamper, acting for Warden Berkebile. The inmate appealed to the North Central Regional Director (BP-10) and the BP-9 was remanded to the institution for reconsideration. An amended BP-9 response indicates that the magazine was improperly rejected. The amended BP-9 response was signed by Dennis Stamper, acting for Warden Berkebile.

2013: 38 BP-9s (zero overturned on appeal); 27 BP-10s (zero overturned on appeal); and 10 BP-11s (zero overturned on appeal)

2014: 28 BP-9s (zero overturned on appeal); 16 BP-10s (zero overturned on appeal); and 19 BP-11s (zero overturned on appeal)

2015: 23 BP-9s (zero overturned on appeal); 14 BP-10s (zero overturned on appeal); and 11 BP-11s (zero overturned on appeal)

  2016: 12 BP-9s (zero overturned on appeal); 8 BP-10s (zero overturned on appeal); and 8 BP-11s (zero overturned on appeal)

  2017: 23 BP-9s (three granted, in part); 17 BP-10s (zero overturned on appeal); and 12 BP-11s (zero overturned on appeal)

  Three of the administrative remedies were partially granted with respect to a rejection of an incoming publication. First, Warden Fox partially granted the inmate's BP-9 to the extent the incoming publication was retained while the inmate utilized the Administrative Remedy Program, but otherwise denied. Second, Warden Fox partially granted the inmate's BP-9 to the extent the incoming publication was retained while the inmate utilized the Administrative Remedy Program, but otherwise denied. Third, Associate Warden Michael Carr granted the inmate's BP-9 to the extent the incoming publication was retained while the inmate utilized the Administrative Remedy Program, but otherwise denied.

  **Interrogatory No. 18:** Identify the number of appeals filed by prisoners or publishers challenging the decision of a Warden to reject a Publication at other BOP facilities within the North Central Region from January 2009 to the present, and the number of rejections that have been overturned on appeal. For each rejection that has been overturned on appeal during this period, state the grounds upon which such rejection has been overturned and the individual responsible for overturning such rejection.

**RESPONSE:** Objection. First, the BOP objects to the interrogatory to the extent it may seek privileged information, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Second, the BOP objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case,

5

for multiple reasons: (1) the time period exceeds the six-year statute of limitations for injunctive relief claims against an agency of the United States, *see* 28 U.S.C. § 2401(a); (2) only the processing and rejection of *Prison Legal News* at the ADX, not other publications generally, is at issue in this case; (3) in order to respond to the interrogatory as written, the BOP would be required to conduct a search of the individual files of every current or former BOP inmate who has been housed in over twenty BOP institutions in the North Central Region for a period of over nine years; and (4) in order to respond to the interrogatory as written, the BOP would be required to conduct an individual search of the files maintained by the North Central Regional Office for a period of over nine years. Third, the BOP objects to this interrogatory as compound, consisting of at least four separate interrogatories.

**Interrogatory No. 19:** Describe in detail the factual and legal basis for your contention that ADX should not have to redact or remove objectionable content from incoming Publications at ADX (instead of rejecting Publications in their entirety), including a detailed description of (a) any alleged burden this would impose on prison officials (beyond the burden of rejecting the Publications in their entirety), and (b) any alleged burden any evaluation[1] of this alternative undertaken by BOP or ADX at any time and the outcome of any such evaluation.

**RESPONSE:** Objection. First, the BOP objects to the interrogatory to the extent it may seek privileged information, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Furthermore, asking for the "legal basis" for the BOP's position not only implicates both the attorney-client and attorney-

---

[1] There may be words omitted from this portion of the interrogatory. The BOP understands this portion of the interrogatory to read as follows: "any evaluation of this alternative . . ."

6

work-product privileges, but also seeks a legal opinion on an issue that is for the Court to resolve. Second, the BOP does not waive its argument that PLN's claims are moot and, therefore objects to this interrogatory because the Tenth Circuit has found that whether a prior practice or action was "legal" has no bearing on the mootness analysis. *Brown v. Buhman*, 822 F.3d 1151, 1177 (10th Cir. 2016) ("It is not a purpose of the [voluntary cessation] doctrine to require an admission from the defendant that the now ceased conduct was illegal. Mootness turns on future threats, not upon penance.") (quoting *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 55 n.9 (1st Cir. 2013)). Third, the BOP objects to this interrogatory as compound, consisting of at least three separate interrogatories.

