**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

## FEDERAL BUREAU OF PRISONS' MOTION FOR SUMMARY JUDGMENT

---

      The undisputed facts have changed since the BOP's motion to dismiss for lack of jurisdiction. In December 2017, the ADX formally revised its policy for incoming publications to explicitly state that a publication may not be rejected solely because it discusses a BOP inmate or staff member. This litigation, in which PLN highlighted the ADX's past focus on names as the impetus for rejecting publications, prompted ADX officials to critically examine the institution's rejection practices. The current ADX Warden confirms, in a sworn declaration, that the ADX will continue to abide by this policy. The undisputed facts show that the eleven issues of *Prison Legal News* that were rejected in the past—and that were delivered to inmate subscribers over a year ago—would not be rejected under the current policy. Further, since the past rejections, the ADX also changed its procedures for notifying publishers about rejections. The new policy requires that notices contain specific information about the grounds for rejection and directs that notices be sent to publishers within ten business days following the Warden's rejection decision.

      On this undisputed record, the BOP is entitled to summary judgment on PLN's First

Amendment, due process, and Administrative Procedure Act ("APA") claims. First, the Court lacks subject-matter jurisdiction over claims about the past rejections of *Prison Legal News*. There is no additional relief the Court can award other than an illegal advisory opinion. Second, any question about whether the ADX may have legitimate penological reasons for applying current ADX incoming-publications procedures to PLN in the future must be decided on concrete facts that are unknown at this time. Such a claim is not ripe, and may never need to be decided. Finally, PLN cannot meet its heavy burden to show that the current ADX incoming-publication practices, on their face, bear no rational connection to the BOP's legitimate penological interests. PLN's mere disagreement with the professional judgment of ADX administrators is insufficient to establish a genuine dispute.

## STANDARD OF REVIEW

A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the non-moving party will bear the burden of proof, the moving party's obligation is satisfied upon a showing that there is a lack of evidence to carry the non-moving party's burden on an essential element of that party's cause of action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must go beyond the pleadings and establish the existence of specific, material fact disputes that would make a difference to the outcome and necessitate a trial. *Id.* The non-movant must proffer "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Here, where PLN attempts to dispute the BOP's professional judgment, the Court's "inferences must accord deference to the views of prison authorities." *Beard v. Banks*, 548 U.S.

521, 529-30 (2006) (court "must distinguish between evidence of disputed facts and disputed matters of professional judgment"); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (professional judgment of prison officials receives "substantial deference").

## ARGUMENT

### I.     Any claim about former ADX policies and the past rejections is moot.

#### A.     Under the current ADX policy, the prior issues would not have been rejected, and new notice requirements would apply to any future rejections.

In the past, the ADX had a practice of flagging publications for rejection merely because they mentioned the name of a BOP inmate or staff member. Facts 1-2.[1] In this litigation, the BOP has referred to this past practice as the "name-alone" practice. This practice began sometime between 1998 and 2002, after ADX staff learned that inmates were using publications as a means to pass clandestine messages. *Id.* In the years that followed, the practice of flagging publications that referenced staff and inmate names continued, including during the period between January 2010 and April 2014 when the ADX rejected eleven issues of *Prison Legal News*. *Id.* 2-4.

This litigation highlighted the name-alone practice and prompted ADX officials to review the ADX policy and practices related to incoming publications. *Id.* 5. As a result, the old name-alone practice was eliminated. *Id.* 6. Since the implementation of the February 2, 2016, ADX Institution Supplement regarding incoming publications, no publication has been referred to the Warden for possible rejection, nor has any publication been rejected, merely because it contained the name of a BOP inmate or staff member. *Id.*

While the ADX eliminated the name-alone practice in February 2016, the February 2,

---

[1] "Fact(s)" refer to the BOP's attached Statement of Undisputed Material Facts.

2016 Institution Supplement did not specifically state that fact. ADX officials made that

prohibition explicit in the ADX Institution Supplement for incoming publications dated

December 21, 2017 (the "December 2017 Policy"):

> **An incoming publication at the ADX may not be rejected solely because it discusses an ADX or Federal Bureau of Prisons (BOP) inmate, or BOP staff member.** When a publication identifies and discusses an ADX or BOP inmate, or BOP staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b). Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment.

