# Exhibit 1
# Declaration of Todd Chapman

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-NYW

PRISON LEGAL NEWS,
a project of the Human Rights Defense Center,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

**DECLARATION OF TODD CHAPMAN**

---

      I, Todd Chapman, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above entitled matter.

      1.      I am employed by the Federal Bureau of Prisons (Bureau) as the Executive Assistant at the United States Penitentiary – Administrative Maximum (ADX), located in Florence, Colorado.   I have been in this position since July 2015.   I have been employed by the Bureau in positions of increasing responsibility since February 1998.   I have also worked in the institution mailroom from 2009 to 2013 at the Federal Medical Center in Devens, Massachusetts, where I routinely reviewed mail and incoming publications as part of my daily duties.

1

2.      As part of my official duties as the Executive Assistant, I am responsible for working with the Associate Wardens and department heads in developing plans, policies, and programs for institution management.   I also oversee the review procedures for drafting and updating all institution supplements at the ADX.   Institution supplements are reviewed annually to ensure compliance with federal regulations and national policy.

3.      I have access to records maintained in the ordinary course of business by the Bureau, including administrative remedy requests of federal inmates, information maintained in the SENTRY[1] database, inmate central files, and documents related to the review of incoming publications at the ADX.   All attachments to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

4.      I have submitted a previous declaration in this matter, *see* Doc. 31-1, and have been deposed twice, once as a fact witness during the jurisdictional phase of discovery and once as the designee for the Bureau on a wide variety of topics pursuant to Fed. R. Civ. P. 30(b)(6).

5.      I am familiar with the procedures for processing incoming publications at ADX Florence.   These procedures are outlined in federal regulations (28 C.F.R. § 540.70 *et seq.*), national Bureau policy (Attachment 1, Program Statement 5266.11, *Incoming Publications*, dated Nov. 9, 2011), and in ADX Florence institutional policy (Attachment 2, FLM 5266.11E, *Incoming Publications*, dated Dec. 21, 2017) (hereafter, the "December 2017 Policy").

6.      The December 2017 Policy included the enhanced review procedures that were implemented in the February 2, 2016, Institution Supplement for incoming publications,

---

[1]  SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

including a mandatory attorney review before any publication can be rejected.[2]  The December

2017 Policy also included these new provisions: (1) the policy explicitly states that an incoming

publication at the ADX may not be rejected solely because it discusses a Bureau inmate or staff

member (§ III.C.); (2) the policy details the procedures for notifying inmates and publishers of

rejected publications, including a directive that rejection notices should be sent to the publisher

within ten business days following the date the Warden signs the rejection notice

(§ III.G.); and (3) the policy specifically states that an ADX attorney will conduct quarterly

training on the incoming publication procedures (§ III.S.).

7.      These changes were implemented, in significant part, because of this litigation.

ADX personnel reviewed the issues this litigation brought to light and determined that these

changes were appropriate.

8.      The December 2017 Policy specifically states that a publication will not be

rejected at the ADX solely because it discusses a Bureau inmate or staff member:

> **An incoming publication at the ADX may not be rejected solely because it discusses an ADX or Federal Bureau of Prisons (BOP) inmate, or BOP staff member**.   When a publication identifies and discusses an ADX or BOP inmate, or BOP staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b).   Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment.

*See* Attachment 2 at 2 (emphasis added).

---

[2] I discussed previous versions of the ADX policy for incoming publications in my first declaration.   *See* Doc. 31-1 ¶¶ 12-20.

9.      In my first declaration, I referred to the former ADX practice of rejecting publications based solely on the mention of inmate and staff names as the "name alone" practice. *See* Doc. 31-1 ¶¶ 24, 25, 28.   I wish to provide clarification concerning the name alone practice, based on information that came to light during discovery in this case.

10.      As I explained in my Rule 30(b)(6) deposition on behalf of the Bureau, the statements in my first declaration concerning the "name alone" practice at the ADX were based on information obtained at that time through discussions with ADX Special Investigative Services (SIS) personnel.   As a result of discovery in this matter, the Bureau learned additional information concerning the origins of the name alone practice.

