# Exhibit 4
# Declaration of Mark Collins

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS,
a project of the Human Rights Defense Center,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

**DECLARATION OF MARK COLLINS**

---

      I, Mark Collins, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in my role as a retained expert in this case, hereby make the following declaration relating to the above-entitled matter.

      1.      I am a retained expert for the Federal Bureau of Prisons (Bureau) in the field of correctional security and correctional management.   I have over 27 years of experience in the field of correctional management in the Bureau at all security levels, including over 16 years working directly at the United States Penitentiary – Administrative Maximum (ADX) in various capacities.   A copy of my Curriculum Vitae is attached as Attachment 1.   All other documents attached to this declaration are documents maintained by the Bureau and provided to me at my request in connection with my expert review in this matter.

      2.      In this declaration, I will address three major points:

(1) The ADX is an unusually dangerous environment where tight security controls are required to maintain the safety of inmates, prison staff, and members of the public in that unique setting.

(2) The procedures for reviewing incoming publications sent to inmates at the ADX, the risks that such publication/communications may pose both within the ADX and to the public, and the methods for managing those risks in accordance with sound correctional judgment; and

(3) Prison Legal News's ("PLN") proposed means for managing incoming publications at the ADX, which are unreasonable, unworkable, and contrary to sound correctional judgment.

A.     **ADX Environment and Security**

3.      The ADX is a facility unlike any other prison.   It houses less than one quarter of one per cent of the entire Bureau inmate population, but that small group is the most violent, predatory, disruptive, and escape-prone of all Bureau inmates. The ADX also houses inmates who were found to be unmanageable in various state correctional systems.   Even after their incarceration, most ADX inmates continue to prey on others.   They have demonstrated that they are a threat to the safety of their fellow inmates, prison staff, and people outside the prison.

4.      An inmate is designated to the ADX only after a due-process procedure in which he is found to meet one or both of two criteria: (1) his placement in other correctional facilities creates a risk to institutional security and good order, or poses a risk to the safety of staff, inmates or others, or to public safety; and (2) as a result of his status, either before or after incarceration, he may not be safely housed in the general population of another institution. Simply put, an inmate "earns" his way to the ADX, and placement at the ADX for any inmate is not taken lightly.   In making that determination, the Bureau considers multiple factors, including, but not limited to: communication restrictions placed on the inmate by the Department

2

of Justice, criminal conduct while incarcerated, disciplinary history, the inmate's role in group misconduct, notoriety of the inmate, and access to resources in the community relating to potential escape.   *See* Attachment 2, Davis Memorandum, dated October 15, 2012, at 2-3.

  5. ADX inmates are extraordinarily dangerous.   Over 99% of current ADX inmates have a history of violence.   Many current ADX inmates have murdered or attempted to murder other inmates and Bureau staff, and many have assaulted or attempted to assault other inmates or staff.   Some of the current ADX population of ADX inmates have murdered law enforcement personnel.   Approximately 140 current inmates are leaders, members, or associates of Bureau-designated Security Threat Groups ("STGs").   The ADX also houses a large number of international and domestic terrorists.

  6. Even though many ADX inmates have shown that they are extremely dangerous, the ADX is a programming prison.   ADX inmates have an opportunity to earn their way to a less restrictive prison setting.   Inmates who enter the ADX are given the opportunity to demonstrate that they no longer need to be housed there.   As of 2014, the average time spent at the ADX was 4.89 years per inmate.

  7. As an ADX inmate demonstrates periods of clear conduct and positive institutional adjustment, he may progress from more restrictive to less restrictive settings within the prison.   *See generally* Attachment 3, FLM 5321.07(1)B, *General Population and Step-Down Unit Operations* (September 1, 2015).   Correctional staff evaluate the inmate's progress on a regular basis to ensure that only those inmates who require the security and controls of the institution are housed at the ADX.

3

8.      Inmates gain progressively more personal freedom and more direct physical contact with other inmates and staff at each phase of the ADX Step-Down Program.   By the final phases of the Step-Down Program, inmates are in unrestrained physical contact with other inmates and staff multiple hours every day.   With that increased freedom comes increased risks, both to the inmates and to correctional staff.   However, despite the efforts by ADX staff to "graduate" inmates from the ADX into a less restrictive housing status, dangers are ever present in all phases of the Step-Down Program.

9.      For example, at the ADX, institution staff deal with and are in close physical proximity to inmates every day.   Correctional staff are physically exposed to inmates when they deliver meals; escort inmates to recreation, medical appointments, and visits; and perform everyday tasks like delivering mail and laundry, etc.   Despite the ADX security controls and the professionalism of staff, they are still at risk.   Correctional officers are physically assaulted by thrown feces, urine, spit, and other substances.   Inmates throw other projectiles, including homemade spears.   Even while in restraints, inmates head butt and kick while being moved from their cells to other locations.   Inmates also bite staff, subjecting them to blood- or fluid-borne diseases.   Staff may suffer injuries (head trauma, deep-tissue lacerations, joint injuries, etc.) as a result of these incidents of violence.

10.      ADX correctional personnel are at risk of serious assaults.   Inmates have defeated hand restraints by pulling their hands through the restraints.   Moreover, even though ADX security controls are rigorous, they are applied by human beings who will sometimes become complacent or make mistakes.   An inmate who overpowers a staff member can seize a

rapid-rotation baton, oleoresin capsicum ("OC") aerosol spray, and keys that will allow him to gain access to other inmates.   For example, in September 2013, a very serious assault occurred at the ADX, leaving three staff injured, one of whom was nearly killed by the inmate.   *See United States v. Petty*, Case No. 15-cr-00029-PAB (D. Colo.) (ADX inmate brutally attacked three staff members after hiding in cell sallyport, spraying homemade pepper spray at staff, wielding a shank, seizing control of two rapid rotation batons, and beating one staff member nearly to death).

11.     At least one inmate has been killed in an ADX general-population unit.   *See United States v. Santiago, et al.*, 10-cr-00164-REB (D. Colo.) (two ADX inmates were convicted and sentenced to life imprisonment after they repeatedly stomped an inmate to death in a general population recreation yard at the ADX in 2005).   The risk of assaults increases in the ADX step-down units, where inmates are allowed to have physical contact with other inmates without a wall, fence, or restraints separating them.   Since 2005, there have been many examples of serious assaults or dangerous inmate conduct.   *See*, *e.g.*, *United States v. Duckett*, No. 10-cr-00129-REB (D. Colo.) (two inmates beat another inmate to death in March 2005); *United States v. Sisson*, No. 09-cr-05293-KLM (D. Colo.) (in May 2009, an inmate murdered another inmate in retaliation for the inmate-victim's murdering the inmate-attacker's biological father 35 years earlier); *United States v. McMillan and Wilson*, Case No. 13-cr-00475-RM (D. Colo.) (in November 2011, two inmates stabbed another inmate 66 times in an attempt to kill him while they were in an indoor recreation area); *Dunbar v. United States, et al.*, Case No. 14-cv-01838-MJW (D. Colo.) (in April 2013, an inmate struck another inmate with a six-inch plastic weapon,

causing facial lacerations); *United States v. Bines*, No. 15-cv-00173-PAB (D. Colo. 2016) (in December 2014, an inmate assaulted a correctional officer by punching him in the face); *United States v. Shields*, No. 15-cr-00200-REB (D. Colo.) (in March 2015, an inmate concealed a shank in his rectum); *United States v. Cole*, Case No. 17-cr-00171-RM (D. Colo.) (in November 2016, an inmate struck another inmate in the head with a weapon).

12.     As these examples illustrate, managing the ADX inmate population is a dangerous task.   Even with the most cautious management techniques, ADX inmates are still able to engage in violent acts.   Inmates have long memories and carry grudges for very long periods of time, waiting for the opportune moment to act.

13.     A critical, ongoing challenge for staff is the need to minimize the dangers associated with inmates housed at the ADX.   The Bureau has an obligation to protect staff, inmates, and the public from the serious risks presented by these highly dangerous ADX inmates. The ADX's mission is not only to address and eliminate *actual* threats, but to identify and mitigate *potential* threats.   These unpredictable and unknown threats are most difficult to control and to prepare for.   It is paramount that ADX officials make predictive judgments about what could possibly occur and how those future events may compromise the safety and security of staff, inmates, and the public.   Therefore, sound correctional judgment necessitates that prison staff anticipate inmate behavior and plan for the worst-case scenario.   Even the slightest mistake can result in serious harm and the possible death of staff and/or inmates.

**B.**     **Monitoring and Controlling Information at the ADX**

14.     Physical controls are not the only method used to preserve the security of the

ADX.  The Warden must also have the ability to control information that comes into the prison and that leaves the prison in order to protect institutional and public safety and to maintain the safe, secure, and orderly operations of other Bureau facilities throughout the country.

15.     Information can be used as a weapon by the ADX inmate population.  The vast majority of ADX inmates are predators who will use any means to get a benefit for themselves. Information about another inmate's criminal history is especially valued by this dangerous population.  Inmates constantly demand to see other inmates' Presentence Investigation Reports (PSRs) and other "papers" (including the Statement of Reasons (SOR) portion of the Judgment and Commitment order) to verify details regarding the inmates' current offense, criminal history, etc.  This is the primary reason inmates are no longer allowed to possess copies of these PSRs and SORs, even though they are court documents.

16.     Criminal histories are used to manipulate inmates in a variety of ways.  Inmates whose histories identify them as former law enforcement, cooperators, gang drop-outs, sex offenders (especially when the victims are children), and government cooperators/informants are especially despised by the inmate population and face particular risks if details about their crimes or history come to light.

17.     Despite the physical controls at the ADX, information is still transmitted among the inmates.  Inmates constantly try to defeat security procedures and protocols to communicate without the knowledge of ADX staff.  Inmates have developed means for transmitting messages between housing units, to include, but not limited to, passing messages in library books, food trays, laundry bags, and yelling back and forth between recreation yards, etc.  Coded messages

are transmitted in library books and are written in the communal newspaper, *USA Today*, and passed down the ranges in the housing units.   ADX Special Investigative Services (SIS) staff have detected information passing between different gangs in different ADX housing units. Inmates manipulate the legal system by means of writs timed to allow them to communicate with other inmates outside the prison.

18.     Inmates (and Bureau staff) whose information is exposed in an incoming publication face other dangers.   Powerful leaders and other high-level operatives of various dangerous gangs and STGs are housed at the ADX, and those powerful inmates continue to wield authority outside the ADX.   These "shot callers" have the authority to order attacks on people outside the prison, including their deaths.

19.     Several of these notorious ADX gang leaders and shot callers are among the subscribers to *Prison Legal News*.   For example, for the June 2010 issue of *Prison Legal News*, 13 of the 32 ADX inmates who were subscribers at that time were leaders, members, or associates of groups frequently engaged in organized crime and violence, and ten were leaders, members, or associates of groups/gangs that actively promote violence, escape, drug, and/or terrorist activities.

20.     Incarceration is not the end of a gang leader's influence.   Many ADX inmates have been prosecuted for issuing "hits" on witnesses from prison.   Likewise, gang leaders, while incarcerated at the ADX, have been caught attempting to provide direction for ongoing gang activity in the community.   The current ADX inmate population includes gang leaders who have circumvented the security controls of other Bureau institutions to order the murder of members

of rival gangs.

21.     An ADX Warden must anticipate how these shot callers may view information they read in incoming publications, and how they may use that information to their personal advantage and to the benefit of their associates on the street and throughout the Bureau.

22.     Even the most careful housing and designation process cannot eliminate all risks to a targeted inmate who may be victimized by a gang member or associate at another Bureau facility.   In many cases, spreading information about an inmate means that he cannot "walk a yard" again and must be placed in protective custody.   Sound correctional management requires that prison officials endeavor to avoid such situations.

23.     Inmates are at risk of many other forms of manipulation when information about their backgrounds comes to light.   These include, but are not limited to, being forced to bring drugs into the institution, being forced to buy commissary items for other inmates, being forced to do work for other inmates, being compelled to purchase protection services from other inmates, and being forced to perform sex acts.

24.     An ADX Warden must take into account these realities when examining the content of an incoming publication and its potential impact on inmates and the public.   The Warden receives assistance from ADX SIS Department personnel, who are trained in detecting coded messages and who develop specialized knowledge of particular inmates, gangs and STGs, and the manner in which they communicate.   However, analyzing inmate communications is complex, and no review is foolproof.   Inmates, especially ADX inmates, are highly skilled in using coded communications and constantly strive to change their methods in an effort to avoid

9

detection.   Moreover, inmates are extremely patient when they choose to be.   A communication sent to or from the ADX may result in violence years after the fact.   In some instances, information about an inmate transferring to the facility is received long before the inmate arrives. The way in which incoming information is managed at the ADX can have an impact on what happens not only at the ADX, but throughout the Bureau and in the community.

