# Exhibit 1

# Docket Entry 105
# (redacted version for public filing)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

Case 1:15-cv-02184-RM-STV   Document 105   Filed 05/14/18   USDC Colorado   Page 2 of 65

# EXHIBIT 10

1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 15-cv-02184-RM-STV
3   _____

4                  RULE 30(b)(6) DEPOSITION OF:
                TODD CHAPMAN - March 16, 2018
5                 (Federal Bureau of Prisons)
               (Confidential Designations Pending)
6   _____

7   PRISON LEGAL NEWS, a project of the Human Rights
    Defense Center,
8
    Plaintiff,
9
    v.
10
    FEDERAL BUREAU OF PRISONS,
11
    Defendant.
12  _____

13
                 PURSUANT TO NOTICE, the Rule 30(b)(6)
14  deposition of TODD CHAPMAN was taken on behalf of the
    Plaintiff at 1225 17th Street, Suite 2300, Denver,
15  Colorado 80202, on March 16, 2018, at 8:11 a.m.,
    before Barbara Birger, Registered Merit Reporter,
16  Certified Realtime Reporter and Notary Public within
    Colorado.
17

18

19

20

21

22

23      **H+G**

24

25      Hunter + Geist, Inc.

303.832.5966      1900 Grant Street, Suite 1025      ■ www.huntergeist.com
800.525.8490      Denver, CO 80203                    ■ scheduling@huntergeist.com

                  Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

Page 2

A P P E A R A N C E S

For the Plaintiff:

        TERRA WHITE FULHAM, ESQ.
        Covington & Burling L.L.P.
        850 Tenth Street, NW
        Washington, D.C. 20001


For the Defendant:

        SUSAN PROSE, ESQ.
        U.S. Department of Justice
        1801 California Street, Suite 1600
        Denver, Colorado 80202


Also Present:

        Kaitlin B. Turner
        Dan Marshall, Esq.
        (Appearing telephonically)

I N D E X

EXAMINATION OF TODD CHAPMAN:                        PAGE
March 16, 2018

By Ms. Fulham        7, 277, 279, 280, 285, 286, 287, 290

By Ms. Prose           276, 278, 279, 282, 285, 286, 288


                                                    INITIAL
DEPOSITION EXHIBITS:                                REFERENCE

Exhibit 93     Notice of Deposition of                 9
               Defendant Federal Bureau of
               Prisons

Exhibit 94     Declaration of Todd Chapman,           31
               7/26/16

Exhibit 95     Program Statement No. 5266.10,         47
               1/10/03

Exhibit 96     Program Statement No. P5266.11,        52
               11/9/11

Exhibit 97     Institution Supplement No.             59
               FLM5266.10C, Subject:
               Incoming Publications, 8/1/07

Exhibit 98     Institution Supplement No.             63
               FLM 5266.10D, 3/1/11

Exhibit 99     Institution Supplement No.             63
               FLM 5266.11A, 1/24/13

Exhibit 100    Institution Supplement No.             63
               FLM 5266.11B, 12/8/14

Exhibit 101    Defendant's First Supplemental         81
               Responses to Plaintiff's
               Second Interrogatories

Exhibit 102    Institution Supplement No.             99
               FLM 5266.11C, 2/2/16

Exhibit 103    Institution Supplement No.            120
               FLM 5266.11D, 5/30/17

Exhibit 104    Institution Supplement No.           123
               FLM 5266.11E, 12/21/17

Exhibit 105    Declaration of Jack Fox,             131
               2/13/17

Exhibit 106    Supplemental Declaration of          136
               Jack Fox, 3/14/17

Exhibit 107    Institution Supplement No.           149
               FLM 5321.07(1)B, 9/1/15

Exhibit 108    Federal Bureau of Prisons -          159
               Electronic Law Library Content

Exhibit 109    Excerpt of "Prison Legal News,"      175
               1/2010

Exhibit 110    Notification to Inmate and           175
               Publisher/Sender of Rejected
               Publication, 2/9/10

Exhibit 111    Excerpt of "Prison Legal News,"      182
               6/2010

Exhibit 112    Notification to Inmate and           182
               Publisher/Sender of Rejected
               Publication, 7/14/10

Exhibit 113    Excerpt of "Prison Legal News,"      190
               10/2011

Exhibit 114    Notification to Inmate and           190
               Publisher/Sender of Rejected
               Publication, 11/7/11

Exhibit 115    Regional Administrative Remedy       191
               Appeal No. 669446-R1, 2/6/12

Exhibit 116    Defendant's Second Supplemental      196
               Responses to Plaintiff's First
               Interrogatories

Exhibit 117    Excerpt of "Prison Legal News,"      200
               6/2012

Exhibit 118    Notification to Inmate and           200
               Publisher/Sender of Rejected
               Publication, 7/3/12

Page 5

Exhibit 119   Excerpt of "Prison Legal News,"      208
              11/2012

Exhibit 120   Notification to Inmate and           208
              Publisher/Sender of Rejected
              Publication, 12/10/12

Exhibit 121   Defendant's First Supplemental       218
              Responses to Plaintiff's First
              Interrogatories

Exhibit 122   Excerpt of "Prison Legal News,"      220
              2/2013

Exhibit 123   Notification to Inmate and           220
              Publisher/Sender of Rejected
              Publication, 3/7/13

Exhibit 124   Excerpt of "Prison Legal News,"      228
              4/2013

Exhibit 125   Notification to Inmate and           228
              Publisher/Sender of Rejected
              Publication, 4/25/13

Exhibit 126   Excerpt of "Prison Legal News,"      237
              8/2011

Exhibit 127   Excerpt of "Prison Legal News,"      243
              7/2013

Exhibit 128   Notification to Inmate and           243
              Publisher/Sender of Rejected
              Publication, 7/31/13

Exhibit 129   Excerpt of "Prison Legal News,"      250
              9/2013

Exhibit 130   Notification to Inmate and           250
              Publisher/Sender of Rejected
              Publication, 10/21/13

Exhibit 131   Excerpt of "Prison Legal News,"      251
              4/2014

Exhibit 132   Notification to Inmate and           251
              Publisher/Sender of Rejected
              Publication, 4/21/14

Exhibit 133   Letter to Yates from Swanson,          257
              6/30/15, Re:  Censorship of
              Prison Legal News at ADX Florence

Exhibit 134   Letter to Swanson from Oliver,         259
              8/6/15, Re:  Rejection of Prisoner
              Legal News at ADX Florence

Exhibit 135   Letter to Swanson from Oliver,         260
              9/15/15, Re:  Rejection of Prison
              Legal News at ADX Florence

Exhibit 136   Defendant's Response to Plaintiff's    267
              Second Interrogatories

Exhibit 138   ADX Florence - Incoming                274
              Publications Rejection Procedures,
              May 18, 2017

Exhibit 138   Federal Bureau of Prisons'             291
              Objections to Plaintiff's
              Supplemental Notice of
              Rule 30(b)(6) Deposition

Case No. 1:15-cv-02184-RM-STV Document 105-1 filed 05/14/18 USDC Colorado pg 9 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 31

 1              (Deposition Exhibit 94 was marked.)

 2         Q.   Mr. Chapman, Exhibit 94 is the

 3    declaration that you submitted in this litigation on

 4    the 26th of July, 2016.  Do you recognize this

 5    document?

 6         A.   I do.

 7         Q.   Is this a document that you reviewed in

 8    preparation for your deposition today?

 9         A.   Yes.

10         Q.   If we can take a look here at

11    paragraph -- before I get into questions about the

12    declaration, to your knowledge is all the information

13    in this declaration still accurate as of today?

14         A.   Do you mind if I peruse a little?  So

15    what you're asking me is has anything changed since

16    this, or was the information up until this point when

17    it was filed correct?

18         Q.   Do you have any reason to think that at

19    the time you submitted this there was anything that

20    was inaccurate in it?

21              MS. PROSE:  You can tell her if you think

22    so.

23         A.   Yes.  There was on page 7, number 18, it

24    says, "The SIS Department" -- second sentence -- "If

25    the SIS Department decides to recommend rejection of

Case No. 1:15-cv-02184-RM-STV   Document 105-1   filed 05/24/18   USDC Colorado   Page 9 of 65
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 32

1    the publication, SIS personnel draft a notice prepared

2    for the Warden's signature."

3              They do not do that.  They prepare a

4    synopsis and send it back to the correctional systems

5    officers who actually generate that form for the

6    warden based on the information that the SIS

7    department has given them.

8         Q.   (BY MS. FULHAM)  Okay.  So just to make

9    sure I'm clear, you're saying that this is inaccurate

10   because, in fact, there was another layer.  So the SIS

11   department was generating a synopsis of their

12   recommendation for why something should be rejected,

13   but it was the correctional system staff who actually

14   prepared the draft letter for the warden?

15        A.   Yes.

16        Q.   Is there anything else -- do I understand

17   you to say that as of July 26, 2016, when this was

18   submitted, that was the case, that it was actually the

19   correctional systems department who was generating the

20   letters for the warden's signature?

