**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-CV-02184-RM-STV

PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER,

      Plaintiff,

      v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

**PLAINTIFF PRISON LEGAL NEWS'S OPPOSITION TO DEFENDANT
FEDERAL BUREAU OF PRISONS' MOTION FOR SUMMARY JUDGMENT**

---

Prison Legal News ("PLN") brought this action to address the unlawful censorship of its magazine *Prison Legal News* ("*PLN*") at the United States Penitentiary — Administrative Maximum Facility ("ADX"). Faced with an extensive factual record supporting PLN's claims that this censorship has violated the Constitution and the Administrative Procedure Act ("APA"), Defendant Federal Bureau of Prisons ("BOP") has not sought summary judgment on a single merits issue. Instead, BOP seeks to re-litigate the same mootness argument the Court previously rejected, and BOP challenges fictional claims that PLN has never asserted in this case.

BOP's renewed effort to moot PLN's claims relies on a new ADX policy: the December 2017 Institution Supplement. But this latest policy—which BOP's counsel initially characterized as containing "quite minimal" revisions, Ex. 6, Email from S. Prose to S. Kiehl (Jan. 17, 2018)—does not change the status quo with regard to *what* the ADX may censor. It only memorializes the prohibition on censoring based on the mere mention of a prisoner or staff member—the so-

called the "name-alone" practice.  This has no bearing on mootness.  When the Court last considered the issue, the BOP had committed to eliminating the name-alone practice.  The Court held that this does not moot PLN's First Amendment and APA claims because those "claims are not premised on names alone."  ECF No. 81 at 9.  BOP presses the same flawed mootness argument in the present motion, and it should once again be rejected.

In fact, the record is *worse* for BOP than the last time, because BOP has now withdrawn its contention that "the name-alone practice was the basis for the challenged rejections," ECF No. 66 at 9—a contention that BOP concedes was "overstated," ECF No. 106-2, ¶ 11.  The record now shows that the censorship was based on determinations that particular information about prisoners and staff members in PLN's publications was detrimental to the security, good order, or discipline of ADX.  It is those determinations that PLN challenges, on an as-applied basis, under the First Amendment and the APA.  BOP still maintains that those determinations were proper as to eight of the eleven Rejected Issues, and BOP's new policy would not preclude similar censorship decisions in the future.  Nor has BOP made any change to its "all-or-nothing" policy, under which entire issues of *PLN* were censored based on one or two pages of allegedly objectionable content, or any policy change that would require rejection notices to articulate the basis for future rejections.  Because live disputes remain with respect to each of these questions, BOP's renewed mootness arguments fail.

BOP's other arguments attack strawmen.  BOP argues that any challenge to future rejections of *PLN* is not ripe, but PLN is challenging rejections that have already happened—not ones that have yet to occur.  Similarly, BOP spends half of its brief defending the latest policy from a *facial* First Amendment challenge, but PLN has not brought any such challenge.

For the reasons discussed below, BOP's motion should be denied, and this case should

proceed to a trial on the merits.

<u>**FACTUAL BACKGROUND & PROCEDURAL HISTORY**</u>

PLN's Complaint challenges, *inter alia*, the rejection of eleven issues of *Prison Legal*

*News* (the "Rejected Issues") at ADX as having violated the First and Fifth Amendments, and the

APA.  *See generally* ECF No. 1 ¶¶ 51–81.  In 2016, BOP filed a motion to dismiss PLN's

claims, arguing that "a significant change in prison policy [] mooted the First Amendment claim

in this lawsuit."  ECF No. 31 at 1.  BOP claimed that, prior to February 2016, the ADX had a

blanket practice "of rejecting publications that contained information discussing an ADX or BOP

inmate, or BOP staff member," *id.* at 3, and that "practice was the reason for the past rejections

of PLN's magazine," ECF No. 78 at 1.  *See also* ECF No. 31-1 ¶ 24 (declaration of an ADX

employee stating that the name-alone practice "was the primary basis for the rejection of the

eleven issues of *Prison Legal News*").  BOP asserted that, after the commencement of PLN's

action, ADX implemented a "new ADX policy in February 2016."  ECF No. 31 at 3.  Although

the February 2016 policy did not expressly address the name-alone practice, BOP claimed that

the practice had been eliminated.  ECF No. 66 at 11 ("[The name-alone] practice was the

'wrong' that caused the rejections, and that practice has ceased due to policy changes.").

