# EXHIBIT 20

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 15-cv-02184-RM-STV
 3    _____

 4    DEPOSITION OF:  TODD CHAPMAN
      _____
 5
      PRISON LEGAL NEWS,
 6    a Project of the Human Rights Defense Center,

 7    Plaintiff,

 8    v.

 9    FEDERAL BUREAU OF PRISONS,

10    Defendant.
      _____
11

12             PURSUANT TO NOTICE, the deposition of
      TODD CHAPMAN was taken on behalf of the Plaintiff at
13    1888 Sherman Street, Suite 370, Denver, Colorado
      80203, on January 17, 2017, at 8:26 a.m., before
14    Teresa Coogle, Registered Professional Reporter,
      Certified Realtime Reporter, and Notary Public within
15    Colorado.

16

17

18

19

20

21

22

23

24

25
```

H+G

Hunter + Geist, Inc.

303.832.5966  
800.525.8490

1900 Grant Street, Suite 1025  
Denver, CO 80203

www.huntergeist.com  
scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**1**

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02184-RM-STV
_____
DEPOSITION OF:  TODD CHAPMAN
_____

PRISON LEGAL NEWS,
a Project of the Human Rights Defense Center,
Plaintiff,
v.
FEDERAL BUREAU OF PRISONS,
Defendant.
_____

         PURSUANT TO NOTICE, the deposition of
TODD CHAPMAN was taken on behalf of the Plaintiff at
1888 Sherman Street, Suite 370, Denver, Colorado
80203, on January 17, 2017, at 8:26 a.m., before
Teresa Coogle, Registered Professional Reporter,
Certified Realtime Reporter, and Notary Public within
Colorado.
```

**2**

```
              A P P E A R A N C E S
  For the Plaintiff:
          STEPHEN KIEHL, ESQ.
          MATTHEW S. SHAPANKA, ESQ.
          Covington & Burling, LLP
          One City Center
          850 Tenth Street, NW
          Washington, DC 20001-4956

  For the Defendant:

          SUSAN PROSE, ESQ.
          Assistant U.S. Attorney
          1225 17th Street, Suite 700
          Denver, Colorado 80202
  Also Present:
          Clay C. Cook, Esq.
```

**3**

```
                    I N D E X
EXAMINATION OF TODD CHAPMAN:              PAGE
January 17, 2017

By Mr. Kiehl                                6

By Ms. Prose                              155

                                       INITIAL
DEPOSITION EXHIBITS:                   REFERENCE

Exhibit 1   Declaration of Todd Chapman     23

Exhibit 2   Program Statement, 11/9/11      32

Exhibit 3   Program Statement, 1/10/03      38

Exhibit 4   Memorandum to Daly from         47
            Krist, 1/1/10, Subject:
            Inmate Mail Rejection -
            Blyther, Michael #31622-007

Exhibit 5   Notification to Inmate and      53
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, June 2010, Vol. 21,
            No. 6, Page 11

Exhibit 6   Prison Legal News, Vol 22,      56
            No. 10, with attachments

Exhibit 7   Notification to Inmate and      61
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, November 2011, Vol. 22,
            Pages 38 and 47

Exhibit 8   Notification to Inmate and      66
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, February 2013, Vol. 24,
            No. 2, Pages 8 and 9

Exhibit 9   Memorandum to Heim from Bier,   74
            4/19/13, Subject:  Inmate Mail
            Rejection - Lawrence, Desmond
            #83529-022
```

**4**

```
Exhibit 10  Memorandum to Heim from Krist,     78
            11/20/12, Subject:  Inmate Mail
            Rejection - Carl Knorr
            #13161-075

Exhibit 11  Notification to Inmate and         82
            Publisher/Sender of Rejected
            Publication, Prison Legal
            News, July 2013, Pages 36 and 37
Exhibit 12  Prison Legal News, with attachment  85
Exhibit 13  Institution Supplement, 8/1/07     93
Exhibit 14  Institution Supplement, 3/1/11    102
Exhibit 15  Institution Supplement, 1/24/13   106
Exhibit 16  Institution Supplement, 12/8/14   107
Exhibit 17  Institution Supplement, 2/2/16    108
Exhibit 18  ADX Florence - Incoming           121
            Publications Rejection Procedures,
            2/24/16
Exhibit 19  ADX Florence - Quarterly          122
            Incoming Publications Training
            Participants, 2/24/16
Exhibit 20  540.71 Procedures,                125
            with attachment

Exhibit 21  ADX Florence - Quarterly          132
            Incoming Publications Training,
            7/19/16

Exhibit 22  ADX Florence - Quarterly          133
            Incoming Publications Training,
            9/8/16

Exhibit 23  ADX Florence - Quarterly          136
            Incoming Publications Training,
            11/29/16

Exhibit 24  Notification to Inmate and        139
            Publisher/Sender of Rejected
            Publication, Soldiers of God
```

Page 5

| | | |
|---|---|---|
| Exhibit 25 | Notification to Inmate and Publisher/Sender of Rejected Publication, San Grabriel Valley Tribune, 6/5/16 | 141 |
| Exhibit 26 | Notification to Inmate and Publisher/Sender of Rejected Publication, El Manana, 12/24/15 | 144 |

Page 6

1  WHEREUPON, the following proceedings were
2  taken pursuant to the Federal Rules of Civil
3  Procedure.
4        *   *   *   *   *
5           TODD CHAPMAN,
6  having been first duly sworn to state the whole truth,
7  testified as follows:
8        (Deponent's Response: I do.)
9              EXAMINATION
10 BY MR. KIEHL:
11     Q. Mr. Chapman, could you please state your
12 name and current position.
13     A. My name is Todd Chapman, and I'm an
14 executive assistant for the Florence Federal
15 Correctional Complex.
16     Q. Okay. And that's also referred to as
17 ADX?
18     A. No --
19     Q. No?
20     A. -- not necessarily. Our complex -- the
21 Federal Bureau of Prisons has a complex. It means
22 there's multiple prisons. So my office is at the ADX,
23 but we also have a penitentiary, a U.S. penitentiary
24 high. We have a federal correctional institution
25 medium, and we also have a federal prison camp

Page 7

1  minimum. So we're all together, and we share
2  services. So I'm over all of those.
3      Q. Okay. Have you been deposed before?
4      A. No.
5      Q. Okay. So you may have spoken with your
6  attorney about this, but I just wanted to go over some
7  of the ground rules with you before we start.
8          First, we'll ask that you give your
9  answers verbally rather than nodding your head or that
10 sort of thing so that we can have all of the answers
11 clearly on the record.
12         We should try not to talk over each other
13 so we can also get a clean record so that if you're
14 giving an answer, I'll wait until you're finished
15 before asking my next question. And if I'm asking a
16 question, wait until the question is finished before
17 beginning your answer.
18         If you don't understand any question I
19 ask, let me know, and I'll rephrase the question to
20 make sure that it's clear. And you understand your
21 obligation to testify truthfully today. And there's
22 no reason you can't do that?
23     A. Oh, yes, yes, I understand that. No, I
24 have no reason why I couldn't.
25     Q. Okay.

