# Exhibit 3
# Declaration of Andre Matevousian

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS,
a project of the Human Rights Defense Center,

    Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

    Defendant.

**DECLARATION OF ANDRE MATEVOUSIAN**

    I, Andre Matevousian, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-entitled matter:

    1.    I am employed by the Federal Bureau of Prisons (Bureau) as the Complex Warden at the Federal Correctional Complex in Florence, Colorado. In this capacity, I am also the Warden at the United States Penitentiary – Administrative Maximum (ADX), also located in Florence, Colorado. I have been in this position since April 2018. I have been employed with the Bureau since May 1997. During my tenure with the Bureau, I have served in numerous positions of increasing responsibility, including various positions at ten different Bureau institutions. I have been an Associate Warden, Acting Warden, and/or Warden since November 2011.

2. As Warden, I have access to records maintained in the ordinary course of business by the Bureau, including policies and procedures specific to the ADX known as Institution Supplements. The document attached hereto is a true and accurate copy of a Bureau policy maintained in the ordinary course of business.

3. As Warden at the ADX, I am very familiar with security protocols of prisons and procedures in place to protect institutional security, including physical barriers. I am responsible for maintaining security and for all aspects of the day-to-day operations of the ADX. This includes protecting staff, inmates and the general public from inmates housed at the ADX, the most dangerous, violent, and predatory inmates in the Bureau. The ADX not only houses federal offenders, but many dangerous state offenders who are too violent and dangerous to be housed in a state department of corrections facility.

4. Among my many duties as ADX Warden, I serve as the final authority for determining whether incoming publications contain content that is "detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity." *See* 28 C.F.R. § 540.71(b). Before my arrival at the ADX, I performed this function at the United States Penitentiary (USP) in Atwater, California, the Federal Correctional Institution in Dublin, California, and the USP in Victorville, California. In total, I have been reviewing publications and determining whether their content poses risks to institutional safety and security of the institution, or if their content might facilitate criminal activity, for more than six years.

5. I have been made aware of the claims against the Bureau brought in this lawsuit filed by Prison Legal News (PLN). I am aware that PLN challenges the rejections by former ADX Wardens, or the Warden's designees, of eleven issues of *Prison Legal News*, a magazine

published by PLN. I am familiar with the current ADX Institution Supplement concerning incoming publications, FLM 5266.11E, *Incoming Publications* (December 21, 2017), as well as the prior iterations of that Institution Supplement dated February 2, 2016, and May 30, 2017. A copy of the December 21, 2017, Institution Supplement (hereafter, the "December 2017 Policy") is attached to my declaration as Attachment 1.

6. Based on my understanding of this lawsuit, there was a past practice of focusing on the names of ADX or Bureau inmates or staff members as a basis for rejecting incoming publications, or at least flagging those publications for possible rejection. I understand that the Bureau has referred to this past practice as the "name alone" practice in this case.

7. Under the standard set forth in federal regulations and Bureau policy, in order to reject a publication, a Warden "may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *See* 28 C.F.R. § 540.71(b). The name of an ADX or Bureau inmate or staff member, in and of itself, is not a sufficient basis for rejection under 28 C.F.R. § 540.71(b). This standard is incorporated in the December 2017 Policy. *See* Attachment 1 at § III.C.

8. However, it would also be contrary to sound correctional judgment to impose a rule mandating that incoming publications can never be rejected when they contain the names of Bureau inmates or staff. As a Warden with 21 years of correctional experience, I know that there are circumstances where identifying an inmate or staff member in a publication, along with other information about the inmate or staff member, could place those people, or others associated with them, in jeopardy.

9. The December 2017 Policy recognizes these realities of the correctional environment:

> An incoming publication at the ADX may not be rejected solely because it discusses an ADX or Federal Bureau of Prisons (BOP) inmate, or BOP staff member. When a publication identifies and discusses an ADX or BOP inmate, or BOP staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b). Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment.

*See* Attachment 1 at § III.C. Any issue of *Prison Legal News* that is sent to the ADX is evaluated under these procedures.

