# Exhibit 6
# Deposition of John Dunkelberger (excerpts)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV



# Transcript of John Lee Dunkelberger, Designated Representative

**Date:** March 9, 2018
**Case:** Prison Legal News -v- Federal Bureau of Prisons

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLORADO
 3    - - - - - - - - - - - - - - x
 4    PRISON LEGAL NEWS, a          :
 5    project of the Human          :
 6    Rights Defense Center,        :
 7                Plaintiff,        : Civil Action No.
 8       v.                         : 15-cv-02184-RM-STV
 9    FEDERAL BUREAU OF PRISONS,    :
10                Defendant.        :
11    - - - - - - - - - - - - - - X
12
13        Deposition of THE FEDERAL BUREAU OF PRISONS
14         By and through its Designated Representative
15                   JOHN LEE DUNKELBERGER
16                      Washington, DC
17                  Friday, March 9, 2018
18                        7:53 a.m.
19
20
21
22
23    Job No.:  180129
24    Pages 1 - 84
25    Reported by:  Debra A. Whitehead
```

1   every page, look at every page of every
2   publication that comes in.
3          Randomly read, would be randomly read
4   letters, randomly read magazine articles, randomly
5   read anything that may look suspicious or raise an
6   eyebrow based on the incoming publication's
7   program statement.
8          So if we were to --
9      Q   Just to clarify. You said that they do
10  read every page or that they would have to read
11  every page?
12     A   I did not say they would read every page.
13  They would have to review every page. That's the
14  way policy stands now.
15         I don't recall if that's in the
16  correspondence -- I believe it's in the
17  correspondence program statement or it could be in
18  the mail management program statement.
19     Q   So what's the difference between
20  reviewing a page of a publication and reading a
21  page of a publication?
22     A   If we're turning the page -- this goes
23  with every page. It could be a book, it could be
24  inmate mail. We want every staff member to look
25  at every single page. Not just for content, but

1   also for contraband such as narcotics.  Inmates
2   have become very clever.  They'll secrete things
3   on paper, and then that will be part of a
4   publication that could be part of a letter that
5   could be part of a book.  But we want our staff to
6   look at -- some of our staff, our facilities have
7   a big bright light that they can put a page on to
8   determine if there's a water mark or a water stain
9   to look at so we could look at it further,
10  assuming that it may have been soaked in a
11  narcotic that could be ingested or cut and placed
12  on their tongue in order for it to release
13  whatever properties it has.
14          So when I say, review every single page,
15  that's what they do.  Randomly read means they're
16  going to randomly read incoming mail, incoming
17  letters, and publications.
18          You look through the publications very
19  quickly to see if it's how to make alcohol, how to
20  break someone's neck.  Some magazines or
21  publications cater to inmate activity or criminal
22  activity.
23          So it may mention something regarding an
24  ongoing crime or individuals that may be
25  incarcerated in that facility or in the Bureau of

Transcript of John Lee Dunkelberger, Designated Representative
Conducted on March 9, 2018

47

1   Prisons that we want to be aware of, that may
2   raise that red flag, hey, it mentions here this
3   guy, this guy, and this guy.  We'll set that
4   aside, come back to it when we're done sorting the
5   rest of our mail and look and see if this person
6   is in our system somewhere.  That may raise it to
7   the next level of should we reject this and here
8   is why we believe it should be rejected.
9          Then it would go to the SCSS or the CMC,
10  or I believe in the ADX case the SIS, whoever
11  prepares something for the warden to review, you
12  know, in order to reject or have their decision as
13  to whether it's rejected or it goes to the inmate.
14  That's what we would look at.  Or that's what they
15  would do.
16         So if we were to start -- if everything
17  we found -- we would have to read -- if in
18  addition to putting our hands on every page,
19  randomly reading, and now we have questionable
20  material that we're going to potentially redact
21  under one of these four methods, then that's
22  another step in the process.  Where it would be
23  more work and more time to review versus what
24  we're doing now.
25      Q   So let me just -- I want to clarify a

Transcript of John Lee Dunkelberger, Designated Representative
Conducted on March 9, 2018
61

