# Exhibit 1
# Docket entry 110 (redacted version)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/18/18 USDC Colorado pg 2 of 96

# EXHIBIT 7

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 15-cv-02184-RM-STV
 3    _____

 4              RULE 30(b)(6) DEPOSITION OF:
                TODD CHAPMAN - March 16, 2018
 5               (Federal Bureau of Prisons)
              (Confidential Designations Pending)
 6    _____

 7    PRISON LEGAL NEWS, a project of the Human Rights
      Defense Center,
 8
      Plaintiff,
 9
      v.
10
      FEDERAL BUREAU OF PRISONS,
11
      Defendant.
12    _____

13
                  PURSUANT TO NOTICE, the Rule 30(b)(6)
14    deposition of TODD CHAPMAN was taken on behalf of the
      Plaintiff at 1225 17th Street, Suite 2300, Denver,
15    Colorado 80202, on March 16, 2018, at 8:11 a.m.,
      before Barbara Birger, Registered Merit Reporter,
16    Certified Realtime Reporter and Notary Public within
      Colorado.
17

18

19

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

**303.832.5966**
**800.525.8490**

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

Page 2

A P P E A R A N C E S

For the Plaintiff:

            TERRA WHITE FULHAM, ESQ.
            Covington & Burling L.L.P.
            850 Tenth Street, NW
            Washington, D.C. 20001


For the Defendant:

            SUSAN PROSE, ESQ.
            U.S. Department of Justice
            1801 California Street, Suite 1600
            Denver, Colorado 80202


Also Present:

             Kaitlin B. Turner
             Dan Marshall, Esq.
             (Appearing telephonically)

Case No. 1:15-cv-02184-RM-STV Document 110-2 filed 06/04/18 USDC Colorado pg 5 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

I N D E X

EXAMINATION OF TODD CHAPMAN:                           PAGE
March 16, 2018

By Ms. Fulham       7, 277, 279, 280, 285, 286, 287, 290

By Ms. Prose         276, 278, 279, 282, 285, 286, 288


                                                     INITIAL
DEPOSITION EXHIBITS:                                 REFERENCE

Exhibit 93     Notice of Deposition of               9
               Defendant Federal Bureau of
               Prisons

Exhibit 94     Declaration of Todd Chapman,          31
               7/26/16

Exhibit 95     Program Statement No. 5266.10,        47
               1/10/03

Exhibit 96     Program Statement No. P5266.11,       52
               11/9/11

Exhibit 97     Institution Supplement No.            59
               FLM5266.10C, Subject:
               Incoming Publications, 8/1/07

Exhibit 98     Institution Supplement No.            63
               FLM 5266.10D, 3/1/11

Exhibit 99     Institution Supplement No.            63
               FLM 5266.11A, 1/24/13

Exhibit 100    Institution Supplement No.            63
               FLM 5266.11B, 12/8/14

Exhibit 101    Defendant's First Supplemental        81
               Responses to Plaintiff's
               Second Interrogatories

Exhibit 102    Institution Supplement No.            99
               FLM 5266.11C, 2/2/16

Exhibit 103    Institution Supplement No.            120
               FLM 5266.11D, 5/30/17

Exhibit 104    Institution Supplement No.              123
               FLM 5266.11E, 12/21/17

Exhibit 105    Declaration of Jack Fox,                131
               2/13/17

Exhibit 106    Supplemental Declaration of             136
               Jack Fox, 3/14/17

Exhibit 107    Institution Supplement No.              149
               FLM 5321.07(1)B, 9/1/15

Exhibit 108    Federal Bureau of Prisons -             159
               Electronic Law Library Content

Exhibit 109    Excerpt of "Prison Legal News,"         175
               1/2010

Exhibit 110    Notification to Inmate and              175
               Publisher/Sender of Rejected
               Publication, 2/9/10

Exhibit 111    Excerpt of "Prison Legal News,"         182
               6/2010

Exhibit 112    Notification to Inmate and              182
               Publisher/Sender of Rejected
               Publication, 7/14/10

Exhibit 113    Excerpt of "Prison Legal News,"         190
               10/2011

Exhibit 114    Notification to Inmate and              190
               Publisher/Sender of Rejected
               Publication, 11/7/11

Exhibit 115    Regional Administrative Remedy          191
               Appeal No. 669446-R1, 2/6/12

Exhibit 116    Defendant's Second Supplemental         196
               Responses to Plaintiff's First
               Interrogatories

Exhibit 117    Excerpt of "Prison Legal News,"         200
               6/2012

Exhibit 118    Notification to Inmate and              200
               Publisher/Sender of Rejected
               Publication, 7/3/12

Exhibit 119    Excerpt of "Prison Legal News,"        208
               11/2012

Exhibit 120    Notification to Inmate and             208
               Publisher/Sender of Rejected
               Publication, 12/10/12

Exhibit 121    Defendant's First Supplemental         218
               Responses to Plaintiff's First
               Interrogatories

Exhibit 122    Excerpt of "Prison Legal News,"        220
               2/2013

Exhibit 123    Notification to Inmate and             220
               Publisher/Sender of Rejected
               Publication, 3/7/13

Exhibit 124    Excerpt of "Prison Legal News,"        228
               4/2013

Exhibit 125    Notification to Inmate and             228
               Publisher/Sender of Rejected
               Publication, 4/25/13

Exhibit 126    Excerpt of "Prison Legal News,"        237
               8/2011

Exhibit 127    Excerpt of "Prison Legal News,"        243
               7/2013

Exhibit 128    Notification to Inmate and             243
               Publisher/Sender of Rejected
               Publication, 7/31/13

Exhibit 129    Excerpt of "Prison Legal News,"        250
               9/2013

Exhibit 130    Notification to Inmate and             250
               Publisher/Sender of Rejected
               Publication, 10/21/13

Exhibit 131    Excerpt of "Prison Legal News,"        251
               4/2014

Exhibit 132    Notification to Inmate and             251
               Publisher/Sender of Rejected
               Publication, 4/21/14

Page 6

Exhibit 133    Letter to Yates from Swanson,          257
               6/30/15, Re:  Censorship of
               Prison Legal News at ADX Florence

Exhibit 134    Letter to Swanson from Oliver,         259
               8/6/15, Re:  Rejection of Prisoner
               Legal News at ADX Florence

Exhibit 135    Letter to Swanson from Oliver,         260
               9/15/15, Re:  Rejection of Prison
               Legal News at ADX Florence

Exhibit 136    Defendant's Response to Plaintiff's    267
               Second Interrogatories

Exhibit 138    ADX Florence - Incoming               274
               Publications Rejection Procedures,
               May 18, 2017

Exhibit 138    Federal Bureau of Prisons'            291
               Objections to Plaintiff's
               Supplemental Notice of
               Rule 30(b)(6) Deposition

Case No. 1:15-cv-02184-RM-STV  Document 110-2  filed 06/04/18  USDC Colorado  pg 9 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 31

 1                    (Deposition Exhibit 94 was marked.)

 2            Q.    Mr. Chapman, Exhibit 94 is the

 3      declaration that you submitted in this litigation on

 4      the 26th of July, 2016.  Do you recognize this

 5      document?

 6            A.    I do.

 7            Q.    Is this a document that you reviewed in

 8      preparation for your deposition today?

 9            A.    Yes.

10            Q.    If we can take a look here at

11      paragraph -- before I get into questions about the

12      declaration, to your knowledge is all the information

13      in this declaration still accurate as of today?

14            A.    Do you mind if I peruse a little?  So

15      what you're asking me is has anything changed since

16      this, or was the information up until this point when

17      it was filed correct?

18            Q.    Do you have any reason to think that at

19      the time you submitted this there was anything that

20      was inaccurate in it?

21                    MS. PROSE:  You can tell her if you think

22      so.

23            A.    Yes.  There was on page 7, number 18, it

24      says, "The SIS Department" -- second sentence -- "If

25      the SIS Department decides to recommend rejection of

Case No. 1:15-cv-02184-RM-STV   Document 112-2   filed 06/04/18   USDC Colorado   pg 9 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 32

1   the publication, SIS personnel draft a notice prepared

2   for the Warden's signature."

3           They do not do that.  They prepare a

4   synopsis and send it back to the correctional systems

5   officers who actually generate that form for the

6   warden based on the information that the SIS

7   department has given them.

8           Q.   (BY MS. FULHAM)  Okay.  So just to make

9   sure I'm clear, you're saying that this is inaccurate

10  because, in fact, there was another layer.  So the SIS

11  department was generating a synopsis of their

12  recommendation for why something should be rejected,

13  but it was the correctional system staff who actually

14  prepared the draft letter for the warden?

15          A.   Yes.

16          Q.   Is there anything else -- do I understand

17  you to say that as of July 26, 2016, when this was

18  submitted, that was the case, that it was actually the

19  correctional systems department who was generating the

20  letters for the warden's signature?

21          A.   Yes.

22          Q.   Okay.  Is there anything else in this

23  document that as of the time it was submitted in

24  July 2016 you think may not have been accurate?

25          MS. PROSE:  Counsel, based on a prior

1   conversation that I have had with Mr. Chapman, I want

2   to take a quick break so we can get the accurate

3   information on the record.

4           MS. FULHAM:  Okay.

5           (Recess taken, 8:49 a.m. to 8:52 a.m.)

6       Q.   (BY MS. FULHAM)  Mr. Chapman, I

7   understand there is a correction that you wanted to

8   make to what you said previously?

9       A.   Yes.  There was one other correction I

10  wanted to make to this declaration.  Page 9, number

11  24.  We stated in here -- and this is the second

12  sentence -- "One past practice that has changed with

13  the implementation of the current institution

14  supplement is that a publication is not rejected

15  solely because it identifies," an inmate, "and

16  discusses an ADX or Bureau inmate, or Bureau staff

17  member."

18           That was an incorrect statement.  New

19  information has come to light that the SIS staff

20  trained each other that anything that had one of those

21  criteria they would flag for rejection.  But when it

22  got to the warden's desk, the warden still only

23  rejected things based on their sound correctional

24  judgment.

25           So none of the wardens made rejections

Case 1:15-cv-02184-RM-STV Document 112 Filed 06/04/18 USDC Colorado Page 12 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 34

1   based off a name of an ADX inmate or former staff or

2   another bureau inmate alone.  SIS flagged every one of

3   those, sent them up, but the warden made the sound

4   correctional judgment for them.  So that was a

5   misstatement.

6           Q.   Okay.  And was that -- were you aware

7   that that was an inaccurate statement on July 26,

8   2016?

9           A.   I was not.

10          Q.   When did you become aware that that was

11  not an accurate statement?

12          A.   Recently more information has come to

13  light as more people were brought into this process,

14  more people that were interviewed.

15          Q.   When you say, "recently," can you be more

16  specific with what you mean by that?

17          A.   Within the last couple of weeks.

18          Q.   At the time that this declaration was

19  prepared, what was the factual basis that you had for

20  asserting that that was a practice that existed at

21  ADX?

22          A.   It was primarily based on interviews of

23  special investigative staff.

24          Q.   And so when I asked earlier about people

25  you had spoken to in preparation for this deposition

Case No. 1:15-cv-02184-RM-STV   Document 112-2   filed 06/04/18   USDC Colorado   pg 12 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 35

1  in sort of a general sense, I don't know that you

2  mentioned any SIS interviews.  Who did you interview?

3       A.   I did, actually.  Amy Kelley, the SIS

4  lieutenant.

5       Q.   Okay.

6       A.   And I also talked to Ms. Hicks.

7       Q.   So Ms. Kelley and Ms. Hicks, were they

8  the source of this information that there had been a

9  practice of rejecting a publication solely because it

10 identified or discussed an ADX or bureau inmate or

11 bureau staff member?

12      A.   Yes.

13      Q.   And when you in the last couple of weeks

14 learned that that was inaccurate, who told you that

15 that was inaccurate?

16      A.   I based that on evidence that came to

17 light with bureau interviews of previous wardens and

18 associate wardens.

19      Q.   And who conducted those interviews?

20      A.   Some were, I believe, depositions that

21 you guys took.

22      Q.   Okay.  So -- sorry, go ahead.

23      A.   PLN.  I shouldn't say, "you guys."

24      Q.   So the information that has come to light

25 is that in the course of depositions of the former

Page 36

1    wardens, the former wardens have indicated that they

2    did not, in fact, follow this practice?

3          A.   Correct.

4          Q.   Is there anything else in this

5    declaration that you think is not accurate as of now?

6          A.   No, not that I'm aware of.

7          Q.   So you indicated that the source of the

8    information in paragraph 24 was Ms. Kelley and

9    Ms. Hicks.  Is your -- is the BOP's understanding that

10   Ms. Kelley and Ms. Hicks were untruthful when they

11   provided this information before?

12         A.   No.  They were under the impression that

13   they flag everything.  They had no idea what the

14   warden did once it got to the warden's level.  They

15   knew what they did at their level.

