# Exhibit 2
# Docket entry 110-1 (redacted version)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

Case No. 1:15-cv-02164-RM-STV   Document 112-3   filed 06/28/18   USDC Colorado   pg 1 of 34

# EXHIBIT 18

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Civil Action No. 15-cv-02184-RM-STV
     _____
4
     DEPOSITION OF:  JACK FOX - February 8, 2018
5    _____

6    PRISON LEGAL NEWS, a project of the Human Rights
     Defense Center,
7
     Plaintiff,
8
     v.
9
     FEDERAL BUREAU OF PRISONS,
10
     Defendant.
11
     _____
12

13              PURSUANT TO NOTICE, the deposition of
     JACK FOX was taken on behalf of the Plaintiff at
14   1225 17th Street, Suite 2300, Denver, Colorado, on
     February 8, 2018, at 9:07 a.m., before Wendy C. Heath,
15   Certified Realtime Reporter, Registered Professional
     Reporter and Notary Public within Colorado.
16

17

18

19

20

21

22   H+G

23

24   Hunter + Geist, Inc.

25
     303.832.5966      1900 Grant Street, Suite 1025      ■ www.huntergeist.com
     800.525.8490      Denver, CO 80203                   ■ scheduling@huntergeist.com

                        Your Partner in Making the Record

                Court Reporting, Legal Videography, and Videoconferencing

A P P E A R A N C E S

For the Plaintiff:

        TERRA W. FULHAM, ESQ.
        ALYSON R. SANDLER, ESQ.
        Covington & Burling LLP
        One CityCenter
        850 Tenth Street Northwest
        Washington, DC 20001


For the Defendant:

        SUSAN PROSE, ESQ.
        Assistant United States Attorney
        U.S. Attorney's Office for the District of
        Columbia
        1225 17th Street
        Suite 700
        Denver, Colorado 80202


Also Present:

        Kaitlin Turner
        Dan Marshall (appearing telephonically)

Case 1:15-cv-02184-RM-STV Document 110-1 Filed 06/04/18 USDC Colorado Page 4 of 33
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 3

I N D E X

EXAMINATION OF JACK FOX:                          PAGE
February 8, 2018

By Ms. Fulham:                                       5


                                                 INITIAL
DEPOSITION EXHIBITS:                            REFERENCE

Exhibit 73  Notice of Deposition of Jack Fox          6

Exhibit 74  Declaration of Jack Fox                  24

Exhibit 75  Declaration of Todd Chapman              25

Exhibit 76  Declaration of Todd Chapman,             42
            Attachment 6

Exhibit 77  Supplemental Declaration of Jack         83
            Fox

Exhibit 78  ADX Florence - Incoming                 110
            Publications Rejection Procedures,
            May 18, 2017 (BOP002109 to 16)

Exhibit 79  Prison Legal News - January 2010        122
            issue (BOP000053 to 55)

Exhibit 80  Confidential Notification to Inmate     122
            and Publisher/Sender of Rejected
            Publication, Inmate: ███████
            (BOP000056)

Exhibit 81  Defendant's First Supplemental          123
            Responses to Plaintiff's First
            Interrogatories

Exhibit 82  Prison Legal News - June 2010 issue     126
            (BOP000116 to 118)

Exhibit 83  Confidential Notification to Inmate     126
            and Publisher/Sender of Rejected
            Publication, Inmate: ███████
            (BOP000082)

Exhibit 84  Prison Legal News - October 2011        130
            issue (BOP000132 to 135)

Exhibit 85   Confidential Notification to Inmate        130
             and Publisher/Sender of Rejected
             Publication, Inmate: ███████
             ███████ (BOP000136)

Exhibit 86   Defendant's Second Supplemental            135
             Responses to Plaintiff's First
             Interrogatories

Exhibit 87   Prison Legal News - November 2011          137
             issue (BOP000244 to 48)

Exhibit 88   Confidential Notification to Inmate        137
             and Publisher/Sender of Rejected
             Publication, inmate: ███████
             (BOP000215)

Exhibit 89   Prison Legal News - February 2013          141
             issue (BOP000342 to 45)

Exhibit 90   Confidential Notification to Inmate        142
             and Publisher/Sender of Rejected
             Publication, Inmate: ███████
             ███████n (BOP000323)

Exhibit 91   Prison Legal News - April 2014             143
             issue (BOP000447 to 48)

Exhibit 92   Confidential Notification to Inmate        143
             and Publisher/Sender of Rejected
             Publication, Inmate: ███████
             ███████ (BOP000449)


DEPOSITION EXHIBITS: (Previously marked)

Exhibit 66                                              36
Exhibit 67                                              61
Exhibit 70                                              94
Exhibit 71                                              97

 1    ADX or Bureau inmate or Bureau staff member.  That

 2    practice, which the ADX followed prior to the

 3    implementation of the current institution supplement

 4    in February 2016, was the primary basis for the

 5    rejection of the 11 issues of Prison Legal News at

 6    issue in this lawsuit.

