# Exhibit 3
# Docket entry 110-2 (redacted version)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

Case No. 1:15-cv-02164-RM-STV   Document 112-4   filed 05/18/18   USDC Colorado   pg 1 of 32

# EXHIBIT 19

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
       Civil Action No. 15-cv-02184-RM-STV
 3     _____

 4     DEPOSITION OF:  MARK COLLINS - April 19, 2018
                       (Designations Pending)
 5     _____

 6     PRISON LEGAL NEWS, a project of the Human Rights
       Defense Center,
 7
       Plaintiff,
 8
       v.
 9
       FEDERAL BUREAU OF PRISONS,
10
       Defendant.
11     _____

12
                    PURSUANT TO NOTICE, the deposition of
13     MARK COLLINS was taken on behalf of the Plaintiff at
       4711 North Elizabeth Street, Pueblo, Colorado 81008,
14     on April 19, 2018, at 8:01 a.m., before Barbara
       Birger, Registered Merit Reporter, Certified Realtime
15     Reporter and Notary Public within Colorado.

16

17

18

19

20

21

22

23     H+G

24

25     Hunter + Geist, Inc.
```

303.832.5966    1900 Grant Street, Suite 1025    ■ www.huntergeist.com
800.525.8490    Denver, CO 80203                 ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

A P P E A R A N C E S

For the Plaintiff:

       PETER A. SWANSON, ESQ.
       Covington & Burling L.L.P.
       850 Tenth Street, NW
       Washington, D.C. 20001


For the Defendant:

       CLAY C. COOK, ESQ.
       U.S. Department of Justice
       1801 California Street, Suite 1600
       Denver, Colorado 80202


Also Present:

       Kaitlin B. Turner
       Dan Marshall, Esq.
       (Appearing telephonically)

Page 3

I N D E X

EXAMINATION OF MARK COLLINS:                    PAGE
April 19, 2018

By Mr. Swanson                                     4


                                                INITIAL
DEPOSITION EXHIBITS:                            REFERENCE

Exhibit 1   Expert Report of Mark Collins,          6
            3/23/18

Exhibit 2   Rebuttal Expert Report of Mark          6
            Collins, 4/6/18

Exhibit 3   Email to Fulham, Sandler,               7
            Shapanka and Swanson from Prose,
            4/6/18, Subject:  PLN - materials
            reviewed by Mark Collins

Exhibit 4   Institution Supplement, Incoming       29
            Publications, 2/2/16

Exhibit 5   Institution Supplement, Incoming       31
            Publications, 12/21/17

Exhibit 6   Handwritten notes with attachments    110

Exhibit 7   Defendant's First Supplemental        129
            Responses to Plaintiff's First
            Interrogatories

Exhibit 8   Defendant's Second Supplemental       129
            Responses to Plaintiff's First
            Interrogatories

Case No. 1:15-cv-02184-RM-STV Document 110-2 Filed 06/04/18 USDC Colorado Page 6 of 31
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 46

