**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02184-RM-STV

PRISON LEGAL NEWS, a project of the Human Rights Defense Center,

 Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

 Defendant.

**REPLY IN SUPPORT OF BOP'S MOTION FOR SUMMARY JUDGMENT (DOC. 106)**

  In its Order denying the motion to dismiss, the Court assumed that PLN was challenging the incoming-publication policy used at the ADX. Doc. 81 at 8 (describing claims as involving ADX's "treatment of incoming publications"); *id.* at 11 (describing claims as a "merits battle over that policy"); *id.* at 17 (describing PLN as challenging BOP's "practices").

  But in this litigation, PLN has now made it clear that its claims are *not* what the Court assumed—a facial challenge to ADX's approach to incoming publications—but instead seek just a judicial determination as to specific past rejections by the ADX. *See* Doc. 109 at 2 (explaining that it is the past "determinations that PLN challenges, on an as-applied basis"); *id.* ("PLN is challenging rejections that have already happened—not ones that have yet to occur"); *id.* (noting that BOP defends the policy from a facial challenge "but PLN has not brought any such challenge"); *id.* at 18 ("PLN has not made a facial challenge to BOP's December 2017 Institution Supplement under *Turner* . . . Rather, PLN brings *as-applied* claims under the First and Fifth Amendments" to the past rejections).

Those as-applied claims are moot. First, those publications have been delivered. This case is thus unlike other cases where the challenged conduct might easily be reversed; PLN does not argue that there is any likelihood at all that these publications will be taken back.

Second, the policy that was in place when those publications were in place has been formally changed in significant ways. The BOP has confirmed that the material would not be rejected under the current ADX publication-review policy. A determination as to whether the past rejections, under the prior policy, was proper will not directly affect the current policy—the policy to which PLN has now confirmed that it is not bringing a facial challenge.

PLN opines that a decision about those past rejections might define "the circumstances under which ADX *may* consider PLN's publications to be a security risk" in the future. *See* Doc. 109 at 11. But this Court lacks jurisdiction to issue such an advisory opinion. *If* any issue is ever rejected again, the Warden at the time will conduct a security assessment based on the particular circumstances. PLN may not litigate such claims unless and until they are ripe, based on clear, concrete facts. Likewise, the BOP's all-or-nothing policy has no present effect on PLN. Unless and until it is applied in a concrete way that harms PLN, any as-applied challenge is not ripe.

The same jurisdictional defects defeat PLN's "as-applied" due-process claim. A declaration about the past rejection notices and the procedures pursuant to which they were issued would be a legal nullity. The magazines have been delivered, the content which triggered the rejections would not be rejected again, and the ADX has changed its procedures. PLN has never received a notice under the new policy. There is no jurisdiction for the Court to enter an advisory opinion that would attempt to define, in the abstract, what information can be included in future rejection notices without compromising security at the ADX. That claim is not ripe.

**ARGUMENT**

The BOP showed that the claim the Court understood PLN to bring—a facial challenge to the ADX incoming-publication policy—would fail because the undisputed facts show the policy satisfies the deferential rational-basis standard under the Constitution and the Administrative Procedure Act ("APA). *See* Doc. 106 at 11-20. Now that PLN has confirmed it is *not* bringing any facial claim, there is nothing left to litigate. There is no subject-matter jurisdiction to issue an advisory decision on PLN's as-applied claims based on the fully-reversed past rejections.

**I.   A declaratory judgment about the past rejections will have no effect on how the BOP applies the current incoming-publication policy at the ADX.**

PLN seeks a declaratory judgment that the past rejections—which have been permanently taken back by BOP—violated the First and Fifth Amendments and the APA. *See*, *e.g.*, Doc. 109 at 11. That claim is moot. The ADX has delivered the issues in their entirety, with no redactions, to the inmates. *See* Ex. 1 hereto, BOP Fact 11. Any declaration would have no "effect in the real world." *Wyo. v. U.S. Dep't of Agriculture*, 414 F.3d 1207, 12121 (10th 2005). A declaration would not impact how ADX officials judge future magazine content under a different policy now in existence. The particular content in the past rejections will not be presented at the ADX again, and even if it were, the ADX would not reject that content under its current policy.

