# Exhibit 2
# Deposition of Todd Chapman (excerpts)

*Prison Legal News v. Fed. Bureau of Prisons*,
No. 15-cv-02184-RM-STV

```
             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
```

Civil Action No. 15-cv-02184-RM-STV
_____

```
                 RULE 30(b)(6) DEPOSITION OF:
                 TODD CHAPMAN - March 16, 2018
                    (Federal Bureau of Prisons)
                 (Confidential Designations Pending)
```
_____

PRISON LEGAL NEWS, a project of the Human Rights
Defense Center,

Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

Defendant.
_____

          PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of TODD CHAPMAN was taken on behalf of the
Plaintiff at 1225 17th Street, Suite 2300, Denver,
Colorado 80202, on March 16, 2018, at 8:11 a.m.,
before Barbara Birger, Registered Merit Reporter,
Certified Realtime Reporter and Notary Public within
Colorado.

Case No. 1:15-cv-02184-RM-STV   Document 114-2   filed 06/18/18   USDC Colorado   pg 3 of 9
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 107

1      Q.   They turned out to be --
2      A.   They incorporated.  So just a change I
3   saw.  There is a change in K, L.  We added Q.
4      Q.   Okay.  So Q is a new portion of
5   institution supplement, and it indicates that the
6   Legal Services Department will conduct quarterly
7   training with the Correctional Systems Department and
8   Special Investigative Services Department staff
9   regarding the procedures outlined in the Program
10  Statement and in this supplement.
11           So that is accurate to summarize that to
12  say that the legal services department is going to
13  conduct training on the review of incoming
14  publications?
15     A.   Correct.
16     Q.   What was the reason that this training
17  requirement was added?
18     A.   Well, I'm not going to lie, this
19  litigation has brought to light our practices and what
20  we do and how we do that.  So as we've done more
21  research to find out what we've done in the past, what
22  we're doing, what we're not doing, we wanted to get
23  another layer of security and review.  So we decided
24  to add this on there to make sure that it's consistent
25  across-the-board from now on and not just a random CSO

1   who is working there for the day or random SIS staff

2   member or someone who has -- like you mentioned

3   earlier, beliefs or whatnot.  By having the legal,

4   they will be able to review the fact that is it a just

5   rejection.

6              So by bringing this to light, they

7   brought more people to the review table than would

8   normally be at the review table.  And so along with

9   counsel, along with other staff from different

10  departments, we came up with this would be a good

11  thing to do.

12       Q.   Both -- and does that reasoning apply to

13  both the introduction of the quarterly training as

14  well as the legal services department review?

15       A.   Correct.

16       Q.   So is it -- based on what you just

17  testified, is it fair to say that this litigation led

18  BOP to have some concerns about the practices it had

19  been using prior to the litigation?

20       A.   It led us to do a closer review of our

21  practices.  Because as it turns out, the other

22  departments may not have been aware of what SIS was

23  doing or what they were instructed to do or what they

24  were trained on.  So this litigation, and with being

25  able to talk to different people in different

1  departments and ask, hey, is this happening, are you
2  doing it, we were able to see more than we would have
3  otherwise if we did not know about it.
4       Q.   You mentioned previously that the
5  name-only practice that we've been discussing ended in
6  February of 2016?
7       A.   Yes.
8       Q.   Is it BOP's position that the enactment
9  of this institution supplement led to the end of the
10 name-only policy?
11      A.   Yes.  Because of the training we were
12 providing at the time, that was discussed at each one
13 of the trainings.  So the staff knew that that was no
14 longer a practice that we need to be doing.
15      Q.   There's nothing in the February 2, 2016,
16 institution supplement that specifically -- or
17 explicitly addresses the name-only policy, correct?
18      A.   No, correct.
19      Q.   At the time that this institution
20 supplement was being prepared, was there any
21 discussion of including that language?
22      A.   We discussed a variety of things, and we
23 came down to it's not a national policy, it's not
24 written anywhere to do anything, so why would we write
25 that it's not to do it, something we didn't have in

Case No. 1:15-cv-02184-RM-STV   Document 114-2   filed 06/18/18   USDC Colorado   pg 6 of 9
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 275

