1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2    Case No. 15-cv-02184-RM-STV
      _____
 3    PRISON LEGAL NEWS,

 4         Plaintiff,

 5    vs.

 6    FEDERAL BUREAU OF PRISONS, THE

 7         Defendant.

 8    _____

 9            Proceedings before SCOTT T. VARHOLAK, United States

10    Magistrate Judge, United States District Court for the

11    District of Colorado, commencing at 10:33 a.m., February 17,

12    2017, in the United States Courthouse, Denver, Colorado.

13    _____

14            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

16    _____

17                           APPEARANCES

18            MATTHEW S. SHAPANKA, STEVEN D. ZANSBERG and PETER

19    A. SWANSON, Attorneys at Law, appearing for the Plaintiff.

20            SUSAN PROSE, Attorney at Law, appearing for the

21    Defendant.

22    _____

23                         MOTIONS HEARING

24

25
```

2

1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3      proceedings are herein transcribed, pursuant to order of

4      counsel.)

5              THE COURT:  This is 15-cv-2184.  Can I have

6      entries of appearance, please.

7              MR. SHAPANKA:  Matthew Shapanka for Prison Legal

8      News, Your Honor.

9              MS. PROSE:  Good morning, Your Honor.  Susan Prose

10     of the US Attorney's Office for the Federal Bureau of

11     Prisons.  And may I also introduce with me at counsel table

12     Clay Cook, senior legal attorney -- senior legal counsel, I

13     believe, for the Bureau of Prisons.

14             THE COURT:  Good morning.

15             MS. PROSE:  I always get his title wrong.

16             And, Your Honor, may I also generally introduce my

17     colleagues and friends in the US Attorney's office.

18             THE COURT:  Good morning, everybody.  And I know

19     Mr. Cook from my days litigating against him on the other

20     side of the public defender's office.

21             MS. PROSE:  Oh, all right.

22             THE COURT:  So, and I would begin by thanking the

23     parties for the briefing on this case.  I think that the

24     briefing is excellent and has really helped to focus the

25     issues on this.  And I wish I could say that in every case,

1    I can't, but the briefing has been excellent on this.

2            I will certainly let either side make the

3    arguments that they want to make, but I want to, at least

4    lay out there initially my questions that I have and sort of

5    the issues that I would like to focus on.

6            On the first issue, on the mootness as to Claim 1,

7    I can tell -- I tended to agree when all we had on record

8    was the -- well, when we didn't have on record a statement

9    by the Warden.  But now that we have a statement by the

10   Warden, why -- and this is for Prison Legal News, why isn't

11   this nearly identical to Brown, at least with respect to the

12   rejection of -- and I see two issues on Claim 1, which is,

13   one is the rejection of magazines or publications because

14   they mention an inmate or mention a staff member.

15           The second one is the rejection of a publication

16   in its entirety, as opposed to a partial striking of the

17   publication.

18           On the first point, which is the striking -- which

19   is the striking of publication for it on the grounds that it

20   contains mention of an inmate or staff member, why doesn't

21   the Warden's now statement under oath that they are not

22   doing that, why doesn't that moot this -- or that portion of

23   the argument in the same way as it did in Brown?

24           For each side, the -- why doesn't the second

25   portion of that survive because the broader striking of the

1   entire publication, as opposed to striking a portion of it?

2   Presumably Prison Legal News may have a publication out

3   there that says something along the lines of, you know, BOP

4   is doing terrible things, BOP is, you know, something like

5   that, where it is determined by the BOP that that single

6   article could potentially be a threat to the security at

7   ADX.  But then the remainder of the publication doesn't say

8   anything -- you know, has nothing to do with a threat or

9   safety.

10          Why isn't it, especially now that the argument

11   that the Thornburg (ph) argument is gone, why isn't that --

12   that portion of it survive a mootness challenge?

13          And then along those lines, the complaint for

14   relief, I don't see any request for relief on that issue.

15   So, the -- your -- they talk about it a lot in the complaint

16   that there is this striking of the entire of the

17   publication.  But if I were to conclude that the first

18   portion of it -- of this is mooted, this striking of a

19   publication simply because it mentioned ADX inmate or staff

20   member, I don't see anywhere in the request for relief that

21   they seek any injunctive relief with respect to the second

22   aspect of it, the part that I'm struggling to find where

23   it's mooted.

24          And it's the final question I have on Claim 1 --

25   and I think we should be dealing with Claim 1 and then to

1    turn to Claim 2 -- is the request for relief, again in the

2    amended -- or in the complaint, is essentially asking for an

3    order saying, Don't violate the law.  And how can I do that?

4    In what the prayer for relief says is a permanent injunction

5    compelling defendant and it agents to deliver all past

6    issues, which they have done, and all future issues, absent

7    legitimate penological interests supported by specific

8    facts.

9            Well, isn't that just saying, Don't violate the

10   CFR?  And if so, how can I address that?

11           So, those are my questions.  Again, I want -- feel

12   free to make any other arguments, but those are the specific

13   questions that I had with respect to the first claim, and

14   then we will turn to second claim after -- after argument on

15   the first claim.

16           So, why don't we start with Prison Legal News, and

17   then we will go to the defendant.

18           MR. SHAPANKA:  Good morning, Your Honor.  Again

19   Matthew Shapanka for Prison Legal News.  And with me at

20   counsel table are Peter Swanson and Steven Zansberg.

21           Let me just start by addressing your questions,

22   Your Honor, directly.

23           The Warden's -- the Warden's declaration doesn't

24   move this case because this is not -- these are not the

25   facts of Brown.  The facts --

1            THE COURT:  Where does it differ?

2            MR. SHAPANKA:  It differs in the sense that in

3    Brown, the prosecutor -- it differs in several respects.

4            First, the prosecutor in Brown, not only made

5    sworn testimony that he wouldn't prosecute the plaintiffs in

6    Brown.  He also embodied in the formal office policy, here,

7    the Warden's declaration is one of those prongs, but nowhere

8    or in no documents or arguments before Your Honor has BOP

9    argued that it has changed its form of policy with respect

10   to the substantive issues in this case, in terms of --

11           THE COURT:  Well, yes, they have.  I mean, they --

12   you are right, there is no written policy that says that

13   they cannot reject an article based -- or a publication

14   based on solely mentioning ADX inmate or staff member.  But

15   in their training that they have handing out, they are

16   saying that you can't do that and they have the Warden, who

17   is the ultimate decision-maker here, saying, I won't do

18   that, that we have changed this policy.

19           So I -- I agree that that's a distinction, that

20   it's not in a written policy.  I'm not sure it's a

21   distinction with a difference, especially since the Brown

22   court, what they really focused on was in order to find the

23   case not moot, they would have to find that the

24   decision-maker had perjured himself and that there was no

25   indication anywhere in the record that the decision-maker

1    had perjured himself.

2              Here, I would have to make the same finding.  I

3    would have to make a finding that the Warden perjured

4    himself in this statement, and I don't see any evidence to

5    support that.

6              MR. SHAPANKA:  Well, Your Honor, again, there --

7    there -- the training documents are not the formal policy;

8    they are the training documents that have been promulgated

9    by the legal department and that's what they are choosing to

10   teach.  There is nothing here to cabin the Warden's

11   discretion in any way.  And while this Court and the Supreme

12   Court would afford wide latitude to prison officials in

13   making decisions related to correct -- in their correctional

14   judgment, those decisions and that discretion are not

15   unbounded.

16             And here, PLN is asking for much more than just a

17   change in this specific blanket policy.  We are asking for a

18   declaration and an injunction from this Court making -- and

19   making specific findings that these -- that would create

20   some constitutional guidance, because the constitution is

21   what binds the Warden's discretion here, and BOP's arguments

22   seem to boil down to the discretion is unbridled.

23             And what we are -- what we are concerned about is

24   that they -- their continued refusal to put it in writing in

25   any formal policy that's not subject to the whims of the

1    Warden or, in this case, lower -- lower officials, including

2    the legal department, who are putting forth the training.

3            THE COURT:  Well, but except it -- I mean, one,

4    your request for injunctive relief, are you asking to

5    essentially tell -- put into -- or ultimately Judge Moore,

6    to put in the injunction that details of exactly what they

7    can and what they cannot let in?  And how do we do that?

8            I mean, the entire complaint reads, on this issue,

9    on the Claim 1, as having two main criticisms of what BOP is

10   doing.  The first is that they are rejecting publications

11   solely because they mention ADX, inmates or staff members,

12   or BOP -- they use the broader, BOP inmates or staff

13   members, and they are rejecting solely on that basis.

14           Certainly, the Court could issue an injunction

15   that says, You can't reject solely because of that.  They

16   are not doing that anymore.

17           The second is the broader issue, which is the --

18   the rejection of entire publications because a portion of

19   them have security risk.  I agree that to this point nothing

20   has been done by BOP anywhere that has addressed that

21   component of it.  And I will ask them about that.

22           The question that I have on that is -- from your

23   perspective is twofold.

24           It's, one, on that issue, does the fact that you

25   haven't anywhere in the prayer for relief requested any sort

1    of injunction on that issue affect whether or not that's