Subject to, and without waiving these objections, federal regulations and BOP national policy direct prison officials at the ADX to reject an entire publication containing objectionable content, rather than redacting or extracting the content that is subject to rejection. A Warden is permitted to reject "a *publication*." *See* 28 C.F.R. § 540.71(b)(1)-(7) (A "Warden may reject *a publication* only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity. The Warden may not reject *a publication* solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant. *Publications* which may be rejected by a Warden include," but are not limited to, those which meet seven criteria.) (emphasis added); Program Statement 5266.11, *Incoming Publications* at 3 ("Only the Warden may reject an incoming *publication*.") (emphasis added); *see also* 28 C.F.R. § 540.70 (the term "publication" means "a book, booklet, pamphlet, or similar document, or a single issue of a magazine, periodical, newsletter, newspaper, plus such other materials addressed to a specific inmate such as advertising

7

brochures, flyers, and catalogs"). Further, all other references in the relevant provisions of the Code of Federal Regulations and BOP national policy pertain to the rejection of the entire publication and not simply the objectionable content. *See*, *e.g.*, 28 C.F.R. § 540.71(c) ("[T]he Warden shall review the individual publication prior to the rejection of that publication. Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in its entirety."); Program Statement 5266.11, *Incoming Publications* at 4 ("The Warden will retain the rejected publication for 20 days from the date the inmate is sent written notification of the rejection.").

These regulations and BOP policies recognize the realities of prison administration and the enormous burden that a redaction/extraction practice would impose, to the detriment of institutional resources and, thus, the inmate population. At the ADX, approximately 55 to 75 incoming publications are received at the ADX *each day*. The mailroom staff are required to perform an initial review of each incoming publication. Following that initial review, the Special Investigative Services ("SIS") Department reviews every incoming publication again to ascertain if it contains content that may be subject to rejection. This review is just one of the many duties that SIS and mailroom personnel must perform every day. Many of the incoming publications are books containing hundreds of pages. Under the regulations and policies which allow BOP personnel to withhold the entire publication, the SIS Department identifies any information in the publication that may be appropriate for rejection and immediately proceeds with preparing the relevant documentation for review by the ADX Legal Department and, ultimately, the Warden. Under a redaction/extraction practice, SIS staff would be obliged to conduct a line-by-line analysis of every word in the publication to ensure that each and every phrase, line, and word

8

that may compromise security or facilitate criminal activity is identified for redaction before dissemination to the inmate. It is physically impossible for SIS technicians, each of whom monitors all communications of a large caseload of inmates, to bring that level of scrutiny to every incoming publication. Imposing that additional work on the ADX SIS Department would compromise all other aspects of the work of the Department, thus jeopardizing the security of ADX staff and inmates and persons outside the prison who are at risk if the Department fails to identify dangerous communications.

Furthermore, under a redaction/extraction practice, some content that warrants rejection inevitably will be missed in the redaction process—especially in lengthy publications. Inadvertent but unavoidable human errors like these will undermine the entire publication-review process because inmates will gain access to the very material that BOP intelligence professionals have determined to be detrimental to security.

In addition to these security risks, a case-by-case mandatory redaction/extraction process would impose significant administrative burdens. Redacting or extracting pages from publications would necessarily destroy inmate property, subjecting ADX staff to potential liability. The ADX would be required to develop procedures to request the inmates' permission to alter their property and to track the inmates' responses. Moreover, redacting or extracting objectionable material from incoming publications would not eliminate the need to continue to implement other procedures. Even if objectionable content was redacted, the inmate would still be provided a rejection notice informing him of the redacted rejection and giving him an opportunity to appeal. And, as with the inmates, the publisher would still receive a rejection notice, informing the publisher that certain pages deemed objectionable were redacted and

9

notifying the publisher that they may appeal the rejection decision to the North Central Regional Director. These administrative burdens escalate if the large number of publications rejected for nudity are included. If such procedures were imposed, it is unclear whether such publications would be excluded from the redaction/extraction procedures.

In addition, the BOP incorporates here the testimony of former ADX Warden David Berkebile, who further explained why forcing ADX personnel to redact objectionable material from a publication is not feasible and triggers unavoidable security risks. *See* Deposition of David Berkebile, 84:5-86:5.

The BOP has not done a formal "evaluation" of "alternatives" to rejecting publications in their entirety at the ADX, which is the approach permitted by federal regulations and BOP national policy. BOP officials have considered the implications of establishing such a procedure in connection with its defense of PLN's claims in this case. The BOP's conclusions are reflected in the response to this interrogatory.

Finally, although the BOP is not required to provide a legal analysis in response to an interrogatory, the BOP's assessment of the reasons for not implementing burdensome and potentially dangerous redaction/extraction protocols at the ADX pass muster under the deferential standard established in *Turner v. Safley*, 482 U.S. 78 (1987). PLN cannot meet its heavy burden to establish that it is irrational for the BOP to conclude that redacting objectionable material is not feasible and jeopardizes security. *Id.* 89-90 (prison restriction is unconstitutional only if "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational").