*Id.* 7 (discussing § III.C. of the December 2017 Policy) (emphasis added). The ADX Warden has

made an affirmative commitment, under oath, that the ADX will continue to abide by Section

III.C. of the December 2017 Policy because it "is in accordance with the law and sound

correctional judgment." *Id.*; *see also* 28 C.F.R. § 540.71(b).

The past rejections of *Prison Legal News*, which occurred between January 2010 and

April 2014, were made under previous versions of the ADX incoming publications Institution

Supplement, and during a period when the name-alone practice was routinely applied. Fact 3.

The magazines were re-reviewed by the then-ADX Warden in March 2017 and delivered to

inmate subscribers. *Id.* 11. The record demonstrates unequivocally that the eleven magazines

would *not* be rejected under the December 2017 Policy. *Id.* 12.

This litigation also prompted changes to the notification procedures following the

rejection of an incoming publication at the ADX. The December 2017 Policy states:

> When an incoming publication is rejected, the Warden will promptly advise the inmate and publisher in writing of the decision and the reason(s) for it.  The notice must contain reference to the specific article(s) or material(s) considered objectionable, **including page references and quotes from the incoming**

> **publication**.  The Warden will advise the publisher or sender that the publisher may obtain independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter.  **Ordinarily, the rejection notice will be mailed to the publisher within ten business days from the Warden's signature date**.

*Id.* 13 (discussing § III.G.) (emphasis added). As a result of a review conducted because of this litigation, ADX officials determined that Section III.G. should be implemented to ensure that rejection notices adequately explain the grounds for rejection and enable publishers to appeal rejections in a timely manner. *Id.* 14. These procedures would apply if any issue of *Prison Legal News* is ever rejected at the ADX in the future. *Id.* 15. Notably, these procedures exceed those required by federal regulation. *Id.* 16; *see also* 28 C.F.R. § 540.71(d) (no requirements concerning page references, quotes, or timeframe for mailing notices). As with Section III.C. of the December 2017 Policy, the ADX Warden has made an affirmative commitment, under oath, that the ADX will continue to abide by Section III.G. of the December 2017 Policy. Fact 17.

### B.     PLN has no remedy for previous ADX policies and past rejections.

PLN cannot litigate the past rejections of *Prison Legal News*, which occurred many years ago and were based on old ADX policies no longer in effect. PLN already received all of the available retrospective relief when the BOP released the magazines to the inmates in March 2017. More importantly, any claim for prospective relief based on past policies and procedures is moot because any future PLN magazines will be reviewed only under the current ADX policy.

As to these past matters, PLN "no longer suffers an actual injury that can be redressed by a favorable judicial decision." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015). In deciding whether a claim is moot, "'[t]he crucial question is whether granting a present determination of the issues offered will have some effect in the real world.'" *Brown v. Buhman*,

822 F.3d 1151, 1165-66 (10th Cir. 2016). On the undisputed facts here, it would not. If the Court assesses the constitutionality of the old policies, that order would have no effect, because those policies have been revoked. If the Court evaluates the past rejections, that order would have no effect, because the magazines have been given to PLN's subscribers. The BOP has made clear that the magazines would *not* be rejected under the December 2017 Policy, and that new notice procedures designed to provide more specific and timely notice would apply to future rejections.

A judicial declaration about past facts, which amounts to no "more than a retrospective opinion that [PLN] was harmed," does not keep PLN's constitutional claims alive. *See*, *e.g.*, *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (to receive declaratory relief, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant"). The same is true of PLN's APA claim. The APA provides for review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. As the Supreme Court has made clear, parties may only challenge *discrete* agency actions through the APA, not programmatic challenges. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64-65 (2004). In general, the only proper relief that may be awarded under the APA is a "remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Here, the only alleged discrete final agency actions are the rejections pursuant to old policies and practices, all of which the BOP has completely and permanently revoked. There is no legal basis for the Court to issue an advisory opinion as to those actions or to remand those actions back to the BOP for further investigation or explanation.