11.      Between 1998 and 2002, the ADX instituted a practice requiring SIS personnel to flag every incoming publication that mentioned a Bureau inmate or staff member by name.   The reason for instituting that practice was that ADX personnel had obtained information indicating that ADX inmates were using publications to pass clandestine messages.   Until that time, ADX personnel were unaware of this illicit use of publications by inmates.   In the years that followed, SIS personnel continued to flag the names of both Bureau inmates and staff during the publication-review process.   In addition, as was revealed during this litigation, the flagging of names did not mean that the individual Wardens (or their designees) who made the decisions to reject publications did not have additional reasons for rejecting particular publications. Therefore, the statement in my first declaration that the name alone practice "was the primary basis for the rejection of the eleven issues of *Prison Legal News* at issue in this lawsuit" (Doc. 31-1 ¶ 24) was overstated.

12.     At the time I submitted my first declaration, the ADX personnel involved with this litigation were not aware of this historical information.   This information came to light in mid-March 2018, while I was preparing for my Rule 30(b)(6) deposition, through a conversation with an ADX attorney who is not handling this litigation.

13.     The changes to ADX incoming-publication review procedures that have been implemented since this litigation began have had a positive effect.   The additional layers of review ensure consistent application of the federal regulations and national policy.   The quarterly training provides an opportunity for all components of the publication-review process to meet together, to discuss the policies and procedures, and to develop an informed approach for reviewing publications.

14.     The number of rejections of publications at the ADX has dropped since the implementation of the changes to ADX incoming-publication review procedures.[3]   On average, 50 to 70 publications are received at the ADX every day.   *See also* Doc. 31-1 at ¶ 21.   The following chart shows the total number of all incoming publications rejected at the ADX, by year, from February 2015 to May 10, 2018:

| Time Period | Number of Rejections and Reasons | Reference |
|---|---|---|
| (1) February 2015 – December 31, 2015 | 106 (total)<br>25 (sexually explicit or nudity-based)<br>81 (non-sexually explicit or nudity-based) | Doc. 31-1 at ¶ 23;<br>Doc. 59-1 at ¶ 8 |
| (2) February 2, 2016 – December 31, 2016 | 49 (total)<br>30 (sexually explicit or nudity-based)<br>19 (non-sexually explicit or nudity-based) | Doc. 31-1 at ¶ 21;<br>Doc. 59-1 at ¶ 8 |

---

[3] The ADX obviously has no control over which publications are sent to the institution, or when those publications are sent, resulting in some fluctuation in the number of rejections at different times.

|  |  |  |
| --- | --- | --- |
| (3) 2017 | 66 (total)<br>25 (sexually explicit or nudity-based)<br>41 (non-sexually explicit or nudity-based) | Doc. 66-1 at ¶ 2 |
| (4) 2018 (through May 4, 2018) | 12 (total)<br>3 (sexually explicit or nudity-based)<br>9 (non-sexually explicit or nudity-based) | N/A |

15.     As reflected in the chart, many of the rejections were because the publications contained sexually explicit content.   The Bureau is required to reject such publications by federal statute.   *See* 18 U.S.C. § 4042 and 28 C.F.R. § 540.72 (commonly known as the "Ensign Amendment").   Of the remaining rejections, some pertain to inmates who are subject to Special Administrative Measures, or "SAMs."   For inmates with SAMs, non-Bureau law enforcement officials review incoming publications and provide recommendations to the Warden.   These officials have particular expertise in matters concerning SAMs inmates, especially national security issues.

16.     Since February 2016, no incoming publication at the ADX has been referred to the Warden for possible rejection solely because it contained the name of a Bureau staff member or Bureau inmate.   *See also* Doc. 31-1 at ¶¶ 21-22; Doc. 59-1 at ¶ 5; Doc. 66-1 at ¶¶ 1.   No publication has been rejected on that basis.   No issue of *Prison Legal News* has been rejected at the ADX since April 2014.   As I testified in my Rule 30(b)(6) deposition, none of the eleven previously rejected issues of *Prison Legal News* would be rejected under the December 2017 Policy.

17.     As I discussed above, the December 2017 Policy included this provision:

When an incoming publication is rejected, the Warden will promptly advise the inmate and publisher in writing of the decision and the reason(s) for it.   The notice

must contain reference to the specific article(s) or material(s) considered objectionable, **including page references and quotes from the incoming publication.** The Warden will advise the publisher or sender that the publisher may obtain independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter. **Ordinarily, the rejection notice will be mailed to the publisher within ten business days from the Warden's signature date.**

*Id.* at § III.G. (emphasis added).