### C.   Incoming Publications Review Procedures at the ADX

25.    In light of these dangers, ADX officials must take a conservative approach when it comes to managing information that comes into (or that leaves) the institution.   The Warden must have the ability to conduct a case-by-case analysis of each publication, taking into account all known information about the context, facts, and potential consequences of disseminating that information.

26.    The ADX incoming publications review procedures are detailed in FLM 5266.11E, *Incoming Publications* (December 21, 2017), included here as Attachment 4 (the "December 2017 Policy").   Specifically, § III.C. of this policy provides that "[a]n incoming publication at the ADX may not be rejected solely because it discusses an ADX or [Bureau] inmate, or Bureau staff member.   When a publication identifies and discusses an ADX or Bureau inmate, or Bureau staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b).   Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this

individualized assessment."

27.      Before an incoming publication is rejected at the ADX, a multi-level review is performed by Correctional Systems (mailroom), SIS, and an attorney, with the final determination made by the Warden.   The review procedures are based on the governing Code of Federal Regulations sections and national policy, known as a Program Statement.   *See* Attachment 5, Program Statement 5266.11, *Incoming Publications* (November 9, 2011).   The local review procedures in the December 2017 Policy outline the manner in which the federal regulations and national policy are implemented and enforced at the ADX.

28.      These policies reflect sound correctional management of the ADX.   Standing alone, the name of an inmate or staff member is not sufficient to implicate security concerns. But read in context of the rest of the article, the inmate population at the ADX, the information known to SIS staff, the climate of the housing unit, and other issues known at the time the incoming publication is reviewed, safety and security concerns might arise from such a publication.

29.      This review and analysis depends heavily on the circumstances at the time an incoming publication is received at the ADX.   By requiring correctional staff to make an individualized assessment of the content—in light of the current inmate population at the ADX, the specific information contained in the publication, and countless other factors that may be relevant—the policy reflects the right balance between the rights of an inmate and publisher to exchange information, and the Warden's heavy responsibility to protect the safety and security of the institution and the public.

30.     Throughout this case, PLN has asserted that the ADX Warden must assume that any "publicly available information," or information that is in the "public domain," that is contained in an incoming publication, is already known to the inmate population and must be allowed into the institution.   Neither of these standards—"public" information or what the inmates supposedly "know"—makes any sense from a correctional perspective.   A Warden is required to exercise his correctional judgment on a case-by-case basis to determine whether a publication is detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity.   While the Warden might choose to take into account, as one factor, whether information is "public" or whether the Warden believes it is well-known to the inmate population at the time, those considerations do not limit his ability to reject an incoming publication to prevent possible security and safety dangers.   The Warden cannot control what information is "publicly available," but he can and must prevent dangerous information from reaching the inmate population if it lies within his power to do so, even if inmates could theoretically discover that information through other channels.

31.     There is no way for a Warden to apply PLN's standards without creating risks. First, short of polling each individual inmate at the ADX, it would be impossible for correctional staff to verify what the inmate population supposedly knows.   Further, by asking them such questions, the potentially dangerous information would likely be exposed.   Even more likely, the inmates may be less than truthful regarding the scope of their knowledge on any given subject.   Second, any information that PLN, or any other publisher, prints is, by definition, "publicly available."   In effect, a "publicly available" standard for rejection means that the

Warden could never reject any publication, no matter how dangerous its introduction may be into the prison.   Such a standard would open a wide door.   Inmates and publishers would know that incoming publications could be used as a conduit to pass information into the institution with little oversight.

32.     There are many examples of "public" information that, if disseminated in the ADX, could threaten the safety and security of staff, inmates, or the public.   Such "public," but nevertheless dangerous, information includes identifying an inmate as a sex offender, former Bureau staff member, former law enforcement officer, gang drop-out, or government witness or informant—inmates who are on the lowest rung of the prison hierarchy and who are particularly vulnerable to assaults by other inmates.   Incoming information about the activities of gangs or STGs, including information about persons targeted by these groups, can also be dangerous. Such content in an incoming publication might incite communications among associates of those groups at the ADX, or communications directed to their contacts on the street.   The result can be violence at the ADX and outside the prison.

33.     The ADX Warden needs discretion to address unknown future content and the risks it may create at the ADX and beyond.   The regulations, policies, and review procedures outlined in the December 2017 Policy allow the Warden to address these currently unknown risks at the time they arise, bringing his experience and correctional judgment to bear on the actual facts at hand.   The review of incoming publications for objectionable content is necessarily predictive in nature.   He cannot know with certainty that bad consequences *will* follow if an incoming publication enters the institution, but he must exercise his informed

judgment to determine that there *might* be a dangerous result based on his assessment of the known facts and available intelligence at the time.

34.     Imposing any rule that prevents a Warden from exercising his predictive judgment will hamper his ability to effectively protect institutional security and public safety. Requiring the Bureau to adopt an approach where the correctional discretion of the Warden is impinged would result in more dangers, both inside the prison and to the public. Controlling information is one of many security practices utilized to effectively manage this extremely violent and disruptive inmate population.   This, in turn, also helps other facilities to operate in a safe and secure manner.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 14th day of May, 2018, in Pueblo, Colorado.


s/ *Mark Collins*
Mark Collins
Pueblo, Colorado


**Attachments:**

Attachment 1, Curriculum Vitae

Attachment 2, Davis Memorandum (October 15, 2012)

Attachment 3, FLM 5321.07(1)B, *General Population and Step-Down Unit Operations* (September 1, 2015)

Attachment 4, FLM 5266.11E, *Incoming Publications* (December 21, 2017)

Attachment 5, Program Statement 5266.11, *Incoming Publications* (November 9, 2011)

# Attachment 1
# Curriculum Vitae of Mark Collins

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

## Curriculum Vitae of Mark Collins

A proven leader who exemplifies correctional excellence with more than 27 years of prison management experience.  This success is directly attributed to effective communication skills, thorough knowledge of policies and procedures, integrity, loyalty and commitment to correctional excellence.  Maintains an uncanny ability to manage the most disruptive inmates and emergency situations in various security level facilities.  These incidents range from one on one to large scale disturbances involving 50 inmates or more.  Dedicated to staff training and developing a safe, secure environment for both staff and inmates.

## PERSONAL SKILLS

- Provided expert testimony as a 30(b)(6) witness in Thomas Silverstein case
- Provided expert testimony as a 30(b)(6) witness in Ahmad Ajaj case
- Provided expert testimony as a 30(b)(6) witness in Carl Hall case
- Testified in a homicide trial of Dominic Stewart
- Testified in a homicide trial of Sylvestre Rivera
- Testified in a civil proceeding of Ralph Gambina
- Testified in a civil proceeding of Nathaniel Liebelson
- Provided numerous declarations and responses to interrogatories as a subject matter expert for the Federal Bureau of Prisons

## CAREER HISTORY

**Associate Warden:** 03/2016 - 12/2017 – United States Penitentiary, Florence, CO

During my tenure I provided oversight of Human Resources, Computer Services, Correctional Services, Correctional Programs, Safety and Facilities. I developed comprehensive internal controls in response to deficiencies identified during Operational/Program Reviews.

There were no repeat deficiencies noted and each program earned a Program Review rating of Good or Superior. Additionally, the facility earned ACA and PREA accreditation with no discrepancies identified. I supervised and coordinated programs in each discipline employing up to 350 staff.

I implemented and operated several operational programs designed to control inmate activities, movement, and time in support of significantly increasing or enhancing staff safety, public safety and inmate safety. Specifically, I developed a split recreation schedule which reduced the number of inmates allowed in recreation at any given time. I also incorporated inmate identification cards on individual cell doors to enhance awareness and accountability of inmates assigned to each cell.  I implemented detailed measures to thoroughly monitor inmates housed in the Special Housing Unit (SHU) and employed various programs resulting in a significant reduction of inmates housed in the SHU. These programs also significantly reduced the number

of serious incidents initiated by inmates, reduced the severity of those incidents which occurred, and reduced the number of incidents involving weapons or alcohol.

I developed comprehensive procedures to enhance the processing of mail and packages that significantly reduced contraband entering the facility.  These procedures were subsequently adopted by all institutions in the North Central Region.  I also reviewed all mail and publication rejections for appropriateness.

I resolved emergency situations with my decision making and direction to staff performing emergency actions. I acted as Warden, served as Administrative Duty Officer and lead staff during emergency situations to include locking down the facility, ordering the use of a Calculated Use of Force Team, and use of Less Lethal Munitions. I made quick and timely decisions resulting in appropriate resolution and minimal risk to staff and inmates. I also developed and implemented an emergency response continuum for resolving any inmate initiated situation within the facility and discussed the plan with all staff.

I participated in and conducted a variety of meetings to include, but not limited to, leadership meetings, department head meetings, Community Relations Board Meetings, Volunteer training and re-entry based meetings with various agencies outside the Bureau of Prisons.

**Associate Warden:** 07/2014-03/2016 – Federal Correctional Institution, McDowell, WV

During my tenure, I oversaw Financial Management, Human Resources, Trust Fund, Health Services, Facilities, Food Service and Safety. Within my division I supervised and coordinated a variety of programs. I chaired bi-weekly meetings with Department Heads under my tutelage to discuss departmental issues and to develop goals and corrective actions when necessary. I participated in monthly Labor Management Relations meetings. I was actively involved in negotiations regarding the Local Supplemental Agreement. I served as Chairman of Work Programming meetings and reported on the progress of major projects. I monitored progress during subsequent meetings to ensure deadlines and procurements were strictly adhered to. I attended Salary/Workforce meetings and recommended changes to enhance efficiency and effective institution operations while strictly adhering to budgetary constraints. I reviewed instances of staff misconduct and recommended corrective action or discipline when appropriate.

I acted in the capacity of Warden and successfully managed the lock down of the facility following numerous fights between various groups of inmates. Due to our thorough review of the incident and preparations the institution returned to normal operations without further disruptions. I made quick and decisive decisions resulting in immediate resolution with minimal risk to staff, inmates and the public.

I implemented and operated several operational programs to enhance staff safety, inmate safety, and institution security. Specifically, I developed new protocols to eliminate inmate access to polyester clothing products that were igniting fires in the institution dryers. After identifying an

2

increase in weapons found crafted from toothbrushes, I developed new procedures to limit the number of toothbrushes inmates possessed.

I was Chairman of the Affirmative Employment Program and worked closely with the Special Emphasis Program Managers to encourage active participation in all related program activities. Accordingly, events were planned and organized effectively resulting in an increase of participation by all staff.  I provided oversight of the Employees Club and related functions. Similarly, membership increased by 25% and attendance at various functions improved. As Coordinator, I developed a staff Mentor/Protege Program at the facility. I developed and implemented a thorough tracking system to effectively monitor due dates for Program Reviews, Review Responses, Follow-Up Reviews, Request for Closure and Operational Reviews that was used by all management officials at the facility.

**Acting Warden:** 01/2014-06/2014 – Federal Correctional Institution, Beckley, WV

During my tenure, I ensured FCI/FPC Beckley supported the mission of the agency and the Regional Office. I provided oversight of the daily operations of the facility and gave guidance and direction to other members of the Executive Staff. There were approximately 350 staff and 2,000 inmates.

I monitored budget activity and balanced staffing levels in each department to effectively meet the needs of the institution. I monitored progress in meeting project goals in the Federal Prison Industries factory at the facility. I monitored staff completion of mandatory training, such as Annual Refresher Training and Institution Familiarization. I ensured each staff member received an annual evaluation and performance awards were given judiciously in an effort to enhance staff morale. I reviewed allegations of staff misconduct and appropriately referred conduct issues for investigation. I conducted bi-weekly meetings with the Special Investigative Agent and Human Resource Manager to ensure all aspects of the disciplinary process were adhered to. I imposed discipline when necessary.

I established a committee and gave specific assignments to members to thoroughly prepare for an ACA Intensive Re-Accreditation Audit, initial Prison Rape Elimination Act audit and a Psychology Program Review. Due to our thorough preparations, we earned ACA Re-Accreditation, surpassed Prison Rape Elimination Act standards and received a Superior Program Review rating. Additionally, I led preparations for an Institution Character Profile, in which FCI Beckley received an Outstanding rating.

I conducted meetings with community leaders comprising the Community Relations Board and West Virginia Task Force. I participated in meetings with various agencies and other facilities regarding re-entry efforts in the local area. I coordinated a Correctional Workers Week celebration with various activities throughout the week enjoyed by all staff. I maintained positive relations with the local Union through open dialogue during weekly meetings. I reviewed and approved all changes in local procedures incorporated in Institution Supplements and submitted

3

articles that were published in the Monday Morning Highlights. I developed and implemented comprehensive procedures regarding staff searches that ensured staff privacy. Due to my guidance and thorough preparations these procedures were employed effectively.

I authorized the use of a Calculated Use of Force Team and Less Lethal Munitions when warranted and acted decisively to emergency situations to obtain immediate resolution with minimal risk to staff and inmates.