21        A.   Yes.

22        Q.   Okay.  Is there anything else in this

23   document that as of the time it was submitted in

24   July 2016 you think may not have been accurate?

25              MS. PROSE:  Counsel, based on a prior

Case No. 1:15-cv-02184-RM-STV   Document 108   Filed 05/14/18   USDC Colorado   Page 11
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 33

1    conversation that I have had with Mr. Chapman, I want

2    to take a quick break so we can get the accurate

3    information on the record.

4             MS. FULHAM:  Okay.

5             (Recess taken, 8:49 a.m. to 8:52 a.m.)

6        **Q.   (BY MS. FULHAM)  Mr. Chapman, I**

7    **understand there is a correction that you wanted to**

8    **make to what you said previously?**

9        A.   Yes.  There was one other correction I

10   wanted to make to this declaration.  Page 9, number

11   24.  We stated in here -- and this is the second

12   sentence -- "One past practice that has changed with

13   the implementation of the current institution

14   supplement is that a publication is not rejected

15   solely because it identifies," an inmate, "and

16   discusses an ADX or Bureau inmate, or Bureau staff

17   member."

18             That was an incorrect statement.  New

19   information has come to light that the SIS staff

20   trained each other that anything that had one of those

21   criteria they would flag for rejection.  But when it

22   got to the warden's desk, the warden still only

23   rejected things based on their sound correctional

24   judgment.

25             So none of the wardens made rejections

1    based off a name of an ADX inmate or former staff or

2    another bureau inmate alone.  SIS flagged every one of

3    those, sent them up, but the warden made the sound

4    correctional judgment for them.  So that was a

5    misstatement.

6         Q.   Okay.  And was that -- were you aware

7    that that was an inaccurate statement on July 26,

8    2016?

9         A.   I was not.

10        Q.   When did you become aware that that was

11   not an accurate statement?

12        A.   Recently more information has come to

13   light as more people were brought into this process,

14   more people that were interviewed.

15        Q.   When you say, "recently," can you be more

16   specific with what you mean by that?

17        A.   Within the last couple of weeks.

18        Q.   At the time that this declaration was

19   prepared, what was the factual basis that you had for

20   asserting that that was a practice that existed at

21   ADX?

22        A.   It was primarily based on interviews of

23   special investigative staff.

24        Q.   And so when I asked earlier about people

25   you had spoken to in preparation for this deposition

Case 1:19-cv-02184-RM-STV Document 108 Filed 05/14/15/2953c Colorado Page 13 of 65
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 35

1    in sort of a general sense, I don't know that you

2    mentioned any SIS interviews.  Who did you interview?

3          A.   I did, actually.  Amy Kelley, the SIS

4    lieutenant.

5          Q.   Okay.

6          A.   And I also talked to Ms. Hicks.

7          Q.   So Ms. Kelley and Ms. Hicks, were they

8    the source of this information that there had been a

9    practice of rejecting a publication solely because it

10   identified or discussed an ADX or bureau inmate or

11   bureau staff member?

12         A.   Yes.

13         Q.   And when you in the last couple of weeks

14   learned that that was inaccurate, who told you that

15   that was inaccurate?

16         A.   I based that on evidence that came to

17   light with bureau interviews of previous wardens and

18   associate wardens.

19         Q.   And who conducted those interviews?

20         A.   Some were, I believe, depositions that

21   you guys took.

22         Q.   Okay.  So -- sorry, go ahead.

23         A.   PLN.  I shouldn't say, "you guys."

24         Q.   So the information that has come to light

25   is that in the course of depositions of the former

```
1    friends and family.  We think that is a good thing for

2    them.  So most -- all the inmates who are in there

3    that don't have -- or any sort of restriction on it is

4    because of something they have done.  And usually it's

5    only temporary, and they are reviewed.

6            Q.   What's the approximate ratio of

7    correctional officers to inmates at ADX?

8                 MS. PROSE:  Can you answer that without

9    compromising the law enforcement privilege?

10                THE DEPONENT:  No.

11                MS. PROSE:  Let me speak with Ms. Turner

12   just a moment.

13                (Discussion was had off the record

14   between the deponent and Ms. Prose.)

15                MS. PROSE:  I believe Mr. Berkebile has

16   already testified about this, so we'll mark this

17   portion of the record confidential, and we'll follow

18   up formally in writing.  But you can answer the

19   question.

20          A.   At the ADX currently, it is about ▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ right now.  Because of

22   the mission at the ADX we have additional correctional

23   officers.  Now, those numbers fluctuate based on our

24   staffing.  Right now ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
```

1           So on any given week -- we're hiring new

2    officers next week, so that number is going to

3    fluctuate based on our -- we have a complement of 366

4    employees that we're authorized to have, but we

5    usually don't have that number.

6           Q.   (BY MS. FULHAM)  I just want to clarify,

7    when you say one-and-a-half to one?

8           A.   Inmates to one.

9           Q.   So slightly more inmates than

10   correctional officers in that ratio?

11          A.   Yes.  I'm sorry, the numbers I gave you

12   were total staff because that's how the bureau does

13   ratios.  If you wanted officers to inmates, that's a

14   different number.

15          Q.   Is that -- if you know that number, what

16   is the ratio of the correctional officers to inmates?

17          A.   A little over two to one, inmates to

18   officers.

19          Q.   ADX inmates have access to a law library,

20   correct?

21          A.   Yes.

22          Q.   What can they access in the law library?

23          A.   I believe we gave you a copy, but I

24   believe I also have a copy.

25          Q.   Here, I've got it.

 1            (Deposition Exhibit 108 was marked.)

 2        A.    Would you like me to read all this?

 3        Q.    No.  No.  No.  So Exhibit 108 is a

 4   document that has been Bates stamped as BOP002129, and

 5   it's listed as "Federal Bureau of Prisons - Electronic

 6   Law Library Content."

 7            My understanding is that inmates at ADX

 8   have had access to the electronic law library since

 9   2010; is that correct?

10        A.    I don't know the exact date, but I know

11   it's been a while.

12        Q.    Prior to having access to the electronic

13   law library, how did inmates access legal information

14   or legal cases?

15        A.    We still had a law library, it just was

16   actual books that were in there.  It was full of

17   books, and the inmates could go in and read those

18   books, and if they didn't have the books that they

19   needed in there they could request them.

20        Q.    So before the electronic law library was

21   introduced, would an inmate -- I assume they would

22   have to request to go to the law library?

23        A.    Yes.  Same now, they still have to

24   request then and now.

25        Q.    And when they request, they would -- if

1    that request is granted, they would go to an actual

2    physical library room, correct?

3           A.    Yes.

4           Q.    And then did they have to put in requests

5    to get specific books, or could they kind of browse

6    and pick out the books they wanted?

7           A.    They had access to all the books that

8    were in the room.

9           Q.    And you mentioned if there was something

10   that they wanted that wasn't in the library, they

11   could potentially put in a request for that?

12          A.    Yes.

13          Q.    And now when an inmate accesses the

14   electronic law library, do they still go to, like, a

15   specific library location to do that?

16          A.    It's the same location, the books are

17   just removed.

18          Q.    And this listing provides a number of --

19   I would call them categories -- for things.  Like if

20   you go to page 2131 at the bottom.  So there's a list

21   here, it says, "US Court of Appeals - Case Update."

22                Do you know whether that includes only

23   published US Court of Appeals opinions, or does it

24   include other material as well?

25          A.    I honestly don't know that.  This list

1       Q.   Sure.

2       A.   It says here in the institutional

3   supplement, incoming publications, 5266.11E, it is

4   Exhibit 104, page 3, letter I, "Publications will be

5   limited to three publications per parcel.  This

6   includes all publication received from an authorized

7   source.  Any package received that includes a number

8   of publications over the established mailing limit

9   will result in the entire package being returned."

10          I believe that actually may be about

11  books or magazines, but it could also be newspapers.

12      Q.   Okay.  So that's a limit on the number of

13  publications that could be sent together in one

14  parcel, correct?

15      A.   It looks like it could be read that way.

16      Q.   That's not a limitation on which

17  newspapers an inmate could subscribe to?

18      A.   Right.  We have no list of any newspapers

19  that can't come in or books that can't come in.

20  Everything is a case-by-case basis.

21      Q.   What review procedures are undertaken for

22  a newspaper; as an example, the Denver Post?

23      A.   Staff will open up the newspaper, will

24  take one of them and go through and see if they see

25  any glaring headlines.  They don't read every article,

Case No. 1:15-cv-02184-RM-STV Document 108-1 filed 05/14/18 USDC Colorado pg 19 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 166

1    every sentence, they go through and say -- just read

2    to see if there is something that sticks out, like

3    they do with magazines.

4           Q.   And is it otherwise similar to the review

5    for other types of incoming publications?

6           A.   Yes.

7           Q.   Are you aware of any instances in which

8    ADX censored materials in a newspaper?

9           A.   When you mean censored, do you mean

10   redact, cut out things, or just didn't give it to them

11   because we thought it was objectionable content?