The Court rejected BOP's arguments and held that PLN's claims were not moot.  ECF

No. 81.  The Court explained that ADX's "new" policy changed "very little if anything" about

ADX's treatment of incoming publications, as it did *not* expressly prohibit the use of the name-

only practice or address PLN's due process challenges.  *Id.* at 8.  And the Court recognized that

**even if BOP *had* eliminated the name-alone practice, this change would *not* moot the case,**

3

**because such an argument "mischaracterizes plaintiff's claims**." *Id.* at 9. As the Court observed, PLN's claims "are not premised on names alone," but rather PLN claims that the eleven Rejected Issues were improperly rejected because the content was not "detrimental to the security, good order, or discipline" of ADX. *Id.* The Court further held that even if it had found the claims moot, the voluntary cessation exception to the mootness doctrine applied because the policy changes could be reversed, and there was "evidence in the record that any change in defendant's practices have been a 'ploy' to avoid this Court's jurisdiction." *Id.* at 14.

Following the denial of the motion to dismiss, the parties engaged in discovery. During discovery, BOP changed its position on its rationale for the censorship of the Rejected Issues. BOP asserted that the Wardens and Acting Wardens who rejected issues of *PLN* had *not* relied on the name-alone practice to reject *PLN*, but instead had made individualized determinations with respect to the Rejected Issues. Ex. 7, Dep. of Todd Chapman (Mar. 16, 2018) ("Chapman Dep. II") at 32:22-34:5 ("[N]one of the wardens made rejections based off of a name of an ADX inmate or former staff or another bureau inmate alone. . . the warden made the sound correctional judgment for them."). In addition, BOP provided interrogatory responses in which BOP contended that the censorship of the Rejected Issues was proper due to information beyond the mere mention of a prisoner or staff member. ECF No. 104-38 at 1–4; ECF No. 104-11 at 3–7.

In December 2017, the ADX issued a new Institution Supplement on incoming publications. Resp. to SOF ¶ 7. This document was produced to PLN on January 17, 2018, nearly one month after going into effect and the day immediately prior to a scheduled deposition in this litigation. Ex. 1, Email from S. Prose to S. Kiehl (Jan. 17, 2018). The email accompanying this document stated that "the revisions [to the Institution Supplement] are quite

minimal." *Id.* The December 2017 Institution Supplement added a new section, III.C., which directs ADX to "conduct an individual assessment of an incoming publication" prior to any rejection, thus incorporating (and not modifying) the governing regulations. Resp. to SOF ¶ 7; *see* 28 C.F.R. § 540.71(b). It also provides that "an incoming publication may not be rejected solely because it discusses an ADX or [BOP] inmate, or BOP staff member." Resp. to SOF ¶ 7. Additionally, the December 2017 Institution Supplement made changes to the notification procedures following the rejection of an incoming publication. *Id.* ¶ 13.

During discovery, PLN sought information about the rationale for the policy changes, in order to test BOP's claim that the changes were not made for purposes of depriving the Court of jurisdiction. *See, e.g.*, ECF No. 104-38 at 3–4. Rather than providing a substantive response, BOP asserted attorney-client privilege, work product protection, and deliberative process privilege over communications and documents concerning the changes to the ADX Institution Supplement and other relevant policies. *See, e.g.*, Ex. 17, at 1–7 (BOP privilege log withholding emails discussing proposed changes to February 2016 Supplement), 15–17 (withholding emails discussing proposed changes to December 2017 Supplement); Ex. 24, Letter from S. Prose to S. Kiehl (Dec. 7, 2017); ECF No. 104-38 at 6–7; ECF No. 104-11 at 3–5. BOP also prevented its witnesses from discussing the reasons for ADX policy changes on the basis of the attorney-client privilege. *See, e.g.*, Ex. 18, Fox Dep. at 57:1–58:4, 84:16–85:10, 89:25–14.

## ARGUMENT

## I.   PLN's First Amendment and APA Claims Are Not Moot.

In Section I of its summary judgment motion, BOP argues that PLN's First Amendment claims are moot. BOP largely repeats the same arguments the Court previously rejected, without

pointing to any meaningful new policy changes or attempting to distinguish the Court's prior ruling. BOP thus has failed to meet its "heavy" burden of showing the claims are moot. *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979); *see also Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015).

### A. BOP Points to No Factual Developments That Would Change the Court's Prior Conclusion That PLN's First Amendment Claims Are Not Moot.

BOP fails to demonstrate that: (1) factual developments "completely and irrevocably eradicate [ ] the effects of the alleged violation," *Rezaq v. Nalley*, 677 F.3d 1001, 1009 (10th Cir. 2012) (quoting *Davis*, 440 U.S. at 631), and (2) no prospective relief remains available, *see id.* at 1010. Each is an independent reason for denying BOP's motion.