Page 8

1      A. I was waiting for you to finish.
2      Q. Sure. And you're not sick today in any
3  way that would prevent you from giving --
4      A. No. I have a little bit of a tickle, but
5  this should take care of it.
6      Q. Okay. Great. Thank you very much. So
7  you said you're currently the executive assistant at
8  -- can you tell me again? It's the --
9      A. The federal correctional complex located
10 in Florence, Colorado.
11     Q. Okay. And how long have you been in that
12 position?
13     A. I started at the end of July 2015. I
14 believe it was July 27 I was officially on their
15 records.
16     Q. July 2015 --
17     A. Yes.
18     Q. -- when you started? Okay. And can you
19 -- well, first, can you give your education, history,
20 beginning with college?
21     A. I'm actually a high school graduate.
22     Q. Okay.
23     A. And I joined the Marine Corps after that.
24     Q. Okay. And how long were you in the
25 Marine Corps?

TODD CHAPMAN - 1/17/2017
Prison Legal News v. Federal Bureau of Prisons

17

1   one I would send for the review process -- out to them
2   of a copy of the old supplement, routing sheet and a
3   little signature saying why you want to change it, you
4   know, and it has a check box for due to program
5   statement change, due to some sort of information law,
6   or something like that change, or it just needs a
7   warden's signature, or it needs, you know, updating
8   because of a mission change.
9         So they will -- we'll send that packet to
10  them.  They will take that packet, they will review
11  the old supplement.  We will also send them a Word
12  copy of the old supplement for them to make changes to
13  that.  They will highlight all of their changes, and
14  they will send an electronic copy with all of their
15  highlighted changes, and they will also print out a
16  copy with all the changes so you can be compared with
17  the old supplement so you can see all of the stuff
18  that was added to it or crossed out and changed,
19  capitalize this, a comma there, whatnot.
20        And then it will go from that department
21  -- it will go to the associate warden who is over that
22  department, and then it will go to me.  And then I'll
23  hand it to the warden's secretary, who hands it to the
24  warden for final review.  So the warden will do the
25  final review on that.

18

1         Now, at that point, the SOC warden and
2   myself, we have a say when it comes through, like, we
3   don't -- you know, is there a valid change needed?
4   You know, like -- because they got to show the proof,
5   okay?  So in the supplement, usually on the first
6   page, possibly the second, it will say, This
7   supplement was changed due to -- a new program
8   statement was issued, so we are updating with that.
9   Or, Hey, we just found inmates are escaping over the
10  fence.  We should probably make that illegal.  You
11  know, stuff like that they may put in there.
12        And then I review it.  I go over their
13  changes and go over the old one and make sure it's a
14  valid change and necessary.  And then I send it to the
15  warden, who does the same thing or signs off for final
16  approval.
17        Once he signs off, he sends it out to all
18  of the department heads at the institution as well as
19  our union and says, These are the proposed changes to
20  this supplement.  Please review these changes and let
21  us know if you have any problems or if you have any
22  concerns related to that.
23        And if they do not, there's no
24  concerns -- and if someone doesn't respond to the
25  email, that's considered they have no problems with

19

1   it.  Respond back, the time will go by, no one has
2   made any changes, and the warden agrees with it, I
3   agree with it, we sign it, we put it into our internet
4   page, and we put it to all of the staff and saying,
5   This supplement number such and such has been changed
6   as of this date.  Everyone has access to it, and then
7   we issue it to the inmates and the staff.
8        **Q.  So to summarize, the people who have**
9   **input into the process of updating an institution**
10  **supplement are the department that's responsible for**
11  **the institution supplement, the associate warden in**
12  **charge of that department, you, the warden, and then**
13  **also the department heads?**
14        A.  Yes.  All department heads at that
15  institution.  Or we also have -- being a complex, the
16  multiple sum of our departments are shared.  So if we
17  have a complex supervisor, while they may not be at
18  that institution, they are over that discipline.  They
19  will have a say as well as the union.  The union --
20  the local union has a say in each one as well,
21  especially when it comes to changing working
22  conditions or something like that.
23        **Q.  And if there's disagreement from these**
24  **various parties that have input into the process, who**
25  **makes the final call?**

20

1        A.  At the end of the day, the warden makes
2   the final calls.  The final reviewing official, the
3   person who is putting their name on the document, they
4   will make the final call.  But they will consult with
5   the different departments who are making the claim,
6   the departments who have the institution supplement
7   they are in charge of.
8        They will also discuss with legal to see
9   if there's a clarification.  So if it comes down,
10  we'll redo it.  Or if -- or if it comes to a point
11  where, Hey, you know, the change that they recommended
12  is valid, then we'll start the whole process over.
13       So we'll go back to the department where
14  it had originated, they will make that other change,
15  they will send it back to me, they will send it back
16  to the associate warden, who will send it back to me
17  for review, who will then send it back to the warden
18  for final review.  They will sign off it again, and
19  then they will send it back out to the department
20  heads going, Okay, we incorporated this other change.
21  Please -- if you have any discussions or complaints or
22  issues, please let us know at this time.
23       **Q.  Okay.  And it sounds like there could be**
24  **several triggers for an institution supplement to be**
25  **updated or revised; is that correct?**

5 (Pages 17 to 20)

## 21

1  A.  Yes.  You are correct.
2  Q.  Okay.  And one trigger might be that a
3  new program statement has come out, and so that would
4  trigger a revision of the institution supplement so
5  that it aligns with the new program statement,
6  correct?
7  A.  Yes, sir.
8  Q.  Okay.  Are there other triggers besides
9  the issuance of a new program statement that could
10  lead to beginning the process to revise an institution
11  supplement?
12  A.  Yes.  There are other -- there can be
13  other triggers.
14  Q.  And what are those other triggers?
15  A.  One could be that we've got new wardens.
16  Like just recently within the last -- during a
17  six-month period, we got all three new wardens.  So in
18  order to bring our supplements online with the people
19  actually working there signing off and agreeing these
20  supplements are good, we will reissue them at that
21  point if only to make that change where there may be
22  no other changes than just to do that.
23       There also may be a new law passed that
24  changes something.  The president could make a
25  proclamation today stating that all inmates must wear

## 22

1  pink jumpsuits from now on.  We would have to jump
2  right in and go in and make changes.  Or if Congress
3  or the Supreme Court were to pass something affecting
4  our agency, we might have to.  Or if we notice flaws
5  in our supplements.  So -- like myself, I transfer
6  around to a lot of institutions.  We have a lot of
7  staff that do that as well.  Some may come in, and so
8  at that point, we say, Hey, you know, this supplement
9  needs to be revised.  But usually our supplements are
10  revised at the issuance of a new program statement,
11  and we're updating to meet that program statement, or
12  we're bettering the security of our institution or our
13  supplement.  So, Hey, this needs another layer or we
14  need to start doing this or we need to start doing
15  this this way and make it better.
16  Q.  Okay.  And that decision as to -- that a
17  change could make it better can come from the
18  department or from an associate warden or from you or
19  from the warden that -- that idea that this
20  institution supplement could be made better and should
21  be revised could come from any number of parties
22  within the complex?
23  A.  A recommendation can be made by a variety
24  of people.  But at the end of the day, the warden is
25  the final approval on whether that change is made.