10. This provision of the December 2017 Policy makes clear that any past practice of rejecting publications based on names alone has been abolished at the ADX. The policy also ensures that the Warden is allowed to find, based on his sound correctional judgment, that the names of Bureau inmates or staff, coupled with more details about the individual, may pose a security risk depending on the specific circumstances at that time. As a Warden, I need the correctional discretion and flexibility to make that determination as it is never a static determination.

11. Examples of security risks arising from the identification of persons include identifying an inmate sex offender, specifically an inmate who has committed sexual crimes against children, or revealing the fact that an inmate was an informant or witness for the government. Inmates who cooperate with the government or commit sexual crimes against children are viewed as the bottom tier of the prison hierarchy and may be subject to attack without provocation. As the Warden, I must take action to attempt to prevent that type of assault

from occurring. If an incoming publication highlights these types of facts, and in my correctional judgment places an identified inmate at serious risk of harm at the hands of another inmate, I will reject the publication and must have discretion to do so. I cannot knowingly subject inmates to those risks.

12. Requiring a Warden to provide information to the ADX inmate population because it is "publicly available," or possibly "already known" by inmates, would render the Warden helpless to take action to prevent any known or reasonably perceived risks. These arbitrary rules would pose a serious security risk. As Warden, I must have the discretion to reject incoming publications that, in my judgment, pose a security risk to inmates, staff, and the public.

13. Even if information is "publicly available," or if some inmates may know that information, that does not diminish the negative impact of highlighting and presenting that information directly to the dangerous inmate population at the ADX. Oftentimes, inmate rumors (i.e., that another inmate cooperated against the government or is a child sex offender) are not acted upon until that information is verified. When a publication affirmatively identifies an inmate and provides details about his crimes and/or history, that verification increases the risk that he will be harmed by other inmates. Based on my many years of correctional experience, I know that giving this information to the inmate population creates an immediate safety risk to the identified inmate. Taking the proactive step of rejecting an incoming publication that presents dangers like these is the correct and safe way to manage a prison.

14. This is true even though the ADX has many security protocols. No prison is foolproof, and no prison design is immune from breach. There have been many instances at the

ADX where inmates have breached security to seriously assault staff and other inmates. On May 3, 2018, an inmate in B/B Unit, the last phase of the ADX Step-Down Program, was seriously injured by another inmate wielding a shank and had to be airlifted to the hospital. ADX staff work constantly to prevent such security breaches, including by controlling information inmates may possess. Just as it would not be sound correctional practice to supply inmates with weapons and expect the security protocols of the ADX to be sufficient, it is not sound correctional practice to supply ADX inmates with information that poses a security risk and expect that information not to be used in a manner that may jeopardize security at the ADX, in other prisons, and to the public.

15. In sum, as Warden, I must be able to exercise my correctional judgment to determine that there are circumstances in which exposing information about individuals creates risks that require rejection of the incoming publication. No ADX security protocol can eliminate all such risks. Moreover, there is no way for me to identify every risk that may occur in the future. I must conduct that risk analysis at the time I review the publication, in the particular context at the time. The many factors I would take into account in reviewing a future publication would include the specific content of the publication; facts involving the identified inmate, staff member, or other person; the identity of the inmate population at the time, including their contacts outside the prison; and a host of other unknown and unknowable factors that may be in play at some hypothetical point in the future.

16. Section III.C. of the December 2017 Policy prevents rejections of incoming publications based on the mere mention of inmates or staff, while giving the Warden the necessary discretion to deal with risks that may arise when information about these people is

6

exposed to the ADX inmate population. The ADX will continue to abide by § III.C. of December 2017 Policy because it is in accordance with the law and sound correctional judgment.

17. The provision of the December 2017 Policy addressing procedures following rejections states as follows:

> When an incoming publication is rejected, the Warden will promptly advise the inmate and publisher in writing of the decision and the reason(s) for it. The notice must contain reference to the specific article(s) or material(s) considered objectionable, including page references and quotes from the incoming publication. The Warden will advise the publisher or sender that the publisher may obtain independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter. Ordinarily, the rejection notice will be mailed to the publisher within ten business days from the Warden's signature date.

Attachment 1 at § III.G.

18. The ADX will continue to abide by § III.G. because it is in accordance with Bureau regulations and sound correctional judgment. These procedures would be applied if any issue of *Prison Legal News* is ever rejected at ADX in the future.