```
 1        Q    Why -- help me understand why as part of
 2   that review they can't just scratch out the -- any
 3   objectionable content they find.
 4        A    As it stands now, if we asked any staff
 5   member to do that, I don't think they would have a
 6   clear understanding as to how much or what to
 7   redact and what to leave.
 8             Would it be the entire article or would
 9   it be surgical throughout the article.  If it
10   talked about someone being a sex offender, and we
11   did not want that information to be known to the
12   inmates because it would cause undue harm or undue
13   risk to that inmate, would we just scratch out the
14   sex offender, would we scratch out, you know, just
15   acts that related to the sex offense?
16             What would we -- what would we do?  In
17   addition to being a cumbersome task of going
18   through the entire thing and scratching things
19   out, where as it stands we would look at it now,
20   and if it is determined rejectable, we would
21   reject the entire thing.
22        Q    So the policy is that content that is
23   deemed detrimental to the security, good order, or
24   discipline of the institution may be rejected.
25             Correct?
```

1    Q    Okay.  So when ADX decides not to censor
2    a publication, does that mean that they have read,
3    someone has read line by line to determine there
4    is no content that is detrimental to security,
5    good order, discipline of the prison?
6    A    If something catches their eye when
7    they're looking through it.
8    Q    So the question is, if they choose -- if
9    the publication is not censored or rejected, that
10   is a determination that there is no content that
11   is detrimental to the security or good order of
12   the prison?
13   A    That's what our expectation would be.
14   Q    Okay.  So isn't it true then that ADX is
15   already reviewing publications in great detail
16   before delivering them to inmates?
17        MR. COOK:  Objection.  Beyond the scope.
18        You can answer.
19   Q    You can answer, if you know.
20   A    I would assume they are.  I would
21   definitely assume they are.
22        If -- the only counterpoint I would say
23   is if they read the first 30 lines, and they start
24   seeing objectionable material, they're going to
25   say, Oh, wow, look at this, and they'll flag that.

```
 1   They may not have to read the rest of it if
 2   they're -- if they believe that the material
 3   should be rejected.
 4       Q    Let's look at Exhibit 12.
 5            (Deposition Exhibit 12 marked for
 6   identification and is attached to the transcript.)
 7       Q    Do you recognize this document?
 8       A    I do.
 9       Q    What is it?
10       A    It's a rejection of a publication.
11       Q    How do you recognize it?
12       A    I've seen these before.
13       Q    Are these a standard BOP form?
14       A    Pretty much, yes.
15       Q    Pretty much.  This appears to be from the
16   ADX.  Correct?
17       A    It does.
18       Q    It's a rejection of the April 2014 issue
19   of Prison Legal News?
20       A    Uh-huh.
21       Q    Why was this issue of Prison Legal News
22   rejected?
23            MR. COOK:  Objection.  Beyond the scope.
24       Q    Based on the document, why is this -- why
25   was this issue of Prison Legal News rejected?
```

1    would be excluded from the redaction process."
2            Why is the preparation of rejection
3    notices an additional administrative burden to
4    BOP?
5        A    Can you say that again.
6        Q    This interrogatory response contends that
7    the -- even under a redaction system, rejection
8    notices would still have to be prepared, and that
9    the preparation of a rejection notice would impose
10   an additional administrative burden.  Correct?
11       A    Sure.
12       Q    Why is that burden greater than the
13   burden of preparing a rejection notice now?
14       A    We would also have to do the redaction.
15   The redaction would have to be taken care of.
16   This wouldn't be just for one magazine.
17           If we're going to -- if ten inmates
18   receive a publication, and we're going to reject
19   that publication, we're just changing the names
20   and numbers on those ten, that's simple.  That's
21   typing, that's printing it off and it's done.
22           To go through and cut out ten pages, or
23   ten parts of pages in ten publications, and
24   replace them with now ten photocopies of what we
25   do allow them to have, that's more work.  And

Transcript of John Lee Dunkelberger, Designated Representative
Conducted on March 9, 2018

69