16         Q.   And so in preparing your declaration

17   about the -- this declaration in July of 2016 about

18   the procedures by which a publication would be

19   rejected, at that time you did not speak to any

20   wardens about what their practices had been?

21         A.   As the Bureau of Prisons, not me?

22         Q.   As the Bureau of Prisons, yes.

23         A.   No, I do not believe so.

24         Q.   Can I direct you to paragraph 6 of your

25   declaration, which says that, "Pursuant to Program

 1    Statement 5266.11, Incoming Publications, '[o]nly the

 2    Warden may reject an incoming publication.  In the

 3    Warden's absence, only the Acting Warden may perform

 4    this function.'"  Do you see that?

 5         A.   Yes.

 6         Q.   So I want to make sure that I understand

 7    that when this declaration was prepared, you know that

 8    the only person who can reject a publication is a

 9    warden or an acting warden, correct?

10         A.   Yes.

11         Q.   But the declaration which discusses the

12    process and practices related to rejection of incoming

13    publications did not account for the practices that

14    the wardens engaged in?

15         A.   Can you rephrase that for me?

16         Q.   You would agree this declaration says

17    that it's the warden who makes the final decision

18    about whether to reject a publication?

19         A.   Yes.

20         Q.   Is it also accurate to say that this

21    declaration describes practices that the ADX used when

22    rejecting publications?

23         A.   It describes practices, yes, that the

24    wardens used and also that the SIS staff did.

25         Q.   But the warden has the ultimate

1    decision-making authority with respect to what gets

2    rejected or not, correct?

3         A.   Yes.

4         Q.   So if a warden isn't following this

5    practice and they are the final step in the rejection

6    process, is it fair to say that this is even a

7    practice that's followed at all?

8         A.   I'm not sure what you mean.

9              MS. PROSE:   Object to form.  I just want

10   to say form objection, but you've answered, so go

11   ahead.

12        A.   Are you asking about is the SIS process

13   not happening, or the warden's process?  I'm not sure

14   which process it is that you're asking about.

15        Q.   (BY MS. FULHAM)  What I'm trying to

16   understand is this:  Paragraph 24 of the declaration

17   says there is a practice at ADX -- or there was a

18   practice prior to February 2016 that any publication

19   that identified and discussed an ADX or bureau inmate

20   or bureau staff member was rejected; is that correct?

21        A.   24 was what I clarified earlier.  So the

22   SIS was still flagging it at that time.  The warden,

23   when it got to their desk, still used their sound

24   correctional judgment and only signed what they

25   believed to -- something that needed to be rejected

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado pg 18 of 95
Case 1:15-cv-02184-RM-STV Document 110 Filed 05/02/18 USDC Colorado Page 18 of 95
of 96

1   based on the seven factors that we reject from.

2          Q.   Okay.   Continuing on in paragraph 24, the

3   last sentence says, "That practice, which the ADX

4   followed prior to the implementation of the current

5   institution supplement in February 2016, was the

6   primary basis for the rejection of the eleven issues

7   of Prison Legal News at issue in this lawsuit."

8               Is that statement still accurate?

9          A.   No, it is not.

10         Q.   So that is something else that needs to

11  be corrected?

12         A.   Yes.   I'm sorry, when I referenced 24, I

13  only singled out that one sentence, but I meant that

14  paragraph.

15         Q.   So it's not the BOP's position that the

16  primary basis for the rejection of the 11 issues of

17  Prison Legal News at issue in this lawsuit is that

18  they identified and discussed an ADX or bureau inmate

19  or bureau staff member?

20         A.   That was taken into account, but it was

21  not the sole reason they were rejecting.

22         Q.   Was it the primary reason they were

23  rejected?

24         A.   It was the primary reason they were

25  flagged, but it was not the primary reason they were

```
 1   rejected.

 2            Q.   So it is not accurate to say that that

 3   practice was the primary basis for the rejection of

 4   the 11 issues?

 5            A.   Yes, it's accurate to say that was not

 6   the practice.

 7            Q.   I think we'll probably -- we will later

 8   talk about each of the individual issues, and it might

 9   make more sense to kind of continue to address that at

10   that time.

11            Going back in your declaration to

12   paragraph 6, which we -- I know we're jumping around

13   in this document -- but this is the paragraph which

14   says only the warden may reject an incoming

15   publication, or in the warden's absence only the

16   acting warden may perform this function.

17            What does it mean that only the warden

18   may reject a publication?

19            A.   A publication does not get rejected until

20   the form is signed saying that it has been rejected,

21   and then that it waits through the appeal process.  So

22   we hold on to that rejection while the appeal process

23   available to the inmates and publisher is followed.

24   If no one has filed an appeal within the guidelines

25   after that, then it is officially rejected.
```

1    Q.   So how much discretion does the warden

2    have in deciding what should be rejected?

3    A.   As the CEO of the institution, the warden

4    has those seven factors listed above in 5 that they go

5    off, and they use their sound correctional judgment

6    based on their experience and their knowledge of the

7    inmates, their knowledge of the institution, their

8    knowledge of the situation.  So they have that sort of

9    discretion.  As long as it meets one of these criteria

10   they feel it does, then they have the right to reject

11   it.

12   Q.   Taking a look at paragraph 5, it says,

13   "Publications which may be rejected by a Warden

14   include, but are not limited to, publications which

15   meet one of the following criteria," and it lists

16   seven criteria, and then at the end it's citing to the

17   Code of Federal Regulations.

18   So this list of seven criteria, to your

19   knowledge, is based on the Federal Code?

20   A.   Yes.

21   Q.   Okay.  And you indicated that a warden

22   would reject only if it met one of these seven

23   criteria; is that correct?

24   A.   I would like to rephrase that a little

25   because in the beginning of number 5 it says,

1    duty and a standard as law enforcement personnel that

2    we leave that stuff at the door and we follow policy.

3    We give the inmates what they have coming.  We treat

4    staff the way they should be treated.

5              Even if maybe someone doesn't like

6    someone or has a different belief system, we're still

7    supposed to follow policy.  Our correctional

8    leadership is not supposed to take their outside

9    personal feelings and beliefs into their decision

10   making.

11        **Q.   Okay.  With respect to incoming**

12   **publications, what policies are limiting a warden's**

13   **ability to use their own personal beliefs to make**

14   **decisions?**

15             A.   The program statement and the

16   institutional supplement give basic guidelines of

17   what.  So a warden would need to be able to defend

18   their decision if it was challenged by an inmate

19   through the administrative remedy process or if it was

20   challenged through a publication rejection, the

21   publisher wrote to the regional office for appeal, at

22   that point there would be another set of eyes, more

23   people reviewing it to see if that was a

24   factually-based rejection.

25        **Q.   So what I understand you to be saying is**

```
 1    that the program statement and institutional

 2    supplement, those are the policies that limit the

 3    discretion of a warden's ability to reject or not

 4    reject a publication?

 5         A.    It's up to the warden's discretion

 6    initially to reject something.  And they base that off

 7    of the institutional supplement and the program

 8    statement as defined in b(1), (2), (3), (4), (5), (6),

 9    and (7).  And there is a review process in case the

10    warden were to go outside of those guidelines, then it

11    can be reviewed and people can look at it under b(1)

12    through (7) and say we do not believe that was a

13    correct rejection.  And at that point it could be

14    overturned or whatnot.

15         Q.    I think we'll talk a little bit more

16    about the appeal process later.  Let's take a look at

17    the next exhibit.

18              (Deposition Exhibit 97 was marked.)

19         Q.    Exhibit 97 is an institution supplement

20    numbered FLM 5266.10C, dated August 1, 2007, regarding

21    incoming publications, and it's Bates stamped

22    BOP000030.  Do you recognize this document,

23    Mr. Chapman?

24         A.    Yes, I do.

25         Q.    What is it?
```

1         A.    It is an institutional supplement,

2    FLM 5266.10C, dated August 1, 2007, titled, "Incoming

3    Publications for ADX Florence."

4         Q.    And institution supplements are documents

5    that are going to be specific to a BOP individual

6    institution; is that correct?

7         A.    It is correct, or a complex if it is

8    written up that way.

9         Q.    This institution supplement that's

10   Exhibit 97, does this -- to which institutions does

11   this apply?  Can I help you out by directing you to

12   the first paragraph?

13        A.    Okay.  Yes, that's what I was looking

14   for.  ADX and the federal prison camp, they have

15   switched ownership over time, so I was making sure

16   which one it was at the time.

17        Q.    So this was the institution supplement

18   concerning incoming publications that applied to ADX

19   as of August 1, 2007.  And this institution supplement

20   was still in place as of January 1, 2010; is that

21   correct?

22        A.    I'm not sure when the next one was.

23        Q.    If you want to take a look at your

24   declaration which was introduced as Exhibit 94.  It

25   might be good to just keep that one handy, I think

Case 1:19-cv-02184-RM-STV Document 112-2 Filed 06/04/18 USDC Colorado Page 23 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 61

1    we'll probably be referring back to it a number of

2    times.

3              I'll direct you to paragraph 12, which

4    outlines the institution supplements from August 1,

5    2007, to February 1, 2016.

6              MS. PROSE:  I'm sorry, what was the

7    question, then, Counsel?

8         Q.   (BY MS. FULHAM)  The question is whether

9    the institution supplement that's Exhibit 97, dated

10   August 1, 2007, was still in effect as of January 1,

11   2010?

12        A.   It appears so, yes.

13        Q.   Who prepares an institution supplement?

14        A.   The entire process of how it starts, or

15   just who is the primary writer?  Who is it you want to

16   know about, or the process?

17        Q.   Well, let's limit it specifically to this

18   incoming -- the incoming publications institution

19   supplement.  Let the start with, first, who is the

20   primary drafter of this document?

21        A.   This would be assigned to the complex

22   CMC.  Or if there was -- this complex CMC was at

23   another institution within the complex, it would be

24   assigned to the CMC over this institution.

25        Q.   Okay.  And for ADX, I believe you said

Case No. 1:15-cv-02184-RM-STV   Document 112-2   Filed 06/04/18   USDC Colorado   Page 24 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 62

1   that was Dee Dee McEvoy; is that correct?

2          A.   I'm not sure if she was the one in 2007

3   who was the CMC.

4          Q.   And you talked previously about some of

5   the process for changing the institution supplement.

6   You mentioned it's reviewed on an annual basis,

7   correct?

8          A.   Yes.

9          Q.   And based on paragraph number 12 in your

10  declaration, it looks like this institution supplement

11  was in effect from August 1, 2007, until the end of

12  February 2011; is that accurate?

13         A.   Yes.

14         Q.   So during that time period this

15  institution supplement was up for review, but the BOP

16  determined there were no changes that were necessary?

17         A.   Correct.

18         Q.   And taking a look at paragraph 13 of your

19  declaration, it says that, "These institution

20  supplements set forth the procedures for review of

21  incoming publications during the time they were in

22  effect, through February 2, 2016, when the current

23  institution supplement was implemented.  The relevant

24  review portions were the same in each of the

25  institution supplements that predated February 2,

Case No. 1:15-cv-02184-RM-STV Document 117-1 filed 06/04/18 USDC Colorado Page 240 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 63

```
 1    2016."

 2                So I just want to -- in the interest of

 3    keeping us moving along, we'll take a quick look at

 4    some of the other . . .

 5                (Deposition Exhibit 98 was marked.)

 6         Q.   So you now have in front of you

 7    Exhibit 98, which is an institution supplement

 8    FLM 5266.10D, dated March 1, 2011, concerning incoming

 9    publications.  Do you recognize this document?

10         A.   Yes.

11         Q.   Okay.  And this institution supplement --

12    based on your declaration, I understand this

13    institution supplement, relevant review portions are

14    the same as the 2007 institution supplement we just

15    took a look at; is that correct?

16         A.   Yes.

17                (Deposition Exhibits 99 and 100 were

18    marked.)

19         Q.   And, Mr. Chapman, Exhibit 99 is

20    institution supplement FLM 5266.11A, dated January 24,

21    2013.  And Exhibit 100 is institution supplement

22    FLM 5266.11B, dated December 8, 2014.

23                And I'll give you a moment to take a look

24    at them, but the question that I want to ask is

25    whether it's accurate that the review procedures
```

Case 1:19-cv-02184-RM-STV Document 112-2 Filed 06/04/16 USDC Colorado Page 26 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 64

1    concerning incoming publications outlined in

2    Exhibits 97, 98, 99, and 100 are all substantively the

3    same?

4         A.   Similar.   The differences being that we

5    removed the camp from being under the provisions of

6    the ADX, and also we changed some stuff about SAMs

7    inmates, inmates with special administrative measures.

8         Q.   And the change that limited the

9    institution supplement just to the ADX, was that

10   which -- when did that occur?

11        A.   I believe that was the Exhibit 99.

12        Q.   The January 24, 2013, supplement?

13        A.   Yes.

14        Q.   Okay.   And the changes to the SAMs

15   procedures?