 7              So the question that I'd asked was, when

 8    you started as warden -- which was, again, December of

 9    2015?

10         A.   Correct.

11         Q.   So prior to February 2016, correct?

12         A.   Correct.

13         Q.   The ADX had a practice of rejecting

14    publications because they contained information

15    discussing an ADX or BOP inmate or a BOP staff member;

16    is that correct?

17         A.   Correct.

18         Q.   Okay.  When was this practice

19    established?

20         A.   I don't know.

21         Q.   Who established it?

22         A.   I don't know.

23         Q.   And what was the rationale for this

24    practice?

25         A.   I don't know.

Case 1:15-cv-02184-RM-STV  Document 110-4  filed 06/04/18  USDC Colorado  pg 8 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 57

```
 1          Q.    How were you made aware of this
 2   practice?
 3          A.    In February of '16 when Clay Cook and I
 4   were discussing this particular supplement that was
 5   being --
 6          MS. PROSE:  Hang on just a second,
 7   Warden.  You can answer Ms. Fulham's questions to the
 8   extent they don't implicate the attorney-client
 9   privilege.  So the content of your discussions with
10   Mr. Cook is privileged, but the fact of your
11   discussion you can share with her.
12          THE DEPONENT:  Okay.
13          MS. PROSE:  So maybe if you could ask
14   your question or have it read back again.
15          MS. FULHAM:  Yes.
16          Q.    (BY MS. FULHAM)  How were you made aware
17   that the ADX had a practice of rejecting publications
18   that contained information discussing an ADX or
19   BOP inmate or a BOP staff member?
20          A.    It would have been in that meeting with
21   Clay Cook.
22          Q.    So you were informed by Mr. Cook?
23          A.    Yes.
24          Q.    Okay.  And when was the meeting?
25          A.    Most likely February of '16.
```

Case No. 1:15-cv-02184-RM-STV   Document 110-12   filed 06/04/18   USDC Colorado   pg 9 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 58

```
 1            Q.    Okay.  And did that meeting occur in
 2   connection with a discussion of the February 2016
 3   institution supplement?
 4            A.    Most likely.
 5            Q.    And the practice that ADX had of
 6   rejecting publications that contained information
 7   discussing an ADX or BOP inmate, that could be an
 8   inmate at any BOP facility, correct?
 9            A.    No.  The supplements are
10   institution-specific only.
11            Q.    Well, no.  I'm asking about -- you just
12   confirmed that prior to February 2016, the ADX had a
13   practice of rejecting publications if they contained
14   information discussing an ADX or BOP inmate or a
15   BOP staff member.
16            A.    Okay.
17            Q.    Do you agree with that?
18            A.    Yes.
19            Q.    Okay.  And I'm asking that -- there
20   would be a rejection of an inmate at any -- if it
21   mentioned an inmate at any BOP facility, not just an
22   inmate at the ADX, correct?
23            A.    I don't know.  That wasn't my practice
24   and that wasn't my procedure, so I don't know what
25   their rationale was at the time.
```

```
 1              MS. SANDLER:  I think we lost Dan, so
 2    I'm just going to dial him back.
 3              (Discussion off the record.)
 4              (Recess taken, 10:10 a.m. to 10:29 a.m.)
 5        Q.   (BY MS. FULHAM)  So before the break we
 6    were talking about the pre-February 2016 practice at
 7    ADX of rejecting publications that contain information
 8    discussing an ADX or BOP inmate or a BOP staff member,
 9    correct?
10        A.   Correct.
11        Q.   All right.  And so prior to 2016, if a
12    publication contained information discussing an ADX or
13    BOP inmate, was any further analysis done to determine
14    whether the information that was being discussed was a
15    security risk at ADX?
16        A.   I wasn't there, but I would only assume
17    that the SIS shop would look into it, not just based
18    on the name.  But if the name was there, then there
19    was going to be a perceived threat.  But I wasn't
20    there.
21        Q.   Okay.  To your knowledge, was this
22    practice ever put in writing?
23        A.   Not that I know of.
24        Q.   And how was it communicated to staff at
25    ADX?
```