```
 1              You have the staff there that are
 2   well-trained and know what to monitor and how to track
 3   inmates as they move through various programs at the
 4   ADX to get them back to a mainstream institution.  So
 5   ████████████████████    ██████████████████████
     █ ████████████████████████████████████████████
     █ ██████████████████████████████████    And I
 8   don't know if I'm being clear, but it's ████████████
     █ ████████████████████████████████████████
     █ ███████████████████████████████████████████████████
     █   ████████████████████████████████████
12         Q.   How many inmates are transferred out of
13   the ADX every year?
14         A.   A number of inmates that work their way
15   through the program.  I don't -- it's going to
16   fluctuate.  It's going to fluctuate based on inmates
17   that meet the criteria to move through the program,
18   inmates that physically follow those procedures and
19   actually move out of the program.  So it's a constant
20   fluctuation.
21         Q.   Do you have a ballpark?  Is it ten or
22   more like 100 or . . .
23         A.   I wouldn't say it's anywhere near 100.  I
24   would say the fluctuation is anywhere from 10 to 20,
25   maybe, a year.  Inmates you know that just -- it's
```

Case No. 1:15-cv-02184-RM-STV   Document 110-12   filed 06/04/18   USDC Colorado   pg 7 of 31
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 47

1   just hard to say.  I mean, to put a number on it.

2          Q.   Can you turn to page 3 of your rebuttal

3   report, Exhibit 2.

4          A.   Okay.

5          Q.   Near the top of that page, about halfway

6   through that paragraph you say, "As Warden Fox said,

7   reiterating a point made in an earlier letter from

8   Warden Oliver, whether information contained in a PLN

9   article is publicly-available is one factor to be

10  considered as part of the overall analysis of whether

11  an incoming publication can be properly rejected."

12              You agree that the fact that information

13  is publicly available weighs against censorship?

14              MR. COOK:  Objection, form.

15         A.   I'm not sure I understand what you are

16  asking.

17         Q.   (BY MR. SWANSON)  What do you mean by

18  this sentence here?

19         A.   Just because it might be something that's

20  published in the community doesn't mean it's

21  appropriate for introduction into the ADX.

22         Q.   But it's a factor?

23         A.   It's a factor that's considered.

24         Q.   Right.  And it's a factor that tends to

25  weigh against rejecting a publication?  It doesn't

Case No. 1:15-cv-02184-RM-STV   Document 110-4   filed 06/04/18   USDC Colorado   pg 8 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 48

1   **weigh in favor of rejection, right?**

2           A.   I don't think it weighs one way or the

3   other.   I think it's a factor that has to be

4   considered.   All information to some degree could be

5   public, I would think, but there might be information

6   that's available to the public that would not be

7   appropriate for production into the ADX.

8           **Q.   And I'm not saying that it's dispositive,**

9   **but you say it's a factor, and presumably it's a**

10  **factor that means it affects the analysis one way or**

11  **the other.   And I'm just asking which way does it**

12  **affect the analysis?**

13          A.   It depends on the individual warden

14  making the determination.

15          **Q.   Would the fact that information is public**

16  **ever be a factor that weighs in favor of censorship?**

17          MR. COOK:   Objection, form.

18          A.   Public would weigh in favor.   I don't

19  understand what your -- so making a weapon, there is

20  public information of how to do it.   So that would be

21  one factor that would be considered when it comes in.

22  Just because it's public information doesn't mean I'm

23  going to give it to the inmates.   That's a clear

24  threat to the safe, secure, and orderly running of the

25  institution.   How to make a bomb, drawings of the ADX.

Case 1:15-cv-02184-RM-STV Document 110-4 Filed 06/04/18 USDC Colorado Page 9 of 31
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 53

1    inmates at the ADX don't have, but at the time, you

2    know, you don't know that inmate is coming, you don't

3    know that inmate possesses that information, and he

4    brings that information in.

5         **Q.    So you're assuming that censorship is an**

6    **effective means, at least in some cases, of**

7    **restricting the flow of information; is that right?**

8         A.    And the warden needs to have that

9    flexibility to do that.

10        **Q.    What's your basis for believing that**

11   **censorship is actually effective at stopping or**

12   **limiting information?**

13        A.    Because it doesn't allow -- it doesn't

14   allow inmates to have access to information that would

15   jeopardize the safe, secure, and orderly running of

16   the institution.  It's kind of like the radio.  It's

17   in my report where when the ADX first opened, the

18   inmates had access to radio out here in the public,

19   107.9 or whatever the radio station is.  And other

20   people in the community, they would communicate and

21   determine and say, hey, on every Wednesday, for

22   example, at 9 a.m., I'm going to do a dedication.

23             Call in the radio, as the radio does

24   dedications, I want to wish Mark a happy birthday, and

25   a message gets passed.  And once you identify that and

Case 1:15-cv-02184-RM-STV  Document 110-2  Filed 06/04/18  USDC Colorado  Page 9 of 81
**MARK COLLINS - 4/19/2018**
**Prison Legal News v. Federal Bureau of Prisons**

Page 54

1    realize that's what inmates are doing to defeat your

2    security practices, you have to eliminate that to the

3    best of their ability.  Now they use satellite radio

4    because inmates were using that as a means to

5    communicate.

6         Q.   Do you have any studies as to whether

7    censorship is actually effective?

8         A.   I haven't done any studies, no.

9         Q.   Do you know whether the BOP has done any

10   studies?