Since the rejections, the ADX incoming-publication policy has changed in significant ways.[1] First, that policy—the December 2017 Policy—both formally eliminates the past ADX

---

[1] PLN cites to undersigned counsel's email transmitting the December 2017 Policy to suggest the changes were minimal. *See* Doc. 109 at 1. This email was sent in anticipation of a deposition to be conducted the next day. Counsel's purpose was to assure PLN that there was no reason to cancel the deposition; her comment was directed to the number of changes, which were minimal, and not their content. As PLN knows, undersigned counsel first had an opportunity to thoroughly read the policy at the deposition, when both she and PLN's counsel remarked on the policy

practice of focusing on names as security risks and states that all personnel involved in the publication-review process "*must conduct an individualized assessment* of each such incoming publication, taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX, and include an evaluation of the factors in 28 C.F.R. § 540.7[1](b). Staff should rely upon his/her correctional experience, using sound correctional judgment, in making this individualized assessment." BOP Fact 7 (emphasis added).

The ADX Warden has confirmed that the eleven magazines rejected under prior policies would *not* be rejected under the current ADX publication-review policy. BOP Fact 12. PLN labels the Warden's statement "conclusory," *see* Doc. 109 at 8, but the Tenth Circuit has made clear that testimony from an official explaining how the government will apply a policy is competent evidence. *Brown v. Buhman*, 822 F.3d 1151, 1171 (10th Cir. 2016) (finding no reason to question a government official's statements, made "under penalty of perjury," describing how a prosecution policy would be applied), *cert. denied*, 137 S. Ct. 828 (2017).[2] Moreover, the Warden's statement is bolstered by concrete actions. The ADX delivered the issues. BOP Fact 11. No issue of *Prison Legal News* has been rejected at the ADX in over four years. BOP Fact 3.

---

language formally eliminating the name-alone practice at the ADX. *See* BOP Fact 7.

[2] The BOP was not required to disclose Warden Matevousian as an "expert," *see* Doc. 109 at n.3. He has testified about facts concerning matters that he addresses in the course of his normal job duties. He testified about factual information known to him, explained how he has evaluated that factual information in light of his knowledge of correctional management, and discussed the conclusions he reached to execute his duty to protect institutional security. Further, the BOP disclosed Warden Matevousian as a witness as soon as it learned that he would assume the position of ADX Warden, which did not occur until April 2018. *See* Doc. 106-4 ¶ 1. PLN did not ask to depose Warden Matevousian following his disclosure. The BOP cannot place personnel changes at the ADX on hold until this litigation is completed, nor would a former Warden be able to testify concerning how the December 2017 Policy will apply to any future magazines.

The BOP does not contend that the magazines should be rejected. Ex. 1, Reply to PLN Fact 10.

The December 2017 Policy also changed the procedures for notifying publishers about rejections, requiring that a more detailed notice be transmitted in a short timeframe. BOP Fact 13. Those procedures—not the ones that were in place when the eleven specific rejections were made—would be applied to any future rejection of *Prison Legal News*. BOP Fact 15. PLN claims to dispute this fact because the policy could be changed again in the future, but that is true of any law or regulation. That fact simply emphasizes how extremely disconnected the past rejections are from the present policy. And PLN's opinion that the notice procedures in the December 2017 Policy are still insufficient, *see* Doc. 109 at 17, is sheer speculation. There is no dispute these notice procedures have never been applied to PLN. Conjecture about how the policy may or may not be applied to PLN in the future—effectively a facial challenge to the policy—does not sustain an as-applied challenge to past notices.

On these facts, a declaratory judgment would amount to nothing "more than a retrospective opinion that [a plaintiff] was wrongly harmed by the defendant." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (2011). While PLN may feel vindicated by that declaration, the Supreme Court has made clear that mere emotional satisfaction is not enough to sustain jurisdiction. *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977); *see also*, *e.g.*, *Green v. Branson*, 108 F.3d 1296, 1299 (10th Cir. 1997) (party's legal interest "must be more than simply the satisfaction of a declaration that a person was wronged").