1  under the impression that that's what we were, you
2  know -- so he was just trying to clarify to them from
3  now on stop it, it's -- put it in black and white,
4  there is no gray area, can't say we didn't talk about
5  it, here it is.
6          Q.   Even though this was included in the
7  training as of May 2017, there was a determination
8  made at some point that this language about the
9  name-only policy would also need to be included in the
10 institution supplement?
11         A.   Correct.
12         Q.   And do you know when that determination
13 was made that it also needed to be included in the
14 institution supplement?
15         A.   Yes.  This goes into a question earlier
16 that you asked.  In late October, early November Clay
17 Cook had approached -- and this is clarified some
18 earlier -- approached Ms. McEvoy and Mr. Nelson, who
19 were over correctional systems, about updating the
20 supplement, and by updating the supplement adding this
21 additional language.
22              So he was actually the one who initiated
23 it, when I originally said I believe it was Ms. McEvoy
24 because she's over the department.  He had initial
25 discussions with her, they introduced it, so he

Case No. 1:15-cv-02184-RM-STV   Document 114-2   filed 06/18/18   USDC Colorado   pg 7 of 9
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 276

1   initiated it and he wanted to have that language put

2   in.

3           Q.   And, sorry, you said that was in late

4   October, early November --

5           A.   That's when the process started.

6           Q.   2017?

7           A.   That was signed off on December 21, 2017.

8           Q.   And you indicated that that was a

9   clarification of something you had said earlier, and I

10  understand that there's some other things that you

11  wanted to clarify?

12          A.   Correct.

13               MS. PROSE:  Thank you, Counsel, that was,

14  in fact, the first point of clarification we were

15  going to raise.  So we can move on from that.

16                        EXAMINATION

17  BY MS. PROSE:

18          Q.   A few other things to clarify for the

19  record, Mr. Chapman.  In response to some of

20  Ms. Fulham's questions earlier today, you made note of

21  one incidence of violence of which you were aware that

22  you believed was related to an incoming publication.

23  Do you recall that testimony, Mr. Chapman?

24          A.   I do.

25          Q.   You wish to make a clarification on that

```
 1                      EXAMINATION
 2   BY MS. FULHAM:
 3          Q.   And did you learn any additional
 4   information today that causes you to change that
 5   testimony?
 6          A.   Just that statement that -- while I still
 7   don't have anything in writing saying that they know,
 8   or no one has told me that they know, based on my
 9   sound correctional judgment at the BOP, I would assume
10   they would have to know -- they would have had to have
11   known.
12               MS. PROSE:  Do you have anything else on
13   that?
14                      EXAMINATION
15   BY MS. PROSE:
16          Q.   Next point of clarification.  Earlier
17   today, Mr. Chapman, in response to some questions from
18   Ms. Fulham, you were discussing -- you were listing, I
19   should say, people who had been -- I think you used
20   the term interviewed in connection with the origins of
21   the name-alone practice; do you recall that testimony?
22          A.   I do.
23          Q.   All right.  And can you provide a full
24   list now of all the people known to the bureau at this
25   time who were questioned in connection with how did
```

Case No. 1:15-cv-02184-RM-STV   Document 114-2   filed 06/18/18   USDC Colorado   pg 9 of 9
TODD CHAPMAN - 3/16/2018
Prison Legal News v. Federal Bureau of Prisons

Page 280

1   that practice get started?

2           A.   I can.  A couple of these I may have

3   already named, but I just want to name them all in

4   order.  So one would be Amy Kelley, with an e-y on the

5   end.  She is a special investigative services

6   lieutenant.

7                Debra Payne, P-a-y-n-e.  She is a former

8   supervisory investigative agent.

9                Timothy Poland.  He was the former

10  supervisory correctional systems specialist at ADX.

11               Chris Synsvoll, S-y-n-s-o-v-a-l-l (sic).

12  Supervisory attorney at FCC Florence.

13               Diana Krist, K-r-i-s-t.  She was also a

14  former supervisory investigative agent -- or special

15  investigative agent, I apologize.

16               And Kelee, spelled K-e-l-e-e, Dell,

17  D-e-l-l, she was a former special investigative

18  services technician.

19               And I have the name of Kerri Hicks,

20  spelled K-e-r-r-i, Hicks, who I was referring to as

21  Ms. Hicks throughout the testimony, she is a current

22  special investigative services technician.

23                         EXAMINATION

24  BY MS. FULHAM:

25          Q.   And in what time period were these