2    even a ripe -- even a claim before the Court, such that if I

3    -- if I -- if I agree with BOP that the first thing is --

4    the first part of that is moot, is the second one not no

5    longer a claim?

6              And then the second question for you is how does

7    the fact that, at least to date, over the -- whatever it is,

8    seven-year period since they started rejecting publications

9    again, the fact that none of Prison Legal News's

10   publications appear to cause any more a security concern for

11   BOP, do you have standing to make the challenge against the

12   -- against this all-or-nothing policy?

13             MR. SHAPANKA:  Sure.  So let me start with the

14   second question, Your Honor.

15             THE COURT:  Sure.

16             MR. SHAPANKA:  With respect to the all-or-nothing

17   policy, first of all, the BOP's reply brief concedes that

18   there's a lot of controversy there.  BOP -- or excuse me,

19   PLN is a newspaper, we publish issues every month.  We have

20   since 1990.  And those issues -- we have 19 subscribers at

21   the ADX and we will continue to send publications to the

22   ADX.

23             THE COURT:  But none of them -- So let's broaden

24   it out.  Let's suppose it's -- I'm trying to think of -- I'm

25   trying to think of the least controversial magazine in the

1   world.  You know, some kids's magazine that couldn't

2   possibly, you know, be rejected for security reasons by BOP.

3   Would they have standing to bring -- say, they were never

4   rejected, it always went through, and all they did was -- it

5   was pictures of animals.  Would they have standing to bring

6   the challenge to the all-or-nothing policy?

7         MR. SHAPANKA:  They -- they -- they may not, Your

8   Honor, but that's not the case before Your Honor.

9         Here, this is not the first time PLN has been

10   censored by BOP and had to resort to litigation to resolve

11   that censorship.  In 2003 in Prison Legal News v. Hood, PLN

12   challenged what was then a policy of the Bureau of Prisons

13   that banned inmate-to-inmate correspondence.  And at the

14   time, inmate-to-inmate correspondence was defined as

15   articles by or about inmates or their causes, which is

16   fairly similar to the idea of mentioning inmates or their

17   causes, which is essentially what PLN does on a regular

18   basis.

19         The Court -- the BOP undertook to actually resolve

20   -- change its policy.  It took its -- its written policy and

21   struck the offending language completely from the policy and

22   reissued it.  The Court found that that alone -- that that

23   mooted the claim because they were no longer going to censor

24   on this basis and they stopped censoring for five years.

25   And then, in 2010, they came back and started doing it

1   again.

2        This is -- when have seen this movie before and we

3   know how it ends.

4        THE COURT:  So then going back to the earlier

5   questions, which are -- well, lets begin -- let me ask this.

6        Does the fact that the request for relief does not

7   seek any relief with respect to all-or-nothing policy, if I

8   were to conclude that the -- that the first portion, the

9   mentioning of ADX inmates or staff, moots it -- moots that

10   portion, is the second portion even allowed controversy?  Or

11   is it -- is it something alleged in the complaint?

12        MR. SHAPANKA:  Well, it's alleged -- it's alleged

13   in the -- in the facts of the complaint and in the -- in the

14   claims for relief.  The pray for relief also asks for -- for

15   any relief that Your Honor finds appropriate.

16        So that is where we -- I would -- I would probably

17   place that.  But I would also add there's another piece of

18   this, which is that this isn't just about the blanket policy

19   and it's not just about the redaction; it's about whether or

20   not BOP has established a rational relationship between the

21   security risk and the content of each of these 11 magazines.

22        So the all-or-nothing -- the all-or-nothing piece

23   is a component of that, if Your Honor finds that, for some

24   -- some or all of the issues that they were rejected

25   unconstitutionally, Your Honor could fashion relief in that

12

1   sense that would allow -- that would say, Okay, well, BOP

2   must -- must censor the offending language, which, in some

3   issues, may only be a sentence or -- or a word.

4           There is -- in the July 2013 issue of -- of Prison

5   Legal News, it was censored on the basis of a article that

6   was about Tenth Circuit case law governing whether or not

7   prisoners at ADX who were challenging their placement at ADX

8   must bring a habeas claim or a Bivens claim.  And the --

9   there's a discussion in there that the BOP found

10  objectionable and that Mr. -- Mr. Chap- -- or a description

11  of an inmate and that Mr. Chapman also mentioned during his

12  deposition that would -- that it would still, even after --

13  under the new policy, give him pause as to whether or not

14  that issue should still be rejected.

15          If Your Honor were to find that under either the

16  old -- alleged old policy or the alleged new policy, that

17  was an unconstitutional rejection, Your Honor could order --

18  order the BOP to simply redact the objectionable content.

19          THE COURT:  If -- and this is a question for both

20  sides.

21          If I were to find that the issue of rejecting

22  solely because it mentions a staff or inmate is moot, but I

23  agree that the other issue, the broader component of

24  striking an entire publication based upon the mention of --

25  striking of the entire publication because a portion of --

1   of it is struck, and the issue of redaction is not moot,

2   what does that mean?  In other words, do I allow only a

3   portion of Claim 1 to go forward?  Or does all of Claim 1 go

4   forward because it's wrapped up together?

5          MR. SHAPANKA:  We think -- we think they are

6   segregable, Your Honor.  If Your Honor finds -- if Your

7   Honor were to find that the claim is moot because they have

8   changed the policy, which is -- as I mentioned before, PLN

9   does not believe the policy has changed --

10          THE COURT:  I understand.  No, I understand.

11          MR. SHAPANKA:  But I would say that -- that the

12   other piece remains live.

13          Again, PLN is going to continue sending these

14   matters and they are going to continue sending actionable

15   information.  I mean, the July 2013 issue I just mentioned,

16   described case law, the February 2013 issue, similarly

17   described case law.  We are a newspaper that needs to get

18   this information to prisoners in a timely manner.  I mean,

19   by the time they are returned -- that they are returned in

20   this case, in some cases five to seven years after they were

21   originally rejected, these are historical documents and not

22   news articles.  And they are not -- they are useless to the

23   prisoners.

24          So, you know, moving forward, PLN is going to

25   continue sending these magazines in to PLN -- in to ADX and,

14

1    Your Honor, could certainly order BOP to -- to redact

2    objectionable content when that is the least restrictive way

3    of allowing in the unobjectionable content.

4            THE COURT:  So, in other words, if I were to find

5    the -- this -- that the first part of this is moot, what I

6    should do is issue an order saying that issue is not a live

7    controversy anymore, the parties shouldn't conduct discovery

8    on it and I won't -- Judge Moore should not reach a ruling

9    on it, but, the remainder of claim goes forward?

10           MR. SHAPANKA:  Yes.

11           THE COURT:  Okay.  So -- and I think I had

12   interrupted you on the distinction between Brown and the

13   instant case, so I want to get back to that.

14           MR. SHAPANKA:  Sure.

15           THE COURT:  Which is -- and I have got Brown up

16   here.  And what they say -- I was trying to find where it

17   says it.  What they say is if Mr. Buman (ph), who was the

18   county attorney, had announced only that his office had

19   decided not to prosecute the Browns, the question of

20   mootness would be closer, but he did much more than that.

21   He announced office policy -- now, that does distinguish

22   from this -- that would prevent prosecution.

23           Second, the UCA old policy is essentially the same

24   as the AG policy, which the district court considers

25   sufficient to deny the Browns standing.

1        Third, the UCA old policy and the decision not to

2    prosecute the Browns are contained in a declaration that was

3    signed under penalty of perjury, and submitted to the

4    Federal District Court.  Violation of the declaration would

5    expose Mr. Buman to prosecution for perjury or contempt.

6        Isn't the -- isn't the last two -- yes, it's not a

7    written policy, okay.  But are you saying that the Tenth

8    Circuit, if Mr. Buman had simply announced that we have a

9    nonwritten policy, but it's now our official policy that we

10   are not going to prosecute the Browns for this, that that

11   wouldn't be sufficient; that it somehow, because it was in

12   the writing, that's what changed it?  And if no -- the

13   answer to that is no, how is Brown, then, distinguished from

14   this case?

15        MR. SHAPANKA:  Well -- well, first of all, nothing

16   here -- the Warden doesn't commit to not renege on the

17   policy; he commits to follow it for -- until he decides not

18   to.  So there's nothing in -- in the record before Your

19   Honor where it says, We will not change this back in the

20   future.  So that's one distinction.

21        The second distinction is that there's a lot of

22   turnover at ADX in terms of wardens that change -- they have

23   had four wardens in four years and they change frequently.

24   And these issues at one point were considered a security

25   risk, by not one but multiple wardens.

1           Mr. Chapman testified in his deposition that --

2     that these -- that some of these issues, even following the

3     Warden -- BOP's promise to return these issues, would still,

4     in his estimation, cause a security risk.  And -- and

5     there's nothing that -- that cabins this warden's discretion

6     to change the policy back; there's nothing that cabins the

7     next warden's -- or even causes the next warden to take

8     pause as to whether or not to change this policy back.  If

9     they are to rely on their sound correctional judgment, the

10    only -- the only limits on these -- on these rejections is

11    their sound correctional judgment.

12          So, in other words, the warden could reinstate the

13    previous policy tomorrow, if he were to so choose --

14          THE COURT:  Well -- well --

15          MR. SHAPANKA:  -- without violating his

16    declaration.