**Interrogatory No. 20**: Identify any BOP institution, other than ADX, that has rejected an issue of *Prison Legal News* from January 2009 to the present, pursuant to 28 C.F.R. § 540.71, including, but not limited to, those rejected on the basis that the Warden determined them to be "detrimental to the security, good order, or discipline of the institution" or that "it might facilitate criminal activity," *id.* § 540.71(b), and describe in detail the basis for such rejection.

**RESPONSE**:  Objection.  First, the BOP objects to the interrogatory to the extent it may seek privileged information, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges.  Second, the BOP objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case, for multiple reasons: (1) the time period exceeds the six-year statute of limitations for injunctive relief claims against an agency of the United States, *see* 28 U.S.C. § 2401(a); (2) only the processing and rejection of *Prison Legal News* at the ADX, and not other BOP institutions generally, is at issue in this case; (3) in order to respond to the interrogatory as written, the BOP would be required to conduct a search of the individual files of every current or former BOP inmate for a period of almost over nine years; and (4) in order to respond to the interrogatory as written, the BOP would be required to conduct an individual search of the files maintained by over 122 BOP institutions nationwide for a period of over nine years.  In responding to this interrogatory, the BOP has not conducted a hand search of files in 122 BOP institutions; it is simply impossible for the BOP to complete such an onerous task in the discovery period established in this case.

Subject to and without waiving these objections, the BOP has asked Central Office personnel to conduct a search of an administrative-remedy database using terms designed to

11

identify whether issues of *Prison Legal News* have been rejected in other institutions. It is uncertain whether this search will identify rejections of *Prison Legal News* in other institutions, even if there are such rejections. The outcome of the search is dependent on whether the terms "Prison Legal News" or "PLN" were used when the information about the administrative remedy was entered in the database. The BOP has no other feasible means of attempting to ascertain whether *Prison Legal News* has been rejected in any BOP institution other than the ADX. If the search identifies any rejections of *Prison Legal News*, it is unknown whether the BOP will be able to locate any related documents that would allow it to "describe in detail the basis for such rejection[s]."

As of the date of the response to this interrogatory, the search has been requested but has not been completed. The BOP will notify PLN of the results of the search upon its completion.

**Interrogatory No. 21**: Explain the facts and circumstances that lead to the adoption of ADX's "practice of rejecting publications that contained information discussing an ADX or BOP inmate, or BOP staff member," Def.'s Mot. to Dismiss [Doc. 31] at 3, including, but not limited to, when such practice was adopted, the ADX personnel involved in the development and adoption of such practice, the legal basis for such practice, and the purported security rationale for such practice.

**RESPONSE**: Objection. First, the BOP objects to the interrogatory to the extent it may seek privileged information, including information protected by the attorney-client, attorney-work-product, deliberative-process, and/or law-enforcement privileges. Furthermore, asking for the "legal basis" for the BOP's past practice not only implicates both the attorney-client and attorney-work-product privileges, but also seeks a legal opinion on an issue that is for the Court

12

to resolve. Second, the BOP does not waive its argument that PLN's claims are moot and, therefore objects to this interrogatory because the Tenth Circuit has found that whether a prior practice or action was "legal" has no bearing on the mootness analysis. *See Brown*, 822 F.3d at 1177. Third, the BOP objects to this interrogatory as compound, consisting of at least three separate interrogatories.

Subject to, and without waiving these objections, the BOP is not able to ascertain, specifically, when the SIS Department's practice of routinely recommending rejecting publications solely because they contained information discussing an ADX or BOP inmate or BOP staff member (which was abolished in February 2016) was established. Based on information the BOP has been able to obtain from current SIS Department personnel, the practice was in place before May 2012.

Because the BOP has not been able to trace the precise origins of the practice at this time, it also cannot provide a response to the other questions asked in this interrogatory, including which BOP personnel were involved in establishing the practice and what their security rationale for establishing the practice in general may have been. There may have been additional, specific security rationales by individual ADX Wardens for particular rejections, depending on their content and the context in which the rejections were made.

The BOP is continuing to attempt to gather information that may be responsive to this interrogatory.

DATED February 8, 2018.

    As to legal objections:

    ROBERT C. TROYER
    United States Attorney

    s/ *Susan Prose*
    Susan Prose
    Assistant United States Attorney
    1801 California Street, Suite 1600
    Denver, Colorado 80202
    Telephone: (303) 454-0100
    Fax: (303) 454-0404
    E-mail: susan.prose@usdoj.gov


    Counsel for the Federal Bureau of Prisons

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

      I hereby certify that on February 8, 2018, I sent the foregoing document by electronic mail to:

Stephen Kiehl
Matthew Shapanka
Peter Swanson
Alyson Sandler
Terra Fulham


                                    s/ *Susan Prose*
                                    Susan Prose
                                    United States Attorney's Office