The voluntary-cessation exception to mootness does not apply here. The Tenth Circuit has emphasized that a government entity can take the concrete step of affirmatively and formally

changing a policy, as the BOP has done here, without triggering voluntary cessation. *Rio Grande Silvery Minnow v. Bureau of Recl.*, 601 F.3d 1096, 1118 (10th Cir. 2010) (voluntary actions may moot litigation if "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation"). In *Silvery Minnow*, the Tenth Circuit rejected plaintiffs' attempt to litigate about a prior agency rule, finding that voluntary cessation did not apply where the agency "took the concrete step" of issuing a new rule, thus rendering obsolete the old rules "that provided the framework for" the plaintiffs' challenge. *Id.*; *Buhman*, 822 F.3d at 1166 (no voluntary cessation where official's sworn declaration confirmed policy change).

Here, as in *Silvery Minnow* and *Buhman*, the BOP has affirmatively adopted a new written policy—notably, one supported by a declaration from a government official attesting that the agency will adhere to that policy. The Court here is not "presented with a mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease." *Silvery Minnow*, 601 F.3d at 1118; *Burbank v. Twomey*, 520 F.2d 744, 748 (7th Cir. 1975) (no voluntary cessation where change in prison policy was "codified into a formal, published administrative regulation"). Nor is there any evidence of "gamesmanship" in the BOP's decisions to formally abolish any vestige of the old name-alone practice, to deliver the past issues of *Prison Legal News*, and to adopt procedures that impose more burdens on ADX staff. *Silvery Minnow*, 601 F.3d at 1118. The Warden submitted a sworn declaration affirming that the ADX will adhere to the December 2017 Policy. This is a strong indicator that the ADX will not revert to old policies or practices. *Buhman*, 822 F.3d at 1172 (in rejecting voluntary cessation, stating that "[v]iolation of the declaration would expose [the declarant] to prosecution

for perjury or contempt"). Where government officials have much to lose by reverting to the old ways, "[c]ourts are more apt to trust public officials than private defendants to desist from future violations." *Ghailani v. Sessions*, 859 F.3d 1295, 1302 (10th Cir. 2017).

The fact that this litigation was the catalyst for these changes strengthens the case for mootness. A federal agency can and should evaluate matters that have come to the fore as a result of litigation. As the Tenth Circuit has emphasized, a policy change that is "a reaction to" a lawsuit "does not necessarily make it suspect. An agency's decision to adopt a policy in the context of litigation may actually make it *more likely the policy will be followed*, especially with respect to the plaintiffs in that particular case." *Buhman*, 822 F.3d at 1171 (citations omitted) (emphasis added). This record is replete with indicators of genuine self-correction which provide "a secure foundation for mootness[.]" *Silvery Minnow*, 601 F.3d at 1118. The BOP has shown that it has not "'changed course simply to deprive the court of jurisdiction.'" *Id.* at 1115-16.

## II.     Any claim based on potential future applications of the policy to PLN is not ripe.

This leaves PLN's challenge limited to relief about hypothetical future rejections of *Prison Legal News* under the December 2017 Policy, but that claim is not ripe for review under either the Constitution or the APA. "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300, 302 (1998) (holding that claim seeking declaratory judgment about the application of certain provisions of Voting Rights Act was not ripe for adjudication). "Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential

reasons for refusing to exercise jurisdiction." *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012). Here, PLN cannot establish that any hypothetical claim based on a future application of the policy is either constitutionally or prudentially ripe. *See Los Alamos Study Group v. Dep't of Energy*, 692 F.3d 1057, 1064 (10th Cir. 2012) (plaintiff bears the burden to establish ripeness).

PLN cannot establish that any claim about a potential future rejection is constitutionally ripe. "[T]he doctrine of ripeness is intended to forestall judicial determinations of disputes until the controversy is presented in clean-cut and concrete form." *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 119 F.3d 1437, 1443 (10th Cir. 1997); *Renne v. Geary*, 501 U.S. 312, 321 (1991) (claim unripe without facts showing "clean-cut and concrete" application of challenged restriction). Here there is no evidence of a concrete, actual or imminent injury related to the current policy. *Prison Legal News* has not been rejected at the ADX for over four years; the current policy abolishes the old name-alone practice and establishes new rejection notification procedures. It is impossible to know if any future issue of the magazine will *ever* be rejected under the current policy and what the circumstances may be of any such hypothetical rejection (including the magazine's content and the Warden's reasoning).[2] Without knowing the most basic facts about such future contingencies, the Court could do no more than issue an advisory opinion. "The ripeness doctrine precludes federal courts from issuing purely advisory opinions regarding what the law might provide if various contingencies eventually come to pass[.]" *Harshbarger v. Stevens*, No. 10-cv-01297-REB-KLM, 2011 WL 684611, at *3 (D. Colo. Feb. 17, 2011).