18. As with the provision specifically stating that publications cannot be rejected based on names alone, this provision was implemented as a result of this litigation. The language concerning page references and quotes is not required by national policy, nor is the statement that a rejection notice should be mailed to the publisher within ten business days of the Warden's signature on the notice. *See* 28 C.F.R. §540.71(d). ADX officials determined that these provisions should be added to ensure that notices adequately explain the grounds for rejection and to enable publishers to appeal rejections in a timely manner.

Pursuant to the provisions of 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 14th day of May 2018, in Florence, Colorado.


 *s/ Todd Chapman*
Todd Chapman
Executive Assistant
ADX Florence, Colorado
Federal Bureau of Prisons

**Attachments:**

Attachment 1, Program Statement 5266.11, *Incoming Publications*, dated Nov. 9, 2011

Attachment 2, FLM 5266.11E, *Incoming Publications*, dated Dec. 21, 2017

8

# Attachment 1
# Program Statement 5266.11, *Incoming Publications* (November 9, 2011)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

| | |
|---|---|
| OPI | CPD/CPB |
| NUMBER | P5266.11 |
| DATE | November 9, 2011 |

# Incoming Publications

/s/
*Approved*: Thomas R. Kane
Acting Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

**§ 540.70 Purpose and scope.**

**Except when precluded by statute (see § 540.72), the Bureau of Prisons permits an inmate to subscribe to or to receive publications without prior approval and has established procedures to determine if an incoming publication is detrimental to the security, discipline, or good order of the institution or if it might facilitate criminal activity.   The term publication, as used in this subpart, means a book, booklet, pamphlet, or similar document, or a single issue of a magazine, periodical, newsletter, newspaper, plus such other materials addressed to a specific inmate such as advertising brochures, flyers, and catalogs.**

Section 7 of this Program Statement contains procedures to implement Sec. 615 of The Commerce, Justice, State Appropriations Act of 2000 (P.L. 106-113) (hereafter referred to as "the Ensign Amendment").

a.   **Summary of Changes**

*Policy Rescinded*
PS 5266.10     Incoming Publications (1/10/03)

This revision updates references to the Ensign Amendment.

**Federal Regulations from 28 CFR are in bold type**.
Implementing instructions are in regular type.

BOP000014

b. **Program Objectives**.   Expected results of this program are:

- Inmates will be permitted to receive and retain publications that do not threaten the security, good order, or discipline of the institution, or that may facilitate criminal activity, or are otherwise prohibited by law.
- Publications determined detrimental to the security, good order, or discipline of the institution or that may facilitate criminal activity, or are otherwise prohibited by law, will be excluded from Bureau facilities.
- A safer environment for staff and inmates will be provided by strengthening procedures to prevent the introduction of contraband.

c. **MCC/MDC/FDC/FTC Application.**   Procedures in this Program Statement apply to Metropolitan Correctional Centers, Metropolitan Detention Centers, Federal Detention Centers, and Federal Transportation Centers, all of which are referred to as "administrative institutions" for the purposes of this Program Statement.

2.   **PROCEDURES**

**§ 540.71 Procedures.**

**(a)(1)   At all Bureau institutions, an inmate may receive hardcover publications and newspapers only from the publisher, from a book club, or from a bookstore.**

The sender's address must be clearly identified on the outside of the package.

**(2)   At medium security, high security, and administrative institutions, an inmate may receive softcover publications (for example, paperback books, newspaper clippings, magazines, and other similar items) only from the publisher, from a book club, or from a bookstore.**

**(3)   At minimum security and low security institutions, an inmate may receive softcover publications (other than newspapers) from any source.**

**(4)   The Unit Manager may make an exception to the provisions of paragraphs (a)(1) and (2) of this section if the publication is no longer available from the publisher, book club, or bookstore.   The Unit Manager shall require that the inmate provide written documentation that the publication is no longer available from these sources.   The approval of any request for an exception is to be documented, in writing, on an Authorization to Receive a Package which will be used to secure the item.**

**(b)   The Warden may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity.   The Warden may not reject a publication solely because its content is**

BOP000015

**religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant.   Publications which may be rejected by a Warden include but are not limited to publications which meet one of the following criteria:**

**(1)   It depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices;**

**(2)   It depicts, encourages, or describes methods of escape from correctional facilities, or contains blueprints, drawings or similar descriptions of Bureau of Prisons institutions;**

**(3)   It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs;**

**(4)   It is written in code;**

**(5)   It depicts, describes or encourages activities which may lead to the use of physical violence or group disruption;**

**(6)   It encourages or instructs in the commission of criminal activity;**

**(7)   It is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.**

Only the Warden may reject an incoming publication.   In the Warden's absence, only the Acting Warden may perform this function.