**Associate Warden:** 06/2012-01/2014 – Federal Correctional Institution, Beckley, WV

During my tenure, I served as Associate Warden of Operations and Programs. In turn, I provided oversight of Financial Management, Human Resources, Computer Services, Correctional Services, Correctional Programs, Health Services, Psychology Services, Religious Services, Food Service, Commissary, Laundry, Safety and Facilities. I developed comprehensive internal controls in response to deficiencies identified during Operational/Program Reviews.

There have been no repeat deficiencies noted and each program earned a Program Review rating of Good or Superior. Additionally, the facility earned JCAHO accreditation with no discrepancies identified. I supervised and coordinated programs in each discipline employing up to 350 staff.

I implemented and operated several operational programs designed to control inmate activities, movement, and time in support of significantly increasing or enhancing staff safety, public safety and inmate safety. Specifically, I developed a split recreation schedule which reduced the number of inmates allowed in recreation at any given time. I realigned quarters assignments for inmates in general population by eliminating the use of 12-man cells and reassigning inmates to a two or three-man cell. I also incorporated inmate identification cards on individual cell doors to enhance awareness and accountability of inmates assigned to each cell.  I implemented detailed measures to thoroughly monitor inmates housed in the SHU and employed various programs resulting in a significant reduction of inmates housed in the SHU. These programs significantly reduced the number of serious incidents initiated by inmates, reduced the severity of those incidents which occurred, and reduced the number of incidents involving weapons or alcohol.

I resolved emergency situations with my decision making and direction to staff performing emergency actions. I acted as Warden, served as Administrative Duty Officer and led staff during emergency situations to include locking down the facility, ordering the use of a Calculated Use of Force Team, and use of Less Lethal Munitions. I made quick and timely decisions resulting in appropriate resolution and minimal risk to staff and inmates. I have also developed and implemented an emergency response continuum for resolving any inmate initiated situation within the facility and discussed the plan with all staff.

I participated in and conducted a variety of meetings to include, but not limited to, leadership meetings, department head meetings, Community Relations Board Meetings, West Virginia Task

4

Force meetings, Volunteer training and re-entry based meetings with various agencies outside the Bureau of Prisons. I served as chairman of Labor Management Relations, chaired monthly meetings and maintained a positive working relationship with the local Union. I also provided oversight of the institution's Employees Club. I participated in a national work group to perform a management assessment to effectively manage inmates with international and domestic terrorist ties. We submitted an Executive Staff paper recommending changes to the classification system, Central Inmate Monitoring Program, and release notification procedures that was approved by the Bureau of Prisons Executive Staff.

**Executive Assistant:** 05/2010-06/2012 – United States Penitentiary, Administrative Maximum, Florence, CO

As Executive Assistant, I provided administrative support to the three Wardens at FCC Florence in all areas of institution operations. Specifically, I relayed relevant information when providing comprehensive tours of each facility at the complex to include, but not limited to, members of Congress and their representatives, Judges, State Department staff, foreign delegates, federal and local law enforcement, members of the community relations board, etc. As Public Information Officer, I thoroughly addressed public and media inquiries regarding complex operations orally and in writing on a weekly basis for national and international media organizations that encompass television, newspaper, and radio. I provided thorough talking points on the ADX to Information Policy and Public Affairs in Central Office to address national/international interests and to assist the Director in addressing Congressional inquiries. The inquiries oftentimes related to the distinct mission of the ADX and numerous high profile inmates housed at the complex. I participated in an interview on CNN that was broadcast live. I provided thorough instruction to staff attending Institution Familiarization, Annual Refresher Training, and Institution Duty Officers (IDO) regarding their responsibilities and reporting requirements. I actively participated in meetings with complex department heads and executive staff to address complex operations and recommended changes as warranted. I drafted speeches for the Warden, which were used at staff recalls and memorial services. I coordinated preparation efforts for the ACA Re-Accreditation audit of FCC Florence. Due to my thorough preparations, the auditors determined we were in compliance with 100% of all standards. I provided instruction to non-bargaining unit staff on proper procedures for developing accurate and thorough Performance Work Plans. I served as coordinator for the Institution Duty Officer and Administrative Remedy Programs, Prison Social Climate Survey, Accountable Property Officer, and the Combined Federal Campaign. As the Administration's Cost Center Manager for two budgets, I ensured all procurements and related documents were completed in strict compliance with policies and procedures. I monitored the annual reviews of Institution Supplements to ensure they were completed timely and accurately. I served as a technical advisor to staff at all levels regarding policy, programs, and institution operations. I maintained an active role in training subordinates and served as a mentor to staff enrolled in the formal mentoring program. I authored numerous reports for the complex, provided lectures during Community Relations Board meetings, and

5

completed additional tasks as assigned. I authored accurate, concise, and comprehensive staff bulletins, Administrative Remedy responses, Congressional Correspondence, Institution Supplements, informational papers regarding ADX operations, Monday Morning Highlights articles that are published and distributed nationally, annual ACA reports, Performance Work Plans, performance log entries, progress reviews, annual evaluations, and Institution Summaries. I authored an Executive Staff paper recommending modifications to inmate housing assignments that was approved by the agency's Executive staff. I provided quality control of official correspondence to ensure it was accurate and free of mechanical, structural, and grammatical errors before review by the Warden. I updated the Executive Staff modules timely and accurately and developed a thorough overview of USP Florence operations that was used by the Regional Director to brief the agency's Executive Staff. I served as Reviewer-in-Charge of an Operational Review of Psychology Services and conducted two local investigations regarding staff misconduct. In both instances, I authored detailed, accurate and comprehensive reports of my findings.

**Unit Manager:** 06/1997-05/2010 – Federal Correctional Institution and United States Penitentiary, Administrative Maximum, Florence, CO

As Unit Manager, I planned, organized, supervised, and evaluated diversified programs housing up to 300 inmates to ensure the mission of the facilities were strictly met. I performed a comprehensive staffing evaluation of the General Population mission at the ADX. In turn, I developed and implemented a staffing plan that eliminated the need of 4 Lieutenants and 8 Correctional Officers that was approved. The results increased efficiency, enhanced effective utilization of resources and improved consistency throughout the facility. I activated the Special Security Unit at the ADX and established concise, comprehensive post orders and Institution Supplements governing daily management of the unit. I supervised, trained, assigned work, and provided guidance to Unit Secretaries, Case Managers, Counselors, and correctional staff assigned to the housing units. I developed a comprehensive staff schedule that was adopted by all Unit Managers at the facility. I responded to emergencies and took immediate control of the incident by directing staff to perform specific tasks, resulting in quick resolution and minimal injury to staff and inmates. I interpreted and applied sentencing guidelines to determine the impact on inmate release dates, security/custody levels, disciplinary sanctions during Unit Discipline Hearing Officer hearings and program eligibility. I explained the complexity of sentence computations, such as current release date, statutory release date, 180-day date, District of Supervision, term of supervision, jail credit, etc., to inmates, department heads, and executive staff. I served as coordinator for the Admission and Orientation, Release Preparation (RPP), and Inmate Skills Development Programs. I supervised, coordinated, and monitored each program to ensure maximum effectiveness. When I assumed responsibility of the FCI RPP program, it lacked the intent of national policy. Through positive interaction and effective communication with institution and community resources, the curriculum was dramatically improved. Within six months, the program exceeded all expectations of national policy and I was referred by the

6

Regional Assistant Correctional Programs Administrator to provide guidance to other coordinators within the region. I implemented and enforced an efficient RPP program at the ADX. I authored concise, comprehensive, and accurate Institution Supplements, responses to inmate and public inquiries, Congressional and Judicial letters, and Administrative Remedy Requests for review and approval by all levels of management. I served as Reviewer-in-Charge of two Operational Reviews and participated in four Program Reviews and three Operational Reviews. In each review, I authored concise and accurate reports of my findings. I provided meaningful feedback to staff during personal meetings, in comprehensive performance log entries, progress reviews, and annual evaluations. I fostered improved performance through incentive awards. I also recognized unacceptable performance, developed a detailed performance improvement plan of action and monitored the employee's continued performance for improvement and appropriateness. I served as chairman during classification meetings, developed detailed program plans for each inmate, and provided close supervision and evaluation. I served as Alternate Cost Center Manager, Accountable Property Officer, Acting Associate Warden, Acting Executive Assistant, Mentor, and Institution Duty Officer. I conducted panel interviews for Psychology, Correctional Services, and Unit Management positions.

**Acting Executive Assistant:** 07/2001-07/2002 - United States Penitentiary, Administrative Maximum, Florence, CO

As Acting Executive Assistant, I provided administrative support to the Warden in all areas of institution operations. Specifically, I provided comprehensive lectures and tours of the facility to groups that included, but were not limited to, congressional representatives, judges, state department staff, foreign delegates, federal and local law enforcement, members of the community relations board, etc. During these tours, I relayed relevant information about the facility and public relations. I interacted with institution staff daily and routinely communicated with Regional and Central office staff regarding media issues. As Public Information officer, I accurately addressed public and media inquiries regarding ADX operations, both orally and in writing, for national and international media organizations to include television, newspaper, and radio. The inquiries were in relation to the distinct mission of the ADX and numerous high profile inmates housed at the facility. I provided thorough instruction to staff attending Institution Familiarization and Annual Refresher Training. I provided thorough training to staff assuming Institution Duty Officer (IDO) responsibilities and provided annual training to all IDO's regarding their responsibilities and reporting requirements. I actively participated in all meetings with the department heads and executive staff to address complex operations and changes. I authored comprehensive staff bulletins, Institution Supplements, informational papers regarding ADX operations, and press releases. I also served as coordinator for the IDO and Administrative Remedy Programs, ACA Re-Accreditation Manager, Accountable Property Officer, and the Combined Federal Campaign. I coordinated the complex ACA Intensive Re-Accreditation Audit by assigning tasks, conducting meetings, providing appropriate follow-up,

and working closely with staff throughout all facilities on the complex. I served as the Administration's Cost Center Manager for two budgets and served as Institution Duty Officer. I monitored the annual reviews of Institution Supplements to ensure timely and accurate completion. I served as technical advisor to staff at all levels and assumed an active role in training subordinates enrolled in the formal mentoring program. I authored accurate, concise, and comprehensive staff bulletins, Administrative Remedy responses, Congressional Correspondence, Institution Supplements, informational papers regarding ADX operations, Monday Morning Highlights articles, annual ACA reports, performance log entries, progress reviews, annual evaluations, and Institution Summaries. I provided quality control when monitoring correspondence to ensure accuracy, free of mechanical, structural, and grammatical errors before review by the Warden. I managed the institution strategic plan and provided progress notes to the Regional Office regarding BOP Strategic planning Objectives.

**Case Management Coordinator:** 10/1995-06/1997 – Federal Correctional Institution, Florence, CO

I managed the Correctional Programs Division ensuring the institution was compliant with all national and local policies. I was the Cost Center Manager for three separate budgets which exceeded $750,000. I provided technical assistance and served as a resource person to Executive Staff, other Department Heads, and line staff regarding Correctional Programs issues.  I was an expert in inmate classification and provided guidance to Case Managers, Unit Managers and Executive staff regularly regarding policies governing inmate classification issues. I served as the subject matter expert of and coordinated the Witness Security Program (WITSEC).  As WITSEC coordinator, I worked closely with not only Central Office Inmate Monitoring Branch, but the United States Marshals Service and Federal Bureau of Investigation.

I reviewed applications of prospective employees and recommended promotions most beneficial to the department, institution, and agency. I was a subject matter expert and administered the Victim/Witness (VWP), Central Inmate Monitoring (CIM), Inmate Performance Pay (IPP), and Financial Responsibility (FRP) Programs. I thoroughly and accurately monitored inmate load data, daily designation, VWP, and CIM logs. I authored comprehensive Institution Supplements on VWP, IPP, Furloughs, Intake Screening, Admission and Orientation, Cost of Incarceration Fee, and CIM. I provided thorough screening site/locator center training, on-the-job training for newly selected Case Managers, Counselors, and Unit Secretaries, and strictly monitored the CIM certification program. I facilitated Case Manager and Unit Support staff meetings, in which training was provided regarding changes in national and local procedures and program review trends. I conducted lectures during Institution Familiarization and Annual Refresher Training on Inmate Security Designation and Classification procedures, Technical Report Writing, Communication Skills, Inmate programs, and CIM/VWP programs. I discussed intake screening, FRP COIF, Community Corrections Center Placement, Unit Management, Designation and Classification Procedures, Release and Gratuities, and Administrative Remedies during A&O lectures with new inmates. I provided quality control of official correspondence prepared by unit

8

staff for all levels of management. I provided written and oral feedback to Case Managers on their work performance through performance log entries. I served as Reviewer-In-Charge of two operational reviews and participated in a Program Review of Correctional Programs. I served as Institution Duty Officer and acted in the capacities of Associate Warden Programs, Camp Administrator, and Executive Assistant. I developed a permanent audit system, to include Treaty Transfer and Supervised Release violator logs, to monitor areas that were noted as deficient during Operational and Program Reviews. These constant and thorough monitoring techniques enabled us to earn a Superior Program Review rating. I communicated with state law enforcement agencies to include, but not limited to, U.S. Probation, U.S. Attorneys, Federal Bureau of Investigation, etc. I developed a comprehensive position description used for an Assistant CMC position.