12          Q.   Well, let me start with any -- are you

13   aware of any instances in which ADX rejected the

14   distribution of a newspaper?  So just didn't give it

15   to them at all?

16          A.   I'm not aware of that.

17          Q.   Are you aware of any instances where ADX

18   personnel redacted or cut things out of a newspaper

19   before distributing it to an inmate?

20          MS. PROSE:  So I'll object to the extent

21   this witness is not authorized or designated to speak

22   on topic number 9, which specifically deals with

23   redactions.  You can answer Counsel's questions,

24   Mr. Chapman, in your individual capacity if you know

25   the answers.

Case No. 1:15-cv-02184-RM-STV   Document 108   filed 05/14/18   USDC Colorado   pg 20 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 167

1          A.    I'm not aware of that.  That's one of the

2    trainings we get in the mailroom is that if you find

3    something that's objectionable, you just reject it.

4    You don't go through -- we don't have the manpower,

5    the staffing to read a 1,000-page Stephen King book to

6    see everything that's on there, or every magazine that

7    comes in to read every article.  So if we find one

8    thing that violates policy, it's done.

9          Plus, if we were to redact, I would need

10   to get permission from the publisher that I'm going to

11   alter their magazine before delivering it to their

12   customer.  The inmate would have to give me

13   permission.  We have deadlines when we get mail in to

14   get to the inmate.  There is no way we could keep up

15   with those deadlines on top of the other things.

16   There is a whole host of reasons why.  So, no, I'm not

17   aware of that ever happening anywhere.

18          Q.    The main reason I asked is because you

19   said something about cutting it out or tearing it out.

20         A.    I didn't understand your question when

21   you said, "censoring," that's why I wasn't sure what

22   you meant by censoring.

23          Q.    You are not aware of any instances in

24   which the Denver Post, for example, has been censored?

25         A.    When you mean censoring, you mean

Case 1:19-cv-02184-RM-STV Document 108 Filed 05/14/19 USDC Colorado Page 200 of 65
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 168

1    rejected?

2          Q.    Rejected at ADX.

3          A.    No, I'm not aware of it.

4          Q.    Any instances you're aware of where the

5    New York Times has been rejected?

6          A.    Not that I'm aware of.

7          Q.    Does -- you mentioned previously that

8    there are files that are maintained by the ADX

9    mailroom staff that would indicate -- that record all

10   of the rejections that are issued?

11         A.    Over a period of time, yes.

12         Q.    Over a period of time, correct.  So

13   presumably it would be possible to go through those

14   records to determine whether any issues of the

15   New York Times or the Denver Post have been rejected?

16         A.    I believe the retention period for those

17   sort of documents is two years, so they could possibly

18   go back to that time frame through there and see if

19   there was one.

20         Q.    And you mentioned previously, and I just

21   wanted to confirm, that despite various security

22   measures it's possible for information to flow among

23   prisoners at ADX?

24         A.    Yes.

25         Q.    And it's possible for information to flow

1   not sure if they viewed them before Warden Fox made

2   his decision.

3          Q.   (BY MS. FULHAM)  I'll represent that all

4   the depositions, other than your first deposition,

5   have occurred in 2018.  So if this decision was made

6   in 2016?

7          A.   Then the parties I named were the ones

8   who had seen them.

9          Q.   And when these 11 issues were reviewed --

10  rereviewed in 2016, was there any investigation of

11  whether the inmate or staff member who is referenced

12  in that article was still at the ADX?

13         A.   We -- I don't know if it was an

14  investigation.  We checked our facts.  We made sure

15  that the bureau had either taken security measures or

16  that the situation had resolved itself.  That was part

17  of the process, being that they were allowed, when the

18  warden reviewed them, to come in.  The bureau had

19  taken, like I said, additional security measures, and

20  that we felt that the threats were no longer valid at

21  ADX.

22         Q.   I'm going to take a look and move into

23  the really fun part where we go through the issues.

24  In case it hasn't been fun.

25              MS. PROSE:  Counsel, this probably raises

Case 1:15-cv-02184-RM-STV Document 108 Filed 05/14/18 USDC Colorado Page 23 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 175

1    a connection with the chart that we provided to you

2    today.

3              MS. FULHAM:  Yes.

4              (Deposition Exhibits 109 and 110 were

5    marked.)

6         Q.   (BY MS. FULHAM)  Mr. Chapman, the court

7    reporter has just handed you Exhibits 109 and 110.

8    Exhibit 109 is -- are documents produced by BOP as

9    BOP000053 through 55.  And this is an excerpt from the

10   January 2010 issue of PLN.

11             And Exhibit 110 is -- was produced at

12   BOP000056, and it is a notification of rejection of

13   the January 2010 issue of PLN.

14        A.   They are two separate ones, okay.  This

15   is Exhibit 110.  Okay, got it.

16        Q.   So do you agree that what this appears to

17   be is the rejection notice for the rejection of the

18   January 2010 issue of PLN as well as -- and then

19   Exhibit 109 is the -- is an excerpt of the pages 30

20   and 31 which are referenced on the rejection notice?

21        A.   Yes.

22        Q.   Okay.  Is this -- are these documents

23   that you reviewed in preparation for your deposition

24   today?

25        A.   Yes.

Case No. 1:19-cv-02184-RM-STV    Document 105    filed 05/14/18    USDC Colorado    pg 24 of 65
Case 1:15-cv-02184-RM-STV    Document 103    filed 05/14/18    USDC Colorado    page 230 of 65
of 66

TODD CHAPMAN - 3/16/2018

Prison Legal News v. Federal Bureau of Prisons

Page 176

```
 1         Q.    I believe you also mentioned earlier that
 2    you spoke to Ms. Leeanne LaRiva in preparation for
 3    your deposition?
 4         A.    I did.
 5         Q.    Is Ms. LaRiva the person who signed the
 6    rejection notice at Exhibit 110?
 7         A.    She confirmed that that was her
 8    signature.
 9         Q.    And Ms. LaRiva was an assistant warden at
10    the time she signed it?
11         A.    She was an acting warden.  I don't know
12    what her official title was, but she was acting warden
13    that day.
14         Q.    So this was during the tenure that
15    Mr. Davis was the complex warden.  Is it safe to
16    assume, then, that he was not at the facility that
17    day, so Ms. LaRiva was the acting warden on the day of
18    this rejection?
19         A.    Well, according to his deposition, he had
20    stated that sometimes he would delegate that authority
21    because he had other things to do, and sometimes he
22    was out of the institution training or teaching.
23         Q.    You're not sure if it was because he was
24    otherwise occupied or because he was not at the
25    facility?
```

Case No. 1:19-cv-02184-RM-STV   Document 108   Filed 05/14/15/39SDC Colorado   Page 24 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 181

1    transferred to ADX -- this article is talking about a

2    period where he was at the federal correctional

3    complex in Coleman, correct?

4         A.   That's where the incident took place.

5         Q.   At some point he was transferred to ADX?

6         A.   Correct.

7         Q.   And I assume that when he was transferred

8    to ADX, ADX officials were aware of this incident at

9    FCC Coleman?

10        A.   Correct.

11        Q.   Did it take any additional security

12   measures with respect to ███████████ given the nature

13   of his offense?

14        A.   I'm not sure what unit he was placed in.

15   I would have to look and see if he was placed in the

16   control unit or if he was placed in the general

17   population unit.

18        Q.   If this article had been distributed in

19   January 2010, what additional safety measures would

20   ADX have had to take if this information was

21   distributed?

22        A.   I'm not sure what other security

23   precautions we could have taken at the time once it's

24   in other than to make staff aware that this is widely

25   known, and so be careful when you have other inmates

1   out because I've seen it with my own two eyes where an

2   inmate was being restrained and escorted by two staff,

3   slip the restraint, push the staff away, and stabbed

4   another inmate.  So we would make them aware that this

5   is a precaution that we need to worry about because

6   this just came to light of hundreds of inmates who may

7   not have known about it before.

8           Q.   Once ████████████ was at ADX, it would be

9   possible for him to tell other inmates about his prior

10  offenses, correct?

11          A.   Sure.

12          Q.   So it's possible that other inmates knew

13  about ████████ offense at the time this issue was

14  rejected?

15          A.   It is a possibility.

16               (Deposition Exhibits 111 and 112 were

17  marked.)

18          Q.   Mr. Chapman, the court reporter just

19  handed you Exhibits 111 and 112.  Exhibit 111 was

20  produced by BOP and is marked BOP000116, and it is an

21  excerpt of the June 2010 issue of Prison Legal News,

22  including pages 1 and 11.

23               And then Exhibit 112 is a notification to

24  inmate and publisher of rejected publication

25  concerning the June 2010 issue of PLN.