### 1. BOP Has Not Completely and Irrevocably Eradicated the Effects of the Alleged First Amendment Violation.

In denying BOP's motion to dismiss, the Court rejected the argument that the First Amendment claims were moot based on (a) the elimination of the name-alone practice along with other changes in the February 2016 Institution Supplement, and (b) a declaration from the then-Warden stating that the ADX was "committed to the current incoming publication review procedures." ECF No. 59-1 ¶ 17. Nothing has changed. Although the ADX has issued another institution supplement (the December 2017 Supplement)—coupled with another promise from the Warden to follow it—it only memorializes the elimination of the name-alone practice. ECF No. 106-2, Att. 2. But as the Court previously held, the elimination of this practice does not moot PLN's claims because they are "not premised upon names alone." ECF No. 81 at 9. Rather, PLN's claims challenge the determination that the particular content of the Rejected Issues was detrimental to the security, good order, or discipline of ADX. *Id.*

BOP's continued reliance on the elimination of the name-alone practice, *see* Mot. at 3–4, is further misplaced in light of the record established during discovery, which made clear that the ADX officials who rejected *PLN* never used the name-alone practice.  Contrary to its prior representation that "PLN's magazines were rejected solely because they identified inmates and staff," ECF No. 66 at 18 (citing Chapman Decl., ECF No. 31-1 ¶ 28), BOP now takes the position that Wardens and Acting Wardens did not follow the name-alone practice.  Resp. to SOF ¶ 3; Ex. 7, Chapman Depo. II at 33:6–34:14 ("[N]one of the Wardens made rejections based off a name of an ADX inmate or former staff or another bureau inmate alone."); ECF No. 106-2 ¶ 11 (stating that Mr. Chapman's earlier declaration that the name-alone practice was the basis for the rejection of *PLN* was "overstated").[1]  According to BOP, the Rejected Issues were instead censored as a result of individualized determinations by the Wardens or their designees that the issues were detrimental to the security of ADX.  *See* Ex. 7, Chapman Dep. II at 33:18-34:5.  The formal renunciation of a practice that was never followed by the relevant decision-makers cannot render PLN's claims moot.

Importantly, BOP has defended most of those censorship decisions as proper, and BOP has proffered justifications for the censorship that go beyond the mere mention of a prisoner or staff member.  ECF No. 104-38 at 1–4; ECF No. 104-11 at 3–7.  PLN's challenge in this case concerns whether those justifications are adequate under the First Amendment and the governing regulation, 28 C.F.R. § 540.71(b).  This presents a live dispute the Court may, and should, resolve.

---

[1] BOP now states that other personnel "flagged" publications for the Warden or Acting Warden pursuant to the name-alone practice.  *See* Resp. to SOF ¶ 2.  But only a Warden or Acting Warden may decide to reject an incoming publication.  *See* Resp. to SOF, PLN Fact ¶¶ 8–9.

Aside from the name-only practice, BOP has not identified any other "past policies and procedures" that have changed at the ADX and that would moot PLN's claims. Mot. at 5. This comes as no surprise. The standard under which PLN's publications were censored—which proscribes censorship unless a publication is "detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity," 28 C.F.R. § 540.71(b)—has not changed, and it is expressly incorporated into the December 2017 Institution Supplement and will therefore serve as the basis for any rejections in the future. *See* ECF No. 106-2, Att. 2, ¶ III.C. Thus, the fact that any "future PLN magazines will be reviewed only under the current ADX policy," Mot. at 5, has no bearing on whether PLN's claims are moot.[2]

For similar reasons, BOP is wrong that the "record demonstrates unequivocally that the eleven magazines would *not* be rejected under the December 2017 Policy." Mot. at 4. Again, the December 2017 Supplement does nothing to change the standard by which publications are deemed to be "detrimental to the security, good order, or discipline of the institution," 28 C.F.R. § 540.71(b), other than the elimination of the name-alone practice. In other words, had the December 2017 Supplement been in effect at the time the Rejected Issues were censored, the Wardens could have reached the same conclusion that the publications were "detrimental to the security, good order, or discipline of the institution."