## 23

1  Q.  Okay.  Thanks.  And I want to show you
2  the declaration that you submitted in this case.
3       (Deposition Exhibit 1 was marked.)
4  Q.  Okay.  So you're looking at Exhibit 1.
5  Can you identify what this document is?
6  A.  Yes.  This is my declaration in regards
7  to this civil action.
8  Q.  Okay.  And if you turn to page 13 --
9  well, page 13 of 13.  That's your --
10  A.  I have 12.  It says -- okay.
11  Q.  Sorry about that.  That's your electronic
12  signature?
13  A.  Yes.
14  Q.  Okay.  And the statements in this
15  declaration are true, as far as you know?
16  A.  Yes, sir.
17  Q.  Okay.  Do you wish to make any changes to
18  the declaration?
19  A.  No, sir.
20  Q.  Okay.  I just want to ask you a couple of
21  questions about it --
22  A.  Okay.
23  Q.  -- as we go through it.  And this will be
24  a large portion of what we do this morning, because we
25  just want to make sure we understand everything

## 24

1  that's --
2  A.  Okay.
3  Q.  -- in the declaration.  If you could turn
4  to, I guess, numbered page 2 --
5  A.  Okay.
6  Q.  -- which is paragraph 4.
7  A.  Okay.
8  Q.  And this paragraph concerns BOP
9  regulations on incoming publications; is that correct?
10  A.  Yes.
11  Q.  And these regulations are from the
12  C.F.R., which is the Code of Federal Regulations,
13  correct?
14  A.  Yeah.  Our program statements usually are
15  derived from the Code of Federal Regulations.
16  Q.  Okay.  And then I'd like to direct your
17  attention to the last sentence of paragraph 4, which
18  is quoting the C.F.R.  And it says, "The Warden may
19  reject a publication only if it is determined
20  detrimental to the security, good order, or discipline
21  of the institution or if it might facilitate criminal
22  activity."
23       What does it mean for a publication to be
24  detrimental to the security, good order, or discipline
25  of the institution?

                                                                    45

1  program statement say that you cannot reject a
2  publication solely because it names an inmate or staff
3  member?
4       A.  Not in those exact records, but I believe
5  that's what it meant is that, you know, it has to meet
6  one of these criteria.
7       Q.  And if the warden decides that -- the
8  fact that an incoming publication discusses or
9  identifies the BOP inmate or staff member, and that is
10 detrimental to the security, good order, or discipline
11 of the institution, in the correctional judgment of
12 the warden, may a warden reject a publication on that
13 basis under this program statement?
14          MS. PROSE:  Could you read the question
15 to me?
16      A.  Yeah, if you could rephrase that
17 question.
18          (The last question was read back as
19 follows: "And if the warden decides that -- the fact
20 that an incoming publication discusses or identifies
21 the BOP inmate or staff member, and that is
22 detrimental to the security, good order, or discipline
23 of the institution, in the correctional judgment of
24 the warden, may a warden reject a publication on that
25 basis under this program statement?")

                                                                    46

1       A.  So what I think you're asking me is that
2  if a warden locally sees something that comes in with
3  just an inmate's name, do they have the authority or
4  can they reject it?  Is that what you're asking me?
5       Q.  (BY MR. KIEHL)  Yes.
6       A.  You know, I would say generally no.  You
7  know, an institution may say something -- an
8  institution supplement -- I haven't seen them all.
9  They are different at every institution.  I haven't
10 seen them all.  But, again, a warden could make that;
11 but that's what we have the appeal process for, both
12 whoever is sending it in plus the inmate that is
13 receiving it.  So if the warden were to make an error
14 in judgment or to overstep their bounds, it gives the
15 people the right to appeal that and to possibly get
16 back that magazine or whatever it was that was
17 rejected.
18      Q.  So you think it would be an error in
19 judgment for the warden to make that call?
20      A.  If the warden had something come across
21 the desk that just said Joe inmate is -- or Joe Smith
22 is an inmate at this prison alone, and there was
23 nothing else, there was no meat, there was no
24 documentation by our special investigative services to
25 say that, Hey, this person is this or that, there was

                                                                    47

1  no reason behind it, no, I believe that would be an
2  error in judgment.
3       Q.  Okay.  And can you point to the language
4  in this Program Statement 5266.11 that leads you to
5  that conclusion.
6       A.  I see two places under -- on page 3 of
7  the document at the bottom.  You see under No. 7, it
8  says, "Only the Warden may reject an incoming
9  publication.  In the Warden's absence, only the Acting
10 Warden may perform."
11          So right there, the warden is the one who
12 is making the rejection.  Also, when you look at 2(b),
13 it kind of gives a general outline of things that only
14 should be rejected.
15      Q.  Okay.  Okay.  You can set those aside for
16 a moment.  And I think we'd like to look at some of
17 the rejection notices that were issued in Prison Legal
18 News.  So we'll mark as Exhibit 4.
19          (Deposition Exhibit 4 was marked.)
20      Q.  So we're marking as Exhibit 4 a document
21 starting with the Bates number BOP000052.
22      A.  Where did you see that number at?
23      Q.  It's the bottom --
24      A.  Oh, that number.  I was looking somewhere
25 -- okay.  Thank you.

                                                                    48

1       Q.  No problem.  Can you identify what this
2  document is?
3       A.  This appears to be a publication of a
4  mail rejection for an inmate Blyther.
5       Q.  And when is this dated?
6       A.  February 1, 2010.
7       Q.  Okay.  And can you tell what publication
8  this concerns?
9       A.  Yes.  I'm on page 2.  It appears in
10 Prison Legal News.
11      Q.  Okay.  And if you turn a couple of pages,
12 it appears that this is Prison Legal News issued
13 January 2010.  I think it's also at the --
14      A.  Yeah, that's what this document says.
15 That's a different inmate name, so I was just making
16 sure it was the same.
17      Q.  -- bottom of page 30.
18      A.  Okay.
19      Q.  So this appears to be Prison Legal News
20 issued January 2010.  And this issue was rejected at
21 ADX, correct?
22      A.  It appears so, yes, sir.
23      Q.  And who signed this notice?
24      A.  It appears to be an acting warden who was
25 acting for Mr. Blake Davis.