19. I am aware that former ADX Warden Jack Fox reviewed the eleven previously rejected issues of *Prison Legal News*. Following his review, the issues were delivered to inmate subscribers in March 2017. *See* Doc. 66-1 at ¶ 4. I agree with his assessment. The eleven issues also would not be rejected under the December 2017 Policy.

Pursuant to the provisions of 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 14th day of May 2018, in Florence, Colorado.

*s/ Andre Matevousian*
Andre Matevousian
Complex Warden
FCC Florence, Colorado
Federal Bureau of Prisons

**Attachment:**

Attachment 1, FLM 5266.11E, *Incoming Publications* (December 21, 2017)

# Attachment 1
# FLM 5266.11E, *Incoming Publications*
# (December 21, 2017)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV



U. S. Department of Justice
Federal Bureau of Prisons

INSTITUTION SUPPLEMENT

OPI: Correctional Systems
NUMBER: FLM 5266.11E
DATE: December 21, 2017

# Incoming Publications

*/s/*
*Approved:   Jack Fox, Warden*
            ADX Florence

I. **PURPOSE AND SCOPE:**   This Institution Supplement is prepared to outline the procedures at the United States Penitentiary, Administrative Maximum (ADX), Florence, Colorado, for implementing Program Statement 5266.11, Incoming Publications. This Institution Supplement must be read in conjunction with the Program Statement for a clear understanding of the policy.

II. **DIRECTIVES AFFECTED:**

   A. **Directives Rescinded:**  FLM 5266.11D, Incoming Publications, dated May 30, 2017.

   B. **Directives Referenced:**  Program Statement 5266.11, Incoming Publications, dated November 9, 2011.

   C. **Standards Referenced:**  American Correctional Association 4th Edition Standards for Adult Correctional Institution:  4-4490

III. **PROCEDURES:**

   A. All incoming inmate publications will be x-rayed by the receiving Correctional Systems Officer (CSO) prior to entering the facility. A further physical search will be conducted by the mail room staff.

   B. The receiving CSO will review all incoming publications for potentially objectionable content in accordance with 28 C.F.R. § 540.70 *et seq.* If content is preliminarily deemed objectionable by the receiving CSO, the objectionable incoming publication will be forwarded to the Special Investigative Services (SIS) department for

      additional review in accordance with 28 C.F.R. § 540.70 et seq.  SIS staff will review each individual incoming publication and, if rejection is recommended, prepare a letter for the Warden's signature.  All recommended rejection letters must notate, in writing, specific objectionable pages and content, as well as the national policy and Code of Federal Regulations citation.

**C.** An incoming publication at the ADX may not be rejected solely because it discusses an ADX or Federal Bureau of Prisons (BOP) inmate, or BOP staff member.  When a publication identifies and discusses an ADX or BOP inmate, or BOP staff member, SIS staff must conduct an individualized assessment of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.70(b).  Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment.

**D.** Prior to being sent to the Warden for formal action, all recommended rejection packets will be forwarded to the Legal Services department for review.

**E.** When a technical or specialized incoming publication is questioned for acceptability, in addition to the above procedures, it will also be forwarded to the department supervisor, with knowledge in that field, for further review and a recommendation of approval or disapproval.  Departments recommending any publication rejection must annotate in writing the specific objectionable pages and the national policy cite for the mailroom's records.

**F.** The CSO will contact the Administrative Remedy Coordinator and/or review the appeal status in SENTRY before returning any publications, to ensure the inmate has not submitted an appeal.  If an appeal is lodged, the materials will be held until the appeal process is exhausted, including Regional and Central Office appeals.  Appeal procedures for publications rejected due to its feature of nudity or sexual explicitness vary from other publication rejections and are outlined in the national directive.

**G.** When an incoming publication is rejected, the Warden will promptly advise the inmate and publisher in writing of the decision and the reason(s) for it.  The notice must contain reference to the specific article(s) or material(s) considered objectionable, including page references and quotes from the incoming publication.  The Warden will advise the publisher or sender that the publisher may obtain independent review of the rejection by writing to the Regional Director within 20 days of receipt of the rejection letter.  Ordinarily, the rejection notice will be mailed to the publisher within ten business days from the Warden's signature date.