```
 1   still do a redaction notice or a rejection notice,
 2   that is more work.
 3        Q    Well, it would be the same rejection
 4   notice.  Right?
 5        A    It would be the same rejection notice.
 6   But now we're putting -- or a notice that
 7   something was redacted to give it to the inmate in
 8   order for them to be, you know, Hey, do you want
 9   this or don't you want this, that's still more
10   work.
11             And another thing I'll add is, if you
12   have a compound with five or six hundred inmates
13   that are locked in their cells.  That would mean
14   you would have to go and deliver those to each
15   one.  Or go to those inmates and say, Hey, do you
16   want this or not, and have them respond back.  If
17   the inmate doesn't respond back in the day or next
18   day -- there's just more legwork involved.  It's
19   more man-hours.
20        Q    Earlier we talked about the New York
21   approach to redaction, which is to -- it says,
22   this is on PLN 6571, which was exhibit, I want to
23   say Exhibit 5.
24        MR. COOK:  Exhibit 9.
25        Q    Exhibit 9.  It says, "This option is
```

1  available only if the objectionable portion is
2  eight pages or less or is a single chapter,
3  article, or section of any length."
4          Couldn't BOP write policies to govern
5  what types of publications would be rejected?  Or
6  let me rephrase.
7          Couldn't BOP adopt rules and regulations
8  that would ease the administrative burden of
9  redacting certain publications?
10         MR. COOK:  Objection.  Calls for
11 speculation.
12         You can answer.
13     A   Well, it's speculation is right.  If --
14 it's almost a relative question.
15         If I say, yes, we could probably do
16 whatever we wanted to.  But what's -- we would
17 need to notify the publisher.  We would also need
18 to notify the inmate, Hey, if you want this, this
19 is going to be redacted.  There's a lot of work,
20 additional work, that would go into that.  One of
21 them is tracking down that inmate and getting that
22 information -- or getting that inmate's consent.
23 And then start that process.
24         If it were eight pages or less, or
25 whatever the case, you know, it's eight pages

1  today.  Well, why isn't it 12 pages tomorrow or
2  next year, hey, you are doing eight, why aren't
3  you doing more?
4           I just think that this could become a
5  growing or a moving target.  So I -- I mean,
6  manpower is something that we don't have in the
7  Bureau of Prisons anymore.  We can barely get our
8  mail out within the 24 hours that we try and get
9  it out as it is.  And then we're going to burden
10 more staff with this.  I mean, this -- it just
11 doesn't stop as far as, hey, you're now redacting
12 and allowing these things in.  Yeah, there could
13 be a few tort claims, there could be some upset
14 feelings versus just a total rejection of
15 something.
16          Or, Hey, I'm trying to read my
17 publication and, look, it's all blacked out.  You
18 know, whether it's removal of the article or
19 surgically removing parts of the article, that
20 could give a different meaning to the article.
21          So when I say this, I don't think it is a
22 quick yes, we could, or -- we could just adopt New
23 York Department of Corrections' policy on
24 redaction.
25     Q    How do you think Connecticut, New York,

1    Arizona, and Illinois navigate these issues?
2             MR. COOK:  Objection.  Calls for
3    speculation.
4        A    I have no idea.  If I had to make an
5    assumption, I would say they have more staff on
6    the job to do that.
7        Q    Go back to Exhibit 5.  It's the
8    declaration of Jack Fox.
9             Looking at the statistics on Pages 1 and
10   2.  As discussed earlier, according to Mr. Fox,
11   only seven total publications were rejected from
12   January 1st, 2017, to March 14, 2017, in
13   approximately one calendar quarter.  Right?
14       A    Uh-huh.
15       Q    That's seven publications.  How hard is
16   it for a -- for the staff to just rip out the
17   objectionable pages of seven publications?
18       A    Okay.  You're ripping out seven pages.
19   That could be one step.  Photocopying or replacing
20   what was on the other side is another step.  A
21   notification to the publisher and a rejection --
22   or a notification to the inmate, that's another
23   step.  Another step would be, Hey, if you want
24   this, it's preparing a form and giving it to the
25   inmate, if you wanted to receive this publication,

```
 1    you're going to have to, you know, yes or no agree
 2    to this.
 3             And so now this mail is sitting here.  So
 4    we have this mail here whether it's one or two,
 5    and then we don't hear back from the inmate within
 6    the required time or what was it, a day or two or
 7    whatever they have.  It just, it's more work.
 8    It's more work.  And what we cannot do is impose
 9    more work on our staff.
10             If we were to do that, I mean, we have
11    line staff, we have unions.  We have to negotiate
12    these types of things with the union.  And
13    anything where you add more work, the union says,
14    Well, then we need more staff.  And I agree with
15    them in this case, we would need more staff.
16             So to go back to just ripping out seven
17    pages, no.  And we both know there is more
18    involved with that.
19        Q    When it comes to publications that are
20    subscriptions, are inmates allowed to just
21    subscribe to publications, or are there -- let me
22    just say, are inmates allowed to subscribe to
23    subscription based publications?
24        A    To receive them monthly or weekly or
25    periodically?
```

```
 1         A    No.
 2         Q    I just have a few more questions.
 3              I want to talk about the burden a little
 4    more, the administrative burden.  And I just want
 5    to clarify what you said.  And if there's, you
 6    know, anything.
 7              You listed off a few reasons that it
 8    would be more burdensome for BOP or specifically
 9    the ADX, but for staff to redact publications.
10    You said it would take longer to review.  You said
11    it would take -- there would be time involved in
12    the actual redaction of whether it's blacking out
13    or ripping.
14              It would take time, additional time to
15    prepare the rejection materials to send to the
16    warden for approval and to the inmate for
17    notification, and for the -- to the publisher for
18    notification.  And that there would also be
19    staffing issues that would require negotiations
20    with the unions.
21         A    Yes.
22         Q    Is there any other administrative burdens
23    that you can point to that would be added above
24    and beyond the existing process, if redaction were
25    to be permitted?
```

1        A    We would have to train staff on what
2    redaction is.  We would have to -- and that's new
3    staff and current staff.
4        Q    Staff are trained, they undergo regular
5    trainings now.  Correct?
6        A    They do, yes.
7        Q    So this would be something you would add,
8    you could add to an additional training?
9        A    Yes.
10       Q    To an existing training, rather?
11       A    Yes; it would be additional training.
12       Q    But it could be incorporated into
13   existing training on mail room procedures?
14       A    Uh-huh.
15       Q    That's a yes?
16       A    That's a yes, yes.
17            I would probably have to consult with the
18   rest of my staff on the additional burdens it
19   would place on the mail room staff if we did
20   redaction as part of policy.
21       Q    And to clarify, your testimony is that it
22   would require a new policy to allow this?
23       A    It would require one of three things; a
24   new policy on redaction or a change notice to the
25   current policy or changing the current policy.