16        A.   Were in the same supplement.

17        Q.   Also in the January 24, 2013.   Let's just

18   take a look at -- given your testimony that the review

19   procedures and all are largely identical, I want to

20   just take a look at Exhibit 100, which is the

21   institution supplement dated December 8, 2014.   Just

22   take a look at the review procedures outlined here.

23             So section number 4, Roman numeral 4,

24   starting at the bottom of BOP000048; do you see that?

25   These are the procedures that are used by ADX to

Case 1:15-cv-02184-RM-STV Document 112-2 Filed 06/04/18 USDC Colorado Page 28 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 65

1    review incoming publications, correct?

2         A.   Yes.

3         Q.   Okay.  And looking at A, it indicates

4    that, "All incoming inmate publications will be

5    x-rayed by the receiving Correctional Systems Officer

6    prior to entering the facility.  A further physical

7    search will be conducted by the mailroom staff."

8              At that step of the process, there is no

9    review of any content of incoming publications at that

10   point, correct?  Sorry, just at this first step.

11        A.   Yes.  When we do the physical search,

12   that's one of the things we're doing.  As we're

13   looking for contraband, we are also looking to see if

14   there are things such as nudity, or, hey, how to build

15   a bomb, page five, something along those lines.  We

16   are doing a cursory inspection as we are going through

17   it.

18        Q.   At step A the correctional systems

19   officer is doing a physical search of the document and

20   they would be looking for contraband, and I assume

21   flagging anything that obviously appeared to be

22   objectionable content?

23        A.   Correct.

24        Q.   The next step says, "When the Mail Room

25   Officer questions the acceptability of any

 1   **or staff members?**

 2            MS. PROSE:  I'll object to speculation.

 3   I think you can answer it.

 4            A.    Not all information that gangs or people

 5   in general pass has to do with people or their true

 6   name.  Most people in prison have nicknames, and they

 7   are very common names.  █████████████████

 ████████████████████████████████████████

 ████████████████████████    ███████████████

 ████████████████████████    ███████████████

 █████████████████████████████████████████████

 ██████████████

13            Q.    (BY MS. FULHAM)  But those things, other

14   than people's names, would not be flagged, at least

15   under the name-only policy that we've discussed,

16   correct?

17            A.    Correct.

18            Q.    And is it BOP's position that the

19   name-only policy was in effect at least from 2002, at

20   the latest, I understand that it's sometime between

21   1998 and 2002.  And when was that policy -- that

22   practice ended?

23            MS. PROSE:  Counsel, you're asking when

24   the practice of -- just to clarify, you're asking when

25   the practice of flagging names solely by virtue of the

Case No. 1:15-cv-02184-RM-STV   Document 116   Filed 06/04/18   USDC Colorado   Page 29 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 96

1   name ended; is that right?

2            MS. FULHAM:  That's correct.

3            MS. PROSE:  Am I understanding correctly?

4   Okay, you can answer the question.

5        A.   I believe we testified to 2016.

6        Q.   (BY MS. FULHAM)  Okay.

7        A.   I'm not sure of the exact date.  I'll

8   look for it.

9        Q.   So BOP's position is that from at least

10  2002 through 2016 that practice was being used at

11  least by SIS?

12       A.   Correct.

13       Q.   Are you aware of any rejections of PLN

14  between 2005 and 2010?

15       A.   Bureau-wide or at the ADX or . . .

16       Q.   At the ADX, we'll stick with that.

17       A.   I don't believe I viewed any documents

18  from that time frame.

19       Q.   Okay.  Even though the name-only practice

20  was being used in that time period from 2005 to 2010?

21       A.   We did a search recently of rejected

22  publications, and we were given a time frame, and we

23  looked during that time frame.  I don't know if that

24  was in that time frame that was requested or not.

25       Q.   The interrogatory answer, Exhibit 101 we

```
 1    were looking at, references a special investigative

 2    agent Danny Shaw, and it appears that he's no longer

 3    an employee of the Bureau of Prisons?

 4         A.    That's correct.

 5         Q.    Do you know when he stopped being

 6    employed by the Bureau of Prisons?

 7         A.    It would be something we would have to

 8    look up.  This information just came to light, and we

 9    haven't had a chance to get that information.

10              MS. PROSE:  Is that information you want,

11    Counsel?

12              MS. FULHAM:  I think that would be

13    helpful.

14              MS. PROSE:  Okay.  Do you think we can

15    get that?

16              MS. TURNER:  We should be able to

17    ascertain that, yes.

18              MS. PROSE:  Okay.

19         Q.   (BY MS. FULHAM)  You mentioned a few

20    times that this information just came to light.  Can

21    you -- let me think about how I want to word this.

22              What efforts were undertaken by the BOP

23    to determine the origin of the name-only practice?

24         A.    We have continued to interview additional

25    staff as this progresses, this process, and so more
```

Case No. 1:15-cv-02184-RM-STV   Document 111-1   Filed 06/04/18   USDC Colorado   Page 31
of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 129

1    other changes, but that is . . .

2          Q.   (BY MS. FULHAM)   Okay.   Earlier you

3    testified that the name-only practice ended as a

4    result of the February 2016 institution supplement,

5    correct?

6          A.   Yes.

7          Q.   And at the time I asked whether there was

8    any language that explicitly addressed that in the

9    February 2016 institution supplement, and you said no,

10   correct?

11         A.   Correct.

12         Q.   And I asked why that was the case.   And

13   to summarize, you said that the BOP determined it

14   wasn't necessary because the name-only practice wasn't

15   part of the program statement so there wasn't a need

16   to address it in the institution supplement; is

17   that --

18         A.   That's part of what I said.

19         Q.   Okay.   What was the rest?

20         A.   I also said that it was -- the warden

21   still had their own discretion, that it was just SIS

22   making that determination based on information they

23   received years ago and continued on, but the warden

24   still uses their sound correctional judgment before

25   they made a rejection.   So -- and it wasn't written

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado pg 32 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 130

1    down, so we weren't counteracting anything at the

2    time.

3              But once again, we talked to staff who

4    were saying that, oh, yes, we were doing this, and we

5    felt we had to put it on there, just had to, because

6    it kept coming up.  Not that people were still

7    rejecting it, but it was still being talked about.  So

8    we decided that let's put it out there, let's put it

9    in black and white.  We can't make it any clearer than

10   it is.  We would provide training on it, but we made

11   it to where even if you don't have the training, you

12   can see that information on there.

13        Q.   So am I understanding you to say that at

14   least part of the reason that you opted to add this

15   Section III C was because there appeared to be some

16   confusion as to whether or not that practice still

17   existed among the staff at ADX?

18        A.   As I testified -- not testified, as I've

19   spoken on other questions that you have asked

20   throughout the day, I can say there was some confusion

21   amongst the different departments throughout the time

22   about what was or was not a way of doing things.  And

23   so we tried to make it more concrete, more black and

24   white, more definitive, as we could.

25        Q.   I'm going to have you take a look

Case No. 1:19-cv-02184-RM-STV   Document 112-2   filed 06/04/18   USDC Colorado   Page 33 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 131

 1    at . . .

 2                 (Deposition Exhibit 105 was marked.)

 3         Q.    The Exhibit 105 that the court reporter

 4    just handed to you is the declaration of former warden

 5    Jack Fox that was filed in this case in February 2017.

 6    Have you seen this document before?

 7         A.    I have.

 8         Q.    Okay.  You can take as much time as you

 9    want to review it.  I'm going to direct you to a

10    specific portion of the declaration.

11         A.    Okay.

12         Q.    So if you could take a look at paragraph

13    19, please.

14         A.    On page 7?

15         Q.    Yes.  Paragraph 19 says that, "The

16    February 2016 Policy, specifically the incoming

17    publication review procedures, are working well for

18    both ADX inmates and the Bureau.  Because of the

19    positive benefits of the enhanced review procedures,

20    the February 2016 Policy does not specifically include

21    language that incoming publications at the ADX may not

22    be rejected solely because they reference or discuss

23    an ADX or Bureau inmate, or Bureau staff member.  The

24    enhanced review procedures, quarterly training, and

25    layers of final review, obviate the need for this

Case No. 1:15-cv-02184-RM-STV   Document 118-1   filed 06/04/19   USDC Colorado   pg 34 of 96
Case No. 1:15-cv-02184-RM-STV   Document 111   Filed 06/16/19   USDC Colorado   Page 33 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 143

1    to overlook things, they are the ones that would be

2    defending this sort of stuff, and so they -- if they

3    had to go to court -- say another group filed saying

4    religious rights, they would be the ones who would be

5    looking at it to know if it's something that is truly

6    something we should reject or legally maybe we

7    couldn't reject this because there's just nothing in

8    here to do that with.

9              Q.   So I want to -- there was a lot in that

10   answer, but to the specific question that I asked, BOP

11   attributes at least some of the reduction in the

12   elimination -- some of the reduction in the rejections

13   to the elimination of the name-only policy, your

14   answer there was yes, correct?

15             MS. PROSE:  So, again, I'll object to the

16   form of that question.  We've made clear here that the

17   witness is not testifying in his official capacity as

18   to this line of questions, which is not encompassed in

19   the noticed topics.  So Mr. Chapman is not answering

20   on behalf of the BOP but in his own individual

21   capacity.  So you can answer counsel's question.

22             A.   I believe that it's encompassing --

23   all-encompassing.  All stuff that we have done, I

24   believe, as a whole, is contributing to this.

25             Q.   (BY MS. FULHAM)  To include the

Case No. 1:15-cv-02184-RM-STV   Document 110   filed 06/04/18   USDC Colorado   pg 34 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 144

1    **elimination of the name-only practice?**

2           A.   Could be.  Could be.

3           **Q.   Since 2009 -- I'm going to shift**

4    **topics -- but since 2009, how many instances of**

5    **violence were committed by prisoners on other**

6    **prisoners each year?**

7           A.   Across the Bureau of Prisons?

8           **Q.   I'm sorry.  At ADX.**

9           A.   I don't have that data on me, but it's

10   something we could get.

11          MS. PROSE:  Counsel, what are you

12   referring to here, and that will help me out?

13          MS. FULHAM:  Sure.  So topic 10.

14          MS. PROSE:  Topic 10.

15          MS. FULHAM:  And my -- after the notice

16   was served there was some follow-up communication

17   between you and Mr. Kiehl in which we identified more

18   specific topics to that, which I believe are

19   referenced in your objections.

20          MS. PROSE:  I see here.  But you want a

21   specific number?  A specific number?  Would you tell

22   me your question again?

23          MS. FULHAM:  The question was how many

24   instances of violence were committed by prisoners on

25   other prisoners each year since 2009.

Case No. 1:19-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado pg 36 of 96
Case 1:15-cv-02184-RM-STV Document 110 Filed 06/04/18 USDC Colorado Page 35 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 145

1          MS. PROSE:  Okay.  Hang on just a second.

2    And within the ADX, yes?

3          MS. FULHAM:  Within the ADX, yeah.

4          MS. PROSE:  You're looking for a specific

5    number.  If I could just ask, for the record, is that

6    a number that could be generated?

7          THE DEPONENT:  Yes.  It would take some

8    work, but it can be generated.

9          MS. PROSE:  Okay.  We can get you that.

10          MS. FULHAM:  Okay.

11          MS. PROSE:  We can get the specific

12    number.

13     A.    I have one question in regards to that

14    number.  A lot of times we count attempted assault the

15    same, code it as assault.  Do you want us to include

16    attempted assaults, or just bona fide the assault

17    actually occurred?

18     Q.    (BY MS. FULHAM)  If the records are kept

19    with attempted assaults, I think that is probably

20    sufficient.

21     A.    Okay.

22          MS. PROSE:  Attempted assaults, okay.

23    And I apologize, Counsel, I guess that's just one

24    question we hadn't anticipated, the actual number.

25    We'll get that for you.

 1              MS. FULHAM:  I'll move on.

 2              MS. PROSE:  Okay.

 3         Q.   (BY MS. FULHAM)  To kind of talk about

 4    some of the general trends to those numbers, in

 5    general have the instances of violence committed by

 6    prisoners on other prisoners from the period of 2009

 7    to 2018, have they generally increased, decreased,

 8    stayed relatively consistent?

 9         A.   The numbers from 2009 to now on inmate

10    assaults are pretty consistent.  There's not a huge

11    variation.

12         Q.   Sorry, was there anything else?

13              And looking specifically over the period

14    of 2016 to 2018, I assume that would mean that those

15    numbers have also stayed relatively consistent?

16         A.   Correct.

17              MS. PROSE:  2016, Counsel?

18              MS. FULHAM:  Yes.  To present.

19              MS. PROSE:  Understood.

20         Q.   (BY MS. FULHAM)  And same question with

21    respect to instances of violence committed by

22    prisoners on prison employees, have those numbers

23    since 2009 increased, decreased, or stayed relatively

24    consistent?