Case 1:15-cv-02184-RM-STV Document 110-11 Filed 06/04/18 USDC Colorado Page 10 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 83

```
 1   standard that we universally apply -- anything that's

 2   going to have a security hazard or anything that's

 3   going to be a compromise of our security or put staff

 4   or inmates at risk, nothing changed.

 5            Q.    (BY MS. FULHAM)  Nothing changed?

 6            A.    From that perspective.

 7            Q.    Okay.  So your position is that as a

 8   result of the February 2016 policy, there was no

 9   difference in the standard that was being applied?

10            A.    Not the Bureau of Prisons' standard.  My

11   interpretation of this particular publication, though,

12   was different than my predecessor's.

13            Q.    When you say "this publication" --

14            A.    The Prison Legal News.

15            Q.    How was your interpretation of -- well,

16   let me strike that.

17                  Let's take a look at the next exhibit.

18   It's going to be Exhibit Number 77.

19                  (Deposition Exhibit 77 was marked.)

20            Q.    (BY MS. FULHAM)  Do you recognize this

21   document?

22            A.    I do.

23            Q.    Okay.  What is it?

24            A.    It is my supplemental declaration.

25            Q.    And this was submitted as of March 14,
```

Case No. 1:15-cv-02184-RM-STV   Document 101-11   filed 06/04/18   USDC Colorado   pg 12 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 84

 1   2017, correct?

 2        A.   Yes.

 3        Q.   Okay.  And paragraph 1 says:  Since

 4   February 2016, no incoming publication at the ADX has

 5   been rejected solely because it contained the name of

 6   a Bureau staff member or a Bureau inmate.

 7             Is that directive that no -- or that

 8   change that no incoming publication is to be rejected

 9   solely because it contained the name of a Bureau staff

10   member or a Bureau inmate, was that part of the

11   February 2016 institution supplement?

12        A.   Yes.

13        Q.   Okay.  Can we take a look at that

14   February 2016 institution supplement?

15        A.   Okay.

16        Q.   Can you show me where in the institution

17   supplement it says that?

18        A.   No.  I don't know that it's written in

19   the supplement, but that doesn't mean that that wasn't

20   the intent of what direction we were moving in or the

21   direction that we were giving out.

22        Q.   How were you giving out that direction?

23        A.   Through quarterly trainings.

24        Q.   If that was the direction you were

25   moving in, why was that not reflected in the written

Case No. 1:15-cv-02184-RM-STV   Document 110-11   Filed 06/04/18   USDC Colorado   Page 13 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 85

1  **policy?**

2          MS. PROSE:  You can answer that question

3  to the extent it doesn't implicate any attorney-client

4  privileged information.

5          Go ahead.

6      A.   I don't know.  You can't -- it would be

7  impossible to write every little word down, every

8  little procedure down, every little direction down in

9  a generalized guidance document, which is what a

10  supplement is.

11     **Q.   (BY MS. FULHAM)  So you're saying the**

12  **reason that it was not included in the February 2016**

13  **institution supplement is because an institution**

14  **supplement can't cover every situation that arises?**

15     A.   Correct.  An institution supplement,

16  just like a national program statement, is designed to

17  provide guidance.

18     **Q.   Okay.  Paragraph 1 of your supplemental**

19  **declaration, would you agree that it suggests that as**

20  **of February 2016, there was guidance that was given to**

21  **ADX personnel that no incoming publication at the ADX**

22  **has been rejected solely because it contained the name**

23  **of a Bureau staff member or Bureau inmate?**

24     A.   Correct.  Yes.

25     **Q.   So that guidance was being given, but**

Case No. 1:15-cv-02184-RM-STV   Document 112   filed 06/04/18   USDC Colorado   pg 14 of
34
JACK FOSS 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 86

1   you were opting not to include that guidance in the

2   institution supplement?

3            A.   At the time I didn't feel like it would

4   be necessary.  It was a part of a bigger picture

5   training session that was being held quarterly.  That

6   wasn't the sole purpose of the training that we

7   provided to the SIS staff and to the ISM staff.

8            Q.   What else was -- what was the other

9   purposes of the training?

10           A.   To understand big picture stuff.  What

11  constitutes a security concern?  What constitutes --

12  what is the incident amendment?  You know, what

13  boundaries are associated with that?  There were a

14  number of things that were discussed in that training.