11        A.   Not to my knowledge.  I don't know.

12        Q.   Have you asked whether the BOP has done

13   those studies?

14        A.   I did not.

15        Q.   Are you aware of any empirical data that

16   shows that censorship actually stops information in a

17   prison?

18        A.   No empirical data, no.

19        Q.   Do you know if they have any such data?

20        A.   I don't know.

21        Q.   You didn't ask for that data?

22        A.   I did not.

23        Q.   We talked a little bit about inmates'

24   criminal history and their gang affiliations, gang

25   activity as some of the types of information that

Case No. 1:15-cv-02184-RM-STV   Document 121-1   filed 06/04/18   USDC Colorado   pg 11 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 55

1    might be detrimental within the institution.  Do

2    inmates at the ADX generally know each other's

3    criminal history and gang affiliations?

4         A.   I don't know.  Some would and some would

5    not.

6         Q.   Within the general population unit, would

7    they tend to know?

8         A.   So there's four general population units.

9    So it goes back to what we talked about before, you

10   have to understand how the ADX works.  When an inmate

11   comes in, and if we identify and we know from his

12   background, his past, why he came to the ADX, that he

13   would have a problem in the unit, then they will try

14   to house the inmate in a unit away from that threat.

15             There are some inmates that have so many

16   enemies that they have a threat in every unit.  So you

17   try to put them in an environment as safely as you

18   possibly can to avoid him from getting hurt.  That's

19   their job.  Their job is to make sure everybody is

20   safe even living at the ADX.

21             I'm sure you know there have been

22   homicides at the ADX.  So you have to be very, very

23   careful whereever you place an inmate anywhere in that

24   institution.  There will be circumstances where you

25   don't know there is a problem.

1    Inmates are interviewed when they come to

2    the institution.  Is there any reason why you can't go

3    to this unit, or is there anybody at this institution

4    you can't be housed with.  Inmates are given the

5    opportunity to let staff know.  Staff interact with

6    the inmates all day long, every single day.  If there

7    is a threat there, there's a problem, they have the

8    ability to let staff know.

9    To try to answer your question, you know,

10   an inmate in one unit may not even know an inmate is

11   there, but he might have information that's

12   detrimental.  So we don't want an article or something

13   in a publication that identifies this inmate is here

14   when his enemy who runs a large disruptive group is a

15   unit up because, as we talked about before, inmates

16   can yell, inmates will use the law library to pass

17   messages, they will use food trays to pass messages,

18   they use laundry to pass messages.

19   They try to circumvent to try to get in

20   the same area at the same time to pass messages.  They

21   will try to use the legal system to be ridded out to

22   go to court together to pass information.  There is a

23   variety of ways that inmates try to communicate.  They

24   never stop, they will never stop, but staff have got

25   to employ every available measure that they possibly

1    can to make sure everybody is safe and the institution

2    is secure every single day.  So controlling

3    communication is a critical aspect of that.

4              Q.   So is it reasonable to believe that

5    censorship prevents inmates from learning about other

6    inmates' criminal histories and gang affiliations?

7              A.   I think there's times where it can, but

8    is it forever?  No.  No.  So I think, you know, timing

9    is another thing that has to be taken into

10   consideration, is it public?  How recent is this

11   issue?  Because over time you know how things can slow

12   down.  I talk about a case in my report, an inmate

13   waited 35 years to kill another inmate.  He was

14   patient.

15             Q.   Is it the case that violence will happen

16   at the ADX, you know, even if information is censored?

17             A.   I don't think you can say it never would.

18   When you have 400 of the most predatory inmates in the

19   Bureau of Prisons, or almost 100 percent of them have

20   a history of violence, I think that's a pretty safe

21   statement to say yes, but at the same time you want to

22   try to avoid it at all cost.

23             Q.   Have you done any studies as to whether

24   censorship actually limits or reduces violence?

25             A.   I have not.

Case No. 1:15-cv-02184-RM-STV   Document 112   filed 06/04/18   USDC Colorado   pg 13 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 58

 1       Q.   Do you know if BOP has done any studies?

 2       A.   I don't -- I'm not aware.

 3       Q.   Have you asked?

 4       A.   I did not.

 5       Q.   Do you have any empirical data showing

 6  that censorship produces violence?

 7       A.   I do not.

 8       Q.   Do you know if BOP does?

 9       A.   I do not.

10       Q.   Have you asked?

11       A.   I did not.

12       Q.   If ADX decided not to censor information

13  like criminal histories and gang activity, would there

14  be any additional security measures that the ADX would

15  need to take?

16       A.   If it was decided -- let me make sure

17  what you're asking me.  If it was decided that nothing

18  was censored, if new security measures would have to

19  be implemented?  The problem you would have, I think,

20  at some point is inmates would never be able to work

21  their way through that program.

22       Q.   What do you mean?

23       A.   Well, because as inmates work through the

24  stepdown program that's in one of these supplements,

25  inmates have increased interaction with each other,

Case No. 1:15-cv-02184-RM-STV Document 110-11 filed 06/04/18 USDC Colorado pg 15 of 32
Case 1:15-cv-02184-RM-STV Document 120-11 Filed 06/04/18 USDC Colorado Page 14 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 59