There is no live controversy between the parties relating to these past rejections, including any claim about content, the BOP's "all-or-nothing" practice, and publisher-notification procedures. PLN's claims for a declaration about the old rejections are moot.

**II.     An advisory opinion about the past rejections will not control how future ADX Wardens evaluate content or notify publishers about rejections.**

PLN claims to seek "prospective" relief for its as-applied claims based on past rejections. There is no jurisdiction for the Court to use the past rejections as the basis for ordering future Wardens how they must handle hypothetical future content in *Prison Legal News*.

**A.     An order about the old issues would not establish "precedent" for the future.**

A declaration that the ADX erred in the past would not establish "precedent" for evaluations of future issues of *Prison Legal News* by ADX Wardens. *See* Doc. 109 at 11. The undisputed record here shows that, not only are the past rejections "unlikely to recur in the future," *see id.* at 18, it is a near certainty they will *never* occur again—unless PLN reprints the exact same content from the eleven previously rejected issues and resends it. "A declaratory judgment involving past conduct that will not recur is not justiciable." *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1266 (10th Cir. 2004) (McConnell, J., concurring). Moreover, even if PLN does reissue its content, the past issues will not be rejected under the current ADX publication-review policy. BOP Fact 12.

While future issues may "discuss the names and prior conduct of BOP prisoners and staff[,]" Doc. 109 at 11, the presentation of "names" and "conduct" will never occur under precisely the same circumstances as those related to the past rejections. When new content about "names" and "conduct" is submitted for the ADX Warden's evaluation, the Warden will take into account the entire context—making an individualized assessment of the risks under the circumstances at the time. BOP Fact 7. As the undisputed facts show, there are situations in which information about persons *could* put them at risk. BOP Fact 35 (discussing risks of identifying inmates who have committed sex crimes against children, inmate informants, inmates

6

who have testified for the government, and inmates who are former law enforcement officers). But there may be many situations in which identifications create no security risk, which the December 2017 Policy recognizes. BOP Fact 7 (prohibiting rejections based solely on names).

PLN points to no law showing that an order about the past rejections would have precedential value for future context-specific security evaluations at the ADX. *See* Doc. 109 at 11 (asserting that "a declaration would settle a dispute . . . by establishing precedent as to the circumstances under which ADX may consider PLN's publications to be a security risk"). But it cites only two cases where the court actually found subject-matter jurisdiction, and both involved claims in which the plaintiffs were seeking declarations to modify current agency polices. *Abdulhaseeb v. Calbone*, 600 F.3d 1031, 1312 (10th Cir. 2010) (finding relief available where "a judgment in his favor may require [the Department of Corrections] *to modify those policies*") (emphasis added); *Chapman v. Fed. Bureau of Prisons*, 285 F. Supp. 3d 1204, 1209 (D. Colo. 2016) (finding that the inmate "is still incarcerated in BOP custody, subject to BOP policies, and a judgment in his favor may require the BOP to *modify those polices*") (emphasis added).

Here, PLN has explicitly stated that it does *not* seek to modify any ADX policy, but rather to regulate specific future conduct. *See* Doc. 109 at 18 ("PLN has *not* made a facial challenge to BOP's December 2017 Institution Supplement under *Turner*, nor has it made a facial challenge to prior iterations of the ADX Institution Supplement.") (emphasis added). An order derived from specifics about the past rejections cannot meaningfully guide a Warden's context-specific assessment of future security risks.

### B.     PLN's claims about future rejections are not ripe.

PLN seeks to use the permanently withdrawn past rejections as an improper basis to

7

obtain an advisory opinion. But the Supreme Court has made clear that PLN must wait for an actual rejection, if one will ever occur, to litigate about speculative future events. PLN's claim is not ripe until those concrete facts are known. *See*, *e.g.*, *Renne v. Geary*, 501 U.S. 312, 321 (1991) (ripeness requires facts showing "clear-cut and concrete" application of challenged restriction); *see also* Doc. 106 at 8-11 (discussing cases and explaining why PLN's claims are not ripe).