17          THE COURT:  I'm not sure about -- I mean,

18    paragraph 21 of his declaration says:  Therefore, while it

19    is impossible for the Bureau to issue a blanket statement

20    that a publication that identifies and discusses any ADX or

21    bureau inmate or bureau staff member will never be rejected,

22    the ADX will not reject incoming publication for that reason

23    alone.

24          If tomorrow -- if this is found moot tomorrow and

25    then on Tuesday, he -- the warden goes back to the old way,

1   why isn't that violating that clear statement that ADX will

2   not reject incoming publication for that reason alone?

3          MR. SHAPANKA:  Because the warden -- the warden

4   could -- could tomorrow say that that's no longer going to

5   be our policy.  There's -- there's nothing -- there's

6   nothing to cabin that discretion, he's -- and, in the

7   addition, Your Honor, the warden states -- reserves the

8   right in his declaration to censor articles like the ones

9   from July 2013 that I just mentioned.

10          He actually says, sometimes an article that is

11   already in public record and that could be accessible at the

12   prison through the public -- the prison law library, or

13   something like that, may not be suitable for introduction

14   into the prison because PLN is pointing the prisoner to

15   those cases.

16          That seems to me kind of a remarkable statement in

17   the sense that he's -- prison -- the warden is asserting the

18   -- that he will not reject for the mere mention of it alone,

19   but still reserves the right to censor these case law type

20   -- type articles that are totally valuable to these

21   prisoners.

22          So, there is -- the -- there is no commitment to

23   not renege on this policy.  And, particularly -- and there's

24   certainly no commitment to -- to not censor on other

25   unconstitutional grounds in the broader -- with respect to

1    our broader as-applied plan.

2            Again, this is not just about the -- the -- the

3    Tenth Circuit -- I mean, excuse me.  This is not just about

4    the blanket claim.  This is about whether or not BOP ask

5    somebody a causal nexus bet-wee -- a rational nexus between

6    the -- between the -- the -- the rejection and the -- and

7    the -- the purported security risk.

8            THE COURT:  Okay.

9            MR. SHAPANKA:  And, again, you know, I would -- I

10   would add that in paragraph 19 of the warden's declaration,

11   he also says that they can't -- they can't put it in

12   writing, which seems to be a distinction from both -- from

13   both Brown and some of government's other cases, including

14   Rio Grande and Wyoming vs. US Department of Agriculture,

15   which, as an aside, those two cases took formal

16   administrative action.  While the Wyoming case was a notice

17   in comment rule-making for the policy change, the Rio Grand

18   case was a -- was administrative opinion.

19           But the warden also says that they can't put it in

20   writing because it might confuse the mailroom staff.  And

21   then, you know, in the same -- in same declaration, two

22   paragraphs before -- or the paragraph before, he says that

23   they can now add it to the training materials, but they

24   still can't add it to the policy because it might lead to

25   confusion.

1              If the policy is truly changed and the policy

2    that's being applied now before the warden's -- the warden's

3    declaration is the same as the policy afterwards, even with

4    the written addition to the training materials, it seems

5    that BOP is not giving it -- giving credit to its -- its

6    staff to say that -- that they can interpret this policy and

7    to not assume that anything -- any article that doesn't

8    mention BOP inmate or staff, however, must be admitted into

9    the prison.  That's certainly not what BOP -- what PLN is

10   arguing and it's certainly not what I imagine that any --

11   any reasonable mailroom official would -- would believe,

12   either.

13             THE COURT:  Okay.  Okay.  I have some questions

14   for -- and later, I will give you a chance to examine

15   anything you want to add to it; but if not, then I have got

16   some questions for the government.

17             MR. SHAPANKA:  Thank you, thank you.

18             MS. PROSE:  Your Honor.

19             THE COURT:  So, let me begin with this:  I have

20   read the warden's affidavit in paragraph 19, I had the same

21   questions that didn't make a lot of sense to me.

22             Why would it -- I think what it said is such a

23   blanket statement may thus lead to potentially objectionable

24   incoming publications being received by the ADX inmate

25   population without a thorough review, thus creating safety

1   and security concerns for inmates if this mandatory language

2   were in there.

3          Why?  If -- if what's being taught is -- if what's

4   being taught at these trainings and everything else, is we

5   do not reject solely because it mentions an inmate or staff

6   member, that doesn't seem that complex to me.  And why

7   doesn't BOP just rewrite the policy to add that language in

8   there?  And that -- because that would seem to be a clear

9   indication that we are not going to change it.  If we just

10  add that -- and I don't see what's so confusing about this

11  that, as long as they teach them they -- just because it

12  mentions an inmate or a staff member, it doesn't mean it

13  automatically comes in, either; it just means that you --

14  you know, that's -- that can't be the sole reason for

15  rejection.

16         So, why -- why can't they just add that?  Why

17  don't they just add that?

18         MS. PROSE:  Several reasons here, Your Honor.

19         THE COURT:  Okay.

20         MS. PROSE:  First is a technical reason.  That

21  policy, the institution supplement that deals with incoming

22  publications at the ADX does not speak specifically in a

23  general way, to any standards for whether or not a

24  publication should or should not be admitted under 540.71.

25         So first of all, it would be inappropriate to

1   insert it in that policy, just as a general -- in that

2   policy, just as a general matter.  That's a procedural

3   policy, not a substantive policy.

4           Now, of course, there's a secondary question of

5   could we create another sub- -- another more appropriate

6   substantive policy by which to communicate that to our -- to

7   our -- to the Federal Bureau of Prisons staff who were

8   involved in this process?

9           Yes, is the answer.  Yes, is what they have agreed

10  to do.  They are going to put that in the training materials

11  which every single one of those individuals is going to see

12  and going to be taught about.  And in that context it will

13  be explored in a way that will make it very clear that,

14  Look, you know, we are not looking for a blanket,

15  everything-comes-in policy, just as we weren't looking --

16  just as we don't approve and everything stays out.

17          And, you know, Your Honor, we -- we may, Your

18  Honor, estimate here how -- how easy or not it is for the

19  people who make the first look who's eyes first lay on

20  publications to discern what is the proper thing to do here.

21          And as you know, Your Honor, from looking at the

22  procedures and from the explanatory declaration that

23  Mr. Chapman and the other warden have provided, the first

24  look, the first time that the ADX identifies material that

25  may be objectionable for entry into the institution,

1    everything hinges on the mailroom staff.  If they don't flag

2    it, not one else looks at it, thinks about it because they

3    are the ones who have to bring it to everyone else's

4    attention.

5           The warden really does believes, knowing the

6    situation at the ADX, knowing how -- how many, many, many

7    publications -- as you see, Your Honor, we estimate that

8    approximately 18,000 publications have come into the ADX

9    between February 2, 2016 and the end of last year, this --

10   this is a difficult thing.  If there is some rules set forth

11   in a policy that -- that is set -- that is set out separate

12   and apart from teaching about the interactive process,

13   that's what's going on here.  We want these folks not to

14   just to go, Oop, you know, there's that PLN case and here's

15   an inmate name, it's coming in, we really think that could

16   happen.  We want that --

17          THE COURT:  By having a policy that simply says,

18   Don't reject solely because it mentions -- and then you

19   could have a second -- not telling them how to write their

20   policy -- but if it had, you cannot reject solely because it

21   mentions an ADX inmate or staff member, but you could reject

22   on any other grounds and the fact that it had mentioned an

23   ADX or inmate or staff member does not mean it automatically

24   comes in.  Did -- the mailroom staff that you have -- is

25   there a concern that the mailroom staff would, despite that

1    clear language, would interpret it as because it mentions an

2    inmate staff member, it goes in?

3              MS. PROSE:  Yes.

4              THE COURT:  Okay.  Okay.

5              MS. PROSE:  Yes, there is.  And, Your Honor, that

6    is a proper exercise of the warden's correctional judgment.

7              THE COURT:  That's fair.  I just -- I want to make

8    clear that that was, in fact, the warden's concerns.

9              MS. PROSE:  Yes, sir, that is --

10             THE COURT:  Okay.

11             MS. PROSE:  That is, indeed, the analysis that's

12   in play here.

13             And, again, what we want really want to happen is

14   we want -- we don't want these blanket rules anymore.  What

15   we want is mailroom staff sees it, hum?  That seems -- that

16   seems like something that ought to move forward, we want our

17   special investigator personnel looking at it, and we want

18   our legal professionals looking at it, too.

19             And I think more than anything, Your Honor, Your

20   Honor's question really emphasizes that point.  And that is

21   that one thing that has come out of all of this is that

22   everything now is getting scrutinized pursuant to these

23   heightened review procedures in such a much more intense

24   way.  And that's extremely important.

25             THE COURT:  So then the next question I have on

1    this is, is the complaint -- well, there certainly -- the

2    two components that I mentioned.  There's the screening

3    simply because it mentions an ADX inmate or staff member,

4    and that may be mooted -- that may be mooted by the change.

5         MS. PROSE:  All right.

6         THE COURT:  It certainly also alleges something

7    boarder, which is that entire publications are being the

8    all-or-nothing policy.  I don't see how this change affects