PLN is also unable to satisfy the prudential aspects of ripeness, which turn on "both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court

---

[2] Again, the record shows that the past issues would not be rejected under the current policy.

consideration.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). The

hypothetical question of whether some future rejection may violate the Constitution is not fit for

adjudication because such a hypothetical rejection will turn on concrete facts, and those concrete

facts are utterly unknowable at this time (if they will ever exist). *Texas v. United States*, 523 U.S.

at 300 (case unfit for adjudication where "we have no idea whether or when such [a sanction]

will be ordered"). This Court has "no idea whether or when" such a rejection will be ordered by

an ADX Warden. "At best, further developments would undoubtedly sharpen the factual issues

in this case; at worst, the failure of certain contingent events may render a decision completely

advisory." *Morgan v. McCotter*, 365 F.3d 882, 891 (10th Cir. 2004).

      Neither can PLN establish any concrete "hardship" if the Court refrains from attempting

to prejudge and proactively restrain the Warden's discretion to conduct a security analysis of

*Prison Legal News*. The mere possibility of a rejection has no "direct effect on the day-to-day

business" of PLN; there is no evidence that PLN is altering the content of its magazine to avoid

rejections at the ADX. *See Texas v. United States*, 523 U.S. at 301 (finding no hardship, and

contrasting case with one in which "the regulation at issue had a 'direct effect on the day-to-day

business' of the plaintiffs"). Similarly here, PLN "is not required to engage in, or to refrain from,

any conduct." *Id.* The existence of the December 2017 Policy, and the BOP regulations which it

implements, in no way affects PLN's "primary conduct." *Id.* at 302.

      In sum, the Court needs concrete facts to decide any claim challenging the current policy.

*See Nat'l Park*, 538 U.S. at 808 (challenge to regulation not ripe "until the scope of the

controversy has been reduced to more manageable proportions, and its factual components

fleshed out, by some concrete action applying the regulation to the claimant's situation in a

fashion that harms or threatens to harm him"). There are no such concrete facts now. Any challenge regarding a hypothetical rejection under the current policy is not ripe for review.

**III.    Even if a facial challenge were permissible, PLN cannot meet its heavy burden to prove that the December 2017 Policy is an irrational approach.**

The December 2017 Policy is the only incoming publications policy in effect at the ADX. That policy has never harmed PLN, whose magazines have not been rejected at the ADX since April 2014. Because PLN has no actual or imminent harm related to the current policy, and because there are no concrete facts related to such a challenge, the Court lacks jurisdiction to render an opinion. But even if a facial challenge to the current policy were permissible, the undisputed evidence shows that PLN cannot meet its burden to prove that the policy, on its face, is so disconnected from any legitimate penological interest as to have been *irrationally* imposed.

**A.    The policy is constitutional under the deferential rational-basis standard.**

**1.    The rational-basis standard is applied with deference to the correctional judgment of prison officials.**

Claims that challenge prison regulations are evaluated under the four-part standard in *Turner v. Safley*, 482 U.S. 78 (1986). *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989) (holding that *Turner* analysis applies to incoming publication regulations). Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. *Turner* is "a unitary, deferential standard for reviewing prisoners' constitutional claims" that does not depend on the purported value of the content of the speech. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001).[3]

---

[3] *Turner* applies even if PLN claims to bring an overbreadth or vagueness challenge. *See*, *e.g.*, *Chrisco v. Raemisch*, No. 17-cv-01036-PAB-MEH, 2018 WL 949319, at *14 (D. Colo. Feb. 20,

Under *Turner*, that deference goes to prison administrators. 482 U.S. at 85-86, 89 (emphasizing "a policy of judicial restraint"). "Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh*, 490 U.S. at 407-08.[4] *Turner*'s deferential rational-basis standard acknowledges that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Prison officials receive deference when the Court evaluates the *Turner* factors on a motion for summary judgment. Where the only dispute is about matters of professional judgment, the Court's "inferences must accord deference to the views of prison authorities." *Beard*, 548 U.S. at 529-30. That is the case here. The informed correctional judgment of BOP officials, not PLN's views, receives deference.