Section 3 of this Program Statement contains procedures for returning a publication under the Ensign Amendment.   In Section 3, "sexually explicit" and "nudity" are defined in terms of pictorial depictions only.   Publications not subject to return under Section 3 (for example, material that does not meet a definition in that section) may still be rejected under this section.

To help staff determine which materials may pose the type of threat that warrants exclusion, the following guidelines are provided.

A Warden may determine that sexually explicit material of the following types will be excluded, as potentially detrimental to the security and good order or discipline of the institution, or as facilitating criminal activity:

- Sadomasochistic.
- Bestiality.
- Involving children.

In addition:

BOP000016

- The Warden must prohibit a sexually explicit publication if it is determined to pose a threat to the institution or is contrary to law.   Child pornography materials, which are prohibited by law, are examples.
- Sexually explicit material does not include material of a news or information type. Publications concerning research or opinions on sexual, health, or reproductive issues, or covering the activities of gay rights organizations or gay religious groups, for example, should be admitted unless they are otherwise a threat to legitimate institution interests.
- Literary publications should not be excluded, solely because of homosexual themes or references, if they are not sexually explicit in a manner that threatens legitimate institution interests.
- Sexually explicit material may be admitted if it has scholarly value, or general social or literary value.

**(c)   The Warden may not establish an excluded list of publications.   This means the Warden shall review the individual publication prior to the rejection of that publication.   Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in its entirety.**

**(d)   Where a publication is found unacceptable, the Warden shall promptly advise the inmate in writing of the decision and the reasons for it.   The notice must contain reference to the specific article(s) or material(s) considered objectionable. The Warden shall permit the inmate an opportunity to review this material for purposes of filing an appeal under the Administrative Remedy Program unless such review may provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the institution or to encourage or instruct in criminal activity.**

In questionable cases, institution staff should consult legal staff.

**(e)   The Warden shall provide the publisher or sender of an unacceptable publication a copy of the rejection letter.   The Warden shall advise the publisher or sender that he may obtain an independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter.   The Warden shall return the rejected publication to the publisher or sender of the material unless the inmate indicates an intent to file an appeal under the Administrative Remedy Program, in which case the Warden shall retain the rejected material at the institution for review.   In case of appeal, if the rejection is sustained, the rejected publication shall be returned when appeal or legal use is completed.**

See BP-A0953, Notification to Inmate and Publisher/Sender of Rejected Publication, for a sample.

The Warden will retain the rejected publication for 20 days from the date the inmate is sent written notification of the rejection.   The 20-day period allows the inmate to file an appeal under the

BOP000017

Administrative Remedy Program.   If he/she does not file within 20 days, the rejected publication may be returned to the publisher.

If the inmate does file an appeal, the Warden will retain the rejected publication at the institution. The rejected publication (or the offensive portion of it) must be reviewed before a staff response is prepared for the BP-229, Request for Administrative Remedy or, when applicable, a BP-230, Regional Appeal of Administrative Remedy or BP-231, Central Office Appeal of Administrative Remedy, respectively.

The Regional Office and Central Office should not respond to a BP-230 or BP-231 appeal without first reviewing either the rejected publication or a copy of the offensive portion of it.

**(f)   The Warden may set limits locally (for fire, sanitation, or housekeeping reasons) on the number or volume of publications an inmate may receive or retain in his quarters.   The Warden may authorize an inmate additional storage space for storage of legal materials in accordance with the Bureau of Prisons procedures on personal property of inmates.**

3.   STATUTORY RESTRICTIONS REQUIRING RETURN OF COMMERCIALLY PUBLISHED INFORMATION OR MATERIAL WHICH IS SEXUALLY EXPLICIT OR FEATURES NUDITY

**§ 540.72 Statutory restrictions requiring return of commercially published information or material which is sexually explicit or features nudity.**

Title 18 of the United States Code, Section 4042 note, states:

> **"[N]one of the funds appropriated or otherwise made available to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity."**

Procedures in this section affect publications received on or after **August 28, 1999.**   Publications authorized before that date will be retained and transferred per the Program Statement **Inmate Personal Property**.