**Case Manager:** 09/1991-09/1995 – United States Penitentiary, Lompoc, CA and United States Penitentiary, Administrative Maximum, Florence, CO

During my tenure as Case Manager, I worked at USP Lompoc and ADX Florence. I became well versed in the governing Program Statements to include, but not limited to, Central Inmate Monitoring, Victim Witness Program, Financial Responsibility Program, Intake Screening, and Security Designation and Custody Classification Manual. In turn, I conducted thorough social intake screening interviews with inmates and relayed sensitive information to the SIS, Unit Manager and Psychology staff when necessary. I conducted comprehensive program review meetings and developed meaningful program plans to address their personal needs. I also provided technical expertise to other members of the unit team. I conducted selective and intensive counseling with inmates whenever necessary. I also authored official correspondence to include, but not limited to, protective custody investigations, threat assessments, management variable/transfer/community corrections center referrals, progress reports, responses to Administrative Remedies, Congressional Inquiries, for review and approval by all levels of management. I developed systems of control to ensure all tasks were completed accurately, concisely, and well in advance of established deadlines. I was a member of the ADX activation team, wherein I developed Institution Supplements and the Institution A&O Handbook. I also served as the Alternate Case Management Coordinator. I participated in two Operational Reviews and two Program Reviews of Correctional programs.

**Correctional Officer:** 09/1990-08/1991 – United States Penitentiary, Lompoc, CA

I ensured the safe, secure and orderly operation of the housing unit by providing direct oversight over unit operations. I supervised unit orderlies to ensure a high level of sanitation was consistently maintained. I also supervised and controlled movement to and from the housing unit.

I conducted visual and pat searches of inmates on a regular basis. I ensured strict accountability of all inmates assigned to my area throughout the day. Additionally, I conducted thorough

searches of the housing unit on a daily basis in an effort to control contraband. I authored concise and comprehensive incident reports, memorandums, log entries, etc. I responded to institution emergencies and actively participated in apprehending three inmates who escaped.

## **Education**

Bachelor's Degree - Criminal Justice Administration – Law Enforcement, Central Missouri State University, 05/1990

## **Job Related Training**

Completed 18 Cross Development Courses/BOP - Various Dates

Completed seven FEMA Courses/GOV - Various Dates

Civil Treatment for Managers - BOP 4/28/2005

EEO Investigator - GOV 3/12/1999

Public Affairs, Public and Media Relations - BOP 5/16/1997

Leadership Forum, Supervisor - BOP 12/20/1996

Instructor Skills - BOP 12/12/1996

Department Head Familiarization - BOP 7/24/1996

2010 Hiring Reform Act - BOP 12/6/10

Schedule A - Appointing Authority - BOP 11/7/11

Uniformed Services Employment and Reemployment Act - BOP 7/24/11

Performance Supervisor's Guide for Bargaining Unit - BOP 5/20/11

Performance Matrix Supervisor's Guide for Bargaining Unit - BOP 5/20/11

Foundations of Coaching - BOP 5/5/11

EEO for Managers/Supervisors - BOP 1/24/11

Crisis Management Training-9/2009; 9/2011; 9/2012; 9/2013

New Associate Warden Training-07/2013

Special Operations Response Team Member at USP Lompoc 2/1991 to 10/1993

Special Operations Response Team Member at FCC Florence 1/2006 to 8/2007

Disturbance Control Team Member 10/2004 to 9/2005.

**Awards**

Time Off Award (12/2012; 4/2011)

Special Act Award (8/2016; 7/2014; 9/2011; 5/2011)

Quality Step Increase (3/2016; 3/2015; 3/2014; 12/2011; 11/2010)

Sustained Superior Performance (3/2017)

Federal Bureau of Prisons Correctional Programs Supervisory Staff Member of the Year (2003)

Supervisor of the Year (2010; 1996)

# Attachment 2
# October 15, 2012, Davis Memorandum

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV



**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, D.C.  20534*

OCT 1 5 2012

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:          Blake R. Davis, Assistant Director
               Correctional Programs Division

SUBJECT:       Administrative Maximum Facility (ADX) General
               Population Referral Procedures


This memorandum supersedes guidance on this topic issued by
D. Scott Dodrill, Assistant Director, Correctional Programs Division
(CPD), on June 9, 2010.  Please review the entire memorandum
carefully.

The Designation and Sentence Computation Center (DSCC) has the
responsibility for processing referrals to the general population at
the United States Penitentiary, Administrative Maximum, Florence,
Colorado.  Placement of inmates in the ADX-GP is at the discretion
of the Assistant Director, CPD, Central Office. (The Executive Panel
retains decision-making authority for placement of inmates in the ADX
Control Unit.)

A Hearing Administrator will be designated by the National Discipline
Hearing Administrator (DHA) to conduct due process hearings for
inmates who are referred for placement to the ADX-GP.

Inmates designated to the ADX-GP will have a two-level administrative
remedy process.

Guidelines for implementing these designation procedures are
attached.

Any questions regarding information outlined in this memorandum or
the attachment should be directed to me or Jose A. Santana, Chief,
DSCC.

## ADX GENERAL POPULATION CRITERIA GUIDELINES

An inmate referred to the ADX General Population (ADX-GP) will originally meet one or both of the following criteria:

- The inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety.

- As a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution.

As a guideline, the following factors have been found sufficient to warrant consideration for such placement:

- The inmate is subject to restrictive conditions of confinement as a result of a Special Administrative Measure, pursuant to 28 C.F.R. §§ 501.2 or 501.3; or based on documented reliable information from a government agency that the inmate was convicted of, charged with, associated with, or in any way linked to terrorist activities and, as a result, presents national security management concerns which cannot adequately be met in an open population institution.

- The inmate is subject to restrictive conditions of confinement after being convicted of any offense, and the sentencing judge imposes restrictions on contacts by the convicted person pursuant to 18 U.S.C. § 3582(d), or similar statute.

- The inmate engaged in any conduct that is prohibited by any federal law or state law in the facility where the inmate is housed.

- The inmate has committed two 100 or 200 level prohibited acts within the last 60 months.

- After being validated as a member of a Disruptive Group, the inmate committed any 100 level prohibited act.

- The inmate has been identified as participating in, organizing, or facilitating any group misconduct that adversely affected the

orderly operation of a correctional facility (including lock-down of an entire facility or any unit therein).

- The inmate engaged in any behavior outlined above, while confined in a correctional facility other than an open population setting, and as a result of the severity of the behavior, it is determined the inmate would be unable to function in a less restrictive correctional environment without being a threat to others or to the secure and orderly operation of a less secure correctional facility.

- The inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting.

- The inmate has access to resources within a correctional environment or in the community to the extent that housing the inmate in a less secure setting poses a heightened probability of an escape.

### ADX GENERAL POPULATION REFERRAL PROCEDURES

Medical Designations

- *Office of Medical Designations and Transportation* (OMDT) – Inmates classified as Care Level 4 (medical or mental health), must first be reviewed (on record) by OMDT to determine an appropriate designation based on the health care needs of the inmate (Medical Referral Center, institution, or community hospital).

- Inmates classified as Care Level 3 (medical or mental health), will be referred to Health Services and/or Psychology Department, FCC Florence, to determine if the ADX can meet the health care needs of the inmate.

- Any inmate with medical or mental health concerns which cannot be addressed while in the ADX will be referred to the Administrator, Intelligence and Counter Terrorism Branch (ICTB), for further review of security concerns regarding designation.

Referral for Currently Designated Inmates

- *Institution Staff* - Staff will initiate the referral process in accordance with the procedures outlined in Program Statement

-2-

5100.08, <u>Inmate Security Designation and Custody Classification</u>, and submit the packet to the Warden for review.

- *Warden* – If the Warden concurs with the referral, the referral packet is signed and forwarded to the Regional Director in the region where the inmate is located.

- *Regional Director* – If the Regional Director concurs with the referral, the referral packet is signed and submitted to the Chief, DSCC.

- *Initial Assessment* – DSCC staff will conduct an initial assessment of the referral packet and the inmate's need for placement at ADX-GP:

  o *Inmates not appropriate for ADX-GP:* If the case is not appropriate for ADX-GP placement, the Chief, DSCC, will forward the packet to the Assistant Director, CPD, who will notify the referring warden via memorandum through the DSCC; or

  o *Inmates appropriate for ADX-GP:* If it is determined the inmate warrants consideration for placement in the ADX-GP, the Chief, DSCC, will forward the packet to the National Discipline Hearing Administrator (DHA). The National DHA will assign a Hearing Administrator to conduct a hearing on the appropriateness of the inmate's placement at the ADX.

- The Chief, DSCC, will also simultaneously forward the packet to the Administrator, Psychology Services, Central Office, for review.  The Administrator will conduct a review of the psychological assessment of the inmate and report findings to the Chief, DSCC.

<u>Referral for Initial Designations after Sentencing</u>

- Inmates identified by the DSCC who warrant consideration for initial designation to the ADX will be referred to the Counter Terrorism Unit (CTU).

- CTU staff will initiate the referral process in accordance with the procedures outlined in Program Statement 5100.08, <u>Inmate Security Designation and Custody Classification</u>, and submit the packet to the Administrator, ICTB.

- *ICTB Administrator* – The Administrator will identify an appropriate high security institution for designation with consideration for ADX placement. The identification of this designation will be made in consultation with affected regional office staff and DSCC staff. The designation will be identified in Sentry by the DSCC. The Administrator will forward the ADX referral packet to the Warden of the designated institution for review.

- *Warden* – If the Warden concurs with the ADX-GP referral, the referral packet is signed and forwarded to the Regional Director in the region where the inmate is located.

- *Regional Director* – If the Regional Director concurs with the referral, the referral packet is signed and submitted to the Chief, DSCC.

- *Initial Assessment* – DSCC staff will conduct an initial assessment of the referral packet and the inmate's need for placement at ADX-GP:

  - *Inmates not appropriate for ADX- GP:* If the case is not appropriate for ADX-GP placement, the Chief, DSCC, will forward the packet to the Assistant Director, CPD, who will notify the referring warden via memorandum through the DSCC; or

  - *Inmates appropriate for ADX GP:* If it is determined the inmate warrants consideration for placement in the ADX-GP, the Chief, DSCC, will forward the packet to the National DHA. The National DHA will assign a Hearing Administrator to conduct a hearing on the appropriateness of the inmate's placement at the ADX.

- The Chief, DSCC, will also simultaneously forward the packet to the Administrator, Psychology Services, Central Office, for review. The Administrator will conduct a review of the psychological assessment of the inmate and report findings to the Chief, DSCC.

Witness Security Program Cases – Referral for Current Protective Custody Unit Inmates

- *Warden* – The Warden will initiate the referral process in accordance with the procedures outlined in Program Statement 5100.08, Inmate Security Designation and Custody

Attachment A, Page 5

Classification, and submit the packet to the Administrator, Correctional Programs Branch (CPB), Central Office, for review.

- *CPB Administrator* – If the Administrator concurs with the referral and determines the inmate warrants consideration for placement in the ADX-GP, the Administrator will forward the packet to the National DHA.  The National DHA will assign a Hearing Administrator to conduct a hearing on the appropriateness of the inmate's placement at the ADX.

- The CPB Administrator will also simultaneously forward the packet to the Administrator, Psychology Services, Central Office, for review.  The Administrator, Psychology Services, will conduct a review of the psychological assessment of the inmate and report findings to the Administrator, CPB.

As a note, only those staff with a specific need to know should be involved in the referral and due process of Witness Security Program cases which are referred for ADX-GP designation.

Witness Security Program Cases – Initial Designations after Sentencing

- *Inmate Monitoring Section (IMS) Staff* – IMS staff will identify an institution pending completion of the ADX referral process. IMS staff will initiate the referral process in accordance with the procedures outlined in Program Statement 5100.08, Inmate Security Designation and Custody Classification, and submit the packet to the Warden for review.

- *Warden* – If the Warden concurs with the referral and determines the inmate warrants consideration for placement in the ADX-GP, the Warden will forward the packet to the Administrator, CPB, for review.

- *CPB Administrator* – If the Administrator concurs with the referral and determines the inmate warrants consideration for placement in the ADX-GP, the Administrator will forward the packet to the National DHA.  The National DHA will assign a Hearing Administrator to conduct a hearing on the appropriateness of the inmate's placement at the ADX.

- The Administrator will also simultaneously forward the packet to the Administrator, Psychology Services, Central Office, for review.  The Administrator, Psychology Services, will conduct

a review of the psychological assessment of the inmate and report findings to the Administrator, CPB.

As a note, only those staff with a specific need to know should be involved in the referral and due process of Witness Security Program cases which are referred for ADX-GP designation.