Case 1:19-cv-02184-RM-STV Document 108 Filed 05/14/15 USDC Colorado Page 27 of 65
Case No. 1:15-cv-02184-RM-STV Document 103-6 filed 05/12/18 USDC Colorado pg 28 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 183

 1          A.    Okay.

 2          Q.    **And looking first at Exhibit 112, the**

 3   **rejection notice, who signed this notice?**

 4          A.    That appears to be Blake Davis'

 5   signature.

 6          Q.    **Okay.  And when was this rejection notice**

 7   **mailed to PLN?**

 8          A.    It would have been mailed shortly after

 9   July 14.

10          Q.    **Does BOP keep any records of when**

11   **specifically rejection notices are mailed to**

12   **publishers?**

13          A.    I found out recently that FCI Fairton

14   does, but I haven't been at an institution that did

15   it.  Because we assume once it's signed, it goes down

16   to the mailroom and they send it out, that's usually

17   the process.  And then so we put our copy in the file,

18   and we assume since the copy is in the file that's

19   when it was sent.  And it will have a month that it's

20   there.  We don't keep track usually of the exact day.

21          Q.    **So there wouldn't be any records that BOP**

22   **keeps about when specifically this -- this rejection**

23   **notice which was signed on July 14, 2010, would**

24   **actually have been mailed out to PLN, for example?**

25          A.    I'm saying ADX doesn't.  I just recently

1  found out another institution does, so there may be

2  more institutions that do, but it's not a policy

3  requirement.

4      Q.  To your knowledge, it's not the practice

5  of ADX to maintain records of that?

6      A.  Well, we have files that have retention

7  dates, so we only keep certain things for certain

8  amounts of time.  The ADX has been different because

9  of our mission and because we sit in a lot of rooms

10  like this because of the ADX.  So we tend to keep some

11  of our documents longer than the rest of the prison

12  system, which goes exactly on the date it purges.

13      So there are some records, but also when

14  we mail stuff out, unless we put a certified -- or if

15  it's legal mail or some sort of accountable, trackable

16  mail, we don't keep a record because we send out so

17  much mail every day.

18      Q.  I just want to confirm that those records

19  don't exist?

20      A.  No.

21      Q.  That's the purpose of my question there.

22      The rejection notice indicates that this

23  June 2010 publication was -- and I'm looking at the

24  second paragraph here of the rejection notice -- was

25  rejected because the referenced page contains

Case 1:15-cv-02184-RM-STV Document 108 Filed 05/12/18 USDC Colorado Page 29 of 35
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 190

```
 1   detrimental to the security, good order, or discipline
 2   of the institution, correct?
 3        A.   Correct.
 4        Q.   So what is it that changed -- so you have
 5   said that you believe this was properly rejected at
 6   the time it was rejected, and that when it was
 7   delivered it was no longer -- or it was not
 8   detrimental to the security, good order, or discipline
 9   of the institution.
10             What changed in the time from when this
11   was rejected to the time when it was actually
12   delivered?
13        A.   We took some security measures during
14   that time frame, and with the lapse of time, but I
15   can't tell you what those security measures are.
16        Q.   Were those security measures that would
17   have been taken regardless of whether this issue of
18   PLN was rejected?
19        A.   Probably.
20        Q.   All right.
21             (Deposition Exhibits 113 and 114 were
22   marked.)
23        Q.   Mr. Chapman, Exhibit 113 is a document
24   produced by BOP labeled BOP000132 through 135, and it
25   is an excerpt from the October 2011 issue of Prison
```

Case 1:15-cv-02184-RM-STV Document 108 Filed 05/14/18 USDC Colorado Page 30 of 65
Case 1:15-cv-02184-RM-STV Document 105-1 Filed 05/15/2018 USDC Colorado Page 290 of 365
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

1    Legal News.

2              Exhibit 114 is a document marked

3    BOP000136, and it's a notification to inmate and

4    publisher of rejected publication concerning the

5    October 2011 issue of PLN.  Do you agree?

6         A.   Yes.

7         Q.   Okay.  And on the rejection notice it

8    indicates that the objectionable material is contained

9    on pages 20 to 21 and page 50; do you see that?

10        A.   Yes.

11        Q.   And the Exhibit 113 is an excerpt from

12   the October 2011 issue that includes pages 20, 21, and

13   50.

14        A.   Okay.

15        Q.   In 2011 -- and we're going to talk about

16   the October 2011 issue -- but in 2011 an inmate

17   appealed the rejection of this issue; is that correct?

18        A.   Correct.

19        Q.   I'm just going to go ahead and introduce

20   that also.

21             (Deposition Exhibit 115 was marked.)

22        Q.   So taking a look at Exhibit 115, this is

23   documents that were produced by BOP, and it's number

24   001077 through 001079.

25        A.   Okay.

Case No. 1:19-cv-02184-RM-STV Document 103 filed 05/14/19 USDC Colorado pg 300 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 192

1        Q.    And taking a look, what is the first page

2    of this Exhibit 115?

3        A.    The 001077?

4        Q.    Yes.

5        A.    That is a BP10, Regional Administrative

6    Remedy.

7        Q.    If I understood your testimony earlier, a

8    BP10 would be a vehicle by which an inmate would make

9    an appeal on some issue to the regional office; is

10   that correct?

11       A.    Correct.

12       Q.    So this letter at 001077, it's signed by

13   Amber Nelson, acting regional director.  So this is a

14   letter from Ms. Nelson to an inmate, correct?

15       A.    Yes.

16       Q.    And it indicates that we -- ". . . in

17   response to your Regional Administrative Remedy Appeal

18   received in this office on January 17, 2012, wherein

19   you claim two incoming publications titled Prison

20   Legal News were improperly rejected."

21             If you continue into this exhibit, what

22   is the second page of this exhibit, which is 1078?

23       A.    This is actually the form that the inmate

24   fills out for the BP10.  So the first one was the

25   regional response.  This is actually the form the

Case No. 1-15-cv-02184-RM-STV Document 108 filed 05/14/18 USDC Colorado page 31 of 65
Case 1:15-cv-02184-RM-STV Document 107-2 filed 05/14/18 USDC Colorado Page 32 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

1   inmate would file to get a regional response.

2          Q.    And then the last page of this, which is

3   001079, what is that?

4          A.    This is an amended BP9 response at the

5   local level.

6          Q.    And that -- who signed that?

7          A.    Looks like Dennis Stamper.

8          Q.    So he was signing for Warden Berkebile --

9          A.    Yes.

10         Q.    -- at this time?  And this -- so this is

11  something that was sent from ADX to ▇▇▇▇▇▇  the

12  inmate who filed the appeal, correct?

13         A.    Yes, that would be the response delivered

14  to the inmate.

15         Q.    And it indicates that ▇▇▇▇▇▇  appeal

16  was successful, correct?

17         A.    Yes.

18         Q.    In fact, at paragraph 2 it says, "Upon

19  re-reviewing the issue raised in your Request for

20  Administrative Remedy, it was determined that the

21  publications were improperly rejected.  The

22  publications were provided to you on August 10, 2012."

23              The appeal that ▇▇▇▇▇▇ filed, it was

24  concerning the October 2011 and November 2011 issues

25  of PLN, correct?

Case 1:19-cv-02184-RM-STV Document 108 Filed 05/14/18 USDC Colorado Page 32 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 194

1      A.    Correct.

2           Q.    So as of September 6, 2012, BOP

3    determined that the October 2011 and November 2011

4    publications had been improperly rejected, correct?

5           A.    Correct.

6           Q.    Let's take a look at the -- is it BOP's

7    position today that the October 2011 issue of PLN was

8    properly rejected at the time it was rejected?

9           A.    Yes, that's the BOP's position, that it

10   was not properly rejected at the time.

11          MS. PROSE:   Could you read me back

12   Mr. Chapman's answer?   It is -- could you read that

13   back to me, Counsel?

14          Q.    (BY MS. FULHAM)   So my question was, is

15   it BOP's position today that the October 2011 issue of

16   PLN was properly rejected at the time it was rejected?

17          MS. PROSE:   And Mr. Chapman said?

18          Q.    (BY MS. FULHAM)   Mr. Chapman said, yes,

19   that's the BOP's position, that it was not properly

20   rejected at the time.   So we might want to clarify.

21   I'm going to ask the question again.

22          A.    Okay.

23          Q.    Okay.   Is it BOP's position today that

24   the October 2011 issue of PLN was properly rejected at

25   the time it was rejected?

1       A.    Correct.  Did I -- can you rephrase that

2    again?  I'm getting this wrong here.  I need more

3    caffeine.

4            **Q.    What is BOP's position today as to**

5    **whether the October 2011 issue of PLN was properly**

6    **rejected at the time it was rejected?**

7            A.    So what we feel today about what we

8    thought about the previous one, is that -- somehow

9    it's not sinking in.

10           MS. PROSE:  Check your chart.  I'm not

11   coaching the witness, Counsel, I just want Mr. Chapman

12   to take a look at his chart before he answers.