The only support BOP offers for its claim that the Rejected Issues would not be censored under the December 2017 Supplement are the conclusory assertions of the current Warden

---

[2] The December 2017 Supplement includes additional levels of review that were added in the February 2016 Supplement. *See* ECF No. 106-2, ¶ III.B, III.D; ECF No. 81 at 8. As the Court previously held, these changes do not moot the case because "not one part of the Complaint is premised upon ADX's incoming publication procedures having an insufficient number of review layers or with the type of employee reviewing a publication." ECF No. 81 at 8.

(Andre Matevousian) and Todd Chapman, the Executive Assistant at the ADX.  *See* BOP SOF ¶ 12 (citing ECF 106-4 ¶ 19 and ECF 106-2 ¶ 16).  Neither BOP official offers any explanation for these one-sentence assertions.  Such unsupported statements are insufficient to carry BOP's burden of proof.  *See Yellowbear v. Lampert*, 741 F.3d 48, 59–60 (10th Cir. 2014) (vacating district court's grant of summary judgment where defendants made "mere conclusory statements" in support of motion) (citations omitted).

Moreover, other statements in the Warden's declaration make clear that content similar to the eleven Rejected Issues *could* be censored today.  The Warden states that "when a publication affirmatively identifies an inmate and provides details about his crimes and/or history . . . giving this information to the inmate population creates an immediate safety risk to the identified inmate," and that "taking the proactive steps of rejecting an incoming publication that presents dangers like these is the correct and safe way to manage a prison."  ECF No. 106-4, ¶ 13. Several of the Rejected Issues contained articles that similarly "identif[y] an inmate and provides details about his crimes and/or history."  *See* Resp. to SOF ¶ 12.  The Warden's declaration thus suggests that he reserves the right to "tak[e] the proactive step[] of rejecting" the Rejected Issues.[3]  ECF No. 106-4, ¶ 13.

Likewise, Mr. Chapman was asked in his deposition why, despite maintaining the issues were properly rejected at the time they were sent, BOP now claims that the issues would not be rejected.  He did not point to anything in the December 2017 Supplement, but rather stated that

---

[3] PLN did not have the opportunity to depose Warden Matevousian to explore this issue, because he was not disclosed as an individual likely to have discoverable information until March 15, 2018, after the fact discovery period closed.  Ex. 28 at 1.  Moreover, BOP relies on Warden Matevousian to provide expert opinions, *see, e.g.*, BOP SOF ¶¶ 33–36, 41–42, 45–46, 48–49, but failed to identify Warden Matevousian in its expert disclosures under Fed. R. Civ. P. 26(a)(2).

the issues would not be rejected due to unspecified "security measures" and the "passage of time." *See* Ex. 7, Chapman Dep. II. at 179:3–180:13; 189:9–190:15; 207:5–25; 215:2–216:5; 236: 2–18.  In other words, Mr. Chapman's statement that "none of the eleven previously rejected issues of *Prison Legal News* would be rejected under the December 2017 Policy," ECF No. 106-2, ¶ 16, means only that these old issues do not *currently* pose a security risk.  The relevant question, however, is whether there has been a policy change that would have precluded the issues from being deemed a security risk at the time they were published.  *See* ECF No. 62 at 16 n.4.  BOP has made no such change, and still maintains that all but three of the Rejected Issues were properly censored.  There can be no question that PLN's claims are not moot.

Finally, the December 2017 Supplement fails to moot PLN's as-applied challenge to the BOP's censorship of the Rejected Issues in their entirety, instead of redacting or removing the allegedly objectionable material (which comprised only a tiny fraction of the Rejected Issues). BOP does not point to any post-suit actions that address this claim.  As the Court previously ruled, a live case or controversy also remains with respect to this issue.  ECF No. 81 at 17.

### 2.    Prospective Relief Remains Available.

BOP also repeats its argument, made in connection with its motion to dismiss, that PLN's claims are moot because no prospective relief is available and declaratory relief is insufficient to keep the case alive.  Mot. at 6; *see also* ECF No. 31 at 6–8; ECF No. 66 at 6–9.  The Court previously found that PLN suffered an injury "that may . . . be resolved by a favorable judicial decision."  ECF No. 81 at 11.  The Court should reject BOP's rehash of this argument.