49

1  Q. Can you tell us why this issue of Prison
2  Legal News was rejected?
3  A. Do you mind if I read this?
4  Q. Yes, please take all of the time you
5  need.
6      MS. PROSE: May I just make a statement
7  to the record? To the extent any of the questions or
8  Mr. Chapman's answers may implicate the confidential
9  information or non-public information about inmates at
10 the ADX, we'll be reviewing the transcript to
11 determine whether or not designations pursuant to the
12 protective order will be appropriate. You can answer
13 his question.
14     A. Oh, I'm still reading.
15        (The deponent read the document.)
16     A. Okay. So do you want me to just -- by
17 looking at this, I -- if Inmate McCullah was an ADX
18 inmate or if the other Sharma was working at the ADX,
19 I definitely would have rejected this one. And not
20 based because it mentions a staff member's name or
21 because it mentions an inmate's name.
22        It says here that Sharma's spouse works
23 for the Federal Bureau of Prisons and also says that
24 she got a life sentence plus three years. By giving
25 this -- and Inmate McCullah wants to be in AB. One,

50

1  inmates don't like snitches, whether they snitch on
2  staff or whether they snitch on other inmates. That
3  is a safety risk.
4         If we were to tell them, Hey, this inmate
5  snitched, then we just put a target on their back. So
6  generally we don't give that information.
7         Now, when it comes to the Sharma thing,
8  now someone can approach her husband and say, Hey, I'm
9  going to have someone kill your wife in prison unless
10 you do X, Y, and Z.
11        So by giving this stuff directly to the
12 inmate, while it may be public information during the
13 case, inmates would have to do their own research;
14 they would have to know about it. So by giving this
15 to them, we just made Officer Sharma, or whatever the
16 title is, a target for extortion, which definitely
17 threatens the security and good order of an
18 institution.
19        We also put Inmate McCullah's life in
20 jeopardy. Because whenever you tell a story about an
21 inmate being a snitch -- and it says right in the
22 article, inmates don't like snitches. They don't like
23 snitches.
24        So this -- that's why that was rejected.
25 I wasn't there when this happened; but if I was

51

1  looking at that and it came across my desk, I would
2  reject it for that reason alone because it definitely
3  threatens security and good order. Because if I'm
4  putting an inmate's life at risk or a staff's life at
5  risk, that violates many different rules.
6      Q. And that's true even if this publication
7  is coming into ADX, but the article concerns inmates
8  or staff members at other BOP facilities? This one, I
9  believe, is Coleman, Florida --
10     A. Yes.
11     Q. -- correct? And so that -- so your
12 concern about the security, good order, safety of the
13 institution, and the inmates and staff remains a
14 concern even if the article is about inmates and staff
15 at another institution?
16     A. If the -- if it was just a staff member
17 who got convicted, and it didn't mention the family of
18 the staff member, who still works in the prison, then
19 if you were to say, Hey, he got arrested and is fired
20 and gone, no big deal, it's done and over. But if
21 that person has a relative, and they mention a person
22 has a relative in there, you open it up. And the same
23 thing with that inmate, now that inmate is threatened,
24 McCullah.
25     Q. Even if that inmate -- even if that staff

52

1  member does not work at the facility that the
2  publication is coming into?
3      A. Yes. And with the ADX, especially so.
4  The heads of all of the major prison gangs who order
5  the hits, who order people murdered on the outside or
6  murder people on the inside, who run everything in the
7  Federal Bureau of Prisons nationwide are at the ADX.
8         So if we're handing them that on a silver
9  plate, it's like, Hey, your next letter out is to have
10 this person killed. Here, we hand-delivered it to
11 you. Because we have all of the heads.
12        When it comes to something like that, if
13 you're mentioning an inmate's name, who may have, like
14 I said, cooperated with authorities or did something
15 like that and you give it to the ADX, especially if
16 it's against one of the gangs, good luck with that.
17     Q. And this rejection notice at BOP000056
18 says, in the first paragraph, that this was rejected
19 in accordance with Program Statement 5266.10, which I
20 assume was the program statement in effect at this
21 time at 2010?
22     A. Yes.
23     Q. And so you believe that this publication
24 was properly rejected under the policy in effect at
25 the time?

53

1 A. I -- I would say so.
2 Q. Okay.
3 A. In my opinion.
4 Q. Okay. Let's look at one more. So we'll
5 mark this as Exhibit 5.
6 (Deposition Exhibit 5 was marked.)
7 Q. So we're marking as Exhibit 5 a document
8 bearing Bates No. BOP000082.
9 A. Okay.
10 Q. And can you identify this document?
11 A. This document, again, appears to be a
12 Notice of Rejected Publication signed by Mr. Blake
13 Davis, the complex warden at the time.
14 Q. And what publication is this for?
15 A. The subject says Prison Legal News.
16 Q. And the issue is June 2010?
17 A. Yes, sir.
18 Q. Okay. And if we go to the second
19 paragraph of the rejection notice, it says that the
20 referenced page contains information on a riot at USP
21 Florence and information on an ADX inmate.
22 And can you -- looking at this document
23 -- and I think the article referenced is on the back
24 page. Can you state why this issue was rejected?
25 A. And do I have -- I can read this again?

54

1 Q. Of course.
2 A. Okay.
3 (The deponent read the document.)
4 A. I would have to reject this one as well.
5 And I'll explain why.
6 Q. Okay.
7 A. Again, I was not there at the time, I did
8 not make the decision, but I will tell you why. Right
9 here in the second paragraph, we mention, "The riot
10 started after members of the Aryan Brotherhood," the
11 most violent and deadly prison gang in the Federal
12 Bureau of Prisons.
13 It then goes on to cite the inmate's
14 name, "'who refused to participate'" and that they
15 beat him.
16 This article is fine, in my personal
17 opinion, if you take that person's -- if they said
18 they beat an inmate for refusing to participate. But
19 you're now putting out the name of a guy that they
20 want beaten or killed, and you're giving it to the
21 heads of the -- the most violent prison gang and
22 saying, Hey, I know you don't remember the name of the
23 guy in the rec yard, but here's the name of the guy in
24 the rec yard.
25 Now you can reach out and kill his

55

1 family, you can reach out and kill him. If that name
2 wasn't on there, I personally would not see anything
3 wrong. But by saying that, Mr. Horne is now a target
4 for the rest of his life, as is his family. You don't
5 ever cross the Aryan Brotherhood and come back from
6 it. If they want you dead, you die. It's just the
7 way it is. And that's the only thing I see wrong.
8 That's why if it would have been my decision, we're
9 handing him in on a silver platter. So no matter
10 where we move him, no matter where we send this
11 inmate, he is a target for the rest of his life.
12 Q. And so this would be considered
13 detrimental to the safety and security of the
14 institution?
15 A. Yes, sir. Especially safety and
16 security, not only making a --
17 MS. PROSE: Slow down a little bit.
18 A. -- not only is it a threat to this
19 inmate, but it is a threat to responding staff as
20 well. So when a threat is out to an inmate, it
21 becomes a threat to staff as well because we have to
22 respond to it.
23 Q. (BY MR. KIEHL) Okay. And you believe
24 this was properly rejected under the policy in effect
25 at the time?