**H.** Inmates involved in approved education courses, which require books that must be purchased or obtained on loan from local colleges, may arrange to obtain these books through the Supervisor of Education.  When the books arrive, a staff member from the Education Services department will complete an appropriate inspection, annotate the

authorization form, stamp each book as inmate personal property with the inmate's name, register number, date received, and the staff member approving the publication and provide for book delivery to the inmate.

**I.** Publications will be limited to three publications per parcel. This includes all publications received from an authorized source. Any package received that includes a number of publications over the established mailing limit will result in the entire package being returned to the sender as unauthorized.

**J.** Publications containing metal or thick plastic bindings will not be permitted and will be rejected by the mail room staff.

**K.** Inmates are not required, but highly encouraged, to consult with unit team or the Supervisor of Education prior to ordering a publication.

**L.** To ensure the security, discipline, and orderly operation, publications in a language other than English will be subject to translation, review, and verification, which may cause a delay in receipt. This review is necessary to ensure compliance with the national directive. Publications which cannot be reasonably translated may be rejected. Foreign publications must be received directly from the publisher, a bookstore, or book club.

**M.** Inmates will be permitted to receive incoming general correspondence containing newspapers or magazine clippings from non-commercial sources, if after review, it is determined the newspaper or magazine clipping poses no threat to institution security, and the quantity of materials does not adversely affect the ability of mail room staff to effectively monitor incoming general correspondence. For purposes of this section, incoming general correspondence containing in excess of 50 pages of newspaper or magazine clippings adversely affects the ability of staff to effectively monitor incoming general correspondence.

**N.** Materials printed directly from the internet will be treated as incoming general correspondence, and inmates will be allowed to receive such materials in quantities which do not adversely affect staff's ability to effectively monitor incoming general correspondence for contraband and other threats to institutional security and good order. Such materials are subject to rejection for content. For purposes of this section, incoming general correspondence containing in excess of 50 pages of materials printed directly from the internet adversely affects the ability of staff to effectively monitor incoming general correspondence.

**O.** Any publication which includes any markings or notations may be regarded as a possible code and will be considered for rejection. Examples of this include, but are not limited to folded or tagged pages, underlining, highlighting, or any written comments within the publication.

**P.** Unit staff should consult with mail room staff before approving any magazine subscription for purchase by an inmate. Prohibited materials that have photographs or drawings entirely cut out or removed by the sender, will be authorized, should there be no other prohibited sections. Attempts to "cover" nude or sexually explicit pictures will not make a publication acceptable for introduction.

**Q.** Hardcover books received in the mail will have the covers removed by mail room staff. The inmate must indicate on the hardcover book approval form (Attachment 1) they are voluntarily authorizing the removal of the cover. Lack of such authorization will cause the entire package to be returned to the sender.

**R.** Publications which are permitted pursuant only to Special Administrative Measures (SAM) will be received and processed in accordance with national directives.

**S.** An Attorney from Legal Services will conduct quarterly training with Correctional Systems staff and SIS staff regarding the procedures outlined in Program Statement 5266.11, Incoming Publications, and this supplement.

---

**DISTRIBUTION:**

**Directives Libraries**          **AFGE**

## HARDCOVER REMOVAL APPROVAL

**Name:** _____ **Register Number:** _____

**Quarters:** _____

I request approval for the following hardcover book(s). The book(s) are necessary and are not available in paperback. I voluntarily authorize the mail room permission to remove the hard cover prior to delivery to me. I understand no more than three publications per mailing are permitted. I acknowledge the entire package will be returned if any unauthorized items are included and this authorization is good for 60 days only.

**Title:**_____

**Title:**_____

**Title:**_____

**Name of Publisher/Bookstore/Bookclub:** _____

**Address:**_____

**Phone Number (for verification purposes by staff):** _____

Inmate Signature: _____

-------------------------------------------------------------------------------------------------------------

**(Do not write below this line - Staff Use Only)**

Date:_____ Expiration Date (60 days): _____

To: Mail Room Officer

The hardcover books listed above have been approved, pending inspection upon arrival. The hard cover is to be removed prior to delivery to the inmate.

**Approved:**   _____
                      Department Head's Signature

---

FLM 5266.11E                    Incoming Publications                 Attachment 1