25         A.   We have -- we've had spikes.  Usually

Case No. 1:15-cv-02184-RM-STV  Document 112  filed 06/04/18  USDC Colorado  pg 37 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 147

 1    they come in groups.  It's one inmate who continually

 2    does it for a period of time for whatever reason, and

 3    we get new wardens, the inmates act out to see how

 4    they can push the limits.

 5              So we've had quite a few wardens over the

 6    last few years, so we've got some spikes in there.  We

 7    can get you the exact data.

 8              MS. PROSE:  Counsel, what was the exact

 9    data that you wanted?

10              MS. FULHAM:  It's the same data as

11    previous except instances of violence committed by

12    prisoners on prison employees.

13              MS. PROSE:  2009 to the present, specific

14    number.  Okay.  Including attempted?

15              MS. FULHAM:  If that's how it's

16    maintained, yeah, I think that would be sufficient.

17              MS. PROSE:  We can get that.

18         **Q.   (BY MS. FULHAM)  Actually, there are many**

19    **answers to this question, but what measures are taken**

20    **to prevent prisoners from committing acts of violence**

21    **against one another?  I don't need, like, lots of**

22    **granular detail, but generally speaking what practices**

23    **are in place?**

24         A.   Well, initially we are in phases.  The

25    ADX has set up in phases because it's mainly a

Case No. 1:15-cv-02184-RM-STV   Document 111   filed 06/04/18   USDC Colorado   pg 39 of 96

Case 1:15-cv-02184-RM-STV   Document 111-1   Filed 06/04/18   USDC Colorado   Page 38 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 148

1    stepdown program to get through.  So the first phase
2    of it, or if they are in the control unit, the inmates
3    have no contact with each other.  Like if one is out,
4    then no one else is out of their cell at the same
5    time.  Unless they are at recreation, then they are in
6    enclosures next to each other to exclude the control
7    unit.
8         Q.   Sorry, you referred a couple times to the
9    control unit.  What does that refer to?
10        A.   It's a special unit we have for special
11   inmates, and they require more security controls than
12   our other inmates.
13        Q.   So that was, you said, phase 1.  I assume
14   that means there's different security measurements in
15   place for phases 2 and 3?
16        A.   Yes, 2, 3, and 4 there are different
17   security measures.  You're only talking about ADX
18   or -- phase 1 and 2 are ADX, and 3 and 4 are at the
19   United States Penitentiary.
20        Q.   Just ADX.
21        A.   At phase 2 they go to a stepdown program,
22   and at that point they are allowed out in small groups
23   together.  So we have constant staff supervision on
24   them.  We do check on them before we put them out, to
25   the best of our knowledge, to make sure we don't have

Page 149

1   rival gangs together, maybe people who don't like each

2   other, stuff like that that we put on.

3            We also house them separately for their

4   own protection.  And whenever we have an inmate in the

5   corridor, for example, around -- there's only one out

6   at a time, so whenever we are moving inmates on a

7   range or any unit or in the hallway, we're only moving

8   one in that area at a time.

9        Q.    And that's within the stepdown unit as

10  well?

11       A.    If we're moving them, yes.

12       Q.    Okay.  But there is -- so is it fair to

13  summarize your answer to say that in phase 2, or the

14  stepdown unit, there's more opportunity for inmates to

15  interact with one another?

16       A.    Yes.

17       Q.    Okay.  Including there are some instances

18  in which they are in small groups?

19       A.    Yes.

20            (Deposition Exhibit 107 was marked.)

21       Q.    So Exhibit 107 is an institution

22  supplement, FLM 5321.07(1)B.  That's dated

23  September 1, 2015.  And this number, you might notice

24  this doesn't have a Bates number on it.  I think we

25  are -- but this was provided to us by your counsel,

Case 1:19-cv-02184-RM-STV Document 117 Filed 06/04/19 USDC Colorado Page 400 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 150

 1    I'll represent that.

 2              MS. PROSE:  Yes, that's correct, and it's

 3    publicly available as well.

 4         Q.   (BY MS. FULHAM)  Do you recognize this

 5    document?

 6         A.   I do.

 7         Q.   And I believe you said earlier that this

 8    was a document that you reviewed in preparation for

 9    your deposition?

10         A.   I did.

11         Q.   Generally speaking, what is the purpose

12    of this document?

13         A.   This is to explain the procedures inside

14    the general population housing units and the stepdown

15    units.

16         Q.   I note that the date for this is

17    September 1, 2015.  Was there -- I assume that prior

18    to September 1, 2015, there was an institution

19    supplement on this same topic of general population

20    and stepdown unit operations?

21         A.   Yes.  They may have been split up at the

22    time.  They may have been two separate ones that we

23    have combined.

24         Q.   Do you know if there were any significant

25    substantive differences between this September 1,

1    **2015, policy and the policies that preceded it?**

2              A.   I honestly haven't read the ones that

3    preceded it.  This came out within a month of me being

4    here.

5              Q.   **And this policy, this institution**

6    **supplement, does it accurately reflect the policies**

7    **that are used by ADX today?**

8              A.   One of the units has a different mission

9    now than it did then.

10             Q.   **Which unit is that?**

11             A.   K/A.

12             Q.   **That's at page 3?**

13             A.   Yes, page 3.

14             MS. PROSE:  Counsel, for the record, this

15   is the most recent institution supplement.

16             MS. FULHAM:  Okay.  I think we may follow

17   up for ones that preceded this since the relevant time

18   period would be before September of 2015.

19             THE DEPONENT:  I got you.  The previous

20   ones.

21             MS. PROSE:  You would like to have copies

22   of those?

23             MS. FULHAM:  Yes.

24             MS. PROSE:  Okay.

25             MS. FULHAM:  If they are substantially

Case No. 1:19-cv-02184-RM-STV  Document 117  filed 06/04/19  USDC Colorado  pg 42 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 152

1    the same in the rest of the relevant time period, that

2    may not be necessary, but I think certainly for the

3    period in which the rejections occurred, so 2010 to

4    '14.

5              MS. PROSE:  Okay.

6         A.   Okay.

7         Q.   (BY MS. FULHAM)  And this is not a

8    question specific to this document, but when a new

9    inmate comes to ADX, ADX personnel takes into account

10   the prisoner's offenses when they are deciding which

11   unit he will be placed in; is that correct?

12        A.   No.  That is predetermined.  What it is,

13   is when inmates are sent here, they are sent here for

14   one of three reasons.  And so if they are designated

15   to the control unit, they are going to the control

16   unit.  If they are designated to our special security

17   unit, they are going to the special security unit.  If

18   they are designated for general population, that would

19   be the only time that we don't know what general

20   population unit they are going to be in, but their

21   crimes are not a factor in the general population.

22        Q.   Who makes the decision about which of

23   those units they would be designated to?

24        A.   That's quite a long process.  What

25   happens is the institution where the inmate is at

**TODD CHAPMAN - 3/16/2018**
**Prison Legal News v. Federal Bureau of Prisons**

Page 153

1    submits a request.  There is paperwork to go to

2    designate someone to the ADX, and depending on which

3    of those three categories they believe the inmate

4    qualifies for, they will fill out paperwork requesting

5    him to be designated there.  It goes through many,

6    many channels before it gets approval and before they

7    get to us.

8         **Q.    Okay.  When a new inmate arrives at ADX,**

9    **does the ADX take into account the inmate's known**

10   **criminal associations or gang associations when**

11   **deciding where he will be placed within the facility?**

12        A.    Yes.  Those factors do come in.  We don't

13   want to put all of one gang in one housing unit or all

14   in the same range next to each other, that's proven

15   bad in the past.  So we take into account, we try to

16   evenly distribute the different gangs, the different

17   races, stuff like that.  So it's not if you are this

18   race you go to this unit, or this gang you go to this

19   unit or you are this age you go here.  We try to

20   balance all the inmates.

21        **Q.    When an inmate arrives at ADX, I assume**

22   **ADX also uses that information about known criminal**

23   **associations or gang activities to decide whether**

24   **there are any specific security procedures or**

25   **precautions that need to be taken with respect to that**

1    **individual, correct?**

2           A.    Inmates in our general housing units are

3    all treated the same.  Inmates in the control unit are

4    all treated the same.  Inmates in the special security

5    unit are all treated the same.  And the only

6    difference is what phase they are in in the program.

7    They may have some different security concerns, but

8    those are outlined in here.

9           **Q.    And I just want to make sure I**

10   **understand.  The general housing units, that does not**

11   **include the stepdown units, correct?**

12          A.    No, those are not considered.

13          **Q.    You mentioned previously for the stepdown**

14   **units, because the inmates have opportunities to**

15   **interact in small groups, ADX personnel are taking**

16   **some active steps to ensure that people who probably**

17   **shouldn't be put together are not put together?**

18          A.    Yes.  And we do that with all of our

19   inmates throughout the prison.  It's just that they

20   get an extra are you sure about that security level on

21   that.  And even then we have a trial period when we

22   put someone in the unit to where they don't just

23   immediately open the door and have at it.  We give

24   them a seven-day period behind a closed door so we can

25   see how they interact with the other inmates.  So the

Case No. 1:15-cv-02184-RM-STV   Document 117   filed 06/04/18   USDC Colorado   pg 46 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 172

```
 1        A.    Right.

 2        Q.    Let me start with a more simple question.

 3   Did the warden review all 11 of those issues?

 4        A.    Yes, he did.

 5        Q.    On an issue-by-issue basis?

 6        A.    He read each one, yes.

 7        Q.    Do you know if anyone else besides Warden

 8   Fox reviewed these 11 issues?

 9        A.    I think everyone in this room has

10   reviewed the 11 issues.  Maybe she hasn't, but the

11   rest of us.

12        Q.    You will by the time we're done.

13              So you have reviewed all 11 issues?

14        A.    Correct.

15        Q.    Did you review them prior to the warden's

16   decision to allow them to be delivered?

17        A.    Yes.

18        Q.    Do you know of any other specific

19   individuals who reviewed the 11 issues before the

20   warden made the determination to deliver them?

21              MS. FULHAM:  Did someone just join?

22              THE DEPONENT:  Maybe it cut off.

23              MS. FULHAM:  That might be.  We might

24   have lost Dan.

25              THE DEPONENT:  I forget Dan is there
```

```
 1   until he gets cut off.

 2            MS. FULHAM:  I was checking because it's

 3   possible Peter Swanson might participate.

 4            Dan, are you still there?

 5            MS. PROSE:  The line has been cut, I

 6   think.

 7            MS. FULHAM:  We'll leave it open.  It's a

 8   dial-in, so he can rejoin.

 9       Q.   (BY MS. FULHAM)  The question that was

10   pending there, do you know of any other specific

11   individuals who reviewed the 11 issues before the

12   warden made the determination to deliver them?

13       A.   I believe Clay Cook, attorney, reviewed

14   them.  I'm not sure if Kaitlin reviewed them before

15   the warden did or she reviewed them after.  I believe

16   Ms. Susan Prose has reviewed them.  I have reviewed

17   them.  And I'm not sure if anyone --

18            MS. FULHAM:  Dan, is that you?

19            MR. MARSHALL:  I'm not sure if it times

20   out after a couple hours or something, but I got

21   kicked out again.

22       A.   There may have been more, I'm not sure,

23   because we have deposed a variety of people, and I'm

24   not aware if the deposals were done before or after

25   those, but I know those people have viewed them.  I'm
```

Case No. 1:15-cv-02184-RM-STV   Document 110-1   filed 06/04/18   USDC Colorado   pg 47 of 95
Case 1:15-cv-02184-RM-STV   Document 110-1   Filed 06/04/18   USDC Colorado   Page 47 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 174

1   not sure if they viewed them before Warden Fox made

2   his decision.

3   **Q.   (BY MS. FULHAM)  I'll represent that all**

4   **the depositions, other than your first deposition,**

5   **have occurred in 2018.  So if this decision was made**

6   **in 2016?**

7   A.   Then the parties I named were the ones

8   who had seen them.

9   **Q.   And when these 11 issues were reviewed --**

10  **rereviewed in 2016, was there any investigation of**

11  **whether the inmate or staff member who is referenced**

12  **in that article was still at the ADX?**

13  A.   We -- I don't know if it was an

14  investigation.  We checked our facts.  We made sure

15  that the bureau had either taken security measures or

16  that the situation had resolved itself.  That was part

17  of the process, being that they were allowed, when the

18  warden reviewed them, to come in.  The bureau had

19  taken, like I said, additional security measures, and

20  that we felt that the threats were no longer valid at

21  ADX.

22  **Q.   I'm going to take a look and move into**

23  **the really fun part where we go through the issues.**

24  **In case it hasn't been fun.**

25  MS. PROSE:  Counsel, this probably raises

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado page 480 of 495
Case 1:15-cv-02184-RM-STV Document 111 Filed 05/04/18 USDC Colorado Page 49 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 176

1          Q.    I believe you also mentioned earlier that

2    you spoke to Ms. Leeanne LaRiva in preparation for

3    your deposition?