15           Q.   So going back to your supplemental

16  declaration, you're aware that the BOP's position is

17  that rejections at ADX have decreased since the

18  February 2016 policy was adopted, correct?

19           A.   Yes.

20           Q.   And taking a look at your declaration,

21  there's a chart at paragraph 2.  How are those

22  statistics compiled?

23           A.   Presumably -- I'm not exactly sure.  I

24  don't know who tracks it.  I don't know that it would

25  be legal or if it would be the mailroom, but clearly

Case No. 1:15-cv-02184-RM-STV Document 111-12 filed 06/04/18 USDC Colorado pg 15 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 88

1    contain the name of a Bureau staff member or Bureau

2    inmate?

3              MS. PROSE:  Object to the form.

4              You can answer it.

5         A.   I don't -- I don't know what the reasons

6    are.  The statistics show -- the chart shows there was

7    a drop.  I don't know what the reasons were.

8         Q.   (BY MS. FULHAM)  So you don't know

9    whether it's attributed to the abolition of the

10   practice that the ADX reject a publication solely

11   because it contains the name of a Bureau staff member

12   or Bureau inmate?

13        A.   I don't know that to be a fact.

14        Q.   Okay.  Why, then, did you opt to include

15   the fact that since February 2016, no incoming

16   publication at the ADX has been rejected solely

17   because it contained the name of a Bureau staff member

18   or Bureau inmate in this supplemental declaration?

19              MS. PROSE:  You can answer that if it

20   doesn't implicate attorney-client privilege.

21              THE DEPONENT:  Okay.

22        A.   Because previously to that

23   11 publications had been rejected because it contained

24   a name -- at a minimum, 11.  And so the chart shows

25   that that was no longer the practice and reflects

Case No. 1:15-cv-02184-RM-STV   Document 112-1   filed 06/06/18   USDC Colorado   pg 16 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 89

1    that.

2              Q.   (BY MS. FULHAM)  So the chart is showing

3    that there is a decrease in rejections as a result of

4    the abolition of the name-only policy?

5              A.   No.  You're twisting my words again.

6              What I said was the chart shows there

7    was a reduction in rejections.  I don't know why that

8    is.  I don't know if it's exclusively because we made

9    a change.  I don't know if it's because a particular

10   inmate got out that was receiving a lot of

11   publications that were rejected.  I don't know.

12             Q.   Are there other factors that changed as

13   of February 2016 that would -- to which you could

14   attribute the drop?

15             A.   There could be a number of things:  a

16   publisher went out of business, a particular group of

17   inmates is no longer at the ADX.

18             Q.   Are you aware of any of those things

19   happening in February 2016?

20             A.   Not specifically.

21             Q.   Okay.  So those are things that may have

22   been the case, but you don't understand those to have

23   actually occurred in February of 2016?

24             A.   Correct.

25             Q.   And what led to the elimination of the

Case 1:15-cv-02184-RM-STV   Document 110-11   Filed 06/04/18   USDC Colorado   Page 16 of
Case No. 1:15-cv-02184-RM-STV   Document 120-1   Filed 06/26/18   USDC Colorado   Page 17 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

1    **practice that ADX had of rejecting a publication**

2    **solely because it contained the name of a Bureau staff**

3    **member or a Bureau inmate?**

4            MS. PROSE:  Again you may answer to the

5    extent you don't disclose attorney-client privileged

6    information, Warden.

7            Go ahead.

8            A.   I don't have an exact answer for that.

9    I can only tell you that when I arrived, which was

10   actually January, not December -- when I actually

11   arrived -- within a month of me arriving, Clay Cook

12   and I had a conversation that resulted in this new

13   supplement.  I don't know how long that supplement had

14   been in the works.  I don't recall any of that.

15          **Q.   (BY MS. FULHAM)  Okay.  Do you**

16   **understand the February 2, 2016, institution**

17   **supplement to abolish that name-only practice?**

18           A.   Yes.

19          **Q.   Even though the policy doesn't say that?**

20          A.   The national program statement?

21          **Q.   No.  The -- even though the institution**

22   **supplement does not expressly say that?**

23          A.   Correct.

24          **Q.   Okay.  How did the elimination of that**

25   **name-only practice change your reviews of incoming**

Case No. 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 17 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 115

1        A.   Correct.

2             Q.   Okay.  At the time that you reviewed the

3    11 rejected PLN issues, did you review any other

4    publications -- any other non-PLN publications that

5    had been rejected based on their content?

6        A.   No.

7             Q.   So other rejected publications where the

8    publisher didn't file suit did not have any

9    publications put through a second review?