```
 1    they have increased interaction with staff.  At one

 2    point they actually have to cell together.  They

 3    haven't done it for years by the time they get to that

 4    point.

 5            So that's a very stressful situation for

 6    an inmate to live with another individual they may not

 7    know.  But everybody is pretty well aware that ADX

 8    houses the worst of the worst in the federal prison

 9    system.  So inmates are constantly on their toes and

10    worried about what the person is about that they are

11    going outside to go to recreation with, that they are

12    going to sit down at a table and eat their meals with.

13            So as they go through these different

14    phases, they have increased interaction with each

15    other and increased interaction with staff, meaning

16    they are no longer in restraints, they are no longer

17    in an individual recreational area together.  They sit

18    in a room like we are right now, and bad things can

19    happen.

20            So if you just said, hey, you can't

21    censor anything, you have to let everything in,

22    everybody already knows that guy is a sex offender,

23    they might know, they might not know.  I don't know

24    what you know, you don't know what I know.  You could

25    potentially preclude an inmate from working his way
```

Case No. 1:15-cv-02184-RM-STV   Document 120-1   filed 08/04/18   USDC Colorado   pg 16 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 91

1    A.    No, I'm not.

2         Q.    I think you might have said earlier that

3    the ADX houses the most violent, disruptive offenders;

4    is that accurate?

5         A.    And escape prone.

6         Q.    Escape prone?

7         A.    Yes.

8         Q.    That's true as of today, 2018?

9         A.    Yes.

10        Q.    And that was true in 2010?

11        A.    Yes.

12        Q.    And was that true in 2014?

13        A.    It was true in 1994 when it was

14   activated, and ever since then.

15        Q.    That's a more efficient way of asking the

16   question.

17        A.    All right.

18        Q.    What institutions within the BOP system

19   are kind of the next step down in terms of housing the

20   most violent offenders?

21        A.    The penitentiaries.

22        Q.    Are there any penitentiaries in

23   particular if you're not quite eligible for ADX but

24   you're still pretty violent?

25        A.    There's special management units that are

Case No. 1:15-cv-02184-RM-STV Document 110-14 filed 06/04/18 USDC Colorado pg 16 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 92

1   kind of a buffer, if you will, between a penitentiary

2   setting and the ADX mission.  So those facilities are

3   designed to provide tighter controls than a

4   penitentiary, but not as restrictive as the ADX.

5              So I don't know if that explains it,

6   but . . .

7         Q.   Can you identify some of those special

8   management units?  Do they have names?

9         A.   Special management units, that's the name

10  of the program.

11        Q.   Would they be housed at a USP somewhere?

12        A.   Yes.  Yes.

13        Q.   And what are -- do you know the USPs,

14  where they are housed?

15        A.   I don't recall specifically off the top

16  of my head.  I know USP Lewisburg in Pennsylvania, I

17  believe is still a program.  I haven't kept up with

18  them.  Some institutions, you know, they activated

19  them, then they changed the mission, so it's changed.

20  So I can't sit here and definitively tell you which

21  institutions have that program.

22        Q.   Okay.  How did those -- how did the USPs

23  differ from the ADX in terms of the amount of

24  violence?  Did they have more violence, less violence,

25  about the same?

1      A.    I would say the penitentiaries -- the

2   open-population penitentiaries have more, and that's

3   because they are open, inmates are out walking around

4   for the majority of the day every day, where the vast

5   majority of the ADX population is individualized.  So

6   you have more physical -- or should I say hands-on

7   assaults at penitentiaries, where at the ADX you have

8   a lot more of the throwing of urine, feces, attempting

9   to make a spear and stab somebody with a spear, making

10  some sort of a slingshot.

11      Q.    **Do things like that also happen at the**

12  **USPs, making a slingshot, throwing a spear?**

13      A.    Yes.  Yes.

14      Q.    **But the ADX is generally more secure than**

15  **the USPs?**

16      A.    The majority of it.  The majority of it.