At this time, those critical facts are a matter of complete speculation. As the ADX Warden has explained, the Warden "must conduct the risk analysis at the time he reviews the incoming publication in the particular context at the time, taking into account the specific content of the publication; facts involving the identified inmate, staff member, or other person; the identity of the inmate population at the time, including their contacts outside the prison; and a host of other unknown and unknowable factors that may be in play at some hypothetical point in the future." BOP Fact 48. PLN cannot litigate claims based on merely theoretical facts.

Further, a prospective judicial opinion purporting to address unknown facts is not the "least intrusive means necessary" to correct any violation of PLN's rights in the past. *See* 18 U.S.C. § 3626(a)(1)(A) (an injunction be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [use] *the least intrusive means necessary* to correct the violation of the Federal right") (emphasis added); *see also id.* (PLRA applies to "any civil action with respect to prison conditions"). Far from being the "least intrusive means" to address any violation associated with the past rejections, an advisory opinion advising the Wardens how to assess unknown information at some distant time would violate established law by interfering with the judgment of correctional officials about how to protect ADX security.

The Supreme Court has long held that correctional professionals, and not the courts,

should decide how to protect the security of the institutions they manage. In this sensitive security context, the Court emphasizes "a policy of judicial restraint" in which the professional judgment of prison officials receives "substantial deference." *Turner v. Safley*, 482 U.S. 78, 85-86, 89 (1987); *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989) (the Supreme Court "has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world"); *see also* Doc. 106 at 12 (discussing additional cases). This Court should decline to substitute its "judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison," and refuse to make a determination about claims that are not ripe. *See O'Lone v. Estate of Shabazz*, 482 U.S. 343, 353 (1987).

The dangers associated with an order prejudging security risks are particularly concerning here, where the security of the ADX is at stake. A vague directive that content "similar to" that contained in the past rejections could not be rejected in the future is an unworkable standard. *See* Doc. 109 at 9. There will never be "similar content" exactly mirroring the content in the past issues. Different people will be named in new issues. Different circumstances will be in play, both at the ADX and on the street. And, while an order about "similar content" will give the Warden no firm guidance about what he should do, it would nevertheless hamstring him and give PLN an easy hook to sue both the Warden and the BOP whenever PLN decides to second-guess his correctional judgment about security at the ADX.

There is only one rule for handling future publications that makes any sense in a context where unpredictable security risks must be assessed on an individualized basis: the Warden must

9

be able to evaluate all of the myriad unknown and unknowable factors to determine, based on his sound correctional judgment, that a publication is detrimental to security. The ADX has already adopted that policy. BOP Fact 7 (requiring an "individualized assessment" of each incoming publication, . . . taking into account specific information about the inmate or staff member, the content of the article, how that information may affect institutional security at the ADX," and including an evaluation of the factors in 28 C.F.R. § 540.71(b)). There is no jurisdictional basis for the Court to enter an order requiring the BOP to obey this facially constitutional rule. *See*, *e.g.*, *Shook v. Bd. of Cnty. Comm'rs,* 543 F.3d 597, 604 (10th Cir. 2008) (observing that "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65") (quotation omitted).

In sum, the Court should refuse to enter a vague, advisory opinion that improperly interferes with the future security judgments of correctional professionals. PLN should be compelled to wait to sue until, if ever, its claims about future rejections ripen.

**C.    The Court should decline to exercise jurisdiction under prudential doctrines.**

Even if the Court had jurisdiction under the Constitution, the Court should decline to exercise that jurisdiction under the prudential ripeness and mootness doctrines. The magazines have been delivered and would not be rejected under the new policy. If there ever is another rejection, the particular reasons for it are unknown at this time, as are the contents of any future rejection notice. But the need to maintain the safety and security of the ADX is the core reason the Court "should stay its hand," and "withhold relief it has the *power* to grant." *Jordan*, 654 F.3d at 1023 (emphasis in original); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (recognizing prudential aspects of the ripeness doctrine).