9    that, in that the third thing is, is there argument even

10   broader than just mentioning the staff member or inmate gets

11   it boated out, but that mentioning public records --

12   mentioning something in a public report get its boated out

13   and that shouldn't happen?  And, if so, should I just let

14   the whole Claim 1 go through because there's aspects of it

15   that aren't moot, rather than trying to piece out, you know,

16   knock out one -- you know, one paragraph here and one

17   paragraph there of the complaint, isn't it better to just

18   allow the entire claim one to go through and move forward?

19        MS. PROSE:  There's a lot in Your Honor's

20   question.

21        THE COURT:  I know.  There's probably about four

22   questions in one, so --

23        MS. PROSE:  I'm going to jump in and then you also

24   guide me --

25        THE COURT:  Okay.

25

1          MS. PROSE:  -- as I.

2          THE COURT:  Sure.

3          MS. PROSE:  -- as you think appropriate.

4          All right.  First of all, let me go way back to

5     the, I guess, sort of first principles here.  And that is, I

6     think that I probably -- and I would take responsibility for

7     this, Your Honor.  I think that I created some confusion in

8     the briefing by segregating out, we will call it the

9     Thornburg aspect of this.

10          THE COURT:  Sure.

11          MS. PROSE:  And in the response brief, Mr. Chapman

12     fairly pointed out, Look, this is all one claim, this is a

13     part and parcel of everything.  I think that is the right

14     way to look at this claim.

15          THE COURT:  Okay.

16          MS. PROSE:  So, with that in mind, let me say

17     this:  We don't think this claim is moot, in part.  We think

18     this claim is moot in its entirety.  And here's why.

19          At this point, Your Honor, given the fact that

20     there is so little likelihood that Prison Legal News, first

21     of all, will have their publication rejected at all --

22          THE COURT:  Well, maybe not.  I mean, first of

23     all, I appreciate the candor of -- because, I think that it

24     simplifies a little bit what I need to do as far as a

25     recommendation, as opposed to trying to piece the two

1   various pieces --

2          MS. PROSE:  Sure, and I apologize for that.

3          THE COURT:  No.  It's -- again, I think the

4   briefing on this was excellent on both sides --

5          MS. PROSE:  Thank you.

6          THE COURT:  -- and it brought the right cases and

7   right issues to light and I appreciate the candor and

8   replies saying that the (inaudible) issue probably --

9   doesn't get rid of this case.  I mean, it makes my job

10  easier when attorneys come forward and say, you know, and

11  acknowledge things.

12         So, going back to the question that I had:  Why is

13  it so unlikely if Mr. Chapman, in his deposition, said,

14  Well, this one article, I -- I still think that this article

15  is properly withheld.  And it's certainly one of the things

16  that Prison Legal News does is they write issues for inmates

17  and inmates' concerns, I certainly don't think that it's out

18  of realm of possibly, given that ADX has rejected 11 of

19  these, or whatever it was before, I certainly don't think it

20  would be beyond the realm of possibility that they are going

21  to find something in this publication that is objectionable.

22  Maybe rightly so objectionable and a security risk, but a

23  security risk, at least.  And if so, isn't this Claim 1 not

24  mooted then?

25         I mean, I get if this were -- if the hypothetical

1 that posed to the other side, if this were the children's

2 magazine that was so outside the realm of possibly of being

3 a security concern, then I think we would have a different

4 story.

5    But it's not like -- and I haven't ready Prison

6 Legal News, but at least from what I sense from the

7 briefing, it's not like there aren't components of this that

8 I could certainly see a warden saying, This a security risk

9 for us.  And -- and if it is, then we are -- then we are not

10 moot anymore.  And especially given that one of the issues

11 that has been rejected, a fairly senior censor staff -- I

12 mean, literally not the decision-maker, but a fairly senior

13 staff member said, I still think this was probably properly

14 rejected.  And the warden, it looks like, disagreed and

15 allowed it to go through, but I don't think we are now in

16 the realm of so outside the possibility of a claim, that

17 it's -- that it's moot.

18    MS. PROSE:  No, Your Honor, but you are in the

19 realm of what is truly a hypothetical claim at this point.

20 And here's the reason.

21    The 11 past issues that were rejected, the warden

22 has said, All right, inmates at the ADX who are subscribers,

23 you get those.  That's as much as we can do to correct that.

24 I mean, it happened in the past, we can't erase the five or

25 six years that have passed --

1           THE COURT:  Right.

2           MS. PROSE:  -- obviously.

3           THE COURT:  Except that -- and this may never

4   survive a summary judgment motion, but what I could do --

5   which Judge Moore could do, is issue an order saying that

6   the warden has not justified the all-or-nothing policy.

7           Now, I get that it doesn't take a lot under

8   Thornburg for the warden to justify that, but that's --

9   that's not -- that doesn't moot it.  It would still need to

10  go to the next stage for the warden to say, Hey, here's why

11  I think that the all-or-nothing policy, very similar to what

12  happened in Thornburg, but that's not here.  That's not at

13  this stage.

14          MS. PROSE:  Your Honor, may I respectfully

15  disagree for this reason?

16          THE COURT:  Sure.

17          MS. PROSE:  The warden gives the magazines to the

18  ADX inmates, who are or were subscribers.  He does not apply

19  the all-or-nothing policy to those magazines.  At that

20  point, that claim is moot.  This is no further relief on

21  that claim that you can award.  It becomes a standing issue

22  and it also becomes a ripeness issue.

23          And, Your Honor, if we are going to litigate this

24  as a separate claim based on those past eleven rejections, I

25  would respectfully ask that we have Prison Legal News file

1   an amended complaint, put that issue straightforward based

2   on those past rejections.  And what would happen would be,

3   we would come in and say -- the Bureau of Prisons would say,

4   Your Honor, it's moot.  We are giving -- we are giving them

5   the full unexcised versions of those magazines.  At that

6   point, there is no ripe claim.  There is no ripe claim for

7   which PLN has standing to litigate the Thornburg

8   all-or-nothing rule.  They haven't been subjected to it.  In

9   the past, if they were, that's moot.  And they -- and to

10   litigate about future rejections, future redactions, that, I

11   think, Your Honor, is expressly not allowed under the Brown

12   versus Buman opinion.

13           And in that case, the Judge Mathison specifically

14   said, If you are not subject -- if you are not subject to

15   some specific harm -- and what is to stop anyone, you or I,

16   or whoever, from objecting to a policy that a governmental

17   entity -- that a governmental entity maintains, making some

18   abstract hypothe- -- you know, abstract --

19           THE COURT:  It's not an abstract hypothetical.

20   It's happened 11 times in the past.  They -- they -- they

21   had a publication that they gave that was rejected based

22   upon a very narrow portion of the publication and then the

23   entire publication was returned.

24           So it's not -- it's not the hypothetical

25   situation.  And, remember, Brown only deal with the

1   voluntary cessation exception to (inaudible), so I think

2   there's a separate question as to whether if -- if a portion

3   of this claim is not mooted at all, would I even need to get

4   to Brown in the sense of if -- if part of the argument is

5   they are rejecting entire publications, they are -- my

6   entire publication is being rejected, has been rejected, and

7   there's a risk of being rejected in the future, based upon

8   the past conduct, based upon minor portions of the

9   publication, I don't know that I even get need to get to

10  voluntary cessation because nothing's been done on that,

11  that no changes occurred on that aspect of this case.  It's

12  same thing that occurred in the past, it still occurred.

13  That policy has not changed at all.  And so I think that

14  does distinguish it from Brown.  Because in Brown, the

15  entire -- in Brown, the policy changed the entire case.

16           Prior to the policy, there was -- if you were in a

17  plural marriage, you were subject to prosecution.  After the

18  policy, after the change in policy, you were only subjected

19  to it if there was any violence or -- or there were

20  exceptions.  It clearly didn't apply to the Browns.  So

21  every portion of what was happening beforehand no longer

22  occurred afterwards.

23           Whereas, here, some of what was occurring

24  beforehand has not changed at all in the policy.  So I don't

25  know if I need to get to Brown in the voluntary cessation

1   because portions of this haven't changed at all.

2          MS. PROSE:  Your Honor, I think you do need to get

3   there.  And, again, it -- again, if this is going to be

4   discerned -- if this is going to be treated by the Court as

5   a separate claim, I think we have got a standing issue.  And

6   it goes back to the fact that these issues are going to be

7   gun over in their entirety to these inmates and, at this

8   point, there's not present injury related to the Thornburg

9   policy, if you will, to litigate about.  I think it's a

10  standing issue, I think it's a ripeness issue.  I think it

11  is all part and parcel of the mootness issue overall.

12         Again, as Brown pointed out, quoting

13  long-established Tenth Circuit -- excuse me, Supreme Court

14  authority:  No matter how vehemently the parties debate or

15  disagree about the lawfulness of a practice, it's no longer

16  something the Court ought to be resolving unless there is an

17  actual controversy.

18         And, Your Honor, I think fundamentally that's my

19  point.  As to the Thornburg issue, somehow separated out and

20  extracted from this broader issue, there is no Article 3

21  case of controversy here now.  And certainly, it's not ripe

22  and I do not believe PLN has standing to bring that at this

23  point.

24         This is a way -- this is a way of looking at PLN's

25  First Amendment claim that, again, was not actually pleaded

1  this way, which I acknowledge.  And so I -- I don't think

2  that a claim is even squarely before the Court here, as

3  separate from --

4          THE COURT:  Well, they certainly -- they certainly

5  raised it in their complaint.  I mean, you, in your briefing