## 2.    PLN bears the burden to prove that the BOP acted irrationally.

Under *Turner*, PLN bears the burden to establish the absence of any rational connection between the December 2017 Policy and the BOP's legitimate penological interests. *Cf. Overton*, 539 U.S. at 132 ("The burden moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."); *Shaw*, 532 U.S. at 232 (under *Turner*, the court must decide whether the inmate has met his "heavy burden" to "overcome the presumption that

---

2018), *adopted*, 2018 WL 1517023 (D. Colo. Mar. 27, 2018); *Koutnik v. Brown*, 456 F.3d 777, 782-83 (7th Cir. 2006); *Waterman v. Farmer*, 183 F.3d 208, 212-13 (3d Cir. 1999)

[4] *Accord O'Lone v. Estate of Shabazz*, 482 U.S. at 342, 353 (1987); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Jones v. N. Carolina Prisoners' Labor Union*, 433 U.S. 119, 126, 132 (1977).

the prison officials acted within their 'broad discretion'") (quoting *Thornburgh*, 490 U.S. at 413).

Turner identified four factors that courts should consider in determining whether a prison regulation is reasonably related to legitimate penological interests. However, *Turner* does not require that all four factors weigh in favor of the government to find that a restriction is rationally imposed. *See Beard*, 548 U.S. at 32-33 (prison policy upheld as reasonable, even though prisoners had *no* "alternative means" of receiving the information at issue); *see also Henderson v. Terhune*, 379 F.3d 709, 715 (9th Cir. 2004) (not every *Turner* factor "must be met in order to find that a regulation is reasonably related to legitimate penological interests").

1.   The legitimate penological interest factor. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. This factor "is the most important [as] it is 'not simply a consideration to be weighed but rather an essential requirement.'" *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012); *see also Beard*, 548 U.S. at 532 (the other factors "add little, one way or another, to the first factor's basic logical rationale"). This factor is satisfied if prison officials, in their professional judgment, believe that a restriction would advance the desired goals, even if there is no concrete proof that it will. *Johnson v. California*, 543 U.S. 499, 513 (2005) (*Turner* standard is what officials "might reasonably have thought"); *Beard*, 548 U.S. at 534-35 (upholding restriction even absent a showing it had "proven effective").

Prison officials are allowed to impose restrictions to address their concern about *potential* threats. "Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." *Jones*, 433 U.S. at 132-33, 136. Officials can exercise their professional

judgment to take preventive actions without waiting for detailed evidence confirming that greater harm will ensue in the absence of the restrictions. *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 334 (2012) (applying *Turner* in rejecting argument that detainees should be exempt from invasive searches absent a "particular reason to suspect them" and holding that officials can reasonably find such an evidentiary standard "unworkable").

2.     The alternative means factor. The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90.  Alternatives need not be ideal; they need only be available. *Overton*, 539 U.S. at 135. Even if the available alternative is not the "best method," the second *Turner* factor "does not undercut the challenged restriction." *Wardell v. Duncan*, 470 F.3d 954, 961-62 (10th Cir. 2006).

3.     The impact-of-the-accommodation factor. "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* The Court should consider whether any accommodation would have more than a "negligible" effect. *Overton*, 539 U.S. at 136 (in upholding restriction on visitors, observing that allowing the visitors "surely would have more than a negligible effect on the goals served" by the restriction).

4.     The "obvious, easy alternatives" factor. The fourth *Turner* factor is whether there are "obvious, easy alternatives" that suggest the restriction is an "exaggerated response" to governmental concerns. *Turner*, 482 U.S. at 90. "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method

of accommodating the claimant's constitutional complaint." *Id.* at 90-91. *Turner* asks "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton*, 539 U.S. at 136. "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *Thornburgh*, 490 U.S. at 419.

> **B.     PLN cannot meet its burden to prove that the December 2017 Policy is an irrational approach unrelated to penological interests.**

> **1.     Section III.C. of the policy is a rational approach.**

The undisputed facts show that PLN cannot meet its burden to show that this policy is an irrational approach for handling incoming publications at the ADX.