**(a)   When commercially published information or material may not be distributed by staff or made available to inmates due to statutory restrictions (for example, a prohibition on the use of appropriated funds to distribute or make available to inmates information or material which is sexually explicit or features nudity), the Warden or designee shall return the information or material to the publisher or sender.   The Warden or designee shall advise the publisher or sender that an independent review of the decision may be obtained by writing to the Regional**

BOP000018

**Director within 20 days of receipt of the notification letter.   Staff shall provide the inmate with written notice of the action.**

Mailroom staff will return publications found to be non-distributable on the basis of the definitions listed in subsection (b) below. The publications will be returned with the appropriate attachment.

Ordinarily, the outside cover is used to assess content or the need for further review.

Non-distributable publications will be returned to the sender or publisher with a BP-A0954, Notification to Publisher of Return of Publication.   The publications may be returned in bulk, annotating the number of returned copies.

Materials extracted, photocopied, or clipped from such publications will also be returned to the sender with a BP-A0955, Notification to Sender of Return of Materials.

Under subsection (a) of this section, there is no need to delay the return of non-distributable publications or materials even when an inmate appeals under the Administrative Remedy Program, because the statutory restriction on making the material available precludes any inmate review.

Inmates will be notified via the BP-A0956, Notification to Inmate of Return of Publication or Materials.

Although the publication or material is returned, the Warden will ensure a copy of the publication cover and one page of the banned information or material is copied and retained at the institution in case of a subsequent appeal by the inmate or publisher/sender.

Inmates may use the Administrative Remedy Program to appeal return of materials.   However, as 18 U.S.C. 4042 note prohibits the Bureau from distributing the material, inmates may not review copies of returned materials in connection with administrative remedy filings.

Only one copy of the retained, statutorily prohibited information is to be retained by the Warden, even if the publication is mailed to several inmates:

- For example, if the April 2009 publication of XYZ is mailed to 20 inmates, that publication cannot be made available to inmates.   Only one issue of the publication needs to be retained.
- A copy of the notification sent to each inmate will be attached to the retained material.

**(b)   *Definitions.*   For the purpose of this section:**

**(1)   *Commercially published information or material* means any book, booklet, pamphlet, magazine, periodical, newsletter, photograph or other pictorial depiction, or similar document, including stationery and greeting cards, published by any individual, organization, company, or corporation which is distributed or made available through any means or media for commercial purposes.   This**

BOP000019

**definition includes any portion extracted, photocopied, or clipped from such items.**

**(2)   *Nudity* means a pictorial depiction where genitalia or female breasts are exposed.**

Specifically, when the pictorial depiction of the female breast displays the areola or nipple, this material will be rejected.

**(3)   *Features* means the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues.   Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.**

Section 2.c. prohibits the establishment of an excluded list of publications.   It is important to review each individual publication for unacceptable content.   The following are examples of commercial publications that "contain nudity illustrative of medical, educational, or anthropological content," which are allowable:

- *National Geographic.*
- *Our Bodies, Ourselves.*

Also, the following are examples of commercial publications that may be allowable **if they do not contain depictions of nudity:**

- *Sports Illustrated* swimsuit issues.
- Lingerie catalogs.

However, if the above examples **contain depictions of nudity not illustrative of medical, educational, or anthropological content,** they should be rejected under this section.   A publication may change a single issue or its general policies and practices at any time, which would make it acceptable or unacceptable for distribution.   The examples above are **guidelines only** and are subject to change.

**(4)   *Sexually explicit* means a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation.**

For purposes of this section, written text does not qualify a publication as sexually explicit.

Publications with sexual content that are not returned under these procedures are still subject to rejection through procedures in Section 2.b.(7).   For example, publications that contain sexually explicit text, feature sadomasochism or bestiality, or involve children may not meet the definitions in this Section for "sexually explicit" or "nudity," but may be considered detrimental to the security and good order of the institution, per Section 2.b.(7).

BOP000020

## REFERENCES

*Program Statements*
P1330.16      Administrative Remedy Program (12/31/07)
P1350.02      Donations, Acceptance of (6/29/98)
P5265.14      Correspondence (4/5/11)
P5360.09      Religious Beliefs and Practices (12/31/04)
P5580.08      Inmate Personal Property (8/22/11)
P5800.16      Mail Management Manual (4/5/11)

*Federal Regulations*
Federal Regulations cited in this Program Statement are contained in 28 CFR 540.70-72.