Hearing

- *Hearing Administrator* - The Hearing Administrator will have correctional experience, including institution work with inmates, institutional experience in observing and evaluating inmate adjustment and disruptive behavior, and knowledge of the options available in the Bureau of Prisons (BOP) for dealing with such conduct.  The Hearing Administrator will be familiar with BOP policies and operations, including the criteria for placement of inmates in different institutions with emphasis on the ADX.

- *Hearing Coordination* - The Hearing Administrator will contact the recommending institution to arrange a time and date for the hearing.  The hearing may be conducted via video conferencing, teleconference, at the institution of confinement or any other location as determined by the Hearing Administrator.

- *Notice Form* - The Hearing Administrator will prepare the Notice of Hearing on Referral for Transfer to ADX-GP (Notice). Specific evidence which forms the basis for the referral shall be placed in the Notice unless such information would jeopardize the safety and security of the institution or endanger staff or others.

- *Delivery of Notice* - The Notice will be sent to the institution for delivery to the inmate, along with a copy of these procedures.  Institution staff shall deliver the Notice to the inmate and will ensure all applicable areas of the form are filled out regarding confirmation of delivery, receipt, and if the inmate chooses to waive his appearance at the hearing.  The Notice must be delivered at least 24 hours prior to the hearing. If an inmate is illiterate, staff shall explain the Notice and these procedures to the inmate and document the date and time the inmate receives the Notice.

- *Inmate Appearance* - The inmate will have the opportunity to be present throughout the hearing, except where institution security and good order are jeopardized.  If the inmate waives

-6-

his right to appear at the hearing, the appropriate section of the Notice must be completed reflecting the waiver. If the inmate is not present at the hearing, the Hearing Administrator will document the reason in the record of the hearing.

- *Inmate Statement/Evidence* – The inmate will have the opportunity to make an oral statement during the hearing and may present documentary evidence to the Hearing Administrator. The evidence must be material and relevant to the issue without posing a threat to staff, inmates, the public, or the orderly operation of the institution.

Hearing Administrator's Recommendation

- *Report* – At the conclusion of the hearing and following a review of all material, the Hearing Administrator shall prepare a written recommendation on whether placement of the inmate at the ADX is warranted. The recommendation will summarize all information and indicate the specific reasons for the recommendation with sufficient detail, unless the information poses a threat to any individual or the orderly operation of an institution.

- *Report Delivery* – The inmate shall receive a copy of the written report prepared by the Hearing Administrator. The inmate shall receive all of the information utilized by the Hearing Administrator in making the recommendation, unless it is determined that release of this information could pose a threat to individual safety or institutional security, in which case limited information may be summarized and withheld. Institution staff shall document in the appropriate section of the report, and all copies, the date and time the inmate receives a copy of the report and the name and signature of the staff member delivering the report. A copy of the report with delivery confirmation must be returned to the Hearing Administrator.

- *Report to the Assistant Director, CPD* - The Hearing Administrator will send a copy of the report with supporting documentation to the National DHA for review before forwarding to the Assistant Director, CPD, or designee. This report will ordinarily be forwarded within 15 working days following the hearing.

Attachment A, Page 8

Review and Final Decision

- *Review and Decision* - The Assistant Director, CPD, or designee, shall review the Hearing Administrator's report and supporting documentation.  The Assistant Director, CPD, or designee, shall accept or reject the Hearing Administrator's recommendation contained in the report, ordinarily within 30 working days of its receipt, unless, for good cause, there is a reason for delay.

- *Decision Delivery* - The Assistant Director, CPD, will notify the Chief, DSCC, of the final decision.  The DSCC will enter a designation in accordance with the decision.  If approved for placement, the Chief, DSCC, will forward a copy of the decision to the institution for delivery to the inmate.  The date and time the inmate receives the written decision, and the name and signature of the staff member confirming delivery, will be recorded on all copies of the written decision and filed in the inmate central file.

Review and Final Decision for Witness Security Program Cases

- *Review and Decision* - The Assistant Director, CPD, or designee, shall review the Hearing Administrator's report and supporting documentation.  The Assistant Director, CPD, or designee shall accept or reject the Hearing Administrator's recommendation contained in the report, ordinarily within 30 working days of its receipt, unless, for good cause, there is a reason for delay.

- *Decision Delivery* - The Assistant Director, CPD, will notify the Administrator, CPB, of the final decision.  IMS will enter a designation in accordance with the decision.  If approved for placement, IMS staff will forward a copy of the decision to the institution for delivery to the inmate.  The date and time the inmate receives the written decision, and the name and signature of the staff member confirming delivery, will be recorded on all copies of the written decision and filed in the inmate central file.

Appeal

- *Administrative Remedy Program* - The inmate will be advised of the opportunity to appeal the decision of the Assistant Director, CPD, through the Administrative Remedy Program, first to the Chief, DSCC, and then to the Office of General Counsel, HOLC Building, 320 First Street, N.W., Washington, D.C. 20534.

Appeal for Witness Security Program Cases

- *Administrative Remedy Program* - The inmate will be advised of the opportunity to appeal the decision of the Assistant Director, CPD, through the Administrative Remedy Program, first to the Administrator, CPB, and then to the Office of General Counsel, HOLC Building, 320 First Street, N.W., Washington, D.C. 20534.

Movement

- *Designation* - If an inmate is approved for placement at the ADX, the ADX Warden will place the inmate on a waiting list and will notify the referring Warden when housing is available.

# Attachment 3
# FLM 5321.07(1)B, *General Population and Step-Down Unit Operations* (Sept. 1, 2015)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV



**U. S. Department of Justice**
Federal Bureau of Prisons
United States Penitentiary
Administrative Maximum Facility
Florence, Colorado   81226

## INSTITUTION SUPPLEMENT

OPI:          Unit Management
NUMBER:   FLM 5321.07(1)B
DATE:        September 1, 2015

# General Population and Step-Down Unit Operations

Approved:        */s/*
                 J. Oliver, Warden
                 Administrative Maximum Security Institution

1.  **PURPOSE AND SCOPE:**   To establish operational guidelines for the units which are designated as the general population and step-down units.

2.  **DIRECTIVES AFFECTED:**

    A.  **Directives Rescinded:**   Institution Supplement FLM 5321.07(1)A, General Population and Step-Down Unit Operations, dated July 20, 2015.

    B.  **STANDARDS REFERENCED:**   None.

3.  **SUMMARY OF CHANGES:**   To add Pre-Intermediate Unit procedures and Privilege Incentive Program (PIP).

4.  **GENERAL PROCEDURES:**

    A.  **GENERAL POPULATION UNITS (D, E, F, and G)**

        1.  Inmates housed in these units require hand restraints, behind the back, and two-officer escorts when being removed from their cells.   Any time an inmate is handcuffed in the front, a martin chain must be used in addition to the handcuffs.

2.      These units have indoor and outdoor, single occupancy recreation areas.   All out-of-cell recreation will occur within the unit, in one of the single occupancy recreation areas.   Inmates will ordinarily be afforded a minimum of ten hours out-of-cell exercise per week.   An inmate will be returned to his cell upon his request.   Anyone returning to his cell for any reason voluntarily terminates the remainder of his recreation period for that day.   Recreation periods missed due to visits (legal or social), medical call-outs, and religious services will not be rescheduled.   The Unit Recreation Log will be completed by the unit officers to document acceptance or refusal of recreation, type of recreation, and amount of time the inmate receives recreation.   The Unit Recreation Log will be provided to, and maintained by the Captain.

3.      Inmates will consume their meals within their cells.

4.      Shower stalls are located within each cell.   Inmates are authorized to shower between the hours of 6:00 a.m. and 10:00 p.m.

5.      Unit orderlies for ranges and recreation areas will be assigned by the Unit Manager.   Barbering facilities are available in each unit.   Social and attorney calls will be conducted as established in the Institution Supplement on Telephone Regulations.   Each unit contains an electronic law library, which inmates may sign-up to utilize.   The majority of programming, including Drug Abuse, Education, Recreation, Religious Services, Re-Entry, and unit/facility information, are available via closed circuit television/radio, which is located in each cell.

6.      **OUTSIDE, OUT-OF-CELL RECREATION SUSPENSION/RESTRICTION**

a.      When an inmate violates institution rules and regulations during his out-of-cell recreation, his outside, out-of-cell recreation on a large recreation yard may be temporarily suspended.   Examples of violations include, but are not limited to, sexual acts or gestures, suicidal attempts or gestures, assaulting or resisting staff during escort to or from the recreation area, destruction of the recreation area, smearing or throwing human waste, etc.

b.      Staff will initiate disciplinary action and notify the Operations Lieutenant of any violation(s) immediately.

c.   The Operations Lieutenant will initiate a memorandum requesting the inmate's outside, out-of-cell recreation on the large recreation yard be immediately suspended.   The memorandum will also request that the inmate's outside, out-of-cell recreation be immediately restricted to the outside, single occupancy recreation areas around the housing unit's control center.   The memo will be forwarded through the Captain and ADX Associate Warden with oversight of Correctional Services, to the Warden for approval, with a copy to the Unit Manager.

d.   If approved, the inmate's initial suspension/restriction will be for three months.   The Warden may impose an increased suspension/restriction for repeated, frequent violations.

e.   Upon initial entry into the Intermediate step of the Program, the Warden may limit or restrict group recreation of the inmate for two weeks.   Inmates transitioning into that step will ordinarily be allowed an out-of-cell recreation for one and a half hours a day.   Unit Staff will provide a written notice of the transition procedures concerning each inmate.

## B.   PRE-INTERMEDIATE UNIT (K/A-Unit):

1.   Ordinarily, the placement of an inmate into this unit is only appropriate if the Step-Down Screening Committee determines that the inmate has demonstrated he can safely function in a less-restrictive unit without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including himself; and/or posing a risk to public safety, but has not demonstrated he can function in the Intermediate Unit of the Program without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including himself; and/or posing a risk to public safety.

2.   The escort requirements for inmates housed in this unit are the same as those in the General Population Units.   Inmates will be assigned to a group.   Each group will have 2 inmates.

3.   This unit has an outdoor recreation area.   Inmates will ordinarily be afforded a minimum of ten hours out-of-cell exercise per week. Out-of-cell recreation will include the use of the outdoor recreation area and unit range.

4.   Inmates will consume their meals within their cells.

**5.**     Showers are located on the ranges. Inmates will be escorted to showers. The escort requirements are the same as those in the General Population Units.

**6.**     All other programming activities, orderly assignments, telephone usage, basic law library usage, and barbering facilities are the same as those in the General Population Units.

**7.**     The Unit Recreation Log will be completed by the unit officers to document acceptance or refusal of recreation, type of recreation, and amount of time the inmate receives recreation.   The Unit Recreation Log will be provided to, and maintained by the Captain.

**8.**     The unit team will review each inmate placed in this unit at least every 90 days, to determined eligibility for consideration for placement in the Program.   The guidance concerning the Program, eligibility factors and review procedure set forth in section 5, below, are applicable to inmates housed in this unit and these reviews.

**C.     STEP-DOWN PROGRAM UNITS**

1.     **Intermediate Unit (J/A-Unit):**

a**.**     Ordinarily, this is the second step of the Step-Down Program (Program) prior to transfer to an appropriate facility.

b**.**     The escort requirements for inmates housed in this unit are the same as those in the General Population Units.   Inmates will be assigned to 1 of 4 groups.   Each group will have a maximum of 8 inmates.

b.     This unit has an outdoor recreation area.   Inmates will ordinarily be afforded a minimum of 20½ hours out-of-cell exercise per week.   Out-of-cell recreation will include the use of the outdoor recreation area and unit range.   Each group of inmates will be allowed on the range for 1½ hours each day. All other aspects of recreation are the same as those in the General Population Units.

c.     Inmates will consume their meals within their cells.

d.     Showers are located on the ranges.   Inmates may shower at any time they are on the range.

e.     All other programming activities, orderly assignments, telephone usage, basic law library usage, and barbering facilities are the same as those in the General Population Units.

      f.      The Unit Recreation Log will be completed by the unit officers to document acceptance or refusal of recreation, type of recreation, and amount of time the inmate receives recreation.   The Unit Recreation Log will be provided to, and maintained by the Captain

**2.**      **Transitional Unit (B/B Unit Phase I):**

      a.      This unit is physically located in B/B Unit at the United States Penitentiary (USP), High Security, Florence, Colorado.

      b.      Ordinarily, this is the third step of the Program prior to transfer to an appropriate facility.

      c.      Inmates will be assigned to 1 of 2 groups.   Each group will have a maximum of 12 inmates.

      d.      Inmates will recreate with their assigned group.   The inmates' out-of-cell recreation will include recreation in the unit and in the outdoor group recreation area.   Recreation periods missed due to visits (legal or social), medical call-outs, and religious services will not be rescheduled. Ordinarily, inmates will receive 30½ hours of recreation per week.

      d.      Inmates will consume their meals on the range with their assigned group.

      e.      Inmates will be unrestrained when out of their cells.   The use of restraints is not required during the escort of inmates to various programming areas.

      f.      Showers are located on the ranges.   Inmates may shower at any time they are on the range.

      g.      All other programming activities, orderly assignments, telephone usage, electronic law library usage, and barbering facilities will be the same as those in the General Population Units.

      h.      Inmates will be escorted to commissary once a week.