13           **Q.    (BY MS. FULHAM)  Is it BOP's position**

14   **that this issue was properly rejected?**

15           A.    No.

16           **Q.    So it is BOP's position that this issue**

17   **should not have been rejected?  The tricky part here**

18   **is that a rejection is like . . .**

19           A.    We reversed our decision.  So at the time

20   we felt that -- after reevaluation we decided it was

21   improperly rejected.  Is that what you are trying to

22   get at?

23           **Q.    That is.  And I want to confirm that that**

24   **is still the BOP's position?**

25           A.    Correct.  Yes.

Case No. 1:19-cv-02184-RM-STV  Document 108  filed 05/14/18  USDC Colorado  pg 34 of 65
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 197

 1    information that was provided specific to

 2    October 2011, which appears to provide information as

 3    to why BOP believes that the October 2011 issue -- the

 4    rejection of the October 2011 issue was lawful; do you

 5    see that?

 6         A.   Yes, under October 2011.

 7         Q.   And I just want to confirm that BOP's

 8    position today is that the October 2011 issue of PLN

 9    was not properly rejected?

10         A.   Can I go back to the October 2011

11    rejection?

12         Q.   Yes.

13              MS. PROSE:  Counsel, for the record, we

14    need to update this response and have not done so yet.

15              MS. FULHAM:  Okay.

16              MS. PROSE:  But you have a question

17    pending, so Mr. Chapman can answer it.  I'm sorry,

18    would you read back your question?  You asked him to

19    confirm that the BOP's position was that the issue was

20    not properly rejected, correct?

21              MS. FULHAM:  Correct.

22         A.   Okay.  So you want me to reaffirm what I

23    said previously, that it was improperly rejected?

24         Q.   (BY MS. FULHAM)  Yes.

25         A.   Okay.  Is that correct?

1      Q.   Yes.

2      A.   Okay.  Yes.

3          Q.   And I'm asking that because in the

4   filings in this case BOP has submitted information

5   that suggested that it was contending that it was

6   properly rejected.  So I just want to be very clear as

7   to the BOP's position.

8      A.   Yes.

9          Q.   Okay.  Okay.  At the time that

10  ███████████  appeal was successful, did it notify PLN?

11     A.   I don't know.

12         Q.   Would it be typical for the BOP to notify

13  a publisher if an inmate was successful in his appeal

14  of the rejection of that publisher's publication?

15     A.   Typically we wouldn't contact a publisher

16  and give private information about an inmate.

17         Q.   And at the time of the --███████████

18  successful appeal, the Exhibit 116 indicated that the

19  October 2011 issue of PLN was delivered to ███████████

20  correct?

21     A.   Yes.

22         Q.   Was that issue delivered to any other PLN

23  subscribers at that time other than ███████████

24     A.   I do not believe so.

25         Q.   ███████████  appeal concerned both the

Case 1:15-cv-02184-RM-STV Document 108-1 Filed 05/14/18 USDC Colorado Page 38 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 199

```
 1    October 2011 and November 2011 issues, correct?
 2            A.    Correct.
 3            Q.    And if you need to look at the -- I think
 4    it was 115 is probably that exhibit number, the appeal
 5    letter.
 6            A.    Is it the administrative remedy?
 7            Q.    So this appeal -- I'm just confirming
 8    that this appeal concerned both the October 2011 and
 9    November 2011 issues of PLN, correct?
10            A.    Yes.
11            Q.    Okay.  And so I also want to confirm, is
12    it BOP's position that the November 2011 issue of PLN
13    was also improperly rejected?
14            A.    It's the same question I messed up
15    before.  So, yes, it was improperly rejected.
16            Q.    I'm going to just stop it there.
17                  And was the November -- after this appeal
18    was successful, the November 2011 issue of PLN was
19    delivered to ▮▮▮▮▮▮▮, correct?
20            A.    Correct.
21            Q.    Was the November 2011 issue of PLN
22    delivered to any other PLN subscribers beyond
23    ▮▮▮▮▮▮▮?
24            A.    I don't believe so.
25            Q.    But as of September 6, 2012, the
```

Case 1:15-cv-02184-RM-STV Document 108 Filed 05/14/18 USDC Colorado Page 370 of 385
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 200

1   November 2011 issue of PLN was -- at least one inmate

2   at ADX had that issue, correct?

3          A.   Correct.

4          Q.   And in 2017 the BOP delivered the

5   November 2011 issue to the rest of the PLN

6   subscribers; is that correct?

7          A.   Correct.

8               (Deposition Exhibits 117 and 118 were

9   marked.)

10         Q.   Exhibit 117 was produced to us as

11  BOP000252 through --

12         A.   Three-pages long.

13         Q.   Yes.  So the rejection notice is labeled

14  as BOP000253.

15              MS. PROSE:  I wonder, Counsel, if there

16  was just some glitch in the numbering and a page was

17  inadvertently missed.  That would be my supposition,

18  but I can double-check that and produce a copy that

19  has, for example, a 251A number for the record.

20              MS. FULHAM:  Okay.

21              MS. PROSE:  But I think that's likely

22  what happened.  We will double-check this and make

23  sure we have a properly numbered exhibit to reproduce

24  to you.

25         Q.   (BY MS. FULHAM)  So Exhibit 117 is an

1    excerpt from the June 2002 PLN issue, and Exhibit 118

2    is a notification to inmate and publisher/sender of

3    the rejected publication for the June 2012 issue of

4    Prison Legal News; do you see that?

5         A.   Yes.

6         Q.   Taking a look first at the rejection

7    notification.  Are you aware of when this rejection

8    notice was mailed to PLN?

9         A.   I don't know the exact date.  If it was

10   signed July 3, within probably three to four days.  It

11   was a holiday, maybe a weekend.  So within probably

12   seven days initially.

13        Q.   This rejection notice, unlike the last

14   few that we've looked at, does not reference any

15   specific pages of objectionable content, correct?

16        A.   I don't see any listed.

17        Q.   So if PLN received this notice, they

18   would not have any information about what specifically

19   within the issue was objectionable, correct?

20        A.   There's some information in paragraph 2,

21   information on that ADX inmate.  So you probably would

22   be able to deduce by reading, but it wouldn't be as

23   obvious as page 21 and 24.

24        Q.   So the rejection notice indicates that

25   this publication has been rejected because it contains

Case No. 1:15-cv-02184-RM-STV Document 108 filed 05/14/18 USDC Colorado Page 390 of 465
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 202

1    information about an ADX inmate and former staff

2    members.  If we take a look back at Exhibit 117, page

3    38 of this, there is an article entitled "Former BOP

4    Guard Convicted, Sentenced in Murder-For-Hire Case."

5            A.    Okay.

6            Q.    And page 44 indicates that there's an

7    article called, "Second BOP Guard Convicted in

8    Connection with Prisoner's Murder."  Do you see that?

9            A.    I do.

10           Q.    Is it your understanding that the two

11   articles I just pointed out to you, the one entitled,

12   "Former BOP Guard Convicted, Sentenced in

13   Murder-For-Hire Case," and "Second BOP Guard Convicted

14   in Connection with Prisoner's Murder," were the

15   reasons for the rejection of the June 2012 issue?

16           A.    These appear to be the ones that we would

17   have rejected it on.

18           Q.    And is it BOP's position that this --

19   that the June 2012 issue of PLN was properly rejected

20   at the time it was rejected?

21           A.    Yes.

22           Q.    And what was the basis for that

23   rejection?

24           A.    In the first story here about "Former BOP

25   guard," on page 38, "Convicted, Sentenced in

Case No. 1:15-cv-02184-RM-STV   Document 107-5   filed 05/14/18   USDC Colorado   pg 40 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 207

1           MS. PROSE:  Just object to the extent it

2    calls for speculation.  You can answer counsel's

3    question.

4           A.   It's possible.

5           Q.   (BY MS. FULHAM)  Turning back to the

6    article on page 38.  Would this article -- if this

7    article were reviewed under the standards in the

8    current institution supplement, would it be rejected?

9           A.   Would it be rejected today if it showed

10   up?  Again, due to security measures that we've

11   undertaken and the passage of time, this would not be

12   rejected.

13          Q.   And same question with respect to the

14   article on page 44.  If this article were reviewed

15   under the standards of the current institution

16   supplement, would this article be rejected?

17          A.   No, same answer.

18          Q.   And this June 2012 issue of Prison Legal

19   News was delivered to inmates in 2017, correct?

20          A.   Correct.

21          Q.   And that's because at that time BOP

22   determined that the June 2012 issue was not

23   detrimental to the security, good order, and

24   discipline of the institution, correct?

25          A.   Correct.

Case No. 1:15-cv-02184-RM-STV  Document 108-1  filed 05/14/18  USDC Colorado  pg 42 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 208

 1              MS. FULHAM:  I think this would be a good

 2    time for a break.

 3              (Recess taken, 2:56 p.m. to 3:14 p.m.)

 4              (Deposition Exhibits 119 and 120 were

 5    marked.)

 6         Q.   (BY MS. FULHAM)  Exhibit 119, which the

 7    court reporter just handed to you, has been marked as

 8    BOP000301 through 302.  And this is an excerpt from

 9    the November 2012 issue of PLN.