A claim for declaratory judgment is not moot if the judgment sought would alter the conduct of the parties in anticipated future interactions.  *See Schell v. OXY USA Inc.*, 814 F.3d

1107, 1114 (10th Cir. 2016); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010)

(claim against department of corrections not moot where judgment in plaintiff's favor may

require defendant to modify its policies to which plaintiff remained subject); *Chapman v.*

*Federal Bureau of Prisons*, 285 F. Supp. 3d 1204, 1209 (D. Colo. 2016) (same).  A declaratory

judgment regarding past conduct is proper where, as here, it is "meant to define the legal rights

and obligations of the parties in anticipation of some future conduct, not simply to proclaim

liability for a past act."  *Lawrence v. Kuenhold*, 271 Fed. Appx. 763, 766 (10th Cir. 2008); *see*

*also Green v. Branson*, 108 F.3d 1296, 1299-1300 (10th Cir. 1997) ("[W]hat makes a declaratory

judgment action a proper judicial resolution of a 'case or controversy' rather than an advisory

opinion—is [ ] the settling of some dispute which affects the behavior of the defendant toward

the plaintiff.") (internal quotations omitted) (citation omitted).

 The relief PLN seeks undoubtedly would have "effect in the real world."  *Brown v.*

*Buhman*, 822 F.3d 1151, 1165–66 (10th Cir. 2016).  PLN seeks a declaratory judgment on its as-

applied First Amendment challenge—*i.e.*, that the content of the Rejected Issues did not pose

any actual security threat at the time they were published.  Such a declaration would settle a

dispute "which affects the behavior of the defendant toward the plaintiff" by establishing

precedent as to the circumstances under which ADX may consider PLN's publications to be a

security risk.  *Branson*, 108 F.3d at 1300.  PLN continues to publish content, which will almost

certainly continue to discuss the names and prior conduct of BOP prisoners and staff.  ECF No.

66 at 3 (noting that from February 2016 to March 2017, the thirteen issues of *PLN* all contained

articles about the BOP and "most of which identified BOP inmates or staff members by name").

And ADX has clearly stated that it may continue to censor such content.  ECF No. 106-4, ¶¶ 11-

13.  A declaratory judgment is thus necessary to "define the legal rights and obligations of the parties in anticipation of some future conduct." *Lawrence*, 271 Fed. Appx. at 766.  Indeed, such a judgment defining the legal rights and obligations of PLN and BOP is necessary given the past litigation history of the parties.  Despite the resolution of prior litigation initiated by PLN against BOP concerning censorship, *see Prison Legal News v. Hood*, No. 03-D-2516(PAC) (D. Colo.), BOP's renewed censorship necessitated the current lawsuit.  Without a declaratory judgment from the Court, this pattern may continue.

*Jordan v. Sosa*, 654 F.3d 1012 (10th Cir. 2011), the primary case cited by BOP, Mot. at 6, is distinguishable.  In that case, plaintiff, a BOP prisoner, brought claims challenging the constitutionality of a statutory and regulatory ban on the distribution of sexually explicit materials against individual officials at ADX, where plaintiff was incarcerated at the time he filed suit.  *Jordan*, 654 F.3d at 1015.  The Tenth Circuit held that the plaintiff's transfer to another BOP facility mooted his claims because the ADX officials named as defendants were no longer "situated to effectuate any prospective relief[.]"  *Id.* at 1030.  The court noted, however, that plaintiff's claims may have survived if he had sought relief against the Bureau of Prisons itself.  *Id.* at 1029–30.  Unlike the plaintiff in *Jordan*, PLN seeks a declaratory judgment against the BOP, which is undoubtedly situated to "effectuate any prospective relief." *Id.*

PLN also seeks injunctive relief to remedy any rejections of *PLN* found to have violated the Constitution.  BOP's argument that an injunction "would have no effect, because [the old] policies have been revoked[,]" Mot. at 6, misses the point.  Such injunctive relief would be designed to prevent censorship of future issues of *Prison Legal News* that does not comply with

the First Amendment and 28 C.F.R. § 540.71(b)—which will continue to constrain ADX's decision-making under the December 2017 Supplement.

BOP's argument that PLN's APA claims are moot is similarly unpersuasive. BOP's argument is premised on its inaccurate assertion that "the only alleged discrete final agency actions are the rejections pursuant to old policies and practices," which have been "permanently revoked." Mot. at 6. As BOP now concedes, the censorship of the Rejected Issues was based on a determination that the censored content was "detrimental to the security, good order, or discipline of the institution," pursuant to 28 C.F.R. § 540.71(b), *see* Ex. 7, Chapman Dep. II at 33:6–24, and this governing regulation remains in effect. PLN's APA claims are not moot.

### B.     The Voluntary Cessation Exception Applies.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (quoting C*ity of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). A defendant's cessation of challenged conduct moots a case only if "the *defendant* carries the formidable burden of showing that it is absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *Brown*, 822 F.3d at 1166 (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013)) (emphasis added). In this case, the Court ruled that BOP's previous attempt to moot the case fell within the voluntary cessation exception. ECF No. 81 at 13. This exception continues to apply.