56

1 A. If they rejected it for the reason I
2 stated, yes. If they just rejected it because of a
3 riot, possibly not; but because of that, yes.
4 Q. Let's look at another one.
5 A. Okay.
6 Q. I just want to make sure I understand
7 this.
8 A. Okay.
9 (Deposition Exhibit 6 was marked.)
10 Q. And so we are marking as Exhibit 6 a
11 document bearing Bates BOP000125. That's the starting
12 Bates number. And it looks like it continues through
13 131. Can you identify this document?
14 A. Yes. It appears to be a Prison Legal
15 News. And it looks like it was a rejected
16 publication.
17 Q. Okay. And who signed this rejection
18 notice?
19 A. It appears to be another acting warden.
20 Q. Signing for --
21 A. Signing for the warden, yes, sir.
22 Q. Blake Davis. And can you say why this --
23 and this concerns Prison Legal News issue
24 October 2011. Does that sound correct?
25 A. Pages 28 and 29. Okay. Okay. I'm going

14 (Pages 53 to 56)

57

1 to read it again real quick.
2 Q. Okay. So my question is --
3 A. Okay.
4 Q. -- can you explain why this issue was
5 rejected?
6 A. Okay.
7 Q. And I'll give you a second to look --
8 A. Thank you.
9 Q. -- to read the article.
10 (The deponent read the document.)
11 A. I do not see good cause on this one to
12 reject based on what I read. It says ADX inmates.
13 I'm not sure which of those inmates were ADX inmates
14 or if there was some implication.
15 Again, I wasn't there at the time; so
16 there may have been a supporting memorandum or a
17 document stating -- citing this person, and it is a
18 threat because of X,Y,Z; but reading it myself, I do
19 not see a reason why we would have rejected it.
20 Q. So if we turn to page BOP000131, what is
21 this document here --
22 A. Okay.
23 Q. -- that we're looking at.
24 A. This is a publication mail rejection that
25 is sent to the inmate, I believe. It's a different

58

1 document than I've used at other institutions, so I'm
2 guessing that's what it is. I missed that originally.
3 Q. And so this says -- I think you were
4 reading paragraph 8 of page BOP131.
5 A. Yes.
6 Q. It says on page 50 -- there is a brief
7 article of the homicide that occurred at FCC Florence.
8 It gives the names of the inmates that were involved
9 in the homicide and the amount of sentence that each
10 received. The article also states that the assault
11 homicide occurred allegedly due to a disrespect issue
12 involving the Surenos --
13 A. Surenos.
14 Q. My apologies -- S-u-r-e-n-o-s -- gang.
15 So if we turn to page 50, it has these little news
16 brief items, and there's one in the middle of the page
17 that says, "In June 2011, following a federal trial in
18 Denver, four prisoners were convicted of beating
19 another prisoner to death at FCC Florence." And it
20 gives the names of the prisoners who were convicted
21 and the prisoner who died. And it says, "The four
22 assailants were members of the prison gang."
23 So that news item, would that be
24 considered detrimental to the security, good order, or
25 discipline of the institution?

59

1 A. It -- it could be. I missed that when I
2 was going through it. I just read the other --
3 Q. How so?
4 A. Well, if this was an unsanctioned hit --
5 so if these guys acted on their own -- a little
6 history. The Surenos are under the umbrella under the
7 leadership of the Mexican mafia or the California
8 Mexican mafia or MA. All of their leaders are also at
9 the ADX there in Florence.
10 So if this was an unsanctioned hit, and
11 they show that these four guys were the ones who
12 murdered our other guy, then that could be very
13 serious because now wherever those inmates are for the
14 rest of their career, if it was an unsanctioned hit,
15 they reach out, and these guys will pass away or their
16 family members.
17 Q. So these four inmates who were convicted
18 in this homicide of another inmate could themselves be
19 at risk based on the circumstances of this hit?
20 A. Yes. When it comes down to it, in the
21 prison system, hits are okay if they are sanctioned.
22 So if a hit is sanctioned, it would be fine. So I
23 don't know the details of this hit. I'm sure there
24 were debriefs. There were investigations done.
25 If we were to find out later that it was

60

1 a sanctioned hit, that it was approved -- and that may
2 have came out during the trial -- I'm not sure -- then
3 there's no harm, no foul to these guys. They can
4 continue to walk. They may even get promoted in rank
5 through the prison. But us, again, having those gang
6 members at the prison if we weren't aware of whether
7 it was a sanctioned hit or not, then that would give
8 us cause for concern, because we are now -- again,
9 here are the names of the people who did the murder.
10 So if you want retaliation, here they are.
11 Other gangs won't retaliate. If the
12 person is a member of the same gang and it was
13 sanctioned, it's a done deal, it's over. If not,
14 these guys are targets for the rest of their lives.
15 Q. So if you don't know if it was a
16 sanctioned hit or not, then you would err on the side
17 of caution and reject the publication?
18 A. Personally, I would. I can't speak for
19 Mr. Davis, who was the warden at the time or others;
20 but, again, when it comes down to the safety and
21 security of -- I've seen staff members stabbed, I've
22 seen many inmates murdered, died, assaults.
23 I personally am a little more
24 conservative, and I also look into this kind of stuff
25 maybe a little more deeper than some people might.

### 61

1  And I actually didn't -- missed that because I was
2  looking at page 20 and 21. I'm, like, this means
3  nothing. Why would we reject this?
4      Q.  Right.
5      A.  It's actually case law.
6      Q.  All right.
7          MR. KIEHL: Maybe we'll look at one more,
8  and then take a break, if that sounds good.
9          MS. PROSE: Whenever.
10         THE DEPONENT: Sure.
11         MS. PROSE: Whenever you'd like.
12         MR. KIEHL: Are you okay?
13         THE DEPONENT: Yeah, I'm fine.
14     Q.  (BY MR. KIEHL) Let's go to No. 7.
15         (Deposition Exhibit 7 was marked.)
16     Q.  So we're marking as Exhibit 7 a document
17 starting with the Bates BOP000215.
18     A.  Okay.
19         MR. KIEHL: And, Suzanne, just for your
20 reference, some of these have multiple copies of the
21 same rejection notice.
22         MS. PROSE: Sure.
23         MR. KIEHL: So I skipped some numbers so
24 I didn't have to print many, many pages of the same
25 thing.