4          A.    I did.

5          Q.    Is Ms. LaRiva the person who signed the

6    rejection notice at Exhibit 110?

7          A.    She confirmed that that was her

8    signature.

9          Q.    And Ms. LaRiva was an assistant warden at

10   the time she signed it?

11         A.    She was an acting warden.  I don't know

12   what her official title was, but she was acting warden

13   that day.

14         Q.    So this was during the tenure that

15   Mr. Davis was the complex warden.  Is it safe to

16   assume, then, that he was not at the facility that

17   day, so Ms. LaRiva was the acting warden on the day of

18   this rejection?

19         A.    Well, according to his deposition, he had

20   stated that sometimes he would delegate that authority

21   because he had other things to do, and sometimes he

22   was out of the institution training or teaching.

23         Q.    You're not sure if it was because he was

24   otherwise occupied or because he was not at the

25   facility?

Case No. 1:15-cv-02184-RM-STV   Document 111-1   filed 06/04/19   USDC Colorado   pg 490 of 505
Case No. 1:15-cv-02184-RM-STV   Document 111-1   filed 06/04/19   USDC Colorado   pg 490 of 505
of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 177

```
 1        A.    Correct.

 2        Q.    But regardless, he had delegated that

 3   authority -- he had delegated the authority for

 4   rejections to Ms. LaRiva that day?

 5        A.    Correct.

 6        Q.    Taking a look at this January 2010 issue,

 7   does -- is it BOP's position at this time that this

 8   issue was properly rejected?

 9              MS. PROSE:  Excuse me, Counsel, the

10   current time?  As of today?

11              MS. FULHAM:  Let me rephrase that,

12   actually, that was a little --

13              MS. PROSE:  Thank you.  I appreciate

14   that.

15        Q.    (BY MS. FULHAM)  Is it BOP's position

16   that this issue was properly rejected at the time of

17   the rejection?

18        A.    Yes.

19        Q.    And what was the basis for rejecting this

20   issue?

21        A.    The inmate who is mentioned in the

22   article was an ADX inmate, and he had cooperated with

23   the government and coordinated with a staff member

24   to -- which ended up being a murder of another inmate,

25   and that created a security risk for that inmate and
```

Case No. 1:15-cv-02184-RM-STV Document 111 filed 06/04/18 USDC Colorado pg 50 of 95
Case 1:15-cv-02184-RM-STV Document 112-20 filed 06/18/18 USDC Colorado Page 50 of 95

TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 178

1    the staff who escort and deal with that inmate,

2    because there may be other inmates who are willing to

3    do almost super human things to get out of restraints

4    or whatnot to get to another inmate that they want to

5    get to.

6             Q.    Was this issue of PLN rejected at any

7    other BOP institutions?

8             A.    I don't believe so.

9             Q.    And you have testified previously that it

10   is possible for information to be shared among inmates

11   at ADX and inmates at other BOP institutions, correct?

12            A.    Correct.

13            Q.    At the time of the rejection of this

14   issue, did BOP undertake any effort to determine

15   whether the information contained in this article

16   about -- I believe you're referring to █████████,

17   right --

18            A.    Yes.

19            Q.    -- was available to inmates through any

20   other sources?

21            A.    No, we did not.

22            Q.    And █████████ had a court case that

23   related to this murder, correct, that's described in

24   this article?

25            A.    I would assume.  I'm not sure if he got

1    time or not.  I believe this talks about the staff

2    member and the sentence they got.

3            **Q.    And there were presumably also court**

4    **cases against the staff members who conspired with**

5    ████████████████ **?**

6            A.    Correct.

7            **Q.    And could ADX inmates have accessed**

8    **information about this case through the law library at**

9    **the time of this rejection?**

10           MS. PROSE:  Object to the extent it calls

11   for speculation.  You can answer the question.

12           A.    They could have as long as it met that --

13   was on that list that we have earlier of what's on the

14   electronic law library, then they could have had

15   access if they knew such a case existed and they knew

16   where to look.

17           **Q.    (BY MS. FULHAM)  But it's possible they**

18   **could have chosen to access that information?**

19           A.    It is.

20           **Q.    Would this article -- or this issue of**

21   **PLN be rejected under the current institution**

22   **supplement?**

23           A.    The current institution supplement, no.

24           **Q.    And why not?  Why would it not be**

25   **rejected if it came in today?**

Case No. 1:15-cv-02184-RM-STV  Document 111  filed 06/04/18  USDC Colorado  Page 52 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 180

1       A.    Like I said, we've taken security

2  measures since this has come out initially that we no

3  longer feel that there would be an issue with this

4  coming in today.

5       Q.    And this issue -- this issue was

6  delivered ultimately to inmates, correct?

7       A.    Correct.

8       Q.    Because at that -- I assume that's

9  because at that time the BOP determined this

10 referenced article was not detrimental to the

11 security, good order, or institution -- of the

12 institution?

13      A.    At this time, correct.

14      Q.    Is ███████████████ still at ADX?

15      A.    I do not believe he is.

16      Q.    Do you know if he's still at a BOP

17 institution?

18      A.    I would have to look that up.

19      Q.    When ███████████████ was transferred to ADX,

20 did ADX officials make any assumptions that other

21 inmates would have been aware of his record?

22      A.    Yes.

23            MS. PROSE:  Could you read the question

24 back.

25      Q.    (BY MS. FULHAM)  When ███████████████ was

1    transferred to ADX -- this article is talking about a

2    period where he was at the federal correctional

3    complex in Coleman, correct?

4         A.    That's where the incident took place.

5         Q.    At some point he was transferred to ADX?

6         A.    Correct.

7         Q.    And I assume that when he was transferred

8    to ADX, ADX officials were aware of this incident at

9    FCC Coleman?

10        A.    Correct.

11        Q.    Did it take any additional security

12   measures with respect to ████████████ given the nature

13   of his offense?

14        A.    I'm not sure what unit he was placed in.

15   I would have to look and see if he was placed in the

16   control unit or if he was placed in the general

17   population unit.

18        Q.    If this article had been distributed in

19   January 2010, what additional safety measures would

20   ADX have had to take if this information was

21   distributed?

22        A.    I'm not sure what other security

23   precautions we could have taken at the time once it's

24   in other than to make staff aware that this is widely

25   known, and so be careful when you have other inmates

Case 1:15-cv-02184-RM-STV Document 110 Filed 06/04/18 USDC Colorado Page 54 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 182

1    out because I've seen it with my own two eyes where an

2    inmate was being restrained and escorted by two staff,

3    slip the restraint, push the staff away, and stabbed

4    another inmate.  So we would make them aware that this

5    is a precaution that we need to worry about because

6    this just came to light of hundreds of inmates who may

7    not have known about it before.

8         Q.    Once ███████████ was at ADX, it would be

9    possible for him to tell other inmates about his prior

10   offenses, correct?

11        A.    Sure.

12        Q.    So it's possible that other inmates knew

13   about ███████ offense at the time this issue was

14   rejected?

15        A.    It is a possibility.

16             (Deposition Exhibits 111 and 112 were

17   marked.)

18        Q.    Mr. Chapman, the court reporter just

19   handed you Exhibits 111 and 112.  Exhibit 111 was

20   produced by BOP and is marked BOP000116, and it is an

21   excerpt of the June 2010 issue of Prison Legal News,

22   including pages 1 and 11.

23             And then Exhibit 112 is a notification to

24   inmate and publisher of rejected publication

25   concerning the June 2010 issue of PLN.

 1          A.    Okay.

 2          Q.    And looking first at Exhibit 112, the

 3    rejection notice, who signed this notice?

 4          A.    That appears to be Blake Davis'

 5    signature.

 6          Q.    Okay.  And when was this rejection notice

 7    mailed to PLN?

 8          A.    It would have been mailed shortly after

 9    July 14.

10          Q.    Does BOP keep any records of when

11    specifically rejection notices are mailed to

12    publishers?

13          A.    I found out recently that FCI Fairton

14    does, but I haven't been at an institution that did

15    it.  Because we assume once it's signed, it goes down

16    to the mailroom and they send it out, that's usually

17    the process.  And then so we put our copy in the file,

18    and we assume since the copy is in the file that's

19    when it was sent.  And it will have a month that it's

20    there.  We don't keep track usually of the exact day.

21          Q.    So there wouldn't be any records that BOP

22    keeps about when specifically this -- this rejection

23    notice which was signed on July 14, 2010, would

24    actually have been mailed out to PLN, for example?

25          A.    I'm saying ADX doesn't.  I just recently

Case 1:15-cv-02184-RM-STV Document 110 Filed 06/04/18 USDC Colorado Page 58 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 184

1  found out another institution does, so there may be

2  more institutions that do, but it's not a policy

3  requirement.

4       Q.   To your knowledge, it's not the practice

5  of ADX to maintain records of that?

6       A.   Well, we have files that have retention

7  dates, so we only keep certain things for certain

8  amounts of time.  The ADX has been different because

9  of our mission and because we sit in a lot of rooms

10  like this because of the ADX.  So we tend to keep some

11  of our documents longer than the rest of the prison

12  system, which goes exactly on the date it purges.

13       So there are some records, but also when

14  we mail stuff out, unless we put a certified -- or if

15  it's legal mail or some sort of accountable, trackable

16  mail, we don't keep a record because we send out so

17  much mail every day.

18       Q.   I just want to confirm that those records

19  don't exist?

20       A.   No.

21       Q.   That's the purpose of my question there.

22       The rejection notice indicates that this

23  June 2010 publication was -- and I'm looking at the

24  second paragraph here of the rejection notice -- was

25  rejected because the referenced page contains

 1    information on a riot at USP Florence and information

 2    on an ADX inmate.  The rejection notice refers

 3    specifically to page 11.  And if you take a look at

 4    Exhibit 112, you can see the referenced article there.

 5              Is it BOP's position that this article

 6    was properly rejected at the time of the rejection?

 7         A.   Yes.

 8         Q.   And what was the basis for the rejection

 9    of this issue?

10         A.   In the warden's judgment at the time, the

11    naming of the inmate was detrimental to security, good

12    order, and discipline of the institution, or might

13    facilitate criminal activity under 28 C.F.R. 540.71,

14    based on the fact that they listed an inmate who did

15    not participate in something and refused to

16    participate, and also named the Aryan Brotherhood as

17    the gang, and we have the leaders of the Aryan

18    Brotherhood.  And his fear was if we handed this over

19    to the Aryan Brotherhood, that inmate is now a target

20    of theirs anywhere he goes in the Bureau of Prisons.

21         Q.   The inmate that you are referring to,

22    this is ███████████████████, is that --

23              MS. PROSE:  I just want to make a record

24    that as to ████████████, and also previously ███████

   ██████████, the bureau will be designating these

Case 1:15-cv-02184-RM-STV Document 110 Filed 06/04/18 USDC Colorado Page 58 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 186

1    portions of the transcript as confidential.  You can

2    go ahead and answer the questions.

3            A.    Yes, it is ██████████.

4            Q.    (BY MS. FULHAM)  From your perspective,

5    were inmates at ADX likely aware of the riot that

6    occurred at the US penitentiary in Florence?

7            A.    Some were, I would guess.

8            Q.    So at least some inmates were aware that

9    the riot had occurred?

10           A.    I would assume so.

11           Q.    At the time that this issue was rejected,

12   did BOP make any effort to determine whether the

13   information contained in this article was available to

14   inmates through other sources?

15           A.    No.

16           Q.    At the time this article was rejected,

17   did ADX inmates have access to the Denver Post if they

18   wanted to subscribe to it?

19           A.    If they had a subscription, yes.

20           Q.    And did at least some inmates subscribe

21   to the Denver Post at that time?

22           A.    I have no idea who or whatever

23   subscriptions they had in 2010.

24           Q.    Does BOP maintain any records of what

25   subscriptions inmates have?

Case No. 1:15-cv-02184-RM-STV Document 112 Filed 06/04/19 USDC Colorado Page 59 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 188

1    Prisons at the time of this rejection?

2          A.    When was it published, the Steele versus

3    US Bureau of Prisons?

4          Q.    I don't know the specific date, but I

5    think it's safe to assume it was filed before this

6    article was published.

7          A.    The reason I ask is because the

8    information that gets entered in the electronic law

9    library isn't minute to minute.  Sometimes it could be

10   months or quarterly or biannual, depends on what it is

11   they are putting in there.  Without knowing the date

12   of this, I can't specify if it was in there or not in

13   there yet.

14         Q.    And you said previously that it's -- it

15   is possible that inmates at the ADX were aware that

16   the riot at USP Florence had occurred?

17         A.    It is possible.

18         Q.    Is it possible that ADX inmates were

19   aware that ████████████ had refused to participate in

20   that riot?

21         A.    Eventually some may have been made aware.

22         Q.    How would they have been made aware?

23         A.    If we were to have an inmate from the

24   penitentiary come over to the ADX, they could let them

25   know.  Maybe a staff member with loose lips.  Maybe

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/19 USDC Colorado pg 600 of 95 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 189

1   carrier pigeon.  They could have been made from -- a

2   third party could have let them know, someone written

3   a letter, told them on the phone.  It is possible.