10       A.   No.

11            Q.   Is it fair to say that the decision to

12   re-review these 11 specific issues was motivated by

13   this lawsuit?

14            MS. PROSE:  You can answer to the extent

15   it doesn't implicate attorney-client privileged

16   information.

17       A.   I don't know why.  I'm not trying to be

18   coy.  I don't know.  Nobody came to me and said:  Hey,

19   because of this lawsuit, we have to do this.

20            Q.   (BY MS. FULHAM)  How was it that you

21   came to review these 11 issues?

22       A.   Through legal.

23            Q.   Okay.  And what information were you --

24   what information did you look at when you made a

25   determination about whether these rejected issues

Case 1:15-cv-02184-RM-STV Document 120-11 Filed 06/04/18 USDC Colorado Page 19 of 34
JACK FOOS 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 116

1    could be provided to subscribers?

2              A.    The documents themselves and then just

3    consultation with the legal department.

4              Q.    Did you review the rejection notices

5    that had been associated with these at the time they

6    were rejected?

7              A.    I don't recall if I did or not.

8              Q.    Okay.  Did you review any internal --

9    any of the internal memoranda that are sometimes

10   associated with a rejection packet for any of these

11   11 issues?

12             A.    No.  I don't recall if I -- if I

13   reviewed the packets, I would have seen it, but I

14   don't recall if I did or not.

15             Q.    So did you personally review the content

16   of these 11 previously rejected issues?

17             A.    Not all 11.  I had reviewed several

18   issues of it personally, but I can't honestly say I

19   looked at all 11.

20             Q.    So you received all 11 -- did you

21   receive all 11 in one package?  It was all part of one

22   discussion about whether to --

23             A.    Correct.

24             Q.    -- release these?

25                   (Discussion off the record.)

Case 1:15-cv-02184-RM-STV Document 112 Filed 06/04/18 USDC Colorado Page 20 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

1          Q.   (BY MS. FULHAM)  So to recap, you did

2     not personally review the content of all 11 of the

3     issues that were determined to be able for release?

4          A.   No.

5          Q.   Okay.  Which of the 11 did you review?

6          A.   I don't know.

7          Q.   Okay.  Would you recognize them if you

8     saw them?

9          A.   Probably not.

10         Q.   And who specifically asked you to review

11    these 11 publications?

12         A.   Clay.  I worked with Clay Cook on this

13    case.

14         Q.   Okay.  And this declaration says that:

15    They were reviewed in accordance with the review

16    procedures set forth in the current institution

17    supplement as annotated above.

18              Is it accurate to say that you -- that

19    for these 11 issues the exact policy in the

20    February 2016 institution supplement was followed with

21    respect to these 11 issues?

22         A.   Yes.

23         Q.   So they went -- they went to the

24    mailroom and they went to a CSO?

25         A.   I don't know how they came in.

Prison Legal News v. Federal Bureau of Prisons

1            Are you asking me how did they come back

2    into the institution?

3        Q.   **The 11 -- I'm trying to understand the**

4    **process by which these 11 previously rejected issues**

5    **were determined to be acceptable for release.**

6        A.   I don't have an answer for you on that.

7    It was something that we looked at when we changed our

8    processes of what we were going to let in, meaning

9    that we weren't going to exclude a document just

10   because it had an inmate or a staff member's name in

11   it.  They were re-reviewed and they were allowed in.

12            Now, the process of how that happened,

13   where they came from, how they were delivered back

14   into the ADX, or if they were just taken off of a file

15   somewhere, I have no idea.

16       Q.   **Okay.  Well, specifically, how did you**

17   **get these 11 issues to re-review?**

18       A.   If I looked at them, it would have been

19   with Clay Cook.  He would have brought them to me.

20       Q.   **He provided them to you.  Okay.**

21            **And did you make an individualized**

22   **publication-by-publication assessment of whether these**

23   **were acceptable for release?**

24       A.   Not every single one of them, but in

25   conversation and in consultation with probably --

Case No. 1:15-cv-02184-RM-STV   Document 112   filed 06/04/18   USDC Colorado   pg 22 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 127

1    that it is detrimental to the security, good order, or

2    discipline of the institution?

3         A.   No.

4         Q.   What is your understanding of why the

5    issue was rejected originally?

6         A.   Because it talked about -- according to

7    the memo that I just read, signed by the warden at the

8    time, it talked about:  Reference pages contains

9    information on a riot at USP Florence and information

10   on an ADX inmate.

11        Q.   You said:  According to the memo you

12   just read.  So you have not seen that document before?