17  So keep in mind the inmates that have more access with

18  each other is where your problems are going to occur

19  99 percent of the time because -- and you are talking

20  about a very small portion of that population as

21  inmates work their way through that program.  The vast

22  majority of inmates are still in individual cells and

23  individual recreational areas, but that doesn't mean

24  they still can't assault somebody.  And there's a lot

25  more inmates at penitentiaries.

 1          Q.   Can we turn back to your opening report,

 2    page 3.

 3          A.   Of the expert report?

 4          Q.   Yes, the expert report.

 5               And starting about halfway down the page

 6    you have some statistics about the history of the

 7    inmates at the ADX?

 8          A.   Correct.

 9          Q.   Where did you get the information that's

10    listed here?

11          A.   I requested it through the legal staff at

12    the ADX.

13          Q.   And what did you request specifically?

14    Did you actually ask for what's the percentage of

15    inmates who have murdered or attempted to murder other

16    inmates?

17          A.   Just the way it's broken down on my

18    report, yes.

19          Q.   So you asked for the number of inmates or

20    percentages of inmates within each of these

21    categories?

22          A.   Yes.

23          Q.   Okay.  And then they did the calculations

24    or got the data and gave it to you?

25          A.   Correct.

1          Q.    Why don't the percentages in the bullet

2    point list on page 3 add up to 100 percent, if I've

3    done my math right, which is always a distinct

4    possibility that I have not?

5          A.    This just did a breakdown -- I just did a

6    breakdown of the more predatory type of inmates, and

7    then kind of segregated the placement on SAMs a little

8    bit.  But if you notice in the opening part it says a

9    small percentage, average around 5 percent are

10   designated directly to the ADX.  So they may have had

11   assaultive behavior or extremely violent or aggressive

12   behavior that required their placement at the ADX upon

13   initial designation.  So it might be stuff that didn't

14   happen in the BOP, it could have been incidents that

15   happened in state facilities as well because there

16   will be state inmates that are housed there.

17         Q.    Are these categories overlapping?

18         A.    They could be, yes.

19         Q.    So someone could be -- someone could have

20   murdered or attempted to murder another inmate or else

21   murdered or attempted to murder BOP staff?

22         A.    Correct, yes.

23         Q.    And does BOP have this data for other

24   institutions?

25         A.    I can't speak on behalf of other

Case No. 1:15-cv-02184-RM-STV   Document 110-21   filed 06/04/18   USDC Colorado   pg 21 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 96

1   institutions.

2          Q.   Did you ask for this data for other

3   institutions?

4          A.   No, because my testimony is about the

5   ADX.

6          Q.   Would there be inmates at USPs that have

7   murdered or attempted to murder other inmates?

8          A.   Yes.

9          Q.   Would there be inmates at other USPs that

10  have murdered or attempted to murder BOP staff?

11         A.   There could be, yes.

12         Q.   Could there be inmates at other USPs that

13  have assaulted or attempted to assault other inmates?

14         A.   Yes.

15         Q.   What about assaulting or attempting to

16  assault BOP staff?

17         A.   Yes.

18         Q.   The bullet point list at the bottom of

19  the page?

20         A.   Yes.

21         Q.   This is based on the current population

22  of ADX inmates?

23         A.   Correct.

24         Q.   That's as of 2018?

25         A.   Yes.

1     Q.   And, again, did you -- well, do you have

2   any sense as to how these numbers compare to inmates

3   at other institutions?

4     A.   I don't.  I don't.  I just asked for the

5   information for the ADX.

6     Q.   Are there leaders, members, or associates

7   of BOP designated security threat groups at other BOP

8   institutions?

9     A.   So I mean, determining a leader, that's a

10  pretty broad statement.  And what I mean by that is

11  every group is going to have somebody that represents

12  in a leadership role for that facility.  So I don't

13  know how to answer your question better than that.

14    Q.   So if you had someone who was in a

15  security threat group at -- strike that.

16         If you had a security threat group whose