The ADX Warden is in the best position to know how the inmate population will react to particular content, at the time it arrives at the institution. He is in the best position to know the inmates' contacts outside the prison and the dangers they may pose. He is in the best position to know the current business of gangs and security threat groups, both inside and outside the prison, and how those groups may use information that enters the ADX to harm others. To use PLN's language, the Warden is in the best position to know when he *should* "consider PLN's publications to be a security risk," and when he should not. If he makes a mistake, PLN can sue then and ask the Court to correct it, based on specific evidence at the time.

A vague order that purports to constrain the Warden's judgment about unknown future security risks is contrary to sound correctional judgment and to the safety and security of ADX inmates, staff, and the public. Prudence counsels against such an order. The Court should decline PLN's invitation to assume the role of ADX Warden and "design" outcome-determinative rules for making security judgments about future incoming publications in "the most restrictive and secure prison operated by the BOP." *Rezaq v. Nalley*, 677 F.3d 1001, 1005 (2012).

**III.    The voluntary-cessation exception does not apply here for the same reasons the Tenth Circuit rejected the exception in *Brown v. Buhman*.**

Voluntary cessation does not apply because the eleven rejections have been permanently rescinded by the BOP. The magazines have all been delivered, and there is no prospect of any further injury related to these issues. There is no reason to believe the BOP will take back the issues once the litigation is over. But even if PLN were raising a broader challenge to the changes to the ADX incoming-publication policy, there is no evidence showing the BOP will take back those changes either. The ADX has implemented significant policy changes that will ensure a highly context-specific inquiry for each publication and ensure that any future rejection

11

notice is timely and contains specific information. Similar to *Brown v. Buhman*, 822 F.3d 1151 (10th Cir. 2016), there is no reason to believe that the ADX will retreat from these changes.

      **1.** **The ADX Warden has sworn to the changes.** The ADX has changed its incoming-publication policy, supported by a sworn declaration from the ADX Warden, who attests (1) that the past issues of *Prison Legal News* would not be rejected under the December 2017 Policy, and (2) that any future rejection notices would have to comply with the requirements set forth in that policy. BOP Facts 12, 15; *Brown*, 822 F.3d at 1171 (after official publicly adopted policy under penalty of perjury, risk that he "will revoke or ignore" the policy "is minimal at best, and certainly not enough to sustain a live case or controversy"). Here, too, violation of the declaration would expose the Warden to prosecution for perjury or contempt.

      **2.** **The ADX did not confine the changes to PLN.** The new ADX incoming-publication policy applies to all publishers, not just PLN. *See* BOP Fact 13 & Doc. 106-2 at 20-24 *Brown*, 822 F.3d at 1172.

      **3.** **The ADX has taken steps to ensure the changes are ingrained at the institution.** The ADX has voluntarily assumed obligations and invested resources in the publication-review process that are not required by federal regulation and which show a long-term commitment to the policy: (1) requiring that both investigative personnel and attorneys approve a potential rejection before it is ever shown to a Warden; (2) requiring that rejection notices contain specific references to the content of the publication; and (3) requiring that employees be trained on the procedures. Doc. 106-2 at 20-24, §§ III.B., D., G., S.; *Brown*, 822 at 1166 (finding that the county attorney's declaration was sufficient to show the government had not "*temporarily* alter[ed] questionable behavior") (emphasis in original).

**4.     This lawsuit prompted the changes.** The ADX changed its incoming-publications policy in response to the issues PLN brought to the fore in this lawsuit, making it more likely the policy will continue to be followed, especially with respect to PLN. BOP Facts 5, 14; *Brown*, 822 F.3d at 1171 ("A government official's decision to adopt a policy in the context of litigation may actually make it *more likely* the policy will be followed, especially with respect to the plaintiffs in that particular case.") (emphasis added).

**5.     The ADX does not contend that the past magazines should be rejected.** Here, the BOP does not contend that the content of the magazines should be rejected, which is more than the official in *Brown* conceded. Reply to PLN Fact 10; *Brown*, 822 F.3d at 1177 ("Mr. Buhman's continued belief in the Statute's constitutionality does not show he will disregard the statements he made to the district court under penalty of perjury.").