6  you broke the two aspects of it out, so they certainly raise

7  it.

8          And so is it your position that because, even

9  though in the past on multiple occasions, they were -- they

10 had articles that were rejected and the entire thing was X'd

11 out, that they no longer have standing to challenge that

12 going into the future?

13         MS. PROSE:  It is my position that such a claim is

14 entirely moot here, because the issues that the -- because

15 those issues are being delivered.

16         If, in fact, in the future an issue of Prison

17 Legal News is rejected and not -- and the Thornburg rule, if

18 you will, is applied, the whole thing is withheld, that's a

19 different matter.  But that case is not before Your Honor

20 now because the 11 issues aspect of this -- moot.

21         THE COURT:  Okay.

22         MS. PROSE:  That's my -- that's my position.

23         Your Honor, may I note one other thing --

24         THE COURT:  Sure, sure.

25         MS. PROSE:  -- that is related.

1           But just -- just, as a matter of fact, that Your

2    Honor can take judicial notice of.  Since February 2, 2016

3    all of the issues at Prison Legal News that came out last

4    year and to date, this year as well, were, in fact,

5    delivered to the inmates.  From February through December,

6    those issues, there were no fewer than 16 articles in which

7    the Federal Bureau of Prisons was mentioned, including by

8    inmate name, by staff member name.  In that year, no

9    rejections to Prison Legal News on that basis.  Again,

10   further emphasizing to any attack to Prison Legal News may

11   wish to mounted based on the Thornburg theory, simply is not

12   ripe or before the Court at this time.

13           THE COURT:  Okay.

14           I want to hear Prison Legal News' response to

15   that, that come component of the argument.

16           MS. PROSE:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           MR. SHAPANKA:  Thank you, Your Honor.

19           So first of all, as we discussed a few minutes

20   ago, the all-or-nothing policy is only one aspect of the

21   First Amendment claim.  And with respect to censorship over

22   the likelihood of recurrency are, the BOP has to show that

23   it's absolutely clear that challenged conduct is unlikely to

24   recur.  So the fact that the -- fact that first -- that

25   first of all, that there have been no rejections since --

34

1     since February 2, 2016, is beside the point.  In the other

2     case, it took five years for the next rejection to come, but

3     it did come.

4              Also, the warden -- the warden, in his

5     declaration, expressly reserves the right to -- in fact,

6     it's much more likely that it will be curbed because the

7     warden expressly reserves the right to -- to censor issues

8     that may involve -- that may involve case law or things that

9     are publicly available.

10             If I -- if I may, for a moment, Your Honor, read

11    paragraph 15 -- 18 of the warden's declaration, where he

12    says:  I undertake this individualized analysis even if the

13    information contained in the article is publicly available.

14    The fact that the information may be publicly available --

15    publicly available or even available to an inmate by means

16    of the prison's electronic law library, does not

17    automatically mean that it is also suitable for introduction

18    into a maximum security institution in the form of a

19    incoming publication that highlights the information.  Here,

20    the warden is saying, Sure, maybe we change the policy, but

21    we still reserve the right to reject these -- these issues.

22    And that makes it, in our view, much more likely that this

23    conduct will recur.

24             THE COURT:  Do you have -- again, let's say that I

25    -- I agree that -- at least with respect to all-or-nothing,

1   that it hasn't been mooted, and I think everybody would, I

2   think, acknowledge that, although now the -- the

3   government's argument is:  Even if it's not mooted, you

4   don't have standing to bring that -- that challenge anymore

5   because your articles aren't -- none of yours are being

6   rejected.

7            So, address that -- that argument.

8            MR. SHAPANKA:  Sure, maybe three points.

9            Number one, is our articles -- our current -- sir,

10  with respect to those eleven issues, that policy is applied.

11  That's the Thornburg rule that has been applied in all.

12           THE COURT:  Right.

13           MR. SHAPANKA:  -- since -- since the '80s.

14           THE COURT:  None of your articles are being

15  rejected anymore if -- if -- let's say that -- that -- that

16  all Prison Legal News did is produce a roster of ADX

17  inmates, okay.  So that's all it was, was just a roster of

18  ADX inmates.

19           And so now, under the new policy -- and I -- I get

20  the you are challenging whether or not the warden can go

21  back and change it.  But let's assume that the warden has,

22  under penalty of perjury said, We will never reject -- it

23  was just right in policy:  We will never reject an article

24  that only mentions inmates of and that's all that you guys

25  did.  That's the only thing you did.  Would you have

1   standing anymore to challenge -- and in the past, every one

2   of your articles was rejected because every single one was a

3   roster of inmates.

4           Now, they changed the policy, now none of your

5   articles are rejected anymore and really have no chance of

6   being rejected because they don't say anything.  It's just

7   an inmate roster.  Would you have standing anymore to

8   challenge the Thornburg portion of this?

9           MR. SHAPANKA:  Yes, we would.

10          THE COURT:  Why?

11          MR. SHAPANKA:  Because the -- the -- the warden --

12  policy that the warden asserts has been implemented is that

13  they will not reject the mere mention of an inmate without

14  more.  What the "more" is really what we are asking this

15  Court to provide in it belief, is, what else -- what else is

16  censorable?

17          And here, a roster of inmates that Mr. Chapman

18  deposition illustrates this nicely.  He says that sometimes

19  the mention of an inmate is not -- it's not, as such, the

20  mention of an inmate that caused the rejection; it's the

21  identity of an inmate.

22          So knowing the name, or knowing certain

23  affiliations of inmates, all of those things that are -- may

24  or may not be publicly known within the prison, may not be

25  known within other prisons, if -- if -- if BOP were to -- if

1    PLN were to publish a roster of ADX inmates -- of ADX

2    inmates in PLN, it would go to the entire -- to all of

3    subscribers in the every federal prison in the country.

4    BOP, under this policy as revised, could come up with a

5    reason as to why permitting just those names to be in there

6    causes a security risk.

7            THE COURT:  But -- but what relief would you ask

8    the Court to fashion on that?  I mean, how -- are you asking

9    Court ultimately to instruct the warden as to what

10   publications come in and what come out?  And what could

11   possibly be written -- what order could possibly be written

12   to satisfy this other than having the Court review every

13   single issue that's rejected?

14           MR. SHAPANKA:  Well, Your Honor, we are -- we are

15   challenging eleven specific issues, and we are asking -- we

16   are asking Your Honor to review those issues.

17           THE COURT:  All of which are now given.  I mean,

18   all of those issues have now been given to them.

19           So -- so what could the Court possibly do to --

20   what order of relief are you seeking here?  If you are

21   seeking an order saying you can't reject a publication

22   solely because it mentions an inmate or an ADX inmate, they

23   are already doing that, that has already been had.

24           What -- what -- I mean, give me the hypothetical

25   order that Judge Moore could issue that would satisfy Prison

38

1    Legal News.

2            MR. SHAPANKA:  It is this "without more" piece,

3    Your Honor, without more, we have to -- we have to set

4    parameters of what's more.

5            THE COURT:  But what order?  I mean, tell me what

6    order you want entered, without -- I mean --

7            MR. SHAPANKA:  So with respect to your

8    hypothetical regarding the roster, I'm not sure what -- what

9    the remedy would be there.

10           But with respect to the forward-looking issues of

11   Prison Legal News going in that mention -- that discuss case

12   law or other aspects, we want an order -- the Court to

13   fashion an order that says that the case law -- that

14   articles discussing published cases of the Tenth Circuit

15   cannot be -- cannot be rejected or published cases of the

16   federal courts or case law that -- legal issues that are

17   there -- on certain legal issues.

18           And -- and in order to -- what exactly that order

19   looks like, I do think has to come after -- after the --

20   after a chance for trial and briefing on -- on the

21   individual issues.  But I -- I do think that there are --

22   there are policies -- there are policies -- certain types of

23   issues that, including these -- these case law issues or

24   these reprints of articles, for example, in the 2015 issue

25   of Prison Legal News, which, as Ms. Prose mentioned, was not

1   censored -- there's a reprint on the front page of a New

2   York Times article about the treatment of prisoners at ADX.

3   That kind of information made it for this time, but, you

4   know, in the -- in the -- we are a newspaper.  It's

5   problematic for a newspaper to wonder every time it sends an

6   article to BOP that discusses something other than mere

7   mention.  Any discussion of issues of prison issues facing

8   ADX inmates could potentially -- could potentially raise red

9   flags for -- for BOP.  And it's difficult for a newspaper to

10   have to wonder every time whether or not its -- it -- its

11   news articles are going to make it in, particularly under

12   the all-or-nothing standard.

13          THE COURT:  Okay.  Let me ask Ms. Prose one last

14   question on this and then let's then move to Claim 2.

15          MS. PROSE:  Yes, Your Honor.

16          THE COURT:  Under the current policy that's in

17   place now, could ADX reject a publication that says simply

18   this:  The Tenth Circuit in the case of United States v. ADX

19   inmate upheld the sentence of that inmate for sexual assault

20   on a child, does ADX have the ability, under the current

21   policy, to reject that because -- I was federal defender for

22   a long time, so I know what the risk inside a prison is --

23          MS. PROSE:  Yes, yes.

24          THE COURT:  -- of them knowing that inmate Smith

25   is a sex offender.  Does ADX, under this policy, have the