<u>First</u>, the undisputed facts show that the ADX has legitimate penological interests and that there is a rational connection between the policy and those legitimate penological interests. Long-established law holds that prison security is a legitimate penological interest. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005); *see also Rezaq v. Nalley*, 677 F.3d 1001, 1013 (2012) (institutional safety and national security are legitimate penological interests); Fact 18. In deciding how to manage incoming publications to protect these security interests, ADX officials have taken into account the uniquely dangerous nature of the ADX inmate population. *Id.* 19-22. The officials have taken into account the myriad ways that ADX inmates can harm others, including by overcoming security protocols to transmit dangerous information. *Id.* 24-26, 29-31, 38-39. ADX security and monitoring protocols cannot eliminate these risks, especially in the face of the inmates' use of codes and other deceptive means of communicating. *Id.* 31, 46.

In this dangerous context, the ADX Warden must have the ability to reject an incoming publication if, in his correctional judgment, its content poses a risk to the security of inmates, staff, or the public. *Id.* 32. This includes publications that present risks because they reveal specific information about people. *Id.* 33, 34, 39, 46, 47. While the mere mention of a name, in and of itself, does not implicate a security interest, the Warden must be able to exercise his predictive judgment to decide that exposure of information about people *could* jeopardize security in some circumstances. *Id.* 47-48; *see also*, *e.g.*, *Thornburgh*, 490 U.S. at 417 ("We agree that it is rational for the Bureau to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time."); *Jones*, 433 U.S. at 132-33, 136.

Section III.C. of the December 2017 Policy allows the Warden to exercise his predictive judgment to forestall security risks. The policy prevents automatic rejections of materials based on nothing more than a name. Fact 7. But it also mandates an individualized assessment based on the particular circumstances at the time. *See id.* (Warden must make individualized assessment, taking into account specifics about the inmate or staff, the content of the article, its impact on institutional security, and the factors in 28 C.F.R. § 540.70(b)). There is no genuine dispute there is a rational connection between this policy and legitimate penological interests at the ADX.

Second, under Section III.C., there are "alternative means" for publishers to disseminate, and for ADX inmates to receive, information, even if some publications will be rejected after the Warden conducts an individualized security analysis. A prison can preclude inmates from receiving certain information that poses a security risk without running afoul of the second *Turner* factor. *Thornburgh*, 490 U.S. at 417-18 (discussing 28 C.F.R. §§ 540.70(b) & 540.71(c)).

The December 2017 Policy—which incorporates one of the regulations at issue in *Thornburgh*—"permit[s] a broad range of publications to be sent, received and read," showing that the second *Turner* "factor is clearly satisfied." *Id.* at 418.

Third, PLN cannot establish that depriving the Warden of discretion to decide that a publication should be rejected, based on his evaluation of the circumstances, would not have a negative impact on the security of others. Here, as in *Thornburgh*, "the class of publications to be excluded is limited to those found potentially detrimental to order and security; the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned." *Id.* The Warden's "informed discretion" that the December 2017 Policy is a reasonable security measure receives deference.

Fourth, PLN cannot prove that there are obvious, easy alternatives to the December 2017 Policy that would not compromise the BOP's legitimate penological interests. PLN contends that "redaction or removal of articles deemed objectionable" is an alternative to the BOP's practice of rejecting an entire publication that contains objectionable content. *See* Doc. 1 ¶ 56. This is effectively a challenge to BOP's longstanding regulation, 28 C.F.R. § 540.71(e), which provides an all-or-nothing approach that allows the Warden either to allow a publication to enter the prison or to "return the rejected publication to the publisher or sender." *Id.* The Supreme Court directly held that this all-or-nothing rule is facially valid under *Turner*. *Thornburgh*, 490 U.S. at 419. Because binding precedent holds that this rule is constitutional, PLN's challenge must be rejected.[5]

---

[5] To the extent PLN seeks to bring an as-applied challenge to the rule, that challenge is not ripe. As detailed above, the Court cannot provide an advisory opinion as to the hypothetical future application of this rule to a hypothetical future publication.

Likewise, to the extent PLN argues that all "publicly available" information must be assumed to be known by inmates and, therefore, must be provided to them, that alternative also fails the *Turner* test. The ADX has considered and rejected that proposition. The problem with this approach is two-fold. First, it is fundamentally incorrect to suggest that every inmate is aware of everything that happened in other inmates' cases, or of all information in the public domain.[6] Fact 43. Just because information may conceivably be found from other sources does not mean that inmates are aware of it. Second, as the Warden explained, even if information may be found through other sources, that does not diminish the negative impact dangerous information could have when highlighted and presented directly to the inmate population. Fact 42. In the Warden's considered correctional judgment, affirmatively identifying and providing details about an inmate's and history crimes can, in certain circumstances, create "an immediate safety risk to the identified inmate." *Id.* 42; *see also id.* 45. PLN may have a different view, but "[i]n [the Supreme Court's] view, when prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *Thornburgh*, 490 U.S. at 419.