*BOP Forms (available on Sallyport)*
BP-229        Request for Administrative Remedy
BP-230        Regional Appeal of Administrative Remedy
BP-231        Central Office Appeal of Administrative Remedy
BP-A0953      Notification to Inmate and Publisher/Sender of Rejected Publication
BP-A0954      Notification to Publisher of Return of Publication
BP-A0955      Notification to Sender of Return of Materials
BP-A0956      Notification to Inmate of Return of Publication or Materials

*ACA Standards*
- 2nd Edition Standards for Administration of Correctional Agencies: 2-CO-5D-01.
- 4th Edition Standards for Adult Correctional Institutions: 4-4490.
- 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-5B-07.

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

BOP000021

# Attachment 2
# FLM 5266.11E, Incoming Publications
# (December 21, 2017)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

 **U. S. Department of Justice**
Federal Bureau of Prisons

INSTITUTION SUPPLEMENT

OPI:      Correctional Systems
NUMBER:  FLM 5266.11E
DATE:    December 21, 2017

# Incoming Publications

                               **/s/**
*Approved:*   *Jack Fox, Warden*
              ADX Florence

**I.**   **PURPOSE AND SCOPE:**  This Institution Supplement is prepared to outline the procedures at the United States Penitentiary, Administrative Maximum (ADX), Florence, Colorado, for implementing Program Statement 5266.11, Incoming Publications.  This Institution Supplement must be read in conjunction with the Program Statement for a clear understanding of the policy.

**II.**  **DIRECTIVES AFFECTED:**

    **A.**   **Directives Rescinded**:  FLM 5266.11D, Incoming Publications, dated May 30, 2017.

    **B.**   **Directives Referenced**:  Program Statement 5266.11, Incoming Publications, dated November 9, 2011.

    **C.**   **Standards Referenced**:  American Correctional Association 4th Edition Standards for Adult Correctional Institution:  4-4490

**III.**  **PROCEDURES:**

    **A.**   All incoming inmate publications will be x-rayed by the receiving Correctional Systems Officer (CSO) prior to entering the facility.  A further physical search will be conducted by the mail room staff.

    **B.**   The receiving CSO will review all incoming publications for potentially objectionable content in accordance with 28 C.F.R. § 540.70 *et seq.*  If content is preliminarily deemed objectionable by the receiving CSO, the objectionable incoming publication will be forwarded to the Special Investigative Services (SIS) department for

additional review in accordance with 28 C.F.R. § 540.70 et seq.  SIS staff will review each individual incoming publication and, if rejection is recommended, prepare a letter for the Warden's signature.  All recommended rejection letters must notate, in writing, specific objectionable pages and content, as well as the national policy and Code of Federal Regulations citation.

**C.**     An incoming publication at the ADX may not be rejected solely because it discusses an ADX or Federal Bureau of Prisons (BOP) inmate, or BOP staff member.  When a publication identifies and discusses an ADX or BOP inmate, or BOP staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b).  Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment.

**D.**     Prior to being sent to the Warden for formal action, all recommended rejection packets will be forwarded to the Legal Services department for review.

**E.**     When a technical or specialized incoming publication is questioned for acceptability, in addition to the above procedures, it will also be forwarded to the department supervisor, with knowledge in that field, for further review and a recommendation of approval or disapproval.  Departments recommending any publication rejection must annotate in writing the specific objectionable pages and the national policy cite for the mailroom's records.

**F.**     The CSO will contact the Administrative Remedy Coordinator and/or review the appeal status in SENTRY before returning any publications, to ensure the inmate has not submitted an appeal.  If an appeal is lodged, the materials will be held until the appeal process is exhausted, including Regional and Central Office appeals.  Appeal procedures for publications rejected due to its feature of nudity or sexual explicitness vary from other publication rejections and are outlined in the national directive.

**G.**     When an incoming publication is rejected, the Warden will promptly advise the inmate and publisher in writing of the decision and the reason(s) for it.  The notice must contain reference to the specific article(s) or material(s) considered objectionable, including page references and quotes from the incoming publication.  The Warden will advise the publisher or sender that the publisher may obtain independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter.  Ordinarily, the rejection notice will be mailed to the publisher within ten business days from the Warden's signature date.