**3.**      **Pre-Transfer Unit (B/B Unit Phase II):**

      a.      This unit is physically located in B/B Unit at the United States Penitentiary (USP), High Security, Florence, Colorado.

b.      Ordinarily, this is the final step of the Step-Down Program prior to transfer to an appropriate facility.

c.      Inmates will be assigned to 1 of 2 groups.   Each group will have a maximum of 28 inmates.

d.      Upon arrival in this step of the Program, an inmate will initially be single celled for three months.   The inmate will then be reviewed by the unit team for placement in a double occupancy cell.   If approved by the Associate Warden, the inmate will be placed in a double occupancy cell with another inmate.   If not approved, the inmate will be provided written notice of the decision, informing of the reasons why and that the decision can be appealed through the Federal Bureau of Prisons' Administrative Remedy Program.   An inmate denied placement in a double occupancy cell will be reviewed at least monthly.

e.      Inmates will be unrestrained when out of their cells.   The use of restraints is not required during the escort of inmates to various programming areas.

f.      Inmates will consume their meals on the range with their assigned group.

g.      Showers are located on the ranges.   Inmates may shower at any time they are on the range.

h.      Inmates will recreate with their assigned group.   The inmates' out-of-cell recreation will include recreation in the unit and in the outdoor group recreation area.   Recreation periods missed due to visits (legal or social), medical call-outs, and religious services will not be rescheduled. Ordinarily, inmates will receive 35½ hours of recreation per week.

i.      Ordinarily, inmates will be employed as orderlies, tutors, maintenance workers, barbers, laundry workers, and recreation/wellness workers in the unit.   Assignments will made by the Unit Manager.

j.      Barbering facilities will be made available.   Social and attorney calls will be conducted as established in the Institution Supplement on Telephone Regulations.   Each unit contains an electronic law library, which inmates may sign-up to utilize.   The majority of programming, including Drug Abuse, Education, Recreation, and Religious Services, are

available via closed circuit television, which is located in the unit.

k.      Inmates will be escorted to commissary once a week.

D.      **CANCELLATION OF OUT-OF-CELL RECREATION** - On those rare occasions when institution emergencies or adverse weather interferes with the recreation schedule, the following procedures will apply:

1.      The Operations Lieutenant has the authority to cancel recreation due to an institution emergency or adverse weather.

2.      Unit officers will ensure any lost recreation time is clearly noted in the unit log, and this information is relayed to the Unit Manager for monitoring.

3.      The Captain and Unit Manager must confer with the appropriate Associate Warden concerning canceled recreation.

5.      **STEP-DOWN PROGRAM (PROGRAM)**

A.      **PURPOSE & SCOPE**

1.      The procedures for the Program do not affect the Federal Bureau of Prisons' authority – pursuant to 18 U.S.C. § 3621(b) and as delegated by the Attorney General under 28 C.F.R. § 0.96(c) – to designate an inmate to a different facility, or transfer an inmate between different facilities.

2.      The Program utilizes a stratified system of less-restrictive housing to provide inmates with incentives to adhere to the standards of conduct associated with a maximum security custody program. Ordinarily, as inmates at the ADX demonstrate periods of clear conduct and positive institution adjustment, it is possible for the inmate to progress from the General Population Units, through the Intermediate, Transitional, and Pre-Transfer Units, with increasing degrees of personal freedom and privileges at each stage, and be transferred out of the Program to an open population institution.   An inmate's placement in, advancement through, and transfer out of, the Program is a classification decision as to whether the inmate can safely function in a less-restrictive unit without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or posing a risk to public safety.

3.      Every inmate has the opportunity to demonstrate he may be housed in a less-restrictive unit.

4.  Ordinarily, the Program consists of four steps, differentiated by the conditions of confinement and the minimum time frames for completion.   Ordinarily, the minimum time period to complete the program is 36 months.   Ordinarily, the minimum stay in a General Population Unit is 12 months, the Intermediate Unit (J/A-Unit) is 6 months, the Transitional Unit (B/B Phase I) is 6 months, and the Pre-Transfer Unit (B/B Phase II) is 12 months.   There is no minimum or maximum time period for completion of the Program.

5.  Staff must assess whether the inmate has actually demonstrated he can function in a less-restrictive environment through his meeting of the eligibility requirements.

6.  In assessing an inmate's compliant behavior for placement into the Intermediate Unit, the Step-Down Screening Committee may determine that while he has demonstrated that he can function in a less restrictive environment without posing a risk to institution security and good order; posing a risk to the safety and security of staff, inmates or others, including himself; and/or posing a risk to public safety, he has not demonstrated that he can function in the Intermediate Unit and may decide to place the inmate in the Pre-Intermediate Unit.   An inmate's placement in, and advancement through the Pre-Intermediate Unit into the Intermediate Unit is a classification decision as to whether the inmate can safely function in a less-restrictive unit without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or posing a risk to public safety.   Ordinarily, the minimum stay in the Pre-Intermediate Unit is 90 days.   An inmate's placement into the Pre-Intermediate Unit does not alter the inmate's progression through the Intermediate, Transitional, and Pre-Transfer steps of the Program.

7.  If the Step-Down Program Screening Committee determines additional time is needed to assess an inmate's compliant behavior to ensure that when placed in, advanced through, or transferred out of the program the inmate will not: pose a risk to institution security and good order; pose a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or pose a risk to public safety with the additional privileges, the inmate's placement in, advancement through, or transfer out of the program may be deferred.

8.  All steps of the program, including the Transitional Unit (B/B Phase I) and the Pre-Transfer Unit (B/B Phase II), are considered part of the ADX.

B.  **REFERRAL & ELIGIBILITY FACTORS -** The unit team will review each inmate to determine eligibility for consideration for placement in,

advancement through, and/or transfer out of, the Program.   Ordinarily, the review will be conducted in connection with regularly scheduled Program Reviews.   The inmates are provided a minimum of 48 hours prior notice of scheduled Program Reviews, are expected to attend, and can personally raise questions and concerns about his placement in, advancement through, or transfer out of the program.   These meetings are held at least once every six months.   Program Reviews give staff and inmates the opportunity to discuss issues in an open forum.

1.      **Eligibility for Placement -** Ordinarily, an inmate must meet the following factors to be eligible for consideration for placement in the Step-Down Program, (Intermediate Unit (J/A-Unit)):

   a.      A minimum of 12 months clear conduct, from the date of the incident, while housed in one of the General Population Units;

   b.      Active participation in and completion of all programs recommended by the unit team;

   c.      Positive behavior and respectful conduct towards staff and other inmates; and

   d.      Positive overall institution adjustment to include, but not limited to, personal hygiene, cell sanitation, etc.

   The inmates who the unit team determines are eligible for consideration for placement into the Program will be referred to the Step-Down Program Screening Committee for consideration.

2.      **Eligibility for Advancement -** Ordinarily, an inmate must meet the following factors to be eligible for consideration for advancement to the next step (Transitional (B/B Phase I) or Pre-Transfer (B/B Phase II) of the program:

   a.      A minimum of 6 months clear conduct, from the date of the incident, while housed in the respective Intermediate (J/A-Unit) and Transitional Unit (B/B Phase I);

   b.      Active participation in and completion of all programs recommended by the unit team;

   c.      Positive behavior, including respectful and appropriate conduct towards staff and other inmates; and

   d.      Positive overall institution adjustment to include, but not limited to, personal hygiene, cell sanitation, etc.

Inmates who the unit team determines are eligible for consideration for advancement to the next step of the Program will be referred to the Step-Down Program Screening Committee for consideration.

3.    **Eligibility for Referral for Transfer Out of the Program -** Ordinarily, an inmate must meet the following factors to be eligible for consideration for transfer out of the program to the general population of a high security institution:

    a.    A minimum of 12 months clear conduct, from the date of the incident while housed in the Pre-Transfer Unit (B/B Phase II);

    b.    A minimum of 3 months being housed in a double-occupancy cell with another inmate;

    c.    Active participation in and completion of all programs recommended by the unit team;

    d.    Positive behavior, including respectful and appropriate conduct towards staff and other inmates; and

    e.    Positive overall institution adjustment to include, but not limited to, personal hygiene, cell sanitation, etc.

Inmates who the unit team determines are eligible for transfer out of the program will be recommended for transfer to the Regional Director, North Central Region, from the Warden, ADX Florence.

C.    **REVIEW PROCEDURE**

1.    Placement/Advancement

    a.    A multi-discipline Step-Down Program Screening Committee (Committee) will review each inmate referred by the unit team to determine whether the inmate can safely function in a less-restrictive unit without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or posing a risk to public safety.

    b.    The composition of the Committee will ordinarily consist of the Warden of the ADX, Associate Warden with daily oversight of ADX Unit Management, ADX Captain, Special Investigative Agent, Case Management Coordinator, Unit Managers (General Population, Pre-Intermediate (K/A-Unit), Intermediate (J/A-Unit), Transitional (B/B Phase I), & Pre-Transfer (B/B Phase II)), Psychology, and Supervisory Attorney.

c.      The determinations made by the Committee are made on a case-by-case basis.

d.      Eligibility for consideration does not equate to appropriateness for placement into or advancement to the next step of the program.

e.      The factors the Committee may consider when determining whether the inmate can safely function in a less-restrictive unit without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or posing a risk to public safety, include, but are not limited to:

    i.      The inmate's conduct while housed at the ADX, the Transitional Unit (B/B Phase I), and/or the Pre-Transfer Unit (B/B Phase II) physically located at the USP;

    ii.     The inmate's participation in and completion of programs recommended by the unit team while housed at the ADX, the Transitional Unit (B/B Phase I), and/or the Pre-Transfer Unit (B/B Phase II) physically located at the USP;

    iii.    The inmate's behavior and conduct towards, and interaction with, staff and other inmates while at the ADX, the Transitional Unit (B/B Phase I), and/or the Pre-Transfer Unit (B/B Phase II) physically located at the USP;

    iv.     The inmate's overall institution adjustment, personal hygiene, and cell sanitation while at the ADX, the Transitional Unit (B/B Phase I), and/or the Pre-Transfer Unit (B/B Phase II) physically located at the USP;

    v.      The reason(s) the inmate was designated to the ADX,

    vi.     The inmate's criminal history;

    vii.    The inmate's involvement with criminal organizations, if any, and the potential safety and security threat(s) implicated by such involvement;

    viii.   The inmate's overall adjustment during his history of confinement;

ix.     The institution's safety and security needs, including the safety and security of staff;

x.      The safety and security needs of the inmate;

xi.     The safety and security needs of other inmates;

xii.    The safety and security needs of the public;

xiii.   Any other relevant factor(s).

f.      The review by the Committee is not a hearing. The inmate is not entitled to be present, to have counsel, or to call witnesses.   As mentioned, the inmate may present issues concerning his advancement during his Program Reviews. The inmate is notified at least 48 hours before his scheduled Program Review.   This is the inmate's opportunity for individual attention and he is encouraged to ask questions and discuss concerns.

g.      The final decision regarding placement in, or advancement to the next step of the program, is made by the   Warden of the ADX.

2.      Recommendation for Transfer Out of the Program

a.      The determinations to transfer inmates out of the program are made on a case-by-case or inmate-by-inmate basis.

b.      Eligibility for consideration to be transferred out of the program does not equate to appropriateness for transfer out of the program.

c.      The recommendation for transfer out of the Program is made by the Warden of the ADX to the Regional Director.

d.      The factors the Regional Director may consider include, but are not limited to, those factors set forth in Part C 1(e), above.

e.      The review by the Regional Director is not a hearing.   The inmate is not entitled to be present, to have counsel, or to call witnesses.   As mentioned, the inmate may present issues concerning his transfer out of the program during his Program Reviews.   The inmate is notified at least 48 hours before his scheduled Program Review.   This is the inmate's opportunity for individual attention and he is encouraged to ask questions and discuss concerns.

f.      The final decision regarding transfer out of the program is made by the Regional Director, North Central Region.

3.      Notification

a.      Each inmate will receive written notification of the decision from the appropriate Associate Warden.

b.      If the inmate is denied placement into, advancement to the next step of, or transfer out of the Program, the Associate Warden's written notification will include the following:

i.      The reason(s) for the denial, unless it is determined the release of this information could pose a threat to individual safety or institutional security, in which case that limited information may be withheld.

ii.     The inmate may appeal the decision through the Administrative Remedy Program.

c.      If the notification concerns the denial of a recommendation for transfer out of the program, the notice will also include the Regional Director's direction as to when the inmate should next be recommended for transfer.