10         A.   Okay.

11         Q.   If you look at Exhibit 120, that's a

12    notification to inmate and publisher of rejected

13    publication concerning the November 2012 issue of PLN.

14         A.   Okay.

15         Q.   And you see on the rejection notice that

16    it indicates that the objectionable content is on

17    page 42.  And the excerpt that you have of the June

18    2012 issue includes pages 1 and then 42.

19         A.   Okay.

20         Q.   The rejection notice at paragraph 2 of

21    Exhibit 120 indicates that, "The publication has been

22    rejected because the referenced page discusses

23    individuals incarcerated at Administrative Maximum

24    Security Institution."

25              Was this issue primarily rejected because

1    it references an ADX inmate or inmates?

2           A.   No.

3           Q.   What was the basis for the rejection at

4    the time?

5           A.   Identifying an inmate at the ADX here as

6    what would be known as a prison snitch, which is --

7    brings his safety to the forefront when we put that

8    sort of information out.  And he was at the ADX.

9           And also it puts in there about his

10   suicide.  That's not something -- public information

11   that we give out, we don't provide to people.  If

12   someone commits a successful one, different story; but

13   as far as attempted, that's not typically something we

14   give out about an inmate or discuss or tell about an

15   inmate.  So it covered multiple things in there.

16          Q.   So this article, the article at page 42,

17   if you take a look at it, this article is discussing a

18   lawsuit that was filed by a number of ADX inmates

19   against the BOP, correct?

20          A.   Correct.

21          Q.   And the portion where you mentioned

22   suicide attempts, correct?

23          A.   Yes.  That's not the main reason, but

24   that's also something else.

25          Q.   Taking a look at the third paragraph,

1       Q.   Okay.  And is that inmate identified in

2   this article?

3       A.   Yes.

4       Q.   Was that inmate identified in the

5   complaint that was filed in this case, in the

6   Cunningham case?

7       A.   I believe so.

8       Q.   And at the time of the rejection of this

9   issue, did BOP make any effort to determine whether

10  the information contained in this article was

11  available to inmates through other means or through

12  other sources?

13      A.   No.

14      Q.   Could ADX inmates have accessed

15  information about the Cunningham case, including

16  potentially the complaint through the electronic law

17  library at the time of the rejection?

18      A.   That's where this might be relevant.  I'm

19  going to read this to you.  I don't understand all of

20  it because I'm not an attorney.

21           We got some clarification.  So on the

22  electronic law library, only published court orders.

23  No other court filings are on the electronic legal

24  library.  So if that met that criteria, then, yes,

25  they might have had access through the electronic law

1   library.  And only orders that were picked up by
2   Federal Reporters; is that correct?  We have Federal
3   Reporters?  So if it met those criteria, then, yes,
4   they would probably have access to it.
5        Q.   How was that information obtained?
6        A.   We contacted a Matthew -- I'm going to
7   spell this for you -- P-r-o-i-e-t-t-a, he's a library
8   tech who works in our BOP central office, and he gave
9   us that information when we were on the break.
10       Q.   Okay.
11       A.   And another thing, since we've covered
12  the rest, and he clarified that we have never censored
13  anything on the electronic law library at any of our
14  prisons.  However, we have had inmates request that
15  their info be removed from there because of the danger
16  to their safety.  We've told them, no, they have to go
17  to the court and get it sealed and removed through
18  them.  So that's what he passed on to us.
19       Q.   So --
20       A.   And you have copies of this.
21       Q.   What I'm hearing, I want to confirm, that
22  ADX has never censored anything that's in the
23  electronic law library?
24       A.   We've never censored anything on the
25  electronic law library.

Case No. 1:19-cv-02184-RM-STV Document 108-5 filed 05/14/18 USDC Colorado pg 46 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 213

```
 1           Q.   On the electronic law library.  And
 2      that's true even in instances where an inmate might
 3      request that information be removed from the
 4      electronic law library because they have concerns
 5      about their safety?
 6           A.   Correct.
 7           Q.   This lawsuit was filed by a number of
 8      inmates at the ADX, correct?
 9                MS. PROSE:  Counsel, we're back at
10      Exhibit 118?
11           Q.   (BY MS. FULHAM)  The November 2012,
12      page 42.
13           A.   Yes, I know there were a group of inmates
14      part of the lawsuit.
15           Q.   Is it safe to assume that any of the
16      inmates who were plaintiffs in that case could have
17      told other inmates about the lawsuit?
18           A.   Sure.
19           Q.   And at the time of the rejection, did ADX
20      inmates have access to the New York Times if they
21      subscribed to it?
22           A.   Sure.
23           Q.   Could they have accessed the Atlantic
24      Magazine if they subscribed to that?
25           A.   Yes.
```

Case No. 1:19-cv-02184-RM-STV   Document 108-4   filed 05/24/21   USDC Colorado   pg 48 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 219

```
 1    interrogatory number 2, which asked the BOP to the

 2    extent it contends that the rejection of any mailing

 3    identified in response to interrogatory 1 was lawful,

 4    describe with specificity for each such mailing the

 5    complete factual and legal basis for your contention,

 6    including a detailed description of any alleged

 7    security risks posed by the mailing.

 8                   If you turn to page 3, there is a

 9    specific discussion of the June 2012 --

10         A.    June?

11         Q.    I'm sorry, the November 2012.

12         A.    Okay.

13         Q.    And it indicates as the basis for the

14    rejection, "An article in this issue of Prison Legal

15    News identified an inmate who witnessed a

16    prisoner-on-prisoner killing and testified for the

17    government against a violent prison gang.  Knowledge

18    that an inmate cooperated with the government can put

19    an inmate in jeopardy in prison.  The inmate was

20    housed in the ADX in November of 2012."

21                   That interrogatory response is similar to

22    information that you provided earlier today.  You also

23    indicated that it was a potential basis for rejection,

24    the fact that it discussed Mr. Powers' attempted

25    suicide, correct?
```

Case No. 1:15-cv-02184-RM-STV Document 108 filed 05/14/18 USDC Colorado Page 470 of 65
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 220

 1        A.    That was not the main reason.  It's just

 2  something I noticed on the thing.

 3        Q.    Are there any other reasons why that

 4  article -- why that issue was rejected beyond the

 5  information that's in this interrogatory response and

 6  potentially the fact that he was -- Mr. Powers had a

 7  suicide attempt?

 8        A.    No.

 9        Q.    No other basis?

10        A.    Not that I'm aware of.

11        Q.    Any other reasons that the BOP is aware

12  of?

13        A.    No, not that they have told me.

14              (Deposition Exhibits 122 and 123 were

15  marked.)

16        Q.    Exhibit 122, which begins with the page

17  marked BOP000342 and continues to 345, is an excerpt

18  from the February 2013 issue of Prison Legal News.

19              And the Exhibit 123 is marked BOP323, and

20  it is a notification to the inmate and publisher of

21  rejected publication concerning the February 2013

22  issue of PLN.

23        A.    Okay.

24        Q.    It indicates on the rejection notice that

25  the potentially objectionable pages were on pages 8

Case No. 1:15-cv-02184-RM-STV   Document 107-4   Filed 05/14/18   USDC Colorado   Page 49 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 221

 1    and 9.  What it appears to be referring to is this

 2    article titled "Tenth Circuit:  Terrorism Prisoners

 3    Lack Liberty Interest in Transfer to ADX."  Do you see

 4    that?

 5            A.    Yes.

 6            Q.    Is that BOP's position, that that's the

 7    article that prompted the rejection of this issue?

 8            A.    Yes.

 9            Q.    The rejection notice indicates that the

10    publication has been rejected because the referenced

11    pages discusses individuals incarcerated at the US

12    penitentiary Florence.

13                  One quick question:  Were those

14    individuals -- my understanding is ADX and the USP are

15    separate facilities?

16            A.    They are.  But if they belong in the

17    stepdown program of the ADX, they are still ADX

18    inmates.

19            Q.    Okay.  So is this indicating that the

20    individual was incarcerated at ADX?

21            A.    It --

22                  MS. PROSE:  I'll object to the form; but,

23    Counsel, can you clarify your question for me so I

24    understand?

25                  MS. FULHAM:  Sure.

Page 222

```
 1          Q.    (BY MS. FULHAM)   The first sentence of

 2    this second paragraph states, "The publication has

 3    been rejected because the referenced pages discusses

 4    individuals incarcerated at US Penitentiary Florence,"

 5    then in parentheses ADX.

 6               And my understanding -- you can correct

 7    me if this is wrong -- my understanding is that

 8    normally when it was referring to the US Penitentiary

 9    Florence, that is a different facility than ADX?

10          A.    I've got this.  I can explain it.  Our

11    official designation for the ADX -- ADX is a nickname.

12    Its official title is United States Penitentiary

13    Administrative Maximum.  And the United States

14    Penitentiary across the way is United States

15    Penitentiary High.  So they used the nickname and --

16    part of our official name and our nickname together.

17          Q.    So it's referring to the ADX here?

18          A.    Correct.

19          Q.    I just wanted to confirm that.  Is it

20    BOP's position that this article was properly rejected

21    at the time it was rejected?

22          A.    Yes.

23          Q.    And what is BOP's position on why this

24    article constitutes a security risk?

25          A.    Mr. Berkebile, he gave a deposition on
```

1    why, about the fact that we're discussing active

2    terrorists and they may have influence over other

3    terrorists or want-to-be terrorists, and the fact that

4    terrorists are targets of the white supremacy gangs,

5    especially the Aryan Brotherhood and their underlings,

6    and we have the heads of those at our prison.