*First*, the Court previously observed that "the February 2016 supplement and/or the statements in the Chapman declaration could be changed at any time, just like those documents allegedly changed previous practices." *Id.* The present motion relies on the same types of

documents:  a new institution supplement, coupled with a declaration promising to adhere to the supplement.  Mot. at 7.  Even if the current warden intends to follow the institution supplement, there is no dispute that a future warden has unfettered discretion to change it.  *See* Factual Background & Proc. Hist., *supra* at 3; *see also* Resp. to SOF ¶ 9, 10, 15, 17.  This distinguishes the present case from *Rio Grande Silvery Minnow v. Bureau of Recl.*, 601 F.3d 1096 (10th Cir. 2010), on which BOP relies, because that case involved a policy change that was codified into a formal, published administrative regulation.  *Id.* at 1118.  BOP has made no similar change here.

      *Second*, the discovery conducted since the denial of BOP's motion to dismiss has only bolstered the Court's previous finding that "any change in defendant's practices have been a 'ploy' to avoid this Court's jurisdiction."  ECF No. 81 at 14.  Throughout the motion to dismiss stage, BOP's mootness argument focused almost entirely on the abolition of the name-alone practice.  *See* ECF No. 31 at 3-4; ECF No. 59 at 1; ECF No. 66 at 9-13; ECF No. 78 at 1.  In making this argument, BOP repeatedly asserted that this "abolished practice was the reason for the past rejections of PLN's magazine," ECF No. 78 at 1, based on a declaration from an ADX employee who claimed that the practice formed the "primary basis" for the rejections of *Prison Legal News* challenged in this case.  ECF No. 31-1, ¶ 24; *see also* ECF No. 31 at 3–4.   Yet, during discovery, multiple former ADX Wardens and Associate Wardens who were responsible for the rejections of *Prison Legal News* claimed *never* to have relied on the name-alone practice. *See* Ex. 13, Davis Dep. at 73:6–11 (stating he "would not solely reject because it had an ADX staff member or an ADX inmate"); Ex. 14, Berkebile Dep. at 52:9–13 (stating it "wasn't necessarily [his] always fast interpretation that only simply because it references an inmate's name and register number that it would warrant rejection"); Ex. 15, Kuta Dep. at 82:1–10

(explaining that he would "review the article in its totality," rather than rely on a name-alone practice); Ex. 16, Stamper Dep. at 74:1–75:3 (explaining "you have to look at it in its totality of . . . why you're rejecting a publication," rather than rely on a name-only practice).

Faced with this testimony, Mr. Chapman now acknowledges that his earlier statements concerning the name-only policy were "overstated."  ECF No. 106-2, ¶ 11; *see also* Ex. 7, Chapman Dep. II at 33:18-34:5 (explaining that his earlier statement that BOP had a "practice" of rejecting publications that identify or discuss a BOP inmate or staff member "was an incorrect statement").   BOP now claims that beginning in 1998, "the ADX instituted a practice requiring *[Special Investigative Support] personnel* to flag every incoming publication that mentioned a Bureau inmate or staff member by name," ECF No. 106-2, ¶ 11 (emphasis added), but that "the flagging of names did not mean that the individual Wardens (or their designees) who made the decisions to reject publications did not have additional reasons for rejecting particular publications," *id.*  In other words, BOP has retreated entirely from its position that the name-alone practice "was the reason for the past rejections of PLN's magazine."  ECF No. 78 at 1.[4] This about-face—made nearly 22 months after Mr. Chapman's initial declaration—undercuts BOP's credibility in claiming there is no "evidence of 'gamesmanship.'"[5] Mot. at 7.

BOP also changed its position on whether its amended policy could be reduced to writing.  BOP initially insisted that it would be problematic, indeed harmful, to abolish the name-

---

[4] This reversal follows the Court's observation that adherence to the name-only practice would have meant that "wardens at ADX *ignored* their governing regulations and presumably applied their own standards."  ECF No. 81 at 10.

[5] BOP's own witnesses also disagree as to when the policy was actually abolished.  *See* Resp. to SOF ¶¶ 2, 6.  BOP's confusion over when the policy effectively ended casts further doubt on the agency's good faith.

only policy in writing:  "Having such mandatory language in the February 2016 Policy would likely result in hindering open, frank, and unfettered internal review/discussion amongst CSM/SIS/Legal staff of the suitability of an incoming publication."  ECF No. 59-1, ¶ 19.  Yet BOP has now amended its Institution Supplement to include language specifying that "[a]n incoming publication at the ADX may not be rejected solely because it discusses an ADX or [BOP] inmate, or BOP staff member."  ECF No. 106-2, Att. 2, ¶ III.C.