### 62

1          MS. PROSE: Thank you.
2      Q.  (BY MR. KIEHL) Okay. And so it appears
3  that this is a rejection notice concerning Prison
4  Legal News, issue November 2011 signed by Blake Davis,
5  or somebody acting for him. Does that all sound
6  correct?
7      A.  Yes, it is someone acting for a warden,
8  Blake Davis.
9      Q.  Okay. Does that guy work? And then if
10 we turn to page BOP000243 at paragraph 1, it says this
11 "Publication contains an article regarding a BOP
12 inmate who cooperated in an investigation who claims
13 he was assaulted by a BOP employee on page 38. Also
14 contains an article regarding a BOP inmate whose
15 charges were dropped due to mishandling of evidence on
16 page 47."
17         So do you mind again taking a look at
18 this?
19     A.  I do not mind. Do you -- I don't know
20 which article.
21     Q.  It sounds like on page 38, it's this top
22 article --
23     A.  Okay.
24     Q.  -- referencing --
25     A.  And then the other article is this one on

### 63

1  the back. Okay, yeah, BOP evidence -- yeah, okay.
2          (The deponent read the document.)
3      A.  I don't see any reason to reject this,
4  especially when they are referring to the inmate as
5  John Doe. And then these inmates, the second story,
6  when it comes down to that, they were just upset that
7  the bureau mishandled evidence. We would have no
8  reason to not let them have that.
9      Q.  Right. Okay. So it appears that there
10 is no reason that this -- that the articles you
11 reviewed in this issue would be detrimental to the
12 security, good order, or discipline of the
13 institution?
14     A.  With the present information I have,
15 without knowing any sort of back story, no, I do not
16 see any reason why.
17     Q.  Okay. Great. Thank you.
18         MR. KIEHL: Maybe we'll take a brief
19 break.
20         (Recess taken, 9:58 a.m. to 10:02 a.m.)
21     Q.  (BY MR. KIEHL) We're back on the record.
22 Mr. Chapman, would you like to clarify a point?
23     A.  Yes. The point I would like to clarify
24 is that one of the attachments --
25     Q.  Which one are you looking for?

### 64

1      A.  The Program Statement 5266.11, I believe,
2  dated November 9, 2011, is, in fact, our current one.
3      Q.  Okay.
4      A.  So there has not been one released since
5  then. I know -- I wasn't sure, but I made sure it is.
6      Q.  Okay. Great. And I think that was
7  Exhibit 2, maybe.
8      A.  Yes, sir, it is Exhibit 2.
9      Q.  Okay. And while you have that, I just
10 wanted to ask another question about Exhibit 2,
11 Program Statement 5266.11. And this is the current
12 program statement on incoming publications, which is
13 issued by the Federal Bureau of Prisons in Washington,
14 as we discussed.
15         Does this set forth the overall standards
16 by which a warden evaluates incoming publications to
17 determine if they can be distributed in the
18 institution?
19     A.  Yes, sir. This is, like, a framework or
20 ground rules of --
21     Q.  Okay.
22     A.  -- this is typically what you should be
23 doing.
24     Q.  Okay.
25     A.  Yes.

16 (Pages 61 to 64)

**Page 77**

1  today and not anything else, I would most likely let
2  that one in.
3      Q.  So you said if you knew of a credible
4  threat to him.
5      A.  Yes.
6      Q.  Can you explain that?
7      A.  And what I can say is possibly one of the
8  inmates we have at the ADX, maybe one of his family
9  members worked there and was killed during that
10 explosion.  And so he might like to seek retribution,
11 knowing who this person is.
12         Again, while most court cases are public
13 information, the inmates have to know the person, they
14 have to know the case, they have to know what they
15 need to look for.
16         It's the time we hand them, Hey, here's
17 the case numbers, here's all of the names involved.
18 Have a good time.  So that would be the only reason I
19 can think of.  Chances are we don't have an inmate who
20 fits that bill.  So like I said, looking at it today,
21 if this were to come through, I would sign it.
22     Q.  You would permit this to be circulated in
23 the prison?
24     A.  Yes.
25     Q.  Yes?  Okay.  So you do not believe it was

**Page 78**

1  properly rejected at the time?
2      A.  Without any supporting documentation, no.
3      Q.  All right.  Okay.
4         (Deposition Exhibit 10 was marked.)
5      Q.  We're marking as Exhibit 10 a document
6  beginning with Bates No. BOP000300.  And this appears
7  to be a rejection notice for Prison Legal News issue
8  November 2012.  Does that appear correct, Mr. Chapman?
9      A.  It does appear correct, yes.
10     Q.  Okay.  And can you tell who signed this
11 one?
12     A.  This is the third different signature
13 I've seen for Mr. Berkebile.
14     Q.  Set a record?
15     A.  So someone who is acting in this
16 capacity.
17     Q.  So this was signed by somebody acting for
18 the warden?
19     A.  I believe so.
20     Q.  And it looks like the signature is dated
21 December 10, 2012?
22     A.  Yes, sir.
23     Q.  Okay.  And if we go back to the first
24 page of the exhibit, Exhibit 10, at BOP300, it says at
25 paragraph 1 at page 42 of this issue of Prison Legal

**Page 79**

1  News, it discusses ADX Inmate John Powers.
2         And page 42, we have an article
3  headlined, "BOP Supermax Lawsuit Claims Horrific Abuse
4  of Mentally Ill at ADX."  And -- let's see.  It -- can
5  you take a look at this --
6      A.  Okay.
7      Q.  -- and let us know why you believe this
8  issue was rejected?
9      A.  Okay.  Will do.
10        (The deponent read the document.)
11     A.  Okay.
12     Q.  Why do you believe this issue was
13 properly rejected?
14     A.  If you look in the second column, there
15 it talks about Inmate Powers.  It says there that he
16 witnessed a prisoner-on-prisoner killing, testified in
17 the case.
18        You can't be more of a bigger snitch than
19 testifying on another inmate, especially over a murder
20 like that.  So if this inmate there was at the ADX and
21 we were to tell everyone else, Hey, your neighbor is a
22 snitch, if you didn't know that, I just wanted to give
23 you a heads up, that is bad for us, bad for business.
24     Q.  Okay.  And that presents a safety and
25 security risk both to Inmate Powers and to the staff