4           Q.   So I'm hearing you say that there is a

5   variety of ways in which it would be possible for

6   someone to know that ███████████ refused to participate

7   in the riot at USP Florence; is that accurate?

8           A.   Yes.

9           Q.   Would this issue, this June 2010 issue of

10  PLN, be rejected under the current institution

11  supplement?

12          A.   No.  Based on the security measures we've

13  undertaken and the passage of time, it would not be

14  rejected today.

15          Q.   And when you say, "the security

16  measures," were there security measures that were

17  taken specifically as a result of this information?

18          A.   I'm going to claim law enforcement

19  privilege on that one.  I can't explain what we -- the

20  security measures we took.

21          Q.   This issue has been delivered to inmates,

22  correct?

23          A.   Correct.

24          Q.   And that was because prior to delivering

25  this issue BOP determined that the article was not

 1    detrimental to the security, good order, or discipline

 2    of the institution, correct?

 3         A.   Correct.

 4         Q.   So what is it that changed -- so you have

 5    said that you believe this was properly rejected at

 6    the time it was rejected, and that when it was

 7    delivered it was no longer -- or it was not

 8    detrimental to the security, good order, or discipline

 9    of the institution.

10              What changed in the time from when this

11    was rejected to the time when it was actually

12    delivered?

13         A.   We took some security measures during

14    that time frame, and with the lapse of time, but I

15    can't tell you what those security measures are.

16         Q.   Were those security measures that would

17    have been taken regardless of whether this issue of

18    PLN was rejected?

19         A.   Probably.

20         Q.   All right.

21              (Deposition Exhibits 113 and 114 were

22    marked.)

23         Q.   Mr. Chapman, Exhibit 113 is a document

24    produced by BOP labeled BOP000132 through 135, and it

25    is an excerpt from the October 2011 issue of Prison

Case 1:19-cv-02184-RM-STV Document 112-2 Filed 06/04/18 USDC Colorado Page 63 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 191

1    Legal News.

2              Exhibit 114 is a document marked

3    BOP000136, and it's a notification to inmate and

4    publisher of rejected publication concerning the

5    October 2011 issue of PLN.  Do you agree?

6         A.   Yes.

7         Q.   Okay.  And on the rejection notice it

8    indicates that the objectionable material is contained

9    on pages 20 to 21 and page 50; do you see that?

10        A.   Yes.

11        Q.   And the Exhibit 113 is an excerpt from

12   the October 2011 issue that includes pages 20, 21, and

13   50.

14        A.   Okay.

15        Q.   In 2011 -- and we're going to talk about

16   the October 2011 issue -- but in 2011 an inmate

17   appealed the rejection of this issue; is that correct?

18        A.   Correct.

19        Q.   I'm just going to go ahead and introduce

20   that also.

21             (Deposition Exhibit 115 was marked.)

22        Q.   So taking a look at Exhibit 115, this is

23   documents that were produced by BOP, and it's number

24   001077 through 001079.

25        A.   Okay.

Case No. 1:15-cv-02184-RM-STV   Document 118   Filed 06/04/18   USDC Colorado   Page 63 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 201

1    excerpt from the June 2002 PLN issue, and Exhibit 118

2    is a notification to inmate and publisher/sender of

3    the rejected publication for the June 2012 issue of

4    Prison Legal News; do you see that?

5         A.    Yes.

6         Q.    Taking a look first at the rejection

7    notification.  Are you aware of when this rejection

8    notice was mailed to PLN?

9         A.    I don't know the exact date.  If it was

10   signed July 3, within probably three to four days.  It

11   was a holiday, maybe a weekend.  So within probably

12   seven days initially.

13        Q.    This rejection notice, unlike the last

14   few that we've looked at, does not reference any

15   specific pages of objectionable content, correct?

16        A.    I don't see any listed.

17        Q.    So if PLN received this notice, they

18   would not have any information about what specifically

19   within the issue was objectionable, correct?

20        A.    There's some information in paragraph 2,

21   information on that ADX inmate.  So you probably would

22   be able to deduce by reading, but it wouldn't be as

23   obvious as page 21 and 24.

24        Q.    So the rejection notice indicates that

25   this publication has been rejected because it contains

Case 1:15-cv-02184-RM-STV Document 111 Filed 06/04/18 USDC Colorado Page 64 of 95
of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 202

1    information about an ADX inmate and former staff

2    members.  If we take a look back at Exhibit 117, page

3    38 of this, there is an article entitled "Former BOP

4    Guard Convicted, Sentenced in Murder-For-Hire Case."

5         A.   Okay.

6         Q.   And page 44 indicates that there's an

7    article called, "Second BOP Guard Convicted in

8    Connection with Prisoner's Murder."  Do you see that?

9         A.   I do.

10        Q.   Is it your understanding that the two

11   articles I just pointed out to you, the one entitled,

12   "Former BOP Guard Convicted, Sentenced in

13   Murder-For-Hire Case," and "Second BOP Guard Convicted

14   in Connection with Prisoner's Murder," were the

15   reasons for the rejection of the June 2012 issue?

16        A.   These appear to be the ones that we would

17   have rejected it on.

18        Q.   And is it BOP's position that this --

19   that the June 2012 issue of PLN was properly rejected

20   at the time it was rejected?

21        A.   Yes.

22        Q.   And what was the basis for that

23   rejection?

24        A.   In the first story here about "Former BOP

25   guard," on page 38, "Convicted, Sentenced in

 1    Murder-For-Hire Case," inmates who are former BOP
 2    staff members are really high up on the food chain of
 3    ones that inmates hate, right below sex offenders and
 4    snitches, and so that alone is something that rings a
 5    bell but wouldn't have been a reason we rejected it.
 6    He was at the ADX at the time when this came out.
 7         Q.    "He" meaning ████████████████?
 8         A.    ████████████.
 9              MS. PROSE:  I'll make a notation for the
10    record, this portion of the testimony will also be
11    marked confidential.  Thank you.
12         A.    So by having that information and
13    providing it to the inmates who wouldn't have already
14    known that, one, he's a BOP guard and he's now at the
15    ADX puts him and anyone escorting him at very high
16    risk to their lives.
17         Q.    (BY MS. FULHAM)  Were there any security
18    measures that were put in place with respect to
19    ████████████ simply because he was a former BOP guard?
20         A.    No.
21         Q.    Taking a look at the article on page 38.
22    If you see at the end of the second to last paragraph
23    there is a case citation for an 11th Circuit case?
24         A.    Yes.
25         Q.    Do ADX inmates have access to 11th

1    Kennedy?

2              Q.    Yes.

3              A.    Okay.

4              Q.    And I believe you've already confirmed

5    that it's possible that an ADX inmate could have

6    accessed 11th Circuit opinions, correct?

7              A.    I believe so.

8              Q.    So they could have accessed information

9    about an 11th Circuit opinion concerning Mr. Kennedy?

10             A.    If opinions are on the electronic law

11   library, then yes.

12             Q.    Was --

13             MS. PROSE:    Counsel, when it's convenient

14   for you could we take a quick break, but it doesn't

15   have to be right this moment, but --

16             MS. FULHAM:    We'll just get through this

17   issue.

18             Q.    (BY MS. FULHAM)    At the time that this

19   issue was rejected, could inmates have subscribed to

20   the Ocala Star Banner, which is a newspaper?

21             A.    Yes, I guess they could have.

22             Q.    Do you agree that it was at least

23   possible that inmates were aware of the information --

24   it's possible that inmates were aware of the

25   information in the article on page 44?

 1              MS. PROSE:  Just object to the extent it

 2    calls for speculation.  You can answer counsel's

 3    question.

 4         A.   It's possible.

 5         Q.   (BY MS. FULHAM)  Turning back to the

 6    article on page 38.  Would this article -- if this

 7    article were reviewed under the standards in the

 8    current institution supplement, would it be rejected?

 9         A.   Would it be rejected today if it showed

10    up?  Again, due to security measures that we've

11    undertaken and the passage of time, this would not be

12    rejected.

13         Q.   And same question with respect to the

14    article on page 44.  If this article were reviewed

15    under the standards of the current institution

16    supplement, would this article be rejected?

17         A.   No, same answer.

18         Q.   And this June 2012 issue of Prison Legal

19    News was delivered to inmates in 2017, correct?

20         A.   Correct.

21         Q.   And that's because at that time BOP

22    determined that the June 2012 issue was not

23    detrimental to the security, good order, and

24    discipline of the institution, correct?

25         A.   Correct.

 1              MS. FULHAM:  I think this would be a good

 2    time for a break.

 3              (Recess taken, 2:56 p.m. to 3:14 p.m.)

 4              (Deposition Exhibits 119 and 120 were

 5    marked.)

 6         Q.   (BY MS. FULHAM)  Exhibit 119, which the

 7    court reporter just handed to you, has been marked as

 8    BOP000301 through 302.  And this is an excerpt from

 9    the November 2012 issue of PLN.

10         A.   Okay.

11         Q.   If you look at Exhibit 120, that's a

12    notification to inmate and publisher of rejected

13    publication concerning the November 2012 issue of PLN.

14         A.   Okay.

15         Q.   And you see on the rejection notice that

16    it indicates that the objectionable content is on

17    page 42.  And the excerpt that you have of the June

18    2012 issue includes pages 1 and then 42.

19         A.   Okay.

20         Q.   The rejection notice at paragraph 2 of

21    Exhibit 120 indicates that, "The publication has been

22    rejected because the referenced page discusses

23    individuals incarcerated at Administrative Maximum

24    Security Institution."

25              Was this issue primarily rejected because

Case No. 1:19-cv-02184-RM-STV Document 112-20 filed 06/04/15 USDC Colorado pg 70 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 209

1    it references an ADX inmate or inmates?

2         A.   No.

3         Q.   What was the basis for the rejection at

4    the time?

5         A.   Identifying an inmate at the ADX here as

6    what would be known as a prison snitch, which is --

7    brings his safety to the forefront when we put that

8    sort of information out.  And he was at the ADX.

9              And also it puts in there about his

10   suicide.  That's not something -- public information

11   that we give out, we don't provide to people.  If

12   someone commits a successful one, different story; but

13   as far as attempted, that's not typically something we

14   give out about an inmate or discuss or tell about an

15   inmate.  So it covered multiple things in there.

16        Q.   So this article, the article at page 42,

17   if you take a look at it, this article is discussing a

18   lawsuit that was filed by a number of ADX inmates

19   against the BOP, correct?

20        A.   Correct.

21        Q.   And the portion where you mentioned

22   suicide attempts, correct?

23        A.   Yes.  That's not the main reason, but

24   that's also something else.

25        Q.   Taking a look at the third paragraph,

Case No. 1:15-cv-02184-RM-STV Document 113-2 filed 06/04/18 USDC Colorado Page 70 of 95
Case 1:15-cv-02184-RM-STV Document 113-2 Filed 06/04/18 USDC Colorado Page 70 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 210

1    that paragraph is in quotations.  Do you understand

2    what document that is quoting?

3            A.    The PLN October 11?

4            Q.    I believe, actually, this is quoting the

5    complaint in this case, but --

6            A.    Oh, you mean, it's quoting the Cunningham

7    lawsuit?

8            Q.    Yes.

9            A.    Okay.

10           Q.    Does -- before we talk anymore about

11   this, was this issue of PLN rejected at any other BOP

12   institution?

13           A.    Not that I'm aware of.

14           Q.    And is it BOP's position that this

15   article was properly rejected at the time of the

16   rejection?

17           A.    Yes.

18           Q.    And to be clear, you indicated that the

19   reasons for this rejection was that it referenced an

20   inmate's attempted suicide.  Was there any other --

21   you said identifying an inmate at the ADX would be

22   known -- is what would be known as a prison snitch?

23           A.    Yes.  It says right here, after they

24   described who he was, they said he witnessed a

25   prisoner-on-prisoner killing, testified in the case.

Case No. 1:19-cv-02184-RM-STV Document 118-2 filed 06/04/19 USDC Colorado Page 72 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 211

 1          Q.   Okay.  And is that inmate identified in
 2    this article?
 3          A.   Yes.
 4          Q.   Was that inmate identified in the
 5    complaint that was filed in this case, in the
 6    Cunningham case?
 7          A.   I believe so.
 8          Q.   And at the time of the rejection of this
 9    issue, did BOP make any effort to determine whether
10    the information contained in this article was
11    available to inmates through other means or through
12    other sources?
13          A.   No.
14          Q.   Could ADX inmates have accessed
15    information about the Cunningham case, including
16    potentially the complaint through the electronic law
17    library at the time of the rejection?
18          A.   That's where this might be relevant.  I'm
19    going to read this to you.  I don't understand all of
20    it because I'm not an attorney.
21               We got some clarification.  So on the
22    electronic law library, only published court orders.
23    No other court filings are on the electronic legal
24    library.  So if that met that criteria, then, yes,
25    they might have had access through the electronic law

Case 1:15-cv-02184-RM-STV Document 111 Filed 06/04/18 USDC Colorado Page 72 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 214

1        Q.    There was an issue of the New York Times

2    that reported on this case.  Was that issue of the

3    New York Times rejected by the ADX?

4        A.    I'm not aware either way.

5        Q.    Is that -- to the extent that the files

6    from that time period still exist, is that information

7    that we could obtain?