13        A.   No.

14        Q.   It was not something you reviewed in

15   connection with the decision to --

16        A.   No.

17        Q.   -- release this article?

18             And if you'd go back to the

19   interrogatory responses we just took a look at.

20        A.   Okay.

21        Q.   At the top of page 3 is the BOP's

22   rationale for the rejection of the June 2010 article,

23   and it says:  An article in this issue of Prison Legal

24   News identified an inmate who refused to engage in a

25   gang-led riot at a United States penitentiary.

Case No. 1:15-cv-02184-RM-STV   Document 110-11   Filed 06/04/18   USDC Colorado   Page 23 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 128

```
1   High-ranking members of that gang who were housed at

2   the ADX have the ability to put a hit on that inmate

3   either in the prison or on the street.

4             In connection with your review and

5   decision to release this article, did you undertake

6   any analysis of whether the inmate referenced, who I

7   believe is ████████, was still in a BOP institution?

8        A.  No.

9        Q.  At the time this article was released

10  were there still ████████████████████████████████

    ████████████████████████████████████

12       A.  Yes.

13       Q.  Okay.  ████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████

16       A.  Yes.

17       Q.  So that was still true at the time that

18  this article was distributed to the inmates?

19       A.  Correct.

20       Q.  But in your correctional judgment, this

21  article should not have been rejected?

22       A.  Correct.

23       Q.  And why is that?

24       A.  Again, there's nothing in there that the

25  inmates wouldn't have found out or didn't already know
```

Case No. 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 23 of
34
Case 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 23 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

1   anyway, and there's nothing in there that compromises

2   the integrity of our institution or puts our staff at

3   risk or inmates at risk.

4           Q.    Okay.  So you're of the opinion that if

5   the information contained in the article is something

6   that inmates would have already known, then there's no

7   reason to reject that publication?

8           A.    I would say that's part of it.  A small

9   part of it, but part of it.

10          Q.    What are the other parts?

11          A.    There's just nothing in there that's

12  going to cause a problem in the institution.  There's

13  nothing in there that's going to put our staff at risk

14  or that's going to create or further any type of gang

15  activity.

16          Q.    There's no risk that ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████?

20          A.    There's absolute risk of that, but it's

21  not based on this publication.

22          Q.    Because that information was otherwise

23  publicly available or available to the inmates at ADX?

24          A.    Potentially.

25          Q.    So if the information contained in an

Case No. 1:15-cv-02184-RM-STV   Document 120-11   filed 06/04/18   USDC Colorado   pg 24 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 136

 1    staff member were detrimental to the security, good
 2    order, and discipline of the institution.  In
 3    particular, one article discussed a murder carried out
 4    by four inmates at FCC Florence, described as having
 5    been prompted by, quote, a disrespect issue involving
 6    the Surenos gang.  Concern exists that this murder may
 7    have been an unsanctioned hit on the victim, thus
 8    endangering the perpetrators in a prison setting.
 9    Such information could not have been placed in
10    rejection notices to the inmates without highlighting
11    this potential issue and increasing the risk to the
12    inmates who were potential targets.
13              So you do not agree with the fact that
14    this article was detrimental to the security, good
15    order, and discipline of the institution?
16         A.   Correct.
17         Q.   And at the time -- were the factors that
18    are listed here, that being that there was concern
19    that the murder may have been an unsanctioned hit on
20    the victim and thus endangering the perpetrators in a
21    prison setting -- was that no longer the case?  What
22    changed?
23         A.   I don't know what changed other than the
24    wardens changed.
25              (Counsel confer.)

Case No. 1:15-cv-02184-RM-STV   Document 110-11   Filed 06/04/18   USDC Colorado   Page 25 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 137

1              (Deposition Exhibit 87 was marked.)

2         Q.    (BY MS. FULHAM)   Exhibit 87 is a

3    November 2011 PLN issue, and it's an excerpt that

4    includes the allegedly objectionable content.

5              (Deposition Exhibit 88 was marked.)

6         Q.    (BY MS. FULHAM)   And then the next

7    exhibit is the rejection notice that was sent to the

8    inmate and publisher.   So the rejection notice

9    indicates that the objectionable content is on

10   pages 38 and 47, correct?

11        A.    All right.

12        Q.    Looking first at page 38, the article on

13   page 38 is titled, 11th Circuit Reverses Dismissal of

14   BOP Failure to Protect Suit.   And it describes a Court

15   of Appeals 11th Circuit case filed by a John Doe.