17  members were located at a USP, somebody within that

18  group is the, quote, unquote, leader?

19    A.   At that facility?

20    Q.   At that facility.

21    A.   It doesn't make them the leader of the

22  group, but it makes them the leader of the group at

23  that facility.

24    Q.   So there would be members of security

25  threat groups at other BOP institutions?

Case No. 1:15-cv-02184-RM-STV   Document 120-11   Filed 06/04/18   USDC Colorado   Page 23 of
32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 98

1        A.    Yes.

2        Q.    Are there terrorists housed at other BOP

3   institutions?

4        A.    Yes.

5        Q.    International and domestic?

6        A.    Yes, I believe so.

7        Q.    Are there inmates at other BOP

8   institutions that have a history of taking hostages?

9        A.    There could be.  I don't know for sure.

10       Q.    Let's turn to page 5 of the report.

11   Actually, before we get there, let's go back to

12   page 3.

13            How would these statistics about the

14   current population of the ADX, how would they compare

15   to the population of the ADX in prior years?

16       A.    Without looking at data from each of the

17   prior years, I can't answer that.  It's a constant

18   fluctuation in and out.  So these numbers are going to

19   change as your population changes.

20       Q.    You didn't ask for the data for prior

21   years?

22       A.    No, just asked for what it is now.  This

23   is just a compilation of information from what the

24   dynamics of the facility are at this point.

25       Q.    Does the population become more dangerous

Case No. 1:15-cv-02184-RM-STV   Document 120-11   filed 06/04/18   USDC Colorado   pg 23 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 99

 1   or less dangerous over time?

 2        A.   Well, many security protocols have been

 3   enhanced at the facility because of the dangerous and

 4   the propensity of violence by the inmates.  An inmate

 5   was killed in a general population unit which required

 6   increased security.  An inmate was killed in a

 7   stepdown component of the programming which increased

 8   security.  So violent individuals do things

 9   sporadically and impulsively.  So, that's . . .

10        Q.   But in terms of the makeup of the

11   offenders there, has that changed over time?

12        A.   As I mentioned before, you know, these

13   inmates are the most violent, disruptive inmates to

14   open-population institutions, the vast majority of

15   them.  Like I said, less than 5 percent are direct

16   core commitment.  So everybody has earned their way

17   there.  It has been that way since the institution

18   activated in November of 1994.

19        The dynamics of the population change as

20   inmates successfully complete the program and leave,

21   and inmates that continue to commit heinous acts in

22   open-population institutions and earn their way to the

23   ADX.  So the ADX, since its activation, continues to

24   house the most violent, disruptive, and escape-prone

25   inmates in the entire federal prison system.

Case No. 1:15-cv-02184-RM-STV Document 112 Filed 06/04/18 USDC Colorado Page 24 of
32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 105

1  force, it's not just assault on a staff member, that's
2  inmate assaults on other inmates as well.  That
3  includes any kind of incident that would occur would
4  encompass that immediate use-of-force number.
5          Q.   Got it.  Is it true that no matter how
6  good your security procedures are there's no way to
7  completely eliminate violence in an institution like
8  the ADX?
9          A.   I think if you think of the most basic
10  type of assault that's available, you can't stop it.
11  If an inmate really wants to assault you or somebody,
12  he'll find a way.
13          Q.   And that's what you say in your rebuttal
14  report, right?
15          A.   Uh-huh.
16          Q.   Despite the best efforts by correctional
17  personnel, the physical design of a correctional
18  institution, there are no security measures that can
19  eliminate all risks associated with incarcerating
20  highly dangerous individuals?
21          A.   Somehow, some way you have to pass food
22  to them.  Any time there is an opening, they can spit
23  on you, they can throw things at you, they can try to
24  stab you.  You can try to put every security practice
25  in place that you possibly can to make things as safe

Case No. 1:15-cv-02184-RM-STV   Document 112-1   filed 06/04/18   USDC Colorado   pg 26 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 106