PLN's arguments do not undermine the BOP's evidence.

<u>First</u>, the Tenth Circuit has specifically rejected PLN's contention that mootness is defeated by the possibility that a future Warden may change the December 2017 Policy. *See* Doc. 109 at 13-14. The very same thing was true in *Brown* and can be said of any law or regulation. *See Brown*, 822 F.3d at 1175 (fact that the county attorney could not bind future county attorneys "does not breathe life into an otherwise moot case. If it did, federal courts would be free to exercise judicial review of any rarely used state statute based on the hypothetical that some unknown and yet-to-be-elected local prosecutor someday may flout or change office policy and decide to enforce it. We are not aware of any Article III basis that would permit federal courts to do this."). The BOP is not required to show that no future changes will ever be made to a policy.

Second, the fact that, as the BOP has obtained information in discovery, it has corrected statements it previously made, does not show that the conduct that triggered PLN's claims will recur. *See* Doc. 109 at 14-16. The BOP, like PLN, is entitled to learn facts during the discovery process. All facts that bear on the many legal issues PLN has raised are not segregated in some central BOP repository, neatly packaged and ready to be retrieved by the BOP and its counsel the moment PLN decides to sue. PLN is litigating about matters that span nearly two decades and the tenure of dozens of ADX personnel who have had some involvement in the publication-review process over those many years. Throughout this case, the BOP has searched for relevant information. When it has found such information, it has supplemented and, if necessary, corrected the record. That happened in March 2018, when a witness brought forward information which clarified the origin of the ADX focus on names in incoming publications. That information was immediately produced to PLN. That is not a "ploy" or a "retreat." *Id.* at 15. That is being honest and forthcoming with information the BOP discovered in the course of discovery.

Third, the BOP's acknowledgment that PLN's lawsuit was the reason for the policy changes is not a "sword-and-shield" tactic. *Id.* at 16. Changing a policy because of litigation is not a "sword." The final December 2017 Policy and the bases for adopting it are *not* privileged matters, but unprivileged facts reflecting the BOP's ultimate decisions. The BOP has not selectively used privileged information to prove a point, but then invoked a privilege to prevent PLN from challenging the assertion. *See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998) ("[A] litigant cannot use the work-product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion."). Here, Mr.

14

Chapman testified in his Rule 30(b)(6) deposition that this litigation was the impetus for the adopting the December 2017 Policy. BOP Fact 5 (Reply).

However, the fact that the ADX policy was changed because of this litigation does *not* entitle PLN to probe all of the predecisional, privileged communications that preceded the policy changes—none of which the BOP relies on here. It is well-established that the internal, pre-decisional communications of the government are privileged, but that its final decisions and the factual bases for them are not. *See*, *e.g.*, *Stewart v. Dep't of Interior*, 554 F.3d 1236, 1239 (10th Cir. 2009) (deliberative-process privilege protects "[a]dvisory opinions, recommendations and deliberations that reflect *how* government decisions are made") (emphasis added).

Were the Court to adopt PLN's construction of the voluntary-cessation exception, no case against a government entity would ever be moot. No matter what an agency might do to make a positive change that benefits the plaintiff, it would still be held to its old ways simply to satisfy the plaintiff's desire to continue to litigate about the past. The Court should not countenance that improper view of the voluntary-cessation exception. For the same reasons the Tenth Circuit found persuasive in *Brown*, the BOP has established that the exception does not apply here.

## CONCLUSION

The BOP is entitled to summary judgment on all of PLN's claims.

Respectfully submitted on June 18, 2018.   ROBERT C. TROYER
United States Attorney

s/ *Susan Prose*
Susan Prose, Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Tel.: (303) 454-0100; Fax: (303) 454-0404
E-mail: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

      I hereby certify that on June 18, 2018, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will electronically send notice to:

    Steven Zansberg
    Sabarish Neelakanta
    Peter Swanson
    Matthew Shapanka
    Elliot Mincberg
    David Shapiro
    Terra Fulham
    Alyson Sandler

                            s/ *Susan Prose*
                            Susan Prose
                            United States Attorney's Office