40

1    ability to do that?  And if so, is it this remain-alive

2    controversy because what the complaint claims is that ADX

3    should not be rejecting any publications because they

4    mention publicly available information?

5            Now, I may agree with you that at the next stage,

6    the warden could certainly justify that, yes, it's public,

7    but there's a real risk if this inmate is found out to be a

8    sex offender, but that doesn't render it moot.

9            So that was, probably again, about four questions

10   in the one, but --

11           MS. PROSE:  No, that's okay, Your Honor.  Let me

12   -- let me kind of parse this out and if I miss your -- your

13   question --

14           THE COURT:  Sure.

15           MS. PROSE:  -- just -- just let me know.

16           Again, let me -- let me drop back and -- and look

17   at this from a little bit broader perspective.

18           First of all, Your Honor, the relief that PLN is

19   asking you to fashion -- if I understand it correctly -- is

20   actually not something that is permissible under the

21   provisions of the Prison Litigation Reform Act because there

22   is no way -- there is no way -- for this Court to craft a

23   workable definition of what may or may not constitute a

24   security risk in the abstract.

25           THE COURT:  I -- I -- I agree with that, I think.

1          MS. PROSE:  Okay.

2          THE COURT:  But -- but if -- let's say -- and

3     again, this is not -- it wouldn't be me; it would be Judge

4     Moore.

5          But let's say Judge Moore were to conclude that --

6     that there -- that -- craft this order.  And, again, I'm in

7     no way saying that this would be appropriate.  I'm not --

8     but I'm just trying to get to mootness question.

9          MS. PROSE:  Okay.

10         THE COURT:  If Judge Moore were to issue an order

11    saying, Prison -- or ADX cannot reject any publication that

12    merely cites published court opinions, limited to just that

13    -- again, I'm in no way saying that's a proper order.

14         MS. PROSE:  Okay.

15         THE COURT:  But if he were to issue that order, if

16    he were to issue that order, that -- that order, which I

17    think is one of things that Prison Legal News is requesting,

18    is something along those lines, I -- I don't think that that

19    would be moot under the policy, unless you are prepared to

20    say that, No, we don't do that.  But, again, I find it hard

21    to imagine that ADX wouldn't say -- maybe I'm wrong, but it

22    would seem to me that ADX would still reserve its right, as

23    it sits here today, to say, if the -- if the quotation say

24    the Tenth Circuit in United States V. Smith, and Smith is an

25    ADX inmate, upheld Mr. Smith's 40-year sentence for

42

1    molesting a six year old -- traveling interstate to molest a

2    six year old, I think that ADX could still reserve its right

3    to prohibit that, because my guess is the warden would

4    consider that to be a security threat.  Maybe I'm wrong on

5    that.  But is ADX still reserving its right on that issue?

6          MS. PROSE:  ADX has to reserve its right to always

7    -- to always was exercise its correctional judgment to

8    protect its inmates, its staff and the public.  But, then,

9    of course, that -- in a way, Your Honor, that begs the

10   question.  Because the question is, What relief can the

11   Court really fashion at the end of the day?

12         THE COURT:  Well, the one I just said.  And,

13   again, I'm not saying that's an appropriate relief.  I don't

14   want anything I am saying here to be interpreted that that

15   was -- because I -- again, I did that for a long time and I

16   understand the unique security concerns that are within a

17   prison.

18         MS. PROSE:  Yes.

19         THE COURT:  The only question before me is, is it

20   moot?  And if Judge Moore, or somebody down the road, some

21   other judge were to say, You know what, it does violate the

22   First Amendment to not allow published opinions in -- in --

23   to not allow writing on published opinions that are publicly

24   available, via, you know, WestLaw, then, yeah, that does

25   violate the First Amendment, then he can fashion an order

1   that isn't mooted by this change in policy.

2          MS. PROSE:  I don't think, Your Honor, that you

3   can undertake the mootness analysis, based on a supposition

4   about relief that the Court cannot award in the first place.

5   I think that the mootness analysis has to be untaken in the

6   context of what the Court has the authority to award.

7          THE COURT:  Why couldn't the Court -- why couldn't

8   the Court award -- why couldn't the Court issue just that --

9   just what I just said?

10          MS. PROSE:  Because it would violate the PLRA.

11          THE COURT:  What provision?

12          MS. PROSE:  Excuse me.  Are you saying just this

13   one case, this particular case?

14          THE COURT:  No.  I'm saying, could the Court issue

15   an order that says -- that Prison Legal News cannot -- or,

16   excuse me -- that ADX can no longer bar publications that

17   only entail -- that only mention published opinions of a

18   court.

19          MS. PROSE:  I don't think the Court can issue that

20   order.

21          THE COURT:  Where would it -- where would it

22   violate --

23          MS. PROSE:  I think it violates the section of 18

24   USC 3626, which requires --

25          THE COURT:  Can you repeat that again?  I'm sorry.

1          MS. PROSE:  Excuse me, I'm not being very clear

2     here.

3          THE COURT:  No, no, no.  I just don't write fast

4     enough.

5          MS. PROSE:  18 USC 3626.  And I apologize, Your

6     Honor, I don't have the subdivision of that right in front

7     of me.

8          THE COURT:  That's okay.  This has gone in a

9     different direction, I'm sure --

10          MS. PROSE:  In fashioning relief -- in applying

11     this provision of the PLRA, the Court must take into account

12     safety issues.

13          And the Court, Your Honor, in addition -- first of

14     all, I think that order would be too vague under the --

15     under the same section of the PLRA in that you can't

16     possibly anticipate all of permutations of this that could

17     come up.

18          And so, again, this anticipated prejudging of what

19     security interests are, I do think it violates those

20     provisions of PLRA that restrict orders or that prohibit

21     orders that are too vague and that also prohibit orders that

22     do not take into account the BOP's ability to exercise its

23     correctional judgment.

24          I wish I had that provision right in front of me.

25          THE COURT:  No, that's okay.

1          MS. PROSE:  And I don't.

2          THE COURT:  I think it would be vague.  I mean, it

3     doesn't seem vague to issue that order.  It may -- and I'm

4     not familiar with the subsections, all right.  I don't -- I

5     don't -- I'm getting into unchartered territory here.

6          But it may be that it would violate the -- not

7     taking into account security issues, and I will ask the --

8     plaintiff about that.  But I don't think it's vague; I think

9     it's very clear what that, you know, possible order is.  But

10    it may -- it may violated a security concern.

11         MS. PROSE:  I wish I cite it for you.

12         THE COURT:  No, that's okay.  I will find it.  I

13    will find it.

14         MS. PROSE:  So have I answered that --

15         THE COURT:  Yes.  Thank you.

16         MS. PROSE:  -- to your satisfaction?

17         THE COURT:  Yes, thank you.

18         MS. PROSE:  Is there -- have I missed something,

19    Your Honor?

20         THE COURT:  No.  I think you have -- I think you

21    have addressed everything on this.  I -- I just -- I want to

22    ask the plaintiff very briefly on -- on that last part.

23         Could the Court issue that proposed order that I

24    just -- that I just threw out?

25         MS. PROSE:  Your Honor, before I surrender the

1    microphone here --

2              THE COURT:  Sure.

3              MS. PROSE:  -- to my friend and colleague here, I

4    -- I do not believe that PLRA, and certainly not Supreme

5    Court case law which speaks to the issue of correctional

6    judgment, I do not think the Court can issue an order that

7    would -- that would mandatorily -- or that would deprive the

8    warden of exercising his correctional judgment.  I think any

9    order that had that flavor, that had that purpose, that had

10   that effect would not be allowable.

11             THE COURT:  Okay.

12             MS. PROSE:  Thank you.

13             THE COURT:  So let me ask the plaintiff.  Do you

14   agree that the Court couldn't issue the -- Judge Moore could

15   not issue an order like the one that I just said?  And if

16   you do agree, what kind of order could he possibly issue

17   that, again, would satisfy prison wardens?

18             MR. SHAPANKA:  Well, Your Honor, we don't agree.

19   We actually dispute whether or not the PLRA applies to this

20   case at all, and that issue has not been fully briefed.  And

21   I -- in any event, the First Amendment trumps the PLRA and

22   any other federal statute.  And, certainly, the warden's

23   correctional judgment is trumped by the First Amendment.

24             What we are asking for here is that the Court

25   determine whether or not -- whether or not the warden's

47

1    correctional judgment is exercised consistently with the

2    First Amendment and, you know, if Your Honor would like

3    further briefing on the application of the PLRA, we would be

4    happy to provide that --

5                THE COURT:  No, no.

6                BY MR. SHAPANKA:  -- but in the meantime, the

7    First Amendment trumps.

8                THE COURT:  Okay.  I know I said this would only

9    take an hour to an hour and a half and we are already more

10   than an hour into it.

11               Let's turn to the second one and, here, my

12   questions are primarily to BOP.

13               So, Ms. Prose, I will hear you take the

14   microphone.

15               MS. PROSE:  Thank you.

16               THE COURT:  So, first -- first question I have is,

17   is at least one of their claims of insufficient process

18   deals with the timing.  And they are alleging they didn't --

19   that one of them they never received any notice of he

20   rejection, and for some unknown others, it took six to nine

21   months in order evidence to get it.

22               In response to that, you make two primary

23   arguments.  The first is that the Court should take judicial

24   notice of the -- of the dates of the -- that the -- that the

25   letters were mailed out.  I don't see how I can do that on a

1    motion to dismiss when the allegations in the complaint

2    state that they didn't get it for six to nine months.