Finally, not only does this alternative conflict with rational penological judgment, it also flies in the face of well-established law which holds that information about prisoners, such as their status as an informant or a sex offender, even if publically available from other sources, poses substantial risks of harms. *See*, *e.g.*, *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th

---

[6] The only way for the prison to find out what each inmate already knows would be to poll them. But this has numerous problems, including that inmates are likely to lie and polling is likely itself to reveal the potentially dangerous information. Fact 43.

Cir. 2001) (holding that revealing an inmate to be an informant poses "the potential for great harm"); *Brown v. Narvais*, 265 F. App'x 734, 736 (10th Cir. 2008) (same for child sex offender). If such publicly available information is so dangerous that a correctional officer who reveals it violates clearly established law, a Warden may rationally take measures to prevent publications from circulating and highlighting such information within an inmate population.[7]

In sum, PLN cannot raise a genuine dispute about the rationality of Section III.C. of the December 2017 Policy which, on its face, satisfies the *Turner* factors. *Turner* does not require a Warden to provide information to inmates that, in his considered judgment, would jeopardize the safety of inmates and others. "[C]ourts should not 'substitute their judgment for that of officials who have made a considered choice." *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 754 (10th Cir. 2014); *see also Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (First Amendment rights must sometimes give way to "the legitimate penological objectives"). PLN's disagreement with the BOP's judgment does not sustain its burden to prove the BOP acted irrationally.

> ### 2.    Section III.G. of the December 2017 Policy is rational under *Turner* .

PLN also cannot meet its burden to show that the current ADX notification procedures in Section III.G. of the December 2017 Policy—which have never been applied to PLN—suffer from any facial constitutional defect. In fact, the ADX notification procedures *exceed* those procedures the Supreme Court confirmed were facially valid in *Thornburgh*. *See* 490 U.S. at 406 (observing that BOP regulations, including 28 C.F.R. § 540.71(d), "provide procedural

---

[7] This alternative also makes no common sense. For example, the Warden is clearly not required to allow a publication describing how to make explosives from ordinary items, even if such information is publicly available. At bottom, whether information is publicly available from other sources is merely a factor to be taken into account in evaluating the full circumstances, but it is not a dispositive factor as PLN appears to suggest.

safeguards for both the recipient and the sender," and that the "regulations are facially valid").

In light of this Supreme Court law, there is no question that these procedures are constitutional under the deferential *Turner* rational-basis test, and that they provide even more process than the Constitution requires in a context where "minimum procedural safeguards" suffice. *See Jacklovich v. Simmon*s, 392 F.3d 420, 433 (10th Cir. 2004) (publisher has only a "qualified liberty interest" in which "minimum procedural safeguards" suffice; only "adequate individualized notice" is required) (citing *Procunier v. Martinez*, 416 U.S. 396, 418 (1974)).

**C.      The December 2017 Policy satisfies the APA's rational-basis test.**

The arbitrary or capricious standard under the APA, like the *Turner* standard for reviewing constitutional claims, is a rational basis standard. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (in reviewing an agency's decision, "[t]he duty of a court . . . is to ascertain whether the agency examined relevant data and articulated a rational connection between the facts found and the decision made"). Because PLN cannot show that the December 2017 Policy is irrational under *Turner*, it also cannot establish that it is an arbitrary or capricious action. PLN's APA claim, like its constitutional claims, fails.

**CONCLUSION**

The Court should enter summary judgment in favor of the BOP on all of PLN's claims.

Respectfully submitted on May 14, 2018.      ROBERT C. TROYER
United States Attorney

s/ *Susan Prose*
Susan Prose, Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Tel.: (303) 454-0100; Fax: (303) 454-0404
E-mail: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on May 13, 2018, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

Steven Zansberg
Sabarish Neelakanta
Peter Swanson
Matthew Shapanka
Elliot Mincberg
David Shapiro
Terra Fulham
Alyson Sandler

_s/ Susan Prose_
Susan Prose
United States Attorney's Office