**H.**     Inmates involved in approved education courses, which require books that must be purchased or obtained on loan from local colleges, may arrange to obtain these books through the Supervisor of Education.  When the books arrive, a staff member from the Education Services department will complete an appropriate inspection, annotate the

authorization form, stamp each book as inmate personal property with the inmate's name, register number, date received, and the staff member approving the publication and provide for book delivery to the inmate.

**I.**     Publications will be limited to three publications per parcel.  This includes all publications received from an authorized source.  Any package received that includes a number of publications over the established mailing limit will result in the entire package being returned to the sender as unauthorized.

**J.**     Publications containing metal or thick plastic bindings will not be permitted and will be rejected by the mail room staff.

**K.**     Inmates are not required, but highly encouraged, to consult with unit team or the Supervisor of Education prior to ordering a publication.

**L.**     To ensure the security, discipline, and orderly operation, publications in a language other than English will be subject to translation, review, and verification, which may cause a delay in receipt.  This review is necessary to ensure compliance with the national directive.  Publications which cannot be reasonably translated may be rejected. Foreign publications must be received directly from the publisher, a bookstore, or book club.

**M.**    Inmates will be permitted to receive incoming general correspondence containing newspapers or magazine clippings from non-commercial sources, if after review, it is determined the newspaper or magazine clipping poses no threat to institution security, and the quantity of materials does not adversely affect the ability of mail room staff to effectively monitor incoming general correspondence.  For purposes of this section, incoming general correspondence containing in excess of 50 pages of newspaper or magazine clippings adversely affects the ability of staff to effectively monitor incoming general correspondence.

**N.**    Materials printed directly from the internet will be treated as incoming general correspondence, and inmates will be allowed to receive such materials in quantities which do not adversely affect staff's ability to effectively monitor incoming general correspondence for contraband and other threats to institutional security and good order.  Such materials are subject to rejection for content.  For purposes of this section, incoming general correspondence containing in excess of 50 pages of materials printed directly from the internet adversely affects the ability of staff to effectively monitor incoming general correspondence.

**O.**    Any publication which includes any markings or notations may be regarded as a possible code and will be considered for rejection.  Examples of this include, but are not limited to folded or tagged pages, underlining, highlighting, or any written comments within the publication.

**P.**     Unit staff should consult with mail room staff before approving any magazine subscription for purchase by an inmate.  Prohibited materials that have photographs or drawings entirely cut out or removed by the sender, will be authorized, should there be no other prohibited sections.  Attempts to "cover" nude or sexually explicit pictures will not make a publication acceptable for introduction.

**Q.**     Hardcover books received in the mail will have the covers removed by mail room staff. The inmate must indicate on the hardcover book approval form (Attachment 1) they are voluntarily authorizing the removal of the cover.  Lack of such authorization will cause the entire package to be returned to the sender.

**R.**     Publications which are permitted pursuant only to Special Administrative Measures (SAM) will be received and processed in accordance with national directives.

**S.**     An Attorney from Legal Services will conduct quarterly training with Correctional Systems staff and SIS staff regarding the procedures outlined in Program Statement 5266.11, Incoming Publications, and this supplement.

---

**DISTRIBUTION:**

**Directives Libraries**                    **AFGE**

## HARDCOVER REMOVAL APPROVAL

**Name:** _____**Register Number:** _____

**Quarters:** _____

I request approval for the following hardcover book(s).  The book(s) are necessary and are not available in paperback.  I voluntarily authorize the mail room permission to remove the hard cover prior to delivery to me.  I understand no more than three publications per mailing are permitted.  I acknowledge the entire package will be returned if any unauthorized items are included and this authorization is good for 60 days only.

**Title:**_____

**Title:**_____

**Title:**_____

**Name of Publisher/Bookstore/Bookclub:** _____

**Address:**_____

**Phone Number (for verification purposes by staff):** _____

Inmate Signature: _____

----------------------------------------------------------------------------------------------------------------

**(Do not write below this line - Staff Use Only)**

Date:_____ Expiration Date (60 days): _____

To: Mail Room Officer

The hardcover books listed above have been approved, pending inspection upon arrival.  The hard cover is to be removed prior to delivery to the inmate.

**Approved:**    _____
                 Department Head's Signature