4.      The denial of an inmate for placement in, advancement to the next step of, or transfer out of the program does not preclude the Committee and/or Regional Director from exercising their discretion to reach a different conclusion at a future review.

5.      Provided the inmate who was denied continues to meet the eligibility factors for placement in or advancement to the next step of the program, the inmate will continue to be reviewed at least every six months.

D.  **REMOVAL**

1.      Inmates may be removed from any step of the program for the following reasons:

a.      If the inmate is found guilty of committing prohibited acts by the UDC or DHO;

b.      If the inmate can no longer safely function in a less-restrictive unit without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates or others, including the inmate himself; and/or posing a risk to

public safety, based on the factors set forth in Part C.1(e), above.

2. The circumstances warranting consideration for removal (e.g., threatening, safety, and security) may require the inmate to be immediately removed from the program.

3. The final decision regarding removal of an inmate from any step of the program is made by the Associate Warden responsible for the daily oversight of Unit Management.

4. If an inmate is removed from any step of the program as a program failure, a recommendation will be made by the Step-Down Unit Team as to whether the inmate should be placed in the Intermediate Unit (J/A-Unit), Transitional Unit (B/B Phase I), or a General Population Unit (D, E, F, & G).   The determination will be made on a case-by-case basis.   However, inmates who are removed from the program and found guilty by the DHO for greatest severity level incident reports (100 series) or high severity level incident reports (200 series) will be placed in the Special Housing Unit and subsequently assigned to an ADX General Population Unit.

5. The inmate will receive written notice that he is being considered for removal from the program.   The notice will contain the reasons for removal from the program, unless it is determined that the release of this information could pose a threat to individual safety or institutional security, in which case that limited information may be withheld. The written notice may be made through the Administrative Detention Order form (BP-308(52)).   The inmate may submit a written statement for consideration, regarding whether removal from the Program is warranted.

6. The inmate will receive written notice of the decision.   The written notice will include the reasons for the decision, unless it is determined the release of this information could pose a threat to individual safety or institutional security, in which case that limited information may be withheld.   The notice will also notify the inmate that he may appeal the decision through the Federal Bureau of Prisons' Administrative Remedy Program.

6. **Privilege Incentive Program (PIP)**

**A.** The PIP is offered to all inmates in the General Population and Step-Down units who are on prolonged disciplinary telephone, visiting, and/or commissary restriction.   By demonstrating positive programming for 3 consecutive months, these inmates may be considered for an exception to their disciplinary sanction.

**B.**     In order to be considered for the PIP, inmates must submit a written request to their respective Unit Manager.

**C.**     The purpose of the PIP is provide incentives for inmates who are on prolonged disciplinary restrictions to participate in available programs and maintain clear conduct, furthering the mission of the General Population and Step-Down Program.   As inmates participate in programs, it is possible for inmates to have certain privileges restored that were supeneded through the discipline process.   A goal of the PIP is to assist inmates by enhancing and promoting the Federal Bureau of Prisons' reentry initiative, which encourages them to build better community ties with other individuals.

**D.**     Inmates must demonstrate positive programming by meeting the following requirements:

1.     Paying all disciplinary fines;

2.     Maintaining clear disciplinary conduct;

3.     Participating in the Inmate Financial Responsibility Program, and/or encumbrance (50/50) program;

4.     Maintaining a job with satisfactory work performance, if applicable;

5.     Active participation in and satisfactory completion of all programs recommended by the Unit Team;

6.     Completion of all ABE/GED, or satisfactory progress towards obtaining a GED as determined by Education staff, or be exempt from the Literacy Program;

7.     Obtaining at least one form of identification;

8.     Positive overall institution adjustment to include, but not limited to, personal hygiene,   cell sanitation with established standards;

9.     Positive behavior and respectful conduct towards staff and other inmates.

10.     Attendance at all Program Reviews

11.     Enrollment and active participation in the Doing Time with the Right Mind program administred through the Unit Team, and Non-Residential Drug and Alcohol Program

E.   The PIP is a four-level program.   The types of incentives are determined by the level.   The privileges will be awarded as follows:

| Level | Time Period | Telephone Incentive |
|---|---|---|
| 1 | 3 months meeting requirements<br><br>Incentives are for the next six months, or expiration of sanctions | 1 15 minute phone call per month<br>$40 commissary purchase per month<br>1 social visit per month |
| 2 | 6 months meeting requirements<br><br>Incentives are for the next six months, or expiration of sanctions | 1 15 minute phone call per monthl<br>$80 commissary purchase per month<br>2 social visit per month |
| 3 | 9 months meeting requirements<br><br>Incentives are for the next six months, or expiration of sanctions | 1 15 minute phone call per month<br>$120 commissary purchase per month<br>3 social visit per month |
| 4 | 12 months meeting requirements<br><br>Incentives continue as long as inmate meets eligibility criteria, or expiration of sanctions | 2 15 minute phone calls per month<br>$160 commissary purchase per month<br>4 social visit per month |

F.   Inmates will be reviewed by their Unit Team every 3 months to determine their appropriateness for additional telephone calls.   Inmates who fail to meet the eligibility criteria at this review will return to Level 1.   An inmate's failure to maintain clear conduct between 3 months reviews will result in the inmate returning to Level 1.

_____

**DISTRIBUTION:**

**Directives Libraries**
**Correctional Programs Administrator, NCRO**
**AFGE**
**Inmate Law Library**

# Attachment 4
# FLM 5266.11E, *Incoming Publications* (December 21, 2017)

*Prison Legal News v. Fed. Bureau of Prisons*, No. 15-cv-02184-RM-STV



**U. S. Department of Justice**
Federal Bureau of Prisons

INSTITUTION SUPPLEMENT

OPI:        Correctional Systems
NUMBER:   FLM 5266.11E
DATE:       December 21, 2017

# Incoming Publications

                         **/s/**
*Approved:*   *Jack Fox, Warden*
                   ADX Florence

**I.**   **PURPOSE AND SCOPE:**   This Institution Supplement is prepared to outline the procedures at the United States Penitentiary, Administrative Maximum (ADX), Florence, Colorado, for implementing Program Statement 5266.11, Incoming Publications.  This Institution Supplement must be read in conjunction with the Program Statement for a clear understanding of the policy.

**II.**   **DIRECTIVES AFFECTED:**

    **A.**   **Directives Rescinded**:  FLM 5266.11D, Incoming Publications, dated May 30, 2017.

    **B.**   **Directives Referenced**:  Program Statement 5266.11, Incoming Publications, dated November 9, 2011.

    **C.**   **Standards Referenced**:  American Correctional Association 4th Edition Standards for Adult Correctional Institution:  4-4490

**III.**   **PROCEDURES:**

    **A.**   All incoming inmate publications will be x-rayed by the receiving Correctional Systems Officer (CSO) prior to entering the facility.  A further physical search will be conducted by the mail room staff.

    **B.**   The receiving CSO will review all incoming publications for potentially objectionable content in accordance with 28 C.F.R. § 540.70 *et seq.*  If content is preliminarily deemed objectionable by the receiving CSO, the objectionable incoming publication will be forwarded to the Special Investigative Services (SIS) department for

additional review in accordance with 28 C.F.R. § 540.70 et seq.  SIS staff will review each individual incoming publication and, if rejection is recommended, prepare a letter for the Warden's signature.  All recommended rejection letters must notate, in writing, specific objectionable pages and content, as well as the national policy and Code of Federal Regulations citation.

**C.**     An incoming publication at the ADX may not be rejected solely because it discusses an ADX or Federal Bureau of Prisons (BOP) inmate, or BOP staff member.  When a publication identifies and discusses an ADX or BOP inmate, or BOP staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b).  Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment.

**D.**     Prior to being sent to the Warden for formal action, all recommended rejection packets will be forwarded to the Legal Services department for review.

**E.**     When a technical or specialized incoming publication is questioned for acceptability, in addition to the above procedures, it will also be forwarded to the department supervisor, with knowledge in that field, for further review and a recommendation of approval or disapproval.  Departments recommending any publication rejection must annotate in writing the specific objectionable pages and the national policy cite for the mailroom's records.

**F.**     The CSO will contact the Administrative Remedy Coordinator and/or review the appeal status in SENTRY before returning any publications, to ensure the inmate has not submitted an appeal.  If an appeal is lodged, the materials will be held until the appeal process is exhausted, including Regional and Central Office appeals.  Appeal procedures for publications rejected due to its feature of nudity or sexual explicitness vary from other publication rejections and are outlined in the national directive.

**G.**     When an incoming publication is rejected, the Warden will promptly advise the inmate and publisher in writing of the decision and the reason(s) for it.  The notice must contain reference to the specific article(s) or material(s) considered objectionable, including page references and quotes from the incoming publication.  The Warden will advise the publisher or sender that the publisher may obtain independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter.  Ordinarily, the rejection notice will be mailed to the publisher within ten business days from the Warden's signature date.

**H.**     Inmates involved in approved education courses, which require books that must be purchased or obtained on loan from local colleges, may arrange to obtain these books through the Supervisor of Education.  When the books arrive, a staff member from the Education Services department will complete an appropriate inspection, annotate the

authorization form, stamp each book as inmate personal property with the inmate's name, register number, date received, and the staff member approving the publication and provide for book delivery to the inmate.

**I.**     Publications will be limited to three publications per parcel.  This includes all publications received from an authorized source.  Any package received that includes a number of publications over the established mailing limit will result in the entire package being returned to the sender as unauthorized.

**J.**     Publications containing metal or thick plastic bindings will not be permitted and will be rejected by the mail room staff.

**K.**     Inmates are not required, but highly encouraged, to consult with unit team or the Supervisor of Education prior to ordering a publication.

**L.**     To ensure the security, discipline, and orderly operation, publications in a language other than English will be subject to translation, review, and verification, which may cause a delay in receipt.  This review is necessary to ensure compliance with the national directive.  Publications which cannot be reasonably translated may be rejected. Foreign publications must be received directly from the publisher, a bookstore, or book club.

**M.**     Inmates will be permitted to receive incoming general correspondence containing newspapers or magazine clippings from non-commercial sources, if after review, it is determined the newspaper or magazine clipping poses no threat to institution security, and the quantity of materials does not adversely affect the ability of mail room staff to effectively monitor incoming general correspondence.  For purposes of this section, incoming general correspondence containing in excess of 50 pages of newspaper or magazine clippings adversely affects the ability of staff to effectively monitor incoming general correspondence.

**N.**     Materials printed directly from the internet will be treated as incoming general correspondence, and inmates will be allowed to receive such materials in quantities which do not adversely affect staff's ability to effectively monitor incoming general correspondence for contraband and other threats to institutional security and good order.  Such materials are subject to rejection for content.  For purposes of this section, incoming general correspondence containing in excess of 50 pages of materials printed directly from the internet adversely affects the ability of staff to effectively monitor incoming general correspondence.

**O.**     Any publication which includes any markings or notations may be regarded as a possible code and will be considered for rejection.  Examples of this include, but are not limited to folded or tagged pages, underlining, highlighting, or any written comments within the publication.

**P.** Unit staff should consult with mail room staff before approving any magazine subscription for purchase by an inmate.  Prohibited materials that have photographs or drawings entirely cut out or removed by the sender, will be authorized, should there be no other prohibited sections.  Attempts to "cover" nude or sexually explicit pictures will not make a publication acceptable for introduction.

**Q.** Hardcover books received in the mail will have the covers removed by mail room staff. The inmate must indicate on the hardcover book approval form (Attachment 1) they are voluntarily authorizing the removal of the cover.  Lack of such authorization will cause the entire package to be returned to the sender.

**R.** Publications which are permitted pursuant only to Special Administrative Measures (SAM) will be received and processed in accordance with national directives.

**S.** An Attorney from Legal Services will conduct quarterly training with Correctional Systems staff and SIS staff regarding the procedures outlined in Program Statement 5266.11, Incoming Publications, and this supplement.

---

**DISTRIBUTION:**

**Directives Libraries**                     **AFGE**

## HARDCOVER REMOVAL APPROVAL

**Name:** _____**Register Number:** _____

**Quarters:** _____

I request approval for the following hardcover book(s).  The book(s) are necessary and are not available in paperback.  I voluntarily authorize the mail room permission to remove the hard cover prior to delivery to me.  I understand no more than three publications per mailing are permitted.  I acknowledge the entire package will be returned if any unauthorized items are included and this authorization is good for 60 days only.

**Title:**_____

**Title:**_____

**Title:**_____

**Name of Publisher/Bookstore/Bookclub:** _____

**Address:**_____

**Phone Number (for verification purposes by staff):** _____

Inmate Signature: _____

-------------------------------------------------------------------------------------------------------

**(Do not write below this line - Staff Use Only)**

Date:_____ Expiration Date (60 days): _____

To: Mail Room Officer

The hardcover books listed above have been approved, pending inspection upon arrival.  The hard cover is to be removed prior to delivery to the inmate.