7            Q.    And that is the entire basis on which the

8    rejection is based?

9            A.    That's why it was rejected originally.

10           Q.    And part of the reason I want to confirm

11   specifically on this is for some of the issues we have

12   written responses that provide the basis for the

13   rejection, and this is an issue for which we don't

14   have a written response.  So I want to confirm and

15   ensure that --

16           A.    That is what Mr. Berkebile said, and he

17   was the one in the process of rejection.

18           Q.    Okay.  The title of the article says,

19   "Tenth Circuit:  Terrorism Prisoners Lack Liberty

20   Interest in Transfer to ADX."

21                 Would you agree that this article appears

22   to be summarizing a 10th Circuit opinion?

23           A.    I don't know why that title was chosen.

24   I mean, it says 10th Circuit, but I don't know if the

25   case was out of the 10th Circuit and someone at your

Case 1:15-cv-02184-RM-STV   Document 108   Filed 05/14/18   USDC Colorado   Page 52 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 224

1    organization chose that title, or that's a quote from

2    a judge or attorney.  I don't know where that came

3    from.

4           Q.   My question now to you is taking a look

5    at this article, would you agree with my

6    characterization of this article that it is

7    summarizing a 10th Circuit opinion?

8           A.   It mentions the 10th Circuit in the

9    story.  I'm not sure what an opinion is as far as when

10   it relates to court.  So I don't know if this is just

11   a summary that someone wrote up, if this was the

12   actual judge's or the court's opinion.  I honestly

13   don't know that.

14          Q.   At the end of the article there is a

15   citation of sorts, it says to see Rezaq v. Nalley,

16   then it says 667 F.3d 1001, 10th Circuit 2002.

17          A.   2012.

18          Q.   2012.  Would you agree that an inmate at

19   the ADX would have had access to the opinion that's

20   referenced here through the electronic law library?

21          A.   If it meets that criteria that I

22   mentioned earlier.  I don't know the legal aspect of

23   it.

24          Q.   So if I represent to you that it's a

25   citation that refers to F.3d, that means it's in the

Case No. 1:19-cv-02184-RM-STV   Document 108   Filed 05/14/15 / 29-SDC   USDC Colorado   Page 52 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 227

1    the current institution supplement?

2         A.    No.

3         Q.    And this February 2013 issue was

4    delivered to inmates in 2017, correct?

5         A.    Correct.

6         Q.    And that was because at the time BOP

7    determined the article was not detrimental to the

8    security, good order, or discipline of the

9    institution?

10        A.    Correct.

11        Q.    Was Mr. Rezaq still at ADX as of 2017?

12        A.    I honestly don't know.

13        Q.    Mr. Saleh?

14        A.    I would have to look to see if any of

15   these are still here.  We could get that information

16   for you.

17        Q.    At the time a determination was made in

18   2017 to deliver this issue to the PLN subscribers, was

19   there an effort undertaken at that time to determine

20   whether the inmates referenced in the article were

21   still at the ADX?

22        A.    That would have been one of the

23   determining factors.  It would not have been the only

24   one.

25        Q.    And to the extent that that was a factor,

1   was it more likely for an issue to be distributed if

2   the referenced individual was no longer at ADX?

3           A.   It all played a part.  I don't want to

4   say what weighed more than others, but it would be a

5   factor that we would look into.

6           Q.   It would be a factor.  And in general,

7   the fact that an inmate was no longer at ADX, would

8   that be a factor that would weigh in favor of

9   distributing the issue or not distributing the issue?

10  I understand it wasn't a determining factor, you've

11  said that.

12          A.   It would be more likely if they were not

13  there.

14          Q.   I think I probably would have been

15  surprised if you said the opposite.

16               (Deposition Exhibits 124 and 125 were

17  marked.)

18          Q.   Exhibit 124, which is marked BOP000348

19  and 349, is an excerpt from the April 2013 issue of

20  Prison Legal News.

21               And Exhibit 125, marked BOP000350, is a

22  notification to inmate and publisher of rejected

23  publication concerning the April 2013 issue of PLN.

24  Do you agree?

25          A.   I agree.

Case No. 1:19-cv-02184-RM-STV Document 108-5 filed 05/14/25 USDC Colorado page 54 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 229

 1          Q.    The rejection notice indicates that the

 2     potentially objectionable content in the April 2013

 3     issue is on page 32; is that correct?

 4          A.    Yes.

 5          Q.    And this makes it relatively easy for us

 6     because page 32 only has one article, "ADX Prisoner

 7     Not Allowed to Communicate with Family Members or

 8     Receive Publications Under SAMs."

 9               Is it accurate that this article was the

10     basis for the rejection of the April 2013 issue of

11     PLN?

12          A.    Yes.

13          Q.    And it indicates in the rejection notice

14     that the publication was rejected because the

15     referenced page discusses individuals incarcerated at

16     the ADX; is that correct?

17          A.    Correct.

18          Q.    Who signed this rejection notice?

19          A.    I don't know if that's Berkebile's or

20     not.  I can't -- I don't know who signed it.  Oh,

21     Kuta.  Shon Kuta.

22          Q.    Okay.  And you mentioned that you spoke

23     to Mr. Kuta in preparation for your deposition today.

24     Did you talk to him about the rejection of the

25     April 2013 issue?

1      A.   I did.

2           Q.   And the April 2013 issue, what is BOP's

3    position on why this article was detrimental to the

4    security, good order, or discipline of the

5    institution?

6           A.   Mr. Kuta described it as it was a

7    large -- because we have such a large AB

8    contingency -- or contingent at the ADX --

9           Q.   I'm going to have you pause.  When you

10   say, "AB," are you referring to the Aryan Brotherhood?

11          A.   Yes, correct.  You're going to get all

12   this lingo down.

13          Q.   I suppose that's good.  I don't know if

14   that's good.

15          A.   Not only did it say he was a terrorist,

16   it stated exactly what terrorist attack he was

17   involved in.  So we have -- about 14 percent of our

18   population does not -- was not born in the United

19   States, so there is also a chance that someone who

20   could have been affected by the attack that is listed

21   in here could have a family member or a friend or

22   relative located at the ADX as well.  So there could

23   be multiple people that want to get him other than

24   just the Aryan Brotherhood or the other white

25   supremacy gangs.

```
 1           Q.    So was the security concern here with

 2    respect to the safety of Mr. Al-Owhali --

 3           A.    Yes --

 4           Q.    -- summarizing your answer?

 5           A.    -- his safety.  We were worried about his

 6    safety.

 7           Q.    If this issue had been delivered to

 8    inmates, is there any additional security measures

 9    that ADX would have had to take with respect to

10    Mr. Al-Owhali?

11           A.    If it was provided at that time?

12           Q.    Yes.

13           A.    Each of the units, the inmates are

14    treated the same.  So if you're in the control unit,

15    all the inmates are treated the same even if we fear

16    for your safety.  If you are in the general housing

17    units, you are treated the same even if we fear for

18    your safety.  If you are in the special security unit

19    we treat you the same.

20                 Again, it comes down to the staff now

21    have to be more worried that, hey, this person may

22    just become a bigger target because we just introduced

23    fresh information about him that people may not have

24    already known, so now staff and the inmate are at

25    risk.
```