Apart from its shifting positions concerning the name only-policy, BOP also employs a classic "sword-and-shield" tactic with respect to the reasons for the post-suit changes.  While claiming that it has made a good-faith change to its censorship policy, BOP withheld from discovery all emails and drafts during the post-suit period leading to the adoption of the February 2016 Institution Supplement, and subsequent revisions to the policy.  In other words, BOP refuses to disclose the very documents that would permit PLN, and the Court, to assess the basis for the change in policy and determine whether it was implemented as a good faith response to PLN's concerns, or as a litigation tactic to moot the case.  *See* Ex. 17; Ex. 24 at 2 (stating that BOP attorneys provided advice concerning "appropriate policy language based, at least in part, on [an] evaluation of the pending case brought by Prison Legal News").  BOP cannot now argue that the changes were the result of "genuine self-correction."  Mot. at 8; *see also Seneca Ins. Co. v. W. Claims Inc.*, 774 F.3d 1272, 1278 (10th Cir. 2014) (litigant may not use the attorney-client privilege or the work product doctrine "as both a sword and shield").

## II.    PLN's Fifth Amendment Claim Is Not Moot.

BOP argues that PLN's due process challenge to the rejection notices is moot because the December 2017 Institution Supplement added requirements that the notices include page

16

references and quotes from the incoming publication, and that notices be sent within 10 business days of rejection.  Mot. at 4-5.  These changes, however, do not moot PLN's due process claim.

*First*, the changes are not "irrevocabl[e]."  *Rezaq*, 677 F.3d at 1009–10.  The Court previously observed that "the February 2016 supplement and/or the statements in the Chapman declaration could be changed at any time, just like those documents allegedly changed previous practices."  ECF No. 81 at 13.  Likewise, the latest changes, embodied in an institution supplement and confirmed in a declaration, may be changed by ADX at any time.  *See supra* at 3; *see also* Resp. to SOF ¶¶ 9, 10, 15, 17.  This is not enough to moot PLN's due process claim.

*Second*, the changes do not "completely . . . eradicate" the violation.  *Rezaq*, 677 F.3d at 1009–10.  Indeed, the core of PLN's due process argument is that ADX's rejection notices contain insufficient detail to permit PLN to adequately challenge those rejections.  Quotes from the objectionable pages might point PLN to *which* specific lines or passages might be deemed a security risk, but they shed no light on *why* BOP might consider those lines a security risk.  In the absence of an explanation by ADX of the reason it believes information on an ADX inmate or employee could be inflammatory or otherwise harmful, PLN is left to guess at the underlying rationale for the rejection, depriving it of a meaningful opportunity to appeal any given rejection.

Accordingly, because BOP's changes to its rejection notices do not "completely and irrevocably" resolve PLN's core Fifth Amendment concerns, and prospective relief remains available, PLN's due process claim is not moot.

**III.    BOP's Arguments Based on the December 2017 Institution Supplement Misapprehend the Nature of PLN's Claims.**

Sections II and III of BOP's motion address two made-up claims related to the December 2017 Institution Supplement.  Because neither claim is actually present in this case, it is unnecessary—and indeed, inappropriate—to rule on these strawmen issues.

In Section II, BOP argues that any challenge to future rejections of PLN is not ripe because there have been no rejections under the December 2017 Institution Supplement.  Mot. at 8–11.  But PLN does not challenge future hypothetical rejections.  The issue, instead, remains whether the December 2017 policy makes any changes that render the past violations unlikely to recur in the future.  This is a question of whether past claims are moot, not a question of whether future claims are ripe.  As discussed above, *supra* §§ I and II, PLN's claims are not moot.

In Section III, BOP argues that the December 2017 policy is facially valid under the *Turner* standard.  Mot. at 9–20.  Again, BOP's motion mischaracterizes PLN's claims.  PLN has not made a facial challenge to BOP's December 2017 Institution Supplement under *Turner*, nor has it made a facial challenge to prior iterations of the ADX Institution Supplement.  Rather, PLN brings *as-applied* claims under the First and Fifth Amendments.  *See* Compl. ¶¶ 51–70.