**Page 80**

1  at ADX?
2      A.  Yes, sir.  The rest of the article, I --
3  I don't see anything wrong with.  Just that one
4  sentence.
5      Q.  And if Mr. Powers today remains an inmate
6  at any BOP facility, would you recommend this issue
7  containing this article be permitted to circulate
8  inside ADX?
9      A.  This one here is a little tougher because
10 it doesn't give the case number or the inmate he
11 snitched on.  While it is telling him he is a snitch,
12 it isn't giving the easier access to the other inmates
13 to look it up.
14        And if he's no longer at the ADX -- it
15 says -- it doesn't give case numbers, it doesn't give
16 any of the inmates he snitched on.  I would give him a
17 fighting chance for other inmates to have to find that
18 information.  But if we would have given a case number
19 or an inmate's name that he testified against, that
20 would have been bad.  But if he's no longer at the
21 ADX, then that would be the reason I might let that
22 one in.
23     Q.  And if he is at any other BOP facility,
24 would you allow this in?
25     A.  That would be tough.  I'd have to look up

TODD CHAPMAN - 1/17/2017
Prison Legal News v. Federal Bureau of Prisons

---

81

1  his -- his -- I would have to see who he testified
2  against, because if he testified against a nobody,
3  it's less of a risk than if he testified against a
4  gang member or gang leader.
5       He will always have a risk because he's
6  labeled a snitch; but depending on who he snitched
7  against, it gives a level of risk.  You know, I would
8  have to weigh -- I would have to do a lot of research
9  into this one to decide if I would let this one in
10 personally.
11      Q.  Okay.  Thank you.
12      A.  You're welcome.
13      Q.  All right.  Let's do one more.  And I
14 appreciate your patience.
15      A.  Oh, no problem.
16      (Deposition Exhibit 11 was marked.)
17      Q.  So this is a document we're marking as
18 Exhibit 11.  It begins with Bates No. BOP000386.  And
19 this appears to be a rejection notice for Prison Legal
20 News issue July 2013.  Does that appear correct,
21 Mr. Chapman?
22      A.  Yes, it does appear to be correct.
23      Q.  And who appears to have signed this
24 rejection notice?
25      A.  It appears to be someone acting in

82

1  capacity of Mr. Berkebile --
2       Q.  Okay.
3       A.  -- acting warden.
4       Q.  Someone acting for the warden signed this
5  apparently on July 31, 2013?
6       A.  Yes.
7       Q.  Okay.  And so this rejection notice
8  references at the top pages 36 to 37 of the July 2013
9  issue of Prison Legal News, and it says, "The
10 publication has been rejected because the referenced
11 pages discuss individuals incarcerated at ADX."
12      And so if we turn to pages 36 and 37,
13 there's an article that begins at the bottom of page
14 36 and continues on to page 37.  Would you take a
15 moment to read that and let us know why you think this
16 issue was rejected?
17      A.  Yes, sir.
18      (The deponent read the document.)
19      A.  Okay.
20      Q.  Okay.
21      A.  I have read this.  And the reason I would
22 reject it, if I rejected it, would be based on the
23 fact of his Sinaloa drug cartel, because we have a
24 very large Mexican national population in our federal
25 prisons.  And because we're putting that, Hey, this is

83

1  the person in charge of the Sinaloa cartel who killed
2  your entire family, beheaded them and threw the bodies
3  in the woods, they might be concerned of that.  And on
4  here, it says that between -- like a 17-month period,
5  he was in three places without incident.
6       We may have more information on that than
7  the inmate may have had.  Due to security reasons, we
8  may not have shared that.  So that could have been why
9  -- because it is very, very unusual for an inmate to
10 go to three prisons in 17 months.  That leads me to
11 believe there was a problem.  Normally inmates will
12 spend a year and a half to the rest of their life in
13 one prison.
14      Q.  Right.
15      A.  So the fact that he transferred that many
16 times in that short of a period of time, red flags all
17 over for me.  And a lot of our investigative material
18 and threats and stuff, we would not share with the
19 inmate, nor would we share with the public.
20      Q.  Okay.
21      A.  So if -- back story.  Knowing if that
22 would have been the case, and if I was working there
23 at that time, and this inmate was my inmate, I would
24 know that fact.
25      So if that was, in fact, the case, and

84

1  this came across my desk, very likelihood, especially
2  with our population, even at the ADX, the amount of
3  Mexican citizens we have could pose a threat to him,
4  because he may have murdered one of the family members
5  of one of the other inmates we have.  If we would not
6  have put the cartel information in there, I would have
7  seen no problem with it.
8       Q.  Okay.  It's -- so this article states
9  that this inmate is a leader in the Sinaloa cartel,
10 right?  That's what you were referencing?
11      A.  Yes.
12      Q.  And that could -- the identification of
13 him as a leader of that cartel could present safety
14 and security issues?
15      A.  Yes.
16      Q.  So you believe, based on the information
17 that you have, that this issue was properly rejected
18 under the policy in effect at the time?
19      A.  I'm speculating based on the movement.
20 To me, that brings up red flags.  So there was a
21 reason he was brought here because there are gang
22 leaders of drug cartels that are in other places.
23      So there was something about him that
24 brought him to us, because we don't randomly pick up
25 inmates who are not management problems and aren't

21 (Pages 81 to 84)

85

1 doing anything and don't have threats and bring them
2 to the ADX. You earn your way to the ADX.
3   Q.  That's a good way of putting it. I think
4 we're just going to show you one more of these
5 rejection notices.
6   A.  Okay.
7      (Deposition Exhibit 12 was marked.)
8   Q.  So we are marking as Exhibit 12 a
9 document beginning with Bates No. BOP000446, and it
10 goes through BOP000449. And looking at that page,
11 this appears to be a rejection notice for an issue of
12 Prison Legal News dated April 2014. And who signed --
13 does that sound correct, Mr. Chapman?
14   A.  Yes, it does.
15   Q.  And who signed this one?
16   A.  Yet another person acting for
17 Mr. Berkebile.
18   Q.  Let me ask you about that now that we've
19 seen, maybe, four or so different signatures for
20 Warden Berkebile. My understanding of the program
21 statement and the regulations is that only the warden
22 may reject a publication or somebody acting for the
23 warden; is that correct?
24   A.  Yes, it is correct.
25   Q.  And so why do we see, maybe, four or more