8        A.    If that file still exists, it should be a

9    record if a rejection was made.

10       Q.    And an issue of the Atlantic Magazine

11   that reported on this lawsuit, was that issue -- was

12   that magazine rejected at the ADX?

13       A.    I'm not aware if it was or not.

14       Q.    Is it possible that an inmate could have

15   learned about this publicly filed lawsuit from someone

16   who is outside the prison?  For example, from a friend

17   or family member?

18       A.    Yes.  They may not have known about the

19   prison snitch part, but they probably could have heard

20   about the lawsuit.

21       Q.    And so do you agree it was at least

22   possible that some ADX inmates could have been aware

23   of the information contained in this article?

24       A.    Yes.

25       Q.    Would this issue be rejected under the

Case 1:19-cv-02184-RM-STV  Document 110  Filed 06/04/19  USDC Colorado  Page 730 of 745
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 215

1    current institution supplement?

2          A.   Based on the security measures we've

3    taken and the passage of time, no, it would not be

4    rejected.

5          Q.   When you say based on the security

6    measures you've taken, were there specific security

7    measures that BOP put in place in response to the

8    information that was in this article?

9          A.   You mean did we wait until this article

10   showed up, then we took security measures because we

11   found out about this?

12         Q.   Yes.

13         A.   Okay.  We took security measures, but not

14   necessarily because we found out about this.

15         Q.   Did you take security measures more

16   generally in response to the lawsuit that was filed by

17   these inmates?

18         A.   No, not because of the lawsuit, we did

19   not take security measures.

20         Q.   I guess what I'm trying to understand is

21   that you said that this article was properly rejected

22   at the time it was rejected.  And then you said that

23   it would not be rejected under the current institution

24   supplement, and that the thing that seems to have

25   changed, according to your testimony, is that there

**TODD CHAPMAN - 3/16/2018**

**Prison Legal News v. Federal Bureau of Prisons**

Page 216

```
1    were security measures that were taken?

2              A.   Yes, due to security measures and the

3    passage of time that there was no problem.  We've

4    given all the inmates at the ADX a copy of the

5    Cunningham lawsuit.

6              Q.   When did that occur?

7              A.   After it was settled.  I don't know the

8    exact date.

9              MS. PROSE:  Counsel, before you ask

10   another question, I would like to get some

11   clarification for my own purposes on the testimony

12   that Mr. Chapman just gave, again in the interest of

13   getting you a full response to some of your questions.

14   Could we take 20 seconds?  It's up to you, but . . .

15             MS. FULHAM:  Yes, I don't have anything

16   pending.

17             MS. PROSE:  There was nothing pending,

18   that's why I asked.  We'll be right back.

19             (Recess taken, 3:27 p.m. to 3:34 p.m.)

20             Q.   (BY MS. FULHAM)  So just to start,

21   Mr. Chapman, I understand that you have some

22   additional information that you were going to share

23   with respect to security measures that were

24   implemented, but -- security measures that were

25   implemented that had a bearing on whether the rejected
```

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado pg 76 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 217

 1    issues could be delivered?

 2          A.    I can tell you one factor that we took

 3    into consideration was whether the inmate that we

 4    feared for their safety originally is still currently

 5    at the ADX, that was one of the factors we took.

 6    That's pretty much the only one I can tell you.

 7          Q.    And just to follow up on that, I want to

 8    be clear that you -- that consideration was whether

 9    they were still at the ADX specifically, right?

10          A.    Yes.

11          Q.    Not whether they were still in the BOP

12    system?

13          A.    That could have also been another factor.

14          Q.    Returning our focus -- I'm actually going

15    to go back, then, a little bit to the November 2012

16    issue which discussed the Cunningham lawsuit.  Were

17    any of the plaintiffs in the Cunningham lawsuit still

18    at the ADX at the time this issue was delivered in

19    2017?

20          A.    Yes, I believe some of the ones were

21    still at the ADX who were part of that lawsuit.

22          Q.    Was ▇▇▇▇▇▇▇▇ specifically still at ADX?

23          A.    We don't typically give locations of

24    where inmates are at.

25          Q.    Okay.

```
 1    and 9.   What it appears to be referring to is this

 2    article titled "Tenth Circuit:  Terrorism Prisoners

 3    Lack Liberty Interest in Transfer to ADX."  Do you see

 4    that?

 5         A.   Yes.

 6         Q.   Is that BOP's position, that that's the

 7    article that prompted the rejection of this issue?

 8         A.   Yes.

 9         Q.   The rejection notice indicates that the

10    publication has been rejected because the referenced

11    pages discusses individuals incarcerated at the US

12    penitentiary Florence.

13              One quick question:  Were those

14    individuals -- my understanding is ADX and the USP are

15    separate facilities?

16         A.   They are.  But if they belong in the

17    stepdown program of the ADX, they are still ADX

18    inmates.

19         Q.   Okay.  So is this indicating that the

20    individual was incarcerated at ADX?

21         A.   It --

22              MS. PROSE:  I'll object to the form; but,

23    Counsel, can you clarify your question for me so I

24    understand?

25              MS. FULHAM:  Sure.
```

Case No. 1:15-cv-02184-RM-STV   Document 113   filed 06/04/18   USDC Colorado   pg 78 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 222

1          Q.    (BY MS. FULHAM)   The first sentence of

2     this second paragraph states, "The publication has

3     been rejected because the referenced pages discusses

4     individuals incarcerated at US Penitentiary Florence,"

5     then in parentheses ADX.

6              And my understanding -- you can correct

7     me if this is wrong -- my understanding is that

8     normally when it was referring to the US Penitentiary

9     Florence, that is a different facility than ADX?

10         A.    I've got this.   I can explain it.   Our

11     official designation for the ADX -- ADX is a nickname.

12     Its official title is United States Penitentiary

13     Administrative Maximum.   And the United States

14     Penitentiary across the way is United States

15     Penitentiary High.   So they used the nickname and --

16     part of our official name and our nickname together.

17         Q.    So it's referring to the ADX here?

18         A.    Correct.

19         Q.    I just wanted to confirm that.   Is it

20     BOP's position that this article was properly rejected

21     at the time it was rejected?

22         A.    Yes.

23         Q.    And what is BOP's position on why this

24     article constitutes a security risk?

25         A.    Mr. Berkebile, he gave a deposition on

Case No. 1-19-cv-02184-RM-STV Document 111-1 filed 06/04/19 USDC Colorado Page 79 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 223

1    why, about the fact that we're discussing active

2    terrorists and they may have influence over other

3    terrorists or want-to-be terrorists, and the fact that

4    terrorists are targets of the white supremacy gangs,

5    especially the Aryan Brotherhood and their underlings,

6    and we have the heads of those at our prison.

7            Q.    And that is the entire basis on which the

8    rejection is based?

9            A.    That's why it was rejected originally.

10           Q.    And part of the reason I want to confirm

11   specifically on this is for some of the issues we have

12   written responses that provide the basis for the

13   rejection, and this is an issue for which we don't

14   have a written response.  So I want to confirm and

15   ensure that --

16           A.    That is what Mr. Berkebile said, and he

17   was the one in the process of rejection.

18           Q.    Okay.  The title of the article says,

19   "Tenth Circuit:  Terrorism Prisoners Lack Liberty

20   Interest in Transfer to ADX."

21                 Would you agree that this article appears

22   to be summarizing a 10th Circuit opinion?

23           A.    I don't know why that title was chosen.

24   I mean, it says 10th Circuit, but I don't know if the

25   case was out of the 10th Circuit and someone at your

 1          Q.    The rejection notice indicates that the

 2   potentially objectionable content in the April 2013

 3   issue is on page 32; is that correct?

 4          A.    Yes.

 5          Q.    And this makes it relatively easy for us

 6   because page 32 only has one article, "ADX Prisoner

 7   Not Allowed to Communicate with Family Members or

 8   Receive Publications Under SAMs."

 9                Is it accurate that this article was the

10   basis for the rejection of the April 2013 issue of

11   PLN?

12          A.    Yes.

13          Q.    And it indicates in the rejection notice

14   that the publication was rejected because the

15   referenced page discusses individuals incarcerated at

16   the ADX; is that correct?

17          A.    Correct.

18          Q.    Who signed this rejection notice?

19          A.    I don't know if that's Berkebile's or

20   not.  I can't -- I don't know who signed it.  Oh,

21   Kuta.  Shon Kuta.

22          Q.    Okay.  And you mentioned that you spoke

23   to Mr. Kuta in preparation for your deposition today.

24   Did you talk to him about the rejection of the

25   April 2013 issue?

1      A.   I did.

2           Q.   And the April 2013 issue, what is BOP's

3   position on why this article was detrimental to the

4   security, good order, or discipline of the

5   institution?

6           A.   Mr. Kuta described it as it was a

7   large -- because we have such a large AB

8   contingency -- or contingent at the ADX --

9           Q.   I'm going to have you pause.  When you

10  say, "AB," are you referring to the Aryan Brotherhood?

11          A.   Yes, correct.  You're going to get all

12  this lingo down.

13          Q.   I suppose that's good.  I don't know if

14  that's good.

15          A.   Not only did it say he was a terrorist,

16  it stated exactly what terrorist attack he was

17  involved in.  So we have -- about 14 percent of our

18  population does not -- was not born in the United

19  States, so there is also a chance that someone who

20  could have been affected by the attack that is listed

21  in here could have a family member or a friend or

22  relative located at the ADX as well.  So there could

23  be multiple people that want to get him other than

24  just the Aryan Brotherhood or the other white

25  supremacy gangs.

 1          Q.    So was the security concern here with

 2    respect to the safety of Mr. Al-Owhali --

 3          A.    Yes --

 4          Q.    -- summarizing your answer?

 5          A.    -- his safety.  We were worried about his

 6    safety.

 7          Q.    If this issue had been delivered to

 8    inmates, is there any additional security measures

 9    that ADX would have had to take with respect to

10    Mr. Al-Owhali?

11          A.    If it was provided at that time?

12          Q.    Yes.

13          A.    Each of the units, the inmates are

14    treated the same.  So if you're in the control unit,

15    all the inmates are treated the same even if we fear

16    for your safety.  If you are in the general housing

17    units, you are treated the same even if we fear for

18    your safety.  If you are in the special security unit

19    we treat you the same.

20                Again, it comes down to the staff now

21    have to be more worried that, hey, this person may

22    just become a bigger target because we just introduced

23    fresh information about him that people may not have

24    already known, so now staff and the inmate are at

25    risk.

1      Q.    Was the fact that Mr. Al-Owhali was in

2   prison for his role in the 1998 bombing of the US

3   Embassy in Kenya, that's information that's publicly

4   available, correct?

5      A.    It is information that people can look

6   up, yes.

7      Q.    Presumably that information is available

8   from a wide variety of sources?

9      A.    I would assume so.

10      Q.    And this article, you'll see at the end,

11   also has a citation to a case?

12      A.    It has that F, so that would be Federal

13   Reporter?

14      Q.    That is correct.

15      A.    I'm learning.

16      Q.    So is it possible that ADX inmates could

17   have read the opinion in Al-Owhali v. Holder in the

18   10th Circuit?  They could have read that 10th Circuit

19   opinion?

20      A.    Yes.

21      Q.    Is it possible that inmates could also

22   have learned about this case, which concerns an ADX

23   inmate's right to communicate, from their own

24   attorneys?

25      A.    Sure.  Attorneys pass on lots of stuff.

1    Prisons based on his correctional judgment.

2            Q.   Are you aware of any factual changes that

3    occurred between when Mr. Kuta rejected this issue and

4    when Mr. Fox made the determination that it could be

5    distributed?

6            A.   What sort of facts are you referencing?

7    That the information in the article was false?

8            Q.   No.   I'm trying to understand why in

9    April 2013 an acting warden looked at this article and

10   said this can't come in, this is a security risk.   And

11   then in 2017, a different warden looked at the same

12   article and said, no problem, let's distribute it.

13           A.   Okay.   I discussed this early on today.

14   Different wardens have different correctional judgment

15   based on their experience, their data, their current

16   knowledge, knowledge at the time, the inmate

17   population.   So Warden Fox's correctional experience

18   and knowledge is not the same as Mr. Kuta, and it

19   wasn't the same at the time.

20              Warden Fox was not there at that time to

21   know what was going on or why Kuta did what he did.