16   Does that look accurate?

17        A.    Yes.

18        Q.    Okay.   And why was this issue rejected,

19   to your understanding?

20        A.    Well, according to this memo, it says:

21   It's been rejected because the referenced pages

22   contain information on inmates who cooperated with

23   BOP investigations.

24        Q.    And taking a look at this article on

25   page 38 now, do you believe that this article posed

Case No. 1:15-cv-02184-RM-STV   Document 111   Filed 06/04/18   USDC Colorado   Page 26 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 138

1    a -- was detrimental to the security, good order, or

2    discipline of the institution?

3         A.    No.

4         Q.    Why not?

5         A.    It's just my correctional judgment.  I

6    don't see anything in here, in skimming over it, that

7    would cause a security concern inside the institution.

8         Q.    Even though it was talking about inmates

9    who cooperated with a BOP investigation?

10        A.    That happens all the time.

11        Q.    So it's common knowledge that an inmate

12   might cooperate with a BOP investigation?

13        A.    Correct.

14        Q.    So, again, the fact that information is

15   generally known in the ADX population, for you, is a

16   reason that would weigh in favor of not rejecting

17   content?

18        A.    Correct.

19        Q.    Okay.  Take a look at the interrogatory

20   responses -- the second supplemental interrogatory

21   responses, the ones we just looked at.

22        A.    Okay.

23        Q.    If you look at page 5, this provides the

24   basis for the rejection of the November 2011 issue.

25   It says that:  In the warden's correctional judgment,

Case No. 1:15-cv-02184-RM-STV   Document 111   Filed 06/04/18   USDC Colorado   Page 27 of 34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 139

1    an article revealing that an inmate in a U.S.

2    penitentiary had cooperated with a BOP investigation

3    was detrimental to the security, good order, or

4    discipline of the institution or might facilitate

5    criminal activity.

6              Although the inmate was not identified

7    and was not incarcerated at the ADX at the time of the

8    investigation, the article provided sufficient details

9    concerning a publicly filed lawsuit to allow inmates

10   at the ADX to identify the inmate.

11             Moreover, the population of the ADX is

12   not static.  ADX inmates are routinely transferred to

13   other institutions, raising serious concern that they

14   would encounter the inmate cooperator referenced in

15   the article.  Inmates who cooperate with BOP

16   investigations who are viewed as snitches face serious

17   security risks in prison, particularly at the ADX,

18   which houses the leaders of many major prison gangs --

19             (Cell phone interruption.)

20        Q.   (BY MS. FULHAM)  -- which houses the

21   leaders of many major prison gangs who have the

22   authority to order hits on others.

23             The article itself presents the idea

24   that correctional staff can turn bad and pose dangers

25   to, quote, snitching inmates.  The inmate who

1    turn bad and pose dangers to snitching inmates.

2                Is this an idea that you think most ADX

3    inmates are already aware of?

4        A.    Yes.

5        Q.    The idea that correctional staff can

6    turn bad?

7        A.    Yes.

8        Q.    Okay.  So that's -- the article would

9    not -- if the article was released, it would not be

10   introducing that concept --

11       A.    Correct.

12       Q.    -- to the inmates?

13       A.    Correct.

14       Q.    And in your opinion and in your

15   correctional judgment, this article -- or this issue

16   should not have been rejected; is that correct?

17       A.    Correct.

18       Q.    So you disagree with the article

19   revealing that an inmate in a U.S. penitentiary who

20   had cooperated with a BOP investigation was

21   detrimental to the security, good order, or discipline

22   of the institution?

23       A.    Correct.

24             MS. SANDLER:  Exhibit 89.

25             (Deposition Exhibit 89 was marked.)

Case 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 29 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 142

1          Q.    (BY MS. FULHAM)   Exhibit 89 is the

2     February 2013 issue of Prison Legal News.

3          A.    Okay.

4          Q.    And then Exhibit 90 is going to be the

5     rejection notice for this February 2013 issue.

6                (Deposition Exhibit 90 was marked.)

7          Q.    (BY MS. FULHAM)   So reviewing the

8     rejection notice and the article, what is your

9     understanding of why this issue was rejected?

10         A.    Well, according to the notice, it says

11    it's rejected because the referenced pages discuss

12    individuals incarcerated at USP Florence, ADX.

13         Q.    So was this issue rejected because it

14    solely discussed or identified a BOP inmate?

15         A.    It would appear so, yes.

16         Q.    Okay.   And based on your correctional

17    judgment, should this article have been rejected -- or

18    this issue been rejected on the basis of this article?