```
 1    as you can, but inmates have all day every day to

 2    figure out how to get to somebody if they need to.

 3            Q.    Let's look at page 7.

 4            A.    Of the same report?

 5            Q.    Yes, opening report.

 6            A.    Okay.

 7            Q.    And the last paragraph on page 7 begins

 8    with, "Information can be used as a weapon."

 9            A.    Yes.

10            Q.    That's true today in 2018?

11            A.    Yes.

12            Q.    And inmates, in fact, do try to use

13    information as a weapon?

14            A.    They always will.

15            Q.    Is that true at other institutions as

16    well?

17            A.    That will probably be in any correctional

18    environment you ever enter.

19            Q.    Earlier on page 7, the first full

20    paragraph, you say, "They," meaning inmates, "carry

21    grudges, and they do not hesitate to act on those

22    grudges."  That's true at the ADX today?

23            A.    Yes.

24            Q.    And that's true at other institutions?

25            A.    Yes.
```

```
1          Q.   On page 8, the second paragraph on that
2    page, about two-thirds of the way into that paragraph,
3    you say, "They," again meaning inmates, "have the
4    ability to target inmates in other institutions and
5    people outside the prison."
6          A.   Yes.
7          Q.   And that's true today at the ADX?
8          A.   Yes.
9          Q.   And that's also true of other
10   institutions?
11         A.   Yes.
12         Q.   Are any of the incidents of violence that
13   you detail in your report linked to information
14   contained in Prison Legal News?
15         A.   Not that I can say definitively, no.
16         Q.   Can you say in any way that any of these
17   are linked to information in PLN?
18         A.   No.
19         Q.   Are they linked to information in any
20   other publication that you are aware of?
21         A.   Not that I know of.
22         Q.   Are you aware of any incidents of
23   violence at ADX that are attributable to Prison Legal
24   News?
25         A.   Not that I'm aware of.
```

```
1          Q.    How about other publications?

2          A.    Not that I'm aware of.

3          Q.    Are you aware of incidents of violence at

4    other BOP institutions that are attributable to Prison

5    Legal News?

6          A.    Not that I'm aware of.

7          Q.    What about other publications?

8          A.    Not that I'm aware of.

9          Q.    Would the environment in the stepdown

10   unit, and by that I mean once you get into the

11   intermediate and transitional units, would that be

12   comparable to the environment at a USP?

13         A.    Not quite at that point, no.  When you

14   get to the pre-transfer phase, that's where you really

15   try to mirror what it's like for inmates where they

16   should have a job, they should be -- have a cellmate

17   for a period of time, like they would in the USP.  You

18   still have pretty tight controls in these various

19   programs as inmates work through.