3            I -- the cases to your cite on the presumption

4    that things put in the mail get there aren't at the motion

5    to dismiss stage.  In other words, you are asking me to take

6    judicial notice that because there is a rejection notice

7    dated February 14, that, indeed, the warden put -- or

8    whatever, mails it out, actually put it in the mail on that

9    day, actually sent it on that date, none of which is --

10   which is in contradiction to the -- to the allegations in

11   the complaint.

12           That might be a summary judgment issue:  That you

13   have put it in mail, submit an affidavit that said, On the

14   date that this rejection was -- was dated, I put it in the

15   mail and I dropped in the mail and it may not survive

16   summary judgment, but that's -- that's a very different

17   issue than at a motion to dismiss stage.

18           The second question that I have on that is -- is

19   your second argument to this is all we ever have to do is

20   give some notice.  It doesn't need to be timely.  It could

21   be any time.  But due process says that notice -- that it

22   must be meaningful notice at a meaningful time.

23           And so doesn't that contradict the argument that

24   sending notice at any time is sufficient?  And also where is

25   the outside limits to that?  We are talking about a

1   publication that is, where time is of value in this

2   publication, especially when it's talking about current

3   cases and that stuff.  Could -- could the notice be sent a

4   decade later and still qualify for due process?  Or 40 years

5   later and still satisfy due process?  And if not, where --

6   where do I set that time?  How is nine months okay, but 40

7   years not okay?  And where am I grabbing this time

8   distinction?  Isn't a meaningful notice at a meaningful time

9   and is nine months late for a publication not really

10  meaningful time?

11          So, go ahead.  That was several questions, I keep

12  doing that to you.

13          MS. PROSE:  That's okay.

14          THE COURT:  But these are the things that I --

15  that I want to focus on.

16          MS. PROSE:  No, it's not a problem, Your Honor.

17  You have to remind me when I lose track of where I am.

18          THE COURT:  Absolutely.

19          MS. PROSE:  As my kids will tell you, frequently

20  happens.

21          THE COURT:  Yes, me, too.  Me, too, which is

22  probably why I'm asking these four-part questions.  So go

23  ahead.

24          MS. PROSE:  First of all, let me go back to your

25  first --

50

1            THE COURT:  Sure.

2            MS. PROSE:  -- the first part of this.

3            Your Honor, just to be -- just to be clear, we are

4    not asking you to take judicial notice of a fact, and I -- I

5    hope I was -- I hope I was very careful, I think I was, but

6    I make mistakes, of course.

7            But we are asking judicial notice, we are asking

8    you to take into account, to consider as part of the factual

9    record that forms the -- that forms the basis for the

10   contextual plausibility analysis under Iqbal, those notices.

11   Those notices, which PLN attached some of them, too, to

12   their complaint.  But those are properly incorporated by

13   reference into the complaint --

14           THE COURT:  But there --

15           MS. PROSE:  -- under DV (ph) Pacheco, okay.

16           THE COURT:  But there -- let -- I can agree with

17   that.

18           MS. PROSE:  Okay.

19           THE COURT:  Except that you are requiring me to

20   make the next leap, which is that because the notice is

21   dated -- has a date on it that, one, that date is accurate;

22   and that, two, it was actually mailed on the date of that,

23   in contradiction to the clearly stated statement in the

24   complaint that they did not get notice on several of these

25   for six to nine months and, one, they never received notice.

1          So, there's -- there's additional facts that you

2   are asking me to assume beyond just taking notice of the --

3   of notice itself.

4          It could have very well -- sticking with what they

5   are claiming, it could have -- and this a prison so it

6   wouldn't be outlandish.  It could have sat on a desk for

7   somewhere for six months.  It was maybe written on that date

8   by whoever served the -- whoever prepared the rejections

9   notice, and then it never got signed by the warden or mailed

10  out or done anything for six to nine months.  That would

11  still comply with what is written on the notice and with

12  what's said there.

13         It could have been -- the warden could have signed

14  it and put it in a pile to -- that it never went anywhere.

15  There's a lot of things that could have happened that would

16  be consistent with the date on the public -- on the

17  publication and still consistent with the allegation that is

18  clearly stated that they didn't get it for six to nine

19  months.

20         MS. PROSE:  Okay, a couple responses, Your Honor.

21         First of all, as to presumptions, I don't -- I

22  don't concede, Your Honor, that those don't necessarily

23  apply in a motion to dismiss context.

24         What I was getting at -- but what I was getting at

25  with the Gee (ph) analysis is this:  Given that those facts

1   are in the record, under Iqbal -- given that those documents

2   are in the record, under Iqbal, that means that PLN has to

3   come forward with more facts, rather than just conclusory

4   ones, Okay, we didn't get it.  I think, under Iqbal, given

5   this context --

6          THE COURT:  What do you want them to allege?  I

7   mean, they don't know -- they're -- they're are at the

8   pleading stage.  How could they possibly know why they

9   didn't get it?  They know that -- as they are alleging in

10  their complaint, they know that they did not get the

11  publication -- they did not get notice -- not just once, but

12  on several times, according to the complaint, they did not

13  get notice for six to nine months.  They can't possibly know

14  at this stage of the litigation -- this was a little unique,

15  so we are here into the case.  But without discovery on what

16  happened, they can't possibly know why it didn't get to

17  them.

18          All they have to do have plausibly state a claim.

19  And by stating, We did not get notice on one of these and on

20  others, we didn't get notice until six to nine months after

21  rejection, what more could they possibly put in there to

22  plausibly state a claim?

23          MS. PROSE:  Your Honor:  What day did you get it?

24  You know, I think that those -- I think that those

25  allegations are insufficient factually in this context.

1          THE COURT:  Okay.  And then the second -- so then

2   the second question, if -- if I accept their allegation that

3   it's six to nine months later, why doesn't that violate the

4   meaningful time component of due process?  And the cases --

5          MS. PROSE:  I was just going to ask you that, Your

6   Honor --

7          THE COURT:  Yes.

8          MS. PROSE:  -- because I -- I do not think that,

9   under the Martinez case, that under the Jaclovich (ph) case,

10  that necessarily this notice has to come immediately.

11         THE COURT:  Well, wait -- so they -- the case, in

12  its -- it's not necessarily a case dealing with notice, but

13  it's discussing due process.

14         And I will quote it exactly.  It's Stanko v.

15  Maher, which is 419 F.3rd 1107, and it quotes Lawrence v.

16  Reed, which is 406 F.3rd 1224, in turn, quoting Mathews v.

17  Eldridge, which is a US Supreme Court case, which is 424 US

18  319.  And if the you need me to repeat those, I can.

19         But quote directly is:  The fundamental

20  requirement of due process is the opportunity to be heard at

21  a meaningful time and in a meaningful manner.

22         They are alleging -- and I will ask them about it.

23  They are alleging it wasn't a meaningful manner in the sense

24  that they weren't given adequate notice.  I'm not sure I

25  agree with that and we will turn to that.  But at least the

54

1    time component of this, if -- if it's required that it be

2    heard at a meaningful time, why isn't a delay of six to nine

3    months not a meaningful time?  And if that delay is okay,

4    what's the outset of that?  If that you are asserting is

5    true, which is that all you need is some notice at some

6    point, why couldn't it be 10 years or 20 years or 30 years

7    or 40 years?  And doesn't that go against spirit of what

8    Martinez is trying -- to do?  Where is the outside limits of

9    that?

10          MS. PROSE:  Well, I don't know that I can answer

11    where the outside limits, Your Honor, are.  But I think in

12    this case there are no facts plausibly showing that there

13    was not a -- there was not a meaningful opportunity to be

14    heard here.

15          THE COURT:  Well, but let's assume that I accept

16    their representation that it is sufficient to say that it

17    was six to nine months.  Let's say they had all of the

18    additional facts that said, We received this one, which you

19    said they could have put in, which is, We received this one

20    on this particular day and that was nine months later.

21          Is nine months a meaningful time?  Is that --

22          MS. PROSE:  In this context.

23          THE COURT:  Why?

24          MS. PROSE:  Yes.  I think the answer is yes.

25          Your Honor, certainly that's within a timeframe in

1    which PLN can readily submit an appeal to the regional

2    director where -- where it goes.  You are within a timeframe

3    in which the news is clearly not so old that it's not

4    relevant.

5             THE COURT:  Would the same be true if it were the

6    New York Times? a daily -- a daily publication?

7             MS. PROSE:  PLN's publication -- and obviously,

8    they can speak to this better than I can -- but tends to

9    deal with -- tends to deal with broader issues and not,

10   obviously, day in/day out reporting.  But, Your Honor is

11   asking me to use the timeframe within a year, do I think

12   that's reasonable under Martinez, under Jaclovich, under

13   those cases?  Yes.

14            THE COURT:  So it would be reasonable for an

15   inmate to learn in October of next year -- of this year that

16   we have President Trump, as opposed to President Clinton?

17            MS. PROSE:  That's -- again, that's not something

18   they would learn through Prison Legal News.

19            THE COURT:  Well, but you are saying it would be

20   okay for any publication.  Would it be okay -- would that be

21   a meaningful time for them to learn in October of this year

22   that -- get the article that -- whatever the cover letters

23   -- the cover page of the New York Times, I'm sure, on

24   November -- or whatever it was, was, you know,

25   President-Elect Trump, would that still be meaningful time

56

```
1    in the October -- October 31st of this year for them to get

2    that publication?

3              MS. PROSE:  To get it or to object to it?  Or

4    to --

5              THE COURT:  To object to it.  To object.  Because

6    that's the whole purpose of the objection, is to say this is

7    an unreasonable rejection of it.

8              MS. PROSE:  Okay.

9              THE COURT:  So for them able to object, would that

10   be meaningful time?

11             MS. PROSE:  I think as long as they had the

12   opportunity to make the objection, that it would be.

13             THE COURT:  Okay.  So how about five years from

14   now?  Would that still be -- that now maybe we have -- have

15   to say nine years from now, where we clearly are going to

16   have a new president, would that still be okay for them to

17   get notice that -- that New York Times from November 7 or

18   2017 had been rejected to them?  Would that be okay in 2026?

19             MS. PROSE:  Well --

20             THE COURT:  Because they --

21             MS. PROSE:  -- Your Honor, of course, these are

22   not the facts in the complaint.

23             THE COURT:  No, they are not.  But I think your

24   argument is as long as they get any notice at any time, that

25   satisfies due process.
```

57

1          MS. PROSE:  Well --

2          THE COURT:  And so, I know I'm making it -- I know

3    I'm pushing the outer limits of it, but I want to see how

4    that argument goes.

5          MS. PROSE:  Actually, Your Honor, our argument,

6    the BOP's argument is, here, that it was -- that it was --

7          THE COURT:  Sure, that's BOP's, but what -- what

8    -- I'm just trying to find actually where it is.  It came in

9    -- it's not in your reply, it's it in your --

10         MS. PROSE:  And then you know, Your Honor, you --

11   of course, the regulation itself, you know -- actually, do

12   you mind if it --

13         THE COURT:  Sure.  No, go ahead.  I mean, where --

14   I'm just trying to find it.

15         MS. PROSE:  I'm looking in 547D1.  I hope I'm in

16   right one.

17         First of all, there -- as to the inmates, there is

18   a timeframe established, I believe.  Am I correct about

19   that?  Do you mind if I ask --

20         THE COURT:  No, go ahead.

21         MS. PROSE:  Am I correct about that?

22         MR. SHAPANKA:  It's within 20 days of receipt of

23   notice.

24         MS. PROSE:  That the inmate must receive?

25         So the inmate must receive within 20 days.

58

1          THE COURT: Right, but -- there are allegations in

2    the complaint -- again, I know you dispute whether it's

3    sufficiently alleged, but at least their allegation in the

4    complaint is that they didn't get it for six to nine months.

5          MS. PROSE: Well --

6          THE COURT: So doesn't -- doesn't the fact that

7    provision suggests 20 days is proper time -- I'm not saying

8    it needs to be the same exact thing for the publication.

9    But at least suggest that BOP, in its judgment, feels 20

10   days is -- is timely -- now, maybe 22 may be timely, too,

11   but it's -- it's a much narrower timeframe than nine months?

12         MS. PROSE: Well, and again, and perhaps, I have

13   misunderstood you, Your Honor, but the 20 days applies to

14   the inmate --

15         THE COURT: Right.

16         MS. PROSE: -- you understand?

17         THE COURT: No, I get that.

18         MS. PROSE: I think what it comes down to is this,

19   Your Honor. That no matter when -- no matter when -- you

20   know, six months, nine months down the road, when PLN gets

21   -- they say they have gotten it late. If they get it six

22   months later after the warden sends or it's dated, their

23   timeframe to appeal to the regional director does not

24   commence until that date. And so there's always going to be

25   -- I mean, I -- I understand, Your Honor -- I mean, there

59

1    can be a point where it seems, you know, sort of the

2    reductio ad absurdum argument, I guess, right?

3              THE COURT:  Right.

4              MS. PROSE:  But there seems a point where it may

5    be absurd, but the truth of matter is that no matter when

6    they get it, they still get the opportunity, within 20 days

7    of receipt whenever they say that is, they get the deference

8    in terms of regular -- in the regulation there, they still

9    get to appeal to regional director.

10             THE COURT:  Well, about -- but again, I mean this

11   is in the -- I finally found it in your -- this is your

12   original motion to dismiss.

13             MS. PROSE:  Oh, no, Your Honor.

14             THE COURT:  As you say, the only notice

15   requirement under Martinez is that some notice be given at

16   some point in time.

17             MS. PROSE:  I -- I think that's right.

18             THE COURT:  But, then, again, under that theory --

19   and I -- I mean, again, I think that the cases after

20   Martinez require meaningful time, but under -- under that

21   theory, Martinez would be fine if a decade later, the notice

22   was given, as long as they have right to -- to appeal,

23   whenever that appeal occurs, it's fine.  And Martinez can't

24   pine that.  It can't mean that at some point somewhere down

25   the road they get the right to appeal because it would

1   render the appeal meaningless.

2          MS. PROSE:  Again, those aren't the facts here

3   but --

4          THE COURT:  Okay.  Okay.  I will let you make any

5   other argument you want on this, because you have answered

6   at least my questions on the due process component.

7          Oh, the last question I have, which is the APA, do

8   you agree the APA falls or dies, depending on what happened

9   with the other two claims?

10         MS. PROSE:  Your Honor, I think I do.

11         THE COURT:  Okay, okay.

12         MS. PROSE:  I think I do.

13         THE COURT:  So now I have a couple of questions

14   for -- for plaintiff on the due process.

15         Why isn't -- again, let's -- why isn't the

16   language in the notice sufficient to put Prison Legal News

17   on notice of what -- of where it's being rejected?  It says

18   we reject it because it mentions staff or BOP inmate or BOP

19   staff member, that's why they rejected it.

20         What more do you want?  Do they have to give a

21   legal rationale for it?  Do they have to give -- why isn't

22   that sufficient to say that's why we reject it?

23         MR. SHAPANKA:  They need to give a factual

24   rationale, Your Honor.  This -- this was their factual

25   rationale at the time, but our view is that that is

1  insufficient.

2         The standard under why, that was their policy at

3  the time.  The policy at the time was any time it mentions

4  an inmate or staff member, we reject it.

5         THE COURT:  But they told you exactly why they

6  reject it.  You may disagree with that.  You may say that's

7  unconstitutional, but you know why it was rejected.

8         MR. SHAPANKA:  We don't know why it was a security

9  risk, which is what the standard is.  The CFR only permits

10  the warden to censor materials that are -- that (inaudible)

11  security could order or discipline of the institution,

12  that -- that the warden had made a -- this created -- that

13  ADX had adhered to this unconstitutional bright line rule

14  with respect to whether or not it mentions an inmate or

15  stuff person, has no bearing on whether or not there -- that

16  -- that -- that --

17         THE COURT:  But you know what, isn't that all the

18  notice is supposed to do?  Is give you notice as to why.

19  And why was because it mentioned an inmate or staff member.

20  To the extent that the notice then allows you to bring a

21  challenge, such as this one, in court, you know what it is,

22  you outlined exactly why it was rejected, because every time

23  they -- it mentions a staff member or inmate, they reject

24  it.

25         What more needs to happen?  Do they need to

1    outline why they think that policy at that time was -- was a

2    safety risk?

3              MR. SHAPANKA:  Yes.

4              THE COURT:  Why it's not any --

5              MR. SHAPANKA:  I think they do.  And it's because

6    the standard --

7              THE COURT:  What more would that give you?  What

8    more would that give you as far as your ability to challenge

9    it?

10             MR. SHAPANKA:  Because, if -- if the bright line

11   rule is all we have to challenge, there's no meaningful

12   opportunity for PLN to attempt to rebut.  There's -- it

13   either mentions an inmate or it doesn't.

14             THE COURT:  But, sure.  You can -- you can then

15   write to the regional director and say, They are rejecting

16   this solely because its mentions an inmate or staff member.

17   This is a published opinion of the Tenth Circuit.

18             You could -- all of the things that you are

19   arguing right here, you could argue to the regional

20   director.  Now, they may just ignore you anyways, but you

21   can argue it to them.

22             MR. SHAPANKA:  We shouldn't be -- PLN shouldn't be

23   left to have to make scatter-shot arguments throwing

24   spaghetti at the wall just to see which one sticks for the

25   regional director.

1          If there's a reason that it was censored because

2   -- the fact that it mentions an inmate is -- is, itself, a

3   security risk, PLN should be afforded an opportunity to

4   rebut that in a meaningful way.  Just knowing that inmate is

5   mentioned, if that's the policy -- and that has been the

6   policy until recently, apparently, according to the BOP

7   claim that they change it.

8          But that's been the policy and there's no

9   meaningful way to rebut that, except to say, No, we didn't

10  mention it when, in fact we -- so, they need to know the --

11  at least at some -- some level the rational nexus between

12  the mention of that inmate and a security concern.

13          THE COURT:  Okay.

14          MR. SHAPANKA:  If I may, Your Honor, one

15  correction.

16          THE COURT:  Sure.

17          MR. SHAPANKA:  The CFR does give the publisher, in

18  addition to the inmate, 20 days to revise the --

19          THE COURT:  Okay.

20          MR. SHAPANKA:  To -- but, again, 20 days from the

21  receipt of the notice.  So if the notice is received a year

22  from now, then 20 days from that date, sir.

23          THE COURT:  What is your view on the timing issue?

24  I mean, is -- is -- go ahead.  But for my questions,

25  what's --

1          MR. SHAPANKA:  Sure.  Quite simply, PLN is a

2    newspaper.  By nine months -- by six to nine months and

3    certainly, any longer than that, these are historical

4    documents, they are not news anymore.  So that, you know,

5    due process requires timely notice in a way that allows us

6    to appeal in a way that he material can get to the inmates

7    when it's still relevant.

8          THE COURT:  Okay.  Those are all the questions

9    that I had.  And I appreciate everybody indulging me on this

10   because I think, one, as I said, I think it's well-briefed.

11   I also think the issues are fairly close and so I appreciate

12   everybody taking the time.

13         I need to get a recommendation off to Judge Moore

14   fairly quickly on this so I can tell the parties that that

15   will happen fairly soon.  I don't know how quickly he will

16   then rule on any objections to it, but I intend to get that

17   out very quickly.

18         To the extent either side is comfortable, I know

19   that we have continued the response on this for a long time,

20   because there was, at least, substantial settlement

21   discussions going on.  To the extent anybody's comfortable,

22   where does that stand at this point?

23         MS. PROSE:  Do you mind?

24         MR. SHAPANKA:  No.  Go ahead.

25         MS. PROSE:  Thank you.  Your Honor, the parties

1   were very cordial and I think we remain so.  I don't

2   anticipate that we will be settling the case.

3          THE COURT:  Okay, that's fair.

4          MS. PROSE:  I -- okay.

5          THE COURT:  Okay.  Is there anything further from

6   either side here today?

7          MR. SHAPANKA:  No, Your Honor.

8          THE COURT:  Once again, I thank everybody for

9   briefing and for the argument today and hope to get

10  something out shortly.

11         Thank you.  We will be in recess.

12         (Whereupon, the within hearing was then in

13  conclusion at 12:01 p.m.)

14

15

16  I certify that the foregoing is a correct transcript to the

17  best of my ability to hear and understand the audio recording

18  and based on the quality of the audio recording from the

19  above-entitled matter.

20

21  /s/ Carol Patterson                January 18, 2019

22  Signature of Transcriber                Date

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com