**Approved:** _____
                    Department Head's Signature

# Attachment 5
# Program Statement 5266.11, *Incoming Publications* (November 9, 2011)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI        CPD/CPB
NUMBER    P5266.11
DATE       November 9, 2011

# Incoming Publications

/s/
*Approved*: Thomas R. Kane
Acting Director, Federal Bureau of Prisons

## 1.  PURPOSE AND SCOPE

**§ 540.70 Purpose and scope.**

**Except when precluded by statute (see § 540.72), the Bureau of Prisons permits an inmate to subscribe to or to receive publications without prior approval and has established procedures to determine if an incoming publication is detrimental to the security, discipline, or good order of the institution or if it might facilitate criminal activity.   The term publication, as used in this subpart, means a book, booklet, pamphlet, or similar document, or a single issue of a magazine, periodical, newsletter, newspaper, plus such other materials addressed to a specific inmate such as advertising brochures, flyers, and catalogs.**

Section 7 of this Program Statement contains procedures to implement Sec. 615 of The Commerce, Justice, State Appropriations Act of 2000 (P.L. 106-113) (hereafter referred to as "the Ensign Amendment").

a.  **Summary of Changes**

*Policy Rescinded*
PS 5266.10    Incoming Publications (1/10/03)

This revision updates references to the Ensign Amendment.

**Federal Regulations from 28 CFR are in bold type.**
Implementing instructions are in regular type.

BOP000014

b. **Program Objectives**.   Expected results of this program are:

- Inmates will be permitted to receive and retain publications that do not threaten the security, good order, or discipline of the institution, or that may facilitate criminal activity, or are otherwise prohibited by law.
- Publications determined detrimental to the security, good order, or discipline of the institution or that may facilitate criminal activity, or are otherwise prohibited by law, will be excluded from Bureau facilities.
- A safer environment for staff and inmates will be provided by strengthening procedures to prevent the introduction of contraband.

c.   **MCC/MDC/FDC/FTC Application.**   Procedures in this Program Statement apply to Metropolitan Correctional Centers, Metropolitan Detention Centers, Federal Detention Centers, and Federal Transportation Centers, all of which are referred to as "administrative institutions" for the purposes of this Program Statement.

2.   **PROCEDURES**

**§ 540.71 Procedures.**

**(a)(1)   At all Bureau institutions, an inmate may receive hardcover publications and newspapers only from the publisher, from a book club, or from a bookstore.**

The sender's address must be clearly identified on the outside of the package.

**(2)   At medium security, high security, and administrative institutions, an inmate may receive softcover publications (for example, paperback books, newspaper clippings, magazines, and other similar items) only from the publisher, from a book club, or from a bookstore.**

**(3)   At minimum security and low security institutions, an inmate may receive softcover publications (other than newspapers) from any source.**

**(4)   The Unit Manager may make an exception to the provisions of paragraphs (a)(1) and (2) of this section if the publication is no longer available from the publisher, book club, or bookstore.   The Unit Manager shall require that the inmate provide written documentation that the publication is no longer available from these sources.   The approval of any request for an exception is to be documented, in writing, on an Authorization to Receive a Package which will be used to secure the item.**

**(b)   The Warden may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity.   The Warden may not reject a publication solely because its content is**

BOP000015

religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant.   Publications which may be rejected by a Warden include but are not limited to publications which meet one of the following criteria:

(1)   It depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices;

(2)   It depicts, encourages, or describes methods of escape from correctional facilities, or contains blueprints, drawings or similar descriptions of Bureau of Prisons institutions;

(3)   It depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs;

(4)   It is written in code;

(5)   It depicts, describes or encourages activities which may lead to the use of physical violence or group disruption;

(6)   It encourages or instructs in the commission of criminal activity;

(7)   It is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.

Only the Warden may reject an incoming publication.   In the Warden's absence, only the Acting Warden may perform this function.

Section 3 of this Program Statement contains procedures for returning a publication under the Ensign Amendment.   In Section 3, "sexually explicit" and "nudity" are defined in terms of pictorial depictions only.   Publications not subject to return under Section 3 (for example, material that does not meet a definition in that section) may still be rejected under this section.

To help staff determine which materials may pose the type of threat that warrants exclusion, the following guidelines are provided.

A Warden may determine that sexually explicit material of the following types will be excluded, as potentially detrimental to the security and good order or discipline of the institution, or as facilitating criminal activity:

- Sadomasochistic.
- Bestiality.
- Involving children.

In addition:

BOP000016

- The Warden must prohibit a sexually explicit publication if it is determined to pose a threat to the institution or is contrary to law.   Child pornography materials, which are prohibited by law, are examples.
- Sexually explicit material does not include material of a news or information type. Publications concerning research or opinions on sexual, health, or reproductive issues, or covering the activities of gay rights organizations or gay religious groups, for example, should be admitted unless they are otherwise a threat to legitimate institution interests.
- Literary publications should not be excluded, solely because of homosexual themes or references, if they are not sexually explicit in a manner that threatens legitimate institution interests.
- Sexually explicit material may be admitted if it has scholarly value, or general social or literary value.

**(c)   The Warden may not establish an excluded list of publications.   This means the Warden shall review the individual publication prior to the rejection of that publication.   Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in its entirety.**

**(d)   Where a publication is found unacceptable, the Warden shall promptly advise the inmate in writing of the decision and the reasons for it.   The notice must contain reference to the specific article(s) or material(s) considered objectionable. The Warden shall permit the inmate an opportunity to review this material for purposes of filing an appeal under the Administrative Remedy Program unless such review may provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the institution or to encourage or instruct in criminal activity.**

In questionable cases, institution staff should consult legal staff.

**(e)   The Warden shall provide the publisher or sender of an unacceptable publication a copy of the rejection letter.   The Warden shall advise the publisher or sender that he may obtain an independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter.   The Warden shall return the rejected publication to the publisher or sender of the material unless the inmate indicates an intent to file an appeal under the Administrative Remedy Program, in which case the Warden shall retain the rejected material at the institution for review.   In case of appeal, if the rejection is sustained, the rejected publication shall be returned when appeal or legal use is completed.**

See BP-A0953, Notification to Inmate and Publisher/Sender of Rejected Publication, for a sample.

The Warden will retain the rejected publication for 20 days from the date the inmate is sent written notification of the rejection.   The 20-day period allows the inmate to file an appeal under the

BOP000017

Administrative Remedy Program.   If he/she does not file within 20 days, the rejected publication may be returned to the publisher.

If the inmate does file an appeal, the Warden will retain the rejected publication at the institution. The rejected publication (or the offensive portion of it) must be reviewed before a staff response is prepared for the BP-229, Request for Administrative Remedy or, when applicable, a BP-230, Regional Appeal of Administrative Remedy or BP-231, Central Office Appeal of Administrative Remedy, respectively.

The Regional Office and Central Office should not respond to a BP-230 or BP-231 appeal without first reviewing either the rejected publication or a copy of the offensive portion of it.

**(f)   The Warden may set limits locally (for fire, sanitation, or housekeeping reasons) on the number or volume of publications an inmate may receive or retain in his quarters.   The Warden may authorize an inmate additional storage space for storage of legal materials in accordance with the Bureau of Prisons procedures on personal property of inmates.**

3.   **STATUTORY RESTRICTIONS REQUIRING RETURN OF COMMERCIALLY PUBLISHED INFORMATION OR MATERIAL WHICH IS SEXUALLY EXPLICIT OR FEATURES NUDITY**

**§ 540.72 Statutory restrictions requiring return of commercially published information or material which is sexually explicit or features nudity.**

Title 18 of the United States Code, Section 4042 note, states:

> **"[N]one of the funds appropriated or otherwise made available to the Federal Bureau of Prisons may be used to distribute or make available any commercially published information or material to a prisoner when it is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity."**

Procedures in this section affect publications received on or after **August 28, 1999.**   Publications authorized before that date will be retained and transferred per the Program Statement **Inmate Personal Property**.

**(a)   When commercially published information or material may not be distributed by staff or made available to inmates due to statutory restrictions (for example, a prohibition on the use of appropriated funds to distribute or make available to inmates information or material which is sexually explicit or features nudity), the Warden or designee shall return the information or material to the publisher or sender.   The Warden or designee shall advise the publisher or sender that an independent review of the decision may be obtained by writing to the Regional**

BOP000018

**Director within 20 days of receipt of the notification letter.   Staff shall provide the inmate with written notice of the action.**

Mailroom staff will return publications found to be non-distributable on the basis of the definitions listed in subsection (b) below. The publications will be returned with the appropriate attachment.

Ordinarily, the outside cover is used to assess content or the need for further review.

Non-distributable publications will be returned to the sender or publisher with a BP-A0954, Notification to Publisher of Return of Publication.   The publications may be returned in bulk, annotating the number of returned copies.

Materials extracted, photocopied, or clipped from such publications will also be returned to the sender with a BP-A0955, Notification to Sender of Return of Materials.

Under subsection (a) of this section, there is no need to delay the return of non-distributable publications or materials even when an inmate appeals under the Administrative Remedy Program, because the statutory restriction on making the material available precludes any inmate review.

Inmates will be notified via the BP-A0956, Notification to Inmate of Return of Publication or Materials.

Although the publication or material is returned, the Warden will ensure a copy of the publication cover and one page of the banned information or material is copied and retained at the institution in case of a subsequent appeal by the inmate or publisher/sender.

Inmates may use the Administrative Remedy Program to appeal return of materials.   However, as 18 U.S.C. 4042 note prohibits the Bureau from distributing the material, inmates may not review copies of returned materials in connection with administrative remedy filings.

Only one copy of the retained, statutorily prohibited information is to be retained by the Warden, even if the publication is mailed to several inmates:

- For example, if the April 2009 publication of XYZ is mailed to 20 inmates, that publication cannot be made available to inmates.   Only one issue of the publication needs to be retained.
- A copy of the notification sent to each inmate will be attached to the retained material.

**(b)   *Definitions*.   For the purpose of this section:**

**(1)   *Commercially published information or material* means any book, booklet, pamphlet, magazine, periodical, newsletter, photograph or other pictorial depiction, or similar document, including stationery and greeting cards, published by any individual, organization, company, or corporation which is distributed or made available through any means or media for commercial purposes.   This**

BOP000019

**definition includes any portion extracted, photocopied, or clipped from such items.**

**(2)   Nudity means a pictorial depiction where genitalia or female breasts are exposed.**

Specifically, when the pictorial depiction of the female breast displays the areola or nipple, this material will be rejected.

**(3)   Features means the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues.   Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.**

Section 2.c. prohibits the establishment of an excluded list of publications.   It is important to review each individual publication for unacceptable content.   The following are examples of commercial publications that "contain nudity illustrative of medical, educational, or anthropological content," which are allowable:

- *National Geographic.*
- *Our Bodies, Ourselves.*

Also, the following are examples of commercial publications that may be allowable **if they do not contain depictions of nudity:**

- *Sports Illustrated* swimsuit issues.
- Lingerie catalogs.

However, if the above examples **contain depictions of nudity not illustrative of medical, educational, or anthropological content,** they should be rejected under this section.   A publication may change a single issue or its general policies and practices at any time, which would make it acceptable or unacceptable for distribution.   The examples above are **guidelines only** and are subject to change.

**(4)   Sexually explicit means a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation.**

For purposes of this section, written text does not qualify a publication as sexually explicit.

Publications with sexual content that are not returned under these procedures are still subject to rejection through procedures in Section 2.b.(7).   For example, publications that contain sexually explicit text, feature sadomasochism or bestiality, or involve children may not meet the definitions in this Section for "sexually explicit" or "nudity," but may be considered detrimental to the security and good order of the institution, per Section 2.b.(7).

BOP000020

# REFERENCES

*Program Statements*
P1330.16       Administrative Remedy Program (12/31/07)
P1350.02       Donations, Acceptance of (6/29/98)
P5265.14       Correspondence (4/5/11)
P5360.09       Religious Beliefs and Practices (12/31/04)
P5580.08       Inmate Personal Property (8/22/11)
P5800.16       Mail Management Manual (4/5/11)

*Federal Regulations*
Federal Regulations cited in this Program Statement are contained in 28 CFR 540.70-72.

*BOP Forms (available on Sallyport)*
BP-229       Request for Administrative Remedy
BP-230       Regional Appeal of Administrative Remedy
BP-231       Central Office Appeal of Administrative Remedy
BP-A0953       Notification to Inmate and Publisher/Sender of Rejected Publication
BP-A0954       Notification to Publisher of Return of Publication
BP-A0955       Notification to Sender of Return of Materials
BP-A0956       Notification to Inmate of Return of Publication or Materials

*ACA Standards*
- 2nd Edition Standards for Administration of Correctional Agencies: 2-CO-5D-01.
- 4th Edition Standards for Adult Correctional Institutions: 4-4490.
- 4th Edition Standards for Adult Local Detention Facilities: 4-ALDF-5B-07.

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

BOP000021