Case No. 1:19-cv-02184-RM-STV   Document 107-1   Filed 05/14/18   USDC Colorado   Page 57 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 232

```
 1          Q.    Was the fact that Mr. Al-Owhali was in
 2    prison for his role in the 1998 bombing of the US
 3    Embassy in Kenya, that's information that's publicly
 4    available, correct?
 5          A.    It is information that people can look
 6    up, yes.
 7          Q.    Presumably that information is available
 8    from a wide variety of sources?
 9          A.    I would assume so.
10          Q.    And this article, you'll see at the end,
11    also has a citation to a case?
12          A.    It has that F, so that would be Federal
13    Reporter?
14          Q.    That is correct.
15          A.    I'm learning.
16          Q.    So is it possible that ADX inmates could
17    have read the opinion in Al-Owhali v. Holder in the
18    10th Circuit?  They could have read that 10th Circuit
19    opinion?
20          A.    Yes.
21          Q.    Is it possible that inmates could also
22    have learned about this case, which concerns an ADX
23    inmate's right to communicate, from their own
24    attorneys?
25          A.    Sure.  Attorneys pass on lots of stuff.
```

```
1   feel this is safe to go in.

2                If I had to guess, based on the other

3   rejections and what I have heard through testimony is

4   that if someone would have saw this, this would have

5   been flagged for rejection.

6         Q.    Does the ADX undertake any efforts to do

7   any sampling or other efforts to determine whether

8   articles are being flagged on a consistent basis from

9   reviewer to reviewer?

10        A.    No.

11              (Deposition Exhibits 127 and 128 were

12  marked.)

13        Q.    Mr. Chapman, the exhibit marked 127 is a

14  document labeled BOP000408 through 410, and this is an

15  excerpt from the July 2013 issue of Prison Legal News.

16        A.    Okay.

17        Q.    The exhibit marked 128 is a notification

18  to inmate and publisher of rejected publication

19  concerning the July 2013 issue of Prison Legal News.

20              First, just taking a look at Exhibit 128,

21  who appears to have signed this rejection?

22        A.    I believe it was Mr. Kuta again.

23        Q.    And it indicates on the rejection notice

24  that the pages with allegedly objectionable content

25  are 36 and 37.  So taking a look at pages 36 and 37,
```

```
 1    it appears that the article that served as the basis

 2    for the rejection is the article titled, "Tenth

 3    Circuit:  No Section 2241 Jurisdiction for BOP

 4    Supermax Challenge; Claims Must be Brought as Bivens

 5    Action."  Do you see that?

 6          A.   Yes.

 7          Q.   Is it BOP's position that this article I

 8    just directed you to is the basis for the rejection of

 9    this issue?

10          A.   Yes.

11          Q.   And what is BOP's position on why this

12    article constitutes a security risk?

13          A.   Mr. Kuta, who signed the form, referenced

14    the fact that it lets everyone know what drug cartel

15    he was over.  We have other cartel leaders or members

16    in the ADX, some of them were rivals to that

17    particular one, so it made him a big target for people

18    whose family may have been killed by him and his

19    cartel.  So he felt at the time that it was undue risk

20    to that inmate by allowing that in.

21          Q.   And that inmate, that's referring to

22    ████████████████████████?

23          A.   Yes.

24          Q.   The second to last paragraph of the

25    article includes a citation to a case Palma-Salazar v.
```

Case No. 1:19-cv-02184-RM-STV Document 108 Filed 05/14/19 USDC Colorado Page 60 of 65
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

1    Davis, and it indicates it's available at 677 F.3d

2    1031, and it's a 10th Circuit opinion.

3         A.   Okay.

4         Q.   You would agree that at the time that

5    this was rejected, ADX inmates would have had access

6    to that opinion in the -- through the electronic law

7    library?

8         A.   I believe so.

9         Q.   And that opinion would not have been

10   censored from the electronic law library in any way?

11        A.   No.

12        Q.   The -- this article -- feel free to take

13   as much time as you need to read it.  Would you agree

14   this article is summarizing a 10th Circuit Court of

15   Appeals decision?

16             MS. PROSE:  I'll just object to the

17   extent the document speaks for itself.  You can answer

18   the question.

19        A.   That's what it appears to be.

20        Q.   (BY MS. FULHAM)  And would you agree that

21   it's important for prisoners to have access to legal

22   developments that may relate to their own

23   incarceration?

24        A.   Sure, if they want it and it pertains to

25   their case or something, they would probably want it.

Case No. 1:19-cv-02184-RM-STV   Document 108   filed 05/14/15/29/48 USDC Colorado   pg 62 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 246

1    I would.

2            Q.   At the time that this issue was rejected,

3    did the BOP make any effort to determine whether the

4    information in this article was available to inmates

5    through other sources?

6            A.   No.

7            Q.   And this article discusses a lawsuit

8    filed by someone who is housed at the ADX at the time,

9    correct?

10           A.   Correct.

11           Q.   Presumably ███████████████   could have

12   informed other inmates about his pending legal case,

13   correct?

14           A.   He could have, yes.

15           Q.   And is it -- would you agree it's

16   possible that inmates could have learned about this

17   legal decision from their attorneys?

18           A.   It is possible.

19           Q.   Or from other individuals who are outside

20   the prison?

21           A.   It could.

22           Q.   So would you agree that it was at least

23   possible that other inmates were aware of the

24   information contained in this article?

25           A.   It is possible.

Case No. 1:15-cv-02184-RM-STV   Document 108-1   filed 05/14/18   USDC Colorado   pg 62 of 65
Case 1:15-cv-02184-RM-STV   Document 108-1   filed 05/14/18   USDC Colorado   page 63 of 65

TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 247

1      Q.    Would this issue be have been rejected

2  under the current institution supplement?

3      A.    No.

4      Q.    And why do you say that?

5      A.    Because the BOP stance today is that it

6  doesn't rise to the level of something we would reject

7  based on our current supplement procedures.

8      Q.    And what has -- you said that the BOP

9  stance is that it doesn't rise to the level of

10  something we would reject on the current supplement

11  procedures?

12      A.    Correct.

13      Q.    What specifically has changed in the

14  institutional supplements that would now make this an

15  article that would not be rejected?

16      A.    When it's changed -- we have changed the

17  way we flag items.  We have also changed the level of

18  review and who reviews this.  We brought more

19  attention to whether somebody should be rejected or

20  not, especially in our trainings we would bring up

21  these things.  Also, Warden Fox made the decision it

22  was good, so we gave it to them.  And all those

23  reasons is why we would not reject it today.

24      Q.    You said Warden Fox made the decision it

25  was good.  Do you mean that Warden Fox made a

 1    respect to all 11 of these issues, one warden looked

 2    at that article, looked at the articles in these 11

 3    issues and decided it was a security risk, and another

 4    warden, specifically Warden Fox, looked at the same

 5    articles and decided that it was not a security risk?

 6            A.   Correct.

 7            Q.   Not that many more issues left.

 8                 MS. PROSE:  Can we go off just a second,

 9    Counsel?

10                 (Recess taken, 4:27 p.m. to 4:35 p.m.)

11                 (Deposition Exhibits 129 and 130 were

12    marked.)

13            Q.   (BY MS. FULHAM)  Mr. Chapman, you just

14    received Exhibits 129 and 130.  Exhibit 129 is a

15    document marked BOP000442, it's an excerpt from the

16    September 2013 issue of Prison Legal News.

17                 Exhibit 130 is the -- a notification to

18    inmate and publisher of rejected publication

19    concerning the September 2013 issue of Prison Legal

20    News.

21                 My first question for you with respect to

22    this issue is whether it's BOP's position that this

23    issue was properly rejected at the time of the

24    rejection?

25            A.   We don't feel that it was properly

Case 1:19-cv-02184-RM-STV Document 107 Filed 05/14/15 USDC Colorado Page 64 of 65
of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 251

1    rejected.

2         Q.    So BOP's position is that this should not

3    have been rejected at the time it was rejected?

4         A.    Yes.

5         Q.    And that's because it is BOP's view that

6    there was nothing in this issue that was detrimental

7    to the security, good order, or discipline of the

8    institution or would facilitate criminal activity?

9         A.    Correct.

10         Q.    Okay.  We can be done with this.  See, if

11    you just answer that way for all of them, we would be

12    done very quickly.

13         A.    Why aren't they all that easy?

14              (Deposition Exhibits 131 and 132 were

15    marked.)

16         Q.    Mr. Chapman, Exhibit 131 is a -- it is

17    marked BOP000447 to 448, and it is an excerpt from the

18    April 2014 issue of Prison Legal News.

19              Exhibit 132 is the notification to inmate

20    and publisher of rejected publication for the

21    April 2014 issue of Prison Legal News.

22         A.    Okay.

23         Q.    My first question for you is who is it

24    that signed the rejection notice for this April?

25         A.    Kevin Johnson, who was acting warden at

Case No. 1:15-cv-02184-RM-STV   Document 108   Filed 05/14/18   USDC Colorado   Page 66 of 66
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 252

1    the time.

2            Q.    And it's my understanding that the BOP

3    has been unable to locate Mr. Johnson at this time?

4            A.    That is correct.

5            Q.    So I assume that you have not talked to

6    Mr. Johnson to discuss the reasons why he determined

7    that this article should be rejected; is that correct?

8            A.    Yeah, we have to ascertain based on

9    reading.

10           Q.    And what is -- what is the BOP's position

11   as to why this article was -- sorry.  Taking a look at

12   the rejection notice, it indicates that the

13   potentially objectionable content is on page 42.  It

14   appears to be that the article in question is this

15   article, "No Death Penalty for Maine Prisoner."

16                 Is that the BOP's basis for the rejection

17   of this issue?

18           A.    Yes.

19           Q.    And what is the BOP's position as to why

20   this article -- why this article was a security risk?

21           A.    I'm actually going to use Prison Legal

22   News' words.  The very last sentence of the story

23   says, "If he were allowed into a prison's general

24   population, he would risk being killed in gang

25   revenge."  We agree with you.