Although BOP's argument misses the mark, two particular points raised by BOP warrant further discussion here.  First, BOP mischaracterizes PLN's challenge to the censorship of the Rejected Issues in their entirety, as opposed to redacting or removing the offending content, as a facial challenge to BOP's "all-or-nothing" policy.  Mot. at 17.  But as the Magistrate Judge recognized in recommending denial of BOP's motion to dismiss, PLN's position with respect to redaction is an as-applied challenge.  ECF No. 62 at 19-22.  The Magistrate Judge further held that Supreme Court and Tenth Circuit precedent permit PLN to pursue an as-applied challenge to BOP's "all-or-nothing" practice, and this challenge requires BOP to "come forward with some

evidence showing a rational basis for their complete censorship of their publications." *Id.* at 22. BOP ignores the Magistrate's previous ruling on this issue.

Second, BOP's motion portrays PLN as taking the position that publicly available information must never be rejected, and argues that prison officials are entitled to deference on their judgment that sharing publicly available information with inmates is detrimental to security. Mot. at 18–19. Again, BOP mischaracterizes PLN's claims. PLN has never taken the position that "all 'publicly available' information must be assumed to be known by prisoners and, therefore, must be provided to them." Mot. at 18. PLN's position, with which multiple BOP witnesses have agreed, is that whether information is otherwise publicly available is a relevant factor in the determination of whether an incoming publication is "detrimental to the security, good order, and discipline" of ADX. Resp. to SOF ¶ 42.

PLN also disputes BOP's contention that that the identification of prisoners or other information about the prisoners, such as offenses committed, necessarily puts prisoners at an "immediate safety risk." *Id.*[6] While PLN does not dispute that dangerous offenders are housed at ADX, PLN rejects the suggestion that the profile of the prisoners gives BOP carte blanche to reject *Prison Legal News* wholesale. To the contrary, the stringent security protocols at the ADX more readily protect prisoners from harm, and ensure that the ADX is a *less* violent or dangerous

---

[6] BOP cites two cases for the proposition that "information about prisoners, such as their status as an informant or sex offender, even if publicly available from other sources, poses substantial risk of harms." Mot. at 18 (citing *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001) and *Brown v. Narvais*, 265 Fed. App'x 734 (10th Cir. 2008)). But as the *Brown* court expressly stated, the disclosure of such information does *not* necessarily result in risk to a prisoner. *See Brown*, 265 Fed App'x 734, at *2 ("We also do not hold that disclosures of this sort always in fact create an actionable danger to the inmate, regardless of circumstances that might materially affect the consequences of the disclosure. . .").

environment than other BOP facilities, which do not routinely reject *Prison Legal News*.

Moreover, the identity of prisoners within an institution and other information about the

prisoners, such as offenses committed, is often a matter of common knowledge within a prison,

and does not, in itself, create a greater risk of harm to prisoners.  *Id.*  At trial, PLN will show that

the censorship of the eleven Rejected Issues was not rationally related to prison security, in part

because the censored content was or likely would have been be known to ADX prisoners.

## <u>CONCLUSION</u>

For the foregoing reasons, BOP's Motion for Summary Judgment should be denied.

DATED: June 4, 2018

Respectfully Submitted,

Sabarish Neelakanta
Masimba Mutamba
Human Rights Defense Center
PO Box 1151
Lake Worth, Florida 33460
Telephone: (561) 360-2523
Email:
sneelakanta@humanrightsdefensecenter.org
mmutamba@humanrightsdefensecenter.org

*Of Counsel:*
Elliot Mincberg
Washington Lawyers' Committee for Civil
Rights & Urban Affairs
11 Dupont Circle NW, Suite 400
Washington, DC 20036
Telephone: (202) 319-1000
Email: elliot_mincberg@washlaw.org

David M. Shapiro
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, IL 60611
Telephone: (312) 503-0711
Email: david.shapiro@law.northwestern.edu

*s/ Terra W. Fulham*
Steven D. Zansberg
Ballard Spahr LLP
1225 17th Street, Suite 2300
Denver, CO 80202
Telephone: (303) 376-2409
FAX: (303) 296-3956
E-mail: zansbergs@ballardspahr.com

Peter A. Swanson
Terra W. Fulham
Matthew S. Shapanka
Alyson R. Sandler
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
FAX: (202) 662-6291
E-mail: pswanson@cov.com
        tfulham@cov.com
        mshapanka@cov.com
        asandler@cov.com

*Attorneys for Plaintiff Prison Legal News*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of June, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF/CM electronic filing system, which will send electronic notification to all counsel of record.


<u>*s/Terra W. Fulham*</u>
Terra W. Fulham