86

1 different signatures for Warden Berkebile on these
2 rejection notices?
3   A.  I have a very good answer for that.
4 Warden Berkebile, as Warden Davis before him, were
5 very well-known, very popular, very influential
6 wardens. That's how they got the position at ADX. So
7 those particular wardens did a lot of training and a
8 lot of teaching throughout the agency. So they get a
9 lot of time on the road teaching other wardens and
10 other associate wardens how to do what they do.
11      So -- and we have seven different
12 associate wardens throughout the complex. So while
13 they were gone, they will rotate the different
14 associate wardens through to get them experience. So
15 that would be my explanation as to why there are so
16 many is because they are so sought after because of
17 their knowledge that they were gone quite frequently.
18   Q.  Okay. And so of those seven associate
19 wardens, whoever is acting for the warden at the time,
20 a rejection notice comes across their desk, and they
21 would use their correctional judgment to decide
22 whether the rejection is appropriate and sign the
23 notice; is that correct?
24   A.  Yes, sir. They would be acting as the
25 final approving official based on whatever information

87

1 was given to them. They would make their sound
2 correctional judgment decision as to whether they
3 would reject it or not.
4   Q.  Okay. Have you ever seen a warden
5 decline to sign a rejection notice for an incoming
6 publication?
7   A.  Yes, I have, but not here. When I was
8 the supervisor over this department at the FMC medical
9 center in Devens, Massachusetts, I had a warden who
10 disagreed with the assessment that was given to him.
11 And so he sent it back and said, Give me more
12 information as to why I should do it or give the
13 inmate the -- whatever the item was.
14   Q.  At any of the other BOP facilities you've
15 worked at, have you seen a warden decline to sign a
16 rejection notice?
17   A.  I have not seen it, but I have not been
18 in the capacity to see it. So I was -- as an officer,
19 I never came across any of these. And as an executive
20 assistant, I don't generally come across these because
21 I'm not entitled to sign for this because I'm not an
22 associate warden. So I would not be in that acting
23 capacity to sign this.
24      So I'm sure there have been. I can't
25 imagine that my warden was the only one ever; but I

88

1 just haven't been in that position to see it, reject
2 it, or approve it.
3   Q.  Okay. Thank you.
4   A.  You're welcome.
5   Q.  So returning back to Exhibit 12 at
6 BOP449, it states, "This publication has been rejected
7 because the referenced page," which appears to be page
8 42, "contains information on an individual
9 incarcerated at ADX and details on his case."
10      And if we turn to page 42 of the issue at
11 BOP448, there's an article headlined, "No Death
12 Penalty For Maine Prisoner," and it identifies an
13 inmate at -- as it says, a federal correctional
14 complex in Florence, Colorado, and it provides the
15 name of the inmate.
16   A.  Okay.
17   Q.  Do you have a second to take a look at
18 this article --
19   A.  Yes, I do.
20   Q.  -- and let us know your thoughts. Thank
21 you.
22      (The deponent read the document.)
23   A.  Okay.
24   Q.  Okay. So in your opinion, why was this
25 issue of Prison Legal News containing this article

89

1 rejected?
2     A.  It met three basic criteria, in my
3 opinion.  It named the person who did the murder, it
4 named the person who he murdered, and it also named
5 the prison gang who we happen to have the leader of
6 said prison gang at our prison at ADX.  So this is
7 another one of those scenarios where we are putting a
8 target on the inmate.
9         We're basically saying this person killed
10 the head of our gang person.  And according to the
11 memo, it is unsanctioned, at least in the article
12 written here.  So this person is in a definite risk.
13         So now, again, we're taking this, we're
14 handing it over to the head of that gang and saying,
15 Here is the name of the person who killed your buddy.
16 Have a good time.
17     Q.  Right.  So this article names an inmate
18 at ADX who -- I'm looking at the -- the fifth
19 paragraph here.  It says that this inmate "snuck up on
20 another inmate while he was playing poker and stabbed
21 him in the neck with a homemade knife."  And the
22 inmate who was stabbed "fell to the floor dead."  And
23 the inmate who was killed was a member of a prison
24 gang identified here as the Nazi Low Riders?
25     A.  Yes.

90

1     Q.  Okay.  So that presents the three flags,
2 three red flags that you identified.  And so you
3 believe this was properly rejected under the policy,
4 correct?
5     A.  Those -- those were three red flags to
6 me.  Whether they are red flags to someone else, I
7 can't say.  But to me, that right there raised three
8 red flags that I would use to -- no.  Because it's
9 definitely going to threaten the security of wherever
10 Mr. Watland is at.
11     Q.  Right.
12     A.  And especially when you have a violent
13 prison gang, and someone has used a weapon to murder a
14 inmate, that's also a serious threat to us, because if
15 they are going to respond, they are not going to slap
16 him, they are going to use some other force and a good
17 chance of getting stabbed or injured as well.
18     Q.  So even if the inmate named here who
19 killed the other inmate is no longer at ADX, but has
20 been transferred to another BOP facility, introducing
21 this article into ADX could still present a threat to
22 his safety and to the safety of staff at that other
23 facility?
24     A.  In my personal opinion, yes.
25     Q.  And in your declaration, your statement

91

1 that the warden now believes this issue should be
2 circulated within ADX is a statement of the warden's
3 opinion that you don't necessarily agree with?
4     A.  Yes.  In my declaration, I'm stating that
5 the warden has made the decision to do this, and that
6 is the warden's right, because he is the approving
7 official, the last person in line.
8         You know, we can all present the warden,
9 or whoever else, with our best advice, and they make
10 their own decision.
11     Q.  Okay.  Thank you.  All right.  I'd like
12 to look at some of the institution supplements that
13 you referenced earlier.  Do you need a break?
14     A.  I'm good.
15     Q.  Okay.  Let's go to Tab 16.  But first
16 let's go back to your declaration, which was
17 Exhibit 1.
18     A.  Okay.
19     Q.  And if we go to paragraph 12 of your
20 declaration, Exhibit 1, paragraph 12, you state that
21 "From August of 2007 to February of 2016, there were
22 four versions of an institution supplement entitled
23 Incoming Publications that were in effect at ADX,"
24 correct?
25     A.  Yes.

92

1     Q.  And you state also in paragraph 12 that
2 "An institution supplement is a document that more
3 fully implements federal regulations and national
4 policy at a particular institution."
5         Can you explain what you mean by saying
6 that an institution supplement more fully implements
7 federal regulations?  What does that mean?
8     A.  Sure.  What this means is that we are
9 tailoring the institution supplement to meet the needs
10 of our institution, whichever institution that is
11 across the agency, and its mission.  And that varies.
12         If you were to go to 119 different
13 federal prisons, which we have, and you were to read
14 the same institution supplement, it would be different
15 at 119 different institutions because it is based off
16 your needs.
17         And at the ADX, we have extreme needs
18 that most of the other institutions -- I would say
19 none of the institutions have, and that's why the ADX
20 is there.
21     Q.  Okay.  And if we look at Footnote 2 on
22 your declaration -- this is on page 5 at the bottom --
23 you describe the changes in the institution
24 supplements that predated February 2, 2016.  Some of
25 these changes seem rather minor, such as updating the