22   But under Warden Fox a determination, based on all the

23   factors he has now, or had when he made this decision,

24   he felt in his sound correctional judgment, and he had

25   the right to, as a warden, give these issues back to

1    the inmates.

2         Q.   And what I'm trying to understand is are

3    there facts that Warden Fox had that are different

4    than the facts that Mr. Kuta had that led to a

5    different outcome while looking at the same

6    information?

7         A.   I'm sure there is.

8         Q.   Okay.  Are there -- do you know what

9    those facts are?

10        A.   It's getting back into whether or not we

11   took security measures you're getting back into that

12   realm.  We're circling back to that again.  And if I

13   was able to say all those factors as to why, because

14   this person may or may not be here, they may or may

15   not be in that unit.  Without divulging our security

16   procedures, I can't tell you all the facts that he had

17   that may have been different than Mr. Kuta's or the

18   situation may be different.

19        Q.   Just to take a step back for a second.

20   When Mr. Fox re-reviewed all of the 11 issues in 2017,

21   at that point he determined that all of them could be

22   delivered, correct?

23        A.   Correct, yes.

24        Q.   So his determination was that none of

25   these issues constituted a security risk, correct?

Case No. 1:15-cv-02184-RM-STV Document 112 Filed 06/04/18 USDC Colorado Page 86 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 237

 1          A.    At the time he made his decision, yes.

 2          Q.    And it's your understanding that Warden

 3    Fox made that determination about the security risk of

 4    these issues on an issue-by-issue basis?  He looked at

 5    each of the rejected issues and made a determination?

 6          A.    Yes.

 7          Q.    And in preparation for your deposition

 8    today, did you talk to Warden Fox about his

 9    decision-making process that he used?

10          A.    I did not.  I read his declarations and,

11    I believe, a deposition, but I did not speak to him

12    about why he did what he did.

13          Q.    So you said you read his deposition

14    testimony?

15          A.    Yes.

16                (Deposition Exhibit 126 was marked.)

17          Q.    I'm going to ask you -- what I've handed

18    you as Exhibit 126, this is a what PLN produced, and

19    this is the August 2011 issue of PLN -- or an excerpt

20    from the 2011 issue of PLN.

21          A.    Okay.

22          Q.    If you take a look at page 27, which is

23    marked as PLN0007365; do you see that?

24          A.    Okay.

25          Q.    Can you take a look and just look at the

1   feel this is safe to go in.

2              If I had to guess, based on the other

3   rejections and what I have heard through testimony is

4   that if someone would have saw this, this would have

5   been flagged for rejection.

6       Q.    Does the ADX undertake any efforts to do

7   any sampling or other efforts to determine whether

8   articles are being flagged on a consistent basis from

9   reviewer to reviewer?

10      A.    No.

11             (Deposition Exhibits 127 and 128 were

12   marked.)

13      Q.    Mr. Chapman, the exhibit marked 127 is a

14   document labeled BOP000408 through 410, and this is an

15   excerpt from the July 2013 issue of Prison Legal News.

16      A.    Okay.

17      Q.    The exhibit marked 128 is a notification

18   to inmate and publisher of rejected publication

19   concerning the July 2013 issue of Prison Legal News.

20             First, just taking a look at Exhibit 128,

21   who appears to have signed this rejection?

22      A.    I believe it was Mr. Kuta again.

23      Q.    And it indicates on the rejection notice

24   that the pages with allegedly objectionable content

25   are 36 and 37.  So taking a look at pages 36 and 37,

1   it appears that the article that served as the basis

2   for the rejection is the article titled, "Tenth

3   Circuit:  No Section 2241 Jurisdiction for BOP

4   Supermax Challenge; Claims Must be Brought as Bivens

5   Action."  Do you see that?

6          A.   Yes.

7          Q.   Is it BOP's position that this article I

8   just directed you to is the basis for the rejection of

9   this issue?

10         A.   Yes.

11         Q.   And what is BOP's position on why this

12  article constitutes a security risk?

13         A.   Mr. Kuta, who signed the form, referenced

14  the fact that it lets everyone know what drug cartel

15  he was over.  We have other cartel leaders or members

16  in the ADX, some of them were rivals to that

17  particular one, so it made him a big target for people

18  whose family may have been killed by him and his

19  cartel.  So he felt at the time that it was undue risk

20  to that inmate by allowing that in.

21         Q.   And that inmate, that's referring to

22  ███████████████████████?

23         A.   Yes.

24         Q.   The second to last paragraph of the

25  article includes a citation to a case Palma-Salazar v.

1    Davis, and it indicates it's available at 677 F.3d

2    1031, and it's a 10th Circuit opinion.

3            A.    Okay.

4            Q.    You would agree that at the time that

5    this was rejected, ADX inmates would have had access

6    to that opinion in the -- through the electronic law

7    library?

8            A.    I believe so.

9            Q.    And that opinion would not have been

10   censored from the electronic law library in any way?

11           A.    No.

12           Q.    The -- this article -- feel free to take

13   as much time as you need to read it.  Would you agree

14   this article is summarizing a 10th Circuit Court of

15   Appeals decision?

16           MS. PROSE:  I'll just object to the

17   extent the document speaks for itself.  You can answer

18   the question.

19           A.    That's what it appears to be.

20           Q.    (BY MS. FULHAM)  And would you agree that

21   it's important for prisoners to have access to legal

22   developments that may relate to their own

23   incarceration?

24           A.    Sure, if they want it and it pertains to

25   their case or something, they would probably want it.

1    rejected.

2            Q.    So BOP's position is that this should not

3    have been rejected at the time it was rejected?

4            A.    Yes.

5            Q.    And that's because it is BOP's view that

6    there was nothing in this issue that was detrimental

7    to the security, good order, or discipline of the

8    institution or would facilitate criminal activity?

9            A.    Correct.

10           Q.    Okay.  We can be done with this.  See, if

11    you just answer that way for all of them, we would be

12    done very quickly.

13           A.    Why aren't they all that easy?

14                 (Deposition Exhibits 131 and 132 were

15    marked.)

16           Q.    Mr. Chapman, Exhibit 131 is a -- it is

17    marked BOP000447 to 448, and it is an excerpt from the

18    April 2014 issue of Prison Legal News.

19                 Exhibit 132 is the notification to inmate

20    and publisher of rejected publication for the

21    April 2014 issue of Prison Legal News.

22           A.    Okay.

23           Q.    My first question for you is who is it

24    that signed the rejection notice for this April?

25           A.    Kevin Johnson, who was acting warden at

Case No. 1:15-cv-02184-RM-STV   Document 112-26   filed 06/04/18   USDC Colorado   pg 90 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 252

1    the time.

2            Q.   And it's my understanding that the BOP

3    has been unable to locate Mr. Johnson at this time?

4            A.   That is correct.

5            Q.   So I assume that you have not talked to

6    Mr. Johnson to discuss the reasons why he determined

7    that this article should be rejected; is that correct?

8            A.   Yeah, we have to ascertain based on

9    reading.

10           Q.   And what is -- what is the BOP's position

11   as to why this article was -- sorry.  Taking a look at

12   the rejection notice, it indicates that the

13   potentially objectionable content is on page 42.  It

14   appears to be that the article in question is this

15   article, "No Death Penalty for Maine Prisoner."

16                Is that the BOP's basis for the rejection

17   of this issue?

18           A.   Yes.

19           Q.   And what is the BOP's position as to why

20   this article -- why this article was a security risk?

21           A.   I'm actually going to use Prison Legal

22   News' words.  The very last sentence of the story

23   says, "If he were allowed into a prison's general

24   population, he would risk being killed in gang

25   revenge."  We agree with you.

Case No. 1:15-cv-02184-RM-STV   Document 110   Filed 06/04/18   USDC Colorado   Page 92 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 253

1          Q.   I will just point out for the record that

2     it appears that this article was originally published

3     by the Portland Phoenix.  So that's the Portland

4     Phoenix's words, it was republished.

5          A.   I understand.

6          Q.   Do you know whether inmates could have

7     had access to the Portland Phoenix newspaper?

8          A.   I don't see why not.

9          Q.   Do you know whether this article was

10    rejected if it was sent to the facility?

11         A.   You mean the newspaper?  I'm not aware of

12    that.

13         Q.   And at the time of the rejection, did the

14    BOP make any efforts to determine whether the

15    information contained in this article was available to

16    inmates through any other sources?

17         A.   We did not.

18         Q.   Okay.  And at the time this article -- at

19    the time this article was published, ▇▇▇▇▇▇▇ was

20    an ADX inmate, correct?

21         A.   Correct.

22         Q.   And presumably he could have told other

23    inmates about the reasons why he was transferred from

24    Maine to the ADX?

25         A.   He wasn't transferred to the ADX from

Case 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado pg 93 of 96
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 276

1    initiated it and he wanted to have that language put

2    in.

3         Q.   And, sorry, you said that was in late

4    October, early November --

5         A.   That's when the process started.

6         Q.   2017?

7         A.   That was signed off on December 21, 2017.

8         Q.   And you indicated that that was a

9    clarification of something you had said earlier, and I

10   understand that there's some other things that you

11   wanted to clarify?

12        A.   Correct.

13             MS. PROSE:   Thank you, Counsel, that was,

14   in fact, the first point of clarification we were

15   going to raise.  So we can move on from that.

16                       EXAMINATION

17   BY MS. PROSE:

18        Q.   A few other things to clarify for the

19   record, Mr. Chapman.  In response to some of

20   Ms. Fulham's questions earlier today, you made note of

21   one incidence of violence of which you were aware that

22   you believed was related to an incoming publication.

23   Do you recall that testimony, Mr. Chapman?

24        A.   I do.

25        Q.   You wish to make a clarification on that

1    point, I believe.

2         A.   I do want to make a clarification.  It

3    was not information received from a publication, it

4    was information received from correspondence.

5                        EXAMINATION

6    BY MS. FULHAM:

7         Q.   So I assume that to mean personal

8    correspondence rather than -- like a magazine or

9    newspaper?

10        A.   Yes, correct.

11             MS. PROSE:  If you want to ask your

12   follow-ups as I go through this, that's fine with us.

13        Q.   (BY MS. FULHAM)  So I just want to make

14   sure that that was the only instance of violence that

15   you provided --

16        A.   That I'm aware of.

17        Q.   -- at that time.

18             So in order to just be clear on the

19   record, in response to my question as to whether the

20   BOP is aware of any instances of violence at

21   facilities outside of ADX that it attributes directly

22   or indirectly to an incoming publication that was

23   received at ADX, the answer to that --

24             MS. PROSE:  So I'll just note an

25   objection for the record.  I believe, Counsel, that

Case No. 1:15-cv-02184-RM-STV Document 112-2 filed 06/04/18 USDC Colorado Page 94 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 278

1   may lie outside the scope of the noticed 30(b)(6)

2   topics; but if you know the answer, you can testify in

3   your individual capacity.

4           A.   I do not.

5           MS. PROSE:  Did you have any other

6   follow-up on these points, Counsel?

7           MS. FULHAM:  No.

8                    EXAMINATION

9   BY MS. PROSE:

10          **Q.   Then moving on to the next point of**

11  **clarification.  Earlier today, Mr. Chapman, in**

12  **response to some questions from Ms. Fulham, you were**

13  **explaining that mailroom personnel were notified of**

14  **the name-alone practice during the tenure of former**

15  **Warden Pugh; do you recall that testimony?**

16          A.   Yes.  I initially stated that I was not

17  sure if the mailroom staff, the CSOs, had the

18  information that the SIS had.  In looking back on it,

19  while we don't have anything in writing, common sense

20  would say, yes, they had to have so they knew how to

21  flag it to send it to SIS.  So while we don't have any

22  proof that they know, it seems logical that they would

23  have had to have known.

24

25

Case No. 1-15-cv-02184-RM-STV   Document 112-26   Filed 06/04/18   USDC Colorado   Page 96
of 96
Case 1:15-cv-02184-RM-STV   Document 112-26   Filed 06/04/18   USDC Colorado   Page 95 of 95
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

```
 1                      EXAMINATION

 2   BY MS. FULHAM:

 3        Q.   And did you learn any additional

 4   information today that causes you to change that

 5   testimony?

 6        A.   Just that statement that -- while I still

 7   don't have anything in writing saying that they know,

 8   or no one has told me that they know, based on my

 9   sound correctional judgment at the BOP, I would assume

10   they would have to know -- they would have had to have

11   known.

12             MS. PROSE:  Do you have anything else on

13   that?

14                      EXAMINATION

15   BY MS. PROSE:

16        Q.   Next point of clarification.  Earlier

17   today, Mr. Chapman, in response to some questions from

18   Ms. Fulham, you were discussing -- you were listing, I

19   should say, people who had been -- I think you used

20   the term interviewed in connection with the origins of

21   the name-alone practice; do you recall that testimony?

22        A.   I do.

23        Q.   All right.  And can you provide a full

24   list now of all the people known to the bureau at this

25   time who were questioned in connection with how did
```