19         A.    No.

20         Q.    Why not?

21         A.    I just don't believe in rejecting

22    articles because a name is mentioned.

23         Q.    Okay.   And there's nothing else in this

24    article beyond just the name of the individuals?

25         A.    Not that would be of concern.

```
 1            Q.    The individuals who were referenced in
 2    this article, were they still at the ADX at the time
 3    that this issue was released?
 4            A.    I don't know.
 5            Q.    Did you undertake any analysis to
 6    determine whether ███████████████████████
 7    ████████████████████████████████████████ were still
 8    at the ADX at the time?
 9            A.    I personally did not, no.
10            Q.    Is it your understanding that anyone
11    did?
12            A.    I don't know.
13            Q.    Let's take a look at tab 34 and 35.
14                  (Deposition Exhibits 91 and 92 were
15    marked.)
16            Q.    (BY MS. FULHAM)  So 91 is the April 2014
17    issue of Prison Legal News.
18            A.    Okay.
19            Q.    It's an excerpt.
20                  And then 92 is the rejection notice for
21    the April 2014 PLN issue.
22            A.    (Deponent perused the document.)
23            Q.    In taking a look at this article, it's
24    about a prisoner, ██████████████, who murdered another
25    prisoner at the ADX, correct?
```

```
1          A.   Not at the ADX.  You mean ████████ at

2     the ADX?  But the murder didn't take place at the ADX.

3          Q.   Okay.  The first sentence says:  In

4     2008, within a supposedly high-security prison in the

5     giant federal correctional complex in Florence,

6     Colorado, ███████, ██████████████  murdered

7     another prisoner, ████████████████.

8          A.   That was not at the ADX.

9          Q.   That was not at the ADX.  Okay.

10         A.   No.

11         Q.   That was at a different Florence

12    institution?

13         A.   Correct.

14         Q.   Okay.  Was ████████████ at the ADX?

15         A.   When?

16         Q.   At any time that you were warden.

17         A.   Yes.

18         Q.   Okay.  And taking a look at this article

19    now, do you believe that this article would be

20    detrimental to the security of the prison?

21         A.   No.

22         Q.   And why not?

23         A.   I don't -- there's just nothing in here

24    that's going to make things worse, compromise

25    security, effect an escape.
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case No. 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 33 of
34
JACK FOSS 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

Page 145

 1          Q.   The bottom -- at the end of this article
 2    there's a little notation that says the article was
 3    originally published by the Portland Phoenix on
 4    February 12, 2014.  It's reprinted by permission of
 5    the author.
 6               Did the fact that this article was
 7    already available publicly affect your decision?
 8          A.   No.
 9          Q.   Did you review this article
10    specifically?
11          A.   No.
12          Q.   If you'd look back at the interrogatory
13    responses.  And this is going to be in the first one.
14          A.   Okay.
15          Q.   This is the April 2014 article.  So the
16    rationale for rejection of this article, it states:
17    An article in this issue of Prison Legal News
18    identified an inmate who murdered a member of a prison
19    gang.  High-ranking members of that gang and other
20    associated gangs housed at the ADX have the ability to
21    put a hit on that inmate.
22               But in your correctional judgment, there
23    was not a threat that was posed by this article?
24          A.   No.
25          Q.   And at the time this article was

Case No. 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 33 of
34
Case 1:15-cv-02184-RM-STV   Document 110-11   Filed 03/26/18   USDC Colorado   Page 34 of
34
JACK FOX - 2/8/2018
Prison Legal News v. Federal Bureau of Prisons

1    released to the inmates, the white -- I assume the

2    Aryan Brotherhood is the gang that this is referring

3    to when it talks about a white supremacist.  Is that

4    correct?

5          A.    I don't know.  There's lots of them.

6          Q.    Okay.  Were there still various white

7    supremacist gangs at ADX at the time?

8          A.    Yes.

9          Q.    Okay.  And high-ranking members of that

10   gang were still at ADX?

11         A.    Correct.

12         Q.    And they still potentially had the

13   ability to put a hit out on an inmate?

14         A.    Correct.

15         Q.    You would agree that inmates within a

16   prison have -- are sometimes successful at being able

17   to communicate with other inmates in the same prison?

18         A.    Correct.

19         Q.    So ADX inmates can find ways to

20   communicate with other ADX inmates?

21         A.    Correct.

22         Q.    And would you agree that ADX inmates can

23   sometimes find ways to communicate with inmates at

24   other BOP institutions?

25         A.    Well, we work hard to make that not the