20               You have them in small groups to assess

21   their adjustment, their ability to get along with

22   others and still function appropriately in that

23   environment as you move them through these stages.  So

24   it's not until you really get to the last phase where

25   you try to get the inmate in the mind-set of this is
```

Case No. 1:15-cv-02184-RM-STV Document 112-1 Filed 06/04/18 USDC Colorado Page 29 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 109

1    what it's going to be like when he leaves that unit

2    and goes to an open-population institution.

3            Q.    That's the direct transitional phase?

4            A.    The pre-transfer phase.  That's the final

5    phase of the program.

6            Q.    That's housed at the USP?

7            A.    That's correct.  Let me make sure I'm

8    clear that those last two phases that are at the

9    penitentiary, that unit is managed completely

10   independent of the rest of the institution.  Those

11   inmates don't interact with any inmates in any way,

12   they only interact with themselves within that housing

13   unit.  They don't go eat meals with those inmates,

14   they don't go to recreation with those inmates, they

15   don't go to work with those inmates, they do

16   everything in the unit just like they have up to that

17   point.

18           Q.    The incidents of violence that you

19   describe in your report, are those incidents that

20   occurred in the stepdown unit, or did any of these

21   occur in other units at the ADX?

22           A.    Every one of the ones I listed in my

23   report were in one of the stepdown phases.

24           Q.    Just to be clear, would that include

25   general population?

```
1   publication?

2        A.   Yes.

3        Q.   And you are not providing an opinion on

4   that issue?

5        A.   No, I'm not.

6        Q.   And you are not providing an opinion as

7   to whether the rejection notices were mailed in this

8   case in a timely manner?

9        A.   No, I'm not.

10       Q.   You're not offering opinion as to whether

11  the censorship in this case violated the first

12  amendment?

13       A.   No.

14       Q.   And you're not offering opinion in this

15  matter as to whether the rejection notices violated

16  the Fifth Amendment?

17       A.   No.

18       Q.   And you are not offering an opinion in

19  this case as to whether the censorship violated the

20  Administrative Procedure Act?

21       A.   No.

22       Q.   Is it your understanding that Prison

23  Legal News has not been censored at the ADX since

24  2014?

25       A.   Yes.
```

Case No. 1:15-cv-02184-RM-STV Document 121 Filed 06/04/18 USDC Colorado Page 36 of 32
MARK COLLINS - 4/19/2018
Prison Legal News v. Federal Bureau of Prisons

Page 139

1           Q.    Do you have an understanding as to why

2     that is?

3           A.    Because of the procedures and the

4     protocols that were put into place.  Better training

5     of staff.  Doing away with the name-only practice that

6     was previously being used.  That greater scrutiny is

7     going in.  And good, legitimate rationale is being

8     used when scrutinizing a rejection or not.

9           Q.    Is there anything to stop a future warden

10    from changing the institution supplements and

11    eliminating those practices?

12          A.    It wouldn't stop it, but what I could say

13    is the way an institution supplement is written is

14    everybody has their degrees of specialty and

15    expertise.  So typically as a warden, when you come

16    in, and especially on a situation like this where the

17    ADX changed their procedures based on this lawsuit

18    because it identified this as a problem, and those

19    publications, for whatever reason, it was decided at

20    some point in time that they shouldn't have been

21    rejected and given to the inmates.

22                So can a warden do it?  He can.  Would he

23    do it?  Very, very, very unlikely because for two

24    reasons:  One, because of the lawsuit, and he doesn't

25    want to do anything that violates moving forward and

1    doing the right thing.  And two, you always are going

2    to take the opinions of your experts that have to

3    process this stuff.  So the people that are involved

4    in the review process, you have to put your trust in

5    them that they are giving you good advice.

6              Most wardens, if not all -- most wardens

7    didn't come up through the ranks of the areas that are

8    used to review these publications to make the

9    recommendations to reject or not reject.  So I don't

10   know if that answers your question.

11        **Q.   In your experience, has a warden ever**

12   **undone an institution supplement?**

13        A.   What I have found is you always are

14   trying to find ways to tweak things, to make them

15   better, to make them more efficient, to make them more

16   comprehensive, to just increase what you are doing.

17             You are not going to see somebody come in

18   and decrease what's happening, because over the years

19   every institution supplement is reviewed every year,

20   that way you can compare it with any changes in

21   national policy, if there are any, or if there's

22   anything happening at the local level that needs to be

23   changed because of procedures, practices, things that

24   have happened at the institution that weren't taken

